

Nicole M. Norris (SBN 222785)
WINSTON & STRAWN LLP
101 California Street, Suite 3900
San Francisco, CA  94111-5894
Telephone:    415-591-1000
Facsimile:    415-591-1400
Email: nnorris@winston.com

James F. Hurst (*Admitted Pro Hac Vice*)
David J. Doyle (*Admitted Pro Hac Vice*)
Samuel S. Park (*Admitted Pro Hac Vice*)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone:    312-558-5600
Facsimile:    312-558-5700
Email: jhurst@winston.com; ddoyle@winston.com;
spark@winston.com

Charles B. Klein (*Pro Hac Vice Pending*)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C.  20006
Telephone:    202-282-5000
Facsimile:    202-282-5100
Email: cklein@winston.com

Attorneys for Defendant
ABBOTT LABORATORIES

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND

| | |
|---|---|
| SMITHKLINE BEECHAM CORPORATION, d/b/a GLAXOSMITHKLINE,<br><br>Plaintiff,<br><br>vs.<br><br>ABBOTT LABORATORIES,<br><br>Defendant. | Case No. C 07-5702 CW<br><br>*Related per November 19, 2007 Order to*<br><br>*Case No. C 04-1511 CW*<br><br>**NOTICE OF MOTION AND MOTION OF ABBOTT LABORATORIES TO DISMISS PLAINTIFF'S CLAIMS PURSUANT TO 12(b)(6)**<br><br>**Date:        March 6, 2008**<br>**Time:        2:00 p.m.**<br>**Courtroom:  2 (4th Floor)**<br>**Judge:       Hon. Claudia Wilken** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   BACKGROUND ...................................................................................................3

    A.    The Alleged Relevant Markets ...................................................................3

    B.    GSK Admits In Its License Agreement With Abbott That Abbott's Patents Cover The Combination Of Norvir And PIs In The Boosted Market...........................4

    C.    GSK's Patent-Monopoly Leveraging Theory .............................................6

III.  STANDARD OF REVIEW ...................................................................................6

IV.   ARGUMENT ........................................................................................................7

    A.    GSK Has Failed To State A Claim Under The Sherman Act ......................7

        1.    GSK's Allegations That Abbott's Patents Cover The Use Of Norvir In Combination With Other PIs Bar Its Sherman Act Claim ......................7

        2.    The Scope Of Abbott's Patent Protection Under The Patent Laws Is Governed By Federal Circuit Precedent, Which Has Rejected GSK's Patent-Monopoly Leveraging Theory .................................................10

    B.    GSK Has Failed To State A Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing .................................................................13

        1.    GSK Cannot Bring An Implied Covenant Of Good Faith And Fair Dealing Claim As A Substitute For Its Nonviable Contract Claim ...............14

        2.    GSK Also Cannot Read New And Conflicting Implied Obligations Into The Parties' Express Contract .................................................15

    C.    GSK Has Failed To State A Claim Under The North Carolina Unfair Trade Practices Act ....................................................................................16

        1.    North Carolina Has Not Adopted, And Would Not Adopt, GSK's Patent-Monopoly Leveraging Theory Of Antitrust Liability ...............17

        2.    GSK's Allegations Of Bad Faith In Count 3 Are Misplaced Because Intent Is Irrelevant To A North Carolina Unfair Trade Practices Act Claim .................................................................................19

        3.    GSK Has Not Adequately Alleged Deceptive Conduct In Violation Of The North Carolina Unfair Trade Practices Act ...............................19

    D.    GSK Has Failed To State A Claim Under The North Carolina Prohibition Against Monopolization .........................................................................20

V.    CONCLUSION...................................................................................................20

i

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
  948 F.2d 536 (9th Cir. 1991) .................................................................8

*Animal Legal Def. Fund v. Quigg*,
  900 F.2d 195 (9th Cir. 1990) .................................................................11

*Atari Games Corp. v. Nintendo of Am. Inc.*,
  897 F.2d 1572 (Fed. Cir. 1990)..............................................................8

*Bell Atl. Corp. v. Twombly*,
  127 S. Ct. 1955 (2007)......................................................................7, 10

*Bepco, Inc. v. Allied-Signal, Inc.*,
  106 F. Supp. 2d 814 (M.D.N.C. 2000) ..................................................18

*Breed v. Hughes Aircraft Co.*,
  253 F.3d 1173 (9th Cir. 2001) ...............................................................11

*Brulotte v. Thys Co.*,
  379 U.S. 29 (1964) .................................................................................8

*Bus. Cabling, Inc. v. Yokeley*,
  643 S.E.2d 63 (N.C. App. 2007)......................................................19, 20

*Cascade Health Solutions v. PeaceHealth*,
  502 F.3d 895 (9th Cir. 2007) ..............................................................1, 2

*Cerberus Int'l Ltd. v. BancTec, Inc.*,
  16 A.D.3d 126 (1st Dep't 2005) ............................................................14

*Christianson v. Colt Indus. Operating Corp.*,
  486 U.S. 800 (1988)...............................................................................11

*Cohen v. Nassau Educators Fed. Credit Union*,
  No. 15094-05, 2006 WL 1540324 (N.Y. Sup. May 10, 2006) ...............14

*Coker v. DaimlerChrysler Corp.*,
  617 S.E.2d 306 (N.C. App. 2005) .........................................................19

*Complaint of Martin*,
  18 F. Supp. 2d 126 (D. Mass. 1998) ......................................................8

*Dalton v. Educ. Testing Serv.*,
  87 N.Y.2d 384 (1995).......................................................................13, 15

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

ii

*Designers N. Carpet, Inc. v. Mohawk Indus., Inc.,*
    153 F. Supp. 2d 193 (E.D.N.Y. 2001) ................................................................14

*DKH Corp. v. Rankin-Patterson Oil Co.,*
    506 S.E.2d 256 (N.C. App. 1998) ...................................................................17

*Early v. Bankers Life and Cas. Co.,*
    959 F.2d 75 (7th Cir. 1992) .............................................................................8

*Engelhard Corp. v. Research Corp.,*
    268 A.D.2d 358 (1st Dep't 2000) ...................................................................14

*Falk v. Gen. Motors Corp.,*
    496 F. Supp. 2d 1088 (N.D. Cal. 2007) ...........................................................6

*Franchise Tax Bd. v. Laborers Vacation Trust,*
    463 U.S. 1 (1982) ..........................................................................................11

*Hann v. Michigan,*
    No. 05-CV-71347, 2007 WL 1565465 (E.D. Mich. May 29, 2007) ..................8

*Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.,*
    535 U.S. 826 (2002) .........................................................................2, 10, 11, 12

*Image Technical Servs. v. Eastman Kodak Co.,*
    125 F.3d 1195 (9th Cir. 1997) ..........................................................11, 12, 13, 18

*In re AST Research. Sec. Litig.,*
    887 F. Supp. 231 (C.D. Cal. 1995) .................................................................16

*In re Graphics Processing Units Antitrust Litig.,*
    No. C 06-07417 WHA, 2007 WL 2875686 (N.D. Cal. Sept. 27, 2007)............7

*In re Independent Service Orgs. Antitrust Litig.,*
    203 F.3d 1322 (Fed. Cir. 2000) ..........................................................12, 13, 18, 19

*In re Microsoft Corp. Antitrust Litig.,*
    333 F.3d 517 (4th Cir. 2003) ..........................................................................18

*In re Silicon Graphics Inc. Sec. Litig.,*
    183 F.3d 970 (9th Cir. 1999) ............................................................................5

*ITCO Corp. v. Michelin Tire Corp., Commercial Div.,*
    722 F.2d 42 (4th Cir. 1983) ............................................................................17

*Jacobs Private Equity, LLC v. 450 Park LLC,*
    22 A.D.3d 347 (1st Dep't 2005) .....................................................................14

*Johnson v. Phoenix Mut. Life Ins. Co.,*
    266 S.E.2d 610 (1980) ....................................................................................18

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

NOT. OF MOT. AND MOT. OF ABBOTT TO DISMISS PLAINTIFF'S CLAIMS PURSUANT TO 12(b)(6)    CASE NO. C 07-5702 CW

*L.C. Williams Oil Co., v. Exxon Corp.,*
    625 F. Supp. 477 (M.D.N.C. 1985) ................................................................. 17

*Mandarin Trading Ltd. v. Wildenstein,*
    No. 602648/06, 2007 WL 3101235 (N.Y. Sup. Sept. 4, 2007) ....................... 14

*Marshall v. Miller,*
    276 S.E.2d 397 (N.C. 1981) ...................................................................... 17, 19

*MetroNet Servs. Corp. v. Quest Corp.,*
    383 F.3d 1124 (9th Cir. 2004) ........................................................................ 7

*Monsanto Co. v. McFarling,*
    302 F.3d 1291 (Fed. Cir. 2002) ...................................................................... 8

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Xerox Corp.,*
    25 A.D.3d 309 (1st Dep't 2006) .................................................................... 15

*Netflix, Inc. v. Blockbuster, Inc.,*
    477 F. Supp. 2d 1063 (N.D. Cal. 2007) ........................................................ 12

*Nikitovich v. O'Neal,*
    40 A.D.3d 300 (1st Dep't 2007) .................................................................... 14

*Nobelpharma AB v. Implant Innovations, Inc.,*
    141 F.3d 1059 (Fed. Cir. 1998) .................................................................... 12

*Parker E. 67th Assocs., L.P. v. Minister, Elders & Deacons of the Reform Dutch Protestant Church of the City of New York,*
    301 A.D.2d 453 (1st Dep't 2003) .................................................................. 14

*R.J. Reynolds Tobacco Co. v. Phillip Morris, Inc.,*
    199 F. Supp. 2d 362 (M.D.N.C. 2002) ..................................................... 17, 20

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.,*
    309 A.D.2d 288 (1st Dep't 2003) .................................................................. 14

*SAI Indus. Corp. v. U.S.,*
    63 Fed. Cl. 1 (Fed. Cl. 2004) ........................................................................ 8

*Schor v. Abbott Laboratories.,*
    457 F.3d 608 (7th Cir. 2006) ..................................................................... 18, 19

*Sewell Plastics, Inc. v. Coca-Cola Co.,*
    720 F. Supp. 1196 (W.D.N.C 1989) ............................................................. 17

*Silvester v. Time Warner, Inc.,*
    1 Misc. 3d 250 (N.Y. Sup. 2003) .................................................................. 16

*SMC Corp. v. Xerox Corp.,*
    645 F.2d 1195 (2d Cir. 1981) ....................................................................... 10

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

iv

*Spindelfabrik Suessen-Schurr Stahlecker & Grill GmbH v. Schubert & Salzer*
    *Maschinenfabrik Aktiengesellschaf,*
    829 F.2d 1075 (Fed. Cir. 1987) ........................................................................13

*Sports, Inc. v. McQuillan,*
    506 U.S. 447 (1993) ..........................................................................................19

*Stidham v. Jackson,*
    No. 2:07cv00028, 2007 WL 2156155 (W.D. Va. July 26, 2007) .......................8

*Sutton Assocs. v. Lexis-Nexis,*
    761 N.Y.S.2d 800 (N.Y. Sup. 2003) .................................................................15

*Texaco Inc. v. Dagher,*
    547 U.S. 1 (2006) ................................................................................................6

*The In Porters, S.A. v. Hanes Printables, Inc.,*
    663 F. Supp. 494 (M.D.N.C. 1987) ..................................................................17

*Triton Partners LLC v. Prudential Sec. Inc.,*
    301 A.D.2d 411 (1st Dep't 2003) .....................................................................14

*Unitherm Food Sys. v. Swift-Eckrich, Inc.,*
    375 F.3d 1341 (Fed. Cir. 2004) ........................................................................12

*Valley Drug Co. v. Geneva Pharms., Inc.,*
    344 F.3d 1294 (11th Cir. 2003) ........................................................................10

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004) ..........................................................................................19

*Virgin Atl. Airways, Ltd. v. British Airways PLC,*
    257 F.3d 256 (2d Cir. 2001) ..............................................................................19

*Westlands Water Dist. v. Amoco Chem. Co.,*
    953 F.2d 1109 (9th Cir. 1991) ..........................................................................17


STATUTES

15 U.S.C. § 2 ..........................................................................................................7

28 U.S.C. § 1295(a)(1) .........................................................................................10

28 U.S.C. § 1338 ..................................................................................................10

28 U.S.C. § 1338(a) ..............................................................................................11

15 U.S.C.A. § 1 ......................................................................................................6

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

v

N.C. Gen. Stat. § 75-2.1 ...................................................................................................................20

**OTHER AUTHORITIES**

Fed. R. Civ. P. § 12(b)(6) ......................................................................................1, 2, 6, 16

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 652(b)(2) (1996) ..............................19

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NOTICE OF MOTION**

**TO PLAINTIFF AND ITS ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on March 6, 2008 at 2:00 p.m., or as soon thereafter as the matter may be heard in Courtroom 2, before the Honorable Claudia Wilken, in the United States District Court for the Northern District of California, Oakland Division, defendant Abbott Laboratories will move this Court pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the claims filed by Plaintiff SmithKline Beecham Corporation d/b/a GlaxoSmithKline ("GSK") on November 7, 2007. This motion is supported by the accompanying Memorandum of Points and Authorities, all pleadings and documents on file with the Court, the confidential License Agreement dated December 13, 2002, that is repeatedly referenced in the pleadings, and such other argument or evidence as may be presented at the hearing on the motion.

## I.    INTRODUCTION

This is one of several lawsuits concerning Norvir®, a patented drug used to "boost" the activity of protease inhibitors ("PIs") in the treatment of HIV. Abbott moves under Rule 12(b)(6) to dismiss all four counts of GSK's complaint because they fail to state a claim upon which relief can be granted.

In Counts 1, 3 and 4 of its complaint, GSK claims monopolistic conduct by Abbott in violation of the Sherman Act, the North Carolina Unfair Trade Practices Act and the North Carolina Prohibition on Monopolization Act, respectively. Like the plaintiffs in the related cases, GSK asserts that Abbott monopolized the purported market for boosted PIs by raising the price of Norvir (ritonavir alone) to make Abbott's Kaletra® (ritonavir plus lopinavir) comparatively less expensive than combining Norvir and competing PIs, including GSK's Lexiva.

The first problem with this claim is that it disregards the Ninth Circuit's recent decision in *Cascade Health Solutions v. PeaceHealth*, 502 F.3d 895 (9th Cir. 2007), which notes that "the Supreme Court has forcefully suggested that we should not condemn prices that are above some measure of incremental cost." *Id.* at 911. *Cascade* thus held that, "in the normal case, above-cost pricing will not be considered exclusionary conduct for antitrust purposes." *Id.* at 912. Pursuant to this Court's Case Management Order dated December 17, 2007, Abbott will file a separate

1    memorandum on January 31, 2008, fully addressing GSK's failure to allege below-cost pricing as

2    part of a global motion to dismiss all of the new complaints under *Cascade*.

3        There are additional, independent reasons to dismiss GSK's three antitrust counts. Although

4    GSK's allegations sound a familiar refrain, this complaint is materially different from the earlier Doe

5    and SEIU Norvir complaints this Court declined to dismiss. Obviously, no Sherman Act claim can

6    survive if the complaint fails to allege conduct *outside* the scope of Abbott's patents. For the Doe

7    and SEIU complaints, this Court declined at that "early juncture" to find that Abbott's patents cover

8    the so-called "Boosted Market" of PIs boosted by Norvir.

9        Here, in contrast, GSK affirmatively alleges—repeatedly—that Abbott's patents, or

10   "intellectual property," *do* cover the sale of "PIs for administration with Norvir." (*See, e.g.,* Compl.

11   ¶¶ 17, 20, 21, 36). GSK also repeatedly references the parties' license agreement, which likewise

12   confirms that Abbott's patents

13

14                                                                    These allegations must be

15   accepted as true under Rule 12(b)(6) and, thus, GSK has pleaded facts disproving its own claim. A

16   patent owner cannot "unlawfully" monopolize a market covered by its patent.

17       The complaint's reference to Abbott's patents also warrants dismissal because GSK has

18   directly implicated federal patent law and, thus, the Federal Circuit has jurisdiction over this case.

19   Federal Circuit jurisdiction exists where, as here, "the plaintiff's right to relief necessarily depends

20   on resolution of a substantial question of federal patent law." *Holmes Group, Inc. v. Vornado Air*

21   *Circulation Sys., Inc.*, 535 U.S. 826, 830 (2002). That is true here. By recognizing the existence of

22   patents over the market Abbott allegedly monopolized "unlawfully," GSK's complaint establishes

23   that its right to relief "necessarily depends on resolution of a substantial question of federal patent

24   law"—*i.e.*, the scope of Abbott's patent protection. Thus, Federal Circuit law controls and, as this

25   Court is aware, the Federal Circuit has already rejected GSK's patent-monopoly leveraging theory.

26       For yet another reason, that Federal Circuit decision (as later confirmed by the Seventh

27   Circuit in a scholarly opinion by Judge Easterbrook) defeats GSK's antitrust claims under the North

28   Carolina statutes (Counts 3 and 4). For those claims, which are based largely on the same patent-

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

2

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

1    monopoly leveraging theory, this Court must decide whether the North Carolina courts would follow

2    the approach taken by the Ninth Circuit (which accepted GSK's purported patent-monopoly

3    leveraging theory) or the approach taken by the Federal Circuit and the Seventh Circuit (which

4    soundly rejected that theory).  The reality is that North Carolina would certainly follow the Federal

5    Circuit and Seventh Circuit decisions, which explain in great detail why the earlier Ninth Circuit

6    decision is contrary to settled patent and antitrust law.  This is especially true given that a North

7    Carolina district court already refused to recognize "monopoly leveraging" as a viable antitrust

8    theory, and no North Carolina court or federal court in the Fourth Circuit has reached the opposite

9    conclusion.

10    The remaining count (Count 2) alleges a breach of the implied covenant of good faith and

11    fair dealing relating to the parties' patent license agreement.  This count is legally defective.

12    Abbott's sole contractual obligation was to permit GSK to promote and market its PIs in

13    combination with Norvir, something GSK readily alleges it has done and is doing.  Accordingly,

14    GSK has not sued for breach of contract.

15    Instead, it asks this Court to read an *implicit* promise into the parties' agreement that Abbott

16    would limit its "future increases in the price of Norvir" to levels "consistent with past increases."

17    (Compl. ¶ 64).  No such promise—which would have been an illegal price-fixing agreement in

18    violation of the Sherman Act—appears anywhere in the parties' license agreement.  On the contrary,

19    the agreement's plain language refutes any such agreement. ████████████████████

20    ████████████████████████████████████████████████████████████

21    ████████████████████████    Governing law uniformly rejects GSK's effort to bring a

22    nonviable contract claim under an implied covenant theory and, in particular, its effort to read new

23    and conflicting obligations into the parties' contract.  This claim, like GSK's antitrust claims, should

24    be dismissed.

25    **II.    BACKGROUND**

26        **A.    The Alleged Relevant Markets**

27    As this Court knows, PIs are powerful drugs used to stop HIV's replication.  (*Id.* ¶ 13).

28    There are many PIs on the market, including two sold by Abbott and one sold by GSK.  (*Id.* ¶¶ 13,

3

19). Norvir® is a PI typically used to "'boost' the effects of a PI paired with it." (*Id.* ¶ 15). Abbott also sells Kaletra®, which combines Abbott's "PI (lopinavir) and Norvir (ritonavir) in a single pill." (*Id.* at ¶ 19).

GSK alleges that there are two relevant markets: the "market for PI boosters" and the "market for boosted PIs." (*Id.* ¶ 38). The "market for PI boosters"—referred to as the Booster Market—consists of the market for Norvir when used to boost the effects of PIs. (*Id.* at ¶ 39). GSK alleges that Abbott "has a 100 percent share of the market for PI boosters," (*id.*), and "is the sole manufacturer of Norvir." (*Id.* ¶ 23). But GSK does not allege that Abbott has "unlawfully" monopolized the Booster Market. This is because, as the Court is aware, the parties in other Norvir cases have not disputed that Abbott's monopoly in that market is perfectly legal under the patent laws. (*See* 10/21/04 Order at 5).

GSK focuses instead on Abbott's conduct in the "market for boosted PIs"—referred to as the Boosted Market. (*Id.* ¶ 40). GSK freely admits that Abbott and GSK, "among others, compete within the market for boosted PIs by developing, marketing and selling boosted PIs." (*Id.* ¶¶ 5-6, 40). At the same time, however, GSK alleges that Abbott has unlawfully monopolized that very same market. (*Id.* ¶¶ 54-62).

**B.    GSK Admits In Its License Agreement With Abbott That Abbott's Patents Cover The Combination Of Norvir And PIs In The Boosted Market**

Far from excluding GSK from the Boosted Market—which Abbott had every legal right to do by virtue of its booster patents—Abbott expressly agreed to allow GSK into the market in exchange for a royalty, which is a completely appropriate use of a patent.

In a December 2002 Non-Exclusive License Agreement, GSK agreed to license Abbott's "intellectual property" concerning Norvir. (*Id.* ¶¶ 17, 20). GSK repeatedly references the License Agreement in its complaint (*see id.* ¶¶ 2, 3, 20, 21, 23, 35, 36, 37, 43, 50, 64, 65, 72, 76), and even bases one of its claims on that agreement. (*Id.* ¶¶ 63-66).

Although GSK did not attach the agreement to its complaint, the Court should consider the referenced License Agreement when deciding whether the complaint states a claim. "[T]he incorporation by reference doctrine . . . permits a district court to consider documents 'whose

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

4

1  contents are alleged in a complaint and whose authenticity no party questions, but which are not

2  physically attached to the [plaintiff's] pleading.'" *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d

3  970, 986 (9th Cir. 1999) (citation omitted) (alteration in original).

4      The License Agreement signed by GSK is replete with admissions that Abbott's patents

5  cover the use of Norvir in combination with PIs.

6

7

8                                                                      In recognition of

9  these patent rights, GSK agreed to pay a royalty for a license to promote and market certain of its

10  PIs, including Lexiva, with Norvir.

11

12

13

14

15

16

17

18

19      Abbott's sole obligation under the License Agreement

20                                              . Abbott had a choice before entering into this

21  agreement.   It could have precluded *any* party, including GSK, from selling a PI for use in

22  combination with Norvir.  But it chose instead to enforce its patents by licensing them in return for a

23  royalty.  (Compl. ¶¶ 20-22, 43).  GSK thus received the right to promote its drug in combination

24  with Norvir, which it has done to the tune of tens of millions of dollars every year.

25      Contrary to GSK's allegation, the License Agreement imposed no other obligation on

26  Abbott, and it certainly did not impose an obligations relating to Norvir's price in the marketplace.

27  Abbott simply did not "agree" on price with a competitor in violation of the Sherman Act's

28  prohibition against any such price fixing agreements. "Price-fixing agreements between two or more

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

5

competitors, otherwise known as horizontal price-fixing agreements, fall into the category of arrangements that are *per se* unlawful." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *see* 15 U.S.C.A. § 1. Nor did Abbott make any assurances to GSK concerning its expected profits under the License Agreement. Moreover, the License Agreement ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

### C. GSK's Patent-Monopoly Leveraging Theory

In its complaint, GSK objects to Abbott's December 2003 price increase on Norvir (but GSK fails to mention that it raised the price of its own PI *five times* since its launch). Specifically, GSK alleges that about one year after execution of the GSK License Agreement, Abbott raised Norvir's price from $1.71 to $8.57 at its most common daily dose of 100 milligrams. (As an aside, GSK charges $40.80 for its recommended non-boosted dose of Lexiva).

GSK now accuses Abbott of improperly "rais[ing] the price of Norvir when co-prescribed with its competitors' boosted PIs, like Lexiva, while keeping the price of Norvir low when used in Abbott's own boosted PI, Kaletra." (Compl. ¶ 45). GSK blames the Norvir price increase for its own drug's allegedly poor performance in the Boosted Market. (*Id.* ¶¶ 46-47). This conduct, according to GSK, violated the Sherman Act as well as North Carolina's unfair trade practices and anti-monopoly statutes and harmed GSK in the Boosted Market. (*Id.* ¶¶ 45-46).

GSK also alleges that Abbott's purported monopolistic conduct breached an implied agreement to keep "future increases in the price of Norvir" at a level "consistent with past increases." (*Id.* ¶ 64). But GSK does not allege that Abbott's pricing of Norvir actually breached any provision of the License Agreement.

### III. STANDARD OF REVIEW

Abbott moves to dismiss all four counts in the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Rule 12(b)(6) "tests the legal sufficiency of the claims alleged in the complaint." *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1093 (N.D. Cal. 2007). "'[A] plaintiffs' obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *Id.*

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

1    (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007)).  To survive a motion to

2    dismiss, a plaintiff must allege facts sufficient to demonstrate "plausible entitlement to relief." *Bell*

3    *Atl. Corp.*, 127 S. Ct. at 1965; *In re Graphics Processing Units Antitrust Litig.*, No. C 06-07417

4    WHA, 2007 WL 2875686, at *8 (N.D. Cal. Sept. 27, 2007) (quoting *Twombly*, 127 S. Ct. at 1964-

5    65).  A "bare assertion" of a violation of the law will not suffice. *Twombly*, 127 S. Ct. at 1966.

6    **IV.    ARGUMENT**

7        GSK's complaint should be dismissed.  As demonstrated below, it fails to allege facts

8    sufficient to demonstrate a plausible entitlement to relief under the Sherman Act, the implied

9    covenant of good faith and fair dealing, the North Carolina Unfair Trade Practices Act, or the North

10    Carolina Prohibition on Monopolization Act.

11        **A.    GSK Has Failed To State A Claim Under The Sherman Act**

12        Count 1 of the complaint fails to state a claim under the Sherman Act, which makes it

13    unlawful to "monopolize any part of the trade or commerce among the several states."  15 U.S.C.

14    § 2.  To prevail on a Section 2 monopolization claim, GSK must plead and prove that Abbott:

15    "(1) possessed monopoly power in the relevant market, (2) willfully acquired or maintained that

16    power through exclusionary conduct, and (3) caused antitrust injury." *MetroNet Servs. Corp. v.*

17    *Quest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004).

18        GSK's own complaint shows that it cannot satisfy this burden as a matter of law for two

19    independent reasons.  First, GSK alleges that Abbott's patent protection covers not only the Booster

20    Market, but the Boosted Market as well, thus falling squarely within the antitrust immunity afforded

21    by the patent laws.  Second, even if the Court were to read GSK's complaint as alleging that

22    Abbott's patent protection covered only the Booster Market, and not the Boost*ed* Market, controlling

23    Federal Circuit precedent establishes that such patent protection immunizes Abbott from antitrust

24    liability.

25            **1.    GSK's Allegations That Abbott's Patents Cover The Use Of Norvir In**
                **Combination With Other PIs Bar Its Sherman Act Claim**
26

27        As this Court previously recognized, antitrust laws are implicated only when a patent owner

28    "extends its monopoly beyond the scope of the patent."  (10/21/04 Order at 4).  That is because a

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

7

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

1    patentee cannot "unlawfully" monopolize a market covered by a patent. As the Supreme Court

2    explained, "[a] patent empowers the owner to exact royalties as high as he can negotiate with the

3    leverage of that monopoly." *Brulotte v. Thys Co.*, 379 U.S. 29, 33 (1964). The Federal Circuit

4    similarly noted that "'[t]he owner of a patented article can, of course, charge such price as he may

5    choose.'" *Monsanto Co. v. McFarling*, 302 F.3d 1291, 1299 (Fed. Cir. 2002) (citation omitted).

6    And, as the Ninth Circuit put it: "[S]etting high prices in the original 'monopoly' market" is among

7    the "ways that a monopolist can permissibly benefit from its position." *Alaska Airlines, Inc. v.*

8    *United Airlines, Inc.*, 948 F.2d 536, 548 (9th Cir. 1991); *see also Atari Games Corp. v. Nintendo of*

9    *Am. Inc.*, 897 F.2d 1572, 1576 (Fed. Cir. 1990) (holding that antitrust laws are implicated only when

10   the patent owner extends its monopoly power "beyond the limits of what Congress intended to give

11   in the patent laws").

12          Under this precedent, GSK has pleaded itself out of court. "Of course a plaintiff can plead

13   himself out of court. . . . If he alleges facts that show he isn't entitled to a judgment, he's out of

14   luck." *Early v. Bankers Life and Cas. Co.*, 959 F.2d 75, 79 (7th Cir. 1992); *see also Stidham v.*

15   *Jackson*, No. 2:07cv00028, 2007 WL 2156155, at *5 (W.D. Va. July 26, 2007) (granting the

16   defendant's motion to dismiss based on the content of the complaint and the plaintiff's admissions);

17   *Hann v. Michigan*, No. 05-CV-71347, 2007 WL 1565465, at *2 (E.D. Mich. May 29, 2007) (holding

18   that "Plaintiff's admissions in his Complaint that he did not file the proper grievances can support a

19   defendant's Rule(b)(6) motion to dismiss"); *SAI Indus. Corp. v. U.S.*, 63 Fed. Cl. 1, 4 n.8 (Fed. Cl.

20   2004) (stating that the court would be justified to dismiss plaintiff's argument based on "plaintiff's

21   contrary admissions"); *Complaint of Martin*, 18 F. Supp. 2d 126, 129 (D. Mass. 1998) (dismissing

22   the plaintiff's petition based on the plaintiff's admissions).

23          GSK pleaded itself out of court by alleging that Abbott owns patents over the very market it

24   allegedly has monopolized. Abbott recognizes that this Court previously denied a motion to dismiss

25   SEIU's complaint on the ground that the Court was "not willing, at [that] early juncture in the

26   litigation, to rule that Defendant can patent a procedure in which HIV patients take a drug

27   manufactured and sold by a third party along with Defendant's own." (*See* 3/02/05 Order at 7).

28          But this case is different. Unlike in the SEIU case, GSK's complaint establishes that

8

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

1  Abbott's patent protection reaches this very procedure.   In its complaint, GSK repeatedly

2  acknowledges that Abbott has patents covering "*PIs for administration with Norvir.*"  (*See, e.g.,*

3  Compl. ¶¶ 17, 20, 21, 36) (emphasis added)).  Specifically, GSK alleges that "Abbott never sought

4  to use its *intellectual property* to prevent others from selling PIs for administration with Norvir.

5  Instead, it chose to profit by *licensing competitors the right to market PIs to be co-administered with*

6  *Norvir.*"  (*Id.* at ¶ 17 (emphasis added)).  Similarly, GSK alleges that it "acquiesced" to Abbott's

7  "demand" that a license from Abbott is required "to promote [GSK's] existing PIs, as well as PIs it

8  had under development, with Norvir." (*Id.* at ¶ 20).

9      The complaint further alleges that "Abbott gave GSK the right to promote the use and

10  administration of its PIs with Norvir" through a license agreement and that, in fact, "GSK paid

11  substantial sums of money" to Abbott for that right.  (*Id.* at ¶ 21).  Elsewhere, the complaint

12  acknowledges that GSK was "able to promote the co-prescription and co-administration of its PI

13  products with Norvir . . . by virtue of the license for which it had paid." (*Id.* at ¶ 36).  According to

14  the complaint, third parties held a similar view that Abbott's patent rights covered the administration

15  of Norvir with PIs:  "GSK is informed and believes . . . that other pharmaceutical companies,

16  including BMS, took similar licenses allowing the promotion of their PIs with Norvir during the

17  same timeframe."  (*Id.* at ¶ 22).

18      In the License Agreement itself, which is referenced throughout the complaint, GSK

19  concedes that Abbott's patents cover

20

21

22

23                    The agreement specifically references at least two such

24  patents—the '036 and '157 patents, both of which concern the combination of Norvir with PIs—and

25  further references the patent application (no. 9/957,171) that resulted in the '403 patent. (*Id.* at 20).

26      Nowhere in the complaint does GSK retreat from its repeated allegations and admissions in

27  the License Agreement that Abbott's patents cover the Boosted Market.  Nor does GSK allege that

28  these patents should be declared invalid, or otherwise unenforceable.  In any event, subsequent

9

invalidation of Abbott's patents would be irrelevant to GSK's antitrust claims. *See Valley Drug Co. v. Geneva Pharms., Inc.*, 344 F.3d 1294, 1309 (11th Cir. 2003) ("To the extent that the appellees have demonstrated nothing more than subsequent invalidity, we hold that this alone is insufficient to render the patent's potential exclusionary effects irrelevant to the antitrust analysis.").

GSK's allegations and admissions in the License Agreement that Abbott's patents cover the Boosted Market distinguish this case from the related cases and, more importantly, establish Abbott's antitrust immunity to GSK's Sherman Act claim. Count 1 thus should be dismissed because GSK has no "plausible entitlement to relief." *Twombly*, 127 S. Ct. at 1967; *see also SMC Corp. v. Xerox Corp.*, 645 F.2d 1195, 1206 (2d Cir. 1981) (in affirming dismissal of Sherman Act claim, court held that "where a patent has been lawfully acquired, subsequent conduct permissible under the patent laws cannot trigger any liability under the antitrust laws").

**2.    The Scope Of Abbott's Patent Protection Under The Patent Laws Is Governed By Federal Circuit Precedent, Which Has Rejected GSK's Patent-Monopoly Leveraging Theory**

This Court should dismiss the Sherman Act claim on the independent ground that the Federal Circuit has jurisdiction over any appeal in this case, and binding Federal Circuit precedent has rejected GSK's patent-monopoly leveraging theory of antitrust liability.

Based on the patent-specific allegations in GSK's complaint—allegations confirmed by the License Agreement—the Federal Circuit, not the Ninth Circuit, will resolve any appeal in this case. In 28 U.S.C. § 1295(a)(1), Congress granted the Federal Circuit exclusive jurisdiction over "an appeal from the final decision of a district court of the United States . . . if the jurisdiction of that court was based, in whole or in part, on [28 U.S.C.] section 1338." Section 1338, in turn, provides in relevant part that "[t]he district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents."

The term "arising under" the patent laws does not, as the Supreme Court has confirmed, limit Federal Circuit jurisdiction to patent infringement cases. *Holmes Group, Inc.*, 535 U.S. at 830. Rather, a claim "arises under" the patent laws if either "'federal patent law creates the cause of action *or* . . . the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law.'" *Id.* (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

10

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

1  (1988)) (emphasis added).  In other words, even if the claim is based on a non-patent statute, the

2  Federal Circuit still has jurisdiction if the complaint demonstrates that the claim requires resolution

3  of a substantial question of patent law.  *See Franchise Tax Bd. v. Laborers Vacation Trust*, 463 U.S.

4  1, 10-11 n.9 (1982) (discussing the standard under the well-pleaded complaint rule, which was

5  adopted for Federal Circuit jurisdiction in *Holmes*).

6  As the Ninth Circuit had explained, even a single claim that meets this broad definition of

7  "arises under"—"no matter how worthy or unworthy and no matter how significant to the

8  litigation—operates as an 'on switch' or automatic trigger for Federal Circuit jurisdiction." *Breed v.*

9  *Hughes Aircraft Co.*, 253 F.3d 1173, 1178 (9th Cir. 2001) (transferring case to Federal Circuit).

10  Moreover, even the lack of any "reference to federal patent law . . . does not necessarily mean the

11  claim does not 'arise under' patent law.  Just as a plaintiff may not defeat removal by omitting to

12  plead necessary federal questions in a complaint, . . . so a plaintiff may not defeat § 1338(a)

13  jurisdiction by omitting to plead necessary federal patent-law questions." *Christianson*, 486 U.S. at

14  809 n.3 (quotation omitted).  For example, the Ninth Circuit transferred a case to the Federal Circuit

15  because even though plaintiffs "structured their arguments in terms" of compliance with the

16  Administrative Procedure Act and its rule-making procedures, the case "turn[ed] on a construction of

17  patent law." *Animal Legal Def. Fund v. Quigg*, 900 F.2d 195, 196 (9th Cir. 1990).

18  Under this settled law, the Federal Circuit has jurisdiction over this case because GSK's

19  allegations necessarily depend on resolution of a substantial question of federal patent law—*i.e.*, the

20  scope of Abbott's patent protection. *See Holmes*, 535 U.S. at 829-30.  Although Federal Circuit

21  jurisdiction cannot be based on defenses, the scope of Abbott's patent protection in the context of

22  this case is not a defense but, rather, an element of GSK's claim for relief.

23  As discussed above, the second element of a Sherman Act claim requires GSK to plead and

24  prove that Abbott willfully acquired or maintained monopoly power through "exclusionary

25  conduct."  Under both Federal Circuit and Ninth Circuit law, resolution of that element of the claim

26  "necessarily" requires the resolution of patent issues.  In *Image Technical Servs. v. Eastman Kodak*

27  *Co.*, 125 F.3d 1195 (9th Cir. 1997), the Ninth Circuit held that in the context of a patent-monopoly

28  leveraging theory, "conduct permissible under the patent laws" is not "exclusionary conduct" for

1  purposes of Sherman Act liability. *Id.* at 1216 (quotation omitted). It noted, however, that the "right

2  of exclusion [does not] protect an attempt to extend a lawful monopoly *beyond* the grant of a patent"

3  and, thus, "*[m]uch depends* . . . on the definition of the patent grant and the relevant market." *Id.* at

4  1216 (emphasis added). As a result, the Court held that resolution of a patent-leveraging claim

5  "*requires* that some weight be given to the intellectual property rights of the monopolist." *Id.* at 217

6  (emphasis added); *see also id.* at 1219 (holding that "desire to profit from . . . intellectual property

7  rights" carries a legal presumption of being "legitimately procompetitive").

8      To state a claim under *Image Technical*, therefore, GSK must establish exclusionary conduct

9  by Abbott beyond its antitrust immunity afforded by the patent laws. Accordingly, GSK's

10 complaint—again, to the extent GSK has not pleaded itself out of court—necessarily depends on

11 resolution of a substantial question of federal patent law concerning the scope of Abbott's patent

12 protection. *See, e.g.*, *Netflix, Inc. v. Blockbuster, Inc.*, 477 F. Supp. 2d 1063, 1066 (N.D. Cal. 2007)

13 (applying Federal Circuit law to claim construction issues). As a result, the Federal Circuit will have

14 exclusive appellate jurisdiction. *See Holmes*, 535 U.S. at 830.

15      This question of appellate jurisdiction is important because the Federal Circuit applies its

16 "own law, not regional circuit law, to resolve issues that clearly involve [its] exclusive jurisdiction."

17 *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1067 (Fed. Cir. 1998). In particular,

18 the Federal Circuit applies its own laws to determining "whether or not the patentee enjoys antitrust

19 immunity under the patent laws" based on the patent grant because any other result would "risk

20 disturbing 'Congress's goal of ensuring patent-law uniformity.'" *Unitherm Food Sys. v. Swifth-*

21 *Eckrich, Inc.*, 375 F.3d 1341, 1355 n.3 (Fed. Cir. 2004) (vacated on other grounds) (quoting

22 *Nobelpharma*, 141 F.3d at 1067-68); *see also Image Technical Servs.*, 125 F.3d at 1216-17 ("The

23 relevant market for determining the patent . . . grant is determined under patent . . . law.").

24      As the Court is aware, the Federal Circuit has already rejected the patent monopoly

25 leveraging theory that GSK has unsuccessfully attempted to plead in this case. In *In re Independent*

26 *Service Orgs. Antitrust Litig.*, 203 F.3d 1322 (Fed. Cir. 2000), the Federal Circuit specifically held

27 that a "patent holder may enforce the statutory right to exclude others from making, using, or selling

28 the claimed invention free from liability under the antitrust laws" and, in fact, "a patent may confer

12

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

1    the right to exclude competition altogether in more than one antitrust market." *Id.* at 1327.  In so

2    holding, the court expressly "declined to follow" the Ninth Circuit's decision in *Image Technical*

3    *Servs. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997), which adopted a rebuttable

4    presumption that the exercise of the statutory right to exclude provides a valid business justification

5    for consumer harm.  *In re Indep. Servs. Org. Litig.*, 203 F.3d at 1328.

6        In sum, binding Federal Circuit precedent cloaks Abbott's Novir pricing decisions with

7    immunity from Sherman Act liability.  Count 1 should be dismissed on this ground as well.

**B.    GSK Has Failed To State A Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing**

10        Count 2 for breach of the implied covenant of good faith and fair dealing also fails to state a

11    claim.  GSK has not alleged that Abbott breached any provision in the License Agreement.  Nor

12    could it do so.  "[A] patent license agreement is in essence nothing more than a promise by the

13    licensor not to sue the licensee."  *Spindelfabrik Suessen-Schurr Stahlecker & Grill GmbH v.*

14    *Schubert & Salzer Maschinenfabrik Aktiengesellschaf*, 829 F.2d 1075, 1081 (Fed. Cir. 1987).  Thus,

15    Abbott's only obligation was to permit GSK to promote and market its PIs in administration with

16    Norvir without fear of a lawsuit—something GSK readily admits it has been allowed to do.  (*See*

17    Compl. ¶ 40).  Instead, GSK seeks to impose a new obligation on Abbott based on GSK's purported

18    "reasonable expectation" that Abbott would limit "future increases in the price of Norvir" to a level

19    "consistent with past increases."  (*Id.* at ¶ 64).

20        This claim fails under New York law, ███████████████████████

21    ████████████████████████████████████  All contracts subject to New

22    York law include an implied covenant of good faith and fair dealing that governs contract

23    performance.  *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995).  But, as the New York

24    Court of Appeals (the highest court in the State) emphasized:  "The duty of good faith and fair

25    dealing . . . is not without limits, *and no obligation can be implied that 'would be inconsistent with*

26    *other terms of the contractual relationship.'*"  *Id.* (emphasis added) (citation omitted).  As

27    demonstrated below, Count 2 far exceeds these limits and, therefore, should be dismissed.

28    / / /

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

1.    **GSK Cannot Bring An Implied Covenant Of Good Faith And Fair Dealing Claim As A Substitute For Its Nonviable Contract Claim**

Count 2 should be summarily dismissed because, in general, "New York does not recognize a separate cause of action for violation of the implied covenant of good faith and fair dealing." *Cohen v. Nassau Educators Fed. Credit Union*, No. 15094-05, 2006 WL 1540324, at *4 (N.Y. Sup. May 10, 2006)). As most New York courts have held: "[I]f the [complaint] alleges only a breach of an implied duty of good faith and fair dealing, and not a breach of contract, that cause of action must be dismissed." *Designers N. Carpet, Inc. v. Mohawk Indus., Inc.*, 153 F. Supp. 2d 193, 197 (E.D.N.Y. 2001).

New York appellate and trial courts thus routinely dismiss claims based on this implied covenant where, as here, no separate claim for breach of contract exists. For example, in *Triton Partners LLC v. Prudential Sec. Inc.*, 301 A.D.2d 411 (1st Dep't 2003), the intermediate appellate court in Manhattan affirmed the dismissal of an implied covenant claim because "it was merely a substitute for a nonviable breach of contract claim." *Id.* at 411. Similarly, in *Mandarin Trading Ltd. v. Wildenstein*, No. 602648/06, 2007 WL 3101235 (N.Y. Sup. Sept. 4, 2007), a Manhattan trial court held that the plaintiff's breach of the implied good faith and fair dealing claim "*must . . . be dismissed*" in the absence of a viable breach of contract claim. *Id.* at *7 (emphasis added).[1]

Notwithstanding this general rule and practice, some courts have held that a claim for breach of the implied covenant of good faith and fair dealing can stand alone in very limited circumstances. For example, an independent implied covenant claim may exist where a contracting party "exercised a [contract] right malevolently, for its own gain as part of a purposeful scheme designed to deprive plaintiffs of the benefits of [the bargain]." *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 302 (1st Dep't 2003). The rationale for these holdings is that "[w]here the contract

---

[1]    These cases are hardly alone. *See, e.g., Nikitovich v. O'Neal*, 40 A.D.3d 300, 301 (1st Dep't 2007) ("A claim for breach of the implied covenant of fair dealing cannot substitute for an unsustainable breach of contract claim."); *Jacobs Private Equity, LLC v. 450 Park LLC*, 22 A.D.3d 347, 347-48 (1st Dep't 2005) (affirming dismissal of good faith and fair dealing claim as duplicative of non-viable breach of contract claim); *Cerberus Int'l Ltd. v. BancTec, Inc.*, 16 A.D.3d 126, 127 (1st Dep't 2005) (same); *Parker E. 67th Assocs., L.P. v. Minister, Elders & Deacons of the Reform Dutch Protestant Church of the City of New York*, 301 A.D.2d 453, 453 (1st Dep't 2003) (same); *Engelhard Corp. v. Research Corp.*, 268 A.D.2d 358, 358-59 (1st Dep't 2000) (same); *Cohen*, 2006 WL 1540324, at *4 (dismissing good faith and fair dealing claim).

1    contemplates the exercise of discretion, this pledge [*i.e.*, the implied covenant of good faith and fair

2    dealing] includes a promise not to act arbitrarily or irrationally in exercising that discretion."

3    *Dalton*, 87 N.Y.2d at 389.

4         This exception to the general prohibition against independent implied covenant claims does

5    not apply here. The exception turns on the presence of a specific contractual provision giving one

6    party discretion on a particular issue, where some courts have reasoned that a malicious abuse of that

7    discretion may support an independent implied covenant claim. *See id.* But, here, there is nothing in

8    the License Agreement remotely referencing Norvir's price, which is simply not a matter two

9    competitors in the market for HIV drugs could agree upon without engaging in a per se violation of

10   the Sherman Act.

11        GSK merely alleges that Abbott's "price increase [for Norvir] was illegitimate, arbitrary,

12   capricious and done in bad faith." (Compl. ¶ 64). But it makes no effort to tie that allegation to any

13   of the terms of the License Agreement, which creates no rights or obligations concerning Abbott's

14   pricing decisions. Noticeably absent from Count 2, therefore, is any allegation that Abbott exercised

15   *any* contractual right, let alone a discretionary right, in bad faith. As a result, this claim should suffer

16   the same fate as the scores of similar misguided attempts to circumvent nonviable contract claims —

17   dismissal.

**2.    GSK Also Cannot Read New And Conflicting Implied Obligations Into The Parties' Express Contract**

20        Even if GSK could bring an implied covenant claim in the absence of a breach of contract

21   (which it cannot), this claim still fails. New York law makes it clear that "[t]he covenant of good

22   faith and fair dealing cannot be construed so broadly as to effectively nullify other express terms of

23   the contract, or to create independent contractual rights." *Nat'l Union Fire Ins. Co. of Pittsburgh,*

24   *PA v. Xerox Corp.*, 25 A.D.3d 309, 310 (1st Dep't 2006); *see also Sutton Assocs. v. Lexis-Nexis*, 761

25   N.Y.S.2d 800, 804 (N.Y. Sup. 2003) (holding that implied covenant of good faith and fair dealing

26   "cannot be used to create independent obligations beyond those agreed upon and stated in the

27   express language of the contract").

28        GSK ignores this well-established precedent by asking the Court to consider its purported

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

15

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

1   "reasonable expectations" at the time of the contract to create new and conflicting contractual

2   obligations, such as an obligation on the part of Abbott to make future Norvir price increases

3   "consistent with past increases." (Compl. ¶ 64). Any such implied agreement directly contradicts

4   the contractual provisions ███████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████████████████████. New York

7   law thus prohibits GSK from claiming that Abbott implicitly warranted or agreed not to increase the

8   price of Norvir beyond some unspecified level. *See, e.g., Silvester v. Time Warner, Inc.*, 1 Misc. 3d

9   250, 258 (N.Y. Sup. 2003) (dismissing implied covenant claim because a party cannot rely on this

10  doctrine to "impose any obligation upon a party to the contract beyond what the explicit terms of the

11  contract provide").

12      Even putting aside this additional legal deficiency in Count 2, GSK's allegation that it

13  "reasonably expect[ed]" the parties to agree on price limits for Norvir is absurd, which, by itself, is a

14  grounds for dismissal given *Twombley*'s mandate that only "plausible" claims survive Rule 12(b)(6).

15  *See also In re AST Research. Sec. Litig.*, 887 F. Supp. 231, 235 (C.D. Cal. 1995) (dismissing claim

16  after finding "allegations are nonsensical"). There is no basis for this Court to find that GSK's

17  purported expectation that the parties agreed to an illegal price-fixing agreement was "reasonable."

18  Nor could this Court plausibly find that GSK reasonably expected Abbott to forfeit its right to set the

19  price of its own product in whatever way it saw fit merely because Abbott granted GSK a license to

20  combine two drugs. This is especially true given that the License Agreement is completely silent

21  when it comes to pricing. GSK cannot construe the contract to mean something other than what it

22  says. As a result, this Court should dismiss Count 2 and hold GSK to the express terms of the

23  License Agreement.

24      **C.    GSK Has Failed To State A Claim Under The North Carolina Unfair Trade
               Practices Act**

25

26      GSK next invokes North Carolina law when it alleges a violation of North Carolina's Unfair

27  Trade Practices Act in Count 3. In its effort to plead an "unfair and deceptive practice[]" under

28  North Carolina law, GSK alleges that Abbott's actions "(1) violate antitrust laws, (2) constitute

16

1    inequitable assertions of Abbott's power or position, (3) violate the requirement that parties at all

2    levels of commerce act in good faith and engage in fair dealings . . . , and (4) constitute deceptive

3    acts." (Compl. ¶ 69). None of these allegations is sufficient to support this claim.

### 1.    North Carolina Has Not Adopted, And Would Not Adopt, GSK's Patent-Monopoly Leveraging Theory Of Antitrust Liability

6    GSK relies primarily on its Sherman Act allegations to support Count 3 when alleging that

7    Abbott's pricing decisions concerning Norvir "violate antitrust laws" and, along these same lines,

8    constitute "inequitable assertions of Abbott's power or position" in violation of the North Carolina

9    Unfair Trade Practices Act. (*Id.* at ¶ 69). The two statutes prohibit similar conduct. In fact, the

10    Unfair Trade Practices Act was modeled after the Sherman Act and is "a comprehensive law

11    designed to include within its reach the federal antitrust laws." *L.C. Williams Oil Co., v. Exxon*

12    *Corp.*, 625 F. Supp. 477, 481 (M.D.N.C. 1985); *see also DKH Corp. v. Rankin-Patterson Oil Co.*,

13    506 S.E.2d 256, 258 (N.C. App. 1998). As a result, a finding by this Court that Abbott's conduct

14    does not violate the Sherman Act would preclude GSK from showing an antitrust violation under

15    North Carolina law. *See R.J. Reynolds Tobacco Co. v. Phillip Morris, Inc.*, 199 F. Supp. 2d 362,

16    395-96 (M.D.N.C. 2002).

17    Even if this Court were to conclude that GSK has stated a Sherman Act claim under Ninth

18    Circuit precedent, GSK's allegations underlying its patent-monopoly leveraging theory still would

19    not state a claim under the North Carolina Unfair Trade Practices Act. North Carolina law, not

20    Ninth Circuit law, applies when determining whether Abbott's conduct violates the Unfair Trade

21    Practices Act. Where, as here, there is no North Carolina Supreme Court decision construing

22    whether the alleged conduct constitutes an antitrust violation, this Court must "predict how the state

23    high court would resolve" the issue. *Westlands Water Dist. v. Amoco Chem. Co.*, 953 F.2d 1109,

24    1111 (9th Cir. 1991) (quotation omitted). North Carolina state courts, as well as federal courts

25    applying North Carolina law, have held that federal decisions, while not binding, provide guidance

26    in determining the scope and meaning of the Unfair Trade Practices Act.[2]

---

[2]    *See, e.g., ITCO Corp. v. Michelin Tire Corp., Commercial Div.*, 722 F.2d 42, 48 (4th Cir. 1983); *Sewell Plastics, Inc. v. Coca-Cola Co.*, 720 F. Supp. 1196, 1221 (W.D.N.C 1989); *The In Porters, S.A. v. Hanes Printables, Inc.*, 663 F. Supp. 494, 501 (M.D.N.C. 1987); *Marshall v. Miller*,

17

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

1   Although the North Carolina Supreme Court has yet to address the viability of a monopoly

2   leveraging theory of antitrust liability, a federal district court in North Carolina has squarely rejected

3   that theory. In *Bepco, Inc. v. Allied-Signal, Inc.*, 106 F. Supp. 2d 814 (M.D.N.C. 2000), the court

4   explained this theory — the precise theory underlying GSK's complaint—as follows: "Under

5   monopoly leveraging, a defendant who enjoys monopoly power in one market faces liability under

6   Section 2 [of the Sherman Act] if it uses such monopoly power to gain unfair advantage in a second

7   market, causing antitrust injury in the second market." *Id.* at 833. After examining several cases

8   that have rejected this theory, the court did not believe "that the Fourth Circuit would recognize

9   monopoly leveraging as a theory independent of attempted monopolization" and dismissed the

10  claim. *Id.* We are aware of no decision by any North Carolina court—or, for that matter, any court

11  in the Fourth Circuit—holding that such a theory of antitrust liability is viable. *See also See In re*

12  *Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 532 (4th Cir. 2003) ("[T]he monopoly leveraging

13  theory on which the district court relied has not been recognized in this circuit nor has it received

14  general acceptance.").

15  Accordingly, this Court should find that North Carolina would chose to follow the majority

16  rule as reflected in the Federal Circuit's holding that "the patent holder may enforce the statutory

17  right to exclude others from making, using, or selling the claimed invention free from liability under

18  the antitrust laws." *In re Indep. Servs. Orgs. Antitrust Litig.*, 203 F.3d at 1327. The Seventh Circuit

19  (Judge Easterbrook) in *Schor v. Abbott Laboratories.*, 457 F.3d 608 (7th Cir. 2006), followed this

20  reasoning and rejected identical claims against Abbott, holding that there is no "free-standing theory

21  of 'monopoly leveraging,'" as alleged by GSK. *Id.* at 611, 613.

22  There is no basis to conclude that the North Carolina Supreme Court would look past these

23  courts to the Ninth Circuit's decision in *Image Technical Services v. Eastman Kodak Co.*, 125 F.3d

24  1195 (9th Cir. 1997), upon which GSK's theory of antitrust liability presumably is based. That

25  decision stands alone in holding that the patent laws merely create a rebuttable presumption that the

26  exercise of the statutory right to exclude provides a valid business justification for consumer harm.

27  No court has followed this holding, and both the Federal and Seventh Circuits have expressly

28  276 S.E.2d 397, 403 (N.C. 1981) (citing *Johnson v. Phoenix Mut. Life Ins. Co.*, 266 S.E.2d 610, 620 (1980)).

1    rejected it. *See In re Indep. Servs. Orgs. Antitrust Litig.*, 203 F.3d at 1327 ("We decline to follow

2    *Image Technical Services.*"); *Schor*, 457 F.3d at 613 (finding that the Ninth Circuit "just got it

3    wrong").[3] GSK thus has not adequately pleaded an antitrust violation sufficient to sustain its claim

4    under the North Carolina Unfair Trade Practices Act.

       **2.    GSK's Allegations Of Bad Faith In Count 3 Are Misplaced Because**

5
              **Intent Is Irrelevant To A North Carolina Unfair Trade Practices Act**

6
              **Claim**

7         As an alternative basis to support its claim under the North Carolina Unfair Trade Practices

8    Act, GSK alleges that Abbott's conduct "violate[s] the requirement that parties at all levels of

9    commerce act in good faith and engage in fair dealings." (Compl. ¶ 69). This allegation confuses

10   the statutory claim pleaded in Count 3 with the implied covenant of good faith and fair dealing claim

11   in Count 2. The North Carolina Supreme Court has held that the intent of the actor is irrelevant to

12   whether there has been a Unfair Trade Practices Act violation. *Marshall v. Miller*, 276 S.E.2d 397,

13   403 (N.C. 1981). Instead, "unfairness and deception are gauged by consideration of the effect of the

14   practice on the marketplace." *Id.* Accordingly, GSK's allegation of bad faith in Count 3 should be

15   summarily ignored as inapposite. *Id.*

       **3.    GSK Has Not Adequately Alleged Deceptive Conduct In Violation Of The**

16
              **North Carolina Unfair Trade Practices Act**

17

18        GSK also includes a catch-all allegation of "deceptive conduct" as part of a final effort to

19   support its claim under the North Carolina Unfair Trade Practices Act. That allegation fails too

20   because GSK failed to plead detrimental reliance. North Carolina law is clear that a claim based on

21   deceptive acts cannot stand unless the "plaintiff can show that plaintiff detrimentally relied upon a

22   statement or misrepresentation and he or she suffered actual injury as a proximate result." *Bus.*

23   *Cabling, Inc. v. Yokeley*, 643 S.E.2d 63, 69 (N.C. App. 2007); *see also Coker v. DaimlerChrysler*

24   *Corp.*, 617 S.E.2d 306, 316 (N.C. App. 2005).

---

25   [3]  Other courts have similarly rejected monopoly leveraging theories. *See, e.g., Verizon Commc'ns*

26   *Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 n.4 (2004) (holding that complaint
did not state a claim under a "monopoly leveraging" theory); *Virgin Atl. Airways, Ltd. v. British*

27   *Airways PLC*, 257 F.3d 256, 272 (2d Cir. 2001) ("[U]ncertainty exists as to the continued scope of a
monopoly leveraging claim as an independent cause of action in light of the Supreme Court's

28   opinion in Spectrum Sports.") (citing *Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993)); Phillip E.
Areeda & Herbert Hovenkamp, Antitrust Law ¶ 652(b)(2) at 93 (1996) (observing that most circuits
and district courts "reject most leveraging claims").

19

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

1    GSK's allegations come nowhere close to satisfying this pleading requirement. GSK merely

2    alleges that "Abbott deliberately deceived its competitors and the public as to the true and

3    illegitimate nature of the price increase. . . . Abbott further misrepresented the pricing of Norvir to

4    the public[.]" (Compl. ¶ 71). GSK has failed to allege that it detrimentally relied in any way on any

5    of Abbott's purported misrepresentations. Nor does it allege any proximate injury resulting from the

6    alleged deception. Accordingly, GSK's catch-all deception allegations do not save its deficient

7    Unfair Trade Practices Act claim. *See Bus. Cabling, Inc.*, 643 S.E.2d at 69 (reversing the trial

8    court's decision for plaintiff under North Carolina's Unfair Trade Practices Act because "the trial

9    court failed to find as fact, and no evidence shows, plaintiff 'detrimentally relied upon'" the

10   defendant's statement).

**D.    GSK Has Failed To State A Claim Under The North Carolina Prohibition Against Monopolization**

GSK's failure to state an antitrust claim under the North Carolina Unfair Trade Practices Act

necessarily dooms Count 4, which alleges that Abbott violated the North Carolina prohibition

against monopolization, N.C. Gen. Stat. § 75-2.1. In *R.J. Reynolds Tobacco Co. v. Phillip Morris,*

*Inc.*, 199 F. Supp. 2d 362 (M.D.N.C. 2002), for example, a North Carolina federal district court

dismissed such a claim because, like here, the plaintiffs failed to allege an antitrust violation in

violation of federal law or North Carolina's Unfair Trade Practices Act. *Id.* at 395-96. It held that

because the plaintiffs did "not allege any facts that suggest that Defendant's conduct is unlawful

beyond the conduct that is the basis for their failed federal claims, Plaintiffs' state . . . statutory

claims fail as well." *Id.* The same result is warranted here.

**V.    CONCLUSION**

For the reasons set forth above, this Court should dismiss all claims in GSK's complaint with

prejudice.

Dated: January 24, 2008                    WINSTON & STRAWN LLP


By:    /s/ Nicole M. Norris
        Attorney for Defendant
        ABBOTT LABORATORIES

Winston & Strawn LLP
101 California Street
Suite 3900
San Francisco, CA 94111-5802

20