IRELL & MANELLA LLP
Alexander F. Wiles (CA 73596) awiles@irell.com
Brian Hennigan (CA 86955) bhennigan@irell.com
Stephanie Kaufman (CA 162644) skaufman@irell.com
Trevor V. Stockinger (CA 226359) tstockinger@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:    (310) 277-1010
Facsimile:    (310) 203-7199

ARNOLD & PORTER LLP
Kenneth A. Letzler (*Admitted Pro Hac Vice*) Kenneth_Letzler@aporter.com
555 Twelfth Street, NW
Washington, DC  20004-1206
Telephone:    (202) 942-5000
Facsimile:    (202) 942-5999

Attorneys for Plaintiff
GlaxoSmithKline

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

|  |  |
|---|---|
| SmithKline Beecham Corporation d/b/a/ GlaxoSmithKline,<br><br>        Plaintiff,<br><br>    v.<br><br>Abbott Laboratories,<br><br>        Defendant. | **Case No. C 07-5702 (CW)**<br><br>*Related per November 19, 2007 Order to* **Case No. C 04-1511 (CW)**<br><br>**PLAINTIFF GLAXOSMITHKLINE'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT** |

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................... 1

I.   THE LEGAL STANDARD. ............................................................................................ 2

II.  ABBOTT'S ASSERTION OF "PATENT IMMUNITY" IS NOT A
     BASIS FOR DISMISSAL OF GSK'S SHERMAN ACT CLAIM......................... 3

     A.   Abbott's Arguments Should Be Raised as an Affirmative
          Defense, Not in a Motion to Dismiss. ......................................................... 4

     B.   GSK Does Not Allege Facts that Give Rise to a Valid
          Affirmative Defense. ...................................................................................... 4

          1.   GSK's Complaint Does Not Allege that Abbott Had a
               Right to Exclude GSK from Competing in the
               Boosted Protease Inhibitor Market. .................................................. 4

          2.   The License Agreement Does Not Constitute an
               Admission of Any Facts that Would Give Rise to a
               Defense of "Patent Immunity." ......................................................... 7

     C.   Abbott Could Not Prevail on Its Motion to Dismiss Even if It
          Had Valid Patents to Which It Had Not Relinquished Its
          Rights. .............................................................................................................. 7

     D.   GSK's Allegations Defeat Abbott's Claimed Defense. ............................. 9

III. GSK'S COMPLAINT SUFFICIENTLY PLEADS A CLAIM FOR
     BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
     AND FAIR DEALING. ............................................................................................. 11

     A.   GSK Pleads What the Law Requires. .......................................................... 11

     B.   Abbott's Various Arguments for Dismissal Misstate the
          Law. ................................................................................................................. 14

IV.  THE COMPLAINT SUFFICIENTLY PLEADS THAT ABBOTT
     VIOLATED SECTION 75-1.1 OF THE NORTH CAROLINA
     UNFAIR TRADE PRACTICES ACT. ................................................................... 17

V.   CONCLUSION ........................................................................................................... 22

1

TABLE OF AUTHORITIES

2

Page

3

4

5

**Cases**

6

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.,*
    773 N.E.2d 496 (N.Y. 2002) ...................................................................................... 12

7

8

*Anton/Bauer, Inc. v. PAG, Ltd.,*
    329 F.3d 1343 (Fed. Cir. 2003) ................................................................................. 10

9

*Bell Atl. Corp. v. Twombly,*
    127 S. Ct. 1955 (2007) ................................................................................................ 3

10

*Business Cabling, Inc. v. Yokeley,*
    643 S.E.2d 63 (N.C. App. 2007) ............................................................................... 21

11

12

*Carolina Water Service, Inc. of North Carolina v. The Town of Pine Knoll Shores,*
    145 N.C. App. 686 (2001) ......................................................................................... 11

13

*Cerberus Int'l Ltd. v. BancTec, Inc.,*
    791 N.Y.S.2d 28 (N.Y. Sup. Ct. 2005) ..................................................................... 15

14

15

*Chase Manhattan Bank, N.A. v. Keystone Distrib., Inc.,*
    873 F. Supp. 808 (S.D.N.Y. 1994) ..................................................................... 12, 14

16

*Christianson v. Colt Indus. Operating Corp.,*
    486 U.S. 800 (1988) ................................................................................................ 8, 9

17

18

*Cohen v. Nassau Educ. Fed. Credit Union,*
    819 N.Y.S.2d 209 (N.Y. Sup. Ct. 2006) ................................................................... 15

19

*Cullen v. Valley Forge Life Insurance Co.,*
    161 N.C. App. 570 (2004) ......................................................................................... 21

20

21

*Dalton v. Educ. Testing Serv.,*
    663 N.E.2d 289 (N.Y. Ct. App. 1995) ................................................................ 12, 16

22

*Denney v. Drug Enforcement Admin.,*
    508 F. Supp. 2d 815 (E.D. Cal. 2007) ........................................................................ 3

23

24

*Designers N. Carpet, Inc. v. Mohawk Indus., Inc.,*
    153 F. Supp. 2d 193 (E.D.N.Y. 2001) ...................................................................... 15

25

*DiFolco v. MSNBC Cable LLC,*
    2007 U.S. Dist. LEXIS 23440 (S.D.N.Y. Mar. 29, 2007) ......................................... 14

26

27

*DKH Corp. v. Rankin-Patterson Oil Co., Inc.,*
    131 N.C. App. 126 (1998) ......................................................................................... 17

28

Page(s)

*Early v. Bankers Life & Cas. Co.*,
    959 F.2d 75 (7th Cir. 1992)............................................................................. 6

*Engelhard Corp. v. Research Corp.*,
    702 N.Y.S.2d 355 (N.Y. Sup. Ct. 2000) .......................................................... 15

*Evans v. S.S. Kresge Co.*,
    544 F.2d 1184 (3d Cir. 1976).......................................................................... 17

*Franchise Tax Board of the State of California v. Construction Laborers Vacation*
    *Trust for Southern California*,
    463 U.S. 1 (1983) ........................................................................................... 9

*Gross v. Empire Healthchoice Assurance, Inc.*,
    No. 602848-2005, 2007 WL 2066390 (N.Y. Sup. Ct. July 18, 2007) ....................... 14, 15

*Havel v. Kelsey-Hayes Co.*,
    83 A.D.2d 380 (N.Y. App. Div. 1981) ............................................................. 16

*Image Tech. Servs. Inc. v. Eastman Kodak & Co.*,
    125 F.3d 1195 (9th Cir. 1997)........................................................... 7, 8, 9, 22

*In re Abbott Lab. Norvir Anti-Trust Litig.*,
    442 F. Supp. 2d 800 (N.D. Cal. 2006) ........................................... 4, 6, 7, 10

*In re Abbott Labs. Norvir Anti-trust Litig.*,
    No. C 04-1511 CW, 2005 WL 2206700 (N.D. Cal. Sept. 12, 2005) ....................... 8

*Intel v. VIA Technologies, Inc.*,
    2001 WL 777085 (N.D. Cal. Mar. 20, 2001) .................................................... 3

*ITCO Corp. v. Michelin Tire Corp.*,
    722 F.2d 42 (4th Cir. 1983)..................................................................... passim

*ITSI T.V. Productions, Inc. v. Agric. Associations*,
    3 F.3d 1289 (9th Cir. 1993)............................................................................. 4

*Jacobs Private Equity, LLC v. 450 Park LLC*,
    803 N.Y.S.2d 14 (N.Y. Sup. Ct. 2005) ............................................................ 15

*Jacobs v. Nintendo of America, Inc.*,
    370 F.3d 1097 (Fed. Cir. 2004)........................................................... 10, 11, 12

*L.C. Williams Oil Co., Inc. v. Exxon Corp.*,
    625 F. Supp. 477 (M.D.N.C. 1985).................................................................. 17

*Lear, Inc. v. Adkins*,
    395 U.S. 653 (1969) ....................................................................................... 7

*Leatherman Tool Group Inc. v. Cooper Indus. Inc.*,
    131 F. 3d 1011 (Fed. Cir. 1997)................................................................... 8, 9

GSK'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
CASE NO. C07-5702 (CW)

1821883

Page(s)

*Lincoln v. Bueche,*
    166 N.C. App. 150 (2004)..................................................................21

*Mandarin Trading Ltd. v. Wildenstein,*
    2007 WL 310235 (N.Y. Sup. Ct. Sept. 4, 2007) ................................15

*Marshall v. Miller,*
    302 N.C. 539 (1981).....................................................17, 18, 20, 21

*McCalden v. Cal. Library Ass'n,*
    955 F.2d 1214 (9th Cir. 1990)...........................................................4

*MedImmune, Inc. v. Genentech, Inc.,*
    127 S. Ct. 764 (2007) ......................................................................7

*Miller v. Nationwide Mut. Ins. Co.,*
    435 S.E.2d 537 (N.C. Ct. App. 1993) ..............................................18

*Parker E. 67th Assocs., LP v. Minister, Elders & Deacons of the Reform Dutch*
    *Protestant Church of the City of New York,*
    754 N.Y.S.2d 255 (N.Y. Sup. Ct. 2003) ..........................................15

*Polk Bros., Inc. v. Forest City Enters., Inc.,*
    776 F.2d 185 (7th Cir. 1985)...........................................................17

*Pope Mfg. Co. v. Gormully,*
    144 U.S. 224 (1892) .........................................................................7

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.,*
    199 F. Supp. 2d 362 (M.D.N.C. 2001).............................................11

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.,*
    765 N.Y.S.2d 575 (N.Y. Sup. Ct. 2003) ..........................................16

*Riddell Sports, Inc. v. Brooks,*
    1997 U.S. Dist. LEXIS 3621 (S.D.N.Y. Mar. 27, 1997)....................14

*S. Atl. Ltd. P'ship of Tenn. v. Riese,*
    284 F.3d 518 (2002) ..................................................................18, 19

*Sara Lee Corp. v. Carter,*
    351 N.C. 27 (1999)........................................................................18

*Snitovsky v. Forest Hills Orthopedic Group, PC,*
    844 N.Y.S.2d 91 (N.Y. App. Div. 2007)...........................................15

*State Oil Co. v. Khan,*
    522 U.S. 3 (1997) ...........................................................................17

*Stidham v. Jackson,*
    2007 U.S. Dist. LEXIS 54032 (W.D. Va. July 26, 2007) .....................6

1821883

Page(s)

*Texaco Inc. v. Dagher,*
    547 U.S. 1 (2006) ...................................................................................... 17

*Triton Partners LLC v. Prudential Sec. Inc.,*
    752 N.Y.S.2d 870 (N.Y. Sup. Ct. 2003) ............................................... 15

*Valley Drug Co. v. Geneva Pharms., Inc.,*
    344 F.3d 1294 (11th Cir. 2003) ............................................................ 3

**Statutes**

Uniform Commercial Code § 1-102(3) ...................................................... 16

**Other Authorities**

23 Williston on Contracts § 63.22 (4th ed. 2007) .................................... 12

5A C. Wright & A. Miller, Federal Practice and Procedure,
    § 1357, at 348 (2d ed. 1990) ................................................................ 4

N.C. Constitution art. I, § 34 ..................................................................... 11

The North Carolina Unfair Trade Practices Act § 75-1.1 .................... passim

The North Carolina Unfair Trade Practices Act § 75-2.1 ............. 1, 11, 22

The Sherman Antitrust Act (1890) ........................................................ passim

**Rules**

Fed. R. Civ. P. 12(b) ..................................................................................... 1

**INTRODUCTION**

Plaintiff SmithKline Beecham Corporation d/b/a GlaxoSmithKline ("GSK") submits this opposition to the Notice of Motion and Motion of Abbott Laboratories To Dismiss Plaintiff's Claims Pursuant to Rule 12(b)(6) ("Motion"). In its complaint, GSK alleges that Abbott wrongfully manipulated pricing and other market conditions to exclude competition and provide a competitive advantage for its protease inhibitor Kaletra® in an attempt to maintain or develop an unlawful monopoly, all to the harm of patients dependent on HIV medicines and other pharmaceutical companies who supply them. GSK further alleges that Abbott destroyed the expected benefits of its contract with GSK, taking those benefits for itself despite extracting significant sums from GSK, and thus breached its duty of good faith and fair dealing. GSK asserts claims under Section 2 of the Sherman Act, sections 75-1.1 and 75-2.1 of the North Carolina Unfair Trade Practices Act (the "UTPA"), and a claim for breach of the implied covenant of good faith and fair dealing.

Abbott asks the Court to dismiss GSK's Sherman Act claim and its claim under North Carolina's anti-monopolization statute (§ 75-2.1 of the UTPA) because, Abbott says, its patents make it immune from suit under those statutes. In the earlier filed Norvir antitrust cases, Abbott made the same contention and lost both at the motion to dismiss and summary judgment stages. In ruling against Abbott on those motions, the Court noted that Abbott's patent argument was a defense that it had the burden to prove. There is nothing in GSK's complaint that justifies a different result. Abbott's "patent immunity" argument is still a defense which must "be asserted in the responsive pleading." Fed. R. Civ. P. 12(b). Nor has GSK alleged facts that invoke the defense on the face of its complaint such that dismissal might be appropriate. In fact, Abbott's admissions in its Motion, coupled with GSK's allegations, make clear that, by virtue of the license Abbott granted to GSK in 2002, Abbott had no right to exclude GSK from competing in the market at the time Abbott engaged in the anticompetitive conduct alleged in the complaint. Without that right, Abbott has no defense based on its patents.

Abbott also moves to dismiss GSK's claim for breach of the implied covenant of good faith and fair dealing. Its arguments are again flawed. GSK has alleged a very traditional implied

1   covenant claim – that the counter party to a contract, Abbott, took actions in bad faith to deprive

2   GSK of the fundamental and reasonably expected fruits of the contract.  Abbott seems to concede

3   that New York (the state whose law governs the contract claim) recognizes this claim even where

4   the defendant has not breached an express term of the contract.  Motion at 14:18-15:3.  But, it tries

5   to graft a new limitation onto the claim by arguing that, unless the conduct at issue falls within the

6   penumbra of an express provision of the contract, it cannot be sufficiently odious to give rise to an

7   implied covenant claim.  *Id.* at 15:4-10.  Abbott cites no case that suggests that such a limitation

8   exists, nor any policy reason for it.  Why, for example, would courts be able to find a breach of the

9   implied covenant when a defendant with express contractual discretion over pricing sets a price

10  that destroys the plaintiff's ability to profit under a contract, but be precluded from finding a

11  breach when the same thing occurs but the contract does not expressly give the defendant control

12  over pricing decisions?  There is no answer to this question, and the law does not compel such an

13  absurd result.  For good measure, Abbott also argues that GSK and Abbott somehow disclaimed

14  the implied covenant of good faith and fair dealing – a contract term read into every contract as a

15  matter of law.  *See*  Motion at 16:3-4.  To reach this conclusion, Abbott relies on warranty

16  disclaimers and an integration clause.  If it were so easy to disclaim the implied covenant of good

17  faith and fair dealing, that important legal doctrine would be eviscerated.  Again, Abbott points to

18  no case support that is remotely on point.   Abbott's arguments on this cause of action are

19  makeweight.

20        Finally, Abbott moves to dismiss GSK's claim under Section 75-1.1 of the UTPA.  That

21  part of its motion fails for many reasons:  because Abbott's antitrust argument fails, because the

22  statute covers other forms of wrongdoing including abuse of a position of power, abuse of contract

23  rights and deceptive acts, and because North Carolina does not require allegations of "detrimental

24  reliance" when a plaintiff bases a § 75-1.1 claim on deceptive acts by the defendant.  GSK has

25  clearly alleged sufficient facts to state a claim under § 75-1.1 of the UTPA.

26  **I.        THE LEGAL STANDARD.**

27        In ruling on a motion to dismiss, "a judge must accept as true all of the factual allegations

28  contained in the complaint," and the plaintiff is given "the benefit of every reasonable inference to

- 2 -

1   be drawn" from the allegations. *Id.* "Thus, the plaintiff need not necessarily plead a particular

2   fact if that fact is a reasonable inference from facts properly alleged." *Id.* "The court may not

3   dismiss the complaint if there is a reasonably founded hope that the plaintiff may show a set of

4   facts consistent with the allegations." *Denney v. Drug Enforcement Admin.*, 508 F. Supp. 2d 815,

5   825 (E.D. Cal. 2007) (citing *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1967-69 (2007)). GSK's

6   Complaint easily meets this standard; GSK's claims are properly pled and withstand Abbott's

7   challenge on the pleadings.

8        Courts are especially reticent to dismiss complaints based on assertions that a defense

9   supposedly apparent from the face of a complaint makes a defendant "immune" to antitrust

10  violations. For example, in *Intel v. VIA Technologies, Inc.*, No. C99-03062, 2001 WL 777085

11  (N.D. Cal. Mar. 20, 2001), Intel moved to dismiss an antitrust claim, asserting among other things

12  that it was "immune" from suit based on the *Noerr-Pennington* doctrine. This Court denied Intel's

13  motion to dismiss noting that "[w]hile ultimately the Court may (or may not) agree with Intel's

14  sweeping categorical rule of immunity, it should not do so at the pleading stage." *Id.* at *6.

15  **II.    ABBOTT'S ASSERTION OF "PATENT IMMUNITY" IS NOT A BASIS FOR**

16  **DISMISSAL OF GSK'S SHERMAN ACT CLAIM.**

17       Abbott asks the Court to dismiss the Sherman Act count of GSK's complaint on the basis

18  of what Abbott calls "patent immunity," which is, in reality, an argument that it has an affirmative

19  defense based on the right to exclusion conferred by a patent. *Valley Drug Co. v. Geneva*

20  *Pharms., Inc.*, 344 F.3d 1294 (11th Cir. 2003) ("The right of exclusion conferred by a patent has

21  been characterized as a defense to an antitrust claim, or as a limited exception to the general rule

22  that markets should be free from barriers to competition." (citations omitted)). This argument is

23  not new. Abbott made this argument in the *Doe/SEIU* case at both the pleading stage and the

24  summary judgment stage, and each time the Court rejected Abbott's contention that its patents

25  entitled it to judgment on the plaintiff's antitrust claims. There is nothing about GSK's complaint

26  that suggests a different result.

27

28

GSK'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
CASE NO. C07-5702 (CW)

1821883

A.    Abbott's Arguments Should Be Raised as an Affirmative Defense, Not in a Motion to Dismiss.

This Court's earlier rulings were correct for a host of reasons.  Most simply, Abbott cannot prevail on its motion to dismiss GSK's Sherman Act claim because that motion rests on a supposed affirmative defense, not on a defect in GSK's complaint.  Thus, in an earlier ruling in the related litigation, this Court held: "Nor is the Court persuaded that Defendant is entitled to immunity provided by its other patents that cover the boosted market.  Defendant has the burden regarding its affirmative defense." *In re Abbott Lab. Norvir Anti-Trust Litig.*, 442 F. Supp. 2d 800, 810 (N.D. Cal. 2006), citing *ITSI T.V. Productions, Inc. v. Agric. Associations*, 3 F.3d 1289, 1291 (9th Cir. 1993) (an affirmative defense must be proved by the party that asserts it).  A motion to dismiss is not the appropriate method for Abbott to make these arguments.

B.    GSK Does Not Allege Facts that Give Rise to a Valid Affirmative Defense.

A defendant can prevail on a motion to dismiss based on an affirmative defense only if the existence of the defense appears clearly, and without question, from the face of the complaint. *McCalden v. Cal. Library Ass'n*, 955 F.2d 1214 (9th Cir. 1990).  "For a complaint to be dismissed because the allegations give rise to an affirmative defense 'the defense clearly must appear on the face of the pleading.'" *Id.* at 1219 (quoting 5A C. Wright & A. Miller, Federal Practice and Procedure, § 1357, at 348-49 (2d ed. 1990)) (rejecting motion to dismiss where the defendant had argued that the plaintiff had pled into the impossibility defense against a breach of contract). Abbott cannot meet this burden.

1.    GSK's Complaint Does Not Allege that Abbott Had a Right to Exclude GSK from Competing in the Boosted Protease Inhibitor Market.

GSK does not allege in its complaint that Abbott ever had a right to exclude competition from the boosted protease inhibitor market, by virtue of patents or any other rights.  The word "patent" appears only once in the complaint, and not in reference to any particular patent belonging to Abbott.[1]  The complaint alleges that Abbott *claimed* it had certain intellectual

---

[1] "There are substantial barriers to entry into both the markets for PI boosters and boosted PIs.  The products in these markets require hundreds of millions of dollars and many years to design, develop and distribute.  Compounding these barriers to entry, both markets require

1821883

1  property rights, and that GSK was willing to pay Abbott for the promise that it would not seek to

2  assert those rights against GSK or others downstream from GSK.  In making its argument, Abbott

3  points to the following allegations from GSK's complaint, but none is an allegation that Abbott

4  has a right to exclude competition in the boosted market:

5  "17.  Abbott never sought to use its intellectual property to prevent others from selling PIs

6  for administration with Norvir.  Instead, it chose to profit by licensing competitors the right to

7  market PIs to be co-administered with Norvir."

8  "20.  In 2000, Abbott approached GSK to demand that it secure a license to allow GSK to

9  promote its existing PIs, as well as PIs it had under development, with Norvir.  GSK acquiesced to

10  this demand, procuring a license from Abbott in December 2002."

11  "21.  Under the agreement, Abbott gave GSK the right to promote the use and

12  administration of its PIs with Norvir.  Abbott knew that GSK's plan was to use the Norvir license

13  in order to promote GSK's PIs in boosted form.  GSK paid substantial sums of money in

14  consideration for this license."

15  "22.  GSK is informed and believes, and therefore alleges, that other pharmaceutical

16  companies, including BMS, took similar licenses allowing the promotion of their PIs with Norvir

17  during the same timeframe."

18  "36.  Abbott's decision to raise the price of Norvir by 400 percent was unprecedented and

19  taken in bad faith.  The 400 percent price hike immediately after GSK's release of Lexiva dashed

20  GSK's reasonable expectation that, by virtue of the license for which it had paid, it would be able

21  to promote the co-prescription and co-administration of its PI products with Norvir at prices

22  competitive with those of Kaletra and other PIs...."

23

24

25  government approvals to enter and are covered by patents and other forms of intellectual property.
Thus, competitors or potential market entrants lack the capacity to increase output in the short
26  run."  GSK Complaint, ¶ 41.

27      The phrase "intellectual property" also appears once: "Abbott never sought to use its
intellectual property to prevent others from selling PIs for administration with Norvir.  Instead, it
28  chose to profit by licensing competitors the right to market PIs to be co-administered with
Norvir."  GSK Complaint, ¶ 17.

GSK'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
CASE NO. C07-5702 (CW)

1821883

1    None of these statements alleges "that Abbott owns patents over the very market it
2    allegedly has monopolized," Motion at 8, or "establishes that Abbott's patent protection reaches
3    this very procedure," *id.* at 8-9. The complaint alleges that Abbott <u>claimed</u> it had patent rights
4    covering the use of Norvir, and that GSK paid good money to obtain a license to whatever rights
5    Abbott claimed to have, whether such claims would have been valid or not.

6    The cases Abbott cites in support of its argument that its defense appears clearly on the
7    face of the pleading do not support Abbott at all. Abbott quotes *Early v. Bankers Life & Cas. Co.*,
8    959 F.2d 75 (7th Cir. 1992), for the proposition that a plaintiff can plead himself out of court.
9    Motion at 8. But *Early* <u>reversed</u> the district court's dismissal on the basis of an affirmative
10   defense. Although the plaintiff's "inartful" complaint and amended complaint were unclear as to
11   whether the claim had been filed in a timely fashion, and although the plaintiff's counsel at oral
12   argument may have admitted that plaintiff's filing was late, Judge Posner took it upon himself to
13   articulate two legal theories upon which the plaintiff could state a claim. The court then reversed
14   the dismissal: "the question is not what are the facts, but is there a set of facts that if proved would
15   show that the case had merit?" *Id.* at 79-80.[2]

16   Here, no great effort is needed to find a set of facts that would support relief. The
17   complaint nowhere says that Abbott had valid patents, and allegations that admit the existence of a
18   license scarcely make that case. As this Court has noted, parties take licenses to intellectual
19   property to remove uncertainty, even where they think no license is required. *In re Abbott Lab.*
20   *Norvir Anti-Trust Litig.*, 442 F. Supp. 2d at 810 (denying motion for summary judgment). Abbott
21   simply has no argument that GSK has alleged the existence of valid patents that would allow
22   Abbott to preclude GSK from competing in the boosted protease inhibitor market. Quite to the
23   contrary, as discussed more fully below, the complaint makes clear that, by the time of the conduct
24   at issue in this case, whatever right Abbott might have had to exclude GSK and its downstream
25   customers from promoting and selling Lexiva for use with Norvir had been voluntarily abandoned
26   through a licensing agreement. Complaint ¶ 21. Indeed, Abbott concedes that it granted GSK the

27   ───────────────
28   [2] Another case upon which Abbott relies, *Stidham v. Jackson*, 2007 U.S. Dist. LEXIS
     54032, at *2 (W.D. Va. July 26, 2007), is one in which the plaintiff "admitted in her [argument
     papers]… that the complaint fails to state a claim." No such concession is made here.

1 right to promote GSK's protease inhibitors with Norvir. Motion at 3. The undisputed fact is that,

2 by the time of the anticompetitive conduct alleged in GSK's complaint, Abbott had no ability to

3 prevent competition from GSK in the boosted protease inhibitor market.

4          2.     The License Agreement Does Not Constitute an Admission of Any Facts

5                 that Would Give Rise to a Defense of "Patent Immunity."

6          Nor can the license agreement itself be deemed an admission that Abbott has valid patents

7 covering the use of Norvir to boost the effectiveness of PIs. Motion at 4-5. Abbott asks this Court

8 to consider the license. GSK does not object. However, there is nothing that the license possibly

9 could say that could constitute an admission that Abbott's patents were valid. As this Court noted,

10 Abbott's "competitors could have decided it was to their advantage to get a license, even while

11 believing that Defendant did make a clear disclaimer [of coverage over PI boosting]." *See In re*

12 *Abbott Labs.*, 442 F. Supp. 2d at 809 (denying motion for summary judgment). Indeed, the

13 Supreme Court has made clear that a patent licensee can take a license and still challenge a patent.

14 *Lear, Inc. v. Adkins*, 395 U.S. 653, 664-65 (1969); *cf. MedImmune, Inc. v. Genentech, Inc.*, 127 S.

15 Ct. 764 (2007) (case and controversy requirement met where licensee sues for declaratory

16 judgment that licensed patent is invalid). Even a recital in the license agreement (absent here) that

17 the parties agreed the patents were valid would not change that result. *Lear, Inc.*, 395 U.S. at 664-

18 65 (discussing the "powerful argument" in *Pope Mfg. Co. v. Gormully*, 144 U.S. 224 (1892)

19 against granting injunctions to enforce promises never to contest patent validity).

20          In sum, Abbott fails to meet its burden of showing that its affirmative defense of "patent

21 immunity" appears clearly on the face of GSK's complaint. Its motion to dismiss GSK's Sherman

22 Act claim should be denied on this basis alone.

23      C.     Abbott Could Not Prevail on Its Motion to Dismiss Even if It Had Valid Patents to

24             Which It Had Not Relinquished Its Rights.

25          Yet another reason exists why Abbott cannot prevail on its motion to dismiss GSK's

26 Sherman Act claims: *Image Tech. Servs. Inc. v. Eastman Kodak & Co.*, 125 F.3d 1195, 1218 (9th

27 Cir. 1997) ("*Kodak*") teaches that an assertion of patent rights as a defense to an antitrust claim

28 can be defeated by a showing of pretext. GSK's complaint contains detailed allegations that

1821883

1  Abbott's claim that it merely raised its price as its patents allowed it to do is a pretext for an effort

2  to remove the patented product from the market as part of an anticompetitive monopolization

3  scheme. Complaint ¶¶ 2, 24-29, 36. In the *Doe/SEIU* case, this Court in fact considered a nearly

4  identical claim of pretext and found that pretext had been alleged and sufficient facts shown to

5  raise a triable issue of fact. 442 F. Supp. 2d at 808 & n.1.

6       Abbott tries to get around this straightforward response to its motion to dismiss by arguing

7  for at least the fourth time that this Court should apply Federal Circuit law, which rejects *Kodak*'s

8  holding. This Court has already expressly rejected that argument. *In re Abbott Labs. Norvir Anti-*

9  *trust Litig.*, No. C 04-1511 CW, 2005 WL 2206700, at *4 (N.D. Cal. Sept. 12, 2005) (Order

10  Granting Plaintiffs' Rule 56(f) Motion). Indeed, Abbott has admitted that it lost this argument.

11  "Thus, as it has argued in the past, Abbott respectfully contends that the Court should follow

12  *Independent Services* and reject the Ninth Circuit's approach in *Kodak*. Abbott understands that

13  this Court already rejected that argument when ruling on Plaintiffs' Rule 56(f) motion."[3] Request

14  for Judicial Notice (filed herewith), Ex. 2 (Renewed Motion for Summary Judgment) at 19 n.2.

15  This complaint is no different.

16       The Supreme Court and Federal Circuit have both clearly stated that "a case raising a

17  federal patent-law defense does not, for that reason alone, 'arise under' patent law, 'even if the

18  defense is anticipated in the plaintiff's complaint'...." *Leatherman Tool Group Inc. v. Cooper*

19  *Indus. Inc.*, 131 F. 3d 1011, 1013 (Fed. Cir. 1997), quoting *Christianson v. Colt Indus. Operating*

20  *Corp.*, 486 U.S. 800, 809 (1988). Thus, in *Leatherman Tool Group*, the Federal Circuit held that it

21  lacked jurisdiction over an appeal of an injunction entered in a trade dress infringement claim

22  where the defendant had asserted an affirmative defense and a counterclaim based on the patent

23  laws. 131 F.3d at 1015. Similarly, in *Christianson*, the Supreme Court held that the determination

24  of whether "patent law is a necessary element of one of the well-pleaded claims" of the complaint

25  is made based on what necessarily appears in the plaintiff's statement of his own claim in the bill

26  or declaration unaided by anything alleged in anticipation or avoidance of defenses which it is

27

28      [3] Abbott raised this argument again in its Omnibus Motion to Dismiss based on the *Cascade* decision, and it has been refuted again in the Joint Opposition to that motion.

1    thought the defendant may interpose." *Christianson*, 486 U.S. at 809.  "Thus a case raising a

2    federal patent-law defense does not … 'arise under' patent law, 'even if the defense is anticipated

3    in the plaintiff's complaint, and even if both parties admit that the defense is the only question that

4    truly is at issue in the case.'"  *Id.* (quoting *Franchise Tax Board of the State of California v.*

5    *Construction Laborers Vacation Trust for Southern California*, 463 U.S. 1, 14 (1983)).  Since

6    GSK's complaint, like that of the plaintiff in *Leatherman Tool Group*, does not require reliance on

7    patent law to succeed, and since the only difference from the earlier complaints is that GSK has

8    anticipated the defense and provided an additional reason why it should fail, this is not a matter

9    arising under the patent law.  *Kodak* governs this case.

10        D.    GSK's Allegations Defeat Abbott's Claimed Defense.

11        Lastly, Abbott's motion to dismiss GSK's Sherman Act claim is flawed because GSK has

12    anticipated and pled facts that provide an additional ground to defeat Abbott's asserted patent

13    based defense (if it at some point chooses to plead such a defense).  In *Christianson*, *supra*,

14    plaintiffs/petitioners alleged that defendant Colt had violated the antitrust laws and committed

15    state law torts by, *inter alia*, falsely claiming that plaintiffs were improperly using Colt's trade

16    secrets.   That claim could be sustained, the Supreme Court noted, if Colt's misconduct in

17    obtaining its patents deprived the trade secrets associated with the patents of state law protection

18    or if "Colt [had] authorized petitioners to use them," in which case there would be no need to

19    examine patent issues.  *Christianson*, 486 U.S. at 811.  Authorization through a license agreement

20    is precisely what GSK alleges here.

21        In particular, GSK alleges that "Abbott voluntarily entered into license agreements with its

22    competitors, including GSK, to promote boosted PIs for administration with Norvir."   GSK

23    Complaint ¶ 43.[4]  "Abbott has facilitated the market for boosted PIs using Norvir."  *Id.* ¶ 44; *see*

24    *also id.* ¶¶ 17, 20, 21, 22 (quoted above).  Even Abbott admits that it "had a choice before entering

25    into this agreement" with GSK; assuming its patents were valid, enforceable, infringed, and not

---

26    [4]  Section 2.1 of the license between Abbott and GSK grants GSK the rights to
27    "recommend, label, market, use, sell, have sold and offer to sell GSK Products, but no other
     product, in co-prescription and/or co-administration with Ritonavir" and to pursue regulatory
28    approval for the same.  Declaration of Nicole M. Norris, filed with Abbott's Motion, Ex. A at §
     2.1.

1    otherwise licensed, Abbott "could have precluded any party, including GSK, from selling a PI for

2    use in combination with Norvir.   But it chose instead to enforce its patents by licensing them in

3    return for a royalty."    Motion at 5.    Abbott thus acknowledges that it had a "contractual

4    obligation" to "permit GSK to promote and market its PIs in combination with Norvir." *Id.* at 3.

5    Thus, Abbott concedes that, at the time of the anticompetitive conduct alleged in the complaint,

6    Abbott had no right to exclude GSK, or presumably other licensees, from competing for customers

7    in the boosted protease inhibitor market.   (This is true whether Abbott's patents are broad or

8    narrow, valid or invalid.)

9         Abbott does not and, indeed, cannot contend that any rights it once may have had to

10   exclude competition from the boosted market were inalterable.   This Court already has held that

11   "an implied license can eliminate patent immunity under anti-trust laws." *In re Abbott Labs.*, 442

12   F. Supp. 2d 800, 810 (N.D. Cal. 2006) (denying motion for summary judgment).   "If Defendant

13   has impliedly licensed Norvir's use as a booster, then it has waived its right to exclude others from

14   using Norvir as a booster, and cannot rely on its patents to immunize its conduct from anti-trust

15   scrutiny." *Id.* at 810-11.[5]   Not surprisingly, the law is clear that an express license likewise

16   "signifies a patentee's waiver of the statutory right to exclude others." *Id.* at 810.   *See*

17   *Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d 1343, 1350 (Fed. Cir. 2003) ("[I]t is well settled that all

18   or part of a patentee's right to exclude others from making, using, or selling a patented invention

19   may be waived by granting a license, which may be express or implied.").   This is true because a

20   license is more than simply an agreement not to sue for infringement as Abbott contends.   Motion

21   at 13.   Rather, a license gives the licensee the right to sell products in the market and persons

22   downstream from the licensee the right to use those products.   *Jacobs v. Nintendo of America,*

23   *Inc.*, 370 F.3d 1097, 1011 (Fed. Cir. 2004) (affirming summary judgment in favor of defendant in

24   patent infringement action because license granted to defendant's supplier precluded a finding of

25   infringement when defendant used the product for the authorized purpose).[6]   Thus, by virtue of the

26         [5] The Court found that there was a factual dispute as to whether Abbott impliedly licensed
27   Norvir and, thus, that summary judgment was inappropriate. *Id.* at 811. In the case of GSK, there
     is no question whether Abbott licensed the use of Norvir as a booster.

28         [6] In *Jacobs,* a patent holder sued defendant's supplier for patent infringement and settled.
     The settlement agreement gave the supplier the rights, among others, to make, use and sell

1  license to GSK, Abbott relinquished whatever right it may have had to keep GSK from competing

2  with Abbott in the boosted protease inhibitor market.  The right to exclude competitors, if there

3  ever was one, is gone, as a matter of contract law.

4      Far from revealing that Abbott has a valid affirmative defense to GSK's antitrust claims,

5  GSK's complaint and Abbott's admissions in its motion to dismiss reveal that Abbott cannot

6  legitimately assert a patent defense to GSK's antitrust claims.  This is yet one more reason why

7  Abbott's motion to dismiss GSK's Sherman Act claim should be denied.[7]

8  **III.    GSK'S COMPLAINT SUFFICIENTLY PLEADS A CLAIM FOR BREACH OF**

9  **        THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.**

10     A.    GSK Pleads What the Law Requires.

11     GSK's complaint alleges a claim for breach of the implied covenant of good faith and fair

12  dealing.  Abbott responds by arguing that the license agreement is nothing more than a promise

13  that it would not sue GSK for infringement.  Motion at 13.  Abbott is wrong.  *See Jacobs,* 370

14  
15  infringing products.  The patent holder then commenced an infringement action against the
   defendant, and the District Court granted summary judgment to the defendant.  The Federal
16  Circuit affirmed, and its reasoning is particularly telling here:

17     We agree with the district court that the clause granting [the supplier] the right to sell its
       accelerometers for use in tilt-sensitive control boxes barred Jacobs from interfering with
       that right by prohibiting [the supplier's] customers from using accelerometers for that
18     authorized purpose by making, using and selling control boxes incorporating [the
       supplier's] devices.  That interpretation is in accordance with the basic contract law
19     principle that a party may not assign a right, receive consideration for it, and then take
       steps that would render the right commercially worthless.

20  370 F.3d at 1101.

21     [7] Similarly, this Court should reject Abbott's assertion that GSK's claim under North
   Carolina anti-monopolization law (§ 75-2.1 of the UTPA) should be dismissed.  Abbott's sole
22  rationale for seeking dismissal of that claim is that GSK has not sufficiently alleged a federal
   antitrust violation.  Motion at 20:11-21.  Since that rationale fails, its motion to dismiss this claim
23  should also be denied.  Moreover, GSK's North Carolina anti-monopolization claim should not be
   dismissed regardless of the Court's ruling on the Sherman Act claim.  The only North Carolina
24  state court to interpret the anti-monopolization statute did not rely on federal law, but instead
   looked to North Carolina's constitutional provision against monopolization – a provision not
25  found in the United States Constitution.  *See Carolina Water Service, Inc. of North Carolina v.*
   *The Town of Pine Knoll Shores,* 145 N.C. App. 686, 690 (2001) (citing N.C. Constitution art. I, §
26  34 ("Perpetuities and monopolies are contrary to the genius of a free state and shall not be
   allowed") in holding that private water company illegally monopolized water rights).  Thus,
27  Abbott's citation to *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.,* 199 F. Supp. 2d 362
   (M.D.N.C. 2001) – a federal court decision that perfunctorily dismissed a Section 75-2.1 claim –
28  is unavailing.  That case did not acknowledge *Carolina Water Service* and, instead, focused its
   analysis on Section 75-1.1 claims concerning unfair trade practices.

1821883

1    F.3d at 1101.  Under basic tenets of contract law, Abbott is bound by an implied covenant that

2    includes:

> any promises which a reasonable person in the position of the promisee would be
>
> justified in understanding were included.  This embraces a pledge that neither party
>
> shall do anything which will have the effect of destroying or injuring the right of
>
> the other party to receive the fruits of the contract.

7    *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. Ct. App. 1995) (citations and internal

8    quotations omitted).[8]  *See Chase Manhattan Bank, N.A. v. Keystone Distrib., Inc.*, 873 F. Supp.

9    808, 815-16 (S.D.N.Y. 1994) ("'Under New York law, every contract contains an implied

10   covenant of good faith and fair dealing,' [citations omitted], which requires that no party to that

11   contract can do anything which will destroy or injure the right of another party to receive the

12   benefits of the contract."); *Jacobs*, 370 F.3d at 1101 (under basic contract law principles, "a party

13   may not assign a right, receive consideration for it, and then take steps that would render the right

14   commercially worthless").

15        In *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496 (N.Y. 2002), which

16   affirmed the denial of a motion to dismiss a breach of implied covenant claim, the New York

17   Court of Appeals explained what was needed at the pleading stage.  "By spelling out the basis for

18   their claim that the [defendant] failed to exercise good faith and deal fairly in fulfilling the terms

19   and promises contemplated by the offering plan, plaintiffs pleaded a valid cause of action for

20   breach of contract."  *Id.* at 501.  "[W]hether particular conduct violates or is consistent with the

21   duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is

22   ordinarily a question of fact to be determined by the jury or other finder of fact."  23 Williston on

23   Contracts § 63.22 (4th ed. 2007).  Given the highly contextual and factual nature of the inquiry,

24   GSK's breach of the implied covenant of good faith and fair dealing claim should not be

25   dismissed at this stage.

---

28   [8] The parties rely upon New York law because they agreed that law would govern their
contract.  Norris Decl., Ex. A, at 17.

GSK'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
CASE NO. C07-5702 (CW)

1821883

1    The complaint alleges that GSK and Abbott executed a contract, that as with all contracts it

2    included an implied covenant of good faith and fair dealing, and that Abbott breached that

3    covenant.  Specifically, the Complaint alleges that GSK entered into a licensing agreement with

4    Abbott concerning the co-administration of GSK PIs with Abbott's product, Norvir:

5        "In 2001, Abbott approached GSK to demand that it secure a license to allow GSK to

6    promote its existing PIs, as well as PIs it had under development, with Norvir.  GSK acquiesced to

7    this demand, procuring a license from Abbott in December 2002."  Complaint ¶ 20.

8        "Under the agreement, Abbott gave GSK the right to promote the use and administration of

9    its PIs with Norvir.  Abbott knew that GSK's plan was to use the Norvir license in order to

10   promote GSK's PIs in boosted form."  *Id.* at ¶ 21.

11   The Complaint further alleges that Abbott had a duty of good faith under that contract to

12   ensure Norvir remained reasonably available:

13   "Abbott is the sole manufacturer of Norvir; thus, despite the license, GSK must rely on

14   Abbott to make and sell it.  Upon entering into the agreement, Abbott was bound to act in good

15   faith to ensure that Norvir remained on the market for co-administration with GSK PIs, as it had

16   done in its previous course of dealings.  Without the continued reasonable availability of Norvir,

17   the agreement would be illusory – GSK would have paid Abbott for nothing."  *Id.* at ¶ 23.

18   "The terms of the agreement, as negotiated, were based on GSK's reasonable expectation

19   that Norvir would continue to be commercially available for use as a PI boosting agent and that

20   future increases in the price of Norvir would be consistent with past increases."  *Id.* at ¶64.

21   The Complaint finally alleges that Abbott acted in bad faith and breached the contract by

22   carrying out its scheme and increasing the price of Norvir by 400 percent:

23   "Abbott's decision to raise the price of Norvir by 400 percent was unprecedented and taken

24   in bad faith.  The 400 percent price hike immediately after GSK's release of Lexiva dashed GSK's

25   reasonable expectation that, by virtue of the license for which it had paid, it would be able to

26   promote the co-prescription and co-administration of its PI products with Norvir at prices

27   competitive with those of Kaletra and other PIs. . . .  As Abbott's internal emails and documents

28

- 13 -

1821883

1    illustrate, Abbott's bad faith conduct was done knowingly and intentionally to interfere with sales

2    of Lexiva and other boosted PIs." *Id.* at ¶ 36.

3        "Abbott's 400 percent price increase for Norvir severely injured GSK's rights, dashed its

4    expectations under the license and thwarted GSK's ability to benefit from the contracted rights.

5    The price increase was illegitimate, arbitrary, capricious and done in bad faith. The price increase

6    devastated the value of the license agreement to GSK." *Id.* at ¶ 64.

7        The Complaint therefore properly pleads a claim for breach of the implied covenant of

8    good faith and fair dealing.

9        B.    Abbott's Various Arguments for Dismissal Misstate the Law.

10       Abbott makes four arguments in an effort to avoid this clear conclusion. Three of those

11   arguments misstate settled law, and the fourth grafts onto the law a limitation that Abbott has

12   invented from whole cloth.

13       First, Abbott asserts that New York law "does not recognize a separate cause of action for

14   violation of the implied covenant of good faith and fair dealing." Motion at 14. New York law

15   directly contradicts Abbott's argument. As stated most recently, "the claim for breach of an

16   implied covenant of good faith and fair dealing does not depend on a breach of the contract;

17   therefore, a plaintiff may bring such a claim, whether or not there is a viable breach of contract

18   claim." *Gross v. Empire Healthchoice Assurance, Inc.*, No. 602848-2005, 2007 WL 2066390

19   (N.Y. Sup. Ct. July 18, 2007) (unpublished in official reporter) (denying motion to dismiss breach

20   of implied covenant claim where no breach of contract claim alleged); *see Riddell Sports, Inc. v.

21   Brooks*, 1997 U.S. Dist. LEXIS 3621, at *8 (S.D.N.Y. Mar. 27, 1997) (denying summary

22   judgment against a breach of implied covenant claim; "there is no bar to Riddell bringing a single

23   claim for breach of contract based on an alleged violation of the implied covenant of good faith

24   and fair dealing."); *DiFolco v. MSNBC Cable LLC*, 2007 U.S. Dist. LEXIS 23440, at *12-13

25   (S.D.N.Y. Mar. 29, 2007) (refusing to dismiss a breach of implied covenant claim where breach of

26   contract claim dismissed); *Chase Manhattan Bank, N.A.,* 873 F. Supp. at 815 (denying motion for

27   summary judgment; "[a] party may be in breach of its implied duty of good faith and fair dealing

28   even if it is not in breach of its express contractual obligations.").

1821883

1    The cases Abbott cites do not address the situation presented here – where a breach of

2  implied covenant of good faith and fair dealing is plead without a breach of contract claim.  The

3  cases Abbott cites address two different issues, neither of which is relevant here:   (1) the

4  redundancy, by virtue of the particular allegations, of some contract and implied contract claims

5  brought together based on identical facts,[9] and (2) the failure of a breach of implied covenant

6  claim where a breach of contract claim was pled and dismissed on the basis that no contract had

7  been alleged.[10]  Here, GSK does not allege a breach of contract separate from its breach of implied

8  contract claim, so there is no question of redundancy.  And, of course, GSK alleges the existence

9  of a contract – the license agreement.  Indeed, after making this argument, Abbott quickly backs

10  away from it, conceding that an implied covenant claim can stand alone when a contracting party

11  acts "for its own gain as part of a purposeful scheme designed to deprive plaintiffs of the benefits

12  of [the bargain.]"  Motion at 14 (internal quotation omitted).  This is exactly what GSK alleges.

13

---

14    [9]   The first type of case simply eliminates the redundancy of complaints that allege breach
of implied covenants and breach of contract based on identical facts.  *See* Motion at 14, citing:
15  *Jacobs Private Equity, LLC v. 450 Park LLC*, 803 N.Y.S.2d 14 (N.Y. Sup. Ct. 2005) (duplicative
of dismissed breach of contract claim); *Triton Partners LLC v. Prudential Sec. Inc.*, 752 N.Y.S.2d
16  870, 870-71 (N.Y. Sup. Ct. 2003) (same); *Cerberus Int'l Ltd. v. BancTec, Inc.*, 791 N.Y.S.2d 28
(N.Y. Sup. Ct. 2005) (same); *Parker E. 67th Assocs., LP v. Minister, Elders & Deacons of the*
17  *Reform Dutch Protestant Church of the City of New York*, 754 N.Y.S.2d 255 (N.Y. Sup. Ct. 2003)
(same); *Engelhard Corp. v. Research Corp.*, 702 N.Y.S.2d 355 (N.Y. Sup. Ct. 2000) (duplicative
18  of non-dismissed breach of contract claim).  "Most of the decisions that appear to reach a contrary
result rely on the oft-cited rule that a claim for breach of an implied duty of good faith and fair
19  dealing cannot stand alone if it only substitutes for a nonviable breach of contract claim." *Gross v.*
*Empire Healthchoice Assurance, Inc.*, 2007 WL 2066390, at *4 (distinguishing, *inter alia, Triton,*
20  *Jacobs, Cerberus, Cohen*).  Not all claims for breach of the implied covenant must be dismissed if
plead along with a contract claim; plaintiffs may plead different facts or may plead in the
21  alternative.  *E.g., Snitovsky v. Forest Hills Orthopedic Group, PC*, 844 N.Y.S.2d 91 (N.Y. App.
Div. 2007) (denying motion to dismiss either breach of implied covenant and contract claims).

22    [10]  The second type of case stands for the proposition that there must be a contract – though
23  not necessarily a breach of an express provision of the contract – in order for there to be a breach
of its implied covenants.  In these cases, the defendant moves to dismiss on the grounds that the
24  complaint alleged a breach of the implied covenant "but did not allege the existence of a contract
or a breach of such contract." *Designers N. Carpet, Inc. v. Mohawk Indus., Inc.*, 153 F. Supp. 2d
25  193, 197 (E.D.N.Y. 2001).  The breach of implied covenant claim is not dismissed so long as a
contract is alleged.  *Id.* (although no allegation of whether the agreements were written or oral,
26  when they were made, or any terms, finding that the complaint provided a "short and plain
statement" of the agreement and denying a motion to dismiss); *see Cohen v. Nassau Educ. Fed.*
27  *Credit Union*, 819 N.Y.S.2d 209 (N.Y. Sup. Ct. 2006) (dismissing both claims where court found
failure of consideration); *Mandarin Trading Ltd. v. Wildenstein*, 2007 WL 310235 (N.Y. Sup. Ct.
28  Sept. 4, 2007) (dismissing both claims where "Plaintiff has not stated or described the terms of
any contract, nor the consideration").

1821883

1    Second, Abbott contends that there can be no breach of implied covenant action unless the

2    plaintiff alleges a "specific contractual provision giving one party discretion on a particular issue."

3    Motion at 15. The cases Abbott quotes do not speak to that issue one way or another; they simply

4    find a breach of the implied covenant where such a provision granting discretion exists and is

5    abused.[11] In fact, Abbott cites no case imposing such a requirement and offers no policy reason

6    why this Court should grant immunity for conduct designed to deprive Abbott's counterparty of

7    the benefits of its bargain. A claim for breach of the implied covenant of good faith and fair

8    dealing "do[es] not create new duties that negate [defendant's] explicit rights under a contract, but

9    rather, seek[s] imposition of an entirely proper duty to eschew this type of bad faith targeted

10    malevolence in the guise of business dealings." *Richbell Info. Servs., Inc. v. Jupiter Partners,*

11    *L.P.*, 765 N.Y.S.2d 575, 587 (N.Y. Sup. Ct. 2003). GSK's allegations are thus consistent with the

12    policy behind the implied covenant claim.

13    Third, Abbott argues that GSK waived any rights under an implied covenant because the

14    license agreement contains a disclaimer of warranties and an integration clause. Motion at 15-16.

15    Under Abbott's interpretation of the law, implied covenants of good faith and fair dealing would

16    routinely be eviscerated by boilerplate warranty and integration language. This is not the law.

17    "Nor does the 'Entire Understanding' clause of the contract bear upon the issue. . . . It is of no

18    relevance if the promise, albeit imperfectly expressed, is implicit in the contract as written."

19    *Havel v. Kelsey-Hayes Co.,* 83 A.D.2d 380, 384 (N.Y. App. Div. 1981) (affirming denial of

20    motion to dismiss claim for breach of implied covenant); *see also Uniform Commercial Code § 1-*

21    *102(3)* ("obligations of good faith, diligence, reasonableness and care prescribed by this Act may

22    not be disclaimed by agreement*").*

23    Finally, the implied covenant pled by GSK is not an illegal price-fixing agreement as

24    Abbott contends. See Motion at 16. GSK alleges that Abbott had an obligation to act in good

25    faith, not price at a particular level. But, since GSK and Abbott are not competitors in the market

26    _____
    [11]    *See* Motion at 14-15 (citing *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 765
27    N.Y.S.2d 575, 587 (N.Y. Sup. Ct. 2003) (denying motion for summary judgment on breach of
    implied covenant claim where bad faith alleged); Motion at 15, citing *Dalton v. Educ. Testing*
28    *Serv.*, 639 N.Y.S.2d 977, 979-80 (N.Y. Ct. App. 1995) (affirming judgment on breach of implied
    covenant claim).

1821883

1  for drugs that boost the effectiveness of PIs, even an agreement that set an upper limit on how

2  much Abbott could charge for Norvir would not have been *per se* unlawful. *See State Oil Co. v.*

3  *Khan*, 522 U.S. 3, 19 (1997) (maximum vertical price restraints not per se illegal). Abbott's

4  argument also ignores even more recent Supreme Court authority. In *Texaco Inc. v. Dagher*, 547

5  U.S. 1 (2006), the Supreme Court approved an agreement between Texaco and Shell to price a

6  new product jointly. "Texaco and Shell Oil did not compete with one another in the relevant

7  market." *Id.* at 5-6. "As such, although [the joint venture's] pricing policy may be price fixing in

8  a literal sense, but it is not price fixing in the antitrust sense." *Id.* at 6. *See also Polk Bros., Inc. v.*

9  *Forest City Enters., Inc.,* 776 F.2d 185 (7th Cir. 1985) (agreement not to compete in the context of

10  a joint venture lawful); *Evans v. S.S. Kresge Co.*, 544 F.2d 1184, 1192 (3d Cir. 1976) (affirming

11  dismissal of a case challenging an asserted price-fixing agreement on the grounds that the parties

12  were not in competition; plaintiff claimed that the price restrictions were illegal per se under § 1.

13  The court held that "the necessary element of competition is lacking.").

14  **IV.    THE COMPLAINT SUFFICIENTLY PLEADS THAT ABBOTT VIOLATED**

15        **SECTION 75-1.1 OF THE NORTH CAROLINA UNFAIR TRADE PRACTICES**

16        **ACT.**

17        The complaint sufficiently pleads a claim under Section 75-1.1 of the North Carolina

18  Unfair Trade Practices Act.    Section 75-1.1 declares unlawful: "[u]nfair methods of

19  competition . . ., and unfair or deceptive acts or practices. . . ." This "broad-sweeping language,"

20  *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 48 (4th Cir. 1983), was copied from the Federal

21  Trade Commission Act and "expanded North Carolina antitrust law," *DKH Corp. v. Rankin-*

22  *Patterson Oil Co., Inc.*, 131 N.C. App. 126, 129 (1998); *see Marshall v. Miller*, 302 N.C. 539, 543

23  (1981). Section 75-1.1 "creates a cause of action broader than traditional common law actions"

24  and was intended to overcome "burdensome elements of proof" included in common law tort and

25  contract actions.    *Marshall*, 302 N.C. at 544 & 547.    While Section 75-1.1 sanctions

26  anticompetitive conduct, "[i]t also sanctions, as part of its broad remedial purpose of promoting

27  ethical business dealings, commercial unfairness and deception beyond traditional antitrust

28  concepts." *L.C. Williams Oil Co., Inc. v. Exxon Corp.*, 625 F. Supp. 477, 481 (M.D.N.C. 1985). It

1   provides "a civil means to maintain ethical standards of dealings between persons engaged in

2   business and the consuming public . . . and it applies to dealings between buyers and sellers at all

3   levels of commerce." *Sara Lee Corp. v. Carter*, 351 N.C. 27, 32 (1999) (internal quotation and

4   alteration omitted).

5        To state a claim, a complaint must allege "(1) an unfair or deceptive act or practice, or

6   unfair method of competition, (2) in or affecting commerce, and (3) which proximately caused

7   actual injury to the plaintiff or his business." *Miller v. Nationwide Mut. Ins. Co.*, 435 S.E.2d 537,

8   542 (N.C. Ct. App. 1993). Thus, a complaint need only sufficiently allege (1) unfair acts *or* (2)

9   deceptive acts *or* (3) anticompetitive acts. *See S. Atl. Ltd. P'ship of Tenn. v. Riese*, 284 F.3d 518,

10   535 (2002); *ITCO Corp.*, 722 F.2d at 48 ("The presence of a single potentially meritorious theory

11   of recovery is enough" to state a claim under Section 75-1.1). "A practice is unfair when it

12   offends established public policy as well as when the practice is immoral, unethical, oppressive,

13   unscrupulous, or substantially injurious to consumers." *Marshall*, 302 N.C. at 548; *see also S. Atl.*

14   *Ltd. P'ship of Tenn.*, 284 F.3d at 535-36 ("[W]here a party engages in conduct manifesting an

15   inequitable assertion of power or position, such conduct constitutes an unfair act or practice.").

16   Under section 75.1-1, "[a] practice is deceptive if it has the capacity or tendency to deceive; proof

17   of actual deception is unnecessary." *Marshall*, 302 N.C. at 548. Given that these claims are

18   considered on a case-by-case basis, "[w]hether a trade practice is unfair or deceptive usually

19   depends upon the facts of each case . . . ." *Id.*

20        *South Atlantic Limited Partnership of Tennessee v. Riese*, 284 F.3d 518 (4th Cir. 2002), is

21   illustrative of the broad reach of Section 75-1.1. There, the Stroud Group and the Riese Group

22   formed the SALT partnership to develop real estate. *Id.* at 523. The partnership hired a

23   construction company owned by the Riese Group. *Id.* Eleven days before selling the project for

24   several tens of millions of dollars, the Stroud Group terminated the partnership and, because its

25   sole obligation under the contract was to pay the Riese Group a proportion of the book value of

26   the partnership, paid none of the money it received to the Riese Group. *Id.* at 524-25, 527. After

27   the Stroud Group sued it, the Reise Group filed a counterclaim alleging that the Stroud Group had

28   violated Section 75-1.1 of the UTPA. *S. Atl. Ltd. P'ship of Tenn.*, 284 F.3d at 527-28. The district

1   court entered judgment in favor of the Reise Group on its UTPA claim, and the Fourth Circuit
2   affirmed. *Id.* at 529, 534-40.  Agreeing with the district court, it concluded that the Stroud Group
3   violated the UTPA by expelling the Riese Group eleven days before selling the project – even
4   though the expulsion was in accordance with the contract terms. *Id.* at 538-40.  The Riese Group
5   had forgone compensation for its construction work in lieu of receiving a share of the project. *Id.*
6   The Fourth Circuit reasoned that, by terminating the Riese Group's partnership interest shortly
7   before the sale, "the Stroud Group exploited its rights under the Partnership Agreement to gain the
8   full value of the Riese Group's labor without compensating it at all." *Id.* at 540.

9        Dismissal of a UTPA claim at the pleading stage is rare, and here there is no doubt that the
10  complaint sufficiently alleges a claim based on Abbott's unfair trade practices, its deceptive acts,
11  *and* its anticompetitive conduct. GSK adequately states a cause of action under all three prongs of
12  § 75-1.1.

13       <u>Unfair Acts</u>:  GSK's complaint meets the test set forth above for the unfairness prong.  In
14  paragraph 69, GSK alleges: "Abbott's actions as alleged above: . . . constitute inequitable
15  assertions of Abbott's power or position [and] violate the requirement that parties at all levels of
16  commerce act in good faith and engage in fair dealings because Abbott has sought to destroy or
17  injure the right of GSK to receive the benefits of the parties' arrangement."  In paragraph 70, it
18  alleges: "Abbott, among other things, manipulated and exploited its position of power over Norvir
19  to lead its competitors to undertake a certain course of conduct and to expect incremental, not
20  extraordinary, price increases and then, after receiving substantial sums of money from those
21  competitors for a license, increased the price of Norvir by 400 percent so as to restrict the
22  commercial availability of Norvir and Abbott PI treatments boosted with Norvir."  The earlier
23  referenced allegations assert that Abbott raised the price of Norvir by 400 percent with the express
24  purpose to "[p]osition Kaletra as a more economical option for boosted ARV therapy," and
25  "increase[] market share of Kaletra." *Id.* at ¶ 28.  Thus, the complaint alleges that just as the
26  Stroud Group in *South Atlantic Limited Partnership* "exploited its rights" under the contract "to
27  gain the full value" of the Riese Group's consideration while denying the Riese Group its share of
28  the contract, so did Abbott exploit its rights under the Norvir license by gaining millions of dollars

1  in compensation and an interest in Lexiva sales, unboosted as well as boosted, while inequitably

2  using its power over Norvir to deprive GSK of the benefits it should have received under the

3  contract

4         <u>Deceptive Acts</u>:  GSK's complaint alleges a host of deceptive acts.  *See* Complaint ¶¶  26,

5  27, 32, and 33 (alleging that Abbott's executives considered several different ways to mislead the

6  public about the availability of Norvir and then, following the price increase, put out false price

7  schedules and falsely denied having considered the effect of the price increase on Kaletra's sales).

8  In paragraph 71, GSK summarizes Abbott's deceptive scheme: "[I]n furtherance of, and as part of

9  its plan to bolster Kaletra's sales and market share by quintupling the price of Norvir, Abbott

10  deliberately deceived its competitors and the public as to the true and illegitimate nature of the

11  price increase. . . . Abbott further misrepresented the pricing of Norvir to the public, compounding

12  the injury to commerce and to its competitors' position in the market, including GSK's

13  position."[12]

14         <u>Anticompetitive Conduct</u>:   GSK's complaint alleges anticompetitive acts.   Count One

15  specifically alleges a violation by Abbott of the Sherman Act, and Count Four alleges that Abbott

16  violated North Carolina's anti-monopolization statute.  These allegations are sufficient to establish

17  a violation of Section 75-1.1 of the UTPA.  *ITCO Corp.*, 722 F.2d at 48 ("We thus hold that proof

18  of conduct violative of the Sherman Act is proof sufficient to establish a violation of the North

19  Carolina Unfair Trade Practices Act.")

20         Try as it might, Abbott cannot mount a successful attack on any of these bases for GSK's

21  claim under Section 75-1.1 of the UTPA, much less on all of them.  Abbott barely acknowledges

22  the existence of the unfairness prong, arguing that GSK's allegations of bad faith are superfluous

23  to a claim under that prong.  Motion at 19:7-15.  Abbott is wrong,[13] but the entire debate is

24

25  [12] Discovery from the *Doe/SEIU* matter shows additional deceptive conduct.  It appears
that Abbott did not, as GSK had assumed, negotiate and sign the license in good faith and only

26  later decide to undercut it.  Rather, it was planning how to vitiate the contract even as it was
negotiating.  Thus, Abbott was crafting a deal where Abbott got non-refundable upfront payments

27  and running royalties based on all Lexiva sales from GSK while at the same time considering
scenarios to remove Norvir from the market or increase its price to unprecedented levels.

28  [13] Abbott cites *Marshall* for the proposition that intent is irrelevant.  Motion at 19:11-13.
*Marshall* actually holds that "good faith is not a defense to an alleged violation of [Section 75-

1    irrelevant since Abbott never even asserts that GSK's allegations are insufficient to base a claim

2    on the unfairness prong. In any case, contrary to the implication of Abbott's motion, "the effect of

3    the [Norvir price increase] on the marketplace," is sufficiently alleged. Motion at 19:13-14. *See*

4    Complaint at ¶¶ 35, 37, 43-48.

5        Abbott attacks GSK's use of the deceptive acts prong of Section 75-1.1 by arguing that

6    GSK must allege detrimental reliance to state a claim. Again, Abbott is mistaken. The North

7    Carolina Supreme Court has made clear, in the *Marshall* case cited by Abbott, that plaintiffs "need

8    only show that an act or practice possessed the tendency or capacity to mislead, or created the

9    likelihood of deception." *Marshall*, 302 N.C. at 548. "[P]roof of actual deception is not

10   required." *Id.*; *Lincoln v. Bueche*, 166 N.C. App. 150, 158 (2004) ("[P]roof of actual deception is

11   not necessary."). Based on this language, North Carolina appellate courts have rejected the

12   contention that detrimental reliance is even an element to a UTPA claim; a plaintiff only need

13   show causation:

14       [Defendant] contends plaintiff cannot show injury in the absence of reliance on the

15       misrepresentation. We disagree. . . . [O]ur Courts have clearly held that *actual*

16       deception is not an element necessary under [Section] 75-1.1 to support an unfair or

17       deceptive practices claim. Accordingly, actual reliance is not a factor.

18   *Cullen v. Valley Forge Life Insurance Co.,* 161 N.C. App. 570, 580 (2004) (granting summary

19   judgment in favor of plaintiff) (citations omitted).[14]

20       Finally, Abbott contends that GSK has failed to allege a claim under the anticompetitive

21   acts prong of Section 75-1.1 because GSK's antitrust claims are defective. North Carolina law is

22   clear, however, that a violation of the Sherman Act is sufficient, although unnecessary, to give rise

23   to a claim for violation of North Carolina's Unfair Trade Practices Act. *ITCO Corp.*, 722 F.2d at

24   _____

25   1.1]." *Marshall*, 302 N.C. at 548. In other words, bad faith conduct is sufficient, but unnecessary,
     to show a violation of Section 75-1.1.

26       [14] *Business Cabling, Inc. v. Yokeley*, 643 S.E.2d 63 (N.C. App. 2007), cited by Abbott
     (Motion at 19-20) is distinguishable on this point. Although the court used the term "detrimental

27   reliance," *Business Cabling* actually turned on the absence of evidence that the plaintiff "suffered
     actual injury as a result of the defendant's deceptive statement" – that is plaintiff could not show

28   proximate cause. *Id.* at 69. Here, however, the Complaint alleges that Abbott's deception caused
     injury to GSK's position in the market. Complaint ¶ 71.

1    48 (4th Cir. 1983) ("We thus hold that proof of conduct violative of the Sherman Act is proof

2    sufficient to establish a violation of the North Carolina Unfair Trade Practices Act."). So, unless

3    this Court dismisses GSK's Sherman Act claim, it cannot dismiss GSK's claim under Section 75-

4    1.1.

5         Abbott devotes considerable effort to speculating whether a North Carolina court would

6    follow the Ninth Circuit's decision in *Image Technical* or the federal circuit decision in

7    *Independent Services.*  Motion at 17-18. This discussion is irrelevant to GSK's Section 75-1.1

8    claim.  As the court made clear in *ITCO Corp.*, proof that conduct violates the Sherman Act

9    suffices to prevail on a claim under Section 75-1.1. This Court is not required, as Abbott suggests,

10   to apply two different views of the Sherman Act.  Ninth Circuit law governs this case, and if GSK

11   proves that Abbott's conduct violates the Sherman Act, as interpreted by the Ninth Circuit, GSK

12   will have stated a claim under Section 75-1.1 of the UTPA. Abbott can cite no case for a contrary

13   proposition.[15]

14   **V.    CONCLUSION**

15        For the foregoing reasons, the complaint sufficiently alleges GSK's claims that Abbott has

16   violated Section 2 of the Sherman Act, breached the implied covenant of good faith and fair

17   dealing contained in the license between Abbott and GSK, and violated Sections 75-1.1 and 75-2.1

18   of North Carolina's Unfair Trade Practices Act.  Abbott's motion to dismiss should be denied.

19

20   Dated: February 14, 2008                    IRELL & MANELLA LLP

21

22                                              By: _____

23                                                  Alexander F. Wiles
                                                    Attorneys for GlaxoSmithKline

24

---

25   [15] This Court need not address at this point the issue of whether GSK could prevail on a
26   claim under the anticompetitive acts prong of Section 75-1.1 if GSK's Sherman Act claim were to
     fail.  Clearly, a showing of anticompetitive acts that violate North Carolina's anti-monopolization
27   statute would suffice to prevail on a claim under Section 75-1.1.  GSK believes that an analysis of
     North Carolina law could well lead this Court to conclude that North Carolina would take a less
28   restrictive view than the Ninth Circuit in some areas and thus reach a different result on the facts
     presented by this case.

- 22 -
1821883

1     Pursuant to General Order No. 45, Section X, I attest under penalty of perjury that

2  concurrence in the filing of this document has been obtained from Alexander F. Wiles.

3  Dated: February 14, 2008

4

5

6                                    By:   /s/ Trevor V. Stockinger
                                          Trevor V. Stockinger
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GSK'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
CASE NO. C07-5702 (CW)

1821883