# Exhibit A

PAGES 1 - 58

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE      CERTIFIED COPY

| | | |
|---|---|---|
| IN RE ABBOTT LABORATORIES | ) | |
| NORVIR ANTITRUST LITITGATION) | | C-04-1511 CW |
| LITIGATION, | ) | |
| | ) | TUESDAY, DECEMBER 11, 2007 |
| SAFEWAY, | ) | |
| PLAINTIFF, | ) | OAKLAND, CALIFORNIA |
| | ) | |
| VS. | ) | |
| | ) | |
| ABBOTT LABORATORIES, | ) | C-07-5470 CW |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |
| SMITHKLINE BEECHMAN, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | C-07-5702 CW |
| | ) | |
| ABBOTT LABORATORIES, | ) | |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |
| MEIJER, INCORPORATED, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | C-07-5985 CW |
| | ) | |
| ABBOTT LABORATORIES, | ) | |
| | ) | |
| DEFENDANT. | ) | |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

(CAPTION AND APPEARANCES CONTINUED ON NEXT PAGE)

REPORTED BY:          DIANE E. SKILLMAN, CSR #4909, RPR, FCRR
                      OFFICIAL COURT REPORTER

```
ROCHESTER DRUG,                )
CO-OPERATIVE,                  )
                              )
            PLAINTIFF,         )
  VS.                          )        C-07-6010 CW
                              )
ABBOTT LABORATORIES,           )
                              )
            DEFENDANT.         )
_____)
                              )
RITE-AID CORPORATION,          )
                              )
            PLAINTIFF,         )
                              )
  VS.                          )        C-07-6120 CW
                              )
ABBOTT LABORATORIES,           )
                              )
            DEFENDANT.         )
_____)
                              )
LOUISIANNA WHOLESALE           )
DRUG COMPANY,                  )
                              )
            PLAINTIFF,         )
                              )
  VS.                          )        C-07-6118 CW
                              )
ABBOTT LABORATORIES,           )
                              )
            DEFENDANT.         )
_____)
```

**APPEARANCES:**

```
FOR DOE & SEIU          BERMAN, DEVALERIO, PEASE,
PLAINTIFFS:             TABACCO, BURT & PUCILLO
                        425 CALIFORNIA STREET, STE. 2025
                        SAN FRANCISCO, CALIFORNIA 94104
                   BY:  JOSEPH J. TABACCO, ESQUIRE
                        JAMES C. MAGID, ESQUIRE
```

1    DIRECT PURCHASERS.

2            **MR. PERWIN:**  THAT'S RIGHT, YOUR HONOR, THE SAFEWAY

3    CASE AND THE RITE-AID CASE.

4            **THE COURT:**  OKAY.  AND DO YOU ALL WANT TO BE IN THE

5    CLASS WITH --

6            **MR. PERWIN:**  NO.  WE INTEND TO OPT OUT OF THE CLASS

7    IF ONE IS CERTIFIED.

8            **THE COURT:**  YOU NEED TO SAY WHO YOU ARE.

9            **MR. PERWIN:**  SCOTT PERWIN FOR THE SAFEWAY

10   PLAINTIFFS.

11           **MS. REBUCK:**  AND MONICA REBUCK ON BEHALF OF THE

12   RITE-AID PLAINTIFFS.  WE ARE IN THE SAME POSITION.  WE ARE

13   OPT-OUTS.

14           TODAY MR. PERWIN WILL BE OFFERING MOST OF THE

15   DISCUSSION ON BEHALF OF OUR GROUPS.

16           **THE COURT:**  OKAY.  IF YOU WOULD STAND OVER THERE BY

17   THEM SO I CAN REMEMBER WHO YOU ARE.

18           WHAT ARE YOU?

19           **MR. WILES:**  GLAXOSMITHKLINE IS A COMPETITOR AND A

20   LICENSEE OF THE PATENTS OF ABBOTT.

21           **THE COURT:**  WHERE DO YOU FIT IN IN THE FIGHT BETWEEN

22   DIRECTS AND INDIRECTS?

23           **MR. HURST:**  THEY'RE IN A DIFFERENT CATEGORY, YOUR

24   HONOR.

25           **MR. WILES:**  WE'RE IN A COMPLETELY DIFFERENT

```
 1    CATEGORY.
 2              THE COURT:  YOU ARE NOT TRYING TO BE A CLASS OF
 3    ANYBODY?
 4              MR. WILES:  CORRECT.  I COULD GIVE IT SOME THOUGHT,
 5    BUT --
 6              THE COURT:  CAN'T FIND ANYONE TO BE IN A CLASS WITH?
 7              IS THAT EVERYBODY?
 8              MS. SALZMAN:  YES, YOUR HONOR.
 9              THE COURT:  WHAT ALL DO YOU KNOW ABOUT WHETHER
10    ANYBODY ELSE IS GOING TO BE COMING FORWARD?
11              WE ALREADY HAVE -- DID WE GET THE TWO NEWEST ONES TO
12    COME IN?
13              THE CLERK:  YES.
14              THE COURT:  SO EVERYONE WE HAVE SO FAR IS HERE.
15              WHAT DO YOU ALL KNOW THROUGH THE GRAPEVINE OR ANY
16    OTHER SOURCE AS TO HOW MANY MORE OF THESE CASES ARE COMING DOWN
17    THE PIKE IF ANY?
18              MR. PERWIN:  WE DON'T EXPECT ANY MORE, YOUR HONOR.
19              MS. SALZMAN:  I CONCUR WITH THAT.
20              THE COURT:  BUT YOU DON'T KNOW.  ANYBODY COULD COME
21    FORWARD AT ANY MOMENT THAT HASN'T BEEN IN TOUCH WITH YOU.  SO
22    YOU ARE SAYING NO ONE HAS BEEN IN TOUCH WITH YOU AT LEAST.
23              WHAT ABOUT YOU, DO YOU KNOW ABOUT ANYBODY?
24              MR. HURST:  NO, WE DON'T EXPECT ANYBODY BECAUSE THE
25    FOUR-YEAR STATUTE OF LIMITATIONS IN THE SHERMAN ACT WOULD HAVE
```

1    EXPIRED ON DECEMBER 4TH.

2            **THE COURT:**  OH, THAT'S WHY EVERYBODY --

3            **MR. HURST:**  THAT'S WHY EVERYONE IS RUSHING IN.

4            **THE COURT:**  CAME IN AT THAT MOMENT.  I WONDERED.

5            **MR. HURST:**  THAT'S RIGHT.

6            **THE COURT:**  DIDN'T HAVE ANYTHING TO DO WITH THE

7    CASCADE HEALTH CASE.

8            **MR. HURST:**  I DON'T IMAGINE THAT PROMPTED ANYBODY TO

9    FILE A LAWSUIT, YOUR HONOR.

10           **THE COURT:**  THAT CAME BEFORE THE STATUTE STARTED TO

11   RUN.

12           **MR. HURST:**  THAT CAME DOWN IN SEPTEMBER.

13           **THE COURT:**  OKAY.

14           I DON'T KNOW WHAT TO DO WITH YOU ALL.  I DON'T WANT

15   TO TRY ANYTHING TWICE THAT I DON'T HAVE TO, BUT ON THE OTHER

16   HAND I DON'T WANT TO PENALIZE PEOPLE WHO HAVE BEEN STRUGGLING

17   ALONG FOR YEARS AND THEN DELAY THEM WHILE WAITING FOR OTHER

18   PEOPLE.

19           SO I AM OPEN TO SUGGESTIONS AS TO HOW WE COULD MOST

20   EFFICIENTLY DEAL WITH THIS WITHOUT DOING ANY TRIALS TWICE

21   CONSIDERING ISSUES OF COLLATERAL ESTOPPEL, RES JUDICATA,

22   BIFURCATION, TRYING CERTAIN THINGS, BUT NOT OTHERS.  THERE'S AN

23   INHERENT PROBLEM WITH THE DIRECTS VERSUS THE INDIRECTS ANYWAY I

24   SUPPOSE, BUT ONLY AS TO DAMAGES NOT AS TO LIABILITY.

25           SO LET ME START WITH THE DOE PEOPLE.  IF YOU CAN

1   TELL ME WHAT IDEAS YOU MIGHT HAVE TO AVOID ME HAVING TO TRY

2   THIS TWICE.

3           **MR. TABACCO:**  BY WAY OF BACKGROUND, YOUR HONOR, AS

4   YOU KNOW, THIS CASE BEGAN IN '04, AND OUR FIRM HAS BEEN

5   REPRESENTING THE END USERS AND MS. SALZMAN'S FIRM HAS BEEN

6   REPRESENTING THE THIRD PARTY PAYERS.  YOUR HONOR HAS CERTIFIED

7   THE CASE TO PROCEED AS A CLASS ACTION.  IN FACT, WE HAVE A

8   MOTION FOR APPROVAL OF THE NOTICE PLAN ON THE CALENDAR, I

9   BELIEVE, IN A FEW WEEKS.

10          **MS. SALZMAN:**  THAT'S SET FOR JANUARY 10TH, YOUR

11  HONOR.

12          **THE COURT:**  IS THAT DISPUTED?

13          **MR. HURST:**  WE ARE STILL EVALUATING, YOUR HONOR.  I

14  THINK WE'RE SUPPOSED TO RESPOND ON DECEMBER 20TH.

15          **THE COURT:**  OKAY.  I WOULDN'T THINK THAT WOULD BE

16  DISPUTED IN A BIG WAY.  IF IT WAS, I WOULD THINK YOU CAN WORK

17  SOMETHING OUT.  IF YOU COULDN'T, I WOULD PROBABLY DECIDE IT ON

18  THE PAPERS.

19          **MS. SALZMAN:**  YOUR HONOR, WE HAD GIVEN THE

20  DEFENDANTS THE NOTICE PAPERS BUT AT THE TIME THE EXPERT

21  DISCOVERY WAS UNDERWAY AND I THINK THEY WERE UNABLE TO REALLY

22  TAKE A CLOSE LOOK, SO AS YOU CAN SEE IN OUR MOTION PAPERS, IT

23  SAYS THAT THEY JUST RESERVE THE RIGHT TO FURTHER COMMENT.

24          WE HAVEN'T DISCUSSED IT, SO THERE MAY BE NO PROBLEM.

25          **MR. HURST:**  THERE IS A REASONABLE CHANCE WE WON'T

1    BIFURCATE THEIR DAMAGES?

2            **MR. TABACCO:**  YOU KNOW, I THINK IF YOU THINK ABOUT

3    THAT IN TERMS OF -- IT SOUNDS GREAT ON ITS FACE, BUT IT'S -- IT

4    COULD WORK.  BUT WHEN I THINK ABOUT TRYING A CASE WHERE I AM

5    TALKING ABOUT PEOPLE WHO ARE VICTIMS IN THE COMMUNITY OF AN HIV

6    DRUG AND I HAVE MY CO-COUNSEL IS SMITHKLINE AND GLAXO, A BIG

7    PHARMACEUTICAL COMPANY, I AM GOING TO BE PREJUDICED TO SOME

8    DEGREE IN TERMS OF TELLING THE JURY ABOUT WHY IT IS THAT BIG

9    PHARMER DOES CERTAIN THINGS THAT OTHER PEOPLE DON'T DO.  SO

10   RIGHT OFF THE BAT --

11           **THE COURT:**  WE CAN BRING IN A THIRD TABLE FOR THEM.

12           **MR. TABACCO:**  I AM DELIGHTED TO HAVE THEM ON THE

13   SIDE OF GOOD AND RIGHT, BUT I THINK EVERYONE WOULD RECOGNIZE --

14   AND THEN WHEN YOU INTERJECT THE LAYER OF LIABILITY UNDER THE

15   SHERMAN ACT, THERE ARE DIFFERENT ISSUES THAT EFFECT THOSE

16   CLAIMS FOR THE WHOLESALERS, AGAIN THEY ARE BUSINESS PEOPLE

17   DEALING BUSINESS TO BUSINESS, SO MAYBE THIS CAN BE SORTED OUT

18   WITH SOME CAREFUL CASE MANAGEMENT, BUT I THINK IT IS NOT A

19   SIMPLE CASE.  THERE ARE PATENT ISSUES THAT HAVE TO BE RESOLVED

20   AND WILL COME UP.  AND I THINK BY CONGLOMERATING EVERYTHING FOR

21   THE SAKE OF SIMPLICITY, PROBABLY WON'T WORK.

22           **THE COURT:**  WHAT I AM MOSTLY HEARING IS THAT YOU

23   DON'T LIKE THE IDEA FOR STRATEGIC REASONS, MORE SO THAN THE

24   FACT THAT IT ACTUALLY WOULDN'T WORK.  AND I AM THINKING IN

25   TERMS OF JUST THE LIABILITY, AND YOU ARE ENTITLED TO YOUR

```
 1   STRATEGIC REASONS, BUT I AM NOT HEARING ANY REAL PROBLEM WITH
 2   TRYING LIABILITY TOGETHER THAT HAS TO DO WITH EFFICIENCY OR
 3   FAIRNESS.
 4             MR. HURST:  CAN I SPEAK TO THAT, YOUR HONOR?
 5             THE COURT:  LET HER FINISH AND THEN I'LL ASK YOU.
 6             MS. SALZMAN:  ONE OTHER ISSUE I WANTED TO POINT OUT
 7   AND I KNOW IT WAS IN THE PAPERS WE FILED WITH YOUR HONOR, IS
 8   THE REAL ISSUE IS THAT AS PART OF OUR CLASS, WE REPRESENT
 9   INDIVIDUALS WHO ARE SUFFERING FROM HIV AIDS.  AND I KNOW YOU
10   ARE NOT NECESSARILY SAYING THAT YOU WOULDN'T WITH KEEP THE JUNE
11   TRIAL DATE, BUT THAT IS A BIG CONCERN OF OURS THAT THE CASES
12   THAT ARE COMING IN ARE GOING TO AT ALL PUSH THAT DATE.
13             THE COURT:  YOUR CO-COUNSEL SAID THAT.  AND I SAID,
14   TOO, THAT I DIDN'T WANT TO MOVE YOUR TRIAL DATE IF I DIDN'T
15   HAVE TO.
16             MS. SALZMAN:  I JUST WANTED TO MAKE THAT POINT TO
17   MAKE SURE THAT --
18             THE COURT:  WE HAVE MENTIONED THAT SEVERAL TIMES
19   ALREADY.
20             ALL RIGHT.  WHAT ARE YOUR THOUGHTS?
21             MR. HURST:  IN TERMS OF WHETHER OR NOT LIABILITY CAN
22   BE SEPARATED FROM DAMAGES, A COMPONENT OF THE ANTITRUST CHARGE
23   IS, OF COURSE, INJURY.  THAT'S ACTUALLY PART OF LIABILITY.
24             SO, THERE WOULD BE REALLY NO DIFFERENCE IN TERMS OF
25   SEGREGATING OUT DAMAGES IN TERMS OF WHAT WOULD BE REQUIRED OF
```

```
 1    ALL OF THE PLAINTIFFS.  THEY'D STILL --

 2         THE COURT:  THERE'S SOME SORT OF -- NOT SOME SORT,

 3    THERE IS A CONFLICT BETWEEN THE DIRECTS AND INDIRECTS WITH

 4    RESPECT TO DAMAGES, AND THEY DON'T WANT TO BE AND PERHAPS CAN'T

 5    BE DONE TOGETHER.

 6         MR. HURST:  RIGHT, BUT IN ORDER TO ESTABLISH

 7    LIABILITY, THEY ALL HAVE TO SHOW ANTITRUST INJURY.  THAT IS

 8    PART OF THE ELEMENT OF THE CLAIM, SO THEREFORE IT DOESN'T

 9    REALLY ACCOMPLISH ANYTHING TO SEPARATE OUT DAMAGES BECAUSE THEY

10    WOULD BE -- THE INJURY PART IS DIFFERENT BETWEEN THESE GROUPS,

11    INCLUDING THE CLASS, YOUR HONOR.

12         THE ORIGINAL CLASS IS SAYING WE ONLY REPRESENT FOLKS

13    WHO BOUGHT NORVIR AS A BOOSTER.  THE NEW CLASS THAT HAS COME IN

14    AND SOME OF THE INDIVIDUAL ACTIONS ARE SAYING THAT THEY WANT

15    DAMAGES FOR THE PURCHASE OF KALETRA AS WELL.  AND THEY WANT TO

16    ACTUALLY REPRESENT KALETRA PURCHASERS.  THAT ADDS A LAYER OF

17    COMPLEXITY RELATING TO THE LIABILITY ISSUES THAT WE HAVE NEVER

18    HAD TO GRAPPLE WITH BEFORE.  IT'S AN ENTIRELY NEW LAWSUIT,

19    ESSENTIALLY, ON AN ISSUE THAT WE HAVE NOT RESOLVED BETWEEN THE

20    PARTIES SO FAR.  WE HAVEN'T DONE THAT YET.

21         THE COURT:  WHAT'S YOUR BOTTOM LINE?

22         MR. HURST:  MY BOTTOM LINE, YOUR HONOR, IS I'M --

23    ONE DISADVANTAGE FOR US GOING FORWARD WITH ONE CASE IS THAT IF

24    WE LOSE AND IT GETS AFFIRMED ON APPEAL, I'M DONE; COLLATERAL

25    ESTOPPEL.  I AM WILLING TO ACCEPT THAT.  IT IS AN ADVANTAGE TO
```

```
 1              THE COURT:  YES.

 2              MR. PERWIN:  AND I RESPECTFULLY DISAGREE, YOUR

 3    HONOR.  I THINK THE SCHEDULE --

 4              THE COURT:  ALL RIGHT.  WHAT ABOUT YOU?

 5              MS. REBUCK:  MONICA REBUCK ON BEHALF OF THE RITE-AID

 6    PLAINTIFFS.

 7              WE AGREE WITH MR. PERWIN THAT WE SHOULD BE GIVEN AN

 8    OPPORTUNITY --

 9              THE COURT:  WHICH ONE IS PERWIN NOW?

10              MS. REBUCK:  THE SAFEWAY PLAINTIFFS.

11              THAT WE SHOULD BE GIVEN AN OPPORTUNITY TO GET

12    OURSELVES IN THE POSITION TO TRY IT IN JUNE.

13              THE COURT:  OKAY.  WHAT ABOUT YOU?

14              MR. WILES:  YOUR HONOR, IN RESPONSE TO YOUR REQUEST,

15    WHAT WE DID FOR GSK WAS TRY TO SEE IF WE COULD COME UP WITH A

16    SCHEDULE THAT WOULD MAKE IT FEASIBLE FOR US TO GO TO TRIAL WITH

17    THE DOE PLAINTIFFS.

18              IT WOULD REQUIRE A DELAY, IN OUR VIEW, OF THREE OR

19    FOUR MONTHS, I THINK IT'S FOUR MONTHS TO THE 20TH OF OCTOBER.

20              WE ARE PREPARED TO ALLOW THEM TO GO FIRST IF THAT'S

21    WHAT YOUR HONOR DECIDES.  IF YOUR HONOR FEELS AS WAS OUR

22    IMPRESSION FROM THE ORDERS THAT WE GOT THAT YOU REALLY ONLY

23    WANT TO TRY THIS ONCE, WE COULD LIVE WITH A TRIAL DATE IN THE

24    MIDDLE OF OCTOBER, WHICH IS ONLY A MODEST DELAY.

25              THE COURT:  WELL, I THINK WHAT I'LL DO IS TRY THE
```

1    INDIRECTS IN JUNE AND TRY THE DIRECTS AT SOME LATER DATE, BOTH

2    CLASS AND OPT-OUTS.  AND THEN THE QUESTION IS WHERE -- DO YOU

3    FIT BEST IN JUNE WITH THE INDIRECTS, SOMETIME LATER WITH THE

4    DIRECTS, OR AS A VERY UNDESIRABLE CLEAR CHOICE SEPARATELY?

5              **MR. WILES:**  I WOULD SAY -- BOTH WE AND ABBOTT AT

6    LEAST AGREE ON ONE THING, AND THAT IS THAT JUNE WOULD NOT BE

7    APPROPRIATE FOR TRIAL OF OUR DISPUTE WITH ABBOTT.

8              **THE COURT:**  THAT WOULD MEAN THAT YOU WOULD HAVE TO

9    GO WITH THE DIRECTS.

10             **MR. WILES:**  SO LOGICALLY EITHER WE WOULD GO WITH THE

11   DIRECTS OR CONCEIVABLY ON OUR OWN, BUT I THINK LOGICALLY WE

12   WOULD GO WITH THE DIRECTS.

13             **THE COURT:**  IS THERE ANY BIG OBSTACLES WITH YOU

14   GOING WITH THE DIRECTS?  ANY SORT OF SUBSTANTIVE OBSTACLE?

15             **MR. WILES:**  NOT THAT I CAN THINK OF.

16             **THE COURT:**  DO ANY OF THE DIRECTS SEE ANY

17   SUBSTANTIVE OBSTACLE?

18             **MR. SAVERI:**  NOT AS I STAND HERE TODAY.  WE'VE GOT,

19   OF COURSE, SOME ISSUES THAT HAVE TO DO WITH SORTING THROUGH THE

20   PLEADINGS AND PERHAPS SOME MOTIONS, BUT NOW BASED ON WHAT I

21   KNOW, I THINK THE CASES COULD GO FORWARD TOGETHER.

22             **THE COURT:**  ANYONE DISAGREE?

23             **MR. PERWIN:**  JUDGE, JUST SLIGHTLY.  THERE ARE

24   OBVIOUSLY DIFFERENT DAMAGE THEORIES; THAT'S A LOSS PROFITS

25   THEORY, WE HAVE OVERCHARGE THEORIES.  IT CAN BE CONFUSING TO

1    THE JURY, AND I JUST WANT TO RESERVE THE POSSIBILITY OF ASKING

2    FOR SEPARATE DAMAGE TRIALS.  I DON'T THINK THERE'S ANYTHING

3    ABOUT THE LIABILITY CASE THAT COULDN'T BE TRIED TOGETHER.

4            **MR. SAVERI:**  I AGREE WITH THAT, YOUR HONOR.

5            **THE COURT:**  IS THAT ALL RIGHT WITH YOU?  WE TRY THE

6    COMPETITORS WITH THE DIRECTS?

7            **MR. HURST:**  THERE'S NOTHING THAT OCCURS TO ME AS AN

8    OBSTACLE TO THAT RIGHT NOW.  THE DATE -- I WILL WANT TO TALK

9    ABOUT THAT LATER -- THE DATE WOULD HAVE TO BE FAIRLY EXTENDED

10   BECAUSE THE CASE WITH GSK IS ENTIRELY DIFFERENT BECAUSE IT HAS

11   NEW CAUSES OF ACTION, BREACH OF LICENSE -- BREACH OF THE

12   LICENSE AGREEMENT, NORTH CAROLINA ANTITRUST LAW.

13           **THE COURT:**  OKAY.

14           THE ONLY OTHER OBSTACLES -- YOU KNOW, THIS JUNE

15   TRIAL DATE ALSO DEPENDS ON THE MOTIONS THAT WE ARE HEARING IN

16   LATE MARCH.  THOSE INCLUDE BOTH ANTITRUST MOTIONS AND PATENT

17   MOTIONS AND CLAIM CONSTRUCTION, AND IT GIVES ME ONLY THREE

18   MONTHS BETWEEN THEN AND THE START OF TRIAL.  THAT I JUST CAN'T

19   SWEAR I WILL BE ABLE TO GET IT DONE IN TIME IF IT'S DIFFICULT,

20   PARTICULARLY IN TIME FOR YOU TO DO ALL YOUR PRETRIAL WORK AND

21   ALL THAT.

22           SO, WHILE I WILL TRY TO TRY IT IN JUNE, IF YOU

23   MAKE -- IF THEY MAKE REALLY COMPLICATED MOTIONS, I MAY NOT BE

24   ABLE TO.

25           **MR. TABACCO:**  WE UNDERSTAND.

1          **THE COURT:**  I DON'T HAVE ANY COMPETING TRIALS UNLESS

2     A CRIMINAL CASE SHOULD COME ALONG, BUT I HAVE BEEN -- IT HAS

3     BEEN KNOWN TO TAKE THAT LONG TO DECIDE DIFFICULT PATENT

4     MOTIONS.

5          YOU'RE JUNE 30TH.  THERE IS NOTHING REALLY

6     DOUBLESET.  I HAVE YOU DOWN FOR EIGHT DAYS.

7          **MR. HURST:**  I THINK --

8          **THE COURT:**  I CAN'T REALLY GIVE YOU ANY MORE THAN

9     THAT.

10         **MR. TABACCO:**  THAT'S FINE.

11         **MR. HURST:**  I GUESS I WOULD ANTICIPATE THE TRIAL

12    WILL END UP BEING, AS WE'RE SEEING THINGS SHAPE UP, YOUR HONOR,

13    POTENTIALLY IF IT WENT FORWARD ON ALL OF THE ISSUES, INCLUDING

14    THE THREE PATENTS, IT WILL TAKE LONGER THAN EIGHT DAYS.

15         **THE COURT:**  DIVIDE THE TIME BY TWO.  EIGHT DAYS IS

16    WHAT I HAVE HAD IT FOR ALL ALONG.  I HAVE SOMETHING RIGHT AFTER

17    IT THAT I CAN'T CHANGE.

18         OKAY.  SO THAT'S THAT.

19         SO WE DON'T NEED TO DO ANYTHING WITH DOE'S BECAUSE

20    YOU HAVE ALL YOUR DATES.

21         **MS. SALZMAN:**  GREAT.  THANK YOU.

22         **THE COURT:**  WHAT WE THEN NEED TO DO IS COME UP WITH

23    DATES FOR EVERYBODY ELSE.  AND I WILL LOOK AT THESE CASE

24    MANAGEMENT SCHEDULES.

25         **MR. TABACCO:**  WE WILL GET OUT OF THE WAY, YOUR

1  SAFEWAY CASE.

2          **THE COURT:**  IS THIS GOING TO BE THE SAME MOTION OR

3  WILL THERE BE --

4          **MR. HURST:**  I GUESS I WOULD LIKE -- I AM GETTING

5  CONFUSED ABOUT WHICH PLAINTIFFS ARE ALLEGING WHAT CLAIMS, BUT

6  IF IT IS THE SAME SHERMAN ACT CLAIM, IT WOULD BE THE SAME

7  MOTION.

8          **THE COURT:**  OKAY.

9          NOW SOMEBODY WANTS TO MOVE TO TRANSFER ONE OF THEM

10  SOMEWHERE.

11          **MR. HURST:**  THAT WAS ABBOTT SEEKING TO TRANSFER SO

12  FAR THE GSK CASE, THE GLAXOSMITHKLINE CASE.

13          **THE COURT:**  ONLY THAT ONE?

14          **MR. HURST:**  SO FAR, YES, YOUR HONOR.

15          SOME OF THE OTHER COMPLAINTS WERE EVALUATED, BUT

16  THEY HAVE NO CALIFORNIA CONNECTION, AND SO THERE IS A

17  POSSIBILITY MORE MOTIONS TO TRANSFER WOULD COME IN.

18          **THE COURT:**  OKAY.  HAVE YOU FILED A MOTION TO

19  TRANSFER THE SMITH --

20          **MR. HURST:**  WE HAVE THIS MORNING, OR THIS AFTERNOON,

21  YOUR HONOR.

22          **THE COURT:**  OKAY.

23          **MR. WILES:**  WE HAVEN'T SEEN IT, BUT WE WILL BE

24  OPPOSING IT.

25          **THE COURT:**  THAT IS NOTICED FOR WHEN?

```
1              MR. HURST:  FOR FEBRUARY --

2              MR. WILES:  20TH.

3              MR. HURST:  21ST.

4              THE COURT:  YOU FILED IT FAR IN ADVANCE.

5              MR. HURST:  WE DID, YOUR HONOR.

6              THE COURT:  THAT DATE MIGHT WORK FOR ALL THE MOTIONS

7    TO DISMISS AS WELL BECAUSE I AM HERE AND NOT --

8              MR. HURST:  I HAVE A TRIAL STARTING FEBRUARY 4TH

9    THAT SHOULD BE FINISHED BY THE 21ST, BUT THERE IS NO GUARANTEE.

10   SO --

11             THE COURT:  IS THERE A PROBLEM WITH THE 21ST,

12   SHEILAH?

13             THE CLERK:  THAT WOULDN'T QUITE BE EIGHT WEEKS YOU

14   NEED.

15             THE COURT:  FOR THE MOTIONS TO DISMISS.

16             THE CLERK:  20 DAYS TO ANSWER AND FIVE DAYS --

17             THE COURT:  YOU SAID YOU HAD WHAT?

18             MR. HURST:  ACTUALLY, I HAVE A TRIAL THAT STARTS ON

19   FEBRUARY 4TH.  RIGHT NOW IT IS SCHEDULED TO BE FINISHED BY

20   THE 21ST.  IF WE ARE GOING TO COLLECT EVERYTHING, MOTIONS TO

21   DISMISS AND THE MOTION TO TRANSFER, A LATER DATE WOULD ACTUALLY

22   BE BETTER FOR ME AS WELL.

23             THE COURT:  OKAY.  WHAT DATE WOULD WORK, SHEILAH?

24             JANUARY 11, PLUS 20 DAYS, PLUS FIVE WEEKS.  THAT'S

25   REALLY PLUS EIGHT WEEKS.  JANUARY 11TH PLUS EIGHT WEEKS.
```

```
 1              THE CLERK:  MARCH 6TH?

 2              THE COURT:  HOW IS MARCH 6TH?

 3         MR. WILES:  ACCEPTABLE TO US.

 4         MR. HURST:  THAT'S ACCEPTABLE TO US, YOUR HONOR.

 5              THE COURT:  OKAY.

 6         BUT WHAT I WOULD LIKE YOU TO DO IS FILE THE MOTION

 7    TO DISMISS 20 DAYS AFTER THE CONSOLIDATED COMPLAINT IS FILED

 8    EVEN THOUGH THAT WILL BE LONG BEFORE THE ACTUAL HEARING, JUST

 9    FILE IT THEN.

10              MR. HURST:  THAT'S FINE.

11              THE COURT:  NOTICE IT FOR THE 6TH.

12         THEN I WANT ALL THE OPPOSITIONS TO COME IN FROM THE

13    DATE THE MOTIONS ARE FILED AS OPPOSED TO BACKWARDS.  IN OTHER

14    WORDS, I WANT MORE TIME INSTEAD OF YOU GETTING MORE TIME.

15         SO BOTH WITH RESPECT TO THE MOTION TO TRANSFER,

16    WHICH IS ALREADY FILED, AND THEN ANY OTHER MOTION TO TRANSFER

17    THAT HAPPENS TO GET FILED AND ANY MOTIONS TO DISMISS THAT ARE

18    FILED, FILE YOUR OPPOSITIONS TWO WEEKS AFTER THE MOTIONS ARE

19    FILED, FILE YOUR REPLIES A WEEK AFTER THAT, AND THAT WILL JUST

20    GIVE ME SOME EXTRA TIME TO PREPARE FOR THEM ON THE 6TH.

21              MR. WILES:  THAT WILL WORK FOR US.  THEIR DATE TO

22    RESPOND TO THE COMPLAINT IN OUR CASE IS JANUARY 3RD.  WE HAD

23    NEGOTIATED AN AGREEMENT THAT WE WOULD GET FOUR WEEKS TO

24    RESPOND.  SO THAT WOULD BE JANUARY 31ST, I THINK.  SO THAT'S

25    ROUGHLY THE SAME PERIOD OF TIME.  IF WE CAN HAVE UNTIL
```

1  JANUARY 31ST, WE WILL BE FINE.

2         **THE COURT:**  TO DO WHAT?

3         **MR. WILES:**  TO OPPOSE THE MOTION TO DISMISS.

4         **THE COURT:**  THAT SHOULD BE -- THAT WOULD BE THE

5  25TH.  CAN YOU DO IT BY THE 25TH?

6         **MR. WILES:**  YES.

7         **THE COURT:**  OKAY.

8         **MR. PERWIN:**  YOUR HONOR, SCOTT PERWIN.  THEY HAVE

9  ALREADY FILED THEIR MOTION IN THE SAFEWAY CASE AND NOTICED IT

10  FOR SOMETIME IN MID-JANUARY.

11         SO THAT HEARING DATE IS OFF; IS THAT RIGHT?

12         **THE COURT:**  IT IS OFF.

13         **MR. PERWIN:**  AND WOULD IT BE POSSIBLE FOR US TO FILE

14  A CONSOLIDATED RESPONSE IF IT'S GOING TO BE THE SAME MOTION

15  RATHER THAN FILING OUR RESPONSE AND THEN HAVING IT ESSENTIALLY

16  DUPLICATED BY THE OTHER PLAINTIFFS?

17         **THE COURT:**  YES, IT WOULD.

18         **MR. PERWIN:**  OKAY.

19         **THE COURT:**  SO I AM GOING TO RE-NOTICE THIS THING

20  THAT YOU HAVE ALREADY FILED -- OR DO YOU WANT TO JUST WITHDRAW

21  IT AND FILE ONE?

22         **MR. HURST:**  IF THERE'S--

23         **THE COURT:**  LET'S DO THAT.

24         **MR. HURST:**  THAT MAKES THE MOST SENSE.

25         **THE COURT:**  LET ME JUST DENY THIS WITHOUT

1    PREJUDICE --

2            **MR. HURST:**  THAT'S FINE.

3            **THE COURT:**  -- AND LET'S HAVE YOU FILE --

4            **MR. HURST:**  ONE SINGLE --

5            **THE COURT:**  -- ONE SINGLE MOTION TO DISMISS ALL OF

6    THEM.  AND THEY CAN HAVE SEPARATE SECTIONS IF THERE'S SOME

7    PARTICULAR CAUSE OF ACTION THAT'S IN ONE BUT NOT THE OTHER, BUT

8    JUST GIVE ME ONE BRIEF SO I DON'T HAVE TO READ THE FACTS OVER

9    AND OVER.

10           **MR. HURST:**  THAT IS SIMPLE ENOUGH.

11           **THE COURT:**  AND THEN YOU CAN ALL RESPOND IN ONE

12   BRIEF.  AND IF ANYONE HAS SOMETHING THEY NEED TO RESPOND TO

13   THAT'S NOT IN EVERYBODY ELSE'S CASE, YOU CAN HAVE PREFERABLY

14   REALLY A SEPARATE SECTION IN ONE BRIEF SO, AGAIN, I DON'T HAVE

15   TO READ ALL THE FACTS.

16           **MR. SAVERI:**  THAT'S FINE, YOUR HONOR.  IF WE HAVE

17   PROBLEMS WITH PAGE LIMITS OR SOMETHING LIKE THAT, I AM SURE WE

18   CAN WORK THAT OUT.

19           **MR. WILES:**  WERE YOU DIRECTING THAT TO GSK AS WELL?

20           **THE COURT:**  YES, TO THE EXTENT YOU CAN.

21           **MR. HURST:**  YOUR HONOR, ACTUALLY IT WOULD NOT REALLY

22   WORK WITH GSK.  THEY HAVE THE SAME CASCADE PROBLEM IN OUR VIEW,

23   BUT THERE'S A LOT MORE COMPLEXITY TO THEIR CASE.  IT WOULD BE A

24   COMPLETELY DIFFERENT MOTION.

25           THEY HAVE FOUR COUNTS, NORTH CAROLINA COUNT, BREACH

1    OF CONTRACT.  IF IT WOULD BE ACCEPTABLE, IT WOULD BE, I THINK,

2    MORE -- IT WOULD BE AN UNDULY COMPLICATED MOTION IF WE TRIED TO

3    DO ONE MOTION FOR EVERYBODY.

4            **THE COURT:**  SO YOU WANT TO DO A SEPARATE MOTION --

5            **MR. HURST:**  I WANT TO DO A SEPARATE GSK MOTION.

6            **THE COURT:**  OKAY.

7            **MR. HURST:**  I THINK IT WILL BE SIMPLER.  I WON'T

8    REPEAT THE CASCADE.  IN FACT, WHAT I COULD DO IS I COULD SAY,

9    "FOR MY CASCADE ARGUMENT, LOOK AT MY OTHER BRIEF."

10           HOW ABOUT IF I DO THAT?

11           **THE COURT:**  GOOD.

12           **MR. HURST:**  OKAY.

13           **THE COURT:**  SO THAT'S THAT.

14           **MS. REBUCK:**  YOUR HONOR, DID YOU SET DATES THEN FOR

15   THEM TO FILE THIS CONSOLIDATED MOTION TO DISMISS AND A RESPONSE

16   DATE?

17           **THE COURT:**  I THINK I DID.

18           **MS. NUSSBAUM:**  TWENTY DAYS AFTER JANUARY 11TH, WHICH

19   IS THE FILING OF THE AMENDED COMPLAINT IS WHEN WE HAVE TO FILE.

20   I BELIEVE SHE SAID YOU GET 20 DAYS AFTER THAT TO OPPOSE.

21           **THE COURT:**  TWO WEEKS.

22           **MS. REBUCK:**  TWO WEEKS.

23           **THE COURT:**  YOU ARE GOING TO FILE THE CONSOLIDATED

24   AMENDED COMPLAINT ON THE 11TH?

25           **MR. HURST:**  WE WILL FILE OUR MOTION TO DISMISS

```
1    WITHIN 20 DAYS.

2            THE COURT:  SO THAT WILL BE THE -- WELL REALLY

3    THE 31ST.

4            MR. HURST:  YES.

5            THE COURT:  SO YOUR OPPOSITION ACTUALLY IS LATER

6    THAN I THOUGHT.  YOUR OPPOSITION WON'T BE DUE UNTIL THE 14TH OF

7    FEBRUARY.

8            MR. WILES:  HE WAS INTENDING TO FILE HIS MOTION ON

9    OUR CASE ON JANUARY 3RD.

10           MR. HURST:  SHOULD WE PUT EVERYTHING ON THE SAME

11   SCHEDULE?

12           THE COURT:  NOW WE ARE NOT GOING TO DO THAT ANYMORE.

13           MR. WILES:  THEN I GUESS -- WHAT I'M SAYING IS THAT

14   GIVEN THE COMPLEXITY OF OUR CASE, I WOULD LIKE A LITTLE MORE

15   TIME TO DO THE MOTION TO DISMISS.  WE HAD NEGOTIATED FOUR WEEKS

16   WITH THEM IN EXCHANGE FOR THE STIPULATION ON THE MOTION -- THE

17   ANSWER DATE.  AND SO I CAN LIVE WITH THREE, BUT I WOULD LIKE

18   THREE AT LEAST.

19           THE COURT:  WELL, WHY DON'T YOU FILE A DRAFT OF THE

20   PART THAT HAS TO DO WITH HIM EARLIER.

21           MR. HURST:  HOW ABOUT IF I FILE MY MOTION TO DISMISS

22   THE GSK CASE A WEEK EARLIER THAN THE OTHER ONE.  THAT WILL GIVE

23   THEM MORE TIME.  DOES THAT WORK?

24           MR. WILES:  THAT'S FINE.

25           THE COURT:  IS IT GOING TO HAVE YOUR CASCADE THING
```

1   IN IT?

2           **MR. HURST:**  I WON'T PUT THE -- I DON'T WANT TO

3   REPEAT THE ARGUMENT TWICE BECAUSE THAT JUST BURDENS --

4           **THE COURT:**  IT'S NOT GOING TO HAVE THE CASCADE PART,

5   BUT IF YOU WANT TO KNOW WHAT HE'S GOT TO SAY ABOUT THAT, YOU

6   CAN ALWAYS READ THAT.

7           **MR. WILES:**  I READ IT OUT IN THE HALLWAY.

8           **THE COURT:**  OKAY.

9           THEN THE OPPOSITIONS ARE GOING TO BE DUE ON THE

10  14TH OF FEBRUARY AND THE REPLY ON THE 21ST, AND HEARING ON THE

11  6TH.

12          SO I DON'T GET ANY EXTRA TIME AFTER ALL.

13          **MR. HURST:**  SHOULD WE MOVE --

14          **THE COURT:**  NO, NO, NO.  I AM JUST KIDDING.

15          **MR. HURST:**  I WOULD BE HAPPY TO FILE EARLIER.

16          **THE COURT:**  THAT'S ALL RIGHT.  OKAY.

17          OKAY.  THEN WE HAVE SETTLEMENT.

18          PLAINTIFFS PROPOSE A MAGISTRATE JUDGE.  WE USUALLY

19  TRY TO USE SOMETHING ELSE FIRST BEFORE A MAGISTRATE JUDGE, AND

20  IN PARTICULAR IN THIS CASE, I THINK WE WOULD BE HARD PRESSED TO

21  THE FIND A MAGISTRATE JUDGE WHO WOULD HAVE THE TIME TO DEVOTE

22  TO ALL OF YOU, SO I PROPOSE THAT YOU AGREE ON A PRIVATE

23  MEDIATOR AND USE THE SAME PERSON FOR ALL THE CASES.

24          HAS DOE SEEN ANYBODY?

25          **MS. SALZMAN:**  YOUR HONOR, WE WENT TO MAGISTRATE

```
 1   WITHIN THE SAME BRIEF.

 2            MR. HURST:  UNDERSTOOD.

 3            THE COURT:  IF YOU NEED MORE PAGES, YOU CAN ASK.

 4   THE DEFAULT WOULD BE ALL THE CASES, ALL ISSUES, EVERYTHING IN

 5   ONE 25-PAGE BRIEF.

 6            IF YOU CAN'T DO THAT, YOU WILL HAVE TO ASK

 7   PERMISSION FOR WHAT YOU WANT.

 8            OPPOSITIONS IDEALLY, OPPOSITION AND CROSS-MOTION

 9   WOULD BE A JOINT ONE FROM EVERYBODY IN ONE 25-PAGE BRIEF.  IF

10   YOU CAN'T DO THAT OR WANT MORE PAGES OR WANT SEPARATE BRIEFS OR

11   WHATEVER, MAKE ME AN OFFER.

12            MR. WILES:  AGAIN, GSK IS GOING TO NEED A SEPARATE

13   BRIEF.  I CAN TELL, I KNOW ALREADY BECAUSE OF WHAT I HEARD

14   COUNSEL SAY.

15            THE COURT:  WELL, I DON'T SEE IT AS A SEPARATE

16   BRIEF.  IT CAN BE A SEPARATE SECTION IN THE BRIEF.  SURELY THE

17   STATEMENT OF FACTS WILL BE THE SAME.

18            MR. HURST:  THEY REALLY DO HAVE A FAIRLY INDEPENDENT

19   CAUSE OF ACTION RELATING TO THE LICENSE AGREEMENT.  SO IT IS A

20   SEPARATE -- I WILL MAKE MY BRIEF, IF I CAN DO IT, ONE 25-PAGE

21   BRIEF, BUT I DON'T DISAGREE THERE IS AN ENTIRELY DISTINCT AND

22   SEPARATE CAUSE OF ACTION WITH GSK.

23            MR. WILES:  THE FACTS ARE GOING TO BE VERY SIMILAR,

24   BUT THERE IS A DIFFERENT CAUSE OF ACTION.

25            THE COURT:  OKAY.  WELL, IN YOUR MOTION FOR EXCESS
```

1    PAGES, YOU CAN ASK TO HAVE YOUR ISSUE ADDRESSED SEPARATELY IN

2    SOME PARTICULAR AMOUNT OF PAGES, WHILE ALL YOUR COMMON ISSUES

3    ARE ADDRESSED JOINTLY WITH EVERYBODY ELSE.  YOU CAN MAKE ME AN

4    OFFER, BUT THAT TELLS ME HOW MANY PAGES I AM GOING TO HAVE TO

5    READ ALTOGETHER IN SUCH A WAY AS TO MINIMIZE HAVE TO READ THE

6    SAME ARGUMENTS OR THE SAME FACTS MORE THAN ONCE.

7              OPPOSITION AND CROSS-MOTION MAY 14TH.

8              **MR. HURST:**  21 DAYS FOR A REPLY?

9              **THE COURT:**  OKAY.  I WAS GOING TO GIVE YOU A MONTH.

10             **MR. HURST:**  I SHOULD HAVE SHUT UP.

11             **THE COURT:**  JUNE 11TH FOR YOUR REPLY.  AND THAT

12   MIGHT ALSO END UP BEING AN OPPOSITION TO A CROSS-MOTION.  THEY

13   DON'T THINK THEY ARE GOING TO MAKE ONE, BUT IF THEY DO --

14             **MR. HURST:**  IF THEY DO AND I NEED MORE TIME, AND I

15   CAN POTENTIALLY ASK THAT?

16             **THE COURT:**  YOU CAN, YES.

17             AND THEN JUNE 18TH WOULD BE THE REPLY TO ANY

18   CROSS-MOTION YOU MIGHT HAVE FILED.  AND THEN WE HAVE GOTTEN UP

19   TO JULY 9TH, LET'S SAY, FOR A HEARING.  WE ARE IN '09 NOW.

20             HOW DID I GET ON JULY 9?  OH, JULY.  OKAY.

21             SO -- WELL, THAT CAUSES ME -- WHAT I AM GOING TO DO

22   THEN IS SET IT FOR TRIAL IN DECEMBER OF '09.  SO SHALL WE SAY

23   DECEMBER 7TH?

24             **MR. WILES:**  IS IT POSSIBLE TO MOVE THE TRIAL UP TO

25   NOVEMBER SO WE CAN GET IT DONE BEFORE THE HOLIDAYS?

```
 1              THE COURT:  IT'S NOT, BUT I CAN DO IT IN JANUARY IF
 2   YOU WOULD LIKE.
 3              MR. HURST:  JANUARY SOUNDS FINE TO ME.
 4              MR. PERWIN:  I PREFER DECEMBER, BUT --
 5              THE COURT:  HOW LONG DID YOU SAY IT WILL TAKE?
 6              MR. WILES:  DECEMBER IS FINE WITH US.
 7              MR. HURST:  I THINK NOBODY HAS COME UP WITH AN
 8   ESTIMATE, BUT IF EVERYBODY IS IN ONE TRIAL, I WOULD THINK THIS
 9   WOULD BE A FOUR-WEEK TRIAL, PROBABLY.
10              MR. SAVERI:  I AM THINKING SOMETHING LIKE THREE TO
11   FOUR WEEKS, BUT.
12              MR. HURST:  DEPENDS ON THE EXPERTS, ET CETERA, ET
13   CETERA.
14              MR. SAVERI:  IT ALSO DEPENDS, I THINK, TO SOME
15   EXTENT TO WHAT HAS BEEN RESOLVED BY WHAT ELSE HAS HAPPENED IN
16   THE CASE BY THAT POINT.
17              THE COURT:  EVEN A THREE-WEEK TRIAL WOULD RUN INTO
18   CHRISTMAS.  THAT WOULD BE HARD TO PICK A JURY.
19              MR. SAVERI:  I THINK THAT'S A BAD IDEA.
20              THE COURT:  SO WE BETTER MAKE IT JANUARY.  HOW ABOUT
21   THE 11TH?  YOU DON'T WANT TO START IT ON THE 4TH.
22              JANUARY 11TH.  I WILL PUT IT --
23              MR. PERWIN:  2010?
24              THE COURT:  YEAH.  I WILL PUT IT DOWN FOR THREE
25   WEEKS.  I AM TRYING THEM FIVE DAYS A WEEK NOW, SO THAT'S 15
```

1    DAYS.  I REALLY THINK THAT IS ENOUGH.

2             **MR. PERWIN:**  WE WILL DO IT, JUDGE.

3             **THE COURT:**  WE WILL HAVE A PRETRIAL CONFERENCE ON

4    DECEMBER 22ND.

5             OKAY.  SO I THINK THAT'S ALL UNLESS ANYONE HAS

6    ANYTHING ELSE.

7             **MR. HURST:**  I DO HAVE TWO MORE ISSUES REALLY

8    QUICKLY, YOUR HONOR.

9             **THE COURT:**  OKAY.

10            **MR. HURST:**  WE DID FILE A MOTION TO TRANSFER WITH

11   RESPECT TO GSK.  WE DO INTEND TO FILE -- WE ARE EVALUATING

12   FILING ADDITIONAL MOTIONS TO TRANSFER, BUT GIVEN THE SCHEDULE,

13   WOULD -- COULD I PROCEED WITH MY DISCOVERY WITHOUT PREJUDICE TO

14   MY MOTION TO TRANSFER GIVEN THE POSSIBILITY THAT I MIGHT LOSE

15   ON THE MOTION TO TRANSFER, BUT IT WILL BE DOWN THE ROAD?

16            **THE COURT:**  SURE.  SURE.

17            **MR. HURST:**  SECOND ISSUE IS, AND PLAINTIFFS CAN

18   DISAGREE WITH ME, BUT I THINK THAT THEIR CLAIMS NECESSARILY

19   TURN ON THE SCOPE OF THE PATENTS THAT YOU ARE FAMILIAR WITH AND

20   MAYBE EVEN THE VALIDITY.  I DON'T KNOW THE ORIGINAL CLAIM,

21   THEY'RE CHALLENGING THE VALIDITY OF THOSE PATENTS.

22            IF I AM CORRECT THAT THEIR CLAIMS TURN ON THE PATENT

23   LAWS, CAN WE HAVE AN ORDER THAT THE LOCAL PATENT RULES APPLY?

24            **THE COURT:**  NO, NOT WHOLESALE, BUT WE WILL NEED A

25   SCHEDULE FOR THAT.

```
 1              THE CLAIM CONSTRUCTION WOULD BE DONE AT THE TIME OF
 2   THE CASE DISPOSITIVE MOTION, SO THERE'S A DIFFERENCE FROM THE
 3   PATENT RULES RIGHT THERE.  ALTHOUGH WE ARE ABOUT TO CHANGE THE
 4   PATENT RULES.  I DON'T KNOW IF WE DID THAT YET.
 5              MR. HURST:  NOT THAT I KNOW OF.
 6              THE COURT:  WE HAVE SOME CHANGES IN THE WORKS.
 7              MR. WIEBE:  THE NEW PATENT LOCAL RULES HAVE TAKEN
 8   EFFECT.
 9              THE COURT:  BUT I THINK THEY'RE STILL THE SAME --
10   SOME OF US NOW ARE DOING CLAIM CONSTRUCTION WITH MOTIONS FOR
11   SUMMARY JUDGMENT, BUT I THINK EVEN THE NEW RULES STILL HAVE IT
12   THE OTHER WAY.  BUT I DO IT THE WAY I DO IT.
13              BUT THE NOTION OF HAVING A DISCLOSURE OF CLAIMS AND
14   ALL THAT IS A GOOD NOTION.  RATHER THAN DO THAT NOW, WHAT I
15   WOULD LIKE YOU TO DO IS SEE IF YOU CAN WORK OUT A SCHEDULE THAT
16   ISN'T, YOU KNOW, BOXED UP WITH THE PATENT LOCAL RULES, BUT
17   FOLLOWS THE GENERAL POLICIES THAT ARE REPRESENTED IN THOSE
18   RULES, BUT CHANGED TO SHOW THAT I AM DOING THE CLAIM
19   CONSTRUCTION LATER RATHER THAN EARLIER.
20              BUT IT IS A GOOD IDEA TO SAY WHAT YOUR INVALIDITY
21   CONTENTIONS ARE, TO SAY WHAT YOUR INFRINGEMENT CONTENTIONS ARE,
22   AND TO DO ALL THOSE THINGS IN SOME KIND OF FORMAT LIKE THE
23   LOCAL RULES DO.
24              SO WHY DON'T YOU SEE IF YOU CAN WORK SOMETHING OUT.
25   YOU DON'T EVEN KNOW IF YOU ARE GOING TO MAKE THOSE CLAIMS, BUT
```

1   YOU CAN SET A SCHEDULE FOR WHAT YOU'LL DO IN CASE YOU DO MAKE

2   THEM.

3           **MR. WILES:**  IF I MAY BE HEARD ONE SECOND.  IN OUR

4   VIEW, TO THE EXTENT THE PATENT ISSUE IS AN ISSUE IN THIS CASE,

5   IT'S IF THEY RAISE IT AS AN AFFIRMATIVE DEFENSE IN THEIR ANSWER

6   WHEN THEY GET AROUND TO ANSWERING.

7           **THE COURT:**  I THINK YOU CAN ANTICIPATE THAT THEY

8   WILL.

9           **MR. WILES:**  I DO ANTICIPATE THEY WILL, AND I ALSO

10  ANTICIPATE THAT WE WILL MOVE TO DISMISS THAT AFFIRMATIVE

11  DEFENSE BECAUSE AS THE COURT KNOWS, ABBOTT HAS LICENSED NOT

12  ONLY GSK, BUT MOST OF THE OTHER COMPETITORS IN THE FIELD.  SO

13  TO THE EXTENT THEY EVER HAD A PATENT ARGUMENT IN THIS CASE,

14  THEY HAVE NOW GIVEN IT AWAY.

15          **THE COURT:**  AGAINST YOU MAYBE, BUT NOT AGAINST THE

16  OTHERS.

17          **MR. WILES:**  WELL, I THINK IT'S TO THE EXTENT THAT --

18  THEY USE IT TO ARGUE THAT IT -- THAT THE PATENT INSULATES THEIR

19  BEHAVIOR AND IT CAN'T HARM COMPETITION.  IN OUR VIEW, GIVEN

20  THAT THEY HAVE LICENSED PRETTY MUCH THE WHOLE INDUSTRY, THEY

21  CAN'T MAKE THAT ARGUMENT.  AND THEY --

22          **MR. PERWIN:**  AND THEY CAN'T MAKE IT AGAINST US

23  EITHER, YOUR HONOR.

24          IN ADDITION TO THAT, THERE'S THE FOR SALE DOCTRINE

25  OF THE IMPLIED LICENSE DOCTRINE YOUR HONOR IS FAMILIAR WITH

# Exhibit B

1  IRELL & MANELLA LLP
   Alexander F. Wiles (CA 73596) awiles@irell.com
2  Brian Hennigan (CA 86955) bhennigan@irell.com
   Stephanie Kaufman (CA 162644) skaufman@irell.com
3  Trevor V. Stockinger (CA 226359) tstockinger@irell.com
   1800 Avenue of the Stars, Suite 900
4  Los Angeles, California 90067-4276
   Telephone:  (310) 277-1010
5  Facsimile:  (310) 203-7199

6  ARNOLD & PORTER LLP
   Kenneth A. Letzler (Admitted *Pro Hac Vice*) Kenneth_Letzler@aporter.com
7  555 Twelfth Street, NW
   Washington, DC  20004-1206
8  Telephone:  (202) 942-5000
   Facsimile:  (202) 942-5999
9
   Attorneys for Plaintiff
10 GlaxoSmithKline

11

12                    UNITED STATES DISTRICT COURT

13                 NORTHERN DISTRICT OF CALIFORNIA

14                          OAKLAND DIVISION

15
   SMITHKLINE BEECHAM CORPORATION, )    Case No. C 07-5702 CW
16 d/b/a GLAXOSMITHKLINE,                )
                                          )
17              Plaintiff,                 )    **GSK'S INITIAL DISCOVERY**
                                          )    **DISCLOSURES**
18        vs.                             )
                                          )
19 ABBOTT LABORATORIES,                   )
                                          )
20              Defendant.                )
                                          )
21

22        GSK's claims derive from Abbott's 400 percent increase in the price it charged for

23 Norvir® (branded ritonavir), a drug that acts to boost the effectiveness of drugs known as

24 protease inhibitors ("PIs").  PIs are used to treat persons with HIV/AIDS.  Abbott and GSK both

25 manufacture and sell PIs that are boosted with ritonavir.  Abbott is the sole manufacturer of

26 ritonavir, and ritonavir is the sole drug that can be used to boost the effectiveness of PIs.  Abbott

27 demanded and took significant payments in exchange for licensing to GSK and others the right to

28 promote their PIs for co-prescription and use with Norvir.  After taking those payments and

1787142

1   establishing a competitive market for boosted PIs, Abbott sought to injure competition as well as

2   its competitors, who were also its licensees, by quintupling the price of Norvir except when sold

3   as part of Abbott's combination PI drug known as Kaletra® (branded lopinavir/ritonavir). Abbott

4   took these steps in order to make Norvir essentially inaccessible for use with all PIs except Kaletra

5   thereby extending Abbott's dominance in the market for boosted PIs.   Abbott's price increase had

6   a dramatic negative impact on GSK's ability to sell its competing PI, Lexiva® (branded

7   fosamprenavir), which was introduced just two weeks before Abbott announced its 400 percent

8   price increase for Norvir.  The price increase had the anticompetitive effect of protecting Kaletra

9   against new PI products, including GSK's Lexiva, that threatened Kaletra's market dominance.

10  Abbott's misconduct violates Section 2 of the Sherman Act, the federal prohibition against

11  monopolization and attempted monopolization, as well as the North Carolina prohibition against

12  monopolization. Abbott's conduct also breaches the covenant of good faith and fair dealing

13  contained in GSK's agreement with Abbott and constitutes unfair and deceptive trade practices in

14  violation of North Carolina's Unfair Trade Practices Act.

15      GSK by and through its undersigned attorneys, provides this Initial Disclosure in

16  compliance with Rule 26(a)(1) of the Federal Rules of Civil Procedure.  This initial disclosure is

17  based on information reasonably available to GSK at this time.  GSK's investigation is ongoing,

18  and Abbott has not yet answered GSK's Complaint.  GSK may amend or supplement these

19  disclosures based on its continuing investigations and discovery.

20      GSK's initial disclosures are made without in any way waiving: (1) the right to object to

21  such information on the grounds of competency, privilege, the work product doctrine, undue

22  burden, relevancy and materiality, hearsay, or any other ground; (2) the right to object to the use of

23  any such information, for any purposes, in whole or in part, in any subsequent proceeding in this

24  action or any other action; and (3) the right to object on any and all grounds, at any time, to any

25  discovery request or proceeding involving or relating to the subject matter of these disclosures.

26      1.    **Witnesses**

27      In compliance with Fed. R. Civ. P. 26(a)(1)(A), GSK identifies the individuals set forth

28  below, to the extent currently known to GSK, as likely to have discoverable information that GSK

1787142

- 2 -

1  may use to support its claims.  GSK expressly reserves the right to identify or to call as witnesses

2  additional or different individuals if, during the course of discovery and investigation relating to

3  this case, GSK learns that such additional or different individuals have relevant knowledge.

4      In making these disclosures, GSK does not waive its right to object to discovery of

5  information from any of these individuals, including by deposition or otherwise, or based on the

6  attorney-client privilege, the informer privilege, work product immunity, or any other applicable

7  privilege or protection.  GSK does not consent to authorize any party to communicate with its

8  current or former employees or board members.  Any individuals designated in this disclosure

9  with an asterisk (*) by their name should be contacted care of Alexander F. Wiles, Irell & Manella

10  LLP, 1800 Avenue of the Stars, Suite 900, Los Angeles, CA 90067-4276, (310) 277-1010,

11  regardless of whether their contact information is also set forth in the chart below.

| Name and Address | Subjects |
|---|---|
| Audet, Patricia*<br>Vice President, Transactions & Asia Strategy<br>GlaxoSmithKline<br>709 Swedeland Road<br>King of Prussia, PA  19406 | GSK/Abbott license and negotiations |
| Brotz , Melissa<br>Abbott Laboratories | Abbott's decision to increase price of Norvir; GSK/Abbott license and negotiations |
| Chenet, Kyle*<br>Former Manager, Business Development<br>for GSK<br>Current Address Unknown | GSK/Abbott license and negotiations |
| Collins, Jeff*<br>Product Director<br>GlaxoSmithKline<br>Five Moore Drive<br>RTP, NC 27709 | Effect of Norvir price increase |
| Devlin, Jeffrey<br>Divisional Vice President and General Manager<br>of HIV Franchise<br>Abbott Laboratories | Abbott's decision to increase price of Norvir; GSK/Abbott license and negotiations |
| Evans, Paul*<br>Product Manager<br>GlaxoSmithKline<br>Five Moore Drive<br>RTP, NC 27709 | Effect of Norvir price increase |
| French, Elizabeth*<br>MedPointe Pharmaceuticals<br>265 Davidson Avenue, Suite 300<br>Somerset, NJ 08873-4120 | GSK/Abbott license and negotiations |

| Name and Address | Subjects |
|---|---|
| Hannan, Michael P.*<br>Acting HIV Regional Sales Director<br>GlaxoSmithKline<br>Five Moore Drive<br>RTP, NC 27709 | Effect of Norvir price increase |
| Hare, Peter*<br>Vice President, HIV Business Unit<br>GlaxoSmithKline<br>Five Moore Drive<br>RTP, NC 27709 | Effect of Norvir price increase |
| Husami, Mateen<br>Abbott Laboratories | Abbott's decision to increase price of Norvir; GSK/Abbott license and negotiations |
| Keller, John*<br>Incyte Corporation<br>DuPont Experimental Station<br>Rt. 141 & Henry Clay Road<br>Wilmington, Delaware 19880 | GSK/Abbott license and negotiations |
| Key, Karen*<br>Former Director in World Wide Business Development for GSK<br>Current Address Unknown | GSK/Abbott license and negotiations |
| Laughery, Tom*<br>Vice President, HIV Marketing<br>GlaxoSmithKline<br>Five Moore Drive<br>RTP, NC 27709 | Effect of Norvir price increase |
| Leal, Jesus<br>Abbott Laboratories | Abbott's decision to increase price of Norvir; GSK/Abbott license and negotiations |
| Leonard, John<br>Vice President of Global Pharmaceutical<br>    Research and Development<br>Abbott Laboratories | Abbott's decision to increase price of Norvir; GSK/Abbott license and negotiations |
| McVeigh, Brian*<br>Director, Business Development<br>GlaxoSmithKline<br>709 Swedeland Road<br>King of Prussia, PA 19406 | Effect of Norvir price increase |
| Pittman, Marlon*<br>Vice President, HIV Sales<br>GlaxoSmithKline<br>Five Moore Drive<br>RTP, NC 27709 | Effect of Norvir price increase |
| Poulos, John<br>Group Vice President of Licensing and<br>    New Business Development<br>Abbott Laboratories | Abbott's decision to increase price of Norvir; GSK/Abbott license and negotiations |
| Rubenstock, Allen<br>Abbott Laboratories | Abbott's decision to increase price of Norvir; GSK/Abbott license and negotiations |

| Name and Address | Subjects |
|---|---|
| Schmid, Fred*<br>Former Vice President, HIV Marketing<br>Administration for GSK<br>Current Address Unknown | Effect of Norvir price increase |
| Shaefer, Mark*<br>Director, Clinical Development<br>GlaxoSmithKline<br>Five Moore Drive<br>RTP, NC 27709 | Use of protease inhibitors |
| Violet, Julie*<br>Finance Director, Alliances<br>GlaxoSmithKline<br>Research and Development<br>Greenford Road<br>Greenford<br>Middlesex<br>United Kingdom<br>UB6 0HE | GSK/Abbott license and<br>negotiations |
| Weinstock, Steven F.<br>Wood Phillips<br>500 West Madison Street Suite 3800<br>Chicago, IL 60661-2562 | Abbott's decision to increase<br>price of Norvir; GSK/Abbott<br>license and negotiations |
| White, Miles<br>Chief Executive Officer<br>Abbott Laboratories | Abbott's decision to increase<br>price of Norvir; GSK/Abbott<br>license and negotiations |

In addition to the individuals listed above, GSK notes that there are likely other individuals who may have knowledge of relevant facts, including:

- Current and former employees of GSK and their affiliates.

- Persons whose names appear in the documents to be produced by the parties.

- Persons employed by companies that manufacture PIs to be boosted with Norvir.

- Representatives of Abbott involved in discussions with GSK regarding the license to promote GSK's PIs with Norvir.

GSK also anticipates that there are individuals known to the defendants who have relevant knowledge. GSK incorporates by reference herein its discovery responses and future supplementations thereof, in which other persons with relevant knowledge may be set forth. GSK may seek information from the above-described persons or persons identified by the defendants to support its claims and defenses.

2.    **Documents**

Pursuant to Fed. R. Civ. P. 26(a)(1)(B), and based upon presently available information, GSK identifies at least the following categories of documents. GSK reserves the right to identify and use documents from additional categories if during the course of discovery and investigation relating to this case, GSK learns that such additional categories contain relevant documents. GSK also reserves the right to rely on any other documents produced in the course of discovery. GSK further reserves the right to respond to and/or rebut the contentions and allegations that the defendants may make.

a.    Documents relating to the development, sale and use of protease inhibitors that are boosted with Norvir for the treatment of HIV.

b.    Documents relating to the effect of changes in Norvir pricing on the ability of Abbott's competitors, including GSK, to sell and distribute their protease inhibitors for the treatment of HIV.

c.    Documents relating to the December 13, 2002 agreement in which Abbott licensed GSK the right to promote protease inhibitors with ritonavir.

d.    Documents relating to the economic losses GSK suffered as a result of Abbott's price increase, breach of contract and unfair business practices.

3.    **Damages**

GSK intends to seek all relief and recover all remedies available under the applicable laws. Abbott is obligated to produce the documents that are necessary for GSK to compute the amount of its damages in this action. Such documents include, but are not limited to, documents concerning the pricing, and forecast and actual sales of Kaletra and Norvir. GSK will need to examine and analyze these and other documents in order to calculate the damages for which Abbott is liable.

In addition, both the approach to the determination of damages and the amount of damages will be the subject of expert analysis and discovery. The experts will require time to review documents, testimony and other information produced by parties including defendants in order to analyze the damage issues in this matter.

1       On GSK's first cause of action for violations of the Sherman Act, GSK claims the full

2 amount of damages, as permitted by federal law, resulting from Abbott's anticompetitive conduct,

3 including its 400% price increase of Norvir, as well as trebling of such damages.  On GSK's

4 second cause of action, GSK claims the full amount of damages as a result of Abbott's breach of

5 the covenant of good faith and fair dealing contained in the December 13, 2002 agreement

6 between Abbott and GSK regarding the promotion of protease inhibitors with Norvir.  On GSK's

7 third cause of action, GSK claims the full amount of damages resulting from Abbott's bad faith

8 and unfair business practices in violation of North Carolina Unfair Trade Practices Act (N.C. Gen.

9 Stat. § 75-1.1).  On GSK's fourth cause of action, GSK claims the full amount of damages

10 resulting from Abbott's violation of North Carolina's prohibition against monopolization (N.C.

11 Gen. Stat. § 75-2.1), including trebling of such damages.  GSK also seeks pre- and post-judgment

12 interest on these damages, an award of attorneys' fees and costs, equitable and injunctive relief as

13 necessary to undo the effects of Abbott's wrongful conduct and to prevent Abbott from repeating

14 that conduct, and any other relief this Court deems just and proper.  GSK reserves the right to

15 request additional relief as discovery progresses.

16       **4.**    **<u>Insurance</u>**

17       At this time, GSK is not aware of any insurance agreements under which any person

18 carrying on an insurance business may be liable to satisfy part or all of a judgment that may be

19 entered in this action or to indemnify or reimburse for payments made to satisfy the judgment.

20 DATED:  January 11, 2008           Respectfully Submitted,

21                         IRELL & MANELLA LLP
                          Alexander F. Wiles (CA 73596)

22                         Brian Hennigan (CA 86955)
                        Stephanie Kaufman (CA 162644)

23                         Trevor V. Stockinger (CA 226359)

24                         ARNOLD & PORTER LLP
                        Kenneth A. Letzler (Admitted *Pro Hac Vice*)

25

26

27                         By: _____
                        Trevor V. Stockinger

28                         Attorneys for Plaintiff
                        GlaxoSmithKline

1

### PROOF OF SERVICE

2

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 1800 Avenue of the Stars, Suite 900, Los Angeles, California 90067-4276.

3

4

On January 11, 2008, I served the foregoing document described as **GSK'S INITIAL DISCOVERY DISCLOSURES** on each interested party, as follows:

5

6          Samuel S. Park
           Winston & Strawn LLP
7          35 W. Wacker Drive
           Chicago, Illinois 60601-9703
8          spark@winston.com

9    [X]   (BY MAIL) I placed a true copy of the foregoing document in a sealed
           envelope addressed to each interested party, as set forth above. I placed each
10         such envelope, with postage thereon fully prepaid, for collection and mailing at
           Irell & Manella LLP, Los Angeles, California. I am readily familiar with Irell &
11         Manella LLP's practice for collection and processing of correspondence for
           mailing with the United States Postal Service. Under that practice, the
12         correspondence would be deposited in the United States Postal Service on that
           same day in the ordinary course of business.

13

14   [X]   (BY ELECTRONIC MAIL) I caused the foregoing document to be served
           electronically by electronically mailing a true and correct copy through Irell &
           Manella LLP's electronic mail system to the e-mail address(es), as set forth
15         above, and the transmission was reported as complete and no error was reported.

16   Executed on January 11, 2008, at Los Angeles, California.

17   I declare under penalty of perjury that the foregoing is true and correct.

18

19   _____          _____
     Lisa M. Siegel (lsiegel@irell.com)                    Lisa M. Siegel
20          (Type or print name)                           (Signature)

21

22

23

24

25

26

27

28

1787142.3 03