Nicole M. Norris (SBN 222785)
WINSTON & STRAWN LLP
101 California Street, Suite 3900
San Francisco, CA 94111-5894
Telephone:   415-591-1000
Facsimile:   415-591-1400
Email: nnorris@winston.com

James F. Hurst (*Admitted Pro Hac Vice*)
David J. Doyle (*Admitted Pro Hac Vice*)
Samuel S. Park (*Admitted Pro Hac Vice*)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone:   312-558-5600
Facsimile:   312-558-5700
Email: jhurst@winston.com; ddoyle@winston.com; spark@winston.com

Charles B. Klein (*Admitted Pro Hac Vice*)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006
Telephone:   202-282-5000
Facsimile:   202-282-5100
Email: cklein@winston.com

Attorneys for Defendant
ABBOTT LABORATORIES

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| SMITHKLINE BEECHAM CORPORATION d/b/a/ GLAXOSMITHKLINE,<br><br>Plaintiff,<br><br>vs.<br><br>ABBOTT LABORATORIES,<br><br>Defendant. | **Case No. C 07-5702 CW**<br><br>*Related per November 19, 2007 Order to Case No. 04-1511 CW*<br><br>**ABBOTT LABORATORIES' REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO RULE 12(B)(6) - UNREDACTED**<br><br>Date:  March 6, 2008<br>Time:  2:00 p.m.<br>Place:  Courtroom 2 (4th Floor)<br><br>The Honorable Judge Wilken |

**TABLE OF CONTENTS**

I. INTRODUCTION ...........................................................................................................1

II. ARGUMENT .................................................................................................................3

    A. GSK Has Pleaded Its Sherman Act Claim Out Of Court ................................3

        1. GSK Admits That Abbott's Patents Cover The "Boosted Market"..............3

        2. GSK's Admission That Abbott's Patents Cover The "Boosted Market" Bars Its Sherman Act Claim ........................................................4

        3. The License Agreement Did Not Waive Abbott's Antitrust Immunity Under The Patent Laws ..............................................................5

    B. GSK Has Failed To Rebut Abbott's Argument That The Sherman Act Claim Should Be Dismissed Under Federal Circuit Precedent ................................8

    C. GSK Has Failed To Justify Its Attempt In The Implied Covenant Claim To Impose Independent Contractual Restraints On Abbott's Pricing Decisions ...............9

    D. GSK's North Carolina Claims Should Be Dismissed Because They Are Based Solely On Conduct That Should Be Deemed Lawful Under North Carolina Law ...................................................................................................12

III. CONCLUSION.............................................................................................................15

-i-

Abbott Laboratories' Reply Brief in Support of its Mot. To Dismiss Plaintiffs' Compl. Pursuant to Rule 12(b)(6)
Case No. C 07-5702 CW

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adenta GmbH v. OrthoArm, Inc.*,
  501 F.3d 1364 (Fed. Cir. 2007) ................................................................................................ 3

*Alaska Airlines Inc. v. United Airlines, Inc.*,
  948 F.2d 536 (9th Cir. 1991) .................................................................................................... 5

*Anton/Bauer, Inc. v. PAG, Ltd.*,
  329 F.3d 1343 (Fed. Cir. 2003) ................................................................................................ 7

*Arizona v. Maricopa County Med. Soc.*,
  457 U.S. 332 (1982) ............................................................................................................... 11

*Bloomfield v. Bloomfield*,
  764 N.E. 2d 950 (N.Y. App. 2001) ........................................................................................ 11

*Bus. Cabling, Inc. v. Yokeley*,
  643 S.E.2d 63 (N.C. App. 2007) ............................................................................................ 14

*Christianson v. Cold Industries Operating Corp.*,
  486 U.S. 800 (1988) ................................................................................................................. 7

*Cullen v. Valley Forge Life Ins. Co.*,
  161 N.C. App. 570 (2003) ................................................................................................ 14, 15

*Geren v. Quantum Chem. Corp.*,
  832 F. Supp. 728 (S.D.N.Y. 1993) ........................................................................................ 10

*Golub Assocs. Inc. v. Lincolnshire Mgmt., Inc.*,
  1 A.D.3d 237 (1st Dep't 2003) .............................................................................................. 10

*Hageman v. Twin City Chrysler-Plymouth Inc.*,
  681 F. Supp. 303 (M.D.N.C. 1988) ................................................................................. 14, 15

*Hartford Fire Ins. Co. v. Federated Dep't. Stores Inc.*,
  723 F. Supp. 976 (S.D.N.Y. 1989) ........................................................................................ 10

*Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*,
  535 U.S. 826 (2002) ................................................................................................................. 8

*Image Technical Services Inc. v. Eastman Kodak & Co.*,
  125 F.3d 1195 (9th Cir. 1997) ......................................................................................... passim

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

-ii-

Abbott Laboratories' Reply Brief in Support of its Mot. To Dismiss Plaintiffs' Compl. Pursuant to Rule 12(b)(6)
Case No. C 07-5702 CW

*In re Abbott Labs. Norvir Anti-Trust Litig.*,
    442 F. Supp. 2d 800 (N.D. Cal. 2006) ................................................................. 4, 5, 7

*In re Indep. Serv. Orgs. Antitrust Litig.*,
    203 F.3d 1322 (Fed. Cir. 2000) ................................................................................. 13

*Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*,
    248 F.3d 1333 (Fed. Cir. 2001) ................................................................................... 6

*Intergraph Corp. v. Intel Corp.*,
    195 F.3d 1346 (Fed Cir. 1999) ................................................................................ 1, 6

*ITCO Corp. v. Michelin Tire Corp.*,
    722 F.2d 42 (4th Cir. 1983) ........................................................................................ 13

*Jacobs v. Nintendo of Am., Inc.*,
    370 F.3d 1097 (Fed. Cir. 2004) ................................................................................... 7

*Johnson v. Insurance Co.*,
    300 N.C. 247 (1980) *overruled on other grounds by Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559 (1988) ................................................................................. 15

*Marshall v. Miller*,
    302 N.C. 539 (1981) ............................................................................................ 13, 15

*Miller v. Rose*,
    138 N.C. App. 582 (2000) .......................................................................................... 14

*Monsanto Co. v. McFarling*,
    302 F.3d 1291 (Fed. Cir. 2002) ......................................................................... 5, 8, 11

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Xerox Corp.*,
    25 A.D.3d 309 (1st Dep't 2006) ............................................................................... 2, 9

*Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*,
    86 N.Y.2d 685 (1995) ............................................................................................. 9, 11

*Pearce v. Am. Defender Life Ins. Co.*,
    316 N.C. 461 (N.C. 1986) .................................................................................... 14, 15

*Primex Intern. Corp. v. Wal-Mart Stores, Inc.*
    89 N.Y.2d 594 (1997) ................................................................................................. 12

*R.J. Reynolds Tobacco Co. v. Philip Morris, Inc.*,
    199 F. Supp. 2d 362 (M.D.N.C. 2002) ...................................................................... 13

*Sabetay v. Sterling Drug, Inc.*,
    69 N.Y.2d 329 (1987) ................................................................................................... 9

-iii-

Abbott Laboratories' Reply Brief in Support of its Mot. To Dismiss Plaintiffs' Compl. Pursuant to Rule 12(b)(6)
Case No. C 07-5702 CW

*Schor v. Abbott Labs.*,
   457 F.3d 608 (7th Cir. 2006) .................................................................................. 5, 13

*Sears, Roebuck & Co. v. Stiffel Co.*,
   376 U.S. 225 (1964) ...................................................................................................... 6

*SMC Corp. v. Xerox Corp.*,
   645 F.2d 1195 (2d Cir. 1981) ....................................................................................... 7

*Spindelfabrik Suessen-Schurr Stahlecker & Grill GmbH v. Schubert & Salzer
   Maschinenfabrik Aktiengesellschaft,*
   829 F.2d 1075 (Fed. Cir. 1987) .................................................................................. 10

*State Oil Co. v. Khan*,
   522 U.S. 3 (1997) ........................................................................................................ 11

*Sutton Assocs. v. Lexis-Nexis*,
   761 N.Y.S.2d 800 (N.Y. Sup. 2003) .............................................................................. 9

*United States v. Studiengesellschaft Kohle, m.b.H.*,
   670 F.2d 1122 (D.C. Cir. 1981) .................................................................................... 6

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
   344 F.3d 1294 (11th Cir. 2003) .................................................................................... 4

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
   382 U.S. 172 (1965) ...................................................................................................... 6

**STATUTES AND OTHER AUTHORITIES**

35 U.S.C. § 282 ..................................................................................................................... 3

Fed. R. Civ. P. 12 ......................................................................................................... 1, 5, 10

U.S. Const., art. I, § 8 ........................................................................................................... 6

-iv-

Abbott Laboratories' Reply Brief in Support of its Mot. To Dismiss Plaintiffs' Compl. Pursuant to Rule 12(b)(6)
Case No. C 07-5702 CW

## I. INTRODUCTION

The antitrust claims in GSK's complaint fail for the reasons addressed in Abbott's omnibus motion addressing all of the new complaints under *Cascade*. Abbott's separately filed motion to dismiss directed specifically to GSK's complaint, as well as this reply in support of that motion, relate to the unique aspects of the GSK complaint that additionally and independently mandate dismissal of GSK's case under Rule 12(b)(6).

In addition to its failure to plead a proper antitrust claim under *Cascade*, GSK's case fails at the threshold because GSK's complaint – and the License Agreement that is an integral part of it – affirmatively show that Abbott's patents cover the alleged Boosted Market. This precludes antitrust liability because a patentee cannot be liable for "unlawfully" monopolizing a market its patents give it every right to monopolize. GSK never disputes this law. Instead, GSK argues that it is irrelevant because GSK has avoided specifically alleging "that Abbott's patents [are] valid." (Opp'n at 7). GSK has it backwards – Abbott's patents are presumed valid by statute and, thus, GSK had to specifically allege invalidity if it believed that allegation was relevant to stating a claim. Moreover, the Supreme Court has held that intentional fraud would be necessary to overcome the antitrust immunity afforded by a government-issued patent. GSK has not even alleged patent invalidity, let alone unenforceability based on intentional fraud. Accordingly, GSK has pleaded its Sherman Act claim out of court.

GSK also argues that the Ninth Circuit's decision in *Image Technical Services Inc. v. Eastman Kodak & Co.*, 125 F.3d 1195 (9th Cir. 1997) authorizes its patent-monopoly leveraging theory despite Abbott's patents. But GSK has misread *Kodak*, which addressed an attempt to monopolize a *non-patented* market, not a *patented* market. As noted, GSK's complaint, in combination with the License Agreement, which the parties agree was incorporated by reference into the complaint, specifically states that Abbott's patents cover the Boosted Market (the allegedly monopolized market here). No case, including *Kodak*, endorses the notion that the Sherman Act prohibits a patentee from monopolizing a patented market. Antitrust laws "do not negate the patentee's right to exclude others from patent property." *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1362 (Fed Cir. 1999).

GSK next argues that Abbott waived its antitrust immunity under the patent laws by entering into its License Agreement with GSK. But no court has held that license agreements eliminate patent immunity, and for good reason. Licensing a patent is an enforcement, not an abandonment, of the right to exclude under a patent. To the extent that conduct by Abbott was purportedly inconsistent with the GSK license, GSK's exclusive remedy would be under contract laws in accordance with the specific terms of the parties' License Agreement, not under the antitrust laws.

GSK's Sherman Act claim should be dismissed on the independent ground that it is barred by controlling Federal Circuit precedent, which squarely rejects a monopolization claim based upon alleged leveraging of monopoly power that itself derives from a patent (here, Abbott's patent on Norvir). As discussed in Abbott's opening brief, GSK's patent-monopoly leveraging claim requires GSK to plead and prove – as an element of its claim for relief – that, at a minimum, Abbott's alleged exclusionary conduct extended "beyond the grant of a patent." *Kodak*, 125 F.3d at 1216. The fact that a well-pleaded complaint would include this essential element confers Federal Circuit jurisdiction, and Federal Circuit precedent dooms GSK's antitrust claim.

GSK also has failed to justify its implied covenant claim. GSK seeks to impose on Abbott a central, independent, implied contractual obligation to maintain Norvir's price at levels that GSK deems acceptable. (Compl. ¶ 64). At the time of the contract, however, GSK never negotiated any limitation on Abbott's right to set the price of its own patented product – an "agreement" that, if reached, would have blatantly violated the Sherman Act as a price-fixing agreement between direct competitors. Not surprisingly, therefore, GSK points to nothing in the License Agreement even indirectly referencing Norvir's price. Settled New York law, which GSK never disputes, precludes the use of the implied covenant of good faith and fair dealing to create "independent contractual rights" not implicated by the terms of a contract. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Xerox Corp.*, 25 A.D.3d 309, 310 (1st Dep't 2006).

Finally, GSK's North Carolina claims fail in light of the fact that, with *Cascade*, federal courts – in the Ninth, Seventh and Federal Circuits – now uniformly reject the federal antitrust claim on which it is based. Further, even were this Court to disagree about the dispositive effect of *Cascade*, a key question would remain regarding the viability of GSK's North Carolina claims – that

-2-

is, whether the North Carolina Supreme Court would follow the Seventh and Federal Circuits' lead in rejecting GSK's theory of antitrust liability. As demonstrated in Abbott's opening brief, there is no basis to conclude that the North Carolina Supreme Court would depart from these rulings. GSK makes no argument to the contrary.

## II.    ARGUMENT

### A.    GSK Has Pleaded Its Sherman Act Claim Out Of Court

GSK agrees, as it must, that the Court should consider the License Agreement part of the complaint. (Opp'n at 7). That agreement, along with the allegations in the complaint itself, establish that GSK has pleaded itself out of court with regard to its Sherman Act claim.

#### 1.    GSK Admits That Abbott's Patents Cover The "Boosted Market"

As Abbott established in its opening brief, GSK repeatedly represented in the License Agreement that Abbott's patents cover not only the alleged Boosting Market (*i.e.*, ritonavir), but also the alleged Boosted Market (*i.e.*, PI's when boosted by ritonavir). These admissions could not be more express: "Abbott owns certain patents related to the use, marketing and promotion of Ritonavir . . . , its protease inhibiting compound (marketed under the trade name Norvir®), in combination with other products indicated for the treatment of HIV." (Norris Decl. in Support of Opening Br., Ex. A at 1). The License Agreement identifies by number the Abbott patents "relating to the use of Ritonavir and pharmaceutical formulations thereof in combination with other protease inhibitors." (*Id*. ¶ 1.12 & p. 20). Similarly, the complaint alleges that Abbott's "intellectual property" covers "PIs for administration with Norvir" – *i.e.*, the alleged "Boosted Market." (Compl. ¶¶ 17, 20, 21, 36, 38, 40).

In its opposition brief, GSK never disputes that it has alleged that Abbott's patents cover the Boosted Market. Instead, GSK attempts to avoid Abbott's "patent immunity" by arguing that it has not pleaded that "Abbott's patents were valid." (Opp'n at 7). This argument turns patent law on its head. First, patents are presumed valid and enforceable by statute. *See* 35 U.S.C. § 282; *Adenta GmbH v. OrthoArm, Inc.*, 501 F.3d 1364, 1371 (Fed. Cir. 2007). GSK has not alleged in its complaint that Abbott's patents are invalid and, thus, they are presumed valid. Given the presumption of validity and the admissions in the License Agreement, this Court must accept that

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Abbott holds valid and enforceable patents covering Norvir in combination with other PIs – *i.e.*, the Boosted Market.

Second, as explained in *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 344 F.3d 1294 (11th Cir. 2003), even a declaration of "subsequent invalidity . . . is insufficient to render the patent's potential exclusionary effects irrelevant to the antitrust analysis" unless the patent was procured by intentional fraud. *Id*. at 1309 (citing *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 179-80 (1965)). Thus, even if GSK had alleged invalidity – which it has not – Abbott's patent immunity would still defeat GSK's claim.

### 2. GSK's Admission That Abbott's Patents Cover The "Boosted Market" Bars Its Sherman Act Claim

GSK's admission that Abbott's patents cover the Boosted Market is fatal to its Sherman Act claim. As this Court previously held, "[l]egally, a patent amounts to a permissible monopoly over the protected work." *In re Abbott Labs. Norvir Anti-Trust Litig.*, 442 F. Supp. 2d 800, 808 (N.D. Cal. 2006) (quoting *Kodak*, 125 F.3d at 1215). Antitrust laws are thus implicated only when a patent owner "extends its monopoly beyond the scope of the patent." (10/21/04 Order at 4). Therefore, given its admission, GSK has failed to allege that Abbott's purported exclusionary conduct extends beyond the scope of its patent protection.

GSK cannot find refuge in *Kodak*. According to GSK, *Kodak* stands for the proposition that antitrust patent immunity can always be defeated by a showing of pretext. That is not true. *Kodak* did not address an alleged attempt to monopolize a *patented* market; it addressed an attempt to monopolize an *unpatented* market. Specifically, the Ninth Circuit found that Kodak leveraged its monopoly over patented photocopier and micrographic parts by refusing to sell these parts to third-party companies that sought to compete in the separate, unpatented services market. *Kodak*, 125 F.3d at 1218-20. That finding is irrelevant to this case, where GSK has pleaded facts showing that Abbott's patents cover *both* alleged relevant markets – *i.e.*, the Boosting and Boosted Markets.

Indeed, this Court distinguished the *Doe/SEIU* case from the allegations in another Norvir-related case filed in the Northern District of Illinois because "[i]n that case, unlike in [the *Doe/SEIU*] case, the plaintiff did not challenge Defendant's assertion that its patents explicitly cover the use of

-4-

Norvir as a booster in combination with another PI." *In re Abbott Labs.*, 442 F. Supp. 2d at 810. As the Seventh Circuit noted when affirming a Rule 12(b)(6) dismissal in the Illinois case, if "the product 'ritonavir in combination with another protease inhibitor' *is* patented to Abbott, [it] is entitled to monopolize the combination." *Schor v. Abbott Labs.*, 457 F.3d 608, 614 (7th Cir. 2006) (emphasis in original). Accordingly, the pretext concept discussed in *Kodak* is irrelevant here, where GSK's own complaint alleges that Abbott's patents cover the Boosted Market.

Moreover, *Kodak* did not address exclusionary conduct through pricing decisions, let alone hold that prices on patented products can subject a patent owner to antitrust liability. The only time the *Kodak* court discussed the pricing of patented products, as opposed to the refusal to deal at issue there, it found that "Kodak is entitled to reap monopoly prices for the sale or licensing of" its patented products. *Kodak*, 125 F.3d at 1218 n.11. This holding is consistent with the Ninth Circuit's previous holding that "setting high prices in the original 'monopoly' market" is among the "ways that a monopolist can permissibly benefit from its position." *Alaska Airlines Inc. v. United Airlines, Inc.*, 948 F.2d 536, 548 (9th Cir. 1991). It is simply beyond debate that "[t]he owner of a patented article can, of course, charge such price as he may choose." *Monsanto Co. v. McFarling*, 302 F.3d 1291, 1299 (Fed. Cir. 2002) (citation omitted).

GSK also mischaracterizes this Court's decision denying summary judgment in the *Doe/SEIU* case prior to the Ninth Circuit's issuance of *Cascade*. According to GSK, "this Court in fact considered a nearly identical claim of pretext and found that pretext had been alleged and sufficient facts shown to raise a triable issue of fact." (Opp'n at 8 (citing *In re Abbott Labs.*, 442 F. Supp. 2d at 808 & n.1)). In that decision, however, the Court merely found that there was a triable issue of fact as to pretext "***if*** [Abbott's] patents do not cover [the] boosted market." *In re Abbott Labs.*, 442 F. Supp. 2d at 808 (emphasis added). The Court did not hold that a finding of pretext would be relevant to Abbott's primary argument "that its patents cover the boosted market." *Id*.

**3.    The License Agreement Did Not Waive Abbott's Antitrust Immunity Under The Patent Laws**

GSK cannot save its Sherman Act claims by pointing to a private licensing agreement. The whole point of a patent is to create a government-sanctioned right to exclude competition in the

-5-

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

patented market. The framers of the Constitution authorized patent laws "to stimulate invention and reward innovation" by granting the patentee a lawful monopoly concerning the patented invention. *United States v. Studiengesellschaft Kohle, m.b.H.*, 670 F.2d 1122, 1127 (D.C. Cir. 1981); *see also* U.S. Const., art. I, § 8. Thus, "[p]atents are not given as favors . . . but are meant to encourage invention by rewarding the inventor with the right, limited to a term of years fixed by the patent, to exclude others from the use of his invention." *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 229 (1964). As the Supreme Court similarly explained in *Walker*: "A patent by its very nature is affected with a public interest. . . . *[It] is an exception to the general rule against monopolies and to the right to access to a free and open market.*" *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) (citation omitted) (emphasis added). Thus, antitrust laws simply "do not negate the patentee's right to exclude others from patent property." *Intergraph Corp.,* 195 F.3d at 1362.

GSK nonetheless argues that Abbott waived its antitrust immunity under the patent laws by entering into the License Agreement. But GSK's limited contractual rights in the Boosted Market – including its potential remedies against Abbott concerning conduct in that market – are governed exclusively by contract laws under the License Agreement, not the antitrust laws.

A license agreement, of course, is not an *abandonment* of a patent's right to exclude. It is the opposite – it is the *enforcement* of the right to exclude by charging a toll for market entry and, thus, it *preserves* patent rights. Indeed, one of the "essential rights of a patentee" is the right "to license others." *Studiengesellschaft Kohle, m.b.H.*, 670 F.2d at 1127. In exchange for a royalty payment, the license represents a "covenant by the patent owner not to sue the licensee for making, using, or selling the patented invention." *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001).

To the extent that Abbott has allegedly trampled on GSK's rights under the License Agreement, GSK may have a *contract action* if the License Agreement prohibits the specific conduct at issue. Indeed, as GSK itself notes, the License Agreement imposes on Abbott "a 'contractual obligation' to 'permit GSK to promote and market its PIs in combination with Norvir.'" (Opp'n at 10 (emphasis added)). But GSK certainly cannot bring an *antitrust action* based on such

-6-

conduct. Abbott has merely *contractually* waived its ability to exclude GSK from the Boosted Market to the limited extent that the *specific terms* of the License Agreement so provide – *and to no further extent.*

There is simply no debate that "conduct permissible under the patent laws cannot trigger any liability under the antitrust laws." *SMC Corp. v. Xerox Corp.*, 645 F.2d 1195, 1206 (2d Cir. 1981). Abbott's statutory right of exclusion obviously still exists; otherwise, GSK and other PI providers would not be paying a royalty to Abbott. Abbott can, for instance, exclude any non-licensed PI provider and can even exclude GSK from the market if GSK fails to comply with its royalty obligations. Thus, GSK's sole remedy for any alleged exclusionary conduct is limited by the parties' contract, not the antitrust laws.

GSK has cited no authority – and Abbott is aware of none – holding that entering into a license agreement exposes the patentee to antitrust liability. The cases cited by GSK confirm that license agreements are creatures of contract law and do not in any way alter the antitrust immunity afforded under the patent laws. *Jacobs v. Nintendo of Am., Inc.*, 370 F.3d 1097 (Fed. Cir. 2004), concerned a patent infringement action – not an antitrust action – in which the court merely enforced the "basic contract law principle that a party may not assign a right, receive consideration for it, and then take steps that would render the right commercially worthless." *Id*. at 1101 (emphasis added). *Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d 1343 (Fed. Cir. 2003), merely noted that license agreements reflect a *contractual* waiver of a patentee's statutory right to exclude and, as with *Jacobs*, did not address antitrust allegations. Although *Christianson v. Cold Industries Operating Corp.*, 486 U.S. 800 (1988), did involve antitrust allegations, that case is irrelevant. The portion of the case relied on by GSK merely noted that the defendant may have *contractually* authorized the plaintiffs to use certain trade secrets. *Id*. at 811. The Court certainly never held that a license agreement waives antitrust immunity under the patent laws.

GSK also cannot find refuge in this Court's statement that relinquishment of patent rights through "an implied license can eliminate patent immunity under anti-trust laws." *In re Abbott Labs.*, 442 F. Supp. 2d at 810. GSK, of course, does not allege the existence of any implied license. It alleges the precise opposite – namely, that Abbott enforced its patents by "demand[ing]" that GSK

-7-

enter into the License Agreement. (Compl. ¶ 20). To the extent this Court finds the implied license argument at all relevant, which it is not since GSK is specifically alleging that Abbott *enforced* its patents, Abbott will avoid duplicative briefing by incorporating by reference its discussion of the implied-license argument at pages 34-37 of its recently filed summary judgment motion in the *Doe/SEIU* case.

In sum, GSK's pleading admissions that Abbott's patents cover the Boosted Market allow Abbott to "charge such price as [it] may choose" for its patented invention. *Monsanto*, 302 F.3d at 1299 (citation omitted). GSK's Sherman Act claim, which does not allege exclusionary conduct beyond the scope of these patents, thus fails as a matter of law.

### B. GSK Has Failed To Rebut Abbott's Argument That The Sherman Act Claim Should Be Dismissed Under Federal Circuit Precedent

As explained in Abbott's opening brief, GSK's Sherman Act claim should be dismissed on the independent ground that it is subject to Federal Circuit jurisdiction and, therefore, is controlled by Federal Circuit precedent specifically rejecting GSK's theory of liability. This Court's earlier decisions on a related issue in Doe/SEIU are not dispositive because this case concerns a unique situation in which the plaintiff has actually pleaded that Abbott's patents cover the Boosted Market. Even if *Cascade* did not separately bar GSK's claim (as it does), GSK's Sherman Act claim would fail under Federal Circuit precedent because Abbott admittedly enjoyed patent protection in the Boosting Market.

Moreover, *Kodak* makes clear that not only GSK, but the other new Norvir plaintiffs as well, must at a minimum plead as part of their patent-monopoly leveraging allegations that Abbott has "attempt[ed] to extend a lawful monopoly *beyond the grant of a patent*." *Kodak*, 125 F.3d at 1216 (emphasis added). The "right to relief" in these cases thus "necessarily depends on resolution of a substantial question of federal patent law." *Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 830 (2002). GSK has ignored this requirement for a well-pleaded claim and, instead, summarily asserts that the issue of Federal Circuit jurisdiction has been decided. This Court has not addressed this specific argument because Abbott previously focused on a pure choice-of-law issue, rather than a jurisdictional argument given the specific pleading requirement under *Kodak*.

### C. GSK Has Failed To Justify Its Attempt In The Implied Covenant Claim To Impose Independent Contractual Restraints On Abbott's Pricing Decisions

As Abbott pointed out in its opening brief, and as GSK seems to acknowledge, New York courts are split on whether even to recognize an independent claim for breach of the implied covenant of good faith and fair dealing. Nevertheless, New York courts have uniformly held that even if such a claim exists, a party may *not* invoke this implied covenant "to create independent contractual rights." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Xerox Corp.*, 25 A.D.3d 309, 310 (1st Dep't 2006); *accord Sutton Assocs. v. Lexis-Nexis*, 761 N.Y.S.2d 800, 804 (N.Y. Sup. 2003) (holding that the implied covenant of good faith and fair dealing "cannot be used to create independent obligations beyond those agreed upon and stated in the express language of the contract").

The prohibition against creating "independent contractual rights" is based on the basic tenet of contract law that parties are held to the terms of their bargain. As the New York Court of Appeals (New York's highest court) explained: "Freedom of contract prevails in an arm's length transaction between sophisticated parties . . . , and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain. If they are dissatisfied with the consequences of their agreement, the time to say so [was] at the bargaining table." *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 695 (1995) (quotation omitted).

According to GSK's complaint, Abbott implicitly agreed in the License Agreement to allow GSK "to promote the co-prescription and co-administration of its PI products with Norvir *at prices competitive with those of Kaletra and other PIs*." (Compl. ¶ 36 (emphasis added)). But pricing of a patented product is central to a patentee's rights. No court has held that such a central right is impliedly limited by a license agreement that does not have any term that places any limitation whatsoever on this central right. Such a limitation would be the sort of "independent obligations beyond those agreed upon and stated in the express language of the contract" that the courts have rejected.

First, "the implied obligation [must be] in aid and furtherance of other terms of the agreement of the parties." *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 335 (1987). Here, however, the

-9-

License Agreement does not address in any way Abbott's pricing decisions or, specifically, Norvir's price. Nor did Abbott guarantee GSK any share of the Boosted Market. The License Agreement is "in essence nothing more than a promise by the licensor not to sue," *Spindelfabrik Suessen-Schurr Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075, 1081 (Fed. Cir. 1987), and, thus, is not an implied agreement to abandon the core right to price Abbott's own patented invention. Indeed, the purpose of the License Agreement was to *enforce* Abbott's right to collect royalties for use of its patented invention not, as GSK alleges, to *waive* Abbott's patent right to set the invention's price. One thing has nothing to do with the other.

A New York federal court dismissed an implied covenant claim under analogous circumstances. In *Geren v. Quantum Chem. Corp.*, 832 F. Supp. 728 (S.D.N.Y. 1993), a bondholder sued to recover for a decline in the value of the bonds after the company paid a special dividend to shareholders. *Id*. at 730. The bondholder admitted that the dividend did not violate the express terms of the parties' agreement, but, rather, alleged that the dividend breached the implied covenant of good faith and fair dealing by reducing the market value of the bonds. *Id*. at 731. The court dismissed the claim under Rule 12(b)(6), holding that implying any such term "would require the court to add a substantive provision for which the parties did not bargain." *Id*. at 733 (citation omitted). The court found this "especially troublesome in light of the fact that the [indenture] could easily have been drafted to incorporate expressly the terms the plaintiffs now urge this court to imply." *Id*. (citation omitted); *see also Hartford Fire Ins. Co. v. Federated Dep't. Stores Inc.*, 723 F. Supp. 976, 991 (S.D.N.Y. 1989) ("[T]he implied covenant of good faith and fair dealing does not provide a court *carte blanche* to rewrite the parties' agreement. . . . Nor can a court imply a covenant to supply additional terms to which the parties did not bargain."); *Golub Assocs. Inc. v. Lincolnshire Mgmt., Inc.*, 1 A.D.3d 237, 238 (1st Dep't 2003) (implied covenant "may not be construed to . . . contrive novel contract rights").

That reasoning is absolutely on point. GSK is a sophisticated party that certainly understood Abbott's right to raise the price of Norvir. If, as GSK alleges, it entered into the License Agreement based on an expectation that future Norvir price increases would be consistent with "past increases," GSK could and should have expressed that expectation and negotiated a contract provision that

-10-

protected itself from larger price increases. (Compl. ¶ 64). In fact, as noted below, GSK takes the position that it may have been lawful to agree with Abbott to constrain Norvir pricing to purported "reasonable levels." (*See* Opp'n at 17). Yet, GSK chose to leave undisturbed Abbott's unfettered patent right to price Norvir "as [it] may choose." *Monsanto*, 302 F.3d at 1299 (citation omitted). The implied covenant of good faith and fair dealing does not allow GSK to reconsider that bargain after leaving "the bargaining table." *Oppenheimer & Co.*, 86 N.Y.2d at 695.

Second, GSK's "implied agreement" fails because "a contract that may be construed both lawfully and unlawfully should be construed in favor of its legality." *Bloomfield v. Bloomfield*, 764 N.E. 2d 950, 953 (N.Y. App. 2001) (collecting cases). Here, GSK is claiming that Abbott and GSK implicitly agreed on the price at which Abbott would sell Norvir to consumers, which price their complaint alleges is critical to the *direct competition* between Kaletra and GSK's drug Lexiva. (Compl. ¶¶ 20-24, 46). But an agreement between direct, horizontal competitors on prices – either maximum or minimum – is a *per se* violation of the Sherman Act. As the Supreme Court has explained, "[o]ur decisions foreclose the argument that the agreements at issue escape *per se* condemnation because they are horizontal and fix maximum prices." *Arizona v. Maricopa County Med. Soc.*, 457 U.S. 332, 348 (1982).

GSK responds by weakly arguing that while their alleged "implied agreement" might be illegal, it would not be "*per se*" illegal because GSK and Abbott do not directly compete in the "Boost*ing* Market." (Opp'n at 16-17). That argument ignores that the crux of GSK's complaint is that Norvir's price impacts the direct and horizontal competition between Lexiva and Kaletra in the so-called "Boosted Market." (*See* Compl. ¶ 24 (alleging that "Kaletra . . . face[s] strong competition from . . . GSK's Lexiva")). Because Abbott and GSK do not share a vertical relationship (*i.e.*, Abbott does not sell Norvir to GSK for resale), the vertical price restraint case that GSK cites, *State Oil Co. v. Khan*, 522 U.S. 3 (1997), is inapplicable. *See Maricopa County Med. Soc.*, 457 U.S. at 348 n.18 ("[H]orizontal restraints are generally less defensible than vertical restraints."). GSK alternatively cites cases permitting price fixing agreements between non-competitors in a "joint venture." (Opp'n at 17). Those cases are irrelevant because Abbott and GSK are not joint venturers, and GSK has not alleged that they are. (*See* Norris Decl. in Support of Opening Br., Ex. A ¶ 11.8).

-11-

<u>Third</u>, the parties included an integration clause for the express purpose of superseding "[a]ll express or implied agreements and understandings, either oral or written[.]" (*Id.* ¶ 11.5). GSK misses the point of this clause. Abbott does not contend that this clause somehow eliminates the implied covenant of good faith and fair dealing. The question here is not whether the covenant binds Abbott to act in good faith with respect to the issues directly, or at least implicitly, addressed *by the express terms of the contract.* But, here, GSK alleges a completely separate and independent obligation on the part of Abbott to limit future price increases on Norvir referenced nowhere in any contract provision either directly or even implicitly. The very purpose of the integration clause was to prevent the parties from asserting "implied agreements" like this that far exceed the four corners of the express contract. *See Primex Intern. Corp. v. Wal-Mart Stores, Inc*. 89 N.Y.2d 594, 600 (1997) (explaining that integration clause reflects "the parties' intent that the Agreement is to be considered a completely integrated writing").

Finally, reading independent, implied obligations into an express contract that contains an integration clause would hardly be "consistent with the policy behind the implied covenant claim," as GSK argues. (Opp'n at 16). To the contrary, allowing GSK's claim to survive would expand in an unprecedented way a patentee's potential liability under a license agreement. Under GSK's theory, any licensee could turn around and sue the patentee/licensor for breach of the implied covenant whenever the patentee asserts its patent rights, such as through a pricing decision, in a way that purportedly impacts the licensee in the marketplace. But nobody enters into patent license agreements with the belief that they are "insurance policies" for the licensee's success in the marketplace. The Court should reject GSK's unprecedented argument, which would be bad policy in any circumstance and certainly with respect to a license agreement between sophisticated companies.

**D.    GSK's North Carolina Claims Should Be Dismissed Because They Are Based Solely On Conduct That Should Be Deemed Lawful Under North Carolina Law**

GSK's allegations fail to state a claim under the North Carolina Unfair Trade Practices Act ("UTPA"), which prohibits unfair, deceptive, or anticompetitive acts. GSK's complaint focuses on allegations of anticompetitive conduct, and these allegations form the basis of its North Carolina law

-12-

claims. Consequently, dismissal of GSK's Sherman Act claim necessarily warrants dismissal of these related state law claims as well. *See R.J. Reynolds Tobacco Co. v. Philip Morris, Inc.*, 199 F. Supp. 2d 362, 395-96 (M.D.N.C. 2002) (holding that dismissal of federal antitrust claims meant that the "state . . . statutory claims fail as well").

But even if this Court were to allow GSK's Sherman Act claim to proceed (despite recent Ninth Circuit precedent that Abbott submits squarely bars that claim), the viability of GSK's North Carolina claims would turn on a choice-of-law question virtually ignored in GSK's opposition brief. As Abbott explained in its opening brief, the Seventh and Federal Circuits have both made it clear that, even aside from the *Cascade* rule, the alleged exclusionary conduct in the complaint is perfectly lawful. *Schor*, 457 F.3d at 613; *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1327 (Fed. Cir. 2000). GSK does not dispute this. Instead, GSK summarily states – without explanation – that "Ninth Circuit law governs" not just its Sherman Act claim but also its North Carolina claims. (Opp'n at 22).

GSK is wrong. The case relied on by GSK itself confirms that North Carolina courts look to federal antitrust laws "for guidance." *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 48 (4th Cir. 1983). But North Carolina law ultimately controls application of the UTPA. *See, e.g., Marshall v. Miller*, 302 N.C. 539, 542-43 (1981). Indeed, GSK concedes in footnotes 7 and 15 of its brief that the North Carolina claims are governed by North Carolina law. Therefore, the North Carolina Supreme Court would be forced to choose which federal precedent to follow "for guidance."

The key question, therefore, is how the North Carolina Supreme Court would view the conduct at issue here from the perspective of federal antitrust law. For the reasons explained in Abbott's opening brief – arguments GSK has failed to rebut – there is no basis to conclude that the North Carolina Supreme Court would find that Abbott's conduct was inconsistent with federal antitrust law.

Perhaps recognizing that its allegations of anticompetitive conduct under North Carolina law are deficient, GSK focuses its opposition brief on alleged conduct that purportedly is deceptive or unfair. But this does not avoid dismissal. GSK's allegations of "unfair acts" fail to state a claim under the UTPA because they merely rehash GSK's breach of the covenant of good faith and fair

-13-

dealing allegations. Under North Carolina law, "[a] mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under" the UTPA, which requires "substantial aggravating circumstances attendant to the breach." *Miller v. Rose*, 138 N.C. App. 582 (2000) (citation omitted) (dismissing claim on this basis). Accordingly, GSK's allegation that Abbott breached its covenant of good faith and fair dealing, standing alone, is insufficient to state a claim under the UTPA as a matter of law.

GSK is thus left with its allegations of deceptive conduct. As Abbott explained in its moving papers, however, deceptive acts require allegations of detrimental reliance and injury proximately caused by the deception. GSK tacitly admits that it has failed to plead detrimental reliance. Instead, it argues that detrimental reliance is not required where a UTPA claim is based on deception. GSK is wrong. As the North Carolina Supreme Court explained, the requirement that the UTPA plaintiff "suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation . . . is similar to the detrimental reliance requirement under a fraud claim." *Pearce v. Am. Defender Life Ins. Co.*, 316 N.C. 461, 471 (N.C. 1986) (finding evidence sufficient to support finding that plaintiff detrimentally relied on alleged deceptive statements). And, as the North Carolina intermediate appellate court recently held in *Bus. Cabling, Inc. v. Yokeley*, 643 S.E.2d 63 (N.C. App. 2007), where a UTPA claim is based on deceptive acts, "*recovery . . . is limited to those situations when a plaintiff can show that plaintiff detrimentally relied upon a statement or misrepresentation and he or she suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation.*" *Id.* at 69 (citation omitted) (emphasis added); *see also Hageman v. Twin City Chrysler-Plymouth Inc.*, 681 F. Supp. 303, 308 (M.D.N.C. 1988) ("To prove actual causation, a plaintiff must prove that he or she detrimentally relied on the defendant's deceptive statement or misrepresentation.").

GSK places undue reliance on *Cullen v. Valley Forge Life Ins. Co.*, 161 N.C. App. 570, 580 (2003), which this Court should ignore. In *Cullen*, the North Carolina intermediate appellate court concluded that the UTPA does not require a showing of reliance – a holding that *directly conflicts* with the prior, controlling precedent in *Pearce* and the subsequent decision by its sister court in *Business Cabling*. *Cullen* got it wrong. It failed even to acknowledge *Pearce*, choosing instead to

-14-

rely upon the holding that "actual deception is not an element" under the UTPA in *Johnson v. Insurance Co.*, 300 N.C. 247, 265 (1980) *overruled on other grounds by Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559 (1988), a holding later echoed in *Marshall v. Miller*, 302 N.C. 539, 548 (1982). But the *Cullen* court misconstrued this holding. As the *Hageman* court explained, the phrase "proof of actual deception is not required" was not intended to eliminate the need to show reliance, but, rather, to relax common law deceit requirements of showing intent to deceive and a misstatement of fact (as opposed to opinion). 681 F. Supp. at 308-09. Neither *Johnson* nor *Marshall* addressed the reliance element. Thus, *Pearce* is controlling.

Even if detrimental reliance were not required as GSK argues (which clearly is not the case), the complaint still would fail, as GSK does not allege that it suffered any injury *as a result* of the allegedly deceptive practices (*Pearce*, 316 N.C. at 471), which even GSK admits is required under North Carolina law. Of course, the complaint does allege, as GSK notes in its opposition brief, that GSK suffered injury as a result of the Norvir price increase. But GSK does not allege that the Norvir price increase was deceptive. Instead, GSK alleges that Abbott made false statements to the public about its pricing for Norvir and the effect of the price increase on Kaletra's sales. (*See* Opp'n at 21). The complaint contains no allegation that these allegedly deceptive acts – as opposed to the price increase itself – proximately caused any harm to GSK.

For these reasons, GSK has failed to properly allege unfair, deceptive, or anticompetitive conduct under North Carolina law. Both North Carolina claims should be dismissed.

## III.  CONCLUSION

For the reasons set forth above and in Abbott's moving papers, this Court should dismiss all claims in GSK's complaint with prejudice.

Dated: February 21, 2008                    WINSTON & STRAWN LLP

                                            By:   /s/ James F. Hurst
                                                  James F. Hurst
                                                  Attorneys for Plaintiff