IRELL & MANELLA LLP
Alexander F. Wiles (CA 73596)
Brian Hennigan (CA 86955)
Stephanie Kaufman (CA 162644)
Trevor V. Stockinger (CA 226359)
Joshua Y. Karp (CA 254424)
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:  (310) 277-1010
Facsimile:   (310) 203-7199

ARNOLD & PORTER LLP
Kenneth A. Letzler (*Pro Hac Vice*)
555 Twelfth Street, NW
Washington, DC  20004-1206
Telephone:  (202) 942-5000
Facsimile:   (202) 942-5999

Attorneys for Plaintiff
GlaxoSmithKline

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SMITHKLINE BEECHAM CORPORATION, d/b/a GLAXOSMITHKLINE,<br><br>    Plaintiff,<br><br>    vs.<br><br>ABBOTT LABORATORIES,<br><br>    Defendant. | Case No. C 07-5702 CW<br><br>*Related by Order to:*<br><br>Case No. C 04-1511 CW<br><br>**NOTICE OF MOTION AND MOTION OF GLAXOSMITHKLINE TO COMPEL PRODUCTION OF DOCUMENTS RELATING TO MARKETING AND COSTS**<br><br>Date:  August 7, 2008<br>Time:  2:00 p.m.<br>Courtroom:  2<br><br>The Honorable Judge Claudia Wilken |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..................................................................................................................2

II. FACTUAL BACKGROUND ................................................................................................3

III. ARGUMENT ..........................................................................................................................8

    A. Legal Standard for Motion to Compel. .......................................................................8

    B. Abbott Should be Ordered to Produce All Norvir and Kaletra Marketing Documents. .................................................................................................9

        1. Norvir and Kaletra marketing documents are relevant to the issues in this case. .............................................................................................9

        2. Abbott's evasiveness is not enough to show burden. ...............................11

    C. Documents Describing Costs of Kaletra and Norvir Should Be Produced. ..................................................................................................................12

IV. CONCLUSION ....................................................................................................................13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Cascade Health Solutions v. PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008) .................................................................................................. 1

*Chase Manhattan Bank, N.A. v. Keystone Distrib. Inc.*,
  873 F. Supp. 808 (S.D.N.Y. 1994) .......................................................................................... 9

*Coker v. Duke & Co., Inc.*,
  177 F.R.D. 682 (M.D. Ala. 1998) ........................................................................................... 8

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
  504 U.S. 451 (1992) .............................................................................................................. 11

*Farber and Partners, Inc. v. Garber*,
  234 F.R.D. 186 (C.D.Cal. 2006) ............................................................................................. 8

*Image Technical Services, Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) .............................................................................................. 10

*L.C. Williams Oil Co., Inc. v. Exxon Corp.*,
  625 F. Supp. 477 (M.D.N.C. 1985) ...................................................................................... 10

*Milner v. Nat'l School of Health Technology*,
  73 F.R.D. 628 (E.D. Pa. 1977) .............................................................................................. 11

*United States v. E.I. DuPont de Nemours & Co.*,
  351 U.S. 377 (1956) .............................................................................................................. 11

**Statutes**

Fed. R. Civ. P. 26(b) ...................................................................................................... 8, 11, 12

Fed. R. Civ. P. 37(a) .............................................................................................................. 11

**Rules**

Jonathan B. Baker, *Market Definition: An Analytic Overview*, 74 Antitrust Law
  Journal 129 (2007) ................................................................................................................ 13

**NOTICE OF MOTION**

**TO DEFENDANT AND ITS ATTORNEYS OF RECORD:**

NOTICE IS HEREBY GIVEN that on August 7, 2008 at 2:00 p.m., or as soon thereafter as the matter may be heard in Courtroom 2, before the Honorable Judge Claudia Wilken, in the United States District Court for the Northern District of California, Oakland Division, Plaintiff SmithKline Beecham Corporation, d/b/a GlaxoSmithKline ("GSK"), will move this Court pursuant to Rule 37 of the Federal Rules of Civil Procedure for an order compelling Defendant Abbott Laboratories ("Abbott") to produce: (1) all documents that refer or relate to the marketing of Norvir and Kaletra; and (2) all reports summarizing the costs, including development, production, shipping, and distribution costs, incurred by Abbott for the sale of Norvir and Kaletra. GSK requests that this Court, rather than a magistrate, hear this motion. Abbott has defended its refusal to produce documents relating to costs based on a position that those documents are not relevant because of this Court's decision denying its Omnibus Motion to Dismiss, which it based on *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008) ("*Cascade*"). As detailed below, these documents are directly relevant to numerous other key issues in this case, and Abbott's reliance on this Court's denial of its *Cascade* motion as a discovery shield is unjustified. Because it was this Court that made the *Cascade* ruling and will be deciding Abbott's request for certification of interlocutory appeal, rather than a magistrate, it is more efficient for this Court to decide this discovery motion.

This motion is supported by the accompanying Memorandum of Points and Authorities, the Declaration of Trevor V. Stockinger in support of this motion, exhibits attached thereto, and such other argument and evidence as may be presented at the hearing on the motion.

A proposed order is lodged herewith.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The vast majority of Abbott's production in this case is merely a re-production of the documents it produced in the related *In re Norvir* action.[1] Abbott's responses to discovery requests served in that case are inconsistent and evasive, and GSK has spent over six months seeking basic information from Abbott's counsel in an attempt to understand the true scope of its production in order to avoid disputes. Amazingly, in many instances, Abbott has claimed to be ignorant of the scope of its production. Thus, GSK has no way to confirm that Abbott has produced all non-privileged documents responsive to the document requests served upon it. GSK brings this motion in order to obtain an order to compel Abbott to produce all non-privileged, responsive materials in two categories.[2]

First, GSK seeks an order compelling Abbott to produce all non-privileged responsive documents relating to the marketing of Norvir and Kaletra. While Abbott acknowledges producing certain of these materials, it cannot (or will not) inform GSK of the precise scope of production. These materials are some of the most relevant to this case, providing information to support Abbott's breach of its contractual obligations to GSK, its deceptive and unfair business conduct, anticompetitive intent, market definition, market power, and a rebuttal of Abbott's justifications for the price increase. Clarity on the scope of production is critical to most cases, but is particularly important here where Abbott is relying primarily on documents re-produced from a case that included fewer causes of action than GSK asserts here.[3] GSK is entitled to know whether that re-production includes requested documents that are relevant to its state law claims. This Court should not countenance Abbott's refusal to apprise GSK of the scope of its production. GSK requests this Court grant GSK's motion to compel production of this category of documents.

---

[1] Abbott has produced over 400,000 pages of documents. Less than 2,000 pages come from productions outside of the documents provided in *In re Norvir*.

[2] GSK is continuing to work with Abbott to resolve additional issues and reserves its right to raise these with the Court if they cannot be amicably resolved.

[3] The Court will recall that in additional to its Sherman Act claim, which the *In re Norvir* plaintiffs also asserted, GSK has claims for breach of contract, violations of the North Carolina Unfair Trade Practices Act, and violations of the North Carolina Anti-Monopolization Act.

Second, Abbott has provided inconsistent responses to requests concerning documents relating to costs of Norvir or Kaletra. While it appears Abbott has produced certain cost documents, it has now refused to produce additional materials or discovery regarding costs, claiming these materials are irrelevant after this Court's ruling regarding *Cascade*. Abbott seems to ignore that these materials regarding the cost of Norvir and Kaletra are relevant to a broad array of issues other than the below-cost pricing test set out in *Cascade*. GSK requests this Court grant GSK's motion to compel Abbott to produce reports summarizing costs associated with the sale of Norvir and Kaletra, including development, production, shipping, and distribution costs.

## II.     FACTUAL BACKGROUND

This case centers on the harm that Abbott inflicted on competition, and on GSK, in the market for boosted protease inhibitors by instituting a massive 400 percent price increase of Norvir in December 2003 – just before GSK launched a competing protease inhibitor, Lexiva, and only shortly after GSK paid Abbott millions of dollars for the right to promote GSK's protease inhibitors with Norvir. GSK asserts that this conduct constitutes a breach of contract, violations of the North Carolina Unfair Trade Practices Act, and violations of federal and state antitrust law. Abbott's price increase cemented Kaletra's market position and derailed GSK's ability to successfully launch Lexiva. The 400 percent price increase also prevented GSK from obtaining the fruits of its license with Abbott for the right to promote Norvir with GSK protease inhibitors. Abbott publicly defends these actions by insisting that its price hike was lawful and justified. For example, Abbott sent a letter to HIV treating doctors and clinicians discussing the price increase and claiming that "[s]ince Norvir was originally launched, the role and value of Norvir … has changed dramatically." Ex. 1.[4] Internal Abbott documents, however, proffer other purported justifications for the price hike. For example, in a correspondence considering the marketing strategy for the Norvir price hike, Jesus Leal, an Abbott executive, posited that Abbott could justify the price hike by telling the public that "it is no longer feasible for Abbott to provide a production line of Norvir capsules at the current price." Ex. 2 at 2.

---

[4] All exhibits referenced herein are attached to the concurrently filed Declaration of Trevor V. Stockinger.

Yet, the evidence adduced thus far suggests that Abbott's justifications are deceptive and pretextual. For example, Jesus Leal acknowledges the "weakness" of his rationale if Abbott were "forced to open [its] books" – indicating that the costs of Norvir do not support such a price increase. *Id.* And, the few documents regarding costs that Abbott has produced show that even before the price hike Abbott was recouping the value of Norvir by earning a significant margin on its sales. Moreover, the FDA has chastised Abbott for its deceptive marketing regarding the price of Norvir. *See* Ex. 3. GSK requested documents relating to marketing Norvir and Kaletra and documents relating to costs incurred from selling Norvir and Kaletra, in part, to find further evidence to show Abbott's bad faith and deception, and the falsity of Abbott's justifications for the price increase.

On December 17, 2007, this Court instructed Abbott to re-produce documents from the *In re Norvir* case into this case. 12/17/2007 Minute Order and Case Management Order, Docket No. 28, at 2:7. In keeping with the spirit of that Order, GSK had propounded on Abbott a request seeking production of all documents responsive to the *In re Norvir* plaintiffs' requests, in addition to a limited number of other document categories. The *In re Norvir* requests for production asked for documents relating to marketing of Norvir and Kaletra and the costs incurred from their sale. GSK's Request No. 3, which integrated the *In re Norvir* requests, and Abbott's response first served on January 9, 2008, are as follows:[5]

| GSK's Request | Abbott's Response |
|---|---|
| GSK Request No. 3: All documents responsive to requests for production served upon you in *In re Abbott Laboratories Norvir Anti-Trust Litigation*, No. C 04-1511 CW (Consolidated Case No. C 04-4203), filed in the United States District Court for the Northern District of California, whether or not you produced those documents. | In addition to its general objections, Abbott objects to this request as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Abbott also incorporates each and every general and specific objection Abbott raised in response to all applicable requests for production served upon it in *In re Abbott Laboratories Norvir Anti-Trust Litigation*, No. C 04-1511 CW (Consolidated Case No. C 04-4203). Abbott further objects to the extent that this request seeks information protected by the attorney-client privilege and/or the |

---
[5] Abbott served amended responses to GSK's First Set of Requests for Production on April 15, 2008. It did not amend this specific response at that time.

- 4 -

| GSK's Request | Abbott's Response |
|---|---|
|  | work product doctrine. Without waiving its objections and subject to them, Abbott agrees to produce non-privileged, responsive documents that it produced in *In re Abbott Laboratories Norvir Anti-Trust Litigation*, No. C 04-1511 CW (Consolidated Case No. C 04-4203), including all responses in which Abbott raised any objections to those requests for production, any motions or court orders concerning those objections, and any non-privileged correspondence between the parties addressing those objections, to the extent they exist and can be located after a reasonable search. |

Ex. 4 at 4:25-5:12.

Both Abbott and GSK understood that to evaluate Abbott's response to GSK's Request No. 3, GSK would have to review the "objections to [*In re Norvir*] requests for production, any motions or court orders concerning those objections, and any non-privileged correspondence between the parties." *Id.* Because the re-production of *In re Norvir* documents comprise the vast majority of documents produced in this case, GSK wrote to Abbott on February 18, 2008 seeking clarification of the scope of the *In re Norvir* production and confirmation that Abbott had produced all of the responses, objections, discovery correspondence, discovery motions, and orders from the *In re Norvir* case. Ex. 5 at 3. After numerous meet and confers over the next four months, on June 5, 2008, Abbott finally produced these explanatory materials. Ex. 19. However, it claimed that many of the discovery agreements reached in that case were made orally such that review of these materials would not provide GSK the answers it needed regarding the scope of Abbott's production. *See*, *e.g.*, Ex. 9 at 2.

Compounding the problem, Abbott would not or could not provide information as to the scope of its production for specific requests seeking marketing materials relating to Norvir and Kaletra. This is problematic because Abbott's written responses to these requests in *In re Norvir* were inconsistent. Abbott apparently first outright refused to produce any materials:

| *In re Norvir* Request | Abbott's Response |
|---|---|
| <u>*In re Norvir* Request No. 16</u>: Any and all documents that refer or relate to the marketing of Norvir from introduction to present time. | In addition to its general objections, Abbott objects to this request as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. |
| <u>*In re Norvir* Request No. 17</u>: Any and all documents that refer or relate to the marketing of Kaletra from introduction to present time. | In addition to its general objections, Abbott objects to this request as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. |

Ex. 6 at 8:19-9:4. Yet, in responses to later requests for production in *In re Norvir*, Abbott states that "[r]elevant documents relating to the marketing of Norvir already have been produced." Ex. 7 at 29:11-30:6. GSK raised this specific inconsistency regarding marketing documents with Abbott's counsel on May 7, 2008. Ex. 8 at 2. Abbott's counsel stated that, through oral agreements with the *In re Norvir* Plaintiffs, these requests were narrowed and Abbott produced some documents relating to the marketing of Norvir and Kaletra. *See* Ex. 9 at 2. Abbott's counsel would not or could not provide details regarding the scope of Abbott's ultimate production of marketing materials, and instead attempted to shift the burden to GSK to list the types of marketing documents Abbott might produce. *See id*. GSK informed Abbott that this approach was not proper. *See id*.

Abbott has also refused to produce documents relating to costs incurred from selling Norvir and Kaletra, now stating that it will reconsider its position after this Court rules on Abbott's request for interlocutory appeal on the decision on *Cascade*. In its written responses in the *In re Norvir* litigation, Abbott states that it would not produce reports relating to costs incurred for the sale of Norvir and Kaletra:

| *In re Norvir* Request | Abbott's Response |
|---|---|
| <u>*In re Norvir* Request No. 3</u>: All weekly, monthly, quarterly, annual or other summary reports that refer or relate to the costs, including development, production, shipping, and distribution, incurred by you for the sale of Norvir from its introduction to the present. | In addition to its general objections, Abbott objects to this request as overly broad, unduly burdensome, vague, ambiguous and not reasonably calculated to lead to the discovery of admissible evidence. |

| *In re Norvir* Request | Abbott's Response |
|---|---|
| *In re Norvir* Request No. 4: All weekly, monthly, quarterly, annual or other summary reports that refer or relate to the costs, including development, production, shipping, and distribution, incurred by you for the sale of Kaletra from its introduction to the present. | In addition to its general objections, Abbott objects to this request as overly broad, unduly burdensome, vague, ambiguous and not reasonably calculated to lead to the discovery of admissible evidence. |

Ex. 6 at 4:6-20. Yet, inconsistent with these responses, in written responses to other requests for production, Abbott agreed to produce "all documents that refer or relate to whether Abbott has recouped its costs relating to its development and manufacturing of Norvir," *Id.* at 20:12-22, and documents sufficient to show "capital costs" and "overhead" costs of Norvir and Kaletra, Ex. 10 at 3:22-4:11.

On April 9, 2008, GSK sought clarification regarding the scope of Abbott's production of documents relating to costs in *In re Norvir*. *See* Ex. 11. Abbott failed to provide such clarification, but again, in seeming contradiction to its own written responses in the *In re Norvir* case, claimed that "Abbott's costs relating to Norvir and Kaletra are irrelevant" and that it would only be willing to reconsider its position if "GSK were to amend its complaint or the Court were to adopt a cost-based standard…." Ex. 12 at 3. GSK again sought clarification of Abbott's position in light of its previous discovery responses, Ex. 13 at 2, but Abbott again refused, stating most recently that it may reconsider its refusal to produce cost documents after this Court rules on its motion for certification of interlocutory appeal, *see* Ex. 9 at 2.

Throughout this process, Abbott's counsel has continued to generally object that GSK's request for information on the scope of Abbott's *In re Norvir* production is "exceedingly broad and burdensome" without providing any detailed basis for that contention. *See, e.g.*, Ex. 14 at 1. Abbott also claims that GSK is attempting to "re-litigate" discovery issues despite the fact that Abbott is primarily relying on its re-production of what it produced in *In re Norvir* to meet its discovery obligations here and despite the fact that GSK has asserted additional claims in this suit

that broaden the scope of relevant discovery.[6] *See id.* GSK now moves this Court to compel Abbott to produce all non-privileged documents related to the marketing of Norvir and Kaletra and non-privileged reports summarizing costs, including development, production, shipping, and distribution costs, incurred for the sale of Norvir and Kaletra. GSK requests that this Court decide this motion, rather than sending it to the magistrate, because this Court is in a better position to determine whether Abbott may rely on this Court's decision relating to *Cascade* to block discovery.

## III. ARGUMENT

### A. Legal Standard for Motion to Compel.

The Federal Rules of Civil Procedure provide that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense…." Fed. R. Civ. P. 26(b)(1). "Relevant information for purposes of discovery is information reasonably calculated to lead to the discovery of admissible evidence." *Farber and Partners, Inc. v. Garber*, 234 F.R.D. 186, 188 (C.D.Cal. 2006) (internal citation omitted); Fed. R. Civ. P. 26(b)(1). A court will only limit relevant discovery if "the burden or expense of the proposed discovery outweighs its likely benefit…." Fed. R. Civ. P. 26 (b)(2)(C)(iii). On a motion to compel, the party that refuses to produce documents on burdensomeness grounds has an obligation to show that "the information is not accessible because of undue burden or cost." *Id.* at 26(b)(2)(B). However, "[a] mere showing of burden and expense is not enough;" the party opposing discovery must submit or offer evidence revealing the nature of the burden. *See Coker v. Duke & Co., Inc.*, 177 F.R.D. 682, 686 (M.D. Ala. 1998). It is clear that documents relating to the marketing of Norvir and Kaletra and reports regarding the costs of selling these products are relevant to this case, and Abbott has offered no evidence of undue burden. These documents should be produced.

---

[6] Further compounding these issues, Abbott's counsel has delayed telephonic meet and confers for as much as four weeks claiming, for example, that they were "preoccupied" "with issues relating to the Court's decision in the Doe/SEIU litigaition," Ex. 15, or they were "still running a few issues by our client," Ex. 16. And, even after meet and confers were held, Abbott often failed to provide substantive responses to GSK's inquiries for many weeks despite promises to do so. *See, e.g.,* Ex. 17.

### B.  Abbott Should be Ordered to Produce All Norvir and Kaletra Marketing Documents.

Abbott may not hide behind purported ignorance of its own production to block relevant document discovery. After six months of meeting and conferring, Abbott has not offered any explanation for withholding relevant materials relating to the marketing of Norvir and Kaletra, any identification of documents it refuses to produce, or any evidence of undue burden.

#### 1.  Norvir and Kaletra marketing documents are relevant to the issues in this case.

By producing some – but not all – of its documents relating to the marketing of Norvir and Kaletra, Abbott admits, as it must, that these documents are relevant to this case. It also admits their relevance by broadly requesting GSK to produce a similar scope of documents: "all marketing materials relating to your ARV drugs." Ex. 18 at 23:2. GSK has agreed to produce all marketing materials relating to its protease inhibitors in response to this request, and Abbott should do the same in response to GSK's.[7] Indeed, in a case concerning anticompetitive conduct in markets that include Norvir and Kaletra, these materials are some of the most relevant. And, the scope of the marketing materials relevant here is arguably broader than in *In re Norvir* because GSK has asserted state law claims not alleged in that case. These documents will specifically provide evidence regarding at least the following aspects of GSK's claims:

**Bad Faith, Unfair Acts, and Deception**: Marketing materials are relevant to GSK's claim for breach of the covenant of good faith and fair dealing, and violation of the North Carolina Unfair Business Practices Act, which prohibits unfair and deceptive business conduct. For example, these documents may reveal that, even while negotiating the contract in which Abbott received millions of dollars in exchange for licensing GSK rights to promote Norvir, Abbott was considering ways to destroy the value of those very rights by raising the price of Norvir. *See Chase Manhattan Bank, N.A. v. Keystone Distrib. Inc.*, 873 F. Supp. 808, 815 (S.D.N.Y. 1994) ("Under New York law, every contract contains an implied covenant of good faith and fair

---

[7] Specifically, GSK has agreed to produce non-privileged documents concerning the marketing, pricing and forecasting of GSK's protease inhibitors when used to treat HIV/AIDS. Ex. 18 at 12:11-13.

dealing, which requires that no party to that contract can do anything which will destroy or injure the right of another party to receive the benefits of the contract." (internal citation and quotation omitted)). Strategy documents may also show the ways that Abbott intended to deceive GSK, its other competitors and the public regarding the price increase. *L.C. Williams Oil Co., Inc. v. Exxon Corp.*, 625 F. Supp. 477, 481 (M.D.N.C. 1985) (North Carolina's UTPA statute "sanctions, as part of its broad remedial purpose of promoting ethical business dealings, commercial 'unfairness' and 'deception' beyond traditional antitrust concepts."). Such materials would thus be relevant to GSK's case even if they were to say nothing about anticompetitive intent, market power, market share or other aspects of GSK's antitrust claim. But, they likely will.

**Anticompetitive Intent and Rebuttal of Abbott's "Defenses:"** Norvir and Kaletra marketing documents are relevant to proving Abbott's anticompetitive intent and to rebutting Abbott's proffered justifications for the Norvir price hike. GSK alleges that Abbott's 400 percent price hike of Norvir was intended to maintain its dominance of the boosted PI market. Complaint, Docket No. 6, at ¶ 40. Abbott, on the other hand, claims that the price hike was intended to re-price Norvir at its "changed" value. Ex. 1. Marketing documents will discuss the reasons, true or false, behind the price increase, including how to "spin" the price increase. Draft marketing documents may also include reasons for the price increase that were later removed from final materials because of the statements' business or legal implications. These documents will therefore illuminate the genesis of Abbott's reasoning behind the price increase. Further, early marketing documents relating to Norvir may show that Abbott knew for years of Norvir's boosting properties, thereby undermining its public explanation for the December 2003 price increase. Thus, marketing documents may show Abbott's anticompetitive intent and expose Abbott's proffered reasons for the price increase as pretext. *See, e.g.*, *Image Technical Services, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997) ("A plaintiff may rebut an asserted business justification by demonstrating either that the justification does not legitimately promote competition or that the justification is pretextual.").

**Market Definition**: Further, Norvir and Kaletra marketing documents are relevant to market definition. Products are typically deemed to be in the same market when they are

"reasonably interchangeable by consumers...." *See, e.g.*, *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 395 (1956). Marketing materials likely compare Norvir and Kaletra to other drugs, discuss with which drugs Norvir and Kaletra compete, and contain market share information for Norvir, Kaletra and competing products. Thus, this information will show the products with which Kaletra and Norvir are interchangeable, helping to define the relevant market.

**Market Power**: Additionally, Norvir and Kaletra marketing documents are relevant to a showing of market power. Monopoly power is "the power to control prices or exclude competition." *E.I. DuPont de Nemours & Co.*, 351 U.S. at 391. Market share is a common indicator of monopoly power. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 464 (1992) ("The existence of such [monopoly] power ordinarily is inferred from the seller's possession of a predominant share of the market."). Materials from Abbott's marketing department for Norvir and Kaletra will likely include analyses of market share for competing products, and sales figures for Norvir and Kaletra, which can be used to show market share when aggregated.

### 2. Abbott's evasiveness is not enough to show burden.

Despite the relevance of these marketing materials, Abbott – after six months of meeting and conferring – has wholly failed to explain what marketing materials it has chosen to produce and the basis for its choice to withhold additional materials. This failure amounts to a non-response to the requested discovery. *See* Fed. R. Civ. P. 37(a)(4) ("[A]n evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond."). Abbott cannot show that the burden or cost of fully producing these materials outweighs their relevance by pleading ignorance. *See* Fed. R. Civ. P. 26(b)(2), Adv. Comm. Note (responding party must identify sources of documents and should "provide enough detail to enable the requesting party to evaluate the burdens and costs of providing the discovery…."). Indeed, Abbott's purported ignorance about its own production is inexplicable given that the same law firm is defending Abbott in this litigation and in *In re Norvir*. Information about the categories of marketing documents Abbott produced in *In re Norvir* is undoubtedly within its control. *See Milner v. Nat'l School of Health Technology*, 73 F.R.D. 628, 632 (E.D. Pa. 1977) ("If a party

cannot furnish details [regarding discovery], he should say so under oath, say why and set forth the efforts he used to obtain the information. He cannot plead ignorance to information that is from sources within his control.").[8]

And, Abbott's contention that GSK is attempting to "re-litigate" issues is baseless. Abbott has relied primarily on its re-production of documents from *In re Norvir* to satisfy its discovery obligations here. GSK has asserted three state law claims that were not asserted in that case, and GSK is entitled to a production of marketing documents relevant to not only GSK's Sherman Act claim, but also its claims for breach of contract, violation of the North Carolina Unfair Trade Practices Act, and violation of the North Carolina Anti-Monopolization Act. Since Abbott is unwilling (or unable) to describe what marketing materials it has re-produced in this case, so that GSK and this Court can evaluate the sufficiency of that production, Abbott should simply be ordered to produce all non-privileged documents relating to the marketing of Norvir and Kaletra – as requested in GSK's document requests.

### C. Documents Describing Costs of Kaletra and Norvir Should Be Produced.

GSK's document requests ask Abbott to produce all summary reports that relate to the costs incurred by Abbott for the sale of Kaletra and Norvir, including development, production, shipping, and distribution costs. Abbott has refused to produce these documents – or to provide additional discovery relating to costs of Norvir and Kaletra. It claims that it will reconsider its position after this Court's ruling on Abbott's request for interlocutory appeal of the *Cascade* issue. The Direct Purchaser Plaintiffs – GSK's co-plaintiffs in related cases – have set out compelling reasons in their brief why these materials should be produced regardless of the Court's decision on *Cascade*. Documents relating to costs of Norvir and Kaletra are equally relevant to GSK's claims.

For example, just as with marketing documents, cost documents are relevant to showing anticompetitive intent under GSK's Sherman Act Section 2 claim, bad faith under GSK's contract claim, and unfairness and deception under GSK's North Carolina Unfair Trade Practices claim, as well as to rebutting, as pretext, Abbott's defense that it re-priced Norvir at its "changed" value as a

---

[8] GSK is also not seeking duplicative or cumulative discovery. *See* Fed. R. Civ. P. 26(b)(2)(C)(iii). It merely seeks production of marketing materials relating to Norvir and Kaletra that have not been previously produced.

booster. Cost documents will be relevant to show that Abbott was already capturing a fair market value for Norvir – given Abbott's costs and other factors – before the 400 percent price increase. This evidence will support that Abbott increased the price, not to capture additional value of Norvir, but rather to harm competition, unfairly attack GSK's business and, in bad faith, undermine the value of GSK's license to promote its protease inhibitors with Norvir.

Further, regardless of whether *Cascade*'s below-cost test applies to this case, is just a sufficient but unnecessary standard, or falls into some other category, cost documents are relevant to show anticompetitive effect. An economic analysis of Abbott's conduct will generally consider whether an equally efficient competitor could respond to the 400 percent price increase – regardless of whether Abbott's pricing meets a strict below-cost test. Costs of Norvir and Kaletra – as well as other market factors – will likely be considered in determining whether an equally efficient competitor could profitably respond to Abbott's pricing maneuver. *See* Jonathan B. Baker, *Market Definition: An Analytic Overview*, 74 Antitrust Law Journal 129, 131 n.15 (2007) ("Direct evidence of anticompetitive effect might include price increases demonstrably unrelated to benign causes, such as higher costs or improved product quality.").

Finally, Abbott has no basis to claim that this relevant discovery is unduly burdensome or costly to produce. GSK's requests are narrowly-tailored to seek only summary reports of costs relating to Norvir and Kaletra, not every document relating to those costs. In addition, this discovery is not cumulative of other requests served in this case. Abbott should be compelled to produce summary reports relating to costs incurred by Abbott in the sale of Norvir and Kaletra, including development, production, shipping, and distribution costs.

## IV.  CONCLUSION

For the foregoing reasons, GSK respectfully requests that the Court order Abbott to produce to GSK: (1) all documents that refer or relate to the marketing of Norvir and Kaletra, and

(2) all summary reports relating to the costs, including development, production, shipping, and distribution costs, incurred for the sale of Norvir and Kaletra.

Dated: July 3, 2008

IRELL & MANELLA LLP

By: /s/ Trevor V. Stockinger
Trevor V. Stockinger
Attorneys for Plaintiff
GlaxoSmithKline