Nicole M. Norris (SBN 222785)
WINSTON & STRAWN LLP
101 California Street, Suite 3900
San Francisco, CA 94111-5894
Telephone: 415-591-1000
Facsimile: 415-591-1400
Email: nnorris@winston.com

James F. Hurst (*Admitted Pro Hac Vice*)
David J. Doyle (*Admitted Pro Hac Vice*)
Samuel S. Park (*Admitted Pro Hac Vice*)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone: 312-558-5600
Facsimile: 312-558-5700
Email: jhurst@winston.com; ddoyle@winston.com; spark@winston.com

Charles B. Klein (*Admitted Pro Hac Vice*)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20007
Telephone: 202-282-5000
Facsimile: 202-282-5100
Email: cklein@winston.com

Attorneys for Defendant
ABBOTT LABORATORIES

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| SMITHKLINE BEECHAM CORPORATION, d/b/a GLAXOSMITHKLINE,<br><br>Plaintiff,<br><br>vs.<br><br>ABBOTT LABORATORIES,<br><br>Defendant. | Case No. C 07-5702 CW<br><br>*Related Per November 19, 2007 Order to Case No. C 04-1511 CW*<br><br>**ABBOTT LABORATORIES' NOTICE OF MOTION AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS**<br><br>**Date:** August 14, 2008<br>**Time:** 2:00 p.m.<br>**Courtroom: 2 (4th Floor)**<br>**Judge:** Hon. Claudia Wilken |

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

# TABLE OF CONTENTS

NOTICE OF MOTION....................1

I. INTRODUCTION....................1

II. BACKGROUND....................2

III. Legal Standard for Motion to Compel....................7

IV. ARGUMENT....................8

A. Abbott Is Entitled To Discovery Relevant To Defining The Relevant Product Market In This Case....................8

1. Courts Permit Broad Discovery Into Matters Concerning The Proper Definition Of The Relevant Market....................8

2. The Requested Discovery Is Relevant To The Proper Relevant Market Definition....................10

B. Abbott Is Entitled To Discovery Relevant To Whether Its Conduct Was Anticompetitive....................12

C. Abbott's Requests Satisfy The Proportionality Requirements Of Rule 26(b)(2)(C)....................14

V. CONCLUSION....................15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*American Key Corp. v. Cole Nat'l Corp.*,
  762 F.2d 1569 (11th Cir. 1985) ..................................................................................................8

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
  182 F.3d 1096 (9th Cir. 1999) ....................................................................................................8

*Chisholm Bros. Farm Equipment Co. v. Int'l Harvester Co.*,
  498 F.2d 1137 (9th Cir. 1974) ..................................................................................................13

*Eastman Kodak Co. v. Image Tech. Servs.*,
  504 U.S. 451 (1972)..................................................................................................................10

*F.T.C. v. Warner Communications Inc.*,
  742 F.2d 1156 (9th Cir. 1984) ....................................................................................................9

*Fineman v. Armstrong World Industries, Inc.*,
  980 F.2d 171 (3d Cir. 1992).......................................................................................................9

*Fisher v. Nat'l R.R. Passenger Corp.*,
  152 F.R.D. 145 (S.D. Ind. 1993)...............................................................................................14

*Flying J Inc. v. TA Operating Corp.*,
  2007 U.S. Dist. LEXIS 55567 (D. Utah 2007) ..........................................................................9

*Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.*,
  386 F.3d 485 (2d Cir. 2004).......................................................................................................9

*Gordon v. Lewistown Hosp.*,
  423 F.3d 184 (3d Cir. 2005).....................................................................................................13

*Haagen-Dazs Co., Inc. v. Double Rainbow Gourmet Ice Creams, Inc.*,
  895 F.2d 1417 (9th Cir. 1990) ....................................................................................................9

*Henderson v. National R.R. Passenger Corp.*,
  113 F.R.D. 502 (N.D. Ill.1986)............................................................................................7, 11

*Hickman v. Taylor,*
  329 U.S. 495 (1947)....................................................................................................................7

*Humphreys v. Regents of the Univ. of Cal.*,
  2006 U.S. Dist. LEXIS 20148 (N.D. Cal. 2006) .................................................................7, 11

*J.H. Westerbeke Corp. v. Onan Corp.*,
  580 F. Supp. 1173 (D. Mass. 1984) ..........................................................................................13

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

*Meijer, Inc. v. Warner Chilcott Holdings Co., III, Ltd.*,
   245 F.R.D. 26 (D.D.C. 2007) ..................................................................................8, 11, 12

*Petersen v. DaimlerChrysler Corp.*,
   2007 WL 2391151 (D. Utah 2007) ..................................................................................7, 11

*R.D. Imports Ryno Industries, Inc. v. Mazda Distributors, Inc.*,
   807 F.2d 1222 (5th Cir. 1987) .............................................................................................9

*RSR Corp. v. F.T.C.*,
   602 F.2d 1317 (9th Cir. 1979) .............................................................................................9

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993) ............................................................................................................8

*Sullivan v. Kelly Servs.*,
   No. C-07-2784, 2008 U.S. Dist. LEXIS 29318 (N.D. Cal. Mar. 4, 2008) ..........................7

*Trace X Chemical, Inc. v. Canadian Industries, Ltd.*,
   738 F.2d 261 (8th Cir. 1984) .............................................................................................13

*U.S. v. IBM Corp.*,
   66 F.R.D. 180 (S.D.N.Y. 1974) ...........................................................................................9

*Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*,
   382 U.S. 172 (1965) ............................................................................................................8

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26 ......................................................................................................... passim

Fed. R. Civ. P. 34 ..............................................................................................................3, 7

Fed. R. Civ. P. 37 ..............................................................................................................1, 7

# NOTICE OF MOTION

## TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on August 14, 2008 at 2:00 p.m.,[1] or as soon thereafter as the matter may be heard in Courtroom 2, before the Honorable Claudia Wilken, in the United States District Court for the Northern District of California, Oakland Division, defendant Abbott Laboratories will move this Court pursuant to Rule 37 of the Federal Rules of Civil Procedure for an order compelling Plaintiff GlaxoSmithKline to produce certain documents. This motion is supported by the accompanying Memorandum of Points and Authorities, the Declaration of Stephanie McCallum and such other argument and evidence as may be presented at the hearing on the motion.

## I. INTRODUCTION

GSK has improperly refused to produce documents concerning Antiretroviral Drugs ("ARV Drugs") that fall outside GSK's proposed definition of the relevant product market. GSK alleges that there are two relevant markets: the "Boosting Market," which consists solely of Abbott's Norvir®, and the "Boosted Market," which consists of all Protease Inhibitors ("PIs") boosted with Norvir. Abbott, by contrast, contends that the relevant product market includes all ARV Drugs—PIs along with Nucleoside/Nucleotide Reverse Transcriptase Inhibitors ("NRTIs") and Non-Nucleoside Reverse Transcriptase Inhibitors ("NNRTIs"), among others. All of these drugs treat HIV and are designed to stop the replication of the virus in the body. The scope of the relevant product market is not only hotly disputed, it is also critical to the outcome of this case: If the relevant market includes all ARVs, GSK cannot possibly establish that Abbott has sufficient market power to support GSK's monopolization claims.

Although GSK put the scope of the relevant market squarely at issue when it brought this action, it now seeks unilaterally to limit discovery to only those documents falling within its limited view of the market. This it cannot do. GSK documents that, for example, discuss (a) how the pricing of Abbott's drugs affect the pricing of GSK's NRTIs (of which there are at least six);

---

[1] Abbott intends to request a modest adjustment to the briefing schedule that would permit this motion to compel to be heard on August 7, 2008, along with two other motions to compel filed by the Meijer plaintiffs and GSK, respectively. Abbott has asked GSK to state its position with regard to this briefing schedule and is awaiting GSK's response.

1  (b) GSK's share of a market consisting of all ARV Drugs; or (c) the factors that influence
2  physicians' or patients' preferences for Norvir and/or Kaletra® in comparison to any other ARV
3  Drug would directly support Abbott's definition of the market and thus are plainly relevant to this
4  dispute. While such documents may not aid GSK's theory of the market, the law is clear that a party
5  cannot limit discovery to its proposed theory of the case.

6  Not only has GSK improperly limited discovery into the definition of the relevant product market, it has also refused to produce any documents responsive to certain of Abbott's requests for documents relevant to GSK's allegations of anticompetitive conduct. Specifically, GSK has refused to produce documents relating to (a) the reasons why GSK "consistently assumed Kaletra remains market leader," as noted in one of in GSK's own internal documents; (b) the scope, meaning, validity, and enforceability of Abbott's patents for Norvir and Kaletra; (c) any governmental investigations of GSK's ARV Drugs, including its pricing of those drugs; and (d) whether GSK has contemplated taking any of its pharmaceutical products off the market. This Court should also compel GSK to produce these relevant documents.

## II. BACKGROUND

GSK alleges that Abbott has leveraged a monopoly in the so-called "Boosting Market" to monopolize or in an attempt to monopolize the so-called "Boosted Market." (Compl. ¶ 58). The "Boosting Market," as GSK defines it, "consists of all drugs that could be used to boost the effects of PIs." (*Id*. at ¶ 39). GSK alleges that only Abbott's drug Norvir meets this definition and, thus, asserts that Abbott has a 100% share of the Boosting Market. (*Id*.). The "Boosted Market," as GSK defines it, consists only of "those PIs that benefit from a PI booster." (*Id*. at ¶ 40).

GSK alleges that Abbott monopolized the "Boosted Market" by engaging in anticompetitive conduct, including "Abbott's decision to raise the price of Norvir by 400%." (*Id*. at ¶ 36). According to GSK, evidence of anticompetitive intent includes, among other things, that Abbott considered withdrawing Norvir from the market entirely (*see id*. at ¶ 27), and that Abbott "publish[ed] misleading comparisons of PI prices" resulting in Abbott receiving an FDA Warning Letter (*id*. at ¶¶ 33-34). GSK alleges that Abbott's conduct "artificially reduced the demand for the

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1 boosted PIs of GSK and Abbott's other competitors, while artificially increasing demand for its own boosted PIs." (*Id*. at ¶ 45).

To test GSK's allegations, Abbott propounded a series of requests for production of documents and things pursuant to Rule 34. The twenty-two document requests at issue in this motion to compel concern the definition of the relevant product market and whether Abbott's conduct is anticompetitive.[2] GSK has objected to the relevance of all but four of these requests.[3] Based on this objection, GSK has agreed to produce documents in response to Abbott's relevant market requests only to the extent they mention GSK's PIs, and it has refused to produce any documents responsive to Abbott's anticompetitive conduct requests.

**Relevant Market Requests.** Abbott narrowly tailored fourteen of its requests to obtain documents concerning the proper definition of the relevant market. (*See* McCallum Decl., Ex. A (Abbott's First Set of RFPs (hereinafter "RFP") Nos. 23, 25, 27-28, 31, 39-40, 42-46, 64, 91)). In its responses, however, GSK has refused to produce any responsive document that did not also reference one of GSK's own PIs, presumably based on GSK's theory that the relevant market contains only PIs. (*See* McCallum Decl., Exs. B (GSK's Supp. Resps. to Abbott's Set of RFP (hereinafter "GSK's Responses") and C (2/26/08 Letter from T. Stockinger at 5))).

The table below reproduces Abbott's relevant market requests and the relevant portions of GSK's responses, in which GSK limits its production either to the extent responsive documents "concern GSK's protease inhibitors when used to treat HIV/AIDS" or are "for GSK's protease inhibitors":

---

[2] Abbott reserves the right to seek to compel additional discovery if the parties are unable to resolve its other concerns with GSK's discovery responses.

[3] GSK also objected to each request on the grounds that it was unduly burdensome, vague and ambiguous, and to the extent that the requests called for information that is readily available from public sources or equally available to Abbott or that is subject to an applicable privilege. GSK further objected to all but RFP No. 51 to the extent they called for information subject to confidentiality agreements or obligations with third parties. GSK explained during the parties' telephonic meet-and-confer, however, that these objections were intended merely to "reserve GSK's rights," and that GSK only intended to limit its production to redact patient identifying information from adverse event reports in accordance with federal law. (*See* McCallum Decl., Ex. D (2/27/08 Letter from C. Klein at 1-2)). Abbott does not contest GSK's redaction of such information.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

| **Relevant Market Requests** ||
|---|---|
| **RFP No. 23:** All documents relating to the pricing of your ARV Drugs and the factors that determine how you set the prices for such drugs. | **GSK's Response to RFP No. 23:** . . . GSK will produce nonprivileged documents located after a reasonable search concerning marketing, pricing, and forecasting for GSK's protease inhibitors, which GSK believes will include the requested documents *to the extent these documents concern GSK's protease inhibitors when used to treat HIV/AIDS.* |
| **RFP No. 25:** All documents relating to your pricing and profit strategies for your ARV drugs. | **GSK Response to RFP No. 25:** . . . GSK will produce nonprivileged documents as set forth in its response to Request Nos. 23 and 26. |
| **RFP No. 27:** All communications relating to the price of your ARV Drugs, including all complaints and concerns that your ARV Drugs are priced too high. | **GSK Response to RFP No. 27:** . . . GSK will produce nonprivileged documents located after a reasonable search concerning marketing, pricing and forecasting for GSK's protease inhibitors, which GSK believes will include the requested documents *to the extent these documents concern GSK's protease inhibitors when used to treat HIV/AIDS.* |
| **RFP No. 28:** All marketing materials relating to your ARV Drugs. | **GSK Response to RFP No. 28:** . . . GSK will produce nonprivileged documents located after a reasonable search concerning marketing, pricing and forecasting for GSK's protease inhibitors, which GSK believes will include the requested documents *to the extent these documents concern GSK's protease inhibitors when used to treat HIV/AIDS.* |
| **RFP No. 31:** All documents discussing your strategy or strategies for marketing your ARV Drugs. | **GSK Response to RFP No. 31:** . . . GSK will produce nonprivileged documents located after a reasonable search concerning marketing of GSK's protease inhibitors, which GSK believes will include the requested documents *to the extent these documents concern GSK's protease inhibitors when used to treat HIV/AIDS.* |
| **RFP No. 39:** All documents discussing your (or any of your ARV Drugs') share of the ARV Drug market. | **GSK Response to RFP No. 39:** . . . GSK will produce nonprivileged documents located after a reasonable search that GSK believes will be sufficient to show market share from January 1, 1999 to the present *to the extent these documents concern GSK's protease inhibitors when used to treat HIV/AIDS.* |
| **RFP No. 40:** All documents discussing your (or any of your ARV Drugs') share of the "market for PI boosters" as that term is used in your Complaint. | **GSK Response to RFP No. 40:** . . . GSK will produce nonprivileged documents located after a reasonable search that GSK believes will be sufficient to show market share from January 1, 1999 to the present *to the extent these documents concern GSK's protease inhibitors when used to treat HIV/AIDS.* |

| **Relevant Market Requests** ||
|---|---|
| **RFP No. 42:** All documents relating to your forecasting or projections concerning the ARV Drug market. | **GSK Response to RFP No. 42:** . . . GSK will produce nonprivileged documents that constitute forecasts *for GSK's protease inhibitors* that are located after a reasonable search. |
| **RFP No. 43:** All documents relating to your forecasting or projections concerning the "market for PI boosters," as that term is used in your Complaint. | **GSK Response to RFP No. 43:** See GSK's Response to Request No. 42. |
| **RFP No. 44:** All documents relating to your forecasting or projections concerning revenue and/or sales of Kaletra, Norvir, Reyataz and/or Lexiva. | **GSK Response to RFP No. 44:** . . . GSK will produce nonprivileged documents located after a reasonable search concerning marketing, pricing and forecasting *for GSK's protease inhibitors*, which GSK believes will include the requested documents. |
| **RFP No. 45:** All documents relating to the different factors that influence physician prescribing practices or preferences for ARV Drugs, including any research revealing physician prescribing preferences and the factors influencing ARV Drug prescriptions. | **GSK Response to RFP No. 45:** . . . GSK will produce such nonprivileged documents relating to physician prescribing practices and preferences *for GSK's protease inhibitors* that are located after a reasonable search. |
| **RFP No. 46:** All documents relating to the different factors that influence patient preferences for ARV Drugs, including any research revealing patient preferences and the factors influencing ARV Drug prescriptions or adherence. | **GSK Response to RFP No. 46:** . . . GSK will produce nonprivileged documents located after a reasonable search relating to patient preferences *for GSK's protease inhibitors*. |
| **RFP No. 64:** All documents relating to your price lists, pricing plans, pricing policies, pricing forecasts, pricing strategies, and pricing decisions relating to all of your ARV Drugs. | **GSK Response to RFP No. 64:** . . . GSK will produce nonprivileged documents as set forth in its response to Request Nos. 23. |
| **RFP No. 91:** All documents relating to the past, current, future and potential market shares of the products in the market for boosted PIs. | **GSK Response to RFP No. 91:** . . . GSK will produce nonprivileged documents located after a reasonable search that GSK believes will be sufficient to show market share from January 1, 1999 to the present *to the extent these documents concern GSK's protease inhibitors when used to treat HIV/AIDS*. |

Although Abbott believes each of these requests seeks information relevant to defining the relevant product market, Abbott offered to modify the scope of these requests to reach an agreement


with GSK on the scope of its production and to avoid seeking relief from this Court. Abbott provided GSK a list of 17 specific categories of documents encompassed within its relevant product market requests. (*See* McCallum Decl., Ex. E (6/04/08 Letter from M. Campbell)). GSK, however, refused to modify its position at all.

**Anticompetitive Conduct Requests.** In addition to documents concerning the definition of the relevant product market, Abbott narrowly tailored eight of its requests to obtain documents from GSK concerning whether Abbott's conduct is anticompetitive. (*See* McCallum Decl., Ex. A (RFP Nos. 3, 47-52, 62)). These requests, which are reproduced in the table below, fall within four categories: (a) GSK's view of Kaletra as the "market leader," (b) Abbott's patents, (c) government investigations of GSK's ARV Drugs, and (d) instances in which GSK contemplated taking one or more of its ARV Drugs off the market. Unlike Abbott's relevant market requests, GSK refused to produce *any* documents in response to these requests.

| Anticompetitive Conduct Requests | |
|---|---|
| GSK's View of Kaletra as the Market Leader | **RFP No. 3:** All documents relating to the reason or reasons GSK has "consistently assumed Kaletra remains market leader," as noted in the internal GSK document titled "908 Competitive Position." |
| Abbott's Patents | **RFP No. 47:** All documents that relate to or discuss the validity and/or enforceability of the Abbott Patents. |
| | **RFP No. 48:** All other documents relating to the Abbott Patents, including but not limited to documents that discuss the scope, meaning, and/or interpretation of such patents or any claims therein. |
| | **RFP No. 49:** All prior art documents to the Abbott Patents. |
| Government Investigations of GSK's ARV Drugs | **RFP No. 50:** All documents relating to any government investigation into or concerning one or more of your ARV Drugs. |
| | **RFP No. 51:** All documents relating to any government investigation into or concerning the pricing of one or more of your ARV Drugs. |
| | **RFP No. 52:** All FDA warning letters in the last ten years that relate in any way to one or more of your ARV drugs. |
| Contemplated Removal of Drugs from the Market | **RFP No. 62:** All documents relating to your actual or contemplated decision to take any other pharmaceutical product off the market. |

Counsel for the parties have met and conferred in an effort to resolve and narrow these dispute. (*See* McCallum Decl., Exs. C-G). With respect to the relevant market requests, GSK's counsel rebuffed Abbott's offer to narrow its requests during the parties' telephonic meet-and-confer

on June 11, 2008. The parties similarly discussed Abbott's anticompetitive conduct requests in correspondence and during the parties' telephonic meet-and-confer on March 3, 2008. GSK, however, did not alter its position concerning these requests in its amended response filed on April 15, 2008. As a result, Abbott seeks an order from this Court compelling production of these responsive documents.

## III.  LEGAL STANDARD FOR MOTION TO COMPEL

Discovery under the Federal Rules is "accorded a broad and liberal treatment." *Hickman v. Taylor,* 329 U.S. 495, 507 (1947). Rule 26 provides that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party. . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

A party may move to compel the production or inspection of documents under Rule 34. Fed. R. Civ. P. 37(a)(3). And courts will grant a motion to compel disclosure so long as the moving party seeks relevant information that does not cause the opposing party "undue burden or expense." Fed. R. Civ. P. 26(c)(1); *Sullivan v. Kelly Servs.*, No. C-07-2784, 2008 U.S. Dist. LEXIS 29318, *3-*4 (N.D. Cal. Mar. 4, 2008) (granting motion to compel disclosure of relevant information that is not "overly burdensome").

Parties may not refuse discovery simply because the requested information does not fit into their legal theories. *See Humphreys v. Regents of the Univ. of Cal.*, 2006 U.S. Dist. LEXIS 20148, *6 (N.D. Cal. 2006) ("Clearly, however, defendants are not allowed to limit discovery based merely upon their theory of the case."); *Petersen v. DaimlerChrysler Corp.,* 2007 WL 2391151, *3 (D. Utah 2007) ("Given Plaintiffs' broad theory of the case, limiting discovery in the fashion [defendant] proposes would be premature and could potentially deprive Plaintiffs of discovery supporting that theory."); *Henderson v. National R.R. Passenger Corp.*, 113 F.R.D. 502, 507 (N.D. Ill.1986) (defendant's attempt "to limit the theory of plaintiff's case" by limiting the scope of discovery "is improper").

## IV. ARGUMENT

Abbott seeks discovery of information relating to its defense of GSK's monopolization claims—in particular, the proper definition of the relevant market and the alleged anticompetitive conduct. This information is clearly relevant to the case, and Abbott's need for this information far outweighs any incidental burden imposed on GSK in this case in which it seeks tens, if not hundreds, of millions of dollars in damages from Abbott. As a result, production of these materials should be compelled.

### A. Abbott Is Entitled To Discovery Relevant To Defining The Relevant Product Market In This Case.

Abbott seeks documents relating to the pricing and marketing of GSK's ARV Drugs; GSK's estimations, forecasts and projections of its share of the ARV Drug market; and physician and/or patient preferences for ARV Drugs. Because these types of documents are relevant to defining the proper relevant product market in this case, they fall well within the scope of permissible discovery.

#### 1. Courts Permit Broad Discovery Into Matters Concerning The Proper Definition Of The Relevant Market.

To prove its Sherman Act claims, GSK bears the burden of defining a relevant market and demonstrating that Abbott's conduct had an anticompetitive effect within that market. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455-56 (1993); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104-05 (9th Cir. 1999). The proper definition of a relevant market is a critical exercise in the determination of antitrust liability under the Sherman Act. *See* ABA Section of Antitrust Law, Antitrust Law Developments 549 (6th ed. 2007) ("Defining a relevant market is often a critical issue, and sometimes the critical issue, in an antitrust case."). "Without a definition of that market there is no way to measure [a defendant's] ability to lessen or destroy competition." *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177 (1965).

Because of its importance to antitrust analysis, courts frequently permit broad discovery of information related to defining the relevant product market. *See American Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1577 (11th Cir. 1985) (granting, in part, motion to compel permitting plaintiff to conduct relevant market discovery); *Meijer, Inc. v. Warner Chilcott Holdings Co., III, Ltd.,* 245

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

F.R.D. 26, 30-33 (D.D.C. 2007) (granting party's motion to compel for discovery that "is relevant to its theory of market definition"); *Flying J Inc. v. TA Operating Corp.*, 2007 U.S. Dist. LEXIS 55567, *20-*21 (D. Utah 2007) (granting motion to compel to allow the plaintiff "to dispute the market definition position adopted by defendants"); *U.S. v. IBM Corp.*, 66 F.R.D. 180, 184-86 (S.D.N.Y. 1974) (allowing discovery into product that "the court may [eventually] decide . . . is properly within the relevant market").

Relevant product markets are defined by the extent to which products can be substituted for one another. "Products which are 'reasonably interchangeable' for the same or similar use should be grouped in the same product market for antitrust purposes." *Haagen-Dazs Co., Inc. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (9th Cir. 1990) (citing *U.S. v. DuPont & Co.*, 351 U.S. 377, 394-95 (1956), and *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962)). Factors to consider in defining a relevant market include "industry or public recognition of the market, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *F.T.C. v. Warner Communications Inc.*, 742 F.2d 1156, 1163 (9th Cir. 1984).

In defining reasonable interchangeability in a relevant market, courts routinely consider the views of participants in the market as to whether goods can be substituted for each other or whether they compete. *See, e.g., FTC v. Warner Communs.,* 742 F.2d 1156, 1163 (9th Cir. 1984) (holding that relevant market of prerecorded music did not include home mixed tapes because record industry executives did not consider such tapes to be interchangeable); *RSR Corp. v. F.T.C.*, 602 F.2d 1317 (9th Cir. 1979) (holding that primary and recycled lead belonged to different markets because the industry distinguishes between them "in terms of the products and their producers"); *Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.,* 386 F.3d 485, 498 (2d Cir. 2004) (considering views of parties as to identities of their competitors). Courts also often rely on the views of customers who use the products. *See, e.g., Fineman v. Armstrong World Industries, Inc.*, 980 F.2d 171, 199 (3d Cir. 1992) (holding that relevant market contained vinyl floor coverings but not carpet because customers did not view them as substitutable); *R.D. Imports Ryno Industries, Inc. v. Mazda Distributors, Inc.,* 807 F.2d 1222, 1225 (5th Cir. 1987) ("Goods that consumers view as

substitutes for other goods can be said to be in competition with each other."). A third factor in defining the relevant market is the "the extent to which consumers will change their consumption of one product in response to a price change in another." *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 469 (1972).

### 2. The Requested Discovery Is Relevant To The Proper Relevant Market Definition.

Abbott's discovery requests are narrowly tailored to obtain information directly relevant to defining the relevant market. These requests seek discovery as to GSK's pricing and marketing of its ARV Drugs, its forecasts and projections of its share of the ARV Drug market, and physician and/or patient practices and preferences for ARV Drugs. These three categories of documents reveal GSK's own internal views and those of physicians and patients as to the competition and interchangeability among various ARV Drugs—including PIs, NRTIs, and NNRTIs—and thus are clearly relevant to defining the relevant market here.

First, Abbott seeks documents relating to GSK's pricing and marketing strategies for its ARV Drugs. (*See* McCallum Decl., Ex. A (RFP Nos. 23, 25, 26, 28, 31, 64)). By restricting its production to documents that happen to reference one of GSK's PIs, GSK refuses to produce, for example, documents discussing the extent to which GSK's NRTIs compete with rival PIs or NNRTIs, as well as the extent to which pricing of GSK's various NRTIs is influenced by the prices of competitors' PIs or NNRTIs. Neither type of document would necessarily—or even likely— reference GSK's PIs. Yet, these documents are clearly relevant to both to GSK's own internal view of the scope of the relevant market and the extent to which GSK's pricing of its ARV Drugs is affected by the pricing of rivals' drugs.

Second, Abbott seeks documents relating to GSK's market share and its forecasts and projections for its various ARV Drugs. (*See id.*, RFP Nos. 39, 40, 42-44, 91). GSK has improperly limited its production of market share documents to those "sufficient to show" its market share "to the extent those documents concern GSK's protease inhibitors when used to treat HIV/AID." (McCallum Decl., Ex. B (GSK's Response to RFP Nos. 39-40, 91)). This restriction, however, improperly excludes documents that discuss, for example, market shares of GSK's NRTIs that

compete with competitors' PIs or NNRTIs. It also improperly excludes documents that discuss GSK's or its rivals' share of the ARV Drug market generally to the extent those documents do not happen to mention a specific GSK PI. Likewise, GSK's refusal to produce its internal forecast and projections for any drugs other than its own PIs would exclude internal GSK documents forecasting or projecting the market shares for Kaletra, Norvir, or Reyataz. Each of these documents, however, is relevant to GSK's own internal views of the competitive landscape.

Third, Abbott seeks documents describing the factors that influence physicians' prescribing practices and patient preferences for ARV Drugs. (*See* McCallum Decl., Ex. A (RFP Nos. 45-46)). By limiting its production to prescribing practices and preferences for its own PIs, GSK attempts to avoid producing its own internal documents showing, for example, that physicians and/or patients view Norvir, Kaletra or another rivals' PIs as interchangeable with GSK's NRTIs. GSK's limitation would also exclude its own internal documents discussing the factors that physicians and patients use to choose between NRTIs, PIs and NNRTIs generally if those documents happened not to name a specific GSK PI. Yet, these documents are clearly relevant to consumers' views of what drugs are reasonably interchangeable for one another.

GSK seeks to limit discovery to only the market for one class of ARV drugs, PIs, because it has unilaterally taken the position that the relevant product market is limited to this drug class. This artificial and improper limitation is designed to prevent discovery outside GSK's chosen definition of the relevant market and thus is improper. *See Humphreys*, 2006 U.S. Dist. LEXIS 20148 at *6.

Courts have rejected such attempts by parties to narrow discovery into relevant markets to suit their own particular theory. *See Humphreys*, 2006 U.S. Dist. LEXIS 20148 at *6; *Petersen,* 2007 WL 2391151 at *3; *Henderson,* 113 F.R.D. at 507. In *Meijer*, for example, the court granted a motion to compel when the plaintiff sought to limit discovery to drugs that it contended were part of the relevant market. 245 F.R.D. at 30-33. The plaintiff agreed to produce information only on a particular contraceptive drug, Ovcon, and its generic equivalents. *Id*. at 31. The defendant, however, sought discovery on a broader range of contraceptives to support its proposed relevant market definition, despite plaintiffs' assertion that these contraceptives were not economic substitutes for Ovcon. *Id*. at 30. The court rejected the plaintiffs' argument as a merits-based

argument that did not "bear on the relevance of the information for purposes of discovery." *Id*. As a result, the court granted the discovery as "relevant to the claims and defenses at issue." *Id*. at 32.

It is axiomatic that the purpose of pretrial discovery is to permit the parties to identify evidence supporting their own theories of the case, as well as evidence that might undermine their opponents' theories. Here, GSK seeks to prevent Abbott from obtaining both types of evidence. Abbott certainly should be entitled to determine whether GSK's internal views of the HIV/AIDS drug market conflict with GSK's litigation position as to the relevant product market in this case. As in *Meijer*, therefore, the market information requested by Abbott concerning GSK's ARV Drugs falls well within the range of discoverable materials under Rule 26.

### B.  Abbott Is Entitled To Discovery Relevant To Whether Its Conduct Was Anticompetitive.

Abbott also seeks documents in GSK's possession, custody or control that are relevant to whether Abbott's conduct was anticompetitive. In addition to showing that Abbott has sufficient monopoly power in the "Boosted Market," GSK must also prove that Abbott engaged in anticompetitive, exclusionary or predatory conduct to obtain or maintain that monopoly power. GSK has alleged that Abbott's anticompetitive conduct and intent consists, among other things, of its decision to raise the price of Norvir by 400% and the fact that it contemplated withdrawing Norvir from the market entirely.

Abbott's document requests on this issue are narrowly tailored to documents that are relevant to disproving that Abbott's conduct was anticompetitive. First, Abbott seeks "[a]ll documents relating to the reason or reasons GSK has 'consistently assumed Kaletra remains market leader,' as noted in the internal GSK document titled '908 Competitive Position.'" (McCallum Decl. Ex. A (RFP No. 3)). This request seeks documents showing GSK's own internal view of why Kaletra achieved its share of the market. These documents are relevant to proving that, to the extent that Kaletra maintained any market share, it was due not to Abbott's pricing conduct, but to other factors such as the qualitative differences between Kaletra and GSK's competing products. Abbott is entitled to documents supporting its defense that "each of the alleged acts and/or omissions was justified, fair, lawful, and/or not fraudulent." (Abbott's Ans. at 9). The requested documents are

reasonably calculated to lead to the discovery of admissible evidence showing GSK's understanding that Abbott's price increase was not anti-competitive because it was done for a legitimate business purpose. *See Chisholm Bros. Farm Equipment Co. v. Int'l Harvester Co.*, 498 F.2d 1137, 1144 (9th Cir. 1974); *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 215 (3d Cir. 2005).

Second, Abbott seeks documents relating to the scope, meaning, validity, and enforceability of Abbott's patents for Norvir and Kaletra. (*See* McCallum Decl. Ex. A (RFP Nos. 47-49)). These documents, which will likely show GSK's internal beliefs as to the validity and enforceability of Abbott's patents, are relevant to Abbott's defense that it had a legitimate business justification for increasing Norvir's price to protect Norvir's intellectual property values.

Third, Abbott seeks documents relevant to GSK's allegations of anticompetitive intent. GSK alleges that Abbott intended to monopolize the "Boosted Market" because it purportedly contemplated withdrawing Norvir from the market and attempted to mislead consumers about its price increase, resulting in Abbott receiving a Warning Letter from the FDA. (*See* Compl. ¶¶ 27, 33-34, 36). GSK claims that, as a result of Abbott's pricing conduct designed to further an anticompetitive intent, demand for Kaletra increased at the expense of rivals' PIs. (*See id.* at ¶ 45). As part of its challenge to these allegations, Abbott seeks documents concerning government investigations of GSK's ARV Drugs, including those relating to GSK's pricing of its ARV Drugs and any FDA Warning Letters GSK received for those drugs. (*See* McCallum Decl., Ex. A (RFP Nos. 50-52)). Abbott also seeks "[a]ll documents relating to [GSK's] actual or contemplated decision to take any other pharmaceutical product off the market." (*Id.* at RFP No. 62).

Both categories of requests seek documents that will show that GSK has engaged in the same type of conduct that it alleges shows that Abbott acted with anticompetitive intent. Such evidence would demonstrate that these are merely"[a]cts which are ordinary business practices typical of those used in a competitive market" and thus "do not constitute anti-competitive conduct violative of Section 2." *Trace X Chemical, Inc. v. Canadian Industries, Ltd.*, 738 F.2d 261, 266 (8th Cir. 1984); *see also J.H. Westerbeke Corp. v. Onan Corp.*, 580 F. Supp. 1173, 1189 (D. Mass. 1984) (holding that it was not anticompetitive to engage in "an ordinary business practice typical of those used in a

competitive market"). These requested documents relate directly to GSK's allegations of anticompetitive behavior and intent and, therefore, should be produced.

### C. Abbott's Requests Satisfy The Proportionality Requirements Of Rule 26(b)(2)(C).

Plaintiffs have the burden to demonstrate that the requests do not meet the proportionality requirements under Fed. R. Civ. P. 26(b)(2)(C). *Fisher v. Nat'l R.R. Passenger Corp.*, 152 F.R.D. 145, 156 (S.D. Ind. 1993). They cannot do so in this case.

First, the discovery sought is not "unreasonably cumulative or duplicative" and cannot "be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i). Abbott seeks information on internal GSK views of the marketplace, the reasons for Kaletra's success, the validity of Abbott's patents, and GSK's own conduct, all of which are uniquely in GSK's possession. These requests do not duplicate any previous discovery in this case.

Second, plaintiffs cannot show that Abbott "has had ample opportunity to obtain the information by discovery in the action." *Id*. at 26(b)(2)(C)(ii). This suit, which was initiated by GSK, is in its early stages and raises issues that were not relevant to, or anticipated by, the prior Norvir antitrust litigation. Abbott has not yet had an opportunity to conduct extensive discovery into issues, for example, relating to GSK's internal views of the relevant product market(s) and the business justifications for Abbott's conduct.

Finally, plaintiffs cannot show that "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." *Id*. at 26(b)(2)(C)(iii). The importance of the relevant market and the legality of Abbott's conduct in this case cannot be understated. GSK seeks treble damages for alleged overcharges that could potentially total tens, if not hundreds, of millions of dollars. Given the amount of damages at issue and the importance of the issues to which Abbott's discovery relates in determining the course of this litigation, the benefits of the discovery sought clearly outweigh any minor burdens imposed on GSK. Thus, GSK cannot claim that the requested discovery would

impose any undue burden, particularly given its refusal to agree to Abbott's narrowing of the scope of its relevant market requests.

## V. CONCLUSION

For the foregoing reasons, Abbott respectfully moves this Court for an order compelling GSK to produce all non-privileged documents responsive to Abbott's First Set of RFPs Nos. 23, 25, 27-28, 31, 39-40, 42-46, 64, and 91 (the "Relevant Market Requests"), and RFPs Nos. 3, 47-52, and 62 (the "Anticompetitive Conduct Requests").

Dated: July 7, 2008                                             WINSTON & STRAWN LLP

By:   /s/ Charles B. Klein

Attorneys for Defendant
ABBOTT LABORATORIES