WINSTON & STRAWN LLP
Nicole M. Norris (SBN 222785)
James F. Hurst (*Admitted Pro Hac Vice*)
David J. Doyle (*Admitted Pro Hac Vice*)
Samuel S. Park (*Admitted Pro Hac Vice*)
101 California Street, Suite 3900
San Francisco, CA 94111
Telephone Number:   415.591.1000
Facsimile Number:   415.591.1400

Attorneys for Defendant
ABBOTT LABORATORIES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SMITHKLINE BEECHAM CORPORATION, d/b/a GLAXOSMITHKLINE,<br><br>Plaintiff,<br><br>vs.<br><br>ABBOTT LABORATORIES,<br><br>Defendant. | Case No. C 07-5702 CW<br><br>*Related by Order to:*<br><br>Case No. C-04-1511 CW<br><br>**ABBOTT LABORATORIES' FIRST SET OF REQUESTS FOR DOCUMENTS AND THINGS TO PLAINTIFF**<br><br>The Honorable Judge Wilken |

PROPOUNDING PARTY:   DEFENDANT ABBOTT LABORATORIES

RESPONDING PARTY:   PLAINTIFF SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITH KLINE

SET NO.:   ONE

ABBOTT LABORATORIES' FIRST SET OF REQUESTS FOR DOCUMENTS AND THINGS TO PLAINITFF
CASE NO. C-07-5702 CW

SF:191626.1

Defendant Abbott Laboratories, by and through its undersigned counsel, pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, hereby requests that SmithKline Beecham Corporation, d/b/a GlaxoSmithKline ("GSK") produce for inspection and copying at the offices of Winston & Strawn, 35 West Wacker Drive, Chicago, Illinois 60601, the following documents and things within 30 days from the date of service of this request.

## I.  DEFINITIONS

1. "Plaintiff" or "you" shall mean GSK and any of its predecessors, successors, parent companies, attorneys, agents, representatives, partners, officers, directors, employees, or persons acting or purporting to act on its behalf.

2. "Defendant" or "Abbott" shall mean Abbott Laboratories and any of its predecessors, successors, parent companies, attorneys, agents, representatives, partners, officers, directors, employees, or persons acting or purporting to act on its behalf.

3. "HIV" shall mean Human Immunodeficiency Virus and shall be used interchangeably with "AIDS," Acquired Immune Deficiency Syndrome.

4. "Complaint" shall mean the complaint filed in this action.

5. "License Agreement" shall mean the December 2002 agreement between Abbott and GSK referenced in the Complaint.

6. "Abbott Competitors" shall include all pharmaceutical companies that market HIV/AIDS drugs, including but not limited to, Hoffmann-La Roche, GSK, Bristol-Myers Squibb, Pfizer, Boehringer Ingelheim, Tibotec, Merck & Co., Gilead Sciences, Pharmasset, Incyte, Achillion Pharmaceuticals, Trimeris, Progenics Pharmaceuticals, Schering-Plough Corporation, Tanox, Vertex, and Biogen Idec, as well as their predecessors, successors, subsidiaries, parent companies, attorneys, agents, representatives, partners, officers, directors employees, or persons acting or purporting to act on their behalf.

7. "Non-Nucleoside Reverse Transcriptase Inhibitors" or "NNRTIs" shall include, but are not limited to, Rescriptor®, Sustiva®, Viramune®, calanolide A, capravirine, and compounds known as BMS-561390, and TMC-125.

8. "Nucleoside/Nucleotide Reverse Transcriptase Inhibitors" or "NRTIs" shall include, but are not limited to, Combivir®, Emtriva®, Epivir®, Epzicom™, Hivid®, Retrovir®, Trizivir®, Truvada™, Videx®, Videx® EC, Viread®, Zerit®, Ziagen®, Reverset™, alovudine, amdoxovir, and elvucitabine.

9. "Protease Inhibitors" or "PIs" shall include, but are not limited to, Crixivan®, Fortovase®, Invirase®, Kaletra®, Lexiva®, Norvir®, Reyataz®, Viracept®, tipranavir, and the compound known as TMC-114.

10. "Entry Inhibitors" shall include, but are not limited to, Fuzeon®, and compounds known as GSK-873, PRO-542, SCH-417690, TNX-355, and UK-427.

11. "Antiretroviral Drugs" or "ARV Drugs" shall include, but are not limited to, Non-Nucleoside Reverse Transcriptase Inhibitors, Nucleoside/Nucleotide Reverse Transcriptase Inhibitors, Protease Inhibitors, Fusion Inhibitors, Integrase Inhibitors, and Entry Inhibitors.

12. "Abbott Patents" shall mean U.S. Patent No. 6,703,403; U.S. Patent No. 6,037,157 and U.S. Patent No. 5,886,036.

13. "Norvir's price increase" shall mean Abbott's increase of the wholesale price of Norvir effective December 2003.

14. "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including, without limitation, electronic or computerized data compilations. A draft or non-identical copy is a separate document within the meaning of this term.

15. "Lexiva" shall mean fosamprenavir, GW433908, 908, or any other name used to identify the pharmaceutical product that is currently marketed as Lexiva.

16. The terms "reflecting," "referring," "concerning," "relating to," or any derivation thereof shall mean, without limitation, consisting of, constituting, containing, mentioning, describing, summarizing, evidencing, listing, indicating, analyzing, explaining, supporting, undermining, contradicting, concerning, pertaining to, prepared in connection with, used in

preparation for, or being in any way legally, logically, or factually connected with the matter discussed.

17. "Communication" shall mean or refer to all inquiries, discussions, conversations, negotiations, agreements, understandings, meetings, telephone conversations, letters, notes, telegrams, advertisements, or other forms of information exchanged, whether oral, electronic, or written.

## II. INSTRUCTIONS

1. This Request is continuing in nature. All documents and things responsive to this Request that come into your possession, custody or control after you have made your first response to this Request shall be produced to Abbott in accordance with your obligation to supplement responses under Rule 26(e) of the Federal Rules of Civil Procedure.

2. If you at any time had possession or control of a document or thing requested herein, and if such document or thing has been lost, destroyed, purged, or is not presently in your possession or control, identify the document, the date of its loss, destruction, purge or separation from your possession or control, and the circumstances surrounding its loss, destruction, purge or separation from your possession or control.

3. Should your refuse, on the grounds of attorney-client privilege, work product immunity, or any other applicable privilege or immunity, to produce any document or tangible thing, provide at the time of making said refusal a list or log of all such non-produced documents or things. With respect to any such document or thing that is being withheld, state the following: (1) the nature of the privilege or immunity being claimed; (2) the number of the Request calling for its production; (3) the date of the document; (3) the name of each person who signed and/or prepared the document; (4) the name of each addressee and person to whom the document or copies thereof were given or sent; (5) a description of the general subject matter of the document; (6) an identification of any document or other material transmitted with or attached to the document; and (7) the nature or character of the document or thing, as well as the number of pages of the document.

4.  Each and every document requested should be produced in its entirety, without deletions or redactions and including all attachments affixed to the document.

5.  This Request for production of documents and things seeks production of every version of the documents and things requested, including, but not limited to, copies of the documents with marginalia, additional attachments, additional handwritten or typed notes, indications of carbon copies, blind carbon copies, or distribution lists, and drafts and revisions of the document.

6.  If any of the requested documents and things cannot be produced in full, produce them to the extent possible, specifying the reasons for your inability to produce the remainder.

7.  Unless the request specifically states otherwise, references to the singular shall include the plural and vice versa; references to one gender shall include the other gender; references to the past include the present and vice versa; and disjunctive terms include the conjunctive and vice versa.

## III. REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

1.  All documents relating to the price difference between boosted Lexiva and unboosted Lexiva, including documents discussing GSK's concerns relating to the "glaring price differences" between the two regimens, as noted in the internal GSK document titled "908 Financial Environment."

2.  All documents relating to Kaletra's potency, including those explaining Kaletra's "potency advantage," as noted in the internal GSK document titled "908 Competitive Position."

3.  All documents relating to the reason or reasons GSK has "consistently assumed Kaletra remains market leader," as noted in the internal GSK document titled "908 Competitive Position."

4.  All documents relating to or discussing the "PR risk" of Lexiva's pricing structure, as noted in the internal GSK document titled "908 Overview."

WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111-5894

5.　　All documents relating to or discussing GSK's concern that ritonavir boosting "cuts revenue per patient by half!!" as noted in the internal GSK document titled "908 Overview."

6.　　All documents relating to any perception that Agenerase is or was an inferior drug, including those that discuss the "AGN [Agenerase] baggage" on Lexiva's performance, as noted in the internal GSK document titled "908 Positioning."

7.　　All documents related to Pete Hare's (VP, HIV Business Unit, HIV Division) presentation to investors on September 17, 2007 in Philadelphia, PA, including: (i) documents supporting his presentation; and (ii) any transcript or recording of his presentation.

8.　　All press releases related to Lexiva.

9.　　All copies of "HIV Strategy Updates."

10.　　All copies of the "Strategic Brand Plan" for Lexiva.

11.　　All documents relating to and discussing each of your price increases on Lexiva, including your price increases on or about January 2004, January 2005, January 2006, December 2006, and August 2007.

12.　　All documents that discuss Lexiva's performance in the marketplace and any factors impacting Lexiva's performance, including, but not limited to: (i) the timing of Lexiva's launch and, particularly, the fact that it post-dated the launch of Reyataz; (ii) the performance of Agenerase; and (iii) the proximity of the Lexiva launch to the holiday season.

13.　　All documents relating to your plan or strategy, at any time, to convert patients from Agenerase to Lexiva.

14.　　All documents relating to clinical studies of Lexiva, including all documents relating to the KLEAN, ALERT, and CONTEXT studies.

15.　　All documents relating to your decision to proceed with the KLEAN, ALERT, CONTEXT and any other clinical studies on Lexiva.

16.　　All publications resulting from the KLEAN, ALERT, and CONTEXT studies.

17.　　All adverse event reports relating to Lexiva.

18.　　New Drug Application ("NDA") No. 21-548.

19. All documents concerning the allegations in your Complaint, including: (i) documents you used, relied upon or referenced in drafting your Complaint; and (ii) documents that support the allegations in your Complaint.

20. All documents you intend to introduce or rely upon at trial.

21. All documents received or obtained from Abbott Competitors during the course of this litigation that relate in any way to the subject matter, underlying facts or claims set forth in your Complaint, including all documents obtained pursuant to subpoena.

22. All documents identified in your responses to Abbott's interrogatories, or referred to or relied upon in preparing such responses.

23. All documents relating to the pricing of your ARV Drugs and the factors that determine how you set the prices for such drugs.

24. All documents and communications relating to any discussions with Abbott concerning the License Agreement.

25. All documents relating to your pricing and profit strategies for your ARV drugs.

26. All price-related analysis relating to Lexiva.

27. All communications relating to the price of your ARV Drugs, including all complaints and concerns that your ARV Drugs are priced too high.

28. All marketing materials relating to your ARV Drugs.

29. All market research materials related to Lexiva, including all internal and third party (e.g., TVG and EIDETICS) marketing research and analysis materials.

30. All Board of Director Minutes and materials related to Lexiva.

31. All documents discussing your strategy or strategies for marketing your ARV Drugs.

32. All documents sufficient to calculate the total research and development costs of each of your ARV Drugs.

33. All licensing agreements related to your ARV Drugs, including all licenses related to Lexiva (fosamprenavir).

34. All documents relating to or discussing Norvir (ritonavir, RTV).

35. All documents relating to or discussing Kaletra (lopinavir/ritonavir).

36. All documents relating to the life cycle strategy of amprenavir and fosamprenavir.

37. All communications, including all letters and e-mails, relating to Norvir's price increase.

38. All communications, including all letters and e-mails, with any television or newspaper reporters (or their employees or staff) related to Norvir, Kaletra and/or Norvir's price increase.

39. All documents discussing your (or any of your ARV Drugs') share of the ARV Drug market.

40. All documents discussing your (or any of your ARV Drugs') share of the "market for PI boosters," as that term is used in your Complaint.

41. All documents used in calculating the respective market shares of Lexiva and/or Kaletra in the "market for PI boosters," as that term is used in your Complaint.

42. All documents relating to your forecasting or projections concerning the ARV Drug market.

43. All documents relating to your forecasting or projections concerning the "market for PI boosters," as that term is used in your Complaint.

44. All documents relating to your forecasting or projections concerning revenue and/or sales of Kaletra, Norvir, Reyataz and/or Lexiva.

45. All documents relating to the different factors that influence physician prescribing practices or preferences for ARV Drugs, including any research revealing physician prescribing preferences and the factors influencing ARV Drug prescriptions.

46. All documents relating to the different factors that influence patient preferences for ARV Drugs, including any research revealing patient preferences and the factors influencing ARV Drug prescriptions or adherence.

47. All documents that relate to or discuss the validity and/or enforceability of the Abbott Patents.

48. All other documents relating to the Abbott Patents, including but not limited to documents that discuss the scope, meaning, and/or interpretation of such patents or any claims therein.

49. All prior art documents to the Abbott Patents.

50. All documents relating to any government investigation into or concerning one or more of your ARV Drugs.

51. All documents relating to any government investigation into or concerning the pricing of one or more of your ARV Drugs.

52. All FDA warning letters in the last ten years that relate in any way to one or more of your ARV drugs.

53. All documents comparing the characteristics or performance of Lexiva against the characteristics or performance of any other ARV Drug.

54. All documents that discuss or relate to the safety, performance and/or efficacy of Lexiva, Agenerase and/or any other protease inhibitor developed, marketed or sold by GSK.

55. All documents that discuss or relate to the safety, performance and/or efficacy of Norvir.

56. All documents that discuss or relate to the safety, performance and/or efficacy of Kaletra.

57. All documents that discuss the comparative safety, performance and/or efficacy of Lexiva and Agenerase.

58. All documents that discuss the comparative safety, performance and/or efficacy of Lexiva and Kaletra.

ABBOTT LABORATORIES' FIRST SET OF REQUESTS FOR DOCUMENTS AND THINGS TO PLAINTIFF
CASE NO. C-07-5702 CW

SF:191626.1

WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111-5894

59. All documents relating to physician perception of the safety, performance and/or efficacy of Kaletra, Norvir, Lexiva, Agenerase and/or any other protease inhibitor developed, marketed or sold by GSK.

60. All documents relating to patient perception of the safety, performance and/or efficacy of Kaletra, Norvir, Lexiva, Agenerase and/or any other protease inhibitor developed, marketed or sold by GSK.

61. All documents relating to your actual or contemplated decision to take Agenerase off the market.

62. All documents relating to your actual or contemplated decision to take any other pharmaceutical product off the market.

63. All documents relating to each and every price increase GSK took on Agenerase between the time of its launch and its removal from the marketplace, including documents discussing the reasons for the increases and the amounts of the increases.

64. All documents relating to your price lists, pricing plans, pricing policies, pricing forecasts, pricing strategies, and pricing decisions relating to all of your ARV Drugs.

65. All documents sufficient to show total sales of Lexiva by types of payor, such as Medicaid, ADAP, out of pocket, and private insurance for each month since its launch.

66. All documents sufficient to show the costs associated with manufacturing Lexiva for each month since its launch.

67. All documents sufficient to show the costs associated with the sale of Lexiva, including any amounts paid as royalties or licensing fees, for each month since its launch.

68. All documents sufficient to show the amount of profits attributable to sales of Lexiva for each month since its launch.

69. All documents related to any antitrust case you were involved in, or are currently involved in, in which you took a position on the definition of any relevant market for pharmaceutical products or ARV Drugs.

70. All documents you produced, filed, or served in *AIDS Healthcare Foundation v. GSK*, Case No. 02 -5223 TJH-Ex, filed on July 1, 2002 in the United States District Court for the Central District of California.

71. All documents you produced, filed, or served in *Chemi Spa v. GlaxoSmithKline*, 04-4545, 2004 U.S. Dist. LEXIS 25335 (E.D. Pa. 2004).

72. All pleadings, depositions transcripts, deposition exhibits, hearing transcripts, and expert reports relating to *AIDS Healthcare Foundation v. GSK*, Case No. 02-5223 TJH-Ex., filed on July 1, 2002 in the United States District Court for the Central District of California.

73. All pleadings, depositions transcripts, deposition exhibits, hearing transcripts, and expert reports relating to *Chemi Spa v. GlaxoSmithKline*, 04-4545, 2004 U.S. Dist. LEXIS 25335 (E.D. Pa. 2004).

74. All documents relating to any position you took in *AIDS Healthcare Foundation v. GSK*, Case No. 02-5223 TJH-Ex, filed on July 1, 2002 in the United States District Court for the Central District of California, regarding the definition of the relevant markets.

75. All documents relating to any position you took in *Chemi Spa v. GlaxoSmithKline*, 04-4545, 2004 U.S. Dist. LEXIS 25335 (E.D. Pa. 2004) regarding the definition of the relevant markets.

76. All documents relating to the Competition Commission of South Africa's 2002 conclusion that you "abused [your] dominance and contravened sections 8(a) (excessive pricing), 8(b) (refusing a competitor access to an essential facility) and 8(c) (an exclusionary act)" of the Competition Act.

77. All documents relating to your discussions or negotiations with the Competition Commission of South Africa and others regarding your issuance of four patented licenses of anti-retroviral drugs to generic manufacturers.

78. All documents relating to any position you took on the definition of the relevant markets in your dealings with the Competition Commission of South Africa.

79. GSK's communications, including all letters and e-mails, with any federal or state government agencies (e.g., attorneys general's offices, FTC, NIH, FDA, DHHS, DOJ), employees, or elected officials (e.g., members of Congress or state legislature) related to Norvir, Kaletra and/or Norvir's price increase.

80. All documents concerning or relating to your claim that Abbott violated the Sherman Act, as alleged in Count 1 of your Complaint, including but not limited to: (i) all documents that support your allegations in Count 1; and (ii) all documents upon which you intend to rely at trial.

81. All documents relating to your allegation that Abbott engaged in anticompetitive conduct or activities.

82. All documents relating to your allegation that "Abbott schemed to remove" Norvir from the market for boosted PIs.

83. All documents relating to your allegation that "Abbott acted with a specific intent to achieve an anticompetitive purpose," including "eliminate[ing] competitors from the market for boosted PIs and to unlawfully acquire or maintain a monopoly in the boosted PI market." (Compl. ¶ 57).

84. All documents relating to your allegation that Abbott's alleged misconduct "has harmed the open and free market, restraining competition and threatening to continue to restrain competition." (Compl. ¶ 61).

85. All documents relating to your allegation that "Abbott's anticompetitive scheme protected Kaletra against new competitors that threatened its market dominance." (Compl. ¶ 1).

86. All documents relating to your allegation that "Abbott's action forced" patients using competitors' PIs "either to pay exorbitant new prices or to use Abbott's PI." (Compl. ¶ 1).

87. All documents relating to your allegation that Abbott's alleged anticompetitive activities have caused medical hospitals to revise their formularies.

88. All documents relating to your allegations regarding the definition of the relevant markets, including your allegation that: (i) the "market for PI boosters" consists of "all drugs that could be used to boost the effects of PIs"; (ii) the "market for boosted PIs" consists of "those PIs that benefit from a PI booster"; and (iv) the geographic scope of both markets is the United States. (Compl. ¶¶ 39-40, 42).

89. All documents relating to the pricing of products in the market for PI boosters and the market for boosted PIs.

90. All documents relating to the costs of products in the market for PI boosters and the market for boosted PIs

91. All documents relating to the past, current, future and potential market shares of the products in the market for boosted PIs.

92. All scientific or journal articles related to the efficacy, benefits, or side effects of products in the market for boosted PIs.

93. All documents relating to your allegation that Abbott "targeted" GSK. (Compl. ¶ 2).

94. All documents relating to your allegation that Abbott "demanded" a License Agreement from GSK. (Compl. ¶ 2).

95. All documents relating to your allegation that "Abbott explicitly considered the negative impacts of its price hike." (Compl. ¶ 2).

96. All documents relating to your allegation that Abbott harmed "competition in the markets into which PIs are sold, harming GSK and Abbott's other competitors in those markets and harming the HIV/AIDS community." (Compl. ¶ 3).

97. All documents relating to your allegation that Abbott had a "contractual obligation" not to raise the price of Norvir. (Compl. ¶ 2).

98. All documents relating to your allegation that Abbott's pricing decision "was designed to render Norvir essentially inaccessible to a wide array of patients." (Compl. ¶ 2).

99. All documents relating to your allegation that "Lexiva sales have fallen short of pre-release forecasts prepared for and by GSK." (Compl. ¶ 3).

100. All documents relating to your allegation that "Abbott's anticompetitive conduct caused GSK to lose sales, profits and market share for Lexiva and its other PI products." (Compl. ¶ 3).

101. All documents relating to your allegation that "Abbott's misconduct interfered with, and continues to interfere with, GSK's ability to serve the HIV/AIDS community and to provide the treatments that HIV-positive patients need." (Compl. ¶ 3).

102. All documents relating to your allegation that "Abbott's price increase has the effect of limiting the types of PIs available to patients – thus interfering with their ability to effectively treat the disease." (Compl. ¶ 4).

103. All documents relating to your allegation that "GSK has been harmed in North Carolina by Abbott's misconduct." (Compl. ¶ 5).

104. All documents relating to your allegation that "Abbott spent significantly less in developing Norvir than typical for other major pharmaceutical drugs." (Compl. ¶ 14).

105. All documents relating to your allegation that Abbott executives "formulated an anticompetitive scheme using Abbott's control of Norvir as leverage to maintain or increase Kaletra's dominant market position." (Compl. ¶ 24).

106. All documents relating to your allegation that Abbott's price increase raised "the wholesale acquisition cost of GSK's boosted Lexiva treatment from $19.43 to $33.15." (Compl. ¶ 30).

107. All documents relating to your allegation that Abbott's communications following its price increase of Norvir "had the intention and effect of confusing prescribers and purchasers about the real impact of the price increase." (Compl. ¶ 31).

108. All documents relating to your allegation that the price increase "had the effect of leveraging Abbott's monopoly power over PI boosters into the boosted market." (Compl. ¶ 35).

109. All documents relating to your allegation that there are "substantial barriers to entry into both the markets for PI boosters and boosted PIs." (Compl. ¶ 41).

110. All documents relating to your statement that GSK had a "reasonable expectation" that "it would be able to promote the co-prescription and co-administration of its PI products with Norvir at prices competitive with those of Kaletra and other PIs." (Compl. ¶ 36).

111. All documents relating to your allegation that Abbott raised the price of Norvir "knowingly and intentionally to interfere with sales of Lexiva and other boosted PIs." (Compl. ¶ 36).

112. All documents relating to your allegation that, in 2003, "Abbott's market share for boosted PIs exceeded 70 percent." (Compl. ¶ 40).

113. All documents relating to your allegation that "[t]hrough its course of dealing with its competitors, Abbott has facilitated the market for boosted PIs ... and caused its competitors to anticipate incremental" price increases for Norvir. (Compl. ¶ 44).

114. All documents relating to your allegation that Abbott's conduct "artificially reduced the demand for the boosted PIs of GSK and Abbott's other competitors, while artificially increasing demand for its own boosted PIs." (Compl. ¶ 45).

115. All documents relating to your allegation that Abbott's conduct "has directly and proximately harmed competition in the market for boosted PIs," and that Abbott's conduct "excluded and handicapped its competitors." (Compl. ¶ 46).

116. All documents relating to your allegation that Abbott's "justification" of its choice to raise the price of Norvir "is pretextual and does not legitimately promote competition." (Compl. ¶ 46).

117. All documents relating to your allegation that "Abbott's competitors in the boosted PI market, including GSK have suffered declines in revenue and reductions in the market share that they otherwise would have obtained." (Compl. ¶ 47).

118. All documents relating to your allegation that, as a result of Abbott's conduct, HIV patients and health care professionals have been harmed by "a) paying more for boosted PI

15

treatments than they would have in the absence of Abbott's unlawful conduct; b) being denied the benefit of a broader variety of boosted PI treatments; and c) being denied the benefit of research and development that likely would have resulted in alternative and superior forms of PI treatments." (Compl. ¶ 48).

119. All documents relating to your allegation that "GSK's injuries are unique and are in addition to, not duplicative of or derivative of, any injuries suffered by its competitors or by consumers." (Compl. ¶ 49).

120. All documents relating to your allegation that "Abbott targets markets in which GSK participates" and that Abbott "intended to harm GSK."

121. All documents relating to your allegation that GSK lost "the benefit of the bargain it struck with Abbott when GSK agreed to a license from Abbott." (Compl. ¶ 50).

122. All documents relating to your allegation that Abbott took "for itself part or all of the expected and reasonably anticipated benefit of the agreement it entered with GSK." (Compl. ¶ 50).

123. All documents concerning your allegation or claim that Abbott violated the Covenant of Good Faith and Fair Dealing in Count 2 of your Complaint, including but not limited to: (i) all documents that support your allegations in Count 2; and (ii) all documents upon which you intend to rely at trial.

124. All documents concerning or reflecting the negotiation of the License Agreement.

125. All documents relating to your allegation that the terms of the License Agreement "were based upon GSK's reasonable expectation ... that future increases in the price of Norvir would be consistent with past increases." (Compl. ¶ 64).

126. All documents relating to your allegation that Abbott's price increase of Norvir "dashed" GSK's "expectations under the [License Agreement] and thwarted GSK's ability to benefit from the contracted rights." (Compl. ¶ 64).

127. All documents relating to your allegation that Abbott's price increase of Norvir "devastated the value of" the License Agreement. (Compl. ¶ 64).

128. All documents concerning your allegation or claim that Abbott violated the North Carolina Unfair Trade Practices Act, as alleged in Count 3 of your Complaint, including but not limited to: (i) all documents that support your allegations in Count 3; and (ii) all documents upon which you intend to rely at trial.

129. All documents relating to your allegation that Abbott "manipulated and exploited its position of power over Norvir." (Compl. ¶ 70).

130. All documents relating to your allegation that Abbott "deliberately deceived its competitors and the public as to the true and illegitimate nature of the price increase." (Compl. ¶ 71).

131. All documents concerning your allegation or claim that Abbott violated the North Carolina Prohibition Against Monopolization in Count 4 of your Complaint, including but not limited to: (i) all documents that support your allegations in Count 4; and (ii) all documents upon which you intend to rely at trial.

132. All documents that substantiate or relate in any way to any damages you allegedly suffered because of Abbott's acts for which you are seeking recovery in this action.

133. All personnel and employment history files for any individual you expect to call as a witness in this lawsuit.

134. All documents concerning Lexiva, Agenerase, Kaletra or Norvir authored or received by any individual you expect to call as a witness in this lawsuit.

135. All documents created or considered, in connection with this case, by any person whom you or your attorneys expect to use as an expert witness in this lawsuit.

136. All communications between you and the other counsel in the related actions to this lawsuit.

137. All documents reviewed or relied upon by your expert witnesses.

138. All documents reviewed or relied upon by your fact witnesses.

Dated: December 17, 2007       WINSTON & STRAWN LLP


By: *Nicole M. Norris*
Nicole M. Norris (SBN 222785)
James F. Hurst (Admitted Pro Hac Vice)
David J. Doyle (Admitted Pro Hac Vice)
Samuel S. Park (Admitted Pro Hac Vice)
101 California Street, Suite 3900
San Francisco, California 94111-5584
Telephone: 415.591.1000
Facsimile: 415. 591.1400

Attorneys for Defendant
ABBOTT LABORATORIES