James F. Hurst *(Admitted Pro Hac Vice)*
David J. Doyle *(Admitted Pro Hac Vice)*
Samuel S. Park *(Admitted Pro Hac Vice)*
Stephanie S. McCallum *(Admitted Pro Hac Vice)*
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone:    (312) 558-5600
Facsimile:    (312) 558-5700
jhurst@winston.com; ddoyle@winston.com;
spark@winston.com; smccallum@winston.com

Nicole M. Norris (SBN 222785)
WINSTON & STRAWN LLP
101 California Street, Suite 3900
San Francisco, CA  94111-5894
Telephone:    415-591-1000
Facsimile:    415-591-1400
nnorris@winston.com

Charles B. Klein *(Admitted Pro Hac Vice)*
Matthew A. Campbell *(Admitted Pro Hac Vice)*
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC  20007
Telephone:    (202) 282-5000
Facsimile:    (202) 282-5100
cklein@winston.com; mcampbell@winston.com

Jeffrey I. Weinberger (SBN 56214)
Stuart N. Senator (SBN 148009)
Keith R.D. Hamilton (SBN 252115)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Los Angeles, CA  90071-1560
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702
jeffrey.weinberger@mto.com;
stuart.senator@mto.com;
keith.hamilton@mto.com

Michelle Friedland (SBN 234124)
MUNGER, TOLLES & OLSON LLP
560 Mission Street
San Francisco, CA 94105-2907
Telephone:    (415) 512-4000
Facsimile:    (415) 512-4077
michelle.friedland@mto.com

Attorneys for Defendant
ABBOTT LABORATORIES

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - OAKLAND DIVISION

| | |
|---|---|
| SMITHKLINE BEECHAM CORPORATION, d/b/a GLAXOSMITHKLINE,<br><br>Plaintiff,<br><br>vs.<br><br>ABBOTT LABORATORIES,<br><br>Defendant.<br><br>*(Caption continued on next page)* | CASE NO.  C 07-5702 (CW)<br><br>Related per December 5, 2007 Order to Case No. C 04-1511 (CW)<br><br>**DEFENDANT ABBOTT LABORATORIES' REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, SUMMARY ADJUDICATION ON DIRECT PURCHASER PLAINTIFFS' CLAIMS**<br><br>**AMENDED REDACTED VERSION FILED PURSUANT TO COURT ORDER**<br><br>Judge:     Honorable Claudia Wilken<br>Date:      October 28, 2010<br>Time:      2:00 pm<br>Location:   Courtroom 2 (4th Floor) |

1

2   SAFEWAY INC; WALGREEN CO.; THE          CASE NO.  C 07-5470 (CW)
    KROGER CO.; NEW ALBERTSON'S,
3   INC.; AMERICAN SALES COMPANY,           Related per November 19, 2007 Order to Case
    INC.; AND HEB GROCERY COMPANY,          No. C 04-1511(CW)
    LP,
4
                Plaintiffs,
5
           vs.
6
    ABBOTT LABORATORIES,
7
                Defendant.
8
    ┌─────────────────────────────────────┐
9   │ RITE AID CORPORATION; RITE AID        CASE NO.  C 07-6120 (CW)
    │ HDQTRS CORP.; JCG (PJC) USA, LLC;
10  │ MAXI DRUG, INC D/B/A BROOKS           Related per December 5, 2007 Order to Case No.
    │ PHARMACY; ECKERD                      C 04-1511 (CW)
    │ CORPORATION; CVS PHARMACY,
11  │ INC.; AND CAREMARK LLC,
    │ Plaintiffs,
12  │ vs.
    │ ABBOTT LABORATORIES,
13  │ Defendant.
    ├─────────────────────────────────────┤
14  │ MEIJER, INC. & MEIJER                 CASE NO.  C 07-5985 (CW)
    │ DISTRIBUTION, INC.; ROCHESTER         (Consolidated Cases)
    │ DRUG CO-OPERATIVE, INC.; AND          Related per November 30, 2007 Order to Case
15  │ LOUISIANA WHOLESALE DRUG              No. C 04-1511 (CW)
    │ COMPANY, INC., ON BEHALF OF
16  │ THEMSELVES AND ALL OTHERS
    │ SIMILARLY SITUATED,
17  │ Plaintiffs,
    │ vs.
18  │ ABBOTT LABORATORIES,
    │ Defendant.
19  └─────────────────────────────────────┘

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................... 1

II.   ARGUMENT ...................................................................................................... 1

    A.   Plaintiffs Fail To Raise A Genuine Issue On "Boosted Market" Monopoly Power ............................................................................................................. 1

        1.   The Facts Showing Abbott's Lack Of Monopoly Power Are Uncontroverted ......................................................................................... 1

        2.   Plaintiffs' Liability Theory Contradicts Their Claim Of Monopoly Power ........................................................................................................ 2

        3.   Plaintiffs Have Not Presented Direct Evidence Of Monopoly Power ....... 3

        4.   Plaintiffs Have No Explanation For Why Abbott's Declining Market Share Is Even Arguably Consistent With Monopoly Power ......... 6

        5.   Plaintiffs Have No Answer To The Lack Of Output Constraints ............... 9

        6.   There Is No Support For An Attempt Claim ............................................. 10

    B.   Plaintiffs Fail To Present Evidence Supporting Application Of *Cascade* ........... 10

        1.   Prior Statements Do Not Estop Abbott ..................................................... 10

        2.   *Cascade* Is Inapplicable Regardless of Prior Statements About Lopinavir ................................................................................................. 11

        3.   The Evidence Does Not Support Application Of *Cascade* ...................... 13

    C.   Plaintiffs' Refusal-To-Deal Claim Fails ............................................................. 13

    D.   Plaintiffs' Boosting Market Monopolization Claims Fail For Lack Of Evidence ............................................................................................................. 14

    E.   The Direct Purchaser Plaintiffs Have Not Suffered Antitrust Injury ................... 15

III.  CONCLUSION ................................................................................................ 17

12062370.1

1

# TABLE OF AUTHORITIES

2

Page(s)

3

4

**FEDERAL CASES**

5

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
  190 F.3d 1051 (9th Cir. 1999) ............................................................................... 17

6

7

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*,
  108 F.3d 1147 (9th Cir. 1997) ................................................................................. 9

8

*Atlantic Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ............................................................................................... 15

9

10

*Baghdasarian v. Amazon.com, Inc.*,
  No. CV 05-8060 AG, 2009 WL 4823368 (C.D. Cal. Dec. 9, 2009) ...................... 16

11

12

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) ...................................................................................... *passim*

13

*California ex rel. Brown v. Safeway, Inc.*,
  No. 08-55671, No. 08-55708, 2010 WL 3222187 (9th Cir. Aug. 17, 2010) ............ 4

14

15

*Cargill, Inc. v. Monfort of Colo., Inc.*,
  479 U.S. 104 (1986) ................................................................................................. 3

16

*Cascade Health Solutions v. PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008) ........................................................................ *passim*

17

18

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................................... 15

19

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) .......................................................................... 3, 15

20

21

*Conwood Co. v. U.S. Tobacco Co.*,
  290 F.3d 768 (6th Cir. 2002) ............................................................................ 7, 14

22

23

*Del. & Hudson Ry. Co. v. Consol. Rail Corp.*,
  902 F.2d 174 (2d Cir. 1990) .................................................................................. 14

24

25

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ................................................................................................. 4

26

*F.T.C. v. Tenet Health Care Corp.*,
  186 F.3d 1045 (8th Cir.1999) .................................................................................. 4

27

28

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Forsyth v. Humana, Inc.*,
    114 F.3d 1467 (9th Cir. 1997)............................................................................. 5, 6

*Hamilton v. State Farm Fire & Cas. Co.*,
    270 F.3d 778 (9th Cir. 2001)............................................................................. 11, 12

*Horst v. Laidlaw Waste Sys., Inc.*,
    917 F. Supp. 739 (D. Colo. 1996) ........................................................................ 10

*In re eBay Seller Antitrust Litig.*,
    No. C 07-01882, 2010 WL 760433 (N.D. Cal. Mar. 4, 2010) ........................................... 4, 17

*In re Int'l Tel. & Tel. Corp.*,
    104 F.T.C. 280 (1984)....................................................................................... 3, 4

*In re Remeron Direct Purchaser Antitrust Litig.*,
    367 F. Supp. 2d 675 (D.N.J. 2005) ........................................................................ 5

*In re Teleglobe Commc'ns Corp.*,
    493 F.3d 345 (3d Cir. 2007)............................................................................. 12, 13

*John Doe I v. Abbott Labs*,
    571 F.3d 930 (9th Cir. 2009)............................................................................. 11, 16

*Kloth v. Microsoft Corp.*,
    444 F.3d 312 (4th Cir. 2006).............................................................................. 15, 17

*Legal Econ. Evaluations, Inc. v. Met. Life Ins. Co.*,
    39 F.3d 951 (9th Cir. 1994).............................................................................. 15, 16

*Longaberger Co. v. Kolt*,
    586 F.3d 459 (6th Cir. 2009) ............................................................................. 11

*Masayesva ex rel. Hopi Indian Tribe v. Hale*,
    118 F.3d 1371 (9th Cir. 1997)............................................................................ 11

*McAuliffe v. United States*,
    No. 2:08-CV-336, 2009 WL 1928547 (S.D. Ohio July 2, 2009)........................................... 13

*Meijer, Inc. v. Abbott Labs.*,
    No. C07-5985, 2008 WL 4065839 (N.D. Cal. Aug. 27, 2007)............................................. 16

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l., Ltd.*,
    262 F.R.D. 58 (D. Mass. 2008) ........................................................................... 16

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l., Ltd.*,
247 F.R.D. 253 (D. Mass. 2008) ........................................................................... 16

*Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*,
210 F.3d 1099 (9th Cir. 2000) .............................................................................. 15

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.*,
838 F.2d 360 (9th Cir. 1988) .................................................................................. 8

*Olin Corp. v. F.T.C.*,
986 F.2d 1295 (9th Cir. 1993) ................................................................................ 4

*Pressure System Int'l v. Airgo Ip LLC.*,
No. SA-07-CV-0498, 2007 WL 4198430 (W.D. Tex. Nov. 26, 2007) .................... 12

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ...................................................................... 3, 6, 8, 9

*Red Lion Medical Safety, Inc. v. Ohmeda, Inc.*,
63 F. Supp. 2d 1218 (E.D. Cal. 1999) ............................................................... 9, 10

*Sicor Ltd. v. Cetus Corp.*,
51 F.3d 848 (9th Cir. 1995) .................................................................................. 12

*United States v. Syufy Enters.*,
903 F.2d 659 (9th Cir. 1990) ............................................................................. 7, 8

*Verizon Commc'ns. Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ............................................................................... 14, 15, 17

12062370.1

1   **I.      INTRODUCTION**

2          The Opposition of the Direct Purchaser Plaintiffs ("Plaintiffs") does not controvert the

3   facts material to this motion:

4          First, Plaintiffs do not dispute the facts showing that Abbott lacks monopoly power in the

5   boosted PI market—including that new boosted PIs have entered the market before and after the

6   Norvir re-pricing, that current PI rivals are not constrained from expanding production, and that

7   Abbott's market share has been in free fall despite Abbott's alleged below-cost pricing of Kaletra.

8          Second, Plaintiffs do not dispute the facts showing Kaletra is not priced below cost.  The

9   undisputed evidence demonstrates that Kaletra is a single integrated product, not a bundle of

10  Norvir and anything.  Kaletra's pricing therefore must be analyzed under *Brooke Group Ltd. v.*

11  *Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993), rather than *Cascade Health Solutions*

12  *v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008), and Plaintiffs do not dispute that they are unable to

13  satisfy the *Brooke Group* test.

14         Third, Plaintiffs tacitly concede that Abbott has never refused to sell Norvir to anyone,

15  and that consumers have purchased Norvir in droves at its new price—facts that preclude any

16  refusal-to-deal claim.

17         Fourth, Plaintiffs confirm that they lack evidence that Abbott's conduct caused

18  competitors to refrain from developing or introducing new PI boosters, as would be necessary to

19  support Plaintiffs' boosting market monopolization claim.

20         Finally, Plaintiffs show no injury that supports antitrust standing on any of their claims.

21         For all of these independent reasons, Abbott is entitled to summary judgment.

22  **II.     ARGUMENT**

23  **A.  Plaintiffs Fail To Raise A Genuine Issue On "Boosted Market" Monopoly Power**

24      **1.  The Facts Showing Abbott's Lack Of Monopoly Power Are Uncontroverted**

25         Plaintiffs do not dispute the facts Abbott used to show that it lacks monopoly power in the

26  alleged boosted PI market: (1) Plaintiffs agree that with the introduction of new boosted PIs,

27  Kaletra's market share began a steep decline—a decline that was well underway at the time of the

28  December 2003 repricing of Kaletra and that has continued (although, Plaintiffs contend, more

1

gradually than it had before) through the present to the point that today Reyataz, not Kaletra, is

the market-leading PI; (2) far from Kaletra's being priced at monopoly levels, Plaintiffs do not

dispute that Kaletra's price has always been lower than even just the Reyataz component of a

boosted Reyataz regimen, and has, at all relevant times, been priced significantly below other

boosted PI regimens; (3) Plaintiffs agree that no boosted PI has exited as a result of the Norvir re-

pricing, while new boosted PIs have entered before and after; (4) Plaintiffs offer no evidence that

Abbott ever restricted the supply of Kaletra; and (5) Plaintiffs offer no evidence that, if Abbott

did restrict the supply of Kaletra or priced it at monopoly levels (neither of which it has done),

there would be any restraint on increased production of other PIs to capture sales Abbott would

otherwise have made.  Indeed, Plaintiffs offer no evidence controverting Abbott's showing that

competing boosted PI sales have consistently increased during the relevant period.

These facts mandate summary judgment in Abbott's favor.  Monopoly power is an

independent element of any Section 2 claim.  While Plaintiffs' opposition is filled with criticism

of Abbott's repricing, the antitrust laws are not a means for the courts to engage in price

regulation.  Congress has chosen to regulate drug pricing in the public payor market—through the

government payor pricing rules to which Plaintiffs repeatedly refer and which Abbott is not

alleged to have violated.  At the same time, Congress has chosen not to regulate drug pricing in

the private payor market.  Section 2 of the Sherman Act likewise has no application to conduct

that does not create, maintain, or threaten monopoly power.[1]

## 2.  Plaintiffs' Liability Theory Contradicts Their Claim Of Monopoly Power

Plaintiffs' liability theory is that once Reyataz and Lexiva entered the market in 2003,

Abbott had an inferior product and was rapidly losing market share.  *E.g.*, Opp. at 1.[2]  Plaintiffs

claim Abbott used the higher price of rivals' boosted PI regimens relative to Kaletra's price to try

to slow Kaletra's allegedly inevitable decline.  *Id*.  But this alleged need to use a comparatively

lower price to drive sales to Kaletra is fundamentally inconsistent with Abbott's having had

---

[1] Abbott incorporates by reference pertinent summary judgment arguments in the GSK case.

[2] Unless otherwise noted, "Opp." refers to the Direct Purchaser Plaintiffs' Opposition brief.

DEFENDANT'S REPLY I/S/O MSJ ON
DIRECT PURCHASERS' CLAIMS
CASE NOS.  07-5470, 07-5985, 07-6120, 07-5702

12062370.1

1  monopoly power in the alleged market for boosted PIs.  What Plaintiffs are really describing is

2  that, with the new (and allegedly better) boosted PIs, the market became competitive and Abbott

3  lost the monopoly power that the company allegedly had previously.  Abbott's alleged below-cost

4  pricing of Kaletra was, according to Plaintiffs, a desperate attempt to try to get back the market

5  share that Kaletra had no power to maintain.

6       Moreover, the uncontroverted evidence shows that, notwithstanding the alleged favorable

7  pricing for Kaletra, Abbott's market share continued to deteriorate, competitors' market shares

8  continued to increase, no competitors exited the market, and additional competitors entered the

9  market.  *See* Mot. at 15-18.  Thus, Plaintiffs cannot establish either monopoly power or a

10  dangerous probability of such power in their boosted PI market.

11       Plaintiffs have no meaningful response.  Notwithstanding Plaintiffs' attempts to portray

12  this case as about "efforts to preserve" monopoly power (Opp. at 1), the uncontroverted evidence

13  shows that Abbott lost any monopoly power with the introduction of the new boosted PIs and that

14  any alleged "efforts" to regain that "power" failed.  The only purported factual issue is whether,

15  with the prior pricing, Abbott's market share would have declined *more* precipitously.[3]  But that

16  is irrelevant.  Monopoly power is a seller's ability, "by restricting its own output, [to] restrict

17  marketwide output and, hence, increase marketwide prices.  *Rebel Oil Co. v. Atl. Richfield Co.*, 51

18  F.3d 1421, 1434 (9th Cir. 1995).  By contrast, a seller's preferential pricing to slow a loss of

19  market share shows competition.  *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1061

20  (8th Cir. 2000) (pricing to gain market share is "the very essence of competition"); *Cargill, Inc. v.*

21  *Monfort of Colo., Inc.*, 479 U.S. 104, 121 n.17 (1986) (same).

22    **3.  Plaintiffs Have Not Presented Direct Evidence Of Monopoly Power**

23       Plaintiffs admit that they need "evidence of supracompetitive prices or restricted output"

24  as direct evidence of monopoly power.[4]  Opp. at 8.  Plaintiffs have neither.

---

[3] This is not a true factual issue because Plaintiffs illegitimately disregard the impact of the
introduction of the improved Kaletra Meltrex product during the relevant period.

[4] "[T]he term 'market power' is used . . . to describe a whole continuum along which the power to
control prices varies, beginning with the complete absence of market power at one end and
ending with monopoly power at the other."  *In re Int'l Tel. & Tel. Corp.*, 104 F.T.C. 280, 411

1    First, there is no evidence that Abbott priced Kaletra supra-competitively—and not a

2    contention, let alone evidence, that Abbott priced Kaletra at monopoly levels.  Plaintiffs argue

3    that Abbott's increasing Kaletra's price a total of 25% from 2005 to 2007 is direct evidence of

4    monopoly power.  *Id.* at 9.  Setting aside that Plaintiffs nowhere explain where the line might be

5    between a price so low as to be predatory and so high as to be supra-competitive, Plaintiffs do not

6    dispute that Lexiva's and Reyataz's prices increased by similar amounts.  *Id.* at 9 n.37.[5]  It is also

7    undisputed that Kaletra's price has always been below that of even the Reyataz component of a

8    boosted Reyataz regimen.  *See* Calamari Decl. ¶ 44, Table 1 (filed with Abbott's moving papers).

9    In any event, price increases "prove[] nothing with respect to whether the prices are

10   supracompetitive."  *In re eBay Seller Antitrust Litig.*, No. C 07-01882, 2010 WL 760433, at *5

11   (N.D. Cal. Mar. 4, 2010).  Indeed, as the Supreme Court has recognized, "[w]here, as here, output

12   is expanding at the same time prices are increasing, rising prices are equally consistent with

13   growing product demand."  *Brooke Group*, 509 U.S. at 237.[6]

14   Plaintiffs also argue that that fact that Kaletra's price exceeds its marginal cost is evidence

15   of supracompetitive pricing.  Opp. at 8.  But it is undisputed that pricing of brand-name drugs

16   above marginal cost is necessary in the pharmaceutical industry, in light of the high sunk costs for

17

18   n.60 (1984).  The Supreme Court has held that evidence sufficient to establish market power is
     not necessarily sufficient to establish monopoly power under Section 2.  *See Eastman Kodak Co.*
19   *v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992) (evidence was sufficient to show market
     power under Section 1 but insufficient to show monopoly power under Section 2).

20   [5] Plaintiffs attempt to downplay the significance of the Lexiva and Reyataz price increases by
21   citing *California ex rel. Brown v. Safeway, Inc.*, No. 08-55671, No. 08-55708, 2010 WL
     3222187, at *13 n.8 (9th Cir. Aug. 17, 2010).  Opp. at 9 n.37.  But that case discussed how small
22   firms typically respond to price-fixing by dominant firms, not how competitors respond to a
     single firm allegedly engaging in below-cost pricing.

23   [6] Plaintiffs wrongly rely on the Merger Guidelines to suggest that any price increase over 5%
24   shows monopoly power.  Opp. at 9.  First, the referenced Merger Guidelines test is one of the
     many rules of thumb that the government uses in merger analysis to determine the relevant
     market; it is neither binding on the Courts, *Olin Corp. v. F.T.C.*, 986 F.2d 1295, 1300 (9th Cir.
25   1993), nor used to determine monopoly power.  *See F.T.C. v. Tenet Health Care Corp.*,186 F.3d
     1045, 1053 (8th Cir.1999) ("used by the FTC to ascertain a relevant geographic market in
26   exercising its prosecutorial discretion to challenge a merger").  Second, Plaintiffs do not dispute
     that Abbott's modest price increases were consistent with the Lexiva and Reyataz increases.  If
27   Plaintiffs were correct, each of these PIs would have monopoly power, a proposition not
     advocated by Plaintiffs and inconsistent with all three products being in the same market.

28

DEFENDANT'S REPLY I/S/O MSJ ON
DIRECT PURCHASERS' CLAIMS
CASE NOS.  07-5470, 07-5985, 07-6120, 07-5702

research and development of drugs.[7]  Indeed, Plaintiffs' economics experts all testified that

Reyataz and Lexiva are priced above marginal cost, and that this is an indication of *market*

*power*, not *monopoly* power.[8]  Moreover, courts have rejected the suggestion that drug pricing

above marginal costs is direct evidence of monopoly power.  *See, e.g.*, *In re Remeron Direct*

*Purchaser Antitrust Litig.*, 367 F. Supp. 2d 675, 684 (D.N.J. 2005) ("Plaintiffs seek to use

nothing beyond the typical reality facing patent holders in the pharmaceutical market (high brand

name prices relative to that of generic entrants) as the sole basis for inferring that the brand name

[drug] has monopoly power.  Plaintiffs' direct evidence is insufficient as a matter of law.").

Moreover, although direct evidence of monopoly power is often stated as including

evidence of supracompetitive prices *or* restricted output, the Ninth Circuit has made clear that a

plaintiff must show both to overcome summary judgment on the basis of "direct evidence."  The

Ninth Circuit's main case on direct evidence, *Forsyth v. Humana, Inc.*, held that evidence of high

prices was not enough to create a triable issue; evidence of restricted output was also needed:

> The plaintiffs submitted evidence that Sunrise Hospital routinely charged higher
> prices than other hospitals while reaping high profits.  With no accompanying
> showing of restricted output, however, the plaintiffs have failed to present direct
> evidence of market power.

114 F.3d 1467, 1476 (9th Cir. 1997).  Thus, *Forsyth* directly disproves Plaintiffs' argument that

"evidence of supracompetitive prices standing alone demonstrates monopoly power because

raising prices necessarily reduces sales."  Opp. at 9.

Second, there is no evidence that Abbott restricted output of Kaletra.  To the contrary,

---

[7] Plaintiffs say that it is "telling" that development efforts on various potential new boosted PIs
were halted during the relevant period.  Opp. at 19.  Plaintiffs present no admissible evidence of
any causal relationship to Abbott's pricing, and there is none.  *See* Declaration of Stuart Senator
in Support of Abbott's Replies ("Senator Decl."), Ex. A (Noll Dep. 81:7-93:20).  In any event, if
any conclusion is to be drawn from this evidence, it is that the pricing of Kaletra was not
supracompetitive.  Supracompetitive pricing increases incentives to innovate.  *See infra* at 15.

[8] *See* Senator Decl. Ex. B (Leffler Dep. 188:8-194:5) (testifying that all branded pharmaceuticals,
including Reyataz and Lexiva, are priced substantially above marginal cost); Ex. C (Singer Dep.
223:13-225:16) (defining "market power" as having a "margin between price and cost," and
testifying that Abbott, GSK, BMS all had market power in the boosted PI market); 228:5-229:7
(testifying that Aptivus also has market power); Ex. A (Noll Dep. 179:14-184:17) (testifying that
that the ability of boosted PIs to price above average variable cost does not constitute monopoly
power).

DEFENDANT'S REPLY I/S/O MSJ ON
DIRECT PURCHASERS' CLAIMS
CASE NOS.  07-5470, 07-5985, 07-6120, 07-5702

Plaintiffs' theory is that Abbott was attempting to sell as much Kaletra as the market would take, and attempted with its Norvir repricing in December 2003 to create a pricing structure that would increase purchases of Kaletra. While Plaintiffs say that the modest 2005-2007 Kaletra price increases reduced Kaletra's sales (Opp. at 10), this is merely the argument, rejected by the Ninth Circuit in *Forsyth*, that a high price alone is sufficient direct evidence to withstand summary judgment. It is also inconsistent with *Brooke Group*'s observation that a price increase in an expanding market is "equally consistent with growing product demand." 509 U.S. at 237.

Even assuming any increases in Kaletra's price reduced its sales, there is no evidence of a shortage of competitors' boosted PIs as alternatives and, therefore, no evidence of the requisite reduction in marketwide output. It is uncontroverted that marketwide boosted PI sales increased significantly throughout the relevant period. *See* Calamari Decl. ¶¶ 25-26 & Exhibits cited therein. Indeed, Plaintiffs do not contend that the 2005-2007 Kaletra price increases reduced sales marketwide.[9] To the contrary, Plaintiffs argue that "relative price changes cause product substitutions . . . in the boosted PI market." Opp. at 12, 16. Again, this shows competitive, not supra-competitive, Kaletra pricing. *See Rebel Oil*, 51 F.3d at 1434 ("A predator has sufficient market power when, by restricting its own output, *it can restrict marketwide output* and, hence, increase marketwide prices.")[10]; *id.* at 1441 ("The ability to control output and prices—the essence of market power—depends largely on the ability of existing firms to quickly increase their own output in response to a contraction by the defendant. . . . Prior expansion by competitors would suggest that the defendant . . . lacked the market power to control marketwide output in the first place.").

**4. Plaintiffs Have No Explanation For Why Abbott's Declining Market Share Is Even Arguably Consistent With Monopoly Power**

Abbott showed in its moving papers that its declining market share was fundamentally

---

[9] By contrast, Plaintiffs do contend that the Norvir price increase reduced sales marketwide in the booster market. Opp. at 10. But that is irrelevant. It is evidence of monopoly power in Plaintiffs' *booster* market, which consists solely of Norvir. The current motion does not contest that Abbott had monopoly power in Plaintiffs' booster market.

[10] In all quotations herein, emphases are added and citations omitted unless otherwise indicated.

DEFENDANT'S REPLY I/S/O MSJ ON
DIRECT PURCHASERS' CLAIMS
CASE NOS. 07-5470, 07-5985, 07-6120, 07-5702

1    inconsistent with a claim that Kaletra had monopoly power, even assuming that Plaintiffs have

2    properly defined a "boosted PI" market.  Plaintiffs have no meaningful response.

3        Plaintiffs first claim that a declining market share does not always disprove monopoly

4    power.  Opp. at 17.  But Abbott did not argue otherwise.  Rather, Abbott argued that a lack of

5    monopoly power is shown from all of the (uncontroverted) circumstances here, including

6    especially that rivals had come on the market with new boosted PIs that are alleged by Plaintiffs

7    to be superior to Kaletra, that rivals are not constrained in the quantity of those new PIs that they

8    can produce, and that Plaintiffs affirmatively contend that Abbott's market share was in free fall

9    and that Abbott's alleged below-cost pricing of Kaletra did not stop that fall, let alone reverse it.

10   Plaintiffs have no argument or evidence to dispute any of those facts.

11       Instead, Plaintiffs claim that *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir.

12   2002), held that all that matters for monopoly power is whether the challenged conduct caused

13   rivals' market shares to grow more slowly.  Opp. at 17.  This is false.  Monopoly power was not

14   at issue in *Conwood*.  290 F.3d at 782 ("In the instant case, [the defendant] does not challenge

15   that it has monopoly power.").  The discussion in *Conwood* Plaintiffs cite concerned assessing

16   injury, not whether the defendant had monopoly power.  It is irrelevant.

17       Plaintiffs also try to save their claim by arguing that the issue of monopoly power is

18   limited to Q3 2003.  Opp. at 18.  But Plaintiffs' own chart (reproduced below) shows that the

19   decline in Abbott's market share was steepest in Q3 2003.  Indeed, on the very next page of their

20   Opposition, Plaintiffs describe Abbott's market share during this period as ████████████

21   ████████████       *Id.* at 19.  Thus, even were Plaintiffs correct, this would only support Abbott's

22   argument.  Yet Plaintiffs are incorrect that the defendant's market share at any particular point in

23   time is determinative.  The Ninth Circuit squarely held in *Syufy* that, "[i]n evaluating monopoly

24   power, it is not market share that counts, but the ability to *maintain* market share."  *United States

25   v. Syufy Enters.*, 903 F.2d 659, 665-66 (9th Cir. 1990) (emphasis in original).  As the Ninth

26   Circuit wrote, the plaintiff "would do better to plot [the market share] points on a graph and

27   observe the pattern they form than to focus narrowly on [the defendant's] market share at a

28   particular time."  *Id.* at 666.  Remarkably, Plaintiffs have engaged in this precise exercise in their

DEFENDANT'S REPLY I/S/O MSJ ON
DIRECT PURCHASERS' CLAIMS
CASE NOS.  07-5470, 07-5985, 07-6120, 07-5702

12062370.1

1   opposition, and the resulting graph (Prowse Declaration ¶ 3, reproduced immediately below)

2   shows just as extended and pronounced a decline in market share as was shown in *Syufy*:[11]



11   Finally, Plaintiffs would distinguish *Syufy* on the basis that entry barriers in that case were

12   low.  Plaintiffs do not and cannot contend that *Syufy* itself so limited the applicability of its

13   statements regarding the significance of a declining market share.  Low entry barriers is simply

14   one circumstance in which a high market share will nonetheless not raise an inference of

15   monopoly power:  As the Ninth Circuit wrote in *Oahu Gas,* and reiterated in *Syufy*:  "A high

16   market share, though it may ordinarily raise an inference of market power, will not do so in a

17   market with low entry barriers or *other evidence of a defendant's inability to control prices or*

18   *exclude competitors.*"  *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 366 (9th Cir. 1988).

19   *Rebel Oil* found that other evidence includes existing competitors' ability to expand output if the

20   defendant raises prices.  51 F.3d at 1443.  As discussed below, it is uncontroverted that this is

21   precisely the situation here.

22   _____

23   [11] This chart is based on a market definition that only includes Kaletra, Reyataz, Lexiva, and
     Prezista.  Prowse Declaration ¶ 3.  Yet, as Abbott showed in its motion, Plaintiffs have not met
24   their burden of proving their narrow market definitions, which exclude NNRTIs and even other
     PIs.  *See* Mot. at 13-14.  Plaintiffs argue that market definition is based on "economic
25   substitutability," which "requires a consideration of 'cross-elasticity of demand between
     products.'"  Opp. at 11.  But Plaintiffs then acknowledge, as they must, that their experts did not
26   measure cross-elasticity.  *Id.* at 13-14.  Instead, Plaintiffs assert that their economic experts
     looked at "practical indicia" of cross-elasticity, which primarily consisted of medical literature
27   about drugs' therapeutic uses.  *Id.*  But Plaintiffs' economists' interpretation of the medical
     literature cannot trump the testimony of Plaintiffs' medical experts that, for many patients,
28   boosted PIs and NNRTIs are interchangeable.  *See*  Mot. at 13-14 and testimony cited therein.

DEFENDANT'S REPLY I/S/O MSJ ON
DIRECT PURCHASERS' CLAIMS
CASE NOS.  07-5470, 07-5985, 07-6120, 07-5702

### 5.  **Plaintiffs Have No Answer To The Lack Of Output Constraints**

Abbott showed in its moving papers that there are no output constraints on the other producers of boosted PIs.  *See* Mot. at 18.  Thus, if Abbott attempted to reduce output of Kaletra, there would be no shortage of alternative boosted PIs.  As *Rebel Oil* held*,* summary judgment is appropriate where there is no evidence of output constraints on existing competitors.

Plaintiffs extensively discuss the purported barriers to *new entry* into their alleged boosted PI market.  This discussion simply highlights that Plaintiffs have no meaningful response to the point that *existing* competitors' ability to expand production provides the very same check on monopoly power as the ability of new competitors to enter.  The Ninth Circuit affirmed summary judgment on this basis in *Rebel Oil*, 51 F.3d at 1443.  *See also Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1154 (9th Cir. 1997) ("Even if [defendant] has a high market share, neither monopoly power nor a dangerous probability of achieving monopoly power can exist absent evidence of barriers to new entry *or expansion*.").

Plaintiffs' discussion of output constraints is truncated.  First, Plaintiffs assert that "rivals could not increase output sufficiently to discipline Abbott's prices precisely because they could no longer efficiently compete on price."  Opp. at 16.  To the extent that this makes any sense, it is an admission that, far from being output-constrained, rivals had excess capacity.[12]  In any event, there is no evidence whatsoever that there were any constraints on rivals' increasing production.  In fact, it is uncontroverted that rivals' production has consistently increased since the Norvir repricing.  *Rebel Oil* expressly held that "[i]f there is undisputed evidence indicating that competitors have expanded output in the recent past, or have the ability to expand output in the future, summary disposition may be appropriate."  *Rebel Oil*, 51 F.3d at 1441.

Second, Plaintiffs assert that a seller's ability to cut off an input to its rival constrains that rival's output.  Opp. at 16 n.62.  However, Plaintiffs' sole case, *Red Lion Medical Safety, Inc. v.*

---

[12] GSK's complaint affirmatively alleges that GSK lost sales as a result of the Norvir repricing, which presupposes that GSK had the capacity to sell more Lexiva than it actually sold.  GSK First Am. Compl. ¶¶ 52, 55.

1    *Ohmeda, Inc.*, 63 F. Supp. 2d 1218, 1233 (E.D. Cal. 1999), found only that actually cutting off

2    the rival's input prevented the rival's expansion, not that the mere unexercised ability to do so

3    created a supply constraint.  There are always events that could, if they occurred, supply constrain

4    a seller (*e.g.*, natural disasters, cancellation of contracts with third party input suppliers).  But the

5    mere possibility of such events does not mean that there is an output constraint on the rival.

6          **6.   There Is No Support For An Attempt Claim**

7          Plaintiffs do not contend that their attempt claim should succeed if their actual

8    monopolization claim fails—for good reason.  Here, the alleged period of predatory pricing in

9    Kaletra is December 2003 through some time in 2007.  It is undisputed that Kaletra's market

10   share was significantly lower in 2007 than it was in 2003.  Moreover, three years after the

11   allegedly predatory conduct has ended, Kaletra's market share is now lower still.  A falling

12   market share is fundamentally inconsistent with a claim that the defendant has a likelihood of

13   obtaining monopoly.  As another district court has held, "as a matter of law, . . . there is no

14   probability of success in monopolizing the relevant market since [defendant's] market share

15   actually decreased during the relevant time period."  *Horst v. Laidlaw Waste Sys., Inc.*, 917 F.

16   Supp. 739, 745 (D. Colo. 1996).

17   **B.   Plaintiffs Fail To Present Evidence Supporting Application Of *Cascade***

18        Abbott's motion presented evidence that: (1) Kaletra is a single integrated product

19   prepared through a specialized manufacturing process from numerous inputs, not a combination

20   of Norvir and anything, and (2) ritonavir is merely a single input in the final products sold as

21   Kaletra and Norvir, whose formulations otherwise differ.  Thus, Abbott showed, its Kaletra

22   pricing properly is evaluated under *Brooke Group*'s single-product test, rather than *Cascade*'s

23   discount-attribution test for bundles.  *See* Mot. at 18-21.  Plaintiffs do not controvert *any* of the

24   relevant facts.  Instead, they argue that Abbott's prior statements in this litigation and *Doe* defeat

25   summary judgment.  Opp. at 20.  On the merits, Plaintiffs' only argument for the *Cascade* test is

26   that consumers allegedly "combined boosted PIs with ritonavir."  *Id*.  Plaintiffs' arguments fail.

27        **1.   Prior Statements Do Not Estop Abbott**

28        Plaintiffs suggest, without any actual argument or a single relevant case citation, that

10

Abbott's prior statements about *Cascade* "may estop" Abbott from arguing that the *Brooke Group* single-product test applies to Plaintiffs' predatory pricing claims. Opp. at 20. But "judicial estoppel is inappropriate when a party is merely changing its position in response to a change in the law," as Abbott did here in response to *linkLine* and *Doe*. *Longaberger Co. v. Kolt*, 586 F.3d 459, 470 (6th Cir. 2009); *see also id.* at 471 ("We . . . adopt the position of our sister circuits and hold that judicial estoppel is not applicable where a party argues an inconsistent position based on a change in controlling law."). Moreover, judicial estoppel is restricted to instances "where the court relied on, or accepted, the party's previous inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001). Plaintiffs do not even attempt to show that the cited arguments have been adopted by any court. Nor could they. In denying Abbott's initial motion to dismiss in this litigation, this Court *rejected* Abbott's argument that *Cascade* applied, concluding that "it is far from clear that Abbott's sale of Kaletra represents a bundled discount" and that there was an exception to *Cascade* for pharmaceuticals. Order Denying Abbott's Motion to Dismiss, at 12, 16-17, No. 4:07-CV-6120, Dkt. No. 41 (N.D. Cal. Apr. 11, 2008).[13] *Doe* likewise held that *linkLine*, not *Cascade*, applied there. *John Doe I v. Abbott Labs*, 571 F.3d 930, 933 (9th Cir. 2009). Where, as here, "no court ever adopted the original . . . position," judicial estoppel is inapplicable. *Masayesva ex rel. Hopi Indian Tribe v. Hale*, 118 F.3d 1371, 1382 (9th Cir. 1997).[14]

### 2. *Cascade* Is Inapplicable Regardless of Prior Statements About Lopinavir

Plaintiffs argue that *Cascade* applies because Abbott has allegedly admitted that "[l]opinavir . . .could be offered separately, just as Abbott's competitors offer their competing PIs." Opp. at 20 & nn.76-77 (quoting Stockinger Decl. ("TSD"), Ex. 119). However, *Cascade*'s

---

[13] It is disingenuous for Plaintiffs to cite the reference to Abbott's arguments (which pre-dated the Ninth Circuit's *Doe* decision) in this Court's ruling on Abbott's motion to dismiss Plaintiffs' amended complaints. *See* Opp. at 20 & n.75 (quoting 1/12/10 Order at 9). As noted above, this Court rejected the argument when Abbott made it. Even had this Court changed course and relied upon the argument notwithstanding that Abbott had withdrawn it, that would have been an implicit (and incorrect) application of judicial estoppel, not a basis for applying judicial estoppel.

[14] Nor have Plaintiffs satisfied the additional estoppel requirement that Abbott "would . . . impose an unfair detriment on the opposing party if not estopped." *Hamilton*, 270 F.3d at 783.

1  inapplicability here does not turn on whether a final drug product containing the active

2  pharmaceutical ingredient ("API") lopinavir, or even that API in its raw form, could someday

3  potentially be sold separately from ritonavir or Norvir.  It is sufficient for the inapplicability of

4  *Cascade* that Norvir is not in Kaletra.  Subtracting the lopinavir from Kaletra (either the Kaletra

5  soft gel capsule or the Kaletra Meltrex tablet) would not yield Norvir; and a hypothetical future

6  lopinavir product cannot be predicted to be a Kaletra product minus its ritonavir API.  *See* Brun

7  Decl. ¶ 20 (filed with Abbott's moving papers).  Norvir and Kaletra were each formulated and

8  tested separately and empirically in complex, expensive, and time-consuming processes.  A drug

9  containing lopinavir as its only API would have to go through the same process, and there is no

10  evidence that ritonavir could simply be omitted from Kaletra to make such a product.

11        Plaintiffs seize on the fact that, in common parlance, final drug products are often referred

12  to by the name of their APIs, and interpret phrases in prior briefing that "lopinavir" could be sold

13  separately to be a judicial admission that, within the meaning of *Cascade*, lopinavir should be

14  considered a "product" and Kaletra should be considered a "bundle" of Norvir and lopinavir.

15  Opp. at 20 & n.77 (quoting TSD, Ex. 122).[15]  Once again, however the evidence is

16  uncontroverted that Norvir is not Kaletra minus lopinavir and any hypothetical lopinavir product

17  would not be Kaletra minus Norvir.[16]  Further, *Cascade*'s applicability is a legal question, and

18  judicial admissions doctrine applies only to unequivocal statements of *fact*.  *In re Teleglobe*

19  ───────────────

[15] Plaintiffs cite an interrogatory response that Abbott has since amended to clarify that "[n]o
20  ingredient contained in . . . Kaletra . . . could be separately sold to the public as a pharmaceutical
   product *like Kaletra is*," and that Kaletra is therefore best analyzed under the single-product
21  pricing test.  Senator Decl., Ex. D at 2 (Abbott's Further Supp. Resp. to GSK's Interrogatory No.
   17).  Abbott's earlier response had stated: "Because the interrogatory asks for Abbott's legal
22  position on an issue currently before the Ninth Circuit, Abbott reserves the right to amend its
   response in light of a decision of that court."  TSD, Ex. 122 at 24.  Plaintiffs' reliance on *Pressure
23  System International v. Airgo Ip LLC.*, No. SA-07-CV-0498, 2007 WL 4198430 (W.D. Tex. Nov.
   26, 2007), is inapposite.  In that case, the district court held only that the possibility of future
24  supplementation of an interrogatory response "does not render the original interrogatory answer
   worthless" in the meantime.  *Id*. at *1.  Abbott does not rely here upon the possibility of future
25  supplementation of an interrogatory response.

[16] Even if there were an arguable inconsistency (and there is not), Abbott would be entitled to
26  clarify to show the lack of inconsistency.  *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 860 (9th Cir.
   1995) (court properly disregarded statement in Complaint alleged to be judicial admission where
27  "Sicor retracted its judicial admission by subsequently recharacterizing the alleged oral
   agreement").

28

DEFENDANT'S REPLY I/S/O MSJ ON
DIRECT PURCHASERS' CLAIMS
CASE NOS.  07-5470, 07-5985, 07-6120, 07-5702

1   *Commc'ns Corp.*, 493 F.3d 345, 377 (3d Cir. 2007) ("To be binding, admissions . . . must be

2   statements of fact that require evidentiary proof, not statements of legal theories."); *McAuliffe v.*

3   *United States*, No. 2:08-CV-336, 2009 WL 1928547, at *23 (S.D. Ohio July 2, 2009) ("[A]

4   judicial admission 'is restricted to unequivocal statements . . . of fact which otherwise would

5   require evidentiary proof; it does not extend to counsel's statement . . . of the legal theory of a

6   case.'").

7         In short, the current motion is fully consistent with past factual statements, and neither this

8   Court nor the Ninth Circuit accepted the legal theory that *Cascade* applies here.  No prior

9   statement cited by Plaintiffs is a basis for defeating the current motion.

10        **3.   The Evidence Does Not Support Application Of *Cascade***

11        Plaintiffs also argue that *Cascade* applies because "consumers would, could, and did

12  assemble the bundle (boosted PI plus ritonavir) on their own."  Opp. at 20.  This fails both

13  factually and legally.  Factually, no consumer assembled *ritonavir* with a boosted PI.  Rather,

14  consumers take *Norvir* with other boosted PIs.  Once again, the evidence is uncontroverted that

15  Norvir is not just ritonavir, and only when formulated can ritonavir be taken to boost another PI.

16  Indeed, the unique properties of ritonavir result in that ingredient being bioavailable only when

17  formulated with a very particularized mix of excipient ingredients.  Brun Decl. ¶ 23.

18        Legally, Plaintiffs' proposed test does not comport with existing law.  The proposed test is

19  based on whether consumers assemble inputs similar to those in the alleged bundle.  But many

20  products that are clearly not *Cascade* bundles are made from inputs that consumers assemble.

21  For example, some consumers buy tobacco and rolling papers and assemble their own cigarettes.

22  But no one could contend that cigarettes qualify as *Cascade* bundles; indeed, cigarettes were the

23  product at issue in the *Brooke Group* decision that enunciated the elements of a single product

24  below-cost pricing claim, as later reiterated in *linkLine* and *Doe*.

25  **C.   Plaintiffs' Refusal-To-Deal Claim Fails**

26        Plaintiffs tacitly concede that Abbott never refused to sell Norvir to anyone.  Plaintiffs

27  also fail to dispute that Abbott has priced Norvir at a level acceptable to consumers.  Indeed, the

28  evidence is uncontroverted that Norvir's sales have vastly increased since the repricing and that

13

1    Reyataz (taken with Norvir)—not Kaletra—is now the most prescribed boosted PI.  GSK's

2    evidence that a "handful" of patients insisted on switching off Norvir after the price increase

3    (GSK Opp. at 20-21 n.20 (citing TSD, Ex. 23 at 272:6-273:8)) only highlights the lack of any

4    evidence of the sort of wholesale exodus from a product that would be necessary to show a

5    refusal to deal, whether "actual," "effective," "essential" or otherwise.  *Cf. Del. & Hudson Ry.*

6    *Co. v. Consol. Rail Corp.*, 902 F.2d 174, 177 (2d Cir. 1990) (plaintiff competitor stopped paying

7    to use defendant's rail lines and declared bankruptcy) (cited in GSK Opp. at 25).[17]

8          Plaintiffs take the position that their refusal-to-deal claim does not depend on whether

9    they can prove below-cost pricing under *Cascade*'s imputed price test.  Opp. at 23.  Even if that

10   were true, it would not overcome the uncontroverted evidence that there has been no wholesale

11   exodus from the boosting use of Norvir, which, as discussed above, is a threshold requirement of

12   a refusal-to-deal claim.  Moreover, Plaintiffs' only response to Abbott's showing that *Cascade*

13   precludes treating above-cost pricing as exclusionary is that *Aspen Skiing* purportedly "found a

14   violation of Section 2 even though there was neither an explicit refusal to deal nor a finding of

15   below-cost pricing."  *Id.*  This is false.  As the Supreme Court has emphasized, the defendant in

16   *Aspen Skiing* "refused" to sell its lift tickets to the plaintiff "even if compensated at retail price."

17   *Verizon Commc'ns. Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004).

18   **D.   Plaintiffs' Boosting Market Monopolization Claims Fail For Lack Of Evidence**

19          Abbott's motion pointed to the lack of any evidence that Abbott's conduct caused

20   competitors to refrain from developing or introducing new PI boosters.  *See* Mot. at 23.

21   Plaintiffs' response confirms that lack of evidence.  Plaintiffs primarily cite passages from Noll's

22   and Singer's expert reports about purported effects on innovation in boost*ed* PIs, not PI boost*ers*.

23   Opp. at 24 (citing Noll Rpt. at 132-34; Noll Rbtl. at 78-80; and Singer Rbtl. ¶¶ 132-33).  On the

24   relevant point, Dr. Noll testified that the Norvir repricing *increased* the incentives to develop new

25   PI boost*ers.*  Senator Decl. Ex. A (Noll Dep. 61:4-10).  Plaintiffs' only other citations (*see* Opp. at

26

27   [17]GSK cites *Conwood, Co. v. U.S. Tobacco Co*, 290 F.3d 768 (6th Cir. 2002), but there was no
     allegation of a refusal to deal in that case.  GSK Opp. at 22-23.

28

DEFENDANT'S REPLY I/S/O MSJ ON
DIRECT PURCHASERS' CLAIMS
CASE NOS.  07-5470, 07-5985, 07-6120, 07-5702

24) are to passages in Singer's expert report that simply *assume* that "Abbott's competitors delayed or deferred developing alternatives to Norvir" because of Abbott's conduct.  TSD, Ex. 69 ¶ 56.[18]  Plaintiffs cite no evidence supporting that assumption, and Singer specifically testified that he was not offering an opinion in support of it.  Senator Decl., Ex C (Singer Dep. 213:5-19); *see also id.* at 196:3-199:10; TSD, Ex. 69 at 5 n.9.

Plaintiffs' own case (*see* Opp. at 23 n.85) emphasizes that summary judgment is appropriate where "a moving party . . . show[s] that the nonmoving party does not have enough evidence to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)).  Plaintiffs' failure to present even a scintilla of evidence to support their boosting market monopolization claims entitles Abbott to summary judgment on those claims.

### E.   The Direct Purchaser Plaintiffs Have Not Suffered Antitrust Injury

Plaintiffs do not dispute that, to state an antitrust damages claim, they must show an injury that is: (1) attributable "to the anticompetitive aspect of the defendants' conduct," *Legal Econ. Evaluations, Inc. v. Met. Life Ins. Co.*, 39 F.3d 951, 954 (9th Cir. 1994) (citing *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 (1990)); (2) direct rather than derivative, *Trinko*, 540 U.S. at 417 (Stevens, J., concurring); and (3) not speculative, *Kloth v. Microsoft Corp.*, 444 F.3d 312, 324 (4th Cir. 2006).  Plaintiffs need to prove an antitrust injury—and antitrust standing based on such injury—for each of their claims.  *Concord Boat Corp.*, 207 F.3d at 1054 ("[P]laintiffs must prove *for each claim* an antitrust violation, the fact of damage or injury, a causal relationship between the violation and the injury, and the amount of damages.").  Plaintiffs lack antitrust injury to support any of their claims.

Plaintiffs argue that the antitrust injury on their predatory pricing claim consists of paying "artificially inflated prices for Norvir and Kaletra."  Opp. at 24.  Focusing first on Plaintiffs'

---

[18] In addition to ¶ 56, Plaintiffs cite Singer Rebuttal ¶ 132, which merely quotes allegations from Plaintiffs' complaints and acknowledges the lack of damages calculations based on those allegations.  Plaintiffs also cite pages 2-4 of their brief, which say nothing about efforts to develop alternative boosters.

DEFENDANT'S REPLY I/S/O MSJ ON
DIRECT PURCHASERS' CLAIMS
CASE NOS.  07-5470, 07-5985, 07-6120, 07-5702

1   Norvir purchases, Plaintiffs have no explanation for how paying a purportedly "inflated" price for

2   Norvir would be attributable "to the *anticompetitive* aspect of" the claimed *below*-cost pricing of

3   Kaletra. *See Legal Econ. Evaluations*, 39 F.3d at 954. Plaintiffs suggest that this Court

4   previously found that paying a high price for Norvir is an injury from alleged predatory pricing of

5   Kaletra. Opp. at 24. But the cited opinion from *Doe* dealt with a "different antitrust theory"

6   (1/12/2010 Order at 6) that is not at issue here and that the Ninth Circuit subsequently held was

7   not viable. *Doe*, 571 F.3d. at 935.[19] Because antitrust injury must be attributable "to the

8   *anticompetitive* aspect of" the challenged conduct, *Legal Econ. Evaluations*, 39 F.3d at 954, the

9   ruling from *Doe* is inapplicable.[20]

10          Plaintiffs' purported injury of paying an inflated price for Kaletra after the 2005-2007

11  modest price increases also fails to support Plaintiffs' predatory pricing claim, because it makes

12  no sense for Plaintiffs to argue that the price of Kaletra was illegally low for purposes of

13  establishing liability at the same time that the price was inflated for purposes of establishing

14  injury and damages. Plaintiffs cite this Court's class certification decision as condoning that

15  inconsistency. Opp. at 25 n.90. But that decision did not consider whether Plaintiffs could

16  establish the elements of antitrust injury or antitrust standing to bring the predatory pricing claim

17  that they subsequently amended their complaints to assert. *See Meijer, Inc. v. Abbott Labs.*, No.

18  C07-5985, 2008 WL 4065839, at *6 (N.D. Cal. Aug. 27, 2007) (noting that it was then a

19  "monopoly leveraging theory upon which Plaintiffs rely for their boosted market claims"). Even

20  if the Court had considered the same issue as presented here, the ruling would not be controlling.

21  *Baghdasarian v. Amazon.com, Inc.*, No. CV 05-8060 AG, 2009 WL 4823368, at *4 (C.D. Cal.

22  [19] Plaintiffs also cite *Natchitoches Parish Hospital Service District v. Tyco Int'l., Ltd.*, 247 F.R.D.
23  253, 261 (D. Mass. 2008), claiming that it found "direct purchasers suffer antitrust injury due to
    bundled discounting." Opp. at 24 n.88. In fact, that case was about volume-based exclusive
24  dealing requirements and involved no allegation of any form of below-cost pricing. *See generally
    Natchitoches*, 247 F.R.D. 253; *see also Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l., Ltd.*,
25  262 F.R.D. 58, 63-64 (D. Mass. 2008) (discussing need to evaluate "Plaintiffs' claim of antitrust
    injury" for their "exclusive dealing theory").

26  [20] Plaintiffs are also wrong to suggest that, if Abbott's alleged "bundling . . . harm[ed]
    competition," Plaintiffs, who are direct purchasers, necessarily suffered antitrust injury. Opp. at
27  24. Unless competitors are driven out of the market, "predatory pricing produces lower aggregate
    prices in the market, *and consumer welfare is enhanced.*" *Brooke Group,* 509 U.S. at 224.

28

16

Dec. 9, 2009) ("[W]hile the Court previously held that Plaintiff had standing for class certification purposes, the earlier holding does not automatically extend to the summary judgment stage.").[21]

Plaintiffs offer no direct response to Abbott's showing that their refusal-to-deal claim fails not just on the merits but for lack of antitrust standing, because any injury from a purported refusal to deal would be "purely derivative of the injury [Abbott's competitors allegedly] suffered." *Trinko*, 540 U.S. at 417 (Stevens, J., concurring).  Plaintiffs merely assert, generally, that this Court already "endorsed" the claim that "Direct Purchasers bought Norvir . . . at supracompetitive prices and therefore suffered antitrust injury." Opp. at 24-25.  But Plaintiffs again cite only this court's class certification ruling, which, as just discussed, is inapposite.

Plaintiffs also have no response to Abbott's pointing out the lack of evidence that new PI boost*ers* would have been introduced but for Abbott's pricing, let alone at prices lower than Norvir's,[22] and that this makes any injury resulting from the absence of new boosters too speculative to support a claim.  *See Kloth*, 444 F.3d at 324.  Plaintiffs assert that they "suffered antitrust injury in the form of reduced innovation in both the boosted and boosting markets." Opp. at 24 n.86.  But the only citations Plaintiffs offer are to the passages of Singer's reports discussed above (*see supra* at 15)—all of which either address the purported effects on innovation in the boost*ed* not boost*er* market, or merely assume the truth of Plaintiffs' allegation about effects on innovation in the booster market without even attempting to support those allegations.  Such allegations, without supporting evidence, are insufficient to survive summary judgment.  *See In re Ebay*, 2010 WL 760433, at *11 (granting summary judgment where plaintiffs failed to "point to admissible evidence . . . that they have suffered injury that was caused by [the defendant's] alleged anticompetitive acts").

---

[21] The lack of antitrust standing "can be raised at any time."  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 n.4 (9th Cir. 1999).

[22] Plaintiffs are purchasers who resell Norvir, not patients who take it, and Plaintiffs' purported injuries are based solely upon the prices at which they make their drug purchases.

DEFENDANT'S REPLY I/S/O MSJ ON
DIRECT PURCHASERS' CLAIMS
CASE NOS.  07-5470, 07-5985, 07-6120, 07-5702

12062370.1

1

**III.   CONCLUSION**

2

For the foregoing reasons, this Court should grant Abbott's motion for summary judgment.

3

DATED: September 30, 2010         MUNGER, TOLLES & OLSON LLP
                                  WINSTON & STRAWN LLP

4

5

                                  By:   */s/ Stuart N. Senator*
6                                         STUART N. SENATOR

                                  Attorneys for Defendant Abbott Laboratories
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S REPLY I/S/O MSJ ON
DIRECT PURCHASERS' CLAIMS
CASE NOS.  07-5470, 07-5985, 07-6120, 07-5702

12062370.1