James F. Hurst *(Admitted Pro Hac Vice)*
Samuel S. Park *(Admitted Pro Hac Vice)*
Stephanie S. McCallum *(Admitted Pro Hac Vice)*
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone:    (312) 558-5600
Facsimile:    (312) 558-5700
jhurst@winston.com; spark@winston.com;
smccallum@winston.com

Nicole M. Norris (SBN 222785)
WINSTON & STRAWN LLP
101 California Street, Suite 3900
San Francisco, CA  94111-5894
Telephone:    415-591-1000
Facsimile:    415-591-1400
nnorris@winston.com

Charles B. Klein *(Admitted Pro Hac Vice)*
Matthew A. Campbell *(Admitted Pro Hac Vice)*
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC  20007
Telephone:    (202) 282-5000
Facsimile:    (202) 282-5100
cklein@winston.com; mcampbell@winston.com

Jeffrey I. Weinberger (SBN 56214)
Stuart N. Senator (SBN 148009)
Keith R.D. Hamilton (SBN 252115)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Los Angeles, CA  90071-1560
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702
jeffrey.weinberger@mto.com;
stuart.senator@mto.com;
keith.hamilton@mto.com

Michelle Friedland (SBN 234124)
MUNGER, TOLLES & OLSON LLP
560 Mission Street
San Francisco, CA 94105-2907
Telephone:    (415) 512-4000
Facsimile:    (415) 512-4077
michelle.friedland@mto.com

*Attorneys for Defendant*
ABBOTT LABORATORIES

**Winston & Strawn LLP**
**101 California Street**
**San Francisco, CA  94111-5802**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| SAFEWAY INC; WALGREEN CO.; THE KROGER CO.; NEW ALBERTSON'S, INC.; AMERICAN SALES COMPANY, INC.; AND HEB GROCERY COMPANY, LP,<br><br>               Plaintiffs,<br><br>    vs.<br><br>ABBOTT LABORATORIES,<br><br>Defendant. | CASE NO. CV 07-5470 (CW)<br><br>Related per December 5, 2007 Order to Case No. CV 04-1511 (CW)<br><br>**REPLY BRIEF IN SUPPORT OF ABBOTT LABORATORIES' MOTION FOR SUMMARY JUDGMENT ON GSK'S AMENDED COMPLAINT**<br><br>**AMENDED REDACTED VERSION PURSUANT TO COURT ORDER**<br><br>**Judge:**     **Honorable Claudia Wilken**<br>**Date:**      **October 28, 2010**<br>**Time:**      **2:00 p.m.**<br>**Location:**  **Courtroom 2 (4th Floor)** |

**AMENDED REDACTED VERSION PURSUANT TO COURT ORDER**

**Winston & Strawn LLP**
101 California Street
San Francisco, CA 94111-5802

| | | |
|---|---|---|
| 1 | SMITHKLINE BEECHAM CORPORATION, d/b/a GLAXOSMITHKLINE, | CASE NO. CV 07-5702 (CW) |
| 2 | | Related per November 19, 2007 Order to Case No. CV 04-1511(CW) |
| 3 | Plaintiff, | |
| 4 | vs. | |
| 5 | ABBOTT LABORATORIES, | |
| 6 | | |
| 7 | Defendant. | |
| 8 | RITE AID CORPORATION; RITE AID HDQTRS CORP.; JCG (PJC) USA, LLC; | CASE NO. CV 07-6120 (CW) |
| 9 | MAXI DRUG, INC D/B/A BROOKS PHARMACY; ECKERD CORPORATION; | Related per December 5, 2007 Order to Case No. CV 04-1511 (CW) |
| 10 | CVS PHARMACY, INC.; AND CAREMARK LLC, | |
| 11 | | |
| 12 | Plaintiffs, | |
| 13 | vs. | |
| 14 | ABBOTT LABORATORIES, | |
| 15 | Defendant. | |
| 16 | MEIJER, INC. & MEIJER DISTRIBUTION, INC.; ROCHESTER DRUG CO-OPERATIVE, INC.; AND LOUISIANA | CASE NO. CV 07-5985 (CW) (Consolidated Cases) |
| 17 | WHOLESALE DRUG COMPANY, INC., ON BEHALF OF THEMSELVES AND ALL | Related per November 30, 2007 Order to Case No. CV 04-1511 (CW) |
| 18 | OTHERS SIMILARLY SITUATED, | |
| 19 | | |
| 20 | Plaintiffs, | |
| 21 | vs. | |
| 22 | ABBOTT LABORATORIES, | |
| 23 | Defendant. | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

1

# TABLE OF CONTENTS

2

**Page**

3    INTRODUCTION ....................................................................................................1

4    ARGUMENT ..........................................................................................................3

5    I.    Abbott Is Entitled To Summary Judgment On GSK's Antitrust Claims. .................3

6          A.    The Undisputed Facts Preclude A Finding Of Monopoly Power. ...................3

7          B.    The Undisputed Facts Preclude A Finding Of Exclusionary Conduct. .........5

8                1.    GSK Has No Evidence That "Abbott Essentially Refused To Deal."..............5

9                2.    As In *Verizon*, GSK Has No Evidence That Abbott Terminated A "Cooperative Venture" With Rivals. .................................................6

10

11               3.    As In *MetroNet*, GSK Has No Evidence Of A Short-Term Sacrifice, Or Separate Prices For Rivals And Consumers. ..................................7

12         C.    GSK Has Waived Any Alternative Theories Of Exclusionary Conduct. ........8

13   II.   Abbott Is Entitled To Summary Judgment On GSK's Implied Covenant Claim. ....8

14         A.    GSK Produced No Evidence That A Reasonable Person In Its Position Would Be Justified In Understanding That Abbott Promised To Constrain Norvir's Price. .................................................................9

15

16         B.    GSK Cannot Save Its Implied Covenant Claim By Arguing That Abbott Intentionally Diverted Sales From Lexiva To Kaletra................................11

17

18         C.    GSK Failed To Prove Compensable Contract Damages. ...........................12

19   III.  Abbott Is Entitled To Summary Judgment On GSK's North Carolina UDTPA Claim. .........13

20         A.    GSK Has Not Supported Its Claim Of "Unfair" Conduct. ........................14

21         B.    GSK Has Not Supported Its Claim Of "Deceptive" Conduct....................14

22   CONCLUSION.......................................................................................................15

23

24

25

26

27

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Agency Development, Inc. v. MedAmerica Ins. Co.*,
    327 F. Supp. 2d 199 (W.D.N.Y. 2004) ......................................................................11

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985)................................................................................. passim

*Bank of New York v. Sasson*,
    786 F. Supp. 349 (S.D.N.Y. 1992)......................................................................3, 12

*Carcano v. JBSS, LLC*,
    684 S.E.2d 41 (N.C. Ct. App. 2009) ......................................................................15

*Cross & Cross Properties, Ltd. v. Everett Allied Co.*,
    886 F.2d 497 (2d Cir. 1989)...................................................................................12

*Dalton v. Educational Testing Service*,
    87 N.Y.2d 384 (N.Y. 1995) ....................................................................................11

*Gilbane Bldg. Co. v. Federal Reserve Bank of Richmond, Charlotte Branch*,
    80 F.3d 895 (4th Cir. 1996) ....................................................................................14

*M/A-COM Security Corp. v. Galesi*,
    904 F.2d 134 (2d Cir. 1990).........................................................................10, 11, 12

*McLamb v. T.P. Inc*
    619 S.E.2d 577, 593 (N.C. Ct. App. 2005) ...........................................................14

*MetroNet Svcs. Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004) ......................................................................1, 2, 7, 8

*Moran v. Erk*,
    11 N.Y.3d 452 (N.Y. 2008) ...........................................................2, 10, 11, 12

*Nelson v. Hartford Underwriters Ins. Co.*,
    177 N.C. App. 595 (N.C. App. 2006) ....................................................................14

*Pacs Indus., Inc. v. Cutler-Hammer, Inc.*,
    103 F. Supp. 2d 570 (E.D.N.Y. 2000) ...................................................................13

*Petroleo Brasileiro, S.A., Petrobras v. Ameropan Oil Corp.*,
    372 F. Supp. 503 (E.D.N.Y. 1974) ........................................................................13

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
　　51 F.3d 1421 (9th Cir. 1995) ............................................................................4, 5

*Rowe v. Great Atlantic & Pacific Tea Co.*,
　　46 N.Y.2d 62 (N.Y. 1978) ...................................................................................11

*Scott v. Palermo*,
　　649 N.Y.S.2d 289 (N.Y. App. Div. 1996) ...........................................................13

*South Atl. Ltd. P'ship v. Riese*,
　　284 F.3d 518 (4th Cir. 2002) ..............................................................................14

*Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*,
　　487 F.3d 89 (2d Cir. 2007).................................................................................13

*Train v. General Electric Capital Corp.*,
　　8 A.D.3d 192 (N.Y. App. Div. 2004) ................................................................12

*United States v. Syufy Enters.*,
　　903 F.2d 659 (9th Cir. 1990) .......................................................................1, 3, 4, 5

*Verizon Comm'cs Inc. v. Law Offices of Curtis V. Trinko, LLP*,
　　540 U.S. 398 (2004)..................................................................................2, 6, 7, 8


**STATUTES**

N.C. Gen. Stat. § 75-1.1 ................................................................................................13


**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(e)(2)................................................................................................1, 8

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

iii

**AMENDED REDACTED VERSION PURSUANT TO COURT ORDER**

## INTRODUCTION

In its motion for summary judgment, Abbott showed that the undisputed facts bar all of GSK's claims for relief. Each claim turns on the central allegation that Abbott's pricing of Norvir adversely affected sales of GSK's boosted PI, Lexiva. Even if GSK could prove this allegation, it would not support *any* claim. Abbott and GSK are direct competitors. Neither antitrust, contract, nor unfair competition laws require Abbott to consider GSK's interests when pricing its products. To defeat summary judgment, GSK needed to "set out specific facts showing a genuine issue for trial" on whether Abbott (a) essentially refused to allow rivals to co-promote their boosted PIs with Norvir, (b) breached an implied contractual obligation to constrain Norvir's price, or (c) deceived consumers into purchasing Kaletra instead of Lexiva. Fed. R. Civ. P. 56(e)(2). GSK failed to do so. Instead, it has attempted to divert attention from the key issues by littering its brief with irrelevant facts. As shown below, summary judgment should be entered against GSK.

***GSK has no viable antitrust claim.*** As discussed in Abbott's motion, the undisputed record makes it impossible for GSK to show that Abbott had monopoly power after the Norvir repricing. According to GSK's own expert, Abbott's market share began falling even before the challenged conduct, fell below 65% just a few months later, and has continued to drop to about 30%. There is no dispute that Abbott's competitors have dominated the market, displacing Abbott as the market leader. The Ninth Circuit's *Syufy* decision precludes a finding of monopoly power here.

Abbott's motion also established that GSK cannot raise a genuine issue as to whether Abbott's conduct was exclusionary. GSK still relies heavily on *Aspen Skiing* to meet this element. But the Supreme Court and the Ninth Circuit have both sharply limited "*Aspen Skiing*'s exception to the general 'no duty to deal' rule" to only those cases that "fit comfortably in the *Aspen Skiing* mold." *MetroNet Svcs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132 (9th Cir. 2004) (citation omitted). This is not such a case. This Court already has held that, under *Aspen Skiing*, the key issue is whether GSK can prove that rival boosted PIs "could not compete with Kaletra." (1/12/10 Order at 15). GSK cannot make such a showing. Boosted PIs *have* been able to compete with Kaletra, and Norvir's price has not stopped existing and new rivals from slashing Kaletra's share of a highly competitive market – regardless of how it is defined.

Winston & Strawn LLP
101 California Street
San Francisco, CA  94111-5802

1

CASE NOS. 07-5470, 07-5985, 07-6120, 07-5702 (CW)
REPLY IN SUPPORT OF ABBOTT LABORATORIES' MOTION FOR SUMMARY JUDGMENT ON GSK'S AMENDED COMPLAINT

**AMENDED REDACTED VERSION PURSUANT TO COURT ORDER**

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1    GSK also offered no "specific facts" to satisfy the Supreme Court's and Ninth Circuit's

2    limitations on an *Aspen Skiing* theory.  The Supreme Court in *Verizon* confirmed that such a theory

3    is viable *only* where the defendant "cease[d] participation in a *cooperative venture*" with rivals.

4    *Verizon Comm'cs Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004) (emphasis

5    added).  As in *Verizon*, the Norvir price increase did not terminate a "course of dealing" with rivals

6    because Abbott never "participat[ed] in a cooperative venture" with rivals to limit Norvir's price.  *Id.*

7    This is undisputed.  (*See* Opp'n at 9 & 24 n.26).  GSK ignores this argument altogether.

8    Nor has GSK distinguished *MetroNet*.  The Ninth Circuit there held that *Aspen Skiing* and

9    *Verizon* require the plaintiff to show, at summary judgment, a "sacrifice of short-term profits for

10   long-term gain" and a refusal to deal with rivals "on the same terms that it deals with direct

11   consumers."  *MetroNet*, 383 F.3d at 1134.  Like the plaintiff in *MetroNet*, GSK has shown neither.

12   ***GSK has no viable implied covenant claim.***  Abbott's motion presented undisputed facts

13   refuting GSK's allegation that Abbott implicitly promised to keep Norvir available or to constrain its

14   price.  In its opposition, GSK actually retreated from its allegations, asserting that "[t]he question

15   posed here is *not* whether Abbott and GSK reached, but failed to memorialize, an agreement

16   concerning the availability or pricing of Norvir."  (Opp'n at 9 (emphasis added)).  Controlling

17   precedent from New York's highest court holds that the implied covenant of good faith and fair

18   dealing encompasses only those "promises which a reasonable person in the position of the promisee

19   would be justified in understanding were included."  *Moran v. Erk*, 11 N.Y.3d 452, 457 (N.Y. 2008).

20   As GSK now admits, those promises do *not* "concern[] the availability or pricing of Norvir."

21   Abbott's motion also showed that GSK received the benefit of any promises *actually made*.

22   This too is now undisputed.  According to GSK's most recent characterization of its contract theory,

23   the purpose of the license "was to allow GSK to increase sales of Lexiva by promoting it with

24   Norvir."  (Opp'n at 7).  GSK did precisely that.  It continuously promoted Lexiva with Norvir

25   worldwide, resulting in profits that would have been impossible absent a license.

26   These undisputed facts leave GSK with a naked argument that Abbott's pricing merely

27   disrupted sales of its direct competitor.  But Abbott never guaranteed GSK any level of profitability.

28   Nor did Abbott agree to refrain from actions that might adversely affect Lexiva profits.  New York

2

law does *not* support GSK's effort to create obligations the parties admittedly never intended, nor reasonably could have understood, to be part of their contract.

**GSK has no viable unfair and deceptive trade practices claim.** Abbott's motion explained that GSK cannot save its failed antitrust and contract claims by relabeling them as "unfair" or "deceptive" conduct under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"). In response, GSK offered no "specific facts" to show that Abbott deceived GSK into entering the license agreement, or deceived the public into buying Kaletra. Indeed, GSK has been unable even to identify any specific public statements that allegedly were deceptive. And, critically, GSK made no effort to show that the purported deception proximately caused it any harm. GSK does not even have a witness on this point. This claim, like the others, fails as a matter of law.

## ARGUMENT

### I. Abbott Is Entitled To Summary Judgment On GSK's Antitrust Claims.

GSK has no facts to support either the monopoly power or exclusionary conduct elements of its antitrust claims. This may explain why GSK deferred its discussion of what *was* its lead theory of liability – the alleged antitrust violation – to the end of its brief.[1]

#### A. The Undisputed Facts Preclude A Finding Of Monopoly Power.

In its motion, Abbott showed that GSK has no viable theory of monopoly power, which is "the power to exclude competitors." *United States v. Syufy Enters.*, 903 F.2d 659, 669 (9th Cir. 1990). Abbott has *not* excluded any competitor. (*See* Hay Decl. ¶ 4 & Ex. 3). According to GSK's own expert analysis, the market has gotten progressively *more competitive* since the challenged conduct, particularly with a *new* and "effective" competitor (Prezista). (*See* Hurst Decl., Ex. K (Noll Rep. Ex. 4a)). Moreover, it is undisputed that, after the challenged conduct, Abbott's market share began dropping precipitously, falling in just a few months below the "sixty-five percent market share" level courts generally require to support an allegation of monopoly power. (5/16/08 Order,

---

[1] GSK has misread Abbott's motion as ignoring GSK's state law antitrust claim. (Opp'n at 15 n.15). Abbott's motion seeks summary judgment on GSK's "claims for federal *and state* antitrust violations (Counts 1 *and 4*)." (Mot. at 1 (emphasis added). As already held, there is "no basis for the Court to apply a different antitrust standard [to GSK's state-law antitrust claim] than that which it has applied to GSK's Sherman Act claim." (4/11/08 Order at 23; *see also* Mot. at 23).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

3

CASE NOS. 07-5470, 07-5985, 07-6120, 07-5702 (CW)
REPLY IN SUPPORT OF ABBOTT LABORATORIES' MOTION FOR SUMMARY JUDGMENT ON GSK'S AMENDED COMPLAINT

*Doe* Dkt. 516, at 10).  Indeed, Abbott's competitors were making a majority of sales in that market by 2005.  And, today, Kaletra's share of that market is barely 30%.  (*See* Mot. at 9).

GSK did not dispute these facts, which preclude a finding of monopoly power as a matter of law.  In *Syufy*, for example, the Ninth Circuit rejected an antitrust claim because market share "numbers reveal that [competitors have] steadily been eating away at Syufy's market share[.]"  903 F.2d at 666.  Such a market share decline confirmed that "Syufy lacked the power to exclude competitors."  *Id.* at 669.  The court recognized that it did not "make economic sense" to find monopoly power because Syufy was "unable to … *maintain* market share," let alone achieve "deliverance from competition."  *Id.* at 663, 666, 669.

GSK has offered no real response to *Syufy*.  It devoted only a single paragraph to this central issue, summarily arguing that "Abbott raised the price of both Norvir and Kaletra[.]"  (Opp'n at 18).  GSK missed the point.  It made no effort to explain how Abbott had "power to exclude competitors" given the extended decline in Kaletra's market share.  *Syufy*, 903 F.2d at 669.  The Norvir and Kaletra price increases prove nothing.  Under GSK' own theory, Norvir is not even in the relevant market.  *Syufy*, 903 F.2d at 572 n.22 ("Antitrust violations must be judged on a market-by-market basis.").  And Abbott did not raise Kaletra's price until June 2005, a mere 3.9% increase consistent with inflation.  (*See* Senator Decl., Ex. F (NOR104437)).  By then, Abbott's rivals had expanded their output and collectively sold to about half of the relevant market, as defined by GSK's expert.  (Hurst Decl., Ex. K (Noll Rep. Ex. 4a)).  This is the *opposite* of monopoly power.  *See Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) ("a market share of less than 50 percent is presumptively *insufficient* to establish market power") (emphasis added).

Nor can GSK distinguish *Syufy* by noting that "barriers to entry are high."  (Opp'n at 8).  *Syufy* recognized that the lack of entry barriers could defeat monopoly power.  903 F.2d at 664 ("If there are no significant barriers to entry, . . . eliminating competitors will not enable the survivors to reap a monopoly profit.").  The undisputed facts show that new competitors have successfully entered the market since Abbott raised the price of Norvir.  (Hurst Decl., Ex. K (Noll Rep. Ex. 4a)).  In addition, even where there are potential barriers to entry, the Ninth Circuit has recognized that monopoly power is defeated where *existing* competitors are not supply constrained.  *Rebel Oil*, 51

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

4

**AMENDED REDACTED VERSION PURSUANT TO COURT ORDER**

1    F.3d at 1439 (holding that plaintiff must show not only "that new rivals are barred from entering the

2    market," but *also* "that existing competitors lack the capacity to expand their output to challenge the

3    predator's high price").  In *Rebel Oil*, the Court of Appeals affirmed summary judgment for the

4    defendant because of a lack of supply constraints on *existing* competitors, despite evidence of entry

5    barriers for *potential* competitors.  *Id.*  Under *Syufy* and *Rebel Oil*, GSK carries the burden of

6    showing barriers to *both* entry *and* expansion.  Because GSK lacks evidence of supply constraints on

7    itself or others in its relevant market, *Syufy* and *Rebel Oil* leave GSK with no hope of showing

8    monopoly power in the face of Kaletra's continuously declining market share.

9         GSK also cannot save its antitrust claims by referring to arguments raised by the Direct

10   Purchasers.  Those arguments are just as deficient as GSK's in failing to account for Kaletra's

11   continuously declining market share and the lack of supply constraints on rival boosted PIs.[2]

12   Moreover, the Direct Purchasers have offered a radically different – and, as discussed in Abbott's

13   separate motion, absurd – method of calculation that improperly inflates Abbott's market share.  (*See*

14   Mot. on Direct Purchasers' Claims at 14-15).  GSK's own expert conceded that, even defining the

15   relevant market favorably to GSK, Abbott's market share continuously declined to where it was

16   below 65% by no later than the third quarter of 2004, reached 50% in the third quarter of 2005, and

17   then declined further still after that.  (Ex. K, Noll Rep. Ex. 4a).  Again, this evidence is fatal under

18   *Syufy* and *Rebel Oil*.  GSK cited *no case* that could support a contrary ruling because none exists.

**B.    The Undisputed Facts Preclude A Finding Of Exclusionary Conduct.**

20        In its motion, Abbott also presented facts that prevent GSK from meeting the *Aspen Skiing*

21   refusal-to-deal standard as construed by this Court, the Supreme Court, and the Ninth Circuit.  GSK

22   has admitted material facts sufficient to defeat this element as well.

**1.    GSK Has No Evidence That "Abbott Essentially Refused To Deal."**

24        Abbott's motion presented facts that preclude a genuine issue on whether "Abbott essentially

25   refused to deal with its competitors."  (Mot. at 10-13 (citing  1/12/10 Order at 15)).  To satisfy this

26   standard, GSK must prove that "the 400 percent price increase on Norvir placed GSK and Abbott's

_____

[2] Abbott incorporates by reference its summary judgment arguments in the Direct Purchaser cases.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

5

CASE NOS. 07-5470, 07-5985, 07-6120, 07-5702 (CW)
REPLY IN SUPPORT OF ABBOTT LABORATORIES' MOTION FOR SUMMARY JUDGMENT ON GSK'S AMENDED COMPLAINT

other competitors in the untenable position of selling their boosted PIs at a price *that could not compete with Kaletra*." (1/12/10 Order at 15 (emphasis added)). GSK has made no effort to satisfy this standard, which is impossible given the facts GSK has failed to dispute:

- "Norvir prescriptions [for boosting use] quintupled since the Norvir repricing" and "*it is now one of the most prescribed HIV drugs*[.]" (Mot. at 11 (citing Hay Decl. ¶ 6)).

- "Abbott's share [of the most narrowly defined market] has dropped all the way to 30%," and thus "70% of patients taking a drug in GSK's relevant market are also taking Norvir." (*Id.* at 9, 11 (citing Hay Decl. ¶ 7 & Ex. 4)).

- "[GSK] has never stopped promoting the combined use of Norvir with Lexiva." (*Id.* at 7 (citing Ex. H, Prowse Dep. at 241-45, 251; *see also* Ex. I).

- "Lexiva has had more than *$1 billion* in sales when boosted since its launch." (*Id.* at 12 (citing Hay Decl. ¶¶ 8-9)).

- "[I]n the 'typical case,' the price paid by an HIV patient 'didn't change' after the Norvir repricing because of insurance and government programs." (*Id.* at 12 (citing Ex. O, Dolan Dep. at 140:19-141:2)).

This undisputed evidence refutes GSK's theory that Abbott has "essentially" refused to deal by charging a price for Norvir that competitors "could not accept." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 592 (1985). Rivals have not only accepted Norvir's price to compete with Kaletra, they have dominated the market.

### 2.    As In *Verizon*, GSK Has No Evidence That Abbott Terminated A "Cooperative Venture" With Rivals.

As explained in Abbott's motion, summary judgment also is required under the Supreme Court's *Verizon* decision, which significantly limited its prior holding in *Aspen Skiing*. (*See* Mot. at 13-15). After noting that "*Aspen Skiing* is at or near the outer boundary of § 2 liability[,]" the Supreme Court limited refusal-to-deal theories to situations where the defendant decided "to cease participation in a *cooperative venture*." *Verizon*, 540 U.S. at 409 (emphasis added). In the motion to dismiss context, this Court ruled that GSK's theory satisfied this limitation because GSK alleged that "Abbott had voluntarily engaged in licensing agreements with its competitors," and the challenged

Winston & Strawn LLP
101 California Street
San Francisco, CA  94111-5802

6

**AMENDED REDACTED VERSION PURSUANT TO COURT ORDER**

1    conduct "essentially" terminated that cooperative venture.  (1/12/10 Order at 14-15).  Abbott showed

2    in its summary judgment motion, however, that GSK's allegations find no support in the record.

3    The Norvir repricing did not terminate any aspect of the ritonavir license.  Indeed, "[GSK] has never

4    stopped promoting the combined use of Norvir with Lexiva."  (Mot. at 7 (citing evidence)).  GSK

5    offered no evidence that the decision to raise Norvir's price "cease[d Abbott's] participation in *a*

6    *cooperative venture*" to constrain Norvir's price because Abbott never entered into such a

7    "cooperative venture" in the first place.  *Verizon*, 540 U.S. at 409.

8         Rather than respond, GSK has retreated from its own allegations.  It conceded that Abbott's

9    purported duty-to-deal "arises *not* from a specific contract" with rivals, but merely from Abbott's

10   historic pricing of Norvir.  (Opp'n at 24 n.26).  Under GSK's new theory, Abbott merely changed its

11   prior – *but unilateral* – "practice of taking only small inflation-level increases in Norvir's price."

12   (Opp'n at 19).  But *Verizon* held that termination of a *unilateral* course of conduct is not enough to

13   show a refusal to deal *with competitors.*  As this Court previously held, GSK must prove that Abbott

14   "deviat[ed] from its prior course of conduct *with its competitors*" to support its refusal-to-deal theory

15   in light of *Verizon*.  (1/12/10 Order at 16 (emphasis added)).  There was no such deviation here.

16   Abbott never entered, let alone terminated, a "cooperative venture" with rivals to constrain Norvir's

17   price.  *Verizon*, 540 U.S. at 409.  And the license agreements Abbott did enter into with rivals were

18   *not* terminated.  Thus, Abbott never terminated a prior course of dealing *with its rivals*.

19         **3.      As In *MetroNet*, GSK Has No Evidence Of A Short-Term Sacrifice, Or**

20              **Separate Prices For Rivals And Consumers.**

21         Abbott's motion showed that summary judgment also is warranted under the Ninth Circuit's

22   *MetroNet* decision.  (Mot. at 14-15).  In that case, the defendant *did* cease participation in a prior,

23   cooperative venture with rivals.  But the Court of Appeals found that case still did "not fall within

24   the *Aspen Skiing* exception to the general 'no duty to deal' rule" because "[t]he circumstances that

25   *Verizon* found significant for creating antitrust liability are not present here."  *MetroNet*, 383 F.3d at

26   1133, 1134.  Those circumstances were that (1) the challenged conduct did "not entail a sacrifice of

27   short-term profits for long-term gain from the exclusion of competition[,]" and (2) the defendant had

28   "not refused to deal with [the plaintiff] on the same terms that it deals with direct consumers."  *Id*. at

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

7

1134.  That is the precise situation here.

GSK has not rebutted Abbott's evidence that the Norvir repricing *increased* Abbott's overall profits, which refutes any allegation that Abbott sacrificed short-term profits for long-term gain. (*See* Hay Decl. ¶ 6).  Indeed, GSK's own expert admitted that "the profitability of Norvir increase[d] after the price increase."  (*See* Senator Decl., Ex. A at 342:25-343:2).  GSK also provided no evidence that, as in *Aspen Skiing*, Abbott "refus[ed] to sell [Norvir] to the plaintiff at the prevailing retail price[.]"  *MetroNet*, 383 F.3d at 1132 (citing *Aspen Skiing*, 472 U.S. at 608).  The Ninth Circuit held that summary judgment is required where, as here, there is no evidence of the "circumstances that *Verizon* found significant."  *Id.* at 1133.  Importantly, the Ninth Circuit expressly rejected arguments like GSK's – namely, that it could not effectively "address[] competition" from the plaintiff, and that the challenged pricing conduct made it "unprofitable" for rivals to compete for the purpose of "win[ning] back market share."  *Id.* at 1128, 1132.

## C.  GSK Has Waived Any Alternative Theories Of Exclusionary Conduct.

GSK argued in a footnote that it has alternative theories of exclusionary conduct.  But it made no effort to support those theories in its opposition brief, other than to assert summarily that they are "viable."  (Opp'n at 18 n.18).  While GSK argued that Abbott has waived its right to address these theories, GSK has it backwards.  Abbott's motion for summary judgment triggered *GSK's* "obligation to respond" with "specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  GSK cannot overcome a motion for summary judgment "merely on allegations or denials in its own pleading."  *Id.*  Thus, it is *GSK* that has waived its right to invoke new theories.

In particular, GSK argues that its complaint is "sufficient to allow GSK to proceed" under a predatory pricing theory.  (Opp'n at 18 n.18).  But GSK has admitted that its complaint did *not* allege such a theory (*see* Senator Decl., Ex. D, Resp. No. 154), and it failed to add allegations to support one in its amended complaint (*see* First Am. Compl. (Dkt. # 170)).  As this Court noted, only the Direct Purchasers have asserted a predatory pricing theory.  (1/12/10 Order at 4).

## II.  Abbott Is Entitled To Summary Judgment On GSK's Implied Covenant Claim.

In its motion for summary judgment, Abbott produced evidence showing that it never undertook any obligation – express or implied – to keep Norvir on the market, or to limit its price.

Winston & Strawn LLP
101 California Street
San Francisco, CA  94111-5802

8

**AMENDED REDACTED VERSION PURSUANT TO COURT ORDER**

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1    (*See* Mot. at 15-22).  This evidence refutes GSK's allegations of implied promises concerning the

2    availability and pricing of Norvir – allegations that got this claim past a motion to dismiss.  As this

3    Court held:  "*GSK alleges that Abbott undertook an implied obligation to continue to make Norvir*

4    *commercially available and to keep future increases in the price of Norvir in line with past*

5    *increases*.  Whether Abbott in fact undertook such an obligation is an issue of fact that is not

6    appropriately determined on a motion to dismiss."  (4/11/08 Order at 22 (Dkt. #82) (emphasis

7    added); *see also* Hurst Decl., Ex. P at No. 12).

8            GSK now admits that it cannot deliver on its own allegations.  It has *abandoned* its theory

9    that the parties reached implied promises "concerning the availability or pricing of Norvir."  (Opp'n

10   at 9 ("The question posed here is ***not*** whether Abbott and GSK reached, but failed to memorialize,

11   an agreement concerning the availability or pricing of Norvir." (emphasis added)).  Given this

12   concession, and for other reasons shown below, GSK has raised no genuine issue as to whether

13   Abbott breached the implied covenant.

14       **A.      GSK Produced No Evidence That A Reasonable Person In Its Position Would Be**

15              **Justified In Understanding That Abbott Promised To Constrain Norvir's Price.**

16           At the pleading stage, this Court construed relevant New York law and allowed GSK to

17   "pursue a breach of contract claim for violation of 'any promise which a reasonable person in the

18   position of the promisee would be justified in understanding were included.'"  (4/11/08 Order at 21

19   (Dkt. #82) (quoting *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496 (N.Y.

20   2002)).  In its motion, Abbott explained that GSK cannot meet this standard.  This is because the

21   evidence shows that no reasonable person in GSK's position would be justified in understanding that

22   the ritonavir license included a promise by Abbott to constrain Norvir's price.  (Mot. at 17-20).

23           GSK agrees.  It conceded that the parties neither intended, nor would have reasonably

24   understood, that the ritonavir license agreement included an implied promise "concerning the

25   availability or pricing of Norvir."  (Opp'n at 9).  GSK had to concede this.  ███████████████

26   ████████████████████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████████████████

1    ███████████████████ (*See* Mot. at 15-20).  GSK disputed none of these facts.

2    GSK also failed to dispute that it received the benefit of all promises it would have been

3    *justified* in understanding were included in the agreement.  In its opposition, GSK asserted that "the

4    purpose of the contract was to allow GSK to increase sales of Lexiva by promoting it with Norvir."

5    (Opp'n at 7).  Even assuming the license included such an implied promise, Abbott has lived up to it.

6    GSK has continuously co-promoted Lexiva with Norvir worldwide since Lexiva's launch, without

7    any effort by Abbott to enforce its ritonavir patents.  This licensed right has allowed GSK to increase

8    sales of boosted Lexiva, which otherwise would have been prohibited under the patent laws.  ████

9    █████████████████████████████████████████████████████████████

10   ███████████████████████████████████████ (*See* Mot. at 17-20; *see*

11   *also* Senator Decl., Ex. E at 93:1:14).  These facts, too, are undisputed.

12   New York's highest court rejected an implied covenant claim where the plaintiff attempted to

13   read entirely new obligations into a contract.  In *Moran v. Erk*, 11 N.Y.3d 452 (N.Y. 2008), the

14   parties entered into a real estate contract contingent on approval by the buyer's attorney.  The sellers

15   sued for breach of the implied covenant after the buyers directed their attorney to disapprove, thus

16   voiding the contract.  According to the sellers, the implied covenant prevented the buyers' attorney

17   from voiding the contract in bad faith.  The New York Court of Appeals rejected that claim on legal

18   grounds, finding that "the plain language of the contract in this case makes clear that any 'fruits' of

19   the contract were *contingent* on attorney approval, *as any reasonable person in the [plaintiffs']*

20   *position should have understood.*"  *Id.* at 457 (citing *511 W. 232nd Owners Corp.*, 98 N.Y. 2d at

21   153) (emphasis added).  Instead of relying on the implied covenant to impose new obligations that

22   qualified this contingency, the Court of Appeals enforced only those "promises which a reasonable

23   person in the position of the promisee would be justified in understanding were included."  *Id.*

24   The Second Circuit (applying New York law) reached a similar conclusion in *M/A-COM*

25   *Security Corp. v. Galesi*, 904 F.2d 134 (2d Cir. 1990).  Galesi had purchased shares of a company

26   (Argo) from M/A-COM.  But before Galesi had fully paid for the purchase, Argo went bankrupt – a

27   result that might have been avoided through a proposed merger with another company.  Galesi

28   sought to avoid the balance of his debt, alleging that M/A-COM deprived him of the fruits of his

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

10

**Winston & Strawn LLP**
**101 California Street**
**San Francisco, CA 94111-5802**

stock purchase by opposing the merger. The Second Circuit disagreed. It explained that "[c]ourts employ the good faith performance doctrine to effectuate the intentions of the parties, or to protect their reasonable expectations." *Id.* at 136. The court affirmed summary judgment for M/A-COM because it offered no promise concerning the merger. As the Second Circuit put it, M/A-COM "neither directly destroyed the value of Galesi's stock, nor engaged in any actions in violation of the parties' presumed intentions or reasonable expectations." *Id.*

*Moran* and *M/A-COM* confirm the limited role of the implied covenant in this case. As in *Moran*, "any reasonable person in [GSK's] position should have understood" that Abbott, a direct competitor, merely promised GSK it could co-promote its boosted PIs with Norvir without threat of an infringement suit – nothing more. 11 N.Y.3d at 457. And, as in *M/A-COM*, Abbott "neither directly destroyed [GSK's right to co-promote its boosted PIs with Norvir], nor engaged in any actions in violation of the parties' presumed intentions or reasonable expectations." 904 F.2d at 136. Summary judgment is warranted where, as here, GSK admittedly seeks damages based on purported obligations that "go beyond those [promises] intended and stated in the express language of the contract." *Agency Development, Inc. v. MedAmerica Ins. Co.*, 327 F. Supp. 2d 199, 204 (W.D.N.Y. 2004) (granting summary judgment on this basis).[3]

**B.      GSK Cannot Save Its Implied Covenant Claim By Arguing That Abbott Intentionally Diverted Sales From Lexiva To Kaletra.**

GSK has attempted to avoid summary judgment by characterizing the undisputed facts discussed above as "irrelevant." (Opp'n at 12). According to GSK, it can support an implied covenant claim merely by showing that Abbott raised the price of Norvir with "with the intention of diverting sales from boosted Lexiva to Abbott's own Kaletra[.]" (Opp'n at 9). Abbott denies ever having such an intention. But assuming for purposes of this motion that it did, that would not be enough to sustain GSK's implied covenant claim. GSK's argument is that the implied covenant in a simple patent license prevented Abbott from competing with a direct rival. That is *not* the law.

---

[3] GSK criticized Abbott for citing *Rowe v. Great Atlantic & Pacific Tea Co.*, 46 N.Y.2d 62 (N.Y. 1978), because that case discussed an implied-in-*fact* obligation. But New York courts of all levels have repeatedly cited *Rowe* when construing the implied-in-*law* covenant of good faith and fair dealing. *E.g.*, *Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 389, 396 (N.Y. 1995).

11

CASE NOS. 07-5470, 07-5985, 07-6120, 07-5702 (CW)
REPLY IN SUPPORT OF ABBOTT LABORATORIES' MOTION FOR SUMMARY JUDGMENT ON GSK'S AMENDED COMPLAINT

**AMENDED REDACTED VERSION PURSUANT TO COURT ORDER**

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1   As the Second Circuit, applying New York law, emphasized:  "The boundaries set by the

2   duty of good faith are generally defined by the parties' intent and reasonable expectations in entering

3   the contract." *Cross & Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir.

4   1989).  Thus, "so long as the promisee is allowed to reap the benefits of the contract, the implied

5   covenant of good faith does not require the promisor to take actions contrary to his own economic

6   interests." *Bank of New York v. Sasson*, 786 F. Supp. 349, 354 (S.D.N.Y. 1992) (citing *Van*

7   *Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*, 30 N.Y.2d 34, 46 (N.Y. 1972)).

8   Nor does the implied covenant "extend so far as to undermine a party's 'general right to act on its

9   own interests in a way that may incidentally lessen' the other party's anticipated fruits from the

10  contract." *M/A-COM*, 904 F.2d at 136 (citing *Van Valkenburgh*).

11  It is undisputed that Abbott never agreed to constrain Norvir's price.  It did *not* promise GSK

12  any level of profitability with regard to Lexiva sales.  And it certainly never agreed to stop

13  competing with Lexiva.  To withstand summary judgment, New York law required GSK to produce

14  evidence that its purported lost profits resulted from Abbott's breach of an implied promise the

15  parties actually intended, or reasonably understood, to be part of the their agreement.  *See Moran*, 11

16  N.Y.3d at 457.  GSK failed to do so.  *See Train v. General Electric Capital Corp.*, 8 A.D.3d 192,

17  192-93 (N.Y. App. Div. 2004) (granting summary judgment for defendant on implied covenant

18  claim because it sought relief not guaranteed by "[t]he plain language of the contract").

19  **C.     GSK Failed To Prove Compensable Contract Damages.**

20  Abbott's motion provided yet another basis to reject GSK's implied covenant claim – the

21  contract bars GSK from recovering the requested damages, *i.e.*, lost profits and restitution.

22  ***Lost Profits.***  In its motion, Abbott showed that ████████████████████████████

23  ████████████████████████████████████  (Mot. at 21).  GSK conceded this.

24  (Opp'n at 13).  But it argued that (1) GSK's lost profits are direct, not consequential damages; and

25  (2) this clause it is unenforceable due to Abbott's bad faith.  Both arguments fail as a matter of law.

26  First, GSK's alleged "lost profits" are consequential damages under New York law.  "Lost

27  profits are consequential damages when, as a result of the breach, the non-breaching party suffers

28  loss of profits on collateral business arrangements….  When the breaching party does not perform,

12

**AMENDED REDACTED VERSION PURSUANT TO COURT ORDER**

1   the non-breaching party's business is in some way hindered, and the profits from potential collateral

2   exchanges are 'lost.'"  *Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89,

3   109 (2d Cir. 2007) (applying N.Y. law).  In contrast, direct damages are monies "the breaching party

4   agreed to pay under the contract," but failed to do so.  *Id.*

5          GSK seeks consequential, not direct, damages under this standard.  It allegedly suffered lost

6   sales of Lexiva *to third parties*, clearly business arrangements collateral to the license with Abbott.

7   *See Petroleo Brasileiro, S.A., Petrobras v. Ameropan Oil Corp.*, 372 F. Supp. 503, 508 (E.D.N.Y.

8   1974) ("consequential damages do not arise within the scope of the immediate buyer-seller

9   transaction, but rather stem from losses incurred by the non-breaching party in its dealings . . . with

10  third parties.").  GSK cannot credibly argue that its "lost profits" are direct damages.  Abbott never

11  agreed that Lexiva would even be profitable, let alone would achieve a particular profit level.

12         Second, ███████████████████████████.  A "provision limiting consequential

13  damages will be enforced so long as it is found not to be unconscionable."  *Scott v. Palermo*, 649

14  N.Y.S.2d 289, 290 (N.Y. App. Div. 1996) (granting partial summary judgment barring consequential

15  damages because of limitation-of-liability clause).  Under New York law, "where businessmen

16  contract in a commercial setting, a presumption of conscionability arises."  *Pacs Indus., Inc. v.*

17  *Cutler-Hammer, Inc.*, 103 F. Supp. 2d 570, 573 (E.D.N.Y. 2000) (citing N.Y. cases).  GSK has made

18  no effort to overcome this presumption.

19         ***Restitution.***  Abbott showed that ████████████████████████████████

20  ██████████████████████████████████████████████████████████ "

21  (Mot. at 21).  This also is undisputed.  (Opp'n at 14).  GSK argued that this provision is ambiguous.

22  But it clearly bars the parties from claiming a breach of one license affects the terms of the other.

23  The contract thus prohibits GSK from increasing the royalty paid by Abbott ████████████████

24  ████████████ by characterizing such relief as "restitution."

25  **III.   Abbott Is Entitled To Summary Judgment On GSK's North Carolina UDTPA Claim.**

26         In its motion, Abbott showed that GSK cannot repackage its antitrust and contract claims as

27  "unfair" or "deceptive" conduct under North Carolina's UDTPA, N.C. Gen. Stat. § 75-1.1.  Under

28  North Carolina law, "[t]he question of what constitutes an unfair or deceptive trade practice is an

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

13

1    issue of law." *Nelson v. Hartford Underwriters Ins. Co.*, 177 N.C. App. 595, 609 (N.C. App. 2006).

2    GSK's opposition provided neither a viable legal theory nor "specific facts" to support its claim.

### A. GSK Has Not Supported Its Claim Of "Unfair" Conduct.

4    Abbott showed in its motion that failed antitrust allegations cannot be characterized as

5    "unfair" conduct under the UDTPA. *GSK did not dispute this point*. In fact, GSK made no effort to

6    distinguish the relevant cases cited by Abbott . (*See* Mot. at 23-24).

7    GSK nonetheless argued that it can recover treble damages under the UDTPA for a mere

8    contract breach. But even the case chiefly relied on by GSK defeats that argument: "It is clear ...

9    that conduct carried out pursuant to contractual relations rarely violates the U[D]TPA. In fact, even

10    an intentional breach of contract is normally insufficient to contravene the U[D]TPA; a breach of

11    contract must be particularly egregious to permit recovery under [the statute.]" *South Atl. Ltd.*

12    *P'ship v. Riese*, 284 F.3d 518, 536, 541-42 (4th Cir. 2002). Although the court in that case found the

13    conduct egregious, it did so only because the defendant's representations "had the capacity to

14    deceive ... as to the manner and completion of the parties' agreement" and involved "the use of

15    construction funds for private purposes." *Id.* As the Fourth Circuit previously held: "[A] broken

16    promise is unfair or deceptive *only* if the promisor had no intent to perform when he made the

17    promise." *Gilbane Bldg. Co. v. Federal Reserve Bank of Richmond, Charlotte Branch*, 80 F.3d 895,

18    903 (4th Cir. 1996) (quotations and citations omitted) (emphasis added). That was not the case here.

19    Abbott clearly intended to perform under the ritonavir license at the outset. In fact, it is still

20    performing. Again, there is no dispute that Abbott has continuously allowed GSK to co-promote its

21    Lexiva with Norvir. This case is thus indistinguishable from *McLamb v. T.P. Inc.*, where the court

22    affirmed dismissal of a UDTPA claim because, as here, the "plaintiffs did not allege that defendant

23    intended to deceive them from the outset." 619 S.E.2d 577, 593 (N.C. Ct. App. 2005).

### B. GSK Has Not Supported Its Claim Of "Deceptive" Conduct.

25    In its motion, Abbott explained that GSK had no facts even arguably satisfying the elements

26    of its "deception" claim under the UDTPA. That claim requires proof that: (1) Abbott's statements

27    had "the capacity or tendency to deceive," (2) GSK "suffered actual injury as a proximate result of

28    defendant's deceptive statement or misrepresentation" and (3) "actual reliance." (Mot. at 24-25

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

14

**AMENDED REDACTED VERSION PURSUANT TO COURT ORDER**

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1    (citing cases)).  GSK's opposition raised no triable issue on any element.  In fact, GSK failed to

2    quote a single public statement claimed to be deceptive – a symptom of a larger problem:  *GSK has*

3    *no witness to testify that Abbott's statements tended to deceive GSK or consumers, or harmed GSK.*

4         GSK's "deceptive" claim rests entirely on two Abbott letters.  The first is the HIV drug chart,

5    which Abbott already explained contained accurate information.  (Mot. at 24-25).  The second letter,

6    which GSK did not even quote, was sent to HIV treating clinicians.  In it, Abbott accurately

7    explained its "new programs," including "new formulations of both of [its] HIV products," and that

8    it "has ensured that [public assistance] patients will not be impacted by this repricing."  (Stockinger

9    Decl., Ex. 24, in Supp. of GSK's Opp'n).  It is undisputed that Abbott did, in fact, introduce a new

10   formulation (Meltrex technology) for Kaletra after this letter (*see* Mot. on Direct Purchasers' Claims

11   at 7); and that the price did not increase for patients on government programs (*see id.* at 6).  Rather

12   than contest these facts, GSK resorts to brazen mischaracterizations of the plain language of the

13   letter.  But GSK cannot defeat summary judgment by attributing statements to Abbott it never made.

14        In any event, GSK offered no theory as to how the letters proximately caused it injury, let

15   alone supporting evidence.  GSK claims only that it "was harmed by the overall level of confusion in

16   the market caused by the price hike, *which Abbott's misleading communications exacerbated*."

17   (Opp'n at 17-18 (emphasis added)).  Yet, the record is devoid of *any* evidence that those

18   communications proximately caused GSK to suffer lost sales of Lexiva, the pertinent standard.  GSK

19   merely points to a single off-hand comment by its expert about the HIV chart, which he claimed

20   "unfortunately added to the fervor that this is what Abbott was trying to use to justify their increase."

21   Stockinger Decl., Ex. 23 at 335:16-17.  But this conjecture says nothing about whether the HIV chart

22   proximately caused GSK harm.  *See Carcano v. JBSS, LLC*, 684 S.E.2d 41, 52 (N.C. Ct. App. 2009)

23   (holding that injury "must be 'distinct and palpable,' and must not be 'abstract or conjectural or

24   hypothetical'")).  Thus, summary judgment is appropriate in the absence of any evidence that

25   Abbott's public statements proximately caused injury to GSK.  (Mot. at 25 (citing cases affirming

26   summary judgment for lack of evidence that statement proximately caused injury)).

27                              **CONCLUSION**

28        For the foregoing reasons, this Court should grant Abbott's motion for summary judgment.

15

AMENDED REDACTED VERSION PURSUANT TO COURT ORDER

1

2
WINSTON & STRAWN LLP
MUNGER TOLLES & OLSON LLP

3

4 Dated: September 30, 2010          By:    /s/ James F. Hurst

5                                          James F. Hurst

6                                          Attorneys for Defendant
                                           ABBOTT LABORATORIES

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28