1   IRELL & MANELLA LLP
    Alexander F. Wiles (CA 73596) awiles@irell.com
2   Brian Hennigan (CA 86955) bhennigan@irell.com
    Trevor V. Stockinger (CA 226359) tstockinger@irell.com
3   S. Albert Wang (CA 250163) awang@irell.com
    1800 Avenue of the Stars, Suite 900
4   Los Angeles, California 90067-4276
    Telephone:   (310) 277-1010
5   Facsimile:   (310) 203-7199

6
    ARNOLD & PORTER LLP
7   Kenneth A. Letzler (*Admitted Pro Hac Vice*) Kenneth_Letzler@aporter.com
    Daniel S. Pariser (*Admitted Pro Hac Vice*) Daniel_Pariser@aporter.com
8   555 Twelfth Street, NW
    Washington, DC  20004-1206
9   Telephone:   (202) 942-5000
    Facsimile:   (202) 942-5999
10
    *Attorneys for Plaintiff GlaxoSmithKline*
11

12                     **UNITED STATES DISTRICT COURT**

13                    **NORTHERN DISTRICT OF CALIFORNIA**

14                              **OAKLAND DIVISION**

15

16   SMITHKLINE BEECHAM CORPORATION          Case No. C 07-5702 (CW)
     d/b/a GLAXOSMITHKLINE,
17                                            **GLAXOSMITHKLINE'S OPPOSITION**
                        Plaintiff,            **TO ABBOTT'S MOTION FOR**
18                                            **SUMMARY JUDGMENT**
                  v.
19                                            Date:       October 28, 2010
     ABBOTT LABORATORIES,                     Time:       2:00 p.m.
20                                            Courtroom:  2 (4th Floor)
                        Defendant.            Judge:      Hon. Claudia Wilken
21

22

23

24

25

26

27

28

                    GSK'S OPPOSITION TO ABBOTT'S SUMMARY JUDGMENT MOTION
                                  CASE NO. C 07-5702

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 2

ARGUMENT ....................................................................................................................... 6

    I.    Triable Issues of Fact Exist With Respect to GSK's Claim for
        Breach of the Implied Covenant of Good Faith and Fair Dealing ......................... 6

        A.    The record contains sufficient evidence for a jury to
               conclude Abbott breached the implied covenant of good faith
               and fair dealing. ............................................................................. 6

        B.    Abbott improperly relies on case law addressing claims for
               breach of an implied-in-fact obligation. ......................................... 8

        C.    Abbott cannot obtain summary judgment by pointing to the
               worldwide scope of the license agreement or GSK's total PI
               revenues over six years. .................................................................. 9

        D.    Abbott's resuscitated arguments from its motion to dismiss
               once again fail. ............................................................................. 11

        E.    GSK can prove compensable damages for Abbott's breach. .................... 13

    II.    Summary Judgment Should be Denied on GSK's Claim Under the
        North Carolina Unfair and Deceptive Trade Practices Act ................................... 15

        A.    GSK can prove Abbott conduct that was "unfair." ................................. 15

        B.    GSK can prove Abbott conduct that was "deceptive." ............................. 17

    III.    Triable Issues of Fact Exist With Respect to GSK's Sherman Act
        Claim ................................................................................................... 18

        A.    Abbott's Declining Market Share Does Not Defeat GSK's
               Antitrust Claim. .......................................................................... 18

        B.    GSK has sufficient evidence of anticompetitive conduct to
               preclude a grant of summary judgment ........................................... 18

            1.    GSK's evidence of Abbott's anticompetitive conduct ................. 18

            2.    Abbott's "no effective refusal to deal" argument fails................. 22

            3.    Abbott's argument that it did not terminate a course
                 of dealing fails. ...................................................................... 24

CONCLUSION .................................................................................................................. 25

1

<u>TABLE OF AUTHORITIES</u>

2

Page(s)

3  **<u>Cases</u>**

4  *511 West 232nd Owners Corp. v. Jennifer Realty Co.*,
     773 N.E.2d 496 (N.Y. 2002) ...................................................................................... 7

5

*Am. Elec. Power Co. v. Westinghouse Elec. Corp.*,

6     418 F. Supp. 435 (S.D.N.Y. 1976) ............................................................................ 13

7  *Am. List Corp. v. U.S. News & World Rep., Inc.*,
     549 N.E.2d 1161 (N.Y. 1989) .................................................................................... 13

8
   *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,

9     472 U.S. 585 (1985) ........................................................................... 19, 20, 21, 25

10 *Banc of Am. Sec. LLC v. Solow Building Co. II*,
     847 N.Y.S.2d 49 (N.Y. App. Div. 2007) ................................................................... 14

11
   *Broadcom Corp. v. Qualcomm Inc.*,

12    501 F.3d 297 (3rd Cir. 2007) ..................................................................................... 25

13 *Byars v. Bluff City News Co.*,
     609 F.2d 843 (6th Cir. 1979) ..................................................................................... 22

14
   *Computrol, Inc. v. Newtrend, L.P.*,

15    203 F. 3d 1064 (8th Cir. 2000) .................................................................................. 13

16 *Conwood Co. v. U.S. Tobacco Co.*,
     290 F.3d 768 (6th Cir. 2002) ......................................................................... 18, 22, 23

17
   *CosmoCom, Inc. v. Marconi Commc'ns Int'l Ltd.*,

18    261 F. Supp. 2d 179 (E.D.N.Y. 2003) ....................................................................... 13

19 *Cullen v. Valley Forge Life Ins. Co.*,
     589 S.E.2d 423 (2003) ............................................................................................... 18

20
   *Dalton v. Educ. Testing Serv.*,

21    663 N.E.2d 289 (N.Y. 1995) ....................................................................................... 7

22 *Dave Greytak Enterprises, Inc., v. Mazda Motors of America, Inc.*,
     622 A.2d 14 (Del. Ch. 1992) ....................................................................................... 9

23
   *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*,

24    902 F.2d 174  (2d Cir. 1990) ..................................................................................... 25

25 *Don King Prod. Inc. v. Douglas*,
     742 F. Supp. 741 (S.D.N.Y. 1990) ............................................................................ 13

26
   *Forward Indus., Inc. v. Rolm of N.Y. Corp.*,

27    506 N.Y.S.2d  453 (N.Y. App. Div. 1986)................................................................. 13

28 *Gray v. North Carolina Insurance Underwriting Ass'n*,
     529 S.E.2d 676 (N.C. 2000) ....................................................................................... 17

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- ii -

Page(s)

*Great N. Assocs., Inc. v. Cont'l Cas. Co.*,
  596 N.Y.S.2d 938 (N.Y. App. Div. 1993) .................... 14

*Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*,
  723 F. Supp. 976 (S.D.N.Y. 1989) .................... 12

*Havel v. Kelsey-Hayes Co.*,
  445 N.Y.S. 2d 333 (N.Y. App. Div. 1981) .................... 12

*Hospira Inc. v. AlphaGary Corp.*,
  671 S.E.2d 7 (N.C. Ct. App. 2009) .................... 18

*Hyatt Corp. v. Women's Int'l Bowling Cong., Inc.*,
  80 F. Supp. 2d 88 (W.D.N.Y. 1999) .................... 13

*Jacobs v. Nintendo of Am., Inc.*,
  370 F.3d 1097 (Fed. Cir. 2004) .................... 10

*Kalisch-Jarcho, Inc. v. City of New York*,
  58 N.Y.2d 377 (N.Y. 1983) .................... 14

*M/A-Com Sec. Corp. v. Galesi*,
  904 F.2d 134 (2d Cir. 1990) .................... 11

*Marshall v. Miller*,
  276 S.E.2d 397 (N.C. 1981) .................... 17

*McLamb v. T.P. Inc.*,
  619 S.E.2d 577 (N.C. Ct. App. 2005) .................... 15, 16

*Meijer, Inc. v. Abbott Labs.*,
  544 F. Supp. 2d 995 (N.D. Cal. 2008) .................... 7, 15

*MetroNet Services Corp. v. Qwest Corp.*,
  383 F.3d 1124 (9th Cir. 2004) .................... 24

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*,
  86 N.Y.2d 685 (1995) .................... 12

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
  129 S. Ct. 1109 (2009) .................... 24

*Pepsi-Cola Bottling Co. of Pittsburgh, Inc. v. Pepsico, Inc.*,
  431 F.3d 1241 (10th Cir. 2005), *amended* 2006 U.S. App. LEXIS 20545
  (10th Cir. 2006) .................... 12

*Rowe v. Great Atlantic & Pacific Tea Co., Inc.*,
  46 N.Y.2d 62 (N.Y. 1978) .................... 8, 9

*Rucker v. Huffman*,
  392 S.E.2d 419 (N.C. Ct. App. 1990) .................... 17

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2287856

- iii -

GSK'S OPPOSITION TO ABBOTT'S SUMMARY JUDGMENT MOTION
CASE NO. C 07-5702

Page(s)

*S. Erectors, Inc. v. City of New York*,
  No. 90-CIV-5651,1992 U.S. Dist. LEXIS 8704 (S.D.N.Y. June 16, 1992) .................... 14

*South Atlantic Ltd. Partnership of Tennessee v. Riese*,
  284 F.3d 518 (4th Cir. 2002).......................................................................................... 16

*Teague v. Bayer AG*,
  671 S.E.2d 550 (N.C. Ct. App. 2009) ............................................................................ 15

*Telemundo Group, Inc. v. Alden Press, Inc.*,
  580 N.Y.S.2d 999 (N.Y. App. Div. 1992)....................................................................... 14

*Travellers International, A.G. v. Trans World Airlines*,
  41 F.3d 1570 (2d Cir. 1994) ........................................................................................... 13

*United States v. Microsoft*,
  253 F.3d 34 (D.C. Cir. 2001) .......................................................................................... 24

*United States v. Syufy Enterprises*,
  903 F.2d 659 (9th Cir. 1990)........................................................................................... 18

*Valve Corp. v. Sierra Entm't, Inc.*,
  431 F. Supp. 2d 1091 (W.D. Wash. 2004) ..................................................................... 14

*Van Valkenburgh, Nooger & Neville, Inc., v. Hayden Publishing Company, Inc.*,
  30 N.Y.2d 34 (N.Y. 1972)............................................................................................... 11

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ........................................................................................................ 24

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.*,
  1 N.Y.3d 470 (N.Y. 2004)................................................................................................. 9

*Wolff v. Rare Medium, Inc.*,
  210 F. Supp. 2d 490 (S.D.N.Y. 2002) ............................................................................ 12

**Statutes**

N.C. Gen. Stat. § 75-1.1 ............................................................................................... 15, 18

N.C. Gen. Stat. § 75-2.1 ..................................................................................................... 15

**Other Authorities**

24 Williston on Contracts § 64:12 (4th ed. 2002) ....................................................... 13

ABA Section of Antitrust Law, Antitrust Law Developments (6th Ed. 2007) ............ 24

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

## **INTRODUCTION**

In this brief, GSK will first show why Abbott's attack on its state law claims fails and then do the same with respect to Abbott's attack on GSK's antitrust claims.  GSK provides a statement of facts geared primarily to its state law claims.  GSK incorporates into its argument on the antitrust claims facts relevant to the issues discussed there.  The Direct Purchaser plaintiffs ("Directs") are providing the Court a summary of the facts relevant to the antitrust claims in these cases, and GSK directs the Court to that summary for further factual background on those claims.

To a great extent Abbott's motion fails because it repeats arguments this Court rejected in denying Abbott's various motions to dismiss.  With respect to GSK's claims for breach of the implied covenant of good faith and fair dealing and for violation of North Carolina's Unfair and Deceptive Trade Practices Act, the Court set out the appropriate legal standard in its April 11, 2008 order.  GSK now introduces evidence to support each of its material allegations, and those claims thus must be allowed to go forward.  With respect to GSK's antitrust claims, Abbott contends in less than two pages that its declining market share negates its monopoly power as a matter of law.   There is, however, no such absolute rule.  The issue is whether Abbott has "acquired, enhanced, or maintained" monopoly power, not whether it has held on to it indefinitely.  Facts relevant to its market share over time, barriers to entry, the pace of decline in market share before and after the price hike, and many other issues are required to make the necessary determination.  Abbott's argument that GSK fails to show anti-competitive conduct fares no better.  Abbott ignores two theories of anti-competitive conduct that GSK put forward in opposition to Abbott's motion to dismiss and, on the one theory it does address—that Abbott violated a duty to deal—Abbott largely repeats arguments it made and lost at the motion to dismiss stage.  As evidence supports GSK's allegations, its antitrust claims likewise must be allowed to proceed.[1]

---

[1] GSK does not respond here to arguments concerning its antitrust claims that Abbott makes only in its motion targeted at the Directs as Abbott's filing of that motion in GSK's case and purported incorporation of those arguments "by reference" is an inappropriate attempt to extend the length of its brief without permission to do so.  GSK expects the Directs to adequately address all of those points.  If the Court has any further questions about how those Abbott arguments bear on GSK's claims, GSK respectfully requests that it direct GSK to file a supplemental brief addressing them.

- 1 -

## **FACTUAL BACKGROUND**

While developing Lexiva, a protease inhibitor (hereinafter "PI"), GSK recognized that the "[s]tandard of care" was shifting because of the "use of low dose ritonavir to boost trough levels of protease inhibitors." Ex. A at GSKABB00980671.[2]  In the same time frame, Abbott was encouraging its competitors to promote their PIs for use with ritonavir and to pay it a royalty for doing so.  *See* Ex. 1 at 31:8-11; 40:7-14; Ex. 2 at 138:21-140:20; Calamari Decl., Exs. 22-25.

Negotiations ensued.  *See* Ex. B; Ex. C; *see also* Ex. 6 at 41:3-41:19. ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████ Ex. 7 at 133:12-134:4; Ex. 8.

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████ Ex. 6 at 100:5-9; *see* Ex. 2 at

156:18-22 & 158:17-159:12. ████████████████████████

████████████████████████████ Ex. 1 at 147:15-148:12; *see id.* at 144:19-

145:24; *see also* Ex. 7 at 133:12-134:4, 176:3-21; 234:8-20; Ex. 6 at  100:5-9.

███████████████  On December 13, 2002, Abbott and GSK executed a license providing GSK rights to promote its protease inhibitors for co-prescription with Norvir.  Calamari Decl., Ex. 23.  The parties also executed a license regarding mAb technology.  Exs. D & E. ███

█████████████ Calamari Decl., Ex. 23 at ¶¶  3.1 - 3.2. ██████████████

████████████████████████████████████████████████████████

████████████████████████████████ *Id.* at ¶ 3.4(a). ███

████████████████████████████████████████████

█████████████████████ Exs. 9 & 10.

---

[2] Unless otherwise specified, all exhibits denoted by alphabetic references are attached to the Declaration of Mark S. Shaefer.  Unless otherwise specified, all exhibits denoted by numerical references are attached to the Declaration of Trevor V. Stockinger.

[3] ████████████████████████████████████

Ex. 9. ████████████████████████████████████████████

1   There is no doubt that the purpose of the license agreement was to allow GSK to increase

2   sales of Lexiva by promoting it for use with Norvir. ████████████████████████████

3   ████████████████████████████████████████████ Calamari Decl.

4   Ex. 23 at 1 & ¶ 2.1. ████████████████████████████████████████

5   ████████████████████████ Ex. 14 at 227:19-228:2; 249:11-16. ████████

6   ████████████████████████████████████████ Abbott Br. at 6:17.

7   ████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████

9   ███████████████ Ex. 2 at 194:24-195:6. ████████████████

10  ████████████████████████████████████ *Id.* at 208:19-21; *see*

11  *id.* at 71:20-72:2, 198:4-24, 208:1-8.

12  Nonetheless, while negotiating its ████████ with GSK, Abbott was also pursuing a

13  separate, contradictory agenda. ████████████████████████████

14  ████████████████████████████████████████████████████████

15  ████████ Ex. 16 at NOR00013358-359. ████████████████████

16  ████ *Id.*; *see* Ex. 1 at 125:23-126:9. ████████████████████

17  ████████████████████████████████████████████████ Ex. 1 at

18  134:1-135:24. ████████████████████████████████████████████

19  ████████████████████████████ *Id.* at 134:1-134:24; *see* Ex. 2 at 268:21-270:22.

20  ████████████████████████

21  ███████████████████████████████████████████ Ex. 11 at
    67:2-17; Ex. 38 at ¶ 217;  Ex. 2 at 221:24-222:13; Ex. 1 at 141:8-142:9; Ex. 7 at 279:6-280:11.

22  [4] John Keller, Vice President of Business Development, who was in charge of negotiating
    the license, explained that GSK "didn't want any impediments" to the ability to market Lexiva

23  because "Lexiva wasn't going to be a viable product if it was only available unboosted." Ex. 7 at
    79:2-11.  Other GSK executives testified similarly.  *See* Ex. 4 at 53:3-7, 115:10-16; Ex. 5 at

24  106:11-107:8; Ex. 6 at 41:3-41:19.

25  [5]████████████████████████████████████████████████████████

26  ████████████████████████████████████ Ex. 1 at 39:22-40:3.
    ████████████████████████████████████████ *Id.* at 40:11-41:14.

27  Steven Weinstock, Abbott's then Chief Patent and Trademark Counsel, ████████████
    ████████████████████ echoed Tyree's understanding. Exs. 11 at 103:16-

28  104:10; Ex. 2 at 68:21-69:1.  So did Abbott employees involved in marketing Kaletra. Exs. 12 at
    273:10-274:6; 13 at 242:13-243:2.

2287856.13  08



1

2                                                                                                              .

3   Ex. 17.

4

5                       Ex. 18 at 95:19-96:4; *see* Ex. 15 at NOR00045540.

6        Abbott ultimately decided to hike Norvir's price by 400%.

7

8

9                                        Ex. 19 at NOR00096647.  Even though

10  Abbott's CEO approved the price hike in October, Ex. 20 at 224:2-18; Ex. 18 at 125:21-126:4,

11                                                                                        .  Ex. 21

12  at RIT0437394-395.

13  *Id.* at RIT0437394.

14        No one had anticipated a price increase of this size, including Abbott.

15

16

17            .  Ex. 73 at NOR00128311; Ex. 74 at 39:22-42:24.

18

19                                        Ex. 74 at 17:7-24.

20

21

22

23          Ex. 74 at 249:3-21, 251:21-24, 259:11-22; Ex. 73 at NOR00128313; Ex. 76-78.

24

25                                        Ex. 75; Ex. 49 at 36:11-38:12.

26        On November 17, 2003, GSK started selling Lexiva.  Three weeks later, on December 4,

27  2003, Abbott announced its price hike.  *See* Ex. 80.  Overnight, the price of Norvir went from

28  $1.71 per 100 milligrams to $8.57.  Ex. 81 at NOR00001135.  As a result, the price of a daily dose

- 4 -

of boosted Lexiva, which included 200 milligrams of Norvir, went from a $0.67 premium to the price of Kaletra to a $14.39 premium.  Declaration of Stephen D. Prowse ("Prowse Decl.") ¶ 5.

The Norvir price hike put doctors into "lock-down" mode. Ex. 22 at 283:16-24.  Mick Hannan, then Director of Lexiva, testified that "[t]he distraction and the lack of understanding about the price increase, the dramatically increased cost of Lexiva, interfered with the ability of Lexiva to effectively get its marketing message out and get a profile of Lexiva out."  Ex. 5 at 168:11-168:18; *see* Ex. 22 at 80:18-81:11 & 73:15-74:19; Ex. 4 at 184:14-22.  According to Dr. Siddiqui, who helped GSK educate HIV treaters, "physicians didn't get an opportunity to understand… information [on Lexiva] when it first was there," Ex. 23 at 372:19-20, and, therefore, Lexiva never got a "foothold in the market."  *Id.* at 345:24-346:1.

For the next several months, Abbott misled the HIV community.  It sent letters to treaters justifying the increase on several false grounds.  *See* Ex. 24, 26 & 27; *see also* Ex. 28.  These "justifications" only fueled the controversy and concern.  *See, e.g.*, Ex. 65, 66 & 67; Ex. M & N; *see also* Ex. 23 at 334:18-335:18.  Abbott claimed the "new" function of Norvir as a booster necessitated the hike, *see* Ex. 24 at NOR00091685, but there was nothing "new" about it. Ex. 30 at 49:12-59:15, 60:1-15, 61:23-63:20 (Norvir's function as a booster was known to Abbott in 1995); Ex. 31 at 17:5-47:9 (same); Ex. 32 at 134-36 ██████████████████████████ ████████████████  Abbott claimed the price hike was necessary to support research on new HIV drugs, *see* Ex. 24 at NOR00091685, but this was never a consideration, *see* Ex. 20 at 191:3-6 ████████████████████████████████████████████ Ex. 33 at RIT0840488 ████████████ ███████████████████████████████  Abbott also announced steps that "ensured that . . . patients" who receive drugs through government programs, like Medicaid, "will not be impacted by this re-pricing."  Ex. 24 at NOR00091684.  This announcement was meaningless as Abbott was "restricted by the law" from raising these prices. Ex. 34 at p. 166-67.

The FDA deemed Abbott's communications with HIV care providers misleading.  It told Abbott to stop using a chart entitled "Daily Cost of Common ARV Agents," because "it compares a subtherapeutic dose of Norvir (100 mg once daily) to the labeled dosing regimens of other

- 5 -

1  antiretroviral agents." Hurst Decl., Ex. T at NOR00094883, 887.  Abbott took down the chart

2  from its website, and sent a new letter to physicians.  Ex. 35 at 16.  Nonetheless, this "added to

3  that fervor" surrounding the price hike.[6]  Ex. 23 at 335:16; *see id.* at 334:18-335:18.

4          GSK's sales of Lexiva fell far short of GSK, Abbott and independent third party

5  expectations.  ███████████████████████████████████████████████████████

6  ████████  Ex. F at GSKABB01007886; Ex. 36 at 259:15-260:1.  ████████████████

7  ████████████████████████████████████████████████  Ex. G at

8  GSKABB00393484; Ex. 38 ¶ 141; *see* Ex. 37.  █████████████████████

9  ████████████████████████  Ex. 38 ¶ 135 & Prowse Ex. 8; *see* Ex. 39 at NOR00023832 &

10  837.  GSK had spent around seven years developing Lexiva for approximately $750 million.

11  Ex. H at GSK00663405; *see* Ex. 40 ¶ 31 (estimating that average development cost of

12  pharmaceutical is $1.2 billion).  ████████████████████████████████████████████

13  ██████████████  *See* Ex. 38 at Ex. 11.  ███████████████████████

14  ████████████████████████████████████████████████████████████████

15  ██████  *See id.* at Exh. 15.[7]

16                              **ARGUMENT**

17  I.      **Triable Issues of Fact Exist With Respect to GSK's Claim for Breach of the Implied**

18          **Covenant of Good Faith and Fair Dealing.**

19          A.      **The record contains sufficient evidence for a jury to conclude Abbott breached**

20                  **the implied covenant of good faith and fair dealing.**

21          In denying Abbott's motion to dismiss, this Court noted, "[u]nder New York law,

22  '[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract

23  performance.'"  *Meijer, Inc. v. Abbott Labs.*, 544 F. Supp. 2d 995, 1007 (N.D. Cal. 2008) (quoting

24  ───────────────

25          [6] Strikingly, even after an admonition from the FDA, Abbott used this same type of cost
   comparison chart in a presentation to the staff of Senator Grassley, the ranking member of the
   Senate Finance Committee, when his office sought to investigate the Norvir price hike in 2007.
26  Ex. 41 at RIT0356167; *see* Ex. 42 at 205:15-206:10.  And, it continues to make similarly
   deceptive comparisons in this litigation.  *See* Calamari Decl., Table 1; Ex. 43 ¶ 343.

27          [7] Although GSK made around $1 billion in net sales of boosted Lexiva and Agenerase
   globally between 2004 and 2009, *see* Hay Decl. ¶¶ 8-9, this compares unfavorably to Abbott's
28  $7.2 billion in sales of Kaletra over that same period.  Prowse Decl. ¶ 2.

1   *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995)) (second alteration in original).  It

2   then held that

3         "[w]hile the duties of good faith and fair dealing do not imply obligations

4         inconsistent with other terms of the contractual relationship," they do require that

5         "neither party shall do anything which will have the effect of destroying or

6         injuring the right of the other party to receive the fruits of the contract."

7   *Meijer, Inc.*, 544 F. Supp. at 1007 (quoting *511 West 232nd Owners Corp. v. Jennifer Realty Co.*,

8   773 N.E.2d 496, 500 (N.Y. 2002)) (alteration in original).  In its motion to dismiss, even Abbott

9   recognized that a claim for breach of the covenant lies when a contracting party acts "for its own

10  gain as part of a purposeful scheme designed to deprive plaintiffs of the benefits of [the bargain]."

11  Dkt. # 42 at 14 (citation and internal quotation omitted).

12        The record developed in this case establishes a triable issue of fact with respect to this

13  claim.  Abbott's actions severely injured GSK's right to receive the benefits of the Norvir license –

14  namely, the right to enhance its profits from Lexiva sales by promoting Lexiva for boosted use

15  with Norvir.  GSK knew Norvir boosting would be critical to Lexiva, ██████████████████

16  ███████████████████████████████████████████████████████████████████

17  ███████████████████████████████████████████████████████████████████

18  Calamari Decl. Ex. 23 at 1.  Thus, in exchange for various consideration from GSK, the parties in

19  December 2002 entered into an agreement ███████████████████████████████

20  ███████████████████████████████████████████████████████████████████

21  ███████████████████████████████████████████████████████████████████

22  ████████████████████████████ *Id.* at ¶ 2.1.  Abbott and GSK employees involved with the

23  license or the marketing of protease inhibitors understood that the purpose of the contract was to

24  allow GSK to increase sales of Lexiva by promoting it with Norvir.  *See* Ex. 7 at 79:2-11; Ex. 5 at

25  106:11-107:8; Ex. 4 at 53:3-7 & 115:10-16; Ex. 6 at 41:3-19; Ex. 1 at 38:20-41:2; Ex. 11 at

26  103:16-104:10; Ex. 2 at 68:21-69:1; Ex. 12 at 273:10-274:6; Ex. 13 at 242:13-243:2.  Yet, even

27  while negotiating the license agreement with GSK, Abbott began to develop a strategy to prevent

28  GSK from obtaining the benefit of that very license agreement. ███████████████████

- 7 -

1  ████████████████████████████████████████████████████████

2  █████████████████████████████████████████████████████

3  ██████████████████████████ *See* Exs. 16 at NOR00013358-859; 15; 60; 19; 21 at

4  RIT0437494-395; 17; 59; 62; 19. ████████████████████████████████

5  ████████████████████████████████████████████████

6  ███████████████████████████ *See above* 4:14-25.  Abbott then bided its time to obtain

7  optimal ill-effect on GSK, quintupling the Norvir price during the first weeks of the Lexiva

8  launch.  *See above* p. 4:9-13.  The impact on GSK was as predictable as it was disastrous –

9  pushing the price of boosted Lexiva to a 77% premium over the cost of Kaletra and completely

10  disrupting its launch.  *See below* nn. 19-22; Prowse Decl. ¶ 5.  The purpose of the price hike was

11  to hinder the ability of GSK and another new competitor, who were both licensees, to sell the

12  products they were licensed to promote with Norvir as an alternative to Kaletra.  *See, e.g.*, Exs. 17;

13  59; 56 at ABL-IL-024733; Ex. 15 at NOR00045540; Ex. 20 at 179:3-180:14.  Abbott's action

14  destroyed Lexiva's value proposition and disrupted its critical launch period.  *See* Ex. 45 ¶¶ 51-93.

15      As a result of Abbott's scheme, sales of Lexiva fell far short of expectations.  *See above*

16  6:4-15 and *below* n. 21. ██████████████████████████████████████

17  █████████████████████████ Ex. 38 at Exh. 15.  By crippling the prospects of the

18  very drug GSK had bargained for the right to promote with Norvir, Abbott clearly injured GSK's

19  right to receive the benefits of the boosting license.

20      **B.    Abbott improperly relies on case law addressing claims for breach of an**

21          **implied-in-fact obligation.**

22      Abbott's argument for summary judgment on this claim relies mainly on sleight of hand.

23  Instead of confronting GSK's claim that Abbott violated an implied-by-law obligation broadly

24  protecting one contracting party from bad faith action by another, Abbott injects concepts from

25  cases addressing the separate legal doctrine of implied-in-fact provisions imposing specific,

26  narrow duties.  *See, e.g.*, Abbott Br. at 2, 15-19.  Abbott's main authority, *Rowe v. Great Atlantic*

27  *& Pacific Tea Co., Inc.*, 46 N.Y.2d 62 (N.Y. 1978), is a case concerning the latter doctrine.  And,

28  it clearly recognized the distinction between implied-by-law and implied-in-fact obligations:

- 8 -

1   [W]e are not here confronted with a situation in which a party seeks to apply a

2   covenant which must be implied by law in a particular contract. Rather, it is

3   petitioner's claim that the parties in fact impliedly did agree . . . and simply neglected,

4   . . . to verbalize that understanding and to incorporate it into their written contract.

5   *Id.* at 68-69. *Rowe* and the arguments Abbott builds from it are simply inapposite here.[8]  The

6   question posed here is not whether Abbott and GSK reached, but failed to memorialize, an

7   agreement concerning the availability or pricing of Norvir.  Rather, it is whether Abbott injured

8   GSK's ability to reap the fruits of the license by deliberately raising Norvir's price by an

9   unprecedented magnitude and timing that increase to coincide with Lexiva's launch, both with the

10   intention of diverting sales from boosted Lexiva to Abbott's own Kaletra.  On that question, there

11   is a triable issue of fact.  *See above* at 3:1-6:15;  Ex. 17; Ex. 59; Ex. 56 at ABL-IL-024733; Ex. 15

12   at NOR00045540; Ex. 21 at RIT0437394-495; Ex. 20 at 179:3-180:14.

13   **C.   Abbott cannot obtain summary judgment by pointing to the worldwide scope**

14   **of the license agreement or GSK's total PI revenues over six years.**

15   Abbott repeatedly stresses that the scope of the license GSK took was "worldwide," but

16   that Abbott's price hike covered only the United States.  Abbott puts forward evidence that GSK's

17   negotiators were motivated in part by the need to obtain a license to promote Lexiva's use with

18   Norvir in Europe.  Abbott Br. at 5-7, 19.  Abbott also asserts that GSK promoted its PIs for use

19   with Norvir and sold, worldwide, more than one billion dollars of Agenerase and Lexiva over the

20

21   _____

    **8** For example, citing *Rowe,* Abbott argues that GSK's claim fails because it cannot prove
    that "a reasonable [party] would not have entered the [contract] without … an understanding about
22   the availability and pricing of Norvir."  Abbott Br. at 2-3, 16, 18-19.  This fact-dependent
    requirement may exist when a party sues on an implied-in-fact promise, but Abbott cites to no
23   case that suggests it is a prerequisite for the claim that GSK is asserting.  Another example is
    Abbott's equally inapposite citation to *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1
24   N.Y.3d 470, 475 (N.Y. 2004), for the proposition that courts should be hesitant to interpret an
    agreement as impliedly stating something the parties did not include.  *See* Abbott Br. at 2, 15.
25   Abbott only cites the portion of *Vermont Teddy Bear* quoting *Rowe*.  Furthermore, *Vermont Teddy
    Bear* concerned interpretation of express terms, not the ambit of the implied covenant of good
26   faith and fair dealing.  *See* 1 N.Y.3d at 475 (noting that "neither party claims that the lease is
    ambiguous or incomplete," and that "[i]n the absence of any ambiguity, we look solely to the
27   language . . . to discern the contract's meaning").  Similarly, Abbott's citation to *Dave Greytak
    Enterprises, Inc., v. Mazda Motors of America, Inc.*, 622 A.2d 14 (Del. Ch. 1992), a decision
28   rendered under Delaware law (New York law applies here), is wholly inapposite as the dispute in
    that case focused on a provision expressly covered in the parties' contract.  *Id.* at 23.

- 9 -

1   six-year period beginning in 2003.  Abbott Br. at 3.  Abbott does not clearly specify under what

2   legal theory it believes these assertions justify summary judgment.  What is clear is that no matter

3   what the assertion, these facts do not support summary judgment.

4          If Abbott is claiming that GSK's ability to enhance its profits by promoting the use of

5   Lexiva with Norvir in the United States was not one of the fruits of the agreement or not

6   sufficiently "interwoven" into the contract to be protectable, *see, e.g.,* Abbott Br. at 16, Abbott is

7   again proceeding by sleight of hand. ███████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████████████████

9   ███████████████████████████████████████████ Calamari Decl. Ex. 23, ¶ 2.1.

10  ████████████████████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████████████████

12  ███████████████████████████████████████████████████ Ex. 6 at 155:17-

13  159:11; Ex. 7 at 133:12-135:22; Ex. 5 at 106:11-108:1; *see also* Exs. 8 & 9. ████████████

14  ████████████████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████████████

18  ███████████████████████████████████████████████ Ex. 6 at 100:5-9; Ex. 2 at

19  156:18-22 & 158:17-159:12; Ex. 1 at 147:16-148:12; Ex. 7 at 133:12-134:5 & 176:3-21; Ex. 9;

20  *see* Ex. 2 at 221:24-222:13; Ex. 1 at 141:8-142:22.  In light of this evidence, Abbott cannot

21  possibly obtain summary judgment by arguing that a price hike in the U.S. did not injure GSK's

22  contractual interest protectable through the covenant of good faith and fair dealing.  *See Jacobs v.*

23  *Nintendo of Am., Inc.*, 370 F.3d 1097, 1100-01 (Fed. Cir. 2004) (settlement allowing contributorily

24  infringing sales barred patentee's suit against settling party's customer, because patentee could not

25  assign a right to settling party and then make it commercially worthless).

26         Abbott's argument fares no better if it intends to use evidence of Lexiva and Agenerase's

27  combined worldwide sales revenue to suggest that Abbott only "incidentally lessened" the fruits of

28  the contract to GSK while pursuing its own interests.  *See, e.g.*, Abbott Br. at 15 (citing *M/A-Com*

- 10 -

*Sec. Corp. v. Galesi*, 904 F.2d 134, 137 (2d Cir. 1990)). Abbott fails to recognize that courts

consider the amount of harm as an indicia of bad faith. As explained in *Van Valkenburgh, Nooger*

*& Neville, Inc., v. Hayden Publishing Company, Inc.*, 30 N.Y.2d 34, 36 (N.Y. 1972) (emphasis

added), upon which Abbott's federal authority, *M/A-Com*, relies:

> Although a publisher has a general right to act on its own interests in a way that
>
> may incidentally lessen an author's royalties, there may be a point where that
>
> activity is *so manifestly harmful to the author, and must have been seen by the*
>
> *publisher so to be harmful,* as to justify the court in saying there was a breach of
>
> the covenant to promote the author's work.

Here, there is extensive evidence Abbott took aim at GSK in an effort to manifestly harm GSK,

not to pursue some legitimate interest that Abbott thought would only incidentally lessen the fruits

of the license. *See, e.g., above* 3:12-4:13; Ex. 62 at NOR00000594 (listing "Impact of actions on

Norvir IP agreements" as one consequence of price hike or withdrawal); Exs. 15; 19; 17; 59.

Even if extent of harm (and anticipated harm) is the focus, Abbott's argument still fails

because it depends on plucking one number from the record devoid of context. Abbott omits that

GSK spent over $750 million to develop Lexiva, Ex. H at GSK00663405, makes no mention of

other significant costs associated with selling Lexiva and neglects the costs of failed research that

GSK would have expected to recoup through a successful drug.[9] More egregiously, Abbott's

argument that any impact was only incidental omits what that impact was: ████████████

████████████████████████████████████████████████████████████████

████████ Ex. 38 at Prowse Ex. 15. ████████████████████████████████

████████████████████████████████████████████ Ex. 44. The

amount of harm to GSK was far more than "incidental."

> **D.     Abbott's resuscitated arguments from its motion to dismiss once again fail.**

Finally, Abbott tries futilely to breathe new life into old arguments. Abbott previously

argued that any restriction on Norvir pricing freedom within the license would be illegal price-

---

9 ████████████████████████████████████████████████████████████

██████████████████████████████████ Ex. 14 at 288:15-16.

- 11 -

2287856.13 08

1   fixing.  *See* Dkt. # 42 at 16 (Abbott's 2008 Motion to Dismiss).  In its current motion, it dresses

2   this argument as a concern of the license negotiators that led each side to shy away from

3   discussing Norvir's price.  In addition to being inaccurate as a matter of antitrust law, *see* Dkt. # 53

4   at 16-17 (GSK's 2008 Opposition), this argument is irrelevant because GSK's theory is not one of

5   an implied-in-fact obligation and, hence, does not depend on convincing the trier of fact that the

6   parties impliedly included a specific price term in the contract.  To the extent evidence of each

7   party's unexpressed reluctance has any bearing, it undercuts Abbott's position by demonstrating

8   that it was difficult for the parties to bargain over Norvir's price.  *Cf. Hartford Fire Ins. Co. v.*

9   *Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 992 (S.D.N.Y. 1989) (noting that it would be

10  troublesome to use implied covenant to impose an obligation for which the parties could easily

11  have bargained).

12       Similarly, Abbott's retread of the importance of the integration clause, *see* Dkt. #35 at 16,

13  continues to be lifeless as explained in *Havel v. Kelsey-Hayes Co.*, 445 N.Y.S. 2d 333, 384 (N.Y.

14  App. Div. 1981): "Nor does the 'Entire Understanding' clause of the contract bear upon the

15  issue. . . .  It is of no relevance if the promise, albeit imperfectly expressed, is implicit in the

16  contract as written."  Finally, Abbott continues to try to paint GSK's theory as one that improperly

17  adds obligations that fall outside of the parties' bargain.  Abbott Br. at 17-20.[10]  But, of course, the

18  doctrine of the implied covenant of good faith and fair dealing exists to protect one party against

19  abuses that were not specifically contemplated and expressly covered in the contract.  "'The

20  covenant is violated when a party to a contract acts in a manner that, although not expressly

21  forbidden by any contractual provision, would deprive the other of the right to receive the benefits

22  under their agreement.'"  *Pepsi-Cola Bottling Co. of Pittsburgh, Inc. v. Pepsico, Inc.*, 431 F.3d

23  1241, 1261 (10th Cir. 2005), *amended* 2006 U.S. App. LEXIS 20545 (10th Cir. 2006) (quoting

24

25       [10] Abbott's boldest statement of this supposed principle comes in the form of a quote,
26  Abbott Br. at 20, from *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685
    (1995), a case having nothing to do with the implied covenant, but rather with the doctrine of
27  substantial performance.  Most of the other cases Abbott cites for the proposition that GSK's claim
    is improper are ones in which the plaintiff asks the court to imply an obligation inconsistent with a
28  term expressly set forth in the contract.  *See, e.g., Hartford Fire Ins. Co.*, 723 F. Supp. at 991-92;
    *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 497 (S.D.N.Y. 2002).

- 12 -

1  *Don King Prod. Inc. v. Douglas*, 742 F. Supp. 741, 767 (S.D.N.Y. 1990)).  The evidence shows

2  that Abbott's actions so deprived GSK.

3        **E.**    **GSK can prove compensable damages for Abbott's breach.**

4       Abbott claims New York law "leaves GSK with no compensable contract remedy."  Abbott

5  Br. at 22.  Yet, this very proposition is contrary to New York law, which refuses to construe

6  limitation of liability clauses so as to completely deprive one party of any remedies.[11]  In any case,

7  Abbott is wrong that GSK cannot recover either lost profits or restitutionary damages.

8       GSK can recover lost profits.  First, there is no general rule in New York forbidding lost

9  profits as a remedy for breach of the implied covenant.  The only case upon which Abbott relies,

10  *Travellers International, A.G. v. TWA*, 41 F.3d 1570 (2d Cir. 1994), is a federal case that made the

11  general statement Abbott quotes in a discussion of liability – not damages, cited no New York

12  authority for it, and actually upheld a lost profits award.  *Id.* at 1576-81.  ████████████

13  ████████████████████████████████████████████████████████

14  ██████████████████████████████  Whether this provision includes lost profits is a

15  question of fact: "[T]he precise demarcation between direct and consequential damages is a

16  question of fact, and the commercial context in which a contract is made is of substantial

17  importance in determining whether particular items of damages will fall into one category or

18  other."  *Am. Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F. Supp. 435, 459 (S.D.N.Y.

19  1976); *see also Am. List Corp. v. U.S. News & World Rep., Inc.*, 549 N.E.2d 1161, 1164 (N.Y.

20  1989).  Direct, or general, damages are "those damages that flow naturally from a breach, that is,

21  damages that would follow any breach of similar character in the usual course of events."  24

22  Williston on Contracts § 64:12 (4th ed. 2002).  GSK has introduced evidence that its lost profits

23  are the invariable and direct result of Abbott's breach, and thus are not covered by Article X; at

24  very least, this is a triable question of fact.[12]  *See, e.g., Computrol, Inc. v. Newtrend, L.P.*, 203 F.

25  ───────────────────

26      [11] *Forward Indus., Inc. v. Rolm of N.Y. Corp.*, 506 N.Y.S.2d  453 (N.Y. App. Div. 1986); *CosmoCom, Inc. v. Marconi Commc'ns Int'l Ltd.*, 261 F. Supp. 2d 179 (E.D.N.Y. 2003); *cf. Hyatt Corp. v. Women's Int'l Bowling Cong., Inc.*, 80 F. Supp. 2d 88, 96 (W.D.N.Y. 1999).

27      [12] GSK's goal, well-known to Abbott, in entering the license was to increase its Lexiva

28  profits through co-promotion.  *See above* 3:1-11.  Abbott targeted those profits and its acts could have caused no harm besides reducing GSK's profits.

3d 1064, 1071 n. 5 (8th Cir. 2000); *Valve Corp. v. Sierra Entm't, Inc.*, 431 F. Supp. 2d 1091, 1101-02 (W.D. Wash. 2004).  Moreover, even if Article X were read to cover lost profits, a triable issue of fact would exist as to whether it is nevertheless unenforceable due to Abbott's bad faith. *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 384-85 (N.Y. 1983) (exculpatory clause unenforceable when the misconduct involves bad faith or reckless indifference to the rights of others); *see S. Erectors, Inc. v. City of New York*, No. 90-CIV-5651,1992 U.S. Dist. LEXIS 8704 (S.D.N.Y. June 16, 1992); *Great N. Assocs., Inc. v. Cont'l Cas. Co.*, 596 N.Y.S.2d 938, 940 (N.Y. App. Div. 1993).[13]  As detailed above, there is ample evidence of Abbott's bad faith, including its targeting of GSK while busily amending its own contracts to protect itself.

Given the factual issues with GSK's lost profits damages, Abbott's contention that GSK cannot recover restitutionary damages is moot.  It is also wrong. ██████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████ Calamari Decl., Ex. 23 ¶ 7.1. ████████

████████████████████████████████████████████████████

████████  Without using the term, Abbott suggests that GSK's evidence should be excluded under the parol evidence rule.  But New York permits parol evidence, even with an integration clause, if the contract is ambiguous.  *Telemundo Group, Inc. v. Alden Press, Inc.*, 580 N.Y.S.2d 999 (N.Y. App. Div. 1992). ██████████████████████████████████████

██████████████████████████████████████████████████████████████████ Abbott has no

---

[13] Abbott cannot argue that the economic gain it reaped from the price hike means that its conduct was not malicious or in bad faith.  "Economic self-interest is the motivation for fraud, self-dealing, and breach of fiduciary duty; it does not excuse such misconduct nor preclude an injured party from seeking redress in the courts."  *Banc of Am. Sec. LLC v. Solow Building Co. II*, 847 N.Y.S.2d 49, 55 (N.Y. App. Div. 2007) (citations omitted).  Rather, the inquiry focuses on whether the defendant aimed solely to better itself, or also to harm the other party.  *See id.* at 57 (citations omitted) (majority's counter to dissent, explaining that the question is if the defendant's gain was for the defendant's "legitimate economic self-interest, or alternatively, whether it evinces the intent to inflict economic harm on" the plaintiff; if the fact finder could find the latter that would "render[] the limitation on recovery contained in the lease unenforceable as a matter of public policy").

1   argument that this unambiguously establishes that the terms were set independently; if anything, it

2   is ambiguous as it suggests they were not. ███████████████████████████████

3   ████████████████████████████████████████████████████████████████████

4   ██████████████

5   **II.     Summary Judgment Should be Denied on GSK's Claim Under the North Carolina**

6   **Unfair and Deceptive Trade Practices Act**

7           Abbott's arguments for summary judgment against GSK's North Carolina Unfair and

8   Deceptive Trade Practices Act (UDTPA) claim also amount to a retread of arguments this Court

9   rejected on Abbott's motion to dismiss.  As GSK has brought forth sufficient evidence to support

10  its allegations within the legal framework the Court has already recognized, *see Meijer*, 544 F.

11  Supp. 2d at 1008, summary judgment on this claim cannot be granted.[15]

12          **A.     GSK can prove Abbott conduct that was "unfair."**

13          Abbott recognizes that the Court has already ruled that the acts alleged by GSK constitute

14  "unfair" acts under the UDTPA as a matter of law, so that the remaining question is really only

15  whether the evidence creates issues of fact as to the veracity of GSK's allegations.  *See* Abbott Br.

16  22 (quoting *Meijer*, 544 F. Supp. 2d at 1008, that "GSK has alleged conduct that could be

17  considered 'unfair' or 'deceptive' under the Act" and then suggesting a failure of evidence).  But,

18  Abbott then proceeds to argue law.  Abbott first incorrectly argues that, as a matter of law, no

19  UDTPA claim can stand without a breach of contract.  *Id.* at 23.  Abbott's lone citation, *McLamb*

20  *v. T.P. Inc.*, 619 S.E.2d 577 (N.C. Ct. App. 2005), contains no such principle.  In *McLamb*, the

21  UDTPA claim failed not for the lack of an unfair act (e.g., no contract breach), but for lack of

22

23

---

24          [14] Abbott's citations to cases involving requests to rewrite contracts, *see* Abbott Br. at 22, are inapposite because Abbott has fundamentally erred in its description of the remedy GSK seeks.

25  ████████████████████████████████████████████████████████████████████

26          [15] This section addresses only N.C. Gen. Stat. § 75-1.1, as Abbott's motion does not even
27  mention GSK's fourth claim under N.C. Gen. Stat. § 75-2.1.  Abbott does not try to sweep this
    claim into its federal antitrust arguments, perhaps because it now realizes that one cannot assume
28  North Carolina courts would simply follow federal precedent, *see Teague v. Bayer AG*, 671 S.E.2d
    550, 556-58 (N.C. Ct. App. 2009).  Thus, GSK's § 75-2.1 claim necessarily survives.

2287856.13 08

1   damages.[16]  As demonstrated by the Fourth Circuit in *South Atlantic Ltd. Partnership of Tennessee*

2   *v. Riese*, 284 F.3d 518, 540 (4th Cir. 2002), UDTPA liability can attach even when there is no

3   breach, if one party's "exploitation of its rights under the Partnership Agreement is sufficiently

4   egregious . . . ."  There, one partner in a real estate development partnership timed its expulsion of

5   the other partner so that the jettisoned party would receive, by the contract's terms, no

6   compensation for its efforts; despite the conformance with the letter of the contract, a UDTPA

7   violation was still found.  *Id.* at 538-40.

8        Abbott next argues that intentional breaches alone are insufficient, so that "substantial

9   aggravating circumstances" must be present to violate the UDTPA.  Thus Abbott concludes:

10   "GSK's contract *allegations* cannot support the UDTPA claim."  Abbott Br. at 23 (emphasis

11   added).  Not only does this ignore the Court's prior ruling, it also ignores the evidence that GSK

12   has accumulated of "substantial aggravating circumstances." ███████████████████

13   ███████████████████████████████████████████████████████

14   █████████████████████████████████████████████████████████

15   █████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████

17   ████████████████████████████████ *See above* 3:13-19; *see also*

18   Exs. 21; 59; 62 at NOR00000593, 595. ██████████████████████████

19   ████████████████████████ *See*, *e.g.*, Exs. 21 at RIT0437394-395; 45 ¶¶ 74-94;

20   72 at NOR00082785-786.  A jury could make findings of these facts—and, under the law, those

21   findings would support a conclusion that Abbott violated the UDTPA.  Moreover, even without a

22   contract breach, this evidence suffices to create an issue of fact as to whether Abbott violated the

23   UDTPA by engaging in "'inequitable assertion[s]' of power," *S. Atl. Ltd P'ship of Tenn.*, 284 F.3d

24   at 540 (quoting *Gray v. North Carolina Insurance Underwriting Ass'n*, 529 S.E.2d 676, 681 (N.C.

25

26   ───────────────────
     [16] The *McLamb* court first rejected plaintiffs' contract claims because no valid contracts
     existed.  *Id.* at 582.  Next, because "the damage to plaintiffs, if any, was the loss of their contract

27   rights," the lack of contracts meant there were no damages for the UDTPA claim: "[B]ecause
     plaintiffs did not have any contract rights . . . they could not allege any damage by virtue of

28   defendant's alleged unfair and deceptive acts."  *Id.* at 583.  *McLamb* did not hold that because
     there was no breach there could be no unfair act.

1  2000)), and unscrupulous behavior, *see Marshall v. Miller*, 276 S.E.2d 397, 403 (N.C. 1981)

2  (practice "unfair" when it "is immoral, unethical, oppressive, unscrupulous, or substantially

3  injurious to consumers.") (citation omitted).

4          **B.      GSK can prove Abbott conduct that was "deceptive."**

5          Addressing the "deception" prong of the UDTPA, Abbott again focuses on one fact while

6  ignoring all others.  The FDA did find that Abbott's chart was misleading for comparing "a

7  subtherapeutic dose of Norvir . . . to the labeled dosing regimens of other antiretroviral agents"

8  and for "impl[ying] that Norvir may be used other than in combination therapy."  Hurst Ex. T at

9  Ex. 1.  This chart contributed to GSK's problems, Ex. 23 at 335:16 (chart "added to the fervor"

10  caused by price hike), but it is far from Abbott's only deceptive act.  Abbott offered public

11  explanations for the hike that focused on patient access and the changing role of Norvir, when its

12  true motives circled around harming its competitors ███████████████████████████████

13  ███████  Ex. 19 at NOR00096647; *see above* 5:11-6:3.  Furthermore, Abbott trumpeted steps it

14  was supposedly taking to reduce the effect on patients covered by government programs when it

15  did nothing more than comply with the law.  Ex. 34 at 166-67.  And, Abbott sold its public pledge

16  to freeze Norvir's price to ADAPs as a magnanimous act, when in fact it was done to save Abbott

17  money—an estimated $900,000 in 2004 alone—because honoring the rebates under Abbott's old

18  ADAP agreement would have resulted in Abbott paying the ADAPs for Norvir.  *See* Exs. 47 & 48.

19          Abbott's own cases explain that GSK need not prove actual deception.  If a practice has the

20  capacity or tendency to deceive, it is deceptive for the purposes of the statute.  *Rucker v. Huffman*,

21  392 S.E.2d 419, 421-22 (N.C. Ct. App. 1990).  Here, Abbott's failure to be straightforward about

22  its motives and the hike's implications in the market clearly had the capacity to deceive.  Ex. 49 at

23  194:24-195:12 (pricing rules "difficult" and "complicated area for everyone to understand").

24  Thus, the lack of specific testimony that GSK was deceived by the Norvir price chart is irrelevant.

25  Abbott's overly narrow focus on the chart and individual witnesses is also the flaw in its proximate

26  cause argument.  Abbott fails to grapple with the fact that GSK was harmed by the overall level of

27  confusion in the market caused by the price hike, which Abbott's misleading communications

28

GSK'S OPPOSITION TO ABBOTT'S SUMMARY JUDGMENT MOTION
CASE NO. C 07-5702

2287856.13  08

1    exacerbated.  *See above* 5:11-6:3.[17]  Given this evidence, GSK is entitled to a trial of its UDTPA

2    claim.

3    **III.    Triable Issues of Fact Exist With Respect to GSK's Sherman Act Claim.**

4         **A.    Abbott's Declining Market Share Does Not Defeat GSK's Antitrust Claim.**

5         Abbott argues, mostly in its motion aimed at the Directs (at 15 -18), that evidence of

6    Kaletra's declining market share is fatal to the antitrust claims.  GSK understands the Directs will

7    explain why this argument fails and observes only that Abbott's reliance on *United States v. Syufy*

8    *Enterprises*, 903 F.2d 659 (9th Cir. 1990), is misplaced.  Assessing a textbook example of an

9    industry with low barriers to entry, the court affirmed a judgment for the defendant, citing

10   evidence that it had not raised prices and that, within two years of the merger at issue, a competitor

11   had entered and outperformed the defendant by one key measure of market share.  *Id*. at 666-67 &

12   n. 11.  The evidence here is very different:  Abbott raised the price of both Norvir and Kaletra, and

13   barriers to entry are high.  For roughly three years there was no new entry, and Abbott maintained

14   a market share of 50% or more.  Ex. 50 at 84-89, 108-115 & Ex. 4a; Ex. 69 ¶¶ 77, 114-15.

15        **B.    GSK has sufficient evidence of anticompetitive conduct to preclude a grant of**

16             **summary judgment.**[18]

17             **1.    GSK's evidence of Abbott's anticompetitive conduct.**

18        GSK asserts that, through the Norvir price hike, Abbott violated a duty to deal, a long-

19

20        [17] Abbott tries to graft an additional actual reliance requirement, as opposed to a simple
     showing of proximate causation of damages, upon deception-based UDTPA claims.  But, Abbott's
21   authority, *Hospira Inc. v. AlphaGary Corp.*, 671 S.E.2d 7 (N.C. Ct. App. 2009), does little to
     dispel the confusion in North Carolina law.  The *Hospira* court did not explore the issue; it labeled
22   *Cullen v. Valley Forge Life Ins. Co.*, 589 S.E.2d 423 (2003), as an insurance case and ignored
     language in *Cullen* that it involved a § 75-1.1 claim.  *Compare Hospira Inc.*, 671 S.E.2d at 12 *with*
23   *Cullen*, 589 S.E.2d at 431.  In any case, even if the formal requirements of deception are not met
     here, it is surely unfair to advantage one's product with misleading communications.

24        [18] Abbott's motion ignores two theories of anticompetitive conduct that GSK put forward
25   in its opposition to Abbott's motion to dismiss, what the Court characterized at oral argument as
     "monopoly leveraging plus" and the theory based on *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d
26   768 (6th Cir. 2002).  Doc. # 182 at 22-24.  Both are viable theories, and Abbott's failure to address
     them is alone reason to reject its argument that GSK has failed to show anticompetitive conduct.
27   By failing to attack those theories, Abbott has waived its right to do so on reply.  Additionally, if
     this Court concludes that Direct Purchasers are entitled to go to trial on a theory that Abbott
28   violated the "equally efficient competitor test," GSK's complaint and the evidence submitted with
     this opposition are sufficient to allow GSK to proceed on that theory as well.  *Id.* at 3 n.1.

standing theory of Section 2 liability discussed at length in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).  In its order denying Abbott's motion to dismiss, this Court set forth the key facts in *Aspen Skiing*, Dkt. #195 at 11- 12 (1/12/10 Order)*,* evaluated the reasoning in that case and subsequent ones discussing it, *id*. at 12-14, and concluded that plaintiffs had stated a claim like the one found sufficient in *Aspen Skiing*.  *Id.* at 14-15.  The record now before the Court substantiates the allegations cited in that order and, in all material respects, parallels *Aspen Skiing*.

The parallels start with the origins of the defendant's duty to deal.  Similar to Ski Co.'s years of offering a joint lift ticket with other resort operators, Abbott had engaged for years in multiple acts encouraging others to develop and market PIs for boosting with Norvir.  Abbott understood Norvir's boosting properties and applied for a method patent around the time of its launch in 1996.  Ex. 30 at 49:12-59:15; Ex. 31 at 17:5-21:23; *see* Ex. 51.  Knowing it would increase sales of Norvir, in early 1996, Abbott cooperated with Hoffmann-LaRoche to sponsor a study of Norvir's boosting effects on Hoffmann-LaRoche's PI, saquinavir.  *See* Ex. 79; Ex. 50 at ¶ 46. ███████████████████████████████████████████████████

███████████████    *See* Ex. 3.  Abbott undertook a practice of taking only small inflation-level increases in Norvir's price, and continued that practice even after Norvir's daily dosage had fallen drastically and boosting had become the standard of care.  Ex. 71 at  NOR00112052; Ex. 52 at ¶¶ 44-46, Ex. 53 at 69:17-20; Ex. 54 at 45:8-11, Ex. 55 at ¶ 15. ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████    *See* Calamari Decl., Ex. 22-25; Stockinger Decl., Ex. 1 at 31:8-16; Ex. 50 at Ex. 5.  These actions made economic sense.  Ex. 50 at 95-101.  Just as the competitive dynamic had given rise to a long-standing pattern of cooperative conduct by Ski Co. in *Aspen Skiing*, Abbott adopted a long-standing cooperative approach with Norvir.

Then, Abbott, like Ski Co., made a sudden decision to break from its long-standing conduct in order to harm its competitors.  Ski Co. had hoped to capture revenues by discontinuing the all-area ticket, and deliberately extended a revenue-sharing offer that it knew Highlands could not accept—evidence of intent that the Supreme Court found probative.  *Aspen Skiing,* 472 U.S. at 592; *see also* 1/12/10 Order at 12.  Abbott's actions too were driven by anticompetitive intent.

- 19 -

1   Kaletra had become the dominant boosted PI.  *See* Ex. 50 at Ex. 4a.  Abbott feared competition

2   from new boostable PIs would change that, ████████████████████████████████████████

3   ████████████████████████████████████████████████████████████ Ex. 56 at ABL-

4   IL-0024733; *see* Ex. 16 at NOR00013358; Ex. 57 at NOR00007335 & 358.

5   ██████████████ Ex. 58 at 31:14-22, ██████████████████████████████████

6   ██████████████████████████████████████████████████████ Ex. 20 at 180:14, 179:3-

7   6; *see id.* at 179:3-180:14; Ex. 82 at 123:12-23; Ex. 59 at NOR00001267. ████████████

8   ████████████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████████████

10   ██████████████████████████ Ex. 32 at 155:16) ████████████ Ex. 16 at

11   NOR00013358-359; Ex. 15; Ex. 60; Ex. 59. ████████████████████████████

12   ████████████████████████████████████████ Ex. 61 at RIT0437369,

13   RIT0437370; *see also* Ex. 62 at NOR00000601; Ex. 50 at 102-108. ████████████████

14   ████████████████████████████████████████████████████████████████████

15   ████████████████████████████████████ Ex. 21 at RIT0437394-395; *see* Ex. 72 at

16   NOR00082785-786; Ex. 20 at 141:12-22; Ex. 18 at 148:22-149:3; Ex. 63 at 121:2-13.

17       In *Aspen Skiing,* the Court assessed the impact of the change in conduct on consumers, the

18   plaintiff and Ski Co. to determine whether the conduct was anti-competitive.  In all material

19   respects, the impacts here echo *Aspen Skiing*.  In both, customers "infuriated" by the action

20   complained vehemently,[19] and accepted options they deemed less desirable.[20]  In both, usage

21   ───────────────────────────────

22   [19] There, the Court addressed whether consumers were "adversely affected by the elimination" of the joint ticket, finding significant that some were "infuriated" by the change and complained to plaintiff Highlands.  472 U.S. at 606-07 & n.36 (quoting testimony).  Here, doctors'

23   ire and confusion equally stymied GSK's marketing efforts, as the 200 mg of Norvir required to boost Lexiva had increased in price from $3.43 to $17.14.  Ex. I at NOR00383326; *see generally*

24   Ex. 5 at 330:4-334:6.  One of Abbott's sales managers had predicted to his colleagues that "people would go crazy" if Abbott "raised the price [of Norvir] more than your standard CPI," Ex. 63 at

25   125:18-24, and that is indeed what happened.  Doctors wrote to Abbott to express their outrage—including Abbott's medical expert in this case, who later explained that he had signed a protest

26   letter "out of emotion."  Ex. 64; Ex. 53 at 191:13; *see, e.g.*, Exs. 65, 66 & 67; Exs. M & N.

      [20] Compare 472 U.S. at 594, 606-07 with the testimony of GSK's physician expert, Dr.

27   Javeed Siddiqui.  Dr. Siddiqui testified that "patients were talking about this [the 400 percent price hike] constantly, so in turn the providers were talking about this constantly."  Ex. 23 at 241:8-10.

28   He explained that patients asked to be switched from Norvir because "their co-pays [had] gone up" or the tiering of their drugs on insurance formularies had become less favorable.  *Id.* at 248:2-6;

- 20 -

1   shifted in favor of the monopolist's product harming plaintiff[21] and rewarding the monopolist.[22]

2   And, in both evidence existed that the change in conduct arose from anti-competitive motives.[23]

3          The Court in *Aspen Skiing* also found it significant that Ski Co. changed its prices to make

4   Highlands' substitute product prohibitively expensive.  472 U.S. at 594 n.15, 607-08.  Here, the

5   timing and magnitude of Abbott's unprecedented price hike left GSK with no economically viable

6   response.  GSK's value proposition, parity pricing with Kaletra, already existed as a reference

7   point when Abbott acted, hindering any effective price-cutting response from GSK.  Ex. 45 at

8   ¶ 82; *see also* Ex. 69 at ¶¶ 53-54; Ex. 70 at ¶¶ 45-46.  Government pricing rules impacted GSK's

9   ability to respond:  because the government must receive lower prices offered to private entities,

10

11   242:8-11; 247:1-13; 280:12-19; 307:17-308:2.  He also testified that of his 200 to 300 patients per
     year, 15 to 20 patients in 2004 and around 10 patients in 2005 asked to switch off Norvir, and he

12   complied by switching ninety percent of them to Kaletra.  *Id.* at 256:9-25 & 306:6-18; 266:23-
     267:2.  In addition, Dr. Siddiqui provided names of six other doctors whose patients also asked to

13   be switched because of the price hike.  *Id.* at 272:6-273:8; 274:12-18; 276:8-24; 277:17-25; 283:5-
     284:14.  Several other physicians informed GSK sales representatives that they were not

14   prescribing Lexiva because of price, and the issue was raised at GSK advisory boards.  Ex. 22 at
     131:7-131:25; 283:16-284:24; Ex. J at GSKABB00611007; Ex. K at GSKABB00036946.

15
     [21] Compare 472 U.S. at 607-08 with testimony of GSK's marketing expert, Professor
16   Robert Dolan.  Professor Dolan testified that the price increase destroyed the value proposition
     GSK had created for Lexiva by moving it from parity pricing to a 77% premium above Kaletra.

17   Ex. 45 ¶¶ 51-66, 69.  The evidence also shows GSK's sales force became mired in questions about
     the price hike's implications and were unable to reach doctors who had gone into "lock-down

18   mode."  Ex. 22 at 283:16-285:2, 290:21-291:17, *see id.* at 73:15-74:19, 80:19-81:11, 132:9-
     132:15; Ex. 5 at 168:11-168:18.  Dr. Siddiqui, who spoke to physicians about Lexiva during this

19   time, had a similar experience.  Ex. 23 at 325:13-326:5.  The damage to Lexiva was long-lasting,
     because physician prescribing practices solidify after the launch period during which doctors were

20   open to spending valuable time absorbing new information, and because physicians need to
     acquire early experience with a drug to gain comfort in prescribing it.  Ex. 45 ¶¶ 33-35, 43-44, 72-

21   76, 89; *see also* Ex. 52 ¶¶ 71 & 72; Ex. 23 at 345:24-346:1; Ex. 5 at 179:23-181:1. ▮▮▮▮▮▮▮
     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *See*

22   Ex. 38 at Ex. 15.
     [22]▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Ex. 50 at 109-14; Ex. 38 at
     ¶¶ 93-97.▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Ex. 50 at 108-15 & Ex. 4a.

25      [23] *See* 472 U.S. at 608 (finding evidence of anti-competitive intent sufficient to support
     jury's conclusion that conduct was not "justified by any normal business purpose.").  As the

26   Court's previous order recognized, even at the pleading stage plaintiffs' complaints already
     "quote[d] documents and emails to corroborate their claims of anticompetitive motive."  Dkt.

27   #195 at 14 (1/12/10 Order).  Those documents and more are now in evidence, ▮▮▮▮▮▮▮▮▮▮▮
     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Ex. 50 at 134-42; *see also* Ex. 69 at

28   ¶¶ 25-28.

- 21 -

2287856.13  08

1   any price cut by GSK would necessarily have to be given to public payors as well as private

2   payors, despite that government rules had prevented Abbott from inflicting the Norvir price hike

3   on public payors.  Ex. 50 at 123-24.  Thus, responding with a lower private payor price would

4   require GSK to take an unnecessary cut in the public sector.  *Id.*  The resulting loss in revenue

5   would have been so severe that increased sales would not cover the shortfall.  *Id.* at 124; Ex. L at

6   GSKABB00383337; Ex. I.  Abbott's action impaired equally efficient competitors of boosted PIs,

7   as any competitor with an equivalent variable cost structure to Abbott's would have had to sell its

8   PI at a loss in order to match lopinavir's imputed price.  *See* Ex. 50 at 118-120.  It is only because

9   Lexiva's attributes are differentiated from Kaletra that it survived at all following the

10  unprecedented Norvir price hike.  *Id.* at 123-24.

### 2.   Abbott's "no effective refusal to deal" argument fails.

12        To make an argument that it did not breach its duty to deal, Abbott focuses on a laundry

13  list of facts that supposedly "utterly refute" the evidence that the Norvir price hike impacted sales

14  of boosted PIs.  But, Abbott's argument turns upon narrowing the relevant inquiry and then

15  ignoring context and the evidence that creates triable issues of fact.

16        This Court framed the anticompetitive conduct issue as whether "the 400 percent price

17  increase on Norvir placed GSK and Abbott's other competitors in the untenable position of selling

18  their boosted PIs at a price that could not compete with Kaletra."  Dkt. # 194 at 15 (1/12/10

19  Order).  As illustrated in the preceding section, whether Abbott's competitors were placed in an

20  "untenable position" depends on more than just Norvir's total price.  Also at play are the market

21  dynamics of launch and promotion, as well as competitors' abilities to respond in an economically

22  rational way given the impact of the government pricing rules.  *See Conwood*, 290 F.3d at 782 ("In

23  a § 2 case, 'only a thorough analysis of each fact situation will reveal whether the monopolist's

24  conduct is unreasonably anticompetitive and thus unlawful.'") (quoting *Byars v. Bluff City News*

25  *Co.*, 609 F.2d 843, 860 (6th Cir. 1979)).  Abbott cannot truncate that analysis by trotting out facts

26  it likes devoid of context and claiming they show it did not "effectively" refuse to deal.

27        Significantly, instead of comparing the relative difference between worlds with and

28  without the price hike—which is the only way to assess competitive effects—Abbott, focuses

- 22 -

1   myopically on the competition that did emerge despite its best efforts.  *See Conwood Co.*, 290

2   F.3d at 788-790 (6th Cir. 2002) (output expansion and defendant's market share decline in actual

3   world not dispositive because "the issue is whether the market would have grown more absent

4   USTC's antitrust violation.").  For instance, Abbott proffers numbers of Norvir prescriptions that

5   sound large in isolation, in the hopes that material issues of fact posed by sound economic analysis

6   might be overcome by hyperbole.[24]  Abbott Br. at 10-12.  ████████████████████████

7   ████████████████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████████████████

9   ███████████████████████████████████████████████  Ex. 50 at 110-14; Ex. 38 at

10  ¶¶ 93-97 & Ex. 15; *see* Ex. 69 at ¶ 34.  ████████████████████████████████████

11  ████████████████████████████████████████████████████████████████████████████

12  ████████████████████████████████  Ex. 72 at NOR00082785-786.  Abbott's experts

13  insist that, by convincing physicians of the merits of Lexiva, GSK should have been able to avoid

14  any concerns about its price when boosted by Norvir, *see, e.g.*, Ex. 55 at ¶ 104, but this argument

15  only strengthens GSK's point:  the evidence shows that physicians went into "lock-down mode"

16  and would not listen to GSK's marketing message.  Ex. 22 at 283:16-284:24.

17          Similarly, Abbott points to GSK's combined Lexiva and Agenerase sales[25] of more than $1

18  billion.  Abbott fails to note, however, the amount GSK invested in Lexiva research and

19  development ($750 million), Ex. H at GSKABB00663405, Kaletra's sales over the same period

20  ($7.2 billion), Prowse Decl. ¶ 2, ████████████████████████████████████████████

21  ██████  Ex. 38 at Ex. 15, █████████████████████████████████████████████████

22  ████████████████████████████████  Ex. 14 at 288:15-16.  Nor does Abbott ever contend

23  with Dr. Noll's explanation about how, in a differentiated market such as this one, even products

24  that have been harmed by anticompetitive acts will have sales – a proposition with which Abbott's

25  own economic expert agrees.  Ex. 50 at 123; Ex. 14 at 171:2-6, 174:15-176:3.

26  _____

    [24] Abbott also proffers numbers about the total sales of other boosted PIs.  Abbott Br. 9,
27  11.  Since all boosted PIs, other than Kaletra, require a prescription of Norvir, this is really another
    way of saying the same thing.  These statistics add nothing to Abbott's argument.

28      [25] Although the motion claims this number to be a Lexiva-only figure, the Hay Declaration
    makes clear it is a combined total.  *See* Hay Decl. ¶¶ 8-9.

1    Finally, Abbott's fixation on the current status of Reyataz and how that "would be

2  impossible had Abbott actually refused to make Norvir available," Abbott Br. at 12, misses the

3  point.  The issue is not whether there was an outright refusal, *see* Dkt. #195 at 14 (1/12/10 Order)

4  ("However, precedent does not require an outright refusal."); nor is it whether Abbott maintained

5  monopoly power indefinitely.  *See, e.g., United States v. Microsoft*, 253 F.3d 34, 57 (D.C. Cir.

6  2001) (long term market conditions irrelevant; issue is whether there are near term constraints on

7  power of monopolist).  Rather, the key is whether Abbott illegally "acquired, enhanced, or

8  maintained" its monopoly power through anticompetitive means.  ABA Section of Antitrust Law,

9  Antitrust Law Developments (6th Ed. 2007) at 225 (citing *Verizon Commc'ns Inc. v. Law Offices

10  of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)).

11    Abbott's remaining factual arguments stand only if one turns a blind eye to GSK's

12  evidence.  As detailed above, GSK has sufficient evidence of doctors changing their prescribing

13  habits to create a material issue of fact.  *See above* n. 20-21.  Abbott's focus on patients' out-of-

14  pocket costs after insurance or government benefits does not negate GSK's evidence as to doctors'

15  behavior, or their concerns about varying patient coverage, systemic costs, and the effectiveness of

16  government procurement rules.  Ex. 52 ¶¶ 66-69, 76-81; Ex. 45 ¶ 48, Ex. 50 at 130-32.  Abbott has

17  its view of doctors' behavior and motivations, and GSK has its contrary evidence.  There is a

18  material issue of fact on the impact of boosted PI prices on sales, precluding summary judgment

19  on whether Abbott violated its duty-to-deal.

20      **3.    Abbott's argument that it did not terminate a course of dealing fails.**

21    Abbott's summary judgment papers on this point[26] largely regurgitate its failed motion to

22  dismiss arguments, with the only difference being that Abbott locates its "requirements" for

23  finding a duty to deal violation not in *Trinko*, but in the Ninth Circuit's *MetroNet Services Corp. v.*

24      [26] This portion of Abbott's papers is somewhat confusing.  It asserts, but does not argue,

25  that to be liable it must refuse to sell on terms available to direct customers.  Abbott Br. at 14.
   This is a variant (also previously made) of its rejected argument that there must be an outright

26  refusal to deal.  *See* Dkt. #195 at 15 (1/12/10 Order).  Abbott also seems to find some importance
   in the absence of an express term in the GSK-Abbott boosting license with respect to Norvir's

27  price. While GSK refutes Abbott's claims relating to the license above in sections I.B, C, & D, this
   issue is really distinct from the antitrust duty-to-deal; the antitrust duty arises not from a specific

28  contract, but a long-standing, voluntary course of conduct that arose in a competitive market.
   *Aspen Skiing*, 472 U.S. at 603-04.  The license is but one aspect of Abbott's course of conduct.

- 24 -

2287856.13  08

1 | *Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004).[27]  *Compare* Abbott Br. 14 *with* Dkt. # 180 at 19-21.

2 | As this Court previously explained in rejecting Abbott's "requirements":

> 3 | Abbott also maintains that a duty to deal violation requires Plaintiffs to show it had
>
> 4 | a "willingness to forsake short-term profits."  However, in <u>Trinko</u> and <u>MetroNet</u>,
>
> 5 | the Supreme Court and the Ninth Circuit inquired into the effect on the defendants'
>
> 6 | short-term profitability to determine whether the defendants were motivated by
>
> 7 | anticompetitive intent. . . .  Proof of a short-term sacrifice is not an element of a
>
> 8 | Section 2 claim, but rather a means to show anticompetitive motives.

9 | Dkt. #195 at 15-16 (internal citation omitted).  Abbott's argument is not new; Abbott previously

10 | cited and discussed *MetroNet*, and the Court rejected its argument.  The Court was correct in

11 | doing so.  *See also Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir.

12 | 1990); Dkt. # 182 (GSK Opp. to Abbott MTD) at 15-17.  In any event, GSK has adduced evidence

13 | of Abbott's willingness to forsake, and its actual forsaking of, short-term gains.  *See* Ex. 50 at 118-

14 | 122.

15 |      Abbott's only other contention is a rehash of its failed administrability argument.  *See* Dkt.

16 | #180 at 20.  As GSK has already explained, this case raises no such questions because GSK is not

17 | seeking injunctive relief, and there is "a long-standing course of conduct . . . involv[ing] a specific

18 | and measurable pricing practice" that illustrates practices in a competitive market.  Dkt. #180 at

19 | 19.  How or why this issue should result in summary judgment, Abbott never really says, and it is

20 | in fact not unprecedented for antitrust courts to get involved in issues of what is and is not a

21 | reasonable price.  *See, e.g.*, *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 n. 8 (3rd Cir.

22 | 2007) (noting that antitrust liability cannot be avoided because court must determine what fair,

23 | reasonable and non-discriminatory royalty would be).

24 | **<u>CONCLUSION</u>**

25 |      For the reasons stated herein, this Court should deny Abbott' motion.

26 |
27 |
28 |

---

[27] Abbott also continues to try discrediting *Aspen Skiing* as a disfavored theory, ignoring the Supreme Court's clear recognition of its continuing vitality in *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 129 S. Ct. 1109, 1118 (2009) ("[t]here are … limited circumstances in which a firm's unilateral refusal to deal with its rivals can give rise to antitrust liability").

- 25 -

1    Dated:  September  9, 2010                    Respectfully submitted,

2                                                  IRELL & MANELLA LLP

3

4                                                  By:_____/s/ Alexander F. Wiles_____
                                                          Alexander F. Wiles
5

6              Pursuant to General Order No. 45, Section X, I attest under penalty of perjury that

7    concurrence in the filing of this document has been obtained from Alexander F. Wiles.

8

9    Dated:  September  9, 2010                    By:_____/s/ S. Albert Wang_____
                                                          S. Albert Wang
10                                                        IRELL & MANELLA LLP
                                                          Attorneys for GlaxoSmithKline
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                              - 26 -