1   IRELL & MANELLA LLP
    Alexander F. Wiles (CA 73596) awiles@irell.com
2   Brian Hennigan (CA 86955) bhennigan@irell.com
    Trevor V. Stockinger (CA 226359) tstockinger@irell.com
3   S. Albert Wang (CA 250163) awang@irell.com
    1800 Avenue of the Stars, Suite 900
4   Los Angeles, California 90067-4276
    Telephone:   (310) 277-1010
5   Facsimile:    (310) 203-7199

6   ARNOLD & PORTER LLP
    Kenneth A. Letzler (*Admitted Pro Hac Vice*) Kenneth_Letzler@aporter.com
7   Daniel S. Pariser (*Admitted Pro Hac Vice*) Daniel_Pariser@aporter.com
    555 Twelfth Street, NW
8   Washington, DC  20004-1206
    Telephone:   (202) 942-5000
9   Facsimile:    (202) 942-5999

10  *Attorneys for Plaintiff GlaxoSmithKline*

11

12                  **UNITED STATES DISTRICT COURT**

13                 **NORTHERN DISTRICT OF CALIFORNIA**

14                      **OAKLAND DIVISION**

15  SMITHKLINE BEECHAM CORPORATION          **Case No. C 07-5702 (CW)**
    d/b/a GLAXOSMITHKLINE,
16
                     Plaintiff,            **GLAXOSMITHKLINE'S RESPONSE
17                                         TO ABBOTT'S SUPPLEMENTAL
                                           BRIEF IN SUPPORT OF ABBOTT
18       v.                                LABORATORIES' MOTION FOR
                                           SUMMARY JUDGMENT ON GSK'S
19  ABBOTT LABORATORIES,                   FIRST AMENDED COMPLAINT**

                     Defendant.
20
                                           Date:        October 28, 2010
21                                         Time:        2:00 p.m.
                                           Courtroom:   2 (4th Floor)
22                                         Judge:       Hon. Claudia Wilken

23
                        **[Filed Under Seal]**
24

25

26

27

28

1

<u>TABLE OF CONTENTS</u>

2

<u>Page</u>

3

INTRODUCTION.................................................................................................1

4

ARGUMENT .....................................................................................................1

5
6

    I.     GSK Is Entitled To Proceed To Trial On Each Of Its Four Theories Of Anti-Competitive Conduct Under Section 2 Of The Sherman Act. ..................................................................................................1

7
8

         A.    GSK's Theory that Abbott Used Its Norvir Monopoly to Evade Regulation at Consumer Expense Should Proceed to Trial. ................................................................................................1

9

         B.    Substantial Evidence Supports a Sabotage Theory of Liability. ...............................................................................4

10
11

         C.    GSK Need Not Amend to Proceed with a Theory of Liability Based on Abbott's Monopoly Bundling Scheme. ........................6

12
13

         D.    This Court Previously Held that Liability for Violation of a Duty to Deal Can Attach if Abbott's Norvir Price Hike Amounts to a Practical Refusal to Deal, and Ample Evidence Exists that it Does...........................................................7

14
15
16

    II.    Even If GSK's Lost Profits Are Not Direct Damages, The Evidence Of Abbott's Bad Faith, Willful, Malicious Or Grossly Negligent Conduct Raises A Triable Issue Of Fact As To GSK's Right To Collect Them As Damages For Abbott's Breach Of Contract.........................8

17

CONCLUSION ...................................................................................................10

18
19
20
21
22
23
24
25
26
27
28

- i -

2334706

1

<u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

**<u>Cases</u>**

4

*Alaska Airlines Inc. v. United Airlines, Inc.,*
    948 F.2d 536 (9th Cir. 1991)...................................................................... 1, 3

5

*Am. Council of Certified Podiatric Physicians & Surgeons v.*
6     *Am. Bd. of Podiatric Surgery,*
    323 F.3d 366 (6th Cir. 2003)........................................................................ 5

7

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal*
8     *and Prof. Publ., Inc.,*
    108 F.3d 1147 (9th Cir. 1997)...................................................................... 5

9

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
10     472 U.S. 585 (1985)................................................................................. 7, 8

11

*Banc of America Sec. LLC v. Solow Bldg. Co.,*
    847 N.Y.S.2d 49 (1st Dept. 2007)............................................................. 10

12

*Cascade Health Solutions v. PeaceHealth,*
13     515 F.3d 883 (9th Cir. 2008)........................................................................ 6

14

*Conwood Co. v U.S. Tobacco Co.,*
    290 F.3d 768 (6th Cir. 2002)................................................................ 4, 5, 6

15

*Corinno Civetta Const. Co. v. City of New York,*
16     67 N.Y.2d 297 (1986)............................................................................. 8, 9

17

*David Gutter Furs v. Jewelers Prot. Serv. Ltd.,*
    79 N.Y.2d 1027 (N.Y. 1992)........................................................................ 8

18

*Doe v. Abbott Labs.,*
19     571 F.3d 930 (9th Cir. 2009)..................................................................... 2, 3

20

*Dooley v. Crab Boat Owners Ass'n,*
    2004 WL 902361 (N.D. Cal. Apr. 26, 2004) ...................................... 4, 5, 6

21

*Earthbank Co. v. City of New York,*
22     568 N.Y.S.2d 101 (1st Dep't 1991) ............................................................ 9

23

*Fontana v. Haskin,*
    262 F.3d 871 (9th Cir. 2001)........................................................................ 6

24

*Kalisch-Jarcho, Inc. v. City of New York,*
25     58 N.Y.2d 377 (1983) ............................................................................. 8, 9

26

*Lamoille Valley R.R. Co. v. Interstate Commerce Co.,*
    711 F.2d 295 (D.C. Cir. 1983) .................................................................... 3

27

*MetroNet Serv. v. Qwest Corp.,*
28     383 F.3d 1124 (9th Cir. 2004) ..................................................................... 7

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- ii -

1                                                                                    Page(s)

2

3    *Metropolitan Life Ins. Co. v. Noble Lowndes Int'l,*
          600 N.Y.S. 2d 212 (1st Dept. 1993) ................................................................ 9

4

5    *Metropolitan Life Ins. Co. v. Noble Lowndes Int'l,*
          84 N.Y.2d 430 (1994) ................................................................................ 9, 10

6    *Pac. Bell Tel. Co. v. linkLine Communications, Inc.,*
          129 S. Ct. 1109 (2009) ................................................................................ 2, 3

7

8    *Paschall v. Kansas City Star Co.,*
          727 F.2d 692 (8th Cir. 1984) ............................................................................ 4

9    *Port Dock and Stone Corp. v. Oldcastle Northeastern, Inc.,*
          507 F.3d 117 (2d Cir. 2008) .............................................................................. 4

10

11   *Premier-N.Y. Inc. v. Travelers Prop. Cas. Corp.,*
          20 Misc.3d 1115(A), 2008 WL 2676800 (N.Y. Sup. Ct. July 8, 2008) .......................... 8

12   *Schor v. Abbott Labs.,*
          457 F.3d 608 (7th Cir. 2006) ........................................................................ 2, 3

13

14   *Town of Concord v. Boston Edison Co.,*
          915 F.2d 17 (1st Cir. 1990) .......................................................................... 1, 3

15   *Western Resources, Inc. v. Surface Transp. Board,*
          109 F. 3d 782 (D.C. Cir. 1997) .......................................................................... 4

16   **Statutes**

17   42 U.S.C. § 1396r-8(c)(2) & (2) .......................................................................... 1

18   **Rules**

19   3A P. Areeda & H. Hovenkamp, Antitrust Law ¶ 787b (2d ed. 2002) .......................... 3

20

21

22

23

24

25

26

27

28

**IRELL & MANELLA LLP**
A Registered Liability
Law Partnership Including
Professional Corporations

2334706

1

**INTRODUCTION**

2      In this response to Abbott's supplemental brief in support of its motion for summary

3   judgment, GSK first demonstrates that it is entitled to proceed to trial on each of the four theories

4   of anti-competitive conduct being pursued by the plaintiffs in these related actions.  It then shows

5   that Abbott errs when it contends that New York allows enforcement of exculpatory clauses in the

6   face of bad faith conduct of the type shown by GSK.[1]

7

**ARGUMENT**

8   **I.      GSK Is Entitled To Proceed To Trial On Each Of Its Four Theories Of Anti-**

9   **Competitive Conduct Under Section 2 Of The Sherman Act.**

10          **A.      GSK's Theory that Abbott Used Its Norvir Monopoly to Evade Regulation at**

11          **Consumer Expense Should Proceed to Trial.**

12      Contrary to Abbott's argument, antitrust laws do not give it *carte blanche* to leverage

13   monopoly power in one market to obtain or maintain a monopoly in a second market.  Where a

14   competitor exploits its monopoly power to evade government-imposed price constraints in one

15   market in order to extract more money from consumers in an adjacent market antitrust liability

16   attaches.  *See Alaska Airlines Inc. v. United Airlines, Inc.,* 948 F.2d 536, 548 n. 17 (9th Cir. 1991);

17   *Town of Concord v. Boston Edison Co.,* 915 F.2d 17, 29 (1st Cir. 1990).  GSK has introduced

18   evidence showing that Abbott had a limited ability to exploit its Norvir monopoly because rules

19   governing sales to government programs like Medicaid and AIDS Drug Assistance Programs

20   ("ADAPs") restrained the profitability of price hikes by imposing penalties on sales to those

21   payers, which amount to half or more of all Norvir sales.  *See* 42 U.S.C. § 1396r-8(c)(2) & (2); *see*

22   Ex. 50, at 23-24, 120-21 (discussing pricing rules and impact on Norvir price hike).[2]  For example,

23   the actual Norvir price hike **reduced** Abbott's per unit revenues on public programs from about

24

25      [1] Abbott also argues that the same standard governs GSK's Sherman Act claim and its
   claim under Section 75-2.1 of North Carolina's Unfair and Deceptive Trade Practices Act
   (UDTPA).  GSK has reviewed the law and does not dispute that the same standard applies.   As
26   this Court recognized at the hearing, the standards are quite different as to the unfair and deceptive
   prongs of GSK's claim under Section 75-1.1 of the UDTPA.
27
      [2] Unless otherwise indicated, all references to exhibits are to those attached to the
28   Stockinger Declaration filed in support of GSK's Opposition to Abbott's Motion for Summary
   Judgment.

- 1 -

1  $1.40 per 100 mg of Norvir before the increase to about $0.61 afterwards.  Wang Decl., Ex. 1 ¶¶

2  129 - 135 & Exh. 5.  According to Abbott, however, the ritonavir in Kaletra was already priced to

3  reflect its value as a booster.  *See* Wang Decl., Ex. 1 ¶ 66; Ex. 2, at 199; Ex. 3, at 129.  Thus, a

4  jury could find that Abbott jacked up the list price of Norvir by 400% to drive business from

5  Norvir in the boosting market, where it was price constrained, to Kaletra in the highly-effective

6  boosted PI market, where it could reap a monopoly return.

7       Monopoly leveraging under these circumstances violates the antitrust laws because, unlike

8  in a typical leveraging case, Abbott has an incentive to extend its monopoly to evade the pricing

9  rules and because its conduct harms consumers.  Courts' skepticism of typical monopoly

10  leveraging claims is rooted in a precept of the "Chicago School" of antitrust theory: that in most

11  monopoly leveraging cases a monopolist can only take its monopoly profit once.  One example is

12  Judge Easterbrook's *Schor v. Abbott Labs.*, 457 F.3d 608 (7th Cir. 2006), opinion, which involved

13  the same price increase as here but on a record that did not include the effect of price regulation:

14       The basic point is that a firm that monopolizes some essential component of a
         treatment (or product or service) can extract the whole monopoly profit by charging
15       a suitable price for the component alone.  If the monopolist gets control of another
         component as well and tries to jack up the price of that item, the effect is the same
16       as setting an excessive price for the monopolized component.

17  *Id.* at 612.  Because there is no incentive to leverage in the typical case, Judge Easterbrook

18  reasoned, such conduct will be rare, "self-deterring," and will not hurt consumers.  *Id.*

19       This single monopoly profit (SMP) theory was also the centerpiece of the argument made

20  to the Supreme Court in *Pac. Bell Tel. Co. v. linkLine Communications, Inc.*, 129 S. Ct. 1109

21  (2009), for the proposition that the price squeeze there was not anticompetitive.  *See* Pet. Br., 2008

22  WL 4063963, at *24 (Aug. 28, 2008) ("an upstream monopolist generally cannot earn any greater

23  profits by eliminating an efficient competitor in the downstream market . . . [it] already has all the

24  power it needs, by assumption, to extract the profit").  And, the foundation of the Court's holding

25  was the conclusion that no economic harm would flow from the conduct at issue: "it is difficult to

26  see any *competitive* significance [of a price squeeze] apart from the consequences of vertical

27  integration itself." *linkLine*, 129 S. Ct. at 1122.  *Doe v. Abbott Labs.*, 571 F.3d 930 (9th Cir.

28  2009), which rests on *linkLine*, likewise turns on the assumption that Abbott's leveraging conduct

- 2 -

did not cause economic harm.  *See* 571 F.3d at 934-35 (summing up *linkLine* to mean that "there is no independently cognizable harm to competition when the wholesale price and the retail price are independently lawful").

But *linkLine*, *Schor*, and *Doe*'s tolerance of leveraging goes no further than the economic logic of the SMP theory will take it.  These cases were decided on records that did not include evidence of government pricing constraints, and they were not addressed.[3]  Regulation or other price constraints change the picture because they provide a monopolist an incentive to leverage into a second market where it can raise prices and increase profits beyond those achievable in a single-market monopoly.  The *Alaska Airlines* case that Abbott cites for the proposition that leveraging is permissible, in a footnote to the very paragraph Abbott quotes, recognizes this:

> We highlight that this case does not involve the special problem of a regulated monopolist … that seeks to evade regulations which limit profits in the monopoly market by creeping into adjacent, unregulated markets.  Such a case might present very different issues.

*Alaska Airlines Inc.,* 948 F.2d at 548 n.17.  The "leading antitrust treatise" (Supp. Br. 6:10) likewise states that while:

> [t]his treatise often observes that the monopolist at one market level cannot ordinarily make greater monopoly profits simply by acquiring or controlling a second level. . . . this limitation does not necessarily apply to the price regulated monopolist, who may be prevented by law from charging its profit-maximizing price in its primary market.

3A P. Areeda & H. Hovenkamp, Antitrust Law ¶ 787b (2009).  Judge (now Justice) Breyer in *Town of Concord*, similarly recognized that the extension of monopoly power into two levels of distribution (as in a price squeeze) is not necessarily anticompetitive, but that "a special problem is posed by a monopolist, regulated at only one level, who seeks to dominate a second, unregulated level, in order to earn at that second level the very profits that regulation forbids at the first."  915 F.2d at 29.  Numerous other authorities are in accord.[4]

---

[3] Abbott claims that evasion of regulation arguments are foreclosed by *Doe* because GSK presented the rules in an amicus brief in that case.  In the Court of Appeals, however, Abbott criticized GSK for making an argument that "relies upon a host of 'evidence' not before this Court." Ex. 120, at 17-18 n.7.  Abbott then conceded that *Linkline* might affect GSK's "claims in additional ways inapplicable on [the *Doe*] appeal," but that these were matters to be left "for determination by the district court in the first instance…." *Id.*

[4] *See also Lamoille Valley R.R. Co. v. Interstate Commerce Co.*, 711 F.2d 295, 318 (D.C. Cir. 1983) ("There is an exception to this rule…for a regulated monopolist, which may be able to obtain from a second level of production 'the monopoly profits which effective regulation of the

1    The evidence before this Court shows that, because of pricing rules, Abbott could **not**

2   charge more for Norvir in half or more of the market.  Rather, Abbott had every incentive to shift

3   price-constrained Norvir sales to Kaletra, which was already monopoly-priced.  That is why

4   Abbott spent so much time plotting to take Norvir off the market in the U.S. (and not abroad) and

5   hit on a mega-price increase as an alternative to cause the shift in sales.  The fundamental premise

6   of the SMP theory does not apply here: there **is** incentive to leverage; it **is** likely to occur; and the

7   resulting higher prices **do** hurt consumer welfare.  In these circumstances, Abbott's leveraging

8   conduct is anti-competitive.  This is no "novel theory" "not . . . recognized" by any "court decision

9   or treatise" as Abbott contends.  Supp. Br. 2:20-23.  In fact, the theory is set out in the very cases

10   Abbott cites, and GSK should be allowed to present it at trial.   Ex. 50, at 139-142 (discussing

11   economics of why SMP theory does not apply here).

12            **B.      Substantial Evidence Supports a Sabotage Theory of Liability.**

13    There is substantial evidence that Abbott engaged in anti-competitive conduct of the type

14   set out in *Conwood Co. v U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002), and cases like *Dooley*

15   *v. Crab Boat Owners Ass'n*, 2004 WL 902361 (N.D. Cal. Apr. 26, 2004).[5]  *Conwood* involved the

16   moist snuff market, 290 F.3d at 782-83, in which "point of sale" (POS) advertising with in-store

17   racks was "critical" for success.  *Id.* at 774.  Conwood argued that USTC excluded competition by

18   interfering with POS advertising of competitors' products, and the jury found in its favor.  *Id.* at

19   778-79, 783.  The Sixth Circuit affirmed, stating: "USTC's pervasive practice of destroying

20   Conwood's racks and POS materials and reducing the number of Conwood facings through

21   exclusive agreements with and misrepresentations to retailers was exclusionary conduct without

22   sufficient justification…."  *Id.* at 788.

23   franchised monopoly precludes.'"); *Port Dock and Stone Corp. v. Oldcastle Northeastern, Inc.*,
     507 F.3d 117, 125 (2d Cir. 2008) (acknowledging several "special circumstances" where "a

24   monopolist's vertical expansion could be anticompetitive, such as where the monopolist uses the
     vertical integration…to avoid government regulation of price at one level…."); *Western*

25   *Resources, Inc. v. Surface Transp. Bd.*, 109 F. 3d 782, 788 (D.C. Cir. 1997) (noting the
     "recognized exception to the one-lump [*i.e.*, single monopoly profit] theory, namely the exception

26   for a regulated monopolist's vertical integration into an unregulated area"); *Paschall v. Kansas*
     *City Star Co.*, 727 F.2d 692, 702 (8th Cir. 1984) (en banc) (citing "evasion of government

27   regulation of first level monopoly profits" as exception to "optimum monopoly price" theory).

28       [5] While Mr. Wiles frankly answered the Court during oral argument on Abbott's second
     motion to dismiss that GSK's sabotage theory may "possibly" be a "stretch," the evidence
     adduced in discovery shows that Abbott's wrongdoing fits comfortably into this theory of liability.

- 4 -

Materially, this case parallels *Conwood*.  Just as POS advertising was critical to success in the moist snuff industry, substantial evidence shows that an unobstructed launch is critical to a drug's success in the pharmaceutical industry; it is during launch that doctors are most likely to listen to key messages about a product.  Ex. 45 ¶¶ 33-35, 44; Ex. 52 ¶¶ 71-72.  Just as USTC interfered with Conwood's POS advertising over a significant period, ███████████ █████████████████████████████████████████████████████████████████ ████████████████████████████████████ Ex. 21, at RIT0437394-395; *see* Ex. 16, at NOR00013358-559; Ex. 17; Ex. 59.  Just as USTC's destruction of racks stymied sales and consumed the time of sales staff, 290 F.3d at 784-85, the price hike caused GSK representatives to spend Lexiva's launch mired in questions from physicians who were in "lock-down mode" and would not prescribe Lexiva until they fully understood the price hike's implications.  Ex. 22, at 283:16-285:2, 290:23-291:17; *see* GSK Opp. 21 n.21.[6]  And, substantial evidence supports that the price hike had "a significant and more than a temporary effect on competition" as well as on GSK.  *Conwood*, 290 F.3d at 783; *see* GSK Opp. 20 n.20, 21 n.21; Ex. 50, at 127-34; Ex. 111, at 76-80.

In the face of these parallels, Abbott claims, without any pertinent supporting authority, that GSK's sabotage theory "runs directly counter to Ninth Circuit precedent."  Supp. Br. 4:22.  Abbott ignores the fact that at least one court in the Northern District of California, *Dooley,* applied similar reasoning to that found in *Conwood* and that the Ninth Circuit has never rejected that court's reasoning.  In *Dooley,* the court denied summary judgment for Section 2 claims brought by a crab boat operator where its competitors cut its crab pot lines, blocked its dock and threatened its customers in an attempt to fix prices in the crab market.  *See* 2004 WL 902361.

Lacking support for its position, Abbott is reduced to relying on two inapposite cases each of which held a multi-factor test must be applied to "[a]n antitrust claim premised primarily on advertising or speech…."  *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery*, 323 F.3d 366, 370 (6th Cir. 2003); *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal and Prof. Publ., Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997).  Neither case is

---

[6] Deceptive conduct was also part of the anticompetitive scheme in *Conwood*, as it is here.  *Compare Conwood*, 290 F.3d at 776, 783 *with* Ex. 23, at 335:16, GSK Opp. 5:11-6:3, 17:5-18:2.

1   on point because here the false statements merely exacerbated the critical conduct—announcing

2   and timing a massive price hike to hamper a key competitive product upon its introduction.

3        Finally, Abbott asserts that *Conwood* and *Dooley* are distinguishable because they

4   involved the destruction of property.  Supp. Br. 6:19-20 & n.2.  This is a distinction without a

5   difference, and, in any case, it is for a properly-instructed jury to decide whether the timing of the

6   price hike in conjunction with Abbott's other concerted efforts to shut down Lexiva sales amount

7   to an antitrust violation as did the physical destruction of property in *Conwood* and *Dooley*.  *See*

8   *Conwood*, 290 F.3d at 788.  GSK has adduced substantial evidence supporting a sabotage theory

9   of liability, and Abbott's late-in-the-game challenge to it should be rejected.

10      **C.      GSK Need Not Amend to Proceed with a Theory of Liability Based on**

11              **Abbott's Monopoly Bundling Scheme.**

12       Despite no Court request to address it, Abbott again asks that GSK be required to amend

13   its complaint to state a theory of anticompetitive conduct based upon *Cascade Health Solutions v.*

14   *PeaceHealth*, 515 F.3d 883 (9th Cir. 2008).  No such amendment is necessary.  GSK already

15   alleges that Abbott engaged in anticompetitive conduct by setting a price on Norvir that penalized

16   buyers for not purchasing ritonavir in Kaletra and left its competitors no economically rational

17   response to that pricing maneuver both because of the magnitude of the price hike in relation to

18   the price of Kaletra and because pricing rules on sales to government payers meant that GSK

19   would lose revenues overall even if it saved sales in the private sector by reducing the price of

20   Lexiva.  *See* GSK's First Amended Complaint ("FAC") (Dkt. 170) ¶¶ 40, 52 & 59.  The clear

21   implication of the first part of this allegation is that, after the Norvir price hike, the imputed price

22   of the lopinavir component of Kaletra fell below an appropriate measure of Abbott's variable

23   costs.  Indeed, contrary to the statements of Abbott's counsel, GSK's economic expert provided

24   evidence to support this theory of liability.  Ex. 50, at 115-127.  To the extent a duty to deal with

25   respect to Norvir is a component of this claim, GSK alleges, and ample evidence supports, that as

26   well.  FAC ¶¶ 15-21, 23-24, 63; *see also* GSK Opp. 19:7-23.  GSK's allegations thus constitute

27   sufficient notice under the Federal Rules of Civil Procedure.  *See Fontana v. Haskin*, 262 F.3d

28   871, 877 (9th Cir. 2001) ("Specific legal theories need not be pleaded so long as sufficient factual

- 6 -

1   averments show that the claimant may be entitled to some relief.").

2        **D.**     **This Court Previously Held that Liability for Violation of a Duty to Deal Can**

3                   **Attach if Abbott's Norvir Price Hike Amounts to a Practical Refusal to Deal,**

4                   **and Ample Evidence Exists that it Does.**

5      In its reply brief in support of its motion for summary judgment directed at the Direct

6   Purchasers, but not in its briefs directed at GSK, Abbott argued that this case does not parallel

7   *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), because there was an

8   "absolute refusal to deal" in that case when the defendant refused to sell lift tickets at retail to its

9   competitors. Dkt. 285, at 14. By contrast, in its brief in support of its motion for summary

10   judgment directed at GSK, Abbott conceded that this Court had rejected any such contention.

11   Dkt. 278, at 10-11 ("Plaintiffs do not…allege an *actual* refusal to deal. This is because Abbott

12   'never refused outright to sell Norvir.' [1/12/10 Order (Dkt. 195)] at 15. The Court nonetheless

13   held that conduct tantamount to an actual refusal to deal is actionable even in the absence of an

14   outright refusal."). At oral argument, Abbott's confusion continued as its counsel made

15   inconsistent statements about whether *Aspen Skiing* involved an "absolute refusal to deal" or

16   merely an effective refusal to deal based on an offer to do business only on unreasonable terms.

17   *Compare* Hurst Decl., Ex. 1, at 61:6-62:5 *with id.* at 80:10-14.

18      Abbott was correct in observing that this Court rejected its argument when the Court

19   denied Abbott's motion to dismiss. This Court stated that "[a]n offer to deal with a competitor

20   only on unreasonable terms can amount to a practical refusal to deal." 1/12/10 Order (Dkt. 195) at

21   15 (quoting *MetroNet Serv. v. Qwest Corp.*, 383 F.3d 1124, 1132 (9th Cir. 2004). That conclusion

22   also accurately reflects the facts of *Aspen Skiing* as there was no absolute refusal to deal in that

23   case either. In *Aspen Skiing,* the monopolist first offered to do business on terms that were very

24   unfavorable to the plaintiff and then, in the end, agreed to accept the traveler's checks that plaintiff

25   included in its substitute multi-day package. *Aspen Skiing*, 472 U.S. at 592, 594. Thus, the

26   monopolist there, like Abbott here, sold to the plaintiff's customers (whom the plaintiff there

27   supplied with traveler's checks to use as currency). In a move analogous to Abbott's, however,

28   the monopolist raised the price of its single day ticket and lowered the price of its multiple day

- 7 -

1   ticket to make it prohibitively expensive for the plaintiff to offer the substitute package containing

2   traveler's checks to consumers.  *Id.* at 594 n. 15.  The result was reduced market share for the

3   plaintiff, *id.* at 594-95, and the Court affirmed a finding of liability despite the fact that the

4   monopolist's conduct did not drive the plaintiff out of business.  *Id.* at 610-11.

5        In both this case and *Aspen Skiing*, the issue is whether the conduct that limited the

6   plaintiff's ability to do business, but did not drive it from the market, amounts to a practical refusal

7   to deal.  Triable issues of fact exist on this issue.  As discussed at oral argument, the fact that

8   Norvir sales increased following the price hike does not change this as both Lexiva and Reyataz

9   were new entrants.  The jury is entitled to weigh evidence showing Norvir sales did not rise nearly

10  as fast as they would have absent the price hike and that Abbott was able to sell Kaletra instead.

11  **II.**    **Even If GSK's Lost Profits Are Not Direct Damages, The Evidence Of Abbott's Bad**

12      **Faith, Willful, Malicious Or Grossly Negligent Conduct Raises A Triable Issue Of**

13      **Fact As To GSK's Right To Collect Them As Damages For Abbott's Breach Of**

14      **Contract.**

15       New York courts are clear that a limitation of liability clause is unenforceable where the

16  breach is "caused by … bad faith or … willful, malicious, or grossly negligent conduct."  *Corinno*

17  *Civetta Const. Co. v. City of New York*, 67 N.Y.2d 297, 309 (1986); *see Kalisch-Jarcho, Inc. v.*

18  *City of New York*¸ 58 N.Y.2d 377, 385 (1983) (exculpatory clause not enforceable where, among

19  other things, the breach is "prompted by the sinister intention of one acting in bad faith.").

20  Contrary to Abbott's contention that GSK's claim is "without evidentiary support," the summary

21  judgment record is replete with evidence of Abbott's bad faith.  ██████████████████

22  ████████████████████████████████████████████████████████

23  ████████████████████████ Ex. 19, at NOR00096647. █████████

24  ███████████████████████████████████████████████████ Ex.

25  21, at RIT0437394-395. ████████████████████████████████

26  ██████████████████████ Ex. 72, at NOR00082785.[7]

27   

28        [7] Abbott cites two cases for the proposition that relief is routinely granted regarding exculpatory clauses.  Supp. Br. 10 n.3.  One is a perfunctory opinion with no reasoning, *David Gutter Furs v. Jewelers Prot. Serv. Ltd.*, 79 N.Y.2d 1027 (N.Y. 1992), and the other is

- 8 -

1    Despite spending three pages of its supplemental brief on this issue (the Court invited it to

2    devote 1/4 page, Hurst Decl., Ex. 1, at 71:22-24), Abbott never confronts this evidence and instead

3    seeks to distort the relevant case law.  First, Abbott miscites *Corrino* to claim that case limited

4    *Kalisch-Jarcho* such that a limitation of liability clause is enforceable unless the breach is of a

5    "fundamental, affirmative obligation the agreement expressly imposes…."  Supp. Br. 8:18-19.

6    *Corrino* set out no such limitation.  It referenced four different exceptions that render an

7    exculpatory clause unenforceable.  67 N.Y.2d at 309.  Abbott's quotation is from the court's

8    discussion of the third of those exceptions.  *See id.*; *see also Earthbank Co. v. City of New York*,

9    568 N.Y.S.2d 101, 102 (1st Dep't 1991) (only discussing third exception).  In fact, the *Corrino*

10   court stated that it was not addressing at all the first exception – applicable here – concerning bad

11   faith, willful or grossly negligent conduct: "We discussed the first of these exceptions at length in

12   [*Kalish-Jarcho*] … and the parties agree that the rule set forth there forecloses recovery for

13   contemplated delays in the absence of proof of willful or grossly negligent conduct.  Their present

14   disputes center on the applicability and scope of the other three exceptions to the general rule."  *Id.*

15   Next, Abbott seems to assert that what GSK must prove is that Abbott's breach of contract

16   amounted to an independent tort, citing to *Metropolitan Life Ins. Co. v. Noble Lowndes Int'l*, 600

17   N.Y.S. 2d 212 (1st Dept. 1993), *aff'd* 84 N.Y.2d 430 (1994) – an opinion from New York's

18   intermediate appellate court.  While Abbott states that the highest New York court – the Court of

19   Appeals – affirmed the opinion, it fails to inform this Court that the Court of Appeals disavowed

20   the very language upon which Abbott relies.  In *Metropolitan Life*, the New York courts

21   interpreted an exculpatory clause which expressly contained an exception for "willful acts" –

22   rather than the court-created exception at issue here.  The Court of Appeals began: "[T]o the

23   extent that the Appellate Division opinion holds that tort law principles apply in all cases in which

24   the word willful is at issue or thereby limits the legal meaning of the word, we do not agree."  84

25   N.Y.2d at 435.  The Court of Appeals clarified that "the term willful acts as used in this contract"

26   meant acts that were not independent torts, but rather "tortious in nature, i.e., wrongful conduct in

27   which defendant willfully intends to inflict harm on plaintiff at least in part through the means of

28   unpublished, *Premier-N.Y. Inc. v. Travelers Prop. Cas. Corp.*, 20 Misc.3d 1115(A), 2008 WL
     2676800, at *16 (N.Y. Sup. Ct. July 8, 2008).  Neither involved facts exhibiting bad faith as here.

- 9 -

1 breaching the contract between the parties." *Id.* at 438. Even if that interpretation bears on the

2 contract here, GSK has offered sufficient evidence of it. *See, e.g.,* GSK Opp. 3:12-5:2, 5:11-6:3.

3    Finally, Abbott claims bad faith cannot be found because the Norvir price hike was

4 "motivated by financial self-interest." Supp. Br. 8:22-9:2. *Banc of America Sec. LLC v. Solow*

5 *Bldg. Co.*, 847 N.Y.S.2d 49 (1st Dept. 2007), cited by both parties, shows there is no such simple

6 escape hatch. In that case, BAS signed a lease with Solow requiring BAS to seek Solow's consent

7 to alterations to the premises, and providing that Solow would not unreasonably withhold consent

8 and would be reimbursed out-of-pocket expenses for reviewing alteration requests. *Id.* at 50.

9 Solow sent BAS a bill for $6 million in costs purportedly incurred and, when BAS refused to pay,

10 Solow withheld approval of subsequent alteration requests and sent notices of default. *Id.* at 50-

11 51. When BAS sued for damages, Solow invoked an exculpatory clause to limit its exposure.

12    The court held that sufficient evidence of bad faith existed to deny summary judgment as

13 to the damages claim in spite of the exculpatory clause. The court rejected the dissent's claim,

14 based on *Metropolitan Life,* that Solow was excused because it was acting in its economic self-

15 interest to obtain $6 million: "It is evident that the Court of Appeals did not intend economic self-

16 interest to be applied as an expansive principle to excuse all manner of misconduct." *Banc of*

17 *America*, 847 N.Y.S.2d at 55. It concluded that a triable issue existed whether Solow's conduct

18 "evinces the intent to inflict economic harm on BAS," *id.* at 57, distinguishing *Metropolitan Life*

19 as involving a breach not to harm the plaintiff but to achieve an entirely different objective, ending

20 an unprofitable contract that interfered with selling the defendant's software division, 84 N.Y.2d at

21 439. Here, as in *Banc of America*, there is ample evidence that Abbott was intent on inflicting

22 harm on GSK – by hiking the Norvir price and timing its announcement to undermine Lexiva

23 sales and drive that business to Kaletra. The result on summary judgment should be the same.[8]

24              **CONCLUSION**

25    For the reasons stated herein, this Court should deny Abbott's motion in its entirety.

26        [8] In any case, the question of whether Article X, which never mentions lost profits,
precludes their recovery is one of fact for the jury. *See* GSK Opp. 13:12-14:2. As the court made

27 clear in *Metropolitan Life*, whether a clause such as Article X precludes the recovery of lost profits
cannot be decided as a matter of law, but rather is a matter of interpreting what the parties

28 intended those terms to mean when they signed the GSK-Abbott license. *See* 84 N.Y.2d at 435.

Dated:  November 11, 2010                    Respectfully submitted,

                                             IRELL & MANELLA LLP


                                             By:_____ /s/ Alexander F. Wiles_____
                                                    Alexander F. Wiles


            Pursuant to General Order No. 45, Section X, I attest under penalty of perjury that

concurrence in the filing of this document has been obtained from Alexander F. Wiles.


Dated:  November 11, 2010                    By:_____ /s/ Trevor V. Stockinger_____
                                                    Trevor V. Stockinger
                                                    IRELL & MANELLA LLP
                                                    Attorneys for GlaxoSmithKline