IRELL & MANELLA LLP
Alexander F. Wiles (CA 73596) awiles@irell.com
Brian Hennigan (CA 86955) bhennigan@irell.com
Trevor V. Stockinger (CA 226359) tstockinger@irell.com
S. Albert Wang (CA 250163) awang@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:   (310) 277-1010
Facsimile:   (310) 203-7199

ARNOLD & PORTER LLP
Kenneth A. Letzler (*Admitted Pro Hac Vice*) Kenneth_Letzler@aporter.com
Daniel S. Pariser (*Admitted Pro Hac Vice*) Daniel_Pariser@aporter.com
555 Twelfth Street, NW
Washington, DC  20004-1206
Telephone:   (202) 942-5000
Facsimile:   (202) 942-5999

ATTORNEYS FOR PLAINTIFF GLAXOSMITHKLINE

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE,<br><br>Plaintiff,<br><br>v.<br><br>ABBOTT LABORATORIES,<br><br>Defendant. | **Case No. C 07-5702 (CW)**<br><br>**GLAXOSMITHKLINE'S TRIAL BRIEF**<br><br><br>Pretrial Conference Date: February 8, 2011<br>Pretrial Conference Time: 2:00 p.m.<br>Trial Start Date: February 22, 2011<br>Trial Start Time: 8:30 a.m.<br>Courtroom:   2 (4th Floor)<br>Judge:       Hon. Claudia Wilken |

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 1

I. Procedural And Evidentiary Issues ............................................................................ 1

II. Substantive Legal Issues ............................................................................................ 1

    A. Abbott's Actions Violated the Sherman Act ................................................ 1

    B. Abbott Violated the North Carolina Unfair and Deceptive Trade Practices Act .................................................................................................. 2

        1. Abbott's acts were unfair ................................................................. 3

        2. Abbott's acts were anticompetitive .................................................. 6

    C. Abbott is Liable to GSK for Breaching the Implied Covenant of Good Faith and Fair Dealing Contained in the GSK-Abbott Boosting License ............................................................................................................ 6

        1. Abbott's Actions Breached the Implied Covenant of Good Faith and Fair Dealing ................................................................... 6

        2. GSK Is Entitled to Recover Lost Profits Damages for the Breach of the Implied Covenant of Good Faith and Fair Dealing ........................................................................................... 7

        3. In the Alternative, GSK Is Entitled to Recover Damages Measured by Its Restitutionary Interest: the Value GSK Gave Abbott for the Norvir Boosting License in the United States ............................................................................................ 10

CONCLUSION .................................................................................................................. 12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
  98 N.Y.2d 144 (2002) ............................................................................................................. 6

*American Electric Power Co. v. Westinghouse Electric Corp.*,
  418 F. Supp. 435 (S.D.N.Y. 1976) ......................................................................................... 8

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985) ............................................................................................................... 2

*Banc of Am. Sec. LLC v. Solow Building Co. II*,
  847 N.Y.S.2d 49 (N.Y. App. Div. 2007) ............................................................................... 7

*Carvel Corp. v. Diversified Mgmt. Group, Inc.*,
  930 F.2d 228 (2nd Cir. 1991) .............................................................................................. 11

*Cascade Health Solutions v. PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008) ................................................................................................. 2

*CBS, Inc. v. Merrick*,
  716 F.2d 1292 (9th Cir. 1983) ....................................................................................... 10, 11

*Computrol, Inc. v. Newtrend, L.P.*,
  203 F.3d 1064 (8th Cir. 2000) ............................................................................................... 8

*Dalton v. Educ. Testing Serv.*,
  87 N.Y.2d 384 (1995) ............................................................................................................ 6

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ............................................................................................................... 2

*Forward Indus., Inc. v. Rolm of N.Y. Corp.*,
  506 N.Y.S.2d 453 (N.Y. App. Div. 1986) ............................................................................. 9

*Great N. Assocs., Inc. v. Cont'l Cas. Co.*,
  596 N.Y.S.2d 938 (N.Y. App. Div. 1993) ............................................................................. 7

*Hardy v. Toler*,
  218 S.E.2d 342 (N.C. 1975) .................................................................................................. 3

*Hyatt Corp. v. Women's Int'l Bowling Congress, Inc.*,
  80 F. Supp. 2d 88 (W.D.N.Y. 1999) ..................................................................................... 9

*In re Asia Global Crossing, Ltd.*,
  404 B.R. 335 (S.D.N.Y. 2009) ................................................................................. 10, 11, 12

*ITCO Corp. v. Michelin Tire Corp.*,
  722 F.2d 42 (4th Cir. 1983) ................................................................................................ 3, 6

*Kalisch-Jarcho, Inc. v. City of New York*,
  58 N.Y.2d 377 (1983) ............................................................................................................ 7

|   | Page(s) |
|---|---|

*Kewaunee Scientific Corp. v. Pegram*,
    503 S.E.2d 417 (N.C. Ct. App. 1998) ................................................................... 5

*L.C. Williams Oil Co., Inc. v. Exxon Corp.*,
    625 F. Supp. 477 (M.D.N.C. 1985) ...................................................................... 3

*Mandelblatt v. Devon Stores, Inc.*,
    521 N.Y.S.2d 672 (N.Y. App. Div. 1987) ............................................................ 9

*Marshall v. Miller*,
    276 S.E.2d 397 (N.C. 1981) ................................................................................. 3

*McDonald v. Scarboro*,
    370 S.E.2d 680 (N.C. Ct. App. 1988) ................................................................... 3

*Meijer, Inc. v. Abbott Labs.*,
    544 F. Supp. 2d 995 (N.D. Cal. 2008) .............................................................. 5, 6

*Metropolitan Life Ins. Co. v. Noble Lowndes Intern, Inc.*,
    84 N.Y.2d 430 (1994). .......................................................................................... 8

*Miller v. Nationwide Mut. Ins. Co.*,
    435 S.E.2d 537 (N.C. Ct. App. 1993) ................................................................... 2

*Moran v. Erk*,
    11 N.Y.3d 452 (2008) ........................................................................................... 6

*S. Atl. Ltd. P'ship of Tenn. v. Riese* (*SALT*),
    284 F.3d 518 (4th Cir. 2002) ........................................................................ 3, 4, 5

*S. Erectors, Inc. v. City of New York*, No. 90-CIV-5651,1992 U.S. Dist. LEXIS
    8704 (S.D.N.Y. June 16, 1992) ............................................................................ 7

*Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*,
    487 F.3d 89 (2d Cir. 2007) .............................................................................. 9, 10

*Travellers International, A.G. v. TWA*,
    41 F.3d 1570 (2d Cir. 1994) ................................................................................. 7

*United Labs., Inc. v. Kuykendall*,
    370 S.E.2d 375 (N.C. 1988) ................................................................................. 2

**Statutes**

North Carolina's Unfair Trade Practices Act § 75-1.1 .......................................... 1, 2, 3, 6

North Carolina's Unfair Trade Practices Act § 75-2.1 ..................................................... 1

North Carolina's Unfair Trade Practices Act § 75-16 ...................................................... 5

# INTRODUCTION

This Court is well aware of the background facts and contentions in these cases, which stem from Abbott's December 2003 quintupling of the price it charged for its drug Norvir. The plaintiffs in these cases contend that Abbott's 400% price hike and related activities violated Section 2 of the Sherman Act by illegally maintaining, or attempting to maintain, Abbott's monopoly in the market in which Kaletra competes. In addition, plaintiff GSK, one of the companies Abbott licensed to promote Norvir for use with its protease inhibitor, also contends that by its actions Abbott breached the implied covenant of good faith and fair dealing inherent in the GSK-Abbott boosting license and violated North Carolina's Unfair Trade Practices Act, N.C. Gen. Stat. § 75-1.1 and North Carolina's state prohibition on monopolization, N.C. Gen. Stat. § 75-2.1.

Because most of the significant disputed legal issues with respect to the antitrust claims have already been fully briefed in the course of this litigation in connection with Abbott's two Motions to Dismiss and Abbott's Motion for Summary Judgment, this brief focuses on issues related to GSK's state law claims.

# ARGUMENT

## I. Procedural And Evidentiary Issues

GSK does not foresee at this time any procedural or evidentiary issues not adequately briefed in the concurrently filed motions *in limine*, or that cannot be adequately addressed through the other disclosures of objections related to exhibits, deposition designations, and written discovery designations.

## II. Substantive Legal Issues

### A. Abbott's Actions Violated the Sherman Act

GSK can prevail on its Sherman Act Section 2 claims in two ways: by proving that Abbott maintained its monopoly in violation of the statute or that Abbott attempted to maintain its monopoly in violation of the statute.

To prove that Abbott violated Section 2 by actually maintaining its monopoly, the GSK "must demonstrate '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" Order Denying in Part

- 1 -

and Granting in Part Defendant Abbott Laboratories' Motion for Summary Judgment on Direct Purchasers' Claims and on GSK's Claims, Case No. 07-cv-5702, Docket No. 325 ("Summary Judgment Order"), at 10 (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 480 (1992)).

To prove that Abbott violated Section 2 by attempting to maintain its monopoly, GSK "must show '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" Summary Judgment Order at 10-11 (quoting *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 893 (9th Cir. 2008)) (internal quotation marks omitted).

As exhaustively briefed in previous motions—and found by the Court to present questions for ultimate determination by a jury—GSK can satisfy all of the above elements for both the actual maintenance of monopoly and attempted maintenance of monopoly claims. GSK expects to be able to show that Abbott engaged in anticompetitive conduct by violating a duty to deal, a recognized theory of liability under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), and by violating the equally efficient competitor test set out in *Cascade* for assessing the legality of the pricing of a bundled product by a monopolist.[1]

**B.      Abbott Violated the North Carolina Unfair and Deceptive Trade Practices Act**

N.C. Gen. Stat. § 75-1.1 forbids "[u]nfair methods of competition" and "unfair or deceptive acts or practices." To recover under section 75-1.1, a plaintiff must show "(1) an unfair or deceptive act or practice, or unfair method of competition, (2) in or affecting commerce, and (3) which proximately caused actual injury to the plaintiff or his business." *Miller v. Nationwide Mut. Ins. Co.*, 435 S.E.2d 537, 542 (N.C. Ct. App. 1993) (citation omitted). The statute splits determinations of fact and law between the jury and the Court: "[I]t is a question for the jury as to whether the defendants committed the alleged acts, and then it is a question of law for the court as to whether these proven facts constitute an unfair or deceptive trade practice." *United Labs., Inc.*

---

[1] All parties agree that the same standards that govern GSK's federal Sherman Act claim also govern its claim under N.C. Gen. Stat. § 75-2.1, a state statute prohibiting monopolization and attempted monopolization. Because of the through briefing of the federal antitrust claim, GSK is submitting no additional argument on section 75-2.1 at this time.

*v. Kuykendall*, 370 S.E.2d 375, 389 (N.C. 1988) (citing *Hardy v. Toler*, 218 S.E.2d 342 (N.C. 1975)). As the jury will decide the final two requirements of the statute, the legal question for the Court is whether Abbott's actions, as a matter of law, constituted unfair or deceptive acts or practices, or an unfair method of competition. Measured against precedent, Abbott's actions were clearly violations.

Section 75-1.1 "creates a cause of action broader than traditional common law actions" and "was needed because common law remedies had proved often ineffective." *Marshall v. Miller*, 276 S.E.2d 397, 400, 402 (N.C. 1981). The statute covers not just anticompetitive conduct, but "also sanctions, as part of its broad remedial purpose of promoting ethical business dealings, commercial 'unfairness' and 'deception' beyond traditional antitrust concepts." *L.C. Williams Oil Co., Inc. v. Exxon Corp.*, 625 F. Supp. 477, 481 (M.D.N.C. 1985) (citing *Marshall*, 276 S.E.2d at 403). It provides a "civil means to maintain ethical standards of dealings between persons engaged in business and the consuming public," *McDonald v. Scarboro*, 370 S.E.2d 680, 683 (N.C. Ct. App. 1988) (internal quotations omitted), and applies to disputes between businesses, *id*.

Abbott's actions violated section 75-1.1 if they were (1) unfair acts *or* (2) deceptive acts *or* (3) anticompetitive acts; liability attaches if Abbott's actions fall into any of these categories. *See S. Atl. Ltd. P'ship of Tenn. v. Riese* (*SALT*), 284 F.3d 518, 535 (4th Cir. 2002); *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 48 (4th Cir. 1983). "Whether a trade practice is unfair or deceptive usually depends upon the facts of each case and the impact the practice has in the marketplace." *Marshall*, 276 S.E.2d at 403 (citation omitted). "Thus, whether a particular practice violates the UTPA is both a question of law and a highly fact-specific inquiry." *SALT*, 284 F.3d at 535.

### 1. Abbott's acts were unfair

"A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Marshall*, 276 S.E.2d at 403 (citation omitted). *South Atlantic Limited Partnership of Tennessee v. Riese* (*SALT*), 284 F.3d 518 (4th Cir. 2002) illustrates how these principles apply. There, the Stroud Group and the Riese Group had formed the SALT partnership to develop real estate. *Id.* at

523. The partnership hired a construction company owned by the Riese Group. *Id.* The Stroud Group eventually expelled the Riese Group from the partnership eleven days before selling the development for several million dollars. *Id.* at 527. Because the contract required paying an expelled partner only its share of the partnership's book value, which was negative before the sale, the Riese Group received nothing. *Id.* at 524-25, 527.

In subsequent litigation, the Riese Group successfully counterclaimed that the Stroud Group violated section 75-1.1, a holding that was upheld on appeal. *Id.* at 528-20, 540. The Fourth Circuit agreed that the expulsion was an unfair trade practice even though it was in accordance with the contract's terms. *Id.* at 538-40. The Riese Group had worked without compensation, taking a share of the project instead, but with careful timing the Stroud Group had "exploited its rights under the Partnership Agreement to gain the full value of the Riese Group's labor without compensating it at all. Such manipulations and assertions of controlling influence are precisely the kind of 'inequitable assertion[s]' of power that North Carolina deems to be unfair trade practices." *Id.* at 540. Abbott's actions here parallel those found to be violations in *SALT*.

Abbott inequitably asserted the power it was delegated in the GSK-Abbott boosting license. After having agreed to permit GSK's Lexiva to compete against Abbott's Kaletra for boosted PI sales through the license agreement, Abbott then used its power over Norvir's price to undermine and disrupt the very sales that Abbott's partner, GSK, was trying to make. Abbott, overnight and without warning, forced GSK's new drug, Lexiva, which had been introduced at parity pricing to be sold at a large premium to Abbott's Kaletra.

Just as the Stroud Group did in *SALT*, Abbott timed its action to exact the greatest toll on Lexiva, thus maximizing the benefit Abbott could wrongfully seize for itself through improperly shielded Kaletra sales. Abbott did so by taking the unprecedented hike at a vital point in GSK's sales efforts: during Lexiva's launch. As GSK's percipient and expert witnesses, as well as its documentary evidence, will show, the timing element severely impaired GSK's ability to establish Lexiva in the marketplace, a result that was well-understood by Abbott. By disrupting GSK's efforts to insert Lexiva into doctors' prescribing habits—which had to occur during that limited

launch period window when those doctors would be receptive to learning about new drugs—Abbott deliberately prevented its licensee GSK from gaining a foothold in the market.

Abbott's behavior here is even more unscrupulous when one realizes that Abbott was considering how to use its power over Norvir to restrict competition, even while negotiating the boosting license with GSK—and yet deliberately withheld this information from GSK. *See id.* at 537-38 ("deliberately with[olding]" knowledge of subcontractor's poor reputation from general contractor partner "is the essence of unscrupulous behavior" and was "sufficiently egregious to constitute an unfair trade practice under the North Carolina UTPA"). While it was negotiating with GSK, Abbott evaluated several different options for using its control over Norvir as a competitive weapon against GSK's Lexiva. After signing a license agreement designed to give GSK freedom to promote Lexiva for use with Norvir, Abbott then executed one of the options, the Norvir price hike, to undermine the competition from GSK that Abbott had enabled with that very license. The price hike was timed during Lexiva's launch to cause maximum disruption and damage to GSK, as a "clever creative way to make them look bad."

If the jury finds any or all of these three facts—Abbott's deliberate withholding of its scheming during the license negotiations, its inequitable assertion of its contractual power, or its manipulation of the timing of the price hike to disrupt and undermine Lexiva's sales—Abbott is clearly liable for violating section 75-1.1. Indeed, this Court has twice found that GSK's allegations, and the evidence that supports it, state a claim under section 75-1.1. Summary Judgment Order at 44-46; *Meijer, Inc. v. Abbott Labs.*, 544 F. Supp. 2d 995, 1008 (N.D. Cal. 2008). Accordingly, the verdict form proposed by GSK asks the jury these three questions, so that if the jury finds that Abbott engaged in any or all of these acts, this Court can confidently declare that Abbott violated North Carolina's UDTPA and direct that judgment be entered in favor of GSK for three times the amount of damages determined by the jury. N.C. Gen. Stat. § 75-16; *Kewaunee Scientific Corp. v. Pegram*, 503 S.E.2d 417, 420 (N.C. Ct. App. 1998) ("If a violation of Chapter 75 is found, treble damages must be awarded.").

## 2. Abbott's acts were anticompetitive

Maintaining or attempting to maintain a monopoly through anticompetitive conduct constitutes an anticompetitive act that also violates section 75-1.1. *See ITCO Corp.*, 722 F.2d at 48. As explained in the previous briefing on Sherman Act claims, a jury could easily find that Abbott has done so. If it does, this Court should find that Abbott has violated section 75-1.1.

### C. Abbott is Liable to GSK for Breaching the Implied Covenant of Good Faith and Fair Dealing Contained in the GSK-Abbott Boosting License

#### 1. Abbott's Actions Breached the Implied Covenant of Good Faith and Fair Dealing

As this Court has repeatedly recognized, "[u]nder New York law, '[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance.'" *Meijer, Inc. v. Abbott Labs.*, 544 F. Supp. 2d 995, 1007 (N.D. Cal. 2008) (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)) (second alteration in original). "The implied covenant of good faith and fair dealing between parties to a contract embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Summary Judgment Order at 36-37 (quoting *Moran v. Erk*, 11 N.Y.3d 452, 456 (2008), itself quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002)).

In denying summary judgment, this Court ruled that GSK could state a claim for breach of the implied covenant of good faith and fair dealing if it could show that "Abbott injured, not destroyed," "GSK's right to co-promote its products with Norvir." Summary Judgment Order at 38. GSK's evidence, much of which was cited in GSK's opposition to Abbott's motion for summary judgment and in the Court's ruling, will show that Abbott's actions severely injured GSK's right to receive the benefits of the Norvir license. That is, Abbott injured GSK's right to enhance its profits from Lexiva sales by taking advantage of the rights granted to GSK in the boosting license.

### 2. GSK Is Entitled to Recover Lost Profits Damages for the Breach of the Implied Covenant of Good Faith and Fair Dealing

Abbott's arguments against GSK's recovery of lost profits damages for Abbott's breach of the implied covenant of good faith and fair dealing are flawed and unavailing. First, as the Court correctly held on summary judgment, such damages are available under New York for breaches of the implied covenant. *See* Summary Judgment Order at 40 (explaining that *Travellers International, A.G. v. TWA*, 41 F.3d 1570 (2d Cir. 1994) cited no authority for the proposition that lost profits could not be awarded for this type of claim, and also eventually affirmed an award of lost profits).

Second, GSK will put forth sufficient evidence that the limitation of liability does not apply because New York courts will not permit such clauses to protect behavior, such as Abbott's, that "smacks of intentional wrongdoing." Summary Judgment Order at 41. GSK will show that Abbott targeted GSK's Lexiva with its price increase, not only seeking to force Lexiva to be priced well above parity with Kaletra, but also intentionally timing the increase to match Lexiva's launch. *See* Summary Judgment Order at 42. Furthermore, Abbott negotiated the GSK-Abbott boosting license without ever giving any hint that Abbott was planning such a move. Abbott cannot claim that the economic benefit that it reaped from these actions insulates it from a finding of bad faith, as "[e]conomic self-interest is the motivation for fraud, self-dealing, and breach of fiduciary duty; it does not excuse such misconduct nor preclude an injured party from seeking redress in the courts." *Banc of Am. Sec. LLC v. Solow Building Co. II*, 847 N.Y.S.2d 49, 55 (N.Y. App. Div. 2007) (citations omitted). The jury could easily conclude that Abbott's actions evince such bad faith that, as a matter of public policy, New York law will not permit Abbott to benefit from the limitation of liability clause so that Abbott can avoid paying GSK lost profits damages. *See Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 384-85 (1983); *see also S. Erectors, Inc. v. City of New York*, No. 90-CIV-5651,1992 U.S. Dist. LEXIS 8704, at *10-11 (S.D.N.Y. June 16, 1992); *Great N. Assocs., Inc. v. Cont'l Cas. Co.*, 596 N.Y.S.2d 938, 940 (N.Y. App. Div. 1993).

Finally, while this Court has noted that GSK's lost profits are "best characterized" as consequential damages, *see* Summary Judgment Order at 40, the applicability of this particular limitation of liability clause to GSK's lost profits damages remains a question of fact. The Court did not hold that GSK's lost profits were consequential damages as a matter of law, and any such holding would have been erroneous. In this case, the issue is not whether GSK's lost profits damages should be considered direct or consequential damages in general, but whether they are considered "special, incidental, indirect or consequential losses" within the meaning of the limitation of liability clause to which GSK and Abbott agreed in the Norvir Boosting License.

As the court in *American Electric Power Co. v. Westinghouse Electric Corp.*, 418 F. Supp. 435 (S.D.N.Y. 1976) remarked, "the precise demarcation between direct and consequential damages is a question of fact, and the commercial context in which a contract is made is of substantial importance in determining whether particular items of damages will fall into one category or other." *Id.* at 459. There, the court held that the issue must be left for resolution at trial despite a limitation of liability clause that provided specific examples of items considered consequential—and the plaintiff was seeking some of those same items of damages. *Id.* at 459-60. In a similar context, the court in *Metropolitan Life Ins. Co. v. Noble Lowndes Intern, Inc.* considered the application of a limitation of liability clause that expressly stated that it was not enforceable if damages arose out of "willful acts." 84 N.Y.2d 430, 435 (1994). Relevantly, the court noted:

> The issue here is not how we and other courts have construed "willful" in other contexts, such as in interpreting statutes using that term or in formulating or applying legal principles in tort or contract law. Rather the issue is what the parties intended by "willful acts" as an exception to their contractual provision limiting defendant's liability for consequential damages arising from its "non-performance under this agreement."

*Id.*; *see Computrol, Inc. v. Newtrend, L.P.*, 203 F.3d 1064, 1071 n. 5 (8th Cir. 2000).

Thus, the factual determination of what GSK and Abbott meant by the term "special, incidental, indirect or consequential losses" given the commercial context surrounding the

- 8 -

limitation of liability clause in the Norvir Boosting License remains for the jury. The jury should be allowed to consider that this situation is very different from one where a supplier breached a contract with GSK to supply a chemical used to manufacture a pharmaceutical compound. There, even if the limitation of liability clause were interpreted to exclude lost profits from ancillary contracts, as some case law suggests, GSK would still be allowed to seek costs for cover to obtain the chemical from another company. Here, in contrast, such a reading of the limitation of liability clause would preclude GSK from recovering any expectancy damages. Reading a contract to wholly preclude recovery of any such damages is disfavored by the courts, and a jury should similarly be allowed to consider the implications of such a reading. *See Forward Indus., Inc. v. Rolm of N.Y. Corp.*, 506 N.Y.S.2d 453, 455-56 (N.Y. App. Div. 1986) (declining to read limitation of liability clause in a way that "would leave the plaintiff without any fair remedy for the defendant's breach of a fundamental obligation of its contract."); *Hyatt Corp. v. Women's Int'l Bowling Congress, Inc.*, 80 F. Supp. 2d 88, 96 (W.D.N.Y. 1999) (quotation omitted) (stating that in contract interpretation a court "should not suppose that one party was to be placed at the mercy of the other."); *Mandelblatt v. Devon Stores, Inc.*, 521 N.Y.S.2d 672, 675 (N.Y. App. Div. 1987) (reversing a lower court's interpretation that would "produce[] an unreasonable result which would, in effect, place one party to the contract at the mercy of the other.").

Indeed, despite the technical language concerning the difference between consequential and direct damages found in *Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 109-10 (2d Cir. 2007), which was cited by this Court in its Summary Judgment Order, the underpinning of the *Tractebel* court's conclusion was that "[i]n this case, lost profits are the direct and probable consequence of the breach. The profits are precisely what the non-breaching party bargained for, and only an award of damages equal to lost profits will put the non-breaching party in the same position he would have occupied had the contract been performed." *Id.* at 109-10.

The same thing is true in this case. In both this case and *Tractebel Energy Marketing,* the core purpose of the contract was to allow the plaintiff to profit from its performance. It matters not that the expected profits in one case came directly from the defendant but in the other stem from successful promotion efforts to third parties. In both cases, the degree of foreseeability is the

same and is evidenced by the terms of the contract. *See id.* at 108 n.19, 110-12 (noting termination provision referencing profits and allowing estimate of 20 years of profits). And, here, the jury will hear undisputed evidence from GSK and Abbott that both understood that the bargained-for agreement was to allow GSK to promote Lexiva with Norvir so that GSK could increase sales of its HIV/AIDS drug. In fact, this understanding was written into the Whereas clauses and the provision governing the scope of rights GSK licensed. Thus, a jury could conclude that lost profits under the Norvir Boosting License were also the "direct and probable consequence" of Abbott's breach as they were "precisely" what GSK bargained for.

### 3. In the Alternative, GSK Is Entitled to Recover Damages Measured by Its Restitutionary Interest: the Value GSK Gave Abbott for the Norvir Boosting License in the United States

In the alternative, if lost profits are not available then GSK is entitled to damages as measured by its restitutionary interest: damages that would return to GSK the value it conferred upon Abbott for the rights that Abbott injured by its breach. The evidence at trial will clearly show the connection between the rights GSK acquired in the GSK-Abbott boosting license and the concessions GSK made to Abbott in the royalty Abbott would have to pay to obtain a license to certain GSK technology. The evidence will show that these concessions were the compensation GSK provided to Abbott in exchange for the benefit of being able to promote Norvir-boosted use of GSK's Lexiva in the U.S.—compensation for a bargained-for benefit that was drastically injured by Abbott's wrongful breach.

This alternative measure of damages is not a separate, equitable claim for restitution, along with its attendant additional requirements. *CBS, Inc. v. Merrick*, 716 F.2d 1292, 1296 (9th Cir. 1983) (under New York law, "[a] party injured by a breach of a contract may recover both restitution and reliance damages") (citations omitted); *In re Asia Global Crossing, Ltd.*, 404 B.R. 335, 342 (S.D.N.Y. 2009) ("[T]he plaintiff in a breach-of-contract action may also elect to measure her damages by the value of the benefit the defendant has unjustly retained.").

Thus, none of the requirements that Abbott's other briefing suggests actually apply here. There is no requirement that GSK rescind the license in order to collect damages reflecting its

restitutionary interest. As explained by Judge Nelson in her concurrence in *CBS, Inc.*, which affirmed a restitutionary damages award and remanded for consideration of additional reliance damages for a contract breach, it is possible to have a restitutionary remedy while still giving force to the contract because a restitutionary remedy "does not actually 'rescind' the breached contract." 716 F.2d at 1297. "[A] plaintiff may request restitution in a breach of contract action as a substitute measure of lost profits…." *Id.* (citation omitted); *see also In re Asia Global Crossing*, 404 B.R. at 342 ("[R]estitution is often an appropriate remedy for breach of an enforceable contract, whether or not there is a 'rescission' of that contract.")

Abbott is similarly wrong in suggesting that GSK only has a claim for damages based on a restitutionary measure if there is a "total breach" as opposed to a "partial breach." Since restitutionary damages are a "substitute measure of lost profits" and lost profits damages are not limited to situations concerning a "total breach," neither should restitutionary damages be so limited. Indeed, Abbott's instruction that the jury should offset any benefits GSK retains from Abbott against GSK's restitutionary damages award suggests that restitutionary damages are available for partial breaches.

In any event, where cases do discuss the severity of a breach in relation to restitutionary damages, they typically speak of a "substantial," not "total," breach. *Cf. In re Asia Global Crossing*, 404 B.R. at 343 (rejecting argument that restitution measure of damages unavailable because non-breaching received "substantially everything" it bargained for); *CBS, Inc.*, 716 F.2d at 1296 (noting "rescission" available if there is a "substantial breach."). And courts have recognized that breach of the covenant of good faith and fair dealing is a substantial breach. *See, e.g.*, *Carvel Corp. v. Diversified Mgmt. Group, Inc.*, 930 F.2d 228, 231 (2nd Cir. 1991).

Finally, the Court should not be fooled by Abbott's attempts to resuscitate its non-existent requirement of recission through an argument that any award to GSK be offset by the benefit received by GSK from Abbott. GSK's believes its evidence will show that Abbott destroyed the fruits of the contract to GSK domestically, so in GSK's view there are no benefits to offset against the value GSK paid for those U.S. rights. If Abbott is successful in convincing the jury that it merely injured that right, then the jury will be in a position to assess what portion of the value

should be returned to GSK. Moreover, GSK is not claiming restitutionary damages for royalties paid on sales outside the United States (where Abbott did not hike Norvir's price) or for the lump sum payments under the contract even though those could be attributed, in part, to the United States portion of the contract. As such, there is no "offsetting value" and Abbott's argument is simply another way to require unwinding the contract even though the case law clearly states that restitutionary remedies need not require simultaneous recission. *In re Asia Global Crossing*, 404 B.R. at 342.

While GSK believes that lost profits are recoverable for Abbott's breach, should those damages become unavailable for any reason, there are no legal hurdles for awarding restitutionary damages as an alternative remedy.

## CONCLUSION

GSK believes that the evidence at trial will show that Abbott is liable on all of GSK's causes of action and that no legal impediments exist to that conclusion. With respect to the UDTPA claim under North Carolina law, GSK further urges the Court to find that Abbott violated section 75-1.1 of that statute, if as GSK expects, the jury finds that Abbott engaged in the conduct listed in that section of the verdict form.

Dated: January 25, 2011

Respectfully submitted,

IRELL & MANELLA LLP

By: */s/ Alexander F. Wiles*
    Alexander F. Wiles

## GENERAL ORDER 45 ATTESTATION

Pursuant to General Order No. 45, Section X, I attest under penalty of perjury that concurrence in the filing of this document has been obtained from Alexander F. Wiles.

Dated: January 25, 2010

    */s/ Trevor V. Stockinger*
    Trevor V. Stockinger
    IRELL & MANELLA LLP
    Attorneys for GlaxoSmithKline