1  WINSTON & STRAWN LLP
   James F. Hurst *(Admitted Pro Hac Vice)*
2  David J. Doyle *(Admitted Pro Hac Vice)*
   Samuel S. Park *(Admitted Pro Hac Vice)*
3  Stephanie S. McCallum *(Admitted Pro Hac Vice)*
   35 W. Wacker Drive
4  Chicago, IL 60601-9703
   Telephone:    (312) 558-5600
5  Facsimile:    (312) 558-5700
   jhurst@winston.com; ddoyle@winston.com;
6  spark@winston.com; smccallum@winston.com

7  MUNGER, TOLLES & OLSON LLP
   Jeffrey I. Weinberger (SBN 56214)
8  Stuart N. Senator (SBN 148009)
   Keith R.D. Hamilton (SBN 252115)
9  355 South Grand Avenue
   Los Angeles, CA  90071-1560
10 Telephone:    (213) 683-9100
   Facsimile:    (213) 687-3702
11 jeffrey.weinberger@mto.com;
   stuart.senator@mto.com;
12 keith.hamilton@mto.com

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Joseph R.  Saveri
Brendan P.  Glackin
Sarah R.  London
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone:    (415) 956-1000
Facsimile:    (415) 956-1008
jsaveri@lchb.com; bglackin@lchb.com;
slondon@lchb.com

IRELL & MANELLA LLP
Alexander F. Wiles (SBN 73596)
Brian Hennigan (SBN 86955)
Trevor V. Stockinger (SBN 226359)
S. Albert Wang (SBN 250163)
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:    (310) 277-1010
Facsimile:    (310) 203-7199
awiles@irell.com; bhennigan@irell.com
tstockinger@irell.com; awang@irell.com

13                                                          [ADDITIONAL COUNSEL ON
                                                            SIGNATURE PAGE]
14
                          **UNITED STATES DISTRICT COURT**
15
              **NORTHERN DISTRICT OF CALIFORNIA - OAKLAND DIVISION**
16

17 SMITHKLINE BEECHAM
   CORPORATION, d/b/a
18 GLAXOSMITHKLINE,

19              Plaintiff,

20 vs.

21 ABBOTT LABORATORIES,

22              Defendant.

23

24

25  *(Caption continued on next page)*

CASE NO.  C 07-5702 (CW)

Related per December 5, 2007 Order to Case No.
C 04-1511 (CW)

**JOINT SUBMISSION OF PROPOSED
JURY INSTRUCTIONS AND ARGUMENT
[UPDATED]**

Judge:      Honorable Claudia Wilken
Date:       N/A
Time:       N/A

26

27

28

1

2   SAFEWAY INC; WALGREEN CO.; THE          CASE NO.  C 07-5470 (CW)
    KROGER CO.; NEW ALBERTSON'S,
3   INC.; AMERICAN SALES COMPANY,           Related per November 19, 2007 Order to Case
    INC.; AND HEB GROCERY COMPANY,          No. C 04-1511(CW)
    LP,
4                                           **JOINT SUBMISSION OF PROPOSED JURY**
                Plaintiffs,                 **INSTRUCTIONS AND ARGUMENT**
5                                           **[UPDATED]**
         vs.
6
    ABBOTT LABORATORIES,
7
                Defendant.
8
    RITE AID CORPORATION; RITE AID          CASE NO.  C 07-6120 (CW)
9   HDQTRS CORP.; JCG (PJC) USA, LLC;
    MAXI DRUG, INC D/B/A BROOKS             Related per December 5, 2007 Order to Case No.
10  PHARMACY; ECKERD                        C 04-1511 (CW)
    CORPORATION; CVS PHARMACY,
11  INC.; AND CAREMARK LLC,                 **JOINT SUBMISSION OF PROPOSED JURY**
                                            **INSTRUCTIONS AND ARGUMENT**
12              Plaintiffs,                 **[UPDATED]**

13       vs.

14
    ABBOTT LABORATORIES,
15
                Defendant.
16
    MEIJER, INC. & MEIJER                   CASE NO.  C 07-5985 (CW)
17  DISTRIBUTION, INC.; ROCHESTER           (Consolidated Cases)
    DRUG CO-OPERATIVE, INC.; AND            Related per November 30, 2007 Order to Case
18  LOUISIANA WHOLESALE DRUG                No. C 04-1511 (CW)
    COMPANY, INC., ON BEHALF OF
19  THEMSELVES AND ALL OTHERS               **JOINT SUBMISSION OF PROPOSED JURY**
    SIMILARLY SITUATED,                     **INSTRUCTIONS AND ARGUMENT**
20                                          **[UPDATED]**
                Plaintiffs,
21
         vs.
22
    ABBOTT LABORATORIES,
23
                Defendant.
24

25

26

27

28

1      Pursuant to this Court's July 1, 2010 Order for pre-trial Preparation, the Parties

2  respectfully submit their Proposed Jury Instructions and Argument, attached herein.  This

3  document replaces the Proposed Jury Instructions and Argument document filed by the parties on

4  January 26, 2011.

| | |
|---|---|
| DATED: January 28, 2011 | Respectfully submitted, |
| | MUNGER, TOLLES & OLSON LLP<br>WINSTON & STRAWN LLP |
| | By:       */s/ Jeffrey I. Weinberger*<br>      JEFFREY I. WEINBERGER<br>*Attorneys for Defendant Abbott Laboratories* |
| | LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP<br>By:   */s/ Brendan P. Glackin*<br>      Brendan P.  Glackin<br>*Local Counsel for the Direct Purchaser Class* |
| | IRELL & MANELLA LLP<br>*Attorneys for Defendant Abbott Laboratories*<br>By:   */s/ Alexander F. Wiles*<br>      Alexander F.  Wiles<br>*Attorneys for Plaintiff Glaxosmithkline Beecham Corporation, d/b/a Glaxosmithkline* |
| | DILLINGHAM & MURPHY, LLP<br>William Francis Murphy<br>Barbara Lynne Harris Chiang<br>Edward Eldon Hartley<br>225 Bush Street, Sixth Floor<br>San Francisco, CA 94104-4207<br>Telephone: (415) 397-2700<br>Facsimile: (415) 397-3300<br>Email: wfm@dillinghammurphy.com,<br>bhc@dillinghammurphy.com,<br>eeh@dillinghammurphy.com |

| | |
|---|---|
| | *Local Counsel for Safeway Inc., et al., and Rite Aid Corp., et al.* |
| | BERGER & MONTAGUE, P.C.<br>Eric L.  Cramer, Pro Hac Vice<br>Daniel Simons, Pro Hac Vice<br>1622 Locust Street<br>Philadelphia, PA 19103<br>Telephone: (215) 875-3000<br>Facsimile: (215) 875-4604<br>Email: ecramer@bm.net, dsimons@bm.net<br><br>*Co-Lead Counsel for the Direct Purchaser Class* |
| | GRANT & EISENHOFER, P.A.<br>Linda Nussbaum, Pro Hac Vice<br>John D.  Radice, Pro Hac Vice<br>485 Lexington Avenue<br>New York, NY 10017<br>Phone: (646) 722-8500<br>Facsimile: (646) 722-8501<br>Email: lnussbaum@gelaw.com, jradice@gelaw.com<br><br>*Co-Lead Counsel for the Direct Purchaser Class* |
| | GARWIN GERSTEIN & FISHER, LLP<br>Bruce E.  Gerstein, Pro Hac Vice<br>Joseph Opper, Pro Hac Vice<br>1501 Broadway, Suite 1416<br>New York, New York 10036<br>Telephone: (212) 398-0055<br>Facsimile: (212) 764-6620<br>Email: bgerstein@garwingerstein.com,<br>jopper@garwingerstein.com<br><br>*Co-Lead Counsel for the Direct Purchaser Class* |
| | KENNY NACHWALTER, PA<br>Lauren C.  Ravkind, Pro Hac Vice<br>Scott Eliot Perwin, Pro Hac Vice<br>201 S.  Biscayne Blvd.<br>1100 Miami Center<br>Miami, Florida 33131<br>Telephone: 305-373-1000<br>Facsimile: 305-372-1861<br>Email: sperwin@kennynachwalter.com<br><br>*Lead Counsel for Safeway Inc., et al.* |

| | |
|---|---|
| 1 | |
| 2 | **HANGLEY ARONCHICK SEGAL & PUDLIN**<br>Steve D.  Shadowen, Pro Hac Vice<br>Monica L.  Rebuck, Pro Hac Vice |
| 3 | 30 North Third Street, Suite 700 |
| 4 | Harrisburg, PA 17101-1701<br>Telephone: (717) 364-1007 |
| 5 | Facsimile: (717) 362-1020<br>Email: sshadowen@hangley.com, |
| 6 | mrebuck@hangley.com |
| 7 | *Lead Counsel for Rite Aid Corp., et al.* |
| 8 | **ODOM & DES ROCHES, LLP**<br>John Gregory Odom, Pro Hac Vice |
| 9 | Stuart E.  Des Roches, Pro Hac Vice<br>John Alden Meade, Pro Hac Vice |
| 10 | Suite 2020, Poydras Center<br>650 Poydras Street |
| 11 | New Orleans, LA 70130<br>Telephone: (504) 522-0077 |
| 12 | Facsimile: (504) 522-0078<br>Email: greg@odrlaw.com; stuart@odrlaw.com; |
| 13 | jmeade@odrlaw.com |
| 14 | **SMITH FOOTE, LLP**<br>David P.  Smith, Pro Hac Vice |
| 15 | W.  Ross Foote, Pro Hac Vice<br>720 Murray Street |
| 16 | P.O.  Box 1632<br>Alexandria, LA 71309 |
| 17 | Telephone: (318) 445-4480<br>Facsimile: (318) 487-1741 |
| 18 | Email: dpsmith@psfllp.com; rfoote@psfllp.com |
| 19 | **SPIEGEL LIAO & KAGAY, LLP**<br>Charles M.  Kagay (State Bar No.  73377) |
| 20 | Wayne M.  Liao (State Bar No.  66591)<br>388 Market Street, Suite 900 |
| 21 | San Francisco, California 94111<br>Telephone: (415) 956-5959 |
| 22 | Facsimile: (415) 962-1431<br>Email: cmk@slksf.com; wml@slksf.com |
| 23 | |
| 24 | **KOZYAK TROPIN & THROCKMORTON**<br>Tucker Ronzetti, Pro Hac Vice |
| 25 | Adam Moskowitz, Pro Hac Vice<br>2800 Wachovia Financial Center |
| 26 | 200 South Biscayne Boulevard<br>Miami, Florida 33131-2335 |
| 27 | Telephone: (305) 372-1800<br>Telecopier: (305) 372-3508 |
| 28 | Email: tr@kttlaw.com; amm@kttlaw.com |

AUBERTINE DRAPER ROSE, LLP
Andrew E.  Aubertine, Pro Hac Vice
8203 SE 7th Avenue
Portland, Oregon 97202
Telephone: (503) 221-4570
Facsimile: (503) 222-3032
Email: aa@adr-portland.com

LAW OFFICES OF JOSHUA P.  DAVIS
Joshua P.  Davis (State Bar No.  193254)
437A Valley Street
San Francisco, CA 94131
Telephone: (415) 422-6223
Email: davisj@usfca.edu

VANEK, VICKERS & MASINI, P.C.
Joseph M.  Vanek, Pro Hac Vice
David P.  Germaine, Pro Hac Vice
111 South Wacker Drive, Suite 4050
Chicago, IL 60606
Telephone: (312) 224-1500
Facsimile: (312) 224-1510
Email: jvanek@vaneklaw.com;
dgermaine@vaneklaw.com

SPERLING & SLATER
Paul E.  Slater, Pro Hac Vice
55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
Telephone: (312) 641-3200
Facsimile: (312) 641-6492
Email: pes@sperling-law.com

*Additional Direct Purchaser Class Counsel*

1

2   **ARNOLD & PORTER LLP**

3   Kenneth A. Letzler (Admitted *Pro Hac Vice*)
    Kenneth_Letzler@aporter.com
    Daniel S. Pariser (Admitted *Pro Hac Vice*)
4   Daniel_Pariser@aporter.com
    Barbara H. Wootton (Admitted *Pro Hac Vice*)
5   Barbara_Wootton@aporter.com
    555 Twelfth Street, NW
6   Washington, DC  20004-1206
    Telephone:   (202) 942-5000
7   Facsimile:     (202) 942-5999

8   *Attorneys for Plaintiff Glaxosmithkline Beecham*
    *Corporation, d/b/a Glaxosmithkline*
9

10  **MUNGER, TOLLES & OLSON LLP**

11  Michelle Friedland (SBN 234124)
    Kathryn A. Eidmann (SBN 268053)
12  MUNGER, TOLLES & OLSON LLP
    560 Mission Street
13  San Francisco, CA 94105-2907
    Telephone:     (415) 512-4000
14  Facsimile:      (415) 512-4077
    michelle.friedland@mto.com
15  kathryn.eidmann@mto.com

16  *Attorneys for Defendant Abbott Laboratories*

17  **WINSTON & STRAWN LLP**

18  Nicole M. Norris (SBN 222785)
    WINSTON & STRAWN LLP
19  101 California Street, Suite 3900
    San Francisco, CA  94111-5894
20  Telephone:     415-591-1000
    Facsimile:      415-591-1400
21  nnorris@winston.com

22  Charles B. Klein *(Admitted Pro Hac Vice)*
    Matthew A. Campbell *(Admitted Pro Hac Vice)*
23  WINSTON & STRAWN LLP
    1700 K Street, N.W.
24  Washington, DC  20007
    Telephone:     (202) 282-5000
25  Facsimile:      (202) 282-5100
    cklein@winston.com; mcampbell@winston.com
26
    *Attorneys for Defendant Abbott Laboratories*
27

28

1    Pursuant to General Order No. 45, Section X, I attest under penalty of perjury that

2    concurrence in the filing of this document has been obtained from Jeffrey I. Weinberger,

3    Alexander F. Wiles, and Brendan P. Glackin.

4

5    Dated:  January 28, 2011

6                                          ___/s/ Michelle Friedland_____
                                           Michelle Friedland
7                                          Munger, Tolles & Olson LLP
                                           *Attorneys for Defendant Abbott Laboratories*
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# GENERAL INSTRUCTIONS

[JOINT] DUTY OF THE JURY ............................................................................1

[DISPUTED] GSK'S PROPOSED INSTRUCTION ON  CLAIMS AND DEFENSES....................................................................................2

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED INSTRUCTION  ON CLAIMS AND DEFENSES 1 .........................................................................3

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED INSTRUCTION ON CLAIMS AND DEFENSES 3 .........................................................................5

[DISPUTED] ABBOTT'S PROPOSED INSTRUCTION ON CLAIMS AND DEFENSES....................................................................................7

[JOINT] BURDEN OF PROOF – PREPONDERANCE OF EVIDENCE ........................10

[DISPUTED] GSK'S PROPOSED INSTRUCTION ON  TWO OR MORE PARTIES – DIFFERENT LEGAL RIGHTS ........................................................11

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED INSTRUCTION ON TWO OR MORE PARTIES – DIFFERENT LEGAL RIGHTS .........................................12

[DISPUTED] ABBOTT'S PROPOSED INSTRUCTION ON  TWO OR MORE PARTIES—DIFFERENT LEGAL RIGHTS...........................................................13

[JOINT] PROPOSED INSTRUCTION ON WHAT IS EVIDENCE ................................16

[DISPUTED] GSK AND CUSTOMER PLAINTIFFS' PROPOSED INSTRUCTION ON WHAT IS NOT EVIDENCE ............................................................17

[DISPUTED] ABBOTT'S PROPOSED INSTRUCTION ON WHAT IS NOT EVIDENCE....................................................................................19

[JOINT] EVIDENCE FOR A LIMITED PURPOSE .........................................................22

[JOINT] PROPOSED INSTRUCTION ON DIRECT AND CIRCUMSTANTIAL EVIDENCE ....................................................................23

[JOINT] RULINGS ON OBJECTIONS.........................................................................24

[JOINT] CREDIBILITY OF WITNESSES......................................................................25

[JOINT] CONDUCT OF THE JURY..............................................................................26

[JOINT] NO TRANSCRIPT AVAILABLE TO THE JURY..............................................27

[JOINT] TAKING NOTES.............................................................................................28

[JOINT] QUESTIONS TO WITNESSES BY JURORS ....................................................29

[JOINT] BENCH CONFERENCES AND RECESSES ....................................................30

[JOINT] OUTLINE OF TRIAL ..........................................................................................31

[JOINT] STIPULATIONS OF FACT ................................................................................32

[JOINT] DEPOSITION IN LIEU OF LIVE TESTIMONY ..............................................33

[JOINT] IMPEACHMENT EVIDENCE – WITNESS .....................................................34

[JOINT] USE OF INTERROGATORIES OF A PARTY ..................................................35

[JOINT] EXPERT OPINION ............................................................................................36

[JOINT] CHARTS AND SUMMARIES NOT RECEIVED IN EVIDENCE ...................37

[JOINT] CHARTS AND SUMMARIES IN EVIDENCE .................................................38

[JOINT] CORPORATIONS – FAIR TREATMENT ........................................................39

[JOINT] LIABILITY OF CORPORATION ......................................................................40

[JOINT] DUTY TO DELIBERATE ..................................................................................41

[JOINT] COMMUNICATIONS WITH COURT ..............................................................42

[JOINT] RETURN OF VERDICT ....................................................................................43

[JOINT] ADDITIONAL INSTRUCTIONS OF LAW ......................................................44

**ANTITRUST INSTRUCTIONS**

[DISPUTED] GSK AND CUSTOMER PLAINTIFFS' PROPOSED
INTRODUCTORY ANTITRUST INSTRUCTION ...........................................................45

[DISPUTED] GSK'S PROPOSED ACTUAL MONOPOLIZATION
ELEMENTS INSTRUCTION ...........................................................................................49

*Relevant Market and Monopoly Power*

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED ACTUAL
MONOPOLIZATION ELEMENTS INSTRUCTION ........................................................50

[DISPUTED] ABBOTT'S PROPOSED ACTUAL MONOPOLIZATION
ELEMENTS INSTRUCTION ...........................................................................................52

[DISPUTED] GSK'S PROPOSED MONOPOLY POWER AND RELEVANT
MARKET INSTRUCTION 1 ................................................................................66

[DISPUTED] GSK'S PROPOSED MONOPOLY POWER AND RELEVANT
MARKET INSTRUCTION 2 ................................................................................67

[DISPUTED] GSK'S PROPOSED MONOPOLY POWER AND RELEVANT
MARKET INSTRUCTION 3 ................................................................................68

[DISPUTED] GSK'S PROPOSED MONOPOLY POWER AND RELEVANT
MARKET INSTRUCTION 4 ................................................................................69

[JOINT] PROPOSED RELEVANT GEOGRAPHIC MARKET
INSTRUCTION..................................................................................................70

[DISPUTED] GSK'S MONOPOLY POWER AND RELEVANT MARKET
INSTRUCTION 5 ...............................................................................................71

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED MONOPOLY
POWER AND RELEVANT MARKET INSTRUCTION 1 .................................74

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED MONOPOLY
POWER AND RELEVANT MARKET INSTRUCTION 2 .................................76

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED MONOPOLY
POWER AND RELEVANT MARKET INSTRUCTION 3 .................................77

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED MONOPOLY
POWER AND RELEVANT MARKET  INSTRUCTION 4 ................................79

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED MONOPOLY
POWER AND RELEVANT MARKET INSTRUCTION 5 .................................80

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED MONOPOLY
POWER AND RELEVANT MARKET INSTRUCTION 6 .................................81

[JOINT] PROPOSED RELEVANT GEOGRAPHIC MARKET
INSTRUCTION..................................................................................................84

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED MONOPOLY
POWER AND RELEVANT MARKET INSTRUCTION 7 .................................85

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND
RELEVANT MARKET INSTRUCTION 1 .........................................................88

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND
RELEVANT MARKET INSTRUCTION 2 .........................................................89

[JOINT] PROPOSED RELEVANT GEOGRAPHIC MARKET
INSTRUCTION ............................................................................................. 90

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND
RELEVANT MARKET INSTRUCTION 3 ....................................................... 91

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND
RELEVANT MARKET INSTRUCTION 4 ....................................................... 92

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND
RELEVANT MARKET INSTRUCTION 5 ....................................................... 93

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND
RELEVANT MARKET INSTRUCTION 6 ....................................................... 94

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND
RELEVANT MARKET INSTRUCTION 7 ....................................................... 97

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND
RELEVANT MARKET INSTRUCTION 8 ....................................................... 98

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND
RELEVANT MARKET INSTRUCTION 9 ....................................................... 99

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND
RELEVANT MARKET INSTRUCTION 10 ................................................... 100

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND
RELEVANT MARKET INSTRUCTION 11 ................................................... 102

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND
RELEVANT MARKET INSTRUCTION 12 ................................................... 103

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND
RELEVANT MARKET INSTRUCTION 13 ................................................... 104

### Anticompetitive Conduct

[DISPUTED] GSK'S AND CUSTOMER PLAINTIFFS' PROPOSED
ANTICOMPETITIVE CONDUCT INSTRUCTION 1 ................................... 141

[DISPUTED] ABBOTT'S PROPOSED ANTICOMPETITIVE CONDUCT
INSTRUCTION 1 .......................................................................................... 143

[DISPUTED] GSK AND CUSTOMER PLAINTIFFS' PROPOSED DUTY
TO DEAL INSTRUCTION ............................................................................. 149

[DISPUTED] ABBOTT'S PROPOSED DUTY TO DEAL INSTRUCTION 1 .............. 151

[DISPUTED] ABBOTT'S PROPOSED DUTY TO DEAL INSTRUCTION 2...............153

[DISPUTED] ABBOTT'S PROPOSED DUTY TO DEAL INSTRUCTION 3...............154

[DISPUTED] ABBOTT'S PROPOSED DUTY TO DEAL INSTRUCTION 4...............155

[DISPUTED] ABBOTT'S PROPOSED DUTY TO DEAL INSTRUCTION 5...............156

[DISPUTED] ABBOTT'S PROPOSED DUTY TO DEAL INSTRUCTION 7...............157

[DISPUTED] ABBOTT'S PROPOSED DUTY TO DEAL INSTRUCTION 6...............165

[DISPUTED] GSK'S PROPOSED PREDATORY BUNDLING
INSTRUCTION....................................................................................................169

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED PREDATORY
BUNDLING INSTRUCTION ..............................................................................171

[DISPUTED] ABBOTT'S PROPOSED PREDATORY BUNDLED
DISCOUNTING  INSTRUCTION 1...................................................................173

[DISPUTED] ABBOTT'S PROPOSED PREDATORY BUNDLED
DISCOUNTING INSTRUCTION 2......................................................................175

[DISPUTED] ABBOTT'S PROPOSED PREDATORY BUNDLED
DISCOUNTING INSTRUCTION 3......................................................................176

[DISPUTED] ABBOTT'S PROPOSED PREDATORY BUNDLED
DISCOUNTING INSTRUCTION 4......................................................................177

[DISPUTED] ABBOTT'S PROPOSED PREDATORY BUNDLED
DISCOUNTING INSTRUCTION 5......................................................................179

[DISPUTED] ABBOTT'S PROPOSED PREDATORY BUNDLED
DISCOUNTING  INSTRUCTION 6......................................................................181

[DISPUTED] ABBOTT'S PROPOSED PREDATORY BUNDLED
DISCOUNTING INSTRUCTION 7......................................................................182

[DISPUTED] ABBOTT'S PROPOSED PREDATORY BUNDLED
DISCOUNTING  INSTRUCTION 8......................................................................183

[DISPUTED] ABBOTT'S PROPOSED PREDATORY BUNDLED
DISCOUNTING INSTRUCTION 9......................................................................199

[DISPUTED] ABBOTT'S PROPOSED PREDATORY BUNDLED
DISCOUNTING INSTRUCTION 10....................................................................201

[DISPUTED] ABBOTT'S PROPOSED ANTICOMPETITIVE CONDUCT
INSTRUCTION 2 ............................................................................................................203

*Injury and Damages*

[DISPUTED] GSK'S PROPOSED DAMAGES INSTRUCTION 1 ................................212

[DISPUTED] GSK'S PROPOSED DAMAGES INSTRUCTION 2 ................................214

[DISPUTED] CUSTOMER PLAINTIFFS' DAMAGES INSTRUCTION 1 ..................215

[DISPUTED] CUSTOMER PLAINTIFFS' DAMAGES INSTRUCTION 2 ..................217

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED DAMAGES
INSTRUCTION 3 ............................................................................................................219

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED DAMAGES
INSTRUCTION 4 ............................................................................................................220

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED DAMAGES
INSTRUCTION 5 ............................................................................................................221

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED DAMAGES
INSTRUCTION 6 ............................................................................................................223

[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 1 .......................224

[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 2 .......................225

[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 3 .......................229

[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 4 .......................230

[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 5 .......................231

[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 6 .......................232

[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 7 .......................234

[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 8 .......................236

*Plaintiffs' Instruction on Patent Relevance*
(Abbott's instructions relevant to this issue are at pages 165 and 199)

[DISPUTED] GSK'S AND CUSTOMER PLAINTIFFS' PROPOSED NO
PATENT IMMUNITY INSTRUCTION ..........................................................................266

*Attempted Monopolization*

[DISPUTED] GSK'S AND CUSTOMER PLAINTIFFS' PROPOSED
INTRODUCTORY ATTEMPTED MONOPOLIZATION CLAIM
INSTRUCTION.......................................................................................................269

[DISPUTED] ABBOTT'S PROPOSED INTRODUCTORY ATTEMPTED
MONOPOLIZATION CLAIM INSTRUCTION .................................................270

[DISPUTED] GSK'S AND CUSTOMER PLAINTIFFS' PROPOSED
ATTEMPTED MONOPOLIZATION ANTICOMPETITIVE CONDUCT
INSTRUCTION.......................................................................................................274

[DISPUTED] ABBOTT'S PROPOSED ATTEMPTED MONOPOLIZATION
ANTICOMPETITIVE CONDUCT INSTRUCTION .........................................275

[DISPUTED] ABBOTT'S PROPOSED SPECIFIC INTENT INSTRUCTION
1...............................................................................................................................278

[DISPUTED] GSK'S PROPOSED SPECIFIC INTENT INSTRUCTION .....................280

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED ATTEMPTED
MONOPOLIZATION – SPECIFIC INTENT INSTRUCTION 1 ....................281

[DISPUTED] ABBOTT'S PROPOSED SPECIFIC INTENT INSTRUCTION
2...............................................................................................................................282

[DISPUTED] GSK'S AND CUSTOMER PLAINTIFFS' PROPOSED
DANGEROUS PROBABILITY OF SUCCESS INSTRUCTION ...................286

[DISPUTED] ABBOTT'S PROPOSED DANGEROUS PROBABILITY OF
SUCCESS INSTRUCTION ...............................................................................287

[JOINT] INSTRUCTION ON INTERSTATE COMMERCE ...........................................293

[DISPUTED] GSK'S PROPOSED ATTEMPTED MONOPOLIZATION
INSTRUCTION 2 ON DAMAGES ...................................................................294

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED ATTEMPTED
MONOPOLIZATION INSTRUCTION ON INJURY ......................................295

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED ATTEMPTED
MONOPOLIZATION INSTRUCTION ON DAMAGES .................................296

[DISPUTED] ABBOTT'S PROPOSED ATTEMPTED MONOPOLIZATION
INSTRUCTION ON DAMAGES ......................................................................297

[DISPUTED] GSK'S AND CUSTOMER PLAINTIFFS' PROPOSED NO
PATENT IMMUNITY INSTRUCTION ........................................................................301


## STATE LAW CLAIMS

[DISPUTED] GSK'S PROPOSED INTRODUCTORY BREACH OF THE
IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
INSTRUCTION .............................................................................................................303

[DISPUTED] ABBOTT'S PROPOSED INTRODUCTORY BREACH OF
THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
INSTRUCTION 1 ...........................................................................................................305

[DISPUTED] ABBOTT'S PROPOSED INTRODUCTORY BREACH OF
THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
INSTRUCTION 2 ...........................................................................................................306

[DISPUTED] ABBOTT'S PROPOSED INTRODUCTORY BREACH OF
THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
INSTRUCTION 3 ...........................................................................................................308

GSK'S PROPOSED BINDING CONTRACT INSTRUCTION .....................................317

[DISPUTED] GSK'S PROPOSED BREACH INSTRUCTION .......................................318

[DISPUTED] ABBOTT'S PROPOSED BREACH INSTRUCTION ..............................319

[DISPUTED] GSK'S PROPOSED DAMAGES INSTRUCTION 1 ...............................326

[DISPUTED] GSK'S PROPOSED BREACH OF IMPLIED COVENANT
DAMAGES INSTRUCTION 2 .......................................................................................327

[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 1 ........................329

[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 2 ........................330

[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 3 ........................331

[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 4 ........................332

[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 5 ........................333

[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 6 ........................334

[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 7 ........................335

[DISPUTED] GSK'S PROPOSED LIMITATION OF LIABILITY DEFENSE
INSTRUCTION 1 ..............................................................................................347

[DISPUTED] GSK'S PROPOSED LIMITATION OF LIABILITY DEFENSE
INSTRUCTION 2 ..............................................................................................348

[DISPUTED] GSK'S PROPOSED LIMITATION OF LIABILITY DEFENSE
INSTRUCTION 3 ..............................................................................................349

[DISPUTED] GSK'S PROPOSED NORTH CAROLINA UNFAIR AND
DECEPTIVE TRADE PRACTICES ACT INSTRUCTION 1 .........................................358

[DISPUTED] GSK'S PROPOSED NORTH CAROLINA UNFAIR AND
DECEPTIVE TRADE PRACTICES ACT INSTRUCTION 2 .........................................359

[DISPUTED] GSK'S PROPOSED NORTH CAROLINA UNFAIR AND
DECEPTIVE TRADE PRACTICES ACT INSTRUCTION 3 .........................................360

[DISPUTED] GSK'S PROPOSED NORTH CAROLINA UNFAIR AND
DECEPTIVE TRADE PRACTICES ACT INSTRUCTION 4 .........................................361

[DISPUTED] GSK'S PROPOSED NORTH CAROLINA UNFAIR AND
DECEPTIVE TRADE PRACTICES ACT INSTRUCTION 5 .........................................362

[DISPUTED] ABBOTT'S PROPOSED NORTH CAROLINA UNFAIR AND
DECEPTIVE TRADE PRACTICES ACT INSTRUCTION 1 .........................................363

[DISPUTED] ABBOTT'S PROPOSED NORTH CAROLINA UNFAIR AND
DECEPTIVE TRADE PRACTICES ACT INSTRUCTION 2 .........................................364

## [JOINT] DUTY OF THE JURY

Ladies and gentlemen:  You are now the jury in this case.  It is my duty to instruct you on the law.

These instructions are ~~preliminary instructions~~ to help you understand the principles that apply to civil trials and to help you understand the evidence as you listen to it.  You will be allowed to keep this set throughout the trial to which to refer.  This set of instructions is not to be taken home and must remain in the jury room when you leave in the evenings.  ~~At the end of the trial, I will give you a final set of instructions.  It is the final set of instructions which will govern your deliberations.~~

You must not infer from these instructions or from anything I may say or do as indicating that I have an opinion regarding the evidence or what your verdict should be.

It is your duty to find the facts from all the evidence in the case.  To those facts you will apply the law as I give it to you.  You must follow the law as I give it to you whether you agree with it or not.  And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy.  That means that you must decide the case solely on the evidence before you.  You will recall that you took an oath to do so.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all important.

**Source**:  9th Cir. MJI (2007) No. 1.1A (modified, subtractions indicated with strikethrough).

[DISPUTED] GSK'S PROPOSED INSTRUCTION ON
CLAIMS AND DEFENSES

To help you follow the evidence, I will give you a brief summary of the positions of the parties:

[One of the plaintiffs is GlaxoSmithKline or GSK.  Another set of plaintiffs are the Customer Plaintiffs who are a group of pharmaceutical retailers.  They include Meijer, Inc., Meijer Distribution, Inc., Louisiana Drug Wholesale Co., Rochester Drug Cooperative, Inc., Rite Aid Corporation, Rite Aid  HDQTRS, Corp., JCG (pjc) USA, L.L.C., Maxi Drug, Inc. d/b/a Brooks Pharmacy, Eckerd Corporation, CVS Pharmacy, Inc., Caremark, L.L.C., Safeway, Inc., Walgreen Co., The Kroger Co., New Albertson's, Inc., American Sales Company, Inc., and HEB Grocery Company LP.  Both GSK and the Customer Plaintiffs claim that the defendant, Abbott Laboratories or Abbott, violated antitrust laws in a manner that damaged them.]

[GSK also claims that Abbott: (1) breached the implied covenant of good faith and fair dealing in a contract between the parties in a manner that damaged GSK, and (2) violated the North Carolina Unfair and Deceptive Trade Practices Act in a manner that damaged GSK.]  The plaintiffs have the burden of proving these claims.

Abbott denies those claims.

**Source:**  9th Cir. MJI (2007) No. 1.2 (modified as indicated by bracketed additions).

## [DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED INSTRUCTION ON CLAIMS AND DEFENSES 1[1]

To help you follow the evidence, I will give you a brief summary of the positions of the parties:

[The defendant in this case is Abbott Laboratories ("Abbott")]

[There are three sets of plaintiffs in this lawsuit. Certain plaintiffs are individual companies bringing claims on their own behalf. In addition, certain claims have been brought as class actions. So, let me explain what a class action is. A group of individuals or companies that have similar legal claims can come together and file a lawsuit as a class. The court appoints some representatives of that group to present their cases on behalf of the class. So although you will not hear from each individual member of the class, you will hear the claims of the individual class representatives, and any judgment – win or lose – will be binding on the rest of the class.]

[The first set of plaintiffs is a group of Abbott's customers who purchased the prescription drugs Norvir or Kaletra directly from Abbott during the period from December 3, 2003 through August 27, 2008. I have certified this group of Plaintiffs as a class, representing customers who bought Norvir or Kaletra directly from Abbott during that time period (the "Class"). The three plaintiffs representing the Class are Meijer, Inc., Meijer Distribution, Inc., Louisiana Drug Wholesale Co., and Rochester Drug Cooperative, Inc.][2]

[The second group of Plaintiffs is a subset of Abbott's customers who purchased Norvir and/or Kaletra from Abbott who decided to sue on their own rather than staying in the Class. These Plaintiffs are Rite Aid, Maxi Drug or Brooks Pharmacy, Eckerd Corporation, CVS, Caremark, Safeway, Walgreen, Kroger, New Albertson's, American Sales Company, and HEB Grocery Company. I will refer to the first and second groups of Plaintiffs as the "Customer Plaintiffs."]

[The pharmaceutical company, GlaxoSmithKline or GSK, is also a plaintiff. GSK is pursuing profits it claims it lost as a result of Abbott's conduct. I will refer to the Customer Plaintiffs and GSK as "Plaintiffs".]

[~~The plaintiff claims that [*plaintiff's claims*]~~. [The Customer Plaintiffs and GSK claim that Abbott violated the U.S. antitrust laws and caused them to suffer damages.]

[GSK also claims that Abbott: (1) breached the implied covenant of good faith and fair dealing in a contract between the parties in a manner that damaged GSK, and (2)

---

[1] The Customer Plaintiffs have included only proposed introductory instructions where they diverge from GSK's proposed introductory instructions (with which the Customer Plaintiffs join) or from the joint instructions.

[2] *Meijer, Inc., v. Abbott Labs., No. C 07-5985,* No. C 07-5985, 2008 U.S. Dist. LEXIS 78219, *21 (N.D. Cal. Aug. 27, 2008) (certifying direct purchaser class).

violated the North Carolina Unfair and Deceptive Trade Practices Act in a manner that damaged GSK.]  The plaintiff[s] ha[ve] the burden of proving these claims.]

[Abbott] ~~The defendant~~ [denies those claims.]

**Source:**  9th Cir. Model Jury Instructions (2007) No. 1.2.

<u>[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED INSTRUCTION ON CLAIMS
AND DEFENSES 3</u>

MORE DETAILED DESCRIPTION OF CASE[3]

I am now going to summarize the nature of this dispute between GSK and Abbott
and between the Customer Plaintiffs and Abbott.  I do not intend to imply by this
summary any views with regard to the claims made by any party to this lawsuit.

[This case involves a dispute over brand-name prescription drugs known as
Protease Inhibitors used to fight the human immunodeficiency virus, or HIV.  Protease
Inhibitors are also known as PIs.  These drugs work by preventing HIV cells from
reproducing.]

[In 1996, Abbott introduced Norvir, a PI used to treat HIV.  Around the time of
Norvir's launch, it was discovered that, when taken in small quantities with another PI,
Norvir would "boost" the effectiveness of that PI.  Because of this "boosting" property,
Norvir is known as a booster.  Its active ingredient is called ritonavir.]

[In 2000, Abbott introduced Kaletra, which is a combination therapy pill
containing two active ingredients: lopinavir and ritonavir.  Ritonavir is used to boost the
effects of lopinavir.  Kaletra is known as a "boosted" PI.]

[Late in 2003, Bristol-Myers Squibb and GSK introduced new PI drugs that were
designed to be boosted by Norvir.  GSK's drug is called Lexiva.  These new boosted PI
drugs competed with Abbott's Kaletra.  Before launching Lexiva, GSK signed a contract
with Abbott which allowed GSK to co-promote and co-market Lexiva with Abbott's
Norvir.]

[On December 3, 2003, Abbott raised the wholesale price of Norvir by 400
percent overnight, while keeping the price of Kaletra steady.]

[Plaintiff GSK contends that the 400% Norvir price increase was a breach of
Abbott's obligation of good faith and fair dealing in its contract with Abbott, as well as a
violation of a statute prohibiting unfair and deceptive trade practices.]

[Plaintiffs allege that the Norvir price increase violated U.S. antitrust laws
because Abbott exploited its monopoly position as the sole manufacturer of Norvir in
order to protect another Abbott drug, Kaletra, from competition.]

[Plaintiffs also claim that because of Abbott's history of cooperation with other
manufacturers selling Boosted PIs, which were created to be used together with Norvir,

---

[3] Customer Plaintiffs believe that this instruction is necessary due to the complex
nature of the claims in order to provide additional guidance to the jury as they consider
the evidence.  This description was adapted from the Court's recitation of the facts in
prior orders.

Abbott had a duty under the antitrust laws to continue making Norvir available at reasonable prices.]

[GSK claims that Abbott's unlawful conduct harmed its ability to compete and caused it to lose profits on Lexiva.  The Customer Plaintiffs assert that they were forced to pay anticompetitive, unfairly inflated high prices for Norvir and Kaletra because of Abbott's unlawful conduct.]

[Abbott contends that the price increase was not unlawful, was made for legitimate business reasons having nothing to do with any conceivable impact on sales of Kaletra, and in any event did not impair Lexiva's ability to compete against Kaletra.]

**Source:**  4 Sand, et al., Modern Federal Jury Instructions – Civil, Instruction 80-3 & 80-18 (Matthew Bender 2009).

[DISPUTED] ABBOTT'S PROPOSED INSTRUCTION ON CLAIMS AND DEFENSES

To help you follow the evidence, I will give you a brief summary of the positions of the parties:

[One of the plaintiffs is GlaxoSmithKline or GSK. Another set of plaintiffs are the Customer Plaintiffs who are a group of pharmaceutical retailers. They include Meijer, Inc., Meijer Distribution, Inc., Louisiana Drug Wholesale Co., Rochester Drug Cooperative, Inc., Rite Aid Corporation, Rite Aid HDQTRS, Corp., JCG (pjc) USA, L.L.C., Maxi Drug, Inc. d/b/a Brooks Pharmacy, Eckerd Corporation, CVS Pharmacy, Inc., Caremark, L.L.C., Safeway, Inc., Walgreen Co., The Kroger Co., New Albertson's, Inc., American Sales Company, Inc., and HEB Grocery Company LP. Both GSK and the Customer Plaintiffs claim that the defendant, Abbott Laboratories or Abbott, violated antitrust laws in a manner that damaged them.]

[GSK also claims that Abbott: (1) breached the implied covenant of good faith and fair dealing in a contract between the parties in a manner that damaged GSK, and (2) violated the North Carolina Unfair and Deceptive Trade Practices Act in a manner that damaged GSK.] The plaintiffs have the burden of proving these claims.

Abbott denies those claims. [Abbott asserts that it did not violate antitrust laws or the North Carolina Unfair and deceptive Trade Practices Act and did not breach the implied covenant of good faith and fair dealing in a contract between itself and GSK. Abbott further disputes that plaintiffs are entitled to recover any damages.]

**Source:** 9th Cir. MJI (2007) No. 1.2 (modified as indicated by bracketed additions).

## GSK's Argument

The Court should adopt GSK's instruction on claims and defenses.  The jury will already be informed of the details of the claims through this Court's reading of the neutral statement as well as the parties' opening statements.  The most important issue, which GSK's instruction includes, is a recitation of the many plaintiffs involved in this suit and the specific claims each group is asserting.  GSK's simple instruction accomplishes this goal.

Abbott's instruction is biased.  For example, as it has done throughout this litigation, it continues to characterize the price hike using an absolute dollar value for a 100 mg dose of Norvir, rather than a percentage increase, and despite that Lexiva, when introduce, was boosted with 200 mg of Norvir.  It also states that Abbott discovered Norvir through its continuing research and testing suggesting that Abbott discovered boosting after it entered the market.  Yet, there are facts suggesting that Abbott knew of Norvir's use as a booster when it was released – an important fact given Abbott's defense that Abbott raised Norvir's price in 2003 to reflect its "new" value as a booster.  The jury should not hear the Court reading Abbott's version of the facts.  Better that a simple instruction, like GSK's, be read.

## Customer Plaintiffs' Argument

The Customer Plaintiffs maintain that the Court should deliver a neutral statement of the facts to the jury at the outset of the case.  The Customer Plaintiffs' summary is drawn from prior opinions of the Court.  If the Court is not satisfied with the summary provided, the Customer Plaintiffs suggest instead a statement agreed upon by the parties or one devised by the Court.

The Customer Plaintiffs believe that any introduction, however, should clearly introduce the three sets of plaintiffs: (1) the class of Customer Plaintiffs represented by Rochester Drug Cooperative, Inc., Louisiana Wholesale Drug Co., Inc., and Meijer Inc. and Meijer Distribution, Inc. ; (2) the opt-out Customer Plaintiffs; and (3) GSK.  The

instruction should also inform the jury of the definition of the class certified by this Court, and provide the jurors a basic understanding of what a class is. The Customer Plaintiffs also join GSK's critiques of this set of Abbott's proposed instructions.

## **Abbott's Argument**

Plaintiffs' description of the claims and defenses in this case are unfairly slanted against Abbott and do not adequately represent Abbott's positions. "Jury instructions must be formulated so that they fairly and adequately cover the issues presented, correctly state the law, and are not misleading." *Mockler v. Multnomah County*, 140 F.3d 808, 812 (9th Cir. 1998) (quotation omitted); *see also Wall Data Inc. v. Los Angeles County Sheriff's Dep't*, 447 F.3d 769, 784 (9th Cir. 2006) (affirming district court's rejection of instructions that were "slanted or argumentative"). Abbott's proposed instruction provides the jurors with a neutral overview of the parties and claims that will be presented in this case.

## [JOINT] BURDEN OF PROOF – PREPONDERANCE OF EVIDENCE

When a party has the burden of proof of any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

**Source**:  9th Cir. MJI (2007) No. 1.3.

[DISPUTED] GSK'S PROPOSED INSTRUCTION ON
TWO OR MORE PARTIES – DIFFERENT LEGAL RIGHTS

You [will be hearing three cases brought by three different plaintiffs, or groups of plaintiffs.  Even though I have decided to try the three cases together, you] should decide the case as to each plaintiff separately.  Unless otherwise stated, the instructions apply to all parties.


**Source:** 9th Cir. MJI (2007) No. 1.5 (modified as indicated by bracketed additions).

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED INSTRUCTION ON
TWO OR MORE PARTIES – DIFFERENT LEGAL RIGHTS

You [will be hearing three cases brought by three different groups of plaintiffs. Even though I have decided to try the three cases together, you] should decide the case as to each plaintiff separately.  Unless otherwise stated, the instructions apply to all parties.

[You are instructed to consider only the claims brought by the plaintiffs currently before the Court, and not claims by other potential plaintiffs.  The Customer Plaintiffs allege that Abbott overcharged them for Norvir and Kaletra and that they paid more for these drugs than they would have if Abbott had not engaged in anticompetitive conduct.  A Customer Plaintiff who purchased Norvir or Kaletra is injured if anticompetitive conduct caused it to pay more for a product or service.  I instruct you not to consider whether the Customer Plaintiffs may have passed on all or some of the alleged overcharge to their own customers, including other stores or patients,[45] in determining whether the Customer Plaintiffs were injured. Under federal antitrust law, direct purchasers are the only parties permitted to recover overcharges caused by anticompetitive conduct.[6]]

**Source:**  9th Cir. Model Jury Instructions (2007) No. 1.5.

---

[4] *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 494 (1968) (defendant "was not entitled to assert a passing-on defense"); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729-30 (1977); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008) (Courts are not permitted to determine "what portion of [an] illegal overcharge was 'passed on' . . . and what part was absorbed by the middlemen" because such an analysis would "involve all the evidentiary and economic complexities that *Illinois Brick* clearly forbade."); *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 327 (9th Cir. 1980); *Meijer, Inc. v. Abbott Labs.*, 251 F.R.D. 431, 435 (N.D. Cal. 2008) ("Given th[e] holding [in *Hanover Shoe*], the parties appear to agree that the downstream sales information Abbott seeks is not relevant to any issue to be tried in this case, including the issue of damages."); *Meijer, Inc. v. Abbott Labs*., No. C 07-5985, 2008 U.S. Dist. LEXIS 78219, *21 (N.D. Cal. Aug. 27, 2008).

[5] *See Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 884-85 (10th Cir. 1997) (rejecting argument that plaintiff benefitted from alleged violation and therefore lacked injury because "[t]hat reasoning  is directly contrary to the Supreme Court's holding in *Hanover Shoe. Hanover Shoe* precludes the argument that [plaintiff] did not suffer cognizable antitrust injury merely because it passed overcharges on to its customers  or otherwise was shielded from competition by the defendants' anticompetitive behavior"); *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 303-04 (D.D.C. 2007); *In re Relafen Antitrust Litig*., 346 F. Supp. 2d 349, 369 (D. Mass. 2004).

[6] *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 726-29 (1977).

## [DISPUTED] ABBOTT'S PROPOSED INSTRUCTION ON
## TWO OR MORE PARTIES—DIFFERENT LEGAL RIGHTS

You [will be hearing three cases brought by three different plaintiffs, or groups of plaintiffs.

First is GlaxoSmithKline, also known as GSK, which is a pharmaceutical company that makes a drug that competes with Abbott's Kaletra.

Second is the class, which consists of a group of wholesalers and pharmacies that purchased Kaletra and Norvir directly from Abbott.  Because they purchased directly from Abbott, the members of the class are sometimes referred to as direct purchasers.

The third group consists of the individual plaintiff pharmacies: Safeway; Walgreen; Kroger; New Albertson's; American Sales; HEB Grocery; Rite Aid Corporation; Rite Aid Headquarters; JCG (PJC) USA; Maxi Drug, which does business as Brooks Pharmacy; Eckerd; CVS; and Caremark.  Those pharmacies bought Kaletra and Norvir from wholesalers who bought the drugs directly from Abbott.

Even though I have decided to try the three cases together, you] should decide the case as to each plaintiff separately. Unless otherwise stated, the instructions apply to all parties.

**Source**:  9th Cir. MJI (2007) No. 1.5 (modified as indicated by bracketed additions).

### GSK's Argument

A straightforward and simple instruction like that proposed by GSK is appropriate. It properly instructs the jury that it should consider each group of plaintiffs' claims separately while at the same time avoids jury confusion by adding numerous facts to the instructions.

### Customer Plaintiffs' Argument

It is important for the jury to understand from the outset that the Customer Plaintiffs are the proper plaintiffs to bring an action for damages for overcharges under the federal antitrust laws. The Customer Plaintiffs have the right to pursue damages measured as overcharges under Section 4 of the Clayton Act, and are entitled to the full amount of the overcharge. *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 489 (1968); *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 729 (1977). Black letter law prohibits consideration of whether the purchasers' injuries were in any way diminished by the "passing on" of overcharges to their customers. *Illinois Brick,* 431 U.S. at 725; *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008), citing *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 327 (9th Cir. 1980). Likewise, the rule of *Hanover Shoe* and *Illinois Brick* prohibits defending against overcharge claims by direct purchasers by claiming that they somehow benefitted from any anticompetitive conduct (by, *e.g.*, obtaining increased revenues, or otherwise benefitting from reselling goods at the artificially inflated price).[7] Simply put, the rule of *Illinois Brick* was intended to

---

[7] *See Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 884-85 (10th Cir. 1997) (rejecting argument that plaintiff benefitted from alleged violation and therefore lacked injury because "[t]hat reasoning is directly contrary to the Supreme Court's holding in *Hanover Shoe. Hanover Shoe* precludes the argument that [plaintiff] did not suffer cognizable antitrust injury merely because it passed overcharges on to its customers or otherwise was shielded from competition by the defendants' anticompetitive behavior"); *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 303-04 (D.D.C. 2007); *In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349, 369 (D. Mass. 2004).

reduce complexity of direct purchaser actions by barring analysis of downstream effects. *See Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1212 (9th Cir. 1984).

Because the jury is likely to be unaware of the law entitling the Customer Plaintiffs to recover their overcharges, jurors should be informed that the Customer Plaintiffs are the proper parties to recover any overcharges which resulted from any anticompetitive conduct, and that jurors are to consider the Customer Plaintiffs injured under the law if they believe that the Customer Plaintiffs have been overcharged due to the anticompetitive conduct. The jury should be informed of this consideration as well.

Finally, while Abbott's proposed instruction introduces the three sets of Plaintiffs (if confusingly), it fails to inform the jury of the definition of the class certified by this Court, and provide the jurors a basic understanding of what a class is. The Customer Plaintiffs' Proposed Instruction on Claims And Defenses #1 should be read instead.

## Abbott's Argument

Abbott's proposed instruction regarding the differing legal rights of two or more parties should be used by this Court because it provides a balanced description of the parties and their rights. GSK's proposed instruction is lacking in that it does not identify who the plaintiffs are or what their relationship is to this case. The Customer Plaintiffs' proposed instruction is unbalanced in that it does not address the other two classes of plaintiffs.

<u>[JOINT] PROPOSED INSTRUCTION ON WHAT IS EVIDENCE</u>

The evidence you are to consider in deciding what the facts are consists of:

    1.       the sworn testimony of any witness

    2.       the exhibits which are received into evidence; and

    3.       any facts to which the lawyers have agreed.


**Source**:  9th Cir. MJI (2007) No. 1.6.

## [DISPUTED] GSK AND CUSTOMER PLAINTIFFS' PROPOSED INSTRUCTION ON WHAT IS NOT EVIDENCE

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

(1)     Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they will say in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

(2)     Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

(3)     Testimony that is excluded or stricken, or that you are instructed to disregard, is not evidence and must not be considered. In addition sometimes testimony and exhibits are received only for a limited purpose; when I give a limiting instruction, you must follow it.

(4)     Anything you may see or hear when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

(5)     [The absence of any party from this lawsuit is not evidence and should not be considered by you];[8]

---

[8] Plaintiffs propose adding item (5) to these instructions. As reflected in the Plaintiffs' motions *in limine*, evidence of whether other parties, including, for example, Bristol Myers Squibs or HIV/AIDS patients, did or could have sued Abbott regarding the Norvir price increase is irrelevant and unfairly prejudicial.  *See, e.g., United States v. Beal*, 430 F.3d 950, 955-56 (8th Cir. 2005) (refusal under Rule 403 to allow introduction of evidence about jury verdicts in unrelated cases because the evidence "would have prolonged the trial and confused the jury."); *Buckman v. Bombardier Corp.*, 893 F. Supp. 547, 557 (E.D.N.C. 1995) (precluding as irrelevant mention of other parties that the plaintiff could have sued); *Allstate Fin. Corp. v. Util. Trailer of Ill., Inc.*, No. 92 C 3477, 1995 WL 347985, at *3 (N.D. Ill. June 8, 1995) (unreported decision) (precluding evidence about the decision not to sue a potential defendant because this issue was of "very marginal relevance, as Plaintiff may have had numerous reasons not to sue" and would "needlessly confuse the jury by creating a sideshow at trial"). In order to avoid prejudice to either party from the jury considering the reasons why additional potential plaintiffs are not represented here, plaintiffs believe modification to this instruction is necessary.

**Source:**  9th Cir. MJI (2007) No. 1.7 (modified as indicated by bracketed additions).

## [DISPUTED] ABBOTT'S PROPOSED INSTRUCTION ON
## WHAT IS NOT EVIDENCE

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

(1) Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

(2) Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

(3) Testimony that has been excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered.  In addition sometimes testimony and exhibits are received only for a limited purpose; when I give a limiting instruction, you must follow it.

(4) Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.


**Source:**  Ninth Circuit Manual of Model Civil Jury Instructions § 1.7 (2007) (verbatim).

**GSK's Argument**

GSK proposes using the Ninth Circuit's model instruction, modified only by the addition of item (5) to this instruction.  As reflected in the Plaintiffs' motions *in limine*, evidence of whether other parties, including, for example, Bristol Myers Squibs or HIV/AIDS patients, did or could have sued Abbott regarding the Norvir price increase is irrelevant and unfairly prejudicial.  *See, e.g., United States v. Beal*, 430 F.3d 950, 955-56 (8th Cir. 2005) (refusal under Rule 403 to allow introduction of evidence about jury verdicts in unrelated cases because the evidence "would have prolonged the trial and confused the jury."); *Buckman v. Bombardier Corp.*, 893 F. Supp. 547, 557 (E.D.N.C. 1995) (precluding as irrelevant mention of other parties that the plaintiff could have sued); *Allstate Fin. Corp. v. Util. Trailer of Ill., Inc.*, No. 92 C 3477, 1995 WL 347985, at *3 (N.D. Ill. June 8, 1995) (unreported decision) (precluding evidence about the decision not to sue a potential defendant because this issue was of "very marginal relevance, as Plaintiff may have had numerous reasons not to sue" and would "needlessly confuse the jury by creating a sideshow at trial").  In order to avoid prejudice to either party from the jury considering the reasons why additional potential plaintiffs are not represented here, GSK believes modification to this instruction is necessary.

**Customer Plaintiffs' Argument**

The Customer Plaintiffs join in GSK's critique of Abbott's proposed instructions.

**Abbott's Argument**

This dispute is the subject of a motion in limine by Plaintiffs , and Abbott's full argument will be provided in Abbott's response to that motion.  But  it is Abbott's position that to the extent the direct purchaser plaintiffs intend to introduce evidence or argument about potentially negative side effects suffered by patients as a result of Abbott's conduct, the jury must be informed that the direct purchasers are not patients and so did not suffer the alleged injury and could not recover for it.  Further, Abbott is

entitled to present evidence of market success of other products that competed with

Kaletra, such as BMS's reyataz, to defeat Plaintiffs' liability claims.

<u>[JOINT] EVIDENCE FOR A LIMITED PURPOSE</u>

Some evidence may be admitted for a limited purpose only.

When I instruct you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose and for no other.

**Source**:  9th Cir. MJI (2007) No. 1.8.

[JOINT] PROPOSED INSTRUCTION
ON DIRECT AND CIRCUMSTANTIAL EVIDENCE

     Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what the witness personally saw or heard or did.  Circumstantial evidence is indirect proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

**Source:** 9th Cir. MJI (2007) No. 1.9.

<u>[JOINT] RULINGS ON OBJECTIONS</u>

There are rules of evidence that control what can be received into evidence. When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object. If I overrule the objection, the question may be answered or the exhibit received. If I sustain the objection, the question cannot be answered, and the exhibit cannot be received. Whenever I sustain an objection to a question, you must ignore the question and must not question and must not guess what the answer might have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore the evidence. That means that when you are deciding the case, you must not consider the evidence that I told you to disregard.

**Source**:  9th Cir. MJI (2007) No. 1.10.

<u>[JOINT] CREDIBILITY OF WITNESSES</u>

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.  Proof of a fact does not necessarily depend on the number of witnesses who testify about it.

In considering the testimony of any witness, you may take into account:

(1)     the opportunity and ability of the witness to see or hear or know the things testified to;

(2)     the witness's memory;

(3)     the witness's manner while testifying;

(4)     the witness's interest in the outcome of the case and any bias or prejudice;

(5)     whether other evidence contradicted the witness's testimony;

(6)     the reasonableness of the witness's testimony in light of all the evidence; and

(7)     any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.

**Source**:  9th Cir. MJI (2007) No. 1.11.

## [JOINT] CONDUCT OF THE JURY

I will now say a few words about your conduct as jurors.

First, keep an open mind throughout the trial, and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

Second, because you must decide this case based only on the evidence received in the case and on my instructions as to the law that applies, you must not be exposed to any other information about the case or to the issues it involves during the course of your jury duty.  Thus, until the end of the case or unless I tell you otherwise:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone or electronic means, via e-mail, text messaging, or any Internet chat room, blog, Web site or other feature.  This applies to communicating with your fellow jurors until I give you the case for deliberation, and it applies to communicating with everyone else including your family members, your employer, the media or press, and the people involved in the trial, although you may notify your family and your employer that you have been seated as a juror in the case.  But, if you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court.

Because you will receive all the evidence and legal instruction you properly may consider to return a verdict:  do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address.  A juror who violates these restrictions jeopardizes the fairness of these proceedings.  If any juror is exposed to any outside information, please notify the court immediately.

**Source**:  9th Cir. MJI (2007) No. 1.12 (verbatim).

<u>[JOINT] NO TRANSCRIPT AVAILABLE TO THE JURY</u>

During deliberations, you will have to make your decision based on what you recall of the evidence.  You will not have a transcript of the trial.  I urge you to pay close attention to the testimony as it is given.

If at any time you cannot hear or see the testimony, evidence, questions, or arguments, let me know so that I can correct the problem.


**Source**:  9th Cir. MJI (2007) No. 1.13.

<u>[JOINT] TAKING NOTES</u>

If you wish, you may take notes to help you remember the evidence.  If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case.  Do not let note-taking distract you.  When you leave, your notes should be left in the jury room.  No one will read your notes.  They will be destroyed at the conclusion of the case.

Whether or not you take notes, you should rely on your own memory of the evidence.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those of your fellow jurors.

**Source**:  9th Cir. MJI (2007) No. 1.14.

## [JOINT] QUESTIONS TO WITNESSES BY JURORS

You will be allowed to propose written questions to witnesses after the lawyers have completed their questioning of each witness.  You may propose questions in order to clarify the testimony, but you are not to express any opinion about the testimony or argue with a witness.  If you propose any questions, remember that your role is that of a neutral fact finder, not an advocate.

Before I excuse each witness, I will offer you the opportunity to write out a question on a form provided by the court.  Do not sign the question.  I will review the question with the attorneys to determine if it is legally proper.

There are some proposed questions that I will not permit, or will not ask in the wording submitted by the juror.  This might happen either due to the rules of evidence or other legal reasons, or because the question is expected to be answered later in the case.  If I do not ask a proposed question, or if I rephrase it, do not speculate as to the reasons.  Do not give undue weight to questions you or other jurors propose.  You should evaluate the answers to those questions in the same manner you evaluate all of the other evidence.

By giving you the opportunity to propose questions, I am not requesting or suggesting that you do so.  It will often be the case that a lawyer has not asked a question because it is legally objectionable or because a later witness may be addressing that subject.

**Source**:  9th Cir. MJI (2007) No. 1.15.

## [JOINT] BENCH CONFERENCES AND RECESSES

From time to time during the trial, it may become necessary for me to talk with the attorneys out of the hearing of the jury, either by having a conference at the bench when the jury is present in the courtroom, or by calling a recess.  Please understand that while you are waiting, we are working.  The purpose of these conferences is not to keep relevant information from you, but to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and error.

Of course, we will do what we can to keep the number and length of these conferences to a minimum.  I may not always grant an attorney's request for a conference.  Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or of what your verdict should be.

**Source**:  9th Cir. MJI (2007) No. 1.18.

<u>[JOINT] OUTLINE OF TRIAL</u>

Trials proceed in the following way: First, each side may make an opening statement.  An opening statement is not evidence.  It is simply an outline to help you understand what that party expects the evidence will show.  A party is not required to make an opening statement.

The plaintiffs will then present evidence, and counsel for the defendant may cross-examine.  Then the defendant may present evidence, and counsel for the plaintiff may cross-examine.

After the evidence has been presented, I will instruct you on the law that applies to the case and the attorneys will make closing arguments.

After that, you will go to the jury room to deliberate on your verdict.

**Source**:  9th Cir. MJI (2007) No. 1.19.

[JOINT] STIPULATIONS OF FACT

The parties have agreed to certain facts to be placed in evidence as Exhibit __ [that will be now read to you].  You should therefore treat these facts as having been proved.


**Source**:  9th Cir. MJI (2007) No. 2.2 (modified as indicated by strikethrough).

## [JOINT] DEPOSITION IN LIEU OF LIVE TESTIMONY

### DEPOSITION IN LIEU OF LIVE TESTIMONY

A deposition is the sworn testimony of a witness taken before trial.  The witness is placed under oath to tell the truth and lawyers for each party may ask questions.  ~~The questions and answers are recorded.  When a person is unavailable to testify at trial, the deposition of that person may be used at the trial.  The deposition of [*witness*] was taken on [*date*].~~

You should consider deposition testimony, presented to you in court in lieu of live testimony, insofar as possible, in the same way as if the witness had been present to testify.  ~~[Do not place any significance on the behavior or tone of voice of any person reading the questions or answers.]~~

**Source**: 9th Cir. MJI (2007) No. 2.4 (modifications indicated with strikethrough).

[JOINT] IMPEACHMENT EVIDENCE – WITNESS

The evidence that a witness [e.g., has been convicted of a crime, lied under oath on a prior occasion, etc.] may be considered, along with all other evidence, in deciding whether or not to believe the witness and how much weight to give to the testimony of the witnesses and for no other purpose.

**Source**:  9th Cir. MJI (2007) No. 2.8.

## [JOINT] USE OF INTERROGATORIES OF A PARTY

      Evidence may be presented to you in the form of answers of one of the parties to written interrogatories submitted by the other side.  These answers have been given in writing and under oath, before the actual trial, in response to questions that were submitted in writing under established court procedures.  You should consider the answers, insofar as possible, in the same way as if they were made from the witness stand.


**Source**:  9th Cir. MJI (2007) No. 2.10.

## [JOINT] EXPERT OPINION

Some witnesses, because of education or experience, are permitted to state opinions and the reasons for those opinions.

Opinion testimony should be judged just like any other testimony.  You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

**Source**:  9th Cir. MJI (2007) No. 2.11.

<u>[JOINT] CHARTS AND SUMMARIES NOT RECEIVED IN EVIDENCE</u>

Certain charts and summaries not received in evidence may be shown to you in order to help explain the contents of books, records, documents, or other evidence in the case.  They are not themselves evidence or proof of any facts.  If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.

**Source**:  9th Cir. MJI (2007) No. 2.12.

## [JOINT] CHARTS AND SUMMARIES IN EVIDENCE

Certain charts and summaries may be received into evidence to illustrate information brought out in the trial.  Charts and summaries are only as good as the underlying evidence that supports them.  You should, therefore, give them only such weight as you think the underlying evidence deserves.


**Source**:  9th Cir. MJI (2007) No. 2.13.

[JOINT] CORPORATIONS – FAIR TREATMENT

     All parties are equal before the law and a corporation is entitled to the same fair and conscientious consideration by you as any party.

**Source**:  9th Cir. MJI (2007) No. 4.1.

## [JOINT] LIABILITY OF CORPORATION

Under the law, a corporation is considered to be a person.  It can only act through its employees, agents, directors, or officers.  Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers performed within the scope of authority.

**Source**:  9th Cir. MJI (2007) No. 4.2.

[JOINT] DUTY TO DELIBERATE

When you begin your deliberations, you should elect one member of the jury as your presiding juror.  That person will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so.  Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not hesitate to change your opinion if the discussion persuades you that you should.  Do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision.  Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.


**Source**:  9th Cir. MJI (2007) No. 3.1.

## [JOINT] COMMUNICATIONS WITH COURT

If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiff signed by your presiding juror or by one or more members of the jury.  No member of the jury should ever attempt to communicate with me except by a signed writing; I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court.  If you send out a question, I will consult with the parties before answering it, which may take some time.  You may continue your deliberations while waiting for the answer to any question.  Remember that you are not to tell anyone—including me—how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged.  Do not disclose any vote count in any note to the court.


**Source**:  9th Cir. MJI (2007) No. 3.2.

<u>[JOINT] RETURN OF VERDICT</u>

A verdict form has been prepared for you.  After you have reached unanimous agreement on a verdict, your presiding juror will fill in the form that has been given to you, sign and date it, and advise the court that you are ready to return to the courtroom.

**Source**:  9th Cir. MJI (2007) No. 3.3.

<u>[JOINT] ADDITIONAL INSTRUCTIONS OF LAW</u>[9]

At this point I will give you a further instruction.  By giving a further instruction at this time, I do not mean to emphasize this instruction over any other instruction.

You are not to attach undue importance to the fact that this was read separately to you.  You shall consider this instruction together with all of the other instructions that were given to you.

**Source**:  9th Cir. MJI (2007) No. 3.4.

---

[9] Read when appropriate.

[DISPUTED] GSK AND CUSTOMER PLAINTIFFS' PROPOSED INTRODUCTORY
ANTITRUST INSTRUCTION

PURPOSE OF SHERMAN ACT

I will now discuss the elements of Plaintiffs' specific claims.  Plaintiffs first allege that Abbott violated the Sherman Act by willfully maintaining a monopoly or attempting to maintain a monopoly in violation of the Sherman Act.  The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace.  The Sherman Act rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.


**Source:**  ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 Ed.), Instruction A-2.

**GSK's Argument**

GSK submits this introductory argument to the section of the proposed instructions addressing plaintiffs' claims under Section 2 of the Sherman Act in order to frame the disagreements between it and Abbott that, as the Court will see, appear throughout the section.  GSK's proposed instructions on the Sherman Act claims are based on the ABA Model Jury Instructions in Civil Antitrust Cases ("ABA Model Instructions") with minimal alterations.  Where alterations are made they are intended to simplify the instructions or clarify them where they do not properly set out Ninth Circuit law or the law as established by this Court.  Each instruction contains footnotes with citations supporting the proposed alterations.

While purportedly based on the ABA Model Instructions, Abbott has made significant changes to these instructions.  GSK's instruction on the purpose of the Sherman Act comes directly from the ABA Model Instructions and helps define the basis for the law under which Plaintiffs are suing.  Abbott does not include this model instruction, which is consistent with Abbott's approach of altering the ABA Model Instructions.

Most of Abbott's changes to the ABA Model Instructions actually serve to complicate instructions that are already complex enough, summarizing as they do an area of law that a jury will no doubt find difficult to understand.  For example, on the issue of "Injury and Damages," Abbott proposes at least 7 separate damages instructions with some of these having numerous subparts.  *See* below, Abbott's Proposed Damages Instructions 1-7.  Similarly, Abbott proposes 10 pages of instructions on the *Cascade Health Solutions v. Peacehealth*, 515 F.3d 883 (9th Cir. 2008), theory of anticompetitive conduct alone; it proposes a total of 20 pages on the issue of anticompetitive conduct generally.  *See* below, Abbott's Proposed Instructions on Predatory Bundling.  In contrast, GSK proposes two instructions covering causation and damages.  These instructions quote directly from the ABA Model, but remove redundancy and simplify

-46-

concepts for the jury.  *See* below, GSK's Proposed Instruction on Damages.  And, GSK

proposes short instructions on anticompetitive conduct, which cite verbatim from the jury

instructions approved by the Supreme Court in *Aspen Skiing v. Aspen Highlands Skiing

Corp.*, 472 U.S. 585 (1985), the jury instructions approved by the Ninth Circuit in *Image

Technical Serv. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) and this Court's

recent Order Denying in Part and Granting in Part Defendant Abbott Laboratories'

Motion for Summary Judgment on Direct Purchasers' Claims and on GSK's Claims,

Case No. 07-cv-5702, Docket No. 325 ("Summary Judgment Order"), which elucidated

subsequent legal developments regarding this theory.  *See* below, GSK's Proposed

Instructions on Anticompetitive Conduct.

Not only are Abbott's proposed instructions confusing, Abbott at times admits

they are legally incorrect.  For example, Abbott includes a footnote in its proposed refusal

to deal instruction stating that, despite this Court's previous rulings affirming the viability

of Plaintiffs' refusal to deal theory, it is "no longer good law and is in any event

inapplicable here."  *See* below Abbott's Proposed Duty to Deal Instruction 1, footnote 25.

Abbott then proceeds to propose language about the supposed requirements for such a

claim that this Court has already rejected in denying Abbott's motions to dismiss and for

summary judgment.  *Compare* Abbott's Proposed Duty to Deal Instruction Nos. 1-5 *with*

1/12/2010 Order Denying Abbott's Motion to Dismiss, Case No. 07-5702, Docket No.

195 at 15-16.  Similarly, Abbott writes that it believes that the *Cascade* theory of liability

is "inapplicable here."  *Id.* It then proposes an instruction on recoupment despite this

Court's previous ruling that recoupment is not an element of this claim.  *See* below,

Abbott's Proposed Duty to Deal Instruction 8.  This Court should not adopt Abbott's

instructions on the antitrust claims in this case when Abbott steadfastly refuses to propose

ones that comport with this Court's previous rulings.

**Customer Plaintiffs' Argument**

The Customer Plaintiffs' join in GSK's critique of Abbott's proposed instructions as stated above. The Customer Plaintiffs have also based their proposed instructions on the ABA Model Instructions, making changes to account for binding law from the Supreme Court, the Ninth Circuit, or prior decisions of this Court in this case.

**Abbott's Argument**

The Supreme Court and the Ninth Circuit have emphasized the importance of clear standards in antitrust law. *See, e.g.*, *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 129 S. Ct. 1109, 1120-21 (2009) (the Supreme Court has "repeatedly emphasized the importance of clear rules in antitrust law"); *Cascade Health Solutions v. PeaceHealth*, 515 F.3d. 883, 899-900 (9th Cir. 2008) (quoting affirmatively the Antitrust Modernization Commission's emphasis of the importance of "clear standards"). This proposed instruction improperly introduces the purported general purpose of the Sherman Act into the jury's deliberation, implicitly inviting the jury to deviate from the applicable legal standards in favor of the purported general purpose of the Act. What does it mean to promote "free and unfettered competition?" Would conduct not satisfying the standards courts have articulated still violate the Sherman Act? This instruction incorrectly suggests the answer is yes.

[DISPUTED] GSK'S PROPOSED ACTUAL MONOPOLIZATION ELEMENTS
INSTRUCTION

ELEMENTS OF ACTUAL MONOPOLIZATION

Plaintiffs allege that they were injured by Abbott's unlawful maintenance of its monopoly power, for a period of several years after the monopoly would have otherwise been lost, in the market for all protease inhibitors boosted with Norvir or subsets of those drugs. To prevail on this claim, Plaintiffs must prove each of the following elements as more probably true than not:[10]

First, that the alleged market is a valid antitrust market;

Second, that the defendant possessed monopoly power in that market when the allegedly anticompetitive conduct occurred;[11]

Third, that Abbott "willfully" maintained monopoly power in that market by engaging in anticompetitive conduct;

Fourth, that Abbott's conduct occurred in or affected interstate commerce; and

Fifth, that plaintiffs were injured in their business or property because of Abbott's anticompetitive conduct.

If you find that Plaintiffs have failed to prove any of these elements, then you must find for Abbott and against Plaintiffs on this claim. If you find that Plaintiffs have proved each of these elements as more probably true than not, then you must find for Plaintiffs and against Abbott on this claim.

**Source:** ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 Ed.), Instruction C-2.

---

[10] Throughout, language concerning the burden of proof has been altered to conform to 9th Cir. Model Jury Instructions (2007) No. 1.3.

[11] *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 362-63, 366-68 (9th Cir. 1988) (limiting its inquiry into the defendant's monopoly power to the years in which the alleged anticompetitive conduct took place)

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED ACTUAL
MONOPOLIZATION ELEMENTS INSTRUCTION

ELEMENTS OF ACTUAL MONOPOLIZATION

Plaintiffs allege that they were injured by Abbott's unlawful maintenance of its monopoly power, for a period of several years after the monopoly power would have otherwise been lost, in the market for protease inhibitors ("PIs") boosted with Norvir or subsets of those drugs. To prevail on this claim, Plaintiffs must prove each of the following elements as more probably true than not:[12]

First, that the defendant possessed monopoly power when the allegedly anticompetitive conduct occurred;[13,14]

---

[12] Throughout, language concerning the burden of proof has been altered to conform to 9th Cir. Model Jury Instructions (2007) No. 1.3.

[13] The ABA's model instruction adds an element not required by binding precedent: that the plaintiff prove a "relevant market." This misstates the law: a plaintiff must show the defendant had monopoly power. This may be done by proving monopoly power directly *or* circumstantially. If the direct approach is taken, there is no need to define the relevant market. Only if a plaintiff relies on circumstantial, or indirect, proof must a relevant market be shown. *See Rebel Oil Co. Inc., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (monopoly power can be shown through direct evidence, or circumstantially by, *inter alia*, defining the relevant market); *In re Abbott Labs. Norvir Anti-Trust Litig.*, 442 F. Supp. 2d 800, 805-06 (N.D. Cal. 2006) (same); *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 307 n.3 (3d Cir. 2007) ("direct proof of monopoly power does not require a definition of the relevant market"); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107-08 (2d Cir. 2002) (where there is direct evidence of monopoly power, "a relevant market definition is not a necessary component of a monopolization claim"); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 n.2 (6th Cir. 2002) (monopoly power "may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market") (internal quotation marks and citation omitted); *Toys "R" Us, Inc. v. Federal Trade Comm'n*, 221 F.3d 928, 937 (7th Cir. 2000) (distinguishing between proving monopoly power by direct evidence, and "by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in the case"); *id.* ("TRU seems to think that anticompetitive effects in a market cannot be shown unless the plaintiff [] first proves that it has a large market share. This, however, has things backwards. As we have explained elsewhere, the share a firm has in a properly defined relevant market is only a way of estimating market power, which is the ultimate consideration.").

[14] *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 362-63, 366-68 (9th Cir. 1988) (limiting its inquiry into the defendant's monopoly power to the years in which the alleged anticompetitive conduct took place).

Second, that Abbott "willfully" maintained monopoly power by engaging in anticompetitive conduct;

Third, that Abbott's conduct occurred in or affected interstate commerce; and

Fourth, that Plaintiffs were injured in its business or property because of Abbott's anticompetitive conduct. For the Customer Plaintiffs, being overcharged for a product means that they were injured in their business or property. The Customer Plaintiffs may show that they were injured in their business or property by showing that they were overcharged for Norvir or Kaletra. This means that they paid more for their purchases of Norvir or Kaletra than they would have paid absent any illegal conduct by Abbott.[15] For GSK, losing profits is an injury to its business or property.

If you find that Plaintiffs have failed to prove any of these elements, then you must find for Abbott and against Plaintiffs on this claim. If you find that Plaintiffs have proved each of these elements as more probably true than not, then you must find for Plaintiffs and against Abbott on this claim.

**Source:** ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 Ed.), Instruction C-2.

---

[15] *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 494 (1968); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729-30 (1977); *Meijer, Inc. v. Abbott Labs.*, 251 F.R.D. 431, 435 (N.D. Cal. 2008).

[DISPUTED] ABBOTT'S PROPOSED ACTUAL MONOPOLIZATION ELEMENTS
INSTRUCTION

ELEMENTS OF MONOPOLIZATION

Plaintiffs claim that they were injured by Abbott's alleged unlawful monopolization of the market in which they allege Kaletra competes.

To prevail on this claim, a Plaintiff asserting the claim must prove each of the following elements by a preponderance of the evidence:

**First,** that the market in which the Plaintiff alleges that Kaletra competes is a valid antitrust market;

**Second,** that Abbott possessed monopoly power in that market during the time period in which the violation allegedly occurred;[16]

**Third,** that Abbott "willfully" acquired or maintained monopoly power in that market by engaging in anticompetitive conduct, rather than as a consequence of a superior product, superior business sense, possession of a patent, or historical accident;[17]

**Fourth,** that Abbott's conduct occurred in or affected interstate commerce; and

**Fifth,** that the Plaintiff was injured in its business or property as a result of that which made the conduct at issue anticompetitive.[18]

If you find any Plaintiff has failed to prove any of these required elements, then you must find for Abbott and against that Plaintiff on this claim.  If you find that a

---

[16] *Oahu Gas Serv., Inc. v. Pac. Res., Inc*, 838 F.2d 360,  362-63 (9th Cir. 1988) (finding that the relevant period of monopoly power was 1972 to 1983 in a case where plaintiff alleged "a decision in 197[2] not to begin producing propane" and "a campaign in 1982 to force Oahu to lower prices by offering sham cut-rate contracts to Oahu's customers"); *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995) (suggesting that courts should look at whether a defendant has monopoly power during the time it charged allegedly supracompetitive prices); *Aspen Skiing Co. v. Aspen Highlands Skiing Co.*, 472 U.S. 585 (1985) (affirming a jury verdict that defendant possessed monopoly power for purposes of a refusal to deal claim from 1977 to 1981).

[17] *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (an element of monopolization is "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.").

[18] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) ("Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.").

Plaintiff has proved each of the elements of either claim by a preponderance of the evidence, then you must find for that Plaintiff and against Abbott on this claim.


**Source:**  ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act - Section 2, Monopolization -- General, Instruction 1 (modified); *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360 (9th Cir. 1988); *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985); *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

**GSK's Argument**

GSK's proposed instruction on the elements of actual monopolization is a verbatim quotation of the ABA Model Instruction with one small, but important, alteration.  GSK has added the phrase "when the allegedly anticompetitive conduct occurred" at the end of the second element on "Abbott possess[ing] monopoly power in the market."  Given that one of Abbott's main arguments is that its declining market share after the price hike and its current position as the second best selling boosted PI prove that it does not have monopoly power, it is important for the jury to be properly instructed that an assessment of monopoly power be done around the time of the anticompetitive conduct, not much later as Abbott has continually advocated – and the Court rejected – in this litigation.  *See Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 362-63, 366-68 (9th Cir. 1988) (limiting its inquiry into the defendant's monopoly power to the years in which the alleged anticompetitive conduct took place); *Microbix Biosystems, Inc. v. Biowhittaker, Inc.*, 172 F. Supp. 2d 680, 686-87 (D. Md. 2000), *aff'd*, 11 Fed. Appx. 279 (4th Cir. 2001) (per curium) ("Abbott's monopoly power is determined as of the time of the alleged monopolization occurred.").  Abbott seems to agree in principle with this proposition as it has also added to the Model language, the less than clear statement that monopoly power is assessed "during the time period in which the violation allegedly occurred."

Abbott proposes additional and unnecessary alterations to the ABA Model Instructions.  To the third element instructing the jury that it must determine whether Abbott maintained its monopoly power through anticompetitive conduct Abbott adds "rather than as a consequence of a superior product, superior business sense, possession of a patent, or historical accident."  While, given the proper context, this language may be a correct statement of law, out of context it provides little guidance to the jury.  The element does not define anticompetitive conduct, but instead, as Abbott writes it, defines what is not anticompetitive conduct.  This is confusing to the jury and is an unnecessary

deviation from the ABA Model Instruction.  These concepts are appropriately introduced in later instructions.  A similarly unnecessary deviation is Abbott's addition of "as a result of that which made the conduct at issue anticompetitive" to the fifth element on injury.  Reference to the complicated concept of antitrust injury is wholly unnecessary in an overview of the elements of this claim.

**Customer Plaintiffs' Argument**

**Proposed Actual Monopolization Elements Instruction**

Monopoly Power Can Be Established Through Direct Proof

In keeping with precedent from the Ninth Circuit and other circuits, and the law of this case, the Customer Plaintiffs' proposed instruction makes an important modification to the ABA Model Instructions: omitting the need to prove a relevant market as an element for a monopolization claim.  As this Court has held, based on binding law, defining a market is unnecessary when monopoly power is proven by direct evidence. *See, e.g., Safeway Inc. v. Abbott Labs*., No. 07-5470-CW, slip op. at 11-17 (N.D. Cal. Jan. 18, 2011)(noting monopoly power may be proven directly, or indirectly through proof of share in relevant market and barriers to entry); *In re Abbott Labs. Norvir Anti-Trust Litig.*, 442 F. Supp. 2d 800, 805-06 (N.D. Cal. 2006); *see also  Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995)(same); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 & n.3 (3d Cir. 2007) ("direct proof of monopoly power does not require a definition of the relevant market"); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107-08 (2d Cir. 2002) (where there is direct evidence of monopoly power, "a relevant market definition is not a necessary component  of a monopolization claim"); *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 n.2 (6th Cir. 2002) (monopoly power "may be proven directly by evidence of the control of prices or the exclusion of

competition, or it may be inferred from one firm's large percentage share of the relevant market") (internal quotation marks and citation omitted).[19]

Indeed, other courts recognize that *Rebel Oil* holds it is unnecessary to define a relevant market when proving market/monopoly power by direct evidence:

> We agree that an antitrust plaintiff is not required to rely on indirect evidence of a defendant's monopoly power, such as high market share within a defined market, when there is direct evidence that the defendant has actually set prices or excluded competition. […]

> This view has been adopted, at least implicitly, in four sister circuits: the First, Eighth, Ninth, and Tenth. *See, e.g.*, *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196-97 (1st Cir.), *cert. denied*, 519 U.S. 927 (1996); *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *Flegel v. Christian Hosp.*, 4 F.3d 682, 688 (8th Cir. 1993); *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951, 966-67 (10th Cir. 1990). As the Eighth Circuit has stated:

> Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, "proof of actual detrimental effects, such as a reduction of output," can obviate the need for an inquiry into market power, which is but a "surrogate for detrimental effects."

> *Flegel*, 4 F.3d 682 at 688 (quoting *Indiana Fed'n*, 476 U.S. 447 at 461).

*RE/MAX Int'l Inc. v. Realty One, Inc.*, 173 F.3d 995, 1018 (6th Cir. 1999).

Because the Customer Plaintiffs' proposed instructions accurately reflect the law, while the other proposed instructions do not, the Court should accept the Customer Plaintiffs' recitation of the elements of a monopolization and attempted monopolization claim.

---

[19] *See also Toys "R" Us, Inc. v. Federal Trade Comm'n*, 221 F.3d 928, 937 (7th Cir. 2000) (distinguishing between proving monopoly power by direct evidence, and "by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in the case"); *id.* ("As we have explained elsewhere, the share a firm has in a properly defined relevant market is only a way of estimating market power, which is the ultimate consideration.").

In all other respects, the Customer Plaintiffs join the arguments set out by GSK related to this set of instructions.

## Abbott's Argument

## Elements Of Monopolization

Abbott's proposed instruction reflects the ABA Model Jury Instructions in Civil Antitrust Cases (2005) Sherman Act -Section 2, Monopolization -- General, Instruction 1, as modified to emphasize principles from binding Supreme Court and Ninth Circuit caselaw cited in the footnotes to Abbott's proposed instruction.  Plaintiffs' instructions are flawed, and Abbott's instruction based on the Model Instruction is superior, for the following reasons:

I.    **GSK'S PROPOSED ACTUAL MONOPOLIZATION ELEMENTS INSTRUCTION AND THE DIRECT PURCHASER PLAINTIFFS' PROPOSED ACTUAL MONOPOLIZATION ELEMENTS INSTRUCTION**

1.    **Burden of Proof:** Plaintiffs' proposed instructions on the elements of actual monopolization misstate Plaintiffs' burden of proof.  Ninth Circuit Model Civil Jury Instruction 1.3, the general instruction on the burden of proof that all parties have agreed should be used, states: "When a party has the burden of proof of any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true." In their proposed instructions on monopolization, GSK and the Direct Purchaser Plaintiffs excerpt the phrase "more probably true than not" but omit the introductory phrase "you must be persuaded by the evidence."  The excerpting leaves the jury with a probablistic analysis that is not directly based upon the actual evidence that is presented at trial.

2.    Abbott believes that after Ninth Circuit Model Civil Jury Instruction 1.3 is given to define what "preponderance of the evidence" means, the Court should utilize the

phrase "preponderance of the evidence" whenever later in the instructions the Court is referencing the burden of proof.

3. **Time Period for Monopoly Power:** Plaintiffs' proposed instructions incorrectly state that the relevant time period for a determination of whether Abbott had monopoly power is limited to December 2003 because that is the date of the allegedly anticompetitive conduct. *See* GSK Proposed Existence of Monopoly Power Instruction 1; Direct Purchaser Plaintiffs Proposed Existence of Monopoly Power Instruction 1.

4. The notion that the relevant time period in which to assess monopoly power should be this single point in time is contrary to the Ninth Circuit Section 2 monopolization case law. Indeed, the case that Plaintiffs cite in support of the proposition that the relevant inquiry about whether Abbott had monopoly power is limited December 2003, *Oahu Gas Service, Inc. v. Pacific Resources, Inc*, 838 F.2d 360 (9th Cir. 1988), is inconsistent with that position. In *Oahu Gas*, plaintiff Oahu Gas alleged that defendant Gasco engaged in two types of anticompetitive conduct: "(1) a decision in 197[2] not to begin producing propane and (2) a campaign in 1982 to force Oahu to lower prices by offering sham cut-rate contracts to Oahu's customers." *Id.* at 362. Yet the Ninth Circuit reviewed "the jury's finding that Gasco possessed monopoly power in the Hawaiian propane market from 1972 to 1983, the relevant period for purposes of Oahu's allegations of exclusionary conduct." *Id.* at 363.

5. The error in Plaintiffs' instructions is particularly glaring with respect to the Plaintiffs' predatory pricing theory. The theory of predatory pricing is that it can lead to obtaining a monopoly in the future; thus, the question in such a case is not whether the defendant had monopoly power at the time that the allegedly predatory conduct began but whether the defendant thereafter obtained monopoly power and was as a result able to increase its prices to monopoly levels. For example, in *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995) the Ninth Circuit stressed that courts should look at defendants' market power "*after* years of below-cost pricing . . . . when [the

defendant] allegedly obtained the power to charge supracompetitive prices." *Id.* at 1440 (emphasis added).  Consistent with this holding, the Circuit considered the presence or absence of entry barriers during the alleged recoupment period (that is, the period after which monopoly power was allegedly attained), 1988 through 1990.  *Id.*

6.     Here, Plaintiffs likewise allege two stages of predatory pricing—first, the alleged  selling of Kaletra below-cost to in some manner neutralize competitors and, second, the alleged increasing of the price of Kaletra to supra-competitive levels.  Far from being the central point at which to measure monopoly power, December 2003 is not even a relevant date on which to evaluate monopoly power.  Rather, it is the period of approximately 2005 through 2007, when Abbott allegedly raised the price of Kaletra to supra-competitive levels, during which the question of monopoly power is relevant.  A whole category of the Direct Purchasers' damage claim is based upon the purportedly supra-competitive Kaletra price during the 2005 through 2007 period.

7.     Similarly with respect to plaintiffs' refusal to deal claim, the relevant period is not limited to the date of the initial pricing conduct.  In *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), the case upon which Plaintiffs chiefly rely in support of their refusal to deal claim, the jury finding was regarding the defendant's monopoly power from 1977 (the year that defendant first withdrew its participation in the joint ski pass) through and including 1981.  472 U.S. at 596 n.20.  The is no basis for the suggestion that a finding of monopoly power just for the moment in time when the defendant first withdrew its participation in the joint ski pass would have been enough to sustain the damages award that concerned losses allegedly suffered over a sustained period of time after that.  To the contrary, if the defendant at any point lost monopoly power, its continued refusal to deal would no longer be of concern under the antitrust laws (because it would not constitute illegal monopolization) and any alleged injury to the plaintiff from pricing in effect after that date would no longer constitute antitrust injury.

8.      In the current introductory instruction on monopolization, Abbott proposes simply to reference "the time period in which the violation allegedly occurred."  In later instructions, the Court can and should specifically define the applicable time period, recognizing that the relevant time period for an alleged predatory pricing claim (which involves a two stages) is different from the relevant time period for a purported refusal to deal claim.

9.      **Antitrust Injury:** Plaintiffs' proposed instructions incorrectly omit the rule that Plaintiffs must suffer antitrust injury in order to recover damages.  Order Granting in Part and Denying in Part Defendant Abbott Laboratories' Motions for Summary Judgment at 33, Jan. 14, 2011 ("1/14/11 Order") ("[P]rivate plaintiffs seeking damages for federal antitrust violations must demonstrate antitrust injury."); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) ("Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.").

## II.     DIRECT PURCHASER PLAINTIFFS' PROPOSED ACTUAL MONOPOLIZATION ELEMENTS INSTRUCTION

10.     **Relevant Antitrust Market:** The Direct Purchaser Plaintiffs' proposed instruction fails to include the element proving a relevant antitrust market, which is a required element of a Section 2 monopolization claim. "Under Section 2 of the Sherman Act, identification of the relevant market is *essential* to proving monopolization or attempted monopolization."  ABA Section of Antitrust Law, Antitrust Law Developments 528 (5th ed. 2002) (emphasis added); *accord* 1 Irving Scher, Antitrust Adviser § 1.22 (4th ed. 2007) ("Antitrust Adviser"); IIB Areeda & Hovenkamp, Antitrust Law ¶ 531c, at 234 (3d ed. 2007) ("[W]e must define a market in order to see whether the defendant dominates it.").  The Supreme Court has repeatedly explained that "[w]ithout a definition of th[e] market there is no way to measure [the defendant's] ability to lessen or destroy competition."  *Walker-Process Equip. Inc. v. Food Mach. & Chem. Corp.*, 382

U.S. 172, 177 (1965); *see also Thurman Indus. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373-74 (9th Cir. 1989) ("[D]efining the relevant market is indispensible to a monopolization claim."); *Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296, 1301 (9th Cir. 1978) ("[T]o define and to prove the relevant market . . . is a necessary predicate for evaluating claims under these provisions [including Sherman Act section 2] of the antitrust laws."); *Oahu Gas Serv., Inc. v. Pac. Res. Inc.*, 838 F.2d 360, 363, 364-66 (9th Cir. 1988) (stating that "the possession of monopoly power *in the relevant market*" is an essential element of monopolization and considering the relevant market definition at length before going on to evaluate whether defendant possessed market power in that market) (emphasis added) (internal quotation marks omitted).

11.     Indeed, when, subsequent to its *Thurman Industries* decision, the Ninth Circuit held that defining a relevant market was not necessary in the limited circumstance in which a Section 2 claim was based upon attempted monopolization rather than upon actual monopolization, the Supreme Court reversed and squarely held that market definition was a necessary element of an attempt claim as well. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993) (reversing verdict for plaintiff because jury instructions allowed finding for plaintiff "without any proof of the relevant market or of a realistic probability that the defendants could achieve monopoly power in that market"). This shows as well the essentiality of a plaintiff's proving a relevant market to show a violation of a claim for actual monopolization.

12.     None of the cases cited by the Direct Purchaser Plaintiffs supports a contrary argument.  Neither *Rebel Oil* nor this Court in the *Doe* suit held that defining and proving a relevant market is not an essential element of proving actual monopolization—indeed, *Rebel Oil* does state, correctly, that defining the relevant market is the first step in demonstrating monopoly power by circumstantial evidence.  51 F.3d at 1434; *see also In re Abbott Labs. Norvir Anti-Trust Litig.*, 442 F. Supp. 2d 800, 805-06 (N.D. Cal. 2006).  But this does not show or suggest that defining the relevant

market is not also a necessary element of a claim for actual monopolization. Once again, the Supreme Court and the Ninth Circuit have both spoken on this issue.

13. **Norvir "Overcharges":** Direct Purchaser Plaintiffs' proposed instruction also incorrectly states that purported overcharges on Norvir are an appropriate remedy for the claims asserted here. This is incorrect. As shown in Abbott's Motion in Limine # 7 on alleged Norvir "overcharge" damages, it is a "basic rule for antitrust damages" that "a purchaser may recover only for the price increment that 'flows from' the distortion of the market caused by the monopolist's anticompetitive conduct." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)); *see also Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 902 (9th Cir. 2008) (explaining same rule). Purported Norvir overcharges simply do not "flow from" any distortion caused by monopolization of the market in which Kaletra competes.

14. The Direct Purchasers have no remaining theory challenging Norvir's repricing in and of itself. *See Doe 1 v. Abbott Labs.*, 571 F.3d 930, 934 (2009); *see also* Order Denying Defendant's Renewed Motion for Summary Judgment at 10, *In re Abbott Labs. Norvir Antitrust Litig.*, Nos. C 04-1511 CW and C 04-4203 CW (July 6, 2006) (same). The Direct Purchasers' only remaining claim is that Abbott engaged in boosted market monopolization through two forms of allegedly anticompetitive conduct— bundled discounting and a refusal to deal. But Plaintiffs' experts have not and could not tie the alleged Norvir "overcharge" damages to the "anticompetitive effect" of either kind of purported anticompetitive conduct.

15. For bundled discounting, Plaintiffs' theory is that Abbott priced Kaletra at predatory levels under the discount attribution test, in an effort eventually to neutralize the ability of other boosted PI manufacturers to compete on price with Kaletra. But the Direct Purchasers have "suffer[ed] no injury in fact from the predation itself, which actually benefits them with lower prices." IIIA Areeda, Antitrust Law ¶ 723f, at 35 (3d

ed. 2008).  "[U]nsuccessful predation is in general a boon to consumers."  *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993).  What makes predatory pricing unlawful is driving competitors from the market or otherwise destroying their ability to compete, thus enabling the defendant to raise prices of the competitive product (here Kaletra) to monopoly levels.  *See Cascade*, 515 F.3d at 897 (possibility of anticompetitive harm from "bundled discounts" is the "threat of . . . *excluding* less diversified but more efficient producers"); *accord Brooke Group*, 509 U.S. at 224-25 (harm from predatory pricing occurs only after the exclusion of competitors); *see also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) ("[B]elow-cost pricing is not anticompetitive in itself.").

16.     Plaintiffs' potentially compensable losses are thus limited to losses that plaintiffs can and do show resulted from supra-competitive prices on Kaletra that were made possible by Abbott's successfully neutralizing price competition from other boosted PIs.  By contrast, paying more for Norvir is not a loss that "stems from a competition-*reducing* aspect or effect of" the alleged bundled discounting.  *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (emphasis in original).

17.     Plaintiffs have also failed to tie the alleged Norvir "overcharge" damages to their refusal to deal theory.  The analysis is the same as with predatory pricing—the problem the Sherman Act would be concerned with is not the alleged refusal to deal itself, but the impact of that refusal on competition.  Plaintiffs' refusal-to-deal allegation is a basis for their claims of monopolization or attempted monopolization of the market in which *Kaletra* competes.  Again, the theory is that Abbott "essentially refused to deal with its competitors" by pricing Norvir such that boosted PIs "could not compete with Kaletra," thereby allowing Abbott to raise the price of Kaletra to monopoly levels.  Order Denying Defendant Abbott Laboratories' Omnibus Motion to Dismiss at 14-15, Jan. 12, 2010 ("1/12/10 Order").  It is only a higher price for Kaletra from a lack of competition—not a higher price for Norvir—that could possibly "flow from" the

"competition-reducing" effect of the alleged refusal to deal. Accordingly, any alleged Norvir "overcharges" are irrelevant.

## III.   ABBOTT'S PROPOSED ACTUAL MONOPOLIZATION ELEMENTS INSTRUCTION

18.    Abbott's proposed instruction describing the elements of monopolization directly tracks the ABA model instruction. ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act - Section 2, Monopolization - General, Instruction 1. Other than substituting the names of the appropriate parties and products, Abbott made only three changes to the form instruction. First, we added that the jury must find that Abbott possessed monopoly power in the market "during the time period in which the violation allegedly occurred." As explained above, this is the relevant time period as required by *Rebel Oil* and *Aspen Skiing*. *See* "Time Period for Monopoly Power," Elements of Monopolization ¶¶ 3-8, *supra*. Second, we added the phrase, "rather than primarily as a consequence of a superior product, superior business sense, or historical accident" to the anticompetitive conduct element. This is a direct quotation from, *inter alia*, *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (an element of monopolization is "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."). Third, we added that Plaintiffs must establish that they was injured "as a result of that which made the conduct at issue anticompetitive," rather than "because of the defendant's anticompetitive conduct." *See Brunswick*, 429 U.S. at 489 ("Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."). This modification is necessary because in this case, unlike in many antitrust cases, antitrust injury is disputed issue. As this Court has previously held, antitrust injury is also a necessary element of monopolization under Section 2 of the Sherman Act, as explained above. *See, e.g.*, 1/14/11 Order at 33

("[P]rivate plaintiffs seeking damages for federal antitrust violations must demonstrate antitrust injury."); "Antitrust Injury," Elements of Monopolization ¶ 9, *supra*.

[DISPUTED] GSK'S PROPOSED MONOPOLY POWER AND RELEVANT
MARKET INSTRUCTION 1

MONOPOLY POWER DEFINED

Monopoly power is the power to control prices and exclude or handicap[20] competition in a relevant antitrust market.  More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time.  To prove its monopolization claim, one of the elements Plaintiffs must prove is that Abbott had monopoly power in a relevant antitrust market when the allegedly anticompetitive conduct occurred.[21]  However, monopoly power, in and of itself, is not unlawful.

I will provide further instructions about how you may determine whether Plaintiffs have met its burden of proving monopoly power in a relevant market.

**Source:**  ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 Ed.), Instruction C-4.

---

[20] *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 597 (1985) (approving jury instruction that reads: "We are concerned with conduct which unnecessarily excludes or handicaps competitors.")

[21] *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 362-63, 366-68 (9th Cir. 1988) (limiting its inquiry into the defendant's monopoly power to the years in which the alleged anticompetitive conduct took place)

[DISPUTED] GSK'S PROPOSED MONOPOLY POWER AND RELEVANT
MARKET INSTRUCTION 2

RELEVANT MARKET GENERAL

Plaintiffs must prove as more probably true than not that the defendant had monopoly power in a relevant market when the allegedly anticompetitive conduct occurred.[22]  Defining the relevant market is essential because you are required to make a judgment about whether defendant has monopoly power in a properly defined economic market.  To make this judgment, you must be able to determine what, if any, economic forces restrain defendant's freedom to set prices for or restrict the output of Kaletra. The most likely and most important restraining force will be actual and potential competition from other firms and their products. This includes all firms and products that act as restraints on Abbott's power to set prices as it pleases.  All the firms and products that exert this restraining force are within what is called the relevant market.

There are two aspects you must consider in determining whether Plaintiffs have met its burden to prove the relevant market as more probably true than not.  The first is the relevant product market; the second is the relevant geographic market.

**Source:**  ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 Ed.), Instruction C-6.

---

[22] *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 362-63, 366-68 (9th Cir. 1988) (limiting its inquiry into the defendant's monopoly power to the years in which the alleged anticompetitive conduct took place)

[DISPUTED] GSK'S PROPOSED MONOPOLY POWER AND RELEVANT
MARKET INSTRUCTION 3

DEFINING THE RELEVANT PRODUCT MARKET

The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other.  In other words, the relevant product market includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test with reference to actual behavior of buyers and marketing efforts of sellers.  Products need not be identical or precisely interchangeable as long as they are reasonable substitutes.

To determine whether products are reasonable substitutes for each other, you should consider whether a small but significant permanent increase in the price of one product would result in a substantial number of consumers switching from that product to another. Generally speaking, a small but significant permanent increase in price is approximately a five percent increase in price not due to external cost factors, but you may conclude in this case that some other percentage is more applicable to the product at issue.  If you find that such switching would occur, then you may conclude that the products are in the same product market.

In evaluating whether various products are reasonably interchangeable or are reasonable substitutes for each other, you may also consider: (1) consumers' views on whether the products are interchangeable; (2) the relationship between the price of one product and sales of another; (3) the presence or absence of specialized vendors; (4) the perceptions of either industry or the public as to whether the products are in separate markets; (5) the views of the plaintiff and defendant regarding who their respective competitors are; and (6) the existence or absence of different customer groups or distribution channels.

In this case, Plaintiffs contend that the relevant product market is the market for all protease inhibitors (PIs) boosted with Norvir or for a subset of those drugs.  By contrast, Abbott asserts that Plaintiffs have failed to allege the proper relevant product market.  Abbott contends that the relevant market includes at least PIs that cannot be boosted and NNRTIs and may include all HIV/AIDS drugs.  If you find that Plaintiffs have proven a relevant product market comprised of products that are reasonably interchangeable, then you should continue to evaluate the remainder of Plaintiffs' claim. However, if you find that Plaintiffs have failed to prove such a market, then you must find in Abbott's favor on this claim.

**Source:**  ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 Ed.), Instruction C-7.

[DISPUTED] GSK'S PROPOSED MONOPOLY POWER AND RELEVANT
MARKET INSTRUCTION 4

RELEVANT MARKET – NECESSITY OF PROOF

If, after considering all the evidence, you find that Plaintiffs have proven as more probably true than not its relevant product market and relevant geographic market, then you must find that Plaintiffs have met the relevant market requirement and you must consider the remaining elements of this claim.

If you find that Plaintiffs have failed to meet its burden in proving either a relevant product market or a relevant geographic market, then you must find for Abbott and against Plaintiffs on this claim.


**Source:**  ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 Ed.), Instruction C-15.

[JOINT] PROPOSED RELEVANT GEOGRAPHIC MARKET INSTRUCTION

The parties agree that for the purposes of this case, the relevant geographic market is the United States.

[DISPUTED] GSK'S MONOPOLY POWER AND RELEVANT MARKET
INSTRUCTION 5

EXISTENCE OF MONOPOLY POWER

If you find that Plaintiffs have proven a relevant market, then you should determine whether Abbott has monopoly power in that market.  The relevant time to evaluate monopoly power is at the time of the alleged anticompetitive conduct, here December 2003.[23]  As I instructed you earlier, monopoly power is the power to control prices and exclude or handicap competition in a relevant antitrust market.  Evidence of the structure of the market can show that Abbott has monopoly power.  The evidence presented by the parties includes evidence of Abbott's market share and barriers to entry.  If this evidence establishes that Abbott has the power to control prices and exclude or handicap competition in the relevant antitrust market, then you may conclude that Abbott has monopoly power in the market.

**Market Share**

The first factor that you should consider is Abbott's market share. Based on the evidence that you have heard about Abbott's market share, you should determine Abbott's market share as a percentage of total industry sales by prescription.

A market share above 50 percent may be sufficient to support an inference that defendant has monopoly power.  The likelihood that a company has monopoly power is stronger the higher that company's share is above 50 percent.

A market share below 50 percent is ordinarily not sufficient to support a conclusion that defendant has monopoly power.  However, if you find that the other evidence demonstrates that Abbott does, in fact, have monopoly power despite having a market share below 50 percent, you may conclude that Abbott has monopoly power.  For example, a finding of monopoly power may be appropriate, even if market share is somewhat below 50 percent, if competition is highly fragmented and the firm has control over the supply market, or if other barriers to entry, which I will discuss in a moment, are significant and are probably a deterrent to the establishment of a new competitor.[24]

**Barriers to Entry**

---

[23] *Oahu Gas Serv., Inc. v. Pac. Res. Inc.*, 838 F.2d 360, 362-64, 366-68 (9th Cir. 1988) (limiting its inquiry into the defendant's monopoly power to the years in which the alleged anticompetitive conduct took place)

[24] *Syufy Enter. v. Am. Multicinema, Inc.*, 793 F.2d 990, 995 (9th Cir. 1986) (citing *Pacific Coast Ag. Expert Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196 (9th Cir. 1975), and stating "We held that when Sunkist's market share, which ranged from 45% to 70% was coupled with such factors as highly fragmented competition and Sunkist's acknowledged control over the supply market, the jury's finding of monopoly power could be sustained.")

You may also consider whether there are barriers to entry into the relevant market. Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way. Barriers to entry might include intellectual property rights (such as patents), specialized marketing practices, and the reputation of the companies already participating in the market (or the brand name recognition of their products). They could also include control of an essential or superior resource, entrenched buyer preferences, high capital entry costs and economics of scale.[25]

The history of entry and exit in the relevant market around the time of the anticompetitive conduct[26] may be helpful to consider in evaluating barriers to entry. Entry of new competitors or expansion of existing competitors may be evidence that barriers to entry are low. On the other hand, departures from the market, the failure of firms to enter the market, or the failure of firms who enter the market to compete effectively may support an inference that defendant has monopoly power.

The trend in defendant's market share around the time of the anticompetitive conduct is something you may also consider. An increasing market share may strengthen an inference that there are high barriers to entry, while a decreasing share might show that barriers to entry are low. A declining market share does not foreclose a finding of monopoly power.[27]

Evidence of low or no entry barriers may be evidence that defendant does not have monopoly power, regardless of defendant's market share. By contrast, evidence of high barriers to entry along with high market share supports an inference that defendant has monopoly power.

---

[25] *Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997) ("Common entry barriers include: patents or other legal licenses, control of essential or superior resources, entrenched buyer preferences, high capital entry costs and economies of scale.") (citation omitted)

[26] *Oahu Gas Serv., Inc. v. Pac. Res. Inc.*, 838 F.2d 360, 367 (9th Cir. 1988) (finding that "the evidence reasonably supports the conclusion that high barriers to entry existed in the [relevant] market throughout the relevant time period.")

[27] *Greyhound Computer Corp. v. Int'l Bus. Machs., Inc.*, 559 F.2d 488, 497 n.18 (9th Cir. 1977) ("A declining market share may reflect an absence of market power, but it does not foreclose a finding of such power") (citations omitted); *see Oahu Gas Serv., Inc. v. Pac. Res. Inc*., 838 F.2d 360, 367 (9th Cir. 1988) (a firm with a "consistently high, albeit declining, market share in a market with high barriers to entry possessed monopoly power"); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 794-95 (1946) (finding dominant market power despite declining market share); *Conwood Co. v. U.S. Tobacco Co.,* 290 F.3d 768, 788-790 (6th Cir. 2002) (rejecting defendant's argument that rivals' market share increases and incumbent's market share decreases precluded Section 2 violation); *Reazin v. Blue Cross & Blue Shield of Kan., Inc*., 899 F.2d 951, 970 (10th Cir. 1990) ("The fact that the share may have declined somewhat does not persuade us" of lack of monopoly power) (citation omitted)

### *Conclusion*

If you find that Abbott has monopoly power in the relevant market, then you must consider the remaining elements of this claim.  If you find that Abbott does not have monopoly power, then you must find for Abbott and against Plaintiffs on this claim.


**Source:**  ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 Ed.), Instruction C-16.

<u>[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED MONOPOLY POWER AND</u>
<u>RELEVANT MARKET INSTRUCTION 1</u>

FIRST ELEMENT: MONOPOLY POWER DEFINED

The first element that Plaintiffs must establish as more probably true than not true is that Abbott had monopoly power[28] at the time of the alleged anticompetitive conduct.[29]

Monopoly power is the power to control prices or exclude or handicap[30] competition.[31]  More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time.  To prove its monopolization claim, one of the elements Plaintiffs must prove is that Abbott had

---

[28] *Rebel Oil Co. Inc., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (monopoly power can be shown through direct evidence, or circumstantially by defining the relevant market); *In re Abbott Labs. Norvir Anti-Trust Litig.*, 442 F. Supp. 2d 800, 805-06 (N.D. Cal. 2006) (same); *Broadcom Corp. v. Qualcomm, Inc*., 501 F.3d 297, 307 n.3 (3d Cir. 2007) ("direct proof of monopoly power does not require a definition of the relevant market"); *PepsiCo, Inc. v. Coca-Cola Co*., 315 F.3d 101, 107-08 (2d Cir. 2002) (where there is direct evidence of monopoly power, "a relevant market definition is not a necessary component  of a monopolization claim"); *Conwood Co., L.P. v. U.S. Tobacco Co*., 290 F.3d 768, 783 n.2 (6th Cir. 2002) (monopoly power "may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market") (internal quotation marks and citation omitted); *Toys "R" Us, Inc. v. Federal Trade Comm'n*, 221 F.3d 928, 937 (7th Cir. 2000) (distinguishing between proving monopoly power by direct evidence, and "by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in the case").

[29] *Oahu Gas Service, Inc. v. Pacific Resources Inc.*, 838 F.2d 360, 362-363, 366-368 (9th Cir. 1988) (limiting its inquiry into the defendant's monopoly power to the years in which the alleged anticompetitive conduct took place).

[30] *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 597 (1985) (approving jury instruction that reads: "We are concerned with conduct which unnecessarily excludes or handicaps competitors.")

[31] As set forth by the Supreme Court, the proper wording is: "the power to control prices *or* exclude competition" – using the disjunctive rather than the subjunctive.  *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966); *United States v. E. I. Du Pont de Nemours & Co*., 351 U.S. 377, 391 (1956); *see also Oahu Gas Service, Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 366 (9th Cir. 1988) (same).  Conforming changes have been made throughout the Customer Plaintiffs' proposed instructions.

monopoly power when the allegedly anticompetitive conduct occurred.[32]  However, monopoly power, in and of itself, is not unlawful.

I will provide further instructions about how you may determine whether Plaintiffs have met their burden of proving monopoly power.


**Source:**  ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005), Instruction C-4.

---

[32] *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 362-63, 366-68 (9th Cir. 1988) (limiting its inquiry into the defendant's monopoly power to the years in which the alleged anticompetitive conduct took place)

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED MONOPOLY POWER AND
RELEVANT MARKET INSTRUCTION 2

TWO TYPES OF PROOF OF MONOPOLY POWER

Plaintiffs may demonstrate monopoly power through either of two types of proof:
direct evidence and indirect, or circumstantial evidence.  I will now explain those two
ways of proving monopoly power in more detail.

**Source:**  *Rebel Oil Co., Inc. v. Atl. Richfield Co*., 51 F.3d 1421, 1434 (9th Cir. 1995);
*Safeway Inc. v. Abbott Labs*., No. 07-5470-CW, slip op. at 12 (N.D. Cal. Jan. 18, 2011);
*In re Abbott Labs. Norvir Anti-Trust Litig.*, 442 F. Supp. 2d 800, 806 (N.D. Cal. 2006).

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED MONOPOLY POWER AND RELEVANT MARKET INSTRUCTION 3

DIRECT EVIDENCE OF MONOPOLY POWER

Plaintiffs first seek to prove Abbott's monopoly power through direct evidence.

Plaintiffs may show Abbott's monopoly power by demonstrating that Abbott had sufficient power to actually inflict injury to competition and that it actually exercised that power.[33]

As I instructed you earlier, monopoly power is the power to control prices or exclude or handicap[34] competition. More precisely, a firm is a monopolist if it can profitably raise or maintain prices substantially above the competitive level for a significant period of time.  Monopoly power is the power to charge a price higher than the competitive price without inducing so rapid and great an expansion of output from competing firms as to make the artificially high price unsustainable and unprofitable.[35]  If a firm can profitably raise prices without causing competing firms to expand output and drive down prices, that firm has monopoly power.[36]

Therefore, under this direct method of proving monopoly power, Plaintiffs have the burden of proving that Abbott has the ability to raise or maintain the prices that it charges for goods or services above competitive levels. [In coming to your conclusion about whether Abbott's pricing indicates monopoly power, one thing you may consider is Abbott's marginal cost of producing Norvir and/or Kaletra.[37]]

Plaintiffs must prove that defendant has the power to raise prices above competitive levels without the assistance of, and despite competition from, any existing or potential competitors.

---

[33] *Safeway Inc. v. Abbott Labs*., No. 07-5470-CW, slip op. at 12 (N.D. Cal. Jan. 18, 2011); *In re Abbott Labs. Norvir Anti-Trust Litig.*, 442 F. Supp. 2d 800, 806 (N.D. Cal. 2006) (monopoly power "can also be shown by injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power.") (internal quotation omitted).

[34] *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 597 (1985) (approving jury instruction that reads: "We are concerned with conduct which unnecessarily excludes or handicaps competitors.")

[35] *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380 (3d Cir. 2005).

[36] *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) (citing *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380 (3d Cir. 2005)).

[37] *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 n.4 (9th Cir. 1995). Plaintiffs are aware of the Court's ruling on point, *Safeway Inc. v. Abbott Labs*., No. 07-5470-CW, slip op. at 12 (N.D. Cal. Jan. 18, 2011), and are including this proposed instruction to preserve the issue for appeal.

Similarly, Plaintiffs must prove that defendant has the ability to exclude or handicap competition. For example, if Abbott attempted to maintain prices above competitive levels, and any new competitors that could entered the market or any existing competitors that could expand their sales could not take so much business from Abbott that its price increase would become unprofitable and would have to be withdrawn, then Abbott has monopoly power.

If you find that the defendant has monopoly power in the relevant market, then you must consider the remaining elements of this claim. If you find that defendant does not have monopoly power, then you must find for defendant and against Plaintiffs on this claim.

**Source:**  ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 Ed.), Instruction C-23.

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED MONOPOLY POWER AND
RELEVANT MARKET  INSTRUCTION 4

CIRCUMSTANTIAL EVIDENCE OF MONOPOLY POWER: GENERALLY

As an alternative to direct evidence, you may find Abbott had monopoly power
through indirect or circumstantial evidence.


**Source:**  *Rebel Oil Co., Inc. v. Atl. Richfield Co*., 51 F.3d 1421, 1434 (9th Cir. 1995);
*Safeway Inc. v. Abbott Labs*., No. 07-5470-CW, slip op. at 12 (N.D. Cal. Jan. 18, 2011).

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED MONOPOLY POWER AND
RELEVANT MARKET INSTRUCTION 5

RELEVANT MARKET – GENERAL

In proving monopoly power via indirect or circumstantial evidence, Plaintiffs
must prove as more probably true than not that the defendant had monopoly power in a
relevant market when the allegedly anticompetitive conduct occurred.[38]  Defining the
relevant market is essential when proving monopoly power via circumstantial evidence
because you are required to make a judgment about whether defendant has monopoly
power in a properly defined economic market.  To make this judgment, you must be able
to determine what, if any, economic forces restrain defendant's freedom to set prices for
or restrict the output of Norvir or Kaletra. The most likely and most important restraining
force will be actual and potential competition from other firms and their products. This
includes all firms and products that act as restraints on Abbott's power to set prices as it
pleases.  All the firms and products that exert this restraining force are within what is
called the relevant market.

There are two aspects you must consider in determining whether Plaintiffs have
met their burden to prove the relevant market as more probably true than not.  The first is
the relevant product market; the second is the relevant geographic market.

**Source:**  ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases
(2005 Ed.), Instruction C-6.

---

[38] *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 362-63, 366-68 (9th Cir.
1988) (limiting its inquiry into the defendant's monopoly power to the years in which the
alleged anticompetitive conduct took place)

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED MONOPOLY POWER AND RELEVANT MARKET INSTRUCTION 6

RELEVANT PRODUCT MARKET

As I have instructed you, in proving monopoly power via indirect or circumstantial evidence, Plaintiffs must prove a relevant product market,

The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other. In other words, the relevant product market includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test with reference to actual behavior of buyers and marketing efforts of sellers. Products need not be identical or precisely interchangeable as long as they are reasonable substitutes. This determination hinges on a determination of those products to which consumers will turn given reasonable variations in price.[39]

To determine whether products are reasonable substitutes for each other, you should consider whether a small but significant permanent increase in the price of one product would result in a substantial number of consumers switching from that product to another. Generally speaking, a small but significant permanent increase in price is approximately a five percent increase in price not due to external cost factors, but you may conclude in this case that some other percentage is more applicable to the product at issue. If you find that such switching would occur, then you may conclude that the products are in the same product market.

In evaluating whether various products are reasonably interchangeable or are reasonable substitutes for each other, you may also consider: (1) consumers' views on

[39] *Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762, 767 (9th Cir. 2001); *Syufy Enterps. v. Am. Multicinema, Inc.*, 793 F.2d 990, 994 (9th Cir. 1986) (market analysis must consider not only whether products are "interchangeable in use", but also "whether there is 'cross-elasticity of demand' between excluded and included products"); *SmithKline Corp. v. Eli Lilly & Co., Inc.*, 575 F.2d 1056, 1064 (3d Cir. 1978) (despite Lilly's evidence that "for virtually every purpose for which hospital physicians use cephalosporins, they also use other antibiotics,"… "the cephalosporins and non-cephalosporin antiinfectives do not demonstrate significant positive cross-elasticity of demand insofar as price is concerned," and should therefore not be placed in the relevant product market); *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 496-99 (2d Cir. 2004) (though identical in all respects, branded warfarin sodium not in the same relevant market as generic warfarin sodium); *In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 81-82 (D.D.C. 2006) (though identical, branded lorazepam not in same relevant market with generic lorazepam, and branded clorazepate not in same relevant market with generic clorazepate, because "[t]he fact that products are just functionally interchangeable does not compel a finding that they belong in the same market").

whether the products are interchangeable; (2) the relationship between the price of one product and sales of another; (3) the presence or absence of specialized vendors; (4) the perceptions of either industry or the public as to whether the products are in separate markets; (5) the views of the plaintiffs and defendant regarding who their respective competitors are; and (6) the existence or absence of different customer groups or distribution channels. Although you may also consider whether protease inhibitors boosted with Norvir (or a subset of those drugs) could be used for the same purposes as other ARVs, this factor is relevant only to the extent that it is probative of whether consumers of one product might actually be willing to switch to the other product in the face of a price increase.[40]

Also bear in mind that within the context of a larger market, there may exist a submarket, if it is sufficiently insulated from competition in the larger market in a way that is economically significant. If so, you may find that the submarket is the relevant product market.[41]

In this case, Plaintiffs contend that the relevant product market is the market for all protease inhibitors (PIs) boosted with Norvir or subsets of those drugs. By contrast, Abbott asserts that Plaintiffs have failed to allege the proper relevant product market. Abbott contends that the relevant market includes at least NNRTIs and may include all HIV/AIDS drugs. If you find that Plaintiffs have proven a relevant product market comprised of products that are reasonably interchangeable, then you should continue to evaluate the remainder of Plaintiffs' claim. However, if you find that Plaintiffs have failed to prove such a market, then you must find in Abbott's favor on this claim.

---

[40] *See Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762, 767 (9th Cir. 2001); *Syufy Enterps. v. Am. Multicinema, Inc.*, 793 F.2d 990, 994 (9th Cir. 1986) (market analysis must consider not only whether products are "interchangeable in use", but also "whether there is 'cross-elasticity of demand' between excluded and included products"); *SmithKline Corp. v. Eli Lilly & Co., Inc.*, 575 F.2d 1056, 1064 (3d Cir. 1978) (despite Lilly's evidence that "for virtually every purpose for which hospital physicians use cephalosporins, they also use other antibiotics,"… "the cephalosporins and non-cephalosporin antiinfectives do not demonstrate significant positive cross-elasticity of demand insofar as price is concerned," and should therefore not be placed in the relevant product market); *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 496-99 (2d Cir. 2004) (though identical in all respects, branded warfarin sodium not in the same relevant market as generic warfarin sodium); *In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 81-82 (D.D.C. 2006) (though identical, branded lorazepam not in same relevant market with generic lorazepam, and branded clorazepate not in same relevant market with generic clorazepate, because "[t]he fact that products are just functionally interchangeable does not compel a finding that they belong in the same market").

[41] *Safeway Inc. v. Abbott Labs.*, No. 07-5470-CW, slip op. at 16 (N.D. Cal. Jan. 18, 2011); *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

**Source:**  ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases
(2005 Ed.), Instruction C-7.

[JOINT] PROPOSED RELEVANT GEOGRAPHIC MARKET INSTRUCTION

   The parties agree that for the purposes of this case, the relevant geographic market is the United States.

<u>[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED MONOPOLY POWER AND
RELEVANT MARKET INSTRUCTION 7</u>

EXISTENCE OF MONOPOLY POWER – INDIRECT PROOF

If you find that Plaintiffs have proven a relevant market, then you should determine whether Abbott had monopoly power in that market.  The relevant time to evaluate monopoly power is at the time of the alleged anticompetitive conduct, here December 2003.[42]  As I instructed you earlier, monopoly power is the power to control prices or exclude or handicap competition.  Evidence of the structure of the market can show that Abbott has monopoly power.  The evidence presented by the parties includes evidence of Abbott's market share and barriers to entry.  If this evidence establishes that Abbott has the power to control prices or exclude or handicap competition in the relevant antitrust market, then you may conclude that Abbott has monopoly power in the market.

***Market Share***

The first factor that you should consider is Abbott's market share. Based on the evidence that you have heard about Abbott's market share, you should determine Abbott's market share as a percentage of total industry sales by prescription.

A market share above 50 percent may be sufficient to support an inference that defendant has monopoly power.  The likelihood that a company has monopoly power is stronger the higher that company's share is above 50 percent.

A market share below 50 percent is ordinarily not sufficient to support a conclusion that defendant has monopoly power.  However, if you find that the other evidence demonstrates that Abbott does, in fact, have monopoly power despite having a market share below 50 percent, you may conclude that Abbott has monopoly power.  For example, a finding of monopoly power may be appropriate, even if market share is somewhat below 50 percent, if competition is highly fragmented and the firm has control over the supply market, or if other barriers to entry, which I will discuss in a moment, are significant and are probably a deterrent to the establishment of a new competitor.[43]

***Barriers to Entry***

---

[42] *Oahu Gas Serv., Inc. v. Pac. Res. Inc.*, 838 F.2d 360, 362-64, 366-68 (9th Cir. 1988) (limiting its inquiry into the defendant's monopoly power to the years in which the alleged anticompetitive conduct took place)

[43] *Syufy Enter. v. Am. Multicinema, Inc.*, 793 F.2d 990, 995 (9th Cir. 1986) (citing *Pacific Coast Ag. Expert Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196 (9th Cir. 1975), and stating "We held that when Sunkist's market share, which ranged from 45% to 70% was coupled with such factors as highly fragmented competition and Sunkist's acknowledged control over the supply market, the jury's finding of monopoly power could be sustained").

You may also consider whether there are barriers to entry into the relevant market. As with the issues of relevant market and market share, you should consider whether barriers to entry and expansion exist at the time of the alleged anticompetitive activity.[44]  The basic idea with barriers to entry and expansion is to evaluate the market structure to determine whether, if a firm exercised power from its dominant position in the market, new or existing competitors could counteract the effects of that monopoly power.[45]  Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way.  Barriers to entry might include legal license[46] or intellectual property rights (such as patents), specialized marketing practices, and the reputation of the companies already participating in the market (or the brand name recognition of their products).  They could also include control of an essential or superior resource, entrenched buyer preferences, high capital entry costs and economics of scale.[47]

The history of entry and exit in the relevant market around the time of the anticompetitive conduct[48] may be helpful to consider in evaluating barriers to entry.  Entry of new competitors or expansion of existing competitors may be evidence that barriers to entry are low.  On the other hand, departures from the market, the failure of firms to enter the market, or the failure of firms who enter the market to compete effectively may support an inference that defendant has monopoly power.

The trend in defendant's market share around the time of the anticompetitive conduct is something you may also consider.  An increasing market share may strengthen an inference that there are high barriers to entry, while a decreasing share might show that barriers to entry are low.  A declining market share does not foreclose a finding of monopoly power.[49]  In evaluating whether Abbott maintained a monopoly through

---

[44] *Oahu Gas Service, Inc. v. Pacific Resources Inc.*, 838 F.2d 360, 362-363, 366-368 (9th Cir. 1988) (limiting its inquiry into the defendant's monopoly power to the years in which the alleged anticompetitive conduct took place).

[45] *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995).

[46] *Image Tech. Serv. v. Eastman Kodak Co.*, 125 F.3d 1195, 1207 (9th Cir. 1997) (common barriers "include: patents or other legal licenses"); *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) ("The main sources of entry barriers are: […] legal license requirements"); *Safeway Inc. v. Abbott Labs.*, No. 07-5470-CW, slip op. at 18 (N.D. Cal. Jan. 18, 2011).

[47] *Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997) ("Common entry barriers include: patents or other legal licenses, control of essential or superior resources, entrenched buyer preferences, high capital entry costs and economies of scale.") (citation omitted).

[48] *Oahu Gas Serv., Inc. v. Pac. Res. Inc.*, 838 F.2d 360, 367 (9th Cir. 1988) (finding that "the evidence reasonably supports the conclusion that high barriers to entry existed in the [relevant] market throughout the relevant time period").

[49] *Greyhound Computer Corp. v. Int'l Bus. Machs., Inc.*, 559 F.2d 488, 497 n.18 (9th Cir. 1977) ("A declining market share may reflect an absence of market power, but it does not foreclose a finding of such power") (citations omitted); *see Oahu Gas Serv., Inc.*

anticompetitive conduct, it is recognized that monopolists almost always lose market share in the long-term because of innovation, change and growth in the market.[50]  The issue to consider is whether Abbott maintained its monopoly power longer than it otherwise would have through anticompetitive conduct.

Evidence of low or no entry barriers may be evidence that defendant does not have monopoly power, regardless of defendant's market share.  By contrast, evidence of high barriers to entry along with high market share supports an inference that defendant has monopoly power.

### Conclusion

If you find that Abbott has monopoly power, then you must consider the remaining elements of this claim.  If you find that Abbott does not have monopoly power, then you must find for Abbott and against Plaintiffs on this claim.


**Source:**  ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 Ed.), Instruction C-16.

---

*v. Pac. Res. Inc.*, 838 F.2d 360, 367 (9th Cir. 1988) (a firm with a "consistently high, albeit declining, market share in a market with high barriers to entry possessed monopoly power"); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 794-95 (1946) (finding dominant market power despite declining market share); *Conwood Co. v. U.S. Tobacco Co.,* 290 F.3d 768, 788-790 (6th Cir. 2002) (rejecting defendant's argument that rivals' market share increases and incumbent's market share decreases precluded Section 2 violation); *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 970 (10th Cir. 1990) ("The fact that the share may have declined somewhat does not persuade us" of lack of monopoly power) (citation omitted)

[50] *Greyhound Computer Corp. v. Int'l Bus. Machs. Corp.*, 559 F.2d 488, 491, 496-97 (9th Cir. 1977) (noting rapid technological change, reviewing market share data from 1964 to 1970 and rejecting claim that IBM had no monopoly power because of "youth, change and growth").

## [DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND RELEVANT MARKET INSTRUCTION 1

### RELEVANT MARKET—PURPOSE

As I just explained, the first element of monopolization that Plaintiffs must prove is that the market in which Kaletra competes and in which they have alleged that Abbott possesses monopoly power is what the law calls a "relevant antitrust market," a "relevant market" or a "properly defined economic market."  Determining the relevant antitrust market is essential because a determination of whether a defendant has monopoly power can meaningfully be made only in the context of a properly defined economic market.


**Source**:  ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act - Section 2, Monopolization-General, Instruction 3 (modified).

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND RELEVANT
MARKET INSTRUCTION 2

RELEVANT MARKET—DEFINITION

The basic idea of a relevant market is that the products within it are reasonable substitutes for each other from the point of view of the consumer or others making the purchasing decision; that is, the products compete with each other. In other words, the relevant product market includes the products that the consumer or others making the purchasing decision believe are reasonably interchangeable or reasonable substitutes for each other. This is a practical test with reference to actual behavior of buyers and marketing efforts of sellers. Products need not be identical or precisely interchangeable as long as they are reasonable substitutes. Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material—such as aluminum foil, cellophane, or even plastic containers—to be reasonable alternatives, then all those products would be in the same relevant product market.

In evaluating whether various products are reasonably interchangeable or are reasonable substitutes for each other, you may also consider: (1) consumers' views on the extent to which the products are interchangeable; (2) the views of others who contribute to the purchasing decision on the extent to which the products are interchangeable; (3) the relationship between the price of one product and sales of another, (4) the perceptions of either industry or the public as to whether the products are in separate markets; (5) the views of the producers in the market regarding who their competitors are; and (6) the existence or absence of different customer groups or distribution channels.

In this case, Plaintiffs contend that the relevant product market in which Kaletra competes consists of all PIs (or a subgroup of PIs) when they are boosted by Norvir. By contrast, Abbott asserts that the Plaintiffs have failed to show that this is a relevant product market and that Plaintiffs' reasons for defining the market as they have are invalid.

If you find that the Plaintiffs have proven that the relevant market in which Kaletra competes is limited to boosted PI drugs (or a subgroup of boosted PI drugs) then you should continue to evaluate the remainder of the Plaintiffs' claim that Abbott unlawfully monopolized the that market. However, if you find that the Plaintiffs have failed to prove that the market is limited to boosted PIs (or a subgroup of boosted PIs), then you must find in Abbott's favor on Plaintiffs' monopolization claim and should not consider the remaining elements of that claim.

**Source**: ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act – Monpolization-General Instruction 4 (modified).

[JOINT] PROPOSED RELEVANT GEOGRAPHIC MARKET INSTRUCTION

      The parties agree that for the purposes of this case, the relevant geographic market is the United States.

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND RELEVANT
MARKET INSTRUCTION 3

MONOPOLY POWER—DEFINITION

If you find that Plaintiffs have proven one of the relevant markets that they allege, then the next element Plaintiffs must prove is that Abbott had monopoly power in that market.  Monopoly power is the power to control prices without regard to competition,[51] and to exclude competition in a relevant antitrust market.  A firm has monopoly power if it can profitably raise prices in the relevant antitrust market substantially above the competitive level for a significant period of time.  Monopoly power, in and of itself, is not unlawful; a defendant is liable for monopolization only when the plaintiff proves both that the defendant is a monopolist and that the other elements of a monopolization claim are also present.  I will provide further instructions about how you may determine whether Plaintiffs have met their burden of proving monopoly power in a relevant market.


**Source:**  ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act—Section 2, Monopolization-General, Instruction 2 (modified); *Greyhound Computer Corp., Inc. v. Int'l Bus. Machs. Corp.*,  559 F.2d 488, 497 (9th Cir. 1977).

---

[51] *Greyhound Computer Corp., Inc. v. Int'l Bus. Mach. Corp.*,  559 F.2d 488, 497 (9th Cir. 1977) (considering as evidence of monopoly power "evidence indicating [defendant's] ability to manage its prices with little regard to competition.").

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND RELEVANT
MARKET INSTRUCTION 4

RELEVANT TIME PERIOD FOR ACCESSING MONOPOLY POWER

Plaintiffs' burden of proving monopoly power is satisfied only if they demonstrate that Abbott maintained monopoly power throughout the relevant time period. For the Direct Purchaser Plaintiffs' bundled discounting claim (on which I will instruct you shortly), the relevant time period begins in 2005 when the Direct Purchaser Plaintiffs allege that Abbott began pricing Kaletra supracompetitively, and continues for as long as the Direct Purchaser Plaintiffs claim to have suffered antitrust damages resulting from Abbott's alleged anticompetitive bundled discounting. For GSK's bundled discounting claim, the relevant time period begins on December 3, 2003, and continues for as long as GSK claims to have suffered antitrust damages resulting from Abbott's alleged anticompetitive bundled discounting. For all Plaintiffs' refusal to deal claims (on which I also will instruct you shortly), the relevant time period begins on December 3, 2003, and continues for as long as Plaintiffs claim to have suffered antitrust damages resulting from Abbott's alleged refusal to deal.

For any theory of anticompetitive conduct, Plaintiffs may not recover damages for any period during which Plaintiffs have failed to prove that Abbott maintained monopoly power.

**Source:** *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1440 (9th Cir. 1995); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 n.20 (1985).

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND RELEVANT
MARKET INSTRUCTION 5

DIRECT EVIDENCE OF MONOPOLY POWER - INTRODUCTION

As I instructed you earlier, monopoly power is the power to control prices and exclude competition in a relevant antitrust market. There are two ways to show that a firm has monopoly power: through direct evidence and through circumstantial evidence. Plaintiffs have tried to use both direct and circumstantial evidence to prove that, during the relevant period, Abbott had monopoly power in the market in which Kaletra competed. By contrast, Abbott contends that both the direct evidence and the circumstantial evidence show that Abbott did not have monopoly power during the relevant period.

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND RELEVANT
MARKET INSTRUCTION 6

DIRECT EVIDENCE OF MONOPOLY POWER

In order to prove that Abbott had monopoly power in the market in which Kaletra competes by direct evidence, Plaintiffs must establish that Abbott (1) raised the price of Kaletra substantially over its competitors,[52] (2) was able to maintain that price increase and make a profit from it over what they contend is the relevant time period,[53] and (3) restricted the manufacture and/or distribution of HIV drugs in the relevant market during that time period.[54]   It is Plaintiffs' burden to prove all of these allegations.  The time period that the Direct Purchaser Plaintiffs contend that Abbott had monopoly power is December 3, 2003 through _____.  The time period that GSK contends that Abbott had monopoly power is December 3, 2003 through the end of 2006.[55]

---

[52] *See* ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act - Section 2, Monopolization - General, Instruction 9 ("[A] firm is a monopolist if it can profitably raise or maintain prices substantially above the competitive level for a significant period of time.").

[53] *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("Without market power to increase prices above competitive levels, and sustain them for an extended period, a predator's actions do not threaten consumer welfare."); *United States v. Syufy Enters.*, 903 F.2d 659, 663 (9th Cir. 1990) ("[U]ltimately, the court must resolve a practical question in every monopolization case: Is this the type of situation where market forces are likely to cure the perceived problem within a reasonable period of time?"  If so, "a court ought to exercise extreme caution because judicial intervention in a competitive situation can itself upset the balance of market forces, bringing about the very ills the antitrust laws were meant to prevent.").

[54] *Forsyth v. Humana, Inc.*,  114 F.3d 1467, 1476 (9th Cir. 1997) ("The plaintiffs submitted evidence that Sunrise Hospital routinely charged higher prices than other hospitals while reaping high profits. With no accompanying showing of restricted output, however, the plaintiffs have failed to present direct evidence of market power."); *Rebel Oil*, 51 F.3d at 1434 ("A predator has sufficient market power when, by restrict its own output, it can restrict marketwide output and, hence, increase marketwide prices.").

[55] *Oahu Gas Serv., Inc. v. Pac. Res., Inc*, 838 F.2d 360, 362-63 (9th Cir. 1988) (finding that the relevant period of monopoly power was 1972 to 1983 in a case where plaintiff alleged "a decision in 197[2] not to begin producing propane" and "a campaign in 1982 to force Oahu to lower prices by offering sham cut-rate contracts to Oahu's customers"); *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995) (suggesting that courts should look at whether a defendant has monopoly power during the time it charged allegedly supracompetitive prices); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) (affirming a jury verdict that defendant possessed monopoly power for purposes of a refusal to deal claim from 1977 to 1981).

In addition, evidence that Abbott did not raise the price of Kaletra substantially over its competitors, was not able to maintain that price increase and make a profit from it over the relevant time period, or that Abbott did not restrict the manufacture and/or distribution of HIV drugs in the relevant market during the relevant time period would be direct evidence that Abbott did not possess monopoly power during the relevant period.

To prove monopoly power by direct evidence, Plaintiffs must prove that Abbott raised the price of Kaletra substantially over its competitors, and was able to maintain that price increase and make a profit from it over the relevant time period by itself—that is, without the assistance of, and despite competition from, any existing or potential competitors. Plaintiffs must also prove that Abbott maintained the price of Kaletra substantially above the prices of competitors' HIV drugs for a significant period of time.

If you find that Abbott did not raise the price of Kaletra substantially above the prices of competitors' HIV drugs in the relevant market, or did raise the price of Kaletra substantially above the prices of competitors' HIV drugs in the relevant market but was unable to maintain that price for a significant period of time without losing so much business to competitors that the price increase became unprofitable, then you must find that Plaintiffs have not proven through direct evidence that Abbott had monopoly power.

To prove by direct evidence that Abbott had monopoly power, Plaintiffs also must prove that Abbott has restricted marketwide output. In other words, Plaintiffs must show that Abbott has decreased the supply of products in the market as a whole by reducing output of Kaletra. If you find that Abbott reduced output of Kaletra, but new competitors entered the market or existing competitors expanded sales of their products and made up for any reduction in the amount of Kaletra that was available, then you must find that Plaintiffs have not shown by direct evidence that Abbott possessed monopoly power. Furthermore, this would be direct evidence that Abbott did not possess monopoly power during the relevant period.

Evidence that Abbott earned a high profit margin or a high rate of return would not be evidence that Abbott had monopoly power during the relevant period. For example, most brand-name drugs have high profit margins in order to recover the high upfront costs involved in researching and developing drugs. However, an ability to sell at higher prices or earn higher profit margins than other companies involved in researching and developing drugs over a long period of time may be evidence of monopoly power. By contrast, evidence that Abbott lost or would have lost a substantial amount of sales of Kaletra if it raised Kaletra's prices substantially above the prices of competitive products, that Kaletra's price was lower or comparable to the prices of competitive products, or that Abbott's profit margins for Kaletra were decreasing, might be evidence that Abbott did not have monopoly power.

If you find that direct evidence establishes that Abbott has monopoly power in the market in which Kaletra competes, then you must consider the remaining elements of Plaintiffs' claim of monopolization of the market in which they allege Kaletra competes. If you do not find sufficient direct evidence that Abbott has monopoly power, then you

must consider whether the plaintiffs have proven that Abbott has monopoly power by using circumstantial evidence.


**Source:**  ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act - Section 2, Monopolization - General, Instruction 9 (modified); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *United States v. Syufy Enters.*, 903 F.2d 659, 663 (9th Cir. 1990); *Oahu Gas Serv., Inc. v. Pac. Res., Inc*, 838 F.2d 360, 362-63 (9th Cir. 1988); *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND RELEVANT
MARKET INSTRUCTION 7

CIRCUMSTANTIAL EVIDENCE OF MONOPOLY POWER

Plaintiffs have also attempted to use circumstantial evidence of the structure of the market to prove that Abbott has monopoly power.  By contrast, Abbott contends that the circumstantial evidence shows that it did not have monopoly power during the relevant period.

The circumstantial evidence presented by the parties includes evidence of Abbott's market share, market share trends, whether other competitors or potential competitors have had difficulty entering the market, the extent to which existing competitors can and have increased their sales of competing HIV drugs, the extent to which competitors have been able to increase their prices and maintain or gain sales or market share, the extent to which other companies entered or exited the market, and the number and size of other actual and potential competitors.  I will now provide you further instruction on each of these factors.

**Source:** ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act - Section 2, Monopolization - General, Instruction 8 (modified).

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND RELEVANT
MARKET INSTRUCTION 8

CIRCUMSTANTIAL EVIDENCE FACTOR 1: MARKET SHARE

The first factor that you should consider is Abbott's share of the market in which Kaletra competes during the relevant period.  Based on the evidence that you have heard about Abbott's market share, you should determine Abbott's market share as a percentage of total industry sales.  The likelihood that a company has monopoly power is stronger the higher that company's market share is.

A market share that is not high is ordinarily insufficient to support a conclusion that a defendant has monopoly power, and a market share of less than 65 percent would affirmatively show that the defendant did not have monopoly power.[56]  A market share only somewhat above 65%, however, can support a finding of monopoly power when significant further evidence of such power exists.[57]

**Source:** ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act - Section 2, Monopolization - General, Instruction 8 (modified); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997); *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 995 (9th Cir. 1986); *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995).

---

[56] *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) ("Courts generally require a 65% market share to establish a prima facie case of market power."); *see also United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424 (2d Cir. 1945) (Hand, J.) (while 90% of the market "is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four per cent would be enough; and certainly thirty-three per cent is not.").

[57] *See, e.g.*, *Image Tech. Servs.*, 125 F.3d at 1206; *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 995 (9th Cir. 1986); *see also Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) (a lower market share is permissible "if entry barriers are high and competitors are unable to expand their output in response to supracompetitive pricing.").

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND RELEVANT
MARKET INSTRUCTION 9

CIRCUMSTANTIAL EVIDENCE FACTOR 2: MARKET SHARE TRENDS

You should also consider the trend over time in Abbott's market share in determining whether Abbott had monopoly power.  Abbott's ability or inability to maintain market share over time is a more significant indicator of whether monopoly power exists than the absolute level of market share at any particular point in time.[58]  An increasing market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share.  On the other hand, a decreasing market share may show that a company does not have monopoly power.  In this case, Abbott argues that it does not have monopoly power in the market in which Kaletra competes because its market share declined significantly during the relevant period.

**Source:** ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act - Section 2, Monopolization - General, Instruction 8 (modified); *United States v. Syufy Enters.*, 903 F.2d 659, 669 (9th Cir. 1990).

---

[58] *United States v. Syufy Enters.*, 903 F.2d 659, 665-66 (9th Cir. 1990) ("In evaluating monopoly power, it is not market share that counts, but the ability to *maintain* market share."); *id.* at 666 (Plaintiffs "would do better to plot the[ market share] points on a graph and observe the pattern they form than to focus narrowly on [Abbott's] market share at a particular time.").

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND RELEVANT
MARKET INSTRUCTION 10

CIRCUMSTANTIAL EVIDENCE FACTOR 3: PRESENCE OR ABSENCE OF
BARRIERS TO ENTRY OR EXPANSION

You may also consider the extent to which there were barriers to entry or barriers to expansion in the relevant market.

Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way.  Barriers to entry might include intellectual property rights (such as patents or trade secrets), specialized marketing practices, and the reputation of the companies already participating in the market (or the brand name recognition of their products).

Barriers to expansion prevent other companies who are already in the market from increasing their output and selling more of their product.  A company faces a barrier to expansion if, for example, its existing production facilities are already producing at maximum capacity and the company could not increase its output without building new facilities.  On the other hand, if a company can increase its production of its product, then the company does not face barriers to expansion.[59]

Evidence of low or no barriers to entry or expansion during the relevant period would be evidence that Abbott did not have monopoly power, regardless of Abbott's market share, because new competitors could enter the market or existing competitors could expand their sales if Abbott attempted to raise the price of Kaletra substantially above competitive levels for a substantial period of time.  By contrast, evidence of high barriers to entry and high barriers to expansion along with high market share, during the relevant period, may support an inference that Abbott had monopoly power.

In evaluating barriers to entry and expansion, the history of entry and exit in the market in which Kaletra competes, and the extent to which existing competitors have already expanded production, may be helpful to consider.  Entry of new competitors or expansion of existing competitors may be evidence that Abbott lacked monopoly power.  On the other hand, departures from the market, or the failure of firms to enter the market, particularly if Abbott's prices and profit margins during the relevant period were

---

[59] *Rebel Oil*, 51 F.3d at 1441 ("The ability to control output and prices-the essence of market power-depends largely on the ability of existing firms to quickly increase their own output in response to a contraction by the defendant. Competitors may not be able to increase output if there are barriers to expansion. One such barrier is lack of excess capacity.") (internal quotation marks omitted); *see also Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1154 (9th Cir. 1997) ("Even if [defendant] has a high market share, neither monopoly power nor a dangerous probability of achieving monopoly power can exist absent evidence of barriers to new entry *or expansion*.") (emphasis added).

relatively high in comparison to the prices and profit margins of its competitors, may support an inference that Abbott had monopoly power during the relevant period.


**Source:** ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act - Section 2, Monopolization -- General, Instruction 8 (modified); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1154 (9th Cir. 1997).

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND RELEVANT
MARKET INSTRUCTION 11

CIRCUMSTANTIAL EVIDENCE FACTOR 4: NUMBER AND SIZE OF
COMPETITORS

You may consider whether Abbott's competitors were capable of effectively
competing.  In other words, you should consider whether the financial strength, market
shares, and number of competitors acted as a check on Abbott's ability to price Kaletra as
it pleased.  If Abbott's competitors were vigorous or had large or increasing market
shares, this may be evidence that Abbott lacked monopoly power during the relevant
period.  On the other hand, if you determine that Abbott's competitors were weak or had
small or declining market shares, this may support an inference that Abbott had
monopoly power during the relevant period.

**Source:** ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act -
Section 2, Monopolization - General, Instruction 8 (modified).

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND RELEVANT
MARKET INSTRUCTION 12

CIRCUMSTANTIAL EVIDENCE FACTOR 4: OTHER FACTORS

Abbott contends not only that the direct evidence does not support a finding of monopoly power, but that the direct evidence shows that Abbott lacked monopoly power during the relevant period.  In determining whether Plaintiffs have proven by circumstantial evidence that Abbott had monopoly power in a relevant market during the relevant period, you may also consider any direct evidence that Abbott was unable to profitably raise or maintain the price of Kaletra substantially above the prices of competitors' HIV drugs in the relevant market during the relevant time period, and maintain its profits, or that Abbott was unable to restrict the manufacture or distribution of competitors' HIV drugs in the relevant antirust market during the relevant time period.


**Source:** ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act - Section 2, Monopolization - General, Instruction 8 (modified).

[DISPUTED] ABBOTT'S PROPOSED MONOPOLY POWER AND RELEVANT
MARKET INSTRUCTION 13

MONOPOLY POWER:  CONCLUSION

If you find that plaintiffs have proven that Abbott had monopoly power in the relevant market during the relevant time period, then you must consider the remaining elements of Plaintiffs' monopolization claim.  If you find that plaintiffs have not proven that Abbott had monopoly power in the relevant market during the relevant period, then you must find for Abbott and against Plaintiffs on Plaintiffs' monopolization claim.

**Source**: ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act - Section 2, Monopolization - General, Instruction 8 (modified).

**GSK's Argument**

GSK's Proposed Instructions

GSK's proposed instructions are verbatim or near verbatim recitations of the ABA Model Instruction. The only two small changes to GSK's first instruction in this section entitled "Monopoly Power Defined" are to add language from a jury instruction approved by the Supreme Court in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 597 (1985) that the question here is whether Abbott "unnecessarily excluded or handicapped" its competitors, and to add language from *Oahu Gas* concerning the proper timeframe to assess monopoly power, discussed above.  The only change to the second instruction entitled "Relevant Market General" is to add language from *Oahu Gas*.  Both of these changes are proper given that (1) the Court has made clear that plaintiffs can prevail by showing that Abbott unnecessarily handicapped its competitors; and, (2) one of Abbott's main arguments depends upon confusing the issue of the proper timeframe within which an assessment of its market power should be made. GSK's third and fourth instructions, entitled "Defining the Relevant Market" and "Relevant Market – Necessity of Proof" are the same as the ABA Model Instructions.

While GSK has attempted to adhere to the ABA Model Instructions, it did modify the order of some of the language of  its fifth proposed instruction entitled "Existence of Monopoly Power."  This modification was done to conform the instruction to Ninth Circuit law.  As this Court recognized, in this Circuit it is settled that: "to demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run."  Summary Judgment Order at 14:20-15:5 (citing *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995)). Following this Court's Summary Judgment Order, GSK proposes changes to the ABA Model Instructions so that the factors discussed in the Model Instructions are worked into

the proper 9th Circuit rubric.  GSK's primary substantive changes from the ABA Model Instructions are the three modest ones noted in the footnotes to the instructions.  They address the definition of what constitutes a barrier to entry, the time frame for assessing monopoly power and the impact of declining market share on the analysis of monopoly power.

> Abbott's First Instruction Entitled "Relevant Market – Purpose"

Abbott's instructions, on the other hand, significantly deviate from the ABA Model Instruction.  Among other things, Abbott has removed language from its first instruction that suggests a market must be defined to "include[] firms and products that act as restraints on defendant's power to set prices as it pleases."  As discussed more fully below, removal of this language is improper as markets are defined with reference to price changes between products.

> Abbott's Second Instruction Entitled "Relevant Market – Definition"

Similarly, Abbott's second instruction entitled "Relevant Market – Definition" removes key language that links market definition to a product's responsiveness to price changes.  As this Court recognized in its Summary Judgment Order, "[a] relevant market, for antitrust purposes, can be broadly characterized in terms of the cross-elasticity of demand for or reasonable interchangeability of a given set of products or services."  Summary Judgment Order at 15:9-12 (internal quotation and citation omitted); *see also Lucas Auto. Eng'g, Inc. v. Bridgestone/ Firestone, Inc.*, 275 F.3d 762, 767 (9th Cir. 2001) ("The determination of what constitutes the relevant product market hinges […] on a determination of those products to which consumers will turn, given reasonable variations in price."); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1271 (9th Cir. 1975) ("[W]here there is a high degree of substitutability in the use of two commodities, it may be said that the cross-elasticity of demand between them is relatively high, and therefore the two should be considered in the same market." (internal quotation marks omitted)); *U.S. v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 248 & n.1

(8th Cir. 1989) (even though consumers might substitute high fructose corn syrup for sugar, they did not reside in same market because "a small change in the price of HFCS would have little or no effect on the demand for sugar" and cross-elasticity was therefore low); *Hayden Pub. Co. v. Cox Broad. Corp.*, 730 F.2d 64, 70 (2d Cir. 1984) (district court erred in "neglect[ing] the factor of cross-elasticity of demand"); *FTC v. Staples*, 970 F. Supp. 1066, 1074 (D.D.C. 1997) (finding, on basis of absence of cross elasticity of demand, that products resided in separate product markets despite functional interchangeability).  This Court's recent Summary Judgment Order makes the same point.  1/14/2011 Order Granting in Part and Denying in Part Defendant Abbott Laboratories' Motions for Summary Judgment on Direct Purchasers' Claims, *GSK v. Abbott Labs.*, Case No. 07-cv-5702, Docket No. 325, at 15-16 ("Summary Judgment Order") (relevant market for antitrust purposes characterized "in terms of the cross-elasticity of demand for or reasonable interchangeability of a given set of products….")

Yet, in the face of this black letter law, Abbott removes from its proposed instructions the following paragraph found in the ABA Model Instructions that expressly addresses the relationship between price changes and relevant market definition:

> To determine whether products are reasonable substitutes for each other, you should consider whether a small but significant permanent increase in the price of one product would result in a substantial number of consumers switching from that product to another. Generally speaking, a small but significant permanent increase in price is approximately a five percent increase in price not due to external cost factors, but you may conclude in this case that some other percentage is more applicable to the product at issue.  If you find that such switching would occur, then you may conclude that the products are in the same product market.

ABA Model Instruction C-7.

This alteration removes the touchstone for market definition.  It also will cause the jury to misinterpret the factors to determine "reasonable substitutes" that are subsequently listed in the ABA Model Instructions and which Abbott does include in its proposal.  These factors are intended to act as a proxy to determine price sensitivity between goods where direct analysis is not possible, and that is exactly what Plaintiffs' experts have done.  *See Am. Multicinema*, 793 F.2d at 994-95 (even absent "direct evidence going to the 'cross-elasticity of demand'", market could be defined by looking at product characteristics and bidding materials).  Devoid of a definition of "reasonable substitutes" tied to price, there is no anchor for the jury to properly apply the law. Ironically, in other filings with this Court, Abbott itself recognizes the primacy of substitution based on variations in price in the relevant market analysis.  *See* Pretrial Conference Statement, Abbott's Disputed Issue of Law No. 9 ("The standards for determining the relevant product market, including whether the plaintiff must show the extent of cross-elasticity of demand among products potentially within the relevant product market.").  Abbott's instruction on this point should be rejected.

Abbott's Fourth Instruction Entitled "Relevant Time Period for Assessing Monopoly Power

Abbott adds an instruction entitled "Relevant Time Period for Assessing Monopoly Power" that is not found in model instructions or supported by case law.  This proposal instructs jurors that GSK must show Abbott has maintained monopoly power from the date of the Norvir price hike "for as long as Plaintiffs claim to have suffered antitrust damages resulting from Abbott's alleged" anticompetitive conduct.  Abbott's proposed instruction goes on to state: "For any theory of anticompetitive conduct, Plaintiffs may not recover damages for any period during which Plaintiffs have failed to prove that Abbott maintained monopoly power."  Setting aside that Abbott's proposal is really a partial summary judgment motion (that it never filed) masquerading as a jury instruction, Abbott's instruction has no basis in the law.

Monopoly power is assessed around the time of the alleged anticompetitive conduct, here the Norvir price hike in December 2003. *See Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 362-63, 366-68 (9th Cir. 1988) (limiting its inquiry into the defendant's monopoly power to the years in which the alleged anticompetitive conduct took place despite that case tried two years after the period ended); *Microbix Biosystems, inc. v. Biowhittaker, Inc.*, 172 F. Supp. 2d 680, 695 (D. Md. 2000), *aff'd*, 11 Fed. Appx. 279 (4th Cir. 2001) (per curium) ("Defendants' anti-competitive conduct is determined as of the time the conduct occurred, not thereafter."). Thus, for example, barriers to entry – one of the factors considered in assessing monopoly power – are only those obstacles that prevent a new competitor from entering the market shortly after the anticompetitive conduct. *United States v. Microsoft Corp.*, 253 F.3d 34, 57 (D.C. Cir. 2001) ("only threats that are likely to materialize in the relatively near future perform this function [i.e. constraining monopolist's prices] to any significant degree"); *United States v. Visa USA, Inc.*, 163 F. Supp. 2d 322, 342 (S.D.N.Y. 2001) (entry must be "timely, likely, and [of a] sufficient scale to deter or counteract any anticompetitive restraint."). The cases Abbott cites to support its jury instruction do stand for a different proposition. In fact, the 9th Circuit made clear in *Rebel Oil* that there is "no authority that would require, as proof of market power, evidence of entry barriers throughout the period of predation." 52 F.3d at 1440. And, the footnote Abbott cites to *Aspen Skiing* only states that the jury found that the plaintiff held market power from 1977 to 1981, when the anticompetitive conduct began in March 1978 and lasted through the 1979 ski seasons. 472 U.S. at 596 n.20.

Abbott's Seventh Instruction, entitled "Circumstantial Evidence Factor 2: Market Share Trends" suffers from the same flaw. It asks the jury to consider Abbott's declining market share over a period of time that the instruction never specifies. Abbott clearly hopes that the jury will consider Abbott's market share in recent years, but as discussed above, Abbott's market share many years after the alleged anticompetitive act bears no

relevance to whether Abbott had monopoly power when it raised the price of Norvir by 400%.

Finally, contrary to Abbott's proposed instruction, Plaintiffs are entitled to damages outside the period that Abbott maintained market power.  Damages in antitrust cases are governed by the principle of proximate causation.  *See, e.g., Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 788-89 (6th Cir. 2002) ("An antitrust plaintiff bears the burden of showing that the alleged violation was a material cause of its injury, a substantial factor in the occurrence of damage or that the violation was the proximate cause of the damage.") (citaiton omitted).  As this Court is aware, GSK has offered significant evidence that the Norvir price hike had long-lasting effects by disrupting Lexiva's launch.

Abbott's Eighth Instruction Entitled "Circumstantial Evidence Factor 2: Market Share"

Abbott presents several disjunctive factors for the jury to consider in evaluating monopoly power, without explaining of how these factors interact and without conforming any of the factors to the rubric set out by Ninth Circuit law.  *See* Abbott's Proposed Monopoly Power and Relevant Market Instructions 8-12.

As presented, these instruction are confusing and without legal basis.  In addition, Abbott makes changes to the ABA Model Instructions which are without legal basis. Abbott's sixth instruction in this section entitled "Circumstantial Evidence Factor 2: Market Share" strikes language from the ABA Model Instructions that properly summarizes the law as holding that "market share above 50 percent may be sufficient to support an inference that defendant has monopoly power…"  ABA Model Instruction C-16; *see Rebel Oil Co. Inc.,* 51 F.3d at 1438 (only shares below 50 percent have been found insufficient as matter of law for monopolization); *Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.,* 526 F.2d 1196 (9th Cir. 1975) (45-70% share over 4-year period sufficient to show monopoly power).  Abbott replaces this language with

the legally incorrect statement that market share of less than 65 percent "affirmatively show[s]" no market power.  It also fails to include any language, as GSK's proposal does, that market shares below 50 percent can still support a finding of actual monopolization where the market includes differentiated products or where a defendant has control over a necessary input into the market.  *See* Summary Judgment Order at 18:14-19:3; *Syufy Enter. v. Am. Multicinema, Inc.*, 793 F.2d 990, 995 (9th Cir. 1986) (citing *Pacific Coast Ag. Expert Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196 (9th Cir. 1975), and stating "We held that when Sunkist's market share, which ranged from 45% to 70% was coupled with such factors as highly fragmented competition and Sunkist's acknowledged control over the supply market, the jury's finding of monopoly power could be sustained.").

> Abbott's Tenth Instruction Entitled "Circumstantial Evidence Factor 3:  Presence or Absence of Barriers to Entry or Expansion"

Abbott again makes changes to the ABA Model Instructions which are without legal basis in its eighth instruction in this section entitled "Circumstantial Evidence Factor 3: Presence or Absence of Barriers to Entry or Expansion."  It adds to the ABA Model Instruction a paragraph on so-called barriers to expansion and then adds the same term to the remaining paragraphs of the instruction.  Abbott's central point seems to be that it cannot have monopoly power if competing manufacturers of PIs are not capacity constrained, a point Abbott raised to no avail in its summary judgment papers.  Abbott's argument does not reflect the solid legal principle Abbott makes it out to be, and, indeed, plaintiffs' experts have explained that Abbott's control over Norvir makes the physical ability of competitors to produce more product irrelevant to an analysis of its market power.  See Declaration of Trevor Stockinger in Opposition to Abbott's Motions for Summary Judgment, Ex. 50 at 87-89 ("A simple example illustrates the point.  Abbott considered refusing to sell Norvir at any price….Had Abbott [done so], sales of other boosted PIs…would have fallen to zero, causing each supplier to have had 100 percent excess capacity….Nevertheless, at no price could these competitive alternatives have

made any dent in the market share or profits of Abbott in the relevant market….").
Abbott relies solely on *Rebel Oil Co., Inc. v. Atlantic Richfield Co*., 51 F.3d 1421 (9th
Cir.1995), but that case involved a homogenous product, gasoline, that could readily be
shipped from one locale to another without interference from the monopolist.  Here, the
products at issue are differentiated, and Abbott itself has the power to render the capacity
of its competitors useless.  It would not be proper to add to the ABA Model Instructions
language which misleadingly suggests that the mere ability of competitors to produce
additional pills suggests that Abbott lacks monopoly power.

### Customer Plaintiffs' Argument

### Proposed Initial Monopoly Power and Relevant Market Instructions

As discussed above, the Customer Plaintiffs have adapted the ABA Model
Instructions to comply with existing law that monopoly power may be proved either
through direct evidence *or* circumstantially through proof of a defendant's share of a
relevant market.  Plaintiffs have thus included a framing instruction informing the jury
that monopoly power may be proven through either direct proof or circumstantial
evidence.  *See* Customer Plaintiffs' Proposed Initial Monopoly Power and Relevant
Market Instruction 2.  An instruction follows, which is based on the ABA Model
Instruction on how to prove monopoly power through direct evidence.  *See* Customer
Plaintiffs' Proposed Initial Monopoly Power and Relevant Market Instructions 3.  Next
are instructions informing the jury how monopoly power can be proven circumstantially
by defining the relevant market.  Customer Plaintiffs' Proposed Initial Monopoly Power
and Relevant Market Instructions 4, 5, 6.

Direct Proof of Monopoly Power

Customer Plaintiffs' Proposed Initial Monopoly Power and Relevant Market
Instruction 3 sets forth the appropriate standard for proving monopoly power with direct
evidence.  It opens with the precept set forth by this Court that monopoly power can be
shown by "injury to competition which a competitor with market power may inflict, and

thus, of the actual exercise of market power." *In re Abbott Labs. Norvir Anti-Trust Litig.*, 442 F. Supp. 2d 800, 806 (N.D. Cal. 2006) (internal quotation omitted); *Safeway Inc. v. Abbott Labs*., No. 07-5470-CW, slip op. at 12 (N.D. Cal. Jan. 18, 2011). Abbott's proposed instruction makes no allowance for this Court's holding.

Abbott also inserts several incorrect notions into its Proposed Existence of Monopoly Power Instruction 4.

*First*, Abbott's instructions repeatedly and wrongly propose to inform the jury that to show monopoly power through the control of price, Plaintiffs must establish that Abbott "raised the price of Kaletra substantially over its competitors." This is simply wrong. There is no such requirement. What Plaintiffs needs to prove to show monopoly power, as stated by the ABA Model Instructions, is the ability to price "above competitive levels." ABA Model Instruction C-23. By definition, this means the ability to charge prices higher than what would have obtained had free competition prevailed, *i.e.*, the ability to charge prices higher than would have existed but-for the allegedly illegal restraint. *Cf. Safeway Inc. v. Abbott Labs*., No. 07-5470-CW, slip op. at 34-35 (N.D. Cal. Jan. 18, 2011) (observing Kaletra's price could have been lower but-for world). Thus, the key determinant is the actual price for Kaletra versus what the price for Kaletra would have been without Abbott's anticompetitive conduct. Indeed, one could not expect Kaletra – an inferior drug on a therapeutic basis – to command a higher price than superior products like Reyataz and Lexiva. Abbott's proposed definition in effect instructs the jury to assume that current market prices are competitive.[60] In so doing, Abbott is contradicting this Court's ruling on summary judgment, which found Plaintiffs could validly claim overcharges on Kaletra purchases – i.e. – the difference between the actual price and the but-for price. *See Safeway Inc. v. Abbott Labs*., No. 07-5470-CW,

---

[60] While the ABA Model Instruction suggests that a firm's ability to sell products at prices higher than rivals can be one form of proof of monopoly power, it does not teach that is the only form of proof.

slip op. at 34-35 (N.D. Cal. Jan. 18, 2011).  By definition, if the price of Kaletra is higher due to anticompetitive conduct, the price is above competitive levels.  *See Gordon v. Lewistown Hosp.,* 423 F.3d 184, 210 (3d Cir. 2005)("Market power, the ability to raise prices above those that would otherwise prevail in a competitive market, is essentially a surrogate for [anticompetitive] effects."). *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001)("a firm is a monopolist if it can profitably raise prices substantially above the competitive level."); *Chattanooga Foundry & Pipe Works v. Atlanta*, 203 U.S. 390, 396 (competitive restraint caused price to be "more than the worth of the pipe") .

*Second*, Abbott suggests that Plaintiffs must prove Abbott maintained monopoly power for the entirety of the time period Plaintiffs allege Abbott had monopoly power. While Plaintiffs intend to prove that Abbott's power persisted for multiple years, Plaintiffs' burden is only to prove that Abbott's had monopoly power at the time of its conduct, and could maintain its monopoly power "for a significant period of time."  ABA Model Instruction C-23; *see also United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 246 (8th Cir. 1988) (same).   Abbott makes the same point in its own proposed instructions.  *See* Abbott's Proposed Existence of Monopoly Power Instruction 1.  Thus, the jury could find monopoly power even if Plaintiffs only succeeded in proving Abbott had such power for a period shorter than alleged.

*Finally*, Abbott's instruction repeats itself in places, giving an undue emphasis upon Abbott's incorrect formulation of Plaintiffs' burden.[61]

<u>Relevant Market</u>

---

[61] Plaintiffs wish to preserve objections to other aspects of Abbott's proposed instruction.  Abbott wrongly suggests that a high rate of return alone will not prove monopoly power, insisting that brand name drugs must recover their research and development cost.  However, pricing above competitive levels must be performed with reference to the monopolist's marginal cost.  *See Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 & n.4 (9th Cir. 195).  Moreover, Plaintiffs should not need to prove a restriction of output where the power to raise price is shown.

The Customer Plaintiffs have adapted the ABA's introductory instruction as to the relevant market (ABA Model Instruction C-6), adapting to make clear that the notion of a relevant market applies only to the indirect method of proving monopoly power. *See* Customer Plaintiffs' Proposed Initial Monopoly Power and Relevant Market Instruction 5.

The Customer Plaintiffs also adopt the ABA's second proposed instruction on relevant market (ABA Model Instruction C-7), adding a few important points. *See* Customer Plaintiffs' Proposed Initial Monopoly Power and Relevant Market Instruction 5.

*First*, in line with binding case law, the jury should be instructed that whether products are in the same market "hinges" on price competition.[62]  To be in the same relevant product market, products must not only be functionally substitutable, but economically interchangeable as well.[63]  To determine economic interchangeability, one considers "cross-elasticity of demand between products[,]" that is, "the responsiveness of

---

[62] *Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc*., 275 F.3d 762, 767 (9th Cir. 2001) ("The determination of what constitutes the relevant product market hinges, therefore, on a determination of those products to which consumers will turn, given reasonable variations in price").

[63] *See, e.g.*, *Syufy Enterps. v. Am. Multicinema, Inc.*, 793 F.2d 990, 994 (9th Cir. 1986) (market analysis must consider not only whether products are "interchangeable in use", but also "whether there is 'cross-elasticity of demand' between excluded and included products");*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995-99 (11th Cir. 1993) (even though products were interchangeable in the sense that they functioned in the same way, absence of cross elasticity of demand between them prevented products from residing in same market); *U.S. v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 248 & n.1 (8th Cir. 1988) (even though consumers would substitute high fructose corn syrup for sugar, they did not reside in same market because "a small change in the price of HFCS would have little or no effect on the demand for sugar" and cross elasticity was therefore low); *Hayden Pub. Co. v. Cox Broad. Corp.*, 730 F.2d 64, 70 (2d Cir. 1984) (district court erred in "neglect[ing] the factor of cross-elasticity of demand").  *Accord United States v. Microsoft*, 253 F.3d 34, 53 (D.C. Cir. 2001) ("[t]he test of reasonable interchangeability, however, required the District Court to consider only substitutes that constrain pricing in the reasonably foreseeable future"); *Bogan v. Hodgkins*, 166 F.3d 509, 516 (2d Cir. 1999).

the sales of one product to price changes of the other."[64]   Thus, despite the fact that certain drugs or classes of drugs may be used to treat the same ailment, relevant product markets for pharmaceuticals can often be quite narrow.  For instance, in *SmithKline Corp. v. Eli Lilly & Co., Inc.*, the defendant offered evidence that "for virtually every purpose for which hospital physicians use cephalosporins, they also use other antibiotics[.]"  575 F.2d 1056, 1064 (3d Cir. 1978).  Nevertheless, the two types of drugs were found to be in separate markets, because they did not "demonstrate significant positive cross-elasticity of demand insofar as price is concerned," and should therefore not be placed in the relevant product market.[65]

*Second*, the Customer Plaintiffs propose omitting a confusing example concerning wrapping materials. Such an example might confuse the jury as to how to appropriately apply the standard test.

*Third*, the Customer Plaintiffs insert a sentence describing submarkets.  Within the context of a larger market, there may exist a submarket which may be the relevant market for antitrust purposes.[66]  It should be made clear to the jury that although there are various anti-HIV therapies, the relevant market may be comprised of a subset of such drugs.

---

[64] *United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 400 (1956).

[65] *See also Geneva Pharms.*, 386 F.3d at 496-99 (finding generic warfarin sodium in separate market from the market for  its branded counterpart, Coumadin, although the two were therapeutically equivalent); *In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 81-82 (D.D.C. 2006) (though identical, branded and generic lorazepam not in the same market because "[t]he fact that products are just functionally interchangeable does not compel a finding that they belong in the same market").

[66] *See Safeway Inc. v. Abbott Labs.*, No. 07-5470-CW, slip op. at 12 (N.D. Cal. Jan. 18, 2011); *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *Geneva Pharms. v. Barr Labs.*, 386 F.3d 485, 496 (2d Cir. 2004) ("'submarket' is somewhat of a misnomer, since the 'submarket' analysis simply clarifies whether two products are in fact 'reasonable' substitutes and are therefore part of the same market. The emphasis always is on the actual dynamics of the market rather than rote application of any formula").

*Fourth*, for the reasons discussed at length above, the Customer Plaintiffs have inserted a sentence noting that market definition is necessary only for circumstantial proof of monopoly power.  The jurors should be reminded that there are two appropriate ways to show monopoly power.

*Finally*, Customer Plaintiffs have adapted the final paragraph, as suggested by the ABA instruction, to reflect the facts of this case.

Abbott, for its part, significantly rewrites the ABA model instruction in two ways. *See* Abbott's Proposed Initial Monopoly Power and Relevant Market Instruction 2.

*First*, Abbott's rewrite eliminates an extended paragraph on the standard test for market definition (the effect of a small but significant permanent increase in price on the market).  As discussed above, cross-elasticity is the "hinge" for defining the relevant market under binding case law.   Abbott's deletion of the standard test for determining the scope of a market invites error.

*Second*, Abbott introduces confuses the instruction by adding reference to "others making the purchasing decision."  Even assuming that there are such "other" entities, their role is not relevant as to the Customer Plaintiffs.

For the above reasons, Customer Plaintiffs request that the Court adopt their proposed jury instructions.  The Customer Plaintiffs also adopt GSK's critiques of Abbott's proposed instructions.

## Proposed Existence of Monopoly Power Instructions

The Customer Plaintiffs' Proposed Existence of Monopoly Power Instruction is similar to GSK's, but adds three crucial points.  *First*, in line with precedent, it instructs the jury that the relevant time frame to evaluate barriers to entry and expansion is at the time of the alleged anticompetitive activity.[67]  *Second*, it informs the jury that barriers to

---

[67] *Oahu Gas Service, Inc. v. Pacific Resources Inc.*, 838 F.2d 360, 362-363, 366-368 (9th Cir. 1988) (limiting its inquiry into the defendant's monopoly power to the years in which the alleged anticompetitive conduct took place).

entry and expansion are a means to assess whether new or existing competitors could counteract the effects of that monopoly power.[68]  *Third*, it reminds the jury that ultimately most companies with monopoly power tend to lose it in the long run.

The Customer Plaintiffs adopt GSK's critiques of Abbott's proposed instructions. The Customer Plaintiffs also note that Abbott has wrongly defined the relevant time period for assessing Abbott's monopoly power in the market in which Kaletra competes. Abbott suggests that for the Customer Plaintiffs, the relevant time period begins in 2005 (when Abbott began taking its price increases on Kaletra).  As noted above, the proper timeframe to evaluate Abbott's monopoly power is at the time of its anticompetitive conduct, including the December 2003 price hike on Norvir.  *See Oahu Gas Service*, 838 F.2d at 362-363, 366-368.  The effect of the price hike on Abbott's market share was immediate, slowing the decline of Kaletra, handicapping rivals, and preserving Abbott's share for years to come.  This ultimately positioned Abbott to take price hikes on Kaletra. *Safeway Inc. v. Abbott Labs*., No. 07-5470-CW, slip op. at 34 (N.D. Cal. Jan. 18, 2011) (recognizing Abbott's "two stage" scheme).

Moreover, in asserting that Plaintiffs' injuries begin in 2005, Abbott improperly disregards the Customer plaintiffs' injuries on purchases of *Norvir*, whose price was inflated as part of Abbott's alleged antitrust violation in 2003.  This Court has repeatedly upheld the notion that Abbott's efforts to enhance its monopoly power in the Boosted PI market involved antitrust injury in the form of a higher price for Norvir.[69]  Indeed, this

---

[68] *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1440 (9th Cir. 1995).

[69] *In re Abbott Labs. Norvir Anti-Trust Litig*., 562 F. Supp. 2d 1080, 1084 (N.D. Cal. 2008) ("Abbott argues that Plaintiffs have failed to show that they have suffered an antitrust injury. The Court has rejected this argument in at least two previous orders."); *In re Abbott Laboratories Norvir Anti-Trust Litig*., 2007 U.S. Dist. LEXIS 44459, *14-15 (N.D. Cal. Jun. 11, 2007) (reaffirming that plaintiff injured through purchase of Norvir had standing); *Doe v. Abbott Labs*., No. C 04-1511 CW, 2004 U.S. Dist. LEXIS 29129, *12 (N.D. Cal. Oct. 21, 2004) (plaintiffs paying higher prices for Norvir injured through "Hobson's choice" of "paying more for competing boosted regimens versus paying less for Defendant's Kaletra while accepting the drug's harmful side effects").

Court has observed regarding Plaintiffs' claim for Norvir overcharges: "It is the 'penalty' consumers pay, in the form of a disparately high price for Norvir when they choose to use one of the competing drugs, that gives rise to the injury."[70]  Moreover, and separately, the Court found that it was a fact question for the jury to decide about whether Abbott's sales of Norvir should be counted when determining Abbott's share of the Boosted PI market. *Safeway Inc. v. Abbott Labs*., No. 07-5470-CW, slip op. at 17 (N.D. Cal. Jan. 18, 2011). Accordingly, and for all of the reasons set forth above, it is for the jury to decide whether to award overcharge damages to the Customer Plaintiffs associated with the Boosted Market monopolization claim.

In all other respects, the Customer Plaintiffs join GSK's argument as to this set of instructions.

## Abbott's Argument

## Monopoly Power & Relevant Market

As demonstrated by the footnotes annotating Abbott's proposed instructions on relevant market and monopoly power, Abbott's proposed instructions reflect the ABA Model Jury Instructions in Civil Antitrust Cases (2005) and binding Supreme Court and Ninth Circuit caselaw.  Plaintiffs' instructions are flawed, and Abbott's instructions based on the Model Instructions are superior, for the following reasons:

I.      **DEFINITION OF MONOPOLY POWER**

      A.      **GSK's Proposed Monopoly Power and Relevant Market Instruction 1 and Direct Purchaser Plaintiffs' Proposed Monopoly Power and Relevant Market Instruction 1**

          1.      **Definition of Monopoly Power-"Handicap" Language:**  Plaintiffs' proposed instructions both incorrectly define monopoly power as "the power to control prices and exclude *or handicap* competition."  In support of their unwarranted addition of

_____

[70] *In re Abbott Labs. Norvir Anti-Trust Litig*., 562 F. Supp. 2d 1080, 1085 (N.D. Cal. 2008),(citing *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982)), *rev'd on other grounds sub nom. Doe v. Abbott Labs*., 571 F.3d 930 (9th Cir. 2009).

the italicized language—"or handicap"—to the relevant model instructions, Plaintiffs cite *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 597 (1985).

2.      *Aspen Skiing* does not warrant this addition to the model instructions. Multiple model instructions are in accord on this point.  ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act—Section 2, Monopolization - General, Instruction 2 ("[M]onopoly power is the power to control prices and exclude competition in a relevant antitrust market.").

3.      Plaintiffs point to *Aspen Skiing's* acceptance of a jury instruction that read: "We are concerned with conduct which unnecessarily excludes or handicaps competitors."  *Aspen Skiing*, 472 U.S. at 597.  But this instruction was not given to define monopoly power; instead it was given to explain the "anticompetitive conduct" element of a monopolization claim.  Indeed, the defendant did not challenge in the Supreme Court the jury's finding that the defendant had monopoly power.  *Id.*  The relevant paragraph of the *Aspen Skiing* confirms that the language at issue was not part of an instruction on monopoly power:

> In other words, if there were legitimate business reasons for the refusal, then the defendant, even if he is found to possess monopoly power in a relevant market, has not violated the law. We are concerned with conduct which unnecessarily excludes or handicaps competitors. This is conduct which does not benefit consumers by making a better product or service available-or in other ways-and instead has the effect of impairing competition.

*Id.*[71]

4.      **Time Period for Monopoly Power:**  As shown above, Plaintiffs' proposed monopoly power instructions both incorrectly and misleadingly state monopoly

---

[71] Abbott preserves its argument that this language from *Aspen Skiing* has been cabined by *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) and *MetroNet Services Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004).  *See* Abbott's Argument in response to "Willful Acquisition or Maintenance of Monopoly Power Through Anticompetitive Conduct," ¶¶ 2, 6-8 & n.78, *infra.*

power needs to be found only "at the time of the alleged anticompetitive conduct."  *See* "Time Period for Monopoly Power," Elements of Monopolization ¶¶ 3-8, *supra.*

### B.  **Direct Purchaser Plaintiffs' Proposed Monopoly Power and Relevant Market Instruction 1**

5.  **Definition of Monopoly Power:**  The Direct Purchaser Plaintiffs' proposed instruction incorrectly and unjustifiably modifies the ABA model instruction to state that Plaintiffs must establish only that Abbott had the power to control prices *or* [rather than "and"] exclude competition in order to prove that Abbott had monopoly power in the market in which Kaletra competes.  In its recent summary judgment ruling, this Court found that the use of "and" rather than "or" is correct.  As the Court wrote:

> supracompetitive pricing, on its own, is not direct evidence of monopoly power.  See Forsyth, 114 F.3d at 1476; see also Harrison Aire, Inc. v. Aerostar Int'l, Inc., 423 F.3d 374, 381 (3d Cir. 2005); Geneva Pharmas. Tech. Corp. v. Barr Laboratories Inc., 386 F.3d 485, 500 (2d Cir. 2004); Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic, 65 F.3d 1406, 1412 (7th Cir. 1995). To prove monopoly power directly, supracompetitive pricing must be accompanied by restricted output.  Rebel Oil, 51 F.3d at 1434. Both are required to prove monopoly power directly.

1/14/11 Order at 13.  The Direct Purchaser Plaintiffs' erroneous alteration of the ABA model instruction on this point should be rejected in the current instruction as well as in all other instructions where it appears.

6.  **Burden of Proof:**  The Direct Purchaser Plaintiffs' proposed instruction on monopoly power also takes the phrase "more probably true than not" out of context, thereby making it sound like the jury may engage in a probablistic analysis that is not wholly based in the evidence presented at trial.  The appropriate phrase to be used in the instruction is "by a preponderance of the evidence."  *See* "Burden of Proof," Elements of Monopolization ¶¶ 1-2, *supra*.

C.    **Abbott's Proposed Monopoly Power and Relevant Market Instructions 1 and 2**

7.      Abbott's Proposed Monopoly Power and Relevant Market Instruction 1 directly tracks the relevant ABA model instruction.  *See* ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act—Section 2, Monopolization - General, Instruction 2.  Abbott's Proposed Monopoly Power and Relevant Market Instruction 2 provides information about the relevant time period for assessing monopoly power.  *See* "Time Period for Monopoly Power," Elements of Monopolization ¶¶ 3-8, *supra*.

II.    **DIRECT EVIDENCE OF MONOPOLY POWER**

A.    **GSK's Lack of Instruction on Direct Evidence of Monopoly Power and Ways to Prove Monopoly Power**

8.      GSK does not propose inclusion of an instruction explaining to the jury that there are two ways of proving monopoly power.  It is important to explain this concept to the jury, so that the jury has a context for understanding what courts require for each manner of proof.  In this instruction, it would be helpful to explain, as Abbott's proposed instruction does, that the relevant question is whether Abbott had monopoly power in the market in which Kaletra competes and to give a general overview of the parties' positions.

B.    **Direct Purchaser Plaintiffs' Proposed Monopoly Power and Relevant Market Instructions 2 and 3**

9.      **Incorrect Definition of Monopoly Power**:  Direct Purchaser Plaintiffs' Monopoly Power and Relevant Market Instruction 3 states, "Plaintiffs may show Abbott's monopoly power by demonstrating that Abbott had sufficient power to actually inflict injury to competition and that it actually exercised that power."  This is an incorrect legal standard.  It is inconsistent with Ninth Circuit law.

10.     Direct evidence is "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted."  *In re Citric Acid Litig.*, 191 F.3d 1090, 1094 (9th Cir. 1999).  Monopoly power is defined by restricted output and

supracompetitive pricing.  A monopoly "exists when one firm controls all or the bulk of a product's output, and no other firm can enter the market, or expand output, at comparable costs" such that the "monopolist has the power to raise price above competitive levels by restricting its output, because the output reduction cannot be offset by expanded output by others."  IIB Areeda, Antitrust Law ¶ 403, at 7.  Because this is what defines monopoly, direct evidence of monopoly power—that is, evidence that is explicit and requires no inference—is evidence that the defendant actually restricted output and raised prices above competitive levels.  *Rebel Oil*, 51 F.3d at 1434 ("[i]f the plaintiff puts forth *evidence of restricted output and supracompetitive prices*, *that is direct proof* of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power"); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1475 (9th Cir. 1997) ("Direct proof of market power may be shown by evidence of restricted output and supracompetitive prices.  Such a showing is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power." (internal quotation marks omitted)); *accord Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) ("The existence of monopoly power may be proven through direct evidence of supracompetitive prices and restricted output."); *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (en banc) (same); *Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196-97 (1st Cir. 1996) (same).

11.     The Ninth Circuit's decision in *Forsyth* shows that it is wrong to posit that there are other forms of direct evidence of market power.  In *Forsyth*, the Ninth Circuit held there was no direct proof of monopoly power even as the circuit court acknowledged there was evidence the defendant had taken steps to "limit[] competition."  114 F.3d at 1476, 1478.  Absent proof of "higher prices" and an "accompanying showing of restricted output," the Ninth Circuit concluded that there was no direct evidence of monopoly power.  *Id*. at 1476.  Similarly, in *Rebel Oil*, the defendant's pricing allegedly

eliminated 37 competitors and reduced the plaintiffs' market share by 20%. The Ninth Circuit nevertheless held as a matter of law that there was insufficient evidence of monopoly power. 51 F.3d at 1431-32. The decision in *Rebel Oil* would be inexplicable if the defendant's pricing and the resulting elimination of competition constituted direct evidence of monopoly power.

12.    In short, neither *Forsyth* nor *Rebel Oil* suggests that anything less than proof of restricted output and supracompetitive prices can qualify as direct evidence of monopoly power. Indeed, both decisions make clear that evidence of purported "injury to competition" (a phrase that the Direct Purchasers Plaintiffs do not in any event define in their proposed instruction) is not direct evidence of monopoly power.

13.    **Omission of Relevant Market:** The Direct Purchaser Plaintiffs' Proposed Monopoly Power and Relevant Market Instruction 3 also incorrectly and unjustifiably omits the required proof of a relevant antitrust market as an element of monopolization claim. As discussed above, under Section 2 of the Sherman Act, identification of the relevant market is essential to proving any monopolization claim. *See* "Relevant Antitrust Market," Elements of Monopolization ¶¶ 10-12, *supra*.

14.    **Monopoly Power in the Market in Which Kaletra Competes:** Moreover, the Direct Purchaser Plaintiffs' Proposed Monopoly Power and Relevant Market Instruction 3 fails to make clear that the Plaintiffs must establish that Abbott has monopoly power *in the market in which Kaletra competes*. Plaintiffs' vague wording is likely to mislead and confuse the jury here, where there is another alleged relevant market in this case as well -- the market in which Norvir competes. The Court granted summary judgment for Abbott with respect to the Direct Purchaser Plaintiffs' claim for monopolization of the alleged "boosting" market, 1/14/11 Order at 35-36, and found that triable issues of fact existed solely on plaintiffs' "Section 2 claims pertaining to the boosted market," *id.* at 35. The instruction should make clear that the only issue before

the jury is whether Abbott possessed monopoly power in the market in which Kaletra competes.

15.     In the same vein, the Direct Purchaser Plaintiffs' instruction is also inadequate because it fails to make clear that the jury must determine whether Abbott charged supracompetitive prices *for Kaletra* and restricted marketwide output in the market *in which Kaletra competes*.  This clarification is critical in the current case where two alleged markets will be discussed at trial.

16.     **Definition of Monopoly Power:** The Direct Purchaser Plaintiffs' Proposed Monopoly Power and Relevant Market Instruction 3 incorrectly states that Plaintiffs must show only that Abbott had the power to control prices *or* exclude competition in order to establish that Abbott possessed monopoly power.  As discussed above and as the Court has recently held, this is an incorrect statement of law—showings of both supracompetitive prices *and* reduced marketwide output are necessary to qualify as direct evidence of monopoly power.  *See* "Definition of Monopoly Power," Monopoly Power & Relevant Market ¶ 5, *supra*.

17.     **Definition of Monopoly Power-"Handicap" Language:**  As discussed above, the Direct Purchaser Plaintiffs' Proposed Monopoly Power and Relevant Market Instruction 3 also improperly states that monopoly power is "the power to control prices and exclude or *handicap* competition in a relevant antitrust market."  *See* "Definition of Monopoly Power - 'Handicap Language,'" Monopoly Power & Relevant Market ¶¶ 1-3, *supra*.

18.     **Pricing Above Marginal Cost:**  It is incorrect and misleading for the Direct Purchaser Plaintiffs' Proposed Monopoly Power and Relevant Market Instruction 3 to state that, "In coming to your conclusion about whether Abbott's pricing indicates monopoly power, one thing you may consider is Abbott's marginal cost of producing Norvir and/or Kaletra."  This is true for several reasons.

19.     First, as the Court recently held, "That all boosted market participants priced above average marginal cost precludes any inference that such pricing reflected Abbott's monopoly power," 1/14/11 Order at 13.  Because it would be incorrect to infer monopoly power from above marginal cost pricing here, it would be incorrect for an instruction to authorize such an inference.

20.     Second, even if evidence of pricing in excess of marginal cost were evidence of monopoly power, the idea that pricing of *Norvir* in excess of marginal cost could be evidence of monopoly power in the market in which *Kaletra* competes would be a *non sequiter*.  *See* "Monopoly Power in the Market in Which Kaletra Competes," Monopoly Power & Relevant Market ¶¶ 14-15, *supra*.  Yet the Direct Purchaser Plaintiffs' proposed language would authorize this improper chain of reasoning.

21.     Third, this instruction is vague and would confuse and mislead the jury because it provides no explanation for what relevance, if any, the marginal cost of producing Kaletra (or Norvir) might with respect to the determination of whether Abbott possessed monopoly power.

C.     **Abbott's Proposed Monopoly Power and Relevant Market Instructions 3 and 4**

22.     By contrast with the instructions just discussed, Abbott's instructions properly explains that it is the market in which Kaletra competes that is at issue in this case.  *See* "Monopoly Power in the Market in Which Kaletra Competes," Monopoly Power & Relevant Market ¶¶ 14-15, *supra*.  Abbott's instructions also appropriately explain in a balanced fashion both that evidence of supracompetitive pricing and restricted output in the market in which Kaletra competes would support a finding of monopoly power in that market, and that the absence of such evidence would likewise support a finding of a lack of monopoly power.

23.     Abbott's instruction also properly explains that a plaintiff must show not only that the defendant raised a price above competitive levels, but that defendant was

able to profitably maintain that price increase for a significant period of time.  *See Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("Without market power to increase prices above competitive levels, and sustain them for an extended period, a predator's actions do not threaten consumer welfare.").  Many cases stress *Rebel Oil*'s concept that the defendant must be able to raise marketwide prices for an extended period to justify a finding of market power.  *See, e.g.*, *United States v. Syufy Enters.*, 903 F.2d 659, 663 (9th Cir. 1990) ("[U]ltimately the court must resolve a practical question in every monopolization case: Is this the type of situation where market forces are likely to cure the perceived problem within a reasonable period of time?"  If so, "a court ought to exercise extreme caution because judicial intervention in a competitive situation can itself upset the balance of market forces, bringing about the very ills the antitrust laws were meant to prevent.").

24.     Finally, Abbott's instruction properly makes clear that a showing of supracompetitive pricing must be combined with a showing of a market-wide restriction on output in which Kaletra competes to constitute direct evidence of monopoly power in that market.  *Forsyth v. Humana, Inc.*,  114 F.3d 1467, 1476 (9th Cir. 1997) ("The plaintiffs submitted evidence that Sunrise Hospital routinely charged higher prices than other hospitals while reaping high profits. With no accompanying showing of restricted output, however, the plaintiffs have failed to present direct evidence of market power."); *Rebel Oil*, 51 F.3d at 1434 ("A predator has sufficient market power when, by restricting its own output, it can restrict marketwide output and, hence, increase marketwide prices."); *id.* at 1441 (stating that expansion by competitors would suggest that defendant "lacked the market power to control *marketwide output* in the first place"); *see also* 1/14/11 Order at 14 (holding that Plaintiffs have established a triable issue of fact with regard to restricted output only as to whether "sales in the boosted market also would have necessarily been higher" if Norvir had not been repriced).

III.   **RELEVANT MARKET**

A.   **Direct Purchaser Plaintiffs' Proposed Monopoly Power and Relevant Market Instruction 4**

25.   **Monopoly Power in the Market in Which Kaletra Competes:** The Direct Purchaser Plaintiffs' Proposed Monopoly Power and Relevant Market Instruction 4 fails to make clear that the market at issue (and, thus, the market in which Plaintiffs must establish that Abbott has monopoly power) *is the market in which Kaletra competes.* This is critical because the jury will hear evidence at trial both about this market and the market in which Norvir competes. *See* "Monopoly Power in the Market in Which Kaletra Competes," Monopoly Power & Relevant Market ¶¶ 14-15, *supra.*

B.   **Errors in GSK's Proposed Monopoly Power and Relevant Market Instruction 2 and Direct Purchaser Plaintiffs' Proposed Monopoly Power and Relevant Market Instruction 5**

26.   GSK's Proposed Monopoly Power and Relevant Market Instruction 2 and Direct Purchaser Plaintiffs' Proposed Monopoly Power and Relevant Market 5 are improper for multiple reasons.

27.   **Burden of Proof:** Plaintiffs take the phrase "more probably true than not" out of context. The excerpting leaves the jury with a probablistic analysis that is not directly based upon the actual evidence that is presented at trial. This phrase should be omitted or changed to "by a preponderance of the evidence." *See* "Burden of Proof," Elements of Monopolization ¶¶ 1-2, *supra.*

28.   **Time Period for Monopoly Power:** Plaintiffs' proposed instructions incorrectly implies that the relevant inquiry about whether Abbott had monopoly power is limited to "when the allegedly anticompetitive conduct occurred." *See* "Time Period for Monopoly Power," Elements of Monopolization ¶¶ 3-8, *supra.*

29.   **Unnecessary Additional Language:** After the first two sentences, the rest of Plaintiffs' instructions are unnecessary. If included, however, the rest of the instructions should at least be corrected to remove the implication that "freedom to set

prices for **or** restrict the output *of Norvir or Kaletra*" (the GSK instruction omits the words "Norvir or") can be determinative here. For reasons previously explained, it is the combination of the ability to price **Kaletra** at supra-competitive levels **and** the ability to restrict output *marketwide* that are key. *See* "Monopoly Power in the Market in Which Kaletra Competes," Monopoly Power & Relevant Market ¶¶ 14-15, *supra*. All plaintiffs improperly change "and" to "or" and the Direct Purchaser Plaintiffs improperly reference Norvir and Kaletra when the market in which Kaletra competes is the only market at issue.

      **C.**    **GSK's Proposed Monopoly Power and Relevant Product Market Instruction 1 and Direct Purchasers' Proposed Monopoly Power and Relevant Product Market Instruction 6**

      30.    **Omitted Example:** Plaintiffs' instructions deviate from the relevant ABA model instruction by omitting the example provided in the ABA model instruction on defining a relevant product market. ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act -Section 2, Monopolization-General, Instruction 4 (modified). Providing an example of interchangeability would help the jurors familiarize themselves with this unfamiliar legal concept.

      31.    **Cross-Elasticity of Demand:** Plaintiffs' instructions are also inappropriate because they suggest that cross-elasticity of demand is the most important factor that must be considered when determining whether products are reasonable substitutes for one another, and that other indicia of reasonable substitutability are only secondary factors that the jury "may" consider. The Court has recently held that cross-price elasticity is one of the many factors that should be considered together when determining whether products are reasonably interchangeable:

> Courts "consider whether the product and its substitutes are reasonably interchangeable by consumers for the same purpose, as well as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities,

distinct customers, distinct prices, sensitivity to price changes, and
specialized vendors."

1/14/11 Order at 15.

> **D.    Direct Purchasers' Proposed Monopoly Power and Relevant Product
> Market Instruction 6**

32.    **Misleading Description of Extent to Which Relevant Market Is
Relevant in a Section 2 Case:**  The Direct Purchasers' Proposed Monopoly Power and
Relevant Product Market Instruction 6 states, "As I have instructed you, in proving
monopoly power via indirect or circumstantial evidence, Plaintiffs must prove a relevant
product market."  This statement incorrectly implies that proving a relevant market is
necessary only to show that a defendant has monopoly power via circumstantial
evidence.  However, as demonstrated above, proving a relevant antitrust market is an
essential element of any claim for monopolization under Section 2 of the Sherman Act.
*See* "Relevant Antitrust Market," Elements of Monopolization ¶¶ 10-12, *supra.*

> **E.    GSK's Proposed Monopoly Power and Relevant Product Market
> Instruction 4**

33.    **Unnecessary:** GSK's Proposed Monopoly Power and Relevant Product
Market Instruction 4 is unnecessary because it does not add anything to GSK's or
Abbott's proposed instructions.  The final paragraph of Abbott's proposed instruction
provides the same guidance to the jury while including more context to assist in the jury's
understanding.

34.    **Burden of Proof:** Additionally, GSK's Proposed Monopoly Power and
Relevant Product Market Instruction 4 takes the phrase "more probably true than not" out
of context.  The excerpting leaves the jury with a probablistic analysis that is not directly
based upon the actual evidence that is presented at trial.  This phrase should be omitted or
changed to "by a preponderance of the evidence."  *See* "Burden of Proof," Elements of
Monopolization ¶¶ 1-2, *supra.*

F.    **Abbott's Proposed Relevant Market Instructions**

1.    **Abbott's Proposed Monopoly Power and Relevant Market Instruction 5**

35.    Abbott's Proposed Monopoly Power and Relevant Market Instruction 5 tracks the relevant ABA model instruction while providing the jury with the additional terminology necessary to understand the language and concepts that appear in the following instructions.  *See* ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act -Section 2, Monopolization - General, Instruction 3.

2.    **Abbott's Proposed Monopoly Power and Relevant Market Instruction 6**

36.    Abbott's Proposed Monopoly Power and Relevant Market Instruction 6 tracks the relevant ABA model instruction almost word for word, including the example taken from the ABA model in order to assist in the jury's comprehension. ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act -Section 2, Monopolization-General, Instruction 4 (modified); *see* "Omitted Example," Monopoly Power & Relevant Market ¶ 30, *supra*.  Other than modifying the form instruction to apply to the parties and products at issue in this case, Abbott's proposed instruction makes only one modification to the ABA form instruction: Abbott's proposed instruction omits the paragraph describing cross-elasticity of demand as favored over other indicia of reasonable substitutability, for the reasons already shown.  *See* "Cross-Elasticity of Demand," Monopoly Power & Relevant Market ¶ 31, *supra*.

IV.    **CIRCUMSTANTIAL EVIDENCE OF MONOPOLY POWER**

A.    **GSK's Monopoly Power and Relevant Market Instruction 5 and Direct Purchaser Plaintiffs' Proposed Monopoly Power and Relevant Market Instruction 7**

37.    **One-Sided Presentation:**  Plaintiffs proposed monopoly power instructions are inappropriately one-sided.  They explain what type of evidence can support a finding of monopoly power, but do not reference what type of evidence would

tend to show a lack of monopoly power.  For example, the instructions of both Plaintiff groups state, "Evidence of the structure of the market can show that Abbott has monopoly power."  But that is only half of the story.  As Abbott's instruction makes clear, evidence of the structure of the market and other types of circumstantial evidence can also show that Abbott *lacks* monopoly power.

38.     Similarly, the instructions of both Plaintiff groups state, "a finding of monopoly power may be appropriate, even if market share is somewhat below 50 percent, . . . if other barriers to entry, which I will discuss in a moment, are significant and are probably a deterrent to the establishment of a new competitor," and discuss different types of barriers to entry.  The jury should receive a balanced instruction that also explains that evidence of lack of barriers to entry (and barriers to expansion; see below) can support a finding of lack of monopoly power.

39.     **Definition of Monopoly Power - "Handicap Language":**  As discussed above, Plaintiffs' proposed instructions also incorrectly state that monopoly power is "the power to control prices and exclude or *handicap* competition in a relevant antitrust market."  *See* "Definition of Monopoly Power - Handicap Language," Monopoly Power & Relevant Market ¶¶ 1-3, *supra*.

40.     **Time Period for Monopoly Power:** Plaintiffs' proposed instructions are also inaccurate as to the relevant time period.  Plaintiffs' instructions state, "The relevant time to evaluate monopoly power is at the time of the alleged anticompetitive conduct, here December 2003."  As discussed above, the relevant period for monopoly power is not the single point in time, December 2003.  *See* "Time Period for Monopoly Power," Elements of Monopolization ¶¶ 3-8, *supra*.

41.     **Relevant Market is the Market in Which Kaletra Competes:**
Plaintiffs' proposed instructions fail to make clear that the relevant market for purposes of Plaintiffs' Sherman Act claims is the market in which Kaletra competes.  As noted, Plaintiffs' vague wording is likely to mislead and confuse the jury here, where there is

another alleged relevant market in this case as well—the market in which Norvir competes.  However, it is only the market in which Kaletra competes in which the jury must consider monopoly power.  *See* "Monopoly Power in the Market in Which Kaletra Competes," Monopoly Power & Relevant Market ¶¶ 14-15, *supra.*

42.   **Market Share Percentage:** Plaintiffs' proposed instructions suggest improperly that a 50 percent market share can be sufficient to support a finding of monopoly power based on circumstantial evidence.  As this Court has previously recognized, courts generally require at least a 65 percent market share.  *In re Abbott Labs. Norvir Anti-Trust Litig.*, 562 F. Supp. 2d 1080, 1086 (N.D. Cal. 2008) (citing *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997)); *see also United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424 (2d Cir. 1945) (Hand, J.) (while 90% of the market "is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four per cent would be enough; and certainly thirty-three percent is not.").

43.   Moreover, even aside from the particular numbers used in Plaintiffs' proposed instructions, the instructions of both Plaintiff groups incorrectly state that evidence of the defendant's market share by itself "may be sufficient to support an inference that defendant has monopoly power."  The law is clear that even a high market share will not be evidence of market power in the absence of evidence of barriers to expansion and entry.  As the Ninth Circuit wrote in *Oahu Gas*, and reiterated in *United States v. Syufy Enters.*, 903 F.2d 659, 664 (9th Cir. 1990): "A high market share, though it may ordinarily raise an inference of market power, will not do so in a market with low entry barriers or *other evidence of a defendant's inability to control prices or exclude competitors*." *Oahu Gas*, 838 F.2d at 366; *Syufy*, 903 F.2d at 664.  *Rebel Oil* found that other evidence includes existing competitors' ability to expand output if the defendant raises prices.  51 F.3d at 1443.

44.   Plaintiffs proposed instructions are incorrect as well in their not sufficiently qualified statement that in some circumstances in which the defendant's

market share is less than 50%, the defendant nevertheless can be found to have monopoly power. As the Ninth Circuit stated in *Rebel Oil* "numerous cases hold that a market share of less than 50 percent is presumptively insufficient to establish market power," 51 F.3d at 1438, and cited with approval in *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1274 (9th Cir. 1975) (suggesting that a 50% market share is inadequate to establish monopoly power), and *Dimmitt Agri Indus., Inc. v. CPC Int'l, Inc.,* 679 F.2d 516, 528 & n.11 (5th Cir. 1982), *cert. denied,* 460 U.S. 1082 (1983) (finding that the Supreme Court has not upheld a finding of monopolization where a defendant possesses less than 75% market share).

45. The suggestion in both proposed instructions that finding of monopoly power could be based on "control over the supply market" (an apparent reference to the fact that Abbott is the only company that sells Norvir, although there is no allegation that there has ever been a shortage of Norvir in the marketplace), is also inappropriate.

46. Plaintiffs cite *Pacific Coast Agricultural Export Association v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1204 (9th Cir. 1975), but the facts of that case bear no resemblance to those here. In *Pacific Coast*, defendant Sunkist was an agricultural cooperative that produced about 75% of the oranges grown in Arizona and California, and plaintiffs were exporters who served as middlemen to export fruit from the United States to Hong Kong. *Id.* at 1200-01. Sunkist had previously used numerous exporting companies, including plaintiffs, to process and maintain sales for export to Hong Kong. *Id.* at 1201. However, Sunkist changed course and began to process all sales for export to Hong Kong through a single exporting company, Reliance. *Id.* On these facts, the court found that Sunkist's control of the market for supply of oranges to the exporters "facilitated" Sunkist's acquisition of monopoly power in the distribution market. In other words, by exercising the ability to terminate selling to all but one export company, with whom Sunkist then dealt exclusively, had created a situation in which it had monopoly power in the distribution market.

47.     By contrast here, Abbott has never cut off or cut back on supply of Norvir to anyone.  While *Sunkist* might be arguably relevant to the question of whether, if Abbott had restricted output of Norvir, Abbott would have obtained monopoly power in the market in which Kaletra competes, neither *Sunkist* nor any other case of which Abbott is aware holds that he mere unexercised theoretical power to stop producing a product that is an input into a market can be a basis for a finding of monopoly power in that market.  For example, Plaintiffs also cite *Syufy Enterprises v. American Multicinema, Inc.*, 793 F.2d 990, 995 (9th Cir. 1986), but that likewise case did not find that an unexercised theoretical ability to cut back production of a complementary product can support a finding of monopoly power.

48.     **Barriers to Entry and Expansion:** Plaintiffs proposed instructions incorrectly state that the jury "may" consider barriers to entry, when in fact the jury *must* consider the presence *or absence* of barriers to entry *and expansion*.  Moreover, GSK's proposed instruction fails to mention barriers to expansion altogether.  The law is clear that there can be no monopoly power absent both barriers to entry and barriers to expansion.  As the Ninth Circuit wrote in *Oahu Gas*, and reiterated in *United States v. Syufy Enters.*, 903 F.2d 659, 664 (9th Cir. 1990): "A high market share, though it may ordinarily raise an inference of market power, will not do so in a market with low entry barriers or *other evidence of a defendant's inability to control prices or exclude competitors.*"  *Oahu Gas*, 838 F.2d at 366; *Syufy*, 903 F.2d at 664.  *Rebel Oil* found and this Court recently held that other evidence includes existing competitors' ability to expand output if defendant raises prices.  "The existence of entry barriers, however, is not sufficient to support an inference of market power. 'The ability to control output and prices -- the essence of market power -- depends largely on the ability of existing firms to quickly increase their own output in response to a contraction by the defendant.'" 1/14/11 Order at 18 (quoting *Rebel Oil*, 51 F.3d at 1441); *see also Rebel Oil*, 51 F.3d at 1443 (finding that defendant lacked market power because "[a]lthough there is a genuine

issue regarding market share and entry barriers, there appears to be no genuine issue regarding the ability of ARCO's existing competitors to increase their output."); *see also Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1154 (9th Cir. 1997) ("Even if [defendant] has a high market share, neither monopoly power nor a dangerous probability of achieving monopoly power can exist absent evidence of barriers to new entry *or expansion*."). Here, of course, the evidence is overwhelming, and on summary judgment was undisputed, that Abbott's rivals have been steadily expanding production of their boosted PIs. There is no basis for omitting an instruction on the significance of this fact from the monopoly power instructions.

49. Relatedly, while the Direct Purchaser Plaintiffs' proposed instruction mentions both "barriers to entry and expansion," their instruction inadequately explains the concept of the presence or absence of barriers to expansion. The Direct Purchaser Plaintiffs' instruction provides many examples of barriers to entry, but none of the presence or absence of barriers to expansion. And the Direct Purchaser Plaintiffs' instruction does do not explain the significance of a lack of barriers to expansion -- in particular, the fact that if existing competitors could have quickly increased their own production of boosted PIs in response to any decrease in output of Kaletra by Abbott, this would be strong evidence against a finding that Abbott had monopoly power in the market in which Kaletra competes. *See also Rebel Oil*, 51 F.3d at 1443.

50. **Incorrect Examples of Entry Barriers:** Two of the examples of entry barriers listed in Plaintiffs' proposed instructions—"control of an essential or superior resource" and "failure of firms who enter the market to compete effectively" should be omitted because they are incorrect, misleading, and irrelevant to this case. On the first point, apparently a reference to the fact that no one but Abbott sells Norvir, this is irrelevant because, as discussed further above, Abbott never restricted production or sales of Norvir in any way. The theoretical but never-exercised ability of a supplier to stop

producing a product has never been held to constitute a barrier to entry.  On the second point, it is unclear to what this phrase is supposed to refer, ""failure of firms who enter the market to compete effectively" is too vague to give the jury guidance.  (Moreover, the discussion in Plaintiffs' proposed instruction on this point is yet another example of the constant negative tilt of these instructions—phrasing every aspect of the instruction in terms of what might show monopoly power, instead of a balanced presentation that is phrased as well in terms of what might be inconsistent with monopoly power.)

> **B.**     **Direct Purchaser Plaintiffs' Proposed Monopoly Power and Relevant Market Instruction 1**

51.     **Definition of Monopoly Power:**  The Direct Purchaser Plaintiffs' proposed instruction incorrectly and unjustifiably modifies the ABA model instruction to state that Plaintiffs must establish only that Abbott had the power to control prices ***or*** exclude competition in order to prove that Abbott had monopoly power in the market in which Kaletra competes.  As discussed above, this "***or***" standard is inconsistent with the Court's recent summary judgment ruling and binding Ninth Circuit precedent and should be rejected.  *See* "Definition of Monopoly Power," Monopoly Power & Relevant Market ¶ ~~273~~, *supra*.

52.     **Incorrect Statement Relating to Market Share Trend Over Time:**  The Direct Purchaser Plaintiffs also modify the relevant ABA model instruction with the following statement that is contrary to Ninth Circuit law: "In evaluating whether Abbott maintained a monopoly through anticompetitive conduct, it is recognized that monopolists almost always lose market share in the long-term because of innovation, change and growth in the market.  The issue to consider is whether Abbott maintained its monopoly power longer than it otherwise would have through anticompetitive conduct."

53.     This extreme mis-statement of the law is not joined by GSK and should be rejected.  The Direct Purchasers' cited cases merely make the point that it is *possible* to find monopoly power despite a declining market share.  *See, e.g.*, *Greyhound Computer*

*Corp. v. Int'l Bus. Machs. Corp.*, 559 F.2d 488, 496 n.18 (9th Cir. 1977) ("A declining market share may reflect an absence of market power, but it does not foreclose a finding of such power") (citations omitted); *Oahu Gas Serv., Inc. v. Pac. Res. Inc.*, 838 F.2d 360, 367 (9th Cir. 1988) (a firm with a "consistently high, albeit declining, market share in a market with high barriers to entry possessed monopoly power"); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 794-95 (1946) (finding dominant market power despite declining market share).

54.     Of course, as *Greyhound Computer* and other cases cited by the Direct Purchaser Plaintiffs acknowledge, courts frequently find that a declining market share is evidence of lack of monopoly power. *See Greyhound Computer*, 559 F.2d at 496 n.18 ("A declining market share may reflect an absence of market power.") (citing *United States v. Int'l Harvester Co.*, 274 U.S. 693, 709 (1927); *United States v. U.S. Steel Corp.*, 251 U.S. 417, 439 n.1 (1920)).

55.     *United States v. Syufy Enterprises*, 903 F.2d 659 (9th Cir. 1990) is particularly relevant here.  Far from finding that a decreasing market share can be dismissed in a cavalier manner as the Direct Purchaser Plaintiffs' proposed instruction would suggest, *Syufy* found the defendant's declining market share to be extremely strong evidence of a lack of monopoly power.  As the Ninth Circuit wrote, plaintiff "would do better to plot the [market share] points on a graph and observe the pattern they form than to focus narrowly on [the defendant's] market share at a particular time."  *Id.* at 666.  *See also id.* at 665-66 ("In evaluating monopoly power, it is not market share that counts, but the ability to *maintain* market share." (emphasis in original)).  The Direct Purchaser Plaintiffs' proposed language is directly contrary to *Syufy*.

**C.     Abbott's Proposed Monopoly Power and Relevant Market Instructions 7-13**

56.     Abbott's proposed instructions on circumstantial evidence of monopoly power closely track the relevant ABA model instruction.  ABA Model Jury Instructions

in Civil Antitrust Cases (2005), Sherman Act -Section 2, Monopolization - General, Instruction 8 (modified)

57.     Abbott's proposed market share instruction is based on this Court's previous holding that courts generally require at least a sixty-five percent market share in order to support a finding of monopoly power.  *In re Abbott Labs. Norvir Anti-Trust Litig.*, 562 F. Supp. 2d 1080, 1086 (N.D. Cal. 2008) (citing *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997)); *see also United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424 (2d Cir. 1945) (Hand, J.) (while 90% of the market "is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four per cent would be enough; and certainly thirty-three per cent is not.").

58.     Abbott's proposed instruction on market share trends closely tracks the relevant section of the ABA model instruction.  The major addition is Abbott's second sentence, which states that "Abbott's ability or inability to maintain market share over time is a more significant indicator of whether monopoly power exists than the absolute level of market share at any particular point in time," states the holding of *United States v. Syufy Enters.*, 903 F.2d 659, 665-66 (9th Cir. 1990) ("In evaluating monopoly power, it is not market share that counts, but the ability to *maintain* market share."); *see id.* at 666 (Plaintiffs "would do better to plot the[ market share] points on a graph and observe the pattern they form than to focus narrowly on [Abbott's] market share at a particular time.").

59.     Abbott's proposed instruction discussing barriers to entry or expansion also tracks the relevant model instruction, adding only information about barriers to expansion.  As discussed above, the concept of barriers to expansion is critical here because even where a defendant has a high market share in a market with barriers to entry, a defendant does not have monopoly power if there are no barriers to expansion. *Rebel Oil* 51 F.3d at 1443; *see also* 1/14/11 Order at 18 ("The existence of entry barriers, however, is not sufficient to support an inference of market power.  'The ability to

control output and prices -- the essence of market power -- depends largely on the ability of existing firms to quickly increase their own output in response to a contraction by the defendant.'"); "Barriers to Entry and Expansion," Monopoly Power & Relevant Market ¶¶ 48-49, *supra.*

[DISPUTED] GSK'S AND CUSTOMER PLAINTIFFS' PROPOSED
ANTICOMPETITIVE CONDUCT INSTRUCTION 1

THIRD ELEMENT: ANTICOMPETITIVE CONDUCT: GENERALLY

The next element that plaintiffs must prove as probably more true than not true is that Abbott willfully maintained its monopoly power by anticompetitive means or for anticompetitive purposes.[72]

In considering whether Abbott's conduct or purposes were anticompetitive, you must draw a distinction between practices which tend to exclude or restrict competition on the one hand and the success of a business which reflects only a superior product, a well-run business, or luck, on the other.[73]   The line between a legitimately gained monopoly, its proper use and maintenance, and improper conduct has been described in various ways.[74]   Or it is said that monopoly power which is thrust upon a firm due to its superior ability and efficiency does not constitute monopolization.[75]

Put another way, anticompetitive conduct refers to practices that unreasonably or unnecessarily impede fair competition; that is, conduct that impairs the efforts of others to compete for customers in an unnecessarily restrictive way.  Such conduct does not refer to ordinary means of competition, like offering better products or services, exercising superior skill or business judgment, utilizing more efficient technology, or exercising natural competitive advantages.[76]

In evaluating whether Abbott maintained a monopoly through anticompetitive conduct, it is recognized that monopolists almost always lose market share in the long-term because of innovation, change and growth in the market.[77]   The issue to consider is whether Abbott maintained its monopoly power longer than it otherwise would have through anticompetitive conduct.

---

[72] *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 (1985) (paraphrase of jury instruction approved by Court).

[73] *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 (1985) (paraphrase of jury instruction approved by Court).

[74] *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 (1985) (quotation to portion of jury instruction approved by Court)

[75] *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596-97 (1985) (quotation to portion of jury instruction approved by Court).

[76] *Image Tech. Serv. v. Eastman Kodak Co.*, 125 F.3d 1195, 1211 n.6 (9th Cir. 1997) (citation to jury instruction approved by court).

[77] *Greyhound Computer Corp. v. Int'l Bus. Machs. Corp.*, 559 F.2d 488, 491, 496-97 (9th Cir. 1977) (noting rapid technological change, reviewing market share data from 1964 to 1970 and rejecting claim that IBM had no monopoly power because of "youth, change and growth").

To sum up, you must determine whether Abbott maintained monopoly power by arrangements and policies which rather than being a consequence of a superior product, superior business sense, or historic element, were designed primarily to further Abbott's dominance.[78]

**Source:** *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596-97 (1985); *Image Tech. Serv. v. Eastman Kodak Co.*, 125 F.3d 1195, 1211 n.6 (9th Cir. 1997).

---

[78] *Aspen Skiing Co. v. Aspen Highlands Corp.*, 472 U.S. 585, 597 (1985) (quotation from a portion of jury instruction approved by Court).

[DISPUTED] ABBOTT'S PROPOSED ANTICOMPETITIVE CONDUCT
INSTRUCTION 1

GENERAL ANTICOMPETITIVE CONDUCT INSTRUCTION

To prevail on their claim that Abbott unlawfully monopolized the market in which
Kaletra competes, another element that plaintiffs must establish is that Abbott willfully
acquired or maintained monopoly power in that market by engaging in anticompetitive
conduct, rather than as a consequence of a superior product, superior business sense,
possession of a patent, or historical accident.

Simply possessing monopoly power and charging monopoly prices does not
violate the antitrust laws.  Monopoly power legally may result, for example, from a
superior product, business skill, possession of a patent, or historic accident.  The ability to
obtain monopoly power and the opportunity to charge monopoly prices is an important
part of the free market system. The opportunity to charge monopoly prices in our system
attracts business acumen, or skill, and encourages companies to take risks that produce
innovation and economic growth. For that reason, a company cannot be held liable for
antitrust violations for simply increasing its prices.  In an effort to encourage innovation,
the law provides that the possession of monopoly power and the charging of monopoly
prices are not unlawful unless plaintiffs can also establish that the monopoly power or
prices resulted from a specific type of anticompetitive conduct that is prohibited by the
antitrust laws.  Similarly, a company may not be held liable for simply engaging in
conduct that causes harm to competitors.  The antitrust laws exist to protect competition,
not competitors.

Here, in support of their claim that Abbott unlawfully monopolized the market in
which they allege Kaletra competes, plaintiffs argue that Abbott engaged in two types of
anticompetitive conduct: (1) unlawful bundled discounting; and (2) refusing to deal with
competitors.

**Source:** *Pacific Bell Telephone Co. v. Linkline Communications, Inc.*, 129 S. Ct. 1109,
1116 (2009); *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540
U.S. 398, 407, (2004); *Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 567
F.3d 1084, 1091 (9th Cir. 2009); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S.
477, 488 (1977).

## GSK's Argument

GSK's theory that Abbott violated a duty to deal claim is based on a very similar set of facts that the Supreme Court found sufficient to establish liability in *Aspen Skiing Co.* Thus, GSK proposes a general instruction on anticompetitive conduct that follows the formulation of jury instructions approved by the Supreme Court in *Aspen Skiing Co.*, 472 U.S. at 596-97 (1985), and the Ninth Circuit in *Image Tech. Serv.*, 125 F.3d at 1211 n.6 (9th Cir. 1997) (which relied on instructions like those approved in *Aspen Skiing*). This instruction should be adopted over Abbott's.

Abbott's instruction selectively paraphrases concepts from a number of cases – some of which are not related to the theories set out by Plaintiffs in this action. Abbott's instruction is also misleading. Plaintiffs' claims are founded, in part, on a theory that the Norvir price hike advantaged Kaletra by imposing a penalty price on purchasers of competing PIs that are used with Norvir but not on users of Kaletra. Language included in Abbott's instruction concerning the general legality of price "increases" will confuse the jury concerning the root of Plaintiffs' claims. GSK's proposed instruction, based on jury instructions already approved by the Supreme Court and Ninth Circuit presents a clear and unbiased view of the law and should be adopted.

## Customer Plaintiffs' Argument

The Customer Plaintiffs join GSK's arguments as to this set of instructions.

## Abbott's Argument

## General Anticompetitive Conduct

1.      The parties' proposals for a general instruction on the anticompetitive conduct element of a Section 2 claim differ significantly. Abbott's proposed instruction uses language directly from controlling cases and conforms, to the extent possible, to the ABA's model instructions. In contrast, Plaintiffs stray far from the model instructions. Despite a significant evolution in the law, Plaintiffs still cling to *Aspen Skiing* and *Kodak* as models for their general and refusal to deal instructions. In doing so, those instructions

fail to observe more recent and controlling Supreme Court precedent in *Trinko* and *LinkLine*, as well as this Court's orders.

2.      Abbott's instructions quote or paraphrase directly from *Trinko* and *LinkLine*, the Supreme Court's two most recent decisions addressing Section 2 liability, and from the Ninth Circuit's recent decision in *Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 567 F.3d 1084, 1091 (9th Cir. 2009).  Those decisions and the ABA model instructions make clear that the jury must distinguish between monopoly acquired and maintained by lawful conduct and one acquired and maintained by anticompetitive conduct; that monopoly derived from ownership of a lawful patent does not violate the antitrust laws; and that a monopolist may lawfully raise its own prices without fear of antitrust liability.

3.      Plaintiffs' instruction, in contrast, misstates the law and ignores binding precedent and this Court's orders in at least five ways:

4.      ***First***, **Plaintiffs' instructions fail to limit anticompetitive conduct to predatory bundling and refusal to deal.**  In its recent summary judgment order, this Court held that Plaintiffs may only go forward with their Section 2 claims "on the theories that Abbott engaged in predatory pricing under Cascade and violated its antitrust duty to deal."  1/14/11 Order at 46.  Yet, Plaintiffs' general instruction on anticompetitive conduct makes no mention of this fact, suggesting that the jury may rule against Abbott if it finds that Abbott engaged in any conduct meeting Plaintiffs' broad (and, as discussed below, erroneous) definition of anticompetitive conduct.  Plaintiffs compound this error in their proposed instructions on predatory bundling and refusal to deal by referring to those merely as "example[s]" of anticompetitive conduct.  Thus, when viewed collectively, Plaintiffs' instructions on anticompetitive conduct fail to make clear that the jury may only find Abbott liability if Plaintiffs prove either predatory bundling or refusal to deal.

5.      The instruction's statement that "[i]n considering whether Abbott's conduct or purposes were anticompetitive, you must draw a distinction between practices which tend to exclude or restrict competition on the one hand and the success of a business which reflects only a superior product, a well-run business, or luck, on the other," is so broad that it would allow a jury to find liability, for example, on facts analogous to those in *LePage's, Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003), even though the Ninth Circuit specifically held in *Cascade* that bundled discounting is not illegal unless it involves below-cost pricing under *Cascade*'s discount attribution test.

6.      ***Second*, Plaintiffs' instruction improperly relies on *Aspen Skiing* and *Kodak*.**  Plaintiffs cite the jury instructions in *Aspen Skiing* and *Kodak*.  Since those decisions, however, the Supreme Court has clarified its view of Section 2 and narrowed the scope of *Aspen Skiing*.[79]  *See Trinko*, 540 U.S. at 409 ("*Aspen Skiing* is at or near the outer boundary of § 2 liability.").  For that reason, the ABA's model jury instructions on anticompetitive conduct neither cite *Aspen Skiing* nor adopt the district court's instruction in that case.  *See* ABA's Model Jury Instructions in Civil Antitrust Cases at C-26 to C-30 (2005 ed.).  Nor do the ABA's model instructions adopt the language from Kodak about conduct that "unreasonably or unnecessarily impede[s] fair competition," or that "impairs the efforts of others to compete for customers in an unnecessarily restrictive way."

7.      Plaintiffs compound their error by omitting the following sentence from the *Aspen Skiing* instruction:  "It has been said that obtaining or maintaining monopoly power cannot represent monopolization if the power was gained and maintained by conduct that was honestly industrial."  *Aspen Skiing*, 472 U.S. at 596.  Accordingly,

---

[79]  Abbott also maintains that *Aspen Skiing* should be overruled.  Indeed, a number of prominent commentators have called for that result in the wake of *Trinko*. *See, e.g.*, *Refusals to Deal and Essential Facilities*, Testimony of R. Hewitt Pate, Submitted On Behalf of the United States Telecom Association, DOJ/FTC Hearings on Single-Firm Conduct, Washington, DC (July 18, 2006).  Abbott raises this argument to preserve it for appeal.

Plaintiffs' proposed general instruction fails to instruct the jury properly that it must distinguish between monopoly acquired and maintained by lawful conduct and one acquired and maintained by anticompetitive conduct.

       8.      Plaintiffs also assert in footnotes that the district court's instructions in *Aspen Skiing* were "approved by the Court." The Supreme Court, however, expressly noted that the defendant in that case had not challenged the jury charge on anticompetitive conduct. *See* 472 U.S. at 596 ("Nor does Ski Co. criticize the trial court's instructions to the jury concerning the second element of the § 2 offense."). Thus, the only question before the Court in *Aspen Skiing* was whether the jury's conclusion that there was no valid business reasons for the defendant's refusal to deal "finds support in the record." *Id*. at 604-605 ("[W]e must assume that the jury concluded that there were no valid business reasons for the refusal. *The question then is whether that conclusion finds support in the record*.").

      10.     ***Third*, Plaintiffs' instruction improperly infers that Abbott should have lost market share absent a violation.** Plaintiffs' instruction includes the statement that "it is recognized that monopolists almost always lose market share in the long-term because of innovation, change and growth in the market." As far as Abbott can tell, this statement finds no support in any model jury instruction or judicial case. As for Plaintiffs' citation to *Greyhound Computer Corp. v. IBM Corp.*, 559 F.2d 488 (9th Cir. 1977), Abbott could find no statement in that case even remotely addressing the proposition. Plaintiffs' inclusion of this language is a crude attempt to weave their own trial themes into the instructions. The proposed instruction improperly would suggest to the jury that any diminishment in Abbott's market share decline must be the result of anticompetitive conduct. This is clearly contrary to the great weight of decisions, which all hold that monopoly power may be lawfully obtained or maintained. *See, e.g.*, *Trinko*, 540 U.S. at 879.

11.     ***Fourth***, **Plaintiffs' instruction fails to distinguish between lawful and unlawful conduct.**     The concluding paragraph of Plaintiffs' instruction is misleading and inconsistent with binding Supreme Court precedent.  It states that the jury must determine whether Abbott maintained its monopoly "by arrangements and policies which rather than being the consequence of [lawful conduct] ***were designed primarily to further Abbott's dominance***."  (Emphasis added).  This is too broad a statement of when Abbott's conduct may be found unlawful, as even lawful conduct may be "primarily designed to further Abbott's dominance."  As such, this instruction fails to distinguish properly between unlawful conduct and monopoly power derived "'from growth or development as a consequence of a superior product, business acumen, or historic accident.'"  *Trinko*, 540 U.S. at 878-79 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).  It is also inappropriate to refer to "Abbott's dominance," as one of the things the jury will need to determine is the definition of the relevant market and whether Abbott has a dominant market share of that market.

[DISPUTED] GSK AND CUSTOMER PLAINTIFFS' PROPOSED DUTY TO DEAL
INSTRUCTION

THIRD ELEMENT: ANTICOMPETITIVE CONDUCT: REFUSAL TO COOPERATE

One example of anticompetitive conduct may be a corporation's refusal to cooperate with its business rivals under certain circumstances. A company that possesses monopoly power is generally not under a duty to cooperate with its business rivals if valid business reasons exist for that refusal to cooperate.[80] In other words, if there were legitimate business reasons for the lack of cooperation or refusal to deal, then the defendant, even if he is found to possess monopoly power in a relevant market, has not violated the law.[81]

Instead, we are concerned with a refusal to cooperate which unnecessarily excludes or handicaps competitors. This is conduct that does not benefit consumers by making a better product or service available—or in other ways—and instead has the effect of impairing competition.[82] Thus, while a competitor may not be under a general duty to cooperate with business rivals, a refusal to cooperate may be anticompetitive where a competitor elects to make an important change to a pattern of distribution that originated in a competitive market and persisted for many years. Such a refusal to cooperate may be anticompetitive if it changed the character of the market, and impacted customers and impaired competition in an unnecessarily restrictive way.[83] In assessing whether Abbott's conduct amounts to an anticompetitive refusal to cooperate, one thing you can consider is whether Abbott was motivated by anticompetitive malice when it

---

[80] *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 597 (1985) (paraphrase to portion of jury instruction approved by Court).

[81] *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 597 (1985) (quotation to portion of jury instruction approved by Court).

[82] *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596-97 (1985) (quotation from portion of jury instruction approved by Court).

[83] *Aspen Skiing Co. v. Aspen Highlands Corp.*, 472 U.S. 585, 603 (1985) ("In the actual case that we must decide, the monopolist did not merely reject a novel offer to participate in a cooperative venture that had been proposed by a competitor. Rather, the monopolist elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years."); *Id.* at 604 ("Ski Co.'s decision to terminate the all-Aspen ticket was thus a decision by a monopolist to make an important change in the character of the market."); *Id.* at 605 ("The question of whether Ski Co.'s conduct may properly be characterized as exclusionary cannot be answered by simply considering its effect on Highlands. In addition, it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way. If a firm has been 'attempting to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory.").

engaged in the conduct in dispute.[84]  In drawing inferences about Abbott's intent, courts have found significance in three things:  (1) a monopolist unilaterally terminates a voluntary and profitable course of dealing with its competitors; (2) a monopolist refuses to deal with its competitors, or offers to deal with a competitor only on unreasonable terms and conditions; and (3) a monopolist refuses to provide its competitors with products that were already sold in a retail market to other customers on the same terms as those other customers.[85]

**Source**:  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596-97, 605 (1985); *Safeway Inc. v. Abbott Labs.*, No. 07-5470-CW, slip op. at 27-28 (N.D. Cal. Jan. 18, 2011).

---

[84] 1/12/2010 Order Denying Abbott's Motion to Dismiss, Case No. 07-5702, Docket No. 195 at 15-16 ("Proof of a short-term sacrifice is not an element of a Section 2 claim, but rather a means to show anticompetitive motives.  Because a defendant is unlikely to admit to that it engaged in exclusionary conduct, a court must look for indicia of a defendant's desire to injure competition, as the Ninth Circuit did in *Metronet*."

[85] *Safeway Inc. v. Abbott Labs.*, No. 07-5470-CW, slip op. at 27-28 (N.D. Cal. Jan. 18, 2011)**.**

[DISPUTED] ABBOTT'S PROPOSED DUTY TO DEAL INSTRUCTION 1

REFUSAL TO DEAL—INTRODUCTION

As stated earlier, one of the elements plaintiffs must prove on their claim that Abbott unlawfully monopolized the market in which Kaletra competes is that Abbott willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct, rather than primarily as a consequence of a superior product, superior business sense, possession of a patent, or historical accident. To try to satisfy this element with respect to their claim of monopolization of the market in which they allege Kaletra competes, plaintiffs claim that Abbott engaged in predatory pricing of Kaletra.

Predatory pricing is a type of anticompetitive conduct on which a claim of monopolization—or a claim of attempted monopolization, about which I will instruct you later—may be based. When predatory pricing is at issue, a plaintiff must demonstrate that the prices complained of are below an appropriate measure of the costs of manufacturing and selling that product.[86] Specifically, here, plaintiffs must demonstrate that Abbott, by pricing Kaletra below its cost, was able to drive other companies that have products that compete with Kaletra from the market or otherwise to destroy these competitors' ability to constrain Abbott's pricing of Kaletra, and that, after Abbott did so, it was able to raise its price above competitive levels.

After considering all the evidence, if you find that plaintiffs have proven by a preponderance of the evidence that Abbott engaged in predatory pricing of Kaletra, then you must consider the remaining elements of plaintiffs' monopolization claim. If you find that Abbott has not engaged in predatory pricing of Kaletra, then you must rule in favor of Abbott, unless you find that Abbott engaged in the other form of anticompetitive conduct that I will describe.

---

[86] Abbott recognizes that this Court has rejected Abbott's argument that recoupment is an element of a predatory pricing claim involving bundled products, holding: "In Cascade, the Ninth Circuit stated that a plaintiff need not prove dangerous probability of recoupment in predatory pricing cases involving bundled products." 1/12/10 Order at 6. Abbott maintains its position that, under Doe and linkLine, recoupment is an element of any claim for predatory pricing and preserves this issue for appeal. Thus, Abbott believes this sentence should read: "When predatory pricing is at issue, a plaintiff must demonstrate that (1) the prices complained of are below an appropriate measure of the costs of manufacturing and selling that product; and (2) there is a dangerous probability that the defendant will be able to recoup its investment in below-cost prices." Abbott believes that the next sentence should read: "In other words, the plaintiff must demonstrate that, by pricing Kaletra below its cost, Abbott was able to drive other companies that have products that compete with Kaletra from the market or otherwise to destroy these competitors' ability to constrain Abbott's pricing of Kaletra, and that, after it did so, it was able to raise its price for Kaletra above competitive levels for sufficient time to recover the profits it previously lost by pricing Kaletra below cost."

**Source**: ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act - Section 2, Monopolization—Predatory Pricing, Instruction 1 (modified); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 129 S. Ct. 1109 (2009); *John Doe 1 v. Abbott Labs.*, 571 F.3d 930 (9th Cir. 2009).

<u>[DISPUTED] ABBOTT'S PROPOSED DUTY TO DEAL INSTRUCTION 2</u>

REFUSAL TO DEAL—REQUIREMENT 1[87]

First, Abbott's pricing action must have terminated unilaterally a voluntary and profitable prior course of dealing. This means that Abbott's pricing conduct must have sacrificed short-term profits in order to gain in the long-term by driving its competitors from the market.

**Source:** *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 409 (2004); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004); 1/14/11 Order at 28-29; 1/12/10 Order at 12, 14-15.

---

[87] As noted, Abbott's position is that Section 2 of the Sherman Act, and other analogous law, should not be interpreted to allow liability to be imposed for a refusal to deal. To the extent that such liability is legally supportable, Abbott's position is that the course of dealing must be with a competitor. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 409 (2004) (limiting *Aspen* situations in which the defendant "voluntarily engaged in [and then terminated] a course of dealing with its rivals"); *Live Universe, Inc. v. MySpace, Inc.*, 304 Fed. Appx. 554, 557 (9th Cir. 2008) (unpublished) ("Though this may indicate a prior course of dealing *between MySpace and its users*, nothing in the complaint suggests an agreement, or even an implicit understanding, *between MySpace and LiveUniverse*."); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 53 (2d Cir. 2007) (noting that the *Aspen Skiing* "exception applies when a monopolist seeks to terminate a prior (voluntary) course of dealing with a competitor"). Abbott therefore believes this instruction should read: "Abbott's pricing action must have terminated a voluntary, cooperative venture with its competitors, like GSK or BMS, as opposed to its consumers or any other party. In addition, anticompetitive malice must have motivated Abbott's conduct."

Abbott offers the alternative instruction above because the Court rejected Abbott's position in its summary judgment ruling. *See* 1/1411 Order at 14. Abbott expressly reserves its appellate and other rights on this issue. Abbott's position continues to be that the Court should enter judgment as a matter of law in Abbott's favor on Plaintiffs' refusal-to-deal claim for the reasons previously articulated.

[DISPUTED] ABBOTT'S PROPOSED DUTY TO DEAL INSTRUCTION 3

REFUSAL TO DEAL—REQUIREMENT 2

Second, plaintiffs must prove that Abbott refused to deal with competitors by charging so much for Norvir that other boosted PIs could not compete with Kaletra.  Put another way, Abbott must have charged an unreasonably high price for Norvir such that Norvir effectively became unavailable to boost other PIs like Lexiva and Reyataz.

**Source:** *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 409 (2004*); MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004); 1/14/11 Order at 29-30; 1/12/10 Order at 12, 14-15.

## [DISPUTED] ABBOTT'S PROPOSED DUTY TO DEAL INSTRUCTION 4

### REFUSAL TO DEAL—REQUIREMENT 3

Third, Abbott  must have refused to deal with competitors on the same terms that it deals with direct purchasers or consumers at retail.

In other words, you must find that Abbott refused a request to sell Norvir to its competitors, like BMS or GSK, on the same terms that it sold Norvir to direct purchasers, like Rochester Drug Cooperative, or to patients at retail.

**Source:** ABA Model Jury Instructions in Civil Antitrust Cases (2005); Monopolization—Refusal to Deal and Leveraging, Instruction 2 (modified); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004); 1/14/11 Order at 30; 1/12/10 Order at 12, 14-15.

<u>[DISPUTED] ABBOTT'S PROPOSED DUTY TO DEAL INSTRUCTION 5</u>

REFUSAL TO DEAL—REQUIREMENT 4

Fourth, you must find that anticompetitive malice motivated Abbott's conduct. This means Abbott must have raised Norvir's price for the sole purpose of driving consumers from Norvir to Kaletra.

**Source**: 1/14/11 Order at 28, 30.

## [DISPUTED] ABBOTT'S PROPOSED DUTY TO DEAL INSTRUCTION 7

### REFUSAL TO DEAL—CONCLUSION

In summary, for you to find that Abbott engaged in a refusal to deal you must find:

(1) that Abbott's pricing action terminated a voluntary and profitable course of dealing to sacrifice short-term profits in order to gain long-term monopoly profits;

(2) that Abbott charged such a high price for Norvir that boosted PIs, like Lexiva and Reyataz, could no longer compete with Kaletra;

(3) that Abbott refused to sell Norvir to competitors at a price it offered to direct purchasers and consumers;

AND

(4) that anticompetitive malice motivated any refusal to deal by Abbott with respect to Norvir.

**Source:** ABA Model Jury Instructions in Civil Antitrust Cases (2005); Monopolization—Refusal to Deal and Leveraging, Instruction 2 (modified); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004); 1/12/10 Order at 12, 14-15.

**GSK's Argument**

<u>Plaintiffs and GSK's Instructions Generally</u>

Plaintiffs propose that this Court adopt an instruction on Plaintiffs' claim that Abbott violated a duty to deal that quotes or closely paraphrases language from the instructions approved by the Supreme Court in *Aspen Skiing v. Aspen Ski Co.*, 472 U.S. 585 (1985) and the Ninth Circuit in *Image Tech. Serv. Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997).   Plaintiffs' proposal also instructs that the jury may consider Abbott's intent in assessing whether its conduct was anticompetitive as this Court held in denying Abbott's motion to dismiss (1/12/2010 Order Denying Abbott's Motion to Dismiss, Case No. 07-5702, Docket No. 195 at 15-16) and on the "three circumstances" that this Court – following *Metronet Serv. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132-34 (9th Cir. 2004) – found "significant for creating antitrust liability."  Summary Judgment Order at 27:21-28:8.   Such an approach minimizes the possibility of error from the competing interpretations of the cases from the past decade commenting on *Aspen Skiing* and quotes almost verbatim this Court's statement of the relevance of the Ninth Circuit's decision in *Metronet*.  Jury instructions are not the place to revisit motions for summary judgment, which is what Abbott's instructions in this area attempt to do.

Abbott's five instructions on this element clearly misstate the law.  Abbott's instructions make some effort to appear to track the circumstances this Court found significant to show liability in its Summary Judgment Motion, but Abbott adds legally erroneous glosses thereby turning things courts have "found significant" into absolute requirements of the claim.  Thus, Abbott begins by instructing that there are four "requirements" that jurors "must" find to render a verdict in favor of Plaintiffs.  Neither this Court nor any other court has held these are requirements.  In fact, in denying Abbott's motion to dismiss, this Court specifically rejected Abbott's central argument that each of the facts discussed in *Metronet* was a requirement to state a claim under *Aspen Skiing*, agreeing with plaintiffs' contention that the court found significance in

these facts as a means of determining whether the monopolist there was motivated by anticompetitive malice.   1/12/2010 Order Denying Abbott's Motion to Dismiss, Case No. 07-5702, Docket No. 195 at 15-16.   Nothing in the Court's most recent order changes that holding.   Instead, as this Court made clear, there are factors, such as the abandonment of a voluntary and presumably profitable pattern of conduct, that are "significant circumstances" to be considered by the fact-finder.   Summary Judgment Order at 27:25-26.   All of Abbott's instructions addressing supposed "requirements" of a refusal to deal claim should be rejected for that reason alone.

<u>Abbott's Second Instruction Entitled "Refusal to Deal – Requirement 1"</u>

On the first factor regarding unilateral termination of a voluntary and profitable course of conduct, Abbott adds that "[t]his means that Abbott's pricing conduct must have sacrificed short-term profits in order to gain in the long-term by driving its competitors from the market."   Yet, this Court clearly held at the motion to dismiss stage that "[p]roof of a short-term sacrifice is not an element of a Section 2 claim, but rather a means to show anticompetitive motives."   1/12/2010 Order Denying Abbott's Motion to Dismiss, Case No. 07-5702, Docket No. 195 at p. 16.   This Court confirmed that holding in its recent Summary Judgment Order.   *See* Summary Judgment Motion at 28:9-15. Abbott's contrary language should be rejected by this Court again.

<u>Abbott's Third Instruction Entitled "Refusal to Deal – Requirement 2"</u>

As to the second factor, Abbott adds that "Abbott must have charged an unreasonably high price for Norvir such that Norvir effectively became unavailable to boost other PIs like Lexiva and Reyataz."   This language is also contrary to this Court's prior orders.   In its ruling on Abbott's second motion to dismiss, this Court clearly held: "[P]recedent does not require an outright refusal." 1/12/2010 Order Denying Abbott's Motion to Dismiss, Case No. 07-5702, Docket No. 195 at p. 15.   In its Summary Judgment Order, this Court rejected Abbott's argument that summary judgment was proper because consumers' continued to purchase Norvir.   Summary Judgment Order at

29:22-30:4.  The language Abbott adds is equivalent to telling a jury that Abbott must have outright refused to deal by making Norvir "unavailable" – a proposition this Court has twice rejected.  It should do so again by rejecting Abbott's instruction on this element.

> Abbott's Fourth Instruction Entitled "Refusal to Deal – Requirement 3"

Similarly, Abbott's instruction on the third supposed requirement includes language setting out a proposition already rejected by this Court.  Abbott proposes to instruct the jury that "you must find that Abbott refused a request to sell Norvir to its competitors, like BMS or GSK, on the same terms that it sold Norvir to direct purchasers, like Rochester Drug Cooperative, or to patients at retail."  Yet, as this Court's Summary Judgment Order makes clear the proper comparison is not whether Abbott sells Norvir on the same terms to GSK as it does to Customer Plaintiffs, but rather whether Abbott sells Norvir to patients who use its competitors' boosted PIs on the same terms as patients who use Kaletra.  Summary Judgment Order at 30:5-12.  Again, Abbott's instruction should not be adopted by this Court.

> Abbott's Fifth Instruction Entitled "Refusal to Deal – Requirement 4"

Abbott proposes an instruction that plaintiffs must prove that Abbott was motivated by anticompetitive malice, meaning "Abbott must have raised Norvir's price for the sole purpose of driving consumers from Norvir to Kaletra."  Abbott cites no law, but this Court's order, for its proposition.  Yet, this Court never says that anticompetitive malice must be the "sole" purpose of the Norvir price hike.  Indeed, anticompetitive malice is not even a requirement of the claim; rather, it is evidence that assists the trier of fact in determining whether Abbott's conduct was anticompetitive.  GSK's instruction accurately describes this Court's holding:  the jury may consider whether Abbott was motivated by anticompetitive objectives and that intent is of significance in assessing whether Abbott's conduct was anticompetitive.  Anticompetitive intent need not be the sole motivating factor for Abbott's actions for the jury to find its conduct anticompetitive.

**Customer Plaintiffs' Argument**

The Customer Plaintiffs join GSK's argument of this set of proposed instructions.

**Abbott's Argument**

**Refusal To Deal**

1.      The parties' proposals for instructions on Plaintiffs' refusal to deal claim differ significantly.  Abbott's proposed instruction uses language directly from controlling cases and conforms, to the extent possible, to the ABA's model instructions. In contrast, Plaintiffs stray far from the model instructions.  Despite a significant evolution in the law, Plaintiffs still cling to *Aspen Skiing* and *Kodak* as models for their refusal to deal instruction.  In doing so, those instructions fail to observe more recent and controlling Supreme Court precedent in *Trinko* and *LinkLine*, as well as this Court's orders.

2.      Abbott's instructions make clear that in light of *Trinko* and *MetroNet*, as construed by this Court, Plaintiffs must prove four elements of a refusal to deal claim: (1) that Abbott's pricing action terminated a voluntary and profitable course of dealing to sacrifice short-term profits in order to gain long-term monopoly profits; (2) that Abbott charged such a high price for Norvir that boosted PIs, like Lexiva and Reyataz, could no longer compete with Kaletra; (3) that Abbott refused to sell Norvir to competitors at a price it offered to direct purchasers and consumers; and (4) that anticompetitive malice motivated any refusal to deal by Abbott with respect to Norvir.  1/12/10 Order at 12, 14-15.  Abbott's instruction also makes clear that Abbott's patents over the ritonavir compound and its use in co-administration with protease inhibitors provides a defense to Plaintiffs' refusal to deal claim consistent with the Ninth Circuit's *Kodak* decision.

3.      Plaintiffs' instruction, in contrast, misstates the law and ignores binding precedent and this Court's orders in at least five ways:

4.      ***First,*** **Plaintiffs' instruction erroneously suggests that they need not prove each of the four elements of a refusal to deal.**  As this Court has recognized,

after *Trinko* and *MetroNet*, a refusal to deal requires proof of each of the following four elements:  (1) that Abbott's pricing action terminated a voluntary and profitable course of dealing to sacrifice short-term profits in order to gain long-term monopoly profits; (2) that Abbott charged such a high price for Norvir that boosted PIs, like Lexiva and Reyataz, could no longer compete with Kaletra; (3) that Abbott refused to sell Norvir to competitors at a price it offered to direct purchasers and consumers; and (4) that anticompetitive malice motivated any refusal to deal by Abbott with respect to Norvir.  Plaintiffs' instruction erroneously suggests that the first three are only some, but not all, of the factors that Plaintiffs can use to prove the fourth element—i.e., anticompetitive malice.  In doing so, Plaintiffs' instruction ignores the holdings in both *Trinko*, which dismissed a claim for failure to allege the termination of a prior voluntary course of dealing, and the Ninth Circuit's decision in *MetroNet*, which granted summary judgment for lack of evidence of short-term profit sacrifice and discriminatory pricing.  Plaintiffs' instructions also ignore this Court's recent summary judgment ruling, which sets forth this standard.  *See* 1/14/11 Order at 24-30.

5.    ***Second*, Plaintiffs' instruction improperly relies on *Aspen Skiing* and *Kodak*.**  As argued at length above in connection with the parties' general instruction on anticompetitive conduct, which are incorporated by reference, Plaintiffs' reliance on the unmodified jury instruction used by the district court in *Aspen Skiing* is improper—particularly in light of subsequent decisions in *Trinko* and *MetroNet*, among others.

6.    ***Third*, Plaintiffs improperly refer to their claim as a refusal to cooperate.**  Plaintiffs improperly attempt to characterize their claim as one for refusal to "cooperate" rather than refusal to deal.  This is contrary to the ABA's model jury instructions, which refer to this type of claim solely as a refusal to deal.  It also erroneously suggests that Plaintiffs need not prove a refusal to deal with their competitors, which is Abbott's position as described above.  *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 409 (2004) (limiting *Aspen* situations

in which the defendant "voluntarily engaged in [and then terminated] a course of dealing with its rivals"); *Live Universe, Inc. v. MySpace, Inc.*, 304 Fed. Appx. 554, 557 (9th Cir. 2008) (unpublished) ("Though this may indicate a prior course of dealing *between MySpace and its users*, nothing in the complaint suggests an agreement, or even an implicit understanding, *between MySpace and LiveUniverse*."); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 53 (2d Cir. 2007) (noting that the *Aspen Skiing* "exception applies when a monopolist seeks to terminate a prior (voluntary) course of dealing with a competitor").

7.      *Fourth*,  **Plaintiffs' instruction fails to inform the jury that they bear the burden of proof on legitimate business justification.**  It is well-established that the "plaintiff . . . bears the burden of proving lack of legitimate business justification." *Image Technical Service, Inc. v. Eastman Kodak Co*., 903 F.2d 612, 620 n.9 (9th Cir. 1990); *see also, e.g*., *City of Vernon v. S. Cal. Edison Co*., 955 F.2d 1361, 1366 (9th Cir. 1992) (holding that "the plaintiff . . . ultimately has the burden of proving that the defendant acted without a legitimate business justification").  By omitting any mention of the burden of proof, Plaintiffs' instruction would erroneously permit the jury to render a verdict for the Plaintiffs without finding that the Plaintiffs had met their burden.  This is contrary to law.

8.      *Fifth*, **Plaintiffs' instruction ignores binding precedent that requires the jury to presume that Abbott legitimately raised Norvir's price to profit from its patented invention.**  Plaintiffs' proposed instructions ignores the Ninth Circuit's decision in *Kodak*, which held in the refusal-to-deal context that a defendant "may assert that its desire to profit from its intellectual property rights justifies its conduct, *and the jury should presume that this justification is legitimately procompetitive.*"  125 F.3d at 1219 (emphasis added).  To overcome this presumption, Plaintiffs carry the heavy burden of showing that Abbott's "business justification" for the price increase, i.e., to increase profits from sales of its patented Norvir, "*played no part* in the decision to act."  *Id.*

(emphasis added); *see also* ABA's Model Jury Instructions in Civil Antitrust Cases at C-37 (2005 ed.) ("If you find that defendant had mixed motives for its refusal to deal—that is, that the conduct was expected to result in some short run benefits for defendants as well as harm competitors—then you must find for defendant on this element.").  In other words, Plaintiffs' antitrust claims necessarily fail unless they prove by a preponderance of the evidence that Abbott increased Norvir's price *solely* to monopolize the market for Kaletra.  This is a critical burden Plaintiffs must (and, Abbott submits, cannot) overcome.

[DISPUTED] ABBOTT'S PROPOSED DUTY TO DEAL INSTRUCTION 6

REFUSAL TO DEAL—RELEVANCE OF PATENT RIGHTS

Abbott's patents may provide a defense to Plaintiffs' refusal-to-deal claim. Where a product is covered by a patent, the law permits the patent holder to withhold the patented product from the market altogether, to refuse to license that patented product, or to set the price for that patented product at whatever level it chooses, provided that price is not below cost.

If you find that Abbott owns an unexpired patent covering either Norvir administered by itself or Norvir in combination with another PI, you must find for Abbott and against Plaintiffs on their refusal to deal theory.

**Source:** *Schor v. Abbott Labs.*, 457 F.3d 608, 610-14 (7th Cir. 2006); *In re Indep. Serv. Orgs. Antitrust Litig. v. Xerox Corp.*, 203 F.3d 1322, 1327-28 (Fed. Cir. 2000).

**GSK's Argument**

In addition to being another summary judgment motion in the guise of a jury instruction, Abbott's instruction on the "relevance of patents rights" is a misstatement of law.  It should be rejected.  Abbott's own case law contradicts Abbott's proposed instruction.  The Court in *Independent Service Organizations Antitrust Litig. CSU, L.L.C. v. Xerox Corp.*, 203 F.3d 1322, 1325 (Fed. Cir. 2000) clearly states: "[i]ntellectual property rights do not confer a privilege to violate the antitrust laws."  The Federal Circuit continues: "The patentee's right to exclude … is not without limit."  *Id.* at 1326.  In other words, a patentee can violate the Sherman Act if the elements of Section 2 liability are met.  *Id.* at 1325.[88]

Abbott's jury instruction is also contrary to many other cases, including cases from the Supreme Court and this Circuit.  *See, e.g.*, *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 479 n.29 (1992) ("The Court has held many times that power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if a seller exploits his dominant position in one market to expand his empire into the next." (internal quotation and citations omitted));  *Image Technical Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1216 (9th Cir. 1997) (recognized that "intellectual property rights do not confer an absolute immunity from antitrust claims").  As the court in *United States v. Microsoft*, 253 F.3d 34, 63 (D.C. Cir. 2001) colorfully explained:  "The [defendant] claims an absolute and unfettered right to use its intellectual property as it wishes: 'If intellectual property rights have been lawfully acquired,' it says, then 'their subsequent exercise cannot give rise to antitrust

---

[88] *Schor v. Abbott Labs.*, 457 F.3d 608 (7th Cir. 2006), is also of no assistance to Abbott.  On entirely different allegations, that court considered whether Abbott was liable on a theory of "free-standing" monopoly leveraging, *id.* at 611, and while it did state that Abbott is "entitled" to monopolize the market because of patents, it also noted circumstances where a patentee was not immune to antitrust laws and it never considered allegations, as asserted here, that Abbott licensed the entire industry to its patents, *id.* at 614.

liability.' That is no more correct than the proposition that use of one's personal property, such as a baseball bat, cannot give rise to tort liability."

Further, Abbott has licensed its Norvir Boosting patents to the entire industry, including GSK. Whatever absolute patent-based rights Abbott believes it once had to "withhold" its products from the market, "refuse to license" them, or price at "whatever level it chooses," Abbott relinquished when it permitted GSK and other competitors to use those rights in exchange for hundreds of millions of dollars in consideration. The Federal Circuit held in *Jacobs v. Nintendo of America*, 370 F.3d 1097, 1101 (Fed. Cir. 2004) that it is a "basic contract law principle that a party may not assign a right, receive consideration for it, and then take steps that would render the right commercially worthless." Having cooperated with its competitors for years in the marketing and sale of boosted PIs and licensed virtually the entire industry to exploit its patented rights, Abbott is bound by the standards recognized by the Supreme Court in *Aspen Skiing*. Its patents are not a "get out of jail free" card, and Abbott cannot use patents it elected to license to escape liability for an anticompetitive change to a long standing pattern of cooperating with competitors in the marketing and sale of their boosted PIs.

## Customer Plaintiffs' Argument

As recognized by precedent that Abbott relies on, "[i]ntellectual property rights do not confer a privilege to violate the antitrust laws." *Independent Service Organizations Antitrust Litig. CSU, L.L.C. v. Xerox Corp.*, 203 F.3d 1322, 1326 (Fed. Cir. 2000). Moreover, as GSK argues, Abbott has already licensed rights under patents related to ritonavir as a booster, and has received ample consideration for those rights. Abbott cannot now claim immunity from violating a "duty to deal" based on those alleged patent rights.

## Abbott's Argument

Abbott acknowledges that this Court has previously found the Federal Circuit's decision in *Independent Service Organizations* and the Seventh Circuit's *Schor* to

conflict with the Ninth Circuit's decision in *Kodak*.  Abbott proffers this instruction, however, to preserve its appellate rights and because it is Abbott's position that those decisions are consistent with what the antitrust laws require.

<u>[DISPUTED] GSK'S PROPOSED PREDATORY BUNDLING</u>
<u>INSTRUCTION</u>

THIRD ELEMENT: ANTICOMPETITIVE CONDUCT: PREDATORY BUNDLING

Another example of anticompetitive conduct is called monopoly or predatory bundling.  Sometimes a company will offer a lower price if a buyer purchases two different products together, in a bundle, rather than buying them separately.  Bundling is generally not anticompetitive because bundled discounts can benefit buyers.

However, bundling may be anticompetitive if a business that has monopoly power over part of the bundle charges a substantial penalty to buyers who purchase the products separately.  Penalizing buyers purchasing from competitors can have the effect of causing buyers to purchase the entire bundle from the monopolist even if those buyers would rather buy one product from the bundler and one product from the competitor.  In this way, monopoly bundling can harm or exclude competitors that sell only one of the bundled products.  This could reduce competition and lead to higher prices.

Abbott engaged in unlawful monopoly bundling in this case if:

(1) Abbott had monopoly power in a ritonavir/Norvir market.

(2) A bundle is two or more different products that are sold together for a single price.

(3) Abbott's Norvir price increase constitutes an improper penalty on buyers who wanted to purchase a Boosted PI other than lopinavir.

One consideration in determining whether there is an improper penalty is if Abbott was effectively selling the lopinavir portion of Kaletra at a price below lopinavir's average variable costs. This is considered anticompetitive because it would make it impossible for an imagined competitor, called a hypothetical equally efficient competitor, which was legally allowed to sell lopinavir, and which had the same costs as Abbott, to sell lopinavir at a profit.

If you decide that Kaletra is a bundle, the price of the lopinavir portion of Kaletra is the price of Kaletra minus the price of Norvir.

Another factor to consider in deciding whether the Norvir price increase constitutes an improper penalty is whether market structures force the equally efficient competitor who produces one product to take unnecessary losses on sales of products to certain customers in the market in order to match the price of the bundler for sales to other customers in the market.  When that happens, competition is handicapped or excluded because the bundler has used its greater breadth in product line to make it impossible for a competitor with the same or superior cost structure to compete.

The variable costs of the lopinavir portion of Kaletra[89] are all of those costs that Abbott incurred in making and selling lopinavir that Abbott would not have incurred if it had (for whatever reason) stopped selling Kaletra.[90]  Variable costs are different from fixed costs.  Fixed costs are those that Abbott would still have even if it stopped selling Kaletra.  Average variable costs of a pill containing lopinavir are the total variable costs Abbott incurs in making and selling each pill.


**Source**:  *Cascade Health Solutions v. Peacehealth*, 515 F.3d 883, 894 (9th Cir. 2008); *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co*., 668 F.2d 1014, 1037 (9th Cir. 1981).

---

[89] *Cascade Health Solutions v. Peacehealth*, 515 F.3d 883, 910 (9th Cir. 2008) ("we hold that the appropriate measure of costs for our cost-based standard is average variable cost"); *id.* at 907 (requiring use of defendant's prices and costs).

[90] *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co*., 668 F.2d 1014, 1037 (9th Cir. 1981).

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED PREDATORY BUNDLING
INSTRUCTION

FOURTH ELEMENT: WILLFUL ACQUISITION OR MAINTENANCE OF
MONOPOLY POWER THROUGH ANTICOMPETITIVE CONDUCT: PREDATORY
BUNDLING

Another example of anticompetitive conduct is called monopoly or predatory
bundling.  Sometimes a company will offer a lower price if a buyer purchases two
different products together, in a bundle, rather than buying them separately.  Bundling is
generally not anticompetitive because bundled discounts can benefit buyers.

However, bundling may be anticompetitive if a business that has monopoly power
over part of the bundle charges a substantial penalty to buyers who purchase the products
separately.  Penalizing buyers purchasing from competitors can have the effect of causing
buyers to purchase the entire bundle from the monopolist even if those buyers would
rather buy one product from the bundler and one product from the competitor.  In this
way, monopoly bundling can harm or exclude competitors that sell only one of the
bundled products.  Thus, it may lead to reduced competition and higher prices.

Abbott engaged in unlawful monopoly bundling in this case if:

(1) Abbott had monopoly power in a ritonavir/Norvir market.

(2) Kaletra is a bundle.  A bundle is two or more different products that are sold
together for a single price.  The Court has already determined that Kaletra can be
considered a bundle.[91]

(3) Abbott's Norvir price increase constitutes an improper penalty on buyers who
wanted to purchase a Boosted PI other than lopinavir.

One consideration in determining whether there is an improper penalty is if
Abbott was effectively selling the lopinavir portion of Kaletra at a price below lopinavir's
average variable costs. This is considered anticompetitive because it would make it
impossible for an imagined competitor, called a hypothetical equally efficient competitor,
which was legally allowed to sell lopinavir, and which had the same costs as Abbott, to
sell lopinavir at a profit.

The price of the lopinavir portion of Kaletra is the price of Kaletra minus the price
of Norvir.

Another factor to consider in deciding whether the Norvir price increase
constitutes an improper penalty is whether market structures force the equally efficient
competitor who produces one product to take unnecessary losses on sales of products to

---

[91] *Safeway Inc. v. Abbott Labs*., No. 07-5470-CW, slip op. at 23-24 (N.D. Cal.
Jan. 18, 2011).

certain customers in the market in order to match the price of the bundler for sales to other customers in the market.  When that happens, competition is handicapped or excluded because the bundler has used its greater breadth in product line to make it impossible for a competitor with the same or superior cost structure to compete effectively.

The variable costs of the lopinavir portion of Kaletra[92] are all of those costs that Abbott incurred in making and selling lopinavir that Abbott would not have incurred if it had (for whatever reason) stopped selling Kaletra.[93]  Variable costs are different from fixed costs.  Fixed costs are those that Abbott would still have even if it stopped selling Kaletra.  Average variable costs of a pill containing lopinavir are the total variable costs Abbott incurs in making and selling each pill.

**Source**: *Cascade Health Solutions v. Peacehealth*, 515 F.3d 883, 894 (9th Cir. 2008); *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co*., 668 F.2d 1014, 1037 (9th Cir. 1981).

---

[92] *Cascade Health Solutions v. Peacehealth*, 515 F.3d 883, 910 (9th Cir. 2008) ("we hold that the appropriate measure of costs for our cost-based standard is average variable cost"); *id.* at 907 (requiring use of defendant's prices and costs).

[93] *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co*., 668 F.2d 1014, 1037 (9th Cir. 1981).

[DISPUTED] ABBOTT'S PROPOSED PREDATORY BUNDLED DISCOUNTING
INSTRUCTION 1

PREDATORY PRICING—GENERAL INSTRUCTION

As stated earlier, one of the elements plaintiffs must prove on their claim that
Abbott unlawfully monopolized the market in which Kaletra competes is that Abbott
willfully acquired or maintained monopoly power in that market by engaging in
anticompetitive conduct, rather than primarily as a consequence of a superior product,
superior business sense, possession of a patent, or historical accident.  To try to satisfy
this element with respect to their claim of monopolization of the market in which they
allege Kaletra competes, plaintiffs claim that Abbott engaged in predatory pricing of
Kaletra.

Predatory pricing is a type of anticompetitive conduct on which a claim of
monopolization—or a claim of attempted monopolization, about which I will instruct you
later—may be based.  When predatory pricing is at issue, a plaintiff must demonstrate
that the prices complained of are below an appropriate measure of the costs of
manufacturing and selling that product.[94]  Specifically, here, plaintiffs must demonstrate
that Abbott, by pricing Kaletra below its cost, was able to drive other companies that
have products that compete with Kaletra from the market or otherwise to destroy these
competitors' ability to constrain Abbott's pricing of Kaletra, and that, after Abbott did so,
it was able to raise its price above competitive levels.

After considering all the evidence, if you find that plaintiffs have proven by a
preponderance of the evidence that Abbott engaged in predatory pricing of Kaletra, then
you must consider the remaining elements of plaintiffs' monopolization claim.  If you
find that Abbott has not engaged in predatory pricing of Kaletra, then you must rule in
favor of Abbott, unless you find that Abbott engaged in the other form of anticompetitive
conduct that I will describe.

---

[94] Abbott recognizes that this Court has rejected Abbott's argument that
recoupment is an element of a predatory pricing claim involving bundled products,
holding:  "In Cascade, the Ninth Circuit stated that a plaintiff need not prove dangerous
probability of recoupment in predatory pricing cases involving bundled products."
1/12/10 Order at 6.  Abbott maintains its position that, under Doe and linkLine,
recoupment is an element of any claim for predatory pricing and preserves this issue for
appeal.  Thus, Abbott believes this sentence should read:  "When predatory pricing is at
issue, a plaintiff must demonstrate that (1) the prices complained of are below an
appropriate measure of the costs of manufacturing and selling that product; and (2) there
is a dangerous probability that the defendant will be able to recoup its investment in
below-cost prices."  Abbott believes that the next sentence should read:  "In other words,
the plaintiff must demonstrate that, by pricing Kaletra below its cost, Abbott was able to
drive other companies that have products that compete with Kaletra from the market or
otherwise to destroy these competitors' ability to constrain Abbott's pricing of Kaletra,
and that, after it did so, it was able to raise its price for Kaletra above competitive levels
for sufficient time to recover the profits it previously lost by pricing Kaletra below cost."

**Source**:  ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act -
Section 2, Monopolization—Predatory Pricing, Instruction 1 (modified); *Pac. Bell Tel.
Co. v. linkLine Commc'ns, Inc.*, 129 S. Ct. 1109 (2009); *Doe 1 v. Abbott Labs.*, 571 F.3d
930 (9th Cir. 2009).

<u>[DISPUTED] ABBOTT'S PROPOSED PREDATORY BUNDLED DISCOUNTING</u>
<u>INSTRUCTION 2</u>

PREDATORY PRICING—BUNDLED DISCOUNTING INTRODUCTION

Predatory pricing is the practice of pricing a product below its cost of production for a substantial period of time, in an attempt to drive competitors out of the market or otherwise to neutralize those competitors' ability to constrain the seller's pricing, in order that, when the company no longer has actual or potential competition, the company may increase the price of its product above competitive levels.

In certain circumstances, a company's sale of two or more of its retail products together is known as a "bundle," and discounting that bundle of products below the price at which the company sells those products separately, can constitute predatory pricing.[95] However, bundled discounting does not necessarily constitute predatory pricing. In many circumstances, bundled discounting is wholly legal. Bundled discounts generally benefit buyers because the discounts allow the buyer to get more for less than the buyer would get without the discount.

Under the law, there are special rules for evaluating whether a company is selling a product in a bundle below cost and is engaged in predatory pricing. Plaintiffs here contend that Kaletra is a bundle of Abbott's PI lopinavir, which is not sold separately, and Norvir. They further contend that Abbott has engaged in bundled discounting to such an extent that it constitutes predatory pricing. Abbott contends that Kaletra is not a bundle because Abbott could not sell the components of Kaletra separately, and that even if Kaletra were a bundle, any bundled discounting reflected in Kaletra's price would be insufficient to constitute predatory pricing, because its price is still above the relevant cost of producing Kaletra.

In considering these positions, you must first determine whether Kaletra is a bundle of products. If you find that Kaletra is a bundle of products, you must then determine whether Abbott has engaged in bundled discounting of Kaletra to such an extent that this constitutes predatory pricing under the rules that I will explain to you.

**Source:** *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 894-95 (9th Cir. 2008); *Brooke Group Ltd v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993).

---

[95] Abbott believes that the discount attribution test articulated in *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 884 (9th Cir. 2008) is inapplicable here. Further, it is Abbott's position that the Supreme Court effectively overruled that test as applied in *Cascade* in *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 129 S. Ct. 1109 (2009). Also, the Ninth Circuit has already held that the *Cascade* discount attribution test does not apply to the Norvir price increase. *Doe 1 v. Abbott Labs.*, 571 F.3d 930, 935 (9th Cir. 2009). Abbott expressly reserves its appellate and other rights on these and other issues, including the issue of whether recoupment is an element of predatory pricing in this context, and continues to maintain that the Court should enter judgment as a matter of law in Abbott's favor on Plaintiffs' predatory pricing claim.

<u>[DISPUTED] ABBOTT'S PROPOSED PREDATORY BUNDLED DISCOUNTING
INSTRUCTION 3</u>

PREDATORY PRICING—BUNDLE OR SINGLE PRODUCT INSTRUCTION

As I just noted, bundling is the practice of offering, for a single price, two or more goods or services that could be sold separately.

The first step in your determination of whether Abbott engaged in predatory pricing of Kaletra by bundled discounting is to determine if Kaletra is a bundle of products.  Plaintiffs contend that Kaletra is a bundle of lopinavir and Norvir, which Plaintiffs contend are two separate products.  Abbott contends that Kaletra capsules and tablets are each single integrated products, that lopinavir is an active ingredient rather than a separate product, and that Norvir is not a bundled component of Kaletra capsules or tablets.

To determine whether Kaletra is a bundle, you must first determine whether lopinavir and Norvir each could have been sold separately by Abbott during the relevant period.  If you find that either lopinavir and Norvir could not have been sold separately by Abbott during the relevant period, then you must find in favor of Abbott on Plaintiffs' predatory pricing claim.

If you find that lopinavir and Norvir each could have been sold separately by Abbott during the relevant period, you must then determine whether Abbott offered, for a single price, a bundle comprised of the lopinavir or Norvir that could have been sold separately during the relevant period.  If you find that Abbott did not sell a bundle of the lopinavir and Norvir that could have been sold separately during the relevant period, then you must find in favor of Abbott on Plaintiffs' predatory pricing claim.

On the other hand, if you find that (1) lopinavir and Norvir each could have been sold separately by Abbott during the relevant period; and (2) Abbott offered, for a single price, a bundle comprised of lopinavir and Norvir, then you should proceed to apply the instructions I will next give to determine whether Abbott's pricing of Kaletra during the relevant period was bundled discounting that may constitute predatory pricing.

**Source:** *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008).

[DISPUTED] ABBOTT'S PROPOSED PREDATORY BUNDLED DISCOUNTING
INSTRUCTION 4

BUNDLED DISCOUNTING—GENERAL

A bundled discount occurs when a company sells a bundle of goods or services for a lower price than the company charges for the goods or services purchased individually.  For example, if a company sells shampoo and conditioner separately at prices of $3 (for shampoo) and $5 (for conditioner), but the company also offers the shampoo and conditioner together for $5.25, this is a bundled discount.  Fast food value meals, which offer a burger, fries, and soda for less than total price of purchasing each item separately are another example of a bundled discount.

In many circumstances, bundled discounting is wholly legal and does not constitute predatory pricing.  Bundled discounts generally benefit buyers because the discounts allow buyers to get more for less than they would pay if the seller did not discount the bundled products.  Bundling can also result in savings to the seller because it usually costs a firm less to sell multiple products to one customer at the same time than it does to sell the products individually.  Because of the benefits of discounted prices, discounting and bundled discounting are practices the antitrust laws generally aim to promote.

However, when a seller's price for a bundle is so low for a substantial period of time that the pricing would have the effect of excluding from the market equally or more efficient competitors who manufacture just one of the products in the bundle, or the effect of otherwise destroying these competitors' ability to constrain the seller's pricing, then the bundled discount can constitute predatory pricing.  If the bundled discount drives competitors out of the market for the product at issue, or otherwise neutralizes these competitors' ability to constrain the seller's pricing of that product, the seller may then have the ability to raise prices for that product to monopoly levels.  This is the potential anticompetitive effect that, in certain circumstances, makes bundled discounting a form of predatory pricing.

For example, imagine that consumers always buy shampoo and conditioner at the same time and there were many companies that produced shampoo, but only one company that produced both shampoo and conditioner.  If the company that produced both shampoo and conditioner sold a bundle of those products for a sufficiently low discounted price that other companies stopped selling shampoo, the discounter might then be able to raise its prices for shampoo to monopoly levels.

If you find that Kaletra was a bundle during the relevant period under the instruction that I have previously given to you, you must determine whether Abbott's price for Kaletra during the relevant period to patients was so low as to constitute predatory pricing.  The law has a specific method to determine whether a bundled discount is so low as to constitute predatory pricing.  In instructing you on this method, I will assume that you have found that, during the relevant period, the Kaletra sold by Abbott was a bundle of lopinavir and Norvir that Abbott could have sold separately, and I

will therefore phrase my instructions in terms of lopinavir and Norvir being separate products that were bundled into Kaletra.  However, you should not take this phrasing as a suggestion by me that you should find that, during the relevant period, Abbott's Kaletra was such a bundle of products; that is an issue solely for your determination and I express no view on it.

**Source:** *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 910 (9th Cir. 2008); *Int'l Travel Arrangers, v. NWA, Inc.*, 991 F.2d 1389, 1396 (8th Cir. 1993).

## [DISPUTED] ABBOTT'S PROPOSED PREDATORY BUNDLED DISCOUNTING INSTRUCTION 5

### DISCOUNT ATTRIBUTION TEST

To determine whether bundled discounting constitutes predatory pricing here, you must consider what the law calls the "imputed price" of the lopinavir component of Abbott's Kaletra sold during the relevant period, and determine whether that imputed price was, for a substantial period of time, less than Abbott's cost of producing that component of Kaletra.[96]

Calculating the imputed price of lopinavir requires **several steps.**

- **First,** you must determine the appropriate daily boosting dose of Norvir to consider.  Each party has presented expert testimony on this issue.

- **Second,** you must determine Kaletra's price.

- **Third,** you must subtract the price of that daily boosting dose of Norvir from Kaletra's price to patients.  The remainder is the imputed price of the lopinavir component of Kaletra.

- **Fourth**, you must determine whether the imputed price of the lopinavir component of Kaletra that you calculated in step three was lower than the average variable cost of producing the lopinavir component of Kaletra.

If, during the relevant period, the imputed price of the lopinavir component of Kaletra was not lower than the average variable cost of producing the lopinavir component of Kaletra, then you must find that Abbott did not engage in predatory bundled discounting.  On the other hand, if the imputed price was lower than the average variable cost of producing the lopinavir component of Kaletra for a substantial period of

---

[96] Abbott's position is that the discount attribution test articulated in *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 884 (9th Cir. 2008), is inapplicable here. Under the rule articulated in *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 129 S. Ct. 1109 (2009), among other cases, the single-product test for predatory pricing articulated in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993), should apply to Abbott's pricing of Kaletra.  Abbott expressly reserves its appellate and other rights on that issue.  Abbott's position continues to be that the Court should enter judgment as a matter of law in Abbott's favor on Plaintiffs' predatory pricing claim for the reasons previously articulated.

time (and you find that Kaletra is a bundle), then Abbott may have engaged in predatory pricing for that period of time, depending on additional considerations.[97]

I will now explain how to calculate the average variable cost of producing the lopinavir component of Kaletra.

**Source:** *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 910 (9th Cir. 2008); *Int'l Travel Arrangers, v. NWA, Inc.*, 991 F.2d 1389, 1396 (8th Cir. 1993); *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993).

---

[97] Abbott continues to maintain its position that, under *Doe* and *linkLine*, recoupment is an element of any claim for predatory pricing and preserves this issue for appeal.  *See* footnote 94 above.

[DISPUTED] ABBOTT'S PROPOSED PREDATORY BUNDLED DISCOUNTING
INSTRUCTION 6

AVERAGE VARIABLE COST—GENERAL

A seller's costs in making and selling a product are divided into two categories:

- First, costs that the seller will incur regardless of its level of output.

- Second, costs that vary with the seller's level of output of its product.

The first kind of cost is referred to as a "fixed cost"—a cost that does not vary if the seller's sales volume increases or decreases somewhat.  An example of a fixed cost might be the cost of machinery used to make a product or the monthly rent on a retailer's store.  This machinery cost or rent will be similar whether the firm sells one unit or one thousand units of its product.  This type of cost is not to be considered in deciding whether the price of Kaletra was a predatory bundled discount.

The second kind of cost is referred to as a "variable cost."  Variable costs, as the name suggests, are those costs that increase when a seller produces more of its product.  Variable costs typically include such things as the materials that go into the product, or fuel needed to produce the product.  "Average variable cost" is the sum of the variable costs, divided by the total number of units of the product in question.

**Source:** ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act—Section 2, Monopolization—Predatory Pricing, Instruction 5 (modified); *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 910 (9th Cir. 2008).

[DISPUTED] ABBOTT'S PROPOSED PREDATORY BUNDLED DISCOUNTING
INSTRUCTION 7

AVERAGE VARIABLE COST—COSTS CONSIDERED

When calculating the average variable cost of the lopinavir component of Kaletra, you should look only at costs that vary with the level of production of Kaletra sold to patients with private health insurance.  To obtain the average variable cost of the lopinavir component of Kaletra, you should then divide the total of those costs by the number of Kaletra prescriptions sold to patients with private insurance.

You should not include variable costs associated with producing Kaletra for patients supported by government programs, like Medicare and Medicaid, because Plaintiffs are not asserting that Abbott engaged in predatory pricing for Kaletra sold to patients supported by government programs.  If there are costs that would need to be incurred even if less lopinavir were produced for patients with private insurance, you should not consider those costs to be variable costs.  When considering what costs are variable, you must assume that Abbott would continue to produce Kaletra for the patients supported by government programs.

**Source:** *Marsann Co. v. Brammal*, 788 F.2d 611, 612 (9th Cir. 1986); *William Inglis & Sons Baking Co. v. Cont'l Baking Co., Inc.*,  942 F.2d 1332, 1336 (9th Cir. 1991), *vacated in part on other grounds*, 970 F.2d 639 (1992); *Scripto-Tokai Corp. v. Gillette Co.*, No. CV-91-2862-LGB, 1994 WL 746072, at *4-5 (C.D. Cal. Sept. 9, 1994).

[DISPUTED] ABBOTT'S PROPOSED PREDATORY BUNDLED DISCOUNTING
INSTRUCTION 8

RECOUPMENT[98]

As I discussed earlier, when predatory pricing is at issue, a plaintiff must demonstrate not only that the prices complained of are below an appropriate measure of the defendant's costs, but also that there is a dangerous probability that the defendant will be able to "recoup," or recover, its investment in below-cost prices. "Recoupment" means that the defendant will, by pricing above the competitive level in the future, be able to make back the profits that it gave up by engaging in below cost pricing.

Recoupment through increased prices in the future is an indispensable aspect of plaintiffs' theory of predatory pricing because a low price, even a below-cost price, is not itself anticompetitive. Competition is harmed only if the predatory pricing successfully excludes competitors for the long term, thereby enabling the monopolist to charge higher prices without competition.

If you find that plaintiffs have shown that Abbott engaged in below-cost, bundled discounting but that plaintiffs have failed to show that there is a dangerous probability that Abbott will be able to recoup its investment in below-cost prices, you must find that Abbott did not engage in anticompetitive conduct through its pricing decisions. On the other hand, if you find that plaintiffs have shown that Abbott engaged in below-cost, bundled discounting and that they also have shown that there is a dangerous probability that Abbott will be able to recoup its investment in below-cost prices, then Abbott may have engaged in predatory pricing for that period of time, depending on whether Abbott acted with legitimate business justification, discussed later.

**Source:** *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 129 S. Ct. 1109 (2009); *Doe 1 v. Abbott Labs.*, 571 F.3d 930 (9th Cir. 2009); *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

---

[98] *See* footnote 94 above.

## **GSK's Argument**

### GSK's Instruction

Like Customer Plaintiffs, GSK proposes an instruction that attempts to present fairly and simply the test set out in *Cascade*.  In addition, this instruction is designed for this case.  For example, one of the issues Plaintiffs' experts discuss is the impact of government pricing rules on an equally efficient competitor's ability to respond to Abbott's Norvir price hike.  Abbott contends that competitors could have simply lowered the price of their boosted protease inhibitors to offset the additional cost to their boosted protease inhibitor plus Norvir regimens that resulted from the Norvir price hike.  As GSK and Customer Plaintiffs have previously informed this Court, government pricing rules imposed a significant cost on any competitor that chose to lower its price to customers affected by the Norvir price hike to offset the Norvir price hike.  That additional cost made it economically irrational for competitors to respond to the Norvir price hike by lowering the price of their own protease inhibitors.  This is a cost Abbott did not have to bear solely because it sold a full line of products that included the combination product, Kaletra.  *See* Plaintiffs' Opposition to Abbott's Supplemental Brief in support of Its Omnibus Motion to Dismiss, Case No. 07-cv-5702, Docket No. 70 at 3:3-20; Plaintiffs' Opposition to Abbott's Motion for Summary Judgment, Case No. 07-5470, Docket No. 236 at 5:12-6:7, 16:7-15.

GSK and Customer Plaintiffs' instructions allow jurors to consider the impact of the cost imposed by the government pricing rules on an equally efficient competitor's ability to respond:

> Another factor to consider in deciding whether the Norvir price increase
> constitutes an improper penalty is whether market structures force the
> equally efficient competitor who produces one product to take
> unnecessary losses on sales of products to certain customers in the market
> in order to match the price of the bundler for sales to other customers in

12958780.2

-184-

the market. When that happens, competition is handicapped or excluded because the bundler has used its greater breadth in product line to make it impossible for a competitor with the same or superior cost structure to compete.

This portion of GSK and Customer Plaintiffs' instruction is proper under *Cascade Health Solutions v. Peachhealth*, 515 F.3d 883 (9th Cir. 2007). The test set out by the *Cascade* court was meant to address "the primary anticompetitive danger posed by a multi-product bundled discount … that such a discount can exclude a rival … who is equally efficient at producing the competitive product simply because the rival does not sell as many products as the bundled discounter." *Id.* at 909. The holding, specifically, references using an "appropriate measure" of costs to make this assessment. *Id.* at 903. And, as this Court observed in denying Abbott's initial motion to dismiss premised on the applicability of *Cascade,* the *Cascade* rule must be applied in such a way as to "achieve its stated goal of prohibiting pricing that results in the exclusion of equally efficient competitors." 4/11/2008 Order Denying Motion to Dismiss, Case No. 07-cv-5702, Docket No. 82, at 15. Here, the impact on more efficient competitors cannot be fully assessed without considering unique government pricing rules in the pharmaceutical industry that impose additional costs on any competitor who sought to lower its price in response to the Norvir price hike.

GSK and the Customer Plaintiffs' proposed language should be included in the Court's instruction. Inclusion of that language will avoid "mechanically apply[ing] the *Cascade* rule regardless of its effect under the circumstances." *Id.* at 13. Nor does including this language offend the *Cascade* court's concern that bundled discounters have "clear guidance" when they set prices. *Id.* at 907. Abbott, as a sophisticated pharmaceutical company, considered the impact of government pricing rules on all of its drugs on a regular basis and surely knew of the costs those rules would impose on competitors considering a price based response to the Norvir price hike. As someone

expert in the industry, Abbott should be able to determine those costs.  Accordingly, jurors should be instructed on and allowed to consider the impact of government pricing rules on the ability of equally efficient competitors to respond to Abbott's Norvir price hike.

<u>Abbott's Instruction</u>

Abbott's instructions on predatory bundling have many flaws and should not be used.  Abbott's instructions start by presenting an issue that is not in dispute—whether Abbott sold Kaletra at a price below its cost—and then presents the bundled pricing issue that is in dispute in an overly-complicated fashion.  For good measure, Abbott adds supposed elements of a bundled pricing claim that this Court has already rejected, including an instruction on recoupment.  It does not take nine or ten instructions to explain the concept that certain bundled pricing practices by a monopolist can prevent equally efficient competitors from competing with the monopolist's price solely because they lack the ability to sell both products in the bundle.  Abbott's instructions seem designed to exasperate the jury, not inform it.  They should not be adopted.

### **Customer Plaintiffs' Argument**

The Customer Plaintiffs propose a single clear and concise (one and one-half page) jury instruction following the relevant and binding Ninth Circuit law on anticompetitive bundling, as set forth in *Cascade Health Solutions v. Peacehealth*, 515 F.3d 883 (9th Cir. 2008).  Abbott, by contrast, offers twelve pages of redundant,[99] argumentative, and error-filled instructions. *See* Abbott's Proposed Predatory Bundled Discounting Instructions 1-10.  Abbott's proposed instructions will not assist the jury in understanding the Cascade test, given the confusing nature of Abbott's proposed

---

[99] *Compare* Abbott's Proposed Instructions (39) ("In many circumstances, bundled discounting is wholly legal and does not constitute predatory pricing.  Bundled discounts generally benefit buyers because the discounts allow buyers to get more for less than they would pay if the seller did not discount the bundled products."), *with* Abbott's Proposed Instructions (41) (using substantially identical language).

instructions, and the liberties that Abbott has taken to incorrectly describe the applicable case law (*e.g.*, Abbott's cite to *Doe* without qualification for the false proposition that "the Ninth Circuit has already held that the *Cascade* discount attribution test does not apply to the Norvir price increase," Abbott's Proposed Instructions (39 n.69)).  This Court should reject Abbott's Proposed Predatory Bundled Discounting Instructions 1-10 inclusive and instead use the clear and correct instruction proposed by the Customer Plaintiffs.

Abbott's proposed instructions are replete with error.   First, Abbott's attempt to conflate the imputed price of lopinavir with the price of Kaletra is error. Abbott asks the Court to instruct the jury "that Plaintiffs must demonstrate that Abbott . . . pric[ed] Kaletra below its cost[.]"  Abbott's Proposed Predatory Bundled Discounting Instruction 1, 2 (instructing jury to consider whether Kaletra is priced "above the relevant cost of producing Kaletra").  Plaintiffs have *never* alleged that Kaletra is priced below its cost, nor do they need to prove this in order to demonstrate anticompetitive bundling.  Kaletra itself is the bundle and Plaintiffs need only prove that the lopinavir portion of the bundle – the imputed price of which is determined by subtracting the price of Norvir from the price of Kaletra – is priced below its average variable costs.  *Cascade*, 515 F.3d at 910 & n.21 ("[A] bundled discounter can exclude its rivals who do not sell as many product lines even when the bundle as a whole, and the individual products within it, are priced above the discounter's incremental cost to produce them.").

Second, Abbott argues throughout its proposed instructions that recoupment is an element of any claim for predatory pricing.  *E.g*., Abbott's Proposed Predatory Bundled Discounting Instructions 2 n.69, 8.  This is an incorrect statement of the law.  Abbott's recoupment argument is directly contrary to *Cascade* and holdings of this Court; the Ninth Circuit, in denying mandamus *in this case*, declined Abbott's invitation to "correct" this Court's purported contrary to law holding on this issue.  *Cascade*, 515 F.3d at 910 n.21 ("We do not believe that the recoupment requirement from single product

cases translates to multi-product discount cases. . . . [E]xclusionary bundling does not necessarily involve any loss of profits for the bundled discounter.").  Abbott's unwavering commitment to rejected theories should be remarked upon, not rewarded.

Third, Abbott argues that Plaintiffs must prove that it engaged in predatory pricing for "a substantial period of time." *E.g.*, Abbott's Proposed Predatory Bundled Discounting Instructions 2, 6.  A "substantial period of time" requirement is found nowhere in *Cascade* or the other leading Ninth Circuit cases.  Abbott should not be allowed to graft such a requirement to the jury instructions in this case.

Fourth, Abbott attempts to revisit summary judgment by offering an instruction to the jury to determine whether Kaletra is a bundle.  *See* Abbott's Proposed Predatory Bundled Discounting Instruction 3.  As this Court has recognized, "Kaletra presents a bundle of two products, a boosting PI and boosted PI, sold together for a single price." *Safeway v. Abbott Labs.*, No. 07-5470-CW, slip op. at 23-24 (N.D. Cal. Jan 18, 2011). The Court's ruling on this point can be no clearer.   By contrast, Abbott and its lawyers and its experts previously conceded this in the *Doe* case, only to shift positions when Plaintiffs adduced evidence that Abbott's pricing failed the *Cascade* discount attribution test.  Abbott's attempt to describe Kaletra as a "single integrated product[]" and Norvir as "not a bundled component of Kaletra" is simply a continuation of Abbott's modus operandi to change legal positions to suit its needs at that moment in the case.  *See* Abbott's Proposed Predatory Bundled Discounting Instruction 3.  Kaletra's own label, published by Abbott and approved by the FDA, describes Kaletra as a co-formulation of two products: Norvir and lopinavir.  Kaletra Label at 11 ("KALETRA (lopinavir/ritonavir) is a co-formulation of lopinavir and ritonavir."), *available at* http://www.rxabbott.com/pdf/kaletratabpi.pdf; *see also Safeway v. Abbott Labs.*, No. 07-5470-CW, slip op. at 23 (N.D. Cal. Jan 18, 2011) ("[F]or the purposes of *Cascade*, the bundled "products" here are ritonavir and lopinavir.").  Functionally, doctors and patients view and use Kaletra as a bundle of Norvir (ritonavir) and lopinavir.  Abbott should not

be allowed to escape that reality by arguing that Kaletra is not a bundle merely because Abbott decided to take what it admitted to be a harder route and sell a co-formulated product instead of selling lopinavir separately. *See* Defendant Abbott Laboratories' Notice of Motion and Motion for Summary Judgment or, Alternatively, Summary Adjudication on Direct Purchaser Plaintiffs' Claims, at 5 (filed Jul. 30, 2010).

Fifth, Abbott's Proposed Predatory Bundled Discounting Instruction 4 on bundled "discounting" turns the facts of this case on their head, and is a wholly inappropriate way to describe Abbott's 400% price *hike*. Abbott's conduct is properly described as predatory bundling or exclusionary bundling, but definitely not bundled *discounting*.[100] Abbott's Proposed Predatory Pricing Instruction 4 engages in unsupported and inappropriate casual empiricism (*e.g.*, "it usually costs a firm less to sell multiple products to one customer at the same time that it does to sell the products individually"), and seeks to reintroduce rejected concepts like recoupment, *e.g.*, instructing that after discounting in a predatory way "the discounter might then be able to raise its prices for shampoo to monopoly levels", and whether Kaletra is a bundle. Abbott's Proposed Predatory Bundled Discounting Instruction 4. Abbott also introduces the concept that the price increase impacted only "patients covered by private health insurance." *Id*. This too is unsupported and unsupportable; just because certain public entities were insulated from the Norvir price hike in no way means that only patients with insurance – and by

---

[100] *See* Einer Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 Harv. L. Rev. 402-403 (2009) ("Bundled discounts have the same power effects as tying when the unbundled price exceeds the but-for price for the product over which the firm has market power. **Calling such pricing a bundled 'discount' is actually misleading in these situations because it wrongly implies there is a true discount from the but-for price (that is, the price that would have been charged 'but for' the bundling).** Instead, a bundled 'discount' just means there is a difference between the price charged to buyers who comply with the bundling condition and to those who do not. If the unbundled price exceeds the but-for level, then the price difference we call a 'discount' is really a penalty imposed on buyers who refuse the bundle.") (emphasis added).

extension, only private insurance companies – were impacted.  For example, the Abbott position ignores patients who self-pay or who lack insurance but do not qualify for or avail themselves of government programs.  More importantly, for purposes of the evaluating the jury instructions, all of these issues are side issues intended to distract the jury from deciding the main issue: whether Abbott priced Kaletra such that the imputed price of lopinavir is below is average variable costs.  Whether intentional or not, the Abbott instructions will confuse the jury and, as such, Abbott's Proposed Predatory Bundled Discounting Instruction 4 should be rejected.

Abbott's Proposed Predatory Bundled Discounting Instruction 5 concerning the discount attribution test is no less opaque.  The application of *Cascade* is simple in this case.  Step 1:  subtract the price of Norvir from the price of Kaletra, and the difference is the imputed price of lopinavir.  Step 2:  determine whether the imputed price of lopinavir is less than its average variable costs.

Abbott spends an entire page instructing the jury on this issue, another attempt at jury confusion.  All parties here are focused on the impact and pricing on the non-governmental market.  Abbott, however, attempts to create an asymmetry by instructing the jury to subtract the price of Kaletra "to patients covered by private health insurance" – again, an improper subset – to the unspecified price of Norvir.  If the jury is instructed that it is to consider the price of Kaletra to private payors, then it would also need to be instructed to apply the price of Norvir to private payors.  The point, though, is that all parties are (or should be) focused on the prices of both products (Norvir and Kaletra) to non-government payors, and Abbott should not be allowed to suggest otherwise through this jury instruction.

More fundamentally, Abbott purports to misconstrue the purpose behind and operation of the discount attribution test by seeking to instruct the jury to "determine the appropriate daily boosting dose of Norvir to consider."  As a matter of law, *Cascade*, by focusing on an *equally* efficient competitor, instructs that one consider the boosting dose

that Abbott itself uses in Kaletra, *i.e.*, 200 mg Norvir/day.  *Cascade*, 515 F.3d at 907-08.[101]  To use anything less than 200 mg would involve assuming a more efficient competitor, not an equally efficient competitor (because it would be assuming a product that required less booster to work appropriately), and that would be inconsistent with the letter and purpose of the test.  Of course, the jury does not need to determine the "appropriate daily boosting dose" to do this test.  What needs to happen is that the jury subtract the stand-alone price of the amount of ritonavir (i.e., the price of Norvir) that is in whatever volume of Kaletra pills one considers.

Abbott's Proposed Predatory Bundled Discounting Instructions 6 and 7, concerning average variable cost (AVC), are similarly confused and wrong.  Costs can be classified as "fixed" or "variable."  "[T]he fixed production costs of a firm are those costs that do not vary with output and that *would remain even if the firm discontinued production*."  *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1037 (9th Cir. 1981) (emphasis added).  Variable, costs, on the other hand, are those costs that *would not* remain if the firm discontinued production.  *Id*. at 1038 (explaining that variable costs include "materials, direct labor, indirect labor, and warehousing and shipping costs"); *Rebel Oil Co., Inc., v. Atlantic Richfield Co.*, 133 F.R.D. 41, 43 n.2 (D. Nev. 1990) (variable costs include "capital, executive, and administrative costs, sales expenses, and some elements of promotional expense").  Costs are considered variable if they could be avoided by exiting a given market.

The cases cited by Abbott do not teach differently.  *See* Abbott's Proposed Predatory Bundled Discounting Instructions 6-7.  In *Marsann*, a case cited repeatedly by

---

[101] The rationale behind this is that an equally efficient competitor test allows a company to determine whether it is engaging in predatory bundling by using a bright-line rule and simply considering its own cost structure.  "A seller can easily ascertain its own prices and costs of production and calculate whether its discounting practices run afoul of the [Cascade test]. . . . [U]nder the discount attribution standard a bundled discounter need not fret over and predict or determine its rivals' cost structure."  *Cascade*, 515 F.3d at 907-08.

Abbott, the Ninth Circuit explained that average variable costs are "those costs that would not be incurred *were that product not produced*." *Marsann Co. v. Brammall, Inc.*, 788 F.2d 611, 613 (9th Cir. 1986) (emphasis added).[102]  Similarly, in *International Travel Arrangers v. NWA, Inc.*, 991, F.2d 1389, 1395 (8th Cir. 1993), another case cited by Abbott, the district court defined – and the appellate court did not take issue with – AVC as "the sum of all variable costs – those costs that vary with output – divided by output."  Accordingly, in calculating the AVC of the lopinavir portion of Kaletra, one must include all variable costs divided by all output, or, said differently, all costs that would be "avoidable" were Abbott to exit the "boosted" PI market.  Abbott's instruction (43) seems at times to agree with this ("AVC is the sum of variable costs, divided by the total number of units of the product in question"), though in other places seeks to measure costs only where volume increases or decreases "somewhat."  That is both vague and incorrect.  The Court should avoid this confusion and use the Customer Plaintiffs' clear instruction on this issue.

Abbott makes another error by focusing Proposed Predatory Bundled Discounting Instruction 7 only on costs "that vary with the level of production of Kaletra sold to patients with private health insurance."  It seems that the basis of this jury instruction is Abbott's argument in its Motion in Limine #6 that because Plaintiffs complain only about the Norvir price hike that impacted the private payor market, the analysis of costs should be limited to that market.  Abbott argues that it would have continued selling to the public payors (*e.g.*, Medicare, ADAP) even if it had withdrawn Norvir from the private market.  Factually, there is no evidence or reason to believe that Abbott was considering withdrawing Norvir only from the private market.  In fact, Abbott seriously considered

---

[102] *See also Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 954 (6th Cir. 2005) (common costs shared among all passengers on a flight "treated as variable costs of the route because the airline could avoid incurring all of them by exiting the route and redeploying the plane to an alternative route") (Moore, J., conc.).

the price hike or withdrawing Norvir from the *entire* market, not just from the private market.  Furthermore, even if counterfactually it were reasonable to accept the possibility that Abbott would have withdrawn from only the private payor market, the AVC analysis would not change.  When calculating *average* variable costs, variable costs are divided by units.  If one decreases the numerator/costs (by for example only considering costs to private payors) one would also need to decrease the denominator/units, and the effect on the calculations would be nil as long as costs to the government market are not disproportionately higher than costs in the private market.  In fact, because Abbott charged private payors five times what it charged public payors for Norvir, Abbott's costs would have declined (and hence would be considered variable) by more than the drop off in units were one to exclude units going to government payors.  That is, Abbott made most of its revenues and profits on private payors and therefore reasonably concentrated its promotional and continuing R&D expenditures[103] on its most profitable customers: private payors.  Absent sales to private payors, Abbott's costs would be disproportionately lower, which simply means while manufacturing costs would have decreased proportionately, promotional and continuing R&D costs would have decreased disproportionately had Abbott stopped selling to private payors.  This disproportionate move in variable costs means that *average* variable costs *would have been even greater if only looking at the private payor market*.  Abbott's proposed instruction that "[w]hen considering what costs are variable, you must assume that Abbott would continue to produce Kaletra for the patients supported by government programs" is both counterfactual and immaterial.  It should not be allowed to mislead and confuse the jury.

---

[103] Continuing R&D expenses often are just promotional expenses by another name.  This is evidenced here by Abbott's admission that continuing R&D projects were funded based on their anticipated ROI (return on investment).  Abbott funded continuing R&D that would most increase sales.

Abbott's proposed jury instructions concerning the *Cascade* test vacillate between confusing, misleading, and wrong. This Court should reject Abbott's attempt through these proposed instructions to rewrite Ninth Circuit law and this Court's holdings, and should instead adopt Customer Plaintiffs clear, concise, and accurate instruction.

<u>**Abbott's Argument**</u>

<u>**Predatory Bundled Discounting**</u>

1.     To properly apply Cascade's discount attribution test, the jury will be required to decide whether Kaletra is a bundle and to determine the imputed price of lopinavir and the average variable cost of making lopinavir, among other things. The jury can only answer these complicated questions if they are given clear instructions on the definition of these terms. In addition, the antitrust laws also require the jury to determine whether there is a dangerous probability of recoupment and whether Abbott's pricing conduct is justified by Abbott's ownership of patents on the use of ritonavir as a booster.

2.     In recognition of the complexity of the discount attribution test, Abbott proposes a series of clear instructions on each element of the below-cost pricing analysis. To the extent possible, these instructions are modeled on language from the Ninth Circuit's decision in Cascade. In contrast, Plaintiffs propose instructions that are either too vague in their descriptions of the components of the analysis, misstate or completely ignore the Cascade standard and this Court's orders interpreting it, or fail to provide any instruction at all on an essential component of the analysis. In short, Plaintiffs' instruction are deficient in at least five ways:

3.     ***First*, Plaintiffs' instructions suggest that they do not have to show below-cost pricing to prove predatory bundling.** *Cascade* held that "the exclusionary conduct element of a claim arising under § 2 of the Sherman Act cannot be satisfied by reference to bundled discounts unless the discounts result in prices that are below an appropriate measure of the defendant's costs." 515 F.3d at 903. In doing so, the Ninth

Circuit noted that the Supreme Court's opinions "strongly suggest that, in the normal case, above-cost pricing will not be considered exclusionary conduct for antitrust purposes, and the Court's reasoning poses a strong caution against condemning bundled discounts that result in prices above a relevant measure of costs." *Id.* at 901.  The Ninth Circuit reaffirmed the principle that predatory pricing requires prices below some measure of cost in its decision in the related Doe case.  There, the court of appeals dismissed the plaintiffs' claim because they alleged "no below cost pricing at the boosted level."  *Doe 1 v. Abbott Labs.*, 571 F.3d 930, 935 (9th Cir. 2009).

4.      Despite this controlling precedent, including a Ninth Circuit decision addressing the precise facts of this case, Plaintiffs' proposed instructions state that below-cost pricing is only "[o]ne consideration" in determining whether Abbott has engaged in predatory bundling.  Those instructions suggest that Plaintiffs can also prove predatory bundling by evidence that "market structures force the equally efficient competitor who produces one product to take unnecessary losses on sales of products to certain customers in the market in order to match the price of the bundler for sales to other customers in the market."  This statement and the paragraph encompassing it are directly contrary to the clear holdings in Cascade and Doe and should not be included in any instruction provided to the jury.  They also conflict with this Court's recent summary judgment ruling rejecting Plaintiffs' alternative "monopoly leveraging plus" theory based on "the additional factor of government pricing rules in the boosting market."  1/14/11 Order at 30-32.  In short, the Court's instruction on bundled discounting must make it clear that Plaintiffs need to satisfy Cascade's discounting attribution test—if not, their predatory pricing theory must be rejected.

5.      ***Second,*  Plaintiffs' instructions improperly refer to a "penalty" for purchasing the bundle.**  Plaintiffs improperly use the term "penalty" throughout their proposed instructions to describe *Cascade*'s discount attribution test.  *Cascade* holds that while "[b]undled discounts generally benefit buyers because the discounts allow the

buyer to get more for less," "it is possible, at least in theory, for a firm to use a bundled discount to exclude an equally or more efficient competitor and thereby reduce consumer welfare in the long run."  515 F.3d at 895, 896; *see also id*. at 895 n.6 (noting that "[t]he Supreme Court has recognized the principle that package pricing is usually precompetitive").  That occurs only where "after allocating the discount given by the defendant on the entire bundle of products to the competitive product or products, the defendant sold the competitive product or products below its average variable cost of producing them."  *Id*. at 910.  The word "penalty" never appears in the Ninth Circuit's decision.  Thus, Plaintiffs' use of that term is improperly argumentative and, thus, should be rejected in favor of Abbott's proposed instruction, which is tailored to the standard in Cascade.  *See Wall Data Inc. v. L.A. County Sheriff's Dep't*, 447 F.3d 769, 784 (9th Cir. 2006) (affirming district court's rejection of instructions that were "slanted or argumentative").

6.      ***Third*, Plaintiffs' instructions incorrectly describe the hypothetical equally efficient competitor.**  *Cascade* explains that the discount attribution test "makes the defendant's bundled discounts legal unless the discounts have the potential to exclude a *hypothetical* equally efficient producer of the competitive product."  515 F.3d at 906 (emphasis in original).  In their description of the test's purpose, Plaintiffs state that the hypothetical equally efficient competitor is one "which was legally allowed to sell lopinavir."  This clause finds no support in Cascade or any other decision.  To the contrary, Abbott contends that the existence of Abbott's patents over lopinavir and the use of ritonavir with protease inhibitors make the Cascade test inapplicable here.

7.      ***Fourth*, Plaintiffs offer erroneous instructions on whether Kaletra is a bundle.**  *Cascade* defined bundling as "the practice of offering, for a single price, two or more goods or services that **could be sold separately**."  515 F.3d at 894 (emphasis added).  Both GSK and the Direct Purchasers, however, proposed instructions providing that "[a] bundle is two or more different products that are sold together for a single

price." This definition focuses improperly on whether the products are sold together—not, as *Cascade* teaches, on whether the products could be sold separately. In doing so, it greatly expands the definition to capture even two products that are never sold separately. In addition, the Direct Purchasers—but not GSK tellingly—include in their proposed instruction the statement that this Court "has already determined that Kaletra can be considered a bundle." This Court's summary judgment decision does no such thing, stating merely that Kaletra "can be regarded" as a bundle. 1/14/11 Order at 24. Indeed, the Court could not have so ruled in any event because none of the plaintiffs moved for summary judgment on this issue, and Abbott vigorously disputes this issue.

8.    ***Fifth*, Plaintiffs provide a legally improper definition of average variable cost.** Cascade held that "the appropriate measure of costs for our cost-based standard is average variable cost." 515 F.3d at 910. As Abbott explained in its motion in limine, the law of this Circuit clearly defines "average variable cost" as a cost that would be avoided by reducing output, not the amount of costs that would be avoided by stopping production entirely. For example, this Court quoted Cascade as noting that "variable costs" are "costs that change with the amount of output." *Meijer, Inc. v. Abbott Labs.*, 544 F. Supp. 2d 995, 1001-02 (N.D. Cal. 2008) (quoting *Cascade*, 502 F.3d at 909). The Cascade court took that definition from an article by leading antitrust law commentators, Areeda and Turner, in which they state that variable costs are "costs that vary with changes in output." *See Janich Bros., Inc. v. Am. Distilling Co.*, 570 F.2d 848, 858 n.11 (9th Cir. 1977) (citing Phillip Areeda & Donald F. Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv. L. Rev. 697, 700 n.11, 716-17 & n.42 (1975)). And the current Areeda treatise likewise defines "average avoidable cost" as "an average of all costs that could be avoided if the firm were to reduce its output." IIIA Areeda & Hovencamp, Antitrust Law ¶ 740a, at 190 (3d ed. 2008).

9.      Given this controlling precedent, it is beyond question that average variable costs are limited to cost that vary with the seller's level of output of its product, and Abbott's proposed instructions define average variable costs as such.  Plaintiffs, on the other hand, define variable costs as "all of those costs that Abbott incurred in making and selling lopinavir that Abbott would not have incurred if it had (for whatever reason) stopped selling Kaletra."  Because Plaintiffs' proposed definition of "average variable cost" fails to state the law correctly and is misleading, it should be rejected.  *See Mockler v. Multnomah County*, 140 F.3d 808, 812 (9th Cir. 1998) ("Jury instructions must be formulated so that they fairly and adequately cover the issues presented, correctly state the law, and are not misleading.") (quotation omitted).

[DISPUTED] ABBOTT'S PROPOSED PREDATORY BUNDLED DISCOUNTING
INSTRUCTION 9

PREDATORY PRICING—RELEVANCE OF PATENT RIGHTS

Abbott's patents may provide a defense to Plaintiffs' predatory pricing claim. Where a product is covered by a patent, the law permits the patent holder to withhold the patented product from the market altogether, to refuse to license that patented product, or to set the price for that patented product at whatever level it chooses, provided that price is not below cost.

If you find that Abbott owns an unexpired patent covering Norvir in combination with another PI, and that Abbott did not price Kaletra below cost, you must find for Abbott and against Plaintiffs on their predatory pricing claim.

**Source:** *Schor v. Abbott Labs.*, 457 F.3d 608, 610-14 (7th Cir. 2006); *In re Indep. Serv. Orgs. Antitrust Litig. v. Xerox Corp.*, 203 F.3d 1322 1327-28 (Fed. Cir. 2000).

### GSK's Argument

GSK refers the Court to its argument on Abbott's proposed instruction on "Relevance of Patent Rights" regarding Plaintiffs' claim for a violation of the duty to deal. Abbott's proposed summary judgment motion in disguise is no more correct when addressed to plaintiffs' bundled pricing theory of liability than it is when addressed to plaintiffs' duty to deal claim.

### Customer Plaintiffs' Argument

The Customer Plaintiffs refer the Court to arguments given with respect to the "Relevance of Patent Rights" regarding Plaintiffs' claim for a violation of the duty to deal.

### Abbott's Argument

Abbott acknowledges that this Court has previously found the Federal Circuit's decision in *Independent Service Organizations* and the Seventh Circuit's *Schor* to conflict with the Ninth Circuit's decision in *Kodak*. Abbott proffers this instruction, however, to preserve its appellate rights and because it is Abbott's position that those decisions are consistent with what the antitrust laws require.

[DISPUTED] ABBOTT'S PROPOSED PREDATORY BUNDLED DISCOUNTING
INSTRUCTION 10

PREDATORY PRICING—CONCLUSION

Once again, if you find that Kaletra is a bundle of two separate products, and if you find that the imputed price of the lopinavir component of Kaletra was lower than the average variable cost of producing the lopinavir component of Kaletra for a substantial period of time, then Abbott may have engaged in predatory pricing for that period of time, depending on additional considerations.  Otherwise, you must find that Abbott did not engage in predatory pricing.


**Source:** *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 910 (9th Cir. 2008); *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993).

### GSK's Argument

As its substantive instructions on Plaintiffs' impermissible bundled discounting claim are flawed, this Court should not adopt Abbott's concluding instruction on this claim.

### Customer Plaintiffs' Argument

For the multitude of reasons set forth above by the Customer Plaintiffs, Abbott's Predatory Bundled Discounting instructions misstate the law, Plaintiffs' allegations, and are otherwise misleading and confusing.  The Court should adopt the Customer Plaintiffs' proposed instruction as to Predatory Bundling and reject Abbott's ten instructions, including this concluding instruction.

### Abbott's Argument

Abbott's arguments in support of its predatory pricing instructions are above. This instruction is merely a summary to be given at the end of those instructions to provide a guidepost to the jury.

[DISPUTED] ABBOTT'S PROPOSED ANTICOMPETITIVE CONDUCT
INSTRUCTION 2

LEGITIMATE BUSINESS JUSTIFICATION

Even if you find that Abbott engaged in some other form of potentially anticompetitive conduct about which I have instructed you, as part of your analysis of plaintiffs' allegations of anticompetitive conduct, you must also consider whether legitimate business reasons motivated Abbott's conduct.  This is because many bundled discounts, refusals to deal, and other forms of potentially anticompetitive conduct can be nothing more than a way of attempting to compete effectively.  Plaintiffs cannot show unlawful monopolization if Abbott's conduct was supported by a legitimate business justification.

A business justification is legitimate if it furthers competition on the merits, reduces prices, increases efficiency, enhances the quality or attractiveness of a product, increases efficiency by reducing costs, or benefits consumers in some other way.  Conduct designed to profit from a patented invention, including charging a monopoly price, rewards innovation and, thus, is a legitimate business justification.  Legally, a patent amounts to a permissible monopoly over the protected product.

In this case, Abbott asserts that its desire to profit from its intellectual property rights justifies its conduct.  Abbott asserts that its patents cover not only ritonavir (Norvir) administered by itself but also ritonavir (Norvir) administered in combination with another protease inhibitor.  According to Abbott, it re-priced Norvir to align its price with ritonavir's new clinical use as a PI booster.  If the evidence supports that conclusion, then Abbott had a legitimately pro-competitive justification for its conduct, which defeats Plaintiffs' claim that Abbott engaged in anticompetitive conduct.  Plaintiffs can rebut this presumption only by showing that Abbott's asserted business justification played no part in its decision to re-price Norvir, or was not a genuine reason for its conduct.  According to plaintiffs, Abbott's justification for increasing Norvir's price but not increasing Kaletra's price is a pretext.  In particular, plaintiffs argue that Abbott increased Norvir's price in December 2003 without increasing Kaletra's price solely to monopolize the market in which they allege Kaletra competes.  In considering whether Abbott acted with a legitimate business justification, or whether Abbott's justification is a pretext to willfully maintain a monopoly, you are not entitled to second guess whether Abbott's business judgment was wise or correct in retrospect.

If Plaintiffs prove that Abbott's conduct was not supported by any legitimate business justification, then you must consider the remaining elements of Plaintiffs' monopolization claim.  If Plaintiffs cannot do so, then you must find for Abbott on plaintiffs' monopolization claim.

**Source**: Kevin F. O'Malley, Jay E. Grenig & William C. Lee, Federal Jury Practice and Instructions, § 150.83 (Thompson-West 2008); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1218-19 (9th Cir. 1997).

**GSK's Argument**

Abbott's instruction on legitimate business justification is unnecessary, biased and should not be adopted.  First, GSK's substantive instructions on its theories of anticompetitive conduct already discuss the role of legitimate business justifications in assessing anticompetitive conduct.  For example, GSK proposes the following language be included in its instruction on its claim for a violation of a duty to deal:

> A company that possesses monopoly power is generally not under a duty
> to cooperate with its business rivals if valid business reasons exist for that
> refusal to cooperate.  In other words, if there were legitimate business
> reasons for the lack of cooperation or refusal to deal, then the defendant,
> even if he is found to possess monopoly power in a relevant market, has
> not violated the law.

Second, Abbott's instruction errs when it contends in the context of this case that "its desire to profit from its intellectual property rights justifies its conduct."  A procompetitive business justification is an assertion that the monopolist's conduct is "a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal."  *Microsoft*, 253 F.3d at 59 (quoting *Eastman Kodak v. Image Technical Servs.*, 504 U.S. 451, 483 (1992)).  A desire to make more profit, standing alone, is not such a business justification.  *ABA Section of Antitrust Law, Antitrust Law Developments* (6th Ed. 2007) at 301 (citing, among others, *Delaware & Hudson Ry. v. Consolidated Rail Corp.* 902 F. 2d 174, 178 (2d Cir. 1990)).  Here, Abbott's supposed desire to profit from Norvir sales cannot be a legitimate business justification for yet another reason—it essentially reverses years of highly profitable cooperation with Abbott's competitors in the marketing and sale of PIs boosted with Norvir.  During those years, Abbott not only profited on sales of its booster at the initial price Abbott had set for it, but took in hundreds of millions of dollars in royalties by licensing virtually everyone of those competitors to promote their drugs for use with

Norvir.  Abbott's supposed desire to "double dip" and extract that value yet again, thereby injuring or destroying the benefits to its licensees hardly qualifies as something that enhances efficiency or gives its products greater consumer appeal.[104]  In these circumstances, the language of the instruction proposed by GSK is more than sufficiently generous to Abbott.

      *Image Technical Services v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997), does not support the issuance of Abbott's one-sided, and inaccurate, instruction.  While the court there stated that a "monopolist's desire to exclude others from its protected work is a presumptively valid business justification," *id.* at 1218 (internal quotation and alteration omitted), and a jury should presume that a "desire to profit from its intellectual property rights … is legitimately procompetitive," *id.* at 1219, the court did not make that statement in a context, like this one, where the monopolist had elected to cooperate with its competitors for years and had even gone so far as to license them to use its intellectual property, reaping huge financial rewards for doing so.  While Abbott is free to argue that its desire to make more money by sabotaging its licensees is a legitimate business justification, it cannot expect this Court to allow the jury to assess that argument stripped of all context as its proposed instruction would do.

      What is also clear from *Image Technical Services* is that enforcement of intellectual property—if that is even what Abbott is saying it is doing—only creates a rebuttable presumption of procompetitive behavior.  *Id.* at 1218.  "[A] monopolist [may not] rely upon a pretextual business justification to mask anticompetitive behavior."  *Id.* at 1219.  In this regard also, Abbott's instruction is misleading to the jury.  While the instruction mentions the word "pretext," it states that in order to show pretext, the

---

[104] Indeed, it is a fundamental principle of intellectual property law that a "party may not assign a right, receive consideration for it, and then take steps that would render the right commercially worthless."  *Jacobs v. Nintendo of America*, 370 F.3d 1097, 1101 (Fed. Cir. 2004).

"asserted business justification [had to] play[] no role in [Abbott's] decision to re-price Norvir." This is senseless. For example, here, there is evidence showing that profiting from its Norvir boosting patents "played a role in its decision to re-price Norvir," but that role was to mitigate against negative public reaction to a complete withdrawal of Norvir – i.e. the role in the decision-making process was to create an alternative to what Abbott really wanted, withdrawal. In *Image Technical*, the court did note that one way of showing pretext was to suggest that the business justification "played no part" in the decision to undertake the anticompetitive act. *Id.* at 1219. But, the court also suggested other ways of showing pretext, and summed up that a business justification is pretextual, more generally, if a monopolist "was not actually motivated by protecting its intellectual property rights." *Id.*

Abbott's jury instruction on this issue cannot be squared with the facts or the law governing this case. Even making the dubious assumption that Abbott has posited something that could qualify as a legitimate business justification, the instruction is still unnecessary. GSK's instructions already cover this issue and instruct the jury to consider procompetitive business justifications when it determines whether Abbott engaged in illegal conduct. That instruction is enough to allow Abbott to make the arguments it wishes and to allow the jury to assess those arguments in light of the law.

### Customer Plaintiffs' Argument

Abbott wrongly claims its desire to profit from its intellectual property rights constitutes a cognizable "valid business justification" under the antitrust laws for its price hike on Norvir. Abbott's instruction is improper for three independent reasons.

*First*, Abbott's conduct here involved *raising its price*. The jury will decide whether that price hike was anticompetitive under Section 2 of the Sherman Act. But anticompetitive or not, a price hike is not, and can never be, a cognizable procompetitive business justification under the relevant law. *See, e.g., Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1151 (9th Cir. 2003)(rejecting justification where "Defendants

offer no explanation for how it improves the efficiency [] or has any effect at all beyond raising prices.").  Indeed, raising price is the opposite of a pro-competitive business justification, which by its nature must involve *lower prices* or increased efficiencies.  *See National Collegiate Athletic Ass'n v. Board of Regents,* 468 U.S. 85, 114  (1984) (defense of procompetitive justification found to have "no predicate" because conduct did not "increase output and reduce the price"); *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997)(valid business justification must promote competition). As one Court of Appeals has explained:

> It remains to consider whether defendant's actions were carried out for "valid business reasons," the only recognized justification for monopolizing. *See, e.g.*, *Eastman Kodak* [*Co. v. Image Tech. Servs.,*] 504 U.S. [451,] 483 [(1992)]. However, a defendant's assertion that it acted in furtherance of its economic interests does not constitute the type of business justification that is an acceptable defense to *§ 2* monopolization. Paraphrasing one corporate executive's well publicized statement, whatever is good for 3M is not necessarily permissible under *§ 2 of the Sherman Act*. As one court of appeals has explained:
>
> > **In general, a business justification is valid if it relates directly or indirectly to the enhancement of consumer welfare. Thus, pursuit of efficiency and quality control might be legitimate competitive reasons . . ., while the desire to maintain a monopoly market share or thwart the entry of competitors would not.**
>
> *Data Gen. Corp. v. Grumman Sys. Support Corp.,* 36 F.3d 1147, 1183 (1st Cir. 1994) (citing *Eastman Kodak,* 504 U.S. at 483); *Aspen Skiing,* 472 U.S. at 608-11).
>
> It can be assumed that a monopolist seeks to further its economic interests and does so when it engages in exclusionary conduct. Thus, for example, exclusionary practice has been defined as "a method by which a firm . . . trades a part of its monopoly profits, at least temporarily, for a larger market share, by making it unprofitable for other sellers to compete with it."  Richard A. Posner, *Antitrust Law: An Economic Perspective* 28 (1976). Once a monopolist achieves its goal by excluding potential competitors, it can then increase the price of its product to the point at which it will maximize its profit. This price is invariably higher than the price determined in a competitive market. That is one of the principal reasons why monopolization violates the antitrust laws. The fact that 3M acted to benefit its own economic interests is hardly a reason to overturn the jury's finding that it violated *§ 2 of the Sherman Act.*

*Lepage's Inc. v. 3M*, 324 F.3d 141, 163-64 (3d Cir. 2003)(emphasis added); *see also United States v. Microsoft*, 253 F.3d 34, 59 (D.C. Cir. 2001) (a procompetitive justification is "a nonpretextual claim that [the] conduct [at issue] is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal").  Abbott does not even contend that its price increase lowered its or its rivals' costs or enhanced its efficiencies.  How could it?  Accordingly, it has not even raised a cognizable pro-competitive business justification.

   *Second*, as GSK has rightly pointed out, Abbott was not enforcing its patent rights; it had already granted licenses to other manufacturers of protease inhibitors.

   *Third*, even if Abbott had stated a valid or applicable defense here, its instruction would be wrong.  Rather than leaving the question to the jury, Abbott seeks a biased instruction that if Abbott merely establishes certain facts concerning its asserted defense, the jury must automatically conclude that a valid business justification exists and find for Abbott.  But it is the jury's province to assess whether a valid business justification exists.

   Abbott's proposed instruction also masks the appropriate burden of proof.  It is Abbott's burden to establish its defense.  *William Inglis & Sons Baking Co. v. Itt Cont'l Baking Co.*, 668 F.2d 1014, 1041 (9th Cir.1981).  Further, Abbott's instruction fails to inform the jury that any asserted justification asserted is rebuttable.  *See Image Tech. Servs. v. Eastman Kodak Co*., 125 F.3d 1195, 1212 (9th Cir. 1997)("A plaintiff may rebut an asserted business justification by demonstrating either that the justification does not legitimately promote competition or that the justification is pretextual."); *see also id*. at 1219 (even assertions of intellectual property justifications may be a pretext); *United States v. Microsoft*, 253 F.3d 34, 59 (D.C. Cir. 2001).  Thus, to the extent the Court gives any instruction on point, the Court should also instruct the jury clearly that it may find for plaintiffs if the jury concludes: (1) that any asserted justification is a pretext, e.g., if it is established that Abbott's motive was not to extract "value" from Norvir, but to protect

Kaletra, or (2) that any benefits asserted by Abbott are outweighed by anticompetitive harm.

The Customer Plaintiffs also join GSK's critique of Abbott's proposed instruction on this topic.

**Abbott's Argument**

**Legitimate Business Justification**

1.      Plaintiffs have failed to offer any specific instruction on the critical issue of "Legitimate Business Justification."  As the Ninth Circuit has explained, "[w]hen a legitimate business justification supports a monopolist's exclusionary conduct, that conduct does not violate § 2 of the Sherman Act."  *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997).  Plaintiffs do not dispute that a legitimate business justification is a complete defense to their refusal-to-deal claim.  But they propose the following limited instruction on this point, buried in the middle of a much longer proposed instruction on their refusal-to-deal theory:  "A company that possesses monopoly power is generally not under a duty to cooperate with its business rivals  if valid business reasons exist for that refusal to cooperate.  In other words, if there were legitimate business reasons for the lack of cooperation or refusal to deal, then the defendant, even if he is found to possess monopoly power in a relevant market, has not violated the law."  Plaintiffs' proposed instruction is materially incomplete and totally ignores that legitimate business justification is also a complete defense to the allegations of predatory pricing.

2.      ***First,*** **Plaintiffs' proposed refusal-to-deal instruction ignores binding precedent that requires the jury to presume that Abbott legitimately raised Norvir's price to profit from its patented invention.**  Plaintiffs' proposed instructions ignores the Ninth Circuit's decision in *Kodak*, which held in the refusal-to-deal context that a defendant "may assert that its desire to profit from its intellectual property rights justifies its conduct, *and the jury should presume that this justification is legitimately*

*procompetitive.*"  125 F.3d at 1219 (emphasis added).  To overcome this presumption, Plaintiffs carry the heavy burden of showing that Abbott's "business justification" for the price increase, i.e., to increase profits from sales of its patented Norvir, "*played no part* in the decision to act."  *Id.* (emphasis added); *see also* ABA's Model Jury Instructions in Civil Antitrust Cases at C-37 (2005 ed.) ("If you find that defendant had mixed motives for its refusal to deal—that is, that the conduct was expected to result in some short run benefits for defendant as well as harm competitors—then you must find for defendant on this element.").  In other words, Plaintiffs' antitrust claims necessarily fail unless they prove by a preponderance of the evidence that Abbott increased Norvir's price *solely* to monopolize the market for Kaletra.  This is a critical burden Plaintiffs must (and, Abbott submits, cannot) overcome.

       3.       ***Second*, Plaintiffs also ignore binding precedent in claiming that Abbott's legitimate business justification is irrelevant to predatory pricing.**
Plaintiffs rely on the Ninth Circuit's decision in *Cascade* to attempt to show predatory bundled discounting.  As the Court is aware, *Cascade* adopted an above-cost safe harbor for bundled discounting—holding that the defendant's conduct cannot be exclusionary unless it flunks the discount attribution test.  515 F.3d at 909.  Critically, the Ninth Circuit made it clear that flunking this test was a necessary, but *not* sufficient, condition for establishing predatory pricing in the bundled discounting context.  In particular, a plaintiff alleging this form of anticompetitive conduct still must prove that the defendant acted "without an adequate business justification":  "A requirement that the bundling practice be sufficiently severe so as to exclude an equally efficient single-product rival, ***and without an adequate business justification***, seems to strike about the right balance between permitting aggressive pricing while prohibiting conduct that can only be characterized as anticompetitive."  515 F.3d at 907 (quoting III Areeda, Antitrust Law ¶ 749a, at 322-23 (Supp. 2006) (footnotes omitted) (emphasis added)).

4.      After *Cascade* was decided, Professor Hovenkamp confirmed that even bundled discounting that flunks the discount attribution test should not be condemned exclusionary in the face of a legitimate business justification—including increasing demand for the primary product, the precise situation here:

> Nevertheless, if a bundled discount flunks [*Cascade*'s] attribution test and is thus considered exclusionary, then a price increase in the primary product that accompanies the inauguration of bundling requires an explanation. The explanation could be anticompetitive, such as when the purpose of the increase is to render the bundle exclusionary under the attribution test. ***However, the explanation could be increasing costs or increasing demand for the primary product.*** Increasing costs do not require any further justification for a proportionate price increase of the primary product. ***Increasing demand is also a benign reason, and bundling may be explained by the fact of increased demand by those who used the primary good, without the secondary good being made subject to the bundled discount, but not by those who prefer the goods together. In that case, bundling would be a price discrimination device, and there is no warrant for condemning it on that ground alone***.

Erik Hovenkamp & Herbert Hovenkamp, *Tying Arrangements and Antitrust Harm*, 52 Ariz. L. Rev. 925, 960-63 (2010) (citing IIIA Areeda, Antitrust Law ¶ 749 at 337-38) (emphases added).

5.      Abbott's proposed "Legitimate Business Justification" instruction captures the controlling, and potentially case-dispositive, legal principles discussed above from *Kodak* and *Cascade*.  In contrast, Plaintiffs simply ignore them.  While Plaintiffs may wish this precedent did not exist, Abbott is "entitled to an instruction about [its] theory of the case if it is supported by law and has foundation in the evidence.  A district court therefore commits error when it rejects proposed jury instructions that are properly supported by the law and the evidence." *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009) (quotation and citation omitted).

## [DISPUTED] GSK'S PROPOSED DAMAGES INSTRUCTION 1

### INJURY AND CAUSATION

I am now going to instruct you on the issue of damages. The fact that I am giving you instructions concerning the issue of Plaintiffs' damages does not mean that I believe Plaintiffs' should, or should not, prevail in this case.

If you find that Abbott engaged in unlawful monopolization as alleged by Plaintiffs, then you must decide if Plaintiffs are entitled to recover damages from Abbott. Plaintiffs are entitled to recover damages for an injury to its business or property if it can establish three elements of injury and causation:

First, that Plaintiffs were in fact injured as a result of Abbott's alleged violation of the antitrust laws;

Second, that Abbott's alleged illegal conduct was a material cause of Plaintiffs' injury; and

Third, that Plaintiffs' injury is an injury of the type that the antitrust laws were intended to prevent.

The first element requires Plaintiffs' to establish that it was injured as a result of Abbott's alleged violation of the antitrust laws.  Proving the fact of damage does not require Plaintiffs to prove the dollar value of its injury.  It requires only that Plaintiffs prove that they were in fact injured by Abbott's alleged antitrust violation.  If you find that Plaintiffs have established that they were in fact injured, you may then consider the amount of Plaintiffs' damages.  It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that Plaintiffs have established that it was in fact injured.

As to the second element, Plaintiffs must also offer evidence that establishes as a matter of fact and with a fair degree of certainty that Abbott's alleged illegal conduct was a material cause of Plaintiffs' injury. This means that Plaintiffs must prove that some damage occurred to them as a result of Abbott's alleged antitrust violation, and not some other cause.  Plaintiffs are not required to prove that Abbott's alleged antitrust violation was the sole cause of its injury; nor does Plaintiff need to eliminate all other possible causes of injury. It is enough if Plaintiffs have proved that the alleged antitrust violation was a material cause of its injury.  However, if you find that Plaintiffs' injury was caused primarily by something other than the alleged antitrust violation, then you must find that Plaintiffs have failed to prove that it is entitled to recover damages from Abbott.

To prove the final element, Plaintiffs must establish that its injury is the type of injury that the antitrust laws were intended to prevent.  If Plaintiffs' injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then Plaintiffs' injuries are antitrust injuries.

**Source:**  ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 Ed.), Instruction F-2, F-11.

[DISPUTED] GSK'S PROPOSED DAMAGES INSTRUCTION 2

AMOUNT OF DAMAGES

If you find that Abbott violated the antitrust laws and that this violation caused injury to Plaintiffs, then you must determine the amount of damages. The law provides that Plaintiffs should be fairly compensated for all damages to its business or property that were a direct result or likely consequence of the conduct that you have found to be unlawful.

The purpose of awarding damages in an antitrust action is to put an injured plaintiff as near as possible in the position in which it would have been if the alleged antitrust violation had not occurred. So long as there is a reasonable basis in the evidence for a damages award, Plaintiffs should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical certainty. The amount of damages must, however, be based on reasonable, non-speculative assumptions and estimates.

GSK claims it lost past and future profits as a result of Abbott's anticompetitive conduct. GSK has proposed to calculate the profits it would have earned if there had been no antitrust violation by showing evidence of the market share it would have had in the absence of the antitrust violation. If you find that GSK has shown reliable evidence of what its market share would have been in the absence of the antitrust violation, then you may calculate GSK's lost past and future profits by considering market share, evidence of the size of the market, and evidence relating to the profit margin plaintiff would have secured on such sales. As to the portion of damages that you determine accounts for future lost profits, you must discount the amount to its present value, using a discount rate of interest that you find reasonable. This is because the right to receive a certain sum of money at a future date is worth less than the same amount of money in hand today – this is known as the time value of money. If you find that the evidence of GSK's market share is not reasonable, and that lost profits may only be calculated using speculation or guesswork, you may not award damages for lost profits based on market share or profit margins.

**Source:** ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 Ed.), Instruction F-12, F-15, F-27, F-33.

[DISPUTED] CUSTOMER PLAINTIFFS'
DAMAGES INSTRUCTION 1

FOURTH ELEMENT: INJURY TO PLAINTIFFS

If you find that defendant has engaged in unlawful monopolization as alleged by Plaintiffs, then you must decide if Plaintiffs are entitled to recover damages from defendant.

Plaintiffs are entitled to recover damages for an injury to their business or property if they can establish three elements of injury and causation:

First, that Plaintiffs were in fact injured as a result of Abbott's alleged violation of the antitrust laws;

Second, that Abbott's alleged illegal conduct was a material cause of Plaintiffs' injury; and

Third, that Plaintiffs' injury is an injury of the type that the antitrust laws were intended to prevent.

The first element requires Plaintiffs to establish that they were injured as a result of defendant's alleged violation of the antitrust laws.  Proving the fact of damage does not require Plaintiffs to prove the dollar value of their injury.  It requires only that Plaintiffs prove that they were in fact injured by Abbott's alleged antitrust violation.  If you find that Plaintiffs have established that they were in fact injured, you may then consider the amount of Plaintiffs' damages.[105]  It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that Plaintiffs have established that they were in fact injured.

As to the second element, Plaintiffs must also offer evidence that establishes as a matter of fact and with a fair degree of certainty that Abbott's alleged illegal conduct were a material cause of Plaintiffs' injury. This means that Plaintiffs must prove that some damage occurred to them as a result of Abbott's alleged antitrust violation, and not some other cause.  Plaintiffs are not required to prove that Abbott's alleged antitrust violation was the sole cause of their injury; nor do Plaintiffs need to eliminate all other possible causes of injury. It is enough if Plaintiffs have proved that the alleged antitrust violation was a material cause of its injury.  However, if you find that Plaintiffs' injury was caused primarily by something other than the alleged antitrust violation, then you must find that Plaintiffs have failed to prove that it is entitled to recover damages from defendant.

---

[105] In the event Customer Plaintiffs' Motion to Divide the Trial Into Two Phases is granted, this sentence should read:  "If you find that Plaintiffs have established that they were in fact injured, for Plaintiff GSK, you must find for Plaintiffs."

To prove the final element, Plaintiffs must establish that their injury is the type of injury that the antitrust laws were intended to prevent.  If Plaintiffs injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then Plaintiffs' injuries are antitrust injuries.

If Plaintiffs can establish that they were in fact injured by Abbott's conduct, that Abbott's conduct was a material cause of Plaintiffs' injuries, and that Abbott's injuries were the type that the antitrust laws were intended to prevent, then Plaintiffs are entitled to recover damages for their injury to its business or property.

**Source:**  ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 Ed.), Instruction F-2, F-11.

[DISPUTED] CUSTOMER PLAINTIFFS' DAMAGES INSTRUCTION 2

FOURTH ELEMENT: OVERCHARGE AS INJURY TO CUSTOMER PLAINTIFFS

The Customer Plaintiffs allege that they were overcharged for Norvir and Kaletra, which means they claim that they paid more for these drugs than they would have absent Abbott's unlawful conduct. A Customer Plaintiff who purchased Norvir or Kaletra directly from Abbott is injured in its business or property if it paid more for Norvir or Kaletra than it otherwise would have paid due to Abbott's unlawful conduct. Paying more for a good or service due to anticompetitive conduct is called an overcharge. Overcharges on Norvir or Kaletra, if proven to be caused by anticompetitive conduct, mean that a Customer Plaintiff suffered injury. That injury is measured by the full extent of the overcharge. I instruct you not to consider whether any of the Customer Plaintiffs or members of the Customer Plaintiff Class may have passed on all or some of the alleged overcharge to their own customers, including retailers and patients,[106] or were otherwise benefited by the allegedly illegal conduct,[107] in determining whether the Customer Plaintiffs or Customer Plaintiff Class members were injured.

You should not consider there are other entities not part of this lawsuit who may also have paid more due to the illegal conduct. By law, entities that purchase directly

---

[106] *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 494 (1968) (defendant "was not entitled to assert a passing-on defense"); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729-30 (1977); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008) ("Courts are not permitted to determine "what portion of [an] illegal overcharge was 'passed on' . . . and what part was absorbed by the middlemen" because such an analysis would "involve all the evidentiary and economic complexities that Illinois Brick clearly forbade.'"); *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 327 (9th Cir. 1980); *Meijer, Inc. v. Abbott Labs.*, 251 F.R.D. 431, 435 (N.D. Cal. 2008) ("Given th[e] holding [in *Hanover Shoe*], the parties appear to agree that the downstream sales information Abbott seeks is not relevant to any issue to be tried in this case, including the issue of damages."); *Meijer, Inc. v. Abbott Labs.*, No. C 07-5985, 2008 U.S. Dist. LEXIS 78219, *21 (N.D. Cal. Aug. 27, 2008).

[107] *See Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 884-85 (10th Cir. 1997) (rejecting argument that plaintiff benefitted from alleged violation and therefore lacked injury because "[t]hat reasoning is directly contrary to the Supreme Court's holding in *Hanover Shoe*. *Hanover Shoe* precludes the argument that [plaintiff] did not suffer cognizable antitrust injury merely because it passed overcharges on to its customers or otherwise was shielded from competition by the defendants' anticompetitive behavior"); *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 303-04 (D.D.C. 2007); *In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349, 369 (D. Mass. 2004).

from the company alleged to have committed antitrust violations are the only entities or persons permitted to recover overcharges caused by anticompetitive conduct.[108]


**Source:** *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 494 (1968); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729-30 (1977); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008); *Royal Printing Co. v. Kimberly-Clark Corp* ., 621 F.2d 323, 327 (9th Cir. 1980); *Meijer, Inc. v. Abbott Labs.*, 251 F.R.D. 431, 435 (N.D. Cal. 2008); *Meijer, Inc. v. Abbott Labs*., No. C 07-5985, 2008 U.S. Dist. LEXIS 78219, *21 (N.D. Cal. Aug. 27, 2008); *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 884-85 (10th Cir. 1997) (rejecting argument that plaintiff _enefited from alleged violation and therefore lacked injury because "[t]hat reasoning  is directly contrary to the Supreme Court's holding in *Hanover Shoe*. *Hanover Shoe* precludes the argument that [plaintiff] did not suffer cognizable antitrust injury merely because it passed overcharges on to its customers  or otherwise was shielded from competition by the defendants' anticompetitive behavior"); *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 303-04 (D.D.C. 2007); *In re Relafen Antitrust Litig*., 346 F. Supp. 2d 349, 369 (D. Mass. 2004); *California v. ARC Am. Corp*., 490 U.S. 93, 105 (1989) (holding that state law remedies for indirect purchasers are "in addition to" those allowed by federal law).

---

[108] *Illinois Brick Co. v. Illinois* 431 U.S. 720, 726-29 (1977); *see also California v. ARC Am. Corp*., 490 U.S. 93, 105 (1989) (holding that state law remedies for indirect purchasers are "in addition to" those allowed by federal law).

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED DAMAGES INSTRUCTION 3

FOURTH ELEMENT: ANTITRUST INJURY – ASSIGNMENTS

Several Customer Plaintiffs are suing via an assignment.  An assignment is a contract under which a direct purchaser tenders all or part of a potential antitrust claim to another party.  I instruct you that if a direct purchaser assigns all or part of its claim to another party, the party receiving the assignment stands in the shoes of the direct purchaser and legally is acting as a direct purchaser, and may recover any overcharge damages that have been assigned.[109]

**Source**:  *Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d 1276, 1282-83 (9th Cir. 1983).

---

[109] *Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d 1276, 1282-83 (9th Cir. 1983) (assignment of antitrust claims confers standing on assignee).

<u>[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED
DAMAGES INSTRUCTION 4[110]</u>

BIFURCATION

The first jury found that defendant violated the antitrust laws by [engaging in monopolization / attempting to monopolize] and that the Customer Plaintiffs were injured. Plaintiffs are entitled to recover for all damages to their business or property that were a direct result or likely consequence of the conduct that the first jury found to be unlawful. You may not, however, award damages for injuries or losses caused by conduct not submitted to the first jury or caused by factors other than defendant's conduct that the first jury found to be anticompetitive.

**Source**:  ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 Ed.), Instruction F-2A.

---

[110] In the event Customer Plaintiffs' Motion to Divide the Trial Into Two Phases is granted, this instruction should be held in abeyance until the jury returns a verdict as to liability and injury.  If the jury returns a verdict finding liability and fact of injury for all Plaintiffs, the jury would immediately thereafter receive instructions as to how to determine damages for GSK.  Another jury empanelled at a later date would determine the amount of damages for the Customer Plaintiffs. The following charge would be given to the second jury prior to receiving the ensuing instructions as to damages.

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED
DAMAGES INSTRUCTION 5[111]

DAMAGES: GENERALLY

If you find that Abbott violated the antitrust laws and that this violation caused injury to a plaintiff, then you must determine the amount of damages for all such plaintiffs. The law provides that Plaintiffs should be fairly compensated for all damages to their business or property that were a direct result or likely consequence of the conduct that you have found to be unlawful.

The purpose of awarding damages in an antitrust action is to put an injured plaintiff as near as possible in the position in which it would have been if the alleged antitrust violation had not occurred. So long as there is a reasonable basis in the evidence for a damages award, Plaintiffs should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical certainty. The amount of damages must, however, be based on reasonable, non-speculative assumptions and estimates.

The Customer Plaintiffs claim the following item of damages: overcharges they paid for Norvir and Kaletra. Overcharges are the difference between the price that the Customer Plaintiffs paid and the price that they would have paid absent the unlawful conduct.[112] Overcharges, if proven to be caused by anticompetitive conduct, mean that the Customer Plaintiffs suffered injury. That injury is measured by the full extent of the overcharge.

Under the applicable federal law, the Customer Plaintiffs are the only entities allowed to sue and recover for the fact that Abbott charged them too much for Norvir and Kaletra. I instruct you not to consider whether these Plaintiffs may have passed on all or some of the alleged overcharge to their own customers, including other sellers or patients,[113] or were otherwise _enefited by the allegedly illegal conduct,[114] in

---

[111] In the event Customer Plaintiffs' Motion to Divide the Trial Into Two Phases is granted, this instruction would be given to the jury determining the amount of the Customer Plaintiffs' damages.

[112] *Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390, 396 (1906).

[113] *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 494 (1968) (defendant "was not entitled to assert a passing-on defense."); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729-30 (1977); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008) ("Courts are not permitted to determine "what portion of [an] illegal overcharge was 'passed on' . . . and what part was absorbed by the middlemen" because such an analysis would "involve all the evidentiary and economic complexities that *Illinois Brick* clearly forbade.""); *Royal Printing Co. v. Kimberly-Clark Corp* ., 621 F.2d 323, 327 (9th Cir. 1980); *Meijer, Inc. v. Abbott Labs.*, 251 F.R.D. 431, 435 (N.D. Cal. 2008) ("Given th[e] holding [in *Hanover Shoe*], the parties appear to agree that the

determining the extent of the Customer Plaintiffs' overcharge damages.  The Customer Plaintiffs are entitled to recover the full amount they and members of the Customer Plaintiff Class were overcharged for Norvir and Kaletra.

Customer Plaintiffs Rite Aid Corporation, Rite Aid  HDQTRS, Corp., JCG (pjc) USA, L.L.C., Maxi Drug, Inc. d/b/a Brooks Pharmacy, Eckerd Corporation, CVS Pharmacy, Inc., Caremark, L.L.C., Safeway, Inc., Walgreen Co., The Kroger Co., New Albertson's, Inc., American Sales Company, Inc., and HEB Grocery Company LP are suing only for any overcharges which they sustained as a result of Abbott's anticompetitive conduct.

As I informed you previously, Customer Plaintiffs Meijer, Louisiana Wholesale Drug, and Rochester Drug Cooperative are suing on behalf of the Class of Abbott's customers that purchased Norvir or Kaletra from Abbott.  In computing damages for this group of Plaintiffs, you should compute the overcharges sustained by the Class as a whole.[115]  The Court will distribute any damages you award to members of the Class in further proceedings.

**Source**:  ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 Ed.), Instruction F-12.

---

downstream sales information Abbott seeks is not relevant to any issue to be tried in this case, including the issue of damages."); *Meijer, Inc. v. Abbott Labs.*, No. C 07-5985, 2008 U.S. Dist. LEXIS 78219, *21 (N.D. Cal. Aug. 27, 2008).

[114] *See Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 884-85 (10th Cir. 1997) (rejecting argument that plaintiff benefitted from alleged violation and therefore lacked injury because "[t]hat reasoning  is directly contrary to the Supreme Court's holding in *Hanover Shoe*. *Hanover Shoe* precludes the argument that [plaintiff] did not suffer cognizable antitrust injury merely because it passed overcharges on to its customers  or otherwise was shielded from competition by the defendants' anticompetitive behavior"); *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 303-04 (D.D.C. 2007); *In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349, 369 (D. Mass. 2004).

[115] *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 534 (6th Cir. 2008) ("[d]amages in an antitrust class action may be determined on a classwide, or aggregate, basis"); *Meijer, Inc. v. Abbott Labs.*, No. C 07-5985, 2008 U.S. Dist. LEXIS 78219, *29 (N.D. Cal. Aug. 27, 2008) ("Plaintiffs have proffered methods for calculating aggregate damages for overcharges paid by class members, based on average market prices. The validity of those methods will be adjudicated at trial…") (internal quotes omitted).

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED
DAMAGES INSTRUCTION 6[116]

DAMAGES: COMPUTING DAMAGES

You are permitted to make reasonable estimates in calculating damages. It may be difficult for you to determine the precise amount of damage suffered by a Plaintiff. If a Plaintiff establishes with reasonable probability the existence of an injury proximately caused by the defendant's antitrust violation, you are permitted to make a just and reasonable estimate of the damages. So long as there is a reasonable basis in the evidence for a damages award, Plaintiffs should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical certainty. The amount of damages must, however, be based on reasonable, non-speculative assumptions and estimates. Plaintiffs must prove the reasonableness of each of the assumptions upon which their damages calculations are based.

In computing damages for the Class, you do not need to determine the amount of overcharges paid by the class as a whole with precision.  It is sufficient for you to determine an average or estimate of the overcharges paid, as long as the average or estimate is based on evidence and reasonable inferences. You may not, however, engage in guesswork or speculation. If damages for the Class can only be ascertained through guesswork or speculation, you may not award damages.

**Source:**  ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 Ed.), Instruction, F-15, F-26 (2005).

---

[116] In the event Customer Plaintiffs' Motion to Divide the Trial Into Two Phases is granted, this instruction would be given to the jury determining the amount of the Customer Plaintiffs' damages.

<u>[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 1</u>

GENERAL INJURY AND DAMAGES INSTRUCTION

I am now going to instruct you on the issue of injury and damages on plaintiffs' monopolization claim.  The fact that I am giving you instructions concerning the issues of injury and damages does not mean that I believe the plaintiffs should, or should not, prevail in this case.  That is an issue for your sole determination.

If you do not find that Plaintiffs have proven every other element of their monopolization claims, you should not consider the issues of injury and damages, and you should disregard the injury and damages instructions that I am about to give.  Instructions as to injury and the measure of damages are given for your guidance in the event you should find in favor of the plaintiffs on all the other elements of their monopolization claim based on a preponderance of the evidence in accordance with the other instructions I have given you.  You should consider whether plaintiffs have suffered compensable injuries and should calculate damages only if you first find that plaintiffs have shown the other required elements of their monopolization claim.

**Source:**  ABA Model Jury Instructions in Civil Antitrust Cases (2005), Causation and Damages, Damages Instruction 1 (modified).

[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 2

ANTITRUST INJURY

If you find that Abbott violated the antitrust laws, you must also find that the violation caused "antitrust injury" to a Plaintiff before you may award damages to that plaintiff.  "Antitrust Injury" means an injury flowing from that which made the defendant's conduct illegal.  In other words, a plaintiff is not entitled to recover damages for an injury simply because a defendant violated the antitrust laws and the defendant's conduct caused injury to the plaintiff.  Pricing conduct, like the Plaintiffs allege here, can have many effects in the marketplace.  And even if such conduct violates the antitrust laws, you may award damages only for those injuries that flow directly from the anticompetitive aspects of that conduct.[117]

### a.        Antitrust Injury from Predatory Pricing

The anticompetitive aspect of predatory pricing is that the practice may drive actual and potential suppliers of competitive products out of the market, or otherwise neutralize these competitors' ability to constrain the seller's pricing, after which time the defendant may be able to raise the price of its product (here, Kaletra) above the competitive level.[118]

For GSK's claim for damages in the form of lost profits, GSK must prove that it suffered injury directly from the alleged predatory pricing of Kaletra.[119]  GSK must show that savings attributable to such allegedly below-cost bundled discounting of Kaletra drove consumers (HIV patients) from GSK's Lexiva product to Abbott's Kaletra product. If you find that GSK has proven that this occurred in the marketplace, and you find that plaintiffs have proven the other elements of a monopolization claim, then you should consider the extent of any GSK damages that flow from this having occurred.

---

[117] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) ("Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."); *id.* at 489 (Plaintiffs must "prove more than injury causally linked to [the alleged illegal conduct]. . . .  The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.");  *see also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) ("[P]laintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior."); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979) ("[A]purchaser may recover only for the price increment that 'flows from' the distortion of the market caused by the monopolist's anticompetitive conduct.").

[118] *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993); *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 897 (9th Cir. 2008);

[119] Abbott disputes that GSK has properly alleged a predatory pricing theory.  To the extent the Court finds otherwise, or GSK amends its complaint to allege such a theory, Abbott offers the following instruction.

The potential antitrust injury to the direct purchaser Plaintiffs from predatory pricing of Kaletra here would be that, as a result of the alleged predatory pricing, Abbott was able to drive actual and potential suppliers of products that competed with Kaletra from the market, or otherwise neutralize these competitors' ability to constrain Abbott's pricing of Kaletra, and then raise the price of Kaletra above competitive levels.[120]  If you find that Plaintiffs have proven that this occurred in the marketplace, and you find that Plaintiffs have proven the other elements of a monopolization claim, then you should consider the extent of any direct purchaser plaintiffs' damages that flow from this having occurred.

Paying "overcharges" for Norvir would not constitute antitrust injury from predatory pricing.[121]

As I previously instructed you, for the Direct Purchaser Plaintiffs' bundled discounting claim, the relevant time period for proving monopoly power begins in 2005 when the Direct Purchaser Plaintiffs allege that Abbott began pricing Kaletra supracompetitively, and continues for as long as the Direct Purchaser Plaintiffs claim to have suffered antitrust damages resulting from Abbott's alleged anticompetitive bundled discounting. For GSK's bundled discounting claim, the relevant time period begins on December 3, 2003, and continues for as long as GSK claims to have suffered antitrust damages resulting from Abbott's alleged anticompetitive bundled discounting.  No Plaintiff may recover damages for anticompetitive bundled discounting for any period during which Plaintiffs have failed to prove that Abbott maintained monopoly power.[122]

### b.        Antitrust Injury from a Refusal To Deal

When considering whether it is appropriate to award damages arising from the allegation about a refusal to deal, you should consider the following.  The anticompetitive aspect of an improper refusal to deal is that the practice may cause a competitor to lose

---

[120] *See Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 897 (9th Cir. 2008) (possibility of anticompetitive harm from "bundled discounts" is the "threat of . . . *excluding* less diversified but more efficient producers") (emphasis added); *accord Brooke Group*, 509 U.S. at 224-25 (harm from predatory pricing occurs only after the exclusion of competitors); *see also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) ("[B]elow-cost pricing is not anticompetitive in itself.").

[121] *See supra* note 117.

[122] *Oahu Gas Serv., Inc. v. Pac. Res., Inc*, 838 F.2d 360, 362-63 (9th Cir. 1988) (finding that the relevant period of monopoly power was 1972 to 1983 in a case where plaintiff alleged "a decision in 197[2] not to begin producing propane" and "a campaign in 1982 to force Oahu to lower prices by offering sham cut-rate contracts to Oahu's customers"); *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995) (suggesting that courts should look at whether a defendant has monopoly power during the time it charged allegedly supracompetitive prices).

sales and may force a purchaser to have to purchase an alternative product in the relevant product market at a higher cost.[123]

If you find that the direct purchaser plaintiffs have proven that, as a result of an improper refusal by Abbott to deal in Norvir, the direct purchaser Plaintiffs were forced to buy Kaletra instead of a competitive product like Lexiva or Reyataz, and you find that plaintiffs have proven the other elements of a monopolization claim, then you should consider the extent of any direct purchaser plaintiffs' damages that flow from this having occurred.[124] Paying "overcharges" for Norvir does not constitute antitrust injury from a refusal to deal in Norvir.[125]

If you find that GSK has proven that, as a result of an improper refusal by Abbott to deal in Norvir, GSK lost sales of Lexiva, and you find that plaintiffs have proven the other elements of a monopolization claim, then you should consider the extent of any GSK damages that flow from this having occurred.[126]

As I instructed you earlier, for Plaintiffs' refusal to deal claims, the relevant time period for proving monopoly power begins on December 3, 2003, and continues for as long as Plaintiffs claim to have suffered antitrust damages resulting from Abbott's alleged refusal to deal. Plaintiffs may not recover damages for a refusal to deal for any period during which Plaintiffs have failed to prove that Abbott maintained monopoly power.[127]

---

[123] *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).

[124] Abbott continues to maintain its argument that the direct purchaser Plaintiffs lack standing to bring a refusal-to-deal claim at all. *See Trinko*, 540 U.S. at 417 (Stevens, J., concurring) (injuries of customers who received poor service because of refusal to deal with AT&T "purely derivative of the injury that AT&T suffered," so customers lacked antitrust standing); *Int'l Bus. Machs. v. Platform Solutions*, 658 F. Supp. 2d 603, 610 (S.D.N.Y. 2009) (software distributor's injuries derivative of injuries to companies with whom IBM refused to deal). Abbott preserves this issue for appeal.

[125] *See supra* note 117.

[126] *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605-10 (1985); *Brunswick*, 429 U.S. at 489 (1977) ("Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.").

[127] *Oahu Gas Serv., Inc. v. Pac. Res., Inc*, 838 F.2d 360, 362-63 (9th Cir. 1988) (finding that the relevant period of monopoly power was 1972 to 1983 in a case where plaintiff alleged "a decision in 197[2] not to begin producing propane" and "a campaign in 1982 to force Oahu to lower prices by offering sham cut-rate contracts to Oahu's customers"); *Aspen Skiing Co. v. Aspen Highlands Skiing Co.*, 472 U.S. 585 (1985) (affirming a jury verdict that defendant possessed monopoly power for purposes of a refusal to deal claim from 1977 to 1981).

**Source:** *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979); *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993); *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 910 (9th Cir. 2008); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).

[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 3

The law provides that Plaintiffs should be fairly compensated only for antitrust injuries, and not for other injuries that they may have suffered as a result of Abbott's conduct.[128] The purpose of awarding damages in an antitrust action is to put an injured plaintiff as near as possible to the position in which it would have been if the anticompetitive effects of the alleged antitrust violation had not occurred. The law does not permit you to award damages to punish a wrongdoer—what we sometimes refer to as punitive damages—or to deter a company from particular conduct in the future, or to provide a windfall to someone who has been the victim of an antitrust violation. You also are not permitted to award to the plaintiffs an amount for attorneys fees or the costs of maintaining this lawsuit. Antitrust damages are compensatory only and must be tied to that which makes the defendant's conduct illegal. In other words, they are designed to compensate a plaintiff for the particular injuries it suffered as a result of that which allegedly made the defendant's conduct a violation of the antitrust laws.

**Source:** ABA Model Jury Instructions in Civil Antitrust Cases (2005), Causation and Damages, Damages Instruction 2 (modified); *Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342 (9th Cir. 1985) *superseded on other grounds by Fed.* R. Civ. P. 50(b); *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361 (9th Cir. 1992).

---

[128] *Farley Transp., Inc. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1352 (9th Cir. 1985) *superseded on other grounds by* Fed. R. Civ. P. 50(b) (antitrust plaintiffs must "segregat[e] between damages attributable to lawful competition and that attributable to the unlawful scheme."); *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1371 (9th Cir. 1992) ("[P]laintiffs [must] prove in a reasonable manner the link between the injury suffered and the *illegal* practices of the defendant.").

<u>[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 4</u>

Damages may not be based on guesswork or speculation.  If you find that a damages calculation cannot be based on evidence and reasonable inferences, and instead can only be reached through guesswork or speculation, then you may not award damages. If the amount of damages attributable to that which makes any conduct by Abbott an antitrust violation[129] cannot be separated from the amount of harm caused by other factors except through guesswork or speculation, then you may not award damages.

You are permitted to make reasonable estimates in calculating damages.  It may be difficult to determine the precise amount of damage suffered by a plaintiff as a result of that which made a defendant's conduct illegal.[130]  If a plaintiff establishes with reasonable probability the existence of an injury proximately caused by that which makes the defendant's conduct illegal,[131] you are permitted to make a just and reasonable estimate of the plaintiff's damages.  So long as there is a reasonable basis in the evidence for a damages award, a plaintiff should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical certainty.  The amount of damages must, however, be based on reasonable, non-speculative assumptions and estimates.  A plaintiff must prove the reasonableness of each of the assumptions upon which its damages calculation is based.  If you find that a plaintiff has failed to carry its burden of providing a reasonable basis for determining damages, then your verdict must be for Abbott with respect to that plaintiff.  If you find that a plaintiff has proved a violation of the antitrust laws and provided a reasonable basis for determining damages flowing from that which made the defendant's conduct illegal, then you may award damages to that plaintiff based on a just and reasonable estimate supported by the evidence.

**Source:**  ABA Model Jury Instructions in Civil Antitrust Cases (2005), Causation and Damages, Damages Instruction 3 (modified); *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979).

---

[129] *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) ("[P]laintiff can recover only if the loss stems from a competition - *reducing* aspect or effect of the defendant's behavior."); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979) ("[A]purchaser may recover only for the price increment that 'flows from' the distortion of the market caused by the monopolist's anticompetitive conduct.").

[130] *Id.*

[131] *Id.*

<u>[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 5</u>

EXPERT TESTIMONY

You have heard testimony regarding damages from Plaintiffs' experts, Hal Singer, Keith Leffler, and Stephen Prowse, and from Abbott's experts, James Langenfeld and Joel Hay.  If you find that any of the pertinent underlying assumptions made by one or more of these experts is not reasonable or was not proven by a preponderance of the evidence, or if you find that one or more of these expert's conclusions depends on a comparison of things that have not been proven to be comparable, then you should consider this in determining the weight—if any—you will give to these assumptions. You should also consider the reliability of the experts' assumptions in determining whether plaintiffs have suffered compensable injuries and the level of Plaintiffs' damages, if any.

**Source:** ABA Model Jury Instructions in Civil Antitrust Cases (2005), Causation and Damages, Damages Instruction 13 (modified).

<u>[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 6</u>

SEGREGATION AND DISAGGREGATION OF DAMAGES

As I explained earlier, this case involves three separate groups of plaintiffs. First GlaxoSmithKline, a large pharmaceutical company that makes a drug that competes with Abbott's Kaletra. Second is the class, which consists of a group of wholesalers and pharmacies that purchased Kaletra and Norvir directly from Abbott. Because they purchased directly from Abbott, the members of the class are sometimes referred to as direct purchasers. The third group consists of the individual plaintiff pharmacies. Those pharmacies bought Kaletra and Norvir from wholesalers who bought the drugs directly from Abbott. Those pharmacies are suing in the shoes of the wholesalers who bought the drugs directly from Abbott and are asserting claims based on the wholesalers' purchases from Abbott, under contractual assignments of claims from the wholesalers to the pharmacies. Although the pharmacies are suing in the shoes of the wholesalers who purchased Kaletra and Norvir directly from Abbott, they declined to join the class. Because the pharmacies opted out of joining the class, they are sometimes called "opt-outs." And because the opt-outs are asserting claims that would have belonged to wholesalers if the wholesalers had not assigned those claims to the opt-outs, the opt-outs are also sometimes called direct purchasers.

In awarding damages, if any, you will be asked what sum of money would fairly and reasonably compensate each Plaintiff or group of Plaintiffs for any injury sustained by that Plaintiff or group of Plaintiffs as a result of that which made the defendant's conduct illegal,[132] to the extent that you find that Abbott's conduct was illegal. Once a particular Plaintiff establishes that it is entitled to recover damages, the law permits that Plaintiff to recover only for those injuries it has sustained and which flow from that which makes the defendant's conduct illegal. Therefore, if you find that two or more of the Plaintiffs are entitled to recover damages, caution should be exercised to be sure that each Plaintiff is awarded damages only if it has shown that it is entitled to damages and then only for its own compensable injuries.

As I explained earlier, Plaintiffs allege two distinct forms of potentially anticompetitive conduct: Plaintiffs argue that Abbott engaged in unlawful predatory bundled discounting in the pricing of Kaletra and that Abbott refused to deal with competitors by raising the price of Norvir without raising the price of Kaletra an equal amount. If you find that Abbott engaged in one but not the other form of allegedly anticompetitive conduct, then you may award only those damages that flow from that which makes illegal the particular anticompetitive conduct you found Abbott to have

---

[132] *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) ("[P]laintiff can recover only if the loss stems from a competition - *reducing* aspect or effect of the defendant's behavior."); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979) ("[A]purchaser may recover only for the price increment that 'flows from' the distortion of the market caused by the monopolist's anticompetitive conduct.").

engaged in.[133]  If you cannot, without speculation and guesswork, separate damages that flow from that which makes conduct you find illegal to be illegal from damages that flow from other causes, then you may not award any damages at all.[134]

I will now provide you with further instructions on how to determine the amount of damages, if any, to which each Plaintiff is entitled.

**Source:** ABA Model Jury Instructions in Civil Antitrust Cases (2005), Causation and Damages, Damages Instruction 15 (modified); *Litton Sys., Inc. v. Honeywell, Inc.*, 1996 WL 634213 (C.D. Cal. July 24, 1996); *Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342 (9th Cir. 1985); *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1371 (9th Cir. 1992).

---

[133] *Litton Sys., Inc. v. Honeywell, Inc.*, No. CV 90-4823 MRP, 1996 WL 634213, at *2 (C.D. Cal. July 24, 1996) ("Disaggregation is required because the antitrust laws are only intended to compensate plaintiffs for losses fairly caused by a defendant's unlawful anticompetitive behavior.").

[134] *Id.*; *Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342 (9th Cir. 1985) (*superseded by Fed. R. Civ. P. 50(b) on other grounds*) (antitrust plaintiffs must "segregat[e] between damages attributable to lawful competition and that attributable to the unlawful scheme."); *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1371 (9th Cir. 1992) ("[P]laintiffs must prove in a reasonable manner the link between the injury suffered and the *illegal* practices of the defendant.").

<u>[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 7</u>

CAUSATION

As I have already instructed you, if you find that Abbott violated the antitrust laws and that a Plaintiff was injured by that violation, that Plaintiff is entitled to recover for such injury to it that was the direct and proximate result of the unlawful acts of Abbott and that flowed from that which makes the acts illegal.[135]  A Plaintiff is not entitled to recover for injury that resulted from other causes.

The direct purchaser Plaintiffs claim that they suffered injury because they paid higher prices for Kaletra as a result of Abbott's alleged antitrust violation.  In the normal course of business activity, prices might rise for a variety of reasons that do not violate the antitrust laws.  For example, prices may rise because producers' costs rose, demand for a product increased, changing technology made a product more valuable to consumers, the sellers engaged in lawful follow-the-leader pricing behavior, or the marketplace otherwise changed to allow producers to raise prices independent of any antitrust violation.

GSK claims that it suffered injury because it lost sales and profits as a result of Abbott's alleged antitrust violation.  In the normal course of competitive business activity, competitors will lose sales to each other, and to third parties, for various reasons that do not violate the antitrust laws; and businesses can be unprofitable for reasons that do not violate the antitrust laws.  GSK may not recover for lost sales if it lost those sales because of superior business acumen or salesmanship on the part of Abbott or another competitor, because Abbott or another competitor offered a superior product, or because of lawful competition from Abbott or other competitors.  GSK also may not recover if it lost sales or profits as a result of other causes, such as changes in demand, increased competition from new competitors, changes in market conditions, poor management or missed opportunities by GSK, or other factors.

Plaintiffs bear the burden of showing that their injuries were caused by that which made Abbott's conduct allegedly violate the antitrust laws—as opposed to any other factors, such as those that I just described to you.  If you find that Plaintiffs' alleged

---

[135] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) ("Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."); *id*. at 489 (Plaintiffs must "prove more than injury causally linked to [the alleged illegal conduct]. . . .  The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."); *see also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) ("[P]laintiff can recover only if the loss stems from a competition - *reducing* aspect or effect of the defendant's behavior."); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979) ("[A]purchaser may recover only for the price increment that 'flows from' the distortion of the market caused by the monopolist's anticompetitive conduct.").

injuries were caused by factors other than that which allegedly made Abbott's conduct illegal, then you must return a verdict for Abbott.

If you find that Plaintiffs' alleged injuries were caused in part by that which allegedly made Abbott's conduct illegal and in part by other factors, then you may award damages only for that portion of Plaintiffs' alleged injuries that were caused by that which allegedly made Abbott's conduct illegal.  Plaintiffs bear the burden of proving damages with reasonable certainty, including apportioning damages between lawful and unlawful causes.  If you find that there is no reasonable basis to apportion Plaintiffs' alleged injury between lawful and unlawful causes, or that apportionment can only be accomplished through speculation or guesswork, then you may not award any damages at all.  If you find that Plaintiffs have proven with reasonable certainty the amount of damage caused by that which allegedly made Abbott's conduct illegal, then you must return a verdict for the Plaintiffs.

**Source:** ABA Model Jury Instructions in Civil Antitrust Cases (2005), Causation and Damages, Instruction 4 (modified); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,  429 U.S. 477, 489 (1977); *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979).

<u>[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 8</u>

ASSIGNMENTS

As I explained earlier, the individual pharmacies that opted out of the class are suing under assignments of claims from the wholesalers who bought Kaletra and Norvir directly from Abbott.  The opt-out pharmacies may recover damages only for purchases for which they received a valid assignment of claims from an entity that purchased Kaletra and Norvir directly from Abbott.  If you find that there are purchases for which the opt-out plaintiffs have not proven by a preponderance of the evidence that they received an assignment of claims, then you may not award damages to the opt-out plaintiffs relating to those purchases.

**Source:** *Klamath-Lake Pharms. Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d 1276, 1282-83 (9th Cir. 1983).

**GSK's Argument**

GSK's proposed damages instructions are drawn from the ABA Model Instructions.  The ABA Model Instructions, however, contain 19 separate instructions on damages from which parties are meant to select. GSK attempted to consolidate and simplify these instructions in order to remove redundancy and make them more presentable to the jury.   GSK has attempted to adhere as closely as possible to the ABA Model Instructions on key issues, in most cases quoting directly to the Model while removing redundant language.

Abbott's proposed instructions take the opposite approach.  Abbott has added instructions that are not sourced to the Model, and where it does include language from the ABA Model, it often makes the discussion more verbose and complicated.  For example, Abbott's Proposed Damages Instruction 2 Entitled "Antitrust Injury" spans two pages discussing the element of antitrust injury, which Abbott has not even challenged in this litigation.  As a further example, Abbott's Proposed Damages Instruction 6 is sourced to an ABA Model Instruction that reads:

> In awarding damages, if any, you will be asked what sum of money would fairly and reasonably compensate each plaintiff for any injury sustained by that plaintiff.  Once a particular plaintiff establishes that it is entitled to recover damages, the law permits that plaintiff to recover only for those injuries it has sustained.  Therefore, if you find that two or more of the plaintiffs are entitled to recover damages, caution should be exercised to be sure that each plaintiff is awarded only damages for injuries it sustained.

Yet, Abbott's proposed instruction purportedly based on the above Model spans a full page and sandwiches these three sentences between language that is unnecessary and biased in the way it describes the Plaintiff groups and language that is complicated and

legally and factually incorrect regarding Plaintiffs' purported allegation of "two distinct forms of anticompetitive conduct."

Along these lines, much of the language Abbott adds to these instructions is prejudicial and inaccurate.  In Abbott's second instruction on antitrust injury, for example, Abbott writes that "predatory pricing" is anticompetitive because it may drive competitors out of the market "after which time the defendant may be able to raise the price of its product … above the competitive level."  This language is tantamount to instructing on recoupment, which the Ninth Circuit and this Court have ruled inapplicable in a case about impermissible bundled pricing.  *See* 1/12/2010 Motion to Dismiss Order ("In *Cascade*, the Ninth Circuit stated that a plaintiff need not prove dangerous probability of recoupment in predatory pricing cases involving bundled products.").  Moreover, Abbott's proposal inexplicably instructs that "[p]aying 'overcharges' for Norvir would not constitute antitrust injury from predatory pricing."  Overcharges are a form of damages Customer Plaintiffs have asserted throughout this litigation, and, in recently denying Abbott's motion for summary judgment, this Court has ruled that Customer Plaintiffs may bring their claims to obtain this measure of damages.  Further, Abbott's instruction continues to embed language suggesting that Plaintiffs' damages are limited to the timeframe in which Abbott held monopoly power.  As discussed previously, this proposition is incorrect, *see Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 362-63, 366-68 (9th Cir. 1988); *Microbix Biosystems, inc. v. Biowhittaker, Inc.*, 172 F. Supp. 2d 680, 695 (D. Md. 2000), and is nothing more than a dilatory attempt to seek summary adjudication through jury instruction.

Throughout Abbott's proposed damages instructions, it includes language that errs in its explanation of causation.  For example, Abbott's Proposed Damages Instruction No. 6 suggests to the jury that "Plaintiffs allege two distinct forms of potentially anticompetitive conduct"  and that if it finds that Abbott engaged in "one but not the other form" of anticompetitive conduct, it can only award "damages that flow

from that which makes illegal the particular anticompetitive conduct." Abbott includes similar language throughout it instructions. *See, e.g.*, Abbott's Proposed Damages Instruction 4, 5, 6, & 7 (altering ABA Model Instruction to add "as a result of that which makes Abbott's conduct illegal.").

It is not clear why Abbott believes the Court ought to deviate from the ABA Model Instructions in this respect. If it is suggesting that Plaintiffs have alleged more than one type of anticompetitive conduct and that Plaintiffs must disaggregate among damages caused by that different conduct, then the language is factually inaccurate. Plaintiffs are asserting two legal theories, but both are derived from the one-time quintupling of the price of Norvir. There are, thus, not two "forms" of anticompetitive conduct for the jury to consider. Moreover, even if Abbott could concoct a jury argument that the 400 percent price hike amounted to more than one act, these acts would be so intertwined that that it would be impracticable for Plaintiffs to disaggregate damages. Abbott, not Plaintiffs, would then have the burden to do so. *Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1126 (7th Cir. 1982) ("A plaintiff claiming injury caused by more than one of the defendant's unlawful practices need not prove the amount of damages caused by each illegal practice if the plaintiff shows that disaggregation is impracticable."); *Ne. Tel. Co. v. Am. Tel. & Tel. Co.*, 497 F. Supp. 230, 248 (D. Conn. 1980) (approving jury award that was not disaggregated because "it would have required greater speculation on the part of the jury to derive the specific amount of damages attributable to each anticompetitive or predatory act than it would to arrive at a single figure attributable to defendants' overall unlawful conduct").

If Abbott is suggesting that the Norvir price hike comprises both lawful and unlawful conduct, then Abbott's proposed language is legally incorrect. Even if Abbott could prove that some portion of the Norvir price hike occurred for lawful reasons, Plaintiffs would still not have a burden to separate the portion of its damages arising from lawful conduct versus unlawful conduct. The lawful and unlawful aspects would be

embedded in one act – the Norvir price hike.  Thus, any hypothetically lawful aspect of that conduct would be "so tightly intertwined as to make it difficult to determine which portion of damages claimed were caused by the unlawful conduct [and therefore] should not diminish the recovery."  *Nat'l Farmers' Org. Inc. v. Assoc. Milk Producers, Inc.*, 850 F.2d 1286, 1307 (8th Cir. 1989).  Indeed, "the Court should recognize that the harmful consequences of certain unlawful conduct may have been exacerbated by otherwise lawful conduct.  In such a situation, the fact that lawful conduct contributed to additional injury should not prohibit recovery for that injury."  *Id.; Omni Outdoor Adver., Inc. v. Columbia Outdoor Adver., Inc.*, 891 F.2d 1127, 1144 (4th Cir. 1989), *overruled on other grounds*, 499 U.S. 365 (1991) ("[T]he inseparability of causes created by a wrongdoer should not redound against the victim.").

Finally, Abbott's language that Plaintiffs are only entitled to damages that "flow from that which makes illegal the particular anticompetitive conduct" confuses the separate concepts of antitrust injury and proximate causation.  *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 435 (5th Cir. 1985), cited approvingly by *Image Technical Services v. Eastman Kodak Co.*, 125 F.3d 1195, 1222 (9th Cir. 1997), states: "The Supreme Court has … separate[ed] the inquiry into the fact of antitrust injury from the computation of the amount of antitrust damages: an antitrust plaintiff must prove by a preponderance of the evidence some element of actual damage caused by the defendant's violation of the antitrust laws."  *Id.* at 435 (internal quotation omitted).  Similarly, then-judge, now-Justice, Kennedy in *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739 (9th Cir. 1984), analyzed the concept of antitrust injury – a standing issue – separate and apart from the amount of injury – which turns on the concept of proximate causation.  He wrote that the Ninth Circuit has "included consequential damages in an antitrust award, but only when the plaintiff also has other damages that are related to the decrease in competition." *Id.* at 750-51 (Kennedy, J., dissenting).   In other words, contrary to Abbott's instruction, all damages proximately caused by the anticompetitive acts are allowable once Plaintiffs

have shown that some portion flows from that which makes the particular conduct illegal under the Sherman Act. *See Pierce*, 753 F.2d at 423 n. 6 (5th Cir. 1985) (approving damages jury instruction based on proximate causation).

Thus, for example, courts have awarded damages that were incurred in markets outside the relevant market, that is damages in a market other than where a plaintiff claimed standing or where there was antitrust injury. *Bonjorno v. Kaiser Aluminum & Chemical Corp*, 559 F. Supp. 922, 938 (E.D. Pa. 1983), *reversed on other grounds* 752 F.2d 802, 814 (3rd Cir. 1984) (reversing trial court's grant of JNOV limiting some damages in order to allow all damages awarded by jury) ("As long as there was some evidence that Columbia would have made sales beyond that geographic area, as there was, plaintiffs were entitled to have the jury consider those estimated sales."); *Lafayette Steel Company v. National Steel Corporation*, 87 F.R.D. 612, 621 (E.D. Mich. 1980) (awarding damages incurred from denial of steel supply despite that antitrust injury occurred in a separate market for automobile blanks); *Greene v. Gen. Foods Corp.*, 517 F.2d 635, 660-66 (5th Cir. 1975) (affirming Sherman Act violation damages award including lost profits from loss suffered in product lines other than defendant manufacturer's). Abbott's instructions on causation are fundamentally flawed. Those flaws are pervasive. To the extent that Abbott includes language or legal propositions that are accurate and non-prejudicial, GSK's instructions already include these concepts in a concise manner. Abbott's instructions should be rejected.

## Customer Plaintiffs' Argument

The Customer Plaintiffs join GSK's critique of Abbott's proposed jury instructions. For the following additional reasons, Abbott's proposed instructions should not be used.

Abbott's Proposed Damages Instruction 1

Abbott has unnecessarily modified the ABA Model Instruction F-11 in an effort to tilt the instruction in its favor.  Abbott's new instruction also improperly conflates the elements of injury-in-fact and damages.  The original text of the ABA instruction is:

Instruction 1 - Effect of Instruction as to Damages

I am now going to instruct you on the issue of damages. The fact that I am giving you instructions concerning the issue of plaintiff's damages does not mean that I believe the plaintiff should, or should not, prevail in this case.

If, for any reason, you reach a verdict for the defendant on the issue of liability, you should not consider the issue of damages, and you may disregard the damages instructions that I am about to give. Instructions as to the measure of damages are given for your guidance in the event you should find in favor of the plaintiff based on a preponderance of the evidence in accordance with the other instructions I have given you. You should only consider calculating damages if you first find that defendant violated the antitrust laws and that this violation caused injury to plaintiff.

ABA Model Instruction F-11 (2005).  Abbott has modified this as follows:

I am now going to instruct you on the issue of injury and damages~~.~~ on plaintiffs' monopolization claim.  The fact that I am giving you instructions concerning the ~~issue~~issues of ~~plaintiff's~~injury and damages does not mean that I believe the ~~plaintiff~~plaintiffs should, or should not, prevail in this case.  That is an issue for your sole determination.

If~~, for any reason, you reach a verdict for the defendant on the issue of liability~~ you do not find that Plaintiffs have proven every other element of their monopolization claims, you should not consider the ~~issue of~~issues of injury and damages, and you ~~may~~should disregard the injury and damages instructions that I am about to give.  Instructions as to the injury and measure of damages are given for your guidance in the event you should find in favor of the ~~plaintiff~~plaintiffs on all the other elements of their monopolization claim based on a preponderance of the evidence in accordance with the other instructions I have given you.  You should ~~only consider calculating damages if you first find that defendant violated the antitrust laws and that this violation caused injury to plaintiff.~~consider whether plaintiffs have suffered compensable injuries and should calculate damages only if you first find that plaintiffs have shown the other required elements of their monopolization claim.

The Court should give plaintiffs' version of this instruction (Customer Plaintiffs' Proposed Damages Instruction 2), which retains its character as an instruction on

damages only (rather than conflating injury and damages as Abbott does).  If it does not, it should reject Abbott's modifications to the ABA Model Instruction.

> Abbott's Proposed Damages Instruction 2

The Customer Plaintiffs' antitrust injury instruction is a near verbatim rendition of ABA Model Instruction F-2 (only noting that the text may need to be modified if Plaintiffs' Motion to Divide the Trial into Two Phases is granted).  In contrast, Abbott's "antitrust injury" instruction has no foundation in the ABA model instructions, and will unduly confuse the jury.  It also makes assertions about plaintiffs' claims that are incorrect.  It also wrongfully seeks reconsideration of the Court's denial of summary judgment on the issue of antitrust injury.

> A.    *Abbott's Instruction is Too Complex*

Abbott's instruction would make this simple issue complex and impossible for the jury to understand.  The ABA provides a concise instruction on the requirement of antitrust injury.

> Finally, plaintiff must establish that its injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If plaintiff's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then plaintiff's injuries are antitrust injuries. On the other hand, if plaintiff's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then plaintiff's injuries are not antitrust injuries and plaintiff may not recover damages for those injuries under the antitrust laws.   n8 [*Insert the following sentence where plaintiff is a competitor of defendant.*] You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against -- such as where a competitor offers better products or services or where a competitor is more efficient and can charge lower prices and still earn a profit -- and the antitrust laws do not permit a plaintiff to recover damages for losses that were caused by the competitive process or conduct that benefits consumers.

Customer Plaintiffs offer the following instruction, consisting of the first two sentences of the ABA instruction:

> To prove the final element, Plaintiffs must establish that its injury is the type of injury that the antitrust laws were intended to prevent.  If Plaintiffs' injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then Plaintiffs' injuries are antitrust injuries.

The last two sentences of the ABA instruction have no relevance to a suit by purchasers such as the Customer Plaintiffs.  If they paid an overcharge, they cannot have done so as a result of "heightened competition, the competitive process itself, or acts that would benefit consumers."   Indeed, Abbott never asserts that its conduct "heightened competition."  Rather, Abbott justifies the price increase as being legal, as an exercise of its alleged rights with respect to ritonavir, or the desire to obtain more "value" for Norvir. Neither of these reasons is a product of increased competition: the provision to the public of better products and lower prices. Indeed raising price is the opposite of a procompetitive effects, which by their nature must involve *lower prices* or increased efficiencies.  *See, e.g., Pool Water Products v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) ("'Consumer welfare is maximized when economic resources are allocated to their best use and when consumers are assured competitive price and quality.")(internal quotes and citation omitted); *see also Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1151 (9th Cir. 2003) ("Defendants offer no explanation for how it improves the efficiency [] or has any effect at all beyond raising prices."); *United States v. Microsoft*, 253 F.3d 34, 59 (D.C. Cir. 2001) ("competition on the merits [] involves, for example, greater efficiency or enhanced consumer appeal"). The fact that Abbott may have acted to increase its own profitability is not an aspect of "heightened competition," nor does it reflect enhanced consumer welfare.  As one Court of Appeals has explained:

> [A] defendant's assertion that it acted in furtherance of its economic interests does not constitute the type of business justification that is an acceptable defense to *§ 2* monopolization. Paraphrasing one corporate executive's well publicized statement, whatever is good for 3M is not necessarily permissible under *§ 2 of the Sherman Act*. As one court of appeals has explained:

> **In general, a business justification is valid if it relates directly or indirectly to the enhancement of consumer welfare. Thus, pursuit of efficiency and quality control might be legitimate competitive reasons . . ., while the desire to maintain a monopoly market share or thwart the entry of competitors would not.**

*Data Gen. Corp. v. Grumman Sys. Support Corp.,* 36 F.3d 1147, 1183 (1st Cir. 1994) (citing *Eastman Kodak,* 504 U.S. at 483); *Aspen Skiing,* 472 U.S. at 608-11).

> It can be assumed that a monopolist seeks to further its economic interests and does so when it engages in exclusionary conduct. Thus, for example, exclusionary practice has been defined as "a method by which a firm . . . trades a part of its monopoly profits, at least temporarily, for a larger market share, by making it unprofitable for other sellers to compete with it." Richard A. Posner, *Antitrust Law: An Economic Perspective* 28 (1976). Once a monopolist achieves its goal by excluding potential competitors, it can then increase the price of its product to the point at which it will maximize its profit. This price is invariably higher than the price determined in a competitive market. That is one of the principal reasons why monopolization violates the antitrust laws. The fact that 3M acted to benefit its own economic interests is hardly a reason to overturn the jury's finding that it violated *§ 2 of the Sherman Act*.

*Lepage's Inc.v. 3M*, 324 F.3d 141, 163-64 (3d Cir. 2003)(emphasis added).

In sum, the Court should adopt the Customer Plaintiffs' instruction or, in the alternative, the model ABA instruction.

> B.     *Abbott's "Injury" Instruction Attempts to Confuse the Jury About the Elements of Anticompetitive Conduct*

Abbott's proposed damages instruction will also confuse the jury because it contains inaccurate guidance on what plaintiffs need to prove to prevail on the element of anticompetitive conduct.  For example, Abbott would tell the jury that this is a predatory pricing case and the jury must find complete exclusion of competitors from the market followed by recoupment.  However, this is a predatory bundling case, not a traditional predatory pricing case.  Accordingly, exclusion followed recoupment need not be proven. *See Cascade Health Solutions v. Peacehealth*, 515 F.3d 883, 910 n.21(9th Cir. 2008). Under this standard, the pricing of bundled products can be found illegal if it has "the *potential* to exclude a hypothetical equally efficient producer of the competitive product."

*Cascade*, 515 F.3d at 906 (emphasis added); *Safeway Inc. v. Abbott Labs*., No. C 07-05470 CW, 2010 U.S. Dist. LEXIS 2145, at *12 (N.D. Cal. Jan. 12, 2010) (same). "[T]he full amount of the discounts given by the defendant on the bundle are allocated to the competitive product or products." *Cascade*, 515 F.3d at 906; *Safeway*, 2010 U.S. Dist. LEXIS 2145, at *12 (same). If the resulting price of the competitive product is below the defendant's cost to produce it, the finder of fact may find the bundling to be exclusionary. *Cascade*, 515 F.3d at 906; *Safeway*, 2010 U.S. Dist. LEXIS 2145, at *12. Plaintiffs thus do not need to prove complete exclusion from the marketplace. Impairment of competition is sufficient. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 597 (1985) ("We are concerned with conduct which unnecessarily excludes *or handicaps* competitors.").

Plaintiffs also do not need to show recoupment, *i.e.*, a loss followed by profits. This is because predatory bundling "does not necessarily involve any loss of profits for the bundled discounter [because it] can exclude its rivals who do not sell as many product lines even when the bundle as a whole, and the individual products within it, are priced above the discounter's incremental cost to produce them." *Cascade*, 910 n.21 (citation omitted). Abbott did not lose profits on Kaletra (the bundle) because Abbott did not ever price Kaletra (the bundle) below its costs. Only the imputed price of lopinavir was below costs due to Abbott's price *increase* on Norvir. *See also* Einer Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 HARV. L. REV. 402-403 (2009) ("Bundled discounts have the same power effects as tying when the unbundled price exceeds the but-for price for the product over which the firm has market power. Calling such pricing a bundled 'discount' is actually misleading in these situations because it wrongly implies there is a true discount from the but-for price (that is, the price that would have been charged 'but for' the bundling). Instead, a bundled 'discount' just means there is a difference between the price charged to buyers who comply with the bundling condition and to those who do not. If the unbundled price exceeds the but-for

level, then the price difference we call a 'discount' is really a penalty imposed on buyers who refuse the bundle.").

Similarly, or a refusal to deal pursuant to *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), does not require proof that competition ended. Rather, it only requires proof that competition was "handicap[ped]." *Id.* at 597 ("We are concerned with conduct which unnecessarily excludes *or handicaps* competitors.") (quoting with approval jury instructions) (emphasis added).

Abbott should not be allowed to introduce erroneous instructions about anticompetitive conduct through the back door of the antitrust injury instruction. This is another reason that the Court should adopt the Customer Plaintiffs' instruction or, in the alternative, the model ABA instruction.

c.    *Abbott's Instruction In Effect Seeks Summary Judgment on Plaintiffs' Claims to Have Suffered Overcharge Damages on Norvir*

Abbott also seeks an instruction that, alternatively, overcharges on either Kaletra or Norvir "would not constitute antitrust injury." This is both erroneous and contrary to law of the case. It is erroneous because direct purchasers' paying inflated prices is universally recognized as a form of antitrust injury. *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 491 (1968) ("the victim of an overcharge is damaged within the meaning of § 4 to the extent of that overcharge"). Thus, overcharges on Norvir or Kaletra, if proven to be caused by anticompetitive conduct, mean that a Customer Plaintiff suffered injury, and that plaintiff is entitled to recover "the full amount of the overcharge[.]" *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).

The evidence here will show that Customer Plaintiffs were overcharged on their purchases of Norvir because 400% Norvir price increase taken as part if Abbott's effort to enhance its monopoly power in the Boosted PI market was unlawful under the antitrust laws. Overcharges are measured as the difference between a world with and a world without the anticompetitive conduct. Here, that is the entire 400% price increase. This

Court has repeatedly stated overcharges on Norvir measured in this fashion constitute antitrust injury. *See*, *e.g.*, *In re Abbott Labs. Norvir Anti-Trust Litig.*, 562 F. Supp. 2d 1080, 1085 (N.D. Cal. 2008) ("It is the 'penalty' consumers pay, in the form of a disparately high price for Norvir when they choose to use one of the competing drugs, that gives rise to the injury"), citing *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982). Overcharges on Norvir begin in December 2003 when Abbott implemented its price increase. Abbott's argument (elsewhere) that the Norvir overcharges relate only to the inoperative boosting market monopolization claim is wrong. Under this Court's prior rulings and *McCready*, the inflated price of Norvir is an integral part of the monopoly bundling and refusal to deal claims. Moreover, Norvir is an integral part of the Boosted PI market. It is for this reason that Plaintiffs' experts count sales of Norvir when computing Abbott's share of the boosted protease inhibitor market, a method the Court held the appropriateness of which is a question of fact for the jury. *Safeway Inc. v. Abbott Labs.*, No. 07-5470-CW, slip op. at 11-17 (N.D. Cal. Jan. 18, 2011). As to Kaletra, the evidence will show Plaintiffs' injuries began in 2005 when Abbott began raising the price of Kaletra higher than it would have been able to raise that price absent the anticompetitive conduct. *Cf. Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 489 (1968) (injury "measured by the difference between the price paid and what the market or fair price would have been" absent violation). Abbott's Norvir price hike (and surrounding conduct) impaired Kaletra's rivals, stabilized Kaletra's market share, and preserved monopoly power. As a result, Abbott was able to artificially inflate the price of Kaletra from 2005 and beyond. *Safeway Inc. v. Abbott Labs.*, No. 07-5470-CW, slip op. at 34-35 (N.D. Cal. Jan. 18, 2011).

Abbott already moved for summary judgment on antitrust injury. The Court denied that motion. Jury instructions should not be used as a vehicle to reargue it. If plaintiffs do not in fact present evidence of an antitrust injury in the form of paying

artificially inflated prices on Norvir or Kaletra as part of the unlawful conduct, the correct remedy is a motion for directed verdict at the close of plaintiffs' case.

<u>Abbott's Proposed Damages Instruction 3</u>

Abbott, has unnecessarily modified the ABA model instruction in an effort to tilt the instruction in its favor.  Abbott's new instruction also improperly conflates the issues of antitrust injury, injury-in-fact and damages.  The original text of the ABA instruction is:

> If you find that defendant violated the antitrust laws and that this violation caused injury to plaintiff, then you must determine the amount of damages, if any, plaintiff is entitled to recover. The law provides that plaintiff should be fairly compensated for all damages to its business or property that were a direct result or likely consequence of the conduct that you have found to be unlawful.

> The purpose of awarding damages in an antitrust action is to put an injured plaintiff as near as possible in the position in which it would have been if the alleged antitrust violation had not occurred. The law does not permit you to award damages to punish a wrongdoer - what we sometimes refer to as punitive damages - or to deter defendant from particular conduct in the future, or to provide a windfall to someone who has been the victim of an antitrust violation. You are also not permitted to award to the plaintiff an amount for attorneys fees or the costs of maintaining this lawsuit. Antitrust damages are compensatory only. In other words, they are designed to compensate a plaintiff for the particular injuries it suffered as a result of the alleged violation of the law.

Abbott has modified this as follows:

> ~~If you find that defendant violated the antitrust laws and that this violation caused injury to plaintiff, then you must determine the amount of damages, if any, plaintiff is entitled to recover.~~ The law provides that ~~plaintiff~~<u>Plaintiffs</u> should be fairly compensated ~~for all damages to its business or property that were a direct~~<u>only for antitrust injuries, and not for other injuries that they may have suffered as a</u> result ~~or likely consequence of the~~<u>of Abbott's</u> conduct ~~that you have found to be unlawful~~.  The purpose of awarding damages in an antitrust action is to put an injured plaintiff as near as possible ~~in~~<u>to</u> the position in which it would have been if the <u>anticompetitive effects of the</u> alleged antitrust violation had not occurred.  The law does not permit you to award damages to punish a wrongdoer ~~—~~<u>—</u>what we sometimes refer to as punitive damages ~~—~~<u>—</u>or to deter ~~defendant~~<u>a company</u> from particular conduct in the future, or

to provide a windfall to someone who has been the victim of an antitrust violation.  You ~~are~~ also are not permitted to award to the ~~plaintiff~~plaintiffs an amount for attorneys fees or the costs of maintaining this lawsuit.  Antitrust damages are compensatory only~~.~~ and must be tied to that which makes the defendant's conduct illegal.  In other words, they are designed to compensate a plaintiff for the particular injuries it suffered as a result of ~~the alleged~~that which allegedly made the defendant's conduct a violation of the ~~law~~antitrust laws.

Abbott has introduced into this instruction the foreign concept of antitrust injury, which it does not otherwise include.  As described above, Plaintiffs' instructions, or the ABA model instruction, succinctly state what must be found by the jury in relation to antitrust injury.  This ABA model instruction deals with the issues of proximate and but-for causation.  Introducing the concept of antitrust injury will tend to confuse those issues in the minds of the jury.

<u>Abbott's Proposed Damages Instruction 4</u>

Abbott has unnecessarily modified the ABA model instruction in an effort to tilt the instruction in its favor.  Abbott's new instruction also improperly conflates the issues of antitrust injury, injury-in-fact and damages.  The original text of the ABA instruction is:

> Damages may not be based on guesswork or speculation. If you find that a damages calculation cannot be based on evidence and reasonable inferences, and instead can only be reached through guesswork or speculation, then you may not award damages. If the amount of damages attributable to an antitrust violation cannot be separated from the amount of harm caused by factors other than the antitrust violation except through guesswork or speculation, then you may not award damages.

> You are permitted to make reasonable estimates in calculating damages. It may be difficult for you to determine the precise amount of damage suffered by the plaintiff. If plaintiff establishes with reasonable probability the existence of an injury proximately caused by the defendant's antitrust violation, you are permitted to make a just and reasonable estimate of the damages. So long as there is a reasonable basis in the evidence for a damages award, plaintiff should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical certainty. The amount of damages must, however, be based on reasonable, non-speculative assumptions and estimates. Plaintiff must prove the reasonableness of each of the assumptions upon which the

damages calculation is based. If you find that plaintiff has failed to carry its burden of providing a reasonable basis for determining damages, then your verdict must be for defendant. If you find that plaintiff has provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.

Abbott has modified this as follows:

Damages may not be based on guesswork or speculation.  If you find that a damages calculation cannot be based on evidence and reasonable inferences, and instead can only be reached through guesswork or speculation, then you may not award damages.  If the amount of damages attributable to that which makes any conduct by Abbott an antitrust violation cannot be separated from the amount of harm caused by other factors ~~other than the antitrust violation~~ except through guesswork or speculation, then you may not award damages.

You are permitted to make reasonable estimates in calculating damages.  It may be difficult ~~for you~~ to determine the precise amount of damage suffered by ~~the~~a plaintiff. ~~If~~ as a result of that which made a defendant's conduct illegal.  If a plaintiff establishes with reasonable probability the existence of an injury proximately caused by that which makes the defendant~~'s antitrust violation~~'s conduct illegal, you are permitted to make a just and reasonable estimate of the plaintiff's damages.  So long as there is a reasonable basis in the evidence for a damages award, a plaintiff should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical certainty.  The amount of damages must, however, be based on reasonable, non-speculative assumptions and estimates. ~~Plaintiff~~  A plaintiff must prove the reasonableness of each of the assumptions upon which ~~the~~its damages calculation is based.  If you find that a plaintiff has failed to carry its burden of providing a reasonable basis for determining damages, then your verdict must be for ~~defendant.~~Abbott with respect to that plaintiff.  If you find that a plaintiff has proved a violation of the antitrust laws and provided a reasonable basis for determining damages flowing from that which made the defendant's conduct illegal, then you may award damages to that plaintiff based on a just and reasonable estimate supported by the evidence.

Abbott has introduced into this instruction the foreign concept of antitrust injury, which it does not otherwise include.  As described above, Plaintiffs' instructions, or the ABA model instruction, succinctly state what must be found by the jury in relation to antitrust injury.  This ABA model instruction deals with the issue of defining estimation as opposed to speculation.  In plaintiffs' view such an instruction is unnecessary.  However,

in the event the Court disagrees, it should give the unmodified ABA instruction.

Introducing the concept of antitrust injury will tend to confuse those issues in the minds

of the jury.

 Abbott's Proposed Damages Instruction 5

 Abbott has unnecessarily modified the ABA model instruction in an effort to tilt

the instruction in its favor.  The original text of the ABA instruction is:

> You have heard testimony from plaintiff's expert, [*damages expert's name*], and from defendant's expert, [*damages expert's name*], regarding the amount of damages to which plaintiff claims it is entitled and the proper amount of damages. If you find that any of the pertinent underlying assumptions made by one of these experts in preparing a damage report are not reasonable or are not proven by a preponderance of the evidence, or if you find that one of these expert's conclusions depend on a comparison of things which have not been proven to be comparable, then you should consider this in determining the weight - if any - you will give to these assumptions and the effect they have on plaintiff's damages claim.

 Abbott has modified this as follows:

> You have heard testimony ~~from plaintiff's expert, [*damages expert's name*], and from defendant's expert, [*damages expert's name*], regarding the amount of damages to which plaintiff claims it is entitled and the proper amount of damages.~~ <u>regarding damages from Plaintiffs' experts, Hal Singer, Keith Leffler, and Stephen Prowse, and from Abbott's experts, James Langenfeld and Joel Hay.</u>  If you find that any of the pertinent underlying assumptions made by one <u>or more</u> of these experts ~~in preparing a damage report are~~<u>is</u> not reasonable or ~~are~~<u>was</u> not proven by a preponderance of the evidence, or if you find that one <u>or more</u> of these expert~~'~~'<u>'</u>s conclusions ~~depend~~<u>depends</u> on a comparison of things ~~which~~<u>that</u> have not been proven to be comparable, then you should consider this in determining the weight——<u>—</u>if any——<u>—</u>you will give to these assumptions ~~and the effect they have on plaintiff's damages claim.~~  <u>You should also consider the reliability of the experts' assumptions in determining whether plaintiffs have suffered compensable injuries and the level of Plaintiffs' damages, if any</u>.

 The Court should give plaintiffs' version of this instruction.  If it does not, it

should reject Abbott's modifications to the ABA model instruction.  Advising the jury to

consider the "reliability" of expert assumptions in addition to whether they are

"reasonable" has no basis in the law, will confuse the jury and adds no conceivable value

to the instruction.

    Abbott's Proposed Damages Instruction 6

    Abbott has unnecessarily modified the ABA model instruction in an effort to tilt

the instruction in its favor.  The original text of the ABA instruction is:

> In awarding damages, if any, you will be asked what sum of money would
> fairly and reasonably compensate each plaintiff for any injury sustained by
> that plaintiff. Once a particular plaintiff establishes that it is entitled to
> recover damages, the law permits that plaintiff to recover only for those
> injuries it has sustained. Therefore, if you find that two or more of the
> plaintiffs are entitled to recover damages, caution should be exercised to
> be sure that each plaintiff is awarded only damages for injuries it
> sustained.

Abbott has again introduced into this instruction the foreign concept of antitrust injury.

Moreover, as the instruction concedes, it simply repeats things that have been said before

in Abbott's prior instruction.  It also contains unnecessary recitations of facts that may or

may not be proven at trial.  The jury finds the relevant facts, not the Court through the

vehicle of jury instructions.  The Court should give plaintiffs' version of this instruction.

If it does not, it should reject Abbott's modifications to the ABA model instruction.

    Abbott's Proposed Damages Instruction 7

    Abbott has unnecessarily modified the ABA model instruction in an effort to tilt

the instruction in its favor.  The original text of the ABA instruction is:

> In awarding damages, if any, you will be asked what sum of money would
> fairly and reasonably compensate each plaintiff for any injury sustained by
> that plaintiff. Once a particular plaintiff establishes that it is entitled to
> recover damages, the law permits that plaintiff to recover only for those
> injuries it has sustained. Therefore, if you find that two or more of the
> plaintiffs are entitled to recover damages, caution should be exercised to
> be sure that each plaintiff is awarded only damages for injuries it
> sustained.

Abbott has again introduced into this instruction the foreign concept of antitrust injury.

Moreover, as the instruction concedes, it simply repeats things that have been said before

in Abbott's prior instruction.  It also contains unnecessary recitations of facts that may or may not be proven at trial.  The jury finds the relevant facts, not the Court through the vehicle of jury instructions.  The Court should give plaintiffs' version of this instruction.  If it does not, it should reject Abbott's modifications to the ABA model instruction.

Customer Plaintiffs' Proposed Injury Instruction 1: Injury to Plaintiffs

As noted above, Customer Plaintiffs' Proposed Injury Instruction 1 is a near-verbatim recitation of ABA Model Instruction F-2. The Court should give the Customer Plaintiffs' version of this instruction.

Customer Plaintiffs' Proposed Injury Instruction 2: Overcharge as Injury to CPs

The Customer Plaintiffs also request that the Court issue Customer Plaintiffs' Proposed  Injury Instruction 2, informing the jury to that the Customer Plaintiffs are the proper plaintiffs to bring an action for damages for overcharges under the federal antitrust laws, and that overcharges qualify as "injury in business or property" within the meaning of the Clayton Act.  Overcharges have been a recognized form of antitrust injury for over 100 years.  *See Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390, 396 (1906) ("person whose property is diminished by a payment of money wrongfully induced is injured in his property").[136]  As direct purchasers (or as their assignees), the Customer Plaintiffs have the right to pursue damages measured as overcharges under Section 4 of the Clayton Act and are entitled to the full amount of the overcharge. *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 489 (1968); *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 729 (1977).  Black letter law prohibits consideration of whether the purchasers' injuries were in any way diminished by the "passing on" of overcharges to their customers.  *Illinois Brick,* 431 U.S. at 725; *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008), citing *Royal Printing Co. v. Kimberly-Clark Corp.*,

---

[136] The Court has already rejected Defendants' challenge as to whether Customer Plaintiffs' injuries as to Kaletra qualify as overcharges.  *Safeway Inc. v. Abbott Labs*., No. 07-5470-CW, slip op. at 33-35 (N.D. Cal. Jan. 18, 2011).

621 F.2d 323, 327 (9th Cir. 1980).  Likewise, the rule of *Hanover Shoe* and *Illinois Brick*

prohibits defending against overcharge claims by direct purchasers by claiming that they

somehow benefitted from any anticompetitive conduct (by, *e.g.*, obtaining increased

revenues, or otherwise benefitting from reselling goods at the artificially inflated

price).[137]  Simply put, the rule of *Illinois Brick* was intended to reduce complexity of

direct purchaser actions by barring analysis of downstream effects.  *See Arizona v.*

*Shamrock Foods Co.*, 729 F.2d 1208, 1212 (9th Cir. 1984).  Because the jury is likely to

be unaware of the law entitling the Customer Plaintiffs to recover their overcharges,

jurors should be informed that the Customer Plaintiffs are the proper parties to recover

any overcharges which resulted from any anticompetitive conduct, and that jurors are to

consider the Customer Plaintiffs injured under the law if they believe that the Customer

Plaintiffs have been overcharged due to the anticompetitive conduct.Plaintiffs have

incorporated similar language into the instruction on damages, Customer Plaintiffs'

Proposed Damages Instruction 5. The requested language should be retained there as

well.

     Customer Plaintiffs' Proposed Injury Instruction 3: Assignments

     Abbott agrees that entities which have received an assignment from a direct

purchaser are permitted to sue in the direct purchaser's shoes.  *See* Abbott's Proposed

Damages Instruction 6.  Abbott's proposed instruction, however, asks the jury to decide

whether the assignments are "valid," but does not identify any factual issues that relate to

that question and does not propose any instruction to the jury as to how to decide whether

---

[137] *See Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 884-85 (10th Cir. 1997) (rejecting argument that plaintiff benefitted from alleged violation and therefore lacked injury because "[t]hat reasoning  is directly contrary to the Supreme Court's holding in *Hanover Shoe*. *Hanover Shoe* precludes the argument that [plaintiff] did not suffer cognizable antitrust injury merely because it passed overcharges on to its customers or otherwise was shielded from competition by the defendants' anticompetitive behavior"); *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 303-04 (D.D.C. 2007); *In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349, 369 (D. Mass. 2004).

the assignments are valid.  The validity of the assignments, to the extent it is disputed at all, is a legal issue for the Court to decide.  The Court should give the Customer Plaintiffs' proposed instruction, which does not ask the jury to decide whether the assignments are valid.

> Customer Plaintiffs' Proposed Damages Instruction 4: Bifurcation

In the event the Court grants Plaintiffs' Motion to Divide the Trial Into Two Phases, the Customer Plaintiffs have provided a proposed instruction to be read to the second jury to be empanelled to decide their damages claim.  The instruction is a close adaptation of the ABA's Model Instruction F-2A.

> Customer Plaintiffs' Proposed Injury Instruction 5

> *No Consideration of Pass-on*

The Customer Plaintiffs again ask the Court to issue an instruction directing the jury not to consider whether the Customer Plaintiffs passed on any overcharges, or otherwise benefitted from Abbott's illegal conduct

> *Damages to the Class*

Customer Plaintiffs also request the jury be instructed to award damages to the class as a whole.  This is in keeping with the law and this Court's own decision upon certification of the class.  *See Meijer, Inc. v. Abbott Labs.*, No. C 07-5985, 2008 U.S. Dist. LEXIS 78219, *29 (N.D. Cal. Aug. 27, 2008) ("Plaintiffs have proffered methods for calculating aggregate damages for overcharges paid by class members, based on average market prices. The validity of those methods will be adjudicated at trial…") (internal quotes omitted); *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 534 (6th Cir. 2008) ("[d]amages in an antitrust class action may be determined on a classwide, or aggregate, basis"); *Greenhaw v. Lubbock County Beverage Ass'n*, 721 F.2d 1019, 1029 (5th Cir. 1983) (affirming aggregated class judgment; *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 525 (S.D.N.Y. 1996)("aggregate judgments have been widely used in antitrust, securities and other class actions"); *In re Antibiotic*

*Antitrust Actions*, 333 F. Supp. 278, 281 (S.D.N.Y.).  As one court recently observed, the question at trial is not whether about a price increase as to a specific class member, but how a defendant's conduct impacted prices for all customers.  *In re TFT-LCD Antitrust Litig.*, 267 F.R.D. 583, 605 (N.D. Cal. 2010).

Customer Plaintiffs' Proposed Injury Instruction 6

The Customer Plaintiffs have adapted ABA Model Instructions F-1.  If the Court does not give plaintiffs' instruction, they ask the Court to give ABA Model Instruction F-15.  However, model instruction F-26 should not be given as it misstates the appropriate standard for assessing damages to the class.  There is no need to compute the average overcharge paid by each class member or estimate the overcharge paid by each class member, and this Court and others have rejected any such requirement.  *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 534 (6th Cir. 2008) ("[d]amages in an antitrust class action may be determined on a classwide, or aggregate, basis"); *Meijer, Inc. v. Abbott Labs.*, No. C 07-5985, 2008 U.S. Dist. LEXIS 78219, *29 (N.D. Cal. Aug. 27, 2008) ("Plaintiffs have proffered methods for calculating aggregate damages for overcharges paid by class members, based on average market prices. The validity of those methods will be adjudicated at trial…") (internal quotes omitted).

**Abbott's Argument**

As demonstrated by the footnotes annotating Abbott's proposed instructions on damages, Abbott's proposed instructions reflect the ABA Model Jury Instructions in Civil Antitrust Cases (2005) and binding Supreme Court and Ninth Circuit caselaw.  Plaintiffs' instructions are flawed, and Abbott's instructions based on the Model Instructions are superior, for the following reasons:

## DAMAGES

I.   **GSK'S DAMAGES INSTRUCTION 1 AND DIRECT PURCHASERS'
     INJURY INSTRUCTION 1**

   1.   **Antitrust Injury:**   GSK's Damages Instruction 1 and Direct Purchaser
Plaintiffs' Injury Instruction 1 both mention the antitrust injury requirement, but then
they ignore that requirement.  They do not explain what antitrust injury would be in the
context of the case and do not explain clearly that Plaintiffs may recover only damages
for antitrust injuries.  Antitrust injury in a fundamental requirement for any recover of
damages under the Sherman Act; it is a concept that must be given emphasis and
explanation, as Abbott's proposed instructions do.  1/14/11 Order at 11 ("[P]rivate party
plaintiffs seeking damages for antitrust violations must also demonstrate antitrust
injury."); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,  429 U.S. 477, 489 (1977)
("Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust
laws were intended to prevent and that flows from that which makes defendants' acts
unlawful."); *Rebel Oil Co. v. Atl. Richfield Co.,* 51 F.3d 1421, 1433 (9th Cir. 1995) ("To
show antitrust injury, a plaintiff must prove that his loss flows from an anticompetitive
aspect or effect of the defendant's behavior."); Abbott's Motion *in Limine* #7.

   2.   The final paragraph of GSK's Damages Instruction 1 and the penultimate
paragraph in the Direct Purchasers' Injury Instruction 1 mention antitrust injury, but
Plaintiffs omit from the following passage that appears in the ABA model instructions:

> On the other hand, if plaintiff's injuries were caused by heightened
> competition, the competitive process itself, or by acts that would benefit
> consumers, then plaintiff's injuries are not antitrust injuries and plaintiff
> may not recover damages for those injuries under the antitrust laws.  You
> should bear in mind that businesses may incur losses for many reasons that
> the antitrust laws are not designed to prohibit or protect against—such as
> where a competitor offers better products or services or where a
> competitor is more efficient and can charge lower prices and still earn a
> profit—and the antitrust laws do not permit a plaintiff to recover damages
> for losses that were caused by the competitive process or conduct that
> benefits consumers.

ABA Model Jury Instructions in Civil Antitrust Cases (2005), Causation and Damages, Instruction 1 at F-4. These are key concepts that should be explained to the jury, at least in this form if not in the more claim-specific manner proposed by Abbott.

       3.     Both instructions also fail to explain that the jury may only award damages for the component of Plaintiffs' injury resulting from that which would make the alleged anticompetitive conduct illegal. The Ninth Circuit bars antitrust plaintiffs from recovering damages based, even in part, on lawful conduct. Antitrust plaintiffs must "segregat[e] between damages attributable to lawful competition and that attributable to the unlawful scheme." *Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1352 (9th Cir. 1985), *superseded on other grounds by* Fed. R. Civ. P. 50(b). Courts have thus been "consistent in requiring plaintiffs to prove in a reasonable manner the link between the injury suffered and the *illegal* practices of the defendant." *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1371 (9th Cir. 1992). Based on this principal, the Ninth Circuit in *Farley* reversed a jury award because "[n]o evidence was produced showing [injury] . . . ***because of the illegal price-cutting activities***, as opposed to legitimate competition" in connection with a scheme that "closely resemble[d] predatory pricing." *Farley*, 786 F.2d at 1347, 1351 (emphasis added). The Court found that "[b]ecause the plaintiffs could have lost customers . . . even in the absence of illegal undercutting . . . , Farley's evidence was inadequate." *Id.* at 1352. For pricing cases, the below-cost benchmark divides lawful prices from potentially unlawful prices. As the Supreme Court explained, "in the predatory pricing context, firms know they will not incur liability as long as their retail prices are above cost." *Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 129 S. Ct. 1109, 1121 (2009). To calculate damages, "the plaintiff must determine the prices that it would have faced absent the predation." IIA Areeda, Antitrust Law ¶ 397g, at 432. If a defendant "got overly aggressive on price and arguably

went too far, legitimate prices would necessarily be higher, but perhaps not by much."
*Id*.  Damages must be limited accordingly.  *Id.*[138]

4.    **Incoherent Footnote**:  In addition, the footnote in the Direct Purchasers'
Damages Instruction 1 is incoherent.  It proposes instructing the jury in a bifurcated trial:
"If you find that Plaintiffs have established that they were in fact injured, for Plaintiff
GSK, you must find for Plaintiffs."  It is not at all clear what Plaintiffs intend this to
mean.

## II.    GSK'S DAMAGES INSTRUCTION 2

5.    **Antitrust Injury:**  GSK's Proposed Damages Instruction 2 incorrectly
instructs the jury to award damages for any injury caused by conduct it finds unlawful.
But direct causation is only one of the requirements for an award of damages.  This is
incorrect as a matter of law.  As discussed above, Plaintiffs must also prove that their
injury flows from that which makes the anticompetitive conduct that caused the injury
unlawful. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,  429 U.S. 477, 489 (1977);
"Antitrust Injury," Damages ¶¶ 1-3, *supra*.

---

[138] *See also Telecomm Tech. Servs., Inc. v. Siemens Rolm Commc'ns, Inc.*, 150 F.
Supp. 2d 1365, 1373 (N.D. Ga. 2000) ("An ingredient of the causation requirement is the
burden on the antitrust plaintiff to disaggregate its damages.  That is . . . a plaintiff must
apportion losses caused by a defendant's lawful, but anticompetitive conduct from losses
stemming from defendant's unlawful anticompetitive conduct."); *In re Independent Serv.
Orgs. Antitrust Litig.*, 85 F. Supp. 2d 1130, 1153 (D. Kan. 2000) ("[Plaintiff] has the
initial burden to show that its injuries are due to unlawful anticompetitive conduct. This
burden includes the duty to disaggregate damages which are attributable to lawful
conduct such as a refusal to sell patented parts.") (internal citation omitted); *see also
Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1494 (8th Cir. 1992) ("When a plaintiff
improperly attributes all losses to a defendant's illegal acts, despite the presence of
significant other factors, the evidence does not permit a jury to make a reasonable and
principled estimate of the amount of damage.  This is precisely the type of speculation or
guesswork not permitted for antitrust jury verdicts.").

## III.     DIRECT PURCHASER PLAINTIFFS' INJURY INSTRUCTION 2

6.      **Antitrust Injury**:  The Direct Purchaser Plaintiffs' Proposed Injury Instruction 2 incorrectly instructs that the Direct Purchaser Plaintiffs are entitled to recover any purported overcharges on Norvir and Kaletra caused by any anticompetitive conduct found by the jury.  This is incorrect as a matter of law.  As discussed above, Plaintiffs must also prove that their injury flows from that which makes the anticompetitive conduct that caused the injury unlawful.  *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); "Antitrust Injury," Damages ¶¶ 1-3, *supra*.

7.      **Norvir Overcharge Damages**:  Similarly, the Direct Purchaser Plaintiffs' contention that the Direct Purchaser Plaintiffs are entitled to recover any purported overcharges on Norvir and Kaletra caused by any anticompetitive conduct found by the jury is also incorrect because Plaintiffs may not recover Norvir overcharge damages as a matter of law.  *See* Abbott's Motion in Limine #7.  As discussed above, it is a "basic rule for antitrust damages" that "a purchaser may recover only for the price increment that 'flows from' the distortion of the market caused by the monopolist's anticompetitive conduct."  *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)); *see also Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 902 (9th Cir. 2008) (explaining same rule).  Purported Norvir overcharges simply do not "flow from" any distortion caused by monopolization of the market in which Kaletra competes.  *See* "Norvir 'Overcharges,'" Elements of Monopolization ¶¶ 13-17, *supra*.

8.      **Pass On**:  The instructions that the jury should not consider whether higher prices are passed on to their customers may be misleading.  It is important to note that, because of rebates and chargebacks in the government payor segment of the market, purchases of drugs for patients on government programs were effectively made at a much lower price than in the private market—indeed, so much so that the price of Norvir went down in the government payor segment of the market in December 2003.  These rebates

and chargebacks must be considered in determining whether there was anticompetitive conduct or effect in the government payor segment of the market. This is true regardless of whether the rebates and/or chargebacks were formally paid directly to the entity that purchased from Abbott or to an entity later in the supply chain, because the purchases and rebates/chargebacks were all part of the same economic transaction.

## IV.    DIRECT PURCHASER PLAINTIFFS' PROPOSED INJURY INSTRUCTION 3

9.     **Antitrust Injury:**  The Direct Purchaser Plaintiffs' Proposed Damages Instruction 3 is misleading because the statement that Plaintiffs "may recover any overcharge damages that have been assigned" could suggest, incorrectly, that antitrust injury is not a requirement for recovery.  As discussed above, overcharge damages are available only if they reflect antitrust injury.  *See* "Antitrust Injury," Damages ¶¶ 1-3, *supra*.

## V.    DIRECT PURCHASER PLAINTIFFS' PROPOSED DAMAGES INSTRUCTION 1

10.     **Bifurcation:**  Abbott opposes bifurcation for the reasons that will be explained in Abbott's opposition to the Direct Purchasers Plaintiffs' motion to bifurcate. The very statement in this instruction that "[y]ou may not, however, award damages for injuries or losses caused by conduct not submitted to the first jury or caused by factors other than defendant's conduct that the first jury found to be anticompetitive" shows how untenable bifurcation would be in this case—the second jury would have to know exactly what the first jury had considered.

11.     **Antitrust Injury**:  In addition, the Direct Purchaser Plaintiffs' Proposed Damages Instruction 1 makes the same error as the Direct Purchaser Plaintiffs' Proposed Injury Instruction 1 in ignoring the antitrust injury requirement.  It is not true that Plaintiffs would be "entitled to recover for all damages to their business or property that were a direct result or likely consequence of the conduct that the first jury found to be

unlawful," because damages are only available for antitrust injury. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also* "Antitrust Injury," Damages ¶¶ 1-3, *supra*; Abbott's Motion in Limine #7.

## VI.   DIRECT PURCHASER PLAINTIFFS' DAMAGES INSTRUCTION 2

12.   **Antitrust Injury:** The Direct Purchaser Plaintiffs' Proposed Damages Instruction 2 again fails to recognize the antitrust injury requirement for recovery of damages under the Sherman Act. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also* "Antitrust Injury," Damages ¶¶ 1-3, *supra*; *see also* Abbott's Motion in Limine #7.

13.   **One-Sided Presentation**: The second paragraph of Direct Purchaser Plaintiffs' Proposed Damages Instruction 2 is inappropriately one-sided.  For example, it states that "[s]o long as there is a reasonable basis in the evidence for a damages award, Plaintiffs should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical certainty."  Abbott's instruction presents this concept in a balanced manner, stating:

> Plaintiffs bear the burden of proving damages with reasonable certainty, including apportioning damages between lawful and unlawful causes.  If you find that there is no reasonable basis to apportion Plaintiffs' alleged injury between lawful and unlawful causes, or that apportionment can only be accomplished through speculation or guesswork, then you may not award any damages at all.  If you find that Plaintiffs have proven with reasonable certainty the amount of damage caused by that which allegedly made Abbott's conduct illegal, then you must return a verdict for the Plaintiffs.

Abbott's Proposed Damages Instruction 7.

14.   **Misleading Suggestion of Double Recovery:** The Direct Purchasers' Proposed Damages Instruction 2 is also worded in a manner that would encourage the jury, if it awarded damages to the opt-out plaintiffs for their purchases of Norvir and/or Kaletra, to also award damages to the class plaintiffs for the purchases made by the opt-out plaintiffs.  This would be an illegal double recovery.  Because some direct purchasers

who would otherwise be members of the class have assigned their claims to the opt-out
plaintiffs, any damages awarded to the opt-out plaintiffs must be subtracted from what
would otherwise be damages to the class.  The following two sentences, in particular, are
therefore inappropriate: "As I informed you previously, Customer Plaintiffs Meijer,
Louisiana Wholesale Drug, and Rochester Drug Cooperative are suing on behalf of the
Class of Abbott's customers that purchased Norvir or Kaletra from Abbott.  In computing
damages for this group of Plaintiffs, you should compute the overcharges sustained by
the Class as a whole."

15.  **Pass On**:  The instructions that the jury should not consider whether
higher prices are passed on to their customers may be misleading.  It is important to note
that, because of rebates and chargebacks in the government payor segment of the market,
purchases of drugs for patients on government programs were effectively made at a much
lower price than in the private market—indeed, so much so that the price of Norvir went
down in the government payor segment of the market in December 2003.  These rebates
and chargebacks must be considered in determining whether there was anticompetitive
conduct or effect in the government payor segment of the market.  This is true regardless
of whether the rebates and/or chargebacks were formally paid directly to the entity that
purchased from Abbott or to an entity later in the supply chain, because the purchases and
rebates/chargebacks were all part of the same economic transaction.

## VII.  DIRECT PURCHASER PLAINTIFFS' DAMAGES INSTRUCTION 3

16.  **Antitrust Injury:**  The Direct Purchaser Plaintiffs' Proposed Damages
Instruction 3 again fails to recognize the antitrust injury requirement for recovery of
damages under the Sherman Act.  It is incorrect that "[i]f a Plaintiff establishes with
reasonable probability the existence of an injury proximately caused by the defendant's
antitrust violation [the jury would be] permitted to make a just and reasonable estimate of
the damages."  The jury must first determine whether any injury constituted antitrust

injury.  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also* "Antitrust Injury," Damages ¶¶ 1-3, *supra*; *see also* Abbott's Motion in Limine #7.

17.    **Redundancy:**  The last paragraph of Direct Purchaser Plaintiffs' Proposed Damages Instruction 6 is redundant with the second paragraph of the Direct Purchasers' Proposed Damages Instruction 3.  Both instructions explain that damages do not need to be calculated with "mathematical certainty" or "with precision," and emphasize that damages may be awarded so long as they are not based on speculation.  It is unnecessary to provide the jury with this instruction twice.

18.    **One-Sided Presentation:**  Like the second paragraph of the Direct Purchasers' Proposed Damages Instruction 2, the final paragraph of the Direct Purchaser's Proposed Damages Instruction 3 is inappropriately one-sided.  It explains when the jury may award damages, but not when the jury may not.  *See* "One-Sided Presentation, Damages ¶ 13, *supra*.

19.    **Misleading and Superfluous:**  The second paragraph of this instruction is also superfluous and could be misleading.  Once the jury is instructed that there needs to be a reasonable basis in the evidence for any damages award, there is no reason to restate that principle again but only with respect to one plaintiff group, as the proposed instruction does for the class plaintiffs.  The burden of proving damages is the same for all Plaintiffs, and singling out one misleadingly suggests otherwise.

[DISPUTED] GSK'S AND CUSTOMER PLAINTIFFS' PROPOSED NO PATENT
IMMUNITY INSTRUCTION

NO PATENT IMMUNITY

Now, I will instruct you on the impact of Abbott's patent rights on the claims in
this case.

Intellectual property does not confer a right to violate the antitrust laws.  The
power gained through some natural and legal advantage such as a patent can give rise to
liability if a seller exploits his dominant position in one market to expand his empire into
the next.  Patent holders are not immune from antitrust liability if they engage in
anticompetitive conduct, and it is up to you to decide according to my previous
instructions whether GSK has proven that Abbott engaged in anti-competitive conduct.[139]

**Source**:  *United States v. Microsoft*, 253 F.3d 34, 63 (D.C. Cir. 2001); *Eastman Kodak
Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 479 n.29 (1992).

---

[139] *United States v. Microsoft*, 253 F.3d 34, 63 (D.C. Cir. 2001) ("Microsoft 's
primary copyright argument borders upon the frivolous. The company claims an absolute
and unfettered right to use its intellectual property as it wishes: 'If intellectual property
rights have been lawfully acquired,' it says, then 'their subsequent exercise cannot give
rise to antitrust liability.' Appellant's Opening Br. at 105. That is no more correct than
the proposition that use of one's personal property, such as a baseball bat, cannot give
rise to tort liability. As the Federal Circuit succinctly stated: 'Intellectual property rights
do not confer a privilege to violate the antitrust laws.' *In re Indep. Serv. Orgs. Antitrust
Litig.*, 203 F.3d 1322, 1325 (Fed. Cir. 2000)."); *Eastman Kodak Co. v. Image Technical
Servs., Inc.*, 504 U.S. 451, 479 n.29 (1992) ("The Court has held many times that power
gained through some natural and legal advantage such as a patent, copyright, or business
acumen can give rise to liability if a seller exploits his dominant position in one market to
expand his empire into the next.") (internal quotation and citations omitted)

### GSK's Argument

Unlike Abbott's earlier instruction on the "Relevance of Patent Rights," Plaintiffs' proposed instruction entitled "No Patent Immunity" properly sets forth the law and is based on quotations to or close paraphrases of key cases on the issue.  *See Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 479 n.29 (1992) ("The Court has held many times that power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if a seller exploits his dominant position in one market to expand his empire into the next." (internal quotation and citations omitted)); *United States v. Microsoft*, 253 F.3d 34, 63 (D.C. Cir. 2001) ("The [defendant] claims an absolute and unfettered right to use its intellectual property as it wishes: 'If intellectual property rights have been lawfully acquired,' it says, then 'their subsequent exercise cannot give rise to antitrust liability.' That is no more correct than the proposition that use of one's personal property, such as a baseball bat, cannot give rise to tort liability."); *Independent Service Organizations Antitrust Litig. CSU, L.L.C. v. Xerox Corp.*, 203 F.3d 1322, 1325 (Fed. Cir. 2000) ("Intellectual property rights do not confer a privilege to violate the antitrust laws."); *Image Technical Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1216 (9th Cir. 1997) (recognized that "intellectual property rights do not confer an absolute immunity from antitrust claims").

It is particularly important that this Court adopt GSK's proposed instruction in order to avoid jury confusion.  There is no doubt that Abbott will inform the jury that it holds patents relating to Norvir's composition and boosting properties.  Jurors react strongly to the proposition that a party holds patents and have a tendency to disregard Plaintiffs' antitrust claims believing that patents grant protection even against antitrust laws.  Jurors should be informed that businesses that hold patents are subject to federal antitrust restrictions, just like any other business.  This is what Plaintiffs' proposed instruction does.

**Customer Plaintiffs' Argument**

The Customer Plaintiffs join GSK's arguments concerning this proposed instruction by Abbott.

**Abbott's Argument**

GSK's proposed instruction misstates controlling Ninth Circuit precedent on this issue.  In *Image Tech. Services, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997), the court of appeals held that a defendant "may assert that its desire to profit from its intellectual property rights justifies its conduct, *and the jury should presume that this justification is legitimately procompetitive.*"  *Id.* at 1219 (emphasis added).  To overcome this presumption, Plaintiffs carry the heavy burden of showing that Abbott's "business justification" for the price increase, i.e., to increase profits from sales of its patented Norvir, "*played no part* in the decision to act."  *Id.* (emphasis added); *see also* ABA's Model Jury Instructions in Civil Antitrust Cases at C-37 (2005 ed.) ("If you find that defendant had mixed motives for its refusal to deal—that is, that the conduct was expected to result in some short run benefits for defendant as well as harm competitors— then you must find for defendant on this element.").  In other words, if Abbott acted within the scope of its patent grant, that *does* give it immunity from the antitrust laws. *See id.*; *see also* Abbott Proposed Duty to Deal Instruction 6 ("Relevance of Patent Rights"); Abbott's Proposed Predatory Pricing Instruction 9 ("Relevance of Patent Rights"); *see also Schor v. Abbott Labs.*, 457 F.3d 608, 610-14 (7th Cir. 2006); *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d at 1327-28.  GSK's proposed instruction is thus entirely misplaced among damages and attempted monopolization instructions, and it ignores controlling precedent holding that exercising patent rights, *i.e*, a legal monopoly, is not subject to antitrust scrutiny.  The Court should give Abbott's Alternative Instructions: Abbott Proposed Duty to Deal Instruction 6 ("Relevance of Patent Rights") and Abbott's Proposed Predatory Pricing Instruction 9 ("Relevance of Patent Rights").

[DISPUTED] GSK'S AND CUSTOMER PLAINTIFFS' PROPOSED
INTRODUCTORY ATTEMPTED MONOPOLIZATION CLAIM INSTRUCTION

ELEMENTS OF ATTEMPTED MONOPOLIZATION CLAIM

Plaintiffs also allege that it was injured by Abbott's unlawful attempt to monopolize.  To prevail on its claim of attempted monopolization, Plaintiffs must prove each of the following elements is more probably true than not:

First, that Abbott engaged in anticompetitive conduct.

Second, that Abbott had a specific intent to achieve monopoly power in a relevant market;

Third, that there was a dangerous probability that Abbott would achieve its goal of monopoly power in the relevant market;

Fourth, that Abbott's conduct occurred in or affected interstate commerce; and

Fifth, that Plaintiffs were injured in its business or property by Abbott's anticompetitive conduct.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Abbott and against Plaintiffs on Plaintiffs' claim of attempted monopolization. If you find that the evidence is sufficient to prove all five elements as to Abbott, then you must find for Plaintiffs and against Abbott on Plaintiffs' claim of attempted monopolization.

**Source:**  ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 Ed.), Instruction C-84.

## [DISPUTED] ABBOTT'S PROPOSED INTRODUCTORY ATTEMPTED MONOPOLIZATION CLAIM INSTRUCTION

### ELEMENTS OF ATTEMPTED MONOPOLIZATION[140]

Plaintiffs also allege that Abbott is liable for an unlawful attempt to monopolize the market in which they allege Kaletra competes. To prevail on their claim of attempted monopolization of the market in which they allege Kaletra competes, plaintiffs must prove each of the following elements by a preponderance of the evidence:

**First,** that Abbott engaged in anticompetitive conduct.

**Second,** that the market alleged by plaintiffs as the market in which Kaletra competes is a valid antitrust market;

**Third,** that Abbott had a specific intent to achieve monopoly power in a relevant antitrust market;

**Fourth**, that there was a dangerous probability that Abbott would achieve its goal of monopoly power in the relevant market;

**Fifth,** that Abbott's conduct occurred in or affected interstate commerce; and

**Sixth,** that plaintiffs were injured in their business or property by that which made the conduct at issue anticompetitive.

If you find plaintiffs have failed to prove any one or more of these required elements, then you must find for Abbott and against plaintiffs on plaintiffs' claim of attempted monopolization of the market in which Kaeltra competes.  If you find plaintiffs have proven all six elements by a preponderance of the evidence, then you must find for plaintiffs and against Abbott on this claim.

**Source**: ABA Model Jury Instructions in Civil Antitrust Cases (2005); Attempt to Monopolize, Instruction 1.

---

[140] Abbott believes that an attempted monopolization claim is flatly inconsistent with Plaintiffs' allegations, and so Plaintiffs' attempt claim fail as a matter of law. Plaintiffs have represented that "This is not a case about the acquisition of monopoly power. Abbott already had a monopoly in the boosting and boosted PI markets. Plaintiffs are challenging Abbott's maintenance of its monopoly power." *See* DLP Opp. to MSJ at 1; *see also* Noll Rebuttal Report at 31 (arguing that Kaletra lost monopoly power more slowly than it would have but for the Norvir price increase). There is also no evidence to support a theory that Abbott increased any purported monopoly power in the market in which Kaletra competes after the Norvir price increase.  Abbott submits this jury instruction while preserving that position and solely in the event that the Court disagrees.

**GSK's Argument**

Plaintiffs' proposal mirrors the ABA Model Instruction exactly.  Abbott's does not.  The Court should use plaintiffs' proposal.

**Customer Plaintiffs' Argument**

The Customer Plaintiffs maintain the proving a relevant market should not be an element of attempted monopolization, as Customer Plaintiffs explained with respect to the elements for an actual monopolization claim.  *See Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (holding, in attempted monopolization case, that direct proof may be used).  If the Customer Plaintiffs' instruction is not given, the ABA Model Instruction should be given.

**Abbott's Argument**

**Elements Of Attempted Monopolization**

1.      Plaintiffs' and Abbott's proposed introductory instructions are similar, and both follow the ABA model instructions.  Plaintiffs, however, have removed all references to the "relevant market" such that the jury may find attempted monopolization without ever defining the relevant market.  Abbott's instructions, in contrast, contain a requirement that "the market alleged by plaintiffs as the market in which Kaletra competes is a valid antitrust market."  Although that requirement is contained in the model instructions and compelled by law, Plaintiffs' instructions omit it.[141]  Plaintiffs also omit language from the model instructions requiring specific intent to achieve monopoly power "in a relevant market."

2.      ***First,* Plaintiffs' instructions improperly allow the jury to find attempted monopolization without defining the relevant market.**  By omitting any

---

[141] Although the model instructions address the relevant market in the course of explaining specific intent, Abbott has broken it out as a separate element for the sake of clarity.  *See* ABA Model Jury Instructions in Civil Antitrust Cases, at C90-91 (2005).  Abbott has no objection if the Court would prefer to use the model instructions without this modification.

requirement to define the relevant market, and any requirement of specific intent with respect to the relevant market, Plaintiffs' instruction is contrary to law.  As the Supreme Court has made clear, it is "necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market" in determining whether a defendant is liable for attempted monopolization.  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *see also* ABA Model Jury Instructions in Civil Antitrust Cases, at C-85 (2005) (noting that "*Spectrum Sports* further confirmed that proof of a relevant market is required").  Because the jury instructions in *Spectrum Sports* "allowed the jury to infer specific intent and dangerous probability of success from the defendants' predatory conduct, without any proof of the relevant market," the Supreme Court found them to be erroneous.  *Spectrum Sports*, 506 U.S. at 459.  Plaintiffs' instruction repeats that error here.

3.      Although Plaintiffs suggest that "specific intent to maintain a monopoly suffices," it is not enough simply "to prove the necessary intent to monopolize." *Spectrum Sports*, 506 U.S. at 459.  Rather, proving attempted monopolization "also requires inquiry into the relevant product and geographic market and the defendant's economic power in that market."  *Id*.  Plaintiffs cite dicta from *Rebel Oil* for the proposition that monopoly power can be proven through direct evidence, and so need not be proven circumstantially by defining the relevant market.  But even if monopoly power could be proven without defining the relevant market, it does not change the fact that proof of the relevant market is an additional element of the claim of attempted monopolization, as *Spectrum Sports* held.

4.      ***Second*, Plaintiffs' instructions improperly invite confusion about the market in which the extent of Abbott's power is at issue.**  The lack of a reference to the relevant market in Plaintiffs' attempt instructions is particularly problematic because Plaintiffs are expected to state at trial that Abbott has a monopoly in the market in which Norvir competes. Whether that is true or not, there is no remaining claim for

monopolization or attempted monopolization of an alleged "boosting" market, and it is important that the jury not be confused or misled into believing that a finding of monopoly power in any market other than that in which Kaletra competes is being addressed in these instructions.

5.      ***Third*, <u>Burden of Proof.</u>** The proposed instruction also take the phrase "more probably true than not" out of context from the general burden of proof instruction, thereby making it sound like the jury may engage in a probabilistic analysis that is not wholly based in the evidence presented at trial.  The appropriate phrase to be used in the instructions is "by a preponderance of the evidence."  *See* "Burden of Proof," Elements of Monopolization ¶ 1-2, *supra*.

[DISPUTED] GSK'S AND CUSTOMER PLAINTIFFS' PROPOSED ATTEMPTED
MONOPOLIZATION ANTICOMPETITIVE CONDUCT INSTRUCTION

  As with Plaintiffs' claim for actual monopolization, Plaintiffs must prove that it is probably more true than not that Abbott engaged in anticompetitive conduct.  You may refer my previous instruction entitled "Anticompetitive Conduct" to guide your determination of this element.

## [DISPUTED] ABBOTT'S PROPOSED ATTEMPTED MONOPOLIZATION ANTICOMPETITIVE CONDUCT INSTRUCTION

### ANTICOMPETITIVE CONDUCT

As stated earlier, one of the elements plaintiffs must prove is that Abbott engaged in anticompetitive conduct. I have already instructed you on Plaintiffs' theories of anticompetitive conduct.

After considering the evidence, if you find that plaintiffs have proven by a preponderance of the evidence that Abbott engaged in anticompetitive conduct under any of the theories on which I have instructed you, then you must consider the remaining elements of plaintiffs' claim of attempted monopolization of the market in which Kaletra competes. If you find that Abbott has not engaged in anticompetitive conduct, you must find for Abbott and against plaintiffs on plaintiffs' claim of attempted monopolization of the market in which they allege Kaletra competes.


**Source**: ABA Model Jury Instructions in Civil Antitrust Cases (2005); Attempt to Monopolize, Instruction 1.

### GSK's Argument

Plaintiffs and Abbott's instructions on this element simply refer the jurors back to the Court's previous instructions on anticompetitive conduct. Plaintiffs proposal is less wordy, and GSK urges the Court to adopt it.

### Customer Plaintiffs' Argument

Plaintiffs join GSK's argument as to this instruction.

### Abbott's Argument

### Anticompetitive Conduct - Attempted Monopolization

1.        Both Plaintiffs' and Abbott's proposed instructions refer the jury back to the anticompetitive conduct instructions for actual monopolization. Abbott thus incorporates its arguments and objections regarding those instructions here. Plaintiffs' instructions should also be rejected for the following additional reasons.

2.        ***First,*** **Plaintiffs' instructions are unclear.** Unlike Plaintiffs' instructions, Abbott's instructions explain anticompetitive conduct in the context of the facts of this case. Plaintiffs' instructions, in contrast, merely refer the reader to the anticompetitive conduct section of the instructions. Without Abbott's more specific directions, the jury may be confused about what it must find.

3.        ***Second,*** **Plaintiffs' instructions erroneously suggest that a finding of anticompetitive conduct is not an absolute prerequisite to a finding of liability.** Although Plaintiffs' instructions state that Plaintiffs' "must prove" anticompetitive conduct, they contradict that statement by instructing only that the jury "*may* refer" to the anticompetitive conduct instructions "to *guide*" its decision, without being required do so. This permissive language is confusing and misleading insofar as it suggests that a finding of anticompetitive conduct is not strictly necessary for a finding of liability. And even if the jury does believe that such a finding is required before it may impose liability, this language improperly suggests that the earlier instructions on anticompetitive conduct are merely optional "guidance" for making the finding. The jury cannot lawfully be

permitted to find attempted monopolization without also finding that Abbott's actions amount to anticompetitive conduct.  *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) (holding that claim for attempted monopolization requires proof of anticompetitive conduct).  Plaintiffs' instructions risk leading the jury to that erroneous result.

4.      ***Third*, Plaintiffs' Instructions Improperly Refer To Maintaining Monopoly Power.**  It does not make sense to speak of "maintenance" of monopoly power in the context of an attempt claim because the essence of an attempt claim is that an entity that does not have monopoly power is trying to attain such power.  If Plaintiffs' theory is that Abbott already had monopoly power in the market in which Kaeltra competes and was engaging in purportedly anticompetitive conduct in an attempt to maintain that alleged power, then there is a potential monopolization claim if the conduct was successful (and the other elements of monopolization are satisfied). However, there is no attempt claim if the conduct was unsuccessful because there would be no dangerous probability of obtaining monopoly power.  The model instruction implicitly recognizes as much when it uses the word "acquiring" monopoly power in describing the attempt claim, and Plaintiffs' need to change that word to "maintaining" shows that their theory of liability is fundamentally inconsistent with an attempt claim.  In any event, the language of the model instruction—"acquiring"—is appropriate for an attempt claim.

<u>[DISPUTED] ABBOTT'S PROPOSED SPECIFIC INTENT INSTRUCTION 1</u>

RELEVANT MARKET

The second element of attempted monopolization that Plaintiffs must prove is that the market in which they allege Kaletra competes is a relevant antitrust market.  I have already instructed you on how to determine whether plaintiffs have established a relevant market.  If you find that plaintiffs have not proven a relevant market, then you must find for Abbott and against plaintiffs on plaintiffs' claim of attempted monopolization of the market in which they allege Kaletra competes.  If you find that plaintiffs have proven a relevant market, you must find that plaintiffs have proven this element of its claim of attempted monopolization of the market in which Kaletra competes and you should consider the other elements of the claim.


**Source:**  ABA Model Jury Instructions in Civil Antitrust Cases (2005), Sherman Act – Section 2, Monopolization – General, Instruction 3 (modified).

**GSK's Argument**

Abbott's instruction presumes the Court will deviate from the ABA Model Instruction on the elements of a claim for attempted monopolization.  If the Court elects to use the ABA Model Instruction on this claim, as proposed by plaintiffs, then this instruction should not be given.

**Customer Plaintiffs' Argument**

The Customer Plaintiffs maintain the proving a relevant market should not be an element of attempted monopolization.  *See Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (holding, in attempted monopolization case, that direct proof may be used).  If the Customer Plaintiffs' instruction is not given, the ABA Model Instruction should be given.

**Abbott's Argument**

Abbott's relevant market instruction follows the ABA model instructions by requiring that Plaintiffs prove a relevant market.  Plaintiffs provide no instruction on relevant market, and thus do not require the jury to find a relevant market.

2.      **Plaintiffs' instructions improperly allow the jury to find attempted monopolization without defining the relevant market.**  As explained above, the absence of a relevant market requirement is contrary to law and invites confusion.  *See* Elements of Attempted Monopolization ¶¶ 2-4, *supra*.  Abbott incorporates those arguments and objections here.

<u>[DISPUTED] GSK'S PROPOSED SPECIFIC INTENT INSTRUCTION</u>

SPECIFIC INTENT

The second element that Plaintiffs must prove is that Abbott had a specific intent to monopolize a relevant market. To do so, Plaintiffs must first prove the market it is talking about – namely, the market for all protease inhibitors boosted with Norvir or subsets of those drugs – is a relevant market for antitrust purposes.  Plaintiffs must then prove that Abbott had a specific intent to monopolize that market. The Court has already instructed you on how to determine whether Plaintiffs proved their relevant market.  You may refer to my previous instructions entitled "Relevant Market General," "Relevant Product Market," and "Relevant Geographic Market" for guidance.

If you find that Plaintiffs have proven a relevant market, you must then decide whether Abbott had the specific intent to monopolize that market.  In other words, you must decide if the evidence shows that Abbott acted with the conscious aim of maintaining the power to control prices and to exclude or handicap competition in the relevant market.

There are several ways in which Plaintiffs may prove that Abbott had the specific intent to monopolize.  There may be evidence of direct statements of Abbott's intent to obtain a monopoly in the relevant market.  Such proof of specific intent may be established by documents prepared by responsible officers or employees of Abbott at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of Abbott.  You must be careful, however, to distinguish between a defendant's intent to compete aggressively (which is lawful), which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Even if you decide that the evidence does not prove directly that Abbott actually intended to obtain a monopoly, specific intent may be inferred from what Abbott did. For example, if the evidence shows that the natural and probable consequence of Abbott's conduct in the relevant market was to give Abbott control over prices, or to exclude or handicap competition, and that this was plainly foreseeable by Abbott, then you may infer that Abbott specifically intended to maintain monopoly power.

**Source**:  ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 Ed.), Instruction C-90.

<u>[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED ATTEMPTED</u>
<u>MONOPOLIZATION – SPECIFIC INTENT INSTRUCTION 1</u>

You must next decide whether Abbott acted with a specific intent to monopolize.[142]  In other words, you must decide if the evidence shows that Abbott acted with the conscious aim of maintaining the power to control prices and to exclude or handicap competition.

There are several ways in which Plaintiffs may prove that Abbott had the specific intent to monopolize.  There may be evidence of direct statements of Abbott's intent to obtain a monopoly.  Such proof of specific intent may be established by documents prepared by responsible officers or employees of Abbott at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of Abbott.  You must be careful, however, to distinguish between a defendant's intent to compete aggressively (which is lawful), which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Even if you decide that the evidence does not prove directly that Abbott actually intended to obtain monopoly power, specific intent may be inferred from what Abbott did.  For example, if the evidence shows that the natural and probable consequence of Abbott's conduct was to give Abbott control over prices, or to exclude or handicap competition, and that this was plainly foreseeable by Abbott, then you may infer that Abbott specifically intended to maintain monopoly power.


**Source**:  ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 Ed.), Instruction C-90.

---

[142] The Customer Plaintiffs contend that the requirement is a specific intent to monopolize; such intent need not be shown with reference to a specific market.  *See Rebel Oil Co. Inc., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (monopoly power can be shown through direct evidence, or circumstantially by defining the relevant market).  They would omit the italicized phrases in this instruction.

<u>[DISPUTED] ABBOTT'S PROPOSED SPECIFIC INTENT INSTRUCTION 2</u>

SPECIFIC INTENT TO MONOPOLIZE

The third element that plaintiffs must prove is that Abbott had a specific intent to monopolize the market in which they allege Kaletra competes. In other words, you must decide whether Plaintiffs have shown that Abbott acted with the conscious aim of acquiring the power to control prices and to exclude or destroy competition in the market in which they allege Kaletra competes, as opposed to some other reason such as capturing the value of Norvir's new use as a booster.

There are several ways in which plaintiffs may prove that Abbott had the specific intent to monopolize the market in which they allege Kaletra competes. There may be evidence of direct statements of Abbott's intent to obtain a monopoly in the relevant market. Such proof of specific intent may be established by documents prepared by responsible officers or employees of Abbott at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of Abbott. You must be careful, however, to distinguish between an intent to compete aggressively or to obtain the financial and other benefits of lawfully obtained patent rights, each of which is lawful and which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Even if you decide that the evidence does not prove directly that Abbott actually specifically intended to obtain a monopoly, specific intent may be inferred from certain conduct.  For example, if the evidence shows that the natural and probable consequence of Abbott's conduct in the relevant market was to give Abbott control over prices and to exclude or destroy competition, and that this was plainly foreseeable by Abbott, then you may (but are not required to) infer that Abbott specifically intended to acquire monopoly power.

If you find that plaintiffs have proven that Abbott had a specific intent to monopolize the market in which they allege Kaletra competes, you must find that plaintiffs have proven this element of its attempted monopolization claim. If you find that plaintiffs failed to prove that Abbott had a specific intent to monopolize, then you must find for Abbott and against plaintiffs on plaintiffs' attempted monopolization claim.

**Source:**  ABA Model Jury Instructions in Civil Antitrust Cases (2005); Attempt to Monopolize, Instruction 3 (modified); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1218 (9th Cir. 1997).

**GSK's Argument**

Plaintiffs' proposal mirrors the organizational structure of the ABA Model Instructions dealing with claims for attempted monopolization. Abbott's does not, but instead adds an additional element to the claim and addresses that element in separate instructions. Abbott's instruction also adds an unnecessary final paragraph that is not in the ABA Model Instruction. The Court should use GSK's proposal, which mirrors the ABA Model Instruction.

**Customer Plaintiffs' Argument**

The Customer Plaintiffs' proposal mirrors the ABA Model Instruction, but replaces the phrase concerning need to establish a "specific intent to monopolize *a relevant market,*" and instead speaks of a need to show a specific intent to monopolize. The Customer Plaintiffs maintain the proving a relevant market should not be an element of attempted monopolization. *See Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (holding, in attempted monopolization case, that direct proof may be used). If the Customer Plaintiffs' instruction is not given, the ABA Model Instruction should be given.

**Abbott's Argument**

**Specific Intent To Monopolize**

1.      Abbott's specific intent instruction follows the ABA model instructions with only one principal difference to tailor them to the context of this case: Abbott's instructions contain a phrase reminding the jury that an intent to "obtain the financial and other benefits of lawfully obtained patent rights" is lawful. This is fully supported by settled law, and the reminder here is necessary to avoid confusion between intent to take advantage of a lawful patent monopoly and intent to gain unlawful non-patent monopoly power. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1219 (9th Cir. 1997) (a defendant "may assert that its desire to profit from its intellectual property rights justifies its conduct, *and the jury should presume that this justification is*

*legitimately procompetitive*") (emphasis added); *Schor v. Abbott Labs*., 457 F.3d 608, 610 (7th Cir. 2006) ("[A] patent holder is entitled to charge whatever the traffic will bear.").

2.     Plaintiffs' proposed instruction departs from the model instructions in three significant and erroneous ways.  First, it omits reference to a relevant market.  Second, it states that intent to monopolize may be inferred from an attempt to "exclude or *handicap* competition," thus replacing the word "handicap" with the word "destroy," which is the word used by Abbott and the model instructions.  Third, Plaintiffs' proposed instruction refers to "maintaining" market power, rather than "acquiring" market power, which is the term used by Abbott and the model instructions.

3.     ***First,*** **Plaintiffs' instructions improperly omit the requirement that Plaintiffs prove intent to acquire monopoly power in a relevant market.**  Here again, Plaintiffs have sanitized their proposed instruction to omit any reference to a relevant market.  As explained above, the absence of a relevant market requirement is contrary to law and invites jury confusion.  *See* Elements of Attempted Monopolization ¶¶ 2-4, *supra*.  Abbott incorporates those arguments and objections here.

4.     ***Second,*** **Plaintiffs' instructions improperly lower the bar by requiring the jury only to find a mere intent to "handicap" competition, rather than an intent to "destroy" it.**  Plaintiffs' use of the word "handicap" is contrary to the model instructions, which use the word "destroy."  A standard requiring an intent to "handicap" competition is a lower standard than one requiring an intent to "destroy" competition.  The Supreme Court has warned that specific intent requires "something more than an intent to compete vigorously."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993).  Yet, an intent merely to "handicap" competitors is little more than vigorous competition, which the antitrust laws permit.  At a minimum, Plaintiffs' use of the word "handicap" is misleading and likely to cause jurors to confuse an intent to compete vigorously with an intent to destroy competition through monopolization.

5.      Plaintiffs apparently borrow the word "handicap" from the instructions at issue in *Aspen Skiing*, but *Aspen Skiing* does not support use of that word here.  For one thing, the instructions in *Aspen Skiing* refer to conduct that "*unnecessarily . . .* handicaps competitors," and that qualifier, in context of the rest of the instruction, refers to the lack of a legitimate business justification.  472 U.S. at 597 (emphasis added).  By omitting the qualifier, Plaintiffs take the word out of context and heighten the risk that the jury will punish Abbott for an intent merely to engage in vigorous competition.  Moreover, as explained in more detail elsewhere, Plaintiffs' reliance on *Aspen Skiing* is also misplaced because the adequacy of the jury instructions was not at issue in that case, and in any event, the Supreme Court has narrowed the scope of its decision in subsequent years.  *See Trinko*, 540 U.S. at 409 ("*Aspen Skiing* is at or near the outer boundary of § 2 liability.");  *Spectrum Sports*, *supra*.

6.      ***Third,* Plaintiffs' Instructions Improperly Refer To Maintaining Monopoly Power.**  It does not make sense to speak of "maintenance" of monopoly power in the context of an attempt claim because the essence of an attempt claim is that an entity that does not have monopoly power is trying to attain such power.  If Plaintiffs' theory is that Abbott already had monopoly power in the market in which Kaeltra competes and was engaging in purportedly anticompetitive conduct in an attempt to maintain that alleged power, then there is a potential monopolization claim if the conduct was successful (and the other elements of monopolization are satisfied). However, there is no attempt claim if the conduct was unsuccessful because there would be no dangerous probability of obtaining monopoly power.  The model instruction implicitly recognizes as much when it uses the word "acquiring" monopoly power in describing the attempt claim, and Plaintiffs' need to change that word to "maintaining" shows that their theory of liability is fundamentally inconsistent with an attempt claim.  In any event, the language of the model instruction—"acquiring"—is appropriate for an attempt claim.

<u>[DISPUTED] GSK'S AND CUSTOMER PLAINTIFFS' PROPOSED DANGEROUS
PROBABILITY OF SUCCESS INSTRUCTION</u>

DANGEROUS PROBABILITY OF SUCCESS

If you find that Abbott had the specific intent to achieve a monopoly and engaged
in anticompetitive conduct, you must next determine if the evidence shows that there was
a dangerous probability that Abbott would succeed in maintaining monopoly power
during the relevant period of time.  The relevant time at which to evaluate Abbott's
probability of success is at the time of the claimed anticompetitive conduct, rather than
the time period since the conduct.[143]

In determining whether there was a dangerous probability that Abbott would
maintain its monopoly power, you should consider the factors described in my previous
instruction to you entitled: "Existence of Monopoly Power."   However, keep in mind
that a monopolist may have a lower share of the market and still be found to have
attempted monopolization.  For example, a market share as low as 30 percent may be
sufficient to support a finding of dangerous probability of success for an attempt claim.[144]
A dangerous probability of success need not mean that success was nearly certain, but it
does mean that there was a substantial and real likelihood that defendant would
ultimately acquire monopoly power.

**Source**:  ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases
(2005 Ed.), Instruction C-95.

---

[143] *United States v. Am. Airlines, Inc.*, 743 F.2d 1114, 1118 (5th Cir. 1984)
("When evaluating the element of dangerous probability of success, we do not rely on
hindsight but examine the probability of success at the time of the acts occur.") (citations
omitted).

[144] *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) (for
actual monopolization market share above 50 percent and for attempt market share above
30 percent sufficient to show monopoly power); *Dooley v. Crab Boat Owners Ass'n*, No.
C 02-0676, 2004 WL 902361, at *10 n.16 (N.D. Cal. Apr. 26, 2004) (same).

<u>[DISPUTED] ABBOTT'S PROPOSED DANGEROUS PROBABILITY OF SUCCESS</u>
<u>INSTRUCTION</u>

DANGEROUS PROBABILITY OF SUCCESS

The next element of attempt to monopolize that plaintiffs must prove is that there was a dangerous probability that Abbott would succeed in achieving monopoly power in the market in which Kaletra competes if it continued to engage in the same or similar allegedly anticompetitive conduct. As I instructed you earlier, monopoly power is the power to control prices and exclude competition in a relevant antitrust market.

In determining whether there was a dangerous probability that Abbott would acquire the ability to control prices in the relevant market, you should consider such factors as

**First,** Abbott's market share;

**Second,** the trend in Abbott's market share;

**Third,** the number and size of actual and potential competitors;

**Fourth,** the extent to which barriers to entry or a lack of barriers to entry into the market made it easy or difficult for competitors to enter the market;

**Fifth ,** the extent to which barriers to expansion or a lack of barriers to expansion in the market made it easy or difficult for existing competitors to expand their production;

**Sixth,** the extent of expansion of output by existing competitors; and

**Seventh**, the extent of entry and exit by other companies; the likely effect of any alleged anticompetitive conduct on Abbott's share of the market.

Again, the purpose of looking at these and other factors is to determine whether there was a dangerous probability that Abbott would ultimately acquire monopoly power. A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Abbott would ultimately acquire monopoly power.

If you find that plaintiffs have proven that Abbott had a dangerous probability of obtaining monopoly power in the market in which they allege Kaletra competes, you must find that plaintiffs have proven this element of their attempted monopolization claim and you should consider whether Plaintiffs were injured in their business or property by that which made anticompetitive any conduct that you find violated the antitrust laws. If you find that plaintiffs failed to prove that Abbott had a dangerous probability of obtaining monopoly power in the market in which they allege Kaletra

competes, then you must find for Abbott and against plaintiffs on plaintiffs' attempted
monopolization claim.


**Source:** ABA Model Jury Instructions in Civil Antitrust Cases (2005); Attempt to
Monopolize, Instruction 4.

**GSK's Argument**

Plaintiffs' instruction on this topic refers back to the earlier instructions on market power, but augments those instructions so that the jury can properly consider whether the factors listed in the market power instruction show that Abbott had a dangerous probability of successfully maintaining its monopoly through the Norvir price hike for longer than it otherwise would have. For example, GSK adds explanation, in accordance with Ninth Circuit law, that a dangerous probability of success can be found based on market shares as low as 30 percent. *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) (for actual monopolization market share above 50 percent and for attempt market share above 30 percent sufficient to show monopoly power); *Dooley v. Crab Boat Owners Ass'n*, No. C 02-0676, 2004 WL 902361, at *10 n.16 (N.D. Cal. Apr. 26, 2004) (same). These changes are proper to ensure that the jury understands the difference between the element of a "dangerous probability of success" in an attempt claim and "monopoly power" in an actual monopolization claim. This Court should adopt Plaintiffs' proposed instruction.

On the other hand, while some of the factors from Abbott's instruction are derived from the ABA Model Instruction, here that instruction creates confusion. That instruction might be appropriate if an attempt claim were asserted standing alone. However, the factors will confuse a jury after they have just been instructed on the complex analysis of considering the existence of monopoly power in an actual monopolization claim. Further, this list of factors suffers from the same problem as the ABA Model Instructions on monopoly power. As GSK discusses above, they do not follow the proper rubric laid out by the Ninth Circuit in cases like *Rebel Oil*. Finally, Abbott's proposed instruction relating to the element of dangerous probability of success fails to note that market shares below 50 percent can support a finding for Plaintiffs on this issue. *Cf. Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) (for actual monopolization market share above 50 percent and for attempt market share

above 30 percent sufficient to show monopoly power); *Dooley v. Crab Boat Owners Ass'n*, No. C 02-0676, 2004 WL 902361, at *10 n.16 (N.D. Cal. Apr. 26, 2004) (same). This Court should reject Abbott's proposed instruction.

**Customer Plaintiffs' Argument**

The Customer Plaintiffs adopt GSK's argument as to this instruction.

**Abbott's Argument**

**Dangerous Probability Of Success**

1.      Abbott's proposed instructions use language directly from the ABA model instructions.  Plaintiffs' proposed instructions, however, differ from the model instructions in two erroneous ways.  First, Plaintiffs include confusing language about the relevant time period.  Second, Plaintiffs overemphasize the amount of market share in determining dangerous probability of success.

2.      ***First,*** **Plaintiffs' instructions improperly refer to an attempt at "maintaining monopoly power" rather than the attempted acquisition of monopoly power.**  As explained further above, Plaintiffs are trying to shoe-horn their claim for alleged illegal maintenance of a monopoly into a claim for attempted monopolization.  Try as they might, it does not work.  It makes no sense to speak of a claim for attempted maintenance of a monopoly, and plaintiffs' replacement of words like "achieving" and "acquiring" monopoly power with the word "maintaining" monopoly power is indicative of this mismatch of their theory and the statutory attempted monopoly offense.

3.      ***Second,***  **Plaintiffs' instructions improperly include confusing and incorrect language about the relevant time period.**  The ABA model instructions and Abbott's proposed instructions define dangerous probability of success as a dangerous probability that Abbott will achieve monopoly power "if it continued to engage in the same or similar allegedly anticompetitive conduct."  Plaintiffs, however, omit that language and add a sentence instructing that the "relevant time at which to evaluate Abbott's probability of success is at the time of the claimed anticompetitive conduct,

rather than the time period since the conduct." This alteration of the model instructions is confusing and likely to mislead the jury into believing that Abbott's alleged conduct happened at a single moment in 2003. The language makes it sound as though one merely takes a snapshot on the first day that any pricing at issue was in effect, rather than looking at the full period in which the relevant pricing was in effect and its effects, if any, over that entire period of time. Plaintiffs' approach is contrary to law. *See* "Time Period for Monopoly Power," Elements of Monopolization ¶¶ 3-8, *supra.*

4.      ***Third,* Plaintiffs' instructions improperly overemphasize the amount of market share as a factor in determining dangerous probability of success.** Instead of following the model instructions by listing the factors relevant to dangerous probability of success, Plaintiffs' proposed instructions merely refer the jury back to the monopoly power instructions addressing those factors. Abbott incorporates its arguments and objections regarding those instructions here.

5.      In addition to referring to the monopoly power instructions, however, Plaintiffs add language found nowhere in the model instructions, emphasizing that the jury should "keep in mind that a monopolist may have a lower share of the market and still be found to have attempted monopolization." Plaintiffs also stress that "a market share as low as 30 percent may be sufficient to support a finding of dangerous probability of success." This language is prejudicial, as it suggests that any market share above 30 percent is sufficient, without regard to other factors—such as the trend in market share. Even if a low 30 percent market share may support a finding of dangerous probability of success in cases where market share is going up, the market share here was going *down*. *See* IIIA Areeda, Antitrust Law ¶807e2, at 448 ("A rising market share is more likely to suggest a dangerous probability of success than a falling share.").

6.      Likewise, although Plaintiffs cite *Rebel Oil* for the proposition that "market share above 30 percent [is] sufficient," that case in fact held that "market share of 44 percent is sufficient as a matter of law to support a finding of market power, *if entry*

*barriers are high and competitors are unable to expand their output in response to sulpracompetitive pricing*" (51 F.3d at 1438 (emphasis added)).  Thus, the court emphasized that we "should be wary of the numbers game of market percentage when considering attempt-to-monopolize claims," and we should instead "carefully analyz[e]" all relevant factors.  *Id*. at 1438 n.10 (quotation omitted).  Plaintiffs' proposed instruction needlessly and improperly overemphasizes the "numbers game" while underemphasizing the other factors.

7.      Moreover, this language again highlights that an attempt claim is meant to deal with the situation in which a defendant is attempting to gain monopoly power, not the situation in which the plaintiffs' theory is that the defendant engaged in anticompetitive conduct to prolong a purported monopoly.  This latter situation, which is the situation alleged here, does not support an attempt claim.  Plaintiffs' difficulty in adapting the standard attempted monopolization jury instructions to their circumstances are indicative of the fact that their theory does not fit the mold of an attempt offense.

[JOINT] INSTRUCTION ON INTERSTATE COMMERCE

INTERSTATE COMMERCE

The parties agree that Abbott sold the products at issue in interstate commerce.

[DISPUTED] GSK'S PROPOSED ATTEMPTED MONOPOLIZATION
INSTRUCTION 2 ON DAMAGES

INJURY, CAUSATION AND DAMAGES

Finally you must determine whether Plaintiffs are entitled to damages and, if so, the amount of damages.  You may refer to my previous instructions entitled "Injury and Causation" and "Amount of Damages" for guidance in making these determinations.

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED ATTEMPTED
MONOPOLIZATION INSTRUCTION ON INJURY

INJURY TO PLAINTIFFS

Finally, each plaintiff must demonstrate as more probably true than not true that it was injured in its property or business as a proximate result of Abbott's anticompetitive conduct.  You may refer to my previous instructions regarding injury with respect to Plaintiffs' claim for monopolization for guidance on this element.

[DISPUTED] CUSTOMER PLAINTIFFS' PROPOSED ATTEMPTED
MONOPOLIZATION INSTRUCTION ON DAMAGES[145]

DAMAGES

Finally, Plaintiffs must prove the amount of their injury.   You may refer to my previous instructions regarding damages with respect to Plaintiffs' claim for monopolization for guidance on this element.

---

[145] In the event Customer Plaintiffs' Motion to Divide the Trial Into Two Phases is granted, this instruction would be given to the jury determining the amount of the Customer Plaintiffs' damages.

<u>[DISPUTED] ABBOTT'S PROPOSED ATTEMPTED MONOPOLIZATION
INSTRUCTION ON DAMAGES</u>

ADDITIONAL ELEMENTS OF ATTEMPTED MONOPOLIZATION

      The final elements of attempted monopolization (antitrust injury) is the same as the corresponding element of monopolization on which I have already instructed you, with two exceptions. The first exception is that direct purchasers may not recover damages based upon attempted monopolization. The second exception is that for either of its theories of anticompetitive conduct, GSK may not recover damages for any period during which Plaintiffs have failed to prove that Abbott had a dangerous probability of achieving monopoly power.

**GSK's Argument**

GSK's proposal merely refers the jury to the Court's earlier instructions concerning damages. This is the most efficient way to address the damages issue on this claim. Abbott's instruction goes well beyond what is needed. In addition, this Court should reject Abbott's instruction because it contains the following legally baseless statement: "The second exception is that for either of its theories of anticompetitive conduct, GSK may not recover damages for any period during which Plaintiffs have failed to prove that Abbott had a dangerous probability of achieving monopoly power." This is statement is legally erroneous for the reasons set out in GSK's argument attached to Abbott's instruction on "Relevant Time Period for Assessing Monopoly Power."

**Customer Plaintiffs' Argument**

The Customer Plaintiffs adopt GSK's argument as to this set of instructions. In addition, Abbott incorrectly asserts that direct purchasers cannot be awarded overcharges for Abbott's attempted maintenance of the monopoly power. In so doing, Abbott is improperly attempting to argue a summary judgment motion through the jury instructions. Such a belated attempt to raise this issue should be rejected. Abbott is also wrong. Attempted monopolization may drive up prices to supracompetitive levels even before maintenance of monopoly power has been completely achieved. If so, purchasers may bring claims against the firm engaging in attempted monopolization to recover overcharges. *See Thompson v. Clear Channel Communs., Inc.*, 247 F.R.D. 98, 152-53 (C.D. Cal. 2007)(explaining purchasers may be harmed before monopoly is completed); *Converse v. Ameritech Corp.*, No. 5:95-CV-141, 1996 U.S. Dist. LEXIS 15603, *11-12 (W.D. Mich. Sept. 26, 1996)(purchasers allowed to pursue damages for supracompetitive prices on attempt claim); *Collins v. Int'l Dairy Queen*, 59 F. Supp. 2d 1305, 1310 (M.D. Ga.1999) (permitting purchaser attempt claim). If the jury finds that Abbott's Norvir and/or Kaletra price increases were due to Abbott's unlawful attempt to monopolize the Boosted PI market, then those price increases and resulting overcharges are recoverable.

**Abbott's Argument**

The parties' proposed instructions on injury and damages refer the jury back to the instructions for those topics in the context of actual monopolization. Abbott thus incorporates its arguments and objections regarding those instructions here, as well as adding the following:

Unlike Plaintiffs' proposed instructions, Abbott's instructions make clear that direct purchasers may not recover damages based upon attempted monopolization. This is because Plaintiffs may only recover for injuries that flow from that which makes the alleged anticompetitive conduct illegal. *ARCO*, 495 U.S. at 334 (damages must be "attributable to an *anticompetitive* aspect of the practice under scrutiny"). The anticompetitive aspect of predatory pricing is that the practice may drive actual and potential suppliers of competitive products out of the market, or otherwise neutralize these competitors' ability to constrain the seller's pricing, after which time the defendant may be able to raise the price of its product (here, Kaletra) above the competitive level. *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993); *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 897 (9th Cir. 2008). By contrast, until the elimination of competition, purchasers only benefit from alleged predatory pricing because they can purchase the goods or services at issue for less than if the defendant were not engaging in predatory pricing. As the Supreme Court has written, "unsuccessful predation is in general a boon to consumers." *Brooke Group,* 509 U.S. at 224. Under an attempted monopolization theory, the defendant by definition never succeeded in eliminating competition, so any alleged overcharges (here, on Kaletra), could not have resulted from Abbott's having obtained monopoly power and then raised the price of Kaletra.[146] There thus can be no damages for the direct purchaser plaintiffs

---

[146] As explained above, overcharges on Norvir do not represent antitrust injury and so are not recoverable at all. *See* "Norvir 'Overcharges,'" Elements of Monopolization ¶¶ 13-17, *supra*.

on an attempted monopolization claim based on predatory pricing.  *See Advo, Inc. v. Phila. Newspapers, Inc.*,51 F.3d 1191, 1200 (3d Cir. 1995) ("Predatory pricing schemes that fail at [or never reach] the recoupment stage. . . do not injure competition ( *i.e.* they do not injure consumers) and so produce no antitrust injury.").

Similarly, the anticompetitive aspect of an improper refusal to deal is that the practice may cause a competitor to lose sales and may force a purchaser to have to purchase an alternative product in the relevant product market at a higher cost.  Thus, antitrust injury to direct purchasers would only exist as a result of an improper refusal by Abbott to deal in Norvir if the direct purchaser Plaintiffs were forced to buy Kaletra instead of a competitive product like Lexiva or Reyataz.  But, by definition, an attempted monopolization theory assumes that Abbott did not succeed in forcing direct purchaser Plaintiffs to buy Kaletra instead of a competitive product like Lexiva or Reyataz.  There therefore can be no damages for the direct purchaser Plaintiffs on an attempt claim.[147]

With respect to GSK, Abbott's instructions also make clear that GSK may not recover damages for any period during which Plaintiffs have failed to prove that Abbott had a dangerous probability of achieving monopoly power.

---

[147] Abbott continues to maintain its argument that the direct purchaser Plaintiffs lack standing to bring a refusal-to-deal claim at all.  *See Trinko*, 540 U.S. at 417 (Stevens, J., concurring) (injuries of customers who received poor service because of refusal to deal with AT&T "purely derivative of the injury that AT&T suffered," so customers lacked antitrust standing); *Int'l Bus. Machs. v. Platform Solutions*, 658 F. Supp. 2d 603, 610 (S.D.N.Y. 2009) (software distributor's injuries derivative of injuries to companies with whom IBM refused to deal).  Abbott preserves this issue for appeal.

[DISPUTED] GSK'S AND CUSTOMER PLAINTIFFS' PROPOSED NO PATENT
IMMUNITY INSTRUCTION

NO PATENT IMMUNITY

As I instructed you earlier, a patent does not confer a right to violate the antitrust
laws.  You may refer to the prior instruction entitled "No Patent Immunity" to remind
yourself in more detail of these points.

## **GSK's Argument**

This Court should adopt this instruction for the same reasons as set out in GSK's argument attached to its "No Patent Immunity" instruction proposed to be read after instructions on the actual monopolization claim.

## **Customer Plaintiffs' Argument**

The Customer Plaintiffs join GSK's argument as to this instruction.

## **Abbott's Argument**

Plaintiffs' proposed patent instruction refers the jury back to an earlier instruction. Abbott thus incorporates its arguments and objections regarding that instruction here.

[DISPUTED] GSK'S PROPOSED INTRODUCTORY BREACH OF THE IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING INSTRUCTION

INTRODUCTION AND ELEMENTS OF GSK'S CLAIM FOR BREACH OF THE
IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

GSK seeks to recover damages for breach of the implied covenant of good faith
and fair dealing contained in the license agreement into which GSK and Abbott entered
on December 13, 2002 ("Norvir Boosting License"). GSK claims that the Norvir
Boosting License provided it the right to market Lexiva for co-administration and co-
promotion with Norvir in order to increase sales of boosted Lexiva. GSK asserts that
Abbott breached the implied covenant of good faith and fair dealing by taking an
unprecedented 400 percent price hike on Norvir deliberately timed to follow shortly after
the launch of GSK's boosted protease inhibitor, Lexiva, in order to disrupt its launch and
interfere with GSK's ability to promote Lexiva. GSK asserts these acts were taken in bad
faith, were intended to and had the actual effect of disrupting Lexiva's launch and
depriving GSK of the benefits of the Norvir Boosting License. Abbott claims that it did
not breach the implied covenant of good faith and fair dealing because its actions were a
good faith pursuit of its economic interests in maximizing revenue from the sale of
Norvir.

Within every contract is an implied covenant of good faith and fair dealing.[148]
The implied covenant of good faith and fair dealing between parties to a contract
embraces a pledge that neither party shall do anything which will have the effect of
destroying or injuring the right of the other party to receive the fruits of the contract.[149]
A breach of the covenant is a breach of the agreement or contract itself, the covenant
being part and parcel of the agreement.[150]

In order to sustain this claim, GSK must establish each of the following elements
as more probably true than not: (1) that the Norvir Boosting License was a binding
contract between GSK and Abbott; (2) that Abbott breached its obligation to deal with

---

[148] Comment, New York Pattern Jury Instructions – Civil 4:1 (Contracts,
Generally, Elements); *see also Meijer, Inc. v. Abbott Labs.*, 544 F. Supp. 2d 995, 1007
(N.D. Cal. 2008) ("[I]mplicit in all contracts is a covenant of good faith and fair dealing
in the course of contract performance.") (quoting *Dalton v. Educ. Testing Serv.*, 87
N.Y.2d 384, 389 (1995))

[149] Comment, New York Pattern Jury Instructions – Civil 4:1 (Contracts,
Generally, Elements); *see also Meijer, Inc. v. Abbott Labs.*, 544 F. Supp. 2d 995, 1007
(N.D. Cal. 2008) ("[w]hile the duties of good faith and fair dealing do not imply
obligations inconsistent with other terms of the contractual relationship, they do require
that neither party shall do anything which will have the effect of destroying or injuring
the right of the other party to receive the fruits of the contract.") (internal quotation
omitted)

[150] Comment, New York Pattern Jury Instructions – Civil 4:1 (Contracts,
Generally, Elements)

GSK fairly and in good faith; and (3) that GSK sustained damage by reason of Abbott's breach.[151]

**Source:**  Comment, New York Pattern Jury Instructions – Civil 4:1 (Contracts, Generally, Elements); *Meijer, Inc. v. Abbott Labs.*, 544 F. Supp. 2d 995, 1007 (N.D. Cal. 2008); *Liberty Envtl. Sys., Inc. v. County of Westchester*, No. 94-CIV-7431(WK), 2000 WL 1752927 (S.D.N.Y. Nov. 29, 2000).

---

[151] *Liberty Envtl. Sys., Inc. v. County of Westchester*, No. 94-CIV-7431(WK), 2000 WL 1752927, at *3 (S.D.N.Y. Nov. 29, 2000) ("In order to sustain this claim, [the plaintiff] must prove, by a preponderance of the evidence, each one of the following elements: (1) that the MOU was a binding contract between [the plaintiff] and the [defendant]; (2) that the [defendant] breached its obligation of good faith; and (3) that [the plaintiff] sustained damage by reason of the [defendant's] breach.") (quoting Tr. 2393 [Jury Charge #12]).

<u>[DISPUTED] ABBOTT'S PROPOSED INTRODUCTORY BREACH OF THE
IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING INSTRUCTION 1</u>

IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

I am now going to instruct you on Plaintiff GSK's claim that Abbott breached the implied covenant of good faith and fair dealing.  Only Plaintiff GSK has asserted this claim.

Implicit in all contracts is a covenant of good faith and fair dealing.[152]  That means that neither party may violate any promises that a reasonable person in the position of the other party would be justified in understanding was included in the contract. [153] This embraces a pledge that a party to the contract shall not do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. [154]  The covenant is intended to effectuate the intentions of the parties, or to protect their reasonable expectations. [155]

---

[152] *511 West 232nd Owners Corp. v. Jennifer Realty Co*., 773 N.E.2d 496, 500 (N.Y. 2002) ("all contracts imply a covenant of good faith and fair dealing in the course of performance"); *Agency Dev., Inc. v. MedAmerica Ins. Co.*, 327 F. Supp. 2d 199, 203 (W.D.N.Y. 2004) ("implicit in every contract is a covenant of good faith and fair dealing"); *Wolff v. Rare Medium, Inc*., 210 F. Supp. 2d 490, 497 (S.D.N.Y. 2002) ("breach of the covenant of good faith and fair dealing is an implied term of every contract and is considered to be a breach of the underlying contract"); *Geren v. Quantum Chem. Corp.*, 832 F. Supp. 728, 732 (S.D.N.Y. 1993); *Hartford Fire Ins. Co. v. Federated Dep't Stores Inc.*, 723 F. Supp. 976, 991 (S.D.N.Y. 1989) ("[e]very contract governed by New York law . . . contains an implied covenant to perform the contract fairly and in good faith").

[153] *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (N.Y. 1978) ("the undertaking of each promisor in a contract must include any promises which a reasonable person in the position of the promisee would be justified in understanding were included"); *Agency Dev., Inc. v. MedAmerica Ins. Co.*, 327 F. Supp. 2d 199, 204 (W.D.N.Y. 2004) ("equitable considerations will not allow an extension of coverage beyond [the agreement's] fair intent and meaning in order to obviate objections which might have been foreseen and guarded against"); 4/11/08 Order at 21 (GSK Docket No. 82).

[154] *511 West 232nd Owners*, 773 N.E.2d at 500 ("This covenant embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract'"); *Geren v. Quantum Chem. Corp.*, 832 F. Supp. 728, 732 (S.D.N.Y. 1993); *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990); ("where a party's acts subsequent to performance on the contract so directly destroy the value of the contract for another party that the acts may be presumed to be contrary to the intention of the parties, the implied covenant of good faith may be implicated"); *Hartford Fire Ins. Co. v. Federated Dep't Stores Inc.*, 723 F. Supp. 976, 991 (S.D.N.Y. 1989) ("[t]his implied covenant means that

---

<u>[DISPUTED] ABBOTT'S PROPOSED INTRODUCTORY BREACH OF THE</u>
<u>IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING INSTRUCTION 2</u>

IMPLIED COVENANT DOES NOT CREATE INDEPENDENT CONTRACT RIGHTS

The duty of good faith and fair dealing does not create contractual rights or obligations going beyond those intended and stated in the language of the contract.[156] Nor does it allow a party to rewrite the parties' agreement to supply additional terms to which the parties did not bargain.[157]

_____

'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract'"); 1/14/11 Order at 36-37; 4/11/08 Order at 21 (GSK Docket No. 82).

[155] *511 West 232nd Owners*, 773 N.E.2d at 500-01 ("While the duties of good faith and fair dealing do not imply obligations 'inconsistent with other terms of the contractual relationship' . . . they do encompass 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included'"); *EBC I, Inc. v. Goldman Sachs*, 5 N.Y.3d 11, 22-23 (where contractual objectives of contract achieved, plaintiff had no claim for breach of implied covenant); *Nat'l Union Fire Ins. Co. v. Xerox Corp*., 807 N.Y.S.2d 344, 345 (App. Div. 2006); *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co*., 86 N.Y.2d 685, 695 (1995); *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990); *Geren v. Quantum Chem. Corp.*, 832 F. Supp. 728, 732 (S.D.N.Y. 1993).

[156] *EBC I*, 5 N.Y.3d at 23; *511 West 232nd Owners Corp. v. Jennifer Realty Co*., 773 N.E.2d 496 (N.Y. 2002); *Nat'l Union Fire Ins. Co. v. Xerox Corp.*, 807 N.Y.S.2d 344, 345 (App. Div. 2006) (a party cannot invoke the duty of good faith and fair dealing "to create independent contractual rights.");; *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990); *Agency Dev., Inc. v. MedAmerica Ins. Co.*, 327 F. Supp. 2d 199, 204 (W.D.N.Y. 2004) (implied covenant cannot "go beyond those [promises] intended and stated in the express language of the contract."); *Wolff v. Rare Medium, Inc*., 210 F. Supp. 2d 490, 497 (S.D.N.Y. 2002) ("the obligation of good faith does not create obligations that go beyond those intended and stated in the language of the contract."); *Hartford Fire Ins. Co. v. Federated Dep't Stores Inc.*, 723 F. Supp. 976, 991 (S.D.N.Y. 1989) ("the implied covenant of good faith and fair dealing does not provide a court *carte blanche* to rewrite the parties' agreement."); 4/11/08 Order at 21 (GSK Docket No. 82).

[157] *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (N.Y. 1978) ("courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include"); *Nat'l Union Fire Ins. Co. v. Xerox Corp.*, 807 N.Y.S.2d 344, 345 (App. Div. 2006); *Hartford Fire Ins. Co. v. Federated Dep't Stores Inc.*, 723 F. Supp. 976, 991 (S.D.N.Y. 1989) ("the implied covenant of good faith and fair dealing does not provide a court *carte blanche* to rewrite the parties' agreement…"Nor can a court imply a covenant to supply additional terms for which the parties did not bargain.").

Freedom of contract prevails in an arm's length transaction between sophisticated parties, and there is no reason to relieve them of the consequences of their bargain.[158]  If they are dissatisfied with those consequences, the time to say so is at the bargaining table.[159]  Where the contractual objectives were achieved, an implied promise cannot be read into the agreement.[160]

---

[158] *Oppenheimer*, 86 N.Y.2d at 695 ("Freedom of contract prevails in an arm's length transaction between sophisticated parties . . . , and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain."); *Agency Dev.*, 327 F. Supp. 2d at 204.

[159] *Oppenheimer*, 86 N.Y.2d at 695 ("If they are dissatisfied with the consequences of their agreement, the time to say so [was] at the bargaining table."); *Agency Dev.*, 327 F. Supp. 2d at 204; *Hartford Fire Ins* , 723 F. Supp. at 991.

[160] *EBC I*, 5 N.Y.3d at 23 (where contractual objectives of contract achieved, plaintiff had no claim for breach of implied covenant); *Hartford Fire Ins.*, 723 F. Supp. at 991.

[DISPUTED] ABBOTT'S PROPOSED INTRODUCTORY BREACH OF THE
IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING INSTRUCTION 3

IMPLIED COVENANT DOES NOT PREVENT ABBOTT FROM ACTING IN ITS
INTERESTS

The implied covenant also does not undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract.[161]

So long as GSK was allowed to reap the benefits of the contract, the implied covenant of good faith does not require Abbott to take actions contrary to its own economic interests.[162]

---

[161] *EBC I*, 5 N.Y.3d at 23; *Nat'l Union Fire Ins.*, 807 N.Y.S.2d at 345; *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) ("the implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract."); *Agency Dev.*, 327 F. Supp. 2d at 203; *Hartford Fire Ins.*, 723 F. Supp. at 991.

[162] *511 West 232nd Owners*, 773 N.E.2d at 500; *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978); *Nat'l Union Fire Ins.*, 807 N.Y.S.2d at 345; *Oppenheimer*, 86 N.Y.2d at 695; *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134 (2d Cir. 1990); *Bank of New York v. Sasson*, 786 F. Supp. 349, 354 (S.D.N.Y. 1992) ("Moreover, so long as the promisee is allowed to reap the benefits of the contract, the implied covenant of good faith does not require the promisor to take actions contrary to his own economic interest such as extending, or even negotiating the possible extension of, a risky loan."); *Hartford Fire Ins.*, 723 F. Supp. at 991.

**GSK's Argument**

GSK's substantive instructions on this claim are primarily based upon commentary to the New York Pattern Jury Instructions, as well as language from this Court's orders regarding GSK's claim for a breach of the covenant of good faith and fair dealing.  (The New York Pattern Jury Instructions do not contain model instructions for this claim.)  It does not appear that Abbott's instructions are drawn from commentary to the New York Pattern Instructions, but instead from a hodge-podge of cases.  In fact, many of these cases have nothing to do with the implied covenant of good faith and fair dealing.  *See, e.g.*, *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (N.Y. 1978); *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 695 (.1995).

GSK's proposed instruction introducing this claim provides a fair summary of GSK's theory of its claim and Abbott's factual contentions in response.  It also concisely summarizes the law regarding this claim.  Importantly, GSK's proposal contains the following statement drawn from comments on the New York Pattern Instructions: "A breach of the covenant is a breach of the agreement or contract itself, the covenant being part and parcel of the agreement."  This statement is important to avoid juror confusion regarding the scope of the implied covenant of good faith and fair dealing.  While it is natural for a lawyer to understand the import of enforcing terms implied into a contract by law, the jury should be reminded that good faith and fair dealing is "part and parcel" of every agreement and does not need to be contained as an explicit term in the contract. Finally, GSK's jury instructions set out the elements of the claim drawn directly from New York case law.  *Liberty Envtl. Sys., Inc. v. County of Westchester*, NO. 94-CV-7431 (WK), 2000 WL 1752927 at *3 (S.D.N.Y. Nov. 29, 2000).

To the extent Abbott's instructions contain accurate statements of the law, they are already encompassed in GSK's proposed introductory instruction as well as its more particular instruction on breach of the implied covenant of good faith and fair dealing

cited below.  The majority of the language in Abbott's general jury instructions, however,

is misleading and based on incorrect law.   For example, in its instruction entitled

"Implied Covenant Does Not Create Independent Contract Rights," Abbott proposes the

following language:

> Freedom of contract prevails in an arm's length transaction between
>
> sophisticated parties, and there is no reason to relieve them of the
>
> consequences of their bargain.  If they are dissatisfied with those
>
> consequences, the time to say so is at the bargaining table.  Where the
>
> contractual objectives were achieved, an implied promise cannot be read
>
> into the agreement.

This language is apparently drawn from *Oppenheimer & Co., Inc. v. Oppenheim, Appel,*

*Dixon & Co.*, 86 N.Y.2d 685, 695 (1995) ("Freedom of contract prevails in an arm's

length transaction between sophisticated parties such as these, and in the absence of

countervailing public policy concerns there is no reason to relieve them of the

consequences of their bargain. If they are dissatisfied with the consequences of their

agreement, the time to say so [was] at the bargaining table."(internal quotation and

citation omitted)).  The *Oppenheimer* court however considered whether an express

condition in a contract should be enforced or whether that express condition could be met

by the concept of substantial performance.  *Oppenheimer* does not involve breach of the

covenant of good faith and fair dealing, and thus has nothing to do with this case; such

language could mislead the jury into concluding, contrary to law, that Abbott was not

bound by good faith and fair dealing when it executed the Norvir Boosting License.

Further, Abbott's proposed instruction entitled "Implied Covenant Does Not

Prevent Abbott From Acting In Its Interests" contains similarly inaccurate statements of

the law.  For example, it states: "So long as GSK was allowed to reap the benefits of the

contract, the implied covenant of good faith does not require Abbott to take actions

contrary to its own economic self-interest."  This sentence is a regurgitation of an

argument Abbott made in its November 4, 2010 Supplemental Brief in support of its Motion for Summary Judgment.  *See* Case. No. 07-cv-5702, Docket No. 300, at 8:22-9:2.  As GSK explained in its response, Abbott's argument is legally incorrect.  *See* Case No. 07-cv-5702, Docket No. 312 at 10:3-23.  Commonsense dictates that "economic self-interest" should not "be applied as an expansive principle to excuse all manner of misconduct." *Banc of America Sec. LLC v. Solow Bldg. Co.*, 847 N.Y.S.2d 49, 55 (1st Dept. 2007).  But that is precisely how Abbott's instruction would encourage the jury to judge Abbott's conduct.

Further, the first line of this instruction that a party has a "general right to act on its own interests" as long as it only "incidentally lessen[s] the other party's anticipated fruits of the contract" is equally flawed; it similarly suggests to the jury that Abbott may act in any self-interested way, without consequence; this language thereby eviscerates the covenant of good faith and fair dealing.  In any case, GSK's proposed instruction on breach of the implied covenant of good faith and fair dealing, found below, already captures the concept that Abbott may generally pursue its interests as long as it does not injure the benefits to GSK.  For example, that instruction cabins the covenant of good faith and fair dealing by admonishing that a party only breaches of a covenant of good faith and fair dealing as to "promises which a reasonable person in the position of the promisee would be justified in understanding were included."

GSK's introductory instruction properly summarizes its claim.  Abbott's multiple introductory instructions are legally flawed and one-sided.  This Court should adopted GSK's instruction.

**Abbott's Argument**

**Implied Covenant Of Good Faith And Fair Dealing**

I.     **INTRODUCTORY INSTRUCTIONS ON BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

1.     The parties' proposals for a general introduction on GSK's claim for breach of the implied covenant of good faith and fair dealing overlap in certain respects, but there are two materially significant differences.  First, Abbott's proposed introduction cites the controlling standard as cited by the New York Court of Appeals and this Court's orders.  In contrast, GSK neglects to mention a critical element of its claim.  Second, Abbott's instruction uses neutral language, whereas GSK's instruction is argumentative.

2.     GSK's instruction is improper for at least two reasons:

3.     *First*, **GSK's proposed general instruction omits a key element of its claim.**  Abbott proposes the following language that does *not* appear in GSK's general instruction: "That means that neither party may violate any promises that a reasonable person in the position of the other party would be justified in understanding was included in the contract."  As evidenced from the footnotes supporting Abbott's instruction, this language comes directly from not only this Court's April 2008 Order (at 21), but also a controlling New York Court of Appeals decision.  *See 511 West 232nd Owners Corp. v. Jennifer Realty Co*., 773 N.E.2d 496, 501 (N.Y. 2002).

4.     GSK concedes this language as law in its subsequent instruction number 40 when it states "Accordingly, a party may pursue a breach of a contract claim for violation of any promises which a reasonable person in the position of the promise would be justified in understanding were included."  GSK Proposed Instruction: Breach of Implied Covenant of Good Faith and Fair Dealing.  But this is a key element of GSK's claim that addresses the scope of the parties' contract and thus is appropriately placed in the general instruction, which introduces to the jury the concept of the implied covenant of good faith and fair dealing.  In particular, GSK must prove that a reasonable party in

its position would have expected Abbott to constrain its pricing of Norvir.  GSK's claim necessarily fails unless and until it can prove this fact.  This point should be made clear to the jury at the outset.

> 5. **_Second_, GSK's Introductory Paragraph Lacks the Fairness and Impartiality Required.**  Abbott's proposed introductory instruction avoids argument or a description of either party's respective position.  In contrast, GSK's introductory paragraph uses sensational adjectives to describe Abbott's alleged conduct in the transparent hope of suggesting to the jury that GSK's assertions should be taken as true.  This is improper.  "Jury instructions must be formulated so that they fairly and adequately cover the issues presented, correctly state the law, and are not misleading." *Mockler v. Multnomah County*, 140 F.3d 808, 812 (9th Cir. 1998) (quotation omitted); *see also People v. Brown*, 150 A.D.2d 472 (2nd Dept. 1989) (instructions should be "neutral in tenor and were not so extensive as to prejudicially draw the jury's attention to the defendant's [actions].").  Slanted, or argumentative instructions should be rejected by the Court.  *Wall Data Inc. v. Los Angeles County Sheriff's Dept.*, 447 F.3d 769, 784 (9th Cir. 2006) (affirming district court's rejection of instructions that were "slanted or argumentative"); *see also New York Pattern Jury Instruction*s, General Principals (charges given to jury by court must contain a "balanced statement of the parties' respective contentions.") (emphasis added), citing *Lynn v. McDonnell Douglas Corp.*, 134 A.D.2d 328 (1987), *Doolittle v. T.E. Conklin Brass & Copper Co., Inc.*, 103 A.D.2d 722 (1984); *Bender v. Nassau Hospital*, 99 A.D.2d 744 (1984); *Blaize v. City of New York*, 80 A.D.2d 594 (1981).  Fairness demands that the governing rules of law be stated in an impartial fashion, without undue emphasis.  *Lyons v New York*, 29 AD2d 923 (1968), aff'd, 25 NY2d 996 (1969); *Kissner v Baxter*, 29 AD2d 905 (1968).

> 6. There is nothing neutral, balanced, or impartial about GSK's use of the slanted and argumentative terms like "unprecedented 400 percent price hike," "deliberately timed," "disrupt," "interfere," "bad faith," and "depriving."  These terms are

fodder for GSK's closing argument, but have no place in the neutral instructions that should be presented to the jury.

7.      The preamble is unnecessary to tell the jury what the elements of the cause of action.  GSK's characterization of its breach of contract allegations should be stricken from the instruction.  To the extent the Court prefers the instruction to describe the parties' contentions, Abbott proposes the following preamble that characterizes those contentions in a neutral manner:

> GSK seeks to recover damages for breach of the implied covenant of good faith and fair dealing contained in the license agreement into which GSK and Abbott entered on December 13, 2002 ("Norvir Boosting License"). GSK asserts that Abbott breached the implied covenant of good faith and fair dealing by raising the price of Norvir shortly after the launch of GSK's boosted protease inhibitor, Lexiva.  Abbott claims that it did not breach the implied covenant of good faith and fair dealing because the parties' contract did not limit Abbott's ability to raise Norvir's price, and GSK received the benefit of its bargain.

## II.     THE IMPLIED COVENANT DOES NOT CREATE INDEPENDENT CONTRACT RIGHTS

8.      As shown in the footnotes to this instruction, it is black-letter law that a party cannot invoke the duty of good faith and fair dealing "to create independent contractual rights."  *Nat'l Union Fire Ins. Co. v. Xerox Corp*., 25 A.D. 3d 309, 310 (1st Dep't 2006).  "The obligation of good faith does not create obligations that go beyond those intended and stated in the language of the contract."  *Wolff v. Rare Medium, Inc*., 210 F. Supp. 2d 490, 497 (S.D.N.Y. 2002) (applying New York law).  GSK, however, does not propose an instruction on this point of established law.

9.      Failure to instruct the jury as to the fundamental laws of the implied covenant would be prejudicial error.  Indeed, "courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include."  *Vermont Teddy Bear Co. v. 538 Madison Realty Co*., 1 N.Y.3d

470, 475 (N.Y. 2004) (quoting *Rowe v. Great Atl. & Pac. Tea Co*., 46 N.Y.2d 62, 69 (N.Y. 1978).

10.     The cited authority reveals there is no question that the limitations of the implied covenant go beyond that of just not implying "obligations inconsistent with other terms of the contractual relationship" as GSK would like the jury to believe, but it affirmatively does not create independent contractual rights.  *Hartford Fire Ins. Co. v. Federated Dept. Stores Inc*., 723 F. Supp. 976, 991 (S.D.N.Y. 1989); *Geren v. Quantum Chem. Corp*., 832 F.Supp. 728, 732 (S.D.N.Y. 1993).

11.     Abbott is thus entitled to this instruction so the jury can properly judge the facts under the legal standard for this claim.  *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009) (each party is "entitled to an instruction about his or her theory of the case if it is supported by law and has foundation in the evidence") (quotation and citation omitted).

## III.     THE IMPLIED COVENANT DOES NOT PREVENT ABBOTT FROM ACTING IN ITS INTERESTS

12.     Abbott's proposed instruction directly quotes from established precedent to instruct the jury that "so long as [GSK] is allowed to reap the benefits of the contract, the implied covenant of good faith does not require [Abbott] to take actions contrary to his own economic interests."  *Bank of New York v. Sasson*, 786 F.Supp.349, 354 (S.D.N.Y. 1992) (*citing Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*, 30 N.Y.2d 34, 46 (N.Y. 1972).  Nor does the implied covenant "extend so far as to undermine [Abbott's] 'general right to act on its own interests in a way that may incidentally lessen' [GSK's] anticipated fruits from the contract."  *M/A-Com Security Corp. v. Galesi*, 904 f.2d 134, 136 (2nd Cir. 1990); see also the remaining cases footnoted in support of Abbott's instruction.

13.     Again, GSK does not propose an instruction on this point of established law.  As Abbott is entitled to an instruction on its theory of law, Abbott's instruction should be adopted.  *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009) (each party is

"entitled to an instruction about his or her theory of the case if it is supported by law and has foundation in the evidence") (quotation and citation omitted).

14.     In fact, one of Abbott's primary defenses, which GSK recognizes in its own instructions, is that Abbott's conduct with respect to the Norvir price increase was in pursuit of its economic interests.  Accordingly, this instruction should be presented to the jury.  *Clem*, 566 F.3d at 1181.  The jury instructions should present statements regarding the "issues raised by the parties contentions, and what, under governing law, the jury must find in order for a party to prevail."  NY Pattern Jury Instructions, General Principals; *Green v. Downs*, 27 N.Y.2d 205.

## GSK'S PROPOSED BINDING CONTRACT INSTRUCTION

BINDING CONTRACT

The parties agree that the Norvir Boosting License is a binding contract between GSK and Abbott.

<u>[DISPUTED] GSK'S PROPOSED BREACH INSTRUCTION</u>

BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

      As I said, implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance.[163]  Such a promise need not be, and usually is not, explicitly contained in the contract.[164]  The covenant of good faith and fair dealing is breached when a party acts in a manner that, although not expressly forbidden by any contractual provision, deprives the other party of the right to receive benefits under their agreement.[165]  Thus, while the duties of good faith and fair dealing do not imply obligations inconsistent with other terms of the contractual relationship, they do require that neither party should do anything that would have the effect of destroying or injuring the right of the other party to the fruits of the contract.  Accordingly, a party may pursue a breach of a contract claim for violation of any promises which a reasonable person in the position of the promisee would be justified in understanding were included.[166]  When a defendant exercises a contractual right malevolently for its own gain and to deprive a plaintiff of its benefits under a contract, new or inconsistent duties under a contract are not created.  Rather, such a duty to eschew bad-faith targeted malevolence in the guise of business dealings is proper.[167]

      If you find that it is more probably true than not that Abbott breached the implied covenant of good faith and fair dealing in the Norvir Boosting License, you must find for GSK.

**Source:**  Comment, New York Pattern Jury Instructions – Civil 4:1 (Contracts, Generally, Elements); *Meijer, Inc. v. Abbott Labs.*, 544 F. Supp. 2d 995, 1007 (N.D. Cal. 2008).

---

      [163] Comment, New York Pattern Jury Instructions – Civil 4:1 (Contracts, Generally, Elements); *see also Meijer, Inc. v. Abbott Labs.*, 544 F. Supp. 2d 995, 1007 (N.D. Cal. 2008) ("[I]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance.") (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995))

      [164] *Meijer, Inc. v. Abbott Labs.*, 544 F. Supp. 2d 995, 1007 (N.D. Cal. 2008) (noting that the New York Court of Appeals allowed a breach of the implied covenant of good faith and fair dealing claim to proceed despite the fact that "[s]uch a promise was not explicitly contained in the contract.")

      [165] Comment, New York Pattern Jury Instructions – Civil 4:1 (Contracts, Generally, Elements)

      [166] *Meijer, Inc. v. Abbott Labs.*, 544 F. Supp. 2d 995, 1007 (N.D. Cal. 2008) (quoting same language); Comment, New York Pattern Jury Instructions – Civil 4:1 (Contracts, Generally, Elements)

      [167] Comment, New York Pattern Jury Instructions – Civil 4:1 (Contracts, Generally, Elements)

[DISPUTED] ABBOTT'S PROPOSED BREACH INSTRUCTION

ELEMENTS

GSK alleges that Abbott undertook an implied obligation to continue to make Norvir commercially available and to keep future increases in the price of Norvir in line with past increases.  In order to demonstrate that Abbott breached the implied covenant of good faith and fair dealing, GSK has the burden to show by the preponderance of the evidence that:

First, the parties had a valid contract.  The parties do not dispute that they entered into a license agreement on December 13, 2002.

Second, a reasonable party in GSK's position would have understood the contract to have included a promise to make Norvir commercially available and to keep future increases in the price of Norvir in line with past increases.[168]  To meet this standard, GSK must show that a reasonable party would not have entered into the parties' contract without such a promise, and that the promise was so interwoven in the whole writing of the contract as to be necessary for effectuation of the purposes of the contract.[169]

Third, Abbott directly destroyed or injured GSK's rights under the license agreement.[170]

---

[168] *511 West 232nd Owners*, 773 N.E.2d at 501 (party can pursue a breach of contract claim for violation of "any promises which a reasonable person in the position of the promisee would be justified in understanding were included."); *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co*., 86 N.Y.2d 685, 695 (1995); *Geren v. Quantum Chem. Corp.*, 832 F. Supp. 728, 732 (S.D.N.Y. 1993); 4/11/08 Order at 21 (quoting *511 West 232nd Owners*).

[169] *Oppenheimer*, 86 N.Y.2d at 695; *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (implied terms must be "so interwoven in the whole writing' of a contract as to be necessary for effectuation of the purposes of the contract."); *Agency Dev.*, 327 F. Supp. 2d at 203; *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69-70 (1978) (An implied promise giving up that right can "be recognized only if it is clear that a reasonable [party] would not have entered into the [contract] without such an understanding," which is the only situation in which refusing to "recognize such a covenant would . . . deprive the [plaintiff] of the fruits of his bargain.").

[170] *EBC I, Inc. v. Goldman Sachs*, 5 N.Y.3d 11, 23 (2005); *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 70 (1978); *Nat'l Union Fire Ins. Co. v. Xerox Corp.*, 25 A.D.3d 309, 310 (1st Dep't 2006); *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co*., 86 N.Y.2d 685, 695 (1995);

**GSK's Argument**

GSK's proposed instruction on breach of the implied covenant of good faith and fair dealing properly explains the law. This instruction is drawn from language contained in this Court's prior orders and comments to the New York Pattern Instructions. It makes clear that the covenant of good faith and fair dealing is implied in all contracts, alleviating potential juror confusion caused by the fact that GSK is suing for breach of a term implied-by-law in all contracts rather than an explicit term contain in the written contract. On the other hand, GSK's instruction admonishes that the covenant of good faith and fair dealing cannot be read to imply obligations inconsistent with other express terms in the contract. It also admonishes that the covenant of good faith and fair dealing only includes "promises which a reasonable person in the position of the promisee would be justified in understanding were included."

Abbott's proposed instruction on the other hand creates three elements with little explanation and without reference to any particular case law in support. Further, the instruction also erroneously suggests that GSK is asserting that Abbott breached an "implied obligation" to "make Norvir commercially available and … keep future increases in the price of Norvir in line with past increases." Such language incorrectly characterizes GSK's claim suggesting that GSK's claim is one for breach of an implied-in-fact promise. *See Rowe v. Great Atlantic & Pacific Tea Co., Inc.,* 46 N.Y.2d 62, 68-69 (N.Y. 1978) (distinguishing claim involving "covenant which must be implied by law" in a contract from "claim that the parties in fact impliedly did agree .. and simply neglected, … to incorporate it into their written contract."),

Inclusion of such language could lead to reversible error. *Carvel Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228 (2nd Cir. 1990) is instructive. There, the lower court instructed the jury on a claim for breach of contract, but not on a claim for breach of the implied covenant of good faith and fair dealing. The Second Circuit reversed and granted a new trial. It rejected an argument that the breach of the implied

covenant of good faith and fair dealing instruction was subsumed in the breach of contract instruction that enumerated improper acts.  The Court characterized the instruction as "misleading":

> More accurately stated, DMG's essential assertion is that Carvel breached the agreement by breaching the duty of good faith and fair dealing, not by each of the specific acts enumerated.  These acts were offered more particularly as evidence of Carvel's bad faith.  Since the contract gave Carvel considerable discretion…, the jury, as instructed, could have mistakenly concluded that Carvel was not in breach because it had near absolute control over these matters.  However, even if it acted within the bounds of its discretion, Carvel would be in breach if it acted unreasonably.

*Id.* at 232 (emphasis omitted).  In this case, Abbott's enumeration of an "implied obligation" could similarly lead the jury to mistakenly conclude that Abbott had "absolute control" over the pricing of Norvir and did not act "unreasonably" when it hiked Norvir's price 400 percent.  This is particularly so given that Abbott has repeatedly made this argument to the Court (Abbott's argument has been repeatedly rejected as legally incorrect).  All such language should be struck from Abbott's instructions.

### Abbott's Argument

1.     As discussed in more detail above (in support of Abbott's Proposed Introductory Instructions), this Court should provide the jury with Abbott's version of the elements of law for breach of the implied covenant of good faith and fair dealing because Abbott's language directly quotes from or paraphrases governing New York precedent, as well as this Court's own rulings.  In particular, those decisions hold that to prove breach of the implied covenant GSK must show that Abbott violated "any promises which a reasonable person in [GSK's position] would be justified in understanding [were]

included" in the agreement. 4/11/08 Order, GSK Dkt. 82, 21:23-27 (citing *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 501 (N.Y. 2002)).

2. In contrast, GSK's proposed instruction on the elements of a claim for breach of the implied covenant are improper for at least two reasons:

3. ***First,*** GSK's instruction conflates the question of what promises were within the reasonable contemplation of the parties with the question of whether Abbott deprived GSK of the "fruits" of those promises. GSK's instruction first states that the duty of good faith and fair dealing "require[s] that neither party should do anything that would have the effect of destroying or injuring the right of the other party to the fruits of the contract." Next, GSK's instruction states: "*Accordingly*, a party may pursue a breach of a contract claim for violation of any promises which a reasonable person in the position of the promissee would be justified in understanding were included." (Emphasis added.)

4. This is backwards. First, the jury must determine what promises are contained in the license. Here, GSK alleges that the license includes the following two implied promises: (1) "Norvir would continue to be commercially available for use as a PI boosting agent," and (2) "future increases in the price of Norvir would be consistent with past increases." (*See* Am. Compl. ¶ 69; Ex. P; GSK Resp. to Rog. No. 12). To prove these allegations, GSK must convince the jury that a reasonable person in GSK's position would be justified in understanding these promises to be included in the license. The jury cannot rule for GSK unless if finds these promises to be part of the agreement. If, and only if, the jury were to agree with GSK as to the existence of these promises, GSK then must prove that Abbott deprived GSK of the "fruits" of those promises.

5. GSK seeks to avoid the first step of its burden by offering an instruction that would allow the jury to find breach of the covenant of good faith and fair dealing if Abbott did "anything" to affect adversely Lexiva's market share. This is not the law. As discussed, the implied covenant does not "extend so far as to undermine [Abbott's]

'general right to act on its own interests in a way that may incidentally lessen' [GSK's] anticipated fruits from the contract."  *M/A-Com Security Corp. v. Galesi*, 904 f.2d 134, 136 (2nd Cir. 1990);

6.      GSK fully understood that Kaletra and Lexiva would compete in the market.  Under GSK's instruction, however, the jury theoretically could find Abbott liable for breach of the implied covenant of good faith and fair dealing merely if Abbott's marketing of Kaletra caused doctors and patients to take Kaletra instead of Lexiva.  No reasonable person in GSK's position could ever read the license as prohibiting Abbott from marketing Kaletra.  This is why the law requires, *as an initial step*, that GSK prove which promises not expressly included in the agreement should be read into it.

7.      By discussing breach before establishing the scope of Abbott's promises—GSK's instruction would confuse and likely mislead the jury into believing that any and all detriments GSK allegedly suffered as a result of Abbott's conduct necessarily breaches the license—regardless of whether GSK bargained to prevent such conduct.  Such an instruction would be highly prejudicial to Abbott because it badly mischaracterizes the law.  *See Geren v. Quantum Chemical Corp.*, 832 F. Supp. 728, 732 (S.D.N.Y. 1993) (implied covenant "ensures that parties to a contract perform the substantive bargained-for terms of their agreement").

8.      ***Second***, GSK's proposed instruction improperly imports suggestive adjectives like "malevolently " and "bad faith," which are not supported by the law.  Its instruction states, in part:  "When a defendant exercises a contractual right malevolently for its own gain and to deprive a plaintiff of its benefits under a contract, new or inconsistent duties under a contract are not created.  Rather, such a duty to eschew bad-faith targeted malevolence in the guise of business dealings is proper."  GSK borrows this language from *Richbell Information Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 302 (N.Y. App. Div. 2003).  But the court in *Richbell* used this language only to characterize the plaintiff's ***allegations***—not to state any general legal standard.  *Id.*

(referring to plaintiff's "claim that Jupiter exercised a right malevolently, for its own gain as part of a purposeful scheme designed to deprive plaintiffs of the benefits of the joint venture"). No New York court has ever adopted this statement as the standard for the breach of the implied covenant of good faith and fair dealing. Moreover, even if *Richbell* could be read to create such a legal standard (which it cannot be), GSK's proposed instruction distorts it by omitting the words "purposeful scheme."

9. Not only is this portion of GSK's proposed instruction unsupported by the law, it is also misleading, unduly prejudicial and argumentative. "Jury instructions must be formulated so that they fairly and adequately cover the issues presented, correctly state the law, and are not misleading." *Mockler v. Multnomah County*, 140 F.3d 808, 812 (9th Cir. 1998) (quotation omitted); *see also People v. Brown*, 150 A.D.2d 472 (2nd Dept. 1989) (instructions should be "neutral in tenor and were not so extensive as to prejudicially draw the jury's attention to the defendant's [actions]."). Slanted, or argumentative instructions should be rejected by the Court. *Wall Data Inc. v. Los Angeles County Sheriff's Dept.*, 447 F.3d 769, 784 (9th Cir. 2006) (affirming district court's rejection of instructions that were "slanted or argumentative"); *see also New York Pattern Jury Instruction*s, General Principals (charges given to jury by court must contain a "balanced statement of the parties' respective contentions.") (emphasis added), citing *Lynn v. McDonnell Douglas Corp.*, 134 A.D.2d 328 (1987), *Doolittle v. T.E. Conklin Brass & Copper Co., Inc.*, 103 A.D.2d 722 (1984); *Bender v. Nassau Hospital*, 99 A.D.2d 744 (1984); *Blaize v. City of New York*, 80 A.D.2d 594 (1981). Fairness demands that the governing rules of law be stated in an impartial fashion, without undue emphasis. *Lyons v New York*, 29 AD2d 923 (1968), aff'd, 25 NY2d 996 (1969); *Kissner v Baxter*, 29 AD2d 905 (1968). Descriptions such as those in GSK's instruction, specifically language along the lines of "exercises a contractual right malevolently for its own gain" and "bad-faith targeted malevolence in the guise of business dealings" are directly in line with the type of language the Court must avoid in jury instructions.

10.     Accordingly, GSK's proposed instruction must be rejected.

[DISPUTED] GSK'S PROPOSED DAMAGES INSTRUCTION 1

INTRODUCTION TO DAMAGES FOR THE IMPLIED COVENANT CLAIM

If you find that GSK has shown that it is more probably true than not that Abbott breached the covenant of good faith and fair dealing contained in the Norvir Boosting License, you can award damages to GSK.  My charge to you on the law of damages must not be taken as a suggestion that you should find for GSK.  It is for you to decide on the evidence presented and the rules of law I have given you whether GSK is entitled to recover from Abbott.  If you decide GSK is not entitled to recover, you need not consider damages.  Only if you decide that GSK is entitled to recover will you consider damages.

GSK is entitled to recover damages which are the natural and probable consequence of Abbott's breach of its implied obligation under the covenant of good faith and fair dealing, as well as damages that do not flow directly from that breach but were foreseeable and within the contemplation of the parties, at the time of or prior to contracting, as a probable result of the breach.[171]  GSK must show that damages are reasonably certain, but nothing like precise mathematical accuracy is necessary.[172]

**Source:**  New York Pattern Jury Instructions – Civil 4:20 (Contracts, Damages, Generally); *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N .Y.*, 10 N.Y.3d 187, 192 (2008); *Haven Assocs. v. Donro Realty Corp.*, 503 N.Y.S.2d 826, 830 (N.Y. App. Div. 1986); *In re Asia Global Crossing, Ltd.*, 404 B.R. 335, 341 (S.D.N.Y. 2009)

---

[171] *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N .Y.*, 10 N.Y.3d 187, 192-93 (2008) ("It is well settled that in breach of contract actions the non breaching party may recover general damages which are the natural and probably consequence of the breach. Special, or consequential damages, which do not so directly flow from the breach … [are] recoverable [when they are] … foreseeable and probable.") (internal quotations and citations omitted)

[172] *Haven Assocs. v. Donro Realty Corp.*, 503 N.Y.S.2d 826, 830 (N.Y. App. Div. 1986) ("[A]lthough damages must be reasonably certain, nothing like precise mathematical accuracy can be obtained in the calculation of the amount of damages") (quotation and citation omitted); *see* Comment, New York Pattern Jury Instructions – Civil 4:20 (Contracts, Damages, Generally)

[DISPUTED] GSK'S PROPOSED BREACH OF IMPLIED COVENANT DAMAGES
INSTRUCTION 2

BREACH OF IMPLIED COVENANT CLAIM – MEASURE OF DAMAGES

GSK measures its damages based on Abbott's breach of the covenant of good faith and fair dealing in two ways.  The first, known as expectation damages, aims to put GSK in as good a position as it would have been had Abbott not breached the implied covenant of good faith and fair dealing.[173]  It is equally fundamental that the injured party should not recover more from the breach than the party would have gained had the contract been fully performed.[174]  Under this measure of damages, GSK claims it lost sales of Lexiva because of the 400 percent price hike on Norvir.  It therefore seeks to recover lost profits from those lost Lexiva sales.

A second measure of damages, known as restitution damages, aims to restore GSK to as good a position as the one it occupied before the Norvir Boosting License was made, without attempting to compensate it for its expectation damages.[175]  This way of measuring damages seeks to restore GSK's "restitution interest," which GSK claims is GSK's interest in any benefit which GSK conferred upon Abbott in order to obtain the Norvir Boosting License for sales of Lexiva in the United States.[176]  Under this approach to damages, GSK claims it is entitled to the return of the value of concessions GSK made on royalties Abbott otherwise would have paid for rights it received from GSK to use GSK-owned technology to manufacture Abbott's drug Humira.

---

[173] Comment, New York Pattern Jury Instructions – Civil 4:20 (Contracts, Damages, Generally); *In re Asia Global Crossing, Ltd.*, 404 B.R. 335, 341 (S.D.N.Y. 2009) ("Expectation damages, the traditional measure of a nonbreaching party's damages, aim to put the nonbreaching party in as good a position as she would have occupied had there been full performance.")

[174] Comment, New York Pattern Jury Instructions – Civil 4:20 (Contracts, Damages, Generally)

[175] *In re Asia Global Crossing, Ltd.*, 404 B.R. 335, 341 (S.D.N.Y. 2009) ("Restitution, by contrast, aims to restore the nonbreaching party to as good a position as the one she occupied before the contract was made, without attempting to compensate her for consequential harms.") (citations omitted)

[176] *Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*, 341 F. Supp. 2d 258, 271 (S.D.N.Y. 2004) ("Contract damages can take any of three forms.  Any of 'expectation, reliance or restitution damages may be appropriate ….'") (quoting *County of Washington v. Counties of Warren & Washington Indus. Dev. Agency*, No. 93-Civ-0086, 1997 WL 152001, at *9 (N.D.N.Y. Mar. 31, 1997)) (footnote omitted); Restatement (Second) of Contracts § 344 (1981) ("Judicial remedies under the rules stated in this Restatement serve to protect one or more of the following interests of a promisee: … his 'restitution interest,' which is his interest in having restored to him any benefit that he has conferred on the other party.")

You should consider whether GSK has proven either or both of these forms of damages.  Provided that you find GSK has proven these measures of damages, you should not be concerned whether awarding both forms of damages would lead to duplicative recovery.  The Court will ensure GSK's recovery is not duplicative.

**Source:**  Comment, New York Pattern Jury Instructions – Civil 4:20 (Contracts, Damages, Generally); Comment, New York Pattern Jury Instructions – Civil 4:1 (Contracts, Generally, Elements); *In re Asia Global Crossing, Ltd.*, 404 B.R. 335, 341 (S.D.N.Y. 2009); *Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*, 341 F. Supp. 2d 258, 271 (S.D.N.Y. 2004); Restatement (Second) of Contracts § 344 (1981)

<u>[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 1</u>

DAMAGES

I am now going to instruct you on damages for GSK's claim of breach of good faith and fair dealing.  You should consider this instruction only if GSK has proven its claim by a preponderance of the evidence.  My charge to you on the law of damages for this claim must not be taken as a suggestion that you should find for the plaintiff, GSK. It is for you to decide based on the evidence and my legal instructions whether GSK is entitled to recover from Abbott.  If you decide that GSK is not entitled to recover, you need not consider damages.  Only if you decide that GSK is entitled to recover should you consider damages.

The burden of proof is on GSK to establish damages.

If you find Abbott breached the covenant of good faith and fair dealing, GSK should not recover more from the breach than it would have gained had the contract been fully performed.  GSK also must establish a causal relationship between the breach of good faith and fair dealing and the damages claimed.[177]

---

[177] Adapted from NY Pattern Jury Instructions § 4:20.

<u>[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 2</u>

LOST PROFITS—LIMITATION ON LIABILITY PROVISION

A provision in a contract placing a limitation on liability represents the parties' agreement on the allocation of the risk of economic loss in the event of a breach of the agreement. Courts and juries must honor liability limitations.

Article X of the license agreement between Abbott and GSK is a limitation on liability provision that prohibits an award of consequential damages, which includes lost profits. As a result, GSK may not recover lost profits for a breach of this contract by Abbott unless GSK proves by a preponderance of the evidence that Abbott's pricing conduct was sufficiently extreme to render this contract limitation on lost profits damages unenforceable.

To meet this burden, GSK must show that Abbott engaged in grossly negligent conduct that evinces intentional wrongdoing and a reckless indifference to the rights of others. Unless GSK satisfies this burden, you must not award any lost profits to GSK for a breach of contract by Abbott.[178]

**Source:** Adapted from NY Pattern Jury Instructions - Civil § 4:20; *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 554 (1992); *Metro. Life Ins. Co. v. Noble Lowndes Int'l*, 84 N.Y.2d 430, 438-39 (1994); 1/14/11 Order at 41-43.

---

[178] This instruction is adopted from the Court's January 14, 2011 Order. Abbott nevertheless maintains its position advanced in its summary judgment briefs that, in the face of a limitation-of-liability clause, "damages may be recovered in a breach of contract action only for the breach of a fundamental, ***affirmative obligation*** the agreement ***expressly imposes on the contractee***." *Corinno Civetta Const. Corp. v. City of New York*, 67 N.Y.2d 297, 312-13 (1986) (emphasis added). GSK's "burden of proving th[is] exception is a heavy one." *Manshul Constr. Corp. Bd. of Educ.*, 559 N.Y.S.2d 260, 261 (App. Div. 1990). GSK must also prove "***tortious misconduct, not mere intentional nonperformance***, that is to say, willful, wanton or grossly negligent acts." *Bank of Am. Secs. LLC v. Solow Bldg. Co. II, L.L.C.*, 847 N.Y.S.2d 49, 55 (App. Div. 2007) (emphasis added).

<u>[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 3</u>

LOST PROFITS—FORESEEABILITY

If you find that that the contract does not prohibit the recovery of lost profits, you must then determine if GSK has carried its burden of proving that it is entitled to recover lost profits.  Under the law, lost profits are not recoverable as damages for breach of contract unless GSK proves that such damages were foreseeable and within the contemplation of the parties at the time the contract was made.

In determining the contemplation of the parties, the nature, purpose and particular circumstances of the contract known by the parties should be considered as well as what liability the Abbott fairly may be supposed to have assumed consciously or to have warranted GSK reasonably to suppose that it assumed when the contract was made.[179]

---

[179] Adapted from NY Pattern Jury Instructions § 4:20.

[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 4

LOST PROFITS—PROXIMATE CAUSATION

In addition to the requirement that consequential damages—in this case lost profits—must be foreseeable, such damages also must be proximately caused by the breach of contract.  This means that GSK's lost opportunity for profit was directly traceable to conduct by Abbott that allegedly breached the parties' contract and not the result of other intervening causes unrelated to the Norvir price increase.[180]

**Source:** Adapted from NY Pattern Jury Instructions - Civil § 4:20; *Cicchetti v. Gen. Accident Ins. Co. of N.Y.*, 708 N.Y.S.2d 883, 884 (App. Div. 2000).

---

[180] *Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 261 (1986) (damages must be "directly traceable to the breach, not remote or the result of other intervening causes"); *Hyde Park Prods. Corp. v. Maximilian Lerner Corp.*, 480 N.E.2d 1084, 1088 (N.Y. 1985) (defendants can rebut damages showing by demonstrating plaintiffs damages caused by some intervening factor other than defendants conduct).

## [DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 5

### LOST PROFITS—REASONABLE CERTAINTY

Even if GSK proves that Abbott's conduct breached the parties' contract and proximately caused GSK to suffer lost profits, GSK must prove its lost profits damages with reasonable certainty.[181]  Lost profits damages cannot be awarded based upon speculative or conjectural proof.[182]

Where a new business seeking to recover for loss of future profits, the party seeking lost profits is held to a stricter standard for the obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty.[183]

---

[181] NY Pattern Jury Instructions - Civil § 4:20 ("consequential damages also must be proximately caused by the breach of contract and must be proven with reasonable certainty."); *Cicchetti v. Gen. Accident Ins. Co. of N.Y.*, 708 N.Y.S.2d 883, 884 (App. Div. 2000).

[182] NY Pattern Jury Instructions - Civil § 4:20 ("Consequential damages cannot be awarded based upon speculative or conjectural proof, [and] Lost profits [is] a form of consequential damages").

[183] NY Pattern Jury Instructions - Civil § 4:20 ("Where plaintiff is a new business seeking to recover for loss of future profits, plaintiff is held to a stricter standard in establishing the amount of loss"); *Hyde Park Prods. Corp. v. Maximilian Lerner Corp.*, 480 N.E.2d 1084, 1088 (N.Y. 1985).

<u>[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 6</u>

LOST PROFITS—APPLICATION TO THIS CASE

In this case, GSK alleges that Abbott's alleged breach of contract caused GSK to suffer lost profits.  According to GSK, the December 2003 price increase on Norvir disrupted its launch of its new boosted PI Lexiva and, as a result, GSK's sales of Lexiva fell far short of expectations.

Abbott disputes this allegation.  According to Abbott, GSK's damages expert did not accurately determine what would have been reasonable expectations for Lexiva sales as of December 2003 but, instead, relied on outdated market share forecasts.  Abbott also argues that Lexiva sales fell short of GSK's outdated expectations for reasons unrelated to the Norvir price increase—including, among other things, GSK's purported failures: (1) to recognize the shortcomings of Lexiva before its launch; (2) to recognize the true nature of a key competitor, Reyataz, which launched before Lexiva; and (3) to execute on key aspects of its own marketing plans.

You must apply the instructions I have given you to the evidence relating to lost profits to determine whether GSK has met its burden of proving to a degree of reasonable certainty lost profits caused directly by the alleged breach of contract and not other factors unrelated to conduct by Abbott.

If you find that GSK established its lost profits, you will be asked to state the amount on the verdict form.

<u>[DISPUTED] ABBOTT'S PROPOSED DAMAGES INSTRUCTION 7</u>

RESTITUTION

As an alternative remedy for breach of contract, GSK alleges that it is entitled to restitution.  GSK may not obtain both restitution and lost profits as damages for Abbott's alleged breach of the covenant of good faith and fair dealing.  As a result, you may award GSK restitution only if you have not awarded GSK lost profits.[184]

The purpose of restitution damages is to return the non-breaching party to the position it occupied before entering into the contract.[185]  Restitution damages thus enable the injured party to recover any actual benefit conferred by it upon the breaching party as the result of the existence of a contract between them.[186]  A party who seeks restitution of a benefit that he has conferred on the other party is expected to return what he has received from the other party.[187]

Where the alleged breach is by non-performance, restitution is available only if the breach gives rise to a claim for damages for total breach and not merely to a claim for damages for partial breach.[188]  GSK cannot prove a total breach if it accepted or retained Abbott's performance under the license with knowledge of defects in that performance. In that situation, GSK would have lost the right to claim damages for total breach and thus also lost the right to restitution.

To determine restitution in this case, you must first decide whether GSK has met its burden of proving by a preponderance of the evidence that Abbott committed a total breach of the license agreement when it raised Norvir's price.  If you find a total breach, you should then measure any financial benefits conferred by GSK to Abbott under the parties' contract tied to the alleged promise to make Norvir commercially available and to keep future increases in the U.S. price of Norvir in line with past increases.  You

---

[184] *Abdul v. Subbiah*, 735 N.Y.S.2d 29, 30 (App. Div. 2001) (crediting defendant with payments already made).

[185] 28 N.Y. Prac., Contract Law § 23:35 ("Restitution damages aim to restore the nonbreaching party to as good a position as that party occupied before the contract was made, without attempting to compensate the party for consequential harms.").

[186] 28 N.Y. Prac., Contract Law § 23:35 ("non-breaching party is entitled to damages to protect its restitution interest by recovery of the value of any benefit that it conferred upon the breaching party by way of part performance or reliance upon the contract.").

[187] Restatement (Second) of Contracts § 373 ("on a breach by non-performance that gives rise to a claim for damages for total breach or on a repudiation, the injured party is entitled to restitution for any benefit that he has conferred on the other party by way of part performance or reliance").

[188] *Abdul*, 735 N.Y.S.2d at 30 ("[s]ince the breach of contract by non-performance was a total breach, plaintiff was entitled to obtain restitution.").

should then subtract from that amount any offsetting financial benefits GSK received under its contract with Abbott.[189]


**Source:** Adapted from NY Pattern Jury Instructions - Civil § 4:2; 28 N.Y. Prac., Contract Law § 23:35; 13 Williston on Contracts § 39:32 (4th ed. 2000).

---

[189] 28 N.Y. Prac., Contract Law § 23:35 ("When a defendant commits a material breach, the plaintiff may recover the reasonable value of services rendered, goods delivered, or property conveyed less the reasonable value of any counter-performance it received."); *Abdul*, 735 N.Y.S.2d at 30 (crediting defendant with payments already made).

**GSK's Argument**

GSK's Instructions

GSK's proposed introductory instruction on damages concisely sets out the law on damages.  The first paragraph is based on language from the New York Pattern instruction.  Because this pattern instruction does not contain additional details, the remainder of the instruction is drawn from case law that is cited in the commentary to the New York Pattern Instruction.  GSK's instruction properly and concisely sets out the rule of law that GSK is entitled to damages that are (1) the natural or probable consequence of Abbott's breach or (2) were foreseeable and within the parties contemplation at the time of the breach.  GSK's instruction also informs the jury that GSK's damages must be the "probable result" of Abbott's breach, thus instructing on proximate causation.  Finally, GSK's proposal instructs the jury that damages must be "reasonably certain."

GSK's second instruction on measure of damages concisely explains the alternative measure of damages that GSK is seeking.  It properly sets out the distinction between damages sought based on an expectation interest and a restitution interest. *See In re Asia Global Crossing, Ltd.*, 404 B.R. 335, 341 (S.D.N.Y. 2009); *Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*, 341 F. Supp. 2d 258, 271 (S.D.N.Y. 2004).  Finally, GSK's proposed instruction admonishes the jury that it need not be concerned about duplicative damages.  Instead, the jury should calculate the amount of damages under either measure and allow the Court to determine what amount is duplicative.  *See, e.g., Britton v. Maloney*, 196 F.3d 24, 32 (1st Cir. 1999) ("The problem of guarding against double recovery is a familiar one when multiple claims exist but separate damages on each would be partly or wholly duplicative…. [W]hen the amounts awarded could conceivably differ depending on the claim but may also involve some overlap, verdict forms sometimes require a separate specification of damages for each claim on which the jury determines liability, leaving it to the judge to make the appropriate adjustments to avoid double recovery"); *Mason v. Okla. Tpk. Auth.*, 115 F.3d

1442, 1459 (10th Cir. 1997) ("Where a jury awards duplicate damages, the court …
should reduce the judgment by the amount of the duplication.").

Abbott's Instructions Generally

Abbott offers several instructions in a confusing and illogical order. For example,
the general instruction on damages is broken from more specific instructions on
foreseeability, proximate causation and reasonable certainty by an instruction on the
limitation of liability clause.  Such an approach is prejudicial to GSK.  Jurors should first
determine whether GSK is entitled to damages before they consider whether Abbott has
met its burden on an affirmative defense.

Abbott's Fourth Instruction Entitled "Lost Profits – Proximate Causation"

This instruction is misleading. Abbott's proposed instruction entitled "Lost
Profits – Proximate Causation" states that the jury must find that "GSK's opportunity for
profit was traceable to conduct by Abbott that allegedly breached the parties' contract
and not the result of other intervening causes unrelated to the Norvir price increase."
Standing alone, this proposition is legally incorrect.  GSK will still be entitled to damages
if it can show that, while there might have been other causal factors for its losses,
Abbott's breach was a substantial factor.  *Noga v. Potenza*, 221 F. Supp. 2d 345, 354
(N.D.N.Y. 2002) (holding that jury instructions were proper without requested instruction
on supervening and intervening causes; proximate cause instruction was neither
misleading nor inaccurate that stated "an injury or damage is proximately caused by an
act, whenever it appears from the evidence in the case that the act played a substantial
part in bringing about, or actually causing, the injury or damage, and that the injury or
damage was either a direct result or a reasonably probable consequence of the act."
(quotation omitted)); *Olejniczak v. E.I. Du Pont De Nemours & Co.*, 998 F. Supp. 274,
278 (W.D.N.Y. 1997) (same); *see also* Joseph Perillo, Corbin on Contracts § 55.7 (4th
ed. 2005) ("The form of [the proximate causation] rule is the same whether it is being
applied in the field of contracts or in the field of torts…."). Abbott's proposal on

causation is particularly problematic in this case since Abbott's defense is founded on the theory of death by one-thousand cuts. It likely will attempt to avoid damages by claiming that numerous other factors, none of which amount to an intervening cause alone, accounted for GSK's lost profits.

A full instruction on proximate causation, as Abbott proposes, is unnecessary and potentially confusing to the jury. GSK's instruction concisely states that GSK is only entitled to the damages that it incurred "as a probable result of the breach." This statement comports with the case law. *See, e.g., Noga v. Potenza*, 221 F. Supp. 2d 345, 354 (N.D.N.Y. 2002). GSK's instruction further avoids jury confusion that could result from the inclusion of the legal terms of art that Abbott proposes for its instruction, like "proximately caused" and "intervening cause." *See* Joseph Perillo, Corbin on Contracts § 55.7 (4th ed. 2005) ("The word 'proximate,' both by its etymology and its general usage in the English language, is unsuited to the purpose of stating rules as to the recovery of damages."). Further, GSK's instruction parallels California's model instruction on damages for breach of contract, which similarly instructs, in pertinent part, that plaintiff is entitled to damages "as a result of the breach of contract." CACI 350.

Abbott's Fifth Instruction Entitled "Reasonable Certainty"

Abbott's proposed instruction entitled "Lost Profits – Reasonable Certainty" is misleading. Abbott proposes the following be included: "Where a new business [is] seeking to recover for loss of future profits, the party seeking lost profits is held to a stricter standard for the obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty." This language, cited in the comments to the New York Pattern Instructions, is originally from *Kenford Co. v. County of Erie*, 67 N.Y.2d 257 (1986). The New York Court of Appeals has subsequently clarified that language from *Kenford*, stating that "[w]hether the claim [for lost profits] involves an established business or a new business, however, the test remains the same, i.e., whether future profits can be calculated with

reasonable certainty." *Ashland Mgmt. Inc. v. Janien*, 82. N.Y.2d 395, 404 (1993).

Accordingly, Abbott's instruction requiring the jury to find a stricter standard than

reasonable certainty for lost profits of a new business[190] is erroneous and misleading.

> Abbott's Sixth Instruction Entitled "Lost Profits – Application to this Case"

Abbott's proposed instruction entitled "Lost Profits – Application to This Case" is

entirely unnecessary.  It does not set out the law and, instead, presents in a one-sided

fashion Abbott's view of GSK's damages theory.  Such an instruction is prejudicial to

GSK, and this type of one-side attorney argument should not be provided in these jury

instructions.  If instructed properly on the law, the jury will be able to properly apply the

law to the facts presented at trial.

> Abbott's Seventh Instruction Entitled "Restitution"

Abbott's instruction entitled "Restitution" is complicated and legally incorrect.

GSK is using restitution as a measure of damages, not as a separate claim.  *CBS, Inc. v.

Merrick*, 716 F.2d 1292 (9th Cir. 1983) (under New York law, "[a] party injured by a

breach of a contract may recover both restitution and reliance damages"); *In re Asia

Global Crossing, Ltd.*, 404 B.R. 335, 342 ("[T]he plaintiff in a breach-of-contract action

may also elect to measure her damages by the value of the benefit the defendant has

unjustly retained.").

Abbott's complicated instruction, however, treats GSK's restitutionary measure of

damages as an equitable and independent claim for restitution.  For example, Abbott's

---

[190] Further, though Lexiva was a new product, GSK was certainly not a new business.  *See Ashland Mgmt. Inc. v. Janien*, 82. N.Y.2d 395, 406 (1993) (discussing why new product launch by experienced businesspeople allowed for imposition of lost profits and finding of requisite reasonable certainty); *Jewell-Rung Agency, Inc. v. Hadad Org., Ltd.*, 814 F. Supp. 337, 342 (S.D.N.Y. 1993) (denying defendant's request to limit recovery of lost profits and noting that it was unclear if plaintiff was a "new business" within the meaning of *Kenford Co.* because although it had never sold the product at issue in Canada, "its experience as a wholesaler of men's clothing in Canada is evidence of its viability as an enterprise and could, for example, yield evidence as to previous patterns of profit on resale of similar lines of clothing.").

instructions directs that "[a] party who seeks restitution of a benefit that he has conferred on the other party is expected to return what he has received from the other party" and GSK is not entitled to restitutionary damages if "it accepted or retained Abbott's performance under the license with knowledge of defects in that performance."  These statements are tantamount to requiring that GSK elect to rescind the contract.

But, rescission is not required to seek damages based on GSK's restitution interest.  Judge Nelson in her concurrence in *CBS, Inc.* affirmed "because it does not actually 'rescind' the breached contract, an award of restitution in a breach of contract action should not preclude the award of additional measures of damages."  716 F.2d at 1297.  "[A] plaintiff may request restitution in a breach of contract action as a substitute measure of lost profits…."  *Id.*  Therefore, language in Abbott's instruction to the effect that GSK is not entitled to restitutionary damages if it retained any benefits under the contract is wrong.  *See also In re Asia Global Crossing*, 404 B.R. at 342 ("[R]estitution is often an appropriate remedy for breach of an enforceable contract, whether or not there is a 'rescission' of that contract.")

Abbott is similarly wrong that GSK only has a claim for damages based on a restitutionary measure if there is a "total breach" as opposed to a "partial breach."  Since restitutionary damages are a "substitute measure of lost profits" and lost profits damages are not limited to situations concerning a "total breach," neither should restitutionary damages be so limited.  Indeed, Abbott's instruction that the jury should offset any benefits GSK retains from Abbott against GSK's restitutionary damages award suggests that restitutionary damages are available for partial breaches.  *See Washington v. Counties of Warren & Washington Indus. Dev. Agency*, No. 93-cv-0086, 1997 U.S. Dist. LEXIS 3985, at *32-33 (N.D.N.Y. March 31, 1997) (stating that "restitution damages may be appropriate" where recission is not because "alleged breach . . . could not constitute a material breach.").

In any event, where cases do discuss the severity of a breach in relation to restitutionary damages, they typically speak of a "substantial," not "total," breach. *Cf. In re Asian Global Crossing*, 404 B.R. at 343 (rejecting argument that restitution measure of damages unavailable because non-breaching received "substantially everything" it bargained for); *CBS*, 716 F.2d at 1296 (noting "rescission" available if there is a "substantial breach."). And, courts have recognized that breach of the covenant of good faith and fair dealing is a substantial breach. *See, e.g., Carvel Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228, 231 (2nd Cir. 1991). Thus, this Court should reject the "total breach" language proposed by Abbott. It is confusing to the jury and not a necessary element of GSK's restitutionary damages claim.

Finally, Abbott's instruction also includes gratuitous language telling the jury that it must offset any financial benefit GSK received under the Norvir Boosting License. If GSK proves that Abbott destroyed the fruits of the contract to GSK, there are no benefits to offset. If Abbott convinces the jury that it only injured, but did not destroy the fruits of the contract to GSK, then the jury will be in a position to assess how much of the value that GSK conveyed upon Abbott should be returned as a consequence of the breach. Moreover, GSK is not claiming restitutionary damages for the royalties it paid on sales outside the United States where Abbott did not hike Norvir's price, and GSK does not seek return of the lump sum payments under the contract even though they could ultimately be attributed, in part, to the United States side of the contract. GSK is simply seeking return of the concessions it made on royalties Abbott should owe under the patent license GSK granted Abbott to manufacture Abbott's drug, Humira. Evidence clearly shows that these concessions were substitute consideration for royalties on Abbott's U.S. patents. Again, GSK is not, and need not, rescind the contract in order to obtain damages based on its restitutionary interest. *In re Asia Global Crossing*, 404 B.R. at 342. Thus, it is not necessary to unwind these contracts through offset. Abbott's restitution instruction is so flawed this Court should reject it in its entirety.

**Abbott's Argument**

**Damages - Implied Covenant Of Good Faith And Fair Dealing**

1.      Abbott's proposed instruction on damages related to breach of the implied covenant follows the proposed model instructions more closely than GSK's and ought to be adopted by this Court.  In most instances, Abbott's instruction quotes almost verbatim from the New York Pattern Jury Instruction.  On the contrary, GSK's instruction misleads the jury into believing it can automatically award different kinds of damages and improperly abbreviates certain points of law.

### 1.      Abbott's Instruction Lays Out the Order of Determination for the Jury

2.      In addition to basing its introductory damages instruction on the New York pattern instructions, Abbott's proposed series of damages instructions addresses logically and separately each damages element the jury must consider before it awards GSK any damages, including the fact that no lost profits may be awarded unless GSK can overcome the limitation of liability provision.  GSK attempts to minimize its burden by providing inadequate guidance on the specific damages elements.  Its instruction would lead to juror confusion, or an improperly inflated damages award.

### 2.      GSK's Instructions Leave Out Important Limitations on Reasonable Certainty

3.      Abbott's instruction provides the jury with guidance as to how it should determine whether GSK has proven damages to a degree of reasonable certainty.  For example, Abbott's instruction regarding a new business seeking to recover lost profits quotes the New York Pattern Jury instruction and represents the controlling law.  In particular, Abbott's instruction properly informs the jury that because of GSK's new business venture with an unproven track record, it must be held to a stricter standard when proving lost profits with reasonable certainty.  *See* N.Y. Pattern Jury Instruction 4.20, Lost Future Profits; *Kenford Co., Inc. v. Erie County*, 67 N.Y.2d 257 (1986).

4.      GSK's instruction ignores this requirement and is limited to one sentence that states: "GSK must show that damages are reasonably certain, but nothing like precise mathematical accuracy is necessary."  This instruction omits material information relevant to the jury's determination of damages—in particular, the meaning of "reasonably certain" damages in the context of this case.

### 3.      GSK's Instruction Is Vague as to Which Party Bears the Burden of Proof

5.      The burden of proof is on GSK to establish damages.  New York Pattern Jury Instructions, 4.20, General Rules; *J.R. Loftus, Inc. v. White*, 85 N.Y.2d 874, 877 (1995).  This is not clearly stated in GSK's proposed instruction as it is in Abbott's.  GSK makes only vague references to "show[ing] that damages are reasonably certain," or telling the jury it must "consider whether GSK has proven" either of GSK's forms of damages.  While not incorrect, the instruction is insufficiently clear.  As articulated in the pattern jury instruction, the jury should be affirmatively instructed that GSK has the burden of proving its damages.  The jury cannot award contract damages unless GSK meets this burden.

### 4.      GSK's Restitution Instruction Omits the Total Breach Requirement

6.      Abbott objects to GSK's instruction on restitution as it appears in the second paragraph of GSK's Damages Instruction 2.  It is black-letter law that a total breach of contract is required before a party can recover restitution damages.  *Abdul v. Subbiah*, 735 N.Y.S.2d 29, 30 (N.Y. App. Div. 2001).  As noted in the footnoted support for Abbott's proposed instruction, "when one party commits a material breach of contract, the other party has a choice between two inconsistent rights – he or she can either elect to allege a total breach, terminate the contract, and bring an action, or instead, elect to keep the contract in force, declare the default only a partial breach, and recover those damages caused by that partial breach."  13 Williston on Contracts § 39:32 (4th ed.

2000).  Accordingly, to recover restitution, GSK must prove to the jury that it did not

"elect[] to continue performance"—otherwise, it "is said to elect to treat the breach as

partial rather than total. . . .  *[t]he consequence is that restitution is not available*, and the

non-breaching party must pursue a claim for damages instead."  *Old Stone Corp. v.*

*United States*, 450 F.3d 1360, 1371 (Fed. Cir. 2006) (quoting 13 Williston on Contracts

§ 39:32); *see also* Restatement (Second) of Contracts § 236 (same); Restatement

(Second) of Contracts § 384, cmt. a.

       7.     GSK ignores this legal principle.  Omitting this instruction would be

erroneous because the jury would be left with the misimpression that it can award

restitution in the absence of a total breach, which is plainly contrary to law.  *See Abdul*,

735 N.Y.S.2d at 30.  GSK has no authority to support its view that the jury can return to

GSK what it purportedly paid for the license while allowing it to continue to reap the

benefits of its license by promoting Lexiva as boosted by Norvir in the face of Abbott's

patents.  That plainly would provide GSK an improper windfall.  It would be erroneous to

so instruct the jury.  *Coursen v. A.H. Robins Co., Inc.*, 764 F.2d 1329, 1337 (9th Cir.

1985) (finding error in instructions that "incorrectly state[] the law").

       8.     Further, each party is "entitled to an instruction about his or her theory of

the case if it is supported by law and has foundation in the evidence. A district court

therefore commits error when it rejects proposed jury instructions that are properly

supported by the law and the evidence."  *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir.

2009) (quotation and citation omitted); *see also Peterson v. BASF Corp.*, 711 N.W.2d

470 (Minn. 2006), cert. denied, 127 S. Ct. 579 (2006).

       **5.     To Overcome the Limitation on Liability, GSK Must Show**
                   **Breach of a "Fundamental, Affirmative, Obligation"**

       9.     GSK carries a heavy burden if it wants avoid the consequences of the

limitation on liability provision in the Boosting License.  Although Abbott's proposed

instruction is based on the Court's January 14, 2001 Order, Abbott contends that, in the

face of a limitation on liability clause, "damages may be recovered in a breach of contract action only for the breach of a fundamental, ***affirmative obligation*** the agreement ***expressly imposes on the contractee*.**" *Corinno Civetta Const. Corp. v. City of New York*, 67 N.Y.2d 297, 312-13 (1986) (emphasis added).  GSK's "burden of proving th[is] exception is a heavy one." *Manshul Contr. Corp. Bd. Of Educ.*, 160 A.D.2d 643, 559 N.Y.S.2d 260, 261 (1st Dep't 1990) (party seeking to recover damages in spite of a "no-damage-for-delay" provision must prove negligence or misconduct). GSK must also prove "***tortious misconduct, not mere intentional nonperformance***, that is to say, willful, wanton or grossly negligent acts" if it hopes to avod the rights it knowingly negotiated away.  *Bank of Am. Secs. LLC v. Solow Building Co. II, L.L.C.*, 47 A.D.3d 239, 247, 847 N.Y.S.2d 49, 55 (1st Dep't 2007) (emphasis added).

### 6.      GSK's Instruction Improperly Relieves GSK of its Obligation to Elect a Remedy.

10.      It is well-established in New York that a plaintiff must elect a remedy if receipt of multiple remedies would result in an inconsistent judgment, and it is also well-established that GSK's requested damages and restitution remedies are inconsistent.  *See Charlet v. Porpora*, 803 N.Y.S.2d 17, *5 (N.Y. Sup. 2005) (holding that restitution remedy was "precluded by plaintiff's election of [damage] remedies").  Although the choice of remedy is "usually not required to be made until the trial at a time within the discretion of the Trial Judge," GSK's instruction defers its election of remedies until *after trial*, and it invites the jury to render an inconsistent verdict.  *Baratta v. Kozlowski*, 94 A.D.2d 454, 464 (N.Y.A.D., 2 Dept. 1983).  This approach will confuse the jury and unfairly relieve GSK of its obligation to elect a remedy prior to trial.

<u>[DISPUTED] GSK'S PROPOSED LIMITATION OF LIABILITY DEFENSE
INSTRUCTION 1</u>

DEFENSE OF LIMITATION OF LIABILITY FOR THE IMPLIED COVENANT
CLAIM – INTRODUCTION

Abbott contends that GSK is not entitled to lost profits damages because of Article X of the Norvir Boosting License.  GSK disagrees.

In pertinent part, Article X of the Norvir Boosting License, titled "Limitation on Liability," reads: "[N]either party shall be liable for any special, incidental, indirect or consequential losses arising out of or relating to this agreement…."

[DISPUTED] GSK'S PROPOSED LIMITATION OF LIABILITY DEFENSE
INSTRUCTION 2

DEFENSE OF LIMITATION OF LIABILITY FOR THE IMPLIED COVENANT
CLAIM – CONTEMPLATION OF PARTIES TO INCLUDE LOST PROFITS WITHIN
ARTICLE X

It is Abbott's burden to show that it is more probably true than not that Article X covers the damages that GSK seeks. You must therefore determine whether it is more probably true than not that GSK's lost profits are direct damages, not covered by Article X, or are "special, incidental, indirect or consequential losses" covered by Article X.

In making this determination it is useful to consider the differences between direct damages, on the one hand, and special, incidental, indirect or consequential damages, on the other. Direct damages are damages that flow naturally from a breach; that is, damages that would follow any breach of similar character in the usual course of events.[191] On the other hand, consequential damages do not so directly flow from the breach.[192] The commercial context in which a contract is made is of substantial importance in determining whether particular items of damages will fall into one category or other.[193]

If you determine that GSK's lost profit damages are direct damages, then they fall outside the losses contemplated by Article X and you may award those damages. If you determine that GSK's lost profits damages are "special, incidental, indirect or consequential damages," you must next determine whether Article X is enforceable.

**Source:** 24 Williston on Contracts § 64:12 (4th ed. 2002); *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 10 N.Y.3d 187, 192 (2008); *Am. Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F. Supp. 435, 459 (S.D.N.Y. 1976)

---

[191] 24 Williston on Contracts § 64:12 (4th ed. 2002)

[192] *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 10 N.Y.3d 187, 192 (2008) ("Special, or consequential damages, … do not flow so directly from the breach….") (quotation omitted).

[193] *Am. Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F. Supp. 435, 459 (S.D.N.Y. 1976) ("[T]he commercial context in which a contract is made is of substantial importance in determining whether particular items of damages will fall into one category or the other.") (citation omitted).

<u>[DISPUTED] GSK'S PROPOSED LIMITATION OF LIABILITY DEFENSE
INSTRUCTION 3</u>

DEFENSE OF LIMITATION OF LIABILITY FOR THE IMPLIED COVENANT
CLAIM – LIMITATION OF LIABILITY CLAUSE ENFORCEABILITY

If you find that Abbott has proven as more probably true than not that the damages GSK is seeking are "special, incidental, indirect or consequential damages" covered by Article X, you must next determine whether Abbott may enforce Article X of the Norvir Boosting License.

Contractual limitations of liability are generally enforceable.[194]  However, a party may not contract to avoid liability for its own bad faith, nor for intentional, willful or grossly negligent misconduct.[195]  Thus, such clauses are not enforceable when the misconduct for which it would grant immunity smacks of intentional wrongdoing.[196]

Therefore, Article X is not enforceable if you determine that GSK has proven it is more probably true than not that Abbott's breach is caused by bad faith or is willful, malicious, or grossly negligent.  While the limitation of liability clause may be enforceable if Abbott breached based on legitimate economic self-interest, it will not be enforceable where Abbott breached with the intent to inflict economic harm on GSK.[197]

If you determine that Article X is not enforceable because of Abbott's bad faith or willful, malicious or grossly negligent conduct, you may award GSK lost profits.  If you determine Article X is enforceable and GSK's damages are covered by it, you may not award GSK lost profits damages.

**Source:**  Comment, New York Pattern Jury Instructions – Civil 4:1 (Contracts, Generally, Elements); *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377,

---

[194] Comment, New York Pattern Jury Instructions – Civil 4:1 (Contracts, Generally, Elements)

[195] Comment, New York Pattern Jury Instructions – Civil 4:1 (Contracts, Generally, Elements)

[196] *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385 (1983) ("[A]n exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing.")

[197] *Banc of Am. Sec. LLC v. Solow Bldg. Co. II*, 847 N.Y.S.2d 49, 57 (N.Y. App. Div. 2007) ("[T]he pertinent inquiry is whether the 'fee' sought from [the plaintiff] is a matter of [the defendant's] *legitimate* economic self-interest or, alternatively, whether it evinces the intent to inflict harm on [the plaintiff].") (citation omitted) (emphasis in original)

385 (1983); *Banc of Am. Sec. LLC v. Solow Bldg. Co. II*, 847 N.Y.S.2d 49, 57 (N.Y. App. Div. 2007)

## GSK's Argument

GSK's instructions on Abbott's limitation of liability defense are proper and should be adopted.  The jury must consider whether GSK's lost profits damages are covered by the limitation of liability language quoted in the first instruction.  The second instruction helps guide that consideration by defining the difference between direct and consequential damages in general terms.

While this Court noted that GSK's lost profits are "best characterized" as consequential damages, see Summary Judgment Order at 40:8-9, GSK's second instruction on this issue is nevertheless proper.  The Court did not hold that, as a matter of law, GSK's lost profits are consequential damages.  Nor can Abbott credibly argue otherwise.  At page 14 of the same summary judgment order, this Court ruled that Kaletra "can be regarded" as a bundle for the purposes of the *Cascade* discount attribution rule.  Yet, Abbott proposes an instruction on the issue, presumably refusing to concede that this Court resolved that issue as a matter of law.  Abbott cannot have it both ways.  If the words "can be regarded" do not resolve an issue as a matter of law, neither do the words "best characterized."  Moreover, it is clear that the issue of whether GSK's lost profits are covered by the limitation of liability because they are  "consequential damages" or excluded because they are "direct damages" is properly a question of fact for the jury.

As the court in *American Electric Power Co. v. Westinghouse Electric Corp.*, 418 F. Supp. 435 (S.D.N.Y. 1976) remarked "the precise demarcation between direct and consequential damages is a question of fact, and the commercial context in which a contract is made is of substantial importance in determining whether particular items of damages will fall into one category or other."  *Id.* at 459.  There, the court held that the issue must be left for resolution at trial despite a limitation of liability clause that provided specific examples of items considered consequential and those were the same items of damages the plaintiff was seeking.  *Id.*  In a similar context, the court in *Metropolitan Life Ins. Co. v. Noble Lowndes Intern, Inc.* considered the application of a

limitation of liability clause that expressly stated that it was not enforceable if damages arose out of "willful acts."  84 N.Y.2d 430, 435 (1994).  Relevantly, the court noted: "The issue here is not how we and other courts have construed 'willful' in other contexts, such as in interpreting statutes using that term or in formulating or applying legal principles in tort or contract law.  Rather the issue is what the parties intended by 'willful acts' as an exception to their contractual provision limiting defendant's liability for consequential damages arising from its 'non-performance under this agreement.'"  *Id.*; *see Computrol, Inc. v. Newtrend, L.P.*, 203 F.3d 1064, 1071 n. 5 (8th Cir. 2000).

Thus, jurors should be instructed on this issue, and be allowed to make a factual determination of what GSK and Abbott meant by the term "special, incidental, indirect or consequential losses" given the commercial context surrounding the limitation of liability clause in the Norvir Boosting License.  The jury should be allowed to consider that this situation is very different from one in which, for example, a supplier breaches a contract with GSK to supply a chemical used to manufacture a pharmaceutical compound.  In such a situation the natural and direct damage to GSK would be the cost of cover to obtain the chemical from another supplier.  Thus, if a limitation of liability clause precluding recovery of "consequential damages" was found applicable to a claim for lost profits on sales of the compound to third parties, GSK would still be able to recover its direct damage.  Here, in contrast, a reading of the limitation of liability clause that includes lost profits on sales engendered by the promotion of Lexiva for use with Norvir would preclude GSK from recovering any expectation damages.  Reading a contract to wholly preclude recovery of  such damages is disfavored by the courts, and a jury should similarly be allowed to consider the implications of such a reading.  *See Forward Indus., Inc. v. Rolm of N.Y. Corp.*, 123 A.D.2d 374, 377 (N.Y. App. Div. 1986) (declining to read limitation of liability clause in a way that "would leave the plaintiff without any fair remedy for the defendant's breach of a fundamental obligation of its contract."); *Hyatt Corp. v. Women's Int'l Bowling Congress, Inc.*, 80 F. Supp. 2d 88, 96 (W.D.N.Y. 1999)

(stating that in contract interpretation courts "should not suppose that one party was to be placed at the mercy of the other."); *Mandelblatt v. Devon Stores, Inc.*, 521 N.Y.S.2d 672, 675 (N.Y. App. Div. 1987) (reversing a lower court's interpretation that would "produce[] an unreasonable result which would, in effect, place one party to the contract at the mercy of the other.").

Indeed, despite the technical language concerning the difference between consequential and direct damages found in *Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 109-10 (2d Cir. 2007) cited by this Court its Summary Judgment Order, the underpinning of that court's conclusion was that "[i]n this case, lost profits are the direct and probable consequence of the breach. The profits are precisely what the non-breaching party bargained for, and only an award of damages equal to lost profits will put the non-breaching party in the same position he would have occupied had the contract been performed." *Id.* at 109.

The same thing is true in this case. In both this case and *Tractebel Energy Marketing,* the core purpose of the contract was to allow the plaintiff to profit from its performance. It matters not that the expected profits in one case came directly from the defendant but in the other stem from successful promotion efforts to third parties. In both cases, the degree of foreseeability is the same and is evidenced by the terms of the contract. *See id.* at 108 n.19 &110 (noting termination provision referencing profits and allowing estimate of 20 years of profits). Similarly, here, the jury will hear undisputed evidence from  GSK and Abbott that both understood that the bargained-for agreement was to allow GSK to promote Lexiva with Norvir so that GSK could increase sales of that HIV/AIDS drug. In fact, this understanding was written into the Whereas clauses and the provision governing the scope of rights GSK licensed. Thus, a jury could conclude that lost profits under the Norvir Boosting License were also the "direct and probable consequence" of Abbott's breach as they were "precisely" what GSK bargained for.

Finally, GSK's third instruction explains that even if GSK's damages fall within the limitation of liability clause, that clause is unenforceable "when the misconduct for which it would grant immunity smacks of intentional wrongdoing."  It further explains that this standard is met by "intentional, willful or grossly negligent misconduct."  This language parallels that cited by this Court in its Summary Judgment Order.  *See* Summary Judgment Order at 41:14-16 & 41:18-22 ("to render such a clause inoperative, conduct must … 'smack of intentional wrongdoing.'" and noting courts do not enforce limitation of liability clauses where damages result from "'intentional misrepresentation, … willful acts or gross negligence.'" (internal citation omitted)).

By contrast, Abbott's instruction on limitation of liability, which is embedded, above, in its damages instructions, does not properly set out the law.  Abbott mischaracterizes this Court's Summary Judgment Order when it proposes as a second requirement that the jury must find that "Abbott engaged in grossly negligent conduct that evinces intentional wrongdoing and a reckless indifference to the rights of others."  This statement of muddles the law.  "Gross negligence" is not "intentional" and therefore cannot "evince intentional wrongdoing."  Similarly, it is a different standard than "reckless indifference."  As this Court's order made clear, the exculpatory clause is unenforceable, not only for intentional misrepresentation and willful acts, but also for "gross negligence," and these various types of conduct should be listed seriatim as GSK has done rather than muddled together. Summary Judgment Order at 41-42.  Abbott's instruction limits that holding by suggesting that only intentional wrongdoing will render the limitation of liability clause inoperative.

## Abbott's Argument

**1.    GSK's Limitation of Liability Defense Instruction 2 Is Irrelevant and Improper as a Result of the Court's Order on Summary Judgment**

1.    Abbott's instructions track this Court's recent summary judgment ruling on GSK's burden for overcoming the contract's limitation of liability provision. (1/14/11 Order at 41-43).  GSK's instruction, in contrast, ignores this Court's unambiguous holding that "the lost profits GSK seeks are best characterized as consequential, not general, damages" and thus fall within the scope of the contract's limitation of liability provision.  (*Id.* at 40).  This is not a question of fact.  So GSK's entire Proposed Limitation of Liability Defense Instruction addressing these points should be rejected out of hand.

2.    If the Court believes that an instruction is necessary on whether GSK's lost profits damages are consequential or general damages, however, this Court must provide the appropriate standard for making such a determination.  And the jury must be informed that *GSK* bears the burden of proof on this issue.  In its January 14, 2011 Order, the Court identified the proper standard for determining whether sought after damages are consequential or direct:

> Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements…By contrast, when the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract, the damages sought are general damages.

Order, 39:21-28, *citing Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 109-110 (2nd Cir. 2007).  Any instruction on this issue should adopt this Court's standard for when damages are consequential.  In addition, the instruction should inform the jury that, as with all the other elements of its claim, GSK bears the burden of proving that the contract authorizes its requested damages .

## 2.    GSK's Third Instruction Deviates from Established Law

3.      GSK's Proposed Limitation of Liability Defense Instruction 3 improperly fabricates a standard of law for determining whether *GSK* has met *its burden* of showing that the limitation of liability clause is unenforceable.  Indeed, GSK imported language into its instruction that does not track the standard adopted by this Court.

4.      First, GSK's proposed instruction omits the requirement that before GSK can avoid the consequences of this clause, it must prove that Abbott breached "a fundamental, affirmative obligation the [Boosting License] expressly imposes on [Abbott]."  *Corinno Civetta Const. Corp. v. City of New York*, 67 N.Y.2d 297, 312-13 (1986).  As Abbott notes above, this is a prerequisite to recovery that should not be omitted.  While the Court did not adopt this standard in its summary judgment ruling, it did not reject it either.

5.      Second, in its January 14, 2011 Order on summary judgment, this court adopted the standard of New York's high court that "a party may not insulate itself from damages caused by grossly negligent conduct."  1/14/2011 Order, 41:8-17, *citing Sommer v. Federal Signal Corporation*, 79 N.Y.2d 540, 554 (1992).  To render a limitation on liability clause such as this inoperative, "conduct must evince a reckless indifference to the rights of others' and 'smack of intentional wrongdoing.'"  *Id*. (citing *Sommer*, 79 N.Y.2d at 554).  Without justifying its departure from the Court's standard, GSK's proposed instruction states that the limitation of liability "is not enforceable if . . . Abbott's breach is caused by bad faith."  "Bad faith" is not the standard adopted by the Court, and it is misleading and prejudicial in light of the fact that GSK's contract claim is based on an alleged breach of the covenant of good faith and fair dealing.  GSK's language will erroneously cause the jury to believe that any breach of the covenant must necessarily void the limitation of liability—despite the legally distinct standards applicable to those two issues.

6.     Finally, GSK offers no support for its instruction that this provision "will not be enforceable where Abbott breached with the intent to inflict economic harm on GSK."  The standard is "intentional *wrongdoing*."  (*Id.* at 42 (emphasis added)). Competitors routinely intend to inflict economic harm on one another—that is what competition is all about.  GSK cannot recover lost profits merely by showing that Abbott intended to compete.  GSK's modification of the Court's ruling must be rejected.

[DISPUTED] GSK'S PROPOSED NORTH CAROLINA UNFAIR AND DECEPTIVE
TRADE PRACTICES ACT INSTRUCTION 1

NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT CLAIM
– INTRODUCTION AND ISSUES

GSK contends that Abbott violated the North Carolina Unfair and Deceptive
Trade Practices Act ("NCUDTPA").  Abbott denies this contention.  You must make
determinations about four issues relating to this claim:

First, you must determine whether Abbott has engaged in certain conduct that
GSK contends it has;

Second, you must determine whether Abbott's conduct was in  commerce or
affected commerce;

Third, you must determine whether Abbott's conduct proximately caused injury
to GSK's business;

Fourth, you must determine the amount of injury to GSK's business.

I will provide you more detail on each of these issues.

**Source:**  North Carolina Pattern Instructions—Civil 813.21, 813.62, 813.70, 813.80
(elements derived from these instructions).

[DISPUTED] GSK'S PROPOSED NORTH CAROLINA UNFAIR AND DECEPTIVE
TRADE PRACTICES ACT INSTRUCTION 2

NCUDTPA CLAIM – ISSUE OF FACTUAL DETERMINATIONS

The first issue for you to determine is whether Abbott did at least one of the
following:

1. During the negotiation of the Norvir Boosting License, Abbott was studying how
   to use its control over Norvir to limit competition with Kaletra, including possibly
   removing Norvir from the market or increasing Norvir's price, and deliberately
   withheld its plans from GSK.

2. Abbott inequitably asserted its power over Norvir by increasing Norvir's price by
   400 percent to undermine and disrupt Lexiva's launch and future sales.

3. Abbott manipulated the timing of the 400 percent Norvir price increase in order to
   disrupt Lexiva's launch and undermine Lexiva's future sales.

4. Abbott maintained or attempted to maintain a monopoly in the market in which
   Kaletra competes through anticompetitive conduct.

On this issue the burden of proof is on GSK.  This means that GSK must prove, as
more probably true than not, that Abbott did at least one of the acts as contended by
GSK.  In this case GSK contends, and Abbott denies, that Abbott did at least one of the
above acts.

Finally, as to this issue on which GSK has the burden of proof, if you find as
more probably true than not that Abbott did an act contended by GSK, then you should
answer "Yes" on the verdict form in the space beside that act.

If, on the other hand, you do not find Abbott did an act contended by GSK, then
you must answer "No" on the verdict form in the space provided.  You must answer
"yes" or "no" with respect to all four acts listed on the verdict form.

**Source:**  North Carolina Pattern Instructions—Civil 813.21.

[DISPUTED] GSK'S PROPOSED NORTH CAROLINA UNFAIR AND DECEPTIVE
TRADE PRACTICES ACT INSTRUCTION 3

NCUDTPA CLAIM – ISSUE OF COMMERCE

The second issue for you to determine is whether Abbott's conduct was in
commerce or affected commerce.

You will answer this issue only if you have found in GSK's favor on at least one
of the factual contentions in the preceding issue.  On this issue the burden of proof is on
GSK.  This means that GSK must prove as more probably true than not that Abbott's
conduct was either "in commerce" or that it "affected commerce."

Conduct is "in commerce" when it involves a business activity.

Conduct "affects commerce" whenever a business activity is adversely and
substantially affected.

Finally, as to this issue on which GSK has the burden of proof, if you find as
more probably true than not that Abbott's conduct was "in  commerce" or that it
"affected  commerce," then you should answer this issue "Yes" in favor of GSK on the
verdict form.

If, on the other hand, you do not find for GSK on this issue then you should
answer this issue "No" in favor of Abbott on the verdict form.

**Source:**  North Carolina Pattern Instructions—Civil 813.62.

[DISPUTED] GSK'S PROPOSED NORTH CAROLINA UNFAIR AND DECEPTIVE
TRADE PRACTICES ACT INSTRUCTION 4

NCUDTPA CLAIM – ISSUE OF PROXIMATE CAUSE

The third issue for you to determine is whether Abbott's actions were a proximate cause of injury to GSK's business.

You will answer this issue only if you have found in GSK's favor on at least one of the previous factual issues and the commerce issue.

On this issue the burden of proof is on GSK.  This means that GSK must prove as more probably true than not two things:

First, that GSK's business has been injured, and

Second, that Abbott's conduct was a proximate cause of the injury to GSK's business.

Proximate cause is a cause which in a natural and continuous sequence produces the injury, and is a cause which a reasonable and prudent person could have foreseen would probably produce such injury or some similar injurious result.

There may be more than one proximate cause of an injury.  Therefore, GSK need not prove that Abbott's conduct was the sole proximate cause of the injury to GSK's business.  GSK must prove as more probably true than not that Abbott's conduct was a proximate cause.

Finally, as to this issue on which GSK has the burden of proof, if you find as more probably true than not that GSK's business has been injured, and that Abbott's conduct proximately caused the injury to GSK's business, then it would be your duty to answer this issue "Yes" on the verdict form in favor of GSK.

If, on the other hand, you do not find for GSK on these issues then you must answer "No" on the verdict form in favor of Abbott.


**Source:**  North Carolina Pattern Instructions—Civil 813.70.

[DISPUTED] GSK'S PROPOSED NORTH CAROLINA UNFAIR AND DECEPTIVE
TRADE PRACTICES ACT INSTRUCTION 5

NCUDTPA CLAIM – ISSUE OF DAMAGES

The final issue for you to determine with respect to the NCUDTPA Claim is the
amount of GSK's injury to its business.

If you have answered at least one of the factual determinations and all of the other
preceding issues with respect to the NCUDTPA claim "Yes" in favor of GSK, GSK is
entitled to recover damages.

On this issue, the burden of proof is on GSK.  This means that GSK must prove as
more probably true than not the amount of actual damages sustained, if any, as a result of
the injury to GSK's business.  Such damages would include any loss in profits suffered or
to be suffered by GSK.

GSK's damages are to be reasonably determined from the evidence presented in
the case.  GSK is not required to prove with mathematical certainty the extent of the
injury to  its business in order to recover damages.  Thus, GSK should not be denied
damages simply because they cannot be calculated with exactness or a high degree of
mathematical certainty.  An award of damages must be based on evidence which shows
the amount of GSK's damages with reasonable certainty.  However, you may not award
any damages based upon mere speculation or conjecture.

Finally, as to this issue on which GSK has the burden of proof, if you find, the
evidence supports an amount of actual damages sustained by GSK by reason of the injury
to  its business, then you should write that amount in the blank space provided on the
verdict form.

**Source:**  North Carolina Pattern Instructions—Civil 813.80.

<u>[DISPUTED] ABBOTT'S PROPOSED NORTH CAROLINA UNFAIR AND
DECEPTIVE TRADE PRACTICES ACT INSTRUCTION 1</u>

NORTH CAROLINA UNFAIR AND DECEPTIVE PRACTICES ACT - GENERAL

Plaintiff GSK's third claim for relief, which Abbott denies, is that Abbott violated the North Carolina Unfair and Deceptive Practices Act.

For this claim, the verdict form will ask you specific questions that you must answer.  Based upon your answers to these questions, I will determine as a matter of law whether Abbott violated the North Carolina Unfair and Deceptive Practices Act.

If you find by the greater weight of the evidence that Abbott did any of the acts contended by  GSK, then you would answer "Yes" in the space beside each act so found.

If, on the other hand, you fail to so find, then you would answer "No" in the space provided.

[DISPUTED] ABBOTT'S PROPOSED NORTH CAROLINA UNFAIR AND
DECEPTIVE TRADE PRACTICES ACT INSTRUCTION 2

DAMAGES

If you answer any of the questions for this claim in the verdict form "Yes," the verdict form will ask you to answer additional questions relating to damages.

GSK may be entitled to recover nominal damages even without proof of actual damages. Nominal damages consist of some trivial amount such as one dollar in recognition of the technical damage caused by the wrongful conduct of the defendant.

GSK may also be entitled to recover actual damages if they were caused directly by the conduct at issue. On this issue, the burden of proof is still on GSK. This means that GSK must prove, by the greater weight of the evidence, the amount of actual damages sustained, if any, as a result of any injury.

Any such damages are to be reasonably determined from the evidence presented in the case. An award of damages must be based on evidence measuring the amount of damages caused by the conduct with reasonable certainty. You may not award any damages based upon mere speculation or conjecture about the amount of damages, if any, that GSK suffered.

**Source:** Adopted from N.C.P.I. Civil 813.80.

### GSK's Argument

This Court should adopt GSK's proposed instructions on its North Carolina Unfair and Deceptive Trade Practices Act (NCUDTPA) claim.  GSK's proposed instructions are based, nearly verbatim, on the North Carolina pattern instructions.  The vast majority of GSK's changes to the pattern instructions are non-substantive and were made to correct awkward language.  For example, the end of each pattern instruction states: "If, on the other hand, you fail to so find ...."  GSK has modified this language to read more smoothly:  "If, on the other hand, you do not find for GSK on this issue...."  GSK has made similar non-substantive changes throughout.

GSK makes two minor substantive changes.  First, the North Carolina pattern instructions do not separately set out the four elements of this claim.  GSK includes such an introductory instruction, drawn from the elements established in case law and set out in the pattern instructions, in order to guide the jury's deliberations and to parallel the order of instructions on GSK's prior claims.  Second, GSK's proposal removes language included in the pattern instruction on the issue of nominal damages.  GSK seeks to recover actual, not nominal, damages and including this language could confuse jurors into believing that they do not need to make a determination of GSK's actual damages arising from a violation of North Carolina's Unfair and Deceptive Trade Practices statute.

GSK has added four factual determinations to its second instruction – as suggested by the pattern instruction.  The NCUDTPA splits determinations of fact and law between the jury and the court: "[I]t is a question for the jury as to whether the defendants committed the alleged acts, and then it is a question of law for the court as to whether these proven facts constitute an unfair or deceptive trade practice."  *United Labs., Inc. v. Kuykendall*, 370 S.E.2d 375, 389 (N.C. 1988) (citing *Hardy v. Toler*, 218 S.E.2d 342 (N.C. 1975)).  Thus, the jury will need to determine whether GSK has established these four facts and then this Court will determine whether these facts amount to a violation.

Each of GSK's proposed facts to be determined are derived from *South Atlantic Limited Partnership of Tennessee v. Riese* (*SALT*), 284 F.3d 518 (4th Cir. 2002). That case provides a clear description of the Court's role in determining a violation and parallels GSK's allegations here. In that case, the Stroud Group and the Riese Group had formed the SALT partnership to develop real estate. *Id.* at 523. The partnership hired a construction company owned by the Riese Group. *Id.* The Stroud Group eventually expelled the Riese Group from the partnership eleven days before selling the development for several million dollars. *Id.* at 527. Because the contract required paying an expelled partner only its share of the partnership's book value, which was negative before the sale, the Riese Group received nothing. *Id.* at 524-25, 527. Both parties cross-claimed for violations of the NCUDPTA, among other causes of action.

In relevant part, the Fourth Circuit affirmed the District Court's conclusions regarding liability. It held that a member of the Stroud Group violated the NCUDTPA by "deliberately with[olding]" knowledge of a subcontractor's poor reputation from the Riese Group's construction company. The Court ruled that this was "the essence of unscrupulous behavior" and was "sufficiently egregious to constitute an unfair trade practice…." *Id.* at 538. GSK's first factual determination parallels this language, asking the jury to consider whether: "During the negotiation of the Norvir Boosting License, Abbott was studying how to use its control over Norvir to limit competition with Kaletra, including possibly removing Norvir from the market or increasing Norvir's price, and deliberately withheld its plans from GSK."

The Fourth Circuit also affirmed that the Stroud Group had "exploited rights under the Partnership Agreement to gain the full value of the Riese Group's labor without compensating it at all. Such manipulations and assertions of controlling influence are precisely the kind of 'inequitable assertion[s]' of power that North Carolina deems to be unfair trade practices." *Id.* at 540. This was true even though the conduct did not breach the parties' agreement. GSK's second proposed factual determination is modeled on this

language: "Abbott inequitably asserted its power over Norvir by increasing Norvir's price by 400 percent to undermine and disrupt Lexiva's launch and future sales."

Further, the *SALT* court found significance in the fact that the Stroud Group waited until the last possible moment to expel the Riese Group. It wrote: "[T]he Stroud Group manipulated the timing of its expulsion such that Riese Group received nothing for its efforts." *Id.* at 540. GSK's third factual determination mirrors this discussion: "Abbott manipulated the timing of the 400 percent Norvir price increase in order to disrupt Lexiva's launch and undermine Lexiva's future sales."

The above three factual findings related to "unfair" trade practices, but the NCUDTPA can also be violated when a firm commits anticompetitive acts. *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 48 (4th Cir. 1983). Thus, GSK concludes its factual findings proposing one that reads: "Abbott maintained or attempted to maintain a monopoly in the market in which Kaletra competes through anticompetitive conduct."

GSK has attempted to lend significance to the factual questions it suggests be posed to the jury by basing them off of key case law. This will help guide this Court's determination of whether there is a violation of the NCUDTPA if the jury concludes that GSK has shown one or more of its proposed factual determinations to be more probably true than not.

Abbott's Instructions

Rather than follow the pattern instructions (outside of the joint causation instruction), Abbott proposes two instructions: an abridged instruction on factual determinations and an incomplete instruction on damages that includes confusing language, discussed above, regarding nominal damages.

Abbott's first instruction refers the jury to the verdict form, which lists factual determinations. The factual determinations it proposes in its verdict form are confusing and wrong on the law. Abbott's instructions ask the jury to first answer questions on whether Abbott breached the covenant of good faith and fair dealing. It then suggests

that, if jurors do not make this finding, GSK cannot prevail on its NCUDTPA claim. This is inaccurate.  A NCUDPTA claim can be found without a breach of contract. *SALT*, 284 F.3d at 538-40.  Abbott then compounds this error by adding an extra question to be answered only if the  jurors find that GSK breached the covenant of good faith and fair dealing:  whether GSK proved that "Abbott never had an intent to fulfill the license agreement?"  This question is asked in a vacuum and is neither linked to GSK's allegations nor to any case law concerning the requirements for stating a claim.  As discussed above, GSK's unfairness claim rests on three things:  that during the license negotiations Abbott deliberately withheld the fact that it was actively considering ways to use its control over Norvir to thwart GSK's ability to compete with Kaletra; that Abbott raised the price of Norvir by 400% in a deliberate attempt to undermine GSK's ability to exploit the license for which it had paid millions of dollars, and that Abbott manipulated the timing of the announcement of the price hike to inflict the greatest degree of harm on GSK.  The Court has recognized in its Summary Judgment Order that such evidence, if accepted by the jury, could give rise to a claim under the NCUDTPA.  Summary Judgment Order at 45-46.  The questions GSK suggests are the ones that should be posed to the jury.  Whether Abbott committed fraud by signing a contract it had no intent to perform is not the standard.

### Abbott's Argument

1.     Abbott's instructions on GSK's claim under North Carolina's Unfair and Deceptive Trade Practices Act adhere more closely to this Court's ruling and should be adopted by this Court.  For the reasons stated below, GSK's proposed instructions stray from the law.  They also are improperly suggestive. GSK's proposed instructions tell the jury that it will have to determine whether Abbott engaged in four different alleged acts. GSK's description of the jury's role in making these "factual determinations" and its statement of the contested factual issues are improper, misleading and unsupported by this Court's summary judgment order.

2.      ***First***, **GSK's proposed instructions improperly suggest to the jury that Abbott's alleged conduct is unlawful.**  GSK's proposed instructions improperly suggest to the jury that the conduct described in the allegations constitutes unfair or deceptive conduct and violates the UDTPA.  This would be unduly prejudicial, misleading, and should be excluded.  *Mockler v. Multnomah County*, 140 F.3d 808, 812 (9th Cir. 1998) (jury instructions cannot be misleading).  Abbott's instruction makes clear the jury's and the Court's respective roles, including that the Court will determine whether any of the alleged conduct actually is unlawful:  "Based on your answers to these questions, I will determine as a matter of law whether Abbott violated the North Carolina Unfair and Deceptive Trade Practices Act."  In contrast, GSK's proposed instruction invites the jury to assume that the allegations, if proven true, are unlawful.  Accordingly, GSK's proposed instructions are improperly argumentative and suggestive in nature.

3.      ***Second***, **GSK improperly includes lawful conduct beyond the two theories of liability that survived summary judgment.**  In its summary judgment order, this Court limited GSK's claim under the UDTPA to its breach-of-contract theory of liability.  (*See* 1/14/11 Order at 43-46).  In doing so, the Court held that "'[a] simple breach of contract, even if intentional, does not amount to a violation of the Act," and that "allegations of 'deceptions, lies, and misrepresentations'… even if proved, 'do not constitutive unfair and deceptive practices' under the UDTPA."  *Id.* at 44-45 (quotes and citations omitted).

4.      Yet, in its "factual determinations," GSK inexplicably includes allegations of lawful conduct going well beyond its two surviving theories.  For example, GSK's proposed instructions ask the jury to determine whether GSK has proven its allegation that "Abbott was studying how to use its control over Norvir to limit competition with Kaletra, including possibly removing Norvir from the market or increasing Norvir's price, and deliberately withheld its plans from GSK."  The Court never allowed GSK to proceed with a theory that Abbott engaged in unlawful "studying."  There is no possible

way GSK could ever prove that Abbott violated the UDTPA by "studying" options never accepted by the company.  Not only is this allegation beyond GSK's breach-of-contract and antitrust theories, it describes an act—i.e., "deceptions, lies, and misrepresentations"—that this Court already has held does not constitute a violation. GSK should not be allowed to include this instruction in an effort to prejudice the jury into believing that merely "studying" certain options concerning Norvir can be unlawful.

       5.      GSK also asks the jury to determine whether "Abbott inequitably asserted its power over Norvir by increasing Norvir's price by 400 percent" and "manipulated the timing" of the price increase to "disrupt Lexiva's launch and undermine Lexiva's future sales."  Even if GSK could prove that Abbott did any of this (which it cannot), such conduct  could not constitute a violation of the UDTPA. As this Court held, the alleged breach of contract cannot violate the UDTPA unless GSK proves that Abbott "never had an intent to fulfill [the] agreement."  (1/14/11 Order at 45 (citing *Unifour Constr. Servs., Inc. v. Bellsouth Telecommc'ns, Inc.*, 163 N.C. App. 657, 667 (2004))).  Thus, if the jury decides that Abbott breached the covenant of good faith and fair dealing, the jury must then decide whether Abbott never intended to live up to its end of the bargain.  GSK's UDTPA claim fails absent such a factual finding.  GSK's proposed instructions, however, fail to ask this critical question.  For that reason, this Court should adopt Abbott's instruction and verdict form, which asks the jury to determine this essential question of fact.

       6.      ***Third***, **GSK's vague reference to anticompetitive conduct is misleading and unnecessary.**  One of the "factual determinations" GSK asks the jury to make in its proposed instruction is whether "Abbott maintained or attempted to maintain a monopoly in the market in which Kaletra competes through anticompetitive conduct." GSK's inclusion of this allegation is both unnecessary and misleading.  It is unnecessary because GSK's federal antitrust claim and its antitrust theory of liability under the UDTPA are co-extensive.  (1/14/11 Order at 44 n.10 ("The parties do not dispute that

Abbott would face liability under the UDTPA for monopolization and attempted monopolization *if and only if* GSK prevailed on its Section 2 claim.") (emphasis added)). Thus, GSK's failure to prove its Sherman Act claim is fatal to its UDTPA claim, and vice versa. GSK would obtain no additional damages by proving a Sherman Act claim and a UDTPA based on the same antitrust violation. Thus, this proposed instruction is completely superfluous.

7.     GSK's instruction also is confusing and misleading because it fails to define what constitutes anticompetitive conduct under the UDTPA. In doing so, it suggests that the jury may find that Abbott engaged in such conduct without meeting the strict requirements of a Sherman Act claim, thereby inviting the jury to make inconsistent findings between that claim and UDTPA claim.