# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SMITHKLINE BEECHAM CORPORATION, doing
business as GLAXOSMITHKLINE,

Plaintiff,

v.

ABBOTT LABORATORIES, Defendant.

No. C 07-5702 CW

FINAL JURY

INSTRUCTIONS

## DUTY OF THE JURY

Members of the Jury: Now that you have heard all of the evidence, it is my duty to instruct you as to the law of the case. A copy of these instructions will be sent with you to the jury room when you deliberate. You should discard the preliminary instructions; the final instructions control and you should not concern yourselves with any differences between them and the preliminary instructions. You must not infer from these instructions or from anything I may say or do that I have an opinion regarding the evidence or what your verdict should be.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all important.

## PARTIES

Abbott Laboratories is the Defendant in this case. It makes drugs called Norvir and Kaletra to treat human immunodeficiency virus (HIV) infection.

The Plaintiff in this case is SmithKline Beecham Corporation, which does business as GlaxoSmithKline, also known as GSK. GSK is a pharmaceutical company that makes Lexiva, a drug that competes with Abbott's drug Kaletra.

1     **CORPORATIONS**

2          All parties are equal before the law and a corporation is entitled to the same fair and

3     conscientious consideration by you as any party.

4          Under the law, a corporation is considered to be a person. It can only act through its

5     employees, agents, directors, or officers. Therefore, a corporation is responsible for the acts of its

6     employees, agents, directors, and officers performed within the scope of authority.

7     **SUMMARY OF DISPUTE AND THE PARTIES' CLAIMS AND DEFENSES**

8          This case involves a dispute over brand-name prescription drugs, known as protease

9     inhibitors, which are used to fight HIV. Protease inhibitors are also known as PIs. These drugs

10    work by preventing HIV cells from reproducing.

11         In 1996, Abbott introduced Norvir, a PI used to treat HIV. Norvir's active ingredient is

12    called ritonavir. Thereafter, it was discovered that, when taken in small quantities with another PI,

13    Norvir would "boost" the effectiveness of the other PI. Because of this "boosting" property,

14    Norvir is known as a booster. The other PI is known as the "boosted" PI.

15         In 2000, Abbott introduced Kaletra, which is a drug that contains two active ingredients:

16    lopinavir and ritonavir, which is the active ingredient in Norvir. Ritonavir is used to boost the

17    effects of lopinavir. Kaletra is known as a "boosted" PI.

18         Late in 2003, Bristol-Myers Squibb and GSK introduced new PI drugs that were designed

19    to be boosted by Norvir. As I mentioned earlier, GSK's drug is called Lexiva. These new boosted

20    PI drugs competed with Abbott's Kaletra. Before launching Lexiva, GSK signed a ~~contract~~license

21    agreement with Abbott which allowed GSK to promote ~~and market Lexiva with Abbott's~~using

22    Norvir to boost Lexiva.

23         On December 3, 2003, Abbott raised the ~~wholesale~~ price of 100 milligrams of Norvir ~~by~~

24    ~~400 percent, but did not raise the price of Kaletra.~~from $1.71 to $8.57, which amounted to a 400

25    percent increase on a per milligram basis.  Abbott maintained the cost of a daily regimen of

26    Kaletra at $18.78.

27         GSK alleges that Abbott's conduct violated federal antitrust laws, causing damage.

28    Specifically, GSK claims that Abbott monopolized or attempted to monopolize the market in

1   which Kaletra competes. GSK also claims that Abbott breached the implied covenant of good

2   faith and fair dealing in their contract and damaged GSK.

3       GSK has the burden of proving these claims. Abbott denies the claims. Abbott contends

4   that it increased Norvir's price for legitimate business reasons, with neither the purpose nor the

5   effect of harming competition or violating any duties to GSK.

6                                   **BURDEN OF PROOF**

7       When a party has the burden of proof of any claim or affirmative defense by a

8   preponderance of the evidence, it means you must be persuaded by the evidence that the claim or

9   affirmative defense is more probably true than not true.

10      You should base your decision on all of the evidence, regardless of which party presented

11  it.

12                                  **WHAT IS EVIDENCE**

13      The evidence from which you are to decide what the facts are consists of:

14          (1)     the sworn testimony of any witness;

15          (2)     the exhibits which have been received into evidence; and

16          (3)     any facts to which the lawyers may agree.

17                               **WHAT IS NOT EVIDENCE**

18      In reaching your verdict, you may consider only the testimony and exhibits received into

19  evidence. Certain things are not evidence, and you may not consider them in deciding what the

20  facts are. I will list them for you:

21      (1)     Arguments and statements by lawyers are not evidence. The lawyers are not

22  witnesses. What they say in their opening statements, closing arguments, and at other times is

23  intended to help you interpret the evidence, but it is not evidence. If the facts as you remember

24  them differ from the way the lawyers state them, your memory of them controls.

25      (2)     Questions and objections by lawyers are not evidence. Attorneys have a duty to

26  their clients to object when they believe a question is improper under the rules of evidence. You

27  should not be influenced by the objection or by the Court's ruling on it.

28

1       (3)     Testimony that has been excluded or stricken, or that you were instructed to

2  disregard, is not evidence and must not be considered.

3       (4)     Anything you see or hear when the Court is not in session is not evidence. You are

4  to decide the case solely on the evidence received at the trial.

5
**[EVIDENCE FOR LIMITED PURPOSE**

6       Some evidence was admitted for a limited purpose only. When I instructed you that an

7  item of evidence was admitted for a limited purpose, you must consider it only for that limited

8  purpose and for no other.]

9
**DIRECT AND CIRCUMSTANTIAL EVIDENCE**

10      Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as

11  testimony by a witness about what that witness personally saw or heard or did. Circumstantial

12  evidence is proof of one or more facts from which you could find another fact. You should

13  consider both kinds of evidence. The law makes no distinction between the weight to be given to

14  either direct or circumstantial evidence. It is for you to decide how much weight to give to any

15  evidence.

16
**RULING ON OBJECTIONS**

17      There are rules of evidence that control what can be received into evidence. When a

18  lawyer asked a question or offered an exhibit into evidence and a lawyer on the other side thought

19  that it was not permitted by the rules of evidence, that lawyer may have objected. If I overruled

20  the objection, the witness was permitted to answer the question. If I sustained the objection, the

21  witness was not permitted to answer the question. If I sustained an objection to a question, you

22  must ignore the question and must not guess what the answer might have been.

**CREDIBILITY OF WITNESSES**

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

(1)  the opportunity and ability of the witness to see or hear or know the things testified to;

(2)  the witness's memory;

(3)  the witness's manner while testifying;

(4)  the witness's interest in the outcome of the case and any bias or prejudice;

(5)  whether other evidence contradicts the witness's testimony;

(6)  the reasonableness of the witness's testimony in light of all the evidence; and

(7)  any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.

**EXPERT OPINION**

Some witnesses, because of education or experience, were permitted to state opinions and the reasons for those opinions. Opinion testimony should be judged just like any other testimony.

You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

**CHARTS AND SUMMARIES**

Certain charts and summaries were received into evidence to illustrate information brought out in the trial. Charts and summaries are only as good as the underlying evidence that supports them. You should, therefore, give them only such weight as you think the underlying evidence deserves.

Certain graphics not received in evidence were shown to you in order to help explain the contents of books, records, documents or other evidence in the case. They are not themselves

1  evidence or proof of any facts. If they do not correctly reflect the facts or figures shown by the

2  evidence in the case, you should disregard these graphics and determine the facts from the

3  underlying evidence.

4  **TESTIMONY THROUGH DEPOSITIONS**

5  A deposition is the sworn testimony of a witness taken before trial. The witness is placed

6  under oath to tell the truth and lawyers for each party may ask questions. You should consider

7  deposition testimony, presented to you in court instead of live testimony, insofar as possible, in

8  the same way as if the witness had been present to testify.

9  **FDA ROLE**

10  You have heard testimony and have seen evidence in this case about a United States Food

11  and Drug Administration (FDA) letter to Abbott.   In weighing this testimony and evidence, you

12  should consider that the FDA does not oversee claims about drug pricing.  The FDA oversees the

13  drug approval process and claims regarding a drug's safety and efficacy.

14  **I.       ANTITRUST CLAIMS - PURPOSE OF ANTITRUST LAWS**

15  I will now discuss GSK's claims. GSK first alleges that Abbott violated the United States

16  antitrust laws by willfully maintaining a monopoly or attempting to acquire a monopoly. The

17  purpose of the antitrust laws is to preserve free and unfettered competition in the marketplace.

18  The antitrust laws rest on the central premise that competition produces the best allocation of our

19  economic resources, the lowest prices, the highest quality, and the greatest material progress.

20  A.       ACTUAL MONOPOLIZATION CLAIM - ELEMENTS

21  The first claim GSK brings under the antitrust laws is that Abbott unlawfully actually

22  monopolized the market in which Kaletra competes. To prevail on this claim, GSK must prove

23  each of the following elements by a preponderance of the evidence:

24  First, that the market that it alleges Abbott monopolized is a validly defined economic

25  market;

26  Second, that Abbott possessed monopoly power in that market during the time period in

27  which the violation allegedly occurred;

28

1    Third, that Abbott willfully maintained monopoly power in that market by engaging in

2    anticompetitive conduct; and

3    Fourth, that GSK was injured in its business or property because of Abbott's

4    anticompetitive conduct.

5    If you find that GSK has failed to prove any of these elements, then you must find for

6    Abbott and against GSK on this claim. If you find that GSK has proved each of these elements by

7    a preponderance of the evidence, then you must find for GSK and against Abbott on this claim.

8          1.     ACTUAL MONOPOLIZATION CLAIM - ELEMENT ONE: RELEVANT

9                 MARKET

10    The first element of its actual monopolization claim that GSK must prove by a

11    preponderance of the evidence is that the market that it alleges Abbott monopolized is a validly

12    defined economic market. GSK defines the market as ~~the market for all protease inhibitors (PIs)~~

13    ~~boosted with Abbott's drug Norvir.~~ Reyataz, Lexiva, the lopinavir component of Kaletra, and

14    (upon Prezista's launch) Prezista.  Abbott asserts  that GSK has failed to ~~define~~ include in the

15    alleged relevant market other HIV drugs including Sustiva and Viracept, and that GSK's reasons

16    for defining the market as it has are invalid.

17    Defining the relevant market is essential because you are required to make a judgment

18    about whether Abbott had monopoly power in a properly defined economic market. To ~~make this~~

19    ~~judgment~~ determine the relevant market, you must be able to determine what, if any, economic

20    forces restrained Abbott's freedom to set prices for or restrict the output of Kaletra. The most

21    likely and most important restraining force is actual and potential competition from other firms

22    and their products. This includes all firms and products that acted as restraints on Abbott's power

23    to set prices as it pleased. All the firms and products that exerted this restraining force are within

24    what is called the relevant market.

25    The basic idea of a relevant market is that the products within it are reasonable substitutes

26    for each other from the buyer's point of view; that is, the products compete with each other. In

27    other words, the relevant market includes the products that consumers believe are reasonably

28    interchangeable or reasonable substitutes for each other. This is a practical test with reference to

1    actual behavior of buyers and marketing efforts of sellers. Products need not be identical or

2    precisely interchangeable as long as they are reasonable substitutes. Thus, for example, if

3    consumers seeking to cover leftover food for storage considered certain types of flexible

4    wrapping material —— such as aluminum foil, cellophane, or even plastic containers —— to be

5    reasonable alternatives, then all those products would be in the same relevant market.

6         To determine whether products are reasonable substitutes for each other, you ~~should~~may

7    consider whether a small but significant permanent increase in the price of one product would

8    result in a substantial number of consumers switching from that product to another. Generally

9    speaking, a small but significant permanent increase in price is approximately a five percent

10   increase in price not due to external cost factors, but you may conclude in this case that some

11   other percentage is more applicable to the product at issue. If you find that such switching would

12   occur, then you may conclude that the products are in the same relevant market.

13        In evaluating whether various products are reasonably interchangeable or are reasonable

14   substitutes for each other, you may also consider: (1) consumers' views on whether the products

15   are interchangeable; (2) the relationship between the price of one product and sales of another; (3)

16   the perceptions of either the industry or the public as to whether the products are in separate

17   markets; (4) the views of the producers in the market about who their respective competitors are;

18   and (5) the existence or absence of different customer groups or distribution channels.

19        The parties agree that, for the purposes of this case, the relevant geographic market is the

20   United States.

21        2.    ACTUAL MONOPOLIZATION CLAIM - ELEMENT TWO: MONOPOLY

22              POWER

23        The second element of its actual monopolization claim that GSK must prove by a

24   preponderance of the evidence is that Abbott possessed monopoly power in the relevant market

25   during the time period in which Abbott allegedly violated the antitrust laws. Monopoly power is

26   the power to control prices and exclude ~~or handicap~~ competition in a relevant market.  **[*Proposed**

27   **addition if the phrase "or handicap" is not removed:*  The power to handicap competition in this**

28   **context means the power to eliminate competition in the relevant market.]** More precisely, a firm

1    is a monopolist if it can profitably raise or maintain prices substantially above the competitive

2    level for a significant period of time. Monopoly power, in and of itself, is not unlawful.

3        There are two ways to show that a firm has monopoly power: through direct evidence and

4    through circumstantial evidence.

5            a.     DIRECT EVIDENCE OF MONOPOLY POWER

6        The first way ~~GSK may~~to prove ~~that Abbott had~~ monopoly power is through direct

7    evidence. ~~To do so, GSK must demonstrate that Abbott had sufficient power to inflict injury to~~

8    ~~competition and that it actually exercised that power. GSK must prove that Abbott had the power~~

9    ~~to do so by itself—that is, without the assistance of, and despite competition from, any existing or~~

10   ~~potential competitors. GSK must also prove that Abbott had the power to maintain prices above a~~

11   ~~competitive level for a significant period of time and that Abbott had the ability to exclude or~~

12   ~~handicap competition~~GSK has not attempted to prove monopoly power through direct evidence in

13   this case.

14           b.     INDIRECT EVIDENCE OF MONOPOLY POWER

15       ~~The second~~In this case, the way ~~that~~ GSK ~~may show~~has attempted to establish that Abbott

16   had monopoly power is through indirect evidence. Factors you may consider as indirect evidence

17   are:  (i) Abbott's market share, (ii) market share trends, (iii) barriers to entry or expansion and (iv)

18   the number and size of Abbott's competitors. If this evidence establishes that Abbott had the

19   power to control prices and exclude ~~or handicap~~ competition in the relevant antitrust market, then

20   you may conclude that Abbott had monopoly power in the market. By contrast, if this evidence

21   establishes that Abbott did not have the power to control prices and exclude competition in the

22   relevant antitrust market, then you may conclude that Abbott did not have monopoly power in the

23   market.  I will now explain each of these factors.

24           i.     INDIRECT EVIDENCE: MARKET SHARE

25       The first factor that you may consider as indirect evidence of monopoly power is Abbott's

26   market share. You heard evidence about Abbott's market share, and you should determine

27   Abbott's market share as a percentage of total industry sales by prescription.

28

1    A market share above ~~fifty~~65 percent may be sufficient to support an inference that

2    Abbott had monopoly power. The likelihood that a company has monopoly power is stronger the

3    higher that company's share is above ~~fifty~~65 percent.

4    A market share ~~below fifty percent is ordinarily not sufficient to support a conclusion that~~

5    ~~a company has monopoly power. However, if you find that the other evidence demonstrates that~~

6    ~~Abbott, in fact, had monopoly power despite having a market share below fifty percent, you may~~

7    ~~conclude that Abbott had monopoly~~ of less than 50 percent is presumptively insufficient to

8    establish market power.

9    `          ii.     INDIRECT EVIDENCE: MARKET SHARE TRENDS

10   The second factor that you may consider as indirect evidence of monopoly power is the

11   trend in Abbott's market share. An increasing market share may strengthen an inference that

12   Abbott had monopoly power, particularly if Abbott had a high market share, while a decreasing

13   share might show that Abbott did not have monopoly power.

14          iii.    INDIRECT EVIDENCE: BARRIERS TO ENTRY OR

15                  EXPANSION

16   The third factor you may consider as indirect evidence of monopoly power is the extent to

17   which there were barriers to entry or barriers to expansion in the relevant market.

18   Barriers to entry make it difficult for new competitors to enter the relevant market in a

19   meaningful and timely way. Barriers to entry might include intellectual property rights (such as

20   patents), specialized marketing practices, and the reputation of the companies already

21   participating in the market or the brand name recognition of their products.

22   Barriers to expansion prevent other companies who are already in the market from

23   increasing their output and selling more of their product.

24   Evidence of low or no barriers to entry or expansion during the relevant period would be

25   evidence that Abbott did not have monopoly power, regardless of Abbott's market share, because

26   new competitors could enter the market or existing competitors could expand their sales if Abbott

27   attempted to raise the price of its drug Kaletra substantially above competitive levels for a

28   substantial period of time. By contrast, evidence of high barriers to entry and high barriers to

1  expansion along with high market share, during the relevant period, may support an inference that

2  Abbott had monopoly power.

3      The history of entry and exit of competitors in the relevant market may be helpful to

4  consider. Entry of new competitors or expansion of existing competitors may be evidence that

5  Abbott lacked monopoly power. On the other hand, departures of competitors from the market, or

6  the failure of competitors to enter the market, particularly if prices and profit margins are

7  relatively high, may support an inference that Abbott had monopoly power.

8                    iv.      INDIRECT EVIDENCE: NUMBER AND SIZE OF

9                              COMPETITORS

10     The fourth factor you may consider as indirect evidence of monopoly power is whether

11 Abbott's competitors were capable of effectively competing. In other words, you should consider

12 whether the financial strength, market shares and number of competitors acted as a check on

13 Abbott's ability to price ~~its products~~Kaletra. If Abbott's competitors were vigorous or had large

14 or increasing market shares, this may be evidence that Abbott lacked monopoly power. On the

15 other hand, if you determine that Abbott's competitors were weak or had small or declining

16 market shares, this may support an inference that Abbott had monopoly power.

17     3.      ACTUAL MONOPOLIZATION CLAIM - ELEMENT THREE:

18             ANTICOMPETITIVE CONDUCT[1]

19     The third element of an actual monopolization claim that GSK must prove by a

20 preponderance of the evidence is that Abbott willfully maintained ~~its~~ monopoly power in the

21 relevant market by engaging in anticompetitive conduct.

22     In considering whether Abbott's conduct was anticompetitive, you must draw a distinction

23 between practices which the law has determined tend to exclude or restrict competition on the one

24

25 _____

26 [1] As argued previously, Abbott's position is that this case is controlled by the Supreme Court's decisions
   in *Pacific Bell Telephone Co. v. linkLine*, 129 S. Ct. 1109 (2009), and *Verizon Commc'ns Inc. v. Law
   Offices of Curtis V. Trinko, LLP*, 540 U.S. 409 (2004), and the Ninth Circuit's decision in *John Doe 1 v.
27 Abbott Labs.*, 571 F.3d 930 (9th Cir. 2009), and that under these cases, neither bundled discounting nor
   refusal to deal is a viable antitrust theory of anticompetitive conduct on the facts here.  Abbott submits
28 these comments on the Court's proposed instructions while reserving all appellate rights.

1  hand and the success of a business which reflects only a superior product, a well-run business, or

2  luck, on the other. Put another way, anticompetitive conduct refers to practices that ~~unreasonably~~

3  ~~or unnecessarily impede fair~~impair competition~~;~~; in a manner that ~~is, conduct that impairs the~~

4  ~~efforts of others to compete for customers in an~~the law has determined may be unnecessarily

5  restrictive ~~way~~. Such conduct does not refer to ordinary means of competition, like offering better

6  products or services, exercising superior skill or business judgment, utilizing more efficient

7  technology, or exercising natural competitive advantages.

8      Here, in support of its claim that Abbott unlawfully monopolized the market in which

9  Kaletra competes, GSK argues that Abbott engaged in two types of anticompetitive conduct:

10      (a) unlawful bundled discounting; and (b) refusing to deal with its competitors. Abbott

11  contends that it did not engage in either form of anticompetitive conduct, and increased Norvir's

12  price for legitimate business reasons, including obtaining a fair value for its patented invention,

13  with neither the purpose nor the effect of harming competition.

14                a.        BUNDLED DISCOUNTING

15      The first type of anticompetitive conduct that GSK alleges to prove the third element of its

16  actual monopolization claim is unlawful bundled discounting. Sometimes a company will offer a

17  lower price if a buyer purchases two different products together for a single price, in a bundle,

18  rather than buying them separately. Bundling is generally not anticompetitive because bundled

19  discounts can benefit buyers.

20      However, bundling may be anticompetitive if ~~a business that has monopoly power over~~

21  ~~part of the bundle charges a substantial penalty to buyers who purchase the products separately.~~

22  ~~Penalizing buyers purchasing from competitors can have the effect of causing buyers to purchase~~

23  ~~the entire bundle from the monopolist even if those buyers would rather buy one product from the~~

24  ~~bundler and one product from the competitor. In this way, monopoly bundling can harm or~~it

25  would exclude hypothetical equally efficient competitors that sell only one of the bundled

26  products. This could reduce competition and lead to higher prices.

27      In order to prove that Abbott engaged in unlawful bundled discounting in this case, GSK

28  must prove that:

1    (i)    Kaletra is a bundle; ~~and (ii) Abbott's Norvir price increase constituted an improper~~

2    ~~penalty on buyers who wanted to purchase a boosted PI other than lopinavir, the active ingredient~~

3    ~~in Kaletra~~(ii) the imputed price of the lopinavir component of Kaletra is below the average

4    variable cost of producing that component, and (iii) this caused anticompetitive effects in the

5    market.

6              i.    BUNDLED DISCOUNTING - IS KALETRA A BUNDLE?

7         The first element that GSK must prove to show that Abbott engaged in unlawful bundled

8    discounting is that Kaletra is a bundle of products. GSK contends that Kaletra is a bundle of

9    lopinavir and Norvir. Abbott contends that Kaletra is a single integrated product, that lopinavir is

10   an active ingredient rather than a separate product, and that Norvir is not a bundled component of

11   Kaletra.

12             ii.    BUNDLED DISCOUNTING - ~~IMPROPER PENALTY~~BELOW

13   COST PRICING OF A BUNDLED PRODUCT[2]

14        ~~The~~If GSK proves that Kaletra is a bundle, then the second element that GSK must prove

15   to show that Abbott engaged in unlawful bundled discounting is that ~~Abbott's Norvir price~~

16   ~~increase constituted an improper penalty. GSK argues that the Norvir price increase imposed a~~

17   ~~penalty on buyers who wanted to purchase a boosted PI other than lopinavir. To explain what is~~

18   ~~an improper penalty~~the imputed price of the lopinavir component of Kaletra is below the average

19   variable cost of producing that component. To explain this further, I must first define for you

20   some terms related to Abbott's costs.

21        Abbott's costs in making and selling Kaletra are divided into two categories.

22        The first kind of cost is referred to as a fixed cost -- a cost that Abbott would bear

23   regardless of how much of a product it sells. An example of a fixed cost might be the rent on a

24   seller's plant or store. This rent probably will be the same whether the firm sells one unit or one

25

26   _____

27   [2] It is Abbott's position that the discount attribution test cannot be applied to Kaletra, because there are no
     components of Kaletra that are or could be sold separately.  Abbott submits this proposed instruction while

28   reserving all appellate and other rights.

1  thousand units of its product. This type of cost is not to be considered in deciding whether

2  Abbott's pricing conduct was improper.

3     The second kind of cost is referred to as "variable cost." Variable costs, as the name

4  suggests, are those costs that increase ~~with the~~as output of the product expands, not all costs that

5  would be avoided if production of ~~each additional unit of~~ the product ceased. Variable costs

6  typically include such things as the materials that go into the product, fuel needed to produce the

7  product, and wages paid to the workers who make the product. "Average variable cost" is the sum

8  of all variable costs, divided by the total number of units expected to be produced and sold.

9     To determine whether Abbott ~~imposed an improper penalty~~would have excluded

10  hypothetical equally efficient competitors, you must consider whether Abbott was effectively

11  selling the lopinavir ~~portion~~component of Kaletra at a price below the lopinavir component's

12  average variable cost. The effective price of the lopinavir ~~portion~~component of Kaletra is the

13  price of Kaletra minus the price of Norvir. An effective price of the lopinavir ~~portion~~component

14  of Kaletra below its average variable cost ~~is~~could be improper because it would make it

15  impossible for ~~an imagined competitor, called~~ a hypothetical equally efficient competitor, which

16  was legally allowed to sell the lopinavir component of Kaletra, and which had the same costs as

17  Abbott, to sell the lopinavir component at a profit.

18         iii.    BUNDLED DISCOUNTING - ANTICOMPETITIVE EFFECTS

19               IN THE MARKET

20     The third element that GSK must prove is that Abbott, by pricing the lopinavir component

21  of Kaletra below cost, was able to drive products that compete with Kaletra from the market or

22  otherwise eliminate these competitors' ability to constrain Abbott's pricing of Kaletra, and that,

23  after Abbott did so, Abbott raised its price for Kaletra above competitive levels.

24         b.    REFUSAL TO DEAL

25     The second type of anticompetitive conduct that GSK alleges to prove the third element of

26  its actual monopolization claim is that Abbott refused to deal with its business rivals with

27  anticompetitive intent. A company that possesses monopoly power generally does not have a duty

28  to deal with its business rivals.

1    However, such a refusal to deal may constitute anticompetitive conduct if the refusal was

2    contrary to Abbott's short-run best interest, but made sense for Abbott because it harmed

3    competitors and ~~helped~~let Abbott maintain monopoly power in the long run. An important change

4    in a pattern of distribution in a competitive market that had persisted for several years can

5    constitute a refusal to deal.

6    In ~~deciding whether Abbott acted with anticompetitive intent, you may consider three~~

7    ~~factors: (1) whether~~order to find that Abbott engaged in a refusal to deal, you must find: (1) that

8    Abbott unilaterally terminated a voluntary and profitable course of dealing with its competitors;

9    (2) ~~whether~~that Abbott refused to deal with its competitors, or offered to deal with its competitors

10   only on such ~~unreasonable~~ terms and conditions that Norvir was effectively unavailable to boost

11   other PIs; ~~and~~ (3) ~~whether~~that Abbott refused to provide its competitors with products that were

12   already sold in a retail market to other customers on the same terms as those other customers;

13   AND (4) that anticompetitive malice motivated any refusal to deal by Abbott with respect to

14   Norvir.

15   C.       ABBOTT'S AFFIRMATIVE DEFENSE - LEGITIMATE BUSINESS REASON

16   ~~Abbott's affirmative defense to GSK's claims of anticompetitive conduct is that Abbott~~If

17   you find that GSK has proven all of the elements previously described, then you should consider

18   whether Abbott has proven that it had a legitimate business reason for the Norvir price increase.

19   A legitimate business reason is one that ~~demonstrates that Abbott did not intend to exclude its~~

20   ~~competitors from the market in which Kaletra competes.~~benefits Abbott, regardless of any

21   harmful effect on competitors, such as a purpose to promote efficiency or quality, offer a better

22   product or service, or increase short run profits.  To prevail on its affirmative defense, Abbott has

23   the burden of proving that it had a legitimate business reason for its alleged anticompetitive

24   conduct.~~It is for you to decide whether this reason is legitimate.~~

25   Conduct that is designed to protect or further Abbott's legitimate business purposes is not

26   anticompetitive, even if that conduct injures competitors. In general, the desire to maintain

27   monopoly power in a separate market or to block entry of competitors in a separate market is not

28   a legitimate business purpose.  Abbott's desire to profit from a patented invention is a

1  presumptively valid business justification for an action, even if the action causes harm to

2  consumers. A legitimate business purpose is one that benefits Abbott, regardless of any harmful

3  effect on competitors, such as a purpose to promote efficiency or quality, offer a better product or

4  service, or increase short run profits. GSK can rebut this presumption by showing that Abbott's

5  desire to profit from a patented invention played no part in its decision to act.

6      If you find that GSK has proved that Abbott committed anticompetitive conduct, through

7  bundled discounting or a refusal to deal with competitors or both, and that Abbott has not proved

8  that it had a legitimate business reason for its conduct, you may find that GSK has proved the

9  third element of its actual monopolization claim. If you find that GSK has not proved that Abbott

10  committed anticompetitive conduct through bundled discounting or a refusal to deal with

11  competitors or both, or if you find that Abbott has proved that it had a legitimate business reason

12  for its conduct, you must find that GSK has not proved the third element of its actual

13  monopolization claim.

14      4.      ACTUAL MONOPOLIZATION CLAIM - ELEMENT FOUR:

15          REQUIREMENT OF INJURY

16      The fourth element of an actual monopolization claim that GSK must prove by a

17  preponderance of the evidence is that, as a result of anticompetitive conduct by Abbott, it suffered

18  injury to its business or property of the type that the antitrust laws were intended to prevent. GSK

19  can satisfy this element if it can prove proves the following:

20      First, that GSK was in fact injured as a result of Abbott's alleged violation of the antitrust

21  laws;

22      Second, that Abbott's alleged illegal conduct was a material cause of GSK's injury; and

23      Third, that GSK's injury is an injury of the type that the antitrust laws were intended to

24  prevent.

25      The first part of this element requires GSK to establish that it was injured as a result of

26  Abbott's alleged violation of the antitrust laws. Proving the fact of injury does not require GSK to

27  prove the dollar value of its injury. It requires only that GSK prove that it was in fact injured by

28  Abbott's alleged antitrust violation. If you find that GSK has established that it was in fact injured

1   by an antitrust violation by Abbott, you will later consider the amount of GSK's antitrust

2   damages. The fact of injury and the amount of damages are different concepts. You will not be

3   asked to consider the amount of antitrust damages unless and until you have concluded that GSK

4   has established all of the elements of a violation of the antitrust laws.

5          As to the second part of this element, GSK must prove that Abbott's alleged illegal

6   conduct was a material cause of GSK's injury. This means that GSK must prove that it was

7   injured as a result of Abbott's alleged antitrust violation, and not some other cause. GSK is not

8   required to prove that Abbott's alleged antitrust violation was the sole cause of its injury; nor

9   does GSK need to eliminate all other possible causes of injury. It is enough if GSK has proved

10  that the alleged antitrust violation was a material cause of its injury. However, if you find that

11  GSK's injury was caused primarily by something other than the alleged antitrust violation, then

12  you must find that GSK has failed to prove the injury element of its antitrust claim.

13          In particular, GSK claims that it suffered injury because it lost sales and profits as a result

14  of Abbott's alleged antitrust violation. In the normal course of competitive business activity,

15  competitors will lose sales to each other, and to third parties, for various reasons that do not

16  violate the antitrust laws; and businesses can be unprofitable for reasons that do not violate the

17  antitrust laws. GSK may not satisfy the second part of this element if it lost sales because of

18  superior business acumen or salesmanship on the part of Abbott or another competitor, because

19  Abbott or another competitor offered a superior product, or because of lawful competition from

20  Abbott or other competitors. GSK also may not recover if it lost sales or profits as a result of

21  other causes, such as changes in demand, increased competition from new competitors, changes

22  in market conditions, poor management or missed opportunities by GSK, or other factors.

23          To prove the third part of this element, GSK must establish that its injury is the type of

24  injury that the antitrust laws are intended to prevent. If GSK's injury was caused by a reduction in

25  competition, or acts that would lead to a reduction in competition, or acts that would otherwise

26  harm consumers, then GSK's injury is an antitrust injury.

27

28

B.        ATTEMPTED MONOPOLIZATION CLAIM - ELEMENTS

The second claim GSK brings under the antitrust laws is that Abbott unlawfully attempted to monopolize the market in which Kaletra competes. You need ~~only~~ consider this claim only if you do not find for GSK on its actual monopolization claim.

To prevail on its claim of attempted monopolization, GSK must prove each of the following elements by a preponderance of the evidence:

First, that Abbott had a specific intent to achieve monopoly power in a relevant market;

Second, that there was a dangerous probability that Abbott would achieve its goal of monopoly power in the relevant market;[3]

Third, that Abbott engaged in anticompetitive conduct; and

Fourth, that GSK was injured in its business or property by Abbott's anticompetitive conduct.

If you find that GSK has failed to prove any of these elements, then you must find for Abbott and against GSK on this claim. If you find that GSK has proved each of these elements by a preponderance of the evidence, then you must find for GSK and against Abbott on this claim.

1.        ATTEMPTED MONOPOLIZATION CLAIM - ELEMENT ONE:  SPECIFIC INTENT TO MONOPOLIZE A RELEVANT MARKET

The first element of an attempted monopolization claim that GSK must prove by a preponderance of the evidence is that Abbott had a specific intent to monopolize the market in which GSK alleges that Kaletra competes. This is the same market as the market relevant to GSK's claim of actual monopolization. As I said earlier, GSK defines this to be the market for ~~all protease inhibitors (PIs) boosted with Abbott's drug Norvir~~ Reyataz, Lexiva, the lopinavir component of Kaletra, and (upon Prezista's launch) Prezista. You must decide whether GSK proved that this market is a validly defined economic market, about which I instructed you earlier.

---

[3] GSK has argued and presented evidence only that this case is about the alleged maintenance of monopoly power.  GSK has not argued or presented evidence that Abbott lacked monopoly power but was attempting to obtain such power and had a dangerous probability of doing so.  Accordingly, the attempted monopolization instructions should be replaced with an instruction that "You are no longer to consider the attempted monopolization claim that was discussed in my opening instructions."

1   Also, you must determine whether GSK has proved that Abbott acted with the conscious aim of

2   ~~maintaining~~obtaining the power to control prices and to exclude ~~or handicap~~ competition in this

3   alleged market.

4          There are two ways GSK may prove that Abbott had the specific intent to monopolize.

5   First, GSK may present evidence of direct statements ~~of~~by Abbott~~'s intent~~ that it intended to

6   obtain a monopoly in the relevant market. Such proof of specific intent may be established by

7   documents prepared by responsible officers or employees of Abbott at or about the time of the

8   conduct in question or by testimony concerning statements made by responsible officers or

9   employees of Abbott. You must be careful, however, to distinguish between Abbott's intent to

10  compete aggressively (which is lawful), which may be accompanied by aggressive language, and

11  a true intent to acquire monopoly power by using anticompetitive means.

12         Second, even if you decide that the evidence does not prove directly that Abbott

13  specifically intended to obtain a monopoly, specific intent may be inferred from what Abbott did.

14  For example, if the evidence shows that the natural and probable consequence of Abbott's

15  conduct in the relevant market was to give Abbott control over prices and to exclude ~~or handicap~~

16  competition, and that this was plainly foreseeable by Abbott, then you may (but are not required

17  to) infer that Abbott specifically intended to acquire monopoly power.

18         On the other hand, if you find that GSK has not proven by a preponderance of the

19  evidence that Abbott specifically intended to acquire monopoly power in the relevant market,

20  then you must find for Abbott on GSK's attempted monopolization claim.

21         2.     ATTEMPTED MONOPOLIZATION CLAIM - ELEMENT TWO:

22                DANGEROUS PROBABILITY OF SUCCESS

23         The second element of an attempted monopolization claim that GSK must prove by a

24  preponderance of the evidence is that there was a dangerous probability that Abbott would

25  succeed in achieving monopoly power in the market in which Kaletra competes if ~~it~~Abbott

26  continued to engage in the same or similar allegedly anticompetitive conduct. As I instructed you

27  in Instruction "A2. ACTUAL MONOPOLIZATION CLAIM - ELEMENT TWO: MONOPOLY

28

1  POWER," monopoly power is the power to control prices and exclude competition in a relevant

2  antitrust market.

3        In determining whether there was a dangerous probability that Abbott would acquire the

4  ability to control prices in the relevant market, you should consider the factors included in

5  Instruction ~~"A.2.a. DIRECT EVIDENCE OF MONOPOLY POWER" and Instruction~~ "A.2.b.

6  INDIRECT EVIDENCE OF MONOPOLY POWER" which I gave earlier. GSK has not

7  attempted to prove by direct evidence that there was a dangerous probability that Abbott would

8  acquire monopoly power. A dangerous probability of success need not mean that success was

9  nearly certain, but it does mean that there was a substantial and real likelihood that Abbott would

10  ultimately acquire monopoly power.

11        3.        ATTEMPTED MONOPOLIZATION CLAIM - ELEMENT THREE:

12                  ANTICOMPETITIVE CONDUCT

13        The third element of an attempted monopolization claim that GSK must prove by a

14  preponderance of the evidence is that Abbott engaged in anticompetitive conduct. GSK alleges

15  that, to attempt to monopolize the market in which Kaletra competes, Abbott (a) engaged in

16  unlawful bundled discounting and (b) unlawfully refused to deal with its competitors. This is the

17  same allegedly anticompetitive conduct that GSK alleges with respect to its actual

18  monopolization claim, about which I instructed you earlier.

19        4.        ATTEMPTED MONOPOLIZATION CLAIM - ELEMENT FOUR:

20                  REQUIREMENT OF INJURY

21        The fourth element of an attempted monopolization claim that GSK must prove by a

22  preponderance of the evidence is that, as a result of anticompetitive conduct by Abbott, it suffered

23  injury ~~to its business or property~~of the type that the antitrust laws were intended to prevent. This

24  is the same type of injury as the injury required for GSK's actual monopolization claim, about

25  which I instructed you earlier.

26

27

28

1  **II.     BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR**

2  **DEALING - INTRODUCTION**

3        Implied in every contract is a covenant, or agreement, of good faith and fair dealing. The

4  implied covenant of good faith and fair dealing between parties to a contract is a pledge that

5  neither party will do anything which will have the effect of destroying or injuring the right of the

6  other party to receive the benefits of the contract. A breach of the covenant is a breach of the

7  contract itself, the covenant being part and parcel of the contract. The covenant encompasses any

8  promises that a reasonable person in the position of the promisee would be justified in

9  understanding were included. However, the covenant cannot be construed so broadly as to create

10 independent contractual rights that was not bargained for by the parties.  Moreover, the implied

11 covenant of good faith and fair dealing does not restrain Abbott from exercising its general right

12 to act on its own interests in a way that may incidentally lessen GSK's anticipated fruits from the

13 contract.

14       A.     BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR

15              DEALING - ELEMENTS

16       GSK alleges that Abbott breached the implied covenant of good faith and fair dealing with

17 respect to the licensing agreement that they executed on December 13, 2002. In order to

18 demonstrate that Abbott breached the implied covenant of good faith and fair dealing, GSK has

19 the burden to prove two elements by the preponderance of the evidence:

20       First, Abbott's conduct directly destroyed or injured GSK's alleged right to receive

21 benefits under the license agreement that a reasonable party in GSK's position would have

22 understood the agreement to have included; and

23       Second, Abbott's conduct constituting a breach of the implied covenant of good faith and

24 fair dealing was a proximate cause of the injury to GSK's business.

25                    1.     BREACH OF THE IMPLIED COVENANT OF GOOD FAITH

26 AND                         FAIR  DEALING - ELEMENT ONE: ALLEGED ACTS

27              CONSTITUTING BREACH OF THE IMPLIED COVENANT

28

1    The first ~~element of its implied covenant claim~~question that ~~GSK must prove by a~~

2    ~~preponderance of the evidence is that~~you must determine is whether Abbott committed ~~an~~ act that

3    ~~showed a lack of good faith and fair dealing, injuring~~directly destroyed or injured GSK's right to

4    receive ~~the benefits GSK alleges it was owed~~any benefit under ~~its license agreement with Abbott.~~

5    ~~The following are the acts GSK claims Abbott committed that breached the implied covenant.~~

6    ~~You must determine whether Abbott committed any of these acts~~the license agreement and that a

7    reasonable party in GSK's position would have understood the agreement to have included that

8    benefit.  If you so find, then you should consider the additional elements of GSK's claim for

9    breach of the implied covenant.  If you do not so find, you must find for Abbott on GSK's claim

10   for breach of the implied covenant.

11   ~~1.      During the negotiation of the Norvir Boosting License, Abbott was considering~~

12   ~~how to use its control over Norvir to limit competition with its drug Kaletra from competitors'~~

13   ~~drugs and deliberately withheld its plans from GSK.~~

14   ~~2.      Abbott inequitably asserted its power over Norvir by increasing Norvir's~~

15   ~~price by 400 percent to undermine and disrupt GSK's launch of its drug, Lexiva, and future sales~~

16   ~~of that drug.~~

17   ~~3.      Abbott timed the 400 percent Norvir price increase in order to disrupt Lexiva's~~

18   ~~launch and undermine Lexiva's future sales.        2.~~      BREACH OF THE IMPLIED

19   COVENANT OF GOOD FAITH AND FAIR DEALING - ELEMENT TWO: CAUSATION

20   The second element of its implied covenant claim that GSK must prove by a

21   preponderance of the evidence is that Abbott's breach of the implied covenant was a proximate

22   cause of the injury to GSK's business.

23   Proximate cause is a cause which in a natural and continuous sequence produces the

24   injury, and is a cause which a reasonable and prudent person could have foreseen would probably

25   produce such injury or some similar injurious result.

26   There may be more than one proximate cause of an injury. Therefore, GSK need not prove

27   that Abbott's conduct was the sole proximate cause of the injury to GSK's business. However,

28   GSK must prove by a preponderance of the evidence that ~~Abbott's conduct was a proximate~~

1   ~~cause~~its injury is directly traceable to a breach of the implied covenant and is not a result of

2   intervening causes.  An intervening cause is a cause that unforeseeably interrupts the natural

3   sequence of events and produces a result that could not reasonably have been expected.

4       B.    ADDITIONAL FACTUAL FINDINGS

5           1.    BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND

6           FAIR DEALING - GROSS NEGLIGENCE

7   ~~The license agreement between Abbott and GSK sets a limit on the damages GSK can~~

8   ~~receive, unless GSK proves by a preponderance of the evidence that Abbott engaged~~

9   If you find that Abbott breached the implied covenant, you will be asked to decide if GSK

10  proved that Abbott did so by engaging in grossly negligent conduct. Such conduct involves

11  ~~intentional wrongdoing and a reckless~~a reckless indifference to the rights of others and smacks of

12  intentional wrongdoing.  This is not an element on which GSK must prevail to prove its claim,

13  but it is a separate issue that the Court requires that you decide.[4]  You need not concern yourself

14  with the reason that the Court is asking you to make this decision.

15          2.    BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND

16          FAIR DEALING - ADDITIONAL FACTUAL FINDINGS

17  If you find that Abbott breached the implied covenant, you will also be asked to decide if

18  any of the following is true:

19      1.    Abbott never had an intent to fulfill its obligations under the license agreement.[5]

20

21

22

23  _____

[4] This instruction is based upon the Court's January 14, 2011 Order. Abbott maintains its position

24  that, in the face of a limitation-of-liability clause, "damages may be recovered in a breach of contract

    action only for the breach of a fundamental, *affirmative obligation* the agreement *expressly imposes*

25  *on the contractee.*" *Corinno Civetta Const. Corp. v. City of New York*, 67 N.Y.2d 297, 312-13 (1986)

    (emphasis added).

26  [5] Abbott's position is that only the first listed factual finding could support a claim under the North

27  Carolina Unfair And Deceptive Trade Practices Act.  Abbott acknowledges, however, that the Court has

    not accepted Abbott's position and submits this proposed instruction while reserving its appellate and

28  other rights to challenge this ruling.

1      2.      During the negotiation of the Norvir Boosting License, Abbott was considering

2  using its control over Norvir to limit competition by competitor's drugs with its drug Kaletra and

3  deliberately withheld a plan to do so from GSK.

4      3.      Abbott inequitably asserted its power over Norvir by increasing Norvir's price by

5  400 percent with the purpose of undermining and disrupting GSK's launch of its drug, Lexiva,

6  and future sales of that drug.

7      4.      Abbott timed the 400 percent Norvir price increase with the purpose of disrupting

8  Lexiva's launch and undermining Lexiva's future sales.

9  indifference to the rights of others. You will be asked to decide if GSK proved that Abbott

10  engaged in grossly negligent conduct in breaching the covenant of good faith and fair dealing.

11  Depending on your answers to the questions on the verdict form, the Court may reduce the

12  damages award you may make. You need not concern yourself with this decision. You need not

13  concern yourself with the reason that the Court is asking you to make this determination.

14                                   **III. DAMAGES**

15      It is the duty of the Court to instruct you about the measure of damages. By instructing

16  you on damages, the Court does not mean to suggest for which party your verdict should be

17  rendered.

18      If you find for GSK on any of its claims, you must determine its damages. GSK has the

19  burden of proving damages by a preponderance of the evidence. Damages means the amount of

20  money that will reasonably and fairly compensate GSK for any injury you find was caused

21  Abbott. GSK seeks an award of damages based on profits it alleges that it lost as a result of

22  Abbott's anticompetitive conduct and Abbott's breach of the implied covenant. These damages

23  are the same for GSK's antitrust claims and its claim for breach of the implied covenant of good

24  faith and fair dealing. If you find that GSK proved an antitrust claim, its breach of the implied

25  covenant claim, or both an antitrust claim and its breach of the implied covenant claim, you must

26  consider the evidence of GSK's damages. If you do not find an antitrust violation, but you find

27  a alleged violation of the antitrust laws and Abbott's alleged breach of the implied covenant of

28

1    ~~good faith and fair dealing without gross negligence, the Court may reduce your damage award.~~

2    ~~You should not concern yourselves with this.~~

3         For GSK's monopolization and attempted monopolization claims, damages means the

4    amount of money that will reasonably and fairly compensate GSK for any injury you find was

5    caused by a violation by Abbott of the antitrust laws and flows from a competition-reducing

6    aspect of such violation.

7         For GSK's implied covenant claim, damages means the amount of money that will

8    reasonably and fairly compensate GSK for any injury you find was caused by a breach of the

9    implied covenant.  You may not award damages on GSK's implied covenant claim for lost profits

10   if those profits were not fairly within the contemplation of the parties at the time that GSK and

11   Abbott entered into the license agreement.  In determining the contemplation of the parties, the

12   nature, purpose and particular circumstances of the contract known by the parties should be

13   considered as well as what liability Abbott fairly may be supposed to have assumed consciously

14   or to have warranted GSK reasonably to suppose that it assumed when the contract was made.

15   You may not award damages for profits GSK lost due to its own failure to make diligent efforts to

16   mitigate the effects of Abbott's actions.  Finally, where a new business is seeking to recover for

17   loss of future profits, the party seeking lost profits is held to a stricter standard for the obvious

18   reason that there does not exist a reasonable basis of experience upon which to estimate lost

19   profits with the requisite degree of reasonable certainty.

20        Because GSK must prove different elements to recover damages on its antitrust claim, the

21   damages, if any, that GSK may recover under its antitrust claims and under its claim for breach of

22   the implied covenant of good faith and fair dealing may not be the same.  However, you may not

23   award duplicative damages.

24        GSK has offered evidence to calculate the profits it ~~would have earned if Abbott had not~~

25   ~~engaged in its alleged misconduct. You may award GSK the amount it has proved its profits~~

26   ~~would have been in the absence of this alleged misconduct~~contends constitute damages in this

27   case. Abbott has offered evidence disputing GSK's calculations.

28

It is for you to determine what damages, if any, have been proved. You must find that the damages amount was proven with reasonable certainty. Your award must be based upon evidence and not upon speculation, guesswork or conjecture.

### USE OF NOTES

Some of you have taken notes during the trial. Whether or not you took notes, you should rely on your own memory of what was said. Notes are only to assist your memory. You should not be overly influenced by the notes.

### DUTY TO DELIBERATE

When you begin your deliberations, you should elect one member of the jury as your presiding juror. That person will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your verdict must be unanimous.

### COMMUNICATION WITH COURT

If it becomes necessary during your deliberations to communicate with me, you may send a note through the marshal, signed by your presiding juror or by one or more members of the jury. No member of the jury should ever attempt to communicate with me except by a signed writing; I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court. If you send out a question, I will consult with the parties before answering it, which may take some time.

You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone -including me -- how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged. Do not disclose any vote count in any note to the Court.

### RETURN OF VERDICT

A verdict form has been prepared for you. After you have reached unanimous agreement on a verdict, your presiding juror will fill in the form that has been given to you, sign and date it, and advise the Court that you are ready to return to the courtroom.

Dated: _____

CLAUDIA WILKEN
United States District Judge