**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SMITHKLINE BEECHAM CORPORATION, doing business as GLAXOSMITHKLINE,

     Plaintiff,

  v.

ABBOTT LABORATORIES,

     Defendant.

_____/

No. C 07-5702 CW

FINAL JURY
INSTRUCTIONS

**DUTY OF THE JURY**

Members of the Jury: Now that you have heard all of the evidence, it is my duty to instruct you as to the law of the case. A copy of these instructions will be sent with you to the jury room when you deliberate. You should discard the preliminary instructions; the final instructions control and you should not concern yourselves with any differences between them and the preliminary instructions. You must not infer from these instructions or from anything I may say or do that I have an opinion regarding the evidence or what your verdict should be.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

In following my instructions, you must follow all of them and

1   not single out some and ignore others; they are all important.

## PARTIES

Abbott Laboratories is the Defendant in this case.  It makes drugs called Norvir and Kaletra to treat human immunodeficiency virus (HIV) infection.

The Plaintiff in this case is SmithKline Beecham Corporation, which does business as GlaxoSmithKline, also known as GSK.  GSK is a pharmaceutical company that makes Lexiva, a drug that competes with Abbott's drug Kaletra.

## CORPORATIONS

All parties are equal before the law and a corporation is entitled to the same fair and conscientious consideration by you as any party.

Under the law, a corporation is considered to be a person.  It can only act through its employees, agents, directors, or officers. Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers performed within the scope of authority.

## SUMMARY OF DISPUTE AND THE PARTIES' CLAIMS AND DEFENSES

The drugs involved in this dispute are known as protease inhibitors, and also known as PIs.

Abbott's drug Norvir, a protease inhibitor, has the active ingredient called ritonavir.  When taken in small quantities with another PI, Norvir "boosts" the effectiveness of the other PI. Because of this "boosting" property, Norvir is known as a booster. The other PI is known as the "boosted" PI.

Abbott's drug Kaletra contains two active ingredients:

*United States District Court*
*For the Northern District of California*

**United States District Court**
For the Northern District of California

lopinavir and ritonavir, which is the active ingredient in Norvir. Ritonavir is used to boost the effects of lopinavir. Kaletra is known as a "boosted" PI.

GSK's drug is called Lexiva, a boosted PI that competes with Abbott's Kaletra. Before launching Lexiva, GSK signed a license agreement with Abbott which allowed GSK to promote and market Lexiva with Abbott's Norvir.

On December 3, 2003, Abbott raised the wholesale price of 100 milligrams of Norvir from $1.71 to $8.57, which amounted to a 400-percent increase. Abbott maintained the cost of a daily regimen of Kaletra at $18.78.

GSK alleges that Abbott's conduct violated federal antitrust laws, causing damage. Specifically, GSK claims that Abbott monopolized or attempted to monopolize the market in which Kaletra competes. GSK also claims that Abbott breached the implied covenant of good faith and fair dealing in their license agreement and damaged GSK.

GSK has the burden of proving these claims. Abbott denies all of GSK's claims. Abbott contends that it increased Norvir's price for legitimate business reasons, with neither the purpose nor the effect of harming competition.

**BURDEN OF PROOF**

When a party has the burden of proof of any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

You should base your decision on all of the evidence,

3

1  regardless of which party presented it.

2                     **WHAT IS EVIDENCE**

3       The evidence from which you are to decide what the facts are

4  consists of:

5       (1) the sworn testimony of any witness;

6       (2) the exhibits which have been received into evidence; and

7       (3) any facts to which the lawyers may agree.

8                   **WHAT IS NOT EVIDENCE**

9       In reaching your verdict, you may consider only the testimony

10 and exhibits received into evidence.  Certain things are not

11 evidence, and you may not consider them in deciding what the facts

12 are.  I will list them for you:

13      (1) Arguments and statements by lawyers are not evidence.  The

14 lawyers are not witnesses.  What they say in their opening

15 statements, closing arguments, and at other times is intended to

16 help you interpret the evidence, but it is not evidence.  If the

17 facts as you remember them differ from the way the lawyers state

18 them, your memory of them controls.

19      (2) Questions and objections by lawyers are not evidence.

20 Attorneys have a duty to their clients to object when they believe

21 a question is improper under the rules of evidence.  You should not

22 be influenced by the objection or by the Court's ruling on it.

23      (3) Testimony that has been excluded or stricken, or that you

24 were instructed to disregard, is not evidence and must not be

25 considered.

26      (4) Anything you see or hear when the Court is not in session

27 is not evidence.  You are to decide the case solely on the evidence

28                              4

**United States District Court**
For the Northern District of California

received at the trial.

**EVIDENCE FOR LIMITED PURPOSE**

Some evidence was admitted for a limited purpose only.  When I instructed you that an item of evidence was admitted for a limited purpose, you must consider it only for that limited purpose and for no other.

**DIRECT AND CIRCUMSTANTIAL EVIDENCE**

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

**RULING ON OBJECTIONS**

There are rules of evidence that control what can be received into evidence.  When a lawyer asked a question or offered an exhibit into evidence and a lawyer on the other side thought that it was not permitted by the rules of evidence, that lawyer may have objected.  If I overruled the objection, the witness was permitted to answer the question.  If I sustained the objection, the witness was not permitted to answer the question.  If I sustained an objection to a question, you must ignore the question and must not guess what the answer might have been.

**CREDIBILITY OF WITNESSES**

In deciding the facts in this case, you may have to decide

United States District Court
For the Northern District of California

which testimony to believe and which testimony not to believe.  You
may believe everything a witness says, or part of it, or none of
it.

In considering the testimony of any witness, you may take into
account:

(1)  the opportunity and ability of the witness to see or hear
     or know the things testified to;

(2)  the witness's memory;

(3)  the witness's manner while testifying;

(4)  the witness's interest in the outcome of the case and any
     bias or prejudice;

(5)  whether other evidence contradicts the witness's
     testimony;

(6)  the reasonableness of the witness's testimony in light of
     all the evidence; and

(7)  any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily
depend on the number of witnesses who testify about it.

**EXPERT OPINION**

Some witnesses, because of education or experience, were
permitted to state opinions and the reasons for those opinions.
Opinion testimony should be judged just like any other testimony.

You may accept it or reject it, and give it as much weight as
you think it deserves, considering the witness's education and
experience, the reasons given for the opinion, and all the other
evidence in the case.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

## CHARTS AND SUMMARIES

Certain charts and summaries were received into evidence to illustrate information brought out in the trial.  Charts and summaries are only as good as the underlying evidence that supports them.  You should, therefore, give them only such weight as you think the underlying evidence deserves.

Certain graphics not received in evidence were shown to you in order to help explain the contents of books, records, documents or other evidence in the case.  They are not themselves evidence or proof of any facts.  If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these graphics and determine the facts from the underlying evidence.

## TESTIMONY THROUGH DEPOSITIONS

A deposition is the sworn testimony of a witness taken before trial.  The witness is placed under oath to tell the truth and lawyers for each party may ask questions.  You should consider deposition testimony, presented to you in court instead of live testimony, insofar as possible, in the same way as if the witness had been present to testify.

## THE FOOD AND DRUG ADMINISTRATION

You have heard mention of the Food and Drug Administration, and I said I would provide an instruction about the role of that federal agency, which is also known as the FDA.  The FDA oversees the drug approval process and claims regarding a drug's safety and efficacy.  The FDA does not regulate pricing.

7

United States District Court
For the Northern District of California

**I.   ANTITRUST CLAIMS - PURPOSE OF ANTITRUST LAWS**

I will now discuss GSK's claims.  GSK first alleges that Abbott violated the United States antitrust laws by willfully maintaining a monopoly or attempting to acquire a monopoly.  The purpose of the antitrust laws is to preserve free and unfettered competition in the marketplace.  The antitrust laws rest on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

### A.   ACTUAL MONOPOLIZATION CLAIM - ELEMENTS

The first claim GSK brings under the antitrust laws is that Abbott unlawfully actually monopolized the market in which Kaletra competes.  To prevail on this claim, GSK must prove each of the following elements by a preponderance of the evidence:

First, that the market that it alleges Abbott monopolized is a validly defined economic market;

Second, that Abbott possessed monopoly power in that market during the time period in which the violation allegedly occurred;

Third, that Abbott willfully maintained monopoly power in that market by engaging in anticompetitive conduct; and

Fourth, that GSK was injured in its business or property because of Abbott's anticompetitive conduct.

If you find that GSK has failed to prove any of these elements, then you must find for Abbott and against GSK on this claim.  If you find that GSK has proved each of these elements by a preponderance of the evidence, then you must find for GSK and against Abbott on this claim.

8

1.   ACTUAL MONOPOLIZATION CLAIM - ELEMENT ONE: RELEVANT MARKET

The first element of its actual monopolization claim that GSK must prove by a preponderance of the evidence is that the market that it alleges Abbott monopolized is a validly defined, relevant economic market.  GSK defines this relevant market as the market for all boosted protease inhibitors or as the market for a subset of such drugs: all highly effective protease inhibitors, including only boosted Reyataz, boosted Lexiva and Kaletra, at the time of the Norvir price increase.  Abbott asserts that the relevant market also includes unboosted protease inhibitors and NNRTI drugs, and that GSK's reasons for defining the market as it has are invalid.

Defining the relevant market is essential because you are required to make a judgment about whether Abbott had monopoly power in a properly defined economic market.  To decide the relevant market, you must be able to determine what, if any, economic forces restrained Abbott's freedom to set prices for or restrict the output of Kaletra.  The most likely and most important restraining force is actual and potential competition from other firms and their products.  This includes all firms and products that acted as restraints on Abbott's power to set prices as it pleased.  All the firms and products that exerted this restraining force are within what is called the relevant market.

The basic idea of a relevant market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other.  In other words, the relevant market includes the products that consumers believe are reasonably interchangeable or reasonable

United States District Court
For the Northern District of California

9

substitutes for each other.  This is a practical test with reference to actual behavior of buyers and marketing efforts of sellers.  Products need not be identical or precisely interchangeable as long as they are reasonable substitutes.  Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material -- such as aluminum foil, cellophane, or even plastic containers -- to be reasonable alternatives, then all those products would be in the same relevant market.

To determine whether products are reasonably interchangeable substitutes for each other, you may consider whether a small but significant permanent increase in the price of one product would result in a substantial number of consumers switching from that product to another.  Generally speaking, a small but significant permanent increase in price is approximately a five percent increase in price not due to external cost factors, but you may conclude in this case that some other percentage is more applicable to the product at issue.  If you find that such switching would occur, then you may conclude that the products are in the same relevant market.

In evaluating whether various products are reasonably interchangeable or are reasonable substitutes for each other, you may also consider: (1) consumers' views on whether the products are interchangeable; (2) the relationship between the price of one product and sales of another; (3) the perceptions of either the industry or the public as to whether the products are in separate markets; (4) the views of the producers in the market about who

10

their respective competitors are; and (5) the existence or absence of different customer groups or distribution channels.

The parties agree that, for the purposes of this case, the relevant geographic market is the United States.

2.   ACTUAL MONOPOLIZATION CLAIM - ELEMENT TWO: MONOPOLY POWER

The second element of its actual monopolization claim that GSK must prove by a preponderance of the evidence is that Abbott possessed monopoly power in the relevant market during the time period in which Abbott allegedly violated the antitrust laws. Monopoly power is the power to control prices and exclude or handicap competition in a relevant market.  The power to handicap competition is the power to limit competition on the merits.  A firm is a monopolist if it can profitably raise or maintain prices substantially above the competitive level for a significant period of time.  Monopoly power, in and of itself, is not unlawful.

GSK may show that Abbott had monopoly power through indirect evidence.  Factors you may consider are: (a) Abbott's market share, (b) market share trends, (c) barriers to entry or expansion and (d) the number and size of Abbott's competitors.  If this evidence establishes that Abbott had the power to control prices and exclude or handicap competition in the relevant antitrust market, then you may conclude that Abbott had monopoly power in the market.  I will explain each of these factors.

a.   MARKET SHARE

The first factor that you may consider as evidence of monopoly power is Abbott's market share.  You heard evidence about Abbott's market share, and you should determine Abbott's market share as a

11

1   percentage of total industry sales by prescription.

2       A market share above fifty percent may be sufficient to

3   support an inference that Abbott had monopoly power.  The

4   likelihood that a company has monopoly power is stronger the higher

5   that company's share is above fifty percent.

6       A market share below fifty percent is ordinarily not

7   sufficient to support a conclusion that a company has monopoly

8   power.  However, if you find that the other evidence demonstrates

9   that Abbott, in fact, had monopoly power despite having a market

10  share below fifty percent, you may conclude that Abbott had

11  monopoly power.

12                  b.   MARKET SHARE TRENDS

13      The second factor that you may consider as evidence of

14  monopoly power is the trend in Abbott's market share.  An

15  increasing market share may strengthen an inference that Abbott had

16  monopoly power, particularly if Abbott had a high market share,

17  while a decreasing share might show that Abbott did not have

18  monopoly power.

19                  c.   BARRIERS TO ENTRY OR EXPANSION

20      The third factor you may consider as evidence of monopoly

21  power is the extent to which there were barriers to entry or

22  barriers to expansion in the relevant market.

23      Barriers to entry make it difficult for new competitors to

24  enter the relevant market in a meaningful and timely way.  Barriers

25  to entry might include intellectual property rights (such as

26  patents), specialized marketing practices, and the reputation of

27  the companies already participating in the market or the brand name

28                              12

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

recognition of their products.

Barriers to expansion prevent other companies who are already in the market from increasing their output and selling more of their product.

Evidence of low or no barriers to entry or expansion during the relevant period would be evidence that Abbott did not have monopoly power, regardless of Abbott's market share, because new competitors could enter the market or existing competitors could expand their sales if Abbott attempted to raise the price of its drug Kaletra substantially above competitive levels for a substantial period of time.  By contrast, evidence of high barriers to entry and high barriers to expansion along with high market share, during the relevant period, may support an inference that Abbott had monopoly power.

The history of entry and exit of competitors in the relevant market may be helpful to consider.  Entry of new competitors or expansion of existing competitors may be evidence that Abbott lacked monopoly power.  On the other hand, departures of competitors from the market, or the failure of competitors to enter the market, particularly if prices and profit margins are relatively high, may support an inference that Abbott had monopoly power.

d.   NUMBER AND SIZE OF COMPETITORS

The fourth factor you may consider as evidence of monopoly power is whether Abbott's competitors were capable of effectively competing.  In other words, you should consider whether the financial strength, market shares and number of competitors acted

13

United States District Court
For the Northern District of California

as a check on Abbott's ability to price Kaletra.  If Abbott's competitors were vigorous or had large or increasing market shares, this may be evidence that Abbott lacked monopoly power.  On the other hand, if you determine that Abbott's competitors were weak or had small or declining market shares, this may support an inference that Abbott had monopoly power.

   3.  ACTUAL MONOPOLIZATION CLAIM - ELEMENT THREE: ANTICOMPETITIVE
                              CONDUCT

      The third element of an actual monopolization claim that GSK must prove by a preponderance of the evidence is that Abbott willfully maintained monopoly power in the relevant market by engaging in anticompetitive conduct.

      In considering whether Abbott's conduct was anticompetitive, you must draw a distinction between practices which tend to exclude or restrict competition on the one hand and the success of a business which reflects only a superior product, a well-run business, or luck, on the other.  Put another way, anticompetitive conduct refers to practices that unreasonably or unnecessarily impede fair competition; that is, conduct that impairs the efforts of others to compete for customers in an unnecessarily restrictive way.  Such conduct does not refer to ordinary means of competition, like offering better products or services, exercising superior skill or business judgment, utilizing more efficient technology, or exercising natural competitive advantages.

      Here, in support of its claim that Abbott unlawfully monopolized the market in which Kaletra competes, GSK argues that Abbott engaged in two types of anticompetitive conduct: (a) a

14

practical refusal to deal with its competitors; and (b) unlawful bundled discounting.  Abbott denies that it engaged in either type of anticompetitive conduct, and contends that it increased Norvir's price for legitimate business reasons, including obtaining a fair value for its patented invention, with neither the purpose nor the effect of harming competition.

a.  PRACTICAL REFUSAL TO DEAL WITH COMPETITORS

The first type of anticompetitive conduct that GSK alleges to prove the third element of its actual monopolization claim is that Abbott effectively refused to deal with its competitors, and did so with anticompetitive intent.  You may recall in my preliminary instructions that I referred to this conduct as a "refusal to deal."  A refusal to deal does not need to be absolute to violate the antitrust laws.  A company's practical, or effective, refusal to deal with its competitors can constitute anticompetitive conduct.

A company that possesses monopoly power generally does not have a duty to deal with its competitors.  However, a practical refusal to deal with competitors may constitute anticompetitive conduct if the practical refusal was contrary to Abbott's short-run best interest, but made sense for Abbott because it harmed competitors and helped Abbott maintain monopoly power in the long run.  An important change in a pattern of conduct, in a competitive market, that had persisted for several years can constitute a practical refusal to deal.

In deciding whether Abbott acted with anticompetitive intent, you may consider: (1) whether Abbott unilaterally terminated a

15

United States District Court
For the Northern District of California

voluntary and profitable course of dealing with its competitors;
(2) whether Abbott offered to deal with its competitors only on
unreasonable terms and conditions; and (3) whether Abbott refused
to provide its competitors' customers with products, that were sold
in a retail market, on the same terms it provided the products to
its own customers.

b.  BUNDLED DISCOUNTING

The second type of anticompetitive conduct that GSK alleges to
prove the third element of its actual monopolization claim is
unlawful bundled discounting.  Sometimes a company will offer a
lower price if a buyer purchases two different products together
for a single price, in a bundle, rather than buying them
separately.  Bundling is generally not anticompetitive because
bundled discounts can benefit buyers.

However, bundling may be anticompetitive if a business that
has monopoly power over part of the bundle charges a substantial
penalty to buyers who purchase the products separately.  Penalizing
buyers purchasing from competitors can have the effect of causing
buyers to purchase the entire bundle from the monopolist even if
those buyers would rather buy one product from the bundler and one
product from the competitor.  In this way, monopoly bundling can
harm or exclude equally efficient competitors that sell only one of
the bundled products.  This could reduce competition and lead to
higher prices.

In order to prove that Abbott engaged in unlawful bundled
discounting in this case, GSK must prove that:

(i) Kaletra is a bundle; and (ii) Abbott's Norvir price

16

**United States District Court**
For the Northern District of California

increase constituted an improper penalty on buyers who wanted to purchase a boosted PI other than lopinavir, the active ingredient in Kaletra.

### i.  BUNDLED DISCOUNTING - IS KALETRA A BUNDLE?

The first element that GSK must prove to show that Abbott engaged in unlawful bundled discounting is that Kaletra is a bundle of products.  GSK contends that Kaletra is a bundle of the active ingredients lopinavir and ritonavir, the active ingredient in Norvir.  Abbott contends that Kaletra is a single integrated product, that lopinavir and ritonavir are active ingredients rather than separate products, that Norvir is not a bundled component of Kaletra and that Kaletra is not a bundle.

### ii.  BUNDLED DISCOUNTING - IMPROPER PENALTY

The second element that GSK must prove to show that Abbott engaged in unlawful bundled discounting is that Abbott's Norvir price increase constituted an improper penalty such that it could exclude a hypothetical competitor, who is equally efficient at producing a boosted PI, because the competitor does not sell Norvir.  GSK argues that the Norvir price increase imposed a penalty on buyers who wanted to purchase a boosted PI other than lopinavir.  To explain what is an improper penalty, I must first define for you some terms related to Abbott's costs.

Abbott's costs in making and selling Kaletra are divided into two categories.

The first kind of cost is referred to as a fixed cost -- a cost that Abbott would bear regardless of how much of a product it sells.  An example of a fixed cost might be the rent on a seller's

17

United States District Court
For the Northern District of California

plant or store.   This rent probably will be the same whether the firm sells one unit or one thousand units of its product.   This type of cost is not to be considered in deciding whether Abbott's pricing conduct was improper.

     The second kind of cost is referred to as "variable cost." Variable costs, as the name suggests, are those costs that increase with the production of each additional unit of the product. Variable costs typically include such things as the materials that go into the product, fuel needed to produce the product, and wages paid to the workers who make the product.   "Average variable cost" is the sum of all variable costs, divided by the total number of units expected to be produced and sold.

     To determine whether Abbott imposed an improper penalty and excluded hypothetical equally efficient competitors, you must consider whether Abbott was, in effect, selling the lopinavir component of Kaletra at a price below the lopinavir component's average variable cost.   The effective price of the lopinavir component of Kaletra is the price of Kaletra minus the price of Norvir.   An effective price of the lopinavir component of Kaletra below its average variable cost is improper because it would make it impossible for a hypothetical equally efficient competitor, which was legally allowed to sell lopinavir, and which had the same costs as Abbott, to sell lopinavir at a profit.

     C.   ABBOTT'S AFFIRMATIVE DEFENSE - LEGITIMATE BUSINESS REASON

     If you find that GSK has proved that Abbott engaged in anticompetitive conduct, you should then consider whether Abbott has proved its affirmative defense that Abbott had a legitimate

business reason for the Norvir price increase.  A legitimate business reason is one that demonstrates that Abbott did not intend to exclude its competitors from the market in which Kaletra competes.  To prevail on its affirmative defense, Abbott has the burden of proving that it had a legitimate business reason for its alleged anticompetitive conduct.  It is for you to decide whether this reason is legitimate.

Conduct that is designed to protect or further Abbott's legitimate business purposes is not anticompetitive, even if that conduct injures competitors.  A legitimate business purpose is one that benefits Abbott, regardless of any harmful effect on competitors, such as a purpose to promote efficiency or quality, offer a better product or service, or increase short-run profits.  In general, the desire to maintain monopoly power or to block entry of competitors is not a legitimate business purpose.

As you have heard during trial, Abbott has patents on Norvir and on Norvir's use as a booster.  Abbott's patents on Norvir and on Norvir's use as a booster provide Abbott with a legal monopoly over Norvir and Norvir's use as a booster.  This fact does not establish whether Abbott violated the antitrust laws through anticompetitive conduct.  It is for you to decide whether Abbott engaged in anticompetitive conduct that violates the antitrust laws.

If you find that GSK has proved that Abbott engaged in anticompetitive conduct, through an effective refusal to deal with its competitors or bundled discounting or both, and that Abbott has not proved that it had a legitimate business reason for its

19

United States District Court
For the Northern District of California

conduct, you may find that GSK has proved the third element of its actual monopolization claim.

### 4. ACTUAL MONOPOLIZATION CLAIM - ELEMENT FOUR: REQUIREMENT OF INJURY

The fourth element of an actual monopolization claim that GSK must prove by a preponderance of the evidence is that it suffered injury to its business or property.  GSK can satisfy this element if it can prove the following:

First, that GSK was in fact injured as a result of Abbott's alleged violation of the antitrust laws;

Second, that Abbott's alleged illegal conduct was a material cause of GSK's injury; and

Third, that GSK's injury is an injury of the type that the antitrust laws were intended to prevent.

The first part of this element requires GSK to establish that it was injured as a result of Abbott's alleged violation of the antitrust laws.  Proving the fact of injury does not require GSK to prove the dollar value of its injury.  It requires only that GSK prove that it was in fact injured by Abbott's alleged antitrust violation.  If you find that GSK has established that it was in fact injured by an antitrust violation by Abbott, you will later consider the amount of GSK's antitrust damages.  The fact of injury and the amount of damages are different concepts.  You will not be asked to consider the amount of antitrust damages unless and until you have concluded that GSK has established all of the elements of a violation of the antitrust laws.

As to the second part of this element, GSK must prove that

United States District Court
For the Northern District of California

Abbott's alleged illegal conduct was a material cause of GSK's injury. This means that GSK must prove that it was injured as a result of Abbott's alleged antitrust violation, and not some other cause. GSK is not required to prove that Abbott's alleged antitrust violation was the sole cause of its injury; nor does GSK need to eliminate all other possible causes of injury. It is enough if GSK has proved that the alleged antitrust violation was a material cause of its injury. However, if you find that GSK's injury was caused primarily by something other than the alleged antitrust violation, then you must find that GSK has failed to prove the injury element of its antitrust claim.

To prove the third part of this element, GSK must establish that its injury is the type of injury that the antitrust laws are intended to prevent. If GSK's injury was caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then GSK's injury is an antitrust injury. On the other hand, if GSK's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then GSK's injuries are not antitrust injuries and GSK may not recover damages for those injuries under the antitrust laws. You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against -- such as where a competitor offers better products or services or where a competitor is more efficient and can charge lower prices and still earn a profit.

21

United States District Court
For the Northern District of California

1    <u>B.   ATTEMPTED MONOPOLIZATION CLAIM - ELEMENTS</u>

2        The second claim GSK brings under the antitrust laws is that

3    Abbott unlawfully attempted to monopolize the market in which

4    Kaletra competes.

5        To prevail on its claim of attempted monopolization, GSK must

6    prove each of the following elements by a preponderance of the

7    evidence:

8        First, that Abbott had a specific intent to achieve monopoly

9    power in a relevant market;

10       Second, that there was a dangerous probability that Abbott

11   would achieve its goal of acquiring monopoly power in the relevant

12   market;

13       Third, that Abbott engaged in anticompetitive conduct; and

14       Fourth, that GSK was injured in its business or property by

15   Abbott's anticompetitive conduct.

16       If you find that GSK has failed to prove any of these

17   elements, then you must find for Abbott and against GSK on this

18   claim.  If you find that GSK has proved each of these elements by a

19   preponderance of the evidence, then you must find for GSK and

20   against Abbott on this claim.

21           1.   ATTEMPTED MONOPOLIZATION CLAIM - ELEMENT ONE:
                  SPECIFIC INTENT TO MONOPOLIZE A RELEVANT MARKET
22

23       The first element of an attempted monopolization claim that

24   GSK must prove by a preponderance of the evidence is that Abbott

     had a specific intent to monopolize the market in which GSK alleges
25
     that Kaletra competes.  This is the same market as the market
26
     relevant to GSK's claim of actual monopolization, about which I
27

28                                   22

instructed you earlier.  You must determine whether GSK has proved that Abbott acted with the conscious aim of obtaining the power to control prices and to exclude or handicap competition in this alleged market.

There are two ways GSK may prove that Abbott had the specific intent to monopolize.  First, GSK may present evidence of direct statements of Abbott's intent to obtain a monopoly in the relevant market.  Such proof of specific intent may be established by documents prepared by responsible officers or employees of Abbott at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of Abbott.  You must be careful, however, to distinguish between Abbott's intent to compete aggressively (which is lawful), which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Second, even if you decide that the evidence does not prove directly that Abbott specifically intended to obtain a monopoly, specific intent may be inferred from what Abbott did.  For example, if the evidence shows that the natural and probable consequence of Abbott's conduct in the relevant market was to give Abbott control over prices and to exclude or handicap competition, and that this was plainly foreseeable by Abbott, then you may (but are not required to) infer that Abbott specifically intended to acquire monopoly power.

2.  ATTEMPTED MONOPOLIZATION CLAIM - ELEMENT TWO:
DANGEROUS PROBABILITY OF SUCCESS

The second element of an attempted monopolization claim that

GSK must prove by a preponderance of the evidence is that there was a dangerous probability that Abbott would succeed in acquiring monopoly power in the market in which Kaletra competes if Abbott continued to engage in anticompetitive conduct.  As I instructed you earlier, monopoly power is the power to control prices and exclude competition in a relevant antitrust market.

In determining whether there was a dangerous probability that Abbott would acquire the ability to control prices in the relevant market, you should consider the factors included in Instruction "A.2.  ACTUAL MONOPOLIZATION CLAIM - ELEMENT TWO: MONOPOLY POWER" which I gave earlier.  A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Abbott would ultimately acquire monopoly power.

### 3.  ATTEMPTED MONOPOLIZATION CLAIM - ELEMENT THREE: ANTICOMPETITIVE CONDUCT

The third element of an attempted monopolization claim that GSK must prove by a preponderance of the evidence is that Abbott engaged in anticompetitive conduct.  GSK alleges that, to attempt to monopolize the market in which Kaletra competes, Abbott engaged in (a) a practical refusal to deal with its competitors and (b) unlawful bundled discounting.  This is the same anticompetitive conduct that GSK alleges with respect to its actual monopolization claim, about which I instructed you earlier.

### 4.  ATTEMPTED MONOPOLIZATION CLAIM - ELEMENT FOUR: REQUIREMENT OF INJURY

The fourth element of an attempted monopolization claim that GSK must prove by a preponderance of the evidence is that it

24

suffered injury to its business or property.  This is the same type of injury as the injury required for GSK's actual monopolization claim, about which I instructed you earlier.

## II.  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - INTRODUCTION

Implied in every contract is a covenant, or agreement, of good faith and fair dealing.  The implied covenant of good faith and fair dealing between parties to a contract is a pledge that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the benefits of the contract.  The implied covenant is part of the contract, even though the contract contains a provision that states that the written contract is the "entire agreement."  A breach of the implied covenant is a breach of the contract itself, the covenant being part and parcel of the contract.  The covenant encompasses any promises that a reasonable person in the position of the promisee would be justified in understanding were included. However, the covenant cannot be construed so broadly as to create independent contractual rights that were not bargained for by the parties.

## A.  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - ELEMENTS

GSK alleges that Abbott breached the implied covenant of good faith and fair dealing with respect to the licensing agreement that they executed on December 13, 2002.  In order to demonstrate that Abbott breached the implied covenant of good faith and fair dealing, GSK has the burden to prove three elements by the preponderance of the evidence:

25

United States District Court
For the Northern District of California

First, Abbott's conduct directly destroyed or injured GSK's alleged right to receive benefits under the license agreement that a reasonable party in GSK's position would have understood the license agreement to have included;

Second, Abbott engaged in grossly negligent conduct; and

Third, Abbott's conduct constituting a breach of the implied covenant of good faith and fair dealing was a proximate cause of the injury to GSK's business.

1.  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - ELEMENT ONE: BAD FAITH OR UNFAIR CONDUCT

The first element of its implied covenant claim that GSK must prove by a preponderance of the evidence is that Abbott committed an act that showed a lack of good faith and dealing, injuring GSK's right to receive the benefits that a reasonable party would have been justified in understanding were included in the license agreement.

2.  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - ELEMENT TWO: GROSS NEGLIGENCE

The second element of its implied covenant claim that GSK must prove by a preponderance of the evidence is that Abbott's breach of the implied covenant constituted grossly negligent conduct.  Such conduct involves intentional wrongdoing or a reckless indifference to the rights of others.

3.  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - ELEMENT THREE : CAUSE OF INJURY

The third element of its implied covenant claim that GSK must prove by a preponderance of the evidence is that Abbott's breach of the implied covenant was a proximate cause of the injury to GSK's

**United States District Court**
For the Northern District of California

business.

Proximate cause is a cause which in a natural and continuous sequence produces the injury, and is a cause which a reasonable and prudent person could have foreseen would probably produce such injury or some similar injurious result.

There may be more than one proximate cause of an injury. Therefore, GSK need not prove that Abbott's conduct was the sole proximate cause of the injury to GSK's business.  However, GSK must prove by a preponderance of the evidence that its injury is directly traceable to Abbott's alleged breach of the implied covenant.

### III.   ADDITIONAL QUESTIONS

Certain issues in this case must be decided by the Court, based on decisions you make on certain factual questions.  You will be asked to decide whether the following statements are true:

1.   During the negotiation of the Norvir Boosting License, Abbott was considering how to use its control over Norvir to limit competition with its drug Kaletra from competitors' drugs and deliberately withheld its plans from GSK.

2.   Abbott inequitably asserted its power over Norvir by increasing Norvir's price by 400 percent to undermine and disrupt GSK's launch of its drug, Lexiva, and future sales of that drug.

3.   Abbott timed the 400 percent Norvir price increase in order to disrupt Lexiva's launch and undermine Lexiva's future sales.

27

1    You will also be asked to determine whether any of this

2  conduct proximately caused injury to GSK.

3                        **IV.  DAMAGES**

4      It is the duty of the Court to instruct you about the measure

5  of damages.  By instructing you on damages, the Court does not mean

6  to suggest for which party your verdict should be rendered.

7      If you find for GSK on any of its claims, you must determine

8  its damages.  GSK has the burden of proving damages by a

9  preponderance of the evidence.  Damages means the amount of money

10 that will reasonably and fairly compensate GSK for any injury you

11 find was caused Abbott.

12     GSK seeks an award of damages on each of its claims based on

13 profits it alleges that it lost as a result of Abbott's

14 anticompetitive conduct and Abbott's breach of the implied

15 covenant.  If you find that GSK proved one or both of its antitrust

16 claims, or its breach of the implied covenant claim, or that it

17 engaged in the specific conduct I described above in Instruction

18 III, you must consider the evidence of GSK's damages.

19     GSK has offered evidence to calculate the profits it would

20 have earned if Abbott had not engaged in its alleged misconduct.

21 You may award GSK the amount it has proved its profits would have

22 been in the absence of this alleged misconduct.

23     You must determine the amount of GSK's damages for all of the

24 claims on which it prevails, if any.  However, GSK is not entitled

25 to recover its damages more than once.  On the verdict form, if you

26 find that an award of damages is appropriate for more than one of

27 GSK's claims, you will be asked questions that ensure that GSK does

28                              28

United States District Court
For the Northern District of California

not recover its damages more than once.

It is for you to determine what damages, if any, have been proved. So long as there is a reasonable basis for a damages award, GSK should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical precision. However, your award must be based upon evidence and not upon speculation, guesswork or conjecture.

**USE OF NOTES**

Some of you have taken notes during the trial. Whether or not you took notes, you should rely on your own memory of what was said. Notes are only to assist your memory. You should not be overly influenced by the notes.

**NO TRANSCRIPT AVAILABLE**

You will have to make your decision based on what you recall of the testimony. You will not have a written transcript of the trial. Although a few portions of the trial have been transcribed, the trial as a whole has not. Portions of it could be read back to you, if necessary, if you can identify particular portions you want to hear. However, read-back is time-consuming.

**DUTY TO DELIBERATE**

When you begin your deliberations, you should elect one member of the jury as your presiding juror. That person will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your verdict must be unanimous.

**COMMUNICATION WITH COURT**

If it becomes necessary during your deliberations to

communicate with me, you may send a note through the Court security officer, signed by your presiding juror or by one or more members of the jury. No member of the jury should ever attempt to communicate with me except by a signed writing; I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court. If you send out a question, I will consult with the parties before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone -- including me -- how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged. Do not disclose any vote count in any note to the Court.

## RETURN OF VERDICT

A verdict form has been prepared for you. After you have reached unanimous agreement on a verdict, your presiding juror will fill in the form that has been given to you, sign and date it, and advise the Court that you are ready to return to the courtroom.

Dated: March 24, 2011

CLAUDIA WILKEN
United States District Judge

United States District Court
For the Northern District of California