James F. Hurst *(Admitted Pro Hac Vice)*
David J. Doyle *(Admitted Pro Hac Vice)*
Samuel S. Park *(Admitted Pro Hac Vice)*
Stephanie S. McCallum *(Admitted Pro Hac Vice)*
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone:    (312) 558-5600
Facsimile:    (312) 558-5700
jhurst@winston.com; ddoyle@winston.com;
spark@winston.com; smccallum@winston.com

Nicole M. Norris (SBN 222785)
WINSTON & STRAWN LLP
101 California Street, Suite 3900
San Francisco, CA  94111-5894
Telephone:    415-591-1000
Facsimile:    415-591-1400
nnorris@winston.com

Charles B. Klein *(Admitted Pro Hac Vice)*
Matthew A. Campbell *(Admitted Pro Hac Vice)*
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC  20007
Telephone:    (202) 282-5000
Facsimile:    (202) 282-5100
cklein@winston.com; mcampbell@winston.com

Jeffrey I. Weinberger (SBN 56214)
Stuart N. Senator (SBN 148009)
Keith R.D. Hamilton (SBN 252115)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Los Angeles, CA  90071-1560
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702
jeffrey.weinberger@mto.com;
stuart.senator@mto.com;
keith.hamilton@mto.com

Michelle Friedland (SBN 234124)
Kathryn Eidmann (SBN 268053)
MUNGER, TOLLES & OLSON LLP
560 Mission Street
San Francisco, CA 94105-2907
Telephone:    (415) 512-4000
Facsimile:    (415) 512-4077
michelle.friedland@mto.com;
kathryn.eidmann@mto.com

Attorneys for Defendant
ABBOTT LABORATORIES

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - OAKLAND DIVISION

| | |
|---|---|
| SMITHKLINE BEECHAM CORPORATION, d/b/a GLAXOSMITHKLINE,<br><br>                Plaintiff,<br><br>vs.<br><br>ABBOTT LABORATORIES,<br><br>                Defendant. | CASE NO.  C 07-5702 (CW)<br><br>Related per December 5, 2007 Order to Case No. C 04-1511 (CW)<br><br>**DEFENDANT ABBOTT LABORATORIES' MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 50(a)**<br><br>Judge:     Honorable Claudia Wilken<br>Date:      TBD<br>Time:      TBD<br>Location:  Courtroom 2 (4th Floor) |

# TABLE OF CONTENTS

**Page**

I.    NOTICE OF MOTION AND INTRODUCTION ................................................................. 1

II.   ARGUMENT ................................................................................................................. 1

    A.    GSK's Monopolization Claim Fails As a Matter of Law. ...................................... 1

        1.    GSK Admits That There Is No Direct Evidence of Monopoly
Power. .................................................................................................... 1

        2.    GSK Has Not Presented Sufficient Indirect Evidence of Monopoly
Power. .................................................................................................... 1

            a.    GSK Failed to Establish a Relevant Antitrust Market. ................... 1

            b.    GSK's Indirect Evidence of Monopoly Power Is
Insufficient. ......................................................................... 5

            Market Share ............................................................................ 5

            Declining Market Share ............................................................. 6

            No Barriers to Entry or Expansion .............................................. 6

            Many Large and Sophisticated Competitors ................................. 7

        3.    GSK Has Not Presented Sufficient Evidence of Anticompetitive
Conduct. ................................................................................................ 7

            a.    GSK Has Not Presented Sufficient Evidence of Predatory
Pricing. ............................................................................... 8

                (1)    Insufficient Evidence of Predatory Pricing Under
linkLine .................................................................. 8

                (2)    Insufficient Evidence of Cascade Violation ......................... 8

                    Insufficient Evidence That Kaletra Is a Bundle ................. 8

                    GSK Presented Insufficient Evidence That the
Discount Attribution Test is Violated ..................... 9

                    GSK Miscalculated the Cost of Lopinavir ....................... 10

            b.    GSK Has Not Shown a Refusal to Deal ...................................... 10

             Aspen Does Not Apply Here ..................................................... 10

            "Effective Refusal" Theory Is at Best Redundant ........................ 11

            Insufficient Evidence of Refusal To Deal Under Trinko
Factors ............................................................................ 11

            Insufficient Evidence of Refusal To Deal Under Jury
Instruction Factors ............................................................ 12

            c.    Abbott Had a Legitimate Business Justification for Its
Pricing Conduct ................................................................ 12

# TABLE OF CONTENTS
(continued)

**Page**

B.    GSK's Attempted Monopolization Claim Fails As a Matter of Law. .................. 14

No Dangerous Probability of Success.................................................................. 14

Insufficient Evidence of Specific Intent.............................................................. 15

C.    GSK's Contract Claim Fails As a Matter of Law. ............................................... 15

   1.    GSK Has Presented Insufficient Evidence of the Alleged Promise.......... 16

   2.    Insufficient Evidence That GSK Was Deprived of the Benefits of Its Bargain. ................................................................................................ 18

   3.    There Is Not Sufficient Evidence to Support GSK's Claimed Damages. .................................................................................................. 19

D.    GSK Has Not Proven That Abbott Violated the UDTPA.................................... 20

No Aggravating Circumstances for the Alleged Breach...................................... 20

Not Independently Unlawful................................................................................ 20

Insufficient Evidence That Abbott Committed Any of the Acts.......................... 21

E.    GSK Has Not Proven Compensable Damages. ................................................... 22

   1.    Prowse's Lost Profits Estimates Are Not Proper Antitrust Damages. ...... 22

      Damages from "Market Confusion". ........................................................... 22

      Failure to Consider Lawful Price Increases ............................................... 23

      Sales Lost to Other Competitors ................................................................ 23

      Lost Sales of Unboosted Lexiva .................................................................. 24

      Lost Sales After Monopoly Power Ended.................................................... 24

   2.    Dr. Prowse's Damages Include Injuries Not Proximately Caused by Abbott........................................................................................................ 24

   3.    Dr. Prowse's Alleged Damages Are Based on Improper Speculation. ............................................................................................... 24

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3 **FEDERAL CASES**

4
*Agency Dev., Inc. v. MedAmerica Ins. Co.,*
5     327 F. Supp. 2d 199 (W.D.N.Y. 2004) ................................................. 16

6 *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.,*
     108 F.3d 1147 (9th Cir. 1997)................................................................. 7
7
*Ariz. v. Maricopa County Med. Soc'y,*
8     457 U.S. 332 (1982)................................................................................ 17

9 *Atlantic Richfield Co. v. USA Petroleum Co.,*
     495 U.S. 328 (1990)......................................................................... 22, 24
10
*Bank of N.Y. v. Sasson,*
11     786 F. Supp. 349 (S.D.N.Y. 1992)........................................................ 18

12 *Berkey Photo, Inc. v. Eastman Kodak Co.,*
     603 F.2d 263 (2d Cir. 1979).................................................................. 22
13
*Blue Shield of Va. v. McCready,*
14     457 U.S. 465 (1982)............................................................................... 24
15
*Brooke Group Ltd v. Brown & Williamson Tobacco Corp.,*
16     509 U.S. 209 (1993)................................................................................ 8

17 *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
     429 U.S. 477 (1977)............................................................................... 22
18
*Byrd v. Maricopa County Sherriff's Dep't,*
19     629 F.3d 1135 (9th Cir. 2011)................................................................. 1
20
*Cascade Health Solutions v. Peacehealth,*
21     515 F.3d 883 (9th Cir. 2008)..................................................... 8, 11, 22

22 *City of Vernon v. S. Cal. Edison Co.,*
     955 F.2d 1361 (9th Cir. 1992)............................................................... 23
23
*Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.,*
24     611 F.3d 495 (9th Cir. 2010)............................................................. 2, 4
25
*Cross & Cross Props., Ltd. v. Everett Allied Co.,*
26     886 F.2d 497 (2d Cir. 1989).................................................................. 16

27 *Designers N. Carpet, Inc. v. Mohawk Indus., Inc.,*
     153 F. Supp. 2d 193 (E.D.N.Y. 2001) ................................................ 15
28

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
 504 U.S. 451 (1992) ..................................................................................................... 1

*Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.*,
 786 F.2d 1342 (9th Cir. 1985) ............................................................................... 23, 24

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*,
 964 F. Supp. 956 (M.D.N.C. 1997) ............................................................................ 24

*Geren v. Quantum Chem. Corp.*,
 832 F. Supp. 728 (S.D.N.Y. 1993) ........................................................................ 16, 19

*Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond, Charlotte Branch*,
 80 F.3d 895 (4th Cir. 1996) ........................................................................................ 20

*Hartford Fire Ins. Co. v. Federated Dep't Stores. Inc.*,
 723 F. Supp. 976 (S.D.N.Y. 1989) ............................................................................. 16

*Horst v. Laidlaw Waste Sys.*,
 917 F. Supp. 739 (D. Colo. 1996) .............................................................................. 15

*Image Technical Servs., Inc. v. Eastman Kodak Co.*,
 125 F.3d 1195 (9th Cir. 1997) ............................................................................... 7, 13

*In re Abbott Labs. Norvir Anti-Trust Litig.*,
 562 F. Supp. 2d 1080 (N.D. Cal. 2008) ....................................................................... 5

*In re Indep. Serv. Orgs. Antitrust Litig. v. Xerox Corp.*,
 203 F.3d 1322 (Fed. Cir. 2000) .................................................................................. 13

*John Doe 1 v. Abbott Labs.*,
 571 F.3d 930 (9th Cir. 2009), 571 F.3d ....................................................................... 8

*Le Page's Inc. v. 3M*,
 No. 97-3483, 2000 WL 280350 (E.D. Pa. Mar. 14, 2000) .......................................... 14

*Legal Econ. Evaluations, Inc. v. Met. Life Ins. Co.*,
 39 F.3d 951 (9th Cir. 1994) ........................................................................................ 24

*M.A.P. Oil Co. v. Texaco Inc.*,
 691 F.2d 1303 (9th Cir. 1982) ...................................................................................... 2

*M/A-COM Sec. Corp. v. Galesi*,
 904 F.2d 134 (2d Cir. 1990) ....................................................................................... 16

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3

*M/A-COM Sec. Corp. v. Galesi*,
   No. 88-0317, 1989 WL 115953 (S.D.N.Y. Sept. 27, 1989)..................................... 18

4

*Marsann Co. v. Brammall, Inc.*,
   788 F.2d 611 (9th Cir. 1986)................................................................................... 10

5

6

*Metro Mobile CTS, Inc. v. NewVector Commc'ns, Inc.*,
   892 F.2d 62 (9th Cir. 1989)...................................................................................... 6

7

8

*MetroNet Servs. Corp. v. Qwest Corp.*,
   383 F.3d 1124 (9th Cir. 2004)................................................................................. 11

9

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
   924 F.2d 1484 (9th Cir. 1991)................................................................................... 2

10

11

*Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.*,
   614 F.2d 832 (2d Cir. 1980).................................................................................... 14

12

13

*Oahu Gas Serv., Inc. v. Pac. Res., Inc*,
   838 F.2d 360 (9th Cir. 1988)................................................................................ 5, 24

14

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
   129 S. Ct. 1109 (2009) ......................................................................................... 8, 23

15

16

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995).......................................................................... 2, 5, 7, 24

17

18

*Richter Concrete Corp. v. Hilltop Concrete Corp.*,
   691 F.2d 818 (6th Cir. 1982).................................................................................. 14

19

*Schor v. Abbott Labs.*,
   457 F.3d 608 (7th Cir. 2006).................................................................................. 13

20

21

*South Atlantic Ltd. Partnership of Tennessee, L.P. v. Riese*,
   284 F.3d 518 (4th Cir. 2002).................................................................................. 21

22

23

*Spindelfabrik Suessen-Schurr Stahlecker & Grill
   GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*,
   829 F.2d 1075 (Fed. Cir. 1987)............................................................................... 17

24

25

*United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990) ................................ 6

26

*United Roasters, Inc. v. Colgate-Palmolive Co.*,
   649 F.2d 985 (4th Cir. 1981).................................................................................. 20

27

28

1

2

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

3

4

*United States v. Aluminum Co. of Am.,*
148 F.2d 416 (2d Cir. 1945)........................................................................... 5

5

*United States v. E.I. du Pont de Nemours & Co.,*
351 U.S. 377 (1956)................................................................................... 4, 5

6

7

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.,*
375 F.3d 1341 (Fed. Cir. 2004),
*rev'd on other grounds,* 546 U.S. 394 (2006) ......................................... 2

8

9

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
540 U.S. 398 (2004) ............................................................................. 10, 11

10

11

*William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,*
668 F.2d 1014 (9th Cir. 1981)...................................................................... 10

12

**STATE CASES**

13

14

*511 West 232nd Owners Corp. v. Jennifer Realty Co.,*
773 N.E.2d 496 (N.Y. 2002)........................................................................ 16

15

*Bloomfield v. Bloomfield,*
764 N.E. 2d 950 (N.Y. 2001)....................................................................... 17

16

17

*Cohen v. Nassau Educators Fed. Credit Union,*
No. 15094-05, 2006 WL 1540324 (N.Y. Sup. May 10, 2006) ..................... 15

18

19

*Corinno Civetta Constr. Corp. v. City of N.Y.,*
67 N.Y.2d 297 (1986) .................................................................................. 19

20

*Dalton v. Camp,*
548 S.E.2d 704 (N.C. 2001)......................................................................... 21

21

22

*Dalton v. Educ. Testing Serv.,*
87 N.Y.2d 384 (1995) .................................................................................. 19

23

*Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.,*
622 A.2d 14 (Del. Ch. 1992)........................................................................ 16

24

25

*EBC I, Inc. v. Goldman Sachs & Co.,*
5 N.Y.3d 11 (2005) ...................................................................................... 18

26

27

*Kenford Co. v. County of Erie,*
67 N.Y.2d 257 (1986) ............................................................................. 24, 25

28

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Madison Apparel Group Ltd. v. Hachette Filipacci Presse, S.A.*,
  861 N.Y.S.2d 296 (App. Div. 2008) ................................................................. 16

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*,
  84 N.Y.2d 430 (1994) .......................................................................... 19, 20

*Mitchell v. Linville*,
  557 S.E.2d 620 (N.C. Ct. App. 2001) ............................................................. 21

*Moran v. Erk*,
  11 N.Y.3d 452 (2008) .............................................................................. 16

*Olivetti Corp. v. Ames Bus. Sys., Inc.*,
  356 S.E.2d 578 (N.C. 1987).......................................................................... 25

*Rowe v. Great Atl. & Pac. Tea Co.*,
  46 N.Y.2d 62 (1978) ................................................................................. 16

*Sabetay v. Sterling Drug, Inc.*,
  69 N.Y.2d 329 (1987) ............................................................................... 19

*Tar Heel Indus., Inc. v. E.I. duPont de Nemours & Co.*,
  370 S.E.2d 449 (N.C. Ct. App. 1988) ......................................................... 20, 21

*Train v. Gen. Elec. Capital Corp.*,
  8 A.D.3d 192 (N.Y. App. Div. 2004)............................................................... 16

*Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.*,
  30 N.Y.2d 34 (1972) ................................................................................. 18

**STATUTES - OTHER**

N.C. Gen. Stat. § 75-37 .................................................................................. 21

**FEDERAL RULES**

Fed. R. Civ. P. 50(a)(1) ................................................................................... 1

Fed. R. Civ. P. 50(b) ..................................................................................... 23

**TREATISES**

Edward D. Cavanagh, *Trinko: A Kinder, Gentler Approach to Dominant Firms Under the
  Antitrust Laws?*, 59 Me. L. Rev. 111 (2007) ..................................................... 11

Erik Hovenkamp & Herbert Hovenkamp, *Tying Arrangements and Antitrust Harm*, 52
  Ariz. L. Rev. 925 (2010) ............................................................................ 13

**TABLE OF AUTHORITIES**
(continued)

Page(s)

IIA Areeda, Antitrust Law ¶ 397g ............................................................................... 23

J. Shahar Dillbary, *Predatory Bundling and the Exclusionary Standard*, 67 Wash. & Lee
L. Rev. 1231 (2010) ................................................................................. 13

Philip J. Weiser, *Regulating Interoperability: Lessons from AT&T, Microsoft, and Beyond*
76 Antitrust L.J. 271 (2009) ..................................................................... 10

1   **I.**     **NOTICE OF MOTION AND INTRODUCTION**

2          Pursuant to Federal Rule 50(a), Abbott moves for judgment as a matter of law on all of

3   GSK's claims.  Any hearing on this motion will be take place at a date and time to be determined

4   by the Court.

5          "Judgment as a matter of law is appropriate when the evidence presented at trial permits

6   only one reasonable conclusion."  *Byrd v. Maricopa County Sherriff's Dep't*, 629 F.3d 1135,

7   1138 (9th Cir. 2011).  Because "a reasonable jury would not have a legally sufficient evidentiary

8   basis" to find for GSK on any of its claims, or to find against Abbott's legitimate business

9   justification defense, the Court should enter judgment in Abbott's favor on all of GSK's claims.

10   Fed. R. Civ. P. 50(a)(1).[1]

11   **II.**     **ARGUMENT**

12       **A.**     **GSK's Monopolization Claim Fails As a Matter of Law.**

13          To prevail on its monopolization claim, GSK must prove: "(1) the possession of

14   monopoly power in the relevant market and (2) the willful acquisition or maintenance of that

15   power as distinguished from growth or development as a consequence of a superior product,

16   business acumen, or historic accident."  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S.

17   451, 480 (1992).  GSK has failed to present sufficient evidence on any of these elements.

18        **1.**     **GSK Admits That There Is No Direct Evidence of Monopoly Power.**

19          GSK admits that it has offered no direct evidence that Abbott had monopoly power in the

20   market in which Kaletra competes.  *See* GSK's Brief Regarding Draft Final Jury Instructions and

21   Verdict Form at 4, Dkt. No. 464 (Mar. 17, 2011); Tr. 1652:6-1653:12 (Dr. Noll testifies that

22   direct evidence is "not reliable in the pharmaceutical industry").

23        **2.**     **GSK Has Not Presented Sufficient Indirect Evidence of Monopoly Power.**

24          **a.**     **GSK Failed to Establish a Relevant Antitrust Market.**

25          To demonstrate monopoly power indirectly, a plaintiff must initially define a relevant

---

[1] Abbott hereby incorporates all prior legal arguments made in its February 5, 2008 Motion to Dismiss (Dkt. 46), September 10, 2009 Motion to Dismiss (Dkt. 180), October 29, 2010 Motion for Summary Judgment (Dkt. 287), Motion *in Limine* (Dkt. 389), and objections to jury instructions (Dkt. 355, 397, 468, 473, 477).

1   market and show that the defendant has a dominant share of that market.  *Rebel Oil Co. v. Atl.*

2   *Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).[2]  GSK's antitrust claims fail at the outset

3   because GSK failed to offer sufficient evidence to support its proposed relevant market.  *See*

4   *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1489-90 (9th Cir. 1991)

5   (rejecting implausibly narrow market definition); *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*,

6   375 F.3d 1341, 1365 (Fed. Cir. 2004), *rev'd on other grounds*, 546 U.S. 394 (2006).

7        "A relevant market, for antitrust purposes, can be broadly characterized in terms of the

8   cross-elasticity of demand for *or* reasonable interchangeability of a given set of products or

9   services."  *Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 507 (9th Cir.

10  2010) (emphasis added).  "Reasonable interchangeability emphasizes the economic factors of use

11  and physical characteristics, while cross-elasticity stresses price."  *M.A.P. Oil Co. v. Texaco Inc.*,

12  691 F.2d 1303, 1306 (9th Cir. 1982).  GSK's economist, Dr. Noll, testified that the relevant

13  market is limited to Kaletra and boosted Reyataz, Lexiva, and Prezista.  *See* Tr. 1553:3-8;

14  1615:24-1616:7.[3]  Dr. Noll conducted no econometric analysis of the cross-elasticity of demand.

15  Tr. 1599:1-8; Tr. 1599:9-15; *see also* Tr. 1598:15-20.  Despite a lack of any medical or

16  pharmacological expertise (Tr. 1551:4-5; 1599:19-1600:2), a lack of experience regarding drug

17  pricing (Tr. 721:21-722:5) or competition among drugs (Tr. 722:7-11; 722:18-723:2), and his

18  failure to consult independent physicians (Tr. 724:9-17), Dr. Noll instead purported to interpret

19  clinical literature and contemporaneous documents and to use his interpretations to categorize

20  certain drugs as "close therapeutic substitutes" that compete on the basis of price.  Tr.1553:3-

21  1554:12.[4]

---

22

23  [2] Relevant market is also an independent element of monopolization and attempted
    monopolization claims.  GSK's monopolization claim fails for this reason as well.  The analysis
24  in the text applies equally to the question of whether GSK has proved the relevant market element
    of monopolization and attempted monopolization claims.

25  [3] Dr. Noll referred to "alternative[]" market definitions, but GSK presented no evidence regarding
    the products included in these alternatives or the reasons for including them.  Tr. 1616:24-25.

26  [4] The evidence does not support Dr. Noll's foundational premise that the products in his market
    definition actually compete based on price.  *See* Tr. 1685:14.  Dr. Noll referred to no clinical
27  literature on price-sensitivity; and conceded that his market share charts were "consistent with the
    idea that physicians are simply selecting the product that they think is best for their patients"
28  (without regard to price).  Tr. 1645:13-16.  Dr. Noll claimed that there is price sensitivity among

---

Dr. Noll's analysis is based only upon his *ipse dixit* and is insufficient.  Indeed, Dr. Noll's definition *contradicts* the DHHS guidelines, which identify a range of reasonably interchangeable regimens far in excess of the four included in GSK's "highly effective PI market."[5]  For example, the February 2002 guidelines list six preferred regimens for naive patients, but the only one of these that Dr. Noll included was Kaletra.  Tr. 1606:23-1607:10 (under Noll market definition, Kaletra held 100% of the market in 2002).  Dr. Noll also included boosted Reyataz in his market as of November 2003 although the then-current DHHS guidelines included only unboosted Reyataz (which Noll excludes from his definition, along with all other unboosted regimens).  Tr. 1608:18-1609:1; 1609:20-25; 1610:25-1611:5.  Although the March 2004 guidelines list seven alternative regimens, including NNRTIs and unboosted PIs, Dr. Noll included none of these in his definition.  Tr. 1611:17-25; 1612:23-1613:2.  Dr. Noll excluded Sustiva (an NNRTI) even though it has appeared as a *preferred* regimen on all DHHS guidelines since 1999.  Tr. 1615:6-12.[6]

---

the relevant drugs because these drugs are expensive, because generic drugs compete in the prescription drug market, and because companies consider the "cost effectiveness" of their products.  Tr. 1571:13-1572:15.  However, the undisputed evidence shows that the amount patients paid for prescriptions was unaffected by the Norvir price increase.  Tr. 2419:5-2422:3.  Additionally, there is no evidence that *any* of the drugs at issue here have generic equivalents.  And the mere fact that some marketing or public relations documents called Kaletra "cost effective" does not mean the market is price sensitive.  GSK's *own* economist Dr. Leffler acknowledged the contrary.  Tr. 1320:1-4; *see also* Tr. 1320:8-10.  And GSK's medical expert Dr. Javeed Siddiqui also testified that he knew of no doctors who took patients off of Norvir (and thus boosted Reyataz or Kaletra) as a result of the price increase (although some patients asked to switch their prescriptions out of "social concerns").  Tr. 532:3-10; 532:19-22; 544:19-545:4.  As Dr. Hay testified, "safety and efficacy are the number one attributes," but HIV drugs also compete on the basis of "the burden of taking the pills, food restrictions, drug-drug interactions, [and] dosing."  Tr. 2425:22-2426:3; *see also* Tr. 2445:21-2446:11.  Dr. Kolassa similarly testified that the market for HIV drugs is not price sensitive.  Tr. 2197:12-2199:5; Tr. 2211:17-2212:5; Tr. 2248:17-2249:20.  Documents regarding Lexiva are similar.  P-065-0008, 0005; TX-0920-0014; P-089-0002.

[5] Dr. Noll conceded that the term "highly effective PI market" is not in medical literature or Abbott or GSK documents.  Tr. 1601:18-21; 1602:4-10.

[6] Dr. Noll said he excluded these regimens because the guidelines did not support categorizing them as "reasonably close therapeutic substitutes," (Tr. 1684:2-11) but he did not identify particular passages supporting his conclusions.  Tr. 1605:15; 2447:15-2448:2.  Additionally, Dr. Douglas Richman, an actual HIV treating physician and a contributor to the IAS guidelines (TX-0767-0007; Richman Dep. 54:20-55:19) testified that NNRTIs and boosted PIs were "equally appropriate alternative[s]" for naive patients (Tr. 148:1-15) and that "[f]or a substantial proportion of treatment-naive patients, one could select either."  Tr. 192:15-193:11.  Lexiva brand director Mr. Hannan testified that GSK's Lexiva launch plan showed Kaletra "taking share away from Viracept" and that this substitution of an unboosted PI was reasonable.  Tr. 969:21-971:1; P-139-0009.

1    GSK's market definition is also unsupported by Dr. Noll's standardless interpretation of

2    contemporaneous Abbott and GSK documents.  *See* Tr. 1554:7-9; 1615:15-1616:3; 1631:16-18.

3    Dr. Noll identified no Abbott documents supporting his definition.  He presented no scientific or

4    other objective methodology for his documentary interpretations, and he disregarded numerous

5    statements to the effect that Sustiva (an NNRTI) and Viracept (an unboosted PI) competed with

6    Kaletra.  *See* P-150-0002; Tr. 1617:1-1618:22 (identifying Viracept as "hav[ing a] significant

7    impact on [the] competitive landscape in 2003"); P-150-0012; Tr. 1619:19-1620:3 (comparing

8    Aptivus, an unboosted PI, to Kaletra); P-299-0072; Tr. 1620:4-1621:11 ("Kaletra will experience

9    competitive pressure from Sustiva and atazanavir"); P-179-0014; Tr. 1621:24-1624:4 (comparing

10   Kaletra to other "key competing products," including NNRTIs and numerous unboosted

11   regimens); P-179-0069-71; Tr. 1624:5-1625:13 (identifying Sustiva, Viramune and the NRTI

12   Trizivir as "Main Competitors" with Kaletra); *see also* TX-0625-0035; Tr. 1625:14-1627:2; TX-

13   0762-0012; Tr. 1627:5-1628:7; Tr. 2758:11-2759:11; TX-1190-0002; Tr. 1630:10-1631:9.

14   Dr. Noll also ignored GSK statements that it saw the PI market as competitive prior to

15   Reyataz's launch, including a June 2002 document characterizing "the current competitive

16   environment surrounding HIV/AIDS [as] fierce" (TX-0558-0006; Tr. 1636:20-1637:23); *see also*

17   P-075-0006; Tr. 1632:10-25; P-075-0014, 0019; Tr. 1633:1-15.  When confronted with an

18   October 2001 GSK document stating that "PI[s] are taking share directly from NNRTIs" (TX-

19   966-0021), Dr. Noll's only response was to declare, without economic analysis, that GSK "made

20   a mistake in that particular page in this particular document."  Tr. 1638:22-1639:8; *see also* TX-

21   1037-0007 (GSK document identifying "increased PI use in first-line regimens at the expense of

22   NNRTIs").

23   Dr. Noll's testimony that these statements are irrelevant to market definition because they

24   "are about qualitative performance variables" (Tr. 1629:7-11; 1685:16-19) is a legal conclusion

25   contrary to this Court's prior opinion, which states that "qualitative performance variables" such

26   as "the product's peculiar characteristics and uses" are relevant.  Order Re Abbott's Motions for

27   Summary Judgment at 15, Dkt. No. 325 (N.D. Cal. Jan. 14, 2011) ("MSJ Order") (quoting *Coal.*

28   *for ICANN Transparency, Inc.*, 611 F.3d at 507); *see also United States v. E.I. du Pont de*

1   *Nemours & Co.*, 351 U.S. 377, 404 (1956).  Because GSK's market definition is contradicted by

2   undisputed evidence of interchangeability, and is based on nothing more than the *ipse dixit* of an

3   expert testifying outside of his area of expertise, it cannot support a jury verdict.

4                  **b.     GSK's Indirect Evidence of Monopoly Power Is Insufficient.**

5         **Market Share.**  As a threshold matter, Dr. Noll's market share calculations are irrelevant

6   because they are based on an unsupported market definition.  *See Rebel Oil*, 51 F.3d at 1434; *see*

7   *also, e.g.*, *E.I. du Pont de Nemours & Co.*, 351 U.S. at 379, 400 (market share decreased from

8   75% to less than 15% when market definition was appropriately expanded).  With a more realistic

9   market definition, Kaletra's market share is entirely inconsistent with monopoly power.  For

10  example, Dr. Noll conceded that Kaletra was never more than 40% of all PI prescriptions, Tr.

11  1648:6-20, and never much more than 20% of all prescriptions for PIs and NNRTIs.  Tr. 1648:21-

12  1649:6; *see also* Tr. 1649:12-1650:6 (Kaletra had 34% of prescriptions for boosted PIs, Sustiva,

13  and Atripla); 1650:9-19 (Kaletra had 29% of prescriptions for Kaletra, boosted Reyataz, boosted

14  Lexiva, and Sustiva); 972:21-23; 1678:19-21; 2440:2-2441:5; 2444:21-25.

15        Even under Dr. Noll's unsupported market definition, the data shows that Abbott did not

16  have monopoly power in the relevant period.  First, courts generally require at least a 65% share to

17  support a finding of monopoly power.[7] *In re Abbott Labs. Norvir Anti-Trust Litig.*, 562 F. Supp.

18  2d 1080, 1086 (N.D. Cal. 2008); *see United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424

19  (2d Cir. 1945) (Hand, J.) ("it is doubtful whether sixty or sixty-four per cent would be enough").

20  Kaletra's share of Dr. Noll's market dropped below 65% by 2005.  Tr. 1655:1-4.  And it is

21  undisputed that Reyataz has now surpassed Kaletra as the most prescribed PI.  Tr. 1658:14-24.

22        Second, the Ninth Circuit has emphasized that "market share is just the starting point for

23  assessing market power."  *Oahu Gas Serv., Inc. v. Pac. Res., Inc*, 838 F.2d 360, 366 (9th Cir.

24  1988).  "A high market share, though it may ordinarily raise an inference of monopoly power,

25  will not do so in a market with low entry barriers or other evidence of a defendant's inability to

---

26  [7] Dr. Noll opined that a market share of "50 percent and sometimes less" is generally sufficient to
    confer market power.  Tr. 1581:9-12.  To the extent that he concludes that Kaletra had monopoly
27  power in the market in which it competes, his opinion should be disregarded because it is based
    on a standard that is not the legal standard.

28

1   control prices or exclude competitors." *Id*; *see also Metro Mobile CTS, Inc. v. NewVector*

2   *Commc'ns, Inc.*, 892 F.2d 62, 63 (9th Cir. 1989) (100% share insufficient to establish monopoly

3   power on the facts presented).  Regardless of Kaletra's market share at any fixed point in time, in

4   light of the undisputed evidence of Kaletra's declining share, the absence of barriers to entry or

5   expansion, and the strength of Abbott's competitors, the evidence is insufficient as a matter of

6   law to sustain a finding of monopoly power.

7        **Declining Market Share.** "In evaluating monopoly power, it is not market share that

8   counts, but the *ability to maintain market share*." *United States v. Syufy Enters.*, 903 F.2d 659,

9   665-66 (9th Cir. 1990) (emphasis added); *see also id.* at 666 (the district court "would do better to

10  plot the [market share] points on a graph and observe the pattern they form than to focus narrowly

11  on [defendant's] market share at a particular time.").  In *Syufy*, the court held the decline of a

12  defendant's market share from 93% to 75% in about 3 years evidenced lack of monopoly power.[8]

13  Here, no matter what relevant market definition is used, Abbott's market share decline has been

14  much more dramatic than in *Syufy*.  Tr. 1649:15-18; 2441:12-14; 2442:7-9.  From Q2 2003 to Q2

15  2004, Abbott's share of GSK's proposed market dropped 30%.  Tr. 1655:14-17.  That share

16  declined another 20% from Q4 2004 to Q4 2005, Tr. 1656:1-4, and fell to 36% by Q2 2009, Tr.

17  1658:9-13.[9]  Reyataz's share of GSK's proposed market increased from 9% in Q3 2003 to 38% in

18  Q2 2009.  Tr. 1658:14-22; *see also* Tr. 502:6-7; 746:12-14; 776:11-12; 777:9-778:8; 1643:21-23.

19  Today, Reyataz's share is greater than Kaletra's.  Tr. 1658:14-1659:5.  Prezista entered in 2006

20  and has become a "major player in the market."  Tr. 781:13-15; 781:23:782:4; *see also* Richman

21  Dep. 49:10-50:4.  This is all inconsistent with monopoly power.  Tr. 2442:15-19.

22       **No Barriers to Entry or Expansion**.  "Even if [defendant] has a high market share,

23  neither monopoly power nor a dangerous probability of achieving monopoly power can exist

24

---

25  [8] Dr. Noll's monopoly power opinion should also be disregarded because Noll testified that he
    considers evidence of a declining market share to be irrelevant to the question of monopoly

26  power. Tr. 1588:3-12. Such an approach is directly contrary to the law of the Ninth Circuit.
    [9] Dr. Noll testified that by the end of this period, Kaletra's market share was zero, as it was no

27  longer considered a "highly effective PI." Tr. 1616:17-23.  It makes no sense to assert monopoly
    power where the defendant's share steadily declined to zero during the relevant period.

28

1    absent evidence of barriers to new entry or expansion." *Am. Prof'l Testing Serv., Inc. v. Harcourt*

2    *Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1154 (9th Cir. 1997); *see also*

3    *Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997).  "The

4    ability to control output and prices—the essence of market power—depends largely on the ability

5    of existing firms to quickly increase their own output in response to a contraction by the

6    defendant. . . . [I]f rivals have idle plants and can quickly respond to any predator's attempt to

7    raise prices above competitive levels, the predator will suffer an immediate loss of market share

8    to competitors.  In that instance, the predator does not have market power." *Rebel Oil*, 51 F.3d at

9    1441 (quoted in MSJ Order at 18).

10       Dr. Noll conceded that the producers of Reyataz, Lexiva, and Prezista are not "constrained

11   in any way in [their] ability to expand the output of [their drug] in response to any price increase

12   by an existing competitor," Tr. 1670:22-1671:6, and have expanded output substantially during

13   the relevant period. Tr. 1671:7-10; *see also* Tr. 2439:15-21; 2442:6-14.  The undisputed fact that

14   the many other boosted PIs could and did expand their output during the relevant period itself

15   disproves any inference that Kaletra had monopoly power.

16       It is also undisputed that new competitors have entered and thrived after the Norvir

17   repricing.  Since mid-2003, Reyataz, Lexiva, and Prezista all entered, capturing 64% of the

18   alleged market by 2009.  Tr. 1671:25-1672:9.  Thus, to the well-financed competitors in this

19   market, entry barriers are not high.  Dr. Noll concedes that the "barriers" he mentions exist in

20   every pharmaceutical market.  Tr. 1671:14-18.

21       **Many Large and Sophisticated Competitors.**  Finally, as GSK's witnesses

22   acknowledged, the companies who produce the boosted PIs that compete with Kaletra are strong

23   and sophisticated.  Tr. 476:9-13; 1673:12-16; 1675:3-6; 2439:8-10.

24       The evidence on each factor affirmatively establishes that Abbott lacked monopoly power

25   in the alleged market; the evidence is certainly insufficient to support a finding of such power.

26       **3.    GSK Has Not Presented Sufficient Evidence of Anticompetitive Conduct.**

27       No reasonable jury could find that GSK has proved either predatory pricing or an illegal

28   refusal to deal here, which are GSK's only theories of anticompetitive conduct.

a.        **GSK Has Not Presented Sufficient Evidence of Predatory Pricing.**

(1)        **Insufficient Evidence of Predatory Pricing Under *linkLine***

As set forth in Abbott's motion to dismiss (docket #180), to prevail on a predatory pricing claim, GSK would need to satisfy the *Brooke Group* standard discussed in *linkLine* and *Doe*. GSK must prove: (1) that Kaletra's price (rather than the imputed price of lopinavir) is below cost, and (2) a "dangerous probability" that Abbott could recoup any "investment" in below-cost prices. *John Doe 1 v. Abbott Labs.*, 571 F.3d 930, 934 (9th Cir. 2009) (quoting *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 129 S. Ct. 1109, 1120 (2009), quoting *Brooke Group Ltd v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-24 (1993)).  GSK did not allege or present evidence of either of these.[10]  GSK's Dr. Leffler testified at trial that "Abbott has never priced Kaletra below cost." Tr. 1310:14-16.  And the evidence was that, rather than driving competitors from the market so that Abbott could recoup by raising prices, Kaletra steadily lost market share. Tr. 1654:15-1656:21.

(2)        **Insufficient Evidence of *Cascade* Violation**

***Insufficient Evidence That Kaletra Is a Bundle***.  Even if *Doe* and *linkLine* did not preclude application of the *Cascade* standard here, GSK cannot meet that standard, which by its terms applies only to bundled products.  *Cascade Health Solutions v. Peacehealth*, 515 F.3d 883, 903 (9th Cir. 2008).  Bundling is "the practice of offering, for a single price, two or more goods or services that could be sold separately."  *Id.* at 894.  The trial evidence was that Kaletra is not a bundle of separate products, but rather is a single, integrated product consisting of the active pharmaceutical ingredients ritonavir and lopinavir formulated together with excipients.  Tr. 2345:15-25.  Dr. Scott Brun's undisputed testimony was that neither unformulated ritonavir nor lopinavir is a pharmaceutical product at all—neither is approved by the FDA, and neither would be efficacious.  Tr. 2342:14-20; 2346:1-15; 2352:17-22.

The work to formulate pharmaceutical products from ritonavir and lopinavir was particularly extensive because of peculiar properties of these molecules.  Further, the evidence is

---

[10] GSK's claims also fail under *Schor v. Abbott Labs.*, 457 F.3d 608 (7th Cir. 2006).

1    undisputed that there would be no medical benefit from trying to formulate a drug product with

2    lopinavir as the only active ingredient, and there would be no guarantee of its success.  *See also*

3    1338:8-1339:5 (GSK's Dr. Leffler testifying to steps that would be required to sell a lopinavir

4    drug product); Tr. 2348:7-2349:8; 2350:21-2351:15; 2366:17-2367:3; 2100:23-2101:5.[11]

5         Abbott understands GSK to be relying on the testimony of its economist Dr. Leffler for

6    the proposition that Kaletra is a bundle.  But Dr. Leffler offered only the conclusion that Kaletra

7    is an "economic bundle," Tr. 1286:10, not that Kaletra meets the appropriate standard.  He also

8    provided *no* analysis supporting his conclusion.  Finally, Dr. Leffler testified that Kaletra is an

9    economic bundle of ***Norvir*** and lopinavir, whereas GSK's theory is now that Kaletra is a bundle

10   of the active ingredients lopinavir and ritonavir.  *Compare* Tr. 1288:13-14 ("That's just what

11   Kaletra is.  It's a bundle of Norvir and Lopinavir sold for $18.76"); 1297:15-19 ("Yes, I

12   remember that Lopinavir equals Kaletra minus Norvir . . .") *with* Court's Final Jury Instructions

13   at 17:7-9, Dkt. No. 474 ("GSK contends that Kaletra is a bundle of the active ingredients

14   lopinavir and ritonavir, the active ingredient in Norvir").  Moreover, Norvir is not a component of

15   Kaletra.  Tr. 2344:7-16; 2353:23-2354:20; 2365:20-2366:5; 2360:7-2364:16.

16         ***GSK Presented Insufficient Evidence That the Discount Attribution Test is Violated.***

17   Even if Kaletra were a "bundle" and ritonavir and lopinavir were the products in that supposed

18   bundle, there is insufficient evidence that Abbott's pricing violated the *Cascade* test.  First, GSK

19   presented an analysis based only upon the price of Norvir, whereas GSK's theory is that the

20   active ingredient ritonavir, not Norvir, is one of the elements of the Kaletra "bundle."  Second,

21   even if it were appropriate to consider lopinavir to be a second product in a purported Kaletra

22   "bundle,"[12] GSK's only testimony that the "imputed price" of lopinavir was below cost rests on a

23   calculation using the Norvir price paid by only a minority of purchasers.  Tr. 2630:24-2633:18;

24
_____

25   [11] The fact that lopinavir is not sold separately also means that there is no price to use in the
     *Cascade* test. Tr. 2621:16-2622:4 ("You cannot go through what the test specifies, which is you
26   take the price of the bundle, compare to that the prices of the individual products, and then do all
     of this allocation and comparison.  You can't do it because those products don't exist.").

27   [12] GSK argues that boosted PIs are differentiated rather than fungible products.  Tr. 1586:13-18;
     1670:4-9.  This exposes another fatal flaw in GSK's theory of bundled discounting.  No
28   competitor sells (or, due to patents, could sell) lopinavir or a drug product containing lopinavir.

1   1342:6-1347:13. GSK ignored the price paid in the more than 60% of the market represented by

2   government payors—to whom the Norvir price increase did not apply. Tr. 2632:3-2633:18;

3   1342:6-1347:13. Using the average price of Norvir, it is undisputed that any imputed lopinavir

4   price is well above average variable cost. Tr. 2633:22-2636:3; 1344:20-1347:13. And the

5   average price is the relevant consideration because it is what determines whether a hypothetical

6   equally efficient competitor could charge enough to cover its costs. Tr. 2634:1-2635:24.[13]

7     **GSK Miscalculated the Cost of Lopinavir.** Even if an average variable cost (AVC) of

8   producing lopinavir could be calculated (to compare with the lopinavir "imputed price"), GSK

9   has not properly calculated it. Dr. Leffler classified a cost as variable if it would be avoided if

10  Abbott shut down domestic production of lopinavir altogether. Tr. 1340:3-1342:8. For example,

11  he categorized as variable R&D "to maintain compliance with the FDA," even though such

12  expenditures would be necessary if Abbott sold any Kaletra in the U.S. at all. Tr. 1298:23-

13  1299:17. Under Ninth Circuit law, however, "[i]t is those costs that change as a result of the

14  expanded output that appropriately are considered to be variable," *William Inglis & Sons Baking*

15  *Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1037 (9th Cir. 1981), not all "costs associated

16  with the production of the total output of the product." *See Marsann Co. v. Brammall, Inc.*, 788

17  F.2d 611, 612 (9th Cir. 1986). GSK's *Cascade* claim fails for this additional reason.

18      **b.  GSK Has Not Shown a Refusal to Deal.**

19    **Aspen Does Not Apply Here**. The Supreme Court's statement in *Verizon Commc'ns Inc.*

20  *v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004), that "*Aspen Skiing* is at or

21  near the outer boundary of § 2 liability," should be interpreted as confining the unilateral refusal-

22  to-deal doctrine to the precise facts of *Aspen*, if *Aspen* retains any viability whatsoever.[14] *See,*

23  *e.g.*, Philip J. Weiser, *Regulating Interoperability: Lessons from AT&T, Microsoft, and Beyond*,

24

---

25  [13] GSK's testimony that lopinavir's imputed price was below cost also rested on a calculation
    using the price of 200 mg of Norvir, even though the actual quantity of Norvir used to boost
26  competitor PIs has averaged less than 150 mg throughout the relevant period. Tr. 1347:17-
    1349:13. If the actual average quantity is used, Dr. Leffler acknowledged that there would be no
27  *Cascade* violation. Tr. 1349:18-1351:1.

    [14] Abbott's position is that *Aspen* is no longer good law even on its precise facts.

28

76 Antitrust L.J. 271, 273 (2009) ("some have suggested that this doctrine is either truly exceptional or is effectively overruled"); Edward D. Cavanagh, *Trinko: A Kinder, Gentler Approach to Dominant Firms Under the Antitrust Laws?*, 59 Me. L. Rev. 111, 130 (2007) ("A fair reading of [*Trinko*'s] language is that cases like *Aspen Skiing* are rare and that its applicability should be limited to its particular facts."). Judgment should be entered on the refusal-to-deal theory for this reason alone.

***"Effective Refusal" Theory Is at Best Redundant***. GSK does not contend that the price of Norvir is itself too high. Tr. 730:22-732:11. Thus, GSK's effective refusal-to-deal theory can only be that the re-pricing of Norvir created a price differential between Norvir and Kaletra that drove customers to Kaletra (thus allegedly maintaining a monopoly for Kaletra). But this theory could add nothing to the *Cascade* theory, because *Cascade* explicitly held that "above-cost pricing will not be considered exclusionary conduct for antitrust purposes," 515 F.3d at 901, and rejected any test that would "ask[] the jury to consider whether the plaintiff has been excluded from the market, but [would] not require the jury to consider whether the plaintiff was at least as efficient of a producer as the defendant." *Id.* at 899. In other words, *Cascade* rejected the idea that there might be some other theory under which pricing can be challenged as exclusionary even though it is not below cost (under *any* measure) and not an actual refusal to deal.

***Insufficient Evidence of Refusal To Deal Under* Trinko *Factors***. Even if the refusal-to-deal doctrine retains some viability, *Trinko* at least strictly limited it. As explained in Abbott's motion to dismiss reply brief (Dkt. No. 185), at a minimum, the defendant must have (1) voluntarily engaged in a course of dealing with its rivals; (2) unilaterally terminated that course of dealing, (3) did so in a manner that "suggested a willingness to forsake short-term profits to achieve an anticompetitive end"; and (4) "turned down a proposal to sell at its own retail price." *Trinko*, 540 U.S. at 409-10; *see also MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004).

GSK's evidence fails to satisfy elements 2 through 4. First, it is undisputed that Abbott did not terminate its Norvir license agreements or stop entering into license agreement. Tr. 754:22-755:3. Second, GSK's Dr. Noll admitted that Abbott did not forsake short-term profits—

1   rather, the Norvir repricing was profitable. Tr. 702:3-8; 786:1-4; 786:21-787:1.  Third, Abbott

2   never turned down a proposal to sell Norvir at Abbott's retail price—it is undisputed that Abbott

3   sold Norvir in larger and larger quantities after the Norvir re-pricing.  Tr. 584:20-585:1; 603:18-

4   21; 726:14-23; 2614:19-23; 727:17-20; 1320:17-1321:6; 1789:19-22; 2611:8-21.

5          ***Insufficient Evidence of Refusal To Deal Under Jury Instruction Factors***.  GSK also

6   failed to present sufficient evidence of an effective or practical refusal to deal under the factors

7   articulated in this Court's jury instructions.  First, it cannot be shown that Abbott's re-pricing of

8   Norvir was contrary to Abbott's short-run interests, because the evidence shows that the re-

9   pricing substantially increased Abbott's profits from Norvir. Tr. 584:20-585:1; 603:18-21;

10  726:14-23; 2614:19-23.  Second, the evidence shows that Abbott did not terminate its course of

11  dealing with its competitors—rather, it maintained its license agreements with competitors and its

12  practice of entering into such license agreements both before and after the Norvir repricing.  Tr.

13  754:22-755:3.  Third, the evidence shows that Abbott did not offer to deal with its competitors

14  only on unreasonable terms and conditions—as evidenced by the ever-increasing sales of Norvir

15  after the re-pricing.  Tr. 727:17-20; 1320:17-1321:6; 1789:19-22; 2611:8-21.  Fourth, Abbott did

16  not refuse to provide its competitors' customers with products that were sold in a retail market on

17  the same terms it provided the products to its own customers.  Abbott's Norvir customers were

18  the very same as Abbott's competitors' customers.  Tr. 1217:17-1221:11; Rivetti Dep. 67:16-19;

19  Tr. 2596:16-2597:7; 2599:2-2600:10.  And the fact that Abbott sold more and more Norvir would

20  be inconsistent with a finding of an effective or practical refusal to deal in Norvir.  Tr. 584:20-

21  585:1; 603:18-21; 726:14-23; 2614:19-23; 727:17-20; 1320:17-1321:6; 1789:19-22; 2611:8-21.

22          **c.      Abbott Had a Legitimate Business Justification for Its Pricing Conduct.**

23          Even if there were sufficient evidence of predatory bundled discounting or a refusal-to-

24  deal (which there is not), the undisputed evidence at trial showed that Abbott repriced Norvir with

25  a legitimate business justification—to capture Norvir's value as a low-dose booster.  Dempsey

26  Dep. 121:11-19, 176:7-23; Tr. 1733:5-15; TX-0500-0008; Tr. 768:4-12; Tr. 2106:15-16; Hare

27  Dep. 121:22-25, 167:8-11; Tr. 1700:20-1702:9; 1703:25-1704:2; 1734:5-23; 1866:10-14; Fiske

28  Dep. 86:11-23; Tr. 2213:11-25; 2220:13-21; 2221:9-2222:5; 2226:21-2228:10; 2596:20-2597:7;

1   2599:18-2600:10; 2601:13-20; 2609:10-14; 2752:1-10; 2213:11-25; 2220:13-21; 2221:9-2222:5;

2   2226:21-2228:10; 2228:18-2230:20.  Abbott's goal was to capture more of the total revenue of a

3   regime including Norvir that corresponded to the value Abbott believed Norvir contributed to the

4   therapy.  Dempsey Dep. 122:23-123:11; Leiden Dep. 135:6-136:4; Tr. 1211:13-1212:15; 1214:4-

5   1216:3; 2228:18-2230:20; 2608:5-13; 2606:4-6.  This precludes a jury finding of Sherman Act

6   liability.

7          As the Ninth Circuit has explained, "[w]hen a legitimate business justification supports a

8   monopolist's exclusionary conduct, that conduct does not violate § 2 of the Sherman Act."

9   *Kodak*, 125 F.3d at 1212; *see also* Erik Hovenkamp & Herbert Hovenkamp, *Tying Arrangements*

10  *and Antitrust Harm*, 52 Ariz. L. Rev. 925, 960-63 (2010) (bundled discounting that "flunks the

11  [*Cascade*] attribution test" may be justified by legitimate business reasons including "increased

12  demand by those who used the primary good"); J. Shahar Dillbary, *Predatory Bundling and the*

13  *Exclusionary Standard*, 67 Wash. & Lee L. Rev. 1231, 1280-81 (2010).  In particular, conduct

14  designed to profit from a patented invention, including by increasing price, is a legitimate

15  business justification.  *Schor*, 457 F.3d at 610-14; *In re Indep. Serv. Orgs. Antitrust Litig. v.*

16  *Xerox Corp.*, 203 F.3d 1322 1327-28 (Fed. Cir. 2000).  Thus, Abbott is "entitled to [charge]

17  monopol[istic] prices on its patented [drug Norvir]."  *Kodak*, 125 F.3d at 1225; *see id.* at 1218

18  n.11 ("Kodak is entitled to reap monopoly prices from the sale or licensing of" its patented

19  products).  A contrary rule would "cut into the core rights conferred by patents" and frustrate the

20  "fundamental and complementary purposes of both the intellectual property and antitrust laws."

21  *Id.* at 1218.

22          Because Abbott "assert[s] that its desire to profit from its intellectual property rights

23  justifies its conduct, and the jury should presume that this justification is legitimately

24  procompetitive."  *Id.* at 1219-20.  GSK would be able to rebut this presumption *only* by showing

25  that Abbott's "proffered business justification played no part in the decision to act," or was "not a

26  genuine reason for [Abbott's] conduct."  *Id.* at 1219.  Moreover, it would not be appropriate for

27  GSK to "second guess" Abbott's business judgment by arguing that Abbott could have increased

28  its profits on Norvir sales through "less restrictive means."  *Id.* at 1225.  But GSK presented

1    insufficient evidence to rebut Abbott's evidence of legitimate business justification, and Abbott is

2    therefore entitled to judgment as a matter of law on this basis as well.

3        **B.**    **GSK's Attempted Monopolization Claim Fails As a Matter of Law.**

4        As a threshold matter, GSK's attempt claim fails because attempt has no place in a case

5    involving only an allegation that the defendant illegally maintained a monopoly longer than it

6    otherwise would have.  GSK has admitted that this "is not a case about the acquisition of

7    monopoly power" but instead about "maintenance of [Abbott's] monopoly power."  *See*

8    Confidential DP Opp. to MSJ at 1 (Sept. 9, 2010); *see also* Stockinger Decl., Ex. 111 (5/5/10 Noll

9    Rebuttal Rep. at 31 (arguing that Kaletra lost monopoly power more slowly than it would have

10   but for the Norvir repricing)).  We are aware of no cases in which courts have permitted claims of

11   "attempted monopoly maintenance."  In the one reported case in which such a claim was asserted,

12   the court rejected it as "inherently illogical."  *Le Page's Inc. v. 3M*, No. 97-3483, 2000 WL

13   280350, at *2 (E.D. Pa. Mar. 14, 2000).  While maintenance of monopoly power requires that

14   monopoly power already exist, an attempt claim presumes that monopoly power does not yet

15   exist and considers whether it is a "dangerous probability."  A claim for attempted

16   monopolization is simply incompatible here.

17       Even if an attempt claim could be asserted here, GSK has not presented sufficient

18   evidence to support a jury verdict on its attempt claim.  This is true for all of the reasons that

19   GSK's actual monopolization claim fails (as discussed above) as well as for the additional

20   reasons that there is insufficient evidence of a dangerous probability of success or a specific intent

21   to monopolize the relevant market.  MSJ Order at 10-11.

22       **No Dangerous Probability of Success.**  First, given Kaletra's precipitous and continuing

23   market share decline, the insufficiency of the evidence of a dangerous probability that Abbott

24   would obtain monopoly power seems self-evident.  *See Nifty Foods Corp. v. Great Atl. & Pac.*

25   *Tea Co*., 614 F.2d 832, 841 (2d Cir. 1980) ("No reasonable jury could conclude from the rapid

26   and continuous decline of [the defendant's] market share . . . that there was a probability that [the

27   defendant] would monopolize the waffle market, let alone a dangerous probability."), *superseded*

28   *by statute on other grounds*; *accord Richter Concrete Corp. v. Hilltop Concrete Corp*., 691 F.2d

1   818, 826 (6th Cir. 1982); *Horst v. Laidlaw Waste Sys.*, 917 F. Supp. 739, 744-45 (D. Colo. 1996).

2   Indeed, GSK's own expert agrees that Abbott lost any monopoly power in the relevant market by

3   the end of 2006, and the evidence is undisputed that the decline in Kaletra's market share has

4   continued.

5        **Insufficient Evidence of Specific Intent**.  GSK has not presented sufficient evidence that

6   Abbott acted with a specific intent to monopolize.  The evidence is that Abbott repriced Norvir to

7   align the price with the drug's increased clinical value as a booster and to capture a share of the

8   total revenue of a regimen including Norvir corresponding to that value.  *See* Section II.A.3.c.

9   Abbott expected no effect on Kaletra's sales.  Tr. 773:17-774:3; Rivetti Dep. 154:3-13; Tr.

10  1771:7-25; TX- 0679-0002, 0004, 0008 0010; Tr. 1772:11-1773:6; P-138; Tr. 1775:6-18;

11  1776:20-1777:1; TX-0500-0009; Tr. 1778:8-1780:22; 1936:2-4; 2234:5-2239:2; 2239:9-18;

12  2602:15-21; 2752:22-2755:13; 2234:5-2239:2; 2239:9-18.  The evidence also shows that Abbott

13  knew Kaletra was losing, and going to continue losing, share.  Tr. 1781:17-24; 2725:13-18;

14  2759:12-2761:8; 2725:4-18; P-290-0009.  There is insufficient evidence that Abbott specifically

15  intended that the repricing would affect that trend.

16        **C.        GSK's Contract Claim Fails As a Matter of Law.**

17        "New York does not recognize a separate cause of action for violation of the implied

18  covenant of good faith and fair dealing."  *Cohen v. Nassau Educators Fed. Credit Union*, No.

19  15094-05, 2006 WL 1540324, at *4 (N.Y. Sup. May 10, 2006).  As many New York courts have

20  held, "if the [complaint] alleges only a breach of an implied duty of good faith and fair dealing,

21  and not a breach of contract, that cause of action must be dismissed."  *Designers N. Carpet, Inc.

22  v. Mohawk Indus., Inc.*, 153 F. Supp. 2d 193, 197 (E.D.N.Y. 2001).  This Court nonetheless

23  previously allowed GSK to pursue a claim for violation of "any promise which a reasonable

24  person in the position of the promisee would be justified in understanding were included" in the

25  parties' ritonavir license, which is governed by New York law.  MSJ Order at 37.  Judgment

26  should now be entered for the threshold reason that GSK's implied covenant claim is not viable

27  under the case law just discussed.  Moreover, even assuming New York law recognizes GSK's

28  implied covenant claim, the evidence supports a finding of neither a breach nor contract damages.

1        **1.      GSK Has Presented Insufficient Evidence of the Alleged Promise.**

2           "The boundaries set by the duty of good faith are generally defined by the parties' intent

3    and reasonable expectations in entering the contract."  *Cross & Cross Props., Ltd. v. Everett*

4    *Allied Co.*, 886 F.2d 497, 502 (2d Cir. 1989); *accord M/A-COM Sec. Corp. v. Galesi*, 904 F.2d

5    134, 136 (2d Cir. 1990).  The implied covenant encompasses only those "promises which a

6    reasonable person in the position of the promisee would be justified in understanding were

7    included" in the contract.  *Moran v. Erk*, 11 N.Y.3d 452, 457 (2008); *511 West 232nd Owners*

8    *Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 501 (N.Y. 2002).

9           New York "courts have declined to find that the implied covenant of good faith and fair

10   dealing adds to the contract a substantive provision not included by the parties."  *Geren v.*

11   *Quantum Chem. Corp.*, 832 F. Supp. 728, 732 (S.D.N.Y. 1993).[15]  An implied promise "is to be

12   recognized only if it is clear that a reasonable [party] would not have entered into the [contract]

13   without [the alleged promise], for it is only in such a situation that it can be said with the requisite

14   certainty that to refuse to recognize such a covenant would be to deprive the [plaintiff] of the

15   fruits of his bargain."  *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69-70 (N.Y. 1978);

16   *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d at 136 (implied covenant applied only "where an

17   implied promise was 'so interwoven in the whole writing' of a contract as to be necessary for

18   effectuation of the purposes of the contract").

19          There is insufficient evidence here to support a jury finding that the GSK license included

20   a promise by Abbott to limit the size or timing of any future price increases on Norvir, or to

21   restrain Abbott from competing with GSK for sales of boosted PIs.  First, the agreement was and

22   is just a "simple patent license" under which GSK obtained the right to promote the use of Lexiva

---

23   [15] *See also Madison Apparel Group Ltd. v. Hachette Filipacci Presse, S.A.*, 861 N.Y.S.2d 296,
     297 (App. Div. 2008) (The covenant cannot be construed so broadly as to "create independent
24   contractual rights that [were] not bargained for by the parties."); *Train v. Gen. Elec. Capital*
     *Corp.*, 8 A.D.3d 192, 192-93 (N.Y. App. Div. 2004) (implied covenant does not provide relief not
25   guaranteed by "[t]he plain language of the contract"); *Agency Dev., Inc. v. MedAmerica Ins. Co.*,
     327 F. Supp. 2d 199, 204 (W.D.N.Y. 2004); *Hartford Fire Ins. Co. v. Federated Dep't Stores.*
26   *Inc.*, 723 F. Supp. 976, 991 (S.D.N.Y. 1989) ("Nor can a court imply a covenant to supply
     additional terms for which the parties did not bargain."); *Dave Greytak Enters., Inc. v. Mazda*
27   *Motors of Am., Inc.*, 622 A.2d 14, 23 (Del. Ch. 1992) ("[W]here the contract is intentionally silent
     as to [a] subject, the implied duty to perform in good faith does not come into play.").

28

1   with Norvir without risk that Abbott would sue GSK for infringing its ritonavir boosting patents.

2   TX-0545; TX-0577; *see also* Tr. 985:8-24; 989:1-10; 995:24-996:6; 998:17-25; 1005:17-1008:15;

3   1057:16-1058:4; 1068:5-14; 1070:15-18; 2395:20-25; Key Dep. 155:17-21; 156:1-7; 156:11-16;

4   156:18-24; 158:5-9; *see also Spindelfabrik Suessen-Schurr Stahlecker & Grill GmbH v. Schubert*

5   *& Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075, 1081 (Fed. Cir. 1987) (A license is

6   "in essence nothing more than a promise by the licensor not to sue."). The license's express

7   language makes clear it is nothing more. P-005-0017 (Section 11.8); *see also* Tr. 1063:22-

8   1064:3. Abbott's only obligation under the license agreement was not to sue GSK for

9   infringement, Tr. 1063:15-17, and GSK is not even obligated to pay royalties on U.S. Lexiva

10  sales until 2014. P-005-0006; Tr. 1012:8-16, 1094:25-1095:12.

11      Second, the evidence is undisputed that Norvir's price was never part of the negotiations

12  or of the license agreement. P-005; Tr. 1000:21-24; 1013:18-1015:9; 1052:24-1054:5; 1054:21-

13  1055:1. GSK's lead negotiator John Keller agreed that "we did not introduce a price control in

14  the agreement on Norvir's price." Tr. 1014:25-1015:9. The parties intentionally avoided

15  discussing the price. Mr. Keller agreed that he does not discuss product pricing with competitors.

16  Tr. 1014:25-1015:9; *see also Ariz. v. Maricopa County Med. Soc'y*, 457 U.S. 332, 348 (1982);

17  *Bloomfield v. Bloomfield*, 764 N.E. 2d 950, 953 (N.Y. 2001).

18      Third, several other companies entered into similar license agreements. P-039; TX-0551;

19  P-038; TX-0770; *see also* Tr. 1071:25-1076:20. Two did so **after** the Norvir repricing. TX-0770;

20  Tr. 1075:25-1076:12. Abbott's negotiator John Poulos testified that price was never a topic of

21  discussion during license negotiations. Tr. 1074:7-18; 1076:15-20.

22      Fourth, Abbott and GSK were competitors both before and after the license. Tr. 1071:19-

23  24. GSK was aware that Abbott would continue to sell Kaletra in competition with GSK's drugs

24  Agenerase and Lexiva (*see* Tr. 988:5-16), and the license makes clear that Abbott was not

25  obligated to market or promote GSK's drugs. P-005-0005 (Section 2.1); Tr. 1067:2-9. In the

26  negotiations, GSK did not disclose to Abbott information regarding GSK's future marketing or

27  pricing plans or GSK's plan to stop selling its drug Agenerase. Tr. 1019:12-1020:22; 1091:7-

28  1092:10; 1743:12-15. Nor did GSK ask Abbott about Abbott's future marketing plans for Norvir

1    or Kaletra.  Tr. 1092:16-23.  In patent license negotiations, competitors do not share with one

2    another internal competitive strategic decisions.  Tr. 1090:22-1091:5; 1092:11-15.

3         Fifth, GSK is one of the most sophisticated parties imaginable, and the license went

4    through multiple layers of review at GSK, was approved by senior management, and was signed

5    by GSK's CEO.  Tr. 1009:7-1012:7; 1051:25-1052:6; 1063:9-14; 2395:20-25; Key Dep. 168:21-

6    24; 169:4; 169:7; 169:23-25; 170:3-5; 170:13-15; 170:18-21; 170:24-171:1; 171:14-15; 171:18-

7    20; 171:22-24; 172:1-3.  The license also contained an expansive integration clause.  P-005-0017

8    (Art. 11.5).  Further, the only oral promises or representations in evidence relate to whether

9    Abbott would continue to supply Norvir, which Abbott has continued to do.  Tr. 1018:12-22;

10   1084:24-1085:12; 2395:20-25; Key Dep. 184:20-22; 185:2-9.  GSK cannot now seek a new

11   promise it never negotiated for.

12        **2.        Insufficient Evidence That GSK Was Deprived of the Benefits of Its Bargain.**

13        GSK's implied covenant claim independently fails because implied promises will not be

14   read into a contract where "the contractual objectives were achieved."  *EBC I, Inc. v. Goldman*

15   *Sachs & Co.*, 5 N.Y.3d 11, 23 (2005).  "[S]o long as the promisee is allowed to reap the benefits

16   of the contract, the implied covenant of good faith does not require the promisor to take actions

17   contrary to his own economic interest."  *Bank of N.Y. v. Sasson*, 786 F. Supp. 349, 354 (S.D.N.Y.

18   1992) (citing *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.*, 30 N.Y.2d 34, 46

19   (1972)).  As explained in *M/A-COM Sec. Corp. v. Galesi*, the implied covenant "does not give a

20   party to a contract an absolute entitlement to be free from harm which stems from actions of the

21   other party."  No. 88-0317, 1989 WL 115953 at *2 (S.D.N.Y. Sept. 27, 1989).  "Courts must . . .

22   consider the other party's freedom to act on its own interests."  *Id.*

23        No reasonable jury could find that Abbott deprived GSK of the fruits of the license.  The

24   evidence shows that GSK has received all of the benefits to which it was entitled.  First, GSK

25   received the benefit of a release of infringement liability for GSK's prior promotion of its PI

26   Agenerase with Norvir.  P-005-0006 (Section 3.1); Tr. 1021:25-1022:17; 1080:9-17.  Second,

27   GSK was able to obtain FDA approval to include boosting on the Lexiva label—an important

28   benefit.  P-005-0005 (Section 2.1(ii)); Tr. 1024:1-5; 1024:19-22; 1081:13-21; 1082:3-22;

1    2395:20-25; Key Dep. 156:11-16; 156:18-24.  Third, GSK was also able to promote boosting

2    Lexiva.  P-005-0005 (Section 2.1(i)); Tr. 1025:25-1026:8.  In the seven years since the parties

3    entered into the license, GSK has not terminated it and to this day promotes Lexiva for use with

4    Norvir. TX-1363; Tr. 1016:13-1018:10; 1083:21-1084:18; 1094:9-17.  In fact, GSK has made

5    $927 million in sales of Lexiva in the U.S. since 2004—the majority of which are boosted.  Tr.

6    839:4-15; 920:11-14; 987:19-22; 1007:9-11; 2644:14-23; TX-1254-00 49.

7           In sum, there is insufficient evidence of a breach of an obligation that was "in aid and

8    furtherance of other terms of the agreement of the parties."  *Sabetay v. Sterling Drug, Inc.*, 69

9    N.Y.2d 329, 335 (1987).  For the jury to find for GSK, it would have to be adding to "the contract

10   a substantive provision not included by the parties."  *Geren*, 832 F. Supp. at 732.  There is also no

11   evidence that would put this case in the realm of the typical implied covenant claim—*i.e.*, where a

12   contract gives a party discretion over a particular element of performance that the party would not

13   otherwise have and that party exercised that discretion in bad faith.  *See Dalton v. Educ. Testing

14   Serv.*, 87 N.Y.2d 384, 389 (1995).

15          **3.        There Is Not Sufficient Evidence to Support GSK's Claimed Damages.**

16          A reasonable jury also could not find that GSK is entitled to its alleged lost Lexiva profits.

17   The license precludes "special, incidental, indirect or consequential losses arising out of or

18   relating to this agreement."  P-005-0015; Tr. 1088:3-13.  Under New York law, a contractual

19   limitation of liability clause precludes lost profits damages absent proof of a "breach of a

20   fundamental, affirmative obligation the agreement expressly imposes on the contractee."  *Corinno

21   Civetta Constr. Corp. v. City of N.Y.*, 67 N.Y.2d 297, 312-13 (1986).  GSK has not alleged or

22   presented sufficient evidence of breach of an "affirmative obligation" of the license.  This Court

23   held that the license's consequential damage limitation could be overcome, and lost profits

24   awarded, if GSK proved that the alleged breach resulted from "intentional misrepresentations, . . .

25   willful acts or gross negligence."  MSJ Order at 41-42 (quoting *Metro. Life*, 84 N.Y.2d at 433).

26   GSK has not met its burden.  *See* TX-0500; Tr. 2725:19-2729:12; 2728:9-18; 2729:19-2730:8;

27   2741:12-22; 2230:21-2234:4; 1745:8-1746:10; 1770:13-1771:5; 1867:24-1868:1; 2074; Fiske

28   Dep. 92:11-21; Tr. 2816:1-3; Leiden Dep. 201:11-13.  Mere "intentional nonperformance of [an]

1   Agreement motivated by financial self-interest" would not be enough.  MSJ Order at 41 (quoting

2   *Metro. Life*, 84 N.Y.2d at 438).

3       **D.      GSK Has Not Proven That Abbott Violated the UDTPA.**

4           GSK alleges that Abbott committed three acts that violate the UDTPA:  (1) deliberately

5   withholding plans for using Norvir to limit competition; (2) "inequitably" asserting power over

6   Norvir by increasing its price 400% to disrupt Lexiva's launch; and (3) timing that price increase

7   to do the same.  These alleged acts are neither "substantial aggravating circumstances" sufficient

8   to turn the alleged breach of contract into a UDTPA violation nor independently unlawful under

9   the Act.[16]  And even if they were, no reasonable jury could find that Abbott committed these acts.

10          ***No Aggravating Circumstances for the Alleged Breach.***  "A simple breach of contract,

11  even if intentional, does not amount to a violation of the Act; a plaintiff must show substantial

12  aggravating circumstances attending the breach to recover under the Act, which allows for treble

13  damages."  MSJ Order at 44-45 (quotation omitted).  A UDTPA claim exists only if there is

14  "unfairness [or] deception in formulation of the contract" or "deception in the circumstances of its

15  breach."  *United Roasters, Inc. v. Colgate-Palmolive Co*., 649 F.2d 985, 992 (4th Cir. 1981).

16  None of GSK's allegations meets this standard.  Deception in the formation of the contract can be

17  shown "only if the promisor had no intent to perform when he made the promise."  *Gilbane Bldg.*

18  *Co. v. Fed. Reserve Bank of Richmond, Charlotte Branch*, 80 F.3d 895, 903 (4th Cir. 1996); *see*

19  *also* MSJ Order at 45.  That Abbott considered options for Norvir (which Abbott did not pursue)

20  before the negotiations and did not so disclose to GSK hardly is evidence that Abbott intended

21  not to honor the license terms.  *Tar Heel Indus., Inc. v. E.I. duPont de Nemours & Co*., 370

22  S.E.2d 449 (N.C. Ct. App. 1988).  Nor do the amount and timing of the repricing relate to

23  Abbott's intent in entering the license, as the repricing occurred a year later.

24          ***Not Independently Unlawful.***  GSK's three alleged acts also are not independently

25  unlawful under the UDTPA.

26  _____

27  [16] The Court allowed GSK to pursue its UDTPA claim only "to the extent it is based on Abbott's
    alleged breach of the implied covenant of good faith and fair dealing."  MSJ Order at 46.  Thus,
    GSK's UDTPA claim fails if its breach of contract claim fails.

28

**#1**: Merely "considering" Norvir options cannot be deemed deceptive because "an act of deception must have some adverse impact on the individual or entity deceived." *Mitchell v. Linville*, 557 S.E.2d 620, 626 (N.C. Ct. App. 2001) (quotation omitted). GSK offered insufficient evidence that it would have acted differently had it known of Abbott's internal considerations, or that those considerations affected GSK. This distinguishes this case from GSK's oft-invoked *South Atlantic Ltd. Partnership of Tennessee, L.P. v. Riese*, 284 F.3d 518, 537 (4th Cir. 2002).

**#2**: Whether conduct was "inequitable" is a legal question, not a jury question. Further, it is not an antitrust violation to raise the price of a product with a legal monopoly. Because "Abbott would face liability under the UDTPA for monopolization if and only if GSK prevailed on its Section 2 claim," this allegation rises or falls with GSK's antitrust claims. MSJ Order at 44 n.10. It is North Carolina's public policy not to defeat "the ability of the market in goods and services from bringing supply back in balance with demand and not defeating the function of price in allocating scarce resources." N.C. Gen. Stat. § 75-37. Application of the UDTPA to lawful pricing conduct would contravene this policy.

**#3**: It would not violate the UDTPA to time product announcements in a manner aimed at gaining an advantage over competitors—this is ordinary "business-related conduct" beyond the UDTPA's reach.[17] *Dalton v. Camp*, 548 S.E.2d 704, 712 (N.C. 2001). Nor could Abbott violate the Act by "disrupting" or "undermining" GSK's business. *See Tar Heel Indus.*, 370 S.E.2d at 451-52 (permitting DuPont to terminate contract with transportation carrier, even though DuPont was carrier's only client and termination would ruin carrier's business).

***Insufficient Evidence That Abbott Committed Any of the Acts.*** In any event, no reasonable jury could find that Abbott committed any of the three acts alleged. GSK produced insufficient evidence that Abbott "deliberately withheld" plans "to use its control over Norvir to limit competition." At most, GSK introduced evidence that some at Abbott ***discussed*** or

---

[17] Although GSK has relied on *Riese* to argue that the timing can be a deceptive act under the UDTPA, *Riese* is inapposite. it involved removing someone from a real estate partnership just days before the partnership sold a major project at a large profit. *S. Atl. P'ship of Tenn., L.P. v. Riese*, 284 F.3d 518, at 538 (4th Cir. 2002). Abbott and GSK are competitors, and the license expressly states that it did not establish a partnership. P-005-0017 (Art. 11.8). Further, the timing of a price increase is not a *deceptive* act.

1 *considered* options in September and early October of 2002. The evidence shows that these were

2 merely preliminary discussions, and that Abbott rejected withdrawing Norvir. P-160; Tr.

3 1936:25-1939:3. As Mr. Poulos testified, there was no such "plan"—"I told them [withdrawal]

4 wouldn't happen … [b]ecause that's what I believed at the time, and I was right." Tr. 1084:24-

5 1085:6. Nor did GSK produce sufficient evidence that Abbott acted to "undermine and disrupt

6 GSK's launch." Witness after witness testified that Abbott's reason for repricing Norvir was to

7 capture Norvir's value as a low-dose booster. *See infra* § II.A.3.c. GSK's claim that Abbott

8 intended to elicit negative publicity about itself to undermine GSK's launch is not supported.

9     **E.**     **GSK Has Not Proven Compensable Damages.**

10         **1.**     **Prowse's Lost Profits Estimates Are Not Proper Antitrust Damages.**

11       GSK's lost profits model fails to meet the legal requirements for antitrust damages. It is a

12 "basic rule for antitrust damages" that "a purchaser may recover only for the price increment that

13 'flows from' the distortion of the market caused by the monopolist's anticompetitive conduct."

14 *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979) (quoting *Brunswick*

15 *Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)); *see also Cascade*, 515 F.3d at 902.

16 As the Supreme Court explained in *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328

17 (1990), challenged conduct may in "some respects . . . reduce competition, in other respects it

18 may increase competition, and in still other respects effects may be neutral as to competition." *Id.*

19 at 344. The "plaintiff can recover *only if the loss stems from a competition-reducing aspect or*

20 *effect of the defendant's behavior*." *Id.* (emphasis added). Thus, Plaintiffs must "prove more than

21 injury causally linked to [the alleged illegal conduct]. . . . The *injury should reflect the*

22 *anticompetitive effect* either of the violation or of anticompetitive acts made possible by the

23 violation." *Brunswick*, 429 U.S. at 489 (emphasis added).

24       ***Damages from "Market Confusion".*** GSK's main theory of damages is that the Norvir

25 repricing resulted in "market confusion" that disrupted Lexiva's launch.[18] But any damages from

---

26 [18] Abbott did not time the price increase to interfere with Lexiva's launch, and GSK's launch was

27 not disrupted. Tr. 1770:21-1771:5; 2230:21-2234:4. GSK made thousands of sales calls, presentations, etc., during the launch. Tr. 2254:22-2256:2; 2256:17-2261:15; 2262:15-2263:15.

28 Contemporaneous documents show that GSK believed these efforts were getting GSK's message

---

1   this alleged conduct do not stem from a competition-reducing aspect or effect of a refusal to deal

2   or bundled discounting.  On the contrary, the Court has rejected the "sabotage" theory of antitrust

3   liability.  MSJ Order at 32-33.  Prowse also never attempted to parse out "market confusion"

4   damages.  GSK's antitrust damages theory is thus flawed for this reason alone.[19]

5          **Failure to Consider Lawful Price Increases**.  The Ninth Circuit requires antitrust

6   plaintiffs to "segregat[e] between damages attributable to lawful competition and [those]

7   attributable to the unlawful scheme."  *Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.*, 786

8   F.2d 1342, 1352 (9th Cir. 1985), *superseded on other grounds by* Fed. R. Civ. P. 50(b).  Courts

9   have thus been "consistent in requiring plaintiffs to prove in a reasonable manner the link

10  between the injury suffered and the *illegal* practices of the defendant."  *City of Vernon v. S. Cal.*

11  *Edison Co.*, 955 F.2d 1361, 1371 (9th Cir. 1992).  Because the below-cost benchmark divides

12  lawful prices from potentially unlawful prices, *linkLine*, 129 S. Ct. at 1121, GSK "must determine

13  the prices that it would have faced [from Abbott] absent the predation."  IIA Areeda, Antitrust

14  Law ¶ 397g, at 432.  If a defendant "got overly aggressive on price and arguably went too far,

15  [its] legitimate prices would necessarily be higher, but perhaps not by much," and damages must

16  be limited accordingly.  *Id.*

17         Prowse improperly assumed that *no portion* of the repricing was lawful, and that Abbott

18  could not have raised Norvir's price *at all* in the but for world.  Thus, he does "not present direct

19  evidence on the portion of that diverted business attributable solely to the [alleged] illegal

20  scheme" to sell at a bundled discount.  *Farley*, 786 F.2d at 1352.  GSK asks the jury

21  impermissibly to "speculate" as to whether GSK was harmed by illegal activities "as opposed to

22  legitimate competition."  *Id.* at 1351.  Similarly, on refusal to deal, Prowse failed to compare

23  GSK's actual sales to sales it would have made had Abbott charged a price that was higher than

24  the November 2003 price but not an "effective" refusal.

25         **Sales Lost to Other Competitors**.  GSK must prove that its losses stem from competition-

26  _____

27  out.  Tr. 2263:16-2265:10; P-102-0003.
    [19] Even if it had a slow launch, Lexiva should have eventually reached its potential, just as did
    Prezista.  Tr. 2251:7-2252:19; 2268:23-2271:2.

28

1    reducing aspects of Abbott's conduct.  *Atl. Richfield*, 495 U.S. at 344.  But Prowse did not

2    separate out the alleged lost Lexiva sales that were lost to Reyataz, not Kaletra.  *See, e.g.*, Tr.

3    1424:3-6; 1427:25-1428:5.  Lost profits from sales that went to Reyataz are not proper antitrust

4    damages.

5            **Lost Sales of Unboosted Lexiva.**  GSK may not recover damages for losses outside the

6    relevant market.  *Blue Shield of Va. v. McCready*, 457 U.S. 465, 479-80 (1982); *Legal Econ.*

7    *Evaluations, Inc. v. Met. Life Ins. Co.*, 39 F.3d 951, 955 (9th Cir. 1994).  Prowse improperly

8    includes lost profits for unboosted Lexiva, which Dr. Noll excluded from the relevant market.  Tr.

9    1567:15-17; 1611:5.

10           **Lost Sales After Monopoly Power Ended.**  GSK may not recover damages for any period

11   during which it failed to prove that Abbott had monopoly power.  *Oahu Gas*, 838 F.2d at 362-63;

12   *Rebel Oil*, 51 F.3d 1421.  Yet, Prowse includes damages for 11 years after Abbott's monopoly

13   power ended.  Tr. 1585:17-1586:12; 2459:8-2460:2.

14           **2.       Dr. Prowse's Damages Include Injuries Not Proximately Caused by Abbott.**

15           GSK may not recover damages unless those damages directly resulted from allegedly

16   unlawful conduct, and not an intervening cause.  *Farley*, 786 F.2d at 1350; *Kenford Co. v. County*

17   *of Erie*, 67 N.Y.2d 257, 261 (1986); *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 964 F. Supp.

18   956, 961 (M.D.N.C. 1997).  Prowse failed to correct for intervening causes,[20] and he included lost

19   sales of unboosted Lexiva, which are not directly traceable to the breach.[21]

20           **3.       Dr. Prowse's Alleged Damages Are Based on Improper Speculation.**

21           Damages must be proven with reasonable certainty without speculation.  *Farley*, 786 F.2d

22   _____

23   [20] For example, Prowse did not correct for losses due to the fact that Reyataz "beat everybody's expectations."  Tr. 1413:2-6; 1411:18-1413:18; 1416:4-1416:22; 2464:10-2467:13.  GSK knew that Reyataz's success would come, at least in part, at Lexiva's expense.  P-079; Tr. 1428:18-

24   1432:7.  Nor did Prowse account for lost sales due to the CONTEXT trial failure.  Tr. 2467:17-2469:8; TX-0673-49.  The evidence demonstrated that Lexiva was a mediocre drug.  Tr. 2253:14-

25   2254:21; 2265:11-2266:5; P-136-0023; 2266:13-2267:20; TX-0800-0004. Moreover, Reyataz got there first, and GSK did not alter its forecasts in light of Reyataz's entry. Tr. 2267:21-2268:22;

26   2271:3-2273:13; P-102-0002; Tr. 2322:22-2323:8.
     [21] GSK's witnesses admitted the license agreement had nothing to do with unboosted Lexiva.

27   Tr. 1477:19-1482:15; Key Dep. 162:6-17; Tr. 2456:19-2458:14.  This error significantly inflated Prowse's damage estimate.  Tr. 1477:19-1482:15; 2456:19-2458:14.

28

1  at 1350; *Kenford*, 67 N.Y.2d at 261; *Olivetti Corp. v. Ames Bus. Sys., Inc.*, 356 S.E.2d 578, 585-

2  86 (N.C. 1987).  Prowse used unreliable pre-launch forecasts and market research studies, Tr.

3  2456:8-2457:13[22]; and his choice and weighting of the forecasts only compounds the error.  Tr.

4  2456:8-2457:13.[23]  Prowse's damages estimate also include 13 years of damages after GSK's

5  own witness testified that the confusion ended, Tr. 2011:8-12; *see also* Tr. 2459:8-2460:2, and

6  more than 10 years of damages after the alleged monopolization ended.  Tr. 1585:20-1586:12;

7  2459:8-2460:2.

8

9  Dated:  March 24, 2011                    By:  ____*/s/ Stuart N. Senator*_____
                                                      Stuart N. Senator
10                                                    MUNGER, TOLLES & OLSON LLP

11                                                    Attorneys for Defendant Abbott
                                                      Laboratories
12

13

14

15

16

17

18

19

20

21  _____

22  [22] GSK's witnesses conceded that it is harder to forecast for new products.  Tr. 1404:18-1405:15; 1409:7-1410:15; 2396:1-6; Morgan Dep. 27:7-27:14; 28:21-28:22; 28:24; 29:1-30:7; 42:1-3, 42:5-7; 42:12-13; 42:15-16; 151:18-152:4.  The forecasts relied on by Prowse were based upon faulty assumptions.  Tr. 1422:21-1423:15; 2396:1-6; Morgan Dep. 27:7-27:14; 28:21-28:22; 28:24; 29:1-30:7; 151:18-152:4; Tr. 2462:10-2463:6; *see also* TX-1040-0024.  The market research studies were conducted about a year before Lexiva's launch, and all but one of the forecasts was created before key events reducing Lexiva's sales.  Tr. 1410:7-15; 1411:18-1413:18; 1413:24-1415:13; 2396:1-6; Morgan Dep. 42:1-3, 42:5-7, 42:12-13, 42:15-16; 184:15-17; 204:12-18; 204:22-24; 205:1-14; Tr. 2464:10-2469:8; 2472:4-7; P-079; TX-0673-0049.  The wide range in forecasts confirm their unreliability.  Tr. 1409:1-15; 2463:7-2464:6.

26  [23] Prowse double-weights the highest forecasts, Tr. 1376:6-9; 1407:9-1408:3; 2469:18- 2470:10; miscalculates the peak share estimate for one, Tr. 2472:14-2475:25; P-075-0023; TX-0920-10; and ignores research that predicted a much lower Lexiva share, Tr. 1432:16-1439:11; 2470:14-2472:3; P-079; TX-0571; TX-0614.  He overstates lost profits by hundreds of millions of dollars. Tr. 1408:4-16; 2477:2-2478:6.