1  IRELL & MANELLA LLP
   Alexander F. Wiles (CA 73596) awiles@irell.com
2  Brian Hennigan (CA 86955) bhennigan@irell.com
   Trevor V. Stockinger (CA 226359) tstockinger@irell.com
3  S. Albert Wang (CA 250163) awang@irell.com
   Andrew M. Ow (CA 266756) aow@irell.com
4  Christopher D. Beatty (CA 266466) cbeatty@irell.com
   1800 Avenue of the Stars, Suite 900
5  Los Angeles, California 90067-4276
   Telephone:   (310) 277-1010
6  Facsimile:   (310) 203-7199

7  ARNOLD & PORTER LLP
   Kenneth A. Letzler (Admitted *Pro Hac Vice*) Kenneth_Letzler@aporter.com
8  Daniel S. Pariser (Admitted *Pro Hac Vice*) Daniel_Pariser@aporter.com
   Barbara H. Wootton (Admitted *Pro Hac Vice*) Barbara_Wootton@aporter.com
9  555 Twelfth Street, NW
   Washington, DC  20004-1206
10 Telephone:  (202) 942-5000
   Facsimile:   (202) 942-5999

11
   Attorneys for Plaintiff
12 GlaxoSmithKline

13

14                 **UNITED STATES DISTRICT COURT**

15                **NORTHERN DISTRICT OF CALIFORNIA**

16                        **OAKLAND DIVISION**

17 SMITHKLINE BEECHAM CORPORATION )   Case No. C07-5702 (CW)
   d/b/a/ GLAXOSMITHKLINE,                          )
18                                                  )   *Related per November 19, 2007 Order to*
                                                    )   **Case No. C-04-1511 (CW)**
19             Plaintiff,                           )
                                                    )
20        v.                                        )   **GLAXOSMITHKLINE'S OPPOSITION**
                                                    )   **TO ABBOTT LABORATORIES'**
21 ABBOTT LABORATORIES,                             )   **MOTION FOR JUDGMENT AS A**
                                                    )   **MATTER OF LAW**
22             Defendant.                           )
                                                    )
23                                                  )
                                                    )
24 _____  )

25

26

27

28

# TABLE OF CONTENTS

Page

I.      Introduction. ..................................................................................................... 1

II.     Abbott Misconstrues the Standard of Review. .................................................... 1

III.    Argument ........................................................................................................... 1

        A.      GSK has Offered Sufficient Evidence that Abbott Breached the
                Implied Covenant of Good Faith and Fair Dealing. ................................. 1

                1.      The Evidence is Sufficient to Show GSK Justifiably
                        Understood Abbott would not use Norvir to Interfere with
                        the Marketing of Lexiva. ............................................................... 1

                2.      The Evidence is also Sufficient that Abbott's 400 percent
                        Norvir Price Hike Injured GSK's Benefit Under the GSK-
                        Abbott License. ............................................................................ 4

                3.      The Evidence is Sufficient to Show Grossly Negligent
                        Behavior on Abbott's Part, Rendering the Limitation of
                        Liability Provision Unenforceable. ............................................... 5

        B.      Substantial Evidence Supports GSK's UDTPA Claim and, Given the
                Jury's Findings, This Court Should Enter Judgment in Favor of GSK
                on This Claim. ........................................................................................ 7

        C.      GSK Has Offered Evidence Sufficient to Support Its Damages
                Claim. .................................................................................................... 11

        D.      GSK Has Offered Sufficient Evidence To Support Its
                Monopolization And Attempted Monopolization Claims. ...................... 14

                1.      GSK has Offered Sufficient Evidence of Monopoly Power. ........ 14

                        a.      The Evidence is Sufficient to Establish a Relevant
                                Market for Highly Effective Boosted PIs or,
                                Alternatively, All Boosted PIs. ....................................... 15

                        b.      The Evidence is Sufficient to Establish that Kaletra
                                has Monopoly Power in the Relevant Market. ................. 17

                2.      GSK has Offered Evidence Sufficient to Support that Abbott
                        Engaged in Anticompetitive Conduct to Protect Kaletra's
                        Monopoly Power. ........................................................................ 18

                        a.      GSK has Offered Sufficient Evidence to Support that
                                Abbott Violated a Duty to Deal Under *Aspen Skiing*. ..... 19

                        b.      GSK has Offered Sufficient Evidence to Support that
                                Abbott is Liable Under *Cascade*. ................................... 21

- i -

Page

c.      Abbott is not Entitled to Judgment as a Matter of
Law Based on Its Affirmative Defense of Legitimate
Business Justification. ....................................................................24

3.      GSK has Produced Sufficient Evidence to Show that Abbott
Attempted to Maintain its Monopoly. .......................................................25

GSK'S OPPOSITION TO ABBOTT'S MOTION FOR JMOL
(CASE NO. 07-5702)

1

## TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ........................................................................ 13, 19, 21

5

*Banc of America Sec. LLC v. Solow Bldg. Co II LLC.*,
6
    847 N.Y.S.2d 49 (App. Div. 2007) ................................................................. 5

7
*Bigelow v. RKO Radio Pictures*,
    327 U.S. 251 (1946) ..................................................................................... 12

8
*Bonjorno v. Kaiser Aluminum & Chem. Corp*,
9
    559 F. Supp. 922 (E.D. Pa. 1983), *reversed on other grounds* 752 F.2d 802
    (3rd Cir. 1984)............................................................................................... 13

10

*Byrd v. Maricopa Cnty. Sherriff's Dep't*,
11
    629 F.3d 1135 (9th Cir. 2011) ....................................................................... 1

12
*Cascade Health Solutions v. Peacehealth*,
    515 F.3d 883 (9th Cir. 2008)................................................................. passim
13

*City of Vernon v. S. Cal. Edison Co.*,
14
    955 F.2d 1361 (9th Cir. 1992) ..................................................................... 14

15
*Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*,
    81 N.Y.2d 821 (1993) ................................................................................... 5
16

*Corinno Civetta Constr. Copr. v. City of New York¸*
17
    67 N.Y.2d 297 (1986) ................................................................................... 6

18
*Dalton v. Camp*,
    548 S.E.2d 704 (N.C. 2001) ......................................................................... 11
19

*DocMagic, Inc. v. Ellie Mae, Inc.*,
20
    2011 WL 871480 (N.D. Cal. March 11, 2011) ............................................ 19

21
*Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.*,
    786 F.2d 1342 (9th Cir. 1985)................................................................ 11, 14
22

*Geren v. Quantum Chem. Corp.*,
23
    832 F. Supp. 728 (S.D.N.Y. 1993)............................................................... 5

24
*Greene v. Gen. Foods Corp.*,
    517 F.2d 635 (5th Cir. 1975)........................................................................ 13
25

*Hardy v. Toler*,
26
    218 S.E.2d 342 (N.C. 1975) ......................................................................... 7

27
*Huff v. Autos Unlimited, Inc.*,
    477 S.E.2d 86 (N.C. Ct. App. 1996) ............................................................ 10

28

- iii -

1

Page(s)

2

3   *Image Technical Servs., Inc. v. Eastman Kodak Co.,*
        125 F.3d 1195 (9th Cir. 1997).................................................................25

4

5   *Jacobs v. Nintendo of America, Inc.,*
        370 F.3d 1097 (Fed. Cir. 2004).........................................................3, 25

6   *John Doe 1 v. Abbott Labs.,*
        571 F.3d 930 (9th Cir. 2009).................................................................21

7

8   *Johnson v. Paradise Valley Unified Sch. Dist.,*
        251 F.3d 1222 (9th Cir. 2001)..................................................................1

9   *Kalisch-Jarcho, Inc. v. City of New York,*
        58 N.Y.2d 377 (1983) ...............................................................................6

10

11  *Lafayette Steel Co. v. Nat'l Steel Corp.,*
        87 F.R.D. 612 (E.D. Mich. 1980)..........................................................13

12  *LePage's Inc. v. 3M,*
        No. 97-3983, 2000 WL 280350 (E.D. Pa. Mar. 14, 2000)......................25

13

14  *Lorain Journal Co. v. United States,*
        342 U.S. 143 (1951)................................................................................25

15  *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.,*
        275 F.3d 762 (9th Cir. 2001)..................................................................15

16

17  *Marsann Co. v. Brammall, Inc.,*
        788 F.2d 611 (9th Cir. 1986)..................................................................23

18  *Marshall v. Miller,*
        276 S.E.2d 397 (N.C. 1981)..................................................................7, 9

19

20  *McDonald v. Scarboro,*
        370 S.E.2d 680 (N.C. Ct. App. 1988) ......................................................7

21  *McGahee v. N. Propane Gas Co.,*
        858 F.2d 1487 (11th Cir. 1988)..............................................................25

22

23  *Meijer, Inc. v. Abbott Labs,*
        544 F. Supp. 2d 995 (N.D. Cal. 2008) ......................................................3

24  *Mosley v. Mosley Builders, Inc. v. Landin Ltd.,*
        97 N.C. App. 511 (1990).....................................................................9, 10

25

26  *MRD Motorsports, Inc., v. Trail Motorsports, LLC,*
        694 S.E.2d 517 (N.C. Ct. App. 2010) ......................................................8

27  *Multiflex, Inc. v. Samuel Moore & Co.,*
        709 F.2d 980 (5th Cir. 1983)..................................................................25

28

Page(s)

*Oahu Gas Serv., Inc. v. Pac. Res. Inc.*,
   838 F.2d 360 (9th Cir. 1988)................................................................. 18

*Ostrofe v. H.S. Crocker Co.*,
   740 F.2d 739 (9th Cir. 1984)................................................................. 12

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
   129 S. Ct. 1109 (2009) ........................................................................ 21

*Pac. Coast Ag. Expert Ass'n v. Sunkist Growers, Inc.*,
   526 F.2d 1196 (9th Cir. 1975)............................................................... 17

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421, 1439 (9th Cir. 1995)........................................................ 18

*Rowe v. Great Atl. & Pac. Tea Co.*,
   46 N.Y.2d 62 (N.Y. 1978)....................................................................... 2

*S. Atl. Ltd. P'ship of Tenn. v. Riese* (*SALT*),
   284 F.3d 518 (4th Cir. 2002)......................................................... 7, 9, 10

*Sabetay v. Sterling Drug, Inc.*,
   69 N.Y.2d 329 (1987) ............................................................................ 5

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
   282 U.S. 555 (1931) ............................................................................. 14

*Syufy Enters. v. Am. Multicinema, Inc.*,
   793 F.2d 990 (9th Cir. 1986)................................................................. 17

*Tar Heel Indus. v. E.I. duPont de Nemours & Co.*,
   370 S.E.2d 449 (N.C. App. 1988) .......................................................... 11

*United Labs., Inc. v. Kuykendall*,
   370 S.E.2d 375 (N.C. 1988)..................................................................... 7

*United Roasters, Inc. v. Colgate-Palmolive Co.*,
   649 F.2d 985 (4th Cir. 1981)................................................................... 9

*United States v. AMR Corp.*,
   335 F.3d 1109 (10th Cir. 2003)........................................................ 22, 23

*United States v. Archer-Daniels-Midland Co.*,
   866 F.2d 242 (8th Cir. 1988)................................................................. 15

*United States v. Syufy Enters.*,
   903 F.2d 659 (9th Cir. 1990)................................................................. 18

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*,
   668 F.2d 1014 (9th Cir. 1981)............................................................... 22

- v -

Page(s)

**<u>Statutes</u>**

.C. Gen. Stat § 75-16.1 ............................................................................................................. 8

N.C. Gen. Stat § 75-16 ............................................................................................................... 7

N.C. Gen. Stat. § 75-1.1 .............................................................................................................. 7

**<u>Other Authorities</u>**

Fed. R. Civ. P. 50(b).................................................................................................................. 14

2405680.5  18

**I.      Introduction.**

Abbott's motion for judgment as a matter of law for the most part rehashes issues this Court decided against Abbott in its January 14, 2011 Order Granting in Part and Denying In Part Abbott's Motion for Summary Judgment, Dkt. No. 325 (hereinafter "1/14/11 Order").  Since the evidence on which GSK relied in opposing that motion is now part of the trial record, and Abbott can point to nothing that negates it, Abbott's latest effort to avoid the consequences of its actions should be rejected.  To the limited extent that Abbott makes new arguments in the instant motion, those arguments are likewise without merit.[1]

**II.      Abbott Misconstrues the Standard of Review.**

Most of Abbott's arguments improperly ask the Court to weigh the evidence and draw inferences in favor of Abbott.  Such arguments misconstrue the JMOL standard: "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001); *see Byrd v. Maricopa Cnty. Sherriff's Dep't*, 629 F.3d 1135, 1138 (9th Cir. 2011) (en banc).  Viewed through the proper standard, Abbott's arguments lack a legal basis.

**III.      Argument.**

    **A.      GSK has Offered Sufficient Evidence that Abbott Breached the Implied Covenant of Good Faith and Fair Dealing.[2]**

        **1.      The Evidence is Sufficient to Show GSK Justifiably Understood Abbott would not use Norvir to Interfere with the Marketing of Lexiva.**

Abbott simply sets up a straw man when it argues that there is insufficient evidence for the jury to conclude Abbott agreed to "limit the size or timing of any future price increase[]" because "Norvir's price was never part of the negotiations or of the license agreement."  Br. 16:20, 17:11-12.  As this Court has recognized, GSK is actually claiming that the purpose of the contract was to

---

[1] While the jury has now rendered a verdict finding Abbott is not liable for antitrust violations, GSK has responded to Abbott's motion on those points in order to avoid prejudice.

[2] Abbott begins this section with a purely legal argument that New York does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing.  Br. 15:17-28.  This argument is wrong, *see* 2/14/08 GSK Opp. to Motion to Dismiss, Dkt. No. 53, at 14:13-15:12, and this Court has already rejected it, 4/11/08 Order Denying Motion to Dismiss, Dkt. No. 82, at 20-22.

1   allow GSK to increase sales of Lexiva by promoting it with Norvir and that it justifiably

2   understood that Abbott would not interfere with GSK's launch and marketing of boosted Lexiva

3   by drastically increasing Norvir's price.  1/14/11 Order, Dkt. No. 325, at 37:13-38:2.

4         There is more than sufficient evidence for a reasonable jury to find for GSK on this point,

5   and it has already done so.  The preamble of the license states its purpose: "GSK is interested in

6   obtaining a license from Abbott to promote and market certain of GSK's HIV products with

7   Ritonavir…."  Ex. P0005-0001.  James Tyree, Abbott's head of licensing, testified that he

8   understood the purpose of the agreement was for companies to exploit information about boosting

9   to "hopefully" increase sales of their protease inhibitors; he went on that "of course" he knew that

10  the licenses were enabling other boosted protease inhibitors to compete with Kaletra.  Tyree Depo.

11  Tr. 39:22-40:14; *see also* Tr. 1915:19-22 (testimony of Heather Mason to same effect).  Key GSK

12  employees testified that the purpose of the license was to "operate free and clear from any  Norvir

13  interference."  Tr. 850:18-22; *see* Tr. 995:24-996:2; Key Depo. Tr. 157:20-158:4.  In fact, John

14  Poulos, Abbott's head negotiator, testified that he assured GSK's negotiator, John Keller, that

15  Abbott would not withdraw Norvir and was not otherwise interested in disrupting its reputation

16  with the HIV community.  Tr. 1130:17-1131:19.  Mr. Keller confirmed this conversation, Tr.

17  992:7-21, and he testified that he would have considered it a violation of good faith had he known

18  about the 400 percent price hike.  Tr. 1002:9-17.  The evidence is also undisputed that no HIV

19  drug had ever increased in price by more than a small percentage, Tr. 1753:17-23, 867:11-17, and

20  that Abbott itself had to scramble to get out of contracts that were made unprofitable for it as a

21  result of the drastic increase in Norvir's price.  Tr. 1904:3-1906:22 (Abbott renegotiated ADAP

22  contracts because they were "structured [] to deal with inflationary price increases"); Fiske Depo.

23  Tr. 251:6-252:15 (explaining that Abbott renegotiated contracts with wholesalers because "we had

24  never contemplated a price increase like this").

25        Abbott's argument cannot negate this evidence.  Abbott continues to improperly conflate

26  the concepts of an implied-by-law covenant of good faith and fair dealing with an implied-in-fact

27  contractual obligation.  For example, Abbott continues to cite *Rowe v. Great Atl. & Pac. Tea Co.*,

28  46 N.Y.2d 62, 68-69 (N.Y. 1978), a case which plainly concerns an implied-in-fact promise:

1   "[W]e are not here confronted with a situation in which a party seeks to apply a covenant which

2   must be implied by law…. Rather, it is petitioner's claim that the parties in fact impliedly did

3   agree … and simply neglected, … to verbalize that understanding and to incorporate it into their

4   written contract." Abbott's arguments that "Norvir's price was never part of the negotiations" or

5   that the "only oral promises" discussed related to continued supply of Norvir are, thus, of no

6   moment.[3] And, to the extent the jury weighs this evidence or the fact that GSK is "one of the most

7   sophisticated parties imaginable," Br. 18:3, it would be reasonable for them to conclude that such

8   a sophisticated party as GSK would know that the covenant of good faith and fair dealing is

9   implied in the GSK-Abbott agreement and that it provided protection to GSK against unexpected,

10  bad faith conduct that interfered with Lexiva's marketing and promotion – like Abbott's Norvir

11  price hike. In fact, John Keller testified that this was precisely his understanding. Tr. 1032:2-13.

12      Abbott is also wrong to suggest that the Norvir boosting license was a "simple patent

13  license" such that "Abbott's only obligation under the license agreement was not to sue GSK for

14  infringement . . . ." Br. 16:21-22, 17:8-9. This Court has recognized several times that "[i]mplicit

15  in all contracts is a covenant of good faith and fair dealing in the course of contract performance,"

16  *e.g.*, *Meijer, Inc. v. Abbott Labs*, 544 F. Supp. 2d 995, 1007 (N.D. Cal. 2008), and patent licenses

17  are no exception. For example, in *Jacobs v. Nintendo of America, Inc.*, 370 F.3d 1097 (Fed. Cir.

18  2004), the Federal Circuit interpreted a patent license in which Jacobs granted Analog the right to

19  sell to Analog's customers products that incorporated Jacobs' technology. The court held that the

20  license precluded Jacobs from interfering with those sales by suing Analog's customers for

21  infringement. *Id.* at 1098. Apropos of this case, the Federal Circuit wrote: "That interpretation is

22  in accordance with the basic contract law principle that a party may not assign a right, receive

23  consideration for it, and then take steps that would render the right commercially worthless." *Id.*

24  at 1101 (citation omitted).

25

26      [3] It is also irrelevant whether "other companies entered similar license agreements" after
27  the price hike without discussing Norvir's price. And, in fact, it is not true that two boosted PI
    competitors entered licenses after the Norvir repricing. Br. 17:18-19. Rather, BMS and Abbott
28  agreed to amend a license entered before the price hike, and the second contract concerned an
    NNRTI, not a PI. Tr. 1113:15-24; TX770-001.

## 2. The Evidence is also Sufficient that Abbott's 400 percent Norvir Price Hike Injured GSK's Benefit Under the GSK-Abbott License.

Abbott's argument that GSK's "contractual objectives" were achieved lacks merit.  Br. 18:13-19:14.  There is more than sufficient evidence for a reasonable jury to conclude, and a jury has already concluded, that GSK was injured in the central purpose of the agreement – to allow GSK to market and promote Lexiva free of Abbott's interference.  This Court has already rejected these arguments on summary judgment, and it should do so again.  1/14/11 Order, Dkt. No. 325, at 38:10-13.

Abbott claims that GSK "to this day promotes Lexiva for use with Norvir" and "has made $927 million in sales of Lexiva in the U.S. since 2004."  Br. 19:2-6.  But, this evidence says nothing about whether a reasonable jury could conclude that GSK's ability to promote Lexiva was injured by the price hike.  For example, while GSK has made $927 million in Lexiva sales since 2004, GSK witnesses testified that it invested $750 to $800 million to develop Lexiva, and Abbott witnesses testified that it spends approximately $2 billion per year on research and development of new pharmaceutical products.  Tr. 834:12-14, 1963:16-22, 2082:20-23; *see id.* 1697:25-1698:3.  Further, the HIV market is large, and Lexiva sales are dwarfed by Kaletra sales.  The evidence shows that Abbott made $3 billion in United States sales from 2003 to 2008, and over $7.2 billion worldwide.  P0032-0021; P0389-0005; P0390-0005; P0391-0005; P0392-0005; P0393-0005; Tr. 1358:12-14, 2794:25-2795:15, 2795:20-23, 2796:2-6, 2796:10-12, 2796:16-18, 2796:22-23.  There is also extensive testimony from both percipient and expert witnesses that the Norvir price hike prevented Lexiva's marketing message from being heard and caused doctors to prescribe Kaletra rather than Lexiva.  This evidence includes two econometric analyses showing how the price hike benefited Kaletra at the expense of Lexiva.  Tr. 458:25-463:3, 464:19-465:13, 712:21-714:11, 881:18-884:1, 981:11-24, 1159:8-1160:23, 1176:1-1179:25, 1180:1-1189:14, 1357:5-1158:16, 1512:12-18, 1979:20-1983:11.[4]

---

[4] Abbott also claims GSK received benefits that the Norvir price hike did not undermine, citing, for example, FDA approval.  Br. 18:23-19:2.  But, of course, the purpose of the license is to enable GSK to promote Lexiva for use with Norvir once the FDA approves that combination.

1   Again, Abbott's legal arguments cannot overcome the evidence. First, Abbott implies that

2   its Norvir price hike must be excused because "[c]ourts must … consider the other party's

3   freedom to act on its own interests." Br. 18:21-22. But, it is common sense – and the law – that

4   "economic self-interest [cannot] be applied as an expansive principle to excuse all manner of

5   misconduct." *Banc of America Sec. LLC v. Solow Bldg. Co II LLC.*, 847 N.Y.S.2d 49, 55 (App.

6   Div. 2007). There is plenty of evidence for the jury to conclude that the Norvir price hike was

7   targeted at injuring GSK's ability to promote Lexiva rather than a legitimate economic interest.

8   *See, e.g.,* Tr. 699:15-704:12; P0081-0010-11; P0157-0001; P0239-0001. Second, jurors would not

9   need to read "substantive provision[s] not included by the parties" into the contract in order to find

10  that the Norvir price hike injured the benefits of the license to GSK. Br. 19:7-14. As noted above,

11  Abbott and GSK witnesses agree that the purpose of the license was to allow GSK to promote

12  Lexiva and increase its sales without interference.[5]

13
14
       **3.**      **The Evidence is Sufficient to Show Grossly Negligent Behavior on Abbott's Part, Rendering the Limitation of Liability Provision Unenforceable.**[6]

15  There is sufficient evidence for a jury to conclude that the Norvir price hike amounted to

16  "intentional wrongdoing or a reckless disregard for the rights of others," and a jury has come to

17  that conclusion. March 23, 2011 Final Jury Instructions, Dkt. No. 485 (hereinafter "Jury Instr."),

18  at 26:20-22; *see Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 81 N.Y.2d 821, 823-24

19
20
21
22      **[5]** In the light of this evidence, Abbott's case law is inapposite. The *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 335 (1987), court simply held that reading a covenant of good faith and fair dealing to constrain an employer's right to terminate an at-will employee would

23  undermine the purpose of that express term. And the court in *Geren v. Quantum Chem. Corp.*, 832 F. Supp. 728, 733 (S.D.N.Y. 1993), only held that bondholders could not claim a violation of

24  the implied covenant of good faith and fair dealing when the corporation incurred debt to pay a special dividend and the indenture did not constrain the amount of debt the corporation could incur

25  or its ability to issue special dividends. Unlike these cases, the license, as well as Abbott and GSK witnesses, make clear the license's purpose and enforcing that purpose through the covenant of

26  good faith and fair dealing would not undermine any express term.

27      **[6]** GSK maintains its prior positions that (1) a finding of bad faith alone renders the limitation of liability clause unenforceable and (2) GSK's lost profits are direct damages not

28  covered by the limitation of liability clause in the first place. GSK believes that the evidence establishes the latter as a matter of law.

1   (1993).  As such, the exculpatory clause is unenforceable, and GSK is entitled to lost profits.  *See*

2   *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385 (1983).[7]

3          There is extensive evidence that, for over a year before Lexiva's launch, Abbott expressed

4   concerns about the competitive threat to Kaletra that the introduction of Reyataz and Lexiva

5   presented.  Tr. 1823:6-13, 1824:12-15; P0151-0003.  During this time, Abbott executives

6   considered ways to use Norvir to protect Kaletra from this threat.  Testimony and documents

7   affirmed that Bill Dempsey, Abbott's head of pharmaceuticals, asked his subordinates "to think

8   about ways to constrain the supply of Norvir,"  Tr. 2107:17-21, because without Norvir patients

9   would switch to Kaletra, P0157-0001; Tr. 1723:1-1725:1; *see* P0306-0001.  Closing down

10  Abbott's ritonavir manufacturing line was considered a "savvy business idea."  P0159-0002.

11  Abbott executives also considered leaving only a liquid form of Norvir on the market, which

12  tasted "really bad."  P0084-0007; Tr. 1845:15-24.  Finally, Abbott considered a "mega price

13  increase" on Norvir as the most palatable way to implement Mr. Dempsey's supply constraint

14  program.  P0153-0002.

15         Testimony and documents confirmed that these three options were alternatives – meant to

16  meet the same goal of protecting Kaletra from competition.  Heather Mason agreed with GSK's

17  counsel that the 400 percent price increase was considered as an alternative to the removal

18  scenarios.  Tr. 1845:25-1846:3.  Documents confirmed they were alternatives.  P0285-0001;

19  P0153-0002.  Ms. Mason testified that a "big driver" of the decision not to withdraw Norvir or

20  Norvir capsules was that withdrawal carried with it a regulatory risk that Abbott would end up

21  losing control of the exclusive right to manufacture Norvir.  Tr. 1836:8-12, 1852:1-6.  And,

22  Jeffrey Devlin, Abbott's marketing director for Kaletra, asked Abbott's communication team to

23  put together a platform for both a "mega price increase" and a "liquid only" scenario.  P0153-

24  0002.  There is further evidence from which the jury could conclude that Abbott delayed the price

---

25         [7] Abbott again argues that GSK must have proved a breach of an "affirmative obligation"
26  of the license in order to make the limitation of liability clause unenforceable.  Br. 19:18-21.  This
    argument is wrong, and this Court rejected it in adopting the final jury instructions.  In any case,
27  there are four exceptions to enforcing an exculpatory clause set out in *Corinno Civetta Constr.*
    *Copr. v. City of New York*, 67 N.Y.2d 297, 309 (1986).  The language Abbott cites concerns a
28  different exception, and *Corinno* expressly stated that it was not addressing the exception
    concerning gross negligence.  *Id.*

1   hike in order to impact Lexiva's launch as a "clever, creative way to make [GSK] look bad."

2   P0081-0010. And, as to reckless indifference, there is ample evidence that Abbott knew that the

3   price hike would impact Lexiva sales because it would "fuel the fire" of Abbott's marketing

4   message that Kaletra was the most cost-effective PI and cause a public outcry that could not help

5   but affect Lexiva's launch. Rivetti Depo. Tr. 125:18-24, 142:5-12; Tyree Depo. Tr. 65:10-16, 19-

6   22; Tr. 2282:18-24, 2287:3-5, 2297:12-14, 2499:22-23; P0007-0009; P0081-0010; P0239-0001.

### B. Substantial Evidence Supports GSK's UDTPA Claim and, Given the Jury's Findings, This Court Should Enter Judgment in Favor of GSK on This Claim.

Abbott's JMOL motion fails because sufficient facts exist to support a finding that Abbott

committed unfair acts in violation of the UDTPA. In addition, based on the jury's conclusion that

Abbott breached the covenant of good faith and fair dealing contained in the Norvir boosting

license, did so in a grossly negligent manner and, during negotiations of that license, deliberately

withheld that it was considering ways to use its control over Norvir to limit competition with

Kaletra (*See* Verdict Form, Dkt. No. 487, at B1-B3 and C1), this Court should hold that Abbott

violated the UDTPA and treble the amount of damages the jury awarded GSK.

N.C. Gen. Stat. § 75-1.1 forbids "[u]nfair methods of competition" and "unfair or

deceptive acts or practices." It "creates a cause of action broader than traditional common law

actions" and "was needed because common law remedies had proved often ineffective." *Marshall

v. Miller*, 276 S.E.2d 397, 400, 402 (N.C. 1981). The statute provides a "civil means to maintain

ethical standards of dealings," *McDonald v. Scarboro*, 370 S.E.2d 680, 683 (N.C. Ct. App. 1988).

An "unfair practice" "is conduct which a court of equity would consider unfair." *S. Atl. Ltd.

P'ship of Tenn. v. Riese* (*SALT*), 284 F.3d 518, 536 (4th Cir. 2002). "Misrepresentations, even

negligent misrepresentations, are sufficient for an act to qualify as an unfair or deceptive trade

practice." *Id.* at 541. The jury decides "whether the defendants committed the alleged acts, and

then it is a question of law for the court as to whether these proven facts constitute an unfair or

deceptive trade practice." *United Labs., Inc. v. Kuykendall*, 370 S.E.2d 375, 389 (N.C. 1988)

(*citing Hardy v. Toler*, 218 S.E.2d 342 (N.C. 1975)).[8]

---

[8] Once a violation is found, damages are automatically trebled. N.C. Gen. Stat § 75-16; *Marshall*, 276 S.E.2d at 402 ("Absent statutory language making trebling discretionary with the

1    First, it is clear that the evidence, viewed in the light most favorable to GSK, could support

2    a finding that Abbott violated this statute.  This Court has already ruled on summary judgment

3    that: "The evidence supporting an award of consequential damages for GSK's breach of the

4    implied covenant claim under New York law could also support liability under the UDTPA based

5    on Abbott's alleged breach."  1/14/2011 Order, Dkt. No. 325, at 45:5-8.  Specifically, this Court

6    found significant, in its summary judgment ruling, evidence that the Norvir price increase was

7    intended to interfere with GSK's launch of Lexiva, that Abbott never informed GSK of its plans

8    for Norvir despite being asked directly about them, and that the price hike resulted in a sudden and

9    substantial increase in the cost to HIV patients in need of treatment, disrupting GSK's launch of

10   Lexiva.  *See* 1/14/2011 Order, Dkt. No. 325, at 45:5-13.  As discussed above in connection with

11   GSK's claim for breach of the implied covenant of good faith and fair dealing, all of that evidence

12   is now in the record.  *Supra* at 6:3-7:6; *see also* Tr. 656:13-659:20, 665:25-671:14, 691:5-692:4,

13   704:23-705:13, 1924:9-18, 2499:9-2500:11; P-0285-0001 (all supporting that Abbott explored

14   ways of using Norvir as a weapon to hinder competition with Kaletra at the same time it

15   negotiated the license agreement with GSK) and P-0171-0001; Tr. 1800:22-1802:17, 1806:13-17,

16   1891:8-1892:10 (all supporting that Abbott viewed the price hike as one means to "defend and

17   grow [Abbott's Kaletra] turf").

18   Second, given the jury's findings, this Court should enter judgment on this claim in favor

19   of GSK and treble the amount of damages that the jury awarded GSK for Abbott's breach of

20   contract.  The jury found that Abbott's 400% Norvir price hike breached the implied covenant of

21   good faith and fair dealing and that Abbott engaged in "intentional wrongdoing" or "reckless

22   indifference" to GSK's rights.  Further, the jury found that Abbott deliberately withheld that it was

23   considering ways to use Norvir against GSK during negotiations of the license – plainly accepting

24   evidence that "Abbott knew that it was taking steps that would undermine the license's value…"

25   1/14/2011 Order, Dkt. No. 325, at 45:24-26.

26   ──────────────────────────────

trial judge, we must conclude that the Legislature intended trebling of any damages assessed to be

27   automatic once a violation is shown."); *MRD Motorsports, Inc., v. Trail Motorsports, LLC*, 694
S.E.2d 517, 520 (N.C. Ct. App. 2010) (reversing, as an abuse of discretion, trial court's failure to

28   treble damages awarded for a default judgment of a section 75-1.1 violation).  The statute also
provides for an award of attorneys' fees.  N.C. Gen. Stat § 75-16.1.

1    Under applicable case law, these findings compel the conclusion that "substantial

2   aggravating circumstances" accompany Abbott's breach of contract, making it a violation of the

3   UDTPA, and requiring trebling of the jury's damage award for that breach.  One of Abbott's own

4   cases highlights the importance to such a conclusion of Abbott's deceptive conduct during the

5   negotiation phase.  *See United Roasters, Inc. v. Colgate-Palmolive Co.*, 649 F.2d 985 (4th Cir.

6   1981).  Abbott thus acknowledges that "deception in formation of the contract" and "deception in

7   the circumstances of its breach" amount to aggravating circumstances.  Br. at 20:13-15 (citing

8   *United Roasters*, 649 F.2d at 992).  The jury necessarily found the former, when it found that

9   Abbott deliberately withheld that it was considering ways to use Norvir to harm GSK and

10   competitors, and it presumably found the latter, when it found that Abbott's breach amounted to

11   bad faith, unfair dealings, and intentional wrongdoing or reckless indifference to GSK's rights.

12   Certainly, substantial evidence supports those findings.[9]  Thus, this is not a situation of "[a] simple

13   breach of contract," as Abbott claims, Br. 20:10-11, but, rather, one evincing "aggravating

14   circumstances" amounting to a UDTPA violation.  *See Marshall*, 276 S.E.2d at 403 ("Whether a

15   trade practice is unfair or deceptive usually depends upon the facts of each case and the impact the

16   practice has in the marketplace."); *SALT*, 284 F.3d at 538 (deliberately withholding of material

17   information "is the essence of unscrupulous behavior").

18    Further, North Carolina courts make clear that the jury's finding that Abbott's Norvir price

19   hike amounts to "intentional wrongdoing" or "reckless indifference to the rights" of GSK leads to

20   a conclusion that Abbott violated the UDTPA.  For example, in *Mosley & Mosley Builders, Inc. v.*

21   *Landin Ltd.*, 97 N.C. App. 511 (1990), the court held a breach of a lease agreement was an "unfair

22   and deceptive trade practice[]" where it was accompanied by intentional or reckless wrongdoing.

23

24    [9] For example, John Keller, GSK's negotiator specifically asked whether Abbott would
intentionally withdraw Norvir from the market, and Abbott's negotiator told expressly told him
25   Abbott would not – going on to say Abbott would not do anything that would disrupt Abbott's
reputation or the HIV community.  Tr. 1032:2-13, 1129:17-1131:7.  Indeed, Abbott's vice
26   president of licensing knew that such options were "inconsistent," despite that he headed a
taskforce to consider withdrawing Norvir from the market.  Tyree Depo. Tr. 134:11-13, 17-24; P-
27   0306-001.  Such information was clearly material, given that, for GSK, "[t]he entire reason for
doing the agreement . . . [was to] make sure that we had essentially [a] contract with Abbott so that
28   Lexiva could . . . operate free and clear from any Norvir interference."  Tr. 850:18-22; *see also* Tr.
849:10-17, 853:24-854:6; P-0001-0018.

1  "Defendant [landlord] wrongfully entered plaintiff's premises relying on defendants'

2  interpretation of ambiguous provisions of the lease" and physically removed plaintiffs

3  merchandise and other property.  *Id.* at 519.  In *Huff v. Autos Unlimited, Inc.*, 477 S.E.2d 86 (N.C.

4  Ct. App. 1996), the Court found a violation of the UDTPA where defendant sold an unsafe car

5  representing to buyer that it has been in a "fender-bender," but the seller acted with reckless

6  indifference to the condition of the vehicle.  He "took no steps to determine the extent of the

7  damage of the vehicle" and "should have known" it was significantly damaged.  *Id.* at 412, 414.

8  There also can be no doubt that these findings on these issues are supported by substantial

9  evidence.[10]

10       North Carolina courts have even held that conduct similar to that present here amounts to

11  an "unfair and deceptive trade practice" where it does not breach a contract at all.  In *SALT*, the

12  Stroud and Riese groups formed a real estate partnership, with Riese providing its construction

13  company for the partnership's development.  284 F.3d at 523.  Stroud expelled Riese just eleven

14  days before selling the project for substantial profit, leaving Riese with nothing under the terms of

15  the partnership contract, which provided only for payouts of book value.  *Id.* at 527.  The Fourth

16  Circuit upheld Riese's claim under section 75-1.1, explaining that the expulsion was an unfair

17  trade practice even though in accord with the contract's terms.  *Id.* at 538-40.

18       Abbott offers several meritless arguments for the proposition that the evidence on which

19  the jury verdict rests cannot support a conclusion that Abbott violated the UDTPA.  First, it argues

20  that GSK has proffered insufficient evidence of the materiality of the nondisclosure claiming there

21  is no evidence GSK would have "acted differently had it known of Abbott's internal

22  considerations."  Br. 21:3-5.  Given the evidence that both Abbott and GSK understood how

23  antithetical the options being reviewed by the Tyree taskforce were to the license's goals, Tyree

24

25  _____

   [10] The evidence shows, among other things, that, when Abbott took the Norvir price hike,
26  the daily dose of boosted Lexiva increased from $19 to $33 overnight, Tr. 867:18-23, 671:12-14,
   an increase so unprecedented that it caused Abbott to scramble to renegotiate its own contracts
27  with ADAPs and wholesalers, Tr. 1753:17-23, 1904:3-1906:22; Fiske Depo. Tr. 251:6-252:15,
   and one which went beyond what Abbott's own expert states in his book would cause a market
28  reaction. Tr. 2286:19-2287:5; 2288:15-2289:5.  The evidence further shows that Abbott knew its
   actions would cause a severe reaction in the marketplace, thereby disrupting Lexiva's launch.
   Rivetti Depo. Tr. 125:18-24, 142:5-12.

1    Depo. Tr. 134:11-13, 17-24; P-0306-001, and the jury's finding that Abbott deliberately withheld

2    this information, this argument is unavailing.

3        Similarly unavailing is Abbott's citation to *Tar Heel Indus. v. E.I. duPont de Nemours &*

4    *Co.*, 370 S.E.2d 449 (N.C. App. 1988), for the proposition that Abbott's failure to disclose was

5    lawful.  In *Tar Heel*, no liability was found for failing to disclose consideration of the "exercise of

6    the termination clause" of the contract.  *Id.* at 452.  In contrast to the consideration of exercising

7    an explicit right in the contract, what Abbott hid was its intention to undertake an act that its own

8    executives concede would be "inconsistent" with the very goal of the contract.  Furthermore, the

9    *Tar Heel* court also noted the plaintiff there had notice for two years about the defendant's

10   intentions before they were actually carried out, *id.*, while it is undisputed here that GSK was

11   given no notice of Abbott's plans.

12       Finally, Abbott cannot avoid liability by pretending that its actions to undermine the very

13   goal of the GSK-Abbott agreement were simply lawful "business-related conduct" such as that

14   considered in *Dalton v. Camp*, 548 S.E.2d 704, 712 (N.C. 2001).  First, the *Dalton* court noted that

15   it was searching in that case for unfair conduct that would "overcome the longstanding

16   presumption against unfair and deceptive practices claims as between employers and employees."

17   *Id.*  Second, the *Dalton* court also focused on the fact that the defendant "continued his best

18   efforts" to fulfill his obligations to the plaintiff employer.  *Id.*  Here, Abbott did the exact opposite:

19   it sought to undermine GSK's goal of increasing Lexiva sales through promotion with Norvir.

20   Such behavior is not standard business conduct.  Tr. 1190:22-1191:3 (Dolan: "But to me, from a

21   business point of view . . . . I wouldn't expect that my partner would, within a year, really do

22   something which prevents me from getting the benefit that I thought I was going to get.").

23       Accordingly, this Court should deny Abbott's JMOL motion directed at GSK's UDTPA

24   claim and enter judgment finding that Abbott violated the UDTPA.

25       **C.      GSK Has Offered Evidence Sufficient to Support Its Damages Claim.**

26       Abbott's own case law recognizes that courts "traditionally required a lesser quantum of

27   proof to support the amount of damages. A[] . . . plaintiff must simply provide evidence to support

28   a just and reasonable estimate of the damage."  *Farley Transp. Co., Inc. v. Santa Fe Trail Transp.*

1    *Co.*, 786 F.2d 1342, 1350 (9th Cir. 1985). GSK's evidence is more than sufficient to meet this

2    standard and for a reasonable juror to calculate damages.

3         First, both GSK's damages expert, Dr. Stephen Prowse, and Abbott's damages expert, Dr.

4    Joel Hay, agree that the standard way to calculate damages is to create a hypothetical market

5    absent the Norvir price hike and compare Lexiva's performance in that market to the actual

6    market. Tr. 1372:5-18; 2485:21-2486:12. The Supreme Court has recognized this method of

7    calculating damages. *See Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 259, 263 (1946). Dr.

8    Hay agreed that one way to construct Lexiva's performance absent the price hike is to use pre-

9    launch forecasts. Tr. 2485:21-2486:12. Second, despite Abbott's claims otherwise, *see* Br. 25:2-

10   4, Dr. Prowse considered the reliability of the pre-launch forecasts he used to determine the

11   hypothetical world. Tr. 1374:12-1375:15. He further substantiated the weighting he gave to each

12   of the forecasts based on his analysis. Tr. 1376:3-1377:7; 1407:22-1408:1; 1374:3-11. Third, far

13   from failing to consider intervening causes, Br. 24:15-19, Dr. Prowse did an extensive analysis to

14   ensure that the damages he calculated were the result of the Norvir price hike rather than

15   something else. In this regard, he evaluated Lexiva's attributes and the timing of its launch, and

16   Reyataz's attributes and the timing of its launch, among other things. Tr. 1383:23-1390:25;

17   1422:5-11; 1424:2-6; 1522:21-1523:3. Dr. Prowse's analysis was sound; Abbott's arguments

18   otherwise are not proper grounds for moving for judgment as a matter of law, but rather speak to

19   the weight of the evidence – which is the purview of the jury.

20        Abbott's remaining legal arguments have already been considered by this Court and

21   rejected. First, Abbott confuses the concepts of antitrust injury and proximate causation. *See* Br.

22   22:11-23. Once GSK has shown antitrust injury from the Norvir price hike, that is, that GSK lost

23   some sales of boosted Lexiva, GSK is entitled to any other damages proximately caused by

24   Abbott's anticompetitive act. *See, e.g., Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739, 751 (9th Cir.

25   1984) (Kennedy J, dissenting) (the Ninth Circuit has "included consequential damages in an

26   antitrust award, but only when the plaintiff also has other damages that are related to the decrease

27   in competition."). For example, courts have frequently awarded damages that were incurred in

28

- 12 -

1   markets outside the relevant market.[11]  Thus, there is no bar to GSK's damages on unboosted

2   Lexiva sales, on sales after Abbott's "monopoly power ended," and for losses on Lexiva sales to

3   Reyataz – as long as these damages were proximately caused by the Norvir price hike.  There is

4   sufficient evidence for a reasonable jury to conclude they were.  Tr. 1183:10-22, 1158:8-1160:23,

5   1360:5-1361:9, 1361:18-1362:11, 1380:19-25, 1479:10-15, 1513:3-10, 1512:12-18, 1525:20-

6   1526:5, 1536:19-1537:8, 1964:24-1965:1, 1984:14-1988:16, 2004:1-13, 2021:14-2022:3; Rivetti

7   Depo. Tr. 121:8-13; Dempsey Depo Tr. 144:5-16.

8        Second, "segregation" of damages between lawful and unlawful aspects is required neither

9   for the violation of a duty to deal theory nor the predatory bundling theory as Abbott claims.  Br.

10  23:5-24.  As this Court has recognized, GSK's claim that Abbott violated a duty to deal is

11  premised on the fact that Abbott elected to make an important change in a pattern of distribution

12  that had originated in a competitive market and had persisted for several years.  *See Aspen Skiing*

13  *Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 603-04 (1985).  The asserted "pattern of

14  distribution" that Abbott changed here was a years-long pattern of cooperation with sellers of

15  boosted PIs that included taking industry-standard price increases tied to CPI.  If the jury finds that

16  this change amounted to a violation of Abbott's duty to deal, there is simply no "lawful" conduct

17  to be disaggregated.  The very change from Abbott's historical pricing amounts to a violation.

18       As to GSK's bundled pricing theory, disaggregating some hypothetically lawful price hike

19  similarly makes no sense.  As this Court has recognized, Abbott took its 400 percent Norvir price

20  hike as a substitute for complete market withdrawal of Norvir.  *See* 1/14/2011 Order, Dkt. No.

21  325, at 4:7-22.  And, the evidence shows that the entire point of abandoning Abbott's prior profit

22  maximizing strategy and taking a "mega price increase" was an alternative to withdrawal with the

23  goal to impair competition in the same way.  Thus, there would have been no point in Abbott

---

24       [11] *Greene v. Gen. Foods Corp.*, 517 F.2d 635, 660-66 (5th Cir. 1975) (affirming Sherman
25  Act violation damages award including lost profits from loss suffered in product lines other than
    defendant manufacturer's); *Bonjorno v. Kaiser Aluminum & Chem. Corp*, 559 F. Supp. 922, 938
26  (E.D. Pa. 1983), *reversed on other grounds* 752 F.2d 802, 814 (3rd Cir. 1984) ("As long as there
    was some evidence that Columbia would have made sales beyond that geographic area, as there
27  was, plaintiffs were entitled to have the jury consider those estimated sales."); *Lafayette Steel Co.
    v. Nat'l Steel Corp.*, 87 F.R.D. 612, 621 (E.D. Mich. 1980) (awarding damages incurred from
28  denial of steel supply despite that antitrust injury occurred in a separate market for automobile
    blanks).

1    taking a non-predatory price increase, and there is no evidence to suggest it considered a *Cascade*-

2    compliant price increase.  Under these facts, again, there is nothing lawful to disaggregate from a

3    price hike that was designed as a substitute for market withdrawal.

4         In any case, Abbott criticizes Dr. Prowse for not accounting for a *hypothetical* price

5    increase Abbott purportedly *could* lawfully have taken but never actually even contemplated.

6    Abbott is insisting upon the sort of unsupported speculation the Supreme Court has foreclosed and

7    Abbott's own citations condemn.**12**  In *Story Parchment Co. v. Paterson Parchment Paper Co.*,

8    282 U.S. 555 (1931), the plaintiff was permitted to seek damages based on the entire difference

9    between pre-predation and post-predation prices, despite defendants' claim that they could have

10   lowered prices anyway by independent (and hence lawful) means.  *See id.* at 561-62.  So long as

11   "the old prices were reasonable and that [] would not have changed by reason of any economic

12   condition, but would have been maintained except for the unlawful acts" of the defendant, the jury

13   might base damages on the difference between the old price and the new one.  *Id.*  It is true the

14   but-for price can never be known with total certainty, but it was for this reason that the Court

15   announced its famous maxim:  "The wrongdoer is not entitled to complain that they cannot be

16   measured with the exactness and precision that would be possible if the case, which he alone is

17   responsible for making, were otherwise."  *Id.* at 563.**13**

18       **D.    GSK Has Offered Sufficient Evidence To Support Its Monopolization And
              Attempted Monopolization Claims.**

19

20            **1.    GSK has Offered Sufficient Evidence of Monopoly Power.**

21

22

23   ────────────────────

24   **12** *See Farley Transp. Co. , Inc. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1351 (9th
     Cir. 1985), *superseded*, Fed. R. Civ. P. 50(b). Abbott's cases involve deductions for *actual*, yet
25   lawful activity in which the defendant engaged, rather than *potential* activity.  *See City of Vernon
     v. S. Cal. Edison Co.,* 955 F.2d 1361, 1371 (9th Cir. 1992).

26   **13** Abbott also suggests that damages from "market confusion" are not compensable
     because they "do not stem from a competition-reducing aspect" of the Norvir price hike.  Setting
27   aside that the standard is proximate cause, there is plenty of evidence that, despite its attempt to
     deny it, Abbott knew the market is price sensitive such that there would be a public outcry
28   interfering with Lexiva's launch.  Rivetti Depo. Tr. 125:18 to 24, 142:5-12; Tyree Depo. Tr.
     65:10-16, 65:19-22; Tr. 2282:18-24, 2287:3-5, 2297:12-14, 2499:22-23; P0007-0009; P0081-10.

a.   **The Evidence is Sufficient to Establish a Relevant Market for
Highly Effective Boosted PIs or, Alternatively, All Boosted PIs.**

GSK has put forth sufficient evidence to establish a relevant market for highly effective

boosted PIs, or, alternatively, all boosted PIs.[14]  Abbott's complaint is merely that it disagrees with

this evidence.

Relevant markets are defined not simply by the functional interchangability of products,

but by whether they are economic substitutes—whether variation in the price of one product will

cause changes in the sales of the other product.  *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone,*

*Inc.*, 275 F.3d 762, 767 (9th Cir. 2001) ("The determination of what constitutes the relevant

product market hinges…on a determination of those products to which consumers will turn, given

reasonable variations in price."); *United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 248

& n.1 (8th Cir. 1988) (even though consumers might substitute high fructose corn syrup for sugar,

they did not reside in same market because "a small change in the price of HFCS would have little

or no effect on the demand for sugar" and cross-elasticity was therefore low).  As explained by Dr.

Roger Noll at trial, in situations such as the pharmaceutical industry, where direct econometric

tests of cross-elasticity of price cannot be performed, the second "standard method that is used to

define markets in antitrust economics" is to look for "functional substitutes" but then "go beyond

that to get at the issue of economic substitutes[,] to read publications by people who are

knowledgeable in the field to see which of the products that are in this functional category actually

compete with each other on the basis of price."  Tr. 1548:25-1549:22; *see also* 1546:2-11; *cf.*

1/14/2011 Order, Dkt. No. 325, at 15:9-20.

Far from being a standardless, free-wheeling approach, what Dr. Noll did was exactly what

an economic expert must do: apply specialized antitrust economics training to the facts of the case.

He did not simply do a qualitative analysis, but engaged in a quantitative analysis of prescription

trends to reach his conclusion that Sustiva and Viracept should be excluded from the relevant

market.  Tr. 1561:8-1563:11, 1563:17-1564:12.  Further, his review of medical literature for

---

[14]  Although it is broadly phrased, Abbott's Motion does not critique Noll's conclusion that
Norvir is the only product in the market for "boosters of PI's." Tr. 1553:3-5.  There is clearly
sufficient evidence establishing this relevant market, as Noll's analysis and conclusion stem from
facts that have not been disputed.  Tr. 1554:13-1555:9 (no other boosters for PIs exist).

- 15 -

*economic ramifications* did not require "medical or pharmacological expertise," Br. 2:15-16,

because Dr. Noll was "not reading these for the purpose of deciding how to treat patients or what

the mechanics are of how a drug actually affects the H.I.V. virus[;]" he was "reading the words

about their conclusions about what drugs are substitutes for what other drugs." Tr. 1551:10-18.[15]

Furthermore, his opinion was not solely based upon this review of the medical literature, but also

upon his review of Abbott and GSK's documents, sales data, and economic literature on the

dynamics of competition between drugs. Tr. 1553:12-24, 1554:7-12. Dr. Noll's position is also

supported by medical expertise—Dr. Siddiqui testified to the lack of interchangability, from

clinicians' perspectives, between NNRTIs and PIs, between unboosted PIs and boosted PIs, and

between any one of the highly effective boosted PIs and the older boosted PIs. Tr. 452:1-456:18;

*see also* Tr. 1564:18-1565:5 (Dr. Noll testimony referencing Dr. Siddiqui testimony on boosted

versus unboosted PIs). Testimony from GSK's Lexiva brand manager also aligns with GSK's

relevant market. Tr. 838:10-839:20, 980:13-24. Abbott's critique itself ignores the analysis and

explanation that Dr. Noll did provide to back-up his opinion on the relevant market in this case,

including his explanation of how the relevant market evolved over time as treatment protocols

changed, the presence of price sensitivity, and his explanation for why Abbott's approach to

treatment guidelines and documents is flawed.[16] Tr. 1555:10-1560:11, 1566:16-1567:14, 1571:5-

1577:4, 1629:2-14, 1681:15-1688:19; P-0031-0015; P-0216-0004; P-0239-0001.

Finally, Abbott resuscitates in a footnote its previously failed argument concerning GSK's

alternative relevant market definition. The Court rejected this argument in framing its jury

instructions and should do so again. *Compare* Abbott's Supp. Br. Re: Court's Tentative Final Jury

Instructions and Verdict Form, Dkt No. 469, at 5 *with* Jury Instr., Dkt No. 485, at 9:5-9. Dr.

---

[15] Noll's economic training also prepared him to understand the statistical methods used in the medical research, as these are the same as those applied in economics. Tr. 1551:19-1552:2.

[16] Abbott also suggests that Dr. Noll's analysis conflicts with the law by ignoring "qualitative performance variables," Br. 4:23-5:3, but this argument fails for two reasons. First, as clarified by the cases cited in the beginning of this section, Dr. Noll's focus on cross-elasticity of price is in accord with the law. Second, Dr. Noll's testimony made clear that his analysis in fact did consider such variables insofar as Abbott's evidence on this point was aimed at showing that "Kaletra is better than Sustiva or Lexiva is better than Viracept" which would "mean[] it's not a therapeutic substitute, and therefore" not in the same relevant market. Tr. 1686:6-16; *see also* Tr. 1628:24-1629:14.

Noll's testimony clearly explains why his rationale for market definition may be questioned, and thus why, "for purposes of conservatism," he analyzed the alternative relevant market consisting of all boosted PIs.  Tr. 1567:21-25; *see also* Tr. 1587:2-24 (finding market power in alternative market).

### b.   The Evidence is Sufficient to Establish that Kaletra has Monopoly Power in the Relevant Market.

Abbott's arguments regarding monopoly power are also just a rehash of its previously rejected positions on market share and barriers to entry or expansion.  On the market share computation, Abbott fails for multiple reasons.  First, the above section makes clear that GSK's definition of the relevant market is well-supported by the evidence.  Second, applying Dr. Noll's market definition results in Abbott's Kaletra having 80% market share in December 2003, when Abbott's anticompetitive price hike occurred.  Tr. 1582:5-12.  Kaletra's market share then stays above 50% for almost three years, falling below 50% for the first time in the final quarter of 2006. Tr. 1586:1-12.  As Dr. Noll explained, with reference to the Hirschman-Herfindahl Index, such percentages show, in this product-differentiated market, that Abbott had monopoly power in the relevant market at the time of the price hike and maintained that power throughout the end of 2006.  Tr. 1578:22-1580:8; 1582:5-12; 1585:17-1587:1; *see also* Tr. 1679:6-1681:14.  This evidence is sufficient for the jury to conclude that the market share factor supports a finding of Kaletra's market power, and Abbott's purported 65% threshold misstates the law (as recognized in the Court's final jury instructions).  *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 995 (9th Cir. 1986) (citing *Pac. Coast Ag. Expert Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196 (9th Cir. 1975); Jury Instr., Dkt. No. 485, at 12:2-11.

GSK has also proffered sufficient evidence of barriers to entry or expansion.  As Dr. Noll explained, the requirements of patents, research and development, FDA approval, and Abbott's Norvir price hike itself (by deterring profitable new entry) all serve as barriers to entering the relevant market.  Tr. 1583:12-1585:7.  Although Abbott trumpets the question of whether there existed barriers to expansion, that inquiry is equally fruitless for Abbott.  Barriers to expansion are a consideration because they can serve to prevent an existing competitor from constraining a

- 17 -

monopolist.  *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439, 1441 (9th Cir. 1995).

Here, Dr. Noll's testimony explained how the market in question in this case differs from the

gasoline market in *Rebel Oil* due to product differentiation, which prevents a monopolist from

being constrained by output expansion by rivals.  Tr. 1679:6-1681:14.  He further explained that

Abbott's control over Norvir, which existing competitors needed as a complementary product in

order to challenge Kaletra, served as a second barrier to expansion.  Tr. 1681:4-8.  This Court has

already ruled that this evidence defeats summary judgment:  Abbott's "power over a necessary

input posed barriers to entry and expansion: to limit either, Abbott could have increased the cost of

Norvir, as it did, which could have rendered Kaletra's potential or existing competitors

unattractive to consumers."  1/14/11 Order, Dkt. No. 325, at 18:26-19:1.  It is sufficient to defeat

Abbott's current motion as well.[17]

Finally, given the evidence of Abbott's market share and barriers to entry and expansion,

the decline in Abbott's share does not preclude the jury from finding monopoly power over the

relevant period.  *Oahu Gas Serv., Inc. v. Pac. Res. Inc.*, 838 F.2d 360, 367 (9th Cir. 1988)

(answering "yes" to "the question . . . [of] whether the jury could reasonably have found that a

firm with a consistently high, albeit declining, market share in a market with high barriers to entry

possessed monopoly power.").  Abbott's citation to *United States v. Syufy Enters.*, 903 F.2d 659

(9th Cir. 1990), continues to be off-point; *Syufy* involved an industry with low barriers to entry

where, within two years of the merger at issue, a competitor had entered and outperformed the

defendant by one key measure of market share.  *Id.* at 666-67 & n. 11.  Those conditions are not

present here.  Tr. 1583:12-1585:7 (barriers); 1679:6-1681:14 (same); 1587:1-1589:23

(maintenance of monopoly power for three years after new entry); *see also* 1/14/11 Order, Dkt.

No. 325, at 19:10-20:3 (discussing *Syufy* and finding a question for the jury).

**2.    GSK has Offered Evidence Sufficient to Support that Abbott Engaged in Anticompetitive Conduct to Protect Kaletra's Monopoly Power.**

---

[17] This same evidence of barriers to expansion also negates the relevance of Abbott's discussion of whether competitors were "large and sophisticated."  Br. 7:21-23.

### a.      GSK has Offered Sufficient Evidence to Support that Abbott Violated a Duty to Deal Under *Aspen Skiing*.

This Court has already rejected Abbott's argument, Br. 10:19-11:6, and held that a violation of a duty to deal (or a practical refusal to deal) is a form of anticompetitive conduct sufficient to support a finding of monopolization or attempted monopolization under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).  *See, e.g.*, 1/12/10 Order Denying Defendant Abbott Laboratories' Omnibus Motion to Dismiss, Dkt. No. 195 (hereinafter "1/12/10 Order"), at 13:21-24; 1/14/2011 Order, Dkt. No. 325, at 30:19-25.[18]  There is ample evidence from which the jury could conclude that the factors set out in the jury instructions as indicators of a practical refusal to deal have been met.

First, there is evidence that Abbott "unilaterally terminated a voluntary and profitable course of dealing."  Jury Instr., Dkt. No. 485, at 15:27-16:1.  The uncontroverted evidence is that there was a "culture of cooperation" in the HIV/AIDS community.  Tr. 465:18-22, 704:23-705:13.  Consistent with that culture, there is evidence that Abbott had taken price increases on Norvir only at or near the rate of inflation, Tr. 658:13-16, 867:11-17, 685:1-18, 1753:17-23, 867:11-17, and that it licensed all of its competitors – even though it recognized that doing so would allow them to compete against Kaletra.  Tyree Depo. Tr. at 39:22-40:14; Tr. 1071:19-24.  GSK also introduced evidence showing that Abbott abandoned this profitable and pro-competitive strategy when it began to consider alternatives of restricting Norvir's supply in order to protect Kaletra from the threat of Lexiva and Reyataz and settled on a "mega price increase" to achieve that objective.  Tr. 665:25-671:14, 704:23-705:13, 2499:9-2500:11.  GSK's economic expert, Professor Noll, testified that, for customers who could choose any boosted PI, the 400% price

---

[18] In holding that GSK has also supported a theory under *Cascade,* this Court has implicitly rejected Abbott's other assertion that GSK's *Aspen Skiing* theory is duplicative of its *Cascade* theory.  *See* Br. 11:7-17.  *Aspen Skiing,* unlike *Cascade,* did not apply a quantitative test, but rather concluded that an antitrust claim exists where the monopolist makes "an offer that [its competitor] could not accept" after a long-term, voluntary course of cooperation with that competitor.  *Aspen Skiing,* 472 U.S. at 592; 1/14/2011 Order, Dkt. No. 325, at 25:16-24; *see also DocMagic, Inc. v. Ellie Mae, Inc.*, 2011 WL 871480, at *10 (N.D. Cal. March 11, 2011) (concluding without applying *Cascade* that a jury could find a price increase constituted a practical refusal to deal).  Here, the evidence shows that Abbott's price hike made boosted Lexiva 75% more expensive than Kaletra and that GSK had no rational response to Abbott's pricing move.  Tr. 697:5-699:7, 1184:19-1185:9, 1305:1-1306:10.

1   increase "had de facto the same effect on Kaletra sales that simply withdrawing Norvir would

2   have had." Tr. 691:5-692:4. And, there is ample evidence from the testimony of Abbott's own

3   executives that the Norvir price hike was motivated by anticompetitive malice. *See, e.g.*, Tr.

4   1860:13-1861:14, 1756:15-21; P-0239-001; P-0245-002.

5         There is also ample evidence from which a reasonable jury could conclude that the second

6   factor is met: Abbott "offered to deal with [GSK] only on unreasonable terms and conditions."

7   Jury Instr., Dkt. No. 485, at 16:2-3. The uncontroverted evidence showed that the Norvir price

8   hike increased the daily cost of boosted Lexiva from $19 to $33, *see* Tr. 867:18-23, 671:12-14,

9   and that government pricing rules made it irrational for GSK to respond by cutting the price of

10  Lexiva. Tr. 873:4-13, 697:5-699:19, 1305:1-1306:10. In addition to his testimony that the price

11  hike had the same impact as withdrawal for patients who could choose among boosted PIs,

12  Professor Noll opined that it caused Kaletra's market share to be higher than it otherwise would

13  have been. Tr. 691:5-692:4, 714:2-11. As this Court held, "a jury could view this as an offer to

14  deal only on unreasonable terms and conditions." 1/14/2011 Order, Dkt. No. 325, at 29:21-22.

15        Third, a jury could conclude that "Abbott refused to provide its competitors' customers

16  with products, that were sold in a retail market, on the same terms it provided the products to its

17  own customers." Jury Instr., Dkt. No. 485, at 16:3-6. It is undisputed that ritonavir is the active

18  ingredient in Norvir, that Kaletra contains ritonavir, and that Abbott did not increase the price of

19  Kaletra when it raised the price of Norvir. Jury Instr., Dkt. No. 485, at 2:20-3:3. Thus, Abbott

20  was selling ritonavir to its own customers on more favorable terms than to the customers of its

21  competitors. Accordingly, "the jury could infer that Abbott refused to provide its competitors

22  with Norvir on the same terms that it provided the drug to its retail customers." 1/14/2011 Order,

23  Dkt. No. 325, at 30:5-7.

24        Fourth, GSK has introduced evidence showing that, by taking the 400% price increase,

25  Abbott sacrificed revenue, Tr. 786:14-18, suffered a decrease in its stock price relative to its peer

26  companies, Tr. 789:8-791:23, and incurred substantial harm to its reputation, Tr. 1907:15-1909:11,

27  1943:16-1945:9, 2158:5-2160:23. Abbott also admits that the price increase caused it to lose

28  revenue in the government sector because of penalties under government procurement rules. Fiske

- 20 -

Depo. Tr. 37:19-20, 38:1-39:21.  This kind of sacrifice is analogous to *Aspen Skiing*, where the monopolist offset lost revenue from ticket sales to its competitor with a larger amount of revenue from additional skiers who came to the monopolist's three resorts.  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608 (1985).  Beyond the evidence of the price hike being contrary to Abbott's short-run best interests, it is also undisputed that the price increase harmed GSK by rendering a daily dose of boosted Lexiva 75% more expensive than Kaletra, Tr. 867:18-23, 671:12-14; Professor Noll testified that his econometric analysis showed that the 400% price increase reduced the decline in Kaletra's share "by between one and two percentage points per month for two years after [the price increase]." Tr. 714:2-11.  A jury could thus find that the Norvir price hike was "contrary to Abbott's short-run best interest, but made sense for Abbott because it harmed competitors and helped Abbott maintain monopoly power in the long run."  *See, e.g.*, Jury Instr., Dkt. No. 485, at 15:20-23; 1/12/10 Order, Dkt. No. 195, at 16:15-26.  Thus, there is ample evidence for a reasonable jury to find for GSK on its *Aspen Skiing* claim.

       **b.**    **GSK has Offered Sufficient Evidence to Support that Abbott is Liable Under *Cascade*.**

       **(1)**    **GSK Has Presented Sufficient Evidence that Kaletra is a Bundle Under *Cascade*.**

Abbott is wrong that there is insufficient evidence from which a reasonable jury could conclude that "Kaletra is a bundle of the active ingredients lopinavir and ritonavir, the active ingredient in Norvir."[19]  Jury Instr., Dkt. No. 485, at 17:7-9.  Contrary to Abbott's contentions, Br. 9:5-15, Dr. Leffler testified that Kaletra is a "bundle" and that "Kaletra equals lopinavir plus ritonavir or Norvir."  Tr. 1285:17-20, 1285:21-1286:10, 1292:24.  In any case, Abbott never explains why using the term "economic bundle" or stating that Kaletra is a combination of lopinavir and Norvir is fatal to the jury finding for GSK on this issue.  In fact, there is evidence that the active ingredients, rather than inert excipients, are what should be considered for this

---

[19] Abbott again argues that the *Cascade* standard does not apply in light of the decisions in *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 129 S. Ct. 1109 (2009), and *John Doe 1 v. Abbott Labs.*, 571 F.3d 930 (9th Cir. 2009).  This Court has already rejected that argument, reasoning: "This Court will not disregard controlling Ninth Circuit precedent based on inapplicable Supreme Court dicta." 1/12/10 Order, Dkt. No. 195, at 10:12-13.

analysis. Dr. Siddiqui testified that the active ingredients of lopinavir and ritonavir that impact the treatment of HIV; the inactive ingredients do not. Tr. 392:19-393:3. Dr. Scott Brun, Abbott's vice president of global pharmaceutical research and develop, agreed that inactive ingredients "don't directly combat the disease." Tr. 2378:22-25.

There is also ample evidence to conclude lopinavir "could be sold separately." *Cascade*, 515 F.3d at 894. Dr. Brun admitted that "it would be theoretically possible" to do so. Tr. 2366:17-2367:3. Dr. John Leonard, Abbott's senior vice president of pharmaceuticals and research and development, testified that Abbott has used lopinavir by itself in clinical trials with human patients. Tr. 2101:18-2102:1. And, it is undisputed that lopinavir can be safely and effectively taken by patients to fight HIV when taken as part of Kaletra. Tr. 392:3-8.

Considering almost identical evidence, this Court flatly rejected Abbott's argument, stating "Kaletra presents a bundle of two products, a boosting PI and boosted PI, sold together for a single price….Thus, for purposes of *Cascade,* the bundled 'products' here are ritonavir and lopinavir." 1/14/11 Order, Dkt. No. 325, at 23:16-23. A reasonable jury could do likewise.

### (2)    Sufficient Evidence Exists for a Jury to Conclude that Abbott Violated the *Cascade* Test.

Abbott is simply wrong that case law precludes Dr. Leffler's calculation of average variable costs. *See* Br. 10:7-17. Rather, as this Court found in denying Abbott's motion *in limine* to preclude Dr. Leffler from testifying to his calculation of average variable costs (Abbott MIL No. 6), "the determination of fixed and variable costs is a matter for the jury under appropriate instructions." *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1038 (9th Cir. 1981). The analysis of appropriate costs depends on the facts of each case. *Id.*; *see United States v. AMR Corp.*, 335 F.3d 1109, 1116 (10th Cir. 2003) (recognizing that the "Supreme Court has declined to state which of the various cost measures is definitive"). While "fixed production costs of a firm are those costs that … would remain even if the firm discontinued production" and "variable costs … are those costs that do vary with output," whether a cost is fixed or variable will change based on the magnitude of the change in production. *Id.* at 1037. Thus, contrary to Abbott's claim that it is improper to consider costs variable if they change when

1    production is shut-down, Br. 10:9-10, Abbott's own case law recognizes that, in appropriate

2    circumstances, costs can be evaluated based on "terminating production altogether." *Id.*; *see*

3    *Marsann Co. v. Brammall, Inc.*, 788 F.2d 611, 613 (9th Cir. 1986) (average variable costs are

4    "those costs that would not be incurred were that product not produced").

5            Here, Dr. Leffler testified that he looked at what costs, under these facts, amounted to

6    "average variable costs," that is, here, "costs that are incurred in order to produce … and market

7    and distribute" a product just like lopinavir.  Tr. 1303:12-1304:3.  He did this because he was

8    attempting to determine whether an equally efficient competitor would be excluded from the

9    market.  Tr. 1288:15-24; *see Cascade Health Solutions v. Peacehealth*, 515 F.3d 883, 909 (9th

10   Cir. 2008).  And, he explained why he considered each category of costs variable under these

11   facts.  Tr. 1294:22-1296:22, 1298:10-1300:10, 1301:1-12.  *Cf. William Inglis*, 668 F.2d at 1038

12   (remanding for new trial because determination of variable costs based on attorney's guidance

13   rather than being "rooted in the particular facts of this case").  Abbott offered no contrary

14   evidence.  Its expert on the topic, Dr. Richard Gilbert, simply adopted Dr. Leffler's analysis of

15   costs.  Tr. 2635:18-19.  The jury is entitled to consider the only evidence on this issue: Dr.

16   Leffler's testimony regarding what costs are variable under the facts of this case.

17           Similarly, Dr. Leffler's approach to determining the imputed price of lopinavir by using

18   the price in the private sector is clearly one that the jury can consider.  *See* Br. 9:16-10:6.

19   Contrary to Abbott's claim, Dr. Leffler did not "ignore" the price paid in the public sector.

20   Rather, he testified that he used the private sector price in his initial calculation because it is in this

21   sector that the price hike had a substantial effect and it is where an equally efficient competitor

22   sets its price.  Tr. 1290:19-1291:14.  The public sector price is linked to the private sector, and the

23   public sector price would automatically drop if an equally efficient competitor dropped the price to

24   compete in the private sector.[20]  Tr. 1305:1-1306:17.  Thus, Dr. Leffler considered public sector

25   pricing, and his analysis is not negated by Abbott's argument that the "average price is the

26   _____

27   [20] There is sufficient evidence for a reasonable jury to conclude that the private sector price
     is the relevant one simply because no firm that did not have the ability to sell the bundled product
     could compete based on price in either segment of the market due to government pricing rules that

28   required a reduction in the public market price to accompany a reduction in the private market
     price.  Tr. 697:5-699:7, 1290:18-1291:14, 1305:1-1306:10.

relevant consideration." Br. 10:4-6.  Dr. Leffler testified that this suggested "average price" approach was a "nonsense calculation,"  Tr. 1343:12-23, because "[t]his doesn't tell you can [a competitor] compete in any sector of the marketplace."  Tr. 1345:8-16.  The jury could well agree. The evidence is thus sufficient for jurors to conclude that Abbott failed the *Cascade* test.

c.      **Abbott is not Entitled to Judgment as a Matter of Law Based on Its Affirmative Defense of Legitimate Business Justification.**

A reasonable jury could conclude that Abbott has not met its burden of showing a legitimate business justification – namely that the Norvir price hike was meant to capture Norvir's value as a low-dose booster.  At trial, the overwhelming evidence showed that Abbott raised the price of Norvir by 400% for the purpose of protecting Kaletra.  The evidence showed that rather than being concerned about capturing Norvir's value as a low-dose booster, prior to the price increase, Abbott executives were concerned that new boosted PIs would take market share from Kaletra.  *See* Tr. 671:15-674:4; P-150-0002; P-67-0002; Tr. 1796:17-1800:21, 1806:13-17.  Miles White, Abbott's CEO, told Abbott executives he did not believe there was plan in place to "defend and grow [Abbott's] turf."  Tr. 1800:22-1802:17, 1806:13-17, 1891:8-1892:10; P-0171-0001. GSK offered uncontroverted evidence that Abbott repeatedly considered withdrawing Norvir from the market entirely – which in no way could capture Norvir's value as a booster.  Tr. 675:12-676:25; P-306-0001; P-0153-0002; P-0157-0001; Tr. 1840:15-1844:7, 2107:12-16, 2110:21-2112:5, 2302:17-2306:4, 2763:1-13; P-0191-0001,0011; P-0209-0001.  And, Heather Mason, the self-proclaimed "architect" of the price increase testified that the price hike was simply an alternative to withdrawal.  *See* Tr. 1924:9-18; P-285-0001; *see also* P-138-0001; Tr. 2754:8-16; P-239-0001.  Further bolstering the evidence that the Norvir price hike was intended to protect Kaletra, GSK offered evidence that Abbott timed it to disrupt the launch of Lexiva.  P-0081-0010-11; 682:13-683:15.  And, Abbott witnesses conceded that Abbott does not spend money marketing Norvir and has never even sought FDA approval of Norvir as a booster.  Tr. 1794:1-15.  All of this evidence is inconsistent with Abbott's proffered "legitimate business justification" of realizing the value of Norvir, and a jury could reasonably find that Abbott intended to protect the market share of Kaletra rather than capture its value as a booster.

1    Moreover, when it refused to provide the jury instruction for which Abbott advocated, this

2  Court rejected Abbott's claim that the jury must presume that Abbott was profiting from its

3  intellectual property through the price hike, and that GSK must show this justification to be

4  pretextual.  Br. 13:22-14:2.  Indeed, such a justification makes no sense here, where Abbott has

5  licensed its patent rights and profited through licensing fees that amount to over $300 million.  Tr.

6  669:11-15.  *See Jacobs v. Nintendo*, 370 F.3d 1097 (Fed. Cir. 2004) (patent holder not allowed to

7  receive compensation from patented invention through license only to undermine licensed rights).

8  Thus, Abbott's citation to *Image Technical Servs., Inc. v. Eastman Kodak Co.,* 125 F.3d 1195 (9th

9  Cir. 1997), is inapposite.

10          **3.      GSK has Produced Sufficient Evidence to Show that Abbott Attempted
                      to Maintain its Monopoly.**

11

12          Abbott's argument that an attempted maintenance claim is "inherently illogical" makes the

13  same error as the district court in *LePage's Inc. v. 3M*, No. 97-3983, 2000 WL 280350, at *2 (E.D.

14  Pa. Mar. 14, 2000): assuming that a defendant who had monopoly power and lost it must never

15  have had it in the first place.  *Id.*  GSK's theory is that Abbott attempted to stem the erosion of its

16  existing monopoly power through anticompetitive conduct.  Courts have recognized such claims.

17  *See, e.g.*, *Lorain Journal Co. v. United States*, 342 U.S. 143, 154 (1951) (holding "that a single

18  newspaper, already enjoying a substantial monopoly in its area, violates the 'attempt to

19  monopolize' clause of § 2 when it uses its monopoly to destroy threatened competition");

20  *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980 (5th Cir. 1983) (affirming jury verdict for

21  attempted monopolization where defendant's market share fell from "almost complete control of

22  the U.S. market to a 38% share…"); *McGahee v. N. Propane Gas Co.*, 858 F.2d 1487, 1492,

23  1505-06 (11th Cir. 1988) (reversing summary judgment for defendant on attempted

24  monopolization where defendant's market share fell from 65% to 35% in two year period).

25          Here, there is sufficient evidence, cited above, of Abbott's high market share and of the

26  slowing in the rate of the decline of that share, Tr. 712:17-714:17, such that the jury could find

27  that Abbott had a dangerous probability of maintaining its monopoly.  Also, the evidence cited

28  above on GSK's refusal-to-deal theory is more than sufficient for a jury to find specific intent.

1   Dated:  March 31, 2011                    Respectfully submitted,

2                                             IRELL & MANELLA LLP

3

4                                             By:____/s/ Alexander F. Wiles_____
                                                 Alexander F. Wiles
5

6

7        Pursuant to General Order No. 45, Section X, I attest under penalty of perjury that

8   concurrence in the filing of this document has been obtained from the above signatories.

9   Dated:  March 31, 2011                    _____/s/ S. Albert Wang_____
                                                 S. Albert Wang
10                                               Counsel for GSK

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28