IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SMITHKLINE BEECHAM CORPORATION, doing business as GLAXOSMITHKLINE,<br><br>    Plaintiff,<br><br>  v.<br><br>ABBOTT LABORATORIES,<br><br>    Defendant.<br>_____/ | No. C 07-05702 CW<br><br>ORDER DENYING ABBOTT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND GRANTING AS UNOPPOSED GSK'S MOTION TO AMEND THE JUDGMENT (Docket Nos. 524 and 525) |

    Defendant Abbott Laboratories renews its motion for judgment as a matter of law. Plaintiff Smithkline Beecham Corporation, doing business as GlaxoSmithKline (GSK), opposes the motion and moves to amend the judgment to include post-verdict interest, as provided by New York law. Abbott does not oppose GSK's motion to amend. The motions were taken under submission on the papers. Having considered the papers submitted by the parties, the Court DENIES Abbott's motion and GRANTS as unopposed GSK's motion.

BACKGROUND

    Because the parties are intimately familiar with the facts of this case, the Court provides only the background necessary to resolve their motions.

I.    Factual Background

    Abbott and GSK manufacture and sell protease inhibitors (PIs), which are drugs used to treat human immunodeficiency virus (HIV) infection.

In 1996, Abbott introduced Norvir, which contained the active ingredient ritonavir, as a stand-alone PI. After Norvir's release, it was discovered that, when used in small quantities with another PI, Norvir would "boost" the anti-viral properties of that PI.

GSK desired to obtain a license from Abbott, "to promote and market certain of GSK's HIV products with Ritonavir for the purpose of co-prescription/co-administration . . . ." GSK's Trial Ex. 5, License Agreement, at 0001. On December 13, 2002, Abbott and GSK executed a "Non-Exclusive License Agreement," under which Abbott granted GSK a license to "recommend, label, market, use, sell, have sold and offer to sell one or more of the GSK Products, but no other product, in co-prescription and/or co-administration with Ritonavir . . . ." Id. at 0001 and 0005. Article X of the agreement limited the parties' liability under the contract, stating that "EXCEPT AS OTHERWISE PROVIDED, NEITHER PARTY SHALL BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL LOSSES ARISING OUT OF OR RELATING TO THIS AGREEMENT . . . ." Id. at 0015 (upper case in original).

In 2003, GSK introduced Lexiva to the market. Although the drug could be prescribed as a stand-alone PI, its daily dose was less if it was administered along with Norvir. Abbott was aware of studies that showed Norvir-boosted doses of Lexiva had efficacy similar to Kaletra, another Abbott PI.

On December 3, 2003, Abbott raised the price of 100 milligrams of Norvir from $1.71 to $8.57, which amounted to a 400-percent increase. This price hike commensurately increased the cost of a boosted Lexiva therapy to some consumers.

2

## II. Procedural and Trial History

GSK brought a claim against Abbott for allegedly breaching the implied covenant of good faith and fair dealing associated with the parties' December 2002 agreement. Under the agreement, New York law applied to this claim.

In its motion for summary judgment, Abbott argued, among other things, that Article X barred GSK from recovering lost profits arising from a breach of the implied covenant. GSK responded that Article X did not apply because the lost profits it sought were general, not consequential, damages. GSK also argued that, even if its lost profits were consequential damages, Kalisch-Jarcho, Inc. v. City of New York, 58 N.Y.2d 377 (1983), provided that Article X could be rendered unenforceable based on Abbott's bad faith. This Court held GSK's alleged lost profits to be consequential damages but denied Abbott's motion as to GSK's implied covenant claim because there was a triable issue as to whether GSK could recover such damages notwithstanding Article X. See Safeway Inc. v. Abbott Laboratories, 761 F. Supp. 2d 874, 899-901 (N.D. Cal. 2011).

GSK's implied covenant claim and its claims under the Sherman Act and North Carolina's Unfair and Deceptive Trade Practices Act (UDTPA) were tried before a jury. At the close of evidence, Abbott moved for judgment as a matter of law. Abbott argued that it was entitled to judgment on GSK's implied covenant claim because the trial record did not support a conclusion that it breached the implied covenant. Abbott also asserted that, even if GSK proved a breach, it could not recover lost profits, reasoning,

3

> The license precludes "special, incidental, indirect or consequential losses arising out of or relating to this agreement." Under New York law, a contractual limitation of liability clause precludes lost profits damages absent proof of a "breach of a fundamental, affirmative obligation the agreement expressly imposes on the contractee." GSK has not alleged or presented sufficient evidence of breach of an "affirmative obligation" of the license. This Court held that the license's consequential damage limitation could be overcome, and lost profits awarded, if GSK proved that the alleged breach resulted from "intentional misrepresentations, . . . willful acts or gross negligence." GSK has not met its burden. Mere "intentional nonperformance of [an] Agreement motivated by financial self-interest" would not be enough.

Abbott's Rule 50(a) Mot. for J. as a Matter of Law (Docket No. 482) at 19-20 (citations omitted). Abbott incorporated into its Rule 50(a) motion all arguments it had made in its motions to dismiss, motion for summary judgment, motions in limine and objections to jury instructions. The Court did not grant Abbott's Rule 50(a) motion and submitted the case to the jury.

The Court incorporated into the jury's instructions on GSK's implied covenant claim an element accounting for the level of culpable conduct necessary for Article X to be negated. The jury was instructed that, to prevail on its implied covenant claim for lost profits, GSK was required to prove that (1) "Abbott's conduct directly destroyed or injured GSK's alleged right to receive benefits under the license agreement that a reasonable party in GSK's position would have understood the license agreement to have included;" (2) "Abbott engaged in grossly negligent conduct;" and (3) "Abbott's conduct constituting a breach of the implied covenant of good faith and fair dealing was a proximate cause of the injury to GSK's business." Final Jury Instructions (Doc. No. 485) at 26. The instructions defined "grossly negligent conduct"

4

to involve "intentional wrongdoing or a reckless indifference to the rights of others." Id.

With respect to GSK's implied covenant claim, the jury found that Abbott "committed an act that showed a lack of good faith and fair dealing, injuring GSK's right to receive the benefits that a reasonable party would have been justified in understanding were included in the license agreement." Verdict Form (Docket No. 487) at 4. The jury also found that Abbott engaged "in grossly negligent conduct when it breached the implied covenant of good faith and fair dealing." Id.

In connection with GSK's claim under the UDTPA, the jury was posed special interrogatories. In response, the jury found that "[d]uring the negotiation of the Norvir Boosting License, Abbott was considering how to use its control over Norvir to limit competition with Kaletra and deliberately withheld this from GSK." Verdict Form at 5. However, according to the jury, GSK did not show that this conduct caused it harm. Id. at 6. Nor did GSK show that "Abbott inequitably asserted its power over Norvir by increasing Norvir's price by 400 percent to undermine and disrupt Lexiva's launch and future sales." Id. at 5. GSK also failed to persuade the jury that "Abbott manipulated the timing of the 400-percent Norvir price increase in order to disrupt Lexiva's launch and undermine Lexiva's future sales." Id.

In accordance with the jury's verdict, judgment was entered in favor of GSK on its implied covenant claim and in favor of Abbott on GSK's other claims. GSK was awarded $4,549,590.96, which was the sum of $3,486,240.00 and interest provided under New York law.

5

LEGAL STANDARD

A motion for judgment as a matter of law after the verdict renews the moving party's prior Rule 50(a) motion for judgment as a matter of law at the close of all the evidence. Fed. R. Civ. P. 50(b). Judgment as a matter of law after the verdict may be granted only when the evidence and its inferences, construed in the light most favorable to the non-moving party, permits only one reasonable conclusion as to the verdict. Josephs v. Pac. Bell, 443 F.3d 1050, 1062 (9th Cir. 2006). Where there is sufficient conflicting evidence, or if reasonable minds could differ over the verdict, judgment as a matter of law after the verdict is improper. See, e.g., Kern v. Levolor Lorentzen, Inc., 899 F.2d 772, 775 (9th Cir. 1990); Air-Sea Forwarders, Inc. v. Air Asia Co., 880 F.2d 176, 181 (9th Cir. 1989).

DISCUSSION

Abbott argues that insufficient evidence supports the jury's verdict that it breached the implied covenant. Abbott also contends that, based on the trial record and the jury's findings, Article X is enforceable against GSK's claim for lost profits.

I. Breach of the Implied Covenant

"The implied covenant of good faith and fair dealing between parties to a contract embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Moran v. Erk, 11 N.Y.3d 452, 456 (2008) (quoting 511 W. 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153 (2002)). The implied covenant encompasses "'any promises which a reasonable person in the position of the promisee would be

6

justified in understanding were included.'" <u>Jennifer Realty</u>, 98 N.Y.2d at 153 (quoting <u>Rowe v. Great Atl. & Pac. Tea Co.</u>, 46 N.Y.2d 62, 69 (1978)); <u>accord</u> <u>M/A-COM Sec. Corp. v. Galesi</u>, 904 F.2d 134, 136 (2d Cir. 1990) (stating that the implied covenant doctrine is used to "effectuate the intentions of the parties, or to protect their reasonable expectations") (citation omitted).

The trial record supports the jury's verdict that Abbott breached the implied covenant of good faith and fair dealing associated with the parties' December 2002 agreement. As noted above, under the agreement, Abbott granted GSK the right to "recommend, label, market, use, sell, have sold and offer to sell one or more of the GSK Products, but no other product, in co-prescription and/or co-administration with Ritonavir . . . ." License Agreement at 0005. The theory of GSK's case was that this right included an implied promise that Abbott would not use "its control over Norvir to interfere with GSK's ability to promote and market boosted Lexiva." GSK's Opp'n at 17 n.6. The evidence presented at trial supports this theory. Abbott was aware that, in seeking an agreement, GSK desired to promote its products with Norvir. Consistent with this awareness, Abbott's head negotiator John Poulos indicated at trial that, during negotiations, he assured GSK representatives that Abbott would not cease manufacturing Norvir. Poulos also represented that he told GSK negotiators that Abbott had no interest in diminishing its reputation with HIV patients. Further, evidence showed that Abbott understood that its licensing program enabled Abbott's competitors to compete with Kaletra.

7

Evidence likewise supports the conclusion that the Norvir price increase interfered with GSK's ability to market and sell Lexiva. Witnesses testified to the medical community's inability to discern GSK's marketing message concerning Lexiva because of the Norvir price hike. Witnesses also testified to the negative effect the price increase had on doctors' perception of Lexiva. Thus, the record presented to the jury supports its finding that Abbott injured GSK's right to receive the benefits GSK reasonably believed it was entitled to under the parties' agreement.

Abbott cites Silvester v. Time Warner, Inc., 763 N.Y.S.2d 912 (2003),[1] which is distinguishable and does not support its position. In that case, the plaintiffs, who were individual recording artists, alleged that the defendant music labels breached the implied covenant by "digitalizing recordings and allowing or facilitating distribution of recordings over the internet, without protecting plaintiffs' rights to royalties and licensing fees." Id. at 915. The parties' contracts provided the defendants with "the unrestricted right to manufacture, use, distribute and sell sound productions of the performances recorded hereunder made by any method now known, or hereafter to become known." Id. at 916. In exchange, the plaintiffs received royalties. Id. The court dismissed the plaintiffs' implied covenant claims because there was no allegation "that defendants intentionally interfered with plaintiffs' rights to obtain royalties under their contracts." Id. at 258. Here, in contrast,

---

[1] Abbott represents that the New York Court of Appeals, the state's high court, rendered this decision. This is incorrect. A state trial court made the decision.

8

the trial record shows that Abbott interfered with GSK's right to market and sell Lexiva with Norvir, a right was expressed in the December 2002 agreement.

Abbott also points to various contractual disclaimers indicating that it did not have a duty to promote Lexiva with Norvir or a partnership, joint venture or agency relationship with GSK. These provisions, however, do not negate the implied promise that Abbott would not interfere with GSK's right to market and sell Lexiva with Norvir. GSK does not argue that Abbott had an affirmative duty to market Lexiva.

Finally, Abbott contends that New York does not permit a plaintiff to bring an implied covenant claim if a breach of contract claim is not also asserted. The Court rejected this argument in its order denying Abbott's motion to dismiss GSK's implied covenant claim. Meijer, Inc. v. Abbott Laboratories, 544 F. Supp. 2d 995, 1007 (N.D. Cal. 2008).

Consequently, the Court concludes that sufficient evidence supports the jury's verdict that Abbott engaged in conduct constituting a breach of the implied covenant of good faith and fair dealing.

II. Enforceability of Article X

As explained above, to recover lost profits for a breach of the implied covenant, GSK was required to prove that Abbott engaged in conduct sufficiently culpable to override Article X's limitation on liability.[2] Abbott contends the trial record and

---

[2] GSK insists that Article X is inapplicable because its lost profits were direct, not circumstantial, damages. This argument was rejected in the Court's Order on Abbott's motion for summary judgment. Safeway Inc., 761 F. Supp. 2d at 899-900.

9

the jury's responses to specific interrogatories show that GSK failed to do so.

New York law provides that exculpatory clauses, like Article X, are contrary to public policy in that State to the extent that they exempt "willful or grossly negligent acts." Kalisch-Jarcho, Inc., 58 N.Y.2d at 385. In Kalisch-Jarcho, Inc., the New York Court of Appeals concluded that a trial court's jury charge did not encapsulate the conduct necessary to nullify an exculpatory clause. Id. at 386. In that case, a plaintiff contractor brought a breach of contract claim against a city, alleging that it suffered damages because the city's conduct delayed the completion of a construction project. Id. at 380-81. The contractor had agreed with the city, however, "to make no claims for delay damages caused by any act or omission to act by the city." Id. at 384. Based on the instruction that it "would have to find no more than that 'the delay was caused by conduct constituting active interference,'" the jury found for the contractor. Id. at 382. The New York Court of Appeals found this instruction to be in error. Recapitulating "announced public policy," the high court first explained,

> [A]n exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing. This can be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith. Or, when, as in gross negligence, it betokens a reckless indifference to the rights of others, it may be implicit.

Id. at 385 (citations omitted). Applying this policy to the case, the court explained,

10

> It was against the background of these policies and principles that, as summarized above, the claim against the city centered on the extraordinarily long delay, the immense number of drawing revisions with which Kalisch was confronted and the failure to co-ordinate the contractors. By attributing all of this to the misconduct of the city, even absent any evidence of malice, Kalisch's proof, if credited, would have to establish that the city's conduct amounted to gross negligence.
>
> To support such a conclusion, however, the jury would have to find more than "active interference", which, incidentally, was not a contract term. For whether conduct is "active" or "passive" does not determine wrongdoing, and "interference", which most commonly translates as "intervention", does not connote willfulness, maliciousness, abandonment, bad faith or other theories through which runs the common thread of intent. So, taken at face value by the jury, the charge was calculated to expose the city to liability for conduct within the umbrella of the exculpatory clause. Accordingly, although the request to charge perhaps could have been more precisely put, the city, at the very least, was entitled to the amplifying instruction that unless Kalisch-Jarcho proved that "the City acted in bad faith and with deliberate intent delayed the plaintiff in the performance of its obligation", the plaintiff could not recover.

Id. at 386.

In Sommer, the New York high court again addressed the gross negligence necessary to negate an exculpatory clause. There, a building owner sought to recover contract damages from an alarm company that failed to notify the fire department of a signal from the building indicating it was on fire. 79 N.Y.2d at 548-49. The parties' contract imposed on the alarm company a "duty to make timely reports to the fire department." Id. at 551. However, the contract precluded liability against the alarm company for "losses or damages . . . caused by performance or nonperformance of obligations imposed by this contract or by negligent acts or omissions." Id. at 549 (internal quotation marks omitted). The trial court granted summary judgment in the alarm company's favor,

11

concluding that the exculpatory clause precluded relief because a jury could not conclude that the alarm company committed gross negligence. Id. at 549-50. The high court reversed. First, it reiterated,

> It is the public policy of this State . . . that a party may not insulate itself from damages caused by grossly negligent conduct. This applies equally to contract clauses purporting to exonerate a party from liability and clauses limiting damages to a nominal sum.
>
> Gross negligence, when invoked to pierce an agreed-upon limitation of liability in a commercial contract, must "smack[] of intentional wrongdoing." It is conduct that evinces a reckless indifference to the rights of others.

Id. at 554 (citations omitted). The building owner adduced evidence suggesting that the alarm company's dispatcher, "without verification or investigation," reached an erroneous conclusion, "recklessly indifferent to the consequences that might flow from a misperception." Id. at 555. As a result, there was a triable issue as to whether the alarm company was grossly negligent. Id.

Here, the trial record supports a conclusion that Abbott, at the least, acted with reckless indifference to GSK's rights under the contract. GSK presented evidence that Abbott, while negotiating for the December 2002 agreement, was considering how to limit competition with Kaletra and did not disclose this to GSK. Based on its investigations of options, Abbott understood it was highly likely that GSK's right to market and sell Lexiva with Norvir, in accordance with their agreement, would be harmed by an unprecedented Norvir price increase. Despite this risk, Abbott raised Norvir's price by 400 percent, which evinced a reckless indifference to GSK's rights under the agreement. Both Kalisch-

12

Jarcho, Inc. and Sommer provide that, under New York law, reckless indifference is sufficient.

Abbott insists that New York law requires intentional, willful conduct. Kalisch-Jarcho, Inc. teaches otherwise, stating that avoidance of an exculpatory clause requires proof of "willful or grossly negligent acts." 58 N.Y.2d at 385 (emphasis added). Indeed, the court stated that the requisite misconduct "smacks of intentional wrongdoing." "Smacks" is defined to mean "to have a trace, vestige, or suggestion." Webster's 3d New Int'l Dictionary 2149 (1993). The court did not require intentional wrongdoing.

Metropolitan Life Insurance Co. v. Noble Lowndes Int'l Inc., 84 N.Y.2d 430 (1994), does not require a contrary conclusion. In that case, the New York Court of Appeals was required to interpret an exculpatory clause that permitted liability for damages arising out of "willful acts or gross negligence." Id. at 433. At trial, the plaintiff proceeded on a theory that the defendant committed willful acts for which liability was not precluded by the exculpatory clause. Here, Abbott's gross negligence is at issue.

Abbott also points to the special interrogatories related to GSK's UDTPA claim. However, those answers do not negate the jury's finding on GSK's implied covenant claim that Abbott committed, at least, acts of reckless indifference.

Finally, for the first time in this action, Abbott argues that Kalisch-Jarcho, Inc.'s and Sommer's holdings that grossly negligent conduct can pierce an exculpatory clause pertain only to cases in which there are "separate tort claims -- not where, as here, the sole surviving trial claim sounds only in contract." Renewed Mot. for J. as a Matter of Law at 7:6-7. It points to

13

language in Kalisch-Jarcho, Inc., in which the court stated that the city was entitled to a jury instruction that, for the contractor to prevail, it would need to prove the city "acted in bad faith and with deliberate intent." 58 N.Y.2d at 386. But that instruction was pertinent to the circumstances of that case, in which the trial court gave the erroneous "affirmative interference" explained above. In the paragraph preceding this statement, the court noted that the contractor "would have to establish that the city's conduct amounted to gross negligence" to prevail and that the trial court's "affirmative interference" instruction did not reflect this requirement. Id. at 386. Both Kalisch-Jarcho, Inc. and Sommer state that a breaching party's reckless indifference can warrant an award of damages notwithstanding an exculpatory clause.

Accordingly, because evidence supports a conclusion that Abbott acted with at least reckless indifference when it raised Norvir's price, judgment is not warranted in Abbott's favor on GSK's implied covenant claim for lost profits.

## CONCLUSION

For the foregoing reasons, the Court DENIES Abbott's renewed motion for judgment as a matter of law and GRANTS as unopposed GSK's motion to amend the judgment. The Clerk shall amend the judgment to include $112,181.69 in post-verdict, pre-judgment interest, as provided under New York law. An amended judgment shall issue forthwith.

IT IS SO ORDERED.

Dated: 9/6/2011

CLAUDIA WILKEN
United States District Judge

14