IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SMITHKLINE BEECHAM CORPORATION, d/b/a GLAXOSMITHKLINE,<br><br>        Plaintiff,<br><br>   v.<br><br>ABBOTT LABORATORIES,<br><br>        Defendant. | No. C 07-5702 CW<br><br>ORDER DENYING DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW (Docket No. 574) |

_____/

In January 2014, the Ninth Circuit issued its opinion in Plaintiff GlaxoSmithKline's (GSK's) cross-appeal of the jury verdict in this case.  The court held that a Batson[1] violation had occurred during jury selection and that, as a result, a new trial must be held.  On July 10, 2014, it issued its mandate with respect to that decision.  Defendant Abbott Laboratories has now renewed its motion for judgment as a matter of law.  GSK opposes the motion.  Having considered the papers filed by the parties and oral argument, the Court DENIES the motion for judgment as a matter of law.  Docket No. 574.

BACKGROUND

Because the parties are intimately familiar with the facts of this case, the Court provides only the background necessary to resolve their motions.

I.   Factual Background

Abbott and GSK manufacture and sell protease inhibitors (PIs), which are drugs used to treat human immunodeficiency

_____

[1] Batson v. Kentucky, 476 U.S. 79 (1986).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  virus (HIV) infection.

2      In 1996, Abbott introduced Norvir, which contained the active

3  ingredient ritonavir, as a stand-alone PI.  After Norvir's

4  release, it was discovered that, when used in small quantities

5  with another PI, Norvir would "boost" the anti-viral properties of

6  that PI.

7      GSK desired to obtain a license from Abbott, "to promote and

8  market certain of GSK's HIV products with Ritonavir for the

9  purpose of co-prescription/co-administration . . . ."  GSK's Trial

10 Ex. 5, License Agreement, at 0001.  On December 13, 2002, Abbott

11 and GSK executed a "Non-Exclusive License Agreement," under which

12 Abbott granted GSK a license to "recommend, label, market, use,

13 sell, have sold and offer to sell one or more of the GSK Products,

14 but no other product, in co-prescription and/or co-administration

15 with Ritonavir . . . ."  Id. at 0001 and 0005.

16     In 2003, GSK introduced Lexiva to the market.  Although the

17 drug could be prescribed as a stand-alone PI, its daily dose was

18 less if it was administered along with Norvir.  Abbott was aware

19 of studies that showed Norvir-boosted doses of Lexiva had efficacy

20 similar to Kaletra, another Abbott PI.

21     On December 3, 2003, Abbott raised the price of 100

22 milligrams of Norvir from $1.71 to $8.57, which amounted to a 400-

23 percent increase.  This price hike commensurately increased the

24 cost of a boosted Lexiva therapy to some consumers.

25 II.  Procedural and Trial History

26     GSK brought a claim against Abbott for allegedly breaching

27 the implied covenant of good faith and fair dealing associated

28 with the parties' December 2002 agreement, as well as claims under

United States District Court
For the Northern District of California

the Sherman Act and North Carolina's Unfair and Deceptive Trade Practices Act (UDTPA).  These claims were tried to a jury.  At the close of evidence, Abbott moved under Rule 50(a) for judgment as a matter of law on all of GSK's claims.  The Court did not grant Abbott's motion and submitted the case to the jury.

In accordance with the jury's verdict, judgment was entered in favor of GSK on its implied covenant claim and in favor of Abbott on GSK's other claims.  GSK was awarded $4,549,590.96, which was the sum of $3,486,240.00 and interest provided under New York law.  After judgment, Abbott filed a renewed motion for judgment as a matter of law pursuant to Rule 50(b) on GSK's claim for breach of the implied covenant of good faith and fair dealing, the only claim on which the jury found for GSK.  GSK opposed the motion and the Court denied it.

On October 3, 2011, Abbott filed a notice of appeal and, the next day, GSK filed its cross-appeal.  On January 14, 2014, the Ninth Circuit issued an opinion, holding that Abbott's use of a peremptory strike against the only identifiable gay member of the venire violated Batson.  Accordingly, the Ninth Circuit remanded the case for a new trial.  SmithKline Beecham Corp. v. Abbott Labs, 740 F.3d 471 (9th Cir. 2014).  In reaching this decision, the panel also held that this Court did not err in denying Abbott's Rule 50(b) motion for judgment as a matter of law on GSK's contract claim and that it "need not consider whether the district court erred in submitting the UDTPA and antitrust claims

United States District Court
For the Northern District of California

1   to the jury."  Id. at 488 n.8.  Abbott has now renewed its Rule 50

2   motion with respect to the UDTPA and antitrust claims.[2]

3                          LEGAL STANDARD

4       Rule 50(a)(1) of the Federal Rules of Civil Procedure

5   provides,

6       If a party has been fully heard on an issue during a
        jury trial and the court finds that a reasonable jury
7       would not have a legally sufficient evidentiary basis to
        find for the party on that issue, the court may: (A)
8       resolve the issue against the party; and (B) grant a
        motion for judgment as a matter of law against the party
9       on a claim or defense that, under the controlling law,
        can be maintained or defeated only with a favorable
10      finding on that issue.

11  Fed. R. Civ. P. 50(a)(1).  The standard for judgment as a matter

12  of law mirrors that for granting summary judgment.  Reeves v.

13  Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-50 (2000).

14  "[I]n entertaining a motion for judgment as a matter of law, the

15  court . . . may not make credibility determinations or weigh the

16  evidence."  Id. at 149.  Rather, the court "must view the evidence

17  in the light most favorable to the nonmoving party . . . and draw

18  all reasonable inferences in that party's favor."  Josephs v. Pac.

19  Bell, 443 F.3d 1050, 1062 (9th Cir. 2006).  "A district court can

20  grant a Rule 50(a) motion for judgment as a matter of law only if

21  there is no legally sufficient basis for a reasonable jury to find

22  _____

23      [2] In its motion, Abbott states that it seeks to renew its
    Rule 50(b) motion.  However, Rule 50(b) provides that, if a trial
24  court does not rule on a party's Rule 50(a) motion for judgment as
    a matter of law and instead submits the action to the jury, the
25  moving party may make a renewed motion for judgment as a matter of
    law to be filed within twenty-eight of entry of judgment.  Here,
26  the Ninth Circuit has vacated the jury's verdict and the
    subsequent judgment.  Accordingly, the Court will interpret
27  Abbott's motion as a renewal of its Rule 50(a) motion for judgment
    of law prior to submission of the action to the jury.
28

                                    4

United States District Court
For the Northern District of California

1  for that party on that issue." Krechman v. Cnty. of Riverside,

2  723 F.3d 1104, 1109 (9th Cir. 2013) (internal quotation marks

3  omitted).

4                              DISCUSSION

5  I.    Propriety of Abbott's Rule 50 Motion

6        As an initial matter, GSK argues that Abbott's motion for

7  judgment as a matter of law is procedurally improper.  GSK first

8  argues that a Rule 50(b) motion must be filed within twenty-eight

9  days after the entry of judgment and Abbott's motion is therefore

10  untimely.  However, as discussed above, the Court construes

11  Abbott's motion to be a Rule 50(a) motion.

12       Citing Ayala v. Wong, 756 F.3d 656 (9th Cir. 2014), GSK next

13  argues that it is entitled to a new trial on all remaining claims

14  because the previous trial was tainted by the structural error of

15  the Batson violation.  Abbott counters that other cases, such as

16  Montiel v. Los Angeles, 2 F.3d 335 (9th Cir. 1993), permit it to

17  renew its Rule 50 motion.  The Court finds that none of the cases

18  cited by the parties is controlling.  Ayala considered whether

19  structural error occurred in the context of a petition for a writ

20  of habeas corpus where defense counsel was excluded from Batson

21  proceedings.  756 F.3d at 673.  Montiel did not address the

22  question of whether a new motion for judgment as a matter of law

23  can be made on remand when a Batson violation is found.  Rather,

24  it found a Batson violation and, in an unrelated discussion,

25  reversed in part the district court's findings on a motion for

26  judgment as a matter of law and remanded that motion to the

27  district court for the consideration of other issues.  2 F.3d at

28  343.  However, the Court need not decide whether this motion is

5

**United States District Court**
For the Northern District of California

1  properly made at this time, because it denies Abbott's motion on

2  all grounds.

3  II.   Antitrust Claim

4       Abbott argues that GSK's antitrust claim fails as a matter of

5  law.   Section 2 of the Sherman Act "makes it unlawful to

6  monopolize, or attempt to monopolize, . . .   any part of the trade

7  or commerce among the several States."   <u>Pac Bell Tel. Co. v.</u>

8  <u>linkLine Commmuns., Inc.</u>, 555 U.S. 438, 448 (2009).   To establish

9  liability for a monopolization claim, GSK must prove "(1) the

10 possession of monopoly power in the relevant market and (2) the

11 willful acquisition or maintenance of that power as distinguished

12 from growth or development as a consequence of a superior product,

13 business acumen, or historic accident."   <u>Eastman Kodak Co. v.</u>

14 <u>Image Tech. Servs., Inc.</u>, 504 U.S. 451, 480 (1992).   Abbott argues

15 that GSK failed to present a legally sufficient evidentiary basis

16 for a reasonable jury to find for GSK as to either element of a

17 monopolization claim.   Moreover, Abbott argues that GSK failed to

18 rebut its evidence of a legitimate business justification for its

19 decision to increase the price of Norvir.

20      A.   Monopoly Power

21      Abbott first argues that GSK has failed to demonstrate that

22 Abbott had monopoly power in the market in which Kaletra competes.

23 Abbott contends that (1) GSK failed to prove that it properly

24 defined the relevant market; (2) GSK failed to prove that Abbott

25 maintained a dominant market share; and (3) GSK failed to prove

26 sufficient barriers to entry or expansion in the market.

27

28

United States District Court
For the Northern District of California

1             1.    Relevant Market

2        Abbott argues that GSK's antitrust claim fails because it

3  relies upon an unduly narrowly defined market.  "A relevant

4  market, for antitrust purposes, can be broadly characterized in

5  terms of the cross-elasticity of demand for or reasonable

6  interchangeability of a given set of products or services."  Coal.

7  for ICANN Transparency, Inc. v. VeriSign, Inc., 611 F.3d 495, 507

8  (9th Cir. 2010) (citations and internal quotation marks omitted).

9  Courts "consider whether the product and its substitutes are

10 reasonably interchangeable by consumers for the same purpose, as

11 well as industry or public recognition of the submarket as a

12 separate economic entity, the product's peculiar characteristics

13 and uses, unique production facilities, distinct customers,

14 distinct prices, sensitivity to price changes, and specialized

15 vendors."  Id. (citations omitted).  The Ninth Circuit has held

16 that "what constitutes a relevant market is a factual

17 determination for the jury."  Image Tech. Servs. v. Eastman Kodak

18 Co., 125 F.3d 1195, 1203 (1997).

19       At trial, GSK's theory relied upon a "highly effective PI

20 market," which it defined as Kaletra and two other drugs, Lexiva

21 and Reyataz, when boosted by Norvir.  GSK's expert, Dr. Roger

22 Noll, testified that these drugs constitute the relevant market

23 because they are "close therapeutic substitutes" and "economic

24 substitutes."  Tr. Tran. 1553:12-1554:12.  Abbott criticizes Dr.

25 Noll's testimony on several grounds and simply states that "no

26 reasonable jury could have accepted this contrived definition--let

27 alone based on the testimony of GSK's Dr. Noll, who admitted that

28 he has no medical or pharmacological expertise, has no experience

in drug pricing or drug competition, and did not consult with

independent physicians to inform his analysis."  Docket No. 574 at

10 (citations omitted).  However, when considering a JMOL, the

Court may not make credibility determinations and must view the

evidence in the light most favorable to the non-moving party.

Abbott also criticizes GSK's definition of the relevant

market because it contends other drugs are interchangeable with

Kaletra.  However, GSK's medical expert, Dr. Javeed Siddiqui,

testified as to the lack of interchangeability between the other

drugs and Kaletra.

Because the Court finds that GSK presented sufficient

evidence for a reasonable jury to find that there was adequate

interchangeability between the products included in its definition

of the relevant market, it need not reach Abbott's arguments with

respect to cross-elasticity.  The Court denies Abbott's motion for

judgment as a matter of law on this ground.

2.   Dominant Market Share and Barriers to Entry

Relying on United States v. Syufy Enterprises, 903 F.2d 659

(9th Cir. 1990), Abbott argues that evidence of its market share

decline from eighty-one percent to below fifty percent over a

three-year period establishes, as a matter of law, that it did not

possess monopoly power over the market.  In Syufy, the Ninth

Circuit concluded that, even though a firm had a large market

share, its inability to maintain that share demonstrated a lack of

monopoly power.  Id. at 666.  As this Court noted in its order on

the summary judgment motions, Syufy is, at least in part,

distinguishable from the instant case because there were no

substantial barriers to entry in that case.  Id. at 666-67.  In

United States District Court
For the Northern District of California

1   this case, GSK presented evidence of significant barriers to entry

2   including obtaining patents, investing in research and

3   development, obtaining FDA approval and depending on Abbott's

4   control over Norvir.  Tr. Tran. 1583:15-1585:7.  Abbott further

5   argues that the Ninth Circuit has "expressed doubt that 50% share

6   of the market is sufficient to establish monopoly power per se."

7   Greyhound Computer Corp., Inc. v. IBM Corp., 559 F.2d 488, 496

8   n.18 (9th Cir. 1977).  However, as discussed above, GSK presented

9   other evidence of monopoly power, so there is no need for a per se

10  finding.

11      Finally, Abbott cites Rebel Oil Co., Inc. v. Atlantic

12  Richfield Co. for the proposition that, where rivals "can quickly

13  respond to any predator's attempt to raise prices above

14  competitive levels, the predator will suffer an immediate loss of

15  market share," indicating that "the predator does not have market

16  power."  51 F.3d 1421, 1441 (9th Cir. 1995).  However, Rebel Oil

17  is factually distinguishable from the instant case.  In Rebel Oil,

18  the Ninth Circuit addressed a claim of predatory pricing among gas

19  stations.  Predatory pricing occurs when a defendant engages in a

20  "price war" by "set[ting] prices below its marginal cost hoping to

21  eliminate rivals and increase its share of the market" then

22  charges "supracompetitive prices--prices above competitive

23  levels."  Id. at 1433-34.  In such situations, competitors'

24  ability quickly to expand their output will undercut the

25  defendant's ability to "recoup the losses suffered during the

26  price war" and undermines a finding of predatory pricing.  Id. at

27  1434.  In contrast to the gas stations in Rebel Oil, where other

28  companies could expand their operations to build new stations to

9

United States District Court
For the Northern District of California

1   draw business away from the defendant, GSK and Abbott's other

2   competitors had to buy Norvir to boost their products.  Therefore,

3   GSK and Abbott's other competitors could not simply increase their

4   production to draw business away from Abbott when Abbott increased

5   the price of Norvir.

6       Accordingly, the Court denies Abbott's motion for judgment as

7   a matter of law on this ground.

8       B.   Anticompetitive Conduct

9       As stated above, in addition to demonstrating monopoly power,

10  GSK must establish anticompetitive conduct.  Abbott argues that

11  GSK failed to present sufficient evidence to permit a reasonable

12  jury to find anticompetitive conduct on either of its theories,

13  (1) a violation of a duty to deal, or (2) predatory pricing

14  through bundled-product discounting.

15      1.   Duty to Deal

16      "As a general rule, businesses are free to choose the parties

17  with whom they will deal, as well as the prices, terms, and

18  conditions of that dealing."  linkLine, 555 U.S. at 448.  However,

19  there are "limited circumstances in which a firm's unilateral

20  refusal to deal with its rivals can give rise to antitrust

21  liability."  Id.  (citing Aspen Skiing Co. v. Aspen Highlands

22  Skiing Corp., 472 U.S. 585 (1985)).  A refusal to deal might take

23  the form of (1) "the unilateral termination of a voluntary and

24  profitable course of dealing;" (2) "an offer to deal with a

25  competitor only on unreasonable terms and conditions," which could

26  "amount to a practical refusal to deal;" and (3) a refusal to

27  provide competitors with "products that were already sold in a

28  retail market to other customers."  MetroNet Services Corp. v.

**United States District Court**
For the Northern District of California

1    Qwest Corp., 383 F.3d 1124, 1132-34 (9th Cir. 2004).  "[A]

2    willingness to forsake short-term profits to achieve an

3    anticompetitive end" is evidence of an anticompetitive refusal to

4    deal.  Id. at 1131 (quoting Verizon Communs., Inc. v. Law Offices

5    of Curtis V. Trinko, LLP, 540 U.S. 398, 409 (2004)).  Accordingly,

6    a decision to alter a course of dealing together with evidence of

7    "anticompetitive malice" is evidence of a refusal to deal.  Id. at

8    1132.

9         At trial, GSK presented evidence that, prior to the 2003

10   price increase, Abbott had a pattern of licensing Norvir and

11   increasing the price only at the rate of inflation.  In contrast,

12   the December 2003 400-percent price increase caused the cost of

13   GSK's boosted Lexiva-based therapy to increase by seventy-one

14   percent.  In addition, GSK presented evidence of "anticompetitive

15   malice" including a presentation recommending delaying the

16   announcement of the price increase to be "simultaneous with" the

17   launch of Lexiva and calling the plan a "clever creative way to

18   make [GSK] look bad."  P-0081.  GSK also presented an email sent

19   shortly after the price increase, from the President of Abbott's

20   United States Pharmaceutical Products Division to a group of

21   individuals responsible for the price increase, stating,

22   "Congratulations to the A Team.  You folks are fantastic.  It's

23   too bad you're giving a lump of coal to BMS and GSK for the

24   holidays, but such is life."  P-0245-0002.  GSK introduced another

25   email from the same individual discussing a "RTV supply constraint

26   program."  P-0157-0003.  This evidence, combined with the sudden

27   price increase, was sufficient to allow a reasonable jury to find

28

United States District Court
For the Northern District of California

1    in GSK's favor on its duty to deal claim.[3]   Accordingly, the Court

2    denies Abbott's motion for judgment as a matter of law on this

3    ground.

4              2.    Bundled Discounting

5         Abbott next argues that it is entitled to judgment as a

6    matter of law on GSK's bundled discounting claim.  "Bundling is

7    the practice of offering, for a single price, two or more goods or

8    services that could be sold separately.  A bundled discount occurs

9    when a firm sells a bundle of goods or services for a lower price

10   than the seller charges for the goods or services purchased

11   individually."  Cascade Health Solutions v. PeaceHealth, 515 F.3d

12   883, 894 (9th Cir. 2008).  "[B]undled discounts, while potentially

13   procompetitive by offering bargains to consumers, can also pose

14   the threat of anticompetitive impact by excluding less diversified

15   but more efficient producers."  Id. at 897.  Under Cascade, a

16   bundled product can be found to cause an antitrust violation if

17   the competitive component of the bundled product is deemed, under

18   the "discount attribution standard," to be sold below cost, even

19   though the bundle as a whole is priced above cost.  515 F.3d at

20   906.

21        At trial, GSK's economic expert, Dr. Keith Leffler, opined

22   that Kaletra is a bundled product of lopinavir and Norvir.  He

23

24        [3] Abbott asserts that, in order to prevail on its duty to
     deal claim, GSK must also establish that Abbott made a short-term
25   profit sacrifice as a result of the price increase.  However, as
     GSK points out, the Court has previously found that "short-term
26   sacrifice is not an element of a Section 2 claim, but rather a
     means to show anticompetitive motives."  Docket No. 195 at 16.
27   Here, there is other evidence of anticompetitive malice.

28

                                  12

United States District Court
For the Northern District of California

further opined that Abbott sold the lopinavir component of Kaletra

below its average variable cost.  Abbott criticizes Dr. Leffler's

methodology on two grounds.  First, it asserts that Dr. Leffler

improperly excluded Abbott's sales of lopinavir to public entities

when calculating the imputed price of the drug.[4]  Second, it

asserts that Dr. Leffler improperly included fixed costs in his

calculations to increase the average variable cost.  However, as

GSK points out, Dr. Leffler explained his reasons for limiting his

analysis to private sector pricing and for the inclusion of

certain costs in his average variable cost analysis.  See, e.g.,

Tr. Tran. 1290:19-1291:14.  Moreover, Dr. Leffler's testimony was

subject to cross-examination and Abbott had the opportunity to

present the testimony of its own expert, Dr. Richard Gilbert.  As

discussed above, when considering a JMOL, the Court may not make

credibility determinations and must view the evidence in the light

most favorable to the non-moving party.  Accordingly, the Court

denies Abbott's motion for judgment as a matter of law on this

ground.

     C.    Legitimate Business Justification

    Abbott argues that GSK failed to present evidence to rebut

Abbott's legitimate business justification of profiting from its

intellectual property rights in Norvir.  "When a legitimate

business justification supports a monopolist's exclusionary

conduct, that conduct does not violate § 2 of the Sherman Act."

---

[4] Abbott's price increase on Norvir applied only to consumers
with private insurance; those purchasing Norvir through public
programs, such as Medicare, were not subject to the increase
because of government pricing rules.

13

**United States District Court**
For the Northern District of California

1  Image Tech. Servs., 125 F.3d at 1212.  In the Ninth Circuit, a

2  defendant's "desire to profit from its intellectual property

3  rights justifies its conduct, and the jury should presume that

4  this justification is legitimately procompetitive."  Id. at 1219.

5  However, the presumption is rebuttable.  Whether valid business

6  reasons motivated a monopolist's conduct is a question of fact.

7  High Tech. Careers v. San Jose Mercury News, 996 F.2d 987, 990

8  (9th Cir. 1993) (citing Eastman Kodak Co., 504 U.S. at 483-84;

9  Aspen Skiing Co., 472 U.S. at 604-05).

10        As discussed above, GSK presented evidence that the price

11  increase was timed to disrupt the launch of Lexiva.  In addition,

12  GSK presented other evidence that, in response to concerns that

13  competitors were taking market share from Kaletra, Abbott was

14  considering either pulling Norvir from the market or implementing

15  the price increase at issue in this case.  Based on this evidence,

16  a reasonable jury could find that Abbott's purported legitimate

17  business justification was pretextual.  Accordingly, the Court

18  denies Abbott's motion for judgment as a matter of law on this

19  ground.

20  III. UDTPA Claim

21        Abbott argues that it is entitled to judgment as a matter of

22  law on GSK's UDTPA claim to the extent it is based on a breach of

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

1    contract.[5]  Abbott's argument is based on <u>Bumpers v. Community</u>

2    <u>Bank of Northern Virginia</u>, a recent case in which the North

3    Carolina Supreme Court held that the UDTPA "has long encompassed

4    conduct tantamount to fraud, which requires reliance."  367 N.C.

5    81, 82 (2013).  Abbott argues that GSK's UDTPA claim must fail

6    because GSK failed to present evidence of reliance on a

7    misrepresentation.  However, as GSK pointed out at the hearing,

8    "in assessing whether particular conduct violates the UDTPA,

9    either unfairness or deception can bring conduct within the

10   purview of the statute; an act need not be both unfair and

11   deceptive."  <u>South Atlantic Ltd. P'Ship of Tenn. v. Riese</u>, 284

12   F.3d 518, 535 (4th Cir. 2002) (internal quotation marks omitted);

13   <u>see also</u> <u>Rucker v. Huffman</u>, 99 N.C. App. 137, 141 (1990).  As

14   Abbott concedes, <u>Bumpers</u> is applicable to cases in which "the

15   allegations address misrepresentations."  Docket No. 574 at 24.

16   To the extent GSK's UDTPA claim is based on a breach of contract,

17   it is based, at least in part, on unfair conduct rather than

18   misrepresentations or deceptive conduct.  Accordingly, the Court

19   denies Abbott's motion for judgment as a matter of law on GSK's

20   UDTPA claim.

21

22

23   _____

24       [5] GSK notes and Abbott does not dispute that, if the Court
     denies Abbott's motion for judgment as a matter of law on GSK's
25   antitrust claims, Abbott's motion for judgment as a matter of law
     on its UDTPA claim must likewise be denied because antitrust
26   liability is sufficient to establish UDTPA liability.  <u>See</u> Docket
     No. 325 at 44 n.10.  Nonetheless, Abbott seeks judgment as a
27   matter of law on GSK's UDTPA claim to the extent it is based on a
     breach of contract.
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONCLUSION

For the foregoing reasons, the Court DENIES Abbott's motion for judgment as a matter of law.

IT IS SO ORDERED.

Dated:   November 24, 2014

CLAUDIA WILKEN
United States District Judge

United States District Court
For the Northern District of California

16