# Exhibit C

**GSK'S PROPOSED MODIFICATIONS TO PRELIMINARY AND FINAL JURY INSTRUCTIONS, ABBOTT'S OBJECTIONS, AND GSK'S RESPONSES IN SUPPORT**

## GSK's Proposed Changes to the Preliminary Jury Instructions

### PARTIES

Abbott Laboratories is the Defendant in this case.  It makes drugs called Norvir and Kaletra to treat human immunodeficiency virus (HIV) infection.  ~~This case is brought by various Plaintiffs.~~

~~First is~~ GlaxoSmithKline, also known as GSK, is the Plaintiff in this case.  GSK is a pharmaceutical company that makes Lexiva, a drug that competes with Abbott's drug Kaletra.

~~Second is a group of Plaintiffs comprised of Meijer, Inc.; Meijer Distribution, Inc.; Rochester Drug Co-Operative, Inc.; and Louisiana Wholesale Drug Company, Inc.  These Plaintiffs are wholesalers and pharmacies that purchased the drugs Kaletra and Norvir directly from Abbott.  They bring their lawsuit on behalf of a class of other wholesalers and pharmacies that purchased Kaletra and Norvir directly from Abbott.  This group of Plaintiffs will be referred to as Customer Plaintiffs.~~

~~Third is a group of Plaintiffs consisting of individual pharmacies:  Safeway; Walgreen; Kroger; New Albertson's; American Sales; HEB Grocery; Rite Aid Corporation; Rite Aid Headquarters; JCG (PJC) USA; Maxi Drug, which does business as Brooks Pharmacy; Eckerd; CVS; and Caremark.  These pharmacies bought Kaletra and Norvir from wholesalers that bought the drugs directly from Abbott.  This group of Plaintiffs will also be referred to as Customer Plaintiffs.~~

~~You must decide the case as to each Plaintiff separately. Unless otherwise stated, the instructions apply to all parties.~~

1

2 **SUMMARY OF DISPUTE AND THE PARTIES' CLAIMS AND DEFENSES**

3 This case involves a dispute over brand-name prescription drugs, known as protease

4 inhibitors, which are used to fight HIV.  Protease inhibitors are also known as PIs.  These drugs

5 work by preventing HIV cells from reproducing.

6 In 1996, Abbott introduced Norvir, a PI used to treat HIV.  Norvir's active ingredient is

7 called ritonavir.  Around the time of Norvir's launch, it was discovered that, when taken in small

8 quantities with another PI, Norvir would "boost" the effectiveness of the other PI.  Because of this

9 "boosting" property, Norvir is known as a booster.  The other PI is known as the "boosted" PI.

10 In 2000, Abbott introduced Kaletra, which is a drug that contains two active ingredients:

11 lopinavir and ritonavir, which is the active ingredient in Norvir.  Ritonavir is used to boost the

12 effects of lopinavir.  Kaletra is known as a "boosted" PI.

13 Late in 2003, Bristol-Myers Squibb and GSK introduced new PI drugs that were designed

14 to be boosted by Norvir.  As I mentioned earlier, GSK's drug is called Lexiva.  These new boosted

15 PI drugs competed with Abbott's Kaletra. Before launching Lexiva, GSK signed a contract with

16 Abbott which allowed GSK to co-promote and co-market Lexiva with Abbott's Norvir.

17 On December 3, 2003, Abbott raised the wholesale price of Norvir by 400 percent, while

18 keeping the price of Kaletra steady.

19 GSK ~~and the Customer Plaintiffs~~ claim~~s~~ that Abbott's conduct violated federal antitrust

20 laws ~~and damaged them.  GSK and the Customer Plaintiffs claim that Abbott~~ by monopoliz~~ed~~ing

21 or attempt~~ing~~ed to monopolize the market in which Kaletra competes and thereby damaged GSK.

22 GSK also claims that Abbott breached the implied covenant of good faith and fair dealing

23 in their contract and damaged GSK.

24 ~~Plaintiffs~~ GSK ha~~s~~ve the burden of proving these claims.  Abbott denies all of

25 ~~Plaintiffs~~GSK's claims.

26

27

28

**ANTITRUST CLAIMS - PURPOSE OF SHERMAN ACT**

I will now discuss the elements of ~~Plaintiffs~~GSK's claims. ~~Plaintiffs~~ GSK first alleges that Abbott violated a United States law called the Sherman Act by willfully maintaining a monopoly or attempting to maintain a monopoly. The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace. The Sherman Act rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

**ANTITRUST CLAIMS - ELEMENTS OF CLAIM OF ACTUAL MONOPOLIZATION**

~~Plaintiffs allege~~GSK alleges that ~~they~~it w~~ere~~as injured by Abbott's unlawful actual monopolization of the market in which Kaletra competes.  To prevail on this claim, ~~Plaintiffs~~ GSK must prove each of the following elements by a preponderance of the evidence:

First, that the alleged market is a valid economic market;

Second, that Abbott possessed monopoly power in that market during the time period in which the violation allegedly occurred;

Third, that Abbott "willfully" maintained monopoly power in that market by engaging in anticompetitive conduct;

Fourth, that ~~Plaintiffs~~ GSK w~~ere~~as injured in ~~their~~its business or property because of Abbott's anticompetitive conduct; and

Fifth, that Abbott's conduct occurred in or affected interstate commerce.  The parties agree that Abbott's conduct occurred in or affected interstate commerce.

If you find that ~~Plaintiffs have~~GSK has failed to prove any of these elements, then you must find for Abbott and against ~~Plaintiffs~~ GSK on this claim.  If you find that ~~Plaintiffs~~ GSK ha~~ve~~s proved each of these elements by a preponderance of the evidence, then you must find for ~~Plaintiffs~~ GSK and against Abbott on this claim.

## ACTUAL MONOPOLIZATION CLAIM - RELEVANT MARKET

The first element ~~Plaintiffs~~ GSK must prove by a preponderance of the evidence is a relevant market.  Defining the relevant market is essential because you are required to make a judgment about whether Abbott had monopoly power in a properly defined economic market.  To make this judgment, you must be able to determine what, if any, economic forces restrained Abbott's freedom to set prices for or restrict the output of Kaletra.  The most likely and most important restraining force is actual and potential competition from other firms and their products. This includes all firms and products that acted as restraints on Abbott's power to set prices as it pleased.  All the firms and products that exerted this restraining force are within what is called the relevant market.

There are two aspects you must consider in determining whether ~~Plaintiffs~~ GSK ha~~ve~~s met ~~their~~ its burden to prove the relevant market by a preponderance of the evidence.  The first is the relevant product market; the second is the relevant geographic market.  The parties agree that, for the purposes of this case, the relevant geographic market is the United States.

The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other.  In other words, the relevant product market includes the products that consumers believe are reasonably interchangeable or reasonable substitutes for each other.  This is a practical test with reference to actual behavior of buyers and marketing efforts of sellers.  Products need not be identical or precisely interchangeable as long as they are reasonable substitutes. Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material -¬such as aluminum foil, cellophane, or even plastic containers -- to be reasonable alternatives, then all those products would be in the same relevant product market.

To determine whether products are reasonable substitutes for each other, you should consider whether a small but significant permanent increase in the price of one product would result in a substantial number of consumers switching from that product to another.  Generally speaking, a small but significant permanent increase in price is approximately a five percent increase in price not due to external cost factors, but you may conclude in this case that some other

percentage is more applicable to the product at issue. If you find that such switching would occur, then you may conclude that the products are in the same product market.

In evaluating whether various products are reasonably interchangeable or are reasonable substitutes for each other, you may also consider: (1) consumers' views on whether the products are interchangeable; (2) the relationship between the price of one product and sales of another; (3) the perceptions of either industry or the public as to whether the products are in separate markets; (4) the views of the producers in the market about who their respective competitors are; and (5) the existence or absence of different customer groups or distribution channels.

As noted above, ~~Plaintiffs~~ GSK contend~~s~~ that the relevant product market is the market in which Kaletra competes, which they define to be the market for all protease inhibitors (PIs) boosted with Abbott's drug Norvir or for a subset of those drugs. By contrast, Abbott asserts that ~~Plaintiffs~~ GSK ha~~ve~~s failed to allege the proper relevant product market and that ~~Plaintiffs~~'-GSK's reasons for defining the market as ~~they~~ it ha~~ve~~s are invalid.

If you find that ~~Plaintiffs~~ GSK ha~~ve~~s proved a relevant product market comprised of products that are reasonably interchangeable, then you should continue to evaluate the remainder of ~~Plaintiffs~~'-GSK's claim. However, if you find that ~~Plaintiffs~~ GSK ha~~ve~~s failed to prove such a market, then you must find in Abbott's favor on this claim.

**ACTUAL MONOPOLIZATION CLAIM - MONOPOLY POWER - DEFINITION**

The second element ~~Plaintiffs~~ GSK must prove by a preponderance of the evidence is monopoly power.  Monopoly power is the power to control prices and exclude or handicap competition in a relevant antitrust market.  More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time.  However, monopoly power, in and of itself, is not unlawful.

~~There are two ways to show that a firm has monopoly power: through direct evidence and through circumstantial evidence.~~

~~**ACTUAL MONOPOLIZATION CLAIM - DIRECT EVIDENCE OF MONOPOLY POWER**~~

~~Plaintiffs may prove directly that Abbott had monopoly power by demonstrating that Abbott had sufficient power to inflict injury to competition and that it actually exercised that power.  A firm is a monopolist if it can profitably raise or maintain prices substantially above the competitive level for a significant period of time.~~

~~Plaintiffs have the burden of proving that Abbott had the ability to raise or maintain the prices that it charged for drugs in the relevant market above competitive levels.  Plaintiffs must prove that Abbott had the power to do so by itself -- that is, without the assistance of, and despite competition from, any existing or potential competitors.~~

~~Plaintiffs must also prove that Abbott had the power to maintain prices above a competitive level for a significant period of time.~~

~~Similarly, Plaintiffs must prove that Abbott had the ability to exclude or handicap competition.~~

~~**ACTUAL MONOPOLIZATION CLAIM - INDIRECT EVIDENCE OF MONOPOLY POWER**~~

~~Evidence of the structure of the market can show indirectly that Abbott had monopoly power~~ GSK may show that Abbott had monopoly power through indirect evidence.  Factors you may consider are: (A) Abbott's market share, (B) market share trends, (C) barriers to entry or expansion and (D) the number and size of Abbott's competitors.  If this evidence establishes that

1   Abbott had the power to control prices and exclude or handicap competition in the relevant

2   antitrust market, then you may conclude that Abbott had monopoly power in the market.

3   ~~INDIRECT EVIDENCE OF MONOPOLY POWER –~~ **(A) MARKET SHARE**

4       The first factor that you may consider as indirect evidence of monopoly power is Abbott's

5   market share.  You will hear evidence about Abbott's market share, and you should determine

6   Abbott's market share as a percentage of total industry sales by prescription.

7       A market share above fifty percent may be sufficient to support an inference that Abbott

8   had monopoly power.  The likelihood that a company has monopoly power is stronger the higher

9   that company's share is above fifty percent.

10      A market share below fifty percent is ordinarily not sufficient to support a conclusion that

11  a company has monopoly power.  However, if you find that the other evidence demonstrates that

12  Abbott, in fact, had monopoly power despite having a market share below fifty percent, you may

13  conclude that Abbott had monopoly power.

14  ~~INDIRECT EVIDENCE OF MONOPOLY POWER –~~ **(B) MARKET SHARE TRENDS**

15      The trend in Abbott's market share is something you may consider as indirect evidence of

16  monopoly power.  An increasing market share may strengthen an inference that Abbott had

17  monopoly power, particularly if Abbott had a high market share, while a decreasing share might

18  show that Abbott did not have monopoly power.  A declining market share, however, does not

19  foreclose a finding of monopoly power.

20  ~~INDIRECT EVIDENCE OF MONOPOLY POWER –~~ **(C) BARRIERS TO ENTRY OF**

21                                          **EXPANSION**

22      You may also consider as indirect evidence of monopoly power the extent to which there

23  were barriers to entry or barriers to expansion in the relevant market.

24      Barriers to entry make it difficult for new competitors to enter the relevant market in a

25  meaningful and timely way.  Barriers to entry might include intellectual property rights (such as

26  patents), specialized marketing practices, and the reputation of the companies already participating

27  in the market or the brand name recognition of their products.

28

1    Barriers to expansion prevent other companies who are already in the market from

2    increasing their output and selling more of their product.

3    Evidence of low or no barriers to entry or expansion during the relevant period would be

4    evidence that Abbott did not have monopoly power, regardless of Abbott's market share, because

5    new competitors could enter the market or existing competitors could expand their sales if Abbott

6    attempted to raise the price of its drug Kaletra substantially above competitive levels for a

7    substantial period of time.  By contrast, evidence of high barriers to entry and high barriers to

8    expansion along with high market share, during the relevant period, may support an inference that

9    Abbott had monopoly power.

10    The history of entry and exit of competitors in the relevant market may be helpful to

11    consider.  Entry of new competitors or expansion of existing competitors may be evidence that

12    Abbott lacked monopoly power.  On the other hand, departures of competitors from the market, or

13    the failure of competitors to enter the market, particularly if prices and profit margins are

14    relatively high, may support an inference that Abbott had monopoly power.

15    ~~INDIRECT EVIDENCE OF MONOPOLY POWER~~ (D) NUMBER AND SIZE OF

16                                       **COMPETITORS**

17    You may consider whether Abbott's competitors were capable of effectively competing.

18    In other words, you should consider whether the financial strength, market shares and number of

19    competitors acted as a check on Abbott's ability to price its products.  If Abbott's competitors

20    were vigorous or had large or increasing market shares, this may be evidence that Abbott lacked

21    monopoly power.  On the other hand, if you determine that Abbott's competitors were weak or

22    had small or declining market shares, this may support an inference that Abbott had monopoly

23    power.

24                              **MONOPOLY POWER - CONCLUSION**

25    If you find, by direct or indirect evidence, that Abbott had monopoly power in the relevant

26    market, then you must consider the remaining elements of this claim.  If you find that Abbott did

27    not have monopoly power, then you must find for Abbott and against ~~Plaintiffs~~ GSK on this claim.

28

**ACTUAL MONOPOLIZATION CLAIM - ANTICOMPETITIVE CONDUCT -**

**GENERALLY**

As I mentioned, the third element of an actual monopolization claim, that ~~Plaintiffs~~ GSK must prove by a preponderance of the evidence, is that Abbott willfully maintained its monopoly power by engaging in anticompetitive conduct.

In considering whether Abbott's conduct was anticompetitive, you must draw a distinction between practices which tend to exclude or restrict competition on the one hand and the success of a business which reflects only a superior product, a well-run business, or luck, on the other. Put another way, anticompetitive conduct refers to practices that unreasonably or unnecessarily impede fair competition; that is, conduct that impairs the efforts of others to compete for customers in an unnecessarily restrictive way. Such conduct does not refer to ordinary means of competition, like offering better products or services, exercising superior skill or business judgment, utilizing more efficient technology, or exercising natural competitive advantages.

Here, in support of their claim that Abbott unlawfully monopolized the market in which they allege Kaletra competes, ~~Plaintiffs~~ GSK argues that Abbott engaged in two types of anticompetitive conduct: (A) unlawful bundled discounting; and (B) refusing to cooperate with its competitors.

**ANTICOMPETITIVE CONDUCT - REFUSAL TO DEAL - INTRODUCTION**

A corporation's refusal to deal with its business rivals may constitute anticompetitive conduct under certain circumstances.  A company that possesses monopoly power is generally not under a duty to deal with its business rivals if valid business reasons exist for that refusal to deal. In other words, if there were legitimate business reasons for the refusal to deal, then the defendant, even if it is found to possess monopoly power in a relevant market, has not violated the law.

However, ~~such~~ a practical refusal to deal with competitors may constitute anticompetitive conduct if the refusal is motivated by anticompetitive malice or is contrary to the short-run best interest of a defendant, and if it makes sense for the defendant only because it harms competitors and helps the defendant maintain monopoly power in the long run.  A short-term profit sacrifice, however, is not required for you to find anticompetitive conduct.

### ATTEMPTED MONOPOLIZATION CLAIM - ELEMENTS

~~Plaintiffs~~ GSK also alleges that it ~~they~~ ~~was~~ere injured by Abbott's unlawful attempt to monopolize. To prevail on ~~their~~ the claim of attempted monopolization, ~~Plaintiffs~~ GSK must prove each of the following elements by a preponderance of the evidence:

First, that Abbott engaged in anticompetitive conduct.

Second, that Abbott had a specific intent to achieve monopoly power in a relevant market;

Third, that there was a dangerous probability that Abbott would achieve its goal of monopoly power in the relevant market;

Fourth, that ~~Plaintiffs~~ GSK ~~was~~were injured in ~~their~~ its business or property by Abbott's anticompetitive conduct; and

Fifth, that Abbott's conduct occurred in or affected interstate commerce. The parties agree that Abbott's conduct occurred in or affected interstate commerce.

~~Plaintiffs~~ GSK alleges that the relevant market for this claim is the same market as the market relevant to their claim of actual monopolization. As I have said earlier, ~~they~~ GSK defines this to be the market for all protease inhibitors (PIs) boosted with Abbott's drug Norvir or for a subset of those drugs.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Abbott and against ~~Plaintiffs~~ GSK on their claim of attempted monopolization. If you find that the evidence is sufficient to prove all five elements as to Abbott, then you must find for ~~Plaintiffs~~ GSK and against Abbott on ~~Plaintiffs~~'GSK's claim of attempted monopolization.

**ATTEMPTED MONOPOLIZATION CLAIM - ANTICOMPETITIVE CONDUCT**

The first element ~~Plaintiffs~~ GSK must prove by a preponderance of the evidence to prove its attempted monopolization claim is that Abbott engaged in anticompetitive conduct.  ~~Plaintiffs~~ GSK alleges that, to attempt to monopolize the market in which Kaletra competes, Abbott (A) engaged in unlawful bundled discounting and (B)  unlawfully refused to deal with its competitors.  This is the same conduct that Plaintiffs allege with respect to their actual monopolization claim.

## ATTEMPTED MONOPOLIZATION CLAIM - SPECIFIC INTENT

The second element that ~~Plaintiffs~~ GSK must prove to prove ~~its~~their attempted monopolization claim is that Abbott had a specific intent to monopolize the market in which ~~they~~ GSK alleges that Kaletra competes.  In other words, you must decide if the evidence shows that Abbott acted with the conscious aim of maintaining the power to control prices and to exclude or handicap competition in the relevant market.

There are several ways in which ~~Plaintiffs~~ GSK may prove that Abbott had the specific intent to monopolize.  ~~They~~ GSK may present evidence of direct statements of Abbott's intent to obtain a monopoly in the relevant market.  Such proof of specific intent may be established by documents prepared by responsible officers or employees of Abbott at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of Abbott.  You must be careful, however, to distinguish between Abbott's intent to compete aggressively (which is lawful), which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Even if you decide that the evidence does not prove directly that Abbott actually intended to obtain a monopoly, specific intent may be inferred from what Abbott did.  For example, if the evidence shows that the natural and probable consequence of Abbott's conduct in the relevant market was to give Abbott control over prices and to exclude or handicap competition, and that this was plainly foreseeable by Abbott, then you may (but are not required to) infer that Abbott specifically intended to maintain monopoly power.

**ATTEMPTED MONOPOLIZATION CLAIM - DANGEROUS PROBABILITY OF SUCCESS**

The next element that ~~Plaintiffs~~ GSK must prove to prove ~~their~~ its attempted monopolization claim is that there was a dangerous probability that Abbott would succeed in achieving monopoly power in the market in which Kaletra competes if it continued to engage in the same or similar allegedly anticompetitive conduct.  As I instructed you earlier, monopoly power is the power to control prices and exclude competition in a relevant antitrust market.

In determining whether there was a dangerous probability that Abbott would acquire the ability to control prices in the relevant market, you should consider the factors included in the "ACTUAL MONOPOLIZATION CLAIM - MONOPOLY POWER - DEFINITION~~ACTUAL MONOPOLIZATION CLAIM - DIRECT EVIDENCE OF MONOPOLY POWER~~" instruction, which I gave earlier.  A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Abbott would ultimately acquire monopoly power.

**MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION CLAIMS -**

**REQUIREMENT OF INJURY**

If you find that Abbott committed monopolization or attempted monopolization in violation of the Sherman Act, then you must decide if ~~Plaintiffs~~ GSK ~~is~~are entitled to recover damages from Abbott.

~~Plaintiffs~~ GSK ~~is~~are entitled to recover damages for an injury to GSK's~~their~~ business or property if ~~they~~ it can establish three elements of injury and causation:

First, that ~~Plaintiffs were~~GSK was in fact injured as a result of Abbott's alleged violation of the Sherman Act;

Second, that Abbott's alleged illegal conduct was a material cause of ~~Plaintiffs'~~ GSK's injury; and

Third, that ~~Plaintiffs'~~ GSK's injury is an injury of the type that the Sherman Act was intended to prevent.

~~Customer Plaintiffs allege that they were injured because they paid higher prices for Norvir and Kaletra than they would have paid in the absence of Abbott's alleged violations of the Sherman Act.~~

~~Overcharges paid by consumers, resulting from higher prices caused by anticompetitive conduct, may be found to be the type of injury the Sherman Act was intended to prevent.~~

**GSK'S CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND**

**FAIR DEALING - INTRODUCTION**

Implied in every contract is a covenant, or agreement, of good faith and fair dealing.  The implied covenant of good faith and fair dealing between parties to a contract is a pledge that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the benefits of the contract.  The implied covenant is part of the contract, even though the contract contains a provision that states that the written contract is the "entire agreement."  A breach of the covenant is a breach of the contract itself, the covenant being part and parcel of the contract.  The covenant encompasses any promises that a reasonable person in the position of the promisee would be justified in understanding were included.  However, the covenant cannot be construed so broadly as to create independent contractual rights.

1

2 ~~GSK'S CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND~~

3 ~~FAIR DEALING -  CONDUCT~~ADDITIONAL QUESTIONS - CONDUCT

4 ~~The following acts are those that GSK claims Abbott committed which showed a lack of~~

5 ~~good faith and fair dealing, injuring GSK's right to receive the benefits GSK alleges it was owed~~

6 ~~under its license agreement with Abbott.  First, you will be asked to determine whether Abbott~~

7 ~~committed these acts.~~Certain issues in this case must be decided by the Court based on the

8 decisions you make on certain factual questions.  You will be asked to decide whether the

9 following statements are true:

10     1.    During the negotiation of the Norvir Boosting License, Abbott was considering

11         how to use its control over Norvir to limit competition with its drug Kaletra from

12         competitors'  drugs, including possibly removing Norvir from the market or

13         increasing Norvir's price, and deliberately withheld its plans from GSK.

14     2.    Abbott inequitably asserted its power over Norvir by increasing Norvir's price by

15         400 percent to undermine ~~and disrupt GSK's launch of its drug, Lexiva, and future~~

16         ~~sales of that drug~~competition faced by Kaletra from other drugs, including GSK's

17         Lexiva.

18     3.    Abbott timed the 400 percent Norvir price increase in order to disrupt Lexiva's

19         launch and undermine Lexiva's future sales.

20     4.    ~~Abbott maintained or attempted to maintain a monopoly in the market in which~~

21         ~~Kaletra competes through anticompetitive conduct.~~

22

23

24

25

26

27

28

1 ~~GSK'S CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND~~

2 ~~FAIR DEALING~~<u>ADDITIONAL QUESTIONS</u> **- INJURY AND CAUSATION**

3    If you determine that GSK proved by a preponderance of the evidence that Abbott

4 committed at least one of these acts, you will then be required to determine:

5    First, whether GSK's business was injured, and

6    Second, whether Abbott's conduct was a proximate cause of the injury to GSK's business.

7    Proximate cause is a cause which in a natural and continuous sequence produces the injury,

8 and is a cause which a reasonable and prudent person could have foreseen would probably

9 produce such injury or some similar injurious result.

10    There may be more than one proximate cause of an injury.  Therefore, GSK need not prove

11 that Abbott's conduct was the sole proximate cause of the injury to GSK's business.  GSK must

12 prove by a preponderance of the evidence that Abbott's conduct was a proximate cause.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**OUTLINE OF TRIAL**

The trial will now begin.  First, each party may make an opening statement.  An opening statement is not evidence.  It is simply an outline to help you understand what that party expects the evidence will show.

After opening statements, GSK ~~and the Customer Plaintiffs~~ will present evidence, and counsel for Abbott may cross-examine.  Then Abbott may present evidence, and counsel for GSK and ~~the Customer Plaintiffs~~ may cross-examine.

After the evidence has been presented, I will instruct you on the law that applies to the case and the attorneys will make closing arguments.  After that, you will go to the jury room to deliberate on your verdict.

After you have reached your verdict, you will be excused.

**GSK's Proposed Changes to the Final Jury Instructions**

**GSK's Proposed Change**

**Market Trends**  [12:13-18][1]

The second factor that you may consider as evidence of monopoly power is the trend in Abbott's market share. An increasing market share may strengthen an inference that Abbott had monopoly power, particularly if Abbott had a high market share, while a decreasing share might show that Abbott did not have monopoly power. A declining market share, however, does not foreclose a finding of monopoly power.

**Sources:**  Order Denying Abbott's Renewed Motion for JMOL at 8-10 (Dkt. No. 591); *see also Greyhound Computer Corp. v. Int'l Bus. Machs. Inc.*, 559 F.2d 488 (9th Cir. 1977)

---

[1] Bracketed references are to the Final Jury Instructions (Dkt. No. 485).

**Abbott's Objection**

This Court previously rejected GSK's proposal to add the very same language to the ABA Model Instruction, and should do so again. *See* Joint Submission of Proposed Jury Instructions and Argument at 70 (Dkt. # 349) ("A declining market share, however, does not foreclose a finding of monopoly power.") (citing *Greyhound Computer Corp. v. Int'l Bus. Machs. Inc.*, 559 F.2d 488 (9th Cir. 1977)). As before, the balanced language of the ABA Model Instruction is appropriate; a skewed emphasis on GSK's theory of the case is not:

> The trend in defendant's market share is something you may consider. An increasing market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing share might show that a company does not have monopoly power.

ABA Model Jury Instructions in Civil Antitrust Cases Instruction 8 – Existence of Monopoly Power – Indirect Evidence. GSK can point to no change in the facts or the law that would merit revisiting or revising the Court's prior ruling. GSK's proposed modification should be rejected.

**GSK's Response**

GSK's proposed addition to this instruction is warranted, as it is consistent with the law and reasonable in light of the circumstances of this case. The Court has previously rejected Abbott's arguments that a decline of Kaletra's market share acts as a per se bar against antitrust liability. Summary Judgment Order (Dkt. No. 325) at 17 (quoting *Oahu Gas Serv., Inc. v. Pac. Resources, Inc.*, 838 F.2d 360, 366 (9th Cir. 1988)). Even more recently, in its order denying Abbott's Renewed JMOL, the Court held that GSK has presented indirect evidence of Abbott's monopoly power that was sufficient to reject Abbott's request for a "per se finding." RJMOL Order at 8-10. While Abbott has every right to make arguments regarding Kaletra's market share trends, the jury should be told that declining market share does not, by itself, preclude antitrust liability. Such an instruction squarely comports with both this Court's and the Ninth Circuit's analysis of the law and is necessary to remove any confusion regarding the correct legal standard.

**GSK's Proposed Change**

**"Duty to Deal"** [15:17-25]

A company that possesses monopoly power generally does not have a duty to deal with its competitors. However, a practical refusal to deal with competitors may constitute anticompetitive conduct if the practical refusal was motivated by anticompetitive malice or was contrary to Abbott's short-run best interest, but made sense for Abbott because it harmed competitors and helped Abbott maintain monopoly power in the long run. A short-term profit sacrifice, however, is not required for you to find anticompetitive conduct. An important change in a pattern of conduct, in a competitive market, that had persisted for several years can constitute a practical refusal to deal.

**Sources:**  Order Denying Abbott's Motion to Dismiss at 16 (Dkt. No. 195); Order Denying Abbott's Renewed Motion for JMOL at 12 n.3 (Dkt. No. 591).

**Abbott's Objection**

Abbott objects to GSK's proposed jury instruction on three grounds. *First*, the Court has already rejected GSK's proposal with respect to "anticompetitive malice," and there is no basis for revisiting that ruling. In its original proposed jury instructions, GSK asked the Court to instruct the jury: "In assessing whether Abbott's conduct amounts to an anticompetitive refusal to cooperate, one thing you can consider is whether Abbott ***was motivated by anticompetitive malice*** . . . ." Joint Submission of Proposed Jury Instructions and Argument at 143-144 (Dkt. # 349) (emphasis added). The Court rejected the proposed reference to "anticompetitive malice."

*Second*, GSK's proposed "anticompetitive malice" modification is not supported by the law and would give the jury a path to find a refusal to deal without considering the specific factors that are actually legally relevant. *See Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002) ("The district court must formulate a set of jury instructions that fairly and accurately states the law, covers the issues presented, and is not misleading."). In its final jury instructions, the Court instructed the jurors as follows:

> In deciding whether Abbott acted with anticompetitive intent, you may consider:
> (1) whether Abbott unilaterally terminated a voluntary and profitable course of
> dealing with its competitors; (2) whether Abbott offered to deal with its
> competitors only on unreasonable terms and conditions; and (3) whether Abbott
> refused to provide its competitors' customers with products, that were sold in a
> retail market, on the same terms it provided the products to its own customers.

Final Jury Instructions at 15-16 (Dkt. #485). It would be wrong for the Court to reference a nebulous concept of "anticompetitive malice" as an alternative to these specific factors.

Finally, it would also be contrary to law for the Court to instruct the jury that a short-term profit sacrifice is unnecessary to find a refusal to deal.[2] *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004); *MetroNet Servs. Corp. v .Qwest Corp.* 383 F.3d 1124, 1134 (9th Cir. 2004); *ASAP Paging, Inc. v. CenturyTel of San Marcos, Inc.*, 137 F. App'x 694, 698-99 (5th Cir. 2005); *Mini Frame Ltd. v. Microsoft Corp.*, 2013 WL 1385704, *5 (S.D.N.Y.

---

[2] Abbott acknowledges that the Court stated in its order denying Abbott's motion to dismiss that "[p]roof of a short-term sacrifice is not an element of a Section 2 claim, but rather a means to show anticompetitive motives." 1/12/10 Order Denying Abbott's Motion to Dismiss at 15-16. However, Abbott respectfully renews its objection for the reasons stated herein.

1   Mar 28, 2013); *Precision CPAP, Inc. v. Jackson Hosp.*, 2010 WL 797170, *11 (M.D. Ala. Mar 8,

2   2010).

3   **GSK's Response**

4       Abbott refuses to accept this Court's repeated (and correct) rulings that a short-term profit

5   sacrifice is ***not*** a required element of GSK's Section 2 claim.  *See* Order Denying Motion to

6   Dismiss (#195) at 16; Order Denying Abbott's Renewed JMOL (#591) at 12 n.3.  GSK's

7   requested revision makes this law of the case clear to the jury.

8       As the Court has explained in those prior decisions, Abbott relies on an erroneous

9   interpretation of the Supreme Court's *Trinko* decision and the Ninth Circuit's subsequent

10  *MetroNet* opinion.  In both of those cases, the reviewing court considered whether the defendant

11  sacrificed short-term profits ***only*** as "a means to show anticompetitive motives."  MTD Order at

12  16; *see Trinko*, 540 U.S. at 409 (defendant's profits are useful in analyzing whether "the

13  defendant's prior conduct sheds [any] light upon the motivation of its refusal to deal—upon

14  whether [defendant's alleged misconduct was] prompted not by competitive zeal but by

15  anticompetitive malice"); *MetroNet*, 383 F.3d at 1132 (critical question of whether refusal to deal

16  was motivated by anticompetitive malice cannot be determined where defendant did not forsake

17  short term profits).

18      Abbott's renewed attempt to cast aside the overwhelming record evidence of the

19  anticompetitive intent that motivated its 400% Norvir price increase should be rejected.  Instead,

20  GSK's requested jury instruction is faithful to governing antitrust law and is helps to ensure that

21  the jury is not misled into believing that GSK is obligated to prove something the law does not

22  require.

23

24

25

26

27

28

**GSK's Proposed Change**

**UDTPA "Additional Questions"** [27:21-24]

   Abbott inequitably asserted its power over Norvir by increasing Norvir's price by 400 percent to undermine ~~and disrupt GSK's launch of its drug Lexiva, and future sales of that drug~~competition faced by Kaletra from other drugs, including GSK's Lexiva.

   **Sources:** *Sunbelt Rentals, Inc. v. Head and Engquist Equip., LLC*, 174 N.C. App. 49 (2005); *Bhatti v. Buckland*, 328 N.C. 240 (1991).

**Abbott's Objection**

GSK proposed modification is improper for at least three reasons.  *First*, it would improperly change the focus from a question of fact about whether Abbott acted to undermine GSK's launch to a legal judgment about whether Abbott's conduct "undermine[d] competition." This is not the role of the jury in evaluating a claim under the N.C. UDTPA.  *See, e.g.*, *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 174 N.C. App. 49, 59 (2005) ("Our Supreme Court has stated, under N.C.G.S. § 75–1.1, it is a question for the jury as to whether the defendants committed  the alleged acts, and then it is a question of law for the court as to whether these proven facts constitute an unfair or deceptive trade practice.").

*Second*, GSK's proposed modification is improperly vague because it fails to articulate any standard for judging whether conduct would "undermine competition."  *See Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002) ("The district court must formulate a set of jury instructions that fairly and accurately states the law, covers the issues presented, and is not misleading.").  Under Section 2 of the Sherman Act, there are complex legal standards to guide the inquiry into whether unilateral conduct was anticompetitive.  Jettisoning any reference to those standards would improperly invite the jury to find for GSK without reference to the actual standards that the courts have developed for guiding the inquiry of whether unilateral conduct is actionable.  *See e.g.*, *Gen. Bus. Sys. v. N. Am. Philips Corp.*, 699 F.2d 965, 979 (9th Cir. 1983) ("[A] defendant, having succeeded in legitimately controlling 'the best, most efficient and cheapest source of supply,' . . . does not have to share 'the fruits of its superior acumen and industry.'"); *see also In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 443 (5th Cir. 1982) ("Legitimate competition cannot anchor an antitrust action.").

*Third*, this Court has already decided this issue against GSK.  In the final verdict form, this Court rejected GSK's proposal to ask the jury whether "Abbott maintained or attempted to maintain a monopoly in the market in which Kaletra competes through *anticompetitive conduct*." (*Compare* Dkt. # 425 (emphasis added), *with* Dkt. # 460.)

Neither of the two cases cited by GSK supports asking the jury to decide the legal question of whether conduct "undermine[d] competition."  As the court in *Sunbelt Rentals, Inc. v. Head &*

1   *Engquist Equip., L.L.C.*, 174 N.C. App. 49 (2005), made clear: "Our Supreme Court has stated,

2   'under N.C.G.S. § 75–1.1, it is a question for the jury as to whether the defendants committed the

3   alleged acts, and then it is a question of law for the court as to whether these proven facts

4   constitute an unfair or deceptive trade practice [.]'" *Id.* at 59. *Bhatti v. Buckland*, 328 N.C. 240

5   (1991), is inapposite. It addressed whether a particular transaction was a "business activity" that

6   was "in or affecting commerce" within the meaning of the UDTPA.

7                                        **GSK's Response**

8           The proposed modification is an appropriate determination for the jury and falls firmly

9   within the broad conduct constituting a violation of the UDTPA. The instruction asks the jury to

10  decide whether Abbott's goal in increasing the price of Norvir was to disrupt competition from

11  drugs that might compete with Kaletra. The jury is determining whether Abbott improperly

12  exercised its power and did so because it was motivated by improper aims. This is a question of

13  fact for the jury to determine after considering the evidence presented at trial. *See In re Jogert,*

14  *Inc.*, 950 F.2d 1498, 1504 (9th Cir. 1991) ("actual fraud is a question of fact involving

15  determinations of intent and evaluations of credibility properly resolved by the jury." (internal

16  quotation marks and citation omitted)); *Pleasant v. Turner*, 2013 WL 5798994 at *4, n.4 (E.D.

17  Cal. Oct. 28, 2013) (determination of malice in a malicious prosecution case "relates to the subject

18  intent" of the defendant and "defendant's motivation is a question of fact to be determined by the

19  jury"); *see also Media Net., Inc. v. Mullen Adver., Inc.*, No. 05 CVS 7255, 2007 WL 2570175, at

20  *15 (N.C. Super. Jan. 19, 2007) *aff'd sub nom. Media Net., Inc. v. Long Haymes Carr, Inc.*, 678

21  S.E.2d 671 (N.C. 2009). Contrary to Abbott's claims, the instruction does not ask the jury to

22  make any legal determinations, or to determine conclusively whether such conduct constitutes

23  anticompetitive or unfair conduct under the statute or under antitrust law.

24          Abbott also argues that GSK's proposed instruction is vague because it does not tell the

25  jury how to determine whether conduct would "undermine competition." But Abbott's argument

26  is misplaced. The jury does not need to be told how to assess whether Abbott's price hike was

27  motivated by a desire to undermine competitors, including GSK's drug Lexiva. The terms are not

28  specialized terms or terms of art, and would be understood by an average juror. *See Herrera v.*

1   *Harrington*, 456 Fed. Appx. 668 (9th Cir. 2011) (no error where district court refused to instruct

2   jury on the definition of a phrase in jury instructions because the phrase "is sufficiently clear such

3   that an average juror would understand its meaning"); *U.S. v. Dixon*, 201 F.3d 1223, 1231 (9th

4   Cir. 2000) (no error where district court refused to instruct jury on the definition of "commercial

5   advantage" and "private financial gain" because "these are common terms, whose meanings are

6   within the comprehension of the average juror").

7          With respect to Abbott's final argument, GSK respectfully submits that the Court has not

8   previously considered the proposed instruction.  GSK's proposed instruction is not asking the jury

9   whether Abbott maintained a monopoly by engaging in anticompetitive conduct.  Rather, the

10  instruction asked whether Abbott inequitably asserted its power over Norvir to undermine

11  competition.  If so, then Abbott has engaged in acts that violate the UDTPA.  *See Miller v.*

12  *Nationwide Mut. Ins. Co.*, 112 N.C. App. 295, 301 (1993) ("A practice is unfair when it offends

13  established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or

14  substantially injurious to consumers."); *In re Kittrell*, 115 B.R. 873, 877 (Bankr. M.D.N.C. 1990)

15  ("[The] Supreme Court has stated that the broad language of the statute indicates that its scope is

16  not limited to precise acts and practices which can be readily catalogued.  Whether a trade practice

17  is unfair or deceptive depends upon the facts of each case.").

18         Therefore, GSK believes the instruction, as proposed, is appropriate for the jury.

19

20

21

22

23

24

25

26

27

28

**GSK's Proposed Change**

**Damages** [28:4-29:7]

It is the duty of the Court to instruct you about the measure of damages. By instructing you on damages, the Court does not mean to suggest for which party your verdict should be rendered.

If you find for GSK on any of its claims, you must determine its damages. GSK has the burden of proving damages by a preponderance of the evidence. Damages means the amount of money that will reasonably and fairly compensate GSK for any injury you find was caused by Abbott.

GSK seeks an award of damages on each of its claims based on profits it alleges that it lost as a result of Abbott's anticompetitive conduct and Abbott's breach of the implied covenant. If you find that GSK proved one or both of its antitrust claims, or its breach of the implied covenant claim, or that Abbott engaged in the specific conduct I described above in Instruction III, you must consider the evidence of GSK's damages. I will now describe the damages you may consider in connection with each claim on which you find for GSK.

GSK has offered evidence to calculate the profits it would have earned if Abbott had not engaged in its alleged misconduct. With respect to any of GSK's claims, ¥you may award GSK the amount it has proved its profits would have been in the absence of this alleged misconduct. This is known as lost profits damages.

With respect to GSK's claim that Abbott breached the implied covenant of good faith and fair dealing, if you find in favor of GSK and against Abbott there is a second method you may consider in determining GSK's damages. This method, known as restitution, aims to give back to GSK some portion of the benefit it conferred upon Abbott in order to obtain the Norvir license. To determine that amount, you may consider evidence of the value of concessions GSK made on royalties Abbott would otherwise have paid GSK for the right to use GSK-owned technology to manufacture Abbott's drug Humira. You should consider an award of restitution damages only if you find that Abbott breached the implied covenant in the Norvir license between Abbott and GSK.

Finally, if you find that Abbott engaged in any of the specific conduct I described above in Instruction III, you may consider both the evidence GSK has offered of GSK's lost profits and the evidence GSK has offered of the value of the benefit Abbott received as a result of the wrongful acts you find Abbott engaged in.  GSK claims that the benefit to Abbott can be calculated by determining the following:  (1) Abbott's profits on additional sales of Kaletra that Abbott would not have earned in the absence of the alleged misconduct; (2) Abbott's profits on additional sales of Norvir, which exceeded what Abbott would have earned in the absence of Abbott's alleged misconduct; and (3) the value of the benefit to Abbott, if any, of the reduction in the amount of royalties Abbott paid to GSK for the Humira license.  You may consider any or all of these in order to determine the benefit Abbott received as a result of its alleged misconduct.

You must determine the amount of GSK's damages for all of the claims on which it prevails, if any. However, GSK is not entitled to recover its damages more than once. On the verdict form, if you find that an award of damages is appropriate for more than one of GSK's claims, you will be asked questions that ensure that GSK does not recover its damages more than once.

It is for you to determine what damages, if any, have been proved. So long as there is a reasonable basis for a damages award, GSK should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical precision. However, your award must be based upon evidence and not upon speculation, guesswork or conjecture.

**Sources:**  *CBS, Inc. v. Merrick*, 716 F.2d 1292 (9th Cir. 1983); *Sunbelt Rentals Inc. v. Head & Engquist Equip.*, 174 N.C. App. 49 (2005); *Bhatti v. Buckland*, 328 N.C. 240 (1991); *Bernard v. Cent. Carolina Truck Sales, Inc.*, 68 N.C. App. 228 (1984); *Coley v. Champion Home Builders Co.*, 162 N.C. App. 163 (2004); *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145 (4th Cir. 1987); *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146 (4th Cir. 2012); *Tradewinds Airlines, Inc. v. C-S Aviation Servs.*, 733 S.E.2d 162 (N.C. Ct. App. 2012), *review denied*, 743 S.E.2d 189 (N.C. 2013).

**Abbott's Objection**

Abbott objects to GSK's proposed instructions on two grounds.  *First*, to the extent it instructs the jury on restitutionary damages, the proposal seeks reconsideration of this Court's prior rulings barring GSK from presenting alternative damages theories to the jury.  On multiple occasions, the Court held that GSK could not move forward with (1) a "complete restitution" theory because the evidence did not show a complete breach of the license agreement, Tr. at 239:20-240:7 (rejecting theory that GSK "should get [its] whole benefit back as opposed to some percentage"), and (2) a partial restitution theory unless GSK had "*previously disclosed*" a "damages calculation that quantifies the *partial restitution* to which it is entitled based on Abbott's alleged partial breach," 2/11/2011 Order (Dkt. # 392) (emphasis added); *see also* Tr. at 237:15-24 ("I think what I said was I would allow that theory if there were *a theory of partial restitution for partial breach, but that theory would have already have to have been disclosed*. . . .  If there is no expert that has any partial restitution theory, then that restitution theory won't be able to come in.") (emphasis added).

*Second*, to the extent GSK asks to instruct the jury on disgorgement damages, GSK has failed to offer any expert opinion or any other evidence supporting such a damages model.[3]

**GSK's Response**

GSK's requested modifications to instructions regarding theories of damages are in accord with the remedies available to GSK under its New York contract claim and North Carolina UDTPA claim.

In its papers filed in advance of the 2011 trial, GSK laid out its position that under new York law (which governs the breach of implied covenant of good faith claim) GSK is entitled to recover damages under theories of *both* GSK's expectation (*i.e.*, lost profits) and restitution (*i.e.*, Abbott's benefit from reduced royalty obligations on Humira sales).  *CBS, Inc. v. Merrick*, 716

---

[3] Abbott has moved *in limine* to exclude expert testimony related to previously-undisclosed damages theories or, in the alternative, to preclude any new damages theories not presented to the first jury.  Were the Court to deny that motion and permit new damages evidence, Abbott reserves the right to object to GSK's proposed damages jury instructions at the appropriate time after GSK has disclosed those new damages theories and Abbott has had an opportunity to take discovery on those theories.

1   F.2d 1292, 1296 (9th Cir. 1983) (applying New York law and permitting a party to recover under

2   restitution in addition to other damages); *see* GSK's Opp. to Abbott's MIL No. 13 at 21-22 (Dkt.

3   No. 408); GSK's Trial Brief at 7-10 (Dkt. No. 341).

4          The Court initially denied Abbott's motion to preclude restitution arguments so long as

5   GSK offered evidence to support a partial restitution recovery.  MIL Order at 7 (Dkt. No. 392).

6   Ultimately, the Court refused to permit GSK to submit this theory to the jury as it concluded GSK

7   only introduced evidence at trial that corresponded with a "full rescission" theory "as opposed to

8   some percentage" of restitutionary recovery.  Trial Tr. at 27-42.  GSK respectfully requests that, as

9   the Court held in its original MIL order, GSK be permitted to make restitution-based arguments to

10  the jury.  The Court should consider, at the close of evidence in the upcoming retrial, whether

11  GSK has introduced evidence at trial that the Court finds sufficient to take a partial restitution

12  theory to the jury.  GSK expects that its expert report will include a restitution theory that is in

13  accord with the Court's instructions.

14          Irrespective of the availability of restitution under the New York contract claim, North

15  Carolina's Unfair and Deceptive Trade Practices Act (UDTPA) provides GSK the opportunity to

16  recover damages measured by both the plaintiff's lost profits ***and*** the benefit the defendant gained

17  as a result of its misconduct. Accordingly, GSK requests that at retrial the jury be instructed on

18  and permitted to consider not only GSK's lost profits but also the value Abbott received from

19  engaging in its unfair and deceptive acts. Although the UDTPA does not specifically identify the

20  types of damages available, North Carolina courts have determined that a plaintiff may be

21  "awarded lost profits and the value of benefit defendants received, two different types of damages

22  permitted under the UDTPA." *Sunbelt Rentals Inc. v. Head & Engquist Equip., LLC*., 174 N.C.

23  App. 49, 62 (2005); *see also Bernard v. Cent. Carolina Truck Sales, Inc*., 68 N.C. App. 228, 233

24  (1984) ("The statute merely refers to the person being 'injured' and does not state the method of

25  measuring damages."); *Coley v. Champion Home Builders Co*., 162 N.C. App. 163, 166 (2004)

26  (noting UDTPA damages can include "the loss of the use of specific and unique property, the loss

27  of any appreciated value of the property, and such other elements of damages as may be shown by

28  the evidence").

1    "The purpose of [UDTPA] is to declare, and to provide civil legal means to maintain,

2    ethical standards of dealings between persons engaged in business and between persons engaged

3    in business and the consuming public within this State to the end that good faith and fair dealings

4    between buyers and sellers at all level[s] of commerce be had in this State." *Bhatti v. Buckland*,

5    328 N.C. 240, 245 (1991) (citing the General Assembly); *see also Stolfo v. Kernodle*, 118 N.C.

6    App. 580, 583 (1995) (finding that UDTPA applies broadly to all parts of commerce). Damages

7    sometimes may be determined by calculating the plaintiff's lost profits, but other times the "best

8    possible measure of damages available" comes from the defendant's actual profits from its

9    wrongful acts. *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 149 (4th Cir. 1987). Such

10   damages are in line with the goals of UDTPA to discourage unfair dealing by preventing a

11   defendant from keeping gains resulting from improper conduct in commerce.

12       GSK is entitled to present the jury with alternative theories of damages available under

13   North Carolina law. At retrial, GSK expects to offer an alternative measure by which the jury can

14   make GSK whole: "the value of [the] benefit" Abbott received. *Sunbelt Rentals, Inc.*, 174 N.C.

15   App. at 62. In this case the jury could determine that the benefit Abbott improperly received as a

16   result of its violation includes: (1) profits Abbott derived from the additional sales of Kaletra

17   Abbott made as a result of its violation of the UDTPA; and (2) the value of the benefit Abbott

18   received with respect to reduced royalty rates GSK agreed to grant Abbott for Abbott to license

19   technology necessary for Abbott's blockbuster drug, Humira.

20       The jury could reasonably determine that Abbott's profits can provide an adequate "rough

21   measure of plaintiff's damages." *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 149 (4th Cir.

22   1987). Just as in *Belk* and *Polo*, consideration of the improper benefits obtained by Abbott may be

23   the best (and most ascertainable) measure of damages to restore GSK to its "original condition"

24   under UDTPA. As the jury must determine the magnitude of any damages award, to be trebled,

25   under UDTPA, GSK should be permitted to present evidence supporting all available theories of

26   recovery under the law.

27       Abbott's arguments in opposition to GSK's request are without merit. First, GSK

28   respectfully submits that GSK has already produced sufficient evidence for a jury to award

1   restitutionary damages.  Abbott distorts GSK's request:  GSK is *not* seeking rescission of the

2   parties' licenses agreements, but rather seeks recovery of the consideration it gave Abbott

3   specifically in exchange for the value of the Norvir license that Abbott deprived GSK by

4   breaching its covenant of good faith.  Second, any additional discovery necessary to support the

5   damages theories would be limited and manageable prior to the retrial.

6       For these reasons, GSK's proposed modified damages instructions should be presented to

7   the jury.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28