1  HUESTON HENNIGAN LLP
   Brian Hennigan (~~CA~~SBN 86955)
2  ~~HUESTON HENNIGAN LLP~~
   Moez M. Kaba (SBN 257456)
3  C. Mitchell Hendy (SBN 282036)
   523 ~~West 6th Street~~W. Sixth St., Suite 400
4  Los Angeles, CA  90014
   Telephone:     (213) 788-4340
5  Facsimile:     (888) 775-0898
   bhennigan@hueston.com;
6  mkaba@hueston.com;
   mhendy@hueston.com
7
   THE LANIER LAW FIRM P.C.
8  W. Mark Lanier (*pro hac vice*)
   6810 FM 1960 West
9  Houston, Texas 77069
   Telephone: (713) 659-5200
10 Facsimile: (713) 659-2204
   wml@lanierlawfirm.com
11
   ~~ARNOLD & PORTER LLP~~
12 ~~Kenneth A. Letzler (DC 25619)~~
   ~~555 Twelfth Street, NW~~
13 ~~Washington, DC 20004-1206~~
   THE LANIER LAW FIRM P.C.
14 Lee A. Cirsch (SBN 227668)
   10866 Wilshire Blvd., Suite 400
15 Los Angeles, California 90024
   Telephone: (~~202~~310) ~~942-5000~~277-5100
16 Facsimile: (~~202~~310) ~~942-5999~~277-5103
   lee.cirsch@lanierlawfirm.com
17
   Attorneys for Plaintiff
18 ~~GlaxoSmithKline~~GLAXOSMITHKLINE

19
                    UNITED STATES DISTRICT COURT
20
                    NORTHERN DISTRICT OF CALIFORNIA
21
                           OAKLAND DIVISION
22

23 SMITHKLINE BEECHAM CORPORATION,        Case No. C07-5702 (CW)
   d/b/a GLAXOSMITHKLINE,
24                                         ~~FIRST~~[PROPOSED] SECOND AMENDED
              Plaintiff,                   COMPLAINT
25        vs.
                                           DEMAND FOR JURY TRIAL
26 ABBOTT LABORATORIES,

27            Defendant.

28

# **INTRODUCTION**

Plaintiff SmithKline Beecham Corporation, d/b/a GlaxoSmithKline ("GSK"), by and through its undersigned attorneys, alleges as follows:

1.      This case is about the attempt of Abbott Laboratories ("Abbott") to ~~monopolize~~dominate the markets into which one of the most promising new HIV/AIDS therapies – protease inhibitors ("PIs") – are sold. Abbott schemed to remove from those markets one of the critical components of PI therapy – a boosting agent called Norvir® (branded ritonavir) – when, overnight and in a radical departure from its long-standing pattern of taking incremental price increases, it raised the price of that component by 400 percent. Abbott's action forced those patients using most of the FDA-approved PI therapies either to pay the exorbitant new price or to use Abbott's PI, known as Kaletra® (branded lopinavir/ritonavir). Kaletra is a combination drug whose price Abbott did not increase despite the fact that it also contains the same boosting agent as Norvir. Abbott's ~~anticompetitive~~ scheme protected Kaletra against new competitors that threatened its market dominance, in violation of the ~~antitrust laws~~law.

2.      But Abbott's action did more than violate ~~antitrust laws~~the law – it targeted one competitor, GSK, in violation of principles of fair business conduct and a license agreement that Abbott itself had demanded of GSK. A year before its price hike, Abbott had extracted substantial sums of money from GSK as part of an agreement that allowed GSK to market and promote its yet-to-~~belaunched~~be-launched PI, Lexiva® (branded fosamprenavir), specifically for boosting with Norvir. Then, two weeks after GSK launched Lexiva, Abbott entirely disregarded its paid-for contractual obligations and took its extraordinary Norvir pricing action. That action was designed to render Norvir essentially inaccessible to a wide array of patients for use with Lexiva and other competitive products. Abbott's misconduct is particularly egregious because Abbott explicitly considered the negative impacts of its price hike – the costs to AIDS/HIV patients, the harmful impact on its competitors, the losses to its contract partners, the likelihood of potential government investigation, and the harm to its own reputation – and decided it was worthwhile to go ahead with the price hike because the profits it expected to generate from sales redirected to Kaletra were so

1  enormous. Internal Abbott documents, including, for example, those recently made public through

2  the Wall Street Journal, attached as Exhibits A & B, reveal:

   • Abbott executives understood the illegal nature of their scheme and sought to

3

4        "minimize any federal investigations regarding price increases in the US."

5  • They also understood that adverse consequences would result if their scheme

6        was discovered, stating that it would "[t]arnish" their CEO's reputation,

7        "[p]osition [Abbott] as a big, bad, greedy pharmaceutical company," and

8        "[r]einforce[] perception[s] that Abbott is not committed to HIV."

9  • To conceal the scheme, Abbott executives crafted excuses, for example, that

10        "[i]t is no longer feasible for ~~bbott~~Abbott to provide a production line of Norvir

11        capsules at the current price." Yet, these same executives recognized that these

12        justifications would be exposed as false if Abbott were "forced to open books."

13        3.      Abbott succeeded in its design, harming competition in the markets into which PIs

14  are sold, harming GSK and Abbott's other competitors in those markets and harming the

15  HIV/AIDS community it was committed to serving. Despite the advent of new competition in

16  2003, Abbott's 2006 Annual Report still proclaims that "Kaletra remains the world's leading

17  protease inhibitor for HIV treatment." In July of 2007, Abbott reported a 27 percent increase in

18  pharmaceutical sales, "driven by strong double-digit growth" in Kaletra and three other drugs. In

19  contrast, GSK's Lexiva sales have fallen short of pre-release forecasts prepared for and by both

20  GSK and Abbott. Abbott's ~~anticompetitive~~illegal conduct caused GSK to lose sales, profits and

21  market share for Lexiva. In addition, Abbott's illegitimate and unprecedented price increase

22  deprived GSK of the benefit of the bargain GSK and Abbott struck when GSK paid Abbott

23  substantial sums of money for a license allowing GSK to promote its PIs for boosting with Norvir.

24  Abbott's misconduct interfered with, and continues to interfere with, GSK's ability to serve the

25  HIV/AIDS community and to provide the treatments that HIV-positive patients need.

26        4.      It is this community that Abbott's misconduct hit hardest. As reported in the Wall

27  Street Journal, one AIDS patient saw his insurance copayments jump from $400 per month to

28

1 $1,000 per month because of the supracompetitive prices Abbott foisted on the market. Abbott's

2 price increase has the effect of limiting the types of PIs available to patients – thus interfering with

3 their ability to effectively treat the disease.

4 **PARTIES**

5      5.     GSK is a Pennsylvania corporation with its headquarters in Research Triangle Park

6 (Durham), North Carolina and Philadelphia, Pennsylvania. Its North Carolina locations are the

7 base for the company's research and development facilities and commercial operations in the

8 HIV/AIDS area, and they also house various sales and marketing, administrative, and corporate

9 functions. GSK has been harmed in North Carolina by Abbott's misconduct.

10      6.     Abbott is an Illinois corporation with its principal place of business in Abbott Park,

11 Illinois. Abbott is engaged in the development, manufacture, and sale of health care products and

12 services. Abbott has operations in six states. Of those, it has the most facilities in California (four),

13 including in Alameda, Santa Clara, and Redwood City. Abbott sells its products, including Norvir

14 and Kaletra, throughout the state of California and the United States.

15 **JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

16      7.     Abbott is subject to the jurisdiction of this Court by virtue of its business dealings,

17 including sales and distribution of Kaletra and Norvir, in this District, and by having caused

18 injuries within this District through its acts and omissions. GSK's damages are well in excess of

19 the jurisdictional minimum in diversity actions.

20      8.     Count one ~~arises under the Sherman Act, 15 U.S.C. § 1 et seq. Count two~~ arises

21 under state common law. Count ~~three~~<u>two</u> arises under the North Carolina Unfair Trade Practices

22 Act, N.C. Gen. Stat. § 75-1.1. ~~Count four arises under North Carolina's anti-monopolization~~

23 ~~statute, N.C. Gen. Stat. § 75-2.1.~~

24      9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. ~~§§ 1331, 1332, and~~

25 ~~1337.~~<u>§ 1332.</u> This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

26      10.     Abbott has business locations in this District, has transacted and continues to

27 transact business in this District, has committed and continues to commit ~~anticompetitive~~<u>illegal</u>

28

1   acts in this District, and has harmed and continues to harm GSK in this District. Venue is therefore

2   proper in this District under ~~15 U.S.C. §§ 15, 22, and 26, respectively, and~~ 28 U.S.C. § 1391(b)

3   and (c).

4        11.    Intradistrict assignment is proper in the San Francisco/Oakland Division, pursuant

5   to L.R. 3-2(c) & (d), because a substantial part of the events which give rise to the claim occurred

6   in Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Napa, San Francisco,

7   San Mateo and Sonoma counties.

8                              **FACTUAL BACKGROUND**

9        12.    HIV/AIDS is one of the worst pandemics in human history. It already has claimed

10  over 500,000 lives in the United States and 25 million worldwide. The quality of life of the 40

11  million people presently living with HIV/AIDS today depends on the effectiveness and

12  availability of HIV treatments. Today, HIV is suppressed using highly active antiretroviral therapy

13  ("HAART"). HAART treatment is effective because it combines three or four different drugs,

14  attacking the HIV virus at different points in its lifecycle.

15       13.    Protease inhibitors ("PIs") attack the HIV protease enzyme necessary in one of the

16  final stages of the HIV virus's replication process. PIs are considered one of the most potent

17  weapons in the HAART arsenal. GSK, Abbott, and Bristol Myers Squibb ("BMS"), among others,

18  design, develop, and distribute PIs. Although PIs present an effective treatment, they have several

19  impediments, including pill burden, dietary requirements and severe side effects. Each PI presents

20  different degrees of impediment and efficacy. In addition, patients develop resistance to certain

21  PIs as the disease progresses – a significant challenge to the treatment of HIV/AIDS. Thus, it is

22  critical that patients have a wide variety of PIs available.

23       14.    With significant funding assistance from the National Institutes of Health, Abbott

24  developed ritonavir, brand named Norvir, which it launched in 1996, for use as a stand-alone PI.

25  Abbott received funding assistance from the National Institutes of Health to research and develop

26  Norvir, and GSK is informed and believes that Abbott spent significantly less in developing

27  Norvir than typical for other major pharmaceutical drugs.

28

15.     While Norvir proved to be a very difficult medicine to tolerate when used as a standalone PI, Abbott recognized even before its release that in smaller, less toxic, doses Norvir could "boost" the effectiveness of a PI paired with it. This boosting effect reduces the dosage amounts of the paired PI and thus the high pill burden on patients and, perhaps most important, slows the development of resistance to any given PI treatment.

16.     Shortly after Norvir's release doctors began to co-prescribe and co-administer Norvir as a booster with other PIs. GSK and other Abbott competitors relied on the reasonable availability of Norvir as a boosting agent when developing and designing their own PIs.

17.     Abbott never sought to use its intellectual property to prevent others from selling PIs for co-administration with Norvir. Instead, from early on, Abbott chose to encourage its competitors to promote their PIs for boosting with Norvir and to profit from Norvir's boosting use both by selling it at a profit and by licensing competitors the right to market PIs to be coadministered with Norvir.

18.     Thus, the competitive market for PIs boosted with Norvir continued uninterrupted; based on Abbott's course of conduct, Norvir became the de facto standard. Since at least 2000, Norvir has been regularly co-prescribed and co-administered with various PIs, including those designed and developed by Abbott's competitors. Today, Norvir is sold almost exclusively as a booster. Physicians recognize that Norvir is the only effective boosting compound available and is an essential component of almost every PI-based treatment for HIV/AIDS.

19.     In 2000, Abbott received government approval to market its own PI (called lopinavir) boosted with the active ingredient in Norvir (called ritonavir), which it marketed as Kaletra. Unlike its rivals, Abbott combined its PI (lopinavir) and Norvir (ritonavir) in a single pill. Kaletra became and remains the only product on the market to combine a boosting dose of Norvir with a PI in one pill. Kaletra quickly gained a very significant share of the market.

20.     In 2001, Abbott approached GSK to demand that it secure a license to allow GSK to promote its existing PIs, as well as PIs it had under development, with Norvir. GSK acquiesced to this demand, procuring a license from Abbott in December 2002.

21.     Under the agreement, Abbott gave GSK the right to promote the use and administration of its PIs with Norvir. Abbott knew that GSK's plan was to use the Norvir license in order to promote GSK's PIs in boosted form. GSK paid substantial sums of money in consideration for this license.

22.     Abbott is the sole manufacturer of Norvir; thus, despite the license, GSK must rely on Abbott to make and sell it. Upon entering into the agreement, Abbott was bound to act in good faith to ensure that Norvir remained on the market for co-administration with GSK PIs, as it had done in its previous course of dealings. Without the continued reasonable availability of Norvir, the agreement would be illusory – GSK would have paid Abbott for nothing.

23.     Other pharmaceutical companies, including BMS, took similar licenses allowing the promotion of their PIs with Norvir during the same timeframe. By mid-2003 Abbott had licensed nearly all manufacturers of protease inhibitors to promote their PIs for co-prescription and coadministration with Norvir.

24.     Abbott's strategy for exploiting Norvir was highly profitable for Abbott. In addition to its licenses, it priced Norvir well above Abbott's per pill cost. Abbott then took periodic price increases on Norvir that were tied to increases in the Consumer Price Index. Thus, for seven years after its introduction, Abbott elected not to make any major adjustment to Norvir's price taking price increases of not more than four percent per year. Abbott limited itself to small adjustments in the price of Norvir despite knowing that its revenues per prescription were continually decreasing as Norvir's predominant use steadily shifted to boosting other PIs. Through Abbott's profitable licensing and pricing strategy, Abbott allowed and, indeed, encouraged others to compete in the boosted PI marketplace.

25.     Abbott changed this long-standing course of conduct in response to its realization that its dominant boosted PI, Kaletra, would face strong competition from two new PIs, GSK's Lexiva and BMS's Reyataz. Abbott engaged in a 15-month deliberative process that began in September 2002 to evaluate and perfect a plan to protect Kaletra's market dominance. Faced with the prospect of new competitors, Abbott's executives forsook legal approaches to defending

1   against a loss of market share. Its executives formulated an ~~anticompetitive~~illegitimate scheme

2   using Abbott's control of Norvir as leverage to maintain or increase Kaletra's dominant market

3   position. Abbott executives were well- aware that Abbott had facilitated the use of Norvir as a

4   booster and caused its competitors to rely on the availability of Norvir – through Abbott's past

5   course of conduct and formally through licensing its competitors to promote their PIs with Norvir.

6   Abbott executives realized that if Abbott could make Norvir unavailable or less desirable when

7   paired with its competitors' PIs – by actually pulling it from the market or by manipulating its

8   price – then its competitors' products, which by that time almost always relied on Norvir for

9   boosting, would never become a significant competitive threat to Kaletra's market dominance.

10      26.      Abbott also had an economic incentive unique to the pharmaceutical industry to use

11  its power over Norvir boosting to preserve Kaletra's dominance of the boosted PI market. Pricing

12  rules for important government programs restricted the amount of money Abbott could obtain,

13  from sales of drugs that reached patients covered by those programs, by taking price increases

14  greater than the CPI-U. By contrast, if Abbott could maintain Kaletra's market dominance, it

15  could circumvent these pricing rules~~,~~ and exploit its power over boosters because Abbott had

16  priced Kaletra at a price that reflected the market power Abbott achieved as a result of the

17  boosting capabilities of Norvir. Thus, by making Norvir less attractive when used as a booster

18  with non-Abbott PIs and thereby protecting Kaletra's market share, Abbott was able to extract

19  additional and excessive revenue from payers that it could not otherwise extract.

20      27.      Internal Abbott emails and other documents, some of which were released by the

21  Wall Street Journal, attached as Exhibits A and B, lay out exactly this scheme. One Abbott

22  executive explained Abbott's concern: Abbott could not "continue to trade a prescription of

23  Kaletra for a prescription of Norvir at 100mg." Rather than ~~rely~~relying on any competitive

24  advantage in the medicinal characteristics of Kaletra, or even ~~on~~ lowering Kaletra's price so that it

25  was more attractive to patients, this executive outlined alternative ~~anticompetitive plans~~schemes

26  that had been discussed among Abbott management and warned other senior Abbott employees

27  not to be "stunned by the outcome of the thought process."

28

28.     But Abbott's documents and emails are stunning. In September 2002, during the final months of its negotiations with GSK over the Norvir license, Abbott began to consider whether to remove Norvir from the United States market by "[g]iv[ing] the remaining supplies [of Norvir] to Africa and shut[ting] down the RTV [ritonavir] manufacturing line." Abbott dubbed this option the "supply constraint program." An email from one Abbott employee candidly reveals that the true purpose of this "[r]eallocation of Abbott product" is "to make physicians and patients switch to Kaletra…."

29.     In 2003, as the threat from Lexiva and Reyataz persisted, Abbott evaluated what it termed the "Withdrawal Option" along with various pricing options. By late summer, Abbott had boiled its options down to two: stating in its documents that a "'mega price increase' and a potential Norvir liquid only [i.e., removing all other dosage forms from the market] are the two scenarios that we will need…to focus on building a communication platform for all." The latter option would have pulled Norvir capsules from the market and left HIV patients only with a liquid form of Norvir that Abbott's own executives admit "taste[s] like someone else's vomit." Other materials reveal that Abbott planned to make up a justification for this withdrawal – one based on its early discussions in 2002; executives considered misleading the public into believing that Abbott was diverting the capsules for humanitarian efforts in "the developing world (i.e. Africa)."

30.     Other emails outlined two potential scenarios for the "mega price increase" in which Abbott radically increased the price of Norvir in an effort artificially to decrease demand for its competitors' PIs. In both scenarios, they suggested leaving the price of Kaletra unchanged, thus giving Abbott a huge price advantage ~~for~~over PIs boosted by Norvir. They outlined a "rationale" for the proposed Norvir price increase, suggesting that Abbott mislead the public into believing that "it is no longer feasible for Abbott to provide a production line of Norvir capsules at the current price." The emails, however, frankly admit the "weakness" of this "rationale" – its falsity. They expressed concerns of "exposure on price if forced to open books" and sought to "minimize any federal investigations regarding price increases in the US."

31.     An Abbott slide presentation created around the time of these emails further illustrates the ~~anticompetitive and~~ illegitimate motives behind Abbott's price hike. The presentation reveals, for example, that Abbott sought to "[p]osition Kaletra as a more economical option for boosted ARV [anti-retroviral] therapy" and noted the "[p]otential for increased market share of Kaletra." Abbott acknowledged the illegitimacy of its plan, and recognized that it would incur significant reputational harm by following its plan. Documents express an understanding that Abbott could be perceived as a "big, bad, greedy pharmaceutical company," that its CEO's image could be "[t]arnish[ed]" in industry organizations, and that the plan "[f]uels perception regarding lack of Abbott commitment to HIV." Nonetheless, Abbott found it easier to mislead the public regarding an ~~anticompetitive~~unprecedented price increase than to try to explain a complete withdrawal of Norvir capsules from the market.

32.     Setting aside repercussions to its corporate reputation – and to the community infected by HIV – Abbott raised the price it charged for Norvir by 400 percent just two weeks after GSK began selling Lexiva. This price increase was unprecedented and totally unexpected outside Abbott. Shortly after the "mega price increase," a senior Abbott executive congratulated Abbott's virology sales team. He told them, "It's too bad you're giving a lump of coal to BMS and GSK for the holidays but such is life."

33.     Outside of its disregard for its own reputation and for the welfare of the HIV/AIDS community, Abbott was also willing to incur direct financial penalties in hiking the price of Norvir by 400 percent in 2003. Pricing rules that dictated what the government will pay for drugs imposed a penalty on companies that tried to raise prices more than the percentage increase of the Consumer Price Index. Because of the 400 percent price hike – a radical price increase well above that of the Consumer Price Index~~,~~ – Abbott wound up getting approximately 70 percent less revenue on each sale of Norvir paid for by key government programs. This was an enormous sacrifice of revenue as government purchases cover half of the purchases of HIV/AIDS drugs.

34.     Because of the 400 percent price increase of Norvir, the cost of boosted PI treatments sold by GSK and other Abbott competitors ~~sky-rocketed~~skyrocketed. Abbott's price

1    hike alone escalated the wholesale acquisition cost of GSK's boosted Lexiva treatment from

2    $19.43 to $33.15. The wholesale acquisition cost of Kaletra, Abbott's PI treatment, however,

3    remained unchanged at $18.76.

4        35.    Abbott's "mega- price increase" and the timing of that increase to follow closely

5    upon Lexiva's release had a massive disruptive effect on GSK's ability to promote its drug –

6    dooming it to a failed launch from which it could not recover or respond. HIV treaters and patients

7    were outraged by the price hike as Abbott expected. For example, the Organization of HIV

8    Healthcare Providers, which represents physicians collectively treating approximately 85,000

9    patients with HIV, wrote Abbott on January 20, 2004, admonishing that Abbott's price hike was

10   "taking advantage of the monopolistic situation, where [its] product is the only effective protease

11   inhibitor boosting agent." Many patients and doctors expressed their anger and concern directly to

12   GSK. Because Abbott had pursued a "recommended" strategy of delaying announcement of the

13   price hike until shortly after GSK released Lexiva, GSK representatives spent the better part of

14   Lexiva's launch period responding to infuriated doctors and patients who complained to GSK

15   about the price increase and expressed reluctance to use the drug until issues surrounding Abbott's

16   price increase could be resolved. GSK lost the opportunity to promote boosted Lexiva to which it

17   was entitled and that it believed it had secured through its license agreement with Abbott.

18       36.    True to its pre-hike plan, Abbott concealed from the public the ~~anticompetitive and~~

19   illegitimate goal of increasing Norvir's price. According to news articles published shortly after

20   the price increase, Abbott representatives publicly stated – in direct contradiction to the internal

21   Abbott materials cited above – that the company had not considered the effect of Norvir's price

22   increase on Kaletra sales or raised the price for the purpose of driving patients to Kaletra. Abbott's

23   false and misleading communications had the intention and effect of further confusing prescribers

24   and purchasers about the real impact of the price increase among different classes of PI patients,

25   and thus further harmed Lexiva's uptake by the market in the months following its launch.

26       37.    Abbott further attempted to manage the fallout from its Norvir price increase by

27   publishing misleading comparisons of PI prices. In promotional and informational materials about

28

1  Norvir after the price increase, Abbott represented that Norvir was the lowest-priced PI on the

2  market.

3      38.    The Department of Health & Human Services (DHHS) responded with a Warning

4  Letter to Abbott about such materials, calling Abbott's price comparison chart "false or misleading

5  in violation of section 502(a) of the Federal Food, Drug, and Cosmetic Act (Act) (21 U.S.C.

6  352(a))." Specifically, DHHS stated that the price chart was misleading because it compared a

7  "subtherapeutic dose of Norvir (100 mg once daily) to the labeled dosing regimens of other

8  antiretroviral agents" and it "implies that Norvir may be used other than in combination therapy,

9  when it is not labeled for such use." Abbott did not contest the FDA letter, choosing instead to

10  send a letter to healthcare providers retracting and "clarifying" its false statements.

11      39.    The price hike had the effect of using Abbott's monopoly power over PI boosters to

12  unnecessarily handicap its competitors in the boosted PI market, where Abbott was already the

13  market leader. For example, as a result of the price hike, Abbott was able to maintain Kaletra's

14  market share while GSK lost anticipated market share for Lexiva. At this point, GSK and others

15  had sunk substantial resources into promoting their PIs with Norvir under license agreements with

16  Abbott. It was not feasible to start over from scratch. For example, it had taken GSK over seven

17  years and hundreds of millions of dollars to bring Lexiva to the market. These high barriers to

18  entry ~~mean~~meant that the market ~~is~~was locked into Norvir for PI boosting for the foreseeable

19  future.

20      40.    In addition, GSK could not respond to the price increase. GSK briefly considered

21  reducing the price of Lexiva to compensate for the Norvir price increase. It quickly realized it

22  could not do so without suffering an overall decline in revenues and profits even if it successfully

23  saved the sales that Abbott had targeted. Because of pricing rules to the government, GSK could

24  not reduce the price of Lexiva in the private sector where GSK felt the largest effect of the Norvir

25  price hike without losing significant revenues in the government sector of the market where

26  Abbott incurred a penalty for the Norvir price hike. For this reason, as well as the magnitude of the

27

28

1    price hike in relation to the price of Kaletra, it became prohibitively expensive for GSK to respond

2    to the price increase.

3          41.      Abbott's decision to raise the price of Norvir by 400 percent was unprecedented

4    and taken in bad faith. The 400 percent price hike immediately after GSK's release of Lexiva

5    dashed GSK's reasonable expectation that, by virtue of the license for which it had paid, it would

6    be able to promote the co-prescription and co-administration of its PI products with Norvir at

7    prices competitive with those of Kaletra and other PIs. Moreover, by announcing its price hike

8    right after GSK launched Lexiva, Abbott left GSK no realistic options to reestablish Lexiva's

9    value in the minds of the purchasing and prescribing public or otherwise to mitigate the effects of

10   Abbott's action. As Abbott's internal emails and documents illustrate, Abbott's bad faith conduct

11   was done knowingly and intentionally to interfere with sales of Lexiva and other boosted PIs.

12         42.      As a direct and proximate result of Abbott's ~~anticompetitive and~~ wrongful

13   misconduct, GSK has lost market share in the boosted PI market that it reasonably expected to

14   achieve under the Abbott license, has lost profits as a direct consequence of Abbott's misconduct,

15   and has incurred other damages. These losses were direct, foreseeable, and the invariable

16   consequence of Abbott's misconduct.

17                               **~~RELEVANT MARKET~~**

18         ~~43.      There are two product markets relevant to these claims: (1) the market for PI boosters~~

19   ~~and all submarkets therein, and (2) the market for boosted PIs and all submarkets therein.~~

20         ~~44.      The market for PI boosters consists of all drugs that could be used to boost the effects~~

21   ~~of PIs. Norvir is the only drug currently in this market. Abbott therefore has a 100 percent share of~~

22   ~~the market for PI boosters.~~

23         ~~45.      The market for boosted PIs consists of those PIs that benefit from a PI booster. GSK~~

24   ~~and Abbott, among others, compete within the market for boosted PIs by developing, marketing and~~

25   ~~selling boosted PIs. In 2003, Abbott's market share for boosted PIs exceeded 70 percent. Abbott's~~

26   ~~400 percent price increase for Norvir was intended to and had the effect of maintaining its dominant~~

27   ~~market position.~~

28

46.    ~~There are substantial barriers to entry into both the markets for PI boosters and boosted PIs. The products in these markets require hundreds of millions of dollars and many years to design, develop and distribute. Compounding these barriers to entry, both markets require government approvals to enter and are covered by patents and other forms of intellectual property. Thus, competitors or potential market entrants lack the capacity to increase output in the short run.~~

47.    ~~The geographic scope of the markets for PI boosters and boosted PIs is the United States.~~

## HARM TO COMPETITION

43.    ~~48.~~ Abbott voluntarily entered into license agreements with its competitors, including GSK, to promote boosted PIs for administration with Norvir.

44.    ~~49.~~ Through its long-standing, voluntary course of dealing with its competitors, Abbott has facilitated the market for boosted PIs using Norvir and caused its competitors to anticipate incremental, rather than unprecedented and exorbitant, price increases for that drug.

45.    ~~50.~~ Subsequent to establishing this course of dealing, Abbott radically changed course and artificially and unreasonably raised the price of Norvir when co-prescribed with its competitors' boosted PIs, like Lexiva, while keeping the price of Norvir low when used in Abbott's own boosted PI, Kaletra. As a direct and proximate result, Abbott's misconduct has artificially reduced the demand for the boosted PIs of GSK and Abbott's other competitors, while artificially increasing demand for its own boosted PIs. Abbott's unlawful misconduct thus enabled it to monopolize or have a dangerous probability of monopolizing that market.

46.    ~~51.~~ Abbott's misconduct has directly and proximately harmed competition in the market for boosted PIs. Abbott engaged in conduct that unnecessarily excluded and handicapped its competitors, including GSK, in order to acquire a monopoly in the market for boosted PIs. Abbott harmed the competitive process without a legitimate business justification. Abbott elected to make an important change in a voluntary pattern of conduct – after encouraging the promotion of Norvir with its competitors' PIs – that existed in a competitive market and had persisted for several years. Abbott made a conscious choice to change this established pattern to the detriment

of its competitors by increasing the price of Norvir to unprecedented levels. Abbott's justification for its choice is pretextual and does not legitimately promote competition. Abbott's conduct harms competition on the merits, increases prices, limits the quality and availability of products, and increases costs.

47. 52. As a direct and proximate result of Abbott's misconduct, Abbott's competitors in the boosted PI market, including GSK, have suffered declines in revenue and reductions in the market share that they otherwise would have obtained. It was prohibitively expensive for GSK and other Abbott competitors to respond to the price hike both because of the magnitude of the price hike that Abbott took in relation to the overall price of Kaletra and because of government pricing rules that would have required GSK and other Abbott competitors to lower the price of their PIs on sales where the government was the payer (even though there was no competitive motive for doing so because Abbott's price hike on Norvir was ineffective in the government sector). GSK and other Abbott competitors thus did not have an economically rational response to the price increase even if they were equally efficient producers of PIs.

48. 53. As a direct and proximate result of Abbott's unlawful conduct, consumers – for example, patients living with HIV/AIDS and the health care professionals who treat them – have been deprived of the benefit of free and open competition in the boosted PI market and have been injured in their business and property, for example, by:

a) paying more for boosted PI treatments than they would have in the absence of Abbott's unlawful conduct;

b) being denied the benefit of a broader variety of boosted PI treatments; and

c) being denied the benefit of research and development that likely would have resulted in alternative and superior forms of PI treatments.

## DAMAGES

49. 54. GSK's injuries are unique and are in addition to, not duplicative or derivative of, any injuries suffered by its competitors or by consumers. There is a direct causal connection between

1   Abbott's ~~antitrust violations~~misconduct and the harm to GSK. Abbott targeted markets in which

2   GSK participates, intended to harm GSK, and such harm was reasonably foreseeable.

3       50.   ~~55.~~ As a direct and proximate result of, among other things, depriving GSK of the

4   opportunity to compete in fair and open markets and dashing GSK's reasonable expectations under

5   its license with Abbott, Abbott's ~~anticompetitive misconduct,~~ breach of the covenant of good faith

6   and fair dealing, unfair business practices, and other unlawful conduct has had an adverse effect on

7   the revenues GSK should have received and will receive on sales of its boosted PIs. GSK has also

8   lost significant market share in the market for boosted PIs. GSK has further lost the benefit of the

9   bargain it struck with Abbott when GSK agreed to a license from Abbott. Abbott has taken for itself

10  part or all of the expected and reasonably anticipated benefit of the agreement it entered with GSK.

11  GSK's losses are direct, foreseeable and the invariable consequence of Abbott's misconduct.

12  ~~TRADE AND COMMERCE~~

13  **TRADE AND COMMERCE**

14      51.   ~~56.~~ Abbott's conduct has a direct, substantial, and reasonably foreseeable effect on

15  commerce within the United States and elsewhere, and competition in such commerce has been and

16  continues to be substantially reduced.

17      52.   ~~57.~~ Abbott's conduct has a direct, substantial, and reasonably foreseeable effect on

18  commerce within the States of California, North Carolina and elsewhere, and competition in such

19  commerce has been and continues to be substantially reduced.

20  **CONTINUING WRONGDOING AND EQUITABLE TOLLING**

21      53.   ~~58.~~ Abbott's wrongdoing alleged herein involved multiple, continuous unlawful acts

22  that occurred over many years and are continuing. GSK's discovery of the wrongful conduct by

23  Abbott was delayed by Abbott's affirmative attempts to conceal evidence, including by

24  misrepresenting the true purpose and effect of the Norvir price hike. As a result, all applicable

25  statutes of limitations have been tolled.

26

27

28

**COUNT 1** <s>VIOLATION OF SHERMAN ACT SECTION TWO (15 U.S.C. § 2)</s>

**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

<s>59. GSK realleges and incorporates by reference paragraphs 1 through 58 as if set forth herein in full.</s>

<s>60. At all relevant times, Abbott possessed a monopoly in the market for PI boosters.</s>

<s>61. The market for PI boosters and the market for boosted PIs constitute separate, relevant markets.</s>

<s>62. As outlined, for example, in Abbott materials released through the Wall Street Journal, Abbott acted with a specific intent to achieve an anticompetitive purpose, including the intent to eliminate competitors from the market for boosted PIs and to unlawfully acquire or maintain a monopoly in the boosted PI market. Abbott had an economic incentive to achieve this result even though it already possessed a monopoly in the market for PI boosters.</s>

<s>63. Among other things, Abbott's specific actions in furtherance of its anticompetitive purpose and scheme include using its market power in the market for PI boosters to unnecessarily handicap its competitors in the market for boosted PIs. Through its "mega price increase," the timing of that increase and its deceptive public defense of its price increase, Abbott sabotaged its competitors in the boosted PI market. In addition, as a result of its long-standing, voluntary course of conduct in taking incremental price increases and voluntarily agreeing with its competitors that they could use Norvir in combination with PIs, Abbott has an antitrust duty to deal on reasonable terms with respect to Norvir. Abbott violated its antitrust duty to deal through the "mega price increase" without a legitimate, procompetitive justification.</s>

<s>64. At all relevant times, Abbott had monopoly power or a dangerous probability of acquiring monopoly power in the market for boosted PIs.</s>

<s>65. Abbott committed its unlawful and anticompetitive misconduct in order to eliminate competitors in the market for boosted PIs, chill the development of potentially competing boosted PIs, and monopolize, or attempt to monopolize, the market for boosted PIs.</s>

66.    The misconduct alleged in the complaint has harmed the open and free market, restraining competition and threatening to continue to restrain competition.

67.    As a proximate result of Abbott's violations of the Sherman Act, GSK has been substantially injured in its business and property and is likely to be injured further in its business and property. The amount of such injury will be determined at trial. These injuries flow from that which makes Abbott's conduct unlawful and anticompetitive.

**COUNT 2 – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

54.    68. GSK realleges and incorporates by reference paragraphs 1 through 58 53 as if set forth herein in full.

55.    69. GSK and Abbott entered an agreement in which Abbott gave GSK a license to promote its boosted PIs to be administered with Norvir. GSK paid substantial sums of money for this right. GSK also reduced the value of royalties it expected to receive from Abbott pursuant to a contemporaneously negotiated agreement relating to a different set of products and technologies. Abbott knew, upon entering the agreement licensing promotion of Norvir with GSK's PIs, that the agreement's sole purpose was for GSK to exploit Norvir in combination with Lexiva and other PIs. The terms of the agreement, as negotiated, were based upon GSK's reasonable expectation that Norvir would continue to be commercially available for use as a PI boosting agent and that future increases in the price of Norvir would be consistent with past increases. Abbott's 400 percent price increase for Norvir severely injured GSK's rights, dashed its expectations under the license and thwarted GSK's ability to benefit from the contracted rights. The price increase was illegitimate, arbitrary, capricious and done in bad faith. The price increase devastated the value of the license agreement to GSK.

56.    70. As a direct and proximate result of Abbott's intentional, wrongful conduct, GSK has been prevented from receiving its reasonably expected and justifiable fruits under the contract.

57.    71. Abbott's bad faith conduct has directly and proximately caused actual damage or loss to GSK, including the loss of profits from sales of its PIs, including Lexiva. These losses were foreseeable, and a direct and invariable consequence of Abbott's misconduct.

1    **COUNT ~~3~~2 – VIOLATION OF STATE UNFAIR TRADE PRACTICE STATUTE**

2    58.   ~~72.~~ GSK realleges and incorporates by reference paragraphs 1 through 53 as if set

3    forth herein in full.

4    59.   ~~73.~~ This claim is brought to recover treble damages for Abbott's violation of the

5    North Carolina Unfair Trade Practices Act, N.C. Gen. Stat. § 75-1.1.

6    60.   ~~74.~~ The actions of Abbott constitute unfair and deceptive practices ~~and unfair~~

7    ~~competition affecting commerce~~. Abbott's actions as alleged above (1~~) violate antitrust laws, (2~~)

8    constitute inequitable assertions of Abbott's power or position, (~~3~~2) violate the requirement that

9    parties at all levels of commerce act in good faith and engage in fair dealings because Abbott has

10   sought to destroy or injure the right of GSK to receive the benefits of the parties' arrangement, and

11   (~~4~~3) constitute deceptive acts.

12   61.   ~~75.~~ More specifically, as alleged above, Abbott, among other things, manipulated

13   and exploited its position of power over Norvir to lead its competitors to undertake a certain course

14   of conduct and to expect incremental, not extraordinary, price increases and then, after receiving

15   substantial sums of money from those competitors for a license, increased the price of Norvir by

16   400 percent so as to restrict the commercial availability of Norvir and Abbott PI treatments boosted

17   with Norvir.

18   62.   ~~76.~~ Further, in furtherance of, and as part of its plan to bolster Kaletra's sales and

19   market share by quintupling the price of Norvir, Abbott deliberately deceived its competitors and

20   the public as to the true and illegitimate nature of the price increase. As alleged above, Abbott further

21   misrepresented the pricing of Norvir to the public, compounding the injury to commerce and to its

22   competitors' position in the market, including GSK's position in the market.

23   63.   ~~77.~~ As a proximate result of Abbott's violations of the North Carolina Unfair Trade

24   Practices Act, GSK has been substantially injured in its business and property and is likely to be

25   injured further in its business and property. Abbott has damaged GSK and taken for itself part or all

26   of the expected and reasonably anticipated benefit of the agreement it entered with GSK. The

27   amount of such injury will be determined at trial. Unless the defendant is enjoined from further

28

1   violations of the North Carolina Unfair Trade Practices Act, GSK will continue to suffer injury from

2   the illegal acts of the defendant.

3   ~~**COUNT 4 – VIOLATION OF STATE PROHIBITION AGAINST MONOPOLIZATION**~~

4   ~~78.    GSK realleges and incorporates by reference paragraphs 1 through 58 as if set forth~~

5   ~~herein in full.~~

6   ~~79.    Abbott has monopolized or attempted to monopolize the boosted PI market in North~~

7   ~~Carolina in violation of N.C. Gen. Stat. § 75-2.1.~~

8   ~~80.    Abbott has, among other things, leveraged its market power in the market for PI~~

9   ~~boosters into the market for boosted PIs, and voluntarily agreed with its competitors that they could~~

10   ~~use Norvir in combination with their PIs and then changed that course of conduct so as to preclude~~

11   ~~the competition it facilitated by drastically increasing the price of Norvir, without a legitimate,~~

12   ~~procompetitive justification.~~

13   ~~81.    As a proximate result of Abbott's violation of North Carolina's anti-monopolization~~

14   ~~prohibition, GSK has been substantially injured in its business and property and is likely to be~~

15   ~~injured further in its business and property. Abbott has damaged GSK and taken for itself part or all~~

16   ~~of the expected and reasonably anticipated benefit of the agreement it entered with GSK. The~~

17   ~~amount of such injury will be determined at trial.~~

18                        **PRAYER FOR RELIEF**

19   WHEREFORE, GSK prays for relief as follows:

20   ~~A.    For damages resulting from Abbott's violation of Section 2 of the Sherman Act in an~~

21   ~~amount to be determined at trial, and the trebling of such damages; B.~~    For damages resulting

22   from Abbott's breach of the covenant of good faith and fair dealing in an amount to be determined

23   at trial;

24   ~~C~~B.    For damages resulting from Abbott's violation of the North Carolina Unfair Trade

25   Practices Act in an amount to be determined at trial, and the trebling of such damages;

26   ~~D.    For damages resulting from Abbott's violation of North Carolina's prohibition~~

27   ~~against monopolization in an amount to be determined at trial, and the trebling of such damages;~~

28

1    E̶C.    For an award of pre- and post-judgment interest on damages;

2    F̶D.    For an award of attorneys' fees and costs, and other expenses;

3    G̶E.    For such equitable and injunctive relief as is necessary to undo the effects of Abbott's

4    wrongful conduct and to prevent Abbott from repeating that conduct; and

5    H̶F.    For an award of such other and further relief as this Court deems just and proper.

6    Dated: _____          HUESTON HENNIGAN LLP
                                     A̶R̶N̶O̶L̶D̶ ̶&̶ ̶P̶O̶R̶T̶E̶R̶ ̶L̶L̶P̶ THE LANIER LAW
7    FIRM P.C.

8

9                                    By: _/s/ _____
                                     Attorneys for GlaxoSmithKline
10
     OF COUNSEL:
11   Timothy A. Thelen
     Assistant General Counsel
12   GlaxoSmithKline
     Five Moore Drive
13   P.O. Box 13398
     Research Triangle Park
14   North, Carolina 27709
     Phone: (919) 483-1480
15   Fax: (704) 899-9234
     e-mail: tim.a.thelen@gsk.com
16
                              **DEMAND FOR JURY TRIAL**
17
              GlaxoSmithKline hereby demands a trial by jury on all issues triable to a jury.
18

19

20

21

22

23

24

25

26

27

28

1

Dated: _____                    HUESTON HENNIGAN LLP

2                                      ~~ARNOLD & PORTER LLP~~ THE LANIER LAW

FIRM P.C.

3

4

By: _/s/ _____

5                                      Attorneys for GlaxoSmithKline

6   OF COUNSEL:
    Timothy A. Thelen

7   Assistant General Counsel
    GlaxoSmithKline

8   Five Moore Drive
    P.O. Box 13398

9   Research Triangle Park
    North, Carolina 27709

10  Phone: (919) 483-1480
    Fax: (704) 899-9234

11  e-mail: tim.a.thelen@gsk.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28