1   HUESTON HENNIGAN LLP
    Brian Hennigan (SBN 86955)
2   Moez M. Kaba (SBN 257456)
    C. Mitchell Hendy (SBN 282036)
3   523 W. Sixth St., Suite 400
    Los Angeles, CA 90014
4   Telephone:     (213) 788-4340
    Facsimile:     (888) 775-0898
5   bhennigan@hueston.com;
    mkaba@hueston.com;
6   mhendy@hueston.com
7

THE LANIER LAW FIRM P.C.
W. Mark Lanier (*pro hac vice*)
6810 FM 1960 West
Houston, Texas 77069
Telephone: (713) 659-5200
Facsimile: (713) 659-2204
wml@lanierlawfirm.com

THE LANIER LAW FIRM P.C.
Lee A. Cirsch (SBN 227668)
10866 Wilshire Blvd., Suite 400
Los Angeles, California 90024
Telephone: (310) 277-5100
Facsimile: (310) 277-5103
lee.cirsch@lanierlawfirm.com

8

9

10  Attorneys for Plaintiff
    GLAXOSMITHKLINE
11

12

UNITED STATES DISTRICT COURT

13

NORTHERN DISTRICT OF CALIFORNIA

14

OAKLAND DIVISION

15

16  SMITHKLINE BEECHAM CORPORATION, )
    d/b/a GLAXOSMITHKLINE,                            )
17                                                                    )
                   Plaintiff,                                    )
18                                                                    )
          vs.                                                      )
19                                                                    )
    ABBOTT LABORATORIES,                        )
20                                                                    )
                   Defendant.                                 )
21  _____ )

Case No. 4:07-cv-05702 (CW)

**GSK'S SUBMISSION ON PRELIMINARY JURY INSTRUCTIONS, FINAL JURY INSTRUCTIONS, AND VERDICT FORM**

Judge: Honorable Claudia Wilken
Final Pretrial Conference Date: April 8, 2015
Time: 2 p.m.
Location: Courtroom 2 (4th Floor)

22

23

24

25

26

27

28

1    **GSK'S STATEMENT IN SUPPORT OF ITS PROPOSED INSTRUCTIONS AND**

2    **VERDICT FORM**

3        In its order granting Plaintiff GlaxoSmithKline's ("GSK's") unopposed motion for leave to

4    file a second amended complaint, the Court directed GSK to file "updated Preliminary Jury

5    Instructions, Final Jury Instructions and Verdict Form…limited to those [edits] necessary to reflect

6    the Second Amended Complaint." Dkt. 631.

7        GSK's proposed instructions (attached hereto as Exhibit A (in redline form against the

8    Court's instructions and verdict form at Dkt. 620-1, 620-2 and 620-3) and Exhibit B (in clean

9    form)) reflect precisely the Court's instruction to "limit[]" edits. GSK has removed the

10   instructions regarding GSK's Sherman Act cause of action and other references to the federal

11   antitrust law. Similarly, GSK has removed the verdict form questions regarding GSK's Sherman

12   Act cause of action. GSK has made no other substantive changes to the jury instructions or

13   verdict form, which the Court issued after due consideration and multiple rounds of extensive

14   briefing by both sides.

15       The Court further directed GSK to "meet and confer with Defendant prior to filing the

16   updated versions with the Court." Dkt. 631. GSK met and conferred with Abbott regarding its

17   updated instructions and verdict form but the parties were not able to come to agreement. Abbott

18   objects to GSK's limited changes, contending that because the second amended complaint no

19   longer includes a claim for violation of the Sherman Act and North Carolina anti-monopolization

20   statute, the UDTPA claims should somehow also no longer be presented to the jury. Ignoring that

21   the UDTPA is broader than and not coterminous with the Sherman Act, Abbott claims the Court

22   should (1) eliminate all three UDTPA questions; (2) eliminate two of the three UDTPA questions;

23

24

25

26

27

28

1    and/or (3) add new instructions proposed by Abbott, including those regarding "background

2    business principles" and Abbott's purported patent rights.

3         GSK has not seen the bases for Abbott's requests or the authorities Abbott contends

4    support its requests.[1]  However, based on what GSK understands Abbott to be requesting, GSK

5    submits that the Court should not accept Abbott's proposal to: (1) eliminate any UDTPA factual

6    findings where all three are proper and legally cognizable bases for GSK to obtain relief

7    notwithstanding that the second amended complaint does not include a claim for violation of the

8    antitrust law, or (2) insert now inapplicable concepts from the Sherman Act or patent laws in order

9    to confuse and mislead the jury.  GSK's proposed updated instructions and verdict form

10   acknowledge the Court's decisions on these matters to date, and do no more and no less than

11   necessary to reflect that the Sherman Act and North Carolina anti-monopolization statute causes of

12   action are no longer in the case.

14   Dated: March 17, 2015

15

16                                                    /s/ Brian Hennigan
                                                      Brian Hennigan
17                                                    HUESTON HENNIGAN LLP
                                                      523 W. Sixth St., Suite 400
18                                                    Los Angeles, CA  90014
                                                      Attorneys for Plaintiff GlaxoSmithKline

---

27        [1] Pursuant to a joint stipulation filed by the parties (Dkt. 636), Abbott will file its proposed
     instructions and verdict form on Thursday, March 19, along with a brief in support thereof.  GSK
28   will file its opposition to Abbott's proposed instructions and verdict form on Tuesday, March 24.

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SMITHKLINE BEECHAM CORPORATION, d/b/a GLAXOSMITHKLINE, | No. C 07-5702 CW |
| Plaintiff, | PRELIMINARY JURY INSTRUCTIONS |
| v. | |
| ABBOTT LABORATORIES, | |
| Defendant. | |
| _____/ | |

**DUTY OF JURY**

Ladies and gentlemen: You are now the jury in this case.  It is my duty to instruct you on the law.

These instructions are preliminary instructions to help you understand the principles that apply to civil trials and to help you understand the evidence as you listen to it.  You will be given a copy of these instructions to keep throughout the trial.  This set of instructions is not to be taken home and must remain in the jury room when you leave in the evenings.  At the end of the trial, I will give you a final set of instructions.  It is the final set of instructions which will govern your deliberations.

You must not infer from these instructions or from anything I may say or do that I have an opinion regarding the evidence or what your verdict should be.

It is your duty to find the facts from all the evidence in the case.  To those facts you will apply the law as I give it to you.  You must follow the law as I give it to you whether you agree with it or not.  And you must not be influenced by any personal likes or dislikes,

opinions, prejudices or sympathy.  That means that you must decide the case solely on the evidence before you.  You will recall that you took an oath to do so.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all important.

### PARTIES

Abbott Laboratories is the Defendant in this case.  It makes drugs called Norvir and Kaletra to treat human immunodeficiency virus (HIV) infection.

The Plaintiff in this case is SmithKline Beecham Corporation, which does business as GlaxoSmithKline, also known as GSK.  GSK is a pharmaceutical company that makes Lexiva, a drug that competes with Abbott's drug Kaletra.

### CORPORATIONS

All parties are equal before the law and a corporation is entitled to the same fair and conscientious consideration by you as any party.

Under the law, a corporation is considered to be a person.  It can only act through its employees, agents, directors, or officers. Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers performed within the scope of authority.

### SUMMARY OF DISPUTE AND THE PARTIES' CLAIMS AND DEFENSES

This case involves a dispute over brand-name prescription drugs, known as protease inhibitors, which are used to fight HIV.  Protease inhibitors are also known as PIs.  These drugs work by preventing HIV cells from reproducing.

In 1996, Abbott introduced Norvir, a PI used to treat HIV. Norvir's active ingredient is called ritonavir.  Thereafter, it was

1

discovered that, when taken in small quantities with another PI, Norvir would "boost" the effectiveness of the other PI.  Because of this "boosting" property, Norvir is known as a booster.  The other PI is known as the "boosted" PI.

In 2000, Abbott introduced Kaletra, which is a drug that contains two active ingredients: lopinavir and ritonavir, which is the active ingredient in Norvir.  Ritonavir is used to boost the effects of lopinavir.  Kaletra is known as a "boosted" PI.

In late 2003, GSK introduced a new PI drug that was designed to be boosted by Norvir.  As I mentioned earlier, GSK's drug is called Lexiva.  This new boosted PI drug competed with Abbott's Kaletra. Before launching Lexiva, GSK on December 13, 2002, signed a contract with Abbott, the Norvir Boosting License, which allowed GSK to promote and market Lexiva with Abbott's Norvir.

On December 3, 2003, Abbott raised the wholesale price of Norvir by 400 percent, while keeping the price of Kaletra steady.

GSK claims that Abbott~~'s conduct violated federal antitrust laws by monopolizing or attempting to monopolize the market in which Kaletra competes and thereby damaged GSK.  GSK~~ also ~~claims that Abbott~~ breached the implied covenant of good faith and fair dealing in their contract and damaged GSK.  ~~Finally,~~ GSK also claims that Abbott engaged in unfair and deceptive trade practices.

GSK has the burden of proving these claims.  Abbott denies all of GSK's claims.  Abbott contends that it increased Norvir's price for legitimate business reasons, with neither the purpose nor the effect of ~~harming competition or~~ violating law or any duties to GSK.

**BURDEN OF PROOF**

2

When a party has the burden of proof of any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

### WHAT IS EVIDENCE

The evidence from which you are to decide what the facts are consists of:

(1)     the sworn testimony of any witness;

(2)     the exhibits which have been received into evidence; and

(3)     any facts to which the lawyers may agree.

### WHAT IS NOT EVIDENCE

In reaching your verdict, you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence, and you may not consider them in deciding what the facts are.  I will list them for you:

(1)     Arguments and statements by lawyers are not evidence. The lawyers are not witnesses.  What they will say in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

(2)     Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the Court's ruling on it.

(3)   ~~(3)~~   Testimony that is excluded or stricken, or that you are instructed to disregard, is not evidence and must not be considered.

(4)   ~~(4)~~   Anything you see or hear when the Court is not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.

### EVIDENCE FOR LIMITED PURPOSE

Some evidence may be admitted for a limited purpose only.  If I instruct you that an item of evidence is admitted for a limited purpose, you must consider it only for that limited purpose and for no other.

### DIRECT AND CIRCUMSTANTIAL EVIDENCE

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

### RULING ON OBJECTIONS

There are rules of evidence that control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object.  If I overrule the objection, the question may be answered or the exhibit received.  If I sustain the objection, the question cannot be answered, or the exhibit cannot be received.  Whenever I sustain an objection

to a question, you must ignore the question and must not guess what the answer might have been.

## CREDIBILITY OF WITNESSES

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

(1)  (1)  the opportunity and ability of the witness to see or hear or know the things testified to;

(2)  (2)  the witness's memory;

(3)  (3)  the witness's manner while testifying;

(4)  (4)  the witness's interest in the outcome of the case and any bias or prejudice;

(5)  (5)  whether other evidence contradicts the witness's testimony;

(6)  (6)  the reasonableness of the witness's testimony in light of all the evidence; and

(7)  (7)  any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.

## EXPERT OPINION

Some witnesses, because of education or experience, are permitted to state opinions and the reasons for those opinions. Opinion testimony should be judged just like any other testimony.

You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and

5

experience, the reasons given for the opinion, and all the other evidence in the case.

### CHARTS AND SUMMARIES

Certain charts and summaries may be received into evidence to illustrate information brought out in the trial. Charts and summaries are only as good as the underlying evidence that supports them. You should, therefore, give them only such weight as you think the underlying evidence deserves.

Certain graphics not received in evidence may be shown to you in order to help explain the contents of books, records, documents or other evidence in the case. They are not themselves evidence or proof of any facts. If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these graphics and determine the facts from the underlying evidence.

I. ~~ANTITRUST CLAIMS - PURPOSE OF ANTITRUST LAWS~~ BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - INTRODUCTION

~~GSK first alleges that Abbott violated the federal antitrust laws by willfully maintaining a monopoly or attempting to acquire a monopoly. The purpose of the federal antitrust laws is to preserve free and unfettered competition in the marketplace. The federal antitrust laws rest on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.~~

#### ~~A. ACTUAL MONOPOLIZATION CLAIM – ELEMENTS~~

~~The first claim GSK brings under the antitrust laws is that Abbott unlawfully actually monopolized the market in which Kaletra competes. To prevail on this claim, GSK must prove each of the following elements by a preponderance of the evidence:~~

First, that the market that it alleges Abbott monopolized is a validly defined economic market;

Second, that Abbott possessed monopoly power in that market during the time period in which the violation allegedly occurred;

Third, that Abbott willfully maintained monopoly power in that market by engaging in anticompetitive conduct; and

Fourth, that GSK was injured in its business or property because of Abbott's anticompetitive conduct.

If you find that GSK has failed to prove any of these elements, then you must find for Abbott and against GSK on this claim.  If you find that GSK has proved each of these elements by a preponderance of the evidence, then you must find for GSK and against Abbott on this claim.

**1. ACTUAL MONOPOLIZATION CLAIM – ELEMENT ONE: RELEVANT MARKET**

The first element of its actual monopolization claim that GSK must prove by a preponderance of the evidence is that the market that it alleges Abbott monopolized is a validly defined, relevant economic market.  GSK defines this relevant market as the market for all boosted protease inhibitors or as the market for a subset of such drugs: all highly effective protease inhibitors, including only boosted Reyataz, boosted Lexiva and Kaletra, at the time of the Norvir price increase.  Abbott asserts that the relevant market also includes unboosted protease inhibitors and NNRTI drugs, and that GSK's reasons for defining the market as it has are invalid.

Defining the relevant market is essential because you are required to make a judgment about whether Abbott had monopoly power in a properly defined economic market.  To decide the relevant market, you must be able to determine what, if any, economic forces restrained

Abbott's freedom to set prices for or restrict the output of Kaletra. The most likely and most important restraining force is actual and potential competition from other firms and their products. This includes all firms and products that acted as restraints on Abbott's power to set prices as it pleased. All the firms and products that exerted this restraining force are within what is called the relevant market.

The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other. In other words, the relevant product market includes the products that consumers believe are reasonably interchangeable or reasonable substitutes for each other. This is a practical test with reference to actual behavior of buyers and marketing efforts of sellers. Products need not be identical or precisely interchangeable as long as they are reasonable substitutes. Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material -- such as aluminum foil, cellophane, or even plastic containers -- to be reasonable alternatives, then all those products would be in the same relevant product market.

To determine whether products are reasonably interchangeable substitutes for each other, you may consider whether a small but significant permanent increase in the price of one product would result in a substantial number of consumers switching from that product to another. Generally speaking, a small but significant permanent increase in price is approximately a five percent increase in price not due to external cost factors, but you may conclude in this case that some other percentage is more applicable to the product

at issue.  If you find that such switching would occur, then you may conclude that the products are in the same relevant market.

In evaluating whether various products are reasonably interchangeable or are reasonable substitutes for each other, you may also consider: (1) consumers' views on whether the products are interchangeable; (2) the relationship between the price of one product and sales of another; (3) the perceptions of either the industry or the public as to whether the products are in separate markets; (4) the views of the producers in the market about who their respective competitors are; and (5) the existence or absence of different customer groups or distribution channels.

## 2. ACTUAL MONOPOLIZATION CLAIM - ELEMENT TWO: MONOPOLY POWER

The second element of its actual monopolization claim that GSK must prove by a preponderance of the evidence is that Abbott possessed monopoly power in the relevant market during the time period in which Abbott allegedly violated the antitrust laws. Monopoly power is the power to control prices and exclude or handicap competition in a relevant market.  The power to handicap competition is the power to limit competition on the merits.  A firm is a monopolist if it can profitably raise or maintain prices substantially above the competitive level for a significant period of time.  Monopoly power, in and of itself, is not unlawful.

GSK may show that Abbott had monopoly power through indirect evidence.  Factors you may consider are: (a) Abbott's market share, (b) market share trends, (c) barriers to entry or expansion and (d) the number and size of Abbott's competitors.  If this evidence establishes that Abbott had the power to control prices and exclude or handicap competition in the relevant antitrust market, then you

9

may conclude that Abbott had monopoly power in the market.   I will explain each of these factors.

### a. MARKET SHARE

The first factor that you may consider as evidence of monopoly power is Abbott's market share.  You will hear evidence about Abbott's market share, and you should determine Abbott's market share as a percentage of total industry sales by prescription.

A market share above fifty percent may be sufficient to support an inference that Abbott had monopoly power.  The likelihood that a company has monopoly power is stronger the higher that company's share is above fifty percent.

A market share below fifty percent is ordinarily not sufficient to support a conclusion that a company has monopoly power.  However, if you find that the other evidence demonstrates that Abbott, in fact, had monopoly power despite having a market share below fifty percent, you may conclude that Abbott had monopoly power.

### b. MARKET SHARE TRENDS

The second factor that you may consider as evidence of monopoly power is the trend in Abbott's market share.   An increasing market share may strengthen an inference that Abbott had monopoly power, particularly if Abbott had a high market share, while a decreasing share might show that Abbott did not have monopoly power.  A declining market share, however, does not foreclose a finding of monopoly power.

### c. BARRIERS TO ENTRY OF EXPANSION

The third factor you may consider as evidence of monopoly power is the extent to which there were barriers to entry or barriers to expansion in the relevant market.

Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way. Barriers to entry might include intellectual property rights (such as patents), specialized marketing practices, and the reputation of the companies already participating in the market or the brand name recognition of their products.

Barriers to expansion prevent other companies who are already in the market from increasing their output and selling more of their product.

Evidence of low or no barriers to entry or expansion during the relevant period would be evidence that Abbott did not have monopoly power, regardless of Abbott's market share, because new competitors could enter the market or existing competitors could expand their sales if Abbott attempted to raise the price of its drug Kaletra substantially above competitive levels for a substantial period of time.  By contrast, evidence of high barriers to entry and high barriers to expansion along with high market share, during the relevant period, may support an inference that Abbott had monopoly power.

The history of entry and exit of competitors in the relevant market may be helpful to consider.  Entry of new competitors or expansion of existing competitors may be evidence that Abbott lacked monopoly power.  On the other hand, departures of competitors from the market, or the failure of competitors to enter the market, particularly if prices and profit margins are relatively high, may support an inference that Abbott had monopoly power.

**d. NUMBER AND SIZE OF COMPETITORS**

The fourth factor you may consider as evidence of monopoly power is whether Abbott's competitors were capable of effectively competing.  In other words, you should consider whether the financial strength, market shares and number of competitors acted as a check on Abbott's ability to price Kaletra.  If Abbott's competitors were vigorous or had large or increasing market shares, this may be evidence that Abbott lacked monopoly power. On the other hand, if you determine that Abbott's competitors were weak or had small or declining market shares, this may support an inference that Abbott had monopoly power.

### 3. ACTUAL MONOPOLIZATION CLAIM - ELEMENT THREE: ANTICOMPETITIVE CONDUCT

The third element of an actual monopolization claim that GSK must prove by a preponderance of the evidence is that Abbott willfully maintained its monopoly power by engaging in anticompetitive conduct.

In considering whether Abbott's conduct was anticompetitive, you must draw a distinction between practices which tend to exclude or restrict competition on the one hand and the success of a business which reflects only a superior product, a well-run business, or luck, on the other.  Put another way, anticompetitive conduct refers to practices that unreasonably or unnecessarily impede fair competition; that is, conduct that impairs the efforts of others to compete for customers in an unnecessarily restrictive way.  Such conduct does not refer to ordinary means of competition, like offering better products or services, exercising superior skill or business judgment, utilizing more efficient technology, or exercising natural competitive advantages.

Here, in support of its claim that Abbott unlawfully monopolized the market in which Kaletra competes, GSK argues that Abbott engaged

12

in two types of anticompetitive conduct:

(a) unlawful bundled discounting; and (b) a practical refusal to cooperate with its competitors.  Abbott denies that it engaged in either type of anticompetitive conduct, and contends that it increased Norvir's price for legitimate business reasons, including obtaining a fair value for its patented invention, with neither the purpose nor the effect of harming competition.

### a. **BUNDLED DISCOUNTING**

The first type of anticompetitive conduct that GSK alleges to prove the third element of its actual monopolization claim is unlawful bundled discounting.  Sometimes a company will offer a lower price if a buyer purchases two different products together for a single price, in a bundle, rather than buying them separately.  Bundling is generally not anticompetitive because bundled discounts can benefit buyers.

However, bundling may be anticompetitive if a business that has monopoly power over part of the bundle charges a substantial penalty to buyers who purchase the products separately. Penalizing buyers purchasing from competitors can have the effect of causing buyers to purchase the entire bundle from the monopolist even if those buyers would rather buy one product from the bundler and one product from the competitor.  In this way, monopoly bundling can harm or exclude equally efficient competitors that sell only one of the bundled products.  This could reduce competition and lead to higher prices.

In order to prove that Abbott engaged in unlawful bundled discounting in this case, GSK must prove that: (i) Kaletra is a bundle; and (ii) Abbott's Norvir price increase constituted an improper

13

penalty on buyers who wanted to purchase a boosted PI other than lopinavir, the active ingredient in Kaletra.

### i. BUNDLED DISCOUNTING - IS KALETRA A BUNDLE?

The first element that GSK must prove to show that Abbott engaged in unlawful bundled discounting is that Kaletra is a bundle of products.  GSK contends that Kaletra is a bundle of the active ingredients lopinavir and ritonavir, the active ingredient in Norvir.  Abbott contends that Kaletra is a single integrated product, that lopinavir and ritonavir are active ingredients rather than separate products, that Norvir is not a bundled component of Kaletra and that Kaletra is not a bundle.

### ii. BUNDLED DISCOUNTING - IMPROPER PENALTY

The second element that GSK must prove to show that Abbott engaged in unlawful bundled discounting is that Abbott's Norvir price increase constituted an improper penalty such that it could exclude a hypothetical competitor, who is equally efficient at producing a boosted PI, because the competitor does not sell Norvir.  GSK argues that the Norvir price increase imposed a penalty on buyers who wanted to purchase a boosted PI other than lopinavir.

### b. PRACTICAL REFUSAL TO DEAL WITH COMPETITORS

The second type of anticompetitive conduct that GSK alleges to prove the third element of its actual monopolization claim is that Abbott effectively refused to deal with its competitors, and did so with anticompetitive intent.  A refusal to deal does not need to be absolute to violate antitrust laws.  A company's practical, or effective, refusal to deal with its competitors can constitute anticompetitive conduct.

A company that possesses monopoly power generally does not have a duty to deal with its competitors.  However, a practical refusal to deal with competitors may constitute anticompetitive conduct if the practical refusal was contrary to Abbott's short- run best interest, but made sense for Abbott because it harmed competitors and helped Abbott maintain monopoly power in the long run.  An important change in a pattern of conduct, in a competitive market, that had persisted for several years can constitute a practical refusal to deal.

In deciding whether Abbott acted with anticompetitive intent, you may consider: (i) whether Abbott unilaterally terminated a voluntary and profitable course of dealing with its competitors; (ii) whether Abbott offered to deal with its competitors only on unreasonable terms and conditions; and (iii) whether Abbott refused to provide its competitors' customers with products, that were sold in a retail market, on the same terms it provided the products to its own customers.

**c. ABBOTT'S AFFIRMATIVE DEFENSE – LEGITIMATE BUSINESS REASON**

If you find that GSK has proved that Abbott engaged in anticompetitive conduct, you should then consider whether Abbott has proved its affirmative defense that Abbott had a legitimate business reason for the Norvir price increase.  A legitimate business reason is one that demonstrates that Abbott did not intend to exclude its competitors from the market in which Kaletra competes.  To prevail on its affirmative defense, Abbott has the burden of proving that it had a legitimate business reason for its alleged anticompetitive conduct.  It is for you to decide whether this reason is legitimate.

Conduct that is designed to protect or further Abbott's legitimate business proposes is not anticompetitive, even if that conduct injures competitors. A legitimate business purpose is one that benefits Abbott, regardless of any harmful effect on competitors, such as a purpose to promote efficiency or quality, offer a better product or service, or increase short-run profits. In general, the desire to maintain monopoly power or to block entry of competitors is not a legitimate business purpose.

As you will hear during trial, Abbott has a patent on Norvir and on Norvir's use as a booster. Abbott's patents on Norvir and on Norvir's use as a booster provide Abbott with a legal monopoly over Norvir and Norvir's use as a booster. This fact does not establish whether Abbott violated the antitrust laws through anticompetitive conduct. It is for you to decide whether Abbott engaged in anticompetitive conduct that violates the antitrust laws.

If you find that GSK has proved that Abbott engaged in anticompetitive conduct, through bundled discounting or an effective refusal to deal with its competitors or both, and that Abbott has not proved that it had a legitimate business reason for its conduct, you may find that GSK has proved the third element of its actual monopolization claim.

### 4. ACTUAL MONOPOLIZATION CLAIM - ELEMENT FOUR: REQUIREMENT OF INJURY

The fourth element of an actual monopolization claim that GSK must prove by a preponderance of the evidence is that it suffered injury to its business or property. GSK can satisfy this element if it can prove the following:

First, that GSK was in fact injured as a result of Abbott's alleged violation of the antitrust laws;

Second, that Abbott's alleged illegal conduct was a material cause of GSK's injury; and

Third, that GSK's injury was an injury of the type that the antitrust laws were intended to prevent.

The first part of this element requires GSK to establish that it was injured as a result of Abbott's alleged violation of the antitrust laws.  Proving the fact of injury does not require GSK to prove the dollar value of its injury.  It requires only that GSK prove that it was in fact injured by Abbott's alleged antitrust violation. If you find that GSK has established that it was in fact injured by an antitrust violation by Abbott, you will later consider the amount of GSK's damages.  The fact of injury and the amount of damages are different concepts.  You will not be asked to consider the amount of antitrust damages until you have concluded that GSK has established all of the elements of a violation of the antitrust laws.

As to the second part of this element, GSK must prove that Abbott's alleged illegal conduct was a material cause of GSK's injury. This means that GSK must prove that it was injured as a result of Abbott's alleged antitrust violation, and not some other cause.  GSK is not required to prove that Abbott's alleged antitrust violation was the sole cause of its injury; nor does GSK need to eliminate all other possible causes of injury.  It is enough if GSK has proved that the alleged antitrust violation was a material cause of its injury. However, if you find that GSK's injury was caused primarily by something other than the alleged antitrust violation, then you must

17

find that GSK has failed to prove the injury element of its antitrust claim.

To prove the third part of this element, GSK must establish that its injury is the type of injury that the antitrust laws are intended to prevent.  If GSK's injury was caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then GSK's injury is an antitrust injury.  On the other hand, if GSK's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then GSK's injuries are not antitrust injuries and GSK may not recover damages for those injuries under the antitrust laws.  You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against -- such as where a competitor offers better products or services or where a competitor is more efficient and can charge lower prices and still earn a profit.

### B. ATTEMPTED MONOPOLIZATION CLAIM - ELEMENTS

The second claim GSK brings under the antitrust laws is that Abbott unlawfully attempted to monopolize the market in which Kaletra competes.  To prevail on the claim of attempted monopolization, GSK must prove each of the following elements by a preponderance of the evidence:

First, that Abbott had a specific intent to achieve monopoly power in a relevant market;

Second, that there was a dangerous probability that Abbott would achieve its goal of acquiring monopoly power in the relevant market;

Third, that Abbott engaged in anticompetitive conduct; and

Fourth, that GSK was injured in its business or property by Abbott's anticompetitive conduct.

If you find that GSK has failed to prove any of these elements, then you must find for Abbott and against GSK on this claim.  If you find that GSK has proved each of these elements by a preponderance of the evidence, then you must find for GSK and against Abbott on this claim.

### 1.  ATTEMPTED MONOPOLIZATION CLAIM - ELEMENT ONE: SPECIFIC INTENT TO MONOPOLIZE A RELEVANT MARKET

The first element of an attempted monopolization claim that GSK must prove by a preponderance of the evidence is that Abbott had a specific intent to monopolize the market in which GSK alleges that Kaletra competes.  This is the same market as the market relevant to GSK's claim of actual monopolization, about which I instructed you earlier.  You must determine whether GSK has proved that Abbott acted with the conscious aim of obtaining the power to control prices and to exclude or handicap competition in this alleged market.

There are two ways GSK may prove that Abbott had the specific intent to monopolize.  First, GSK may present evidence of direct statements of Abbott's intent to obtain a monopoly in the relevant market.  Such proof of specific intent may be established by documents prepared by responsible officers or employees of Abbott at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of Abbott.  You must be careful, however, to distinguish between Abbott's intent to compete aggressively (which is lawful), which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Second, even if you decide that the evidence does not prove directly that Abbott specifically intended to obtain a monopoly, specific intent may be inferred from what Abbott did.  For example, if the evidence shows that the natural and probable consequence of Abbott's conduct in the relevant market was to give Abbott control over prices and to exclude or handicap competition, and that this was plainly foreseeable by Abbott, then you may (but are not required to) infer that Abbott specifically intended to acquire monopoly power.

## 2. ATTEMPTED MONOPOLIZATION CLAIM – ELEMENT TWO: DANGEROUS PROBABILITY OF SUCCESS

The second element of an attempted monopolization claim that GSK must prove by a preponderance of the evidence is that there was a dangerous probability that Abbott would succeed in acquiring monopoly power in the market in which Kaletra competes if Abbott continued to engage in anticompetitive conduct.  As I instructed you earlier, monopoly power is the power to control prices and exclude competition in a relevant antitrust market.

In determining whether there was a dangerous probability that Abbott would acquire the ability to control prices in the relevant market, you should consider the factors included in Instruction "A.2. ACTUAL MONOPOLIZATION CLAIM – ELEMENT TWO: MONOPOLY POWER," which I gave earlier.  A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Abbott would ultimately acquire monopoly power.

## 3. ATTEMPTED MONOPOLIZATION CLAIM – ELEMENT THREE: ANTICOMPETITIVE CONDUCT

The third element of an attempted monopolization claim that GSK must prove by a preponderance of the evidence is that Abbott engaged in anticompetitive conduct.  GSK alleges that, to attempt to monopolize the market in which Kaletra competes, Abbott engaged in (a) unlawful bundled discounting; and (b) a practical refusal to deal with its competitors.  This is the same anticompetitive conduct that GSK alleges with respect to its actual monopolization claim, about which I instructed you earlier.

### 4. ATTEMPTED MONOPOLIZATION CLAIM - ELEMENT FOUR: REQUIREMENT OF INJURY

The fourth element of an attempted monopolization claim that GSK must prove by a preponderance of the evidence is that it suffered injury to its business or property.  This is the same type of injury as the injury required for GSK's actual monopolization claim, about which I instructed you earlier.

## II. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - INTRODUCTION

I will now discuss GSK's claims.  Implied in every contract is a covenant, or agreement, of good faith and fair dealing.  The implied covenant of good faith and fair dealing between parties to a contract is a pledge that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the benefits of the contract.  The implied covenant is part of the contract, even though the contract contains a provision that states that the written contract is the "entire agreement." A breach of the covenant is a breach of the contract itself, the covenant being part and parcel of the contract. The covenant encompasses any promises that a reasonable person in the position of the promisee would be

justified in understanding were included.  However, the covenant cannot be construed so broadly as to create independent contractual rights that were not bargained for by the parties.

## A. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – ELEMENTS

GSK alleges that Abbott breached the implied covenant of good faith and fair dealing with respect to the Norvir Boosting License. In order to demonstrate that Abbott breached the implied covenant of good faith and fair dealing, GSK has the burden to prove three elements by a preponderance of the evidence:

First, that Abbott's conduct directly destroyed or injured GSK's right to receive benefits under the Norvir Boosting License that a reasonable party in GSK's position would have understood the Norvir Boosting License to have included;

Second, that Abbott engaged in grossly negligent conduct; and

Third, that Abbott's conduct constituting a breach of the implied covenant of good faith and fair dealing was a proximate cause of the injury to GSK's business.

### 1. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – ELEMENT ONE: CONDUCT

The first element of its implied covenant claim that GSK must prove by a preponderance of the evidence is that Abbott committed an act that showed a lack of good faith and fair dealing, injuring GSK's right to receive the benefits that a reasonable party would have been justified in understanding were included in the Norvir Boosting License.

## 2. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – ELEMENT TWO: GROSS NEGLIGENCE

The second element of its implied covenant claim that GSK must prove by a preponderance of the evidence is that Abbott's breach of the implied covenant constituted grossly negligent conduct.  Such conduct involves intentional wrongdoing or a reckless indifference to the rights of others.

**3. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING –=**

**ELEMENT THREE: CAUSE OF INJURY**

The third element of its implied covenant claim that GSK must prove by a preponderance of the evidence is that Abbott's breach of the implied covenant was a proximate cause of the injury to GSK's business.

Proximate cause is a cause which in a natural and continuous sequence produces the injury, and is a cause which a reasonable and prudent person could have foreseen would probably produce such injury or some similar injurious result.

There may be more than one cause of an injury.  Therefore, GSK need not prove that Abbott's conduct was the sole cause of the injury to GSK's business.  However, GSK must prove by a preponderance of the evidence that its injury is directly traceable to Abbott's alleged breach of the implied covenant.

**~~III~~II. UNFAIR AND DECEPTIVE TRADE PRACTICES**

GSK alleges that Abbott engaged in unfair and deceptive trade practices.  To prove this claim, GSK must prove one or more of the following:

1. ~~1.~~ During the negotiation of the Norvir Boosting License, Abbott was considering how to use its control over Norvir to limit competition with its drug Kaletra from competitors' drugs and deliberately withheld its plans from GSK; or ~~—~~

23

2. ~~2.~~ Abbott inequitably asserted its power over Norvir by increasing Norvir's price by 400 percent to disrupt Lexiva's launch or undermine Lexiva's future sales or both; or~~—~~

3. ~~3.~~ Abbott timed the 400 percent Norvir price increase in order to disrupt Lexiva's launch or undermine Lexiva's future sales or both.

You will also be asked to determine whether any of this conduct proximately caused injury to GSK.

## IV. DAMAGES

It is the duty of the Court to instruct you about the measure of damages.  By instructing you on damages, the Court does not mean to suggest for which party your verdict should be rendered.

If you find for GSK on any of its claims, you must determine its damages.  GSK has the burden of proving damages by a preponderance of the evidence.  Damages means the amount of money that will reasonably and fairly compensate GSK for any injury you find was proximately caused by Abbott.

GSK seeks an award of damages on each of its claims based on profits it alleges that it lost as a result of Abbott's ~~anticompetitive conduct, Abbot's~~ breach of the implied covenant~~,~~ and Abbott's unfair and deceptive trade practices.  If you find that GSK proved ~~one or more of its antitrust claims, or~~ its breach of the implied covenant claim, or its claim of unfair and deceptive trade practices, you must consider the evidence of GSK's damages.

GSK will offer evidence to calculate the profits it would have earned if Abbott had not engaged in its alleged misconduct.  You may award GSK the amount it has proved its profits would have been in the absence of this alleged misconduct.

24

It is for you to determine what damages, if any, have been proved. So long as there is a reasonable basis for a damages award, GSK should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical precision. However, your award must be based upon evidence and not upon speculation, guesswork or conjecture.

### CONDUCT OF THE JURY

I will now say a few words about your conduct as jurors.

First, keep an open mind throughout the trial, and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

Second, because you must decide this case based only on the evidence received in the case and on my instructions as to the law that applies, you must not be exposed to any other information about the case or the issues it involves during the course of your jury duty. Thus, until the end of the case or unless I tell you otherwise do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone or electronic means, via e-mail, text messaging, or any Internet chat room, blog, Web site or other feature. This applies to communicating with your fellow jurors until I give you the case for deliberation, and it applies to communicating with everyone else including your family members, your employer, and the people involved in the trial, although you may notify your family and your employer that you have been seated as a juror in the case. But, if you are asked or approached in any way about your jury service or about this case, you must respond that you have been ordered not to discuss the

25

matter and to report the contact to the court. Because you will receive all the evidence and legal instruction you properly may consider to return a verdict: do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address.  A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over.  If any juror is exposed to any outside information, please notify the court immediately.

**TAKING NOTES**

If you wish, you may take notes to help you remember the evidence. If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case.  Do not let note-taking distract you.  When you leave, your notes should be left in the jury room. No one will read your notes. They will be destroyed at the conclusion of the case.

Whether or not you take notes, you should rely on your own memory of the evidence.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those of your fellow jurors.

**NO TRANSCRIPT AVAILABLE TO JURY**

During deliberations, you will have to make your decision based on what you recall of the evidence.  You will not have a written

transcript of the trial.  I urge you to pay close attention to the testimony as it is given.

If at any time you cannot hear or see the testimony, evidence, questions or arguments, let me know so that I can correct the problem.

## QUESTIONS TO WITNESSES BY JURORS

You will be allowed to propose written questions to witnesses. You may propose questions in order to clarify the testimony, but you are not to express any opinion about the testimony or argue with a witness.  If you propose any questions, remember that your role is that of a neutral fact finder, not an advocate.  You may write out your questions. Do not sign the questions. I will review the questions with the attorneys to determine if they are legally proper.

There are some proposed questions that I will not permit, or will not ask in the wording submitted by the juror. This might happen either due to the rules of evidence or other legal reasons, or because the question is expected to be answered later in the case.  If I do not ask a proposed question, or if I rephrase it, do not speculate as to the reasons.  Do not give undue weight to questions you or other jurors propose.  You should evaluate the answers to those questions in the same manner you evaluate all of the other evidence.

By giving you the opportunity to propose questions, I am not requesting or suggesting that you do so.  It will often be the case that a lawyer has not asked a question because it is legally objectionable or because a later witness may be addressing that subject.

## OUTLINE OF TRIAL

The trial will now begin.  First, each party may make an opening statement.  An opening statement is not evidence.  It is simply an

outline to help you understand what that party expects the evidence will show.

After opening statements, GSK will present evidence, and counsel for Abbott may cross-examine.  Then Abbott may present evidence, and counsel for GSK may cross-examine.

After the evidence has been presented, I will instruct you on the law that applies to the case and the attorneys will make closing arguments.  After that, you will go to the jury room to deliberate on your verdict.

After you have reached your verdict, you will be excused.


Dated:                                  _____
                                        CLAUDIA WILKEN
                                        United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SMITHKLINE BEECHAM CORPORATION, d/b/a GLAXOSMITHKLINE, | No. C 07-5702 CW |
| Plaintiff, | FINAL JURY INSTRUCTIONS |
| v. | |
| ABBOTT LABORATORIES, | |
| Defendant. | |
| _____/ | |

**DUTY OF JURY**

   Members of the Jury: Now that you have heard all of the evidence, it is my duty to instruct you as to the law of the case. A copy of these instructions will be sent with you to the jury room when you deliberate.  You should discard the preliminary instructions; the final instructions control and you should not concern yourselves with any differences between them and the preliminary instructions.  You must not infer from these instructions or from anything I may say or do that I have an opinion regarding the evidence or what your verdict should be.

   It is your duty to find the facts from all the evidence in the case.  To those facts you will apply the law as I give it to you.  You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy.  That means that you must decide the case solely on the evidence before you.  You will recall that you took an oath to do so.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all important.

## PARTIES

Abbott Laboratories is the Defendant in this case.  It makes drugs called Norvir and Kaletra to treat human immunodeficiency virus (HIV) infection.

The Plaintiff in this case is SmithKline Beecham Corporation, which does business as GlaxoSmithKline, also known as GSK.  GSK is a pharmaceutical company that makes Lexiva, a drug that competes with Abbott's drug Kaletra.

## CORPORATIONS

All parties are equal before the law and a corporation is entitled to the same fair and conscientious consideration by you as any party.

Under the law, a corporation is considered to be a person.  It can only act through its employees, agents, directors, or officers.  Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers performed within the scope of authority.

## SUMMARY OF DISPUTE AND THE PARTIES' CLAIMS AND DEFENSES

The drugs involved in this dispute are known as protease inhibitors, and also known as PIs.  Abbott's drug Norvir, a protease inhibitor, has the active ingredient called ritonavir.  When taken in small quantities with another PI, Norvir "boosts" the effectiveness of the other PI.  Because of this "boosting" property, Norvir is known as a booster.  The other PI is known as the "boosted" PI.

Abbott's drug Kaletra contains two active ingredients: lopinavir and ritonavir, which is the active ingredient in Norvir.  Ritonavir

1

is used to boost the effects of lopinavir.  Kaletra is known as a "boosted" PI.

GSK's drug is called Lexiva, a boosted PI that competes with Abbott's Kaletra.  Before launching Lexiva, GSK signed a license agreement with Abbott, the Norvir Boosting License, on December 13, 2002, which allowed GSK to promote and market Lexiva with Abbott's Norvir.

On December 3, 2003, Abbott raised the wholesale price of 100 milligrams of Norvir from $1.71 to $8.57, which amounted to a 400-percent increase.  Abbott maintained the cost of a daily regimen of Kaletra at $18.78.

GSK ~~alleges that Abbott's conduct violated federal antitrust laws, causing damage.  Specifically, GSK claims that Abbott monopolized or attempted to monopolize the market in which Kaletra competes.  GSK also~~ claims that Abbott breached the implied covenant of good faith and fair dealing in their license agreement and damaged GSK.  ~~Finally, GSK~~GSK also claims that Abbott engaged in unfair and deceptive trade practices.

GSK has the burden of proving these claims.  Abbott denies all of GSK's claims.  Abbott contends that it increased Norvir's price for legitimate business reasons, with neither the purpose nor the effect of ~~harming competition or~~ violating law or any duties to GSK.

**BURDEN OF PROOF**

When a party has the burden of proof of any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

## WHAT IS EVIDENCE

The evidence from which you are to decide what the facts are consists of:

(1)    the sworn testimony of any witness;

(2)    the exhibits which have been received into evidence; and

(3)    any facts to which the lawyers may agree.

## WHAT IS NOT EVIDENCE

In reaching your verdict, you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence, and you may not consider them in deciding what the facts are.  I will list them for you:

(1)    ~~(1)~~  Arguments and statements by lawyers are not evidence. The lawyers are not witnesses.  What they say in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

(2)    ~~(2)~~  Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the Court's ruling on it.

(3)    ~~(3)~~  Testimony that has been excluded or stricken, or that you were instructed to disregard, is not evidence and must not be considered.

(4)   ~~(4)~~ Anything you see or hear when the Court is not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.

### EVIDENCE FOR LIMITED PURPOSE

Some evidence may have been admitted for a limited purpose only. If I instructed you that an item of evidence was admitted for a limited purpose, you must consider it only for that limited purpose and for no other.

### DIRECT AND CIRCUMSTANTIAL EVIDENCE

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

### RULING ON OBJECTIONS

There are rules of evidence that control what can be received into evidence.  When a lawyer asked a question or offered an exhibit into evidence and a lawyer on the other side thought that it was not permitted by the rules of evidence, that lawyer may have objected. If I overruled the objection, the witness was permitted to answer the question, or the exhibit was received.  If I sustained the objection, the witness was not permitted to answer the question, or the exhibit was not received.  If I sustained an objection to a question, you must ignore the question and must not guess what the answer might have been.

### CREDIBILITY OF WITNESSES

4

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

(1) ~~(1)~~ the opportunity and ability of the witness to see or hear or know the things testified to;

(2) ~~(2)~~ the witness's memory;

(3) ~~(3)~~ the witness's manner while testifying;

(4) ~~(4)~~ the witness's interest in the outcome of the case and any bias or prejudice;

(5) ~~(5)~~ whether other evidence contradicts the witness's testimony;

(6) ~~(6)~~ the reasonableness of the witness's testimony in light of all the evidence; and

(7) ~~(7)~~ any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.

**EXPERT OPINION**

Some witnesses, because of education or experience, were permitted to state opinions and the reasons for those opinions. Opinion testimony should be judged just like any other testimony.

You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

**CHARTS AND SUMMARIES**

5

Certain charts and summaries were received into evidence to illustrate information brought out in the trial.  Charts and summaries are only as good as the underlying evidence that supports them.  You should, therefore, give them only such weight as you think the underlying evidence deserves.

Certain graphics not received in evidence were shown to you in order to help explain the contents of books, records, documents or other evidence in the case.  They are not themselves evidence or proof of any facts.  If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these graphics and determine the facts from the underlying evidence.

### TESTIMONY THROUGH DEPOSITIONS

A deposition is the sworn testimony of a witness taken before trial.  The witness is placed under oath to tell the truth and lawyers for each party may ask questions.  You should consider deposition testimony, presented to you in court instead of live testimony, insofar as possible, in the same way as if the witness had been present to testify.

### THE FOOD AND DRUG ADMINISTRATION

You have heard mention of the Food and Drug Administration.  That federal agency, which is also known as the FDA, oversees the drug approval process and claims regarding a drug's safety and efficacy.  The FDA does not regulate pricing.

I. ~~ANTITRUST CLAIMS - PURPOSE OF ANTITRUST LAWS~~ **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - INTRODUCTION**

~~I will now discuss GSK's claims.  GSK first alleges that Abbott violated the federal antitrust laws by willfully maintaining a monopoly or attempting to acquire a monopoly.  The purpose of the~~

6

federal antitrust laws is to preserve free and unfettered competition in the marketplace.  The antitrust laws rest on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

### A. ACTUAL MONOPOLIZATION CLAIM - ELEMENTS

The first claim GSK brings under the antitrust laws is that Abbott unlawfully actually monopolized the market in which Kaletra competes. To prevail on this claim, GSK must prove each of the following elements by a preponderance of the evidence:

First, that the market that it alleges Abbott monopolized is a validly defined economic market;

Second, that Abbott possessed monopoly power in that market during the time period in which the violation allegedly occurred;

Third, that Abbott willfully maintained monopoly power in that market by engaging in anticompetitive conduct; and

Fourth, that GSK was injured in its business or property because of Abbott's anticompetitive conduct.

If you find that GSK has failed to prove any of these elements, then you must find for Abbott and against GSK on this claim.  If you find that GSK has proved each of these elements by a preponderance of the evidence, then you must find for GSK and against Abbott on this claim.

### 1. ACTUAL MONOPOLIZATION CLAIM - ELEMENT ONE: RELEVANT MARKET

The first element of its actual monopolization claim that GSK must prove by a preponderance of the evidence is that the market that it alleges Abbott monopolized is a validly defined, relevant economic market.  GSK defines this relevant market as the market for all boosted

protease inhibitors or as the market for a subset of such drugs: all highly effective protease inhibitors, including only boosted Reyataz, boosted Lexiva and Kaletra, at the time of the Norvir price increase. Abbott asserts that the relevant market also includes unboosted protease inhibitors and NNRTI drugs, and that GSK's reasons for defining the market as it has are invalid.

Defining the relevant market is essential because you are required to make a judgment about whether Abbott had monopoly power in a properly defined economic market. To decide the relevant market, you must be able to determine what, if any, economic forces restrained Abbott's freedom to set prices for or restrict the output of Kaletra. The most likely and most important restraining force is actual and potential competition from other firms and their products. This includes all firms and products that acted as restraints on Abbott's power to set prices as it pleased. All the firms and products that exerted this restraining force are within what is called the relevant market.

The basic idea of a relevant market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other. In other words, the relevant market includes the products that consumers believe are reasonably interchangeable or reasonable substitutes for each other. This is a practical test with reference to actual behavior of buyers and marketing efforts of sellers. Products need not be identical or precisely interchangeable as long as they are reasonable substitutes. Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material -- such as aluminum foil, cellophane, or even plastic containers -- to be

8

reasonable alternatives, then all those products would be in the same relevant market.

To determine whether products are reasonably interchangeable substitutes for each other, you may consider whether a small but significant permanent increase in the price of one product would result in a substantial number of consumers switching from that product to another. Generally speaking, a small but significant permanent increase in price is approximately a five percent increase in price not due to external cost factors, but you may conclude in this case that some other percentage is more applicable to the product at issue. If you find that such switching would occur, then you may conclude that the products are in the same relevant market.

In evaluating whether various products are reasonably interchangeable or are reasonable substitutes for each other, you may also consider: (1) consumers' views on whether the products are interchangeable; (2) the relationship between the price of one product and sales of another; (3) the perceptions of either the industry or the public as to whether the products are in separate markets; (4) the views of the producers in the market about who their respective competitors are; and (5) the existence or absence of different customer groups or distribution channels.

**2. ACTUAL MONOPOLIZATION CLAIM - ELEMENT TWO: MONOPOLY POWER**

The second element of its actual monopolization claim that GSK must prove by a preponderance of the evidence is that Abbott possessed monopoly power in the relevant market during the time period in which Abbott allegedly violated the antitrust laws. Monopoly power is the power to control prices and exclude or handicap competition in a relevant market. The power to handicap competition is the power to

limit competition on the merits.  A firm is a monopolist if it can profitably raise or maintain prices substantially above the competitive level for a significant period of time.  Monopoly power, in and of itself, is not unlawful.

GSK may show that Abbott had monopoly power through indirect evidence.  Factors you may consider are: (a) Abbott's market share, (b) market share trends, (c) barriers to entry or expansion and (d) the number and size of Abbott's competitors.  If this evidence establishes that Abbott had the power to control prices and exclude or handicap competition in the relevant antitrust market, then you may conclude that Abbott had monopoly power in the market.  I will explain each of these factors.

### a.  MARKET SHARE

The first factor that you may consider as evidence of monopoly power is Abbott's market share.  You heard evidence about Abbott's market share, and you should determine Abbott's market share as a percentage of total industry sales by prescription.

A market share above fifty percent may be sufficient to support an inference that Abbott had monopoly power.  The likelihood that a company has monopoly power is stronger the higher that company's share is above fifty percent.

A market share below fifty percent is ordinarily not sufficient to support a conclusion that a company has monopoly power. However, if you find that the other evidence demonstrates that Abbott, in fact, had monopoly power despite having a market share below fifty percent, you may conclude that Abbott had monopoly power.

### b.  MARKET SHARE TRENDS

The second factor that you may consider as evidence of monopoly power is the trend in Abbott's market share.  An increasing market share may strengthen an inference that Abbott had monopoly power, particularly if Abbott had a high market share, while a decreasing share might show that Abbott did not have monopoly power.  A declining market share, however, does not foreclose a finding of monopoly power.

### c. BARRIERS TO ENTRY OR EXPANSION

The third factor you may consider as evidence of monopoly power is the extent to which there were barriers to entry or barriers to expansion in the relevant market.

Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way. Barriers to entry might include intellectual property rights (such as patents), specialized marketing practices, and the reputation of the companies already participating in the market or the brand name recognition of their products.

Barriers to expansion prevent other companies who are already in the market from increasing their output and selling more of their product.

Evidence of low or no barriers to entry or expansion during the relevant period would be evidence that Abbott did not have monopoly power, regardless of Abbott's market share, because new competitors could enter the market or existing competitors could expand their sales if Abbott attempted to raise the price of its drug Kaletra substantially above competitive levels for a substantial period of time.  By contrast, evidence of high barriers to entry and high barriers to expansion along with high market share, during the

relevant period, may support an inference that Abbott had monopoly power.

The history of entry and exit of competitors in the relevant market may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that Abbott lacked monopoly power. On the other hand, departures of competitors from the market, or the failure of competitors to enter the market, particularly if prices and profit margins are relatively high, may support an inference that Abbott had monopoly power.

### d. NUMBER AND SIZE OF COMPETITORS

The fourth factor you may consider as evidence of monopoly power is whether Abbott's competitors were capable of effectively competing. In other words, you should consider whether the financial strength, market shares and number of competitors acted as a check on Abbott's ability to price Kaletra. If Abbott's competitors were vigorous or had large or increasing market shares, this may be evidence that Abbott lacked monopoly power. On the other hand, if you determine that Abbott's competitors were weak or had small or declining market shares, this may support an inference that Abbott had monopoly power.

### 3. ACTUAL MONOPOLIZATION CLAIM – ELEMENT THREE: ANTICOMPETITIVE CONDUCT

The third element of an actual monopolization claim that GSK must prove by a preponderance of the evidence is that Abbott willfully maintained monopoly power in the relevant market by engaging in anticompetitive conduct.

In considering whether Abbott's conduct was anticompetitive, you must draw a distinction between practices which tend to exclude or restrict competition on the one hand and the success of a business

which reflects only a superior product, a well-run business, or luck, on the other. Put another way, anticompetitive conduct refers to practices that unreasonably or unnecessarily impede fair competition; that is, conduct that impairs the efforts of others to compete for customers in an unnecessarily restrictive way. Such conduct does not refer to ordinary means of competition, like offering better products or services, exercising superior skill or business judgment, utilizing more efficient technology, or exercising natural competitive advantages.

Here, in support of its claim that Abbott unlawfully monopolized the market in which Kaletra competes, GSK argues that Abbott engaged in two types of anticompetitive conduct: (a) unlawful bundled discounting; and (b) a practical refusal to deal with its competitors. Abbott denies that it engaged in either type of anticompetitive conduct, and contends that it increased Norvir's price for legitimate business reasons, including obtaining a fair value for its patented invention, with neither the purpose nor the effect of harming competition.

### a. BUNDLED DISCOUNTING

The first type of anticompetitive conduct that GSK alleges to prove the third element of its actual monopolization claim is unlawful bundled discounting. Sometimes a company will offer a lower price if a buyer purchases two different products together for a single price, in a bundle, rather than buying them separately. Bundling is generally not anticompetitive because bundled discounts can benefit buyers.

However, bundling may be anticompetitive if a business that has monopoly power over part of the bundle charges a substantial penalty

13

to buyers who purchase the products separately. Penalizing buyers purchasing from competitors can have the effect of causing buyers to purchase the entire bundle from the monopolist even if those buyers would rather buy one product from the bundler and one product from the competitor.  In this way, monopoly bundling can harm or exclude equally efficient competitors that sell only one of the bundled products.  This could reduce competition and lead to higher prices.

In order to prove that Abbott engaged in unlawful bundled discounting in this case, GSK must prove that: (i) Kaletra is a bundle; and (ii) Abbott's Norvir price increase constituted an improper penalty on buyers who wanted to purchase a boosted PI other than lopinavir, the active ingredient in Kaletra.

### i. BUNDLED DISCOUNTING - IS KALETRA A BUNDLE?

The first element that GSK must prove to show that Abbott engaged in unlawful bundled discounting is that Kaletra is a bundle of products.  GSK contends that Kaletra is a bundle of the active ingredients lopinavir and ritonavir, the active ingredient in Norvir. Abbott contends that Kaletra is a single integrated product, that lopinavir and ritonavir are active ingredients rather than separate products, that Norvir is not a bundled component of Kaletra and that Kaletra is not a bundle.

### ii. BUNDLED DISCOUNTING - IMPROPER PENALTY

The second element that GSK must prove to show that Abbott engaged in unlawful bundled discounting is that Abbott's Norvir price increase constituted an improper penalty such that it could exclude a hypothetical competitor, who is equally efficient at producing a boosted PI, because the competitor does not sell Norvir.  GSK argues that the Norvir price increase imposed a penalty on buyers who wanted

14

to purchase a boosted PI other than lopinavir.   To explain what is an improper penalty, I must first define for you some terms related to Abbott's costs.

Abbott's costs in making and selling Kaletra are divided into two categories.

The first kind of cost is referred to as a fixed cost -- a cost that Abbott would bear regardless of how much of a product it sells. An example of a fixed cost might be the rent on a seller's plant or store.   This rent probably will be the same whether the firm sells one unit or one thousand units of its product.   This type of cost is not to be considered in deciding whether Abbott's pricing conduct was improper.

The second kind of cost is referred to as "variable cost."   Variable costs, as the name suggests, are those costs that increase with the production of each additional unit of the product. Variable costs typically include such things as the materials that go into the product, fuel needed to produce the product, and wages paid to the workers who make the product. "Average variable cost" is the sum of all variable costs, divided by the total number of units expected to be produced and sold.

To determine whether Abbott imposed an improper penalty and excluded hypothetical equally efficient competitors, you must consider whether Abbott was, in effect, selling the lopinavir component of Kaletra at a price below the lopinavir component's average variable cost.   The effective price of the lopinavir component of Kaletra is the price of Kaletra minus the price of Norvir.   An effective price of the lopinavir component of Kaletra below its average variable cost is improper because it would make it impossible

for a hypothetical equally efficient competitor, which was legally allowed to sell lopinavir, and which had the same costs as Abbott, to sell lopinavir at a profit.

### b. PRACTICAL REFUSAL TO DEAL WITH COMPETITORS

The second type of anticompetitive conduct that GSK alleges to prove the third element of its actual monopolization claim is that Abbott effectively refused to deal with its competitors, and did so with anticompetitive intent. A refusal to deal does not need to be absolute to violate the antitrust laws. A company's practical, or effective, refusal to deal with its competitors can constitute anticompetitive conduct.

A company that possesses monopoly power generally does not have a duty to deal with its competitors. However, a practical refusal to deal with competitors may constitute anticompetitive conduct if the practical refusal was contrary to Abbott's short- run best interest, but made sense for Abbott because it harmed competitors and helped Abbott maintain monopoly power in the long run. An important change in a pattern of conduct, in a competitive market, that had persisted for several years can constitute a practical refusal to deal.

In deciding whether Abbott acted with anticompetitive intent, you may consider: (i) whether Abbott unilaterally terminated a voluntary and profitable course of dealing with its competitors; (ii) whether Abbott offered to deal with its competitors only on unreasonable terms and conditions; and (iii) whether Abbott refused to provide its competitors' customers with products, that were sold in a retail market, on the same terms it provided the products to its own customers.

### c. ABBOTT'S AFFIRMATIVE DEFENSE - LEGITIMATE BUSINESS REASON

If you find that GSK has proved that Abbott engaged in anticompetitive conduct, you should then consider whether Abbott has proved its affirmative defense that Abbott had a legitimate business reason for the Norvir price increase. A legitimate business reason is one that demonstrates that Abbott did not intend to exclude its competitors from the market in which Kaletra competes. To prevail on its affirmative defense, Abbott has the burden of proving that it had a legitimate business reason for its alleged anticompetitive conduct. It is for you to decide whether this reason is legitimate.

Conduct that is designed to protect or further Abbott's legitimate business purposes is not anticompetitive, even if that conduct injures competitors. A legitimate business purpose is one that benefits Abbott, regardless of any harmful effect on competitors, such as a purpose to promote efficiency or quality, offer a better product or service, or increase short-run profits. In general, the desire to maintain monopoly power or to block entry of competitors is not a legitimate business purpose.

As you have heard during trial, Abbott has patents on Norvir and on Norvir's use as a booster. Abbott's patents on Norvir and on Norvir's use as a booster provide Abbott with a legal monopoly over Norvir and Norvir's use as a booster. This fact does not establish whether Abbott violated the antitrust laws through anticompetitive conduct. It is for you to decide whether Abbott engaged in anticompetitive conduct that violates the antitrust laws.

If you find that GSK has proved that Abbott engaged in anticompetitive conduct, through bundled discounting or an effective refusal to deal with its competitors or both, and that Abbott has not

proved that it had a legitimate business reason for its conduct, you may find that GSK has proved the third element of its actual monopolization claim.

### 4. ACTUAL MONOPOLIZATION CLAIM - ELEMENT FOUR: REQUIREMENT OF INJURY

The fourth element of an actual monopolization claim that GSK must prove by a preponderance of the evidence is that it suffered injury to its business or property.  GSK can satisfy this element if it can prove the following:

First, that GSK was in fact injured as a result of Abbott's alleged violation of the antitrust laws;

Second, that Abbott's alleged illegal conduct was a material cause of GSK's injury; and

Third, that GSK's injury is an injury of the type that the antitrust laws were intended to prevent.

The first part of this element requires GSK to establish that it was injured as a result of Abbott's alleged violation of the antitrust laws.  Proving the fact of injury does not require GSK to prove the dollar value of its injury.  It requires only that GSK prove that it was in fact injured by Abbott's alleged antitrust violation. If you find that GSK has established that it was in fact injured by an antitrust violation by Abbott, you will later consider the amount of GSK's antitrust damages.  The fact of injury and the amount of damages are different concepts.  You will not be asked to consider the amount of antitrust damages unless and until you have concluded that GSK has established all of the elements of a violation of the antitrust laws.

As to the second part of this element, GSK must prove that Abbott's alleged illegal conduct was a material cause of GSK's injury. This means that GSK must prove that it was injured as a result of Abbott's alleged antitrust violation, and not some other cause. GSK is not required to prove that Abbott's alleged antitrust violation was the sole cause of its injury; nor does GSK need to eliminate all other possible causes of injury. It is enough if GSK has proved that the alleged antitrust violation was a material cause of its injury. However, if you find that GSK's injury was caused primarily by something other than the alleged antitrust violation, then you must find that GSK has failed to prove the injury element of its antitrust claim.

To prove the third part of this element, GSK must establish that its injury is the type of injury that the antitrust laws are intended to prevent. If GSK's injury was caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then GSK's injury is an antitrust injury. On the other hand, if GSK's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then GSK's injuries are not antitrust injuries and GSK may not recover damages for those injuries under the antitrust laws. You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against -- such as where a competitor offers better products or services or where a competitor is more efficient and can charge lower prices and still earn a profit.

**B. ATTEMPTED MONOPOLIZATION CLAIM - ELEMENTS**

The second claim GSK brings under the antitrust laws is that Abbott unlawfully attempted to monopolize the market in which Kaletra competes.

To prevail on its claim of attempted monopolization, GSK must prove each of the following elements by a preponderance of the evidence:

First, that Abbott had a specific intent to achieve monopoly power in a relevant market;

Second, that there was a dangerous probability that Abbott would achieve its goal of acquiring monopoly power in the relevant market;

Third, that Abbott engaged in anticompetitive conduct; and

Fourth, that GSK was injured in its business or property by Abbott's anticompetitive conduct.

If you find that GSK has failed to prove any of these elements, then you must find for Abbott and against GSK on this claim.  If you find that GSK has proved each of these elements by a preponderance of the evidence, then you must find for GSK and against Abbott on this claim.

### 1. ATTEMPTED MONOPOLIZATION CLAIM - ELEMENT ONE: SPECIFIC INTENT TO MONOPOLIZE A RELEVANT MARKET

The first element of an attempted monopolization claim that GSK must prove by a preponderance of the evidence is that Abbott had a specific intent to monopolize the market in which GSK alleges that Kaletra competes.  This is the same market as the market relevant to GSK's claim of actual monopolization, about which I instructed you earlier.  You must determine whether GSK has proved that Abbott acted with the conscious aim of obtaining the power to control prices and to exclude or handicap competition in this alleged market.

There are two ways GSK may prove that Abbott had the specific intent to monopolize.  First, GSK may present evidence of direct statements of Abbott's intent to obtain a monopoly in the relevant market.  Such proof of specific intent may be established by documents prepared by responsible officers or employees of Abbott at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of Abbott.  You must be careful, however, to distinguish between Abbott's intent to compete aggressively (which is lawful), which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Second, even if you decide that the evidence does not prove directly that Abbott specifically intended to obtain a monopoly, specific intent may be inferred from what Abbott did.  For example, if the evidence shows that the natural and probable consequence of Abbott's conduct in the relevant market was to give Abbott control over prices and to exclude or handicap competition, and that this was plainly foreseeable by Abbott, then you may (but are not required to) infer that Abbott specifically intended to acquire monopoly power.

## 2. ATTEMPTED MONOPOLIZATION CLAIM - ELEMENT TWO: DANGEROUS PROBABILITY OF SUCCESS

The second element of an attempted monopolization claim that GSK must prove by a preponderance of the evidence is that there was a dangerous probability that Abbott would succeed in acquiring monopoly power in the market in which Kaletra competes if Abbott continued to engage in anticompetitive conduct.  As I instructed you earlier, monopoly power is the power to control prices and exclude competition in a relevant antitrust market.

21

In determining whether there was a dangerous probability that Abbott would acquire the ability to control prices in the relevant market, you should consider the factors included in Instruction "A.2. ACTUAL MONOPOLIZATION CLAIM - ELEMENT TWO: MONOPOLY POWER" which I gave earlier.  A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Abbott would ultimately acquire monopoly power.

### 3. ATTEMPTED MONOPOLIZATION CLAIM - ELEMENT THREE: ANTICOMPETITIVE CONDUCT

The third element of an attempted monopolization claim that GSK must prove by a preponderance of the evidence is that Abbott engaged in anticompetitive conduct.  GSK alleges that, to attempt to monopolize the market in which Kaletra competes, Abbott engaged in (a) unlawful bundled discounting; and (b) a practical refusal to deal with its competitors.  This is the same anticompetitive conduct that GSK alleges with respect to its actual monopolization claim, about which I instructed you earlier.

### 4. ATTEMPTED MONOPOLIZATION CLAIM - ELEMENT FOUR: REQUIREMENT OF INJURY

The fourth element of an attempted monopolization claim that GSK must prove by a preponderance of the evidence is that it suffered injury to its business or property.  This is the same type of injury as the injury required for GSK's actual monopolization claim, about which I instructed you earlier.

## II. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - INTRODUCTION

I will now discuss GSK's claims.  Implied in every contract is a covenant, or agreement, of good faith and fair dealing.  The implied

covenant of good faith and fair dealing between parties to a contract is a pledge that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the benefits of the contract.  The implied covenant is part of the contract, even though the contract contains a provision that states that the written contract is the "entire agreement." A breach of the implied covenant is a breach of the contract itself, the covenant being part and parcel of the contract.  The covenant encompasses any promises that a reasonable person in the position of the promisee would be justified in understanding were included. However, the covenant cannot be construed so broadly as to create independent contractual rights that were not bargained for by the parties.

## A. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – ELEMENTS

GSK alleges that Abbott breached the implied covenant of good faith and fair dealing with respect to the Norvir Boosting License. In order to demonstrate that Abbott breached the implied covenant of good faith and fair dealing, GSK has the burden to prove three elements by a preponderance of the evidence:

First, Abbott's conduct directly destroyed or injured GSK's alleged right to receive benefits under the license agreement that a reasonable party in GSK's position would have understood the license agreement to have included;

Second, Abbott engaged in grossly negligent conduct; and

Third, Abbott's conduct constituting a breach of the implied covenant of good faith and fair dealing was a proximate cause of the injury to GSK's business.

## 1. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - ELEMENT ONE: CONDUCT

The first element of its implied covenant claim that GSK must prove by a preponderance of the evidence is that Abbott committed an act that showed a lack of good faith and fair dealing, injuring GSK's right to receive the benefits that a reasonable party would have been justified in understanding were included in the Norvir Boosting License.

## 2. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - ELEMENT TWO: GROSS NEGLIGENCE

The second element of its implied covenant claim that GSK must prove by a preponderance of the evidence is that Abbott's breach of the implied covenant constituted grossly negligent conduct. Such conduct involves intentional wrongdoing or a reckless indifference to the rights of others.

## 3. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - ELEMENT THREE: CAUSE OF INJURY

The third element of its implied covenant claim that GSK must prove by a preponderance of the evidence is that Abbott's breach of the implied covenant was a proximate cause of the injury to GSK's business.

Proximate cause is a cause which in a natural and continuous sequence produces the injury, and is a cause which a reasonable and prudent person could have foreseen would probably produce such injury or some similar injurious result.

There may be more than one proximate cause of an injury. Therefore, GSK need not prove that Abbott's conduct was the sole proximate cause of the injury to GSK's business. However, GSK must

prove by a preponderance of the evidence that its injury is directly traceable to Abbott's alleged breach of the implied covenant.

~~III~~II. UNFAIR AND DECEPTIVE TRADE PRACTICES

GSK alleges that Abbott engaged in unfair and deceptive trade practices.  To prove this claim GSK must prove one or more of the following:

1. ~~1.~~ During the negotiation of the Norvir Boosting License, Abbott was considering how to use its control over Norvir to limit competition with its drug Kaletra from competitors' drugs and deliberately withheld its plans from GSK; or~~—~~

2. ~~2.~~ Abbott inequitably asserted its power over Norvir by increasing Norvir's price by 400 percent to disrupt Lexiva's launch or undermine Lexiva's future sales or both; or

3. ~~3.~~ Abbott timed the 400 percent Norvir price increase in order to disrupt Lexiva's launch or undermine Lexiva's future sales or both.

You will also be asked to determine whether any of this conduct proximately caused injury to GSK.

IV. DAMAGES

It is the duty of the Court to instruct you about the measure of damages.  By instructing you on damages, the Court does not mean to suggest for which party your verdict should be rendered.

If you find for GSK on any of its claims, you must determine its damages.  GSK has the burden of proving damages by a preponderance of the evidence.  Damages means the amount of money that will reasonably and fairly compensate GSK for any injury you find was proximately caused by Abbott.

GSK seeks an award of damages on each of its claims based on profits it alleges that it lost as a result of Abbott's ~~anticompetitive conduct, Abbott's~~ breach of the implied covenant~~,~~ and Abbott's unfair and deceptive trade practices.  If you find that GSK proved ~~one or both of its antitrust claims, or~~ its breach of the implied covenant claim~~,~~ or its claim of unfair and deceptive trade practices, you must consider the evidence of GSK's damages.

GSK has offered evidence to calculate the profits it would have earned if Abbott had not engaged in its alleged misconduct.  You may award GSK the amount it has proved its profits would have been in the absence of this alleged misconduct.

You must determine the amount of GSK's damages for all of the claims on which it prevails, if any.  However, GSK is not entitled to recover its damages more than once.  On the verdict form, if you find that an award of damages is appropriate for more than one of GSK's claims, you will be asked questions that ensure that GSK does not recover its damages more than once.

It is for you to determine what damages, if any, have been proved.  So long as there is a reasonable basis for a damages award, GSK should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical precision.  However, your award must be based upon evidence and not upon speculation, guesswork or conjecture.

### USE OF NOTES

Some of you have taken notes during the trial.  Whether or not you took notes, you should rely on your own memory of the evidence.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those of your fellow jurors.

26

**NO TRANSCRIPT AVAILABLE**

You will have to make your decision based on what you recall of the evidence.  You will not have a written transcript of the trial.  Although a few portions of the trial have been transcribed, the trial as a whole has not.  Portions of it could be read back to you, if necessary, if you can identify particular portions you want to hear.  However, read-back is time-consuming.

**DUTY TO DELIBERATE**

When you begin your deliberations, you should elect one member of the jury as your presiding juror.  That person will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so.  Your verdict must be unanimous.

**COMMUNICATION WITH COURT**

If it becomes necessary during your deliberations to communicate with me, you may send a note through the Court security officer, signed by your presiding juror or by one or more members of the jury.  No member of the jury should ever attempt to communicate with me except by a signed writing; I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court.  If you send out a question, I will consult with the parties before answering it, which may take some time.  You may continue your deliberations while waiting for the answer to any question.  Remember that you are not to tell anyone -- including me -- how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged.  Do not disclose any vote count in any note to the Court.

**RETURN OF VERDICT**

A verdict form has been prepared for you.  After you have reached unanimous agreement on a verdict, your presiding juror will fill in the form that has been given to you, sign and date it, and advise the Court that you are ready to return to the courtroom.


Dated: _____        _____
                                      CLAUDIA WILKEN
                                      United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SMITHKLINE BEECHAM CORPORATION,                No. C 07-5702 CW
d/b/a GLAXOSMITHKLINE,
                                               VERDICT FORM
        Plaintiff,

v.

ABBOTT LABORATORIES,

        Defendant.
_____/


I. ~~ANTITRUST CLAIMS~~ **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM**

~~MONOPOLIZATION CLAIM~~

~~A.1. Do you find that GSK has proven a validly defined economic market?~~

~~Yes _____ ("Yes" is a finding for GSK.)~~

~~No _____ ("No" is a finding for Abbott.)~~

~~If you answered "Yes" to this question, then answer Question A.2. If you answered "No" to this question, proceed to Question B.1.~~

~~A.2. Do you find that GSK has proved that Abbott had monopoly in the relevant market?~~

~~Yes _____ ("Yes" is a finding for GSK.)~~

~~No _____ ("No" is a finding for Abbott.)~~

~~Whether you answered "Yes" or "No" to this question, answer Question A.3.~~

~~A.3. Do you find that GSK has proved that Abbott engaged in the following types of anticompetitive conduct:~~

~~A.3.a. a practical refusal to deal with its competitors?~~

~~Yes _____ ("Yes" is a finding for GSK.)~~

~~No _____ ("No" is a finding for Abbott.)~~

~~A.3.b.   unlawful bundled discounting?~~

Yes _____ ("Yes" is a finding for GSK.)

No _____ ("No" is a finding for Abbott.)

If you answered "Yes" to Question A.2., and to Question A.3.a. or A.3.b. or both, proceed to Question A.4. Otherwise, proceed to Question B.1.

A.4. Do you find that Abbott has proved that it had a legitimate business reason for its conduct?

Yes _____ ("Yes" is a finding for Abbott.)

No _____ ("No" is a finding for GSK.)

If you answered "Yes" to this question, proceed to Question B.1. If you answered "No" to this question, proceed to Question A.5.

A.5. Do you find that GSK suffered injury to its business or property as a result of Abbott's monopolization of the relevant market, that this monopolization was a material cause of GSK's injury and that the injury was of the type that the antitrust laws were intended to prevent?

Yes _____ ("Yes" is a finding for GSK.)

No _____ ("No" is a finding for Abbott.)

Proceed to Question A.6.

ATTEMPTED MONOPOLIZATION CLAIM

A.6. Did you find in Question A.1. above that GSK has proven a validly defined economic market?

Yes _____ ("Yes" is a finding for GSK.)

v ("No" is a finding for Abbott.)

If you answered "Yes" to this question, then answer Question A.7. If you answered "No" to this question, proceed to Question B.1.

A.7. Do you find that Abbott had a specific intent to acquire monopoly power in the relevant market?

Yes _____ ("Yes" is a finding for GSK.)

No _____ ("No" is a finding for Abbott.)

If you answered "Yes" to this question, then answer Question A.8. If you answered "No" to this question, proceed to Question A.12.

A.8. Do you find that there was a dangerous probability that Abbott would acquire monopoly power in the relevant market?

1

Yes _____ ("Yes" is a finding for GSK.)

No _____ ("No" is a finding for Abbott.)

If you answered "Yes" to this question, then answer Question A.9. If you answered "No" to this question, proceed to Question A.12.

A.9. Did you find in Question A.3. above that GSK has proved that Abbott engaged in the following types of anticompetitive conduct:

A.9.a.   a practical refusal to deal with its competitors?

Yes _____ ("Yes" is a finding for GSK.)

No _____ ("No" is a finding for Abbott.)

A.9.b.   unlawful bundled discounting?

Yes _____ ("Yes" is a finding for GSK.)

No _____ ("No" is a finding for Abbott.)

If you answered "Yes" to Question A.9.a. or A.9.b. or   both, proceed to Question A.10.  Otherwise, proceed to   Question B.1.

A.10. Did you find in Question A.4 above that Abbott has proved that it had a legitimate business reason for its conduct?

Yes _____ ("Yes" is a finding for Abbott.)

No _____ ("No" is a finding for GSK.)

If you answered "Yes" to this question, then proceed to Question B.1.  If you answered "No" to this question, proceed to Question A.11.

A.11. Do you find that GSK suffered injury to its business or property as a result of Abbott's attempted monopolization of the relevant market, that this attempted monopolization was a material cause of GSK's injury and that the injury was of the type that the antitrust laws were intended to prevent?

Yes _____ ("Yes" is a finding for GSK.)

No _____ ("No" is a finding for Abbott.)

Proceed to Question A.12.

A.12. If you answered "Yes" to Question A.5. or A.11. or both, what amount of damages, if any, do you find GSK has proved it suffered in lost profits from the misconduct you found Abbott to have committed?

$ _____

~~Proceed to Question B.1.~~

~~II. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM~~

~~B~~A.1. Do you find that Abbott committed an act that showed a lack of good faith and fair dealing, injuring GSK's right to receive the benefits that a reasonable party would have been justified in understanding were included in the license agreement?

Yes _____ ("Yes" is a finding for GSK.)

No _____ ("No" is a finding for Abbott.)

If you answered ~~"~~"Yes~~"~~" to this question, then answer   Question ~~B~~A.2.  If you answered ~~"~~"No~~"~~" to this question, proceed to Question ~~C~~B.1.

~~B~~A.2. Did Abbott engage in grossly negligent conduct when it breached the implied covenant of good faith and fair dealing?

Yes _____ ("Yes" is a finding for GSK.)

No _____ ("No" is a finding for Abbott.)

If you answered ~~"~~"Yes~~"~~" to this question, then answer Question ~~B~~A.3.  If you answered ~~"~~"No~~"~~" to this question, proceed to Question ~~C~~B.1.

~~B~~A.3. Do you find that Abbott's breach of the implied covenant of good faith and fair dealing was a proximate cause of the injury to GSK's business?~~Yes~~

Yes _____ ("Yes" is a finding for GSK.)

No _____ ("No" is a finding for Abbott.)

If you answered ~~"~~"Yes~~"~~" to this question, then answer Question ~~B~~A.4.  If you answered ~~"~~"No~~"~~" to this question, proceed to Question ~~C~~B.1.

~~B~~A.4. If you answered "Yes" to Question ~~B~~A.3., what amount of damages, if any, do you find GSK has proved it suffered in lost profits from Abbott's breach of the implied covenant of good faith and fair dealing?  Enter the number below~~, even if you awarded some or all of these damages in Question A.12. above.  (The Court will ensure that GSK is not awarded the same damages more than once.)~~.

$ _____

3

~~If you entered a number in this line, answer Question B.5.~~
~~Otherwise, proceed to Question C.1.~~

~~B.5. How much of the damages you found in Question B.4., if any, were~~
~~NOT awarded in Question A.12. above?~~

$ _____

Proceed to Question ~~C~~B.1.


### ~~III.~~ II. UNFAIR & DECEPTIVE TRADE PRACTICES CLAIM

~~C~~B.1. Are any of the following true?

~~C~~B.1.a. During the negotiation of the Norvir Boosting License,
Abbott was considering how to use its control over Norvir
to limit competition with Kaletra from competitors' drugs
and deliberately withheld this from GSK.

Yes _____ ("Yes" is a finding for GSK.)

No _____ ("No" is a finding for Abbott.)

~~C~~B.1.b. Abbott inequitably asserted its power over Norvir by
increasing Norvir's price by 400 percent to disrupt
Lexiva's launch or undermine Lexiva's future sales or both.

Yes _____ ("Yes" is a finding for GSK.)

No _____ ("No" is a finding for Abbott.)

~~C~~B.1.c. Abbott timed the 400 percent Norvir price increase in
order to disrupt Lexiva's launch or undermine Lexiva's
future sales or both.

Yes _____ ("Yes" is a finding for GSK.)

No _____ ("No" is a finding for Abbott.)


If you answered "Yes" to Question ~~C~~B.1.a., ~~C~~B.1.b., or ~~C~~B.1.c.,
or to more than one of them, then answer Question ~~C~~B.2.  If you
answered "No" to Questions ~~C~~B.1.a., ~~C~~B.1.b., and ~~C~~B.1.c., please
have your presiding juror sign, date and return your verdict.

~~C~~B.2. Do you find that the conduct you found in Question ~~C~~B.1. that
     Abbott engaged in was a proximate cause of injury to GSK?

     Yes  _____  ("Yes" is a finding for GSK.)

     No   _____  ("No" is a finding for Abbott.)

     If you answered "Yes" to this question, then answer
     Question ~~C~~B.3.  If you answered "No" to this question, please
     have your presiding juror sign, date and return your verdict.

~~C~~B.3. If you answered "Yes" to Question ~~C~~B.2, what amount of damages,
     if any, do you find GSK has proved it suffered in lost profits
     from the conduct you found in Question ~~C~~B.1.?  Enter the number
     below, even if some or all of these damages are the same damages
     that you awarded in Question A.~~12. or B.5.~~4. above. (The Court
     will ensure that GSK is not awarded the same damages more than
     once.)


     $ _____

     If you entered a number in this line, answer Question ~~C~~B.4.
     Otherwise, please have your presiding juror sign, date and return
     your verdict.

~~C~~B.4. How much of the damages you found in Question ~~C~~B.3., if any,
     were NOT awarded in Question A.~~12. or B.5.~~4. above?


     $ _____

Please have the presiding juror sign, date and return this form.

  Signed:_____ Date:_____
          Presiding Juror

5

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SMITHKLINE BEECHAM CORPORATION,　　　　　No. C 07-5702 CW
d/b/a GLAXOSMITHKLINE,

　　　　　　　　　　　　　　　　　　　　　PRELIMINARY JURY
　　　　　　Plaintiff,　　　　　　　　　　INSTRUCTIONS

v.

ABBOTT LABORATORIES,

　　　　　　Defendant.
_____/

**DUTY OF JURY**

　　　Ladies and gentlemen: You are now the jury in this case.  It is my duty to instruct you on the law.

　　　These instructions are preliminary instructions to help you understand the principles that apply to civil trials and to help you understand the evidence as you listen to it.  You will be given a copy of these instructions to keep throughout the trial. This set of instructions is not to be taken home and must remain in the jury room when you leave in the evenings.  At the end of the trial, I will give you a final set of instructions.  It is the final set of instructions which will govern your deliberations.

　　　You must not infer from these instructions or from anything I may say or do that I have an opinion regarding the evidence or what your verdict should be.

　　　It is your duty to find the facts from all the evidence in the case.  To those facts you will apply the law as I give it to you.  You must follow the law as I give it to you whether you

1  agree with it or not.  And you must not be influenced by any

2  personal likes or dislikes, opinions, prejudices or sympathy.

3  That means that you must decide the case solely on the evidence

4  before you.  You will recall that you took an oath to do so.

5      In following my instructions, you must follow all of them

6  and not single out some and ignore others; they are all

7  important.

**PARTIES**

9      Abbott Laboratories is the Defendant in this case.  It makes

10  drugs called Norvir and Kaletra to treat human immunodeficiency

11  virus (HIV) infection.

12      The Plaintiff in this case is SmithKline Beecham

13  Corporation, which does business as GlaxoSmithKline, also known

14  as GSK.  GSK is a pharmaceutical company that makes Lexiva, a

15  drug that competes with Abbott's drug Kaletra.

**CORPORATIONS**

17      All parties are equal before the law and a corporation is

18  entitled to the same fair and conscientious consideration by you

19  as any party.

20      Under the law, a corporation is considered to be a person.

21  It can only act through its employees, agents, directors, or

22  officers.  Therefore, a corporation is responsible for the acts

23  of its employees, agents, directors, and officers performed

24  within the scope of authority.

25      **SUMMARY OF DISPUTE AND THE PARTIES' CLAIMS AND DEFENSES**

26      This case involves a dispute over brand-name prescription

27  drugs, known as protease inhibitors, which are used to fight HIV.

28

1

1    Protease inhibitors are also known as PIs.  These drugs work by
2    preventing HIV cells from reproducing.

3         In 1996, Abbott introduced Norvir, a PI used to treat HIV.
4    Norvir's active ingredient is called ritonavir.  Thereafter, it
5    was discovered that, when taken in small quantities with another
6    PI, Norvir would "boost" the effectiveness of the other PI.
7    Because of this "boosting" property, Norvir is known as a
8    booster.  The other PI is known as the "boosted" PI.

9         In 2000, Abbott introduced Kaletra, which is a drug that
10   contains two active ingredients: lopinavir and ritonavir, which
11   is the active ingredient in Norvir.  Ritonavir is used to boost
12   the effects of lopinavir.  Kaletra is known as a "boosted" PI.

13        In late 2003, GSK introduced a new PI drug that was designed
14   to be boosted by Norvir.  As I mentioned earlier, GSK's drug is
15   called Lexiva.  This new boosted PI drug competed with Abbott's
16   Kaletra.  Before launching Lexiva, GSK on December 13, 2002,
17   signed a contract with Abbott, the Norvir Boosting License, which
18   allowed GSK to promote and market Lexiva with Abbott's Norvir.

19        On December 3, 2003, Abbott raised the wholesale price of
20   Norvir by 400 percent, while keeping the price of Kaletra steady.

21        GSK claims that Abbott breached the implied covenant of good
22   faith and fair dealing in their contract and damaged GSK.  GSK
23   also claims that Abbott engaged in unfair and deceptive trade
24   practices.

25        GSK has the burden of proving these claims.  Abbott denies
26   all of GSK's claims.  Abbott contends that it increased Norvir's
27   price for legitimate business reasons, with neither the purpose
28   nor the effect of violating law or any duties to GSK.

**BURDEN OF PROOF**

When a party has the burden of proof of any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

**WHAT IS EVIDENCE**

The evidence from which you are to decide what the facts are consists of:

(1)   the sworn testimony of any witness;

(2)   the exhibits which have been received into evidence; and

(3)   any facts to which the lawyers may agree.

**WHAT IS NOT EVIDENCE**

In reaching your verdict, you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence, and you may not consider them in deciding what the facts are.  I will list them for you:

(1)   Arguments and statements by lawyers are not evidence.  The lawyers are not witnesses.  What they will say in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

(2)   Questions and objections by lawyers are not evidence.  Attorneys have a duty to their clients to object when they

believe a question is improper under the rules of
evidence.  You should not be influenced by the objection
or by the Court's ruling on it.

(3)  Testimony that is excluded or stricken, or that you are
instructed to disregard, is not evidence and must not be
considered.

(4)  Anything you see or hear when the Court is not in session
is not evidence.  You are to decide the case solely on the
evidence received at the trial.

**EVIDENCE FOR LIMITED PURPOSE**

Some evidence may be admitted for a limited purpose only.
If I instruct you that an item of evidence is admitted for a
limited purpose, you must consider it only for that limited
purpose and for no other.

**DIRECT AND CIRCUMSTANTIAL EVIDENCE**

Evidence may be direct or circumstantial.  Direct evidence
is direct proof of a fact, such as testimony by a witness about
what that witness personally saw or heard or did.  Circumstantial
evidence is proof of one or more facts from which you could find
another fact.  You should consider both kinds of evidence.  The
law makes no distinction between the weight to be given to either
direct or circumstantial evidence.  It is for you to decide how
much weight to give to any evidence.

**RULING ON OBJECTIONS**

There are rules of evidence that control what can be
received into evidence.  When a lawyer asks a question or offers
an exhibit into evidence and a lawyer on the other side thinks
that it is not permitted by the rules of evidence, that lawyer

4

1  may object.  If I overrule the objection, the question may be
2  answered or the exhibit received.  If I sustain the objection,
3  the question cannot be answered, or the exhibit cannot be
4  received.  Whenever I sustain an objection to a question, you
5  must ignore the question and must not guess what the answer might
6  have been.

7                       **CREDIBILITY OF WITNESSES**

8       In deciding the facts in this case, you may have to decide
9  which testimony to believe and which testimony not to believe.
10 You may believe everything a witness says, or part of it, or none
11 of it.

12      In considering the testimony of any witness, you may take
13 into account:

14      (1)  the opportunity and ability of the witness to see or
15           hear or know the things testified to;
16      (2)  the witness's memory;
17      (3)  the witness's manner while testifying;
18      (4)  the witness's interest in the outcome of the case and
19           any bias or prejudice;
20      (5)  whether other evidence contradicts the witness's
21           testimony;
22      (6)  the reasonableness of the witness's testimony in light
23           of all the evidence; and
24      (7)  any other factors that bear on believability.

25      The weight of the evidence as to a fact does not necessarily
26 depend on the number of witnesses who testify about it.

27                          **EXPERT OPINION**

28

                                   5

1    Some witnesses, because of education or experience, are
2 permitted to state opinions and the reasons for those opinions.
3 Opinion testimony should be judged just like any other testimony.
4    You may accept it or reject it, and give it as much weight
5 as you think it deserves, considering the witness's education and
6 experience, the reasons given for the opinion, and all the other
7 evidence in the case.

8                        **CHARTS AND SUMMARIES**

9    Certain charts and summaries may be received into evidence
10 to illustrate information brought out in the trial.  Charts and
11 summaries are only as good as the underlying evidence that
12 supports them.  You should, therefore, give them only such weight
13 as you think the underlying evidence deserves.

14    Certain graphics not received in evidence may be shown to
15 you in order to help explain the contents of books, records,
16 documents or other evidence in the case.  They are not themselves
17 evidence or proof of any facts.  If they do not correctly reflect
18 the facts or figures shown by the evidence in the case, you
19 should disregard these graphics and determine the facts from the
20 underlying evidence.

21 **I. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
22                        **- INTRODUCTION**

23    I will now discuss GSK's claims.  Implied in every contract
24 is a covenant, or agreement, of good faith and fair dealing.  The
25 implied covenant of good faith and fair dealing between parties
26 to a contract is a pledge that neither party will do anything
27 which will have the effect of destroying or injuring the right of
28 the other party to receive the benefits of the contract.  The

                                    6

1  implied covenant is part of the contract, even though the

2  contract contains a provision that states that the written

3  contract is the "entire agreement."  A breach of the covenant is

4  a breach of the contract itself, the covenant being part and

5  parcel of the contract.  The covenant encompasses any promises

6  that a reasonable person in the position of the promisee would be

7  justified in understanding were included.  However, the covenant

8  cannot be construed so broadly as to create independent

9  contractual rights that were not bargained for by the parties.

10  **A. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

11  **- ELEMENTS**

12      GSK alleges that Abbott breached the implied covenant of

13  good faith and fair dealing with respect to the Norvir Boosting

14  License.  In order to demonstrate that Abbott breached the

15  implied covenant of good faith and fair dealing, GSK has the

16  burden to prove three elements by a preponderance of the

17  evidence:

18      First, that Abbott's conduct directly destroyed or injured

19  GSK's right to receive benefits under the Norvir Boosting License

20  that a reasonable party in GSK's position would have understood

21  the Norvir Boosting License to have included;

22      Second, that Abbott engaged in grossly negligent conduct;

23  and

24      Third, that Abbott's conduct constituting a breach of the

25  implied covenant of good faith and fair dealing was a proximate

26  cause of the injury to GSK's business.

27      **1. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR**

28  **DEALING - ELEMENT ONE: CONDUCT**

7

The first element of its implied covenant claim that GSK must prove by a preponderance of the evidence is that Abbott committed an act that showed a lack of good faith and fair dealing, injuring GSK's right to receive the benefits that a reasonable party would have been justified in understanding were included in the Norvir Boosting License.

**2. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – ELEMENT TWO: GROSS NEGLIGENCE**

The second element of its implied covenant claim that GSK must prove by a preponderance of the evidence is that Abbott's breach of the implied covenant constituted grossly negligent conduct.  Such conduct involves intentional wrongdoing or a reckless indifference to the rights of others.

**3. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – ELEMENT THREE: CAUSE OF INJURY**

The third element of its implied covenant claim that GSK must prove by a preponderance of the evidence is that Abbott's breach of the implied covenant was a proximate cause of the injury to GSK's business.

Proximate cause is a cause which in a natural and continuous sequence produces the injury, and is a cause which a reasonable and prudent person could have foreseen would probably produce such injury or some similar injurious result.

There may be more than one cause of an injury.  Therefore, GSK need not prove that Abbott's conduct was the sole cause of the injury to GSK's business.  However, GSK must prove by a preponderance of the evidence that its injury is directly traceable to Abbott's alleged breach of the implied covenant.

## II. UNFAIR AND DECEPTIVE TRADE PRACTICES

GSK alleges that Abbott engaged in unfair and deceptive trade practices.  To prove this claim, GSK must prove one or more of the following:

1. During the negotiation of the Norvir Boosting License, Abbott was considering how to use its control over Norvir to limit competition with its drug Kaletra from competitors' drugs and deliberately withheld its plans from GSK; or

2. Abbott inequitably asserted its power over Norvir by increasing Norvir's price by 400 percent to disrupt Lexiva's launch or undermine Lexiva's future sales or both; or

3. Abbott timed the 400 percent Norvir price increase in order to disrupt Lexiva's launch or undermine Lexiva's future sales or both.

You will also be asked to determine whether any of this conduct proximately caused injury to GSK.

### IV. DAMAGES

It is the duty of the Court to instruct you about the measure of damages.  By instructing you on damages, the Court does not mean to suggest for which party your verdict should be rendered.

If you find for GSK on any of its claims, you must determine its damages.  GSK has the burden of proving damages by a preponderance of the evidence.  Damages means the amount of money that will reasonably and fairly compensate GSK for any injury you find was proximately caused by Abbott.

1    GSK seeks an award of damages on each of its claims based on
2    profits it alleges that it lost as a result of Abbott's breach of
3    the implied covenant and Abbott's unfair and deceptive trade
4    practices.  If you find that GSK proved its breach of the implied
5    covenant claim, or its claim of unfair and deceptive trade
6    practices, you must consider the evidence of GSK's damages.

7    GSK will offer evidence to calculate the profits it would
8    have earned if Abbott had not engaged in its alleged misconduct.
9    You may award GSK the amount it has proved its profits would have
10   been in the absence of this alleged misconduct.

11   It is for you to determine what damages, if any, have been
12   proved.  So long as there is a reasonable basis for a damages
13   award, GSK should not be denied a right to be fairly compensated
14   just because damages cannot be determined with absolute
15   mathematical precision.  However, your award must be based upon
16   evidence and not upon speculation, guesswork or conjecture.

**CONDUCT OF THE JURY**

18   I will now say a few words about your conduct as jurors.

19   First, keep an open mind throughout the trial, and do not
20   decide what the verdict should be until you and your fellow
21   jurors have completed your deliberations at the end of the case.

22   Second, because you must decide this case based only on the
23   evidence received in the case and on my instructions as to the
24   law that applies, you must not be exposed to any other
25   information about the case or the issues it involves during the
26   course of your jury duty.  Thus, until the end of the case or
27   unless I tell you otherwise do not communicate with anyone in any
28   way and do not let anyone else communicate with you in any way

about the merits of the case or anything to do with it.  This
includes discussing the case in person, in writing, by phone or
electronic means, via e-mail, text messaging, or any Internet
chat room, blog, Web site or other feature.  This applies to
communicating with your fellow jurors until I give you the case
for deliberation, and it applies to communicating with everyone
else including your family members, your employer, and the people
involved in the trial, although you may notify your family and
your employer that you have been seated as a juror in the case.
But, if you are asked or approached in any way about your jury
service or about this case, you must respond that you have been
ordered not to discuss the matter and to report the contact to
the court.  Because you will receive all the evidence and legal
instruction you properly may consider to return a verdict: do not
read, watch, or listen to any news or media accounts or
commentary about the case or anything to do with it; do not do
any research, such as consulting dictionaries, searching the
Internet or using other reference materials; and do not make any
investigation or in any other way try to learn about the case on
your own.

The law requires these restrictions to ensure the parties
have a fair trial based on the same evidence that each party has
had an opportunity to address.  A juror who violates these
restrictions jeopardizes the fairness of these proceedings, and a
mistrial could result that would require the entire trial process
to start over.  If any juror is exposed to any outside
information, please notify the court immediately.

**TAKING NOTES**

11

1   If you wish, you may take notes to help you remember the
2   evidence.  If you do take notes, please keep them to yourself
3   until you and your fellow jurors go to the jury room to decide
4   the case.  Do not let note-taking distract you.  When you leave,
5   your notes should be left in the jury room.  No one will read
6   your notes.  They will be destroyed at the conclusion of the
7   case.

8   Whether or not you take notes, you should rely on your own
9   memory of the evidence.  Notes are only to assist your memory.
10  You should not be overly influenced by your notes or those of
11  your fellow jurors.

12  **NO TRANSCRIPT AVAILABLE TO JURY**

13  During deliberations, you will have to make your decision
14  based on what you recall of the evidence.  You will not have a
15  written transcript of the trial.  I urge you to pay close
16  attention to the testimony as it is given.

17  If at any time you cannot hear or see the testimony,
18  evidence, questions or arguments, let me know so that I can
19  correct the problem.

20  **QUESTIONS TO WITNESSES BY JURORS**

21  You will be allowed to propose written questions to
22  witnesses.  You may propose questions in order to clarify the
23  testimony, but you are not to express any opinion about the
24  testimony or argue with a witness.  If you propose any questions,
25  remember that your role is that of a neutral fact finder, not an
26  advocate.  You may write out your questions.  Do not sign the
27  questions.  I will review the questions with the attorneys to
28  determine if they are legally proper.

1    There are some proposed questions that I will not permit, or

2  will not ask in the wording submitted by the juror.  This might

3  happen either due to the rules of evidence or other legal

4  reasons, or because the question is expected to be answered later

5  in the case.  If I do not ask a proposed question, or if I

6  rephrase it, do not speculate as to the reasons.  Do not give

7  undue weight to questions you or other jurors propose.  You

8  should evaluate the answers to those questions in the same manner

9  you evaluate all of the other evidence.

10    By giving you the opportunity to propose questions, I am not

11  requesting or suggesting that you do so.  It will often be the

12  case that a lawyer has not asked a question because it is legally

13  objectionable or because a later witness may be addressing that

14  subject.

15                        **OUTLINE OF TRIAL**

16    The trial will now begin.  First, each party may make an

17  opening statement.  An opening statement is not evidence.  It is

18  simply an outline to help you understand what that party expects

19  the evidence will show.

20    After opening statements, GSK will present evidence, and

21  counsel for Abbott may cross-examine.  Then Abbott may present

22  evidence, and counsel for GSK may cross-examine.

23    After the evidence has been presented, I will instruct you

24  on the law that applies to the case and the attorneys will make

25  closing arguments.  After that, you will go to the jury room to

26  deliberate on your verdict.

27    After you have reached your verdict, you will be excused.

28

Dated: _____

CLAUDIA WILKEN
United States District Judge

1

IN THE UNITED STATES DISTRICT COURT

2

FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4   SMITHKLINE BEECHAM CORPORATION,              No. C 07-5702 CW
     d/b/a GLAXOSMITHKLINE,

5                                                FINAL JURY
              Plaintiff,                         INSTRUCTIONS

6    v.

7    ABBOTT LABORATORIES,

8             Defendant.

9    _____/

10

11                              **DUTY OF JURY**

12      Members of the Jury: Now that you have heard all of the

13   evidence, it is my duty to instruct you as to the law of the

14   case. A copy of these instructions will be sent with you to the

15   jury room when you deliberate.  You should discard the

16   preliminary instructions; the final instructions control and you

17   should not concern yourselves with any differences between them

18   and the preliminary instructions.  You must not infer from these

19   instructions or from anything I may say or do that I have an

20   opinion regarding the evidence or what your verdict should be.

21      It is your duty to find the facts from all the evidence in

22   the case.  To those facts you will apply the law as I give it to

23   you.  You must follow the law as I give it to you whether you

24   agree with it or not.  And you must not be influenced by any

25   personal likes or dislikes, opinions, prejudices, or sympathy.

26   That means that you must decide the case solely on the evidence

27   before you.  You will recall that you took an oath to do so.

28

In following my instructions, you must follow all of them and not single out some and ignore others; they are all important.

**PARTIES**

Abbott Laboratories is the Defendant in this case.  It makes drugs called Norvir and Kaletra to treat human immunodeficiency virus (HIV) infection.

The Plaintiff in this case is SmithKline Beecham Corporation, which does business as GlaxoSmithKline, also known as GSK.  GSK is a pharmaceutical company that makes Lexiva, a drug that competes with Abbott's drug Kaletra.

**CORPORATIONS**

All parties are equal before the law and a corporation is entitled to the same fair and conscientious consideration by you as any party.

Under the law, a corporation is considered to be a person. It can only act through its employees, agents, directors, or officers.  Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers performed within the scope of authority.

**SUMMARY OF DISPUTE AND THE PARTIES' CLAIMS AND DEFENSES**

The drugs involved in this dispute are known as protease inhibitors, and also known as PIs.  Abbott's drug Norvir, a protease inhibitor, has the active ingredient called ritonavir. When taken in small quantities with another PI, Norvir "boosts" the effectiveness of the other PI.  Because of this "boosting" property, Norvir is known as a booster.  The other PI is known as the "boosted" PI.

1    Abbott's drug Kaletra contains two active ingredients:

2 lopinavir and ritonavir, which is the active ingredient in

3 Norvir.  Ritonavir is used to boost the effects of lopinavir.

4 Kaletra is known as a "boosted" PI.

5    GSK's drug is called Lexiva, a boosted PI that competes with

6 Abbott's Kaletra.  Before launching Lexiva, GSK signed a license

7 agreement with Abbott, the Norvir Boosting License, on December

8 13, 2002, which allowed GSK to promote and market Lexiva with

9 Abbott's Norvir.

10    On December 3, 2003, Abbott raised the wholesale price of

11 100 milligrams of Norvir from $1.71 to $8.57, which amounted to a

12 400-percent increase.  Abbott maintained the cost of a daily

13 regimen of Kaletra at $18.78.

14    GSK claims that Abbott breached the implied covenant of good

15 faith and fair dealing in their license agreement and damaged

16 GSK.  GSK also claims that Abbott engaged in unfair and deceptive

17 trade practices.

18    GSK has the burden of proving these claims.  Abbott denies

19 all of GSK's claims.  Abbott contends that it increased Norvir's

20 price for legitimate business reasons, with neither the purpose

21 nor the effect of violating law or any duties to GSK.

22                          **BURDEN OF PROOF**

23    When a party has the burden of proof of any claim or

24 affirmative defense by a preponderance of the evidence, it means

25 you must be persuaded by the evidence that the claim or

26 affirmative defense is more probably true than not true.

27    You should base your decision on all of the evidence,

28 regardless of which party presented it.

2

**WHAT IS EVIDENCE**

The evidence from which you are to decide what the facts are consists of:

(1)   the sworn testimony of any witness;

(2)   the exhibits which have been received into evidence; and

(3)   any facts to which the lawyers may agree.

**WHAT IS NOT EVIDENCE**

In reaching your verdict, you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence, and you may not consider them in deciding what the facts are.  I will list them for you:

(1)   Arguments and statements by lawyers are not evidence. The lawyers are not witnesses.  What they say in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

(2)   Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence.  You should not be influenced by the objection or by the Court's ruling on it.

(3)   Testimony that has been excluded or stricken, or that you were instructed to disregard, is not evidence and must not be considered.

(4)   Anything you see or hear when the Court is not in

session is not evidence.  You are to decide the case

solely on the evidence received at the trial.

**EVIDENCE FOR LIMITED PURPOSE**

Some evidence may have been admitted for a limited purpose only.  If I instructed you that an item of evidence was admitted for a limited purpose, you must consider it only for that limited purpose and for no other.

**DIRECT AND CIRCUMSTANTIAL EVIDENCE**

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

**RULING ON OBJECTIONS**

There are rules of evidence that control what can be received into evidence.  When a lawyer asked a question or offered an exhibit into evidence and a lawyer on the other side thought that it was not permitted by the rules of evidence, that lawyer may have objected.  If I overruled the objection, the witness was permitted to answer the question, or the exhibit was received.  If I sustained the objection, the witness was not permitted to answer the question, or the exhibit was not received.  If I sustained an objection to a question, you must

4

1  ignore the question and must not guess what the answer might have
2  been.

3  **CREDIBILITY OF WITNESSES**

4      In deciding the facts in this case, you may have to decide
5  which testimony to believe and which testimony not to believe.
6  You may believe everything a witness says, or part of it, or none
7  of it.

8      In considering the testimony of any witness, you may take
9  into account:

10     (1)  the opportunity and ability of the witness to see or
11          hear or know the things testified to;
12     (2)  the witness's memory;
13     (3)  the witness's manner while testifying;
14     (4)  the witness's interest in the outcome of the case and
15          any bias or prejudice;
16     (5)  whether other evidence contradicts the witness's
17          testimony;
18     (6)  the reasonableness of the witness's testimony in light
19          of all the evidence; and
20     (7)  any other factors that bear on believability.

21     The weight of the evidence as to a fact does not necessarily
22  depend on the number of witnesses who testify about it.

23  **EXPERT OPINION**

24     Some witnesses, because of education or experience, were
25  permitted to state opinions and the reasons for those opinions.
26  Opinion testimony should be judged just like any other testimony.

27     You may accept it or reject it, and give it as much weight
28  as you think it deserves, considering the witness's education and

5

experience, the reasons given for the opinion, and all the other evidence in the case.

**CHARTS AND SUMMARIES**

Certain charts and summaries were received into evidence to illustrate information brought out in the trial.  Charts and summaries are only as good as the underlying evidence that supports them.  You should, therefore, give them only such weight as you think the underlying evidence deserves.

Certain graphics not received in evidence were shown to you in order to help explain the contents of books, records, documents or other evidence in the case.  They are not themselves evidence or proof of any facts.  If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these graphics and determine the facts from the underlying evidence.

**TESTIMONY THROUGH DEPOSITIONS**

A deposition is the sworn testimony of a witness taken before trial.  The witness is placed under oath to tell the truth and lawyers for each party may ask questions.  You should consider deposition testimony, presented to you in court instead of live testimony, insofar as possible, in the same way as if the witness had been present to testify.

**THE FOOD AND DRUG ADMINISTRATION**

You have heard mention of the Food and Drug Administration. That federal agency, which is also known as the FDA, oversees the drug approval process and claims regarding a drug's safety and efficacy.  The FDA does not regulate pricing.

1  **I.   BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
2  **– INTRODUCTION**

3       I will now discuss GSK's claims.  Implied in every contract
4  is a covenant, or agreement, of good faith and fair dealing.  The
5  implied covenant of good faith and fair dealing between parties
6  to a contract is a pledge that neither party will do anything
7  which will have the effect of destroying or injuring the right of
8  the other party to receive the benefits of the contract.  The
9  implied covenant is part of the contract, even though the
10 contract contains a provision that states that the written
11 contract is the "entire agreement."  A breach of the implied
12 covenant is a breach of the contract itself, the covenant being
13 part and parcel of the contract.  The covenant encompasses any
14 promises that a reasonable person in the position of the promisee
15 would be justified in understanding were included.  However, the
16 covenant cannot be construed so broadly as to create independent
17 contractual rights that were not bargained for by the parties.

18 **A. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
   **– ELEMENTS**
19
20      GSK alleges that Abbott breached the implied covenant of
   good faith and fair dealing with respect to the Norvir Boosting
21 License.  In order to demonstrate that Abbott breached the
22 implied covenant of good faith and fair dealing, GSK has the
23 burden to prove three elements by a preponderance of the
24 evidence:
25
26      First, Abbott's conduct directly destroyed or injured GSK's
   alleged right to receive benefits under the license agreement
27

28

that a reasonable party in GSK's position would have understood the license agreement to have included;

Second, Abbott engaged in grossly negligent conduct; and

Third, Abbott's conduct constituting a breach of the implied covenant of good faith and fair dealing was a proximate cause of the injury to GSK's business.

### 1. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – ELEMENT ONE: CONDUCT

The first element of its implied covenant claim that GSK must prove by a preponderance of the evidence is that Abbott committed an act that showed a lack of good faith and fair dealing, injuring GSK's right to receive the benefits that a reasonable party would have been justified in understanding were included in the Norvir Boosting License.

### 2. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – ELEMENT TWO: GROSS NEGLIGENCE

The second element of its implied covenant claim that GSK must prove by a preponderance of the evidence is that Abbott's breach of the implied covenant constituted grossly negligent conduct.  Such conduct involves intentional wrongdoing or a reckless indifference to the rights of others.

### 3. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – ELEMENT THREE: CAUSE OF INJURY

The third element of its implied covenant claim that GSK must prove by a preponderance of the evidence is that Abbott's breach of the implied covenant was a proximate cause of the injury to GSK's business.

Proximate cause is a cause which in a natural and continuous sequence produces the injury, and is a cause which a reasonable

and prudent person could have foreseen would probably produce
such injury or some similar injurious result.

There may be more than one proximate cause of an injury.
Therefore, GSK need not prove that Abbott's conduct was the sole
proximate cause of the injury to GSK's business.  However, GSK
must prove by a preponderance of the evidence that its injury is
directly traceable to Abbott's alleged breach of the implied
covenant.

### II.  UNFAIR AND DECEPTIVE TRADE PRACTICES

GSK alleges that Abbott engaged in unfair and deceptive
trade practices.  To prove this claim GSK must prove one or more
of the following:

1. During the negotiation of the Norvir Boosting License,
   Abbott was considering how to use its control over Norvir
   to limit competition with its drug Kaletra from
   competitors' drugs and deliberately withheld its plans
   from GSK; or

2. Abbott inequitably asserted its power over Norvir by
   increasing Norvir's price by 400 percent to disrupt
   Lexiva's launch or undermine Lexiva's future sales or
   both; or

3. Abbott timed the 400 percent Norvir price increase in
   order to disrupt Lexiva's launch or undermine Lexiva's
   future sales or both.

You will also be asked to determine whether any of this
conduct proximately caused injury to GSK.

### IV.  DAMAGES

It is the duty of the Court to instruct you about the measure of damages.  By instructing you on damages, the Court does not mean to suggest for which party your verdict should be rendered.

If you find for GSK on any of its claims, you must determine its damages.  GSK has the burden of proving damages by a preponderance of the evidence.  Damages means the amount of money that will reasonably and fairly compensate GSK for any injury you find was proximately caused by Abbott.

GSK seeks an award of damages on each of its claims based on profits it alleges that it lost as a result of Abbott's breach of the implied covenant and Abbott's unfair and deceptive trade practices.  If you find that GSK proved its breach of the implied covenant claim or its claim of unfair and deceptive trade practices, you must consider the evidence of GSK's damages.

GSK has offered evidence to calculate the profits it would have earned if Abbott had not engaged in its alleged misconduct. You may award GSK the amount it has proved its profits would have been in the absence of this alleged misconduct.

You must determine the amount of GSK's damages for all of the claims on which it prevails, if any.  However, GSK is not entitled to recover its damages more than once.  On the verdict form, if you find that an award of damages is appropriate for more than one of GSK's claims, you will be asked questions that ensure that GSK does not recover its damages more than once.

It is for you to determine what damages, if any, have been proved.  So long as there is a reasonable basis for a damages award, GSK should not be denied a right to be fairly compensated

1  just because damages cannot be determined with absolute

2  mathematical precision.  However, your award must be based upon

3  evidence and not upon speculation, guesswork or conjecture.

4  **USE OF NOTES**

5  Some of you have taken notes during the trial.  Whether or

6  not you took notes, you should rely on your own memory of the

7  evidence.  Notes are only to assist your memory.  You should not

8  be overly influenced by your notes or those of your fellow

9  jurors.

10  **NO TRANSCRIPT AVAILABLE**

11  You will have to make your decision based on what you recall

12  of the evidence.  You will not have a written transcript of the

13  trial.  Although a few portions of the trial have been

14  transcribed, the trial as a whole has not.  Portions of it could

15  be read back to you, if necessary, if you can identify particular

16  portions you want to hear.  However, read-back is time-consuming.

17  **DUTY TO DELIBERATE**

18  When you begin your deliberations, you should elect one

19  member of the jury as your presiding juror.  That person will

20  preside over the deliberations and speak for you here in court.

21  You will then discuss the case with your fellow jurors to

22  reach agreement if you can do so.  Your verdict must be

23  unanimous.

24  **COMMUNICATION WITH COURT**

25  If it becomes necessary during your deliberations to

26  communicate with me, you may send a note through the Court

27  security officer, signed by your presiding juror or by one or

28  more members of the jury.  No member of the jury should ever

11

attempt to communicate with me except by a signed writing; I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court.  If you send out a question, I will consult with the parties before answering it, which may take some time.  You may continue your deliberations while waiting for the answer to any question.  Remember that you are not to tell anyone -- including me -- how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged.  Do not disclose any vote count in any note to the Court.

**RETURN OF VERDICT**

A verdict form has been prepared for you.  After you have reached unanimous agreement on a verdict, your presiding juror will fill in the form that has been given to you, sign and date it, and advise the Court that you are ready to return to the courtroom.

Dated: _____          _____

CLAUDIA WILKEN
United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SMITHKLINE BEECHAM CORPORATION,                    No. C 07-5702 CW
d/b/a GLAXOSMITHKLINE,
                                                   VERDICT FORM
            Plaintiff,

v.

ABBOTT LABORATORIES,

            Defendant.
_____/

## I.   BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM

A.1. Do you find that Abbott committed an act that showed a lack of good faith and fair dealing, injuring GSK's right to receive the benefits that a reasonable party would have been justified in understanding were included in the license agreement?

Yes  ____ ("Yes" is a finding for GSK.)

No   ____ ("No" is a finding for Abbott.)

If you answered "Yes" to this question, then answer Question A.2. If you answered "No" to this question, proceed to Question B.1.

A.2. Did Abbott engage in grossly negligent conduct when it breached the implied covenant of good faith and fair dealing?

Yes  ____ ("Yes" is a finding for GSK.)

No   ____ ("No" is a finding for Abbott.)

If you answered "Yes" to this question, then answer Question A.3. If you answered "No" to this question, proceed to Question B.1.

A.3. Do you find that Abbott's breach of the implied covenant of good faith and fair dealing was a proximate cause of the injury to GSK's business?

Yes _____ ("Yes" is a finding for GSK.)

No   _____ ("No" is a finding for Abbott.)

If you answered "Yes" to this question, then answer Question A.4. If you answered "No" to this question, proceed to Question B.1.

A.4. If you answered "Yes" to Question A.3., what amount of damages, if any, do you find GSK has proved it suffered in lost profits from Abbott's breach of the implied covenant of good faith and fair dealing?  Enter the number below.

$ _____

Proceed to Question B.1.


## II.   UNFAIR & DECEPTIVE TRADE PRACTICES CLAIM

B.1. Are any of the following true?

B.1.a. During the negotiation of the Norvir Boosting License, Abbott was considering how to use its control over Norvir to limit competition with Kaletra from competitors' drugs and deliberately withheld this from GSK.

Yes _____ ("Yes" is a finding for GSK.)

No   _____ ("No" is a finding for Abbott.)

B.1.b. Abbott inequitably asserted its power over Norvir by increasing Norvir's price by 400 percent to disrupt Lexiva's launch or undermine Lexiva's future sales or both.

Yes _____ ("Yes" is a finding for GSK.)

No   _____ ("No" is a finding for Abbott.)

1

B.1.c. Abbott timed the 400 percent Norvir price increase in order to disrupt Lexiva's launch or undermine Lexiva's future sales or both.

Yes ____ ("Yes" is a finding for GSK.)

No ____ ("No" is a finding for Abbott.)

If you answered "Yes" to Question B.1.a., B.1.b., or B.1.c., or to more than one of them, then answer Question B.2.  If you answered "No" to Questions B.1.a., B.1.b., and B.1.c., please have your presiding juror sign, date and return your verdict.

B.2. Do you find that the conduct you found in Question B.1. that Abbott engaged in was a proximate cause of injury to GSK?

Yes ____ ("Yes" is a finding for GSK.)

No ____ ("No" is a finding for Abbott.)

If you answered "Yes" to this question, then answer Question B.3.  If you answered "No" to this question, please have your presiding juror sign, date and return your verdict.

B.3. If you answered "Yes" to Question B.2, what amount of damages, if any, do you find GSK has proved it suffered in lost profits from the conduct you found in Question B.1.? Enter the number below, even if some or all of these damages are the same damages that you awarded in Question A.4. above. (The Court will ensure that GSK is not awarded the same damages more than once.)

$ _____

If you entered a number in this line, answer Question B.4. Otherwise, please have your presiding juror sign, date and return your verdict.

B.4. How much of the damages you found in Question B.3., if any, were NOT awarded in Question A.4. above?

$ _____

2

Please have the presiding juror sign, date and return this form.

    Signed:_____ Date:_____
             Presiding Juror