James F. Hurst *(Admitted Pro Hac Vice)*
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
james.hurst@kirkland.com

Charles B. Klein (*Admitted Pro Hac Vice*)
Matthew A. Campbell (*Admitted Pro Hac Vice*)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC 20007
Telephone: (202) 282-5000
Facsimile: (202) 282-5100
cklein@winston.com;
macampbell@winston.com

Jeffrey I. Weinberger (SBN 56214)
Stuart N. Senator (SBN 148009)
Keith R.D. Hamilton (SBN 252115)
Caroline McKay Cunningham (SBN 270927)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702
jeffrey.weinberger@mto.com;
stuart.senator@mto.com;
keith.hamilton@mto.com;
caroline.cunningham@mto.com

Counsel for Defendant
ABBOTT LABORATORIES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE,

Plaintiff,

vs.

ABBOTT LABORATORIES,

Defendant.

Case No. C 07-5702 (CW)

**ABBOTT'S BRIEF ON JURY INSTRUCTIONS AND VERDICT FORM IN RESPONSE TO MARCH 10, 2015 ORDER GRANTING MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ....................................................................................... 1

I. GIVEN GSK'S DECISION TO ABANDON ITS ANTITRUST CLAIMS, THE COURT SHOULD DISMISS THE UDTPA CLAIM. ................................ 3

II. ALTERNATIVELY, THE COURT SHOULD STRIKE THE VERDICT FORM'S FIRST TWO UDTPA QUESTIONS, WHICH INVOLVE ANTITRUST CONCEPTS. ......................................................................... 6

III. IF IT WERE TO KEEP ANY OF THE UDTPA QUESTIONS, THE COURT SHOULD AT LEAST PROVIDE THE JURY WITH MORE GUIDANCE. ......................................................................................... 9

A. The Court Should Retain The Guidance In The Antitrust Instructions With Respect To What Constitutes Fair Competition ............................. 9

B. The Court Should Add Additional Instructional Limitations On The UDTPA Claim ......................................................................... 13

IV. WITHOUT THE ANTITRUST CLAIMS, THE UDTPA CLAIM MAY PROCEED ONLY IF THE JURY FINDS A BREACH OF THE PATENT LICENSE. ........................................................................................ 14

CONCLUSION ........................................................................................ 16

Case4:07-cv-05702-CW Document639 Filed03/19/15 Page3 of 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
948 F.2d 536 (9th Cir. 1991) ........ 7

*Bollenbach v. United States*,
326 U.S. 607 (1946) ........ 9

*Brulotte v. Thys Co.*,
379 U.S. 29 (1964) ........ 7

*Century 21 Real Estate LLC v. All Professional Realty, Inc.*,
889 F. Supp. 2d 1198 (E.D. Cal. 2012) ........ 4

*Continental Airlines, Inc. v. Mundo Travel Corp.*,
412 F. Supp. 2d 1059 (E.D. Cal. 2006) ........ 5

*County of Maricopa v. Maberry*,
555 F.2d 207 (9th Cir. 1997) ........ 12

*Dawson Chemical Co. v. Rohm & Haas Co.*,
448 U.S. 176 (1980) ........ 8, 11

*Gaidon v. Guardian Life Inurance Co. of America*,
750 N.E.2d 1078 (N.Y. 2001) ........ 6

*Griffith v. Glen Wood Co.*,
646 S.E.2d 550 (N.C. Ct. App. 2007) ........ 15

*Hunter v. County of Sacramento*,
652 F.3d 1225 (9th Cir. 2011) ........ 9

*Image Technical Services, Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) ........ 7, 15

*In re Polyurethane Foam Antitrust Litigation*,
2014 WL 6461355 (N.D. Ohio Nov. 17, 2014) ........ 12

*Klaxon Co. v. Stentor Electric Manufacturing Co.*,
313 U.S. 487 (1941) ........ 3

*MediMatch, Inc. v. Lucent Technologies Inc.*,
120 F. Supp. 2d 842 (N.D. Cal. 2000) ........ 5

*Monsanto Co. v. McFarling*,
302 F.3d 1291 (Fed. Cir. 2002) ........ 7, 15

*Nedlloyd Lines B.V. v. Superior Court*,
834 P.2d 1148 (Cal. 1992) ........ 1, 4

-ii-

ABBOTT'S BRIEF ON JURY INSTRUCTIONS AND VERDICT FORM IN RESPONSE TO MARCH 10, 2015 ORDER GRANTING MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT: CASE NO. 07-5702

Case4:07-cv-05702-CW Document639 Filed03/19/15 Page4 of 20

*Norwood v. Vance*,
591 F.3d 1062 (9th Cir. 2010) .................... 9

*O'Bannon v. National Collegiate Athletic Association*,
2010 WL 445190 (N.D. Cal. Feb. 8, 2010) .................... 10

*Olinick v. BMG Entertainment*,
138 Cal. App. 4th 1286 (2006) .................... 4

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
85 N.Y.2d 20 (N.Y. 1995) .................... 6

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
555 U.S. 438 (2009) .................... 11, 15

*Patel v. City of Los Angeles*,
738 F.3d 1058 (9th Cir. 2013) .................... 12

*Samica Enterprises LLC v. Mail Boxes Etc., Inc.*,
460 F. App'x 664 (9th Cir. 2011) .................... 4, 5

*Schor v. Abbott Laboratories*,
457 F.3d 608 (7th Cir. 2006) .................... 7, 13

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993) .................... 10

*Stack v. Abbott Laboratories, Inc.*,
979 F. Supp. 2d 658 (M.D.N.C. 2013) .................... 15

*Tar Heel Industries, Inc. v. E.I. duPont de Nemours & Co.*,
370 S.E.2d 449 (N.C. Ct. App. 1988) .................... 12

*Tatarian v. Aluf Plastics*,
2002 WL 1065880 (D.N.J. May 13, 2002) .................... 12

*Ticknor v. Choice Hotels International, Inc.*,
265 F.3d 931 (9th Cir. 2001) .................... 3

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) .................... 11, 15

**Rules**

Fed. R. Civ. P. 12(b)(6) .................... 3

Fed. R. Civ. P. 12(c) .................... 3

Fed. R. Civ. P. 12(h)(2) .................... 3

-iii-

ABBOTT'S BRIEF ON JURY INSTRUCTIONS AND VERDICT FORM IN RESPONSE TO MARCH 10, 2015 ORDER GRANTING MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT: CASE NO. 07-5702

## INTRODUCTION

After seven years of litigation, on the eve of trial, GSK has abandoned its antitrust claims, leaving only a breach of contract claim and an alleged violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"). This has fundamentally altered the landscape of the litigation. It is critical that this case's verdict form and jury instructions be revised to reflect that significant shift.

The parties agree that, given the voluntary withdrawal of the antitrust claims, the portions of the jury instructions that solely relate to those claims should be stricken. But the parties disagree over other changes to the instructions and verdict form—in particular, the three questions forming the basis of GSK's UDTPA claim.

Now that GSK has abandoned its antitrust claims, the Court should strike all three UDTPA questions because there is no longer any basis to apply North Carolina law. Under controlling California choice-of-law rules, a contract's choice-of-law provision—like the one here designating New York law—governs "all causes of action arising from or related to the[] contract," including any "tortious breaches of duties emanating from the agreement or the legal relationships it creates." *Nedlloyd Lines B.V. v. Superior Court*, 834 P.2d 1148, 1153-55 (Cal. 1992) (en banc). When this case began, GSK's UDTPA claim included theories that were entirely independent of the parties' contract, such as alleged consumer deception and antitrust violations. The Court previously entered summary judgment on the consumer deception theory, and now that GSK dismissed its antitrust claims, GSK's UDTPA claim has been whittled down to one that necessarily arises *entirely* out of their contractual relationship. Thus, the parties' choice of New York law controls, requiring dismissal of the UDTPA claim (Section I).

Alternatively, if the Court finds that North Carolina law applies, the Court should still strike the first two of the three UDTPA questions because those questions—though arising out of the parties' contractual relationship—are inextricably intertwined with antitrust principles. These questions refer to Abbott's alleged unfair use of its "power" or "control" over Norvir to either

"limit competition" or to "inequitably" "undermine Lexiva's future sales." At the last trial, the Court provided the jury with context and detailed guidance on these questions through its antitrust instructions. The Court first advised the jury that Abbott has patents and thus a "legal monopoly over Norvir and Norvir's use as a booster." The Court then explained in detail how, despite that legal patent monopoly, Abbott's conduct might still amount to improper anticompetitive conduct in violation of the antitrust laws. Now that GSK is no longer arguing that it can pierce Abbott's patent rights with an alleged antitrust violation, those two questions should be stricken. A patent holder's rights include the right to exclude competitors and raise prices (Section II).

If the Court were to uphold the UDTPA claim and retain any of the related questions, it should at least include some modest patent law and competition law instructions to provide context and proper guidance. To allow the jury to fairly and properly evaluate issues about the alleged "unfair" and "inequitable" use of "power" and "control" to "limit competition" and "undermine sales," the Court should provide some basic explanation of competition law concerning what is and is not legitimate business competition, including the proper exercise of patent rights (Section III).

Indeed, if the Court keeps any of the UDTPA questions, the Court should do more, and tell the jury that, because there is no longer an antitrust claim, the only circumstance under which it may find a violation of the UDTPA is if it first finds a grossly negligent breach of the license agreement (Section IV).

In contrast to Abbott's proposals for handling GSK's last-minute abandonment of its antitrust claims, GSK proposes providing the jury with no guidance—literally not one word—for its deliberations over the UDTPA questions. That proposal would permit the jury to award damages allegedly exceeding $800 million (over $2.4 billion with GSK's requested trebling) based on their unbounded sense of what constitutes a proper exercise of patent rights, what conduct "*limits*" competition as opposed to being *part of* competition, and/or when the use of a legal monopoly is "inequitable"—all in circumstances where none of the disputed conduct is (any

longer) alleged to violate the antitrust laws. Such an approach would be highly improper, thoroughly inequitable, and clearly erroneous.[1]

## I. GIVEN GSK'S DECISION TO ABANDON ITS ANTITRUST CLAIMS, THE COURT SHOULD DISMISS THE UDTPA CLAIM.

With no antitrust claims left, it is now clear that GSK's UDTPA claim arises solely out of the parties' contractual relationship. Thus, under California choice-of-law rules, New York law applies to that claim, which means GSK cannot proceed with its North Carolina claim.

When this case began, GSK had three theories for why the Norvir repricing violated the North Carolina UDTPA—*i.e.*, that Abbott's conduct was unfair, deceptive, and anticompetitive. (Dkt. # 53 at 19-20). But the Court granted Abbott summary judgment on GSK's theory about deceiving consumers (Dkt. # 325 at 46:4-9), and GSK has now abandoned its antitrust theory, leaving only GSK's unfairness theory. The gist of that theory is that after entering into a license with GSK, Abbott acted unfairly by increasing Norvir's price in a way that allegedly undermined the value of that license to GSK. Without any antitrust claims, that sole remaining theory necessarily rests on the parties' contractual relationship and, thus, is governed by New York law.

Abbott and GSK included a broad choice-of-law provision in the Norvir license agreement, providing that "[t]his Agreement shall be governed exclusively by the laws of the State of New York, USA, excluding its conflict of laws provisions." Ex. A, Norvir License Agreement at P00005-17. Under California choice-of-law rules—which this Court sitting in diversity applies, *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Ticknor v. Choice Hotels*

---

[1] Abbott does not intend by submitting this brief to waive its personal jurisdiction defense and, on the contrary, reasserts that defense here. Given that Abbott is seeking dismissal of GSK's UDTPA claim through its first argument, the Court should treat that argument as an alternative basis for a Rule 12(b)(6) motion to dismiss Count II of GSK's newly filed Second Amended Complaint or, alternatively, as a Rule 12(c) motion. "Failure to state a claim upon which relief can be granted . . . may be raised . . . by a motion under Rule 12(c)" or by argument made "at trial." Fed. R. Civ. P. 12(h)(2). Here, there has been no earlier ruling on the applicable choice of law, particularly as it relates to GSK's newly filed complaint, which eliminates the earlier mish-mosh of contract-related and non-contract-related allegations supporting its UDTPA claim.

*Int'l, Inc.*, 265 F.3d 931, 937 (9th Cir. 2001)—a contract's choice-of-law provision applies not only to breach of contract claims, but also to "all causes of action arising from or related to the[] contract," including any "tortious breaches of duties emanating from the agreement or the legal relationships it creates." *Nedlloyd*, 834 P.2d at 1153, 1155. As the California Supreme Court has explained, "[w]hen two sophisticated, commercial entities agree to a choice-of-law clause . . . , the most reasonable interpretation of their actions is that they intended for the clause to apply *to all causes of action arising from or related to their contract*." *Id.* at 1153 (emphasis added). "The phrase 'governed by' is a broad one signifying a relationship of absolute direction, control, and restraint. Thus, the clause reflects the parties' clear contemplation that 'the agreement' is to be completely and absolutely controlled by [the chosen] law." *Id.* at 1154. The California Supreme Court "seriously doubt[s] that any rational businessperson, attempting to provide by contract for an efficient and businesslike resolution of possible future disputes, would intend that the laws of multiple jurisdictions would apply to a single controversy having its origin in a single, contract-based relationship." *Id.*

Courts applying the *Nedlloyd* rule have held that a choice-of-law provision "covers all contract claims, including pre-contract wrongs," *Samica Enterprises LLC v. Mail Boxes Etc., Inc.*, 460 F. App'x 664, 667 (9th Cir. 2011), as well as statutory claims related to the contract. *See Olinick v. BMG Entm't*, 138 Cal. App. 4th 1286, 1299-1300 (2006). In fact, courts routinely dismiss claims under *one state's* unfair competition statute when the dispute arises out of a contract that specifies the application of a *different state's* law. For example, in *Century 21 Real Estate LLC v. All Professional Realty, Inc.*, the court dismissed a California Unfair Competition Law ("UCL") claim, holding that because the parties' contract had a New Jersey choice-of-law provision, that state's law applied to the unfair competition claim. 889 F. Supp. 2d 1198, 1216-17 (E.D. Cal. 2012), *aff'd*, 2015 WL 191502 (9th Cir. Jan. 15, 2015). Similarly, in *Continental Airlines, Inc. v. Mundo Travel Corp.*, the court dismissed a California UCL claim because that claim "[arose] from the relationship of the parties" created by the contract, and that contract had a

Virginia choice-of-law provision. *See* 412 F. Supp. 2d 1059, 1070 (E.D. Cal. 2006). And in *MediMatch, Inc. v. Lucent Techs. Inc.*, the Northern District of California dismissed with prejudice a California UCL claim because the parties' contract provided for New Jersey law. 120 F. Supp. 2d 842, 862 (N.D. Cal. 2000).

Here, New York law clearly applies now that GSK has abandoned its antitrust claims, thus eliminating any possible argument that its unfair competition claim arises from anything *other than* the license. For example, in its first UDTPA question, GSK claims that Abbott violated the UDTPA because "[d]uring the negotiation of the Norvir Boosting License, Abbott was considering how to use its control over Norvir to limit competition with its drug Kaletra from competitors' drugs and deliberately withheld its plans from GSK." (Dkt. ## 620-1 at 25, 620-2 at 26; *see also* Dkt. # 620-3 at 5). Without any pending antitrust claims, this question clearly *only* refers to alleged "pre-contract wrongs," which the Ninth Circuit held in *Samica Enterprises* are controlled by the parties' choice-of-law provision—here, not North Carolina but New York law. *See* 460 F. App'x at 667.

Similarly, in its second and third questions, GSK claims that Abbott violated the UDTPA because it "inequitably asserted its power over Norvir by increasing Norvir's price by 400 percent to disrupt Lexiva's launch or undermine Lexiva's future sales or both," or "timed the 400 percent Norvir price increase in order to disrupt Lexiva's launch or undermine Lexiva's future sales or both." (Dkt. ## 620-1 at 25, 620-2 at 26-27, 620-3 at 6). But again, without any antitrust claim, these two claims now must arise solely out of the parties' contractual relationship. Indeed, absent an antitrust claim and without any contractual relationship, there is no possible theory of liability under the UDTPA. Companies are obviously free to unilaterally raise their prices and they have no obligation to time those increases in ways that are most convenient for their competitors.

For these reasons, GSK's UDTPA claim necessarily arises out of and relates to the Norvir license agreement and thus must be dismissed because New York law now indisputably applies. GSK cannot cure this defect by amending its complaint to add a claim under New York's

deceptive practices act, N.Y. Gen. Bus. Law § 349, because that claim would be barred by New York's three-year statute of limitations, *see, e.g.*, *Gaidon v. Guardian Life Ins. Co. of Am.*, 750 N.E.2d 1078, 1083 (N.Y. 2001), and because GSK's claim based on the parties' contractual relationship "would not fall within the ambit of the statute." *E.g.*, *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (N.Y. 1995) ("Private contract disputes, unique to the parties, for example, would not fall within the ambit of the statute.").

## II. ALTERNATIVELY, THE COURT SHOULD STRIKE THE VERDICT FORM'S FIRST TWO UDTPA QUESTIONS, WHICH INVOLVE ANTITRUST CONCEPTS.

Even if the Court finds that North Carolina law applies, it should still strike the first two UDTPA questions, which are inextricably intertwined with antitrust concepts. Those questions ask whether Abbott acted to "limit competition" or "inequitably asserted its power over Norvir"—concepts that require the jury to distinguish between lawful and unlawful competition and to judge what is and is not equitable use of a legal monopoly.

Again, the first question asks whether, "[d]uring the negotiation of the Norvir Boosting License, Abbott was considering how to use its control over Norvir to *limit competition with its drug Kaletra from competitors' drugs* and deliberately withheld its plans from GSK." (Dkt. ## 620-1 at 25, 620-2 at 26-27 (emphasis added); *see also* Dkt. # 620-3 at 5). The second asks whether, "Abbott *inequitably asserted its power over Norvir* by increasing Norvir's price by 400 percent to disrupt Lexiva's launch or undermine Lexiva's future sales or both." (Dkt. ## 620-1 at 25, 620-2 at 26-27, 620-3 at 5-6 (emphasis added)).

Now that GSK is no longer arguing that the antitrust laws constrained Abbott's patent rights, these questions now relate to nothing more than the mere legitimate exercise of patent rights. At the last trial, this Court explained Abbott's "legal monopoly" over Norvir's use as a booster:

> As you will hear during trial, Abbott has a patent on Norvir and on Norvir's use as a booster. Abbott's patents on Norvir and on Norvir's use as a booster provide Abbott with a legal monopoly over Norvir and Norvir's use as a booster.

(Dkt. # 620-1 at 17-18). The Court then explained, however, that Abbott's "legal" patent monopoly "does not establish whether Abbott violated the antitrust laws through anticompetitive conduct." (*Id.* at 18).

Over the course of roughly eighteen pages in the final instructions, the Court explained in detail how—despite having a legal patent monopoly—Abbott could still be liable for improper anticompetitive conduct, but *only* if GSK proved: (1) that Abbott had a "monopoly" in a "relevant market"—that is, a market in which *Kaletra* competed; (2) that Abbott "willfully maintained" that "monopoly" through "anticompetitive conduct" in the form of either "unlawful bundled discounting" or an "effective refusal to deal with its competitors" with "anticompetitive intent"; and (3) that the anticompetitive conduct was a "material cause" of damage to GSK "of the type that the antitrust laws were intended to prevent." (*See* Dkt. # 620-2 at 7-24).

Now that GSK is no longer asserting that the antitrust laws constrained Abbott's ability to raise Norvir's price, Abbott's price increase cannot be the basis for liability. "[S]etting high prices in the original 'monopoly' market" is among the "ways that a monopolist can permissibly benefit from its position." *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 548 (9th Cir. 1991); *accord Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1218-19, 1225 (9th Cir. 1997) ("[S]ome measure must guarantee that the jury account for the procompetitive effects and statutory rights extended by the intellectual property laws" and a firm is "entitled to monopoly prices on its patented" products); *see also Brulotte v. Thys Co.*, 379 U.S. 29, 33 (1964) ("A patent empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly."); *Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006) (a patent holder is entitled to charge "whatever the traffic will bear"); *Monsanto Co. v. McFarling*, 302 F.3d 1291, 1299 (Fed. Cir. 2002) ("The owner of a patented article can, of course, charge such price as he may choose."); *Image Technical*, 125 F.3d at 1218 n.11 ("Kodak is entitled to reap monopoly prices from the sale or licensing of" its patented products).

Case4:07-cv-05702-CW Document639 Filed03/19/15 Page12 of 20

The Court's instructions refer to "unfair" trade practices, and then immediately turn to question one, which concerns Abbott's internal deliberations about allegedly using its "control over Norvir to *limit competition with Kaletra from competitors' drugs*" (Dkt. # 620-3 at 5 (emphasis added))—the implication being that such thoughts are "unfair" or improper in some way. But, in fact, the very "essence of a patent grant is the right to exclude others from profiting by the patented invention." *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 215 (1980). And Abbott had the right to price as it pleases, at least if its pricing did not violate its license to GSK. Thus, the question should be stricken.

Question two similarly refers to conduct falling fully within Abbott's competitive and patent rights. It asks whether "Abbott *inequitably asserted its power over Norvir* by increasing Norvir's price" (Dkt. # 620-3 at 6)—the implication being, again, that the price increase alone could somehow be an unfair trade practice. But, again, Abbott's now unchallenged patent and competition rights allowed it to charge whatever the market would bear. If there were a limitation, it would be found in GSK's license. But no such limitation exists.

If it declines to dismiss the UDTPA claim, the Court should simply delete the two questions. Doing so would at least align GSK's UDTPA claim to a case with no pending allegation that Abbott violated the antitrust laws. The jury still would address the third UDTPA question (question C.1.c)—*i.e.*, whether "Abbott timed the 400 percent Norvir price increase in order to disrupt Lexiva's launch or undermine Lexiva's future sales or both." (*Id.*)

Because it does not incorporate antitrust words and concepts, this third UDTPA question does not suffer from the same problems as the other two questions.[2] And it goes to the very heart of GSK's theory of the case. *See* GSK Pretrial Br. at 4 (Dkt. # 341 (claiming that "Abbott timed its action to exact the greatest toll on Lexiva, thus maximizing the benefit Abbott could wrongfully seize for itself through improperly shielded Kaletra sales. Abbott did so by taking the

---

2 Abbott maintains all of its objections to this and the other UDTPA questions (*see, e.g.*, Dkt. ## 616 at 3; 601-4 at 5, 7-8; 468-1 at 24 n.5), but is not seeking to reargue those objections here.

-8-

ABBOTT'S BRIEF ON JURY INSTRUCTIONS AND VERDICT FORM IN RESPONSE TO MARCH 10, 2015 ORDER GRANTING MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT: CASE NO. 07-5702

unprecedented hike at a vital point in GSK's sales efforts: during Lexiva's launch")). That is the question asked in question C.1.c. Thus, because GSK has dropped its antitrust claims, and if the Court finds that North Carolina law applies, the third UDTPA question should be the only one presented to the jury.

## III. IF IT WERE TO KEEP ANY OF THE UDTPA QUESTIONS, THE COURT SHOULD AT LEAST PROVIDE THE JURY WITH MORE GUIDANCE.

### A. The Court Should Retain The Guidance In The Antitrust Instructions With Respect To What Constitutes Fair Competition

Abbott believes it would be clear error to present any of the UDTPA questions to the jury. But if the Court were to reject Abbott's request to dismiss the UDTPA claim and delete related questions, the Court should at least provide some limited instructions on patent rights and competition law addressing what is (and is not) appropriate competition and legitimate business conduct. Exhibit B (redline) and Exhibit C (clean version) present proposed revised instructions. These edits omit references to the antitrust claims, but maintain (with only modest additions for continuity) competition concepts under a new heading called "Background Business Principles." They also add a basic description of the rights granted through a patent.

While Abbott believes that dismissing the UDTPA claim and deleting all of the related questions, or at least the first two questions, is the correct way to cure the concerns addressed above, this alternative proposal would be far preferable to GSK's—which invites clear error and juror confusion. "Discharge of the jury's responsibility for drawing appropriate conclusions from the testimony depend[s] on discharge of the judge's responsibility to give the jury the required guidance by a lucid statement of the relevant legal criteria." *Bollenbach v. United States*, 326 U.S. 607, 612 (1946); *see also Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1234-35 (9th Cir. 2011) (vacating judgment for defendants because judge had refused supplemental instruction from plaintiff that would have given a more complete definition of "practice or custom," where supplement was "vital" to plaintiff's case and instruction that was given "may well have encouraged the jury to disregard" plaintiff's key evidence); *Norwood v. Vance*, 591 F.3d 1062,

Case4:07-cv-05702-CW Document639 Filed03/19/15 Page14 of 20

1067 (9th Cir. 2010) (vacating judgment for plaintiff because judge's failure to give additional guidance regarding prison officials' competing Eighth Amendment obligations "rendered the instruction incomplete and misleading").

For the first question, the jury must find that the steps Abbott considered (but did not necessarily take) would have had the effect of "limit[ing] competition . . . from competitors' drugs," and that Abbott then "deliberately" withheld those internal strategy considerations from GSK. Without any guidance from antitrust instructions on what it means to "limit competition," the jury will be forced to simply guess.

At the first trial, this Court gave the jury guidance—through the antitrust instructions—on what practices limit competition. For example, the Court distinguished between the "ordinary means of competition" and practices that "unreasonably or unnecessarily impede fair competition":

> In considering whether Abbott's conduct was anticompetitive, you must draw a distinction between practices which tend to *exclude or restrict competition* on the one hand and the success of a business which reflects only a superior product, a well-run business, or luck, on the other. Put another way, anticompetitive conduct refers to practices that *unreasonably or unnecessarily impede fair competition*; that is, *conduct that impairs the efforts of others to compete for customers in an unnecessarily restrictive way*. Such conduct does not refer to ordinary means of competition, like offering better products or services, exercising superior skill or business judgment, utilizing more efficient technology, or exercising natural competitive advantages.

Dkt. # 620-1 at 14 (emphases added); *cf. O'Bannon v. National Collegiate Athletic Association*, Nos. C 09–1967 CW, C 09–3329 CW, C 09–4882 CW, 2010 WL 445190, at *7 (N.D. Cal. Feb. 8, 2010) (Wilken, J.) ("'The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.'" (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993))). As the Court further noted in its instructions, Abbott's conduct is not unlawful even if it injured competitors such as GSK:

-10-

ABBOTT'S BRIEF ON JURY INSTRUCTIONS AND VERDICT FORM IN RESPONSE TO MARCH 10, 2015 ORDER GRANTING MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT: CASE NO. 07-5702

"Conduct that is designed to protect or further Abbott's legitimate business purposes is not anticompetitive, *even if that conduct injures competitors*." (Dkt. # 620-1 at 17 (emphasis added)).

GSK proposes deleting all of these instructions. Without them, however, the jury would have no meaningful way to either interpret or apply the phrase "limit competition." The jury would not know how to distinguish legitimate competitive conduct from unlawful conduct that limits competition, or even that it is necessary to do so. In fact, GSK's proposal improperly invites the jury to find that lawful—indeed, routine—conduct violates the UDTPA.

For instance, suppose the jury finds that Abbott "deliberately" withheld from GSK the plan to raise Norvir's price. How will it decide whether any such discussions would "limit competition?" In fact, pricing is *part* of the competitive process; it is not a "limit" on competition. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). As reflected in the Court's prior rulings, pricing decisions are perfectly lawful—indeed, even *pro*-competitive—unless they result in some recognized form of anticompetitive conduct, such as below-cost bundled discounting. (*See* Dkt. # 325 at 24 ("'As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing.' . . . . However, there are 'limited circumstances in which a firm's unilateral refusal to deal with its rivals can give rise to antitrust liability.'" (quoting *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009)))).

The same is true of the internal discussion about potentially withdrawing Norvir from the market, which—if it were ever pursued—would have been an exercise of Abbott's "right to exclude others from profiting by the patented invention" of boosting, thus keeping the invention exclusively to itself in the form of Kaletra. *Dawson*, 448 U.S. at 215. Investing resources to create patentable innovations—whether a company then sells the invention exclusively or shares it with others through patent licenses—is *part* of the competitive process; it is not a *limit* on competition. *Verizon*, 540 U.S. at 407 ("The mere possession of monopoly power, and the

concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system.”).

In addition, without guidance regarding legitimate business practices, the jury may also place inappropriate weight on Abbott declining to voluntarily disclose internal deliberations from GSK during the license negotiations. Doing so is obviously not unlawful. It is “not unfair or deceptive for [a party] to study and seek alternative[s]” during contract negotiations. *Tar Heel Indus., Inc. v. E.I. duPont de Nemours & Co.*, 370 S.E.2d 449, 452 (N.C. Ct. App. 1988). And it is widely accepted that pricing and other competitive strategies are highly confidential—strategies that a company should *never* have to share with a *direct competitor*. *See Patel v. City of L.A.*, 738 F.3d 1058, 1062 (9th Cir. 2013) (“Th[e] expectation of privacy is one society deems reasonable because businesses do not ordinarily disclose, and are not expected to disclose, the kind of commercially sensitive information contained in the records—*e.g.*, customer lists, pricing practices, and [other information].”); *see also, e.g.*, *In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2014 WL 6461355, at *33 (N.D. Ohio Nov. 17, 2014) (finding that internal cost and pricing information are properly “closely guarded secrets”); *Tatarian v. Aluf Plastics*, No. 01-cv-5372(WGB), 2002 WL 1065880, at *3 (D.N.J. May 13, 2002) (“The Court finds credible API’s contentions that it closely guarded its sales and pricing information.”).

Indeed, without guidance, the first UDTPA question gets very close to improperly directing the jury to answer “yes,” given that Abbott did not—of course—disclose highly confidential strategy discussions to its direct competitor. *See Cnty. of Maricopa v. Maberry*, 555 F.2d 207, 216 (9th Cir. 1997) (vacating judgment for plaintiff because judge’s excisions and modifications of the jury instructions “in essence, directed a verdict”).

The second UDTPA question requires explanatory instructions as well. It asks whether “Abbott *inequitably asserted its power over Norvir* by increasing Norvir’s price by 400 percent to disrupt Lexiva’s launch or undermine Lexiva’s future sales or both.” (Dkt. ## 620-1 at 25, 620-2 at 26-27, 620-3 at 5-6 (emphasis added)). GSK proposes deleting any possible guidance about

what it means for Abbott to have "power over Norvir" or to have "inequitably asserted" that power. For instance, GSK proposes deleting the text explaining that Abbott has "patents" and thus a "legal monopoly over Norvir and Norvir's use as a booster." (Dkt. # 620-1 at 17-18).

Without this instruction, the jury could mistakenly conclude that by taking steps to increase the value of its lawful rights over Norvir, Abbott "inequitably asserted its power over Norvir" and did so to "undermine" GSK's sales. Such conduct, however, is a lawful and *pro*-competitive assertion of its invention, including the right to "charge whatever the traffic will bear." *Schor*, 457 F.3d at 610. If the Court were to keep loaded terms such as "limit competition" and "power over Norvir" undefined, this would invite juror confusion and legal error.

The third question requires guidance too because it asks if Abbott "timed the 400 percent Norvir price increase in order to disrupt Lexiva's launch or undermine Lexiva's future sales or both." (Dkt. ## 620-1 at 25, 620-2 at 27, 620-3 at 6). Without being advised that a patent provides exclusivity and consequent pricing power—which, indeed, is the very point of a patent—the jury will be misled into believing the mere *amount* of the price increase is somehow wrongful. And they would be misled, too, if not told, for instance, that it is not inequitable to engage in "ordinary means of competition" such as exercising "natural competitive advantages," which include exercising patent rights awarded as a result of innovation.

### B. The Court Should Add Additional Instructional Limitations On The UDTPA Claim

The Court should provide additional guidance without the complete antitrust instructions. The Court's summary judgment order sets forth the following guidance for assessing a UDTPA violation: "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." (Dkt. # 325 at 44 (citations omitted)). This instruction should be provided to the jury given the absence of the related antitrust claim that previously provided context for the UDTPA questions.

In addition, references to "deceptive" trade practices should be stricken from the jury instructions and verdict form. GSK's UDTPA theory has been limited solely to a theory of "unfair" acts after the Court granted summary judgment "on GSK's UD[TP]A claim to the extent it is based on Abbott's allegedly deceptive representations to the public about the Norvir price increase." (Dkt. # 325 at 46). Reference to "deception" in the instructions and verdict form could confuse the jury into believing that it may find liability on this basis. (*See* Dkt. # 341 at 3-6 (GSK did not allege any deceptive acts in its pretrial brief)). To avoid confusion, Abbott suggests that the UDTPA claim be referred to in the instructions and verdict form as simply "Unfair Trade Practices Act."

## IV. WITHOUT THE ANTITRUST CLAIMS, THE UDTPA CLAIM MAY PROCEED ONLY IF THE JURY FINDS A BREACH OF THE PATENT LICENSE.

Were the Court to find that any of GSK's UDTPA questions can go to the jury, it nevertheless should instruct the jurors not to proceed to those questions unless they first find that a "grossly negligent" breach occurred. (*See* Dkt. # 620-3 at 4 (question B.2. addresses GSK's allegation of a "grossly negligent" breach)).

The Court previously rejected Abbott's motion for summary judgment on the UDTPA claim because: (1) the UDTPA is violated when the antitrust laws are violated, and (2) GSK's alleged "breach of the implied covenant claim under New York law could also support liability under the UDTPA." (Dkt. # 325 at 43-45 & n.10). Thus, the Court concluded that "summary judgment is not warranted on GSK's UDTPA claim to the extent it is based on Abbott's alleged breach of the implied covenant of good faith and fair dealing." (*Id.* at 46).

Now that GSK has abandoned its antitrust claims, its only remaining theory under the UDTPA is that Abbott engaged in unfair acts when it "knew that it was taking steps that would undermine the license's value." (*Id.* at 45; *accord id.* at 37). But under that theory, if the jury rejects the breach of the implied covenant claim—meaning that Abbott *complied* with its duty of good faith and fair dealing—there can be no liability under the UDTPA.

Allowing liability under the UDTPA when there has been no anticompetitive act, no breach of contract, and no breach of any implied covenant would require construing the UDTPA as imposing some independent duty to aid competitors, such as through licensing or low prices, when of course no such duty exists. (*See* Dkt. # 325 at 24 ("'As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing.' . . . However, there are 'limited circumstances in which a firm's unilateral refusal to deal with its rivals can give rise to antitrust liability.'" (quoting *Pac. Bell*, 555 U.S. at 448 (2009)))). Such a duty does not exist—particularly because Abbott's patent rights allowed it to set a monopoly price and exclude all competitors. Exploiting a legitimate "monopoly power" in that way is "not only not unlawful; it is an important element of the free-market system." *Verizon*, 540 U.S. at 407; *Monsanto*, 302 F.3d at 1299; *Image Technical*, 125 F.3d at 1225 (a firm "is entitled to [charge] monopoly prices on its patented [products]").

For the last trial, the parties argued over whether the jury must first determine that a breach occurred before proceeding to determine UDTPA questions. GSK argued essentially that this Court should reconsider its summary judgment rulings, and permit it to try a different UDTPA claim that was *not*—contrary to how the Court previously ruled—"based on Abbott's alleged breach of the implied covenant of good faith and fair dealing." (Dkt. # 325 at 46).

Because circumstances are now markedly different, this Court should adhere to its original summary judgment ruling. "The Fourth Circuit has cautioned . . . that it is inappropriate to allow a boilerplate UDTPA claim to ride piggyback on a contract action." *Stack v. Abbott Labs., Inc.*, 979 F. Supp. 2d 658, 668 (M.D.N.C. 2013). And a "mere breach of contract cannot sustain a UDTPA claim." *Id.* There must be "'substantial aggravating circumstances[]" beyond the breach. *Griffith v. Glen Wood Co.*, 646 S.E.2d 550, 558 (N.C. Ct. App. 2007); *cf. Stack*, 979 F. Supp. 2d at 668.

At the first trial, the parties tried issues over alleged anticompetitive conduct by Abbott, complete with detailed legal instructions and antitrust experts, and that conduct was potentially the "substantial aggravating circumstances" within the Court's purview. Four years later, that is no

longer true. This case is now solely a matter of contract (with a UDTPA claim "piggyback[ing]" as a secondary claim). Under these new circumstances, it is *only* through a finding that Abbott committed a grossly negligent breach of its contract that, in turn, the jury could find Abbott to have violated the UDTPA. The jury should be so advised.

**CONCLUSION**

For these reasons, Abbott respectfully requests that the Court dismiss the UDTPA claim or, alternatively, effect these requested changes to the Preliminary Jury Instructions, Final Jury Instructions, and the Verdict Form.

Dated: March 19, 2015

/s/ James F. Hurst
James F. Hurst
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
james.hurst@kirkland.com

Attorneys for Abbott Laboratories