James F. Hurst (Admitted *Pro Hac Vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654-3406
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
james.hurst@kirkland.com

Charles B. Klein (Admitted *Pro Hac Vice*)
Matthew A. Campbell (Admitted *Pro Hac Vice*)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC 20006-3817
Telephone:     (202) 282-5000
Facsimile:     (202) 282-5100
cklein@winston.com;
macampbell@winston.com

Jeffrey I. Weinberger (SBN 56214)
Stuart N. Senator (SBN 148009)
Keith R.D. Hamilton (SBN 252115)
Caroline McKay Cunningham (SBN 270927)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Los Angeles, CA 90071-1560
Telephone:     (213) 683-9100
Facsimile:     (213) 687-3702
jeffrey.weinberger@mto.com;
stuart.senator@mto.com;
keith.hamilton@mto.com;
caroline.cunningham@mto.com

Counsel for Defendant
ABBOTT LABORATORIES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE,<br><br>Plaintiff,<br><br>vs.<br><br>ABBOTT LABORATORIES,<br><br>Defendant. | Case No. C 07-5702 (CW)<br><br>**ABBOTT LABORATORIES' OMNIBUS MOTIONS IN LIMINE** |

# TABLE OF CONTENTS

**Page**

MOTION #1.   DR. PROWSE'S DAMAGES OPINIONS ARE INADMISSIBLE ....................................................... 1

MOTION #2.   DR. DOLAN'S NEW OPINIONS IN PARAGRAPHS 13 AND 14 OF HIS SUPPLEMENTAL REBUTTAL REPORT SHOULD BE STRICKEN ...................................................... 17

MOTION #3.   DR. SIDDIQUI SHOULD BE BARRED FROM TESTIFYING ON THE EFFECT OF THE PRICE INCREASE ON LEXIVA OR PRESCRIBING HABITS ................... 20

MOTION #4.   GSK SHOULD BE BARRED FROM OFFERING DR. PROWSE'S OPINION ON "RESTITUTIONARY" DAMAGES ........................................................................... 22

MOTION #5.   GSK SHOULD BE BARRED FROM REFERRING TO GSK AND ABBOTT AS "PARTNERS" ............................................ 24

MOTION #6.   THE PARTIES SHOULD BE BARRED FROM USING ANTITRUST TERMINOLOGY, SUCH AS "MONOPOLIST," "MONOPOLY POWER" OR "MARKET POWER" ................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brooks v. Ingram Barge Co.,*
    2008 WL 5070236 (N.D. Miss. Nov. 21, 2008) ................................................................. 13

*Caraker v. Sandoz Pharmaceuticals Corp.,*
    172 F. Supp. 2d 1046 (S.D. Ill. 2001) ............................................................................... 13

*Cartel Asset Management v. Ocwen Financial Corp.,*
    249 F. App'x 63 (10th Cir. 2007) ..................................................................................... 14

*Claar v. Burlington Northern Railroad Co.,*
    29 F.3d 499 (9th Cir. 1994) ............................................................................................. 15

*Cooper v. Brown,*
    510 F.3d 870 (9th Cir. 2007) ........................................................................................... 15

*Cooper v. Travelers Indemnity Co. of Illinois,*
    113 F. App'x 198 (9th Cir. 2004) ..................................................................................... 14

*Craftsmen Limousine, Inc. v. Ford Motor Co.,*
    363 F.3d 761 (8th Cir. 2004) ........................................................................................... 16

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    509 U.S. 579 (1993)................................................................................... 8, 10, 20, 22

*Digital Reg of Texas, LLC v. Adobe Systems, Inc.,*
    2014 WL 4090550 (N.D. Cal. Aug. 19, 2014) ................................................................. 10

*Estate of Bojcic v. City of San Jose,*
    358 F. App'x 906 (9th Cir. 2009) ..................................................................................... 11

*Farley Transportation Co. v. Santa Fe Trail Transportation Co.,*
    786 F.2d 1342 (9th Cir. 1985) ......................................................................................... 16

*Fujitsu Ltd. v. Belkin International, Inc.,*
    2012 WL 6096664 (N.D. Cal. Dec. 7, 2012) ................................................................... 11

*Grantham & Mann, Inc. v. American Safety Products, Inc.,*
    831 F.2d 596 (6th Cir. 1987) ............................................................................................. 8

*Group Health Plan, Inc. v. Philip Morris USA, Inc.,*
    344 F.3d 753 (8th Cir. 2003) ........................................................................................... 14

*Hathaway v. Bazany,*
    507 F.3d 312 (5th Cir. 2007) ............................................................................................. 8

*Hein v. Merck & Co.,*
    868 F. Supp. 230 (M.D. Tenn. 1994)................................................................................. 8

*Internet Services LLC v. Immersion Corp.*,
    2008 WL 2051028 (N.D. Cal. May 13, 2008) ...................................................................... 19

*Isaksen v. Vermont Castings, Inc.*,
    825 F.2d 1158 (7th Cir. 1987) ............................................................................................ 16

*Johnson Electric North America Inc. v. Mabuchi Motor America Corp.*,
    103 F. Supp. 2d 268 (S.D.N.Y. 2000) .................................................................................. 8

*Jones v. United States*,
    933 F. Supp. 894 (N.D. Cal. 1996) ..................................................................................... 21

*KFD Enterprises, Inc. v. City of Eureka*,
    2013 WL 2384236 (N.D. Cal. May 30, 2013) ..................................................................... 19

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ............................................................................................................ 20

*Life Plus International v. Brown*,
    317 F.3d 799 (8th Cir. 2003) .............................................................................................. 23

*Luke v. Family Care & Urgent Medical Clinics*,
    323 F. App'x 496 (9th Cir. 2009) ....................................................................................... 19

*Maionchi v. Union Pacific Corp.*,
    2007 WL 2022027 (N.D. Cal. July 9, 2007) ....................................................................... 20

*Marine Midland Bank-Southern v. Thurlow*,
    53 N.Y.2d 381 (1981) .......................................................................................................... 24

*Mause v. Global Household Brands, Inc.*,
    2003 WL 22416000 (E.D. Pa. Oct. 20, 2003) .................................................................... 13

*MediaTek Inc. v. Freescale Semiconductor, Inc.*,
    2014 WL 690161 (N.D. Cal. Feb. 21, 2014) ...................................................................... 23

*MicroStrategy Inc. v. Business Objects, S.A.*,
    429 F.3d 1344 (Fed. Cir. 2005) .......................................................................................... 16

*Newell Rubbermaid, Inc. v. Raymond Corp.*,
    676 F.3d 521 (6th Cir. 2012) .............................................................................................. 21

*O'Bannon v. National Collegiate Athletic Association*,
    2010 WL 445190 (N.D. Cal. Feb. 8, 2010) ........................................................................ 25

*Pecover v. Electronic Arts Inc.*,
    2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) .................................................................... 14

*Primex International Corp. v. Wal-Mart Stores, Inc.*,
    89 N.Y.2d 594 (1997) .......................................................................................................... 24

*Reinsdorf v. Skechers U.S.A*,
    922 F. Supp. 2d 866 (C.D. Cal. 2013) ................................................................................ 19

*Schenk v. Novartis Pharmaceuticals Corp.*,
    2014 WL 3656904 (D. Ariz. July 23, 2014) ................................................ 11

*Schron v. Troutman Sanders LLP*,
    986 N.E. 2d 430 (N.Y. 2013) ...................................................................... 24

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ..................................................................................... 25

*Three Crown Ltd. Partnership v. Salomon Brothers, Inc.*,
    906 F. Supp. 876 (S.D.N.Y. 1995) .............................................................. 14

*United States Fidelity & Guaranty Co. v. Lee Investments LLC*,
    641 F.3d 1126 (9th Cir. 2011) ..................................................................... 11

*United States v. Freeman*,
    498 F.3d 893 (9th Cir. 2007) ....................................................................... 20

*United States v. Southern California Edison, Co.*,
    2005 WL 7862243 (E.D. Cal. Sept. 23, 2005) ............................................ 19

*Vondrak v. City of Las Cruces*,
    671 F. Supp. 2d 1239 (D.N.M. 2009) ......................................................... 21

*W.W.W. Associates, Inc. v. Giancontieri*,
    77 N.Y. 2d 157 (1990) ................................................................................. 24

**Rules**

Fed. R. Civ. P. 26(a)(2)(B) ................................................................................. 11, 15

Fed. R. Civ. P. 37(c)(1) ...................................................................................... 11, 16

Fed. R. Evid. 702 .................................................................................................... 8, 9

1    Pursuant to the Court's Order dated November 13, 2014, (Dkt. # 588), and ¶ 3(f) of this

2    Court's Standing Order, below are Abbott's Motions in Limine.

3    **MOTION #1.**          **DR. PROWSE'S DAMAGES OPINIONS ARE INADMISSIBLE**

4                            **INTRODUCTION**

5    In his supplemental report, Dr. Prowse offers four brand-new damages estimates, which

6    fluctuate by nearly half a billion dollars from a low of ████████████████████████.[1]

7    Of his four new estimates, he says his "best" estimates are ███████████ ("Scenario 1") and

8    ██████████ ("Scenario 2"), each of which represents a massive increase of about ██████████

9    over the estimates he offered at the first trial.

10    Pursuant to Federal Rule of Evidence 702, Dr. Prowse's damages estimates should be

11    excluded in their entirety as unreliable.  The sheer magnitude of the variation between Dr. Prowse's

12    lowest and highest estimates—covering nearly a half a billion dollars—confirms the gross

13    speculation and evident unreliability of his methods.  That is further confirmed by the fact that

14    Dr. Prowse's "updated" damages estimates are ██████████ higher than the estimates he offered at

15    the first trial, even though he uses identical assumptions.  His wildly varying estimates alone justify

16    exclusion.

17    The Court should exclude Dr. Prowse's "updated" damages estimates for several additional

18    reasons.  To dramatically increase his damages estimates from the last trial, Dr. Prowse focuses on

19    the fact that Lexiva did far worse from 2010 to 2014 than even Dr. Prowse or GSK ██████████

20    late as 2009.  But to attribute that disappointing performance to Abbott, Dr. Prowse must offer an

21    admissible expert opinion that Norvir's price increase in 2003 somehow caused Lexiva to miss

22    GSK's 2009 forecast—a forecast that *already* accounted for the Norvir price increase based on six

23    years of sales data.  He has failed to offer any such admissible opinion.

---

26    [1]    Throughout this motion, Dr. Prowse's most recent damages estimates have been corrected for the
27    ██████████ deduction from Scenario 1 and Scenario 2 that he disclosed at his deposition; the
       deduction did not apply to his alternative estimates of ██████████ ("Scenario 1(a)") and
28    ██████████ ("Scenario 1(b)").  (Ex. A, Prowse 2/27/15 Report ¶¶ 16-20; Ex. B, Prowse 2015
       Dep. Tr. 5:6-25.)

*First*, Dr. Prowse's two supplemental reports offer no opinion whatsoever on any connection between Norvir's price increase in 2003 and Lexiva's failure to match GSK's 2009 forecast. Dr. Prowse first claimed a connection at his deposition last week, when he theorized that Lexiva's recent troubles were caused by GSK's decision in 2010 to stop marketing Lexiva and that GSK's decision in turn was caused indirectly by the 2003 price increase.  That new opinion came too late. Under Federal Rule of Civil Procedure 26, Dr. Prowse was required to disclose in his *reports* both his opinions and "the basis and reasons" for those opinions, as well as "the facts or data considered by the witness in forming" those opinions.  Because he failed to do so without justification, GSK "is not allowed to use that information . . . at trial" under Federal Rule 37(c).

*Second*, Dr. Prowse's "updated" damages estimates violate this Court's February 17, 2015 Order, which limited new expert reports "to updating prior disclosed opinions based only on relevant market events that occurred since the 2011 trial."   The key event supporting Dr. Prowse's new damages theory was GSK's December 2010 decision to stop marketing Lexiva, which occurred *before* the 2011 trial.

*Third*, Dr. Prowse offers no legally-sufficient foundation for any "expert" opinion that Norvir's 2003 price increase proximately caused GSK's 2010 decision to stop marketing Lexiva, much less the drug's failure to meet GSK's 2009 forecast.  He admits that the *sole* basis for that opinion is two short phone calls with GSK employees—calls that occurred *after he had signed and submitted his expert report* seeking higher damages.  And GSK outright denied Dr. Prowse's request to review contemporaneous documents to attempt to corroborate their stories.   GSK told Dr. Prowse—incredibly—that no such documents existed, even though the decision to stop marketing Lexiva allegedly caused GSK to lose well over ████████ in profits.   These uncorroborated and self-serving statements by two GSK employees are simply not a "reliable foundation" to support a claim for $███████ in additional damages.

*Fourth*, Dr. Prowse did not adequately account for obvious alternative explanations for GSK's alleged losses, which again is reason for exclusion under Rule 702.  Rather, Dr. Prowse simply assumed that Lexiva's *entire* underperformance had been caused by the Norvir repricing.

The Court should exclude Dr. Prowse's damages opinion for all these reasons and more, as explained more fully below.

## BACKGROUND

Dr. Prowse's theory has always been that Abbott's 2003 Norvir price increase was 100% responsible for Lexiva's failure to live up to forecasts generated before Lexiva launched. According to Dr. Prowse, no other event contributed to any part of Lexiva's shortfall over its 14-year life cycle—not the fact that Lexiva failed in a head-to-head clinical trial with Kaletra, nor the fact that Reyataz's and Prezista's sales dramatically outperformed anyone's predictions.

Based on that theory, Dr. Prowse's math is straightforward. For periods when he has actual Lexiva sales data, he simply subtracts actual sales from the pre-launch forecast of sales, and then claims that every dollar of difference represents "lost profits" entirely attributable to the 2003 Norvir price increase. (*See* Ex. B, Prowse 2015 Dep. Tr. 77:3-14.)

For time periods without actual sales data, however, Dr. Prowse has to rely on predictions upon predictions. For both his current opinion and his earlier opinion, he relies on internal GSK *forecasts* as if they represent *actual* sales. At the last trial, he used a ███████████████ ███████████ sales for 2010 through 2017 (when Lexiva goes off patent). (Ex. C, Prowse 2/1/10 Report ¶ 195.) ████████████████████████████████████████ ██████████ claimed that every dollar of difference was "lost profits" caused entirely by the 2003 price increase. (*Id.*)

As it turns out, however, Lexiva failed to meet GSK's 2009 forecast. At his deposition, Dr. Prowse was forced to concede that GSK's 2009 forecast—like its pre-launch forecasts— overestimated Lexiva's actual performance "by a fair amount." (Ex. B, Prowse 2015 Dep. Tr. 17:5-10, 35:10-12.) That is an understatement. GSK's 2009 forecast overestimated Lexiva's performance through 2014 by ████████████████ (*Compare* Ex. A, Prowse 2/27/15 Report at Ex. 25 *with* Ex. C, Prowse 02/1/10 Report at Ex. 17.) And that massive overestimation occurred even though the 2009 forecast had *six years of actual sales* to support its prediction and,

thus, a far more solid foundation than Dr. Prowse's pre-launch forecasts, for which there was no sales history.  (Ex. B, Prowse 2015 Dep. Tr. 34:19-35:1.)

Dr. Prowse's two new expert reports were silent on why he believed the 2009 forecast turned out to be incorrect.  But there are numerous possibilities, none of which Dr. Prowse mentioned in his reports.  The most obvious is the reality that predicting the future is a rough exercise, and the 2009 forecast therefore could simply have been wrong.  Another is that GSK was forced in November 2009 to amend Lexiva's label to add a risk of heart attack (myocardial infarction), and then it sent a letter to all HIV doctors warning them of that new risk.  (*See id.* at 38-39; Ex. D, Prowse 2015 Dep., Ex. 4.)  And yet another is that Lexiva was demoted in the DHHS Guidelines in December 2009 and dropped completely in May 2014.  (*See* Ex. B, Prowse 2015 Dep. Tr. 30:17-31:18.)  Dr. Prowse mentioned none of these possibilities nor the multitude of other factors that could impact drug sales in the report he signed, which is now seeking as high as nearly $800 million in damages.

At his deposition, however, Dr. Prowse came up with a new theory mentioned nowhere in his expert reports.  He claimed that Lexiva missed GSK's 2009 forecast*s solely* because of Norvir's price increase many years earlier in 2003.  His new theory is as follows:

- Lexiva allegedly missed the 2009 forecast because GSK decided in December 2010 to stop marketing Lexiva;

- GSK allegedly decided to stop marketing Lexiva in December 2010 because of Lexiva's low market share at the time;

- Lexiva's low market share in 2010 was allegedly caused by the Norvir price increase seven years earlier in 2003.

- Therefore, the 2003 Norvir price increase "proximately caused" Lexiva to miss GSK's 2009 forecast.

(*See id.* at 27:22-28:8, 61:16-62:6.)

When pressed, however, Dr. Prowse admitted that he had no basis for this series of bald assumptions—to which he added zero "expert" opinion.  He is just *parroting back* what GSK's

employees told him during two short phone calls, allegedly in support of literally hundreds of millions of dollars in damages:

> Q:  So what evidence are you relying on that the decision to stop marketing Lexiva in 2011 was proximally caused by [the 2003] Norvir price hike?
>
> A:  My discussions with Mr. Kowalski and Mr. Shafer regarding the decision to stop marketing Lexiva, and they told me that the—the decision was—would have been different had Lexiva been performing much better.  They would not have decided to do that.
>
> ***
>
> Q:  How long did the conversation last?
>
> A:  Probably half an hour with each of them.
>
> ***
>
> Q:  But the difference you're talking about here is over ██████████ from the highest Scenario 1 estimate to the lowest at the time of the calls], right? And when you say your analysis, the analysis you did in order to justify that ████ ████████ difference is two phone calls that were approximately a half-hour each, correct?
>
> A:  Two phone calls that were approximately half hour each.

(*Id.* at 28:9-17, 29:6-7, 64:5-11.)

Even worse, Dr. Prowse admitted during his deposition on Monday, March 16th, that these two short calls did not even occur until *after he signed his expert report* seeking hundreds of millions in extra damages:

> Q:  The report was February 27, 2015.  Did the conversations that you just described regarding GSK's decision to stop marketing Lexiva occur before or after you signed this report?
>
> A:  I think they occurred after.
>
> ***

1      Q:      And when did you talk to Mr. Kowalski and Mr. Shafer?

2      A:      The end of last—sometime last week.

3  (*Id.* at 28:18-20, 29:15-19; *see also* Ex. A, Prowse 2/27/15 Report (not reporting any such phone

4  conversations).)

5        This has gone too far.   There is no legitimate justification for an expert signing and

6  submitting a report seeking hundreds of millions in extra damages, and then *later* finding a

7  justification for that claim.   There has to be *some* limit on the "expert" opinions Dr. Prowse proposes

8  arguing to the jury.

9        And it actually gets worse.   Dr. Prowse clearly recognizes how absurd it is to seek extra

10  hundreds of millions in damages based solely on a couple of short phone calls—particularly with

11  two employees biased by their company's request for over        in damages (after trebling).

12  So he asked GSK for documents to help corroborate their stories.   But GSK denied his request,

13  claiming "they didn't have any" such documents:

14      Q:      Did you ask the attorneys that are representing GSK whether, gosh, this is a

15             big deal, it's a $300 million delta, let me see some documents about what led

16             GSK to stop marketing Lexiva in 2011?  Did you ask for any documents? . . .

17      A:      I believe we did inquire whether such documents were available, and we

18             didn't get any documents.

19      Q:      Are you saying GSK didn't generate any documents about its decision in 2011

20             to stop marketing Lexiva?  Is that the position you're taking?

21      A:      I'm not taking any position.  I'm telling you what I asked for—if there were

22             any documents and we didn't receive any.

23      ***

24      Q:      But a person told you that, right, that no documents existed about why GSK

25             decided to stop marketing Lexiva in 2011, right?

26      A:      We were told there—we—they didn't have any.

27      Q:      But who told you?  Somebody told you.  Who was that person who told you?

28

A:     An attorney. . . . I think it was—I can't recall his name.  Moez maybe.

(Ex. B, Prowse 2015 Dep. Tr. 64:16-65:10 (objection omitted), 65:23-66:9.)

That is not plausible.  Lexiva was still generating approximately $120 million in annual revenue when GSK decided to stop marketing the drug in December 2010.  (*Id.* at 57:20-58:7.)  And Dr. Prowse admitted that "a lot of factors go into" a decision to stop marketing, that it "depends on the company" and "depends on the circumstances," and includes analysis of factors like the current "profit margin," the cost of marketing, whether a product is "at the end of its life or close," the predicted sales "decline if you stopped marketing," and so on.  (*Id.* at 58:8-24, 67:10-68:14, 70:2-18.)  It is thus impossible to believe that GSK failed to generate a *single* document supporting its decision to stop marketing.

Lacking any ability to verify his naked assumptions, Dr. Prowse simply offered *every* possible opinion, asserting that it was "reasonable" to assume that the 2003 Norvir price increase was anywhere from *0% to 100%* responsible for the failure of Lexiva to meet the 2009 forecast after 2010—which is the equivalent of no opinion at all, just a rank guess.  (*Id. at* 20:9-22:1.)  He did so by offering three different options, all of which he claimed were "reasonable," where the 2003 Norvir price increase was responsible for 0% of Lexiva's new shortfall in Scenario 1(a), 100% in Scenario 1 and 2, and some number in between in Scenario 1(b).  (*Id.*)  Thus he opined:

Q:     I'm just ask, is it a—even if it's not the best assumption, is it a reasonable assumption that *none* of GSK's lost profits after 2011 are attributable to Abbott Laboratories?

A:     I don't think it's the best assumption, but I—*I think it's an assumption that one could reasonably make*.

(*Id.* at 21:21-22:1 (emphasis added).)

## ARGUMENT

**A.     Dr. Prowse's Damages Opinions Should Be Excluded In Their Entirety.**

The huge range in Dr. Prowse's damages estimates and the disparity in his estimates from one trial to the next demonstrate that his methodology is unreliable.  Under Federal Rule of Evidence

7

702, federal courts must serve as "gatekeep[ers]" to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but *reliable*." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993) (emphasis added). To be reliable, expert evidence must be the product of reliable principles and methods and the expert must apply those principles and methods reliably to the facts of the case. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 594-95. Moreover, "even where an expert's methodology is reliable, if the analysis is not based upon relevant and reliable data, the expert's opinion will be inadmissible." *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000) (excluding proffered expert's regression analysis). "[T]he existence of sufficient facts and a reliable methodology is in all instances mandatory." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007).

Under these principles, Dr. Prowse's damages model violates Rule 702's reliability requirement in multiple ways.

*First*, the simple fact that Dr. Prowse's four current damages estimates—using different assumptions—vary by nearly ████████ dollars confirms the grossly speculative and unreliable nature of his methodology. To assess reliability, "the court ordinarily should consider the known or potential rate of error." *Daubert*, 509 U.S. at 593-94. With his enormous range, Dr. Prowse is conceding a ██████ dollar margin for error, which means his methodology has no meaningful predictive power and thus is inadmissible. *See Grantham & Mann, Inc. v. Am. Safety Prods., Inc.*, 831 F.2d 596, 604 (6th Cir. 1987) (excluding damages expert who "could not even decide on the proper measure of damages, but submitted for the jury's cogitation two calculations of damages, premised on different assumptions . . . that differed in the total amount of damages alleged by almost $110,000"); *Hein v. Merck & Co.*, 868 F. Supp. 230, 233 (M.D. Tenn. 1994) (excluding damages expert whose "[v]alues for an anonymous life have varied in these studies from $100,000 to $12,000,000" because "[a] spread of this magnitude not only admits the possibility of error, it casts serious doubt on the validity and usefulness of the exercise").

Indeed, even were the jury to wholly accept Dr. Prowse's testimony, his opinions would leave them with no guidance on what specific damage figure to choose from his vast range.

Dr. Prowse claims that all four of his estimates are "reliable"; the two highest numbers are "the best reliable range" (not even representing maximums); and the two lowest are "the best reliable range of the minimum amount of damages."  (Ex. B, Prowse 2015 Dep. Tr. 10:16-11:1, 13:16-21.)

*Second*, Dr. Prowse outright admitted at his deposition that his methodology is not reliable. The whole point of his testimony is to attempt to estimate what, if any, impact Norvir's price increase had on Lexiva's sales.  Yet, at his recent deposition, he testified that it is "reasonable" to assume the 2003 Norvir price increase was anywhere from *0% to 100%* responsible for Lexiva's failure to meet GSK's expectations from 2009 (let alone from 2003).  (*Id.* at 20:9-22:1; 21:21-22:1 (emphasis added).)

In other words, he doesn't have any idea.  That's not an "expert" opinion.  He's saying *anything* could be true—from 0% to 100%—which gives the jury no help in choosing a reliable damages figure.  His opinion fails the fundamental requirement of Rule 702 that the expert's "specialized knowledge will help the trier of fact" and all four of his estimates should be excluded on this basis.  *See* Fed. R. Evid. 702.

*Third,* even when Dr. Prowse uses identical assumptions, his methodology *still* produces widely varying results—yet another confirmation of its unreliability and high error rate.  For example, at the first trial, Dr. Prowse claimed that, under his Scenario 1 assumptions, GSK would suffer ███████ in lost profits over the period 2003 to 2017.  (Ex. E, Prowse 2/11/11 Report ¶ 1.)  He now claims that using those same assumptions, GSK will suffer ███████ in lost profits over the same period.  (Ex. A, Prowse 2/27/15 Report ¶¶ 16-20; Ex. B, Prowse 2015 Dep. Tr. 5:6-25.)  Similarly, at the last trial, Dr. Prowse claimed that under his Scenario 2 assumptions, GSK would suffer ███████ in lost profits damages from 2003 to 2017, but now claims that using those same assumptions, GSK will suffer ███████ over that same period.  (Ex. A, Prowse 2/27/15 Report ¶¶ 16-20; Ex. B, Prowse 2015 Dep. Tr. 5:6-25; Ex. E, Prowse 2/11/11 Report ¶ 1.)

Again, the reason for the huge inconsistency in his estimates from one trial to the next is that GSK's 2009 forecast, which he used at the first trial to predict Lexiva's future sales for 2010 through 2017, turned out to be widely off base.  (*See* Ex. B, Prowse 2015 Dep. Tr. 15:20-18:3.)  Yet despite

1  this clear evidence that GSK's forecasts are unreliable, Dr. Prowse continues to use them in all the

2  critical elements of his damages model.  This includes using them as a part of his calculation of

3  Lexiva's but-for peak market share.  (*See* Ex. C, Prowse 2/1/10 Report ¶ 127.)  It also includes using

4  them as the sole basis for estimating how Lexiva's sales would "ramp up" to and "ramp down" from

5  the peak market share (*see* Ex. B, Prowse 2015 Dep. Tr. 53:17-21) and predicting Lexiva's actual

6  sales for 2015 to 2017 (*see id.* at 41:15-18).

7         Nor has he explained any basis for believing that other GSK forecasts will turn out to be any

8  more reliable than the 2009 forecast.  At his deposition, for example, when asked this question for

9  the 2015-2017 forecast, he responded merely, "I believe it's their best estimate of what the sales of

10 Lexiva are going forward."  (*Id.* at 42:21-25.)  And this is despite the fact that Dr. Prowse received

11 the 2015-2017 forecast from GSK's counsel, could not recall whether he had spoken to the person

12 who prepared it, and apparently used it on the basis that it "looked very similar to previous

13 forecasts" from GSK.  (*Id.* at 42:4-20.)

14        Dr. Prowse's wildly varying damages estimates are the product of unsupported speculation,

15 and not remotely the kind of reliable and predictable analysis Rule 702 requires.  *See Digital Reg of*

16 *Tex., LLC v. Adobe Sys., Inc.*, No. 12-CV-1971, 2014 WL 4090550, at *1 (N.D. Cal. Aug. 19, 2014)

17 (excluding damages expert because "the inputs of [expert's] damages calculation are inherently

18 unreliable"); *see also Daubert*, 509 U.S. at 590, 597 (expert testimony must have "a reliable

19 foundation" and not be based on "subjective belief or unsupported speculation").

**B.     Dr. Prowse's New "Updated" Estimates Claiming Dramatically Higher Damages Should Be Excluded For Multiple Additional Reasons.**

22        In his supplemental report, Dr. Prowse provides two "updated" estimates of GSK's lost

profits that are about ███████ *higher* than the estimates he provided at the first trial.  The reason

24 for this massive increase is that Lexiva did far worse from 2010 to 2014 than even Dr. Prowse or

25 GSK had predicted as late as 2009.  But it was not until his deposition that Dr. Prowse first claimed

26 that Norvir's 2003 price increase somehow caused Lexiva's failure to meet GSK's 2009 forecast.

27 That belated opinion is inadmissible for three independent reasons.

28

1

2

      **a.**     **Dr. Prowse May Not Offer Undisclosed Opinions On The Cause Of Lexiva's Poor Performance Or Its Nexus To The Price Increase.**

3

      Rule 26 requires the parties to provide for all expert witnesses "a complete statement of all

4

opinions the witness will express and reasons for them," as well as "the facts or data considered by

5

the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B). Under Rule 37(c), "a party [that] fails to

6

provide information . . . as required by Rule 26(a) . . . is not allowed to use that information . . . at

7

trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

8

      Here, neither Dr. Prowse's supplemental report nor his supplemental rebuttal report even

9

hinted that Lexiva's failure to meet GSK's 2009 forecast had anything to do with GSK's 2010

10

decision to stop marketing Lexiva—much less that the decision was due to the Norvir price increase

11

seven years earlier in 2003.

12

      The failure to disclose his opinions on these subjects is neither justified nor harmless. Due to

13

that failure, Abbott never had a chance to request relevant documents before the deposition, Abbott's

14

experts had no opportunity to respond in their rebuttal reports, and Abbott's counsel had no warning

15

of the need to gather evidence, perform analysis, and adequately prepare in advance of Dr. Prowse's

16

deposition.

17

      Accordingly, Dr. Prowse's opinions—disclosed for the first time at his deposition—should

18

be excluded. *See U.S. Fid. & Guar. Co. v. Lee Invs. LLC*, 641 F.3d 1126, 1138 (9th Cir. 2011)

19

(upholding district court's decision to limit expert testimony to "the subjects contained in the

20

expert's disclosure"); *Estate of Bojcic v. City of San Jose*, 358 F. App'x 906, 907-08 (9th Cir. 2009)

21

(affirming exclusion of expert's opinion because his report "did not include his opinion on the issue"

22

in dispute and plaintiffs failed to "satisf[y] their burden of showing that their discovery violation was

23

substantially justified or harmless"); *Schenk v. Novartis Pharm. Corp.*, No. 12-CV-8223,

24

2014 WL 3656904, at *4 (D. Ariz. July 23, 2014) (excluding expert because his report "does not

25

include facts in support of his conclusion . . . . [and] states that he formed his opinion based on

26

[plaintiff's] medical records but gives no indication of the content of the records reviewed."); *Fujitsu*

27

*Ltd. v. Belkin Int'l, Inc.*, No. 10-CV-3972, 2012 WL 6096664 (N.D. Cal. Dec. 7, 2012) (striking

28

portion of expert's supplemental report that disclosed supporting articles that should have been disclosed in original report).

### b. Because They Rely On Events Before The First Trial, Dr. Prowse's New Damages Estimates Violate This Court's Order.

In its February 17, 2015 Order, this Court limited new expert reports "to updating prior disclosed opinions based only on relevant market events that occurred since the 2011 trial," and made clear that "[e]xpert witnesses will not be permitted to testify to entirely new theories, even those that are consistent with previously-offered testimony." (Dkt. # 619 at 2-3.) Yet, the key event supporting Dr. Prowse's new higher damages estimates is GSK's decision *in December 2010* to stop marketing Lexiva—an event that occurred *before* the 2011 trial.

During the last trial, Dr. Prowse told the jury—under oath—that the 2009 forecast with six years of market history was so reliable that it could be a proxy for actual sales. But now that it turned out to be flawed by hundreds of millions of dollars, he is suddenly using that inaccuracy to *increase* his damages opinion by hundreds of millions. That is simply inappropriate. Bottom line, the specific event that supports his new opinion as the first prong of his four-step argument—the December 2010 decision to stop marketing Lexiva—occurred *before* the 2011 trial and is thus inadmissible because it is not a "market event[] that occurred since the 2011 trial." (*Id.*)

### c. Two Short, Unverified Phone Calls With Interested GSK Employees Made After The Fact Are Not A "Reliable Foundation" For Hundreds Of Millions Of Dollars In Additional Damages.

Even on its merits, Dr. Prowse's claim that the 2003 Norvir price increase caused Lexiva sales to miss even GSK's 2009 forecast for the drug is inadmissible. At his deposition, Dr. Prowse conceded that his only support for this opinion was two 30-minute phone calls with two GSK employees. But these two phone calls are not a "reliable foundation" to support Dr. Prowse's opinions for several reasons.

*First*, despite his claim to the contrary, Dr. Prowse could not possibly have based his opinions on the two phone calls because they occurred *after* he had signed and submitted his expert report. Given the timing, the phone calls were clearly a last-ditch, after-the-fact effort to plug up a

massive hole in his analysis that he only recognized *after* signing his report.  *See Caraker v. Sandoz Pharm. Corp.*, 172 F. Supp. 2d 1046, 1049 n.5 (S.D. Ill. 2001) (excluding expert testimony and remarking regarding expert's "afterthought" application of a methodology: "[j]ustifying a conclusion after the fact by applying a methodology does not generally lead to reliable scientific knowledge"); *Mause v. Global Household Brands, Inc.*, No. 01-CV-4313, 2003 WL 22416000, at *2 (E.D. Pa. Oct. 20, 2003) (excluding expert because "[i]t appears to the Court that the reference to the [methodology in expert's testimony at *Daubert* hearing] is an after the fact attempt to buttress an opinion that was not formed as a result of any scientific methodology"); *Brooks v. Ingram Barge Co.*, No. 07-CV-62, 2008 WL 5070236, at *1 (N.D. Miss. Nov. 21, 2008) (striking statement where expert "for the first time develop[ed] numerical data from which to base his opinion. . . .  This method offers no assurance of reliability, but instead allows an expert to mold his supporting evidence in order to testify to any conclusion he wishes.").

*Second*, even had Dr. Prowse actually relied on the two phone calls to form his opinion, they would not constitute a "reliable foundation" to support his opinions.  *Daubert*, 509 U.S. at 597. Dr. Prowse admits that a decision to stop marketing—particularly for a drug generating approximately $120 million in annual revenue (Ex. B, Prowse 2015 Dep. Tr. 57:20-58:7)—is a complex analysis requiring consideration of "a lot of factors," like current "profit margin," the cost of marketing, the product's expected life cycle, and the expected sales "decline if you stopped marketing."  (*Id.* at 58:8-24, 67:10-68:14, 70:2-18.)

But Dr. Prowse didn't do that analysis, and didn't review a single document to assess GSK's underlying analysis, which surely exists despite GSK's representation to Dr. Prowse.  Instead, he just accepted the claims of two GSK employees—who might very well have not even *participated* in the decision to stop marketing Lexiva—and is now repeating those claims back as his own "expert" opinion that Norvir's 2003 price increase "proximately" caused GSK's 2010 decision to stop marketing.  Given that there were hundreds of millions of dollars on the line with the decision to stop marketing Lexiva, this is simply incredible.

The case law mandates exclusion under these circumstances. In *Cooper v. Travelers Indemnity Co. of Illinois*, for example, the Ninth Circuit affirmed the exclusion of a lost profits opinion where, like here, the expert failed to "verify client-provided data" before relying on it as the sole basis for his conclusion, which means his "testimony was not based on the type of data on which experts in economics would reasonably rely." 113 F. App'x 198, 201-02 (9th Cir. 2004); *see also Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, 249 F. App'x 63, 79-80 (10th Cir. 2007) (affirming exclusion of plaintiff's damages expert who used a four-year period in his calculations based solely on discussions with plaintiff's CEO: "[t]he four-year time frame was merely [the CEO's] *unsubstantiated* suggestion contained and endorsed in [the expert's] calculations. This is insufficient." (emphasis added)); *Pecover v. Elec. Arts Inc.*, No. 08-CV-2820, 2010 WL 8742757, at *6 (N.D. Cal. Dec. 21, 2010) (excluding portion of expert's testimony because she relied on CEO's declaration and conversations with CEO, bases which "do not concern 'specialized knowledge' . . . beyond the common knowledge of the average layman"); *Three Crown Ltd. P'ship v. Salomon Bros., Inc.,* 906 F. Supp. 876, 887, 894 (S.D.N.Y. 1995) (excluding damages expert who made assumptions "based wholly on conclusory and self-serving statements of [company's] principals *without supporting documentation*" (emphasis added)).

The situation here is even more egregious. Dr. Prowse seeks to offer a "best estimate" opinion based solely on the claims of GSK employees—claims he did not obtain until *after* he signed his opinion—and yet "the cases are legion that assert that expert testimony is inadmissible when it is based on speculative assumptions." *Grp. Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 760 (8th Cir. 2003). Nothing could be more "speculative" than the undocumented, after-the-fact assertions of employees of a party seeking over *$2 billion* in damages. Dr. Prowse himself proves they are wholly unreliable and arbitrary by offering, based on absolutely *nothing*, his "expert" opinion that Abbott is anywhere from 0% to 100% responsible for losses occurring after 2010. The testimony should be excluded.

1

2

       **d.**     **Dr. Prowse Failed To Mention—Much Less Account For—Alternative Causes Of Lexiva's Recent Poor Performance.**

3

     Dr. Prowse's new "updated" damages opinions should also be excluded because he fails to

4

properly apportion damages, and instead attributes *all* of GSK's alleged losses to Abbott's conduct

5

in his latest "best" estimates without even *mentioning* multiple alternative causes.   (*See* Ex. B,

6

Prowse 2015 Dep. Tr. 71:20-72:7, 10:16-22.)   The failure to exclude losses not attributable to the

7

defendant's misconduct renders an expert's opinions inadmissible under Rule 702 and *Daubert*.   *See,*

8

*e.g., Cooper v. Brown*, 510 F.3d 870, 948 (9th Cir. 2007) ("The Advisory Committee notes to the

9

Federal Rules of Evidence instruct the Court to consider 'whether the expert has adequately

10

accounted for obvious alternate explanations.'"); *Claar v. Burlington N.R.R. Co.*, 29 F.3d 499

11

(9th Cir. 1994) (excluding testimony where expert failed to consider other causes for plaintiff's loss).

12

     Here, for his two largest damages estimates, Dr. Prowse admits that he "assumed that *all*

13

of Lexiva's lost profits after January 1, 2011 are attributable to Abbott Laboratories."  (Ex. B, Prowse

14

2015 Dep. Tr. 23:20-23 (emphasis added).)   But he failed to exclude sums attributable to other

15

sources of competition or market forces, such as (1) the obvious fact that forecasts about future sales

16

are imprecise; (2) Lexiva was dropped from the DHHS Guidelines' list of "recommended" drugs in

17

December 2009 and was dropped as an "alternative" drug in May 2014; (3) Prezista, a direct

18

competitor to Lexiva, obtained a market share ten times higher than GSK's forecasters predicted;

19

and  (4) new competitors entered the market.   These factors are mentioned nowhere in his

20

supplemental reports.

21

     Dr. Prowse nevertheless claimed to have considered and ruled out these events (*id.* at 30:17-

22

31:18), and then tried to justify his failure to mention any of them in his supplemental report by

23

claiming that he did not believe that he had an "obligation to report every little thing [that he]

24

investigated."  (*Id.* at 31:9-23.)  But he clearly *does*.  Rule 26 requires him to provide "a complete

25

statement of all opinions the witness will express and reasons for them," as well as "the facts or data

26

considered by the witness in forming them."  Fed. R. Civ. P. 26(a)(2)(B).  And under Rule 37(c), "a

27

party [that] fails to provide information . . . as required by Rule 26(a) . . . is not allowed to use that

28

---

15

1    information . . . at trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P.

2    37(c)(1).

3            Courts exclude expert damages testimony where, as here, the expert's report fails to consider

4    alternative causes of the plaintiff's losses.  For example, in *Craftsmen Limousine, Inc. v. Ford Motor*

5    *Co.*, the court held that the opinions of plaintiff's damages expert were inadmissible where the

6    expert "did not analyze whether general economic conditions or increased competition affected

7    [plaintiff's] growth rate."   363 F.3d 761, 770-71 (8th Cir. 2004).   "Instead, he assumed that

8    defendants caused all of [plaintiff's] injuries."  *Id.* at 771.  The court held that such opinions were

9    unreliable and therefore inadmissible under Rule 702 and *Daubert*.  *Id.* at 777.

10           Similarly, in *MicroStrategy Inc. v. Business Objects, S.A.*, the court held that plaintiff's

11   damages expert had been properly excluded where he had attributed all of the plaintiff's post-2000

12   losses solely to the defendant, without accounting for "the rather obvious role that [defendant's]

13   financial instability played in the company's ongoing struggles."  429 F.3d 1344, 1354 (Fed. Cir.

14   2005).  While the expert claimed he had chosen a but-for comparison (the year 2000) that eliminated

15   the effect of the financial instability, the court rejected his attempt, noting that "[t]he record

16   contained no indication that these economic set-backs had no effect in 2000 and thereafter."  *Id.*

17           Indeed, this is not only the rule under Rule 702, it is also a fundamental principle.  In *Farley*

18   *Transportation Co. v. Santa Fe Trail Transportation Co.*, for example, the Ninth Circuit held that an

19   expert's "utter failure to make any segregation between damages attributable to lawful competition

20   and that attributable to the unlawful scheme . . . requires reversal of the verdict and remand for a new

21   trial on the amount of damages."  786 F.2d 1342, 1352 (9th Cir. 1985), *superseded by rule on other*

22   *grounds*, 103 F.3d 868, 878 n.9 (9th Cir. 1996).   Much like Dr. Prowse does here, in *Farley*,

23   plaintiff's damages expert "admitted that he had merely assumed that the lost profits were due to

24   [defendant's] illegal activities."  *Id.* at 1351; *see also Isaksen v. Vt. Castings, Inc.*, 825 F.2d 1158,

25   1165 (7th Cir. 1987) ("We do not allow antitrust plaintiffs *or any other plaintiffs* to obtain damage

26   awards without proving what compensable damages were actually suffered as a result of the

27   defendant's unlawful conduct." (emphasis added)).

28

e.      **If The Court Permits Dr. Prowse To Testify About His "Updated" Opinions, Abbott Should Be Granted Discovery.**

In the event the Court denies this motion, Abbott respectfully requests to be granted leave to take additional discovery regarding GSK's decision to stop marketing Lexiva, including: (1) obtaining all documents relating to the decision, as well as any alleged connection between that decision and GSK's failure to meet its 2009 forecast; (2) depositions of Mr. Kowalski and Mr. Shafer, the GSK employees Dr. Prowse claims he spoke to; and (3) a supplemental deposition of Dr. Prowse.  Additionally, Abbott should be afforded the opportunity to respond with its own expert analysis after getting discovery and a proper expert disclosure.

**MOTION #2.        DR. DOLAN'S NEW OPINIONS IN PARAGRAPHS 13 AND 14 OF HIS SUPPLEMENTAL REBUTTAL REPORT SHOULD BE STRICKEN**

The Court should strike new opinions recently offered by GSK's marketing expert Dr. Robert Dolan in paragraphs 13 and 14 of his supplemental rebuttal report because those opinions violate both Rule 26(a)(2)(B) and this Court's order dated February 17, 2015.  In that Order, this Court authorized the parties to submit supplemental expert reports by February 27 and rebuttal reports by March 11.  (Dkt. # 619 at 2-3.)  When doing so, the Court placed strict limits on the content of new reports, holding that the "[e]xpert witnesses will not be permitted to testify to entirely new theories, even those that are consistent with previously-offered testimony," and further that their reports must be limited "to updating prior disclosed opinions based only on relevant market events that occurred since the 2011 trial."  (*Id.*)

Dr. Dolan failed to file a supplemental report by February 27.  Instead, he submitted a "rebuttal" report on March 13 to respond to Abbott's marketing expert, Dr. Mick Kolassa.  As the Court directed, Dr. Kolassa's supplemental expert report was properly limited to "relevant market events that occurred since the 2011 trial":  (1) GSK's many new price increases for Lexiva since then; (2) new price increases for other HIV drugs; (3) the pricing of new boosted HIV drugs; (4) new examples of post-2011 price increases by other drug manufacturers of over 400%; and (5) Lexiva's removal from the "Recommended" and "Alternative" antiretroviral regimens in the 2014 DHHS Guidelines.  (Ex. F, 2/27/15 Kolassa 2d. Supp. Report at 2-4, 8.)

In addition to responding to these new events, Dr. Dolan's supplemental "rebuttal" report includes new opinions that should be stricken as violating this Court's order and/or Rule 26.  For example, in paragraphs 13 and 14 of his new "rebuttal" report, Dr. Dolan responds to the italicized testimony about the HIV drug market by Dr. Kolassa—opinions offered not in Dr. Kolassa's supplemental report, but *at trial*:

> Q:   Can you recap in a couple sentences your conclusion about how marketing principles apply in the pharmaceutical industry?
>
> A:   Yes.  In—it's important to understand that—that the way we think about marketing and the way pharmaceutical markets work really [are] quite different.  A key difference is, for the most part, especially in H.I.V. markets, the patient doesn't pay the price of the drug.  They pay a copay.  And for the patient, in H.I.V. drug[s], all the oral drugs, the copay is the same, regardless of what the drug is or how much of the drug they take.  So there's really no pricing implications there. The price has to do with—with budgets and spending, *but there's no evidence, never has been, that the price of a medicine has an effect on whether or not that medicine is prescribed*.  That's the principal difference.

(Ex. G, 3/15/11 Trial Tr. 2211:17-2212:5 (emphasis added).)

In response to this *trial testimony*, Dr. Dolan points to references from 1999, 2000, and 2004—which not only pre-date the trial, but GSK's entire case—to support a brand new theory that

████████████████████████████████████████████████████████

████████████████

    ████████████████████████████████████████████

    ████████████████████████████████████████████

    ████████████████████████████████████████████

    ████████████████████████████████████████████

    ██████████████████████    ████████████████████

1

2

3

4   (Ex. H, 3/11/15 Dolan Suppl. Rebuttal Report ¶¶ 13, 14 (emphasis added).)

5        Even putting aside that Dr. Dolan has mischaracterized—by selectively quoting—

6   Dr. Kolassa's trial testimony, this new "rebuttal" opinion responding to something Dr. Kolassa said

7   *at the last trial* is *exactly* the kind of new opinion testimony the parties debated in the briefing

8   leading to this Court's February 17 Order.  As Abbott noted then, the Ninth Circuit has stated that

9   the opportunity to file supplemental reports does not "create a loophole through which a party who

10  submits partial expert witness disclosures, or who wishes to revise her disclosures in light of her

11  opponent's challenges to the analysis and conclusions therein, can add them to her advantage after

12  the court's deadline for doing so has passed."  *Luke v. Family Care & Urgent Med. Clinics*, 323 F.

13  App'x 496, 500 (9th Cir. 2009); *see also Reinsdorf v. Skechers U.S.A*, 922 F. Supp. 2d 866, 880

14  (C.D. Cal. 2013) (duty to supplement not a "license to sandbag one's opponent" with new theories;

15  *KFD Enters., Inc. v. City of Eureka*, No. 08-CV-4571, 2013 WL 2384236, at *4 (N.D. Cal. May 30,

16  2013) (Rule 26 does not allow a party to supplement an expert report merely because its expert has

17  developed another theory to rebut the opposing side's experts).

18       Obviously, articles and studies from 1999, 2000, and 2004 are not "relevant market events

19  that occurred since the 2011 trial" and, thus, the new opinions violate this Court's February 17 order

20  limiting supplemental expert reports "to updating prior disclosed opinions based only on relevant

21  market events that occurred since the 2011 trial."  (Dkt. # 619 at 2-3.)  The new opinions also violate

22  Rule 26(a)(2)(B) as going beyond the scope of Dr. Kolassa's recent supplemental report—which, as

23  the Court ordered, was limited to post-trial events.   Rebuttal reports are "intended solely to

24  contradict or rebut evidence on the same subject matter identified by another party under

25  Rule 26(a)(2)(B)."  *Internet Servs. LLC v. Immersion Corp.*, No. 06-CV-02009, 2008 WL 2051028,

26  at *1 (N.D. Cal. May 13, 2008); *accord United States v. S. Cal. Edison, Co.*, No. 01-CV-5167,

27  2005 WL 7862243 (E.D. Cal. Sept. 23, 2005) (striking purported "rebuttal" report that was not truly

28

1    in rebuttal to initial expert report); *Maionchi v. Union Pac. Corp.*, No. 03-CV-0647,
2    2007 WL 2022027, at *1 (N.D. Cal. July 9, 2007) (excluding purported rebuttal expert because he
3    "does not opine regarding the reasonableness of the subject").

4           In sum, Dr. Dolan's improper opinions and the related evidence referenced in paragraphs 13
5    and 14 of his supplemental rebuttal report should be excluded.  Alternatively, if the Court were to
6    allow Dr. Dolan to testify as to these new opinions offered for the first time in a supplemental
7    rebuttal report, Dr. Kolassa should be allowed to offer testimony responding to these new opinions at
8    trial.

9    **MOTION #3.        DR. SIDDIQUI SHOULD BE BARRED FROM TESTIFYING ON THE**
10   **EFFECT   OF   THE   PRICE   INCREASE   ON   LEXIVA   OR**
     **PRESCRIBING HABITS**

11          At the last trial, this Court sustained an objection to GSK's efforts to elicit testimony from
12   Dr. Javeed Siddiqui that goes well beyond his expertise.  Dr. Siddiqui is a physician, and at the last
13   trial he testified about HIV medications.  He is not (and does not purport to be) an expert on drug
14   pricing or the effects of drug pricing on doctors' prescribing habits.  Thus, consistent with its ruling
15   at the last trial, this Court should bar him from testifying on either subject.

16          The Federal Rules "grant expert witnesses testimonial latitude unavailable to other witnesses
17   on the 'assumption that the expert's opinion will have a *reliable basis in the knowledge and*
18   *experience of his discipline*.'"  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999) (quoting
19   *Daubert*, 509 U.S. at 592) (emphasis added).  When a purported expert "ceas[es] to apply his
20   specialized knowledge," he is "no longer testifying as an expert but rather as a lay witness."
21   *United States v. Freeman*, 498 F.3d 893, 902 (9th Cir. 2007).  Dr. Siddiqui has no "specialized
22   knowledge" of pharmaceutical pricing, and as a medical doctor, pharmaceutical pricing is simply not
23   within the "knowledge and experience of his discipline."

24          At the last trial, Dr. Siddiqui explained that he was only asked to opine about "HIV
25   treatment," "how medications come together in order to form a treatment regimen," and "about my
26   experiences with regards to providing peer medical education programs during the time frame."
27   (Ex. I, 3/1/11 Trial Tr. at 361:16-362:4, Dkt. # 540.)  When GSK attempted to ask him about the

28

Norvir price increase's effect on Lexiva's launch, the Court sustained Abbott's objection that such testimony would exceed the scope of his expertise and expert reports:

> Mr. Hennigan:   Based on your experience with launches, what impact or effect on the Lexiva launch do you think the Abbott price increase of 400 percent had on the Lexiva launch?
>
> Mr. Hurst:   Objection, your honor, it's not—he's not tendered as an expert on commercial launches nor is it in his expert reports.
>
> The Court:   Sustained.

(*Id.* at 407:23-408:4.)  This Court should likewise prohibit GSK from eliciting such testimony from Dr. Siddiqui at the second trial.[2]

The Court also should bar Dr. Siddiqui from discussing the effect of the Norvir price increase on doctors' prescribing habits.  When asked about the subject at his deposition, Dr. Siddiqui admitted that he had only talked to a few doctors about it—which is far short of the rigorous expert analysis necessary to aid the jury in its fact-finding effort.   Courts must be wary of expert testimony that relies on anecdotal evidence and lacks sufficient testing:  "Red flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012); *see also Vondrak v. City of Las Cruces*, 671 F. Supp. 2d 1239, 1243 (D.N.M. 2009) (courts should consider whether witness' conclusion unduly relies on anecdotal evidence); *Jones v. United States*, 933 F. Supp. 894, 898 (N.D. Cal. 1996) (evidence showing at most anecdotal support for hypothesis does not meet *Daubert* standard). Dr. Siddiqui's discussion of his information-gathering from ███████ is typical of the anecdotal, non-scientific, nature of his inquiry into this issue:

---

[2]   Based on discussion with GSK's counsel, Abbott understands that GSK will not seek reconsideration of this sustained objection.



(Ex. J, Siddiqui 2010 Dep. Tr. at 272:24-273:13 (objection omitted).)  This discussion of a "handful" of patients that occurred sometime in the course of 2004 fails to satisfy the requirement that expert testimony be reliable.  *Daubert*, 579 U.S. at 589 ("[U]nder the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."); *see also Jones*, 933 F. Supp. at 898 (excluding opinion based on anecdotal evidence).

For essentially the same reasons this Court previously barred him from testifying about the effect of the Norvir price increase on Lexiva's launch, Dr. Siddiqui should be barred from speculating about the effect of the Norvir price increase on doctors' prescribing habits.  He is not a pharmaceutical pricing expert.  His testimony is grounded in no more than his personal medical practice and discussions with a few doctors about their own prescribing habits.  That falls well short of the reliability required by *Daubert*.  Accordingly, this Court should preclude Dr. Siddiqui from testifying about the effect of the Norvir price increase on the Lexiva launch or doctors' prescribing habits.

**MOTION #4.**    **GSK SHOULD BE BARRED FROM OFFERING DR. PROWSE'S OPINION ON "RESTITUTIONARY" DAMAGES**

On multiple occasions, this Court has barred GSK from introducing Dr. Prowse's belatedly-disclosed partial "restitutionary" damages opinion.  To enforce that ruling, GSK should be excluded from any attempt to offer such a theory through attorney argument or fact witness testimony.

At the pre-trial hearing before the first trial, the Court explained that GSK was not entitled to "full" restitution:

> Do you have an expert who says the H[umira] license was worth "x" dollars and you got "x" percent of the Norvir license, so, therefore, you should get x percent of the value of the . . . I just don't think you can get the whole thing, and I don't understand how you would parse it out.

(Ex. K, 2/8/11 Hr'g Tr. 86:6-11, 87:3-5, Dkt. # 555.)  In light of this, the Court held that GSK could only offer restitution theory based on "a previously disclosed damages calculation that quantifies the *partial* restitution to which it is entitled on Abbott's alleged partial breach." (2/11/11 Order at 7:2-3, Dkt. # 392 (emphasis added).)

On the first day of trial, this Court reiterated that same point:  "[I]f there were a theory of *partial* restitution for partial breach, but that theory would have already have to have been disclosed. . . .   If it hadn't, then it is going to be too late now to disclose one because expert reports have been done."  (Ex. L, 2/28/11 Trial Tr. 237:17-23, Dkt. # 539 (emphasis added).)  The Court thus excluded that belatedly-disclosed damages theory.  (*Id.* at 237:23-24) ("If there is no expert that has any partial restitution theory, then that restitution theory won't be able to come in.")

During trial and on remand, GSK has repeatedly asked the Court to modify its ruling without success.  (*See* Dkt. ## 408, 414, 419, 420, 456, 459, 614, 615, and 619.)  Despite being repeatedly rebuffed, Dr. Prowse provided an updated "restitutionary" calculation in his supplemental expert report.  (*See* Ex. A, 2/27/15 Prowse Report ¶ 18.)

GSK's multiple requests for the Court to modify its ruling, and the updated Prowse restitution calculation, make it imperative that the Court enforce its earlier ruling by expressly precluding GSK from attempting to offer its excluded damages theory through a "back door"—that is, through fact witnesses or attorney argument.  *See*, *e.g.*, *Life Plus Int'l v. Brown,* 317 F.3d 799, 804 (8th Cir. 2003), *as amended on reh'g in part* (Feb. 19, 2003) ("We believe Life Plus was attempting to get admitted through the back door of rebuttal evidence that which the district court had correctly barred as being untimely disclosed at the front door."); *MediaTek Inc. v. Freescale*

*Semiconductor, Inc.*, No. 11-CV-5341, 2014 WL 690161, at *2 (N.D. Cal. Feb. 21, 2014) ("Had [defendant] wished to assert invalidity on these grounds, it should have disclosed this theory in its invalidity contentions.  Having failed to do so, it cannot now offer this evidence through the back door of a damages theory.").

**MOTION #5.        GSK SHOULD BE BARRED FROM REFERRING TO GSK AND ABBOTT AS "PARTNERS"**

GSK should be barred from arguing that the Norvir boosting license created a "partnership" between GSK and Abbott.  This, too, is an implementation of an earlier holding of this Court:  "[I]f I were to hear testimony that said the contract says 'X' but really we talked about 'Y,' that wouldn't be allowed."  (Ex. M, 3/4/11 Trial Tr. 974:8-10, Dkt. # 542.)

That is exactly the situation on this "partnership" issue.   The parties' agreement unambiguously forecloses any argument that they were "partners":  "It is expressly understood and agreed that GSK and Abbott are and shall be independent contractors and that *the relationship between the two parties shall not constitute, nor shall it be deemed to be, a partnership*, joint venture or agency."  (Ex. N, P5 at 17, § 11.8 (emphasis added).)

Under New York law, "[p]arol evidence—evidence outside the four corners of the document—is admissible only if a court finds an ambiguity in the contract."  *Schron v. Troutman Sanders LLP*, 986 N.E. 2d 430, 433 (N.Y. 2013) (citing *W.W.W. Assoc., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)).  Parol evidence similarly may not be used to "contradict" the express terms of a contract or "add to or vary its terms."  *Primex Int'l Corp. v. Wal-Mart Stores, Inc.*, 89 N.Y.2d 594, 600 (1997); *see also Marine Midland Bank-Southern v. Thurlow*, 53 N.Y.2d 381, 387 (1981) (same).

Yet that is precisely what GSK intends to do by offering testimony that the parties intended to establish a "partnership" through the license agreement or that Abbott's lead contract negotiator, John Poulos, "wanted Abbott to be seen as the partner of choice for the other licensing companies." (Ex. O, 3/7/11 Trial Tr. 1141:20-21, Dkt. # 543.)  Because such testimony clearly contradicts the parties' agreement, the Court should bar GSK from introducing such evidence or argument.  To do otherwise would mislead and confuse the jury.

24

1

2

**MOTION #6.        THE PARTIES SHOULD BE BARRED FROM USING ANTITRUST TERMINOLOGY, SUCH AS "MONOPOLIST," "MONOPOLY POWER" OR "MARKET POWER"**

3        Now that GSK has abandoned its antitrust claims, terms unique to those claims are irrelevant

4   to GSK's contract and unfair trade practices claims and could only serve to confuse and mislead the

5   jury.  Other than the fact that both sides should be free to refer to Abbott's *patent* monopoly on

6   Norvir and boosting—a necessity for the limited purpose of describing the patent licensing

7   agreement—there is no place for these terms in this proceeding.

8        The Court's former instructions illustrate that these antitrust terms have a meaning beyond

9   everyday understanding, and thus any use of these terms at trial—for example, accusations that

10  Abbott is a "monopolist" or exercised "market power"—would invite juror error in the absence of

11  pertinent instructions.  *Cf. O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 2010 WL 445190, at *7

12  (N.D. Cal. Feb. 8, 2010) (Wilken, J.) ("'The law directs itself not against conduct which is

13  competitive, even severely so, but against conduct which unfairly tends to destroy competition

14  itself.'") (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993)).  Now that the

15  Court's 18 pages of antitrust instructions will no longer serve as a guide, a juror may hear the word

16  "monopolist," "monopoly power," or "market power" and cast an aspersion against Abbott, even if

17  Abbott's conduct would not be considered unlawful under the now-mooted antitrust claims.

18        To be clear, Abbott is not seeking to limit GSK's ability to refer to market shares or

19  competition in general.[3]  But outside of a discussion of patents, neither side should be allowed to use

20  the charged antitrust-specific terms—"monopolist," "monopoly," or exercised "market power"—

21  because their usage would be substantially more prejudicial than probative.  Thus, under Federal

22  Rules of Evidence 401, 402, and 403, usage of such antitrust terminology should be barred.

23

24

25

26

27  _____

    [3]   The parties have agreed to defer (until after discussions with the Court at the Pretrial Conference
28  and resolution of the revised jury instructions) the issue of the line between admissible and
    inadmissible expert economist testimony in light of the dropping of the antitrust claims.

25

1

2
Dated:  March 25, 2015

3

/s/ Charles B. Klein
Charles B. Klein
WINSTON & STRAWN LLP

Attorneys for Abbott Laboratories

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28