1   HUESTON HENNIGAN LLP
    Brian Hennigan (SBN 86955)
2   Moez M. Kaba (SBN 257456)
    Padraic W. Foran (SBN 268278)
3   C. Mitchell Hendy (SBN 282036)
    523 W. Sixth St., Suite 400
4   Los Angeles, CA 90014
    Telephone:    (213) 788-4340
5   Facsimile:    (888) 775-0898
    bhennigan@hueston.com;
6   mkaba@hueston.com;
    pforan@hueston.com;
7   mhendy@hueston.com

8   THE LANIER LAW FIRM P.C.
    W. Mark Lanier (*pro hac vice*)
9   6810 FM 1960 West
    Houston, Texas 77069
10  Telephone: (713) 659-5200
    Facsimile: (713) 659-2204
11  wml@lanierlawfirm.com

12  THE LANIER LAW FIRM P.C.
    Lee A. Cirsch (SBN 227668)
13  10866 Wilshire Blvd., Suite 400
    Los Angeles, California 90024
14  Telephone: (310) 277-5100
    Facsimile: (310) 277-5103
15  lee.cirsch@lanierlawfirm.com

16  Attorneys for Plaintiff
    GLAXOSMITHKLINE

17

18                 UNITED STATES DISTRICT COURT

19              NORTHERN DISTRICT OF CALIFORNIA

20                      OAKLAND DIVISION

21  SMITHKLINE BEECHAM CORPORATION, )   Case No. 4:07-cv-05702 (CW)
    d/b/a GLAXOSMITHKLINE,          )
22                                  )   **PLAINTIFF'S OPPOSITION TO ABBOTT**
                 Plaintiff,         )   **LABORATORIES' MOTION TO DISMISS**
23                                  )   **GSK'S SECOND AMENDED**
         vs.                        )   **COMPLAINT**
24                                  )
    ABBOTT LABORATORIES,            )
25                                  )
                 Defendant.         )   Judge: Honorable Claudia Wilken
26                                  )   Hearing Date: April 8, 2015
                                    )   Time: 2 p.m.
27  _____  )   Location: Courtroom 2 (4th Floor)

28

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ..................................................................................................... 1

II.  FACTUAL BACKGROUND ................................................................................... 2

    A.  Abbott's Extensive Operations in California ............................................... 2

    B.  Abbott Exploited the California Market in Pricing Norvir and
        Selling Kaletra .............................................................................................. 3

III.  PROCEDURAL BACKGROUND ........................................................................... 4

    A.  Abbott Consents to Personal Jurisdiction in This Court ............................. 4

    B.  Abbott Repeatedly Asks This Court to Dismiss GSK's Antitrust
        Claims and Resolve GSK's State Law Claims on the Merits ...................... 5

    C.  After More Than Seven Years of Litigation, Abbott First Asserts Its
        Personal Jurisdiction Objection .................................................................... 6

IV.  ARGUMENT ........................................................................................................... 6

    A.  ABBOTT WAIVED ANY OBJECTION TO PERSONAL
        JURISDICTION ........................................................................................... 6

    B.  THIS COURT HAS PERSONAL JURISDICTION OVER
        ABBOTT ...................................................................................................... 7

        1.  Abbott Is Subject to General Personal Jurisdiction in
            California ........................................................................................... 8

        2.  Abbott Is Subject to Specific Personal Jurisdiction in
            California ......................................................................................... 10

            a.  Abbott Purposefully Availed Itself of California and
                Purposefully Directed Its Activities to California ...................... 11

            b.  Abbott Engaged in Extensive Forum-Related
                Conduct ....................................................................................... 17

            c.  Personal Jurisdiction Over Abbott Is Reasonable ...................... 18

        3.  The Court Should Exercise Its Discretion to Continue to
            Exercise Pendent Personal Jurisdiction Over GSK's State
            Law Claims ..................................................................................... 21

    C.  IN THE ALTERNATIVE, THE COURT SHOULD PERMIT
        JURISDICTIONAL DISCOVERY ........................................................... 23

V.  CONCLUSION ...................................................................................................... 24

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>Cases</u>

*Action Embroidery Corp. v. Atl. Embroidery, Inc.*,
   368 F.3d 1174 (9th Cir. 2004)................................................................... 1, 6, 22

*Albino v. Baca*,
   747 F.3d 1162 (9th Cir. 2014)................................................................... 22

*America West Airlines, Inc. v. GPA Group, Ltd.*,
   877 F.2d 793 (9th Cir.1989)...................................................................... 23

*Anderson v. Century Products Co.*,
   943 F. Supp. 137 (D.N.H. 1996)............................................................... 23

*Anglemyer v. Hamilton County Hosp.*,
   58 F.3d 533 (10th Cir. 1995)..................................................................... 21

*Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano City*,
   480 U.S. 102 (1987).................................................................................. 17

*Bancroft & Masters, Inc. v. Augusta Nat. Inc.*,
   223 F.3d 1082 (9th Cir. 2000)................................................................... 14

*Brainerd v. Governors of the Univ. of Alberta*,
   873 F.2d 1257 (9th Cir. 1989)................................................................... 17

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985)....................................................................... 7, 11, 13, 18

*CE Distrib., LLC v. New Sensor Corp.*,
   380 F.3d 1107 (9th Cir. 2004).................................................................... 6

*Cepheid, Inc. et al. v. Abbott Labs.*,
   14-cv-05652-EJD (N.D. Cal., filed Dec. 30, 2014) .................................. 9

*CollegeSource, Inc. v. AcademyOne, Inc.*,
   653 F.3d 1066 (9th Cir. 2011).......................................................... 18, 19, 20

*Corporate Inv. Business Brokers v. Melcher*,
   824 F.2d 786 (9th Cir. 1987)..................................................................... 12

*D'Addario v. Geller*,
   264 F. Supp. 2d 367 (E.D. Va. 2003)........................................................ 23

*Daimler AG v. Bauman*,
   134 S. Ct. 746 (2014) ...................................................................... 1, 8, 9, 10

*Decker Coal Co. v. Commonwealth Edison Co.*,
   805 F.2d 834 (9th Cir. 1986)..................................................................... 13

**TABLE OF AUTHORITIES (cont.)**

**Page(s)**

*Diaz v. Gates,*
    420 F.3d 897 (9th Cir. 2005)..................................................................................21

*Doe by Fein v. District of Columbia,*
    93 F.3d 861 (D.C. Cir. 1996) ....................................................................................7

*Dole Food Co. v. Watts,*
    303 F.3d 1104 (9th Cir. 2002)............................................................................17, 20

*Fireman's Fund Ins. Co. v. Nat'l Bank of Cooperatives,*
    103 F.3d 888 (9th Cir. 1996)...................................................................................17

*Gator.com v. L.L. Bean, Inc.,*
    341 F.3d 1072 (9th Cir. 2003)....................................................................................8

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
    131 S. Ct. 2846 (2011) ..........................................................................1, 8, 9, 10

*Google Inc. v. Rockstar Consortium U.S. LP,*
    No. C 13-5933 CW, 2014 WL 1571807 (N.D. Cal. Apr. 17, 2014) ................................10

*Gullette v. Lancaster & Chester Co.,*
    No. 3:14-CV-00537-HZ, 2014 WL 3695515 (D. Or. July 23, 2014) .............................13

*Haisten v. Grass Valley Med. Reimbursement Fund, Ltd.,*
    784 F.2d 1392 (9th Cir. 1986)...................................................................................12

*Hammons v. Alcan Aluminum Corp.,*
    No. SA CV 96-319-LHM, 1996 WL 397455 (C.D. Cal. May 31, 1996) ........................18

*Hawaii Island Air, Inc. v. Merlot Aero Ltd.,*
    No. CIV. 14-00466 BMK, 2015 WL 675512 (D. Haw. Jan. 30, 2015) ...........................11

*Helicopteros Nacionales de Colombia, S.A. v. Hall,*
    466 U.S. 408 (1984) ....................................................................................................7

*Imagineering, Inc. v. Kiewit Pacific Co.,*
    976 F.2d 1303 (9th Cir. 1992)....................................................................................21

*In re Kieslich,*
    258 F.3d 968 (9th Cir. 2001)........................................................................................6

*In re W. States Wholesale Natural Gas Antitrust Litig.,*
    715 F.3d 716 (9th Cir. 2013)................................................................................17, 18

*Int'l Shoe Co. v. Washington,*
    326 U.S. 310 (1945) ....................................................................................................7

*J.B. ex rel. Benjamin v. Abbott Laboratories Inc.,*
    No. 12-cv-385, 2013 WL 452807 (N.D. Ill. 2013) .........................................................10

1

**TABLE OF AUTHORITIES (cont.)**

2

**Page(s)**

3

*John Doe 1 v. Abbott Labs.,*
    571 F.3d 930 (9th Cir. 2009)................................................................................ 4

4

*Keeton v. Hustler Magazine, Inc.,*
    465 U.S. 770 (1984) ...........................................................................2, 15, 18

5

*Laska v. Abbott Severance Pay Plan for Employees of Kos Pharmaceutical, et al.,*
    13-cv-04417-MWF-AGR (C.D. Cal., filed June 19, 2013) ................................. 9

6

7

*LocusPoint Networks, LLC v. D.T.V., LLC,*
    No. 3:14-CV-01278-JSC, 2014 WL 3836792 (N.D. Cal. Aug. 1, 2014)................... 12, 13

8

*Malone v. Clark Nuber,*
    No. C07-2046RSL, 2008 WL 4279502 (W.D. Wash. Sept. 12, 2008)........................... 22

9

10

*Martinez v. Aero Caribbean,*
    764 F.3d 1062 (9th Cir. 2014)................................................................................ 8

11

*Mavrix Photo, Inc. v. Brand Techs., Inc.,*
    647 F.3d 1218 (9th Cir. 2011 ...................................................................passim

12

13

*Menken v. Emm,*
    503 F.3d 1050 (9th Cir. 2007)................................................................................ 11

14

*Motorola Credit Corp. v. Uzan,*
    388 F.3d 39 (2d Cir. 2004)...................................................................... 21, 22

15

16

*Otto v. Abbott Labs.,*
    12-cv-01411-SVW-DTB (C.D. Cal., filed Aug. 22, 2012)................................. 9

17

*Panavision Int'l, L.P. v. Toeppen,*
    141 F.3d 1316 (9th Cir. 1998)...................................................................... 7, 18

18

19

*Pebble Beach Co. v. Caddy,*
    453 F.3d 1151 (9th Cir. 2006)................................................................................ 7

20

*Roth v. Garcia Marquez,*
    942 F.2d 617 (9th Cir. 1991)...................................................................... 12, 13

21

22

*Schneider v. TRW, Inc.,*
    938 F.2d 986 (9th Cir. 1991)................................................................................ 21

23

*Schwarzenegger v. Fred Martin Motor Co.,*
    374 F.3d 797 (9th Cir. 2004)................................................................................ 11

24

25

*Shanks v. Abbott Labs. et al.,*
    15-cv-01151-NC (N.D. Cal., filed March 11, 2015)........................................ 9

26

*Sinatra v. Nat'l Enquirer, Inc.,*
    854 F.2d 1191 (9th Cir. 1988)...................................................................... 12, 19

27

28

## <u>TABLE OF AUTHORITIES (cont.)</u>

<u>Page(s)</u>

*Smith v. Idaho,*
    392 F.3d 350 (9th Cir. 2004)................................................................................ 6

*Southern Machine Company v. Mohasco Industries, Inc.,*
    401 F.2d 374 (6th Cir. 1968)................................................................................ 12

*Tatung Co. v. Shu Tze Hsu,*
    No. SACV 13-1743-DOC ANX, 2014 WL 4306561
    (C.D. Cal. Sept. 2, 2014) ..................................................................................... 15

*Thompson v. StreetSmarts, Inc.,*
    No. CV-10-1885-PHX-LOA, 2011 WL 2600744 (D. Ariz. June 30, 2011).................... 11

*United States v. Botefuhr,*
    309 F.3d 1263 (10th Cir. 2002)..................................................................... 2, 21, 22

*Washington Shoe Co. v. A-Z Sporting Goods Inc.,*
    704 F.3d 668 (9th Cir. 2012)...................................................................... 7, 11, 14

*Wells Fargo & Co. v. Wells Fargo Exp. Co.,*
    556 F.2d 406 (9th Cir. 1977)............................................................................... 23

*Woodco Dynamic, LLC v. Venetian Investments, LLC,*
    No. 2:10-CV-00035 JWS, 2010 WL 1813788 (D. Ariz. May 5, 2010)........................ 13

*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286 (1980) ......................................................................................... 17

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme,*
    433 F.3d 1199 (9th Cir. 2006).......................................................................passim

<u>Statutes</u>

28 U.S.C. § 1272 .................................................................................................. 21

28 U.S.C. § 1367 .................................................................................................. 21

28 U.S.C. § 1404(a) ............................................................................................... 4

28 U.S.C. § 1631 ............................................................................................... 4, 24

<u>Rules</u>

Fed. R. Civ. P 12 .................................................................................................. 6

<u>Other Authorities</u>

Wright & Miller, 4A Fed. Prac. & Proc. Civ. § 1069.7 (3d ed.)................................... 22

1  **I.      INTRODUCTION**

2        Defendant Abbott Laboratories ("Abbott") has litigated this case (and several others

3  arising from the very same underlying conduct) in this Court and Circuit for more than seven

4  years, including a three-week trial and an appeal. Never once has Abbott objected to personal

5  jurisdiction. Less than two months before the second trial, Abbott brings a Motion to Dismiss

6  claiming Plaintiff GlaxoSmithKline's ("GSK") voluntary withdrawal of its federal antitrust claims

7  deprives this Court of personal jurisdiction. Dkt. No. 633. The Motion should be denied.

8        First, Abbott has waived any objection to personal jurisdiction. It is well established that

9  this Court's exercise of pendent personal jurisdiction is discretionary, *Action Embroidery Corp. v.*

10  *Atl. Embroidery, Inc.*, 368 F.3d 1174, 1181 (9th Cir. 2004), yet Abbott never objected to it. Abbott

11  instead wrote that it "does not dispute … that this Court has personal jurisdiction." Dkt. No. 17.

12  Abbott also repeatedly asked this Court to dismiss GSK's federal antitrust claims and then try

13  GSK's state law claims on the merits.[1] *See, e.g.*, Dkt. No. 168, 574. But Abbott did not previously

14  claim that such a posture would deprive the Court of jurisdiction.

15        Second, this Court has general personal jurisdiction over Abbott. Abbott has seven

16  California facilities (more than in any other state), employs thousands of people in California, and

17  has sold millions of prescriptions to California patients. March 25, 2015 Declaration of Moez M.

18  Kaba ("Kaba Decl."), Ex. 1 (Abbott Labs., Annual Report (Form 10-K) (Feb. 27, 2015)), Ex. 10

19  (Abbott.com Career FAQs, http://www.abbott.com/careers/faqs.html (last visited March 25,

20  2015)), Ex. 2 (Comprehensive Annual Financial Report, Fiscal Year Ended June 30, 2013,

21  Redwood City, California), Ex. 3 (Comprehensive Annual Financial Report, Fiscal Year Ended

22  June 30, 2013, City of Temecula, California). In other words, Abbott's contacts with this state are

23  "so continuous and systematic as to render [it] essentially at home" and subject to general personal

24  jurisdiction here. *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011);

25  *see also Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014); *Goodyear Dunlop Tires Operations,*

26  *S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011).

27  _____

28        [1] Of course the Court has not dismissed GSK's antitrust claims; instead, GSK voluntarily filed a second amended complaint without including the antitrust causes of action.

1    Third, this Court has specific personal jurisdiction over Abbott. Abbott "purposefully

2    availed" itself of doing business in, and purposefully directed its conduct to, California. By

3    entering into the Norvir License Agreement with GSK (which extended to California) and by

4    hiking the price of Norvir by 400% (including in California), Abbott was "carrying on a 'part of

5    its general business' in" California, the very activity that gives rise to this action. *Keeton*, 465 U.S.

6    at 779-80. Abbott even specifically targeted California doctors and patient groups in its sale of

7    Kaletra and in its public relations apology tour for the Norvir price hike, disrupting the launch of

8    Lexiva in California.  Kaba Decl., Ex. 8 (Plaintiff's Exhibit 284), Ex. 9 (Plaintiff's Exhibit 296).

9    But for these California activities, GSK would have suffered considerably less harm. Abbott

10   cannot present any case—let alone a "compelling case," as required—to show that exercising

11   jurisdiction under these circumstances would be unreasonable. To the contrary, continuing to

12   exercise jurisdiction after more than seven years of litigation is eminently reasonable.

13   Fourth, the Court should use its discretion to continue to exercise pendent personal

14   jurisdiction over Abbot in connection with GSK's remaining claims given that "the parties have

15   already expended a great deal of time and energy on the state law claims." *United States v.*

16   *Botefuhr*, 309 F.3d 1263, 1272-73 (10th Cir. 2002).

17   Finally, if the Court is not satisfied that GSK has made a sufficient jurisdictional showing,

18   GSK should be entitled to jurisdictional discovery to develop further facts about the extensive

19   scope of Abbott's California activities.

20   **II.    FACTUAL BACKGROUND**

21        **A.    Abbott's Extensive Operations in California.**

22   Abbott currently operates seven facilities in California—including four in this District—

23   more facilities than it operates in any other state. Kaba Decl., Ex. 1; *see also id.* Ex. 10 ("In the

24   U.S., we have a significant presence in California (Alameda, Milpitas, Redwood City, Santa Ana,

25   Santa Clara and Temecula) …."). Abbott employs thousands in California. *Id.* Exs. 2, 3. Even

26   according to Abbott's own securities filing, its research and development facilities are "primarily

27   located in California" and three other states. *Id.* Ex. 1. These California connections are long-

28   standing. Abbott first registered to do business in California more than a century ago, in 1905, and

1 remains registered today. *Id.* Ex. 4 (Registration of Abbott Laboratories with California Secretary

2 of State). Abbott has an agent for service of process in California, and GSK served its initial

3 complaint and summons on Abbott through that agent in California. Dkt. No. 6.

4         **B.**         **Abbott Exploited the California Market in Pricing Norvir and Selling Kaletra.**

5         In addition to operating in California, Abbott's business depends on and exploits the

6 California HIV-drug market. California is home to nearly 15% of all Americans living with

7 HIV/AIDS, second only to New York. Kaba Decl., Ex. 5 (Centers for Disease Control and

8 Prevention, HIV Surveillance Report, Vol. 25 (February 2015)). California has nearly twice as

9 many residents living with HIV as Illinois and North Carolina *combined*. *Id.* Abbott admits that it

10 markets and sells its drugs, especially its HIV drugs, in California. Dkt. No. 197 at ¶ 6. Abbott's

11 HIV-drug sales in California have consistently made up a significant portion of its overall sales; █

12 ████████████████████████████████████████████████████████████████████████

13 ████████████████████████ Kaba Decl., Ex. 6 (NOR00005031). According to industry data,

14 California is one the three largest state markets for Kaletra and Norvir, and California accounts for

15 a substantial portion of domestic Norvir and Kaletra sales. In 2014, Norvir and Kaletra were each

16 prescribed to thousands of California patients, resulting in tens of thousands of Norvir and Kaletra

17 pills prescribed, delivered, and taken in California.

18         Abbott's exploitation of the California HIV-drug market is the result of extensive

19 marketing, public relations, and sales operations targeting the State. The parties have not

20 conducted jurisdictional discovery, because Abbott never raised any jurisdictional objection. But

21 Abbott's internal documents show, for example, ████████████████████████████████

22 ████████████████████, *id.* Ex. 7 (NOR00090730), and Abbott launched a public relations blitz in

23 California designed to minimize backlash against the Norvir price increase, sell more Kaletra in

24 California, and disrupt the launch of Lexiva in California. *See, e.g.*, *id.* Ex. 8, ████████████

25 ████████████████████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████████

28

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

1 ████████████████████████████████████████████████

2 ████████████████ ).

3 **III.    PROCEDURAL BACKGROUND**

4          This action has been pending for more than seven years. Abbott has also defended itself

5 against other cases brought in California arising out of the very conduct at issue here. *See John*

6 *Doe 1 v. Abbott Labs.*, 571 F.3d 930 (9th Cir. 2009). Abbott has not previously objected to this

7 Court's exercise of personal jurisdiction. Instead, Abbott previously asked this Court to decide

8 GSK's state law claims on their merits, *after dismissing the antitrust claims. See, e.g.*, Dkt. Nos.

9 168, 574 ("retrial should be limited to GSK's New York law claim for breach of the implied

10 covenant of good faith and fair dealing"). Abbott now has what it asked for: a trial on only the

11 remaining claims.

12          **A.    Abbott Consents to Personal Jurisdiction in This Court.**

13          Shortly after GSK served its first complaint on Abbott in California, the Court related this

14 case to the *Doe/SEIU* litigation (*John Doe 1*, 571 F.3d 930), which featured a California resident

15 as lead plaintiff. Dkt. No. 7. In late 2007, Abbott explicitly consented to personal jurisdiction in a

16 joint case management statement: "Abbott, the sole defendant, does not dispute that it was

17 properly served or that this Court has personal jurisdiction." Dkt. No. 17.

18          In 2008, Abbott moved to transfer this matter to the Northern District of Illinois (Dkt. No.

19 19),[2] but the Court denied its motion, holding that "Illinois has no particular interest in this case

20 other than the generalized interest in ensuring that its citizens receive fair adjudications." Dkt. No.

21 67 at 24.

22          **B.    Abbott Repeatedly Asks This Court to Dismiss GSK's Antitrust Claims and**

23          **Resolve GSK's State Law Claims on the Merits.**

24          In 2009, Abbott stated in a joint case management statement that it would move to dismiss

25 GSK's antitrust claims in light of an appellate ruling in the related *Doe* action. Dkt. No. 168.

26

27          [2] Abbott moved to transfer venue under 28 U.S.C. § 1404(a), which allows transfer for the
convenience of the parties, and not under 28 U.S.C. § 1631, which allows transfer for want of

28 jurisdiction. Dkt. No. 19.

1   Abbott also noted that it had asked GSK to dismiss the antitrust claims—the very step Abbott now

2   claims eradicates personal jurisdiction. Dkt. Nos. 168, 633. But Abbott did not raise any

3   jurisdictional objection. *Id.* Abbott instead asked the Court to "address[] the merits" of GSK's

4   state law claims *after dismissing its antitrust claims.* Dkt. No. 168.[3]

5          In 2009, GSK filed its first amended complaint (Dkt. No. 170), and Abbott again moved to

6   dismiss GSK's claims under the Sherman Act and GSK's claim under the UDTPA to the extent

7   the claim relies on antitrust allegations. Dkt. No. 197. But Abbott did *not* move to dismiss the

8   UDTPA claim altogether, nor did it move to dismiss GSK's claim for breach of the implied

9   covenant of good faith and fair dealing. Even though Abbott effectively asked the Court to litigate

10  only the UDTPA and implied covenant claims, Abbott raised no objection to the Court's exercise

11  of personal jurisdiction over Abbott for the remaining claims. *Id.* The Court subsequently denied

12  Abbott's motion to dismiss the antitrust claims. Dkt. No. 195.

13         In 2011, the parties conducted a three-week trial, in which Abbott presented 15 witnesses.

14  Again, Abbott raised no jurisdictional objection. The parties then cross-appealed to the Ninth

15  Circuit. Abbott again failed to raise any jurisdictional issue.

16         After the case was remanded, Abbott filed a renewed JMOL on August 8, 2014, seeking to

17  dismiss GSK's Sherman Act and UDTPA causes of action and stating that "retrial should be

18  limited to GSK's New York law claim for breach of the implied covenant of good faith and fair

19  dealing." Dkt. No. 574. Yet again, Abbott raised no jurisdictional objection to this Court retrying

20  the claims, and did not allege that if the Court granted the JMOL, then it should also dismiss for

21  lack of personal jurisdiction. The Court denied the motion. Dkt. No. 591.

22

23

24

_____

25     [3] Later in 2009, when Abbott's motion for summary judgment on the antitrust claims was
   coming due, Abbott moved for leave to file for summary judgment on the state law claims too.
26  Dkt. No. 174. Abbott stated that dismissal of the antitrust claims "would leave only GSK's
   implied covenant and UDTPA claims to be litigated." Dkt. Nos. 174, 178. *Id.* But again, Abbott
27  raised no claim that dismissing the antitrust claims would deprive this Court of personal
   jurisdiction. The Court denied the motion. Dkt. No. 179.
28

1      **C.      After More Than Seven Years of Litigation, Abbott First Asserts Its Personal**

2              **Jurisdiction Objection.**

3          On March 10, 2015, GSK filed a second amended complaint dismissing the Sherman Act

4   claims, but continuing to assert the very claims that Abbott repeatedly asked the Court to resolve

5   on the merits: the UDTPA claim and the breach of the implied covenant of good faith and fair

6   dealing. Dkt. No. 632. Abbott now claims for the first time that this Court has no power to hear

7   this case. Dkt. No. 633. The Motion should be denied.

8   **IV.    ARGUMENT**

9          **A.      ABBOTT WAIVED ITS OBJECTION TO PERSONAL JURISDICTION.**

10         Once "available," a motion to dismiss for lack of personal jurisdiction must be filed at the

11  first opportunity or any objection to personal jurisdiction is waived. Fed. R. Civ. P 12(g), (h)(1);

12  *see Smith v. Idaho*, 392 F.3d 350, 355 (9th Cir. 2004) (observing "longstanding rule that personal

13  jurisdiction, in the traditional sense, can be waived" if not raised). Abbott claims it did not

14  previously object to personal jurisdiction because it was subject to the common law doctrine of

15  pendent personal jurisdiction. Dkt. No. 633 at 3. It is well established that pendent personal

16  jurisdiction is not mandatory, but "is committed to the sound discretion of the district court." *CE*

17  *Distrib., LLC v. New Sensor Corp.*, 380 F.3d 1107, 1113 (9th Cir. 2004); *Action Embroidery*

18  *Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1181 (9th Cir. 2004) ("[T]he actual exercise of

19  personal pendent jurisdiction in a particular case is within the discretion of the district court.").

20         Abbott therefore could have argued many years ago (as it does now) that this Court lacked

21  pendent personal jurisdiction over GSK's state law claims. But it never did. Abbott instead stated

22  that it "does not dispute that . . . this Court has personal jurisdiction." Dkt. No. 17, at 2. It then

23  litigated this case through trial and appeal, without ever raising a personal jurisdiction objection

24  (to the pendent claims) with any Court. In other words, Abbott manifestly consented to this

25  Court's authority to adjudicate this suit. *Cf. In re Kieslich*, 258 F.3d 968, 970 (9th Cir. 2001) ("We

26  have held that a party waives any objection to the district court's exercise of its discretion to retain

27  jurisdiction over such supplemental claims when the party fails to raise its objection at the trial

28

1  level."); *Doe by Fein v. District of Columbia*, 93 F.3d 861, 871 (D.C. Cir. 1996) ("The

2  discretionary aspect to supplemental jurisdiction is waivable.").

3        Moreover, Abbott has not merely failed to object to this Court's jurisdiction, it has actively

4  urged the Court to dismiss GSK's federal antitrust claims and *then* "address[ ] the merits" of the

5  remaining state law claims. Dkt. No. 168 (requesting "an early summary judgment motion" to

6  "address[ ] the merits" of remaining state law claims); *see also* Dkt. No. 574 (requesting JMOL on

7  GSK's federal claims and UDTPA claims and a trial *only* on GSK's breach of implied covenant

8  claim). Abbott has therefore waived any objection to personal jurisdiction.

9        **B.       THIS COURT HAS PERSONAL JURISDICTION OVER ABBOTT**

10       This Court may exercise personal jurisdiction over a non-resident defendant so long as the

11  defendant "ha[s] certain minimum contacts with [the forum] such that the maintenance of the suit

12  does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v.

13  Washington*, 326 U.S. 310, 316 (1945). "Although the burden is on the plaintiff to show that the

14  court has jurisdiction over the defendant, … the plaintiff need only make a 'prima facie showing

15  of jurisdictional facts to withstand the motion to dismiss.'" *Washington Shoe Co. v. A-Z Sporting

16  Goods Inc.*, 704 F.3d 668, 671-72 (9th Cir. 2012) (quoting *Pebble Beach Co. v. Caddy*, 453 F.3d

17  1151, 1154 (9th Cir. 2006) (internal quotation marks omitted). Additionally, the court resolves all

18  disputed facts in favor of the plaintiff. *Id.*

19       Personal jurisdiction may be either general or specific. *Panavision Int'l, L.P. v. Toeppen*,

20  141 F.3d 1316, 1320 (9th Cir. 1998). General jurisdiction exists when the defendant maintains

21  "continuous and systematic" contacts with the forum state, even if the cause of action is unrelated

22  to those contacts. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16

23  (1984). Specific jurisdiction exists where the defendant has "purposefully directed his activities at

24  residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to'

25  those activities." *Burger King Corp.*, 471 U.S. at 472. Abbott is subject both to general and

26  specific jurisdiction here.

27

28

1          1.     Abbott Is Subject to General Personal Jurisdiction in California.

2          A corporation is subject to general jurisdiction wherever the corporation's "affiliations

3    with the State are so continuous and systematic as to render [the corporation] essentially at home

4    in the forum State." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011)

5    (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011))

6    (internal quotation marks omitted). A corporation is "essentially at home" in, at the very least, its

7    formal place of incorporation and its principal place of business. *Daimler AG v. Bauman*, 134 S.

8    Ct. 746, 760 (2014). But contrary to Abbott's argument, a corporation may be "essentially at

9    home" in other states too. *Id.* at 760 (*Goodyear* "did not hold that a corporation may be subject to

10   general jurisdiction *only* in a forum where it is incorporated or has its principal place of business,"

11   (emphasis in original)).

12         To determine whether a corporation is "essentially at home" in a state, the court evaluates

13   the defendant's state contacts, such as whether it has "offices or staff," is "registered to do

14   business," has designated a "registered agent for service of process," or pays "state taxes." *Mavrix

15   Photo*, 647 F.3d at 1225; *accord. Gator.com v. L.L. Bean, Inc.*, 341 F.3d 1072, 1077 (9th Cir.

16   2003) ("We . . . focus upon the economic reality of the defendants' activities rather than a

17   mechanical checklist." (internal quotation marks omitted)); *see Martinez v. Aero Caribbean*, 764

18   F.3d 1062, 1070 (9th Cir. 2014) (evaluating whether defendant had "offices, staff, or other

19   physical presence in California," or was "licensed to do business in the state."). The Court then

20   compares these state contacts to the defendant's contacts with other states and countries to make

21   sure the defendant will not become subject to general jurisdiction everywhere it conducts business.

22   *Daimler AG v. Bauman*, 134 S. Ct. at 761.

23         Abbott's California presence and activity is extensive, showing that it is "essentially at

24   home" here. Abbott has seven facilities in California, *the most of any state*. Kaba Decl., Ex. 1.

25   Four of these facilities are in this District. SAC ¶ 6; Answer to FAC ¶ 6. Abbott is registered to do

26   business and has a registered agent for service of process in California. *See Mavrix Photo*, 647

27   F.3d at 1225; Answer to FAC ¶ 10. Abbott also employs thousands of people in California. Kaba

28   Decl., Exs. 2, 3; *see Gator.com Corp.*, 341 F.3d at 1077 (though neither incorporated, licensed,

nor based in California, defendant L.L. Bean was subject to general jurisdiction in California, where it obtained 6% of revenue, sold millions of dollars in merchandise, solicited residents directly through the mail, and operated a "highly interactive" website in the State). Abbott is also a frequent litigant in California court. A recent PACER search shows that Abbott is currently litigating several other cases in California federal court, and has previously litigated dozens more. *See, e.g., Otto v. Abbott Labs.*, 12-cv-01411-SVW-DTB (C.D. Cal., filed Aug. 22, 2012); *Laska v. Abbott Severance Pay Plan for Employees of Kos Pharmaceutical, et al.*, 13-cv-04417-MWF-AGR (C.D. Cal., filed June 19, 2013); *Cepheid, Inc. et al v. Abbott Labs.*, 14-cv-05652-EJD (N.D. Cal., filed Dec. 30, 2014); *Shanks v. Abbott Labs. et al.*, 15-cv-01151-NC (N.D. Cal., filed March 11, 2015).

It is clear that California is integral to Abbott's business.  In other words, even if general jurisdiction extends beyond headquarters and place of incorporation only in "the exceptional case," this is the exceptional case. *Daimler*, 134 S. Ct. at 761.

Abbott's California contacts are unlike the attenuated contacts between the defendants and respective forum states in *Daimler*, 134 S. Ct. at 760, and *Goodyear*, 131 S. Ct. at 2851. Dkt. No. 633 at 5-6. The defendants in those cases (DaimlerChrysler Aktiengesellschaft, a German public stock company, and Goodyear Luxembourg Tires, SA, Goodyear Lastikleri T.A.S., and Goodyear Dunlop Tires France, SA) were international corporations, headquartered and doing business abroad. The events giving rise to each of those suits occurred overseas, and the defendants had no connection to the forum states except through their respective parent or subsidiary corporations.[4] *See also Mavrix Photo*, 647 F.3d at 1225 (defendant had no offices or business in California, but merely operated a website that allowed "third parties to advertise jobs, hotels, and vacations in California"). Abbott, by contrast, is a U.S. company that appears to have more facilities and sell

---

[4] Abbott misstates the facts by stating that the "defendant in *Daimler* had 'considerable contacts with California,'" including a regional headquarters, multiple facilities, and workforce in California. Dkt. No. 633 at 6. Those were the contacts of Mercedes-Benz USA, LLC (MBUSA), a subsidiary of Daimler that was not a defendant in the case. *Daimler*, 134 S. Ct at 758 n.12. Although MBUSA is incorporated in Delaware and headquartered in New Jersey, the Supreme Court assumed "that MBUSA qualifies at home in California" based on its large presence in the State. *Id.* at 758.

1   more pharmaceuticals in California than anywhere else in the United States. *See* Kaba Decl.,

2   Ex. 1.

3        Abbott nevertheless argues that the Northern District of Illinois—where Abbott is

4   incorporated and headquartered—is its one and only forum for all-purpose jurisdiction. Dkt. No.

5   633 at 6. The Supreme Court and Ninth Circuit have rejected such formalism. *Daimler*, 134 S. Ct.

6   at 760. Even after *Goodyear*, the Northern District of Illinois has found that Abbott is subject to

7   general jurisdiction outside the Northern District:

8        In contrast to the foreign subsidiaries in *Goodyear*, Abbott has 46 employees who
         sell and market Abbott's products directly in the Southern District. . . . By
9        soliciting business, selling and marketing products, and employing a sales team in
         the Southern District, Abbott could reasonably anticipate being haled into the
10       District. Therefore, Abbott is subject to ***general personal jurisdiction*** in the
         Southern District of Illinois.

11

12  *J.B. ex rel. Benjamin v. Abbott Laboratories Inc.*, No. 12-cv-385, 2013 WL 452807, at *3 (N.D.

13  Ill. 2013). Compared to its contacts with the Southern District of Illinois, Abbott's California

    contacts are even more systematic and substantial. The same analysis applies.

14       Abbott's argument that general jurisdiction in California would be "unacceptably

15

16  grasping" or "exorbitant" is without merit. Dkt. 633 at 5. GSK does not claim that Abbott is

17  subject to general jurisdiction anywhere it has sizeable sales or even a physical presence. But

18  Abbott's presence is California appears to be as large or larger than Abbott's presence in any other

19  state; it operates more facilities than in any other state and employs thousands of people. Under

20  *Daimler*'s comparative analysis, Abbott is "essentially at home" in California. *Daimler*, 134 S. Ct.

    at 761.

21

22             2.      <u>Abbott Is Subject to Specific Personal Jurisdiction in California.</u>

23       The Court may also exercise specific jurisdiction "based on the relationship between the

24  defendant's forum contacts and the plaintiff's claim." *Yahoo! Inc. v. La Ligue Contre Le Racisme*

25  *Et L'Antisemitisme*, 433 F.3d 1199, 1205 (9th Cir. 2006) (en banc). Specific jurisdiction may be

26  appropriate "even if those contacts [with the forum state] are isolated and sporadic." *Google Inc. v.*

27  *Rockstar Consortium U.S. LP*, No. C 13-5933 CW, 2014 WL 1571807, at *6 (N.D. Cal. Apr. 17,

28  2014) (Wilken, J.). To analyze specific jurisdiction, the Court uses a three-prong test: "(1)

1  purposeful availment and direction; (2) forum-related conduct; and (3) reasonableness." *Menken v.*

2  *Emm*, 503 F.3d 1050, 1057 (9th Cir. 2007); *Yahoo! Inc.*, 433 F.3d at 1205-06. Each of the three

3  prongs is satisfied here.

> *a.*     *Abbott Purposefully Availed Itself of California and Purposefully*
> *Directed Its Activities to California*

6       A plaintiff satisfies the first prong by showing "that the defendant either purposefully

7  availed itself of the privilege of conducting activities in the forum, or purposefully directed its

8  activities at the forum," thus invoking the benefits and protections of the forum state's laws.

9  *Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 672 (9th Cir. 2012). Although

10  "purposefully availed" and "purposefully directed" are sometimes used "in shorthand fashion as a

11  single concept, they are, in fact, two distinct concepts." *Washington Shoe Co. v. A-Z Sporting*

12  *Goods Inc.*, 704 F.3d 668, 672 (9th Cir. 2012) (internal quotations omitted). The purposeful

13  availment test is typically used in cases sounding in contract, while the purposeful direction test is

14  typically used in cases sounding in tort. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797,

15  802 (9th Cir. 2004). GSK's implied covenant claim sounds in contract and its UDTPA claim

16  sounds in tort. *See Thompson v. StreetSmarts, Inc.*, No. CV-10-1885-PHX-LOA, 2011 WL

17  2600744, at *6 (D. Ariz. June 30, 2011) (finding specific jurisdiction for implied covenant claim

18  under purposeful availment test); *Hawaii Island Air, Inc. v. Merlot Aero Ltd.*, No. CIV. 14-00466

19  BMK, 2015 WL 675512, at *4, n.2, 10 (D. Haw. Jan. 30, 2015) (finding specific jurisdiction for

20  Hawaii UDTPA under purposeful direction test). Under either test, Abbott is subject to personal

21  jurisdiction.

> (1)     Abbott purposefully availed itself of doing business in
> California.

24       Requiring purposeful availment "ensures that a defendant will not be haled into a

25  jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral

26  activity of another party or a third person." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475

27  (1985) (internal quotations omitted). A defendant therefore purposefully avails itself of a forum

28  when it "perform[s] some type of affirmative conduct which allows or promotes the transaction of

1  business within the forum state." *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1195 (9th Cir.

2  1988). "For example, the solicitation of business in the forum state that results in business being

3  transacted … will probably be considered purposeful availment." *Sinatra v. Nat'l Enquirer, Inc.*,

4  854 F.2d 1191, 1195 (9th Cir. 1988). Likewise, "activities such as delivering goods" will generally

5  establish purposeful availment. *Yahoo! Inc.*, 433 F.3d at 1206.

6      There can be no doubt that Abbott performed "affirmative conduct which allows or

7  promotes the transaction of business within" California, given Abbott's seven facilities and

8  thousands of employees in California. Kaba Decl., Exs. 1, 2, 3. In particular, California is one of

9  the three largest markets for Kaletra and Norvir. Abbott also employs a California sales forces, has

10  held conferences in California, and has contacted California doctors in order to sell such products

11  in California. *See, e.g* , *id*. Exs. 8, 9.

12      Abbott alleges that it cannot have purposefully availed itself, because GSK is not a

13  California corporation, and GSK and Abbott did not negotiate the Norvir License Agreement in

14  California. Dkt. 633 at 8. The Ninth Circuit rejects such formalism, and instead looks to the

15  "economic reality" of a contract. *Haisten v. Grass Valley Med. Reimbursement Fund, Ltd.*, 784

16  F.2d 1392, 1398 (9th Cir. 1986) ("the technicalities of the execution of the contract and the

17  contractual provision that the contract was made in New York ... cannot change the business

18  realities of the transaction" (quoting *Southern Machine Company v. Mohasco Industries, Inc.*, 401

19  F.2d 374, 382 (6th Cir. 1968))).[5]

20      The court does not consider merely where a contract is negotiated, nor the citizenship of

21  parties to the contract, but also contemplates the "*future consequences* of the contract." *Roth v.*

22  *Garcia Marquez*, 942 F.2d 617, 622 (9th Cir. 1991) (emphasis added); *Corporate Inv. Business*

23  *Brokers v. Melcher*, 824 F.2d 786, 789 (9th Cir. 1987) (*Burger King* "insisted that past and future

24  consequences of the contractual arrangement involving a resident of the forum state be

25  ───────────────

26      [5] As the case Abbott relies upon demonstrates, it is not dispositive that the Norvir License Agreement does not include a California choice-of-law provision. *See LocusPoint Networks, LLC v. D.T.V., LLC*, No. 3:14-CV-01278-JSC, 2014 WL 3836792, at *7 (N.D. Cal. Aug. 1, 2014)

27  (defendant who entered into contract governed by Delaware law subject to specific jurisdiction in California).

28

1   evaluated."). In *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 840 (9th Cir.

2   1986), for instance, an Illinois corporation was subject to specific jurisdiction in Montana

3   regarding a contract negotiated in Nebraska by parties incorporated in Delaware and Oregon,

4   simply because the contract contemplated delivery of goods in Montana. *See also Roth v. Garcia*

5   *Marquez*, 942 F.2d 617, 621 (9th Cir. 1991) (foreign defendants who negotiated film rights

6   contract overseas for film to be shot in Brazil were subject to specific jurisdiction in California

7   where production work, editing, and marketing would be performed in Los Angeles).

8        Here, the parties necessarily understood that GSK would market and sell Lexiva boosted

9   with Norvir in California. The parties knew that California is the second-largest market for HIV

10   drugs, and that GSK planned to sell Lexiva boosted with Norvir in California. Kaba Decl., Ex. 5.

11   In other words, by entering into this agreement, Abbott "committed itself to ongoing obligations,

12   including cooperation," in California. *LocusPoint Networks*, 2014 WL 3836792, at *6.

13        These forum state contacts are starkly unlike those in the unpublished, out-of-jurisdiction

14   cases that Abbott relies upon. *See Gullette v. Lancaster & Chester Co.*, No. 3:14-CV-00537-HZ,

15   2014 WL 3695515, at *2 (D. Or. July 23, 2014) (South Carolina defendant's only Oregon contact

16   was sending mail order catalog and contract to Oregon plaintiff, and all work contemplated by the

17   contract was to be performed in South Carolina by people who lived in or near South Carolina);

18   *Woodco Dynamic, LLC v. Venetian Investments, LLC*, No. 2:10-CV-00035 JWS, 2010 WL

19   1813788, at *2 (D. Ariz. May 5, 2010) (Maryland defendant had no connection to Arizona other

20   than fact that buyer of property in Florida happened to be Arizona company). In those cases, the

21   defendant's faint connection to the forum state was by "random, fortuitous, or attenuated

22   contacts." *Burger King Corp.*, 471 U.S. at 475 (internal quotation marks omitted). Here, by

23   contrast, Abbott has extensive and permanent facilities in California, and the parties expected the

24   Norvir Licensing Agreement to be performed, at least in part, in California, one of the country's

25   two largest HIV-drug markets.

26                   (2)     Abbott purposefully directed its conduct to California.

27        Abbott also purposefully directed its conduct to California. Under the purposeful effects

28   test, Abbott purposefully directed its conduct to this forum, if it "(1) committed an intentional act,

1  (2) expressly aimed at the forum state, (3) causing harm that [it] knows is likely to be suffered in

2  the forum state." *Yahoo! Inc.*, 433 F.3d at 1206.

3       In *Washington Shoe*, 704 F.3d 668, an Arkansas shoe seller committed an intentional act

4  expressly aimed at Washington State and knew harm would occur there when it imported from

5  China and sold knockoff shoes in Arkansas that infringed on copyrights belonging to a

6  Washington resident. In *Bancroft & Masters, Inc. v. Augusta Nat. Inc.*, 223 F.3d 1082, 1089 (9th

7  Cir. 2000), a Georgia corporation expressly aimed its conduct at California and knew harm would

8  occur merely by sending a single cease-and-desist letter to a California resident and by initiating

9  an administrative dispute resolution process against the California resident in Virginia.

10       Abbott's forum-directed conduct was even more extensive than that in *Washington Shoe* or

11  *Bancroft*. Abbott admits that it regularly sells and markets its pharmaceutical products—including

12  both Norvir and Kaletra—in California. Dkt. 197 at ¶ 6. Rather than merely selling a shoe that

13  infringed on a copyright held in the forum state, or sending a single letter to the forum state,

14  Abbott has extensive facilities and employees in California.

15       Abbott contends that it did not expressly aim its conduct at California, because it caused

16  GSK to lose sales not only in California, but "throughout the entire United States and elsewhere."

17  Dkt. 633 at 10. This argument fails. The Ninth Circuit has held that a plaintiff need not show that

18  the "brunt" of the harm occurred in the forum state. *Yahoo! Inc.*, 433 F.3d at 1207. As long as a

19  "jurisdictionally sufficient amount of harm is suffered in the forum state, it does not matter that

20  even more harm might have been suffered in another state." *Id.* For specific jurisdiction (unlike

21  general jurisdiction), it makes no difference if the defendant might also be subject to jurisdiction in

22  other forums; a defendant that causes harm in many forum states is subject to jurisdiction arising

23  from that harm. *Id.*

24       In *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984), a New York plaintiff sued

25  a California-based magazine for libel in New Hampshire. Even though the plaintiff had virtually

26  no connection to New Hampshire, and even though it was "undoubtedly true that the bulk of the

27  harm done to [plaintiff] occurred outside New Hampshire," the defendant magazine was

28  nevertheless subject to specific jurisdiction in New Hampshire because a small proportion of its

1   national circulation went to New Hampshire. *Id* at 778. As the Court explained, the magazine was

2   "carrying on a 'part of its general business' in New Hampshire, and that is sufficient to support

3   jurisdiction when the cause of action arises out of the very activity being conducted, in part, in

4   New Hampshire." *Id.* at 779-80.

5          In entering into the Norvir License Agreement (which extended to California) and in

6   hiking the price of Norvir by 400% (including in California), Abbott was "carrying on a 'part of

7   its general business' in" California. *Keeton*, 465 U.S. at 779-80. That is the very activity that gives

8   rise to this action. The harm Abbott caused GSK in California is much more extensive than was

9   the New Hampshire damage caused in *Keeton*. It make no jurisdictional difference that GSK was

10  also substantially harmed in North Carolina or in any other state. *See* Dkt. 633 at 9; *Yahoo! Inc.*,

11  433 F.3d at 1207 (as long as a "jurisdictionally sufficient amount of harm is suffered in the forum

12  state, it does not matter that even more harm might have been suffered in another state").

13         Abbott next contends that this Court cannot exercise personal jurisdiction because GSK is

14  not based or incorporated in California, but the caselaw makes clear that GSK's place of

15  incorporation is not significant. *See Keeton*, 465 U.S. at 780 (1984) ("[P]laintiff's residence in the

16  forum State is not a separate requirement, and lack of residence will not defeat jurisdiction

17  established on the basis of defendant's contacts."); *see also Tatung Co. v. Shu Tze Hsu*, No. SACV

18  13-1743-DOC ANX, 2014 WL 4306561 (C.D. Cal. Sept. 2, 2014) ("[I]t is not necessary that the

19  victim be a California resident . . . ."). In *Mavrix Photo*, 647 F.3d at 1229, a Florida celebrity

20  photo agency alleged that an Ohio website had infringed its photo copyrights. Although the photos

21  were taken overseas, and although the "passive website" reached a "national audience," the

22  website was nevertheless found to have purposefully directed its conduct to California. "Based on

23  the website's subject matter [celebrity culture], as well as the size and commercial value of the

24  California market," the Court concluded that the defendant "anticipated, desired, and achieved a

25  substantial California viewer base," and had therefore "continuously and deliberately exploited the

26  California market for its own commercial gain." *Id.* at 1230.

27         Abbott's exploitation of the California market is indistinguishable from the exploitation in

28  *Mavrix*. GSK alleges that, among other things, Abbott increased Norvir's price by 400 percent in

1  order to disrupt Lexiva's launch and undermine Lexiva's future sales, including in California, the

2  nation's second largest HIV-drug market. As in *Mavrix*, the Court can conclude "[b]ased on the …

3  subject matter [HIV drugs], as well as the size and commercial value of the California market"

4  that Abbott "anticipated, desired, and achieved a substantial California [customer] base." *Id.* at

5  1230. It is also clear from Abbott's internal documents that it expressly aimed its Norvir re-pricing

6  strategy at California, and specifically knew that Norvir re-pricing was likely to cause harm in

7  California. *See, e.g.*, Kaba Decl. Ex. 9, ██████████████████████████████████████

8  ████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████ *id.*

10 Ex. 8, ██████████████████████████████████████████████████████████

11 ████████████████████████████████████████████. Soon after the

12 Norvir price hike, Abbott launched a public relations blitz in California in order to minimize

13 patient and doctor backlash, sell more Kaletra, and disrupt the launch of Lexiva. *See, e.g.*, *id.* ██

14 ████████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████████

18 ██████████████████████████.

19     Abbott knew that re-pricing would injure patients and providers in California, and that

20 Norvir re-pricing would injure GSK's market share in California. In other words, GSK does not

21 allege "untargeted negligence," but rather acts that were "performed for the very purpose of

22 having their consequences felt in the forum state." *Brainerd v. Governors of the Univ. of Alberta*,

23 873 F.2d 1257, 1259-60 (9th Cir. 1989) (finding specific jurisdiction in Arizona over Canadian

24 defendants who had made allegedly defamatory statements in response to telephone calls they

25 received from Canada); *see also Dole Food Co. v. Watts*, 303 F.3d 1104, 1112 (9th Cir. 2002).

26     Finally, contrary to Abbott's suggestion, GSK need not invoke any "stream of commerce"

27 theory. Dkt. No 633 at 10. Abbott did not merely "deliver its products into the stream of

28 commerce with the expectation that they will be purchased by consumers in the forum State,"

1   *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 298 (1980), nor were its products

2   merely "swept" into California. *See Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano City*, 480

3   U.S. 102, 111-12 (1987). Rather, Abbott targeted California physicians and patients for Kaletra

4   and Norvir, and unlawfully undermined GSK's ability to compete for these physicians and

5   patients. Unlike the "stream of commerce" defendants, who neither reside nor sell directly to the

6   forum state, *see Asahi Metal Indus. Co.*, 480 U.S. at 111-12, Abbott both resides in California

7   (with more than seven facilities in the State) and markets and transacts its business within

8   California. *See* Dkt. No. 197 at ¶ 6. Abbott thus targeted its Norvir re-pricing and its deceptive

9   conduct to California.

10              *b.     Abbott Engaged in Extensive Forum-Related Conduct.*

11          Under the second prong of the specific jurisdiction test, the Court considers whether this

12  lawsuit "arises out of" Abbott's purposeful activities in California. *Fireman's Fund Ins. Co. v.

13  Nat'l Bank of Cooperatives*, 103 F.3d 888, 894 (9th Cir. 1996). "[A] lawsuit arises out of a

14  defendant's contacts with the forum state if a direct nexus exists between those contacts and the

15  cause of action." *Fireman's Fund Ins. Co.*, 103 F.3d at 894; *In re W. States Wholesale Natural

16  Gas Antitrust Litig.*, 715 F.3d 716, 742 (9th Cir. 2013).

17          There is a direct nexus between Abbott's California contacts and this action. GSK alleges

18  that Abbott increased Norvir's price by 400 percent in order to disrupt Lexiva's launch and

19  undermine Lexiva's future sales, including in California, the nation's second-largest HIV-drug

20  market. But for Abbott's Norvir price hike and public relations strategy in California, Abbott

21  would not have sold so much Kaletra and GSK would not have sold so little Lexiva. Thus, but for

22  Abbott's purposeful California activities, GSK's claims and damages would be much smaller. *In

23  re W. States Wholesale Natural Gas Antitrust Litig.*, No. 2:03-CV-01431-PMP, 2010 WL

24  4386950, at *3 (D. Nev. Oct. 29, 2010) ("but for" test is satisfied unless "Plaintiffs' claims …

25  action would be *precisely the same in both character and scope*" without forum-related activities

26  (emphasis added)).

27          Abbott nevertheless argues that GSK's claims do not arise out of the California activities,

28  because Abbott's activities also harmed GSK in other states. Dkt. No. 633 at 16. Again, this

1   argument fails. *Yahoo! Inc.*, 433 F.3d at 1207 ("[I]t does not matter that even more harm might

2   have been suffered in another state."); *Keeton*, 465 U.S. at 779-80 (libel lawsuit arose out of New

3   Hampshire magazine circulation even though it was "undoubtedly true that the bulk of the harm

4   done to [plaintiff] occurred outside New Hampshire"); *see also Panavision*, 141 F.3d at 1322 (but-

5   for test satisfied where defendant's registration of plaintiff's trademarks as domain names "had the

6   effect of injuring [defendant] in California," even though it injured defendant in every other state

7   too). Even relying on unpublished, out-of-jurisdiction cases, Abbott cannot find support in any

8   analogous case. Dkt. No. 633 at 12-13; *Hammons v. Alcan Aluminum Corp.*, No. SA CV 96-319-

9   LHM, 1996 WL 397455, at *2 (C.D. Cal. May 31, 1996) (defendant was "not registered to do

10   business in California; maintains no offices, records, telephone directory listing, or mailing

11   address in California; does not own property in California; does not file tax returns in California;

12   and has not designated an agent for service of process in California").

13                *c.*     *Personal Jurisdiction Over Abbott Is Reasonable.*

14        Once the first two specific jurisdiction prongs are satisfied (as they are here), the burden

15   passes to the defendant to present a "'compelling case' that the exercise of jurisdiction would not

16   be reasonable." *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011)

17   (quoting *Burger King Corp.*, 471 U.S. at 476-78). To determine whether jurisdiction is reasonable,

18   the court considers seven factors: "(1) the extent of the defendants' purposeful injection into the

19   forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of

20   the conflict with the sovereignty of the defendant's state; (4) the forum state's interest in

21   adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the

22   importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the

23   existence of an alternative forum." *CollegeSource*, 653 F.3d at 1079.

24        Continuing to exercise personal jurisdiction over Abbott after more than seven years of

25   litigation in this Court is of course "reasonable." Each of the seven factors weighs heavily in favor

26   of reasonableness. Abbott therefore does not even attempt to address factors 1, 2, 3, or 6, let alone

27   present a "compelling case." Dkt. No. 633 at 14.

28

1         (1)  Abbott's "purposeful injection" into California is extensive.

2    For the reasons set forth above, Abbott's "purposeful injection" is extensive. Abbott has a

3 substantial presence in California and operates several offices in this state; Abbott sells a large

4 proportion of its products (including HIV drugs) into California; Abbott's re-pricing applied to

5 Norvir sales in California; Abbott maintained Kaletra's price in California; and Abbott targeted

6 Kaletra to California HIV patients and doctors. *See CollegeSource*, 653 F.3d at 1080 ("solicit[ing]

7 California business by phone, email, and in-person marketing" constituted purposeful injection).

8         (2)  Litigating in this forum is not overly burdensome to Abbott.

9    Abbott has not presented any showing that litigating in this Court would cause any burden.

10 The Court previously rejected Abbott's motion to transfer venue, Dkt. No. 82, and Abbott has

11 already litigated a three-week trial in this Court, and has highly competent California counsel. *See*

12 *CollegeSource*, 653 F.3d at 1080 (finding burden minimal where defendant's "counsel was able to

13 participate in oral argument on appeal before this court via videoconference"); *cf. Sinatra v. Nat'l*

14 *Enquirer, Inc.*, 854 F.2d 1191, 1199 (9th Cir.1988) ("[M]odern advances in communications and

15 transportation have significantly reduced the burden of litigating in another" jurisdiction). Given

16 that GSK has voluntarily dropped claims in order to streamline its case and shorten trial, the

17 second trial imposes even less burden on Abbott than did the first.

18         (3)  Abbott does not identify any conflict with the sovereignty of

19               another state.

20    Abbott does not point to any potential conflict between this action and the sovereignty of

21 any other state, and no such conflict exists. Dkt. No. 633 at 14.

22         (4)  California has a great interest in resolving this dispute.

23    Contrary to Abbott's argument, the Court has already held that California has a significant

24 interest in resolving this dispute, in part because of the size of its HIV population and Abbott's

25 extensive contacts with the State. Dkt. No. 82. The Court further held that "Illinois has no

26 particular interest in this case other than the generalized interest in ensuring that its citizens

27 receive fair adjudications." *Id.* at 24.

28

1            (5)     This forum provides the most efficient judicial resolution of

2            this controversy.

3      The parties, this Court, and the Ninth Circuit have already expended substantial financial

4 and judicial resources on this case, including a trial and an appeal. The second trial is now less

5 than six weeks away. To start over in a new jurisdiction would be a tremendous waste of

6 resources. Abbott's argument that bringing witnesses to this forum will be inefficient is

7 disingenuous. Dkt. No. 633 at 14. Several of Abbott's key witnesses, including Heather Mason

8 and experts Dr. Hay and Dr. Gilbert, live in California. *See Dole Food*, 303 F.3d at 1116 ("There

9 are some witnesses in Europe and some in California, so neither forum has a clear efficiency

10 advantage with respect to witnesses."). Other of Abbott's witnesses attended the first trial without

11 incident.

12            (6)     This forum is essential to GSK's interest in convenient and

13            effective relief.

14      GSK has invested significant financial resources over more than seven years in obtaining

15 relief in this jurisdiction. Abbott seeks to dismiss for the very purpose of thwarting GSK's

16 convenient and effective relief. Failing to exercise jurisdiction would do just that.

17            (7)     Alternative forums would not be reasonable.

18      "Whether another reasonable forum exists becomes an issue only when the forum state is

19 shown to be unreasonable." *CollegeSource*, 653 F.3d at 1080. It is not unreasonable to try this

20 case in this forum, as Abbott has tried this and many other cases here. Moreover, it would not be

21 reasonable to restart this litigation in North Carolina, Pennsylvania, or Illinois.

22      Each of these factors therefore weighs in favor of reasonableness, and Abbott fails to make

23 any showing that personal jurisdiction would be unreasonable.

24         3.    <u>The Court Should Exercise Its Discretion to Continue to Exercise Pendent</u>

25            <u>Personal Jurisdiction Over GSK's State Law Claims.</u>

26      Finally, even if Abbott were not otherwise subject to general or specific jurisdiction (it is),

27 the Court may and should continue to exercise pendent personal jurisdiction, even though GSK's

28 current complaint does not include the federal antitrust claim.  As the Tenth Circuit explained in a

case Abbott relies upon: "[I]t is appropriate, perhaps even advisable, for a district court to retain supplemented state claims after dismissing all federal questions *when the parties have already expended a great deal of time and energy on the state law claims*." *Botefuhr*, 309 F.3d at 1272-73 (emphasis added) (citing *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 541 (10th Cir. 1995)).

Pendent personal jurisdiction is a "federal common law doctrine" that, although not authorized by any statute, "traces its origins" to the doctrine of supplemental subject matter jurisdiction, now codified at 28 U.S.C. § 1367. *Id*. at 1272-73. Cases regarding supplemental subject-matter jurisdiction, though not precisely on point, illustrate the principle that district courts have broad discretion to exercise jurisdiction over state claims, even after federal-law claims are dismissed. *See Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F.2d 1303, 1309 (9th Cir. 1992), *abrogated on other grounds by Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc). In considering whether to continue exercising supplemental subject-matter jurisdiction, district courts consider factors that "include [judicial] economy, convenience, fairness, and comity." *Id*. at 1309. In this analysis, judicial economy may be the single most important factor. The Ninth Circuit "frequently has upheld decisions to retain pendent claims [after dismissal of federal claims] on the basis that returning them to state court would be a waste of judicial resources." *Id*.; *see also Schneider v. TRW, Inc.*, 938 F.2d 986, 994 (9th Cir. 1991) (listing cases affirming retention of jurisdiction on judicial economy grounds where action was pending for less than one year). In *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004), the Second Circuit approved supplemental subject-matter jurisdiction over state claims after federal claims were dropped where the district court "not only spent considerable time dealing with the legal issues and becoming fully conversant with the facts *but also has conducted a trial on the merits*." *Id.* The Second Circuit explained that

> when the dismissal of the federal claim occurs late in the action, after there has been substantial expenditure in time, effort, and money in preparing the dependent claims, knocking them down with a belated rejection of supplemental jurisdiction may not be fair. Nor is it by any means necessary.

*Id.*

1    The same discretion and analysis extends to the Court's exercise of pendent personal

2 jurisdiction after an "anchor" claim is dismissed. *Cf. Action Embroidery Corp. v. Atl. Embroidery*,

3 *Inc.*, 368 F.3d 1174, 1181 (9th Cir. 2004) ("[W]e leave it to the discretion of [the district] court to

4 decide whether to retain or dismiss the pendent state-law claims.").[6] As in *Uzan*, this Court (and

5 the parties) have expended an enormous amount of time and resources adjudicating GSK's state

6 law claims, including a three-week trial and multiple rounds of dispositive motions. 388 F.3d at

7 56. Furthermore, this Court has repeatedly affirmed the viability of GSK's state law (and federal)

8 claims. Dismissing them now would be unfair and wasteful. *Albino v. Baca*, 747 F.3d 1162, 1170

9 (9th Cir. 2014) ("[P]ersonal jurisdiction, venue, abstention, and exhaustion are all issues of

10 'judicial administration' that are appropriately decided early in the proceeding.").

11    Abbott relies on non-analogous cases where federal anchor claims were dismissed early in

12 litigation, before any substantial resources had been expended on the pendent state law claims. *See*

13 Dkt. No. 4-5. In *Botefuhr*, 309 F.3d at 1269, jurisdiction was "problematic" from the beginning.

14 Critically, the defendant objected to personal jurisdiction even before the federal "anchor" claim

15 was dismissed. The *Botefuhr* plaintiff's pleading strategy was rife with gamesmanship: The IRS

16 plaintiff withdrew its anchor claim "within days of the court using it as a basis for asserting

17 personal jurisdiction," and could not identify "any persuasive reason for retaining personal

18 jurisdiction" of the pendent claims. *Id.* at 1274; *see also Malone v. Clark Nuber*, No. C07-

19 2046RSL, 2008 WL 4279502, at *1-2 (W.D. Wash. Sept. 12, 2008) (defendant objected to

20 jurisdiction before dismissal of anchor claim). Here, by contrast, Abbott never previously raised a

21 personal jurisdiction objection, and in fact urged dropping the very antitrust claims that Abbott

22 now contends requires dismissal of the entire action.

23    Abbott's reliance on *Anderson v. Century Products Co.*, 943 F. Supp. 137, 147 n.1 (D.N.H.

24 1996), and *D'Addario v. Geller*, 264 F. Supp. 2d 367, 388 (E.D. Va. 2003) is also misplaced. Dkt.

25

26    [6] Although Wright and Miller's civil procedure treatise does not address the precise

27 situation here, it implies that a court has discretion to retain jurisdiction over pendent claims after the dismissal of the anchor claim, especially if the anchor claim is not dismissed "early in the litigation." Wright & Miller, 4A Fed. Prac. & Proc. Civ. § 1069.7 (3d ed.) (noting dismissal of

28 pendent claims may be appropriate where anchor claim is dismissed "early in the litigation").

1   No. 633 at 4. The *Anderson* court decided to retain pendent personal jurisdiction, but speculated in

2   dictum whether its decision might change if the anchor claim were hypothetically dismissed *and* if

3   defendant had "no meaningful contacts, ties, or relations" with the forum state. 943 F. Supp. at

4   147 n.1. Contrary to *Anderson*'s hypothetical, Abbott's contacts are extensive. *D'Addario* likewise

5   exercised pendent personal jurisdiction, but speculated in dictum about the merely hypothetical

6   dismissal of the anchor claim. 264 F. Supp. 2d at 388. Both cases thus support this Court's

7   exercise of jurisdiction here.

8       **C.      IN THE ALTERNATIVE, THE COURT SHOULD PERMIT**

9              **JURISDICTIONAL DISCOVERY.**

10          GSK has met its burden to make a "prima facie showing of jurisdictional facts" sufficient

11   to find personal jurisdiction over Abbott. To the extent the Court disagrees, GSK requests an

12   evidentiary hearing and jurisdictional discovery. "[I]t is clear that a court may allow discovery to

13   aid in determining whether it has in personam or subject matter jurisdiction." *Wells Fargo & Co.*

14   *v. Wells Fargo Exp. Co.*, 556 F.2d 406, 430 (9th Cir. 1977). Requests for such discovery should

15   ordinarily be granted "where pertinent facts bearing on the question of jurisdiction are

16   controverted ... or where a more satisfactory showing of the facts is necessary." *Id.*; *see also*

17   *America West Airlines, Inc. v. GPA Group, Ltd.*, 877 F.2d 793, 801 (9th Cir. 1989). Abbott has

18   never before asserted any jurisdictional objection, and GSK has therefore never pursued discovery

19   into the issue. With an opportunity to conduct such discovery, GSK in good faith believes it can

20   develop prima facie facts supporting general and specific personal jurisdiction.

21          In the second alternative, the Court should permit GSK to withdraw its Second Amended

22   Complaint and associated motion for leave to amend, and proceed to trial on its First Amended

23   Complaint.

24          In the third alternative, the Court could transfer this case pursuant to 28 U.S.C. § 1631

25   rather than granting Abbott's motion to dismiss outright.

26

27

28

1    **V.     CONCLUSION**

2           For the foregoing reasons, GSK respectfully requests that the Court deny Abbott's Motion

3    to Dismiss.

4    Dated:  March 25, 2015

5

6                                                           /s/ Brian Hennigan
                                                            Brian Hennigan
7                                                           HUESTON HENNIGAN LLP
                                                            523 W. Sixth St., Suite 400
8                                                           Los Angeles, CA  90014
                                                            Attorneys for Plaintiff GlaxoSmithKline
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28